Donald Ridge, Esq. (SBN: 132171)
**CLARK HILL LLP**
1055 West Seventh Street, Suite 2400
Los Angeles, CA 90017
Telephone: (213) 891-9100
Facsimile: (213) 488-1178
DRidge@clarkhill.com

Aaron L. Parker (*Pro Hac Vice* pending)
aaron.parker@finnegan.com
David C. Reese (*Pro Hac Vice* pending)
david.reese@finnegan.com
Nicholas A. Cerulli (*Pro Hac Vice* pending)
nicholas.cerulli@finnegan.com
Ryan T. Davies (SBN: 330922)
ryan.davies@finnegan.com
**FINNEGAN, HENDERSON, FARABOW,**
 **GARRETT & DUNNER, LLP**
901 New York Avenue NW
Washington, D.C. 20001-4413
Telephone: (202) 408-4000
Facsimile: (202) 408-4400

*Attorneys for Defendant and Counterclaim Plaintiffs*
*TETRA TECH, INC. AND TETRA TECH TAS INC.*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAVEMETRICS SYSTEMS, INC.<br><br>Plaintiff,<br><br>v.<br><br>TETRA TECH, INC.<br><br>Defendant. | CASE NO. 2:21-cv-1289 MCS-MMA<br><br>**COUNTERCLAIM PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**<br><br>**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL** |

1

TETRA TECH, INC.

                                    Counterclaim Plaintiff,

TETRA TECH TAS INC.

                       Third-Party
                       Counterclaim Plaintiff,

            v.

PAVEMETRICS SYSTEMS, INC.

                       Counterclaim
                       Defendant.

**[Honorable Mark C. Scarsi]**

**Date: April 5, 2021**
**Time:  9:00 AM**
**Courtroom:** 7C

1

## **TABLE OF CONTENTS**

2

3   I.    INTRODUCTION .............................................................................6

4   II.   FACTUAL BACKGROUND .........................................................7

5         A.    Tetra Tech's History and Reputation .................................7

6         B.    Tetra Tech's Innovative and Patented 3DTAS ...................8

7         C.    Tetra Tech's Negotiations with CSX and Related Lost Sales .............9

8         D.    Pavemetrics' Use of its Infringing LRAIL ..........................12

9         E.    Tetra Tech Has Been and Will Continue to Be Irreparably Harmed..13

10  III.  THE COURT SHOULD ENJOIN PAVEMETRICS ....................13

11        A.    Tetra Tech's Patent Infringement Claims Are Likely to Succeed ......14

12              1.    Pavemetrics Infringes At Least Claim 1 of the '293 Patent .....14

13              2.    Pavemetrics' Only Defense to Infringement Fails ..................20

14              3.    The '293 Patent Is Presumed Valid ..........................................22

15        B.    Tetra Tech Will Suffer Irreparable Harm Without Injunction............22

16              1.    Business Harms by a Direct Competitor ..................................22

17              2.    Loss of Business Opportunities .................................................24

18              3.    Erosion of Tetra Tech's Exclusivity, Goodwill, and

19                    Reputation ................................................................................25

20              4.    Continued Infringement Will Encourage Other Infringers ......26

21              5.    Infringement Has and Will Continue to Cause Price Erosion..27

22              6.    Causal Nexus Between Infringement and Irreparable Harm....28

23        C.    The Balance of Equities Favors Tetra Tech.......................................29

24        D.    The Public Interest Favors Entry of a Preliminary Injunction............29

25  IV.   CONCLUSION .............................................................................30

26

27

28

3

## **TABLE OF AUTHORITIES**

**Cases**

*Abbott Laboratories. v. Sandoz Inc.*,
    544 F.3d 1341 (Fed. Cir. 2008) ........................................................................22

*Amgen, Inc. v. F. Hoffmann La Roche Ltd.*,
    581 F. Supp. 2d 160 (D. Mass. 2008).............................................................27

*Anderson v. TOL, Inc.*,
    927 F. Supp. 2d 475 (M.D. Tenn. 2013) .......................................................27

*Apple Inc. v. Samsung Elecs. Co.*,
    695 F.3d 1370 (Fed. Cir. 2012) ......................................................................28

*Apple Inc. v. Samsung Elecs. Co.*,
    809 F.3d 633 (Fed. Cir. 2015) ........................................................................28

*Bio-Technology Gen. Corp. v. Genentech, Inc.*,
    80 F.3d 1553 (Fed. Cir. 1996) ........................................................................27

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
    664 F.3d 922 (Fed. Cir. 2012) ...........................................23, 24, 25, 28, 29, 30

*Cordis Corp. v. Medtronic, Inc.*,
    780 F.2d 991 (Fed. Cir. 1985) ........................................................................30

*Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*,
    C.A. No. 93-108, 1993 U.S. Dist. LEXIS 19959, (D. Del. July 16, 1993) ........27

*Douglas Dynamics, LLC v. Buyers Products Co.*,
    717 F.3d 1336 (Fed. Cir. 2013) ......................................................23, 26, 27, 28

*eBay Inc. v. MercExchange*, *LLC*,
    547 U.S. 388 (2006)..........................................................................................29

*Fisher-Price, Inc. v. Safety 1st, Inc.*,
    279 F. Supp. 2d 526 (D. Del. 2003) ...............................................................27

*Hybritech Inc. v. Abbott Laboratories*,
    849 F.2d 1446 (Fed. Cir. 1988) .................................................................23, 27

*Janssen Prods. v. Lupin Ltd.*,
    109 F. Supp. 3d 650 (D.N.J. 2014)..................................................................29

*M/A-COM Tech. Sols. Holdings, Inc. v. Laird Techs., Inc.,*
  C.A. No. 14-181, 2014 U.S. Dist. LEXIS 86661 (D. Del. June 13, 2014) ........28

*Metalcraft of Mayville, Inc. v. Toro Co.,*
  848 F.3d 1358 (Fed. Cir. 2017) ...................................................................14, 22

*Pfizer, Inc. v. Teva Pharm., USA, Inc.,*
  429 F.3d 1364 (Fed. Cir. 2005) ...................................................................14, 27

*Revision Military, Inc. v. Balboa Manufacturing Co.,*
  700 F.3d 524 (Fed. Cir. 2012) ...........................................................................14

*Robert Bosch LLC v. Pylon Mfg. Corp.,*
  659 F.3d 1142 (Fed. Cir. 2011) ...................................................................27, 29

*Sanofi-Synthelabo v. Apotex, Inc.,*
  470 F.3d 1368 (Fed. Cir. 2006) ...................................................................28, 30

*Sofamor Danek Grp., Inc. v. DePuy-Motech, Inc.,*
  74 F.3d 1216 (Fed. Cir. 1996) ...........................................................................14

*Summit 6, LLC v. Samsung Elecs. Co.,*
  802 F.3d 1283 (Fed. Cir. 2015) .........................................................................15

*Tivo Inc. v. EchoStar Communs. Corp.,*
  446 F. Supp. 2d 664 (E.D. Tex. 2006) ..............................................................24

*Trebro Mfg., Inc. v. Firefly Equipment, LLC,*
  748 F.3d 1159 (Fed. Cir. 2014) .........................................................................23

*Windsurfing Int'l, Inc. v. AMF, Inc.,*
  782 F.2d 995 (Fed. Cir. 1986) ...........................................................................30

**Statutes**

35 U.S.C. § 273 ...........................................................................................20, 22

35 U.S.C. § 282 .................................................................................................22

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      INTRODUCTION**

Defendant and Counterclaim Plaintiff Tetra Tech, Inc. and Third-Party Counterclaim Plaintiff Tetra Tech TAS Inc. (collectively, "Tetra Tech") respectfully request a preliminary injunction barring Plaintiff and Counterclaim Defendant Pavemetrics Systems, Inc. ("Pavemetrics") from its continued infringement of Tetra Tech's U.S. Patent No. 10,362,293 ("the '293 patent") through importation, use, and sale of Pavemetrics' Laser Rail Inspection System ("LRAIL") in the United States.

The '293 patent discloses an innovative three-dimensional track assessment system ("3DTAS") for gathering and processing data from high-speed assessment of a railway track bed. The 3DTAS increases rail safety by quickly and accurately identifying railway track features and locating potential defects along the track.

Pavemetrics unfairly gained a foothold in the railroad track inspection market by improperly using Tetra Tech's patented system to secure federal funding for testing its LRAIL in the United States and by marketing the LRAIL to the select few North American Class I railroads. Most recently, Pavemetrics robbed Tetra Tech from a significant sales opportunity with CSX Transportation Inc. ("CSX"), one of a few major Class I railroads and potential customers operating in the United States, threatening to destroy Tetra Tech's railroad inspection business. Even now, Pavemetrics plans to imminently deliver partially completed LRAILs to CSX. If Pavemetrics' infringing behavior is not swiftly enjoined, Tetra Tech will lose its narrow window to reap the benefits of being a primary mover of its innovative technology in the niche railroad track inspection market.

Tetra Tech's road to developing and commercializing its innovative and patented 3DTAS system has been arduous. It has involved millions of dollars, years of research, development, and testing, and considerable efforts in establishing customer relationships in a fiercely competitive industry, including prevailing in multiple patent infringement suits brought by another competitor. Persevering through these and other challenges,

Tetra Tech ultimately brought its 3DTAS system to market to serve the Class I railroads operating in the United States.

The railroad transportation industry in North America consists of only seven Class I railroad companies with trackage in the United States. Business transactions with the railroads typically involve high-priced items with long lifetimes and require significant planning, marketing, relationship building, and negotiation. With so few potential customers and sales opportunities, the consequences of losing even a single sale after a long negotiation process can be catastrophic to business. Recognizing the advantages of Tetra Tech's patented 3DTAS in this competitive marketplace, Pavemetrics chose to copy and sell it. As a result, Tetra Tech is now forced to compete with its own patented invention. Moreover, Pavemetrics' open infringement is eroding Tetra Tech's hard-won market position, goodwill, and reputation.

Congress passed the patent statute to incentivize and protect innovation, including endeavors like Tetra Tech's. Pavemetrics' infringement of the '293 patent directly contradicts this purpose. Tetra Tech will ultimately prove infringement and that it has lost specific sales due to Pavemetrics' acts. But the continued infringement of the '293 patent by Pavemetrics has and continues to irreparably harm Tetra Tech's railroad inspection business in ways that simply cannot be accounted for with money damages.

As explained below, Pavemetrics' infringement of the '293 patent is clear and Tetra Tech has been and will continue to be irreparably harmed by Pavemetrics' infringement. Indeed, even the loss of one of the few rail industry customers will irreparably harm Tetra Tech's railroad inspection business and cannot be compensated with money damages. A preliminary injunction is thus urgently needed to avoid further irreparable harm. Accordingly, Tetra Tech asks the Court to enjoin Pavemetrics' infringement of the '293 patent.

## II.    FACTUAL BACKGROUND

### A.    Tetra Tech's History and Reputation

Tetra Tech has been a pioneer of worldwide consulting and engineering products

and services since 1966. Keyes Decl., ¶ 2. Tetra Tech provides innovative and sustainable solutions to help its clients address their water, environment, infrastructure, transportation, resource management, energy, and international development challenges. *Id*. In keeping with Tetra Tech's full-service reputation and client-focused approach, Tetra Tech TAS Inc., a subsidiary of Tetra Tech, Inc., provides a complete range of innovative products and services in the railroad transportation sector. *Id.,* ¶ 3.

Tetra Tech's reputation for innovative solutions is not by chance. Tetra Tech focuses heavily on R&D and diligently protects its intellectual property. *Id.*, ¶ 5. Tetra Tech carefully considers how and when to introduce its products, thoroughly assessing the relevant market and the impact of its developed solutions for particular applications. *Id*. Tetra Tech invests resources in its systems both before and after launch by tailoring its proposals to individual clients and by providing installation and follow-up support. *Id*. The '293 patent was issued to Tetra Tech in July 2019 and protects such a tailored system, the 3DTAS. *Id*. Pavemetrics' infringing LRAIL, however, inequitably competes with Tetra Tech's patented 3DTAS and upends Tetra Tech's years of work and investment-backed business expectations.

**B.  Tetra Tech's Innovative and Patented 3DTAS**

A key aspect of rail safety involves routine inspection of tracks. Historically, rail companies inspected tracks manually in a time consuming and subjective process. As annual rail traffic volumes and regulatory reporting requirements increased, however, a need arose for objective, repeatable, and accurate automated processes. Mesher Decl., ¶ 6. Automated systems yield significant economic benefits in the operation, maintenance, and capital planning of rail networks. *Id.*

One objective of automated systems is high-speed track assessment without changing or damaging the track. *Id.*, ¶ 7. Track inspection and assessment systems may use coherent light emitting technology, such as laser radiation, to illuminate regions of a railway track bed during assessment operations and collect data concerning the track structure. *Id.* Once the data is collected, it can be used to identify, categorize, and track

1  different railway track features. *Id.* But the processing of this data is time-consuming, and

2  how the data is processed can greatly impact the effectiveness of the system.

3     Tetra Tech's innovative and patented 3DTAS addresses these and other track

4  inspection needs by providing a robust and reliable system for quickly and accurately

5  identifying railway track features and associated measured data at high speeds. *Id.*, ¶ 9.

6  3DTAS does this by automatically processing full width track surface elevation data (e.g.,

7  the measured elevation at each location) and intensity data (e.g., the measured intensity

8  of reflected laser light) to identify track features and extract physical parameters of

9  interest. *Id.* Tetra Tech spent considerable time and resources developing 3DTAS from

10  at least as early as 2015. *Id.*, ¶ 8.

11     The '293 patent covers Tetra Tech's 3DTAS system. The '293 patent issued on

12  July 23, 2019, and is owned by Tetra Tech, Inc. Tetra Tech, Inc. exclusively licenses the

13  '293 patent to its indirect, wholly owned subsidiary Tetra Tech TAS Inc., which has been

14  joined in this dispute through the concurrently filed Answer and Counterclaim.

15     From its development beginning around 2015, Tetra Tech's 3DTAS has been a

16  greatly differentiated, high value product that no one else was offering in the market—

17  that is, until Pavemetrics' infringing LRAIL. Keyes Decl., ¶ 33. Tetra Tech primarily

18  marketed its 3DTAS through a product called RailAI™, an unmanned, fully autonomous

19  real-time track inspection platform. *Id.*, ¶ 35. Tetra Tech distinguished its RailAI™ from

20  other competitors' offerings by advertising the features of its patented 3DTAS

21  technology, including its ability to accurately identify railroad features (such as ties, tie

22  plates, fasteners, rails, etc.) and associated defects at high speeds. *Id.*, ¶ 36.

23     Tetra Tech's RailAI™ system has been described as "game-changing." *Id.*, ¶ 37.

24  Indeed, the RailAI™ system holds great promise as its benefits will increase

25  as Federal Railroad Administration (FRA) pilot programs mature to allow autonomous

26  inspection systems to incrementally replace manual inspection methods. *Id.*, ¶ 39.

27     **C.    Tetra Tech's Negotiations with CSX and Related Lost Sales**

28  ██████████████████████████████████████████████

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### D. Pavemetrics' Use of its Infringing LRAIL

Pavemetrics knew of Tetra Tech's 3DTAS technology at least as early as 2015—the same year as the '293 patent's provisional application filing date—when Tetra Tech was involved in a patent dispute with Georgetown Rail Equipment Company ("GREX"), in which Tetra Tech eventually prevailed. Mesher Decl., ¶ 24. At that time, Pavemetrics' CEO Richard Habel indicated to Darel Mesher at Tetra Tech that Pavemetrics had no desire to enter the railroad inspection business because of the risk of being sued for patent infringement by GREX. *Id.*, ¶¶ 24-25. But behind-the-scenes, Pavemetrics was busy ramping up launch of its infringing LRAIL. Indeed, between March and December 2017, after bidding for and securing a contract with the FRA, Pavemetrics imported and performed field use and testing of its LRAIL at Amtrak's facilities in Delaware. Mesher Decl., Ex. B, 27, 32. Between May and September 2019, Pavemetrics performed additional LRAIL use and field testing on Amtrak lines starting at approximately MP 25 on the south leg of Wye-Landlith (north of Wilmington, DE) until approximately MP 17 at the Hook Interlocking (Marcus Hook, PA). Mesher Decl., Ex. F, 67 and 74. And between at least May 2019 and August 2020, Pavemetrics performed additional LRAIL field use and testing at the Transportation Technology Center (TTC) in Pueblo, Colorado. Mesher Decl., Ex. I, 180-181 (High Tonnage Loop at TTC being located in Pueblo, Colorado). Pavemetrics also recently started its fourth FRA-funded project involving its infringing LRAIL. Mesher Decl., Ex. J, 211-212.

The description of Pavemetrics' LRAIL, based on publicly available information (including information and documents available on Pavemetrics' website), as offered and contracted for, imported, used, and tested in the United States (e.g., in at least Delaware Pennsylvania, Colorado), confirms that the LRAIL infringes numerous claims of Tetra Tech's '293 patent directed to its patented 3DTAS technology. *See*, e.g., Mesher Decl., Exs. B, C, D, E, F, G, H, I, J, K, and L. Pavemetrics' infringing FRA bid offer and contract, importation, use, and testing of its LRAIL system (along with the associated promotion and advertising) in the United States constitutes infringement of Tetra Tech's

1   '293 patent as detailed in the sections below.

2        Separately, as discussed above, Pavemetrics has also at least offered to sell, sold, imported, used, tested, and/or delivered its LRAIL to CSX. Keyes Decl., ¶ 23. Tetra Tech understands that Pavemetrics has offered to sell and contracted with CSX to provide LRAILs for delivery and installation on two of CSX's ATAC boxcars in March-April 2021. *Id.* Pavemetrics' additional acts of at least offering to sell and selling its LRAIL to CSX in the United States, and the act of importing the same into the United States, also constitutes infringement of the '293 patent, as detailed in the sections below.

### E.   Tetra Tech Has Been and Will Continue to Be Irreparably Harmed

        Pavemetrics' infringing LRAIL has severely and irreparably harmed Tetra Tech and left it no choice but to seek a preliminary injunction to stop collapse of its growing automated track assessment business. Tetra Tech was on the verge of making a significant sale to CSX but lost the sale due to Pavemetrics' infringing LRAIL. Keyes Decl., ¶¶ 6-23. Pavemetrics also has taken and continues to take away FRA opportunities from Tetra Tech. *Id.*, ¶¶ 31-32. Beyond the lost revenue from those sales/contracts, Tetra Tech also lost the opportunity to gain immediate credibility and visibility in the burgeoning automated railroad track assessment industry. Pavemetrics continues to offer to sell, import, and use its LRAIL on railroads throughout the United States. Pavemetrics, if left unchecked, will disrupt more of Tetra Tech's valuable sales opportunities by offering its infringing LRAIL to the few other potential customers in the Class I railroads. Due to the lengthy negotiation process in this industry, the limited number of customers, the high cost of each sale, and the infrequency of purchases by customers, if Tetra Tech loses more sales opportunities in the next few months, it will lead to irreparable harm to its railroad business in terms of market share, reputation, pricing and revenues, ability to continue in research and development, and customer traction in ways that money damages cannot compensate.

### III.   THE COURT SHOULD ENJOIN PAVEMETRICS

        A preliminary injunction should be granted where "the patent owner has shown:

(1) a reasonable likelihood of success on the merits; (2) the prospect of irreparable harm to the patent owner in the absence of the injunction; (3) that this harm would exceed harm to the alleged infringer when subject to the injunction; and (4) that granting the injunction is in the public interest." *Pfizer, Inc. v. Teva Pharm., USA, Inc.*, 429 F.3d 1364, 1372 (Fed. Cir. 2005). Because Tetra Tech has established each of these elements, the Court should enter the requested preliminary injunction.

## A.   Tetra Tech's Patent Infringement Claims Are Likely to Succeed

"To establish a likelihood of success on the merits, a patentee must show that it will likely prove infringement of the asserted claims and that its infringement claim will likely withstand the alleged infringer's challenges to patent validity and enforceability." *Metalcraft of Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1364 (Fed. Cir. 2017). As shown below, Pavemetrics' LRAIL infringes at least claim 1 of the '293 patent and claim 1 is neither invalid nor unenforceable.

### 1.   Pavemetrics Infringes At Least Claim 1 of the '293 Patent

"To prove infringement, a patentee must show that an accused product or method meets every claim limitation either literally or under the doctrine of equivalents." *Pfizer*, 429 F.3d at 1376. Likelihood of success on the merits requires the patentee to show that success in establishing infringement is "more likely than not." *Revision Military, Inc. v. Balboa Mfg. Co.*, 700 F.3d 524, 526 (Fed. Cir. 2012). Pavemetrics' LRAIL includes every element of at least claim 1 of the '293 patent. Thus, Pavemetrics' offer for sale, sale, importation, and use of the LRAIL in the United States infringes the '293 patent.

At the preliminary injunction stage, the claims need not be conclusively interpreted. *See Sofamor Danek Grp., Inc. v. DePuy-Motech, Inc.*, 74 F.3d 1216, 1221 (Fed. Cir. 1996) ("[T]he trial court has no obligation to interpret [the claims] conclusively and finally during a preliminary injunction proceeding."). Claim 1 of the '293 patent does not require construction because it uses clear terms that should be accorded their plain and ordinary meaning. *See Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015).

As described below (and in the Counterclaim) and supported by Dr. Mesher's declaration, Pavemetrics' LRAIL includes each and every element of claim 1.[1]

Pavemetrics' LRAIL is "*[a] system for assessing a railway track bed*," as recited in the preamble, and as shown below. Mesher Decl., ¶ 14, Ex. E, 55, Ex. G, 139.



The LRAIL comprises "*a power source*," as shown below. Mesher Decl., ¶ 15, Ex. F, 71, Ex. G, 138-139, Ex. K, 224.



The LRAIL comprises "*a light emitting apparatus powered by the power source for emitting light energy toward a railway track*." Mesher Decl., ¶ 16, Ex. D, 54, Ex. G,

---

[1] In this section, each claim element is shown in bold and italics for emphasis. All red line, circle, arrow, and box annotations have been added to the Figures, except for the red boxes in the original images of Figures 16 and 17.

139. As shown below, the LRAIL includes laser profilers for emitting light energy toward a railway track. *Id.* The laser profilers are powered by the LRAIL's power source. *Id.*



The LRAIL comprises "***a data storage apparatus in communication with at least one processor***," as shown below. Mesher Decl., ¶ 17, Ex. F, 71, Ex. G, 138-139, Ex. K, 224.



The LRAIL comprises "***at least one sensor for sensing reflected light that was emitted from the light emitting apparatus and acquiring three dimensional surface elevation and intensity image data of the railway track to be stored in the data storage***

*apparatus, wherein the at least one sensor is in communication with the at least one processor*." Mesher Decl., ¶ 18, Ex. D, 53-54, Ex. G, 139, Ex. K, 224. As shown below, the LRAIL includes at least one sensor for sensing reflected light emitted from the LRAIL's light emitting apparatus and acquiring three-dimensional surface elevation and intensity image data of the railway to be stored in the LRAIL's data storage apparatus. *Id.* The at least one sensor is also in communication with the LRAIL's at least one processor. *Id.*



The LRAIL's at least one processor "*is configured to run an algorithm for processing three-dimensional surface elevation and intensity data gathered from the at least one sensor and saved in the data storage apparatus*." Mesher Decl., ¶ 19, Ex. I, 193, Ex. K, 224. As shown below, the LRAIL's at least one processor is configured to run an algorithm for processing three-dimensional surface and elevation and intensity data gathered from the LRAIL's at least one sensor and stored in the data storage apparatus. *Id.*

The LRAIL's algorithm comprises the steps of "***a. acquiring three dimensional surface elevation and intensity data representative of an area segment of railway track bed; b. generating a track elevation map based on the acquired three dimensional data***." Mesher Decl., ¶ 20, Ex. F, 72-73; *see also*, Ex. G, 142-144, Ex. I, 187-190, Ex. K, 225-227. As shown below, range images are produced by mapping the elevation of each measurement point, and intensity images are produced by mapping the intensity of reflected laser light, resulting in a scan of the railway. *Id.*



Figure 6 – Range Image                    Figure 5 – Intensity Image



Figure 7 – 1 mm by 1 mm Scan of Railway

The LRAIL's algorithm also comprises the steps of "***c. identifying a railway track bed feature from the track elevation map further including the steps of: i. defining an appropriate gradient neighborhood representing a small 2D track section over which differential vertical measurements are calculated and ii. moving the gradient***

*neighborhood like a sliding window over the 3D elevation data using the processor*." Mesher Decl., ¶ 24, Ex. B, 41-42. For example, as shown below, the LRAIL's processor executes algorithms including the step of defining a region of interest (ROI) to represent a small 2D track section over which differential vertical measurements are calculated, at the intersection of rails (vertical) and ties (horizontal) and identifies railway track bed features, such as anchors and fasteners, using a 3D model. *Id.* According to Dr. Mesher, the ROI gradient neighborhood is moved like a sliding window over the 3D elevation data using the processor in order to identify track features, such as, for example, a fastener (labeled blue below), or an anchor (labeled in red below). Mesher Decl., ¶ 24.



Figure 16 – Fastener Detection Algorithm

Figure 17 – Anchor Change Detection

### 3.2   Fastener Change Detection

The change detection process first detects the ties and rails, and then defines four regions of interest (ROI) at each intersection (two on the gauge side and two on the field side). Each ROI is then inspected for the presence of fasteners using a three-dimensional model. The status of each ROI was reported in three states: a) fastener present, b) ROI contained an object that resembles a fastener, and c) ROI was empty (Figure 16).

### 3.3   Anchor Change Detection

For change detection of anchors, each ROI was inspected for the presence of anchors using a 3-dimensional model before a run-to-run comparison was completed to detect changes (Figure 17).

The LRAIL's algorithm comprises the step of "*d. storing information corresponding to the identified railway track bed feature in the data storage apparatus.*" Mesher Decl., ¶ 25, Ex. I, 193, Ex. K, 224. As shown below, the LRAIL's

1  data storage apparatus stores information corresponding to the identified railway track

2  bed features. *Id.*



### 2. Pavemetrics' Only Defense to Infringement Fails

In its Complaint filed February 11, 2021, Pavemetrics alleges that it has a defense

to infringement under 35 U.S.C. § 273. Section 273 creates a prior-use defense for an

accused infringer that commercially used or sold a claimed invention at least one year

before the effective filing date of the claimed invention. *See* 35 U.S.C. § 273.

Pavemetrics alleges that it "has been commercially using and selling its LRAIL

track inspection system in the United States since as early as 2012." Complaint, ¶ 18.

However, the Complaint provides absolutely <u>no facts</u> to support this conclusion. This is

because Pavemetrics cannot prove that its LRAIL was being commercially used or sold

in 2012, let alone more than one year before the effective filing date of the '293 patent.

On February 12, 2020—the day after filing the Complaint—Pavemetrics, through

its counsel, sent Tetra Tech's counsel a letter reiterating its claim that "Pavemetrics has

been commercially using its LRAIL technology in the United States since at least 2012."

Parker Decl., Ex. M. In this letter (but not the Complaint), Pavemetrics' counsel attached

a proposal from Tetra Tech to one of Tetra Tech's customers dated January 2015, which

describes Pavemetrics' 3D Laser Crack Measurement System (LCMS). Parker Decl., Ex.

N. But neither the letter nor the January 2015 proposal provides any support for

Pavemetrics' alleged prior-use defense.

First and foremost, Pavemetrics fails to explain how the use of its LCMS qualifies as a prior use of the invention of the '293 patent. Pavemetrics' LCMS is for pavement inspection, not a "system for assessing a railway track bed," as recited in claim 1 of the '293 patent. Mesher Decl., ¶ 25; Parker Decl., Ex. O. Thus, for at least this reason, Pavemetrics' only defense to infringement fails.

But that's not all. In 2015, Pavemetrics' CEO, Mr. Richard Habel, stated to Tetra Tech's Darel Mesher that Pavemetrics was not participating in (and had no plans to participate in) the railroad track inspection business. Mesher Decl., ¶¶ 24-25. Thus, by Pavemetrics' own admissions to Tetra Tech in 2015, Pavemetrics was not commercially using or selling a system covered by the '293 patent at least one year before the priority date of the '293 patent (February 2015). This is buttressed by the fact that Pavemetrics only just recently filing a trademark application for the mark "Railmetrics," as an "intent to use" application filed on November 3, 2020 and claiming priority to a Canadian trademark application filed on October 20, 2020. Parker Decl., Ex. P.

What's more, setting aside the obvious differences in Pavemetrics' pavement inspection LCMS and the railroad track bed inspection system claims of the '293 patent, the LCMS does not include a processor configured to run an algorithm that comprises a step of "identifying a railway track bed feature from [a] track elevation map," let alone "defining an appropriate gradient neighborhood representing a small 2D track section over which differential vertical measurements are calculated," and "moving the gradient neighborhood like a sliding window over the 3D elevation data using the processor," as recited in claim 1 of the '293 patent. Mesher Decl., ¶ 25. For these additional reasons, the use of LCMS is not a "prior use" of the invention claimed in the '293 patent.

Finally, even assuming Pavemetrics' LCMS was relevant to and included each and every feature of the '293 patent claims (which it does not), January 2015 is only one month prior to the priority date of the '293 patent (February 2015). Thus, any disclosure in the January 2015 proposal is insufficient to support a prior-use defense under § 273, which requires disclosure at least one year prior to the effective filing date of the '293

patent. Therefore, Pavemetrics' only defense to infringement fails, and its LRAIL infringes the '293 patent.

### 3.    The '293 Patent Is Presumed Valid

The '293 patent must be presumed valid under 35 U.S.C. § 282, including during the preliminary injunction stage. *Abbott Labs. v. Sandoz Inc.*, 544 F.3d 1341, 1346 (Fed. Cir. 2008). That is, the '293 patent cannot be invalidated unless and until Pavemetrics proves a theory of invalidity by clear and convincing evidence. Despite having been put on notice of the '293 patent since as early as January 5, 2021, Pavemetrics has yet to come forward with any evidence that the '293 patent is invalid. In fact, in its declaratory judgment action initiating this lawsuit, Pavemetrics did not even seek a declaration that the '293 patent is invalid, which is a typical defense in declaratory judgement actions. Thus, Pavemetrics is unlikely to succeed on any invalidity defense.

### B.    Tetra Tech Will Suffer Irreparable Harm Without Injunction

"A party seeking a preliminary injunction must establish that it is likely to suffer irreparable harm if the preliminary injunction is not granted and there is a causal nexus between the alleged infringement and the alleged harm." *Metalcraft*, 848 F.3d at 1368. "[B]ecause the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole." *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1456-57 (Fed. Cir. 1988). "Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm." *Celsis in Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012). Irreparable harm can also result from other factors, such as damage to market position and business opportunities, unpredictable potential injuries, and encouraging other potential infringers. *See Hybritech*, 849 F.2d at 1456. Tetra Tech has suffered and will continue to suffer these irreparable harms, as explained in detail below.

### 1.    Business Harms by a Direct Competitor

It is undisputed that Tetra Tech and Pavemetrics are direct competitors in the

1   market for LRAIL systems. Thus, Pavemetrics' infringement irreparably harms Tetra

2   Tech's position by putting Tetra Tech in the impossible position of competing against its

3   own invention. *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed.

4   Cir. 2013) ("Where two companies are in competition with one another, the patentee

5   suffers the harm—often irreparable—of being forced to compete against products that

6   incorporate and infringe its own patented inventions.").

7           Moreover, Tetra Tech and Pavemetrics are directly competing for the business of

8   a very small number of customers—"Class I" railroad companies. There are only seven

9   such companies operating in the United States. Keyes Decl., ¶ 24. Tetra Tech should not

10   be forced to directly compete for a diminishing share of this market in a field that

11   comprises so few customers against a product that infringes its own patented design.

12   *Douglas*, 717 F.3d at 1345; *see also Trebro Mfg. v. FireFly Equip., LLC*, 748 F.3d 1159,

13   1170 (Fed. Cir. 2014) (finding irreparable harm in a tiny market with only three players,

14   where any sale by a competitor was a lost customer for patent owner, and patent owner

15   was likely to lose significant market share as well as customers).

16           Tetra Tech has also invested considerably in the 3DTAS' development, marketing,

17   and customer service to earn its place as a market leader. Mesher Decl., ¶¶ 6-9. The

18   3DTAS is a relatively new product in a critical growth period where every sale helps

19   establish Tetra Tech's market presence. Permitting Pavemetrics' market entry with an

20   infringing product improperly derails Tetra Tech's carefully laid business plans based on

21   its innovation and right to exclude. Tetra Tech will lose its narrow window to reap the

22   benefits of being a primary mover in a new niche-product segment of the market it helped

23   create. The value of Tetra Tech's investment will be curtailed, leading to unquantifiable

24   harm that cannot be undone. Indeed, such harm has already occurred through

25   Pavemetrics' poaching of a critical sale to CSX. *Celsis In Vitro*, 664 F.3d at 930 (finding

26   irreparable harm where "[t]he record included evidence that the [plaintiff's products] are

27   [plaintiff's] flagship products and that the products are in their growth phase and will

28   soon be entering the mature phase . . . ."). Thus, Pavemetrics' continued infringement

23

1  will irreparably harm Tetra Tech.

2  **2.  Loss of Business Opportunities**

3  Many customers in the railroad track assessment market are "sticky customers,"

4  that is, they tend to remain customers of the company from which they obtain their first

5  product. *See Tivo Inc. v. EchoStar Communs. Corp.*, 446 F. Supp. 2d 664, 670 (E.D. Tex.

6  2006), *rev'd in part on other grounds*, 516 F.3d 1290 (Fed. Cir. 2008). To be sure, not

7  only is a potential customer's choice of Pavemetrics' LRAIL over Tetra Tech's 3DTAS

8  a lost sale to Tetra Tech, but such customers' evaluation and adoption of Pavemetrics'

9  LRAIL translates into lost opportunities to earn future business as well. Pavemetrics has

10 at least offered to sell, sold, imported, and delivered an LRAIL to CSX. Pavemetrics has

11 also offered to sell and contracted with CSX to provide further LRAILs for delivery and

12 installation on two of CSX's ATAC boxcars in March-April 2021. Keyes Decl., ¶ 23. In

13 addition, Pavemetrics has been testing its infringing LRAIL under the guise of an FRA

14 contract on Amtrak lines in Delaware and Pennsylvania, and Colorado. Mesher Decl.,

15 Ex. B, 27, 32, Ex. F, 67 and 74, Ex. I, 180-181. And Pavemetrics boasts that these trials

16 are conducted with industry partners including two more of the Class I railroads,

17 Canadian National Railway Company ("CN") and Burlington Northern Santa Fe, LLC

18 ("BNSF"). Mesher Decl., Ex. G, 131, Ex. I, 180. Pavemetrics' usurpation of the publicity

19 of winning the FRA contract and its attempts to make inroads with other potential

20 customers among the Class I railroads further demonstrates the risk of imminent harm as

21 Pavemetrics lures customers away from Tetra Tech. If Pavemetrics is not immediately

22 enjoined from its infringing activities, potential customers (including CSX, CN, and

23 BNSF) will be more reluctant to switch to Tetra Tech's 3DTAS after conducting

24 evaluations and adopting Pavemetrics' LRAIL.

25 Furthermore, the small number of customers in this industry—the seven Class I

26 railroads—means that Tetra Tech is particularly vulnerable to customer poaching. Losing

27 one of the seven customers is effectively like losing one seventh of the market share in

28 this industry. In addition, customers in this industry buy automated railroad track

inspection products (such as Tetra Tech's 3DTAS and Pavemetrics' LRAIL) infrequently. Keyes Decl., ¶ 28. Such products are typically high-value items and sales are made only after significant consideration. *Id.*, ¶¶ 29-30. Accordingly, the loss of a single sale in this market is more harmful than products purchased on a more frequent basis (e.g., day-to-day). Moreover, a customer who purchases an automated railroad track inspection system typically remains a customer after making a purchase and would be unlikely to later switch to a competitor's system. *Id.*, ¶ 30. It is therefore critical to enjoin Pavemetrics from poaching any more of the other six Class I railroads.

### 3.    Erosion of Tetra Tech's Exclusivity, Goodwill, and Reputation

Tetra Tech has invested substantially in 3DTAS' development, successfully defending itself from patent infringement allegations by another competitor, obtaining the '293 patent, and earning its reputation as an innovator and provider of robust and reliable high-speed railroad inspection systems, such as 3DTAS, that practice the '293 patent. Tetra Tech's reputation as an innovator in the field of engineering products and services has convinced other customers to choose Tetra Tech over cheaper competitors. This reputation is critical to Tetra Tech's continued growth, particularly in the burgeoning field of automated high-speed railroad inspection products. *Celsis In Vitro*, 664 F.3d at 930-31 ("During the growth stage of a product, it is particularly crucial to be able to distinguish oneself from competitors. This includes building the brand, expanding the customer base, and establishing one's reputation and leadership in the market."). While Tetra Tech was embroiled in patent infringement disputes with competitor, GREX, in which Tetra Tech ultimately prevailed, Pavemetrics viewed the railroad market as too risky to enter. Mesher Decl., ¶¶ 24-25. Now, suddenly after Tetra Tech prevailed in those legal disputes and removed barriers to entry, Pavemetrics is seeking to freeride on the path that Tetra Tech paved in the marketplace.

Pavemetrics' infringing LRAIL is also undermining Tetra Tech's efforts to build goodwill in the marketplace. If Pavemetrics is not enjoined, customers might no longer distinguish Tetra Tech from Pavemetrics as a provider of robust and reliable high-speed

railroad inspection systems over other inferior products or previous generation technologies. *Douglas Dynamics*, 717 F.3d at 1344-45 ("[Tetra Tech's] reputation as an innovator will certainly be damaged if customers found the same 'innovations' appearing in competitors' [products], particularly products considered less prestigious and innovative.").

Furthermore, allowing Pavemetrics to continue to infringe would irreparably harm Tetra Tech's established reputation as an innovator. *Douglas Dynamics*, 717 F.3d at 1344-45 (finding that the district court clearly erred in overlooking the irreparable harm caused by the patentee's loss of reputation as an innovator). And money damages are inadequate because Tetra Tech chooses not to license the '293 patent to third parties. "Exclusivity is closely related to the fundamental nature of patents as property rights. It is an intangible asset that is part of a company's reputation, and here, [Tetra Tech's] exclusive right to make, use, and sell the patented inventions is under attack by [Pavemetrics'] infringement." *Douglas Dynamics*, 717 F.3d at 1345. Pavemetrics' infringement thus threatens to undermine the perceived value of Tetra Tech's 3DTAS and the strength of Tetra Tech's intellectual property in the eyes of its customers, investors, and competitors. *See, e.g.*, *Anderson v. TOL, Inc.*, 927 F. Supp. 2d 475, 487-88 (M.D. Tenn. 2013) (finding irreparable harm where continuing infringement "threatened to degrade the value of [the] Patents to such a degree that other companies might not do business with [patentee] at all").

### 4. Continued Infringement Will Encourage Other Infringers

Without an injunction, Pavemetrics' continued infringement encourages other would-be infringers to enter the market. Encouragement of other potential infringers is a form of irreparable harm and would result in significant enforcement costs and uncertainty about the value of the '293 patent. *See Hybritech*, 849 F.2d at 1456; *see also Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, C.A. No. 93-108, 1993 U.S. Dist. LEXIS 19959, at *30 (D. Del. July 16, 1993); *Amgen, Inc. v. F. Hoffmann La Roche Ltd.*, 581 F. Supp. 2d 160, 212 (D. Mass. 2008). And "[t]he fact that other infringers may

1   be in the marketplace does not negate irreparable harm." *Pfizer*, 429 F.3d at 1381.

2          Pavemetrics initiated the present case by bringing a declaratory judgment action,

3   seeking a finding of noninfringement. Thus, Tetra Tech was left with no choice but to

4   counterclaim for infringement. Otherwise, Tetra Tech's reputation would be irreparably

5   harmed if others in the industry "believed it did not enforce its intellectual property

6   rights." *Douglas Dynamics*, 717 F.3d at 1345; *see also Fisher-Price, Inc. v. Safety 1st,*

7   *Inc.*, 279 F. Supp. 2d 526, 528 (D. Del. 2003). In addition, without an injunction, further

8   innovation by Tetra Tech would be stymied because it would be forced to reduce its

9   research and development activities due to its loss in revenues, customers, and goodwill.

10  *See Bio-Technology Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1566 (Fed. Cir. 1996);

11  *Allergan Sales LLC v. Sandoz, Inc.*, C.A. No. 17-10129, 2018 U.S. Dist. LEXIS 130285,

12  at *25 (D.N.J. July 13, 2018)

13          **5.     Infringement Has and Will Continue to Cause Price Erosion**

14          Tetra Tech faces price erosion due to Pavemetrics' aggressive pricing strategy for

15  the LRAIL. *See Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1155 (Fed. Cir.

16  2011). Tetra Tech understands that Pavemetrics has offered to sell the LRAIL for a unit

17  price of ███████████        the price of Tetra Tech's 3DTAS. Keyes Decl., ¶ 41.

18  Pavemetrics has publicly touted critical benefits derived from the '293 patent—e.g., that

19  it "automatically detect[s] railway features" by combining 2D imaging and 3D scanning.

20  Mesher Decl., Ex. D, 54. As the '293 patent explains, "[f]ollowing generation of full

21  width 3D elevation maps, analysis including automated processing is completed to

22  extract objective, repeatable, and accurate measures for detected features of interest."

23  '293 patent, 9:22-25. Thus, Pavemetrics is effectively marketing its product as having the

24  same benefits as Tetra Tech's 3DTAS at half the price. *Douglas Dynamics*, 717 F.3d at

25  1344.

26  ████████████████████████████████████

27  ████████████████████████████████████

28  █████████████████████████        Keyes, Decl., ¶ 45. Such price erosion is

itself a form of irreparable harm. *Celsis*, 664 F.3d at 930; *see also Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1382 (Fed. Cir. 2006); *see M/A-COM Tech. Sols. Holdings, Inc. v. Laird Techs., Inc.*, C.A. No. 14-181, 2014 U.S. Dist. LEXIS 86661, at *16-17 (D. Del. June 13, 2014). Tetra Tech has and will continue to face price pressure from its current customers because the railroad industry is aware that CSX is no longer purchasing Tetra Tech's RailAI™ and is instead incorporating a cheaper replacement product.

### 6. Causal Nexus Between Infringement and Irreparable Harm

In patent cases, irreparable harm in the context of a preliminary injunction is established if (1) absent an injunction, the patentee will suffer irreparable harm, and (2) there is a causal nexus between the alleged harm and the alleged infringement. *Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012).

There is a direct causal nexus between Pavemetrics' infringing LRAIL and Tetra Tech's irreparable harm. Proving a causal nexus requires only a showing of "some connection between the patented features and the demand for the infringing products." *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 641 (Fed. Cir. 2015). Pavemetrics touts critical benefits derived from the '293 patent to drive sales of LRAIL and displace Tetra Tech in the market. *See* Mesher Decl., Ex. D, 54. ███████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
████████████████████████████ Tetra Tech essentially paved the way for Pavemetrics to snatch the sale to CSX away from Tetra Tech at the final stages of negotiations.

Pavemetrics uses the patented features of the '293 patent to get its foot in the door with Class I railroad customers like CSX by offering its LRAIL at significantly cheaper prices than Tetra Tech's RailAI™. If Pavemetrics is not enjoined, customers will become accustomed to Pavemetrics' products and will effectively be locked into Pavemetrics' product ecosystem. Furthermore, courts have recognized that even if the accused infringer does not expressly tout a patented feature, a patentee may show causal nexus by

the benefits that a claim confers. *See Janssen Prods. v. Lupin Ltd.*, 109 F. Supp. 3d 650, 700 (D.N.J. 2014). Pavemetrics' LRAIL incorporates key features from the '293 patent and Tetra Tech's 3DTAS, including a processor configured to run an algorithm for processing three-dimensional surface elevation and intensity data, with the algorithm comprising the step of "identifying a railway track bed feature from [a] track elevation map," as recited in claim 1 of the '293 patent.

### C.   The Balance of Equities Favors Tetra Tech

To satisfy the third factor for a preliminary injunction, a patentee must show that the balance of hardships weighs in its favor. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). Here, the balance of equities favors Tetra Tech for several reasons.

Absent an injunction, Tetra Tech would be forced "to compete against its own patented invention, with the resultant harms described above, plac[ing] a substantial hardship on [Tetra Tech]." *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1156 (Fed. Cir. 2011). For Tetra Tech "to lose the value of its patent as well as suffer the irreparable harms" detailed above tilts overwhelmingly in Tetra Tech's favor. *Celsis*, 664 F.3d at 931. By contrast, "[o]ne who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986). Furthermore, courts favor preserving the status quo between parties, which just until a few months ago was a market without the infringing LRAIL being sold to Class I railroads including CSX. *Cordis Corp. v. Medtronic, Inc.*, 780 F.2d 991, 994 (Fed. Cir. 1985). A balancing of the equities favors granting the preliminary injunction to keep Pavemetrics from continuing to infringe Tetra Tech's '293 patent.

### D.   The Public Interest Favors Entry of a Preliminary Injunction

The public interest favors protecting Tetra Tech's patent rights and entry of a preliminary injunction. *See Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d at 1383 (Fed. Cir. 2006). Investment in research and development "must be encouraged and protected by the exclusionary rights conveyed in valid patents," and this "incentive would be adversely

affected by taking market benefits away from the patentee and giving them to the accused infringer." *Celsis*, 664 F.3d at 931-32. An injunction would not harm the public because automated railroad inspections may be performed with Tetra Tech's 3DTAS and its accompanying patented features. Moreover, Tetra Tech, as the proprietor of 3DTAS is in a better position to configure automated railroad inspections for its customers using the patented features recited in the '293 patent. Thus, the public interest favors granting a preliminary injunction to stop Pavemetrics' infringement.

## IV.   CONCLUSION

For the foregoing reasons, Tetra Tech respectfully requests that the Court grant its Motion for Preliminary Injunction.

Dated:  March 3, 2021

**CLARK HILL LLP**

By: _____/s/_____
                Donald L. Ridge

*Attorneys for Defendant and Counterclaim Plaintiffs*
*TETRA TECH, INC. AND TETRA TECH TAS INC.*
Aaron L. Parker (*Pro Hac Vice* pending*)*
David C. Reese (*Pro Hac Vice* pending*)*
Nicholas A. Cerulli (*Pro Hac Vice* pending*)*
Ryan T. Davies (SBN:  330922)
**FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP**