Joseph R. Re (SBN 134,479)
joe.re@knobbe.com
Christy G. Lea (SBN 212,060)
christy.lea@knobbe.com
Nicholas M. Zovko (SBN 238,248)
nicholas.zovko@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Phone: (949) 760-0404
Facsimile: (949) 760-9502

Attorneys for Plaintiff/Counterclaim Defendant
PAVEMETRICS SYSTEMS, INC.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| PAVEMETRICS SYSTEMS, INC.<br><br>Plaintiff,<br><br>v.<br><br>TETRA TECH, INC.<br><br>Defendant. | Case No. 2:21-cv-1289 MCS-MMA<br><br>**PAVEMETRICS' MEMORANDUM IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:     April 19, 2021<br>Time:     9:00 a.m.<br>Crtrm:   7C<br><br>Honorable Mark C. Scarsi |
| TETRA TECH, INC.<br><br>Counterclaim Plaintiff<br><br>TETRA TECH TAS INC.<br><br>Third-Party Counterclaim Plaintiff<br><br>v.<br><br>PAVEMETRICS SYSTEMS, INC.<br><br>Counterclaim Defendant | |

# TABLE OF CONTENTS

**Page No.**

I.      INTRODUCTION ................................................................................. 1

II.     COUNTERSTATEMENT OF FACTS .................................................. 3

        A.      Pavemetrics Has Long Been in the Computer-Vision
                Inspection Field ........................................................................ 3

        B.      Pavemetrics Has Been Selling Its System for Inspecting
                Railway Tracks Since at Least 2010 ......................................... 4

                1.      In 2010, Pavemetrics First Sold Its System in
                        Europe ............................................................................ 4

                2.      In 2012, Pavemetrics First Sold Its System in the
                        United States .................................................................. 5

        C.      Since at Least 2012, Pavemetrics Has Publicly Promoted
                Its System for Inspecting Railway Tracks ................................. 6

        D.      Since 2014, Pavemetrics Has Marketed Its System for
                Inspecting Railway Tracks Under Its LRAIL Brand .................. 7

        E.      Tetra Tech Has Long Purchased Inspection Systems
                from Pavemetrics ....................................................................... 8

        F.      Tetra Tech's Late-Filed Patent Claims Well-Known
                Features ..................................................................................... 9

III.    TETRA TECH'S MOTION SHOULD BE DENIED ......................... 10

        A.      Tetra Tech Has Not Shown that It Is Likely to Succeed
                on the Merits ............................................................................ 10

                1.      Tetra Tech Has Not Met Its Burden to Prove
                        Infringement ................................................................. 11

                2.      Tetra Tech Has Not Met Its Burden to Prove
                        Claim 1 Is Likely to Withstand an Invalidity
                        Challenge ...................................................................... 13

        B.      Tetra Tech Has Failed to Show Irreparable Harm .................... 14

                1.      Tetra Tech Has Failed to Establish a Nexus
                        between the Alleged Infringement and Alleged
                        Harm .............................................................................. 14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS
### (*Cont'd*)

**Page No.**

2. Tetra Tech's Alleged Harm Is Speculative and Unsupported ................................................................... 16

3. Other Factors Demonstrate No Irreparable Harm .......... 22

C. The Hardship to Pavemetrics Substantially Outweighs the Hardship to Tetra Tech of Losing a Sale ........................... 23

D. The Public Interest Would be Harmed by an Injunction .......... 24

IV. CONCLUSION .................................................................... 25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page No(s).**

*Apple, Inc. v. Samsung Elecs. Co.*,
    678 F.3d 1314 (Fed. Cir. 2012) ............................................................... 14

*Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*,
    132 F.3d 701 (Fed. Cir. 1997) .................................................................. 23

*Bettcher Indus., Inc. v. Bunzl USA, Inc.*,
    692 F. Supp. 2d 805 (N.D. Ohio 2010) ..................................................... 21

*Docusign, Inc. v. Sertifi, Inc.*,
    468 F. Supp. 2d 1305 (W.D. Wash. 2006) ................................................ 12

*EcoServices v. Certified Aviation Servs.*,
    2018 WL 5629301 (C.D. Cal. 2018) ......................................................... 16

*Eli Lilly & Co. v. Am. Cyanamid Co.*,
    82 F.3d 1563 (Fed. Cir. 1996) .................................................................. 20

*Gunter & Zimmerman Construction Div., Inc., v. Gomaco Corp.*,
    2020 WL 6948364 (D. Iowa 2020) ........................................................... 21

*Hoist Fitness Sys., Inc. v. Tuffstuff Fitness Int'l, Inc.*,
    2017 WL 5640562 (C.D. Cal. 2017) ......................................................... 21

*Ill. Tool Works, Inc. v. Grip-Pak, Inc.*,
    906 F.2d 679 (Fed. Cir. 1990) ............................................................ 23, 24

*Intel Corp. v. ULSI Sys. Tech., Inc.*,
    995 F.2d 1566 (Fed. Cir. 1993) ................................................................ 10

*Kimberly-Clark Worldwide, Inc. v. Tyco Healthcare Grp. LP*,
    635 F. Supp. 2d 870 (E.D. Wis. 2009) ............................................... 18, 20

*Litton Sys., Inc. v. Sundstrand Corp.*,
    750 F.2d 952 (Fed. Cir. 1984) ........................................................... 23, 24

*Minerva Surgical, Inc. v. Hologic, Inc.*,
    2018 WL 306689 (N.D. Cal. 2018) ........................................................... 18

*Multilift Wellbore Tech. Ltd. v. ESP Completion Techs. LLC*,
    2017 WL 10222420 (E.D. Tex. 2017) ....................................................... 16

*Mylan Institutional LLC v. Aurobindo Pharma Ltd.*,
    857 F.3d 858 (Fed. Cir. 2017) ........................................................... 10, 11

-iii-

# TABLE OF AUTHORITIES
## (*Cont'd*)

**Page No(s).**

*Nichia Corp. v. Everlight Ams., Inc.*,
  855 F.3d 1328 (Fed. Cir. 2017) .................................................................21

*Nivel Parts & Mfg. Co. v. Textron, Inc.*,
  2017 WL 1552034 (M.D. Fla. 2017) ...................................................16, 17

*Novozymes v. Genencor Int'l, Inc.*,
  2005 WL 2716496 (D. Del. 2005) ...........................................................13

*Nutrition 21 v. United States*,
  930 F.2d 867 (Fed. Cir. 1991) .............................................................13, 18

*Open Text, S.A. v. Box, Inc.*,
  2014 WL 1389065 (N.D. Cal. 2014) ........................................................16

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.*,
  55 F. Supp. 2d 1070 (C.D. Cal. 1999),
  *aff'd*, 202 F.3d 278 (9th Cir. 1999) ........................................................22

*Reebok Int'l Ltd. v. J. Baker, Inc.*,
  32 F.3d 1552 (Fed. Cir. 1994) ................................................................19

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
  659 F.3d 1142 (Fed. Cir. 2011) ..............................................................20

*TeleSign Corp. v. Twilio, Inc.*,
  2015 WL 12532491 (C.D. Cal. 2015) .....................................................16

*Valeo Intellectual Prop., Inc. v. Data Depth Corp.*,
  368 F. Supp. 2d 1121 (W.D. Wash. 2005) .........................................22, 23

*Wavetronix LLC v. Iteris, Inc.*,
  2015 WL 300726 (W.D. Tex. 2015) ........................................................25

*Westinghouse Air Brake Techs. Corp. v. Siemens Indus., Inc.*,
  2018 WL 3655782 (D. Del. 2018) ...........................................................25

*Whitewater West Indus. v. Pacific Surf Designs*,
  2017 WL 4583869 (S.D. Cal. 2017) ........................................................16

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ..............................................................................10, 24

# TABLE OF AUTHORITIES
### (*Cont'd*)

**Page No(s).**

# OTHER AUTHORITIES

35 U.S.C. § 103................................................................................14

35 U.S.C. § 273................................................................................13

49 C.F.R. §§ 213.231-241...............................................................24

Fed. R. Civ. P. 65.............................................................................25

L.R. 7-20..........................................................................................25

L.R. 52-4.1.......................................................................................25

# I. **INTRODUCTION**

Tetra Tech seeks extraordinary relief that would seriously harm Pavemetrics and its rail inspection business, a business it has been in since at least 2012. Because Tetra Tech cannot show a likelihood of success on the merits or that any of the equitable factors favor a preliminary injunction, this Court should deny Tetra Tech's motion.

Tetra Tech incorrectly asserts that LRAIL is a copy of Tetra Tech's 3DTAS system. Pavemetrics pioneered using computer vision to inspect transportation infrastructure and sold its first system to inspect roads in 2009. A few years later in 2012, Pavemetrics sold that same system to inspect railway tracks and has continued to do so ever since. Tetra Tech did not even begin to develop 3DTAS or file its patent application until 2015.

Tetra Tech conceals that it has known about LRAIL since at least 2015. Tetra Tech is a Pavemetrics customer. In 2012, Tetra Tech started purchasing transportation inspection systems from Pavemetrics. In 2015, Pavemetrics shared details about its LRAIL system with Darel Mesher, Tetra Tech's CTO and the named inventor on the '293 patent. Nine months ago, Tetra Tech requested a quote from Pavemetrics to purchase multiple LRAIL systems and rail inspection software. Tetra Tech cannot omit these basic facts and demand extraordinary equitable relief.

Tetra Tech fails to make any meaningful showing on infringement.[1] Throughout its brief, Tetra Tech broadly identifies its patented invention as a system for identifying railway track features and associated defects. But it never explains that it obtained its patent by including specific algorithmic steps for identifying those features and defects. Tetra Tech relies on Dr. Mesher's

---

[1] Tetra Tech failed to submit the asserted patent (U.S. Patent No. 10,362,293) on this Motion, so Pavemetrics has attached it to the Declaration of Nicholas Zovko as Exhibit 1. Pavemetrics also included a table of all exhibits for both parties in Addendum A.

conclusory opinion that LRAIL satisfies those algorithms.  He never explains what steps LRAIL performs.  None of the LRAIL documents he cites show the algorithmic steps, and, even if they did, Pavemetrics has been commercially using its algorithms for inspecting railway track beds since 2012, three years before Tetra Tech filed its patent.

The '293 patent claims steps that have been performed by well-known image filters, including the "Sobel" filter invented in 1968.  In 2014, more than a year before Tetra Tech filed for its patent, Pavemetrics published an article teaching its use of the Sobel filter for identifying rail track features.  Pavemetrics' public uses and that article raise a substantial question of invalidity and make it impossible for Tetra Tech to meet its burden of showing a likelihood of success on the merits.

Tetra Tech also cannot meet its burden on the equitable factors.  Its alleged harms have no nexus to the claimed algorithmic steps.  Tetra Tech cannot show any irreparable harm because of the numerous competitors in the market and its late entry into that market.  Tetra Tech's reliance on its prior litigation with another competitor undermines its showing of any harm.  Tetra Tech obscures that it succeeded in that case by convincing the Patent Office to cancel four asserted railway track inspection patents for obviousness.

The balance of hardships also favors Pavemetrics, a small company with less than two dozen employees.  Pavemetrics would have to lay off several employees if it had to shut down its rail inspection business.  On the other hand, Tetra Tech is a multi-billion-dollar company that did not start selling rail inspection systems until 2015, three years after Pavemetrics.  Thus, Tetra Tech cannot show any hardship by waiting for trial.  Accordingly, this Court should deny Tetra Tech's request for preliminary injunctive relief.

/ / /

/ / /

## II.  <u>COUNTERSTATEMENT OF FACTS</u>

**A.    <u>Pavemetrics Has Long Been in the Computer-Vision Inspection Field</u>**

Pavemetrics is a world leader in vision systems for the automated inspection of transportation infrastructures, including railway tracks. Pavemetrics originally developed its computer-vision inspection technology at an industrial technology research center in Canada known as INO. Laurent ¶¶ 12-13.   INO focused its research on optics and photonics, the physical science of light generation, detection, and manipulation.

Pavemetrics' technology for the automated inspection of transportation infrastructure uses 3D laser triangulation, a technique developed in 1978 by the National Research Council Canada.  *Id.* ¶ 11.   Laser triangulation captures 3-dimensional measurements by pairing a laser light with a camera sensor to create a triangle with a target or surface to be scanned.   In the late 1990s, INO began working with the Quebec Ministry of Transportation to apply this technology to roadways. *Id.* ¶ 11.



INO's work resulted in the Laser Rut Measurement System ("LRMS"), first sold in 2001.  *Id.*  ¶ 12.  However, the LRMS application was limited to measuring ruts in the road.  *Id.*  By 2002, INO began developing the Laser Crack Measurement system ("LCMS"), which had broader applications.  *Id.* The LCMS incorporated the 3D laser triangulation technology from the LRMS, along with simultaneous high-resolution 2D imaging of the surface being inspected.  *Id.* ¶ 13.  By integrating this 2D and 3D data, the LCMS was able to obtain a detailed, high-resolution 3D profile of the surface it was imaging.  *Id.*

/ / /



The LCMS system mounts on a vehicle that travels along any surface such as a road. Laurent ¶ 9; Ex. 11. It uses 3D laser profilers consisting of two high-speed camera sensors and line lasers placed at the rear of the vehicle. *See* Ex. 11 at 432–33. The camera sensors and line lasers face down to scan the entire width of the road. *Id.* at 430. By facing the road



surface, the system can acquire 2D images and high-resolution 3D profiles of the road. Laurent ¶ 9. The system simultaneously measures range (distance from camera sensor to surface) and intensity (reflected light) to generate a 3D elevation map of the track. *See id.* Its software automatically interprets the 3D elevation map to identify defects in the surface. *Id.* In 2009, Pavemetrics spunoff from INO to commercialize its LCMS technology. *Id.* ¶ 13-14.

**B.**   **Pavemetrics Has Been Selling Its System for Inspecting Railway Tracks Since at Least 2010**

Tetra Tech misrepresents that Pavemetrics never used LCMS for inspecting railroads. Br. at 21. Since its first European sale in 2010, and its first United States sale in 2012, Pavemetrics has been advertising and offering for sale its LCMS system for inspecting railroads. Laurent ¶¶ 10, 16-17, 19.

**1.**   **In 2010, Pavemetrics First Sold Its System in Europe**

In 2010, Pavemetrics sold three LCMS systems to a global consulting firm called EuroConsult. Laurent ¶ 16. EuroConsult used LCMS in various countries to inspect railway tracks. *Id.* ¶¶ 16, 37; *see* Ex. 32 at 179. In January 2014, EuroConsult published a report on its LCMS use for the Transportation

Research Board (TRB) annual meeting in Washington, D.C.   Laurent ¶ 36, Ex. 32.    The paper disclosed the LCMS system's features, including an algorithm to identify railway track features.  *Id.*

### 2. In 2012, Pavemetrics First Sold Its System in the United States

By 2012, Pavemetrics had adapted the LCMS algorithms to inspect railway tracks.  *See* Laurent ¶¶ 17–18.   That year it sold an LCMS system for railway track inspection to the University of Massachusetts Lowell (UML).  *Id.* ¶ 17, Exs. 16, 17.  Over the next year, Pavemetrics and the UML team worked to demonstrate LCMS's ability to detect defects on the St. Louis Metro track.  *Id.* ¶¶ 24, 28; Exs. 25, 27.



In January 2014, at the TRB annual meeting, Pavemetrics and UML presented their results demonstrating that ability.  Laurent ¶ 35; Ex. 31.  They also published the results in an article.  *Id.* ¶ 32-34, Ex. 10.  The article discussed the features of the LCMS system, including its ability to measure range and intensity data to create a merged 3D map, as shown in the images to the right.  *Id.* ¶ 34-35; Ex. 10 at 420-21; Ex. 31 at 167.   It described how LCMS used

 

Intensity          Range          Merged 3D View

standard, well-known imaging processing techniques (such as a Sobel filter and the Canny method) to detect rail edges.  *See id.* ¶ 34-35, Ex. 10 at 422.

/ / /

/ / /

**C.**   **Since at Least 2012, Pavemetrics Has Publicly Promoted Its System for Inspecting Railway Tracks**

Since 2012, Pavemetrics has publicly disclosed and promoted LCMS for inspecting railway tracks and detecting features such as rail edges and fasteners. *See, e.g.*, Laurent ¶¶ 19-23.

Pavemetrics advertised its 3D sensors to inspect railway tracks during trade shows and conferences. *Id.* ¶ 47.   For example, since 2012, Pavemetrics' presented at the Road Profile Users' Group (RPUG) conference, explaining how its LCMS system can inspect railway tracks. *Id.* ¶¶ 19-20, 30, 38, Exs. 19, 28, 29, 30, 33.   Since that time, Pavemetrics also distributed various marketing materials advertising its 3D sensors for inspecting railway tracks. Laurent ¶ 47; *see id.* ¶¶ 40-41, Ex. 34.



**LCMS**
- 3D Pavement Imaging
- Pavement Rutting
- Macro-Texture
- Pavement Cracking
- Pavement Roughness
- Road/Airport/Tunnel/Rail Inspection

In November 2012, Pavemetrics publicly demonstrated in Chicago the LCMS technology for inspecting railway tracks. Laurent ¶ 22.   Pavemetrics presented the demonstration data to CN, a large transportation company. *Id.*; Ex. 22.   The next month, Pavemetrics posted a video of the demonstration to its public YouTube channel with the caption "LCMS for High-speed Rail Inspection." *Id.* ¶ 23, Ex. 24.   That video has over 4,000 views. *Id.*, Ex. 23.



**D.** **Since 2014, Pavemetrics Has Marketed Its System for Inspecting Railway Tracks Under Its LRAIL Brand**

In 2014, Pavemetrics rebranded its LCMS technology for inspecting railway tracks under the name "Laser Rail Inspection System," or "LRAIL." Laurent ¶ 40. It described LRAIL in a data sheet that it distributed at various conferences. *Id.* ¶ 41, Ex. 34. By December 2014, Pavemetrics marketed the "LRAIL" system on its public website, where it posted rail-inspection articles and papers. *Id.* ¶ 43; Ex. 36.

By February 2015, Pavemetrics' website described the LRAIL system in more detail. Laurent ¶ 45; Ex. 37. It explained that LRAIL "automatically detects railway features such as rails, ties and fasteners as well as defects such as cracking on concrete ties," using "high-speed cameras, custom optics and laser line projectors to acquire both 2D images and high-resolution 3D profiles of the railway." *Id.*

In 2017, Pavemetrics secured a contract with the Federal Railroad Administration (FRA) to demonstrate the capability of its LRAIL system. Laurent ¶ 49. From March to December 2017, Pavemetrics performed that testing at Amtrak's Delaware facility. *Id.* ¶¶ 49–50. The FRA published the results in a March 2020 report. Mesher Ex. B at 21.

Today, Pavemetrics continues to sell and offer for sale LRAIL around the world. Laurent ¶ 48. Since 2019, Pavemetrics began using deep neural networks to identify defects in railway tracks, as shown in the flow diagram below. *Id.* ¶ 54. A deep neural network develops its own operators that allow a computer to analyze images similar to how a human would. Frakes ¶ 107.



### E.   Tetra Tech Has Long Purchased Inspection Systems from Pavemetrics

Tetra Tech's brief ignores the longstanding relationship between the parties.  It never mentions that its affiliate, EBA Engineering Consultants, first acquired an LCMS system in 2012.  Laurent ¶¶ 55, 57; Exs. 40, 41, 42.  It also ignores that Dr. Mesher, the named inventor on the '293 patent and Tetra Tech's opining "expert" witness on this Motion, was responsible for that purchase.  *Id.*.

In 2014, Tetra Tech used the LCMS to inspect roads in Canada.  *See* Laurent ¶ 58.  It submitted the report for that project on this Motion.  *See* Parker Decl., Ex. N.  Tetra Tech dismisses the report as irrelevant because it is dated January 2015, less than a year before the filing of the '293 patent application.  Br. at 20-21. But Tetra Tech's LCMS use is described in Appendix B to the report and that Appendix is dated ***February 12, 2014***.  Ex. N at 52.  Thus, Tetra's Tech's LCMS use



occurred before that date, qualifying it as prior art to the '293 patent.  Appendix B explained the LCMS's capabilities, such as the ability to acquire 3D range and intensity data using high-speed cameras and line lasers, as well as the ability to process the data automatically to identify defects in the road.

Tetra Tech conceals that it has long known that Pavemetrics makes and sells systems for inspecting railway tracks.   Tetra Tech's claim that Pavemetrics' CEO, Richard Habel, told Dr. Mesher that Pavemetrics had no plans to enter the railway track inspection business in 2015 is belied by emails between Pavemetrics and Dr. Mesher himself.  Br. at 21.  For example, in 2015, a Pavemetrics consultant told Dr. Mesher that Pavemetrics had been "moving the LRAIL product algorithms forward" and even sent Dr. Mesher "examples of a brand-new algorithm that can detect and quantify rail surface defects."  Laurent ¶¶ 60-61, Exs. 44, 45.

Even after its patent issued, Tetra Tech continued to do business with Pavemetrics and encouraged sales of LRAIL systems.  In June 2020, Tetra Tech requested a quote for an LRAIL system.  Laurent ¶¶ 62-63, Exs. 46, 47.  Tetra Tech sought a discount to buy several LRAIL systems.  *Id.*  It also inquired as to whether LRAIL software would work with the LCMS sensors Tetra Tech already owns.  *Id.*  And finally, Tetra Tech requested to attend the delivery of the LRAIL system to Pavemetrics' customer, CSX, and "see the CSX system in action."  *Id.*  Never during these exchanges did Tetra Tech suggest LRAIL would infringe its '293 patent.  *See id.* ¶ 63.

## F.    Tetra Tech's Late-Filed Patent Claims Well-Known Features

Tetra Tech admits that it did not start developing its 3DTAS until "around 2015."  Br. at 9.  In that year, Tetra Tech filed its provisional patent application for its rail inspection system.  Ex. 1.  Because of a tortuous examination, the '293 patent did not issue until July 2019.  *See* Ex. 2.

On this Motion, Tetra Tech asserts that Pavemetrics infringes Claim 1 only.  Br. at 14-21.  Claim 1 recites a system for assessing a railway track bed and requires conventional features of a rail inspection system.  Ex. 1 at 71.  Those features are (1) a power source; (2) a light emitting apparatus; (3) a data storage apparatus, (4) at least one sensor for acquiring three dimensional surface elevation and intensity image data of the railway track, and (5) a processor configured to run an algorithm for processing that data.  The algorithm comprises: (a) acquiring 3D elevation and intensity data of a segment of railway track bed, (b) generating a track elevation map based on that 3D data, and:

c. identifying a railway track bed feature from the track elevation map **further including the steps of:**

i.    **defining an appropriate gradient neighborhood representing a small 2D track section over which differential vertical measurements are calculated and**

ii.     **moving the gradient neighborhood like a sliding window over the 3D elevation data using the processor**

The final step of the algorithm requires storing information corresponding to the identified "railway track bed feature." *Id.*

Tetra Tech amended Claim 1 to add the bolded sub-steps during prosecution to overcome a prior-art rejection. Frakes ¶¶ 76-79, Ex. 2 at 114. But those sub-steps do not actually overcome the prior art. They recite well-known steps performed by edge-detection tools long known in the art, such as a Sobel filter (invented by Irwin Sobel in 1968), Prewitt filter, or the Canny method, as explained in the accompanying declaration of David Frakes, Ph.D, an expert in computer vision. Frakes ¶¶ 48-55, 118-24, 126–29. Accordingly, this patent does not give Tetra Tech any exclusionary rights in the railway inspection market as its Motion pretends.

### III.  TETRA TECH'S MOTION SHOULD BE DENIED

A "preliminary injunction is a drastic and extraordinary remedy that is not to be routinely granted." *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993). Tetra Tech must prove that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Tetra Tech has not shown that any of these factors favors an injunction.

### A.  Tetra Tech Has Not Shown that It Is Likely to Succeed on the Merits

"To establish likelihood of success on the merits, a patentee must show that it will likely prove infringement of the asserted claims and that its infringement claim will likely withstand the alleged infringer's challenges to patent validity." *Mylan Institutional LLC v. Aurobindo Pharma Ltd.*, 857 F.3d 858, 866 (Fed. Cir. 2017). An injunction "should not issue if the accused

infringer raises a substantial question concerning either infringement or validity." *Id.* Substantial questions dominate both issues here.

Tetra Tech argues as if Pavemetrics is limited to the claim it pled in its Declaratory Judgment Complaint. Br. at 20, 22. Tetra Tech ignores that it bears the burden on *all* issues on the Motion. Moreover, Pavemetrics has yet to file its Answer to the infringement counterclaims where it can raise all of its defenses, including invalidity.

### 1.   Tetra Tech Has Not Met Its Burden to Prove Infringement

Tetra Tech has not shown that the LRAIL, as sold in the United States after the patent issued, includes every limitation of Claim 1. Tetra Tech relies exclusively on the "infringement opinion" from its CTO and named inventor, Dr. Mesher. But Dr. Mesher never construes any term in Claim 1, including the "gradient neighborhood" limitations added during prosecution. His meager "infringement analysis" glosses over the claim language and fails to notify Pavemetrics which algorithm is the basis of the infringement claim.

Dr. Mesher cites to eleven different documents (Exhibits B-L) to show the features of Pavemetrics' LRAIL system. He cites *only one document* (Exhibit B) to opine that the LRAIL performs the recited algorithmic sub-steps for "moving the gradient neighborhood" to calculate "differential vertical measurements." Br. at 19. But Exhibit B reflects use of an LRAIL system in 2017, two years before the '293 patent issued. Ex. B at 27; Laurent ¶ 50. Pavemetrics significantly changed how LRAIL processes data in 2019, when it switched to detecting missing features by using deep neural networks. Laurent ¶¶ 51-54. Exhibits C-L reflect this significant change. Deep neural networks develop their own neighborhood operators to see the rail tracks, similar to how a human would see them. Frakes ¶ 107. They do not use gradient or any other neighborhood operator programmed by Pavemetrics. *Id*. Thus, Tetra Tech

/ / /

-11-

could not point to Exhibits C-L to allege that LRAIL uses the recited algorithmic sub-steps.

Moreover, Tetra Tech has not shown that the LRAIL system in Exhibit B, even if it were sold after the '293 patent issued, included the algorithmic sub-steps, including the ones requiring a "gradient neighborhood." Exhibit B is too general and vague. It refers merely to using algorithms to detect changes in rail features, including a 3D model to inspect for the presence of fasteners and anchors. Ex. B at 41-42. It never discusses anything about "defining an appropriate gradient neighborhood" that calculates "differential vertical measurements" over a region by "moving the gradient neighborhood," whatever meaning Tetra Tech ascribes to those limitations. For this reason, Tetra Tech was unable to perform any infringement analysis at all.

The LRAIL shown in Exhibit B uses template matching to detect fasteners and anchors. Laurent ¶ 50. Template matching is a well-known technique that uses various algorithms. *See* Frakes ¶ 102. Pavemetrics continuously used various forms of template matching from 2013 to 2017. Laurent ¶ 50. To detect rails, Pavemetrics uses another set of algorithms including a well-known technique called a Sobel filter. *See* Ex. 26 at 105, 110; Ex. 10 at 422. Pavemetrics first used the Sobel filter ***to detect rails in 2012***. *See* Laurent ¶ 18, Ex. 18 at 39; Ex. 10 at 422, 427. As the patentee, Tetra Tech bears the burden to identify and explain the algorithms at issue to allege a *prima facie* case of infringement. Because Tetra Tech performed no meaningful infringement analysis, it is unknown which algorithm is the basis of the infringement claim.[2]

/ / /

---

[2] Tetra Tech should not be allowed to present new claim constructions and infringement theories for the first time on Reply. *Docusign, Inc. v. Sertifi, Inc.*, 468 F. Supp. 2d 1305, 1307 (W.D. Wash. 2006).

Finally, Pavemetrics has been commercially using its rail inspection system in the United States since 2012. Laurent ¶¶ 17-18. While its algorithms have evolved over time, its rail inspection system has always performed the basic algorithms for identifying railway track features. Tetra Tech's broad infringement allegation appears to rely on general features and characteristics that Pavemetrics has been using since 2012, years before the 2015 effective filing date of the '293 patent. Under these circumstances, Pavemetrics could not be liable because the prior-use statute allows Pavemetrics to continue selling systems it sold one year before the patent filing date. 35 U.S.C. § 273.

## 2. Tetra Tech Has Not Met Its Burden to Prove Claim 1 Is Likely to Withstand an Invalidity Challenge

In preliminary injunction proceedings, "because of the extraordinary nature of the relief, the **patentee** carries the burden of showing likelihood of success on the merits with respect to the patent's validity." *Nutrition 21 v. United States*, 930 F.2d 867, 869 (Fed. Cir. 1991); *see also Novozymes v. Genencor Int'l, Inc.*, 2005 WL 2716496, at *2 (D. Del. 2005). Tetra Tech did not even bother to discharge its burden here. Rather, it relies on the presumption of validity and wrongly argues that Pavemetrics has the burden to raise specific invalidity defenses on this Motion. Br. at 22. Tetra Tech addressed no prior art, not even the prior art it knows about and raised in prior litigation. Thus, it ignored the mountain of prior art detailed in this brief and in the Frakes and Laurent declarations.

At a minimum, Pavemetrics has raised a substantial question of validity with its public offers for sale, its actual sales, and its many public uses, most of which are detailed in numerous publications. Its "UL-TRB2014" publication is exemplary. *See* Ex. 10. It shows every feature of Claim 1, including the algorithm sub-steps of defining and "moving the gradient neighborhood." Frakes ¶¶ 108-125, Ex. 10 at 418–22.

As Pavemetrics' expert, Dr. Frakes, explains, a person of ordinary skill would have understood the recited phrase "gradient neighborhood" to mean a zone of limited area used for calculating differential vertical measurements on the 3D elevation data. Frakes ¶¶ 87-93. Such a person would have understood that the processor performs this calculation by moving or sliding the gradient neighborhood operator window to calculate differential vertical measurements over the entire region to be processed (e.g., the railway track). *Id.* ¶ 88.

UL-TRB2014 discloses an algorithm to identify the edges of a rail head that includes applying Sobel kernels for edge detection. Frakes ¶¶ 118-21, Ex. 10 at 421-22. Sobel kernels are a well-known gradient detecting filter that slides like a window to calculate local changes in intensity based on a 3x3 neighborhood. Frakes ¶¶ 122-23, 49-50. Calculating differential vertical measurements by moving a Sobel kernel like a sliding window over the 3D elevation data is a necessary and inevitable result of applying "horizontal and vertical Sobel kernels" for "edge detection." *Id.* ¶ 123-24. Because UL-TRB2014 discloses every feature of Claim 1, it anticipates the claim. *See id.* ¶ 108. At a minimum, it shows the claimed invention would have been obvious. 35 U.S.C. § 103; *see* Frakes ¶¶ 126-29. Accordingly, Pavemetrics has raised at least a substantial question of invalidity with respect to Claim 1.

**B.    Tetra Tech Has Failed to Show Irreparable Harm**

A party seeking injunctive relief "must make a ***clear showing*** that it is at risk of irreparable harm." *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012) (emphasis added). Tetra Tech has failed to establish any harm, let alone irreparable harm.

**1.    Tetra Tech Has Failed to Establish a Nexus between the Alleged Infringement and Alleged Harm**

Tetra Tech must show a nexus between the alleged infringements and the harm it would suffer without an injunction. *Apple*, 678 F.3d at 1323-28 (no

-14-

irreparable harm "if consumers buy [accused] product for reasons other than the patented feature").  For many reasons, Tetra Tech failed to show any true identifiable harm.  But even if Tetra Tech had done so, it failed to show the required **nexus** between any alleged harm and the patented features of Claim 1.

Tetra Tech never identifies the alleged patented features of Claim 1.  Instead, it broadly proclaims that its "patented 3DTAS" is "a robust and reliable system for quickly and accurately identifying railway track features and associated measured data at high speeds."  Br. at 9.  Tetra Tech asserts that it does so "by automatically processing full width track surface elevation data and intensity data to identify track features and extract physical parameters of interest."  *Id.* at 9 (parentheticals omitted).  Pavemetrics has been selling LRAIL or its predecessor using those features since at least 2012, *see* Laurent ¶¶ 17-18, and, thus, any harm caused by the sale of LRAIL cannot be tied to Claim 1.

Moreover, Tetra Tech promotes its 3DTAS system based on numerous features not in Claim 1.  For example, in its proposal to CSX, Tetra Tech highlighted the following main features, which are unrelated to Claim 1:  (1) boxcar platform; (2) 24/7 continuous operation; (3) 70 mph operating speed; (4) high-performance geo-referencing; (5) tailored inspection criteria; (6) client owned data, with unrestricted use; and (7) modular architecture providing scalability.  Ex. R at 28.

Tetra Tech provides no evidence that recited features of Claim 1 drive customer demand for LRAIL.  *See* Br. at 28-29.  Tetra Tech cites a single Pavemetrics brochure.  *Id.* at 28 (citing Ex. D at 54).  But that brochure describes using artificial intelligence to process data, which is not recited in Claim 1. Ex. D at 54; Frakes ¶¶ 106-07.  Tetra Tech also points to Pavemetrics offering a lower price to CSX.  Br. at 28.  But that only suggests CSX was interested in a better price.  Tetra Tech provided no evidence of what drives

/ / /

-15-

customer demand, such as through testimony from non-parties or consumers. *See Open Text, S.A. v. Box, Inc.*, 2014 WL 1389065, at \*15-16 (N.D. Cal. 2014).

Tetra Tech's weak allegations cannot establish the required nexus. *See, e.g.*, *EcoServices v. Certified Aviation Servs.*, 2018 WL 5629301, at \*12 (C.D. Cal. 2018) (denying permanent injunction where patentee was unable to show that features of asserted patent drove customer demand for accused product); *Whitewater West Indus. v. Pacific Surf Designs*, 2017 WL 4583869, at \*2-3 (S.D. Cal. 2017) (denying preliminary injunction for similar reason); *TeleSign Corp. v. Twilio, Inc.*, 2015 WL 12532491, at \*6-7 (C.D. Cal. 2015) (same). Thus, Tetra Tech has not shown the nexus required to establish irreparable harm.  Its Motion should be denied for this reason alone.

## 2.  Tetra Tech's Alleged Harm Is Speculative and Unsupported

Even if Tetra Tech could show a nexus, each type of its alleged harm is speculative and lacks evidentiary support, as explained below.

**Alleged business harms by a direct competitor**

Tetra Tech asserts that it would suffer irreparable harm with no injunction because Tetra Tech and Pavemetrics are direct competitors.  Br. at 22.  But Tetra Tech's Annual Report identifies its **18** "principal competitors," and Pavemetrics is not identified.  Ex. 13 at 575-76.  Regardless, competition alone does not establish irreparable harm.  *Multilift Wellbore Tech. Ltd. v. ESP Completion Techs. LLC*, 2017 WL 10222420, at \*1-2 (E.D. Tex. 2017).

Tetra Tech wrongly assumes that any Pavemetrics' sale would have been made by Tetra Tech, as if the parties compete in a two-supplier market.  *See* Br. at 23.  Tetra Tech ignores at least **five** other competitors in this industry. Laurent ¶ 72.   The number of competitors alone completely undercuts irreparable harm. *Nivel Parts & Mfg. Co. v. Textron, Inc.*, 2017 WL 1552034, at \*1-3 (M.D. Fla. 2017) (denying preliminary injunction in market with

numerous competitors).  Tetra Tech's reliance on *Trebro* is misplaced.  Br. at 23.  The market in that case had only one unauthorized competitor.

Tetra Tech also asserts that Pavemetrics "market entry" will impede Tetra Tech's ability to be a "primary mover" in the market.  Br. at 23.  But Tetra Tech, not Pavemetrics, is the new entrant in the market.  Pavemetrics has been selling its rail inspection technology for nearly a decade.  Laurent ¶¶ 17-18.  Tetra Tech also wrongly asserts that the parties compete for only seven customers' business.  Br. at 23.  But there are more than 600 railroad companies in the United States, and Pavemetrics targets dozens of them.  Laurent ¶ 66.

**Alleged loss of business opportunities**

Tetra Tech also claims that it would suffer lost business opportunities.  Br. at 24-25.  Tetra Tech contends that "[m]any customers" are "sticky customers," such that "they tend to remain customers of the company from which they obtain their first product."  *Id.* at 24.  But Tetra Tech provides no evidence to support this assertion.  *See id.* at 24.  Tetra Tech cites *Tivo.  Id.*  But Tivo presented evidence that DVR customers are sticky customers.  Also, Tivo was a small company with one main product, unlike here, where Tetra Tech is a large company with many products and services.  Ex. 13 at 568, 572 (more than 65,000 projects).  Thus, any alleged lost business opportunities would have a miniscule effect on Tetra Tech's overall business.

Tetra Tech also asserts "imminent harm" by additional sales to one customer, CSX, and potential sales to two customers, CN and BNSF.  Br. at 24.  But again, Tetra Tech assumes that all Pavemetrics' sales would automatically go to Tetra Tech.  The assumption contradicts Tetra Tech's earlier assertion that this is a "fiercely competitive industry."  Br. at 6.  The assumption also ignores all the other competitors in the rail inspection industry.  Laurent ¶¶ 71-72; *Nivel*, 2017 WL 1552034, at *1-3 (explaining alleged lost business opportunities were conjecture based on erroneous assumption defendant was only competitor).

Moreover, Pavemetrics began working with CN and BNSF nearly two years ago.  Ex. G at 131; Ex. I at 180.  Thus, Tetra Tech's belated complaint of imminent harm is baseless.

Moreover, this Court should disregard Tetra Tech's unsupported speculation from its own employees.  Tetra Tech provides no evidence or analysis of market share.  Instead, it assumes that it would lose one-seventh (14%) of the market by losing one customer.  Br. at 24-25.  This pure speculation is insufficient to establish irreparable harm.  *See Nutrition 21 v. U.S.*, 930 F.2d 867, 871 (Fed. Cir. 1991); *Minerva Surgical, Inc. v. Hologic, Inc.*, 2018 WL 306689, at *4-7 (N.D. Cal. 2018) (finding no irreparable harm where plaintiff relied on cursory declarations from its sales representatives).

**Alleged erosion of exclusivity, goodwill, and reputation**

Tetra Tech asserts that Pavemetrics will erode Tetra Tech's exclusivity, goodwill, and reputation.  Br. at 25-26.  But Tetra Tech cites nothing for its sweeping assertion.  Tetra Tech claims that it has a "reputation as an innovator in the field," and customers "choose Tetra Tech over cheaper competitors."  *Id.* at 25.  But Tetra cites nothing for this pure speculation.

Tetra Tech also asserts that competition from Pavemetrics will harm Tetra Tech's "reputation as an innovator."  *Id.* at 26.  Again, Tetra Tech provides no supporting evidence.  Competing products, without more, do not harm a patentee's reputation.  *Kimberly-Clark Worldwide, Inc. v. Tyco Healthcare Grp. LP*, 635 F. Supp. 2d 870, 880 (E.D. Wis. 2009).

Tetra Tech also asserts that its high-speed railroad inspection systems "practice the '293 patent."  Br. at 25.  However, as explained above, Tetra Tech has not shown that any of its systems, including 3DTAS, are covered by Claim 1, the only claim at issue on this Motion.

Tetra Tech suggests that its prior lawsuit against GREX supports irreparable harm here.  Br. at 25.  But, in that lawsuit, Tetra Tech was not

enforcing its patent.  Rather, GREX sued Tetra Tech, asserting Tetra Tech was infringing GREX patents.  *See* Ex. 12 at 512-13.  Tetra Tech never explains how that lawsuit in anyway supports its Motion.  Actually, it undercuts it.  Tetra Tech ultimately succeeded *by invalidating all four asserted patents based on the prior art*.  *See, e.g.*, Ex. 12 at 512; Ex. 43 (Pavemetrics providing prior art support).  It showed that it would have been obvious *in 2005* to automatically inspect railway tracks using well-known computer vision techniques.  Ex. 12 at 532–33.  That ruling puts such systems in the public domain.  Having cancelled GREX's patents in view of prior art, Tetra Tech cannot ignore the art and pretend it was first in the market to inspect railway tracks using automatic vision systems.

Tetra Tech's assertion that "Pavemetrics viewed the railroad market as too risky to enter" is untrue and contradicts the evidence.  Pavemetrics has been selling its rail inspection system since 2012.  Laurent ¶¶ 17-18, 40-45, Exs. 34, 35.  Also, in 2016, Pavemetrics and GREX exchanged letters, where Pavemetrics explained why it does not infringe GREX's patents.  *Id.* ¶ 46, Exs. 38, 39.  Thus, Tetra Tech's claim that Pavemetrics is "suddenly" trying to "freeride on the path that Tetra Tech paved" by invalidating GREX's patents is just not true.  Also, the argument makes no sense.  When one invalidates patents, the patented inventions are free for *all* to use.

Lastly, Tetra Tech asserts that money damages are inadequate because "Tetra Tech chooses not to license the '293 patent to third parties."  Br. at 26.  This assertion is baseless for two reasons.  First, Tetra Tech cited no evidence about its licensing activity—only attorney argument.  Second, whether monetary damages are inadequate does not turn on a patentee's licensing activity.  Rather, courts consider all relevant factors.  *See Reebok Int'l Ltd. v. J. Baker, Inc*., 32 F.3d 1552, 1557-57 (Fed. Cir. 1994).

/ / /

**Alleged encouragement of more infringements**

Tetra Tech speculates that Pavemetrics' continued sales would "encourage[] other would-be-infringers to enter the market." Br. at 26-27. However, once again, Tetra Tech cites nothing. At least five other competitors sell rail inspection systems. Laurent ¶ 72. Tetra Tech is silent on whether it believes any of those systems infringe. And Tetra Tech identifies no one that might enter the market if an injunction were denied. Also, the cases Tetra Tech cites are unhelpful. *See* Br. at 26-27. For example, *Critikon* and *Pfizer* involved the now-overruled presumption of irreparable harm. *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1149 (Fed. Cir. 2011) (explaining that *eBay* "jettisoned the presumption of irreparable harm"). *Amgen* involved a permanent injunction and the patents were the foundation of the patentee's business, neither of which apply here.

Tetra Tech also asserts that, without an injunction, it "would be forced to reduce its research and development activities." Br. at 27. Again, Tetra Tech cites no evidence, not even its R&D budget. *See* Mesher ¶¶ 6-9. Tetra Tech generates more than $3 billion in revenue annually. Ex. 13 at 568. Pavemetrics could not possibly cause a material effect on Tetra Tech's R&D activity. *See Kimberly-Clark*, 635 F. Supp. 2d at 880 (any R&D reduction would be "essentially unnoticeable" for patentee with $19 billion global revenue). Regardless, a lost research opportunity does not establish irreparable harm and would disserve the patent system. *Eli Lilly & Co. v. Am. Cyanamid Co.*, 82 F.3d 1563, 1578 (Fed. Cir. 1996).

**Alleged price erosion**

Tetra Tech claims that Pavemetrics' continued sales cause price erosion, resulting in irreparable harm. Br. at 27-28. Tetra Tech's system is significantly more expensive than Pavemetrics' system. Keyes ¶¶ 9, 44; Ex. Q at 25. Unlike Pavemetrics, Tetra Tech provides a "fully-autonomous revenue-service boxcar

system," doing much more than inspecting railway tracks.  Ex. Q at 16.  Tetra Tech's system also includes: a 3D rail web system; an autonomous rail corridor LiDAR system; car ventilation; a climate control system; a telemetry system; a security system; a fire suppression system; an environmental monitoring system; a health monitoring system; and a real-time position and orientation system.  *Id.* at 25.  Most of those components do not relate to the subject matter of Claim 1.

Tetra Tech claims to have dropped its price to compete for CSX's business, and may need to continue to reduce its price.  Br. at 27-28.  But no evidence suggests that Pavemetrics caused this price reduction.  If Tetra Tech chooses to offer a comprehensive boxcar system, then it cannot reasonably expect to compete on price with Pavemetrics' rail inspection system.  *See Gunter & Zimmerman Construction Div., Inc., v. Gomaco Corp.*, 2020 WL 6948364, at *10 (D. Iowa 2020) (denying preliminary injunction where price erosion allegations "vague and unsupported"); *Hoist Fitness Sys., Inc. v. Tuffstuff Fitness Int'l, Inc.*, 2017 WL 5640562, at *4 (C.D. Cal. 2017) (no preliminary injunction where no evidence the price difference caused price erosion).

Moreover, the evidence shows that **CSX required** Tetra Tech to lower its price.  Keyes ¶ 20.  Tetra Tech provided no evidence that CSX did so because of Pavemetrics, and Pavemetrics does not offer an expensive boxcar system.  *See id.* ¶¶ 20-23; *Nichia Corp. v. Everlight Ams., Inc.*, 855 F.3d 1328, 1343 (Fed. Cir. 2017) (explaining that patentee's lower-price sale had been required by the customer, so the patentee "was going to have to lower its prices, regardless of [the accused infringer's] competition").

Even if Tetra Tech could show that it would need to lower its price to compete with Pavemetrics, this indicates monetary damages would suffice.  *See Bettcher Indus., Inc. v. Bunzl USA, Inc.*, 692 F. Supp. 2d 805, 821-22 (N.D.

Ohio 2010) (economic harm "should be readily calculable and compensable by money damages" where patentee's employee testified about pricing decisions in response to specific pricing actions taken by the accused infringer).

Lastly, Tetra Tech argues that Pavemetrics promotes the same benefits as Tetra Tech. Br. at 27:18-25. But Pavemetrics' system does not have most components in Tetra Tech's comprehensive boxcar system. *Compare* Ex. 46 at 232, *with* Ex. Q at 25. While Pavemetrics promotes the 2D imaging and 3D scanning capabilities of its system, those basic concepts have been used for many years before Tetra Tech filed its patent. *See* Frakes ¶¶ 57–63; Ex. 10; *see supra* Section III.A.2. Today, Pavemetrics heavily promotes its use of Deep Neural Networks to automatically inspect railroads. Exs. G, I, K, L.

### 3.    Other Factors Demonstrate No Irreparable Harm

Tetra Tech ignores two additional facts establishing no irreparable harm: its delay and its size.

**Tetra Tech's Delay Demonstrates No Imminent Harm**

Tetra Tech waited 18 months after its patent issued to notify Pavemetrics of Tetra Tech's concerns, despite Pavemetrics' years of sales and public disclosures. And then it waited another two months to file this Motion. It filed this Motion only after Pavemetrics filed its Declaratory Judgement Complaint. Tetra Tech's delay shows a lack of substantial and immediate irreparable injury. *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 55 F. Supp. 2d 1070, 1090 (C.D. Cal. 1999) (five-month delay in seeking injunctive relief demonstrates lack of irreparable harm), *aff'd*, 202 F.3d 278 (9th Cir. 1999); *Valeo Intellectual Prop., Inc. v. Data Depth Corp.*, 368 F. Supp. 2d 1121, 1128 (W.D. Wash. 2005) (three-month delay "inconsistent" with irreparable harm").

**The Parties' Relative Size Negates Irreparable Harm**

Pavemetrics is a small, privately held company with 22 employees and less than $15 million in annual revenue. Laurent ¶¶ 64-65. The accused system

is about 40% of Pavemetrics' revenue.  *Id.* ¶ 64.  An injunction would be devastating, as Pavemetrics likely would be forced to lay off at five of its 22 employees.  *Id.* ¶ 65.  Pavemetrics likely would never re-hire those employees or find similar talent after this disputed is resolved.  *Id.*  This would have a long-lasting, detrimental effect on Pavemetrics.

Tetra Tech, in stark contrast, is a large, publicly traded company with 20,000 employees and $3 billion in annual revenue.  Ex. 13 at 568.  The price of Tetra Tech's 3DTAS is a tiny fraction of its annual revenue.  *See* Keyes ¶ 43. And Tetra Tech planned to sell only a few systems incorporating 3DTAS in 2021.  *Id.* ¶ 28.  Denying an injunction would have a relatively trivial impact on Tetra Tech's bottom line, and no evidence suggests that Tetra Tech would be forced to lay off a single employee.  The massive size disparity between the parties weighs against a finding of irreparable harm. *See Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 708 (Fed. Cir. 1997).

For all of these reasons, Tetra Tech has failed to show irreparable harm.

## C.   The Hardship to Pavemetrics Substantially Outweighs the Hardship to Tetra Tech of Losing a Sale

Tetra Tech correctly states that it must show the balance of hardships weighs in its favor.  Br. at 29; *see Litton Sys., Inc. v. Sundstrand Corp.*, 750 F.2d 952, 959 (Fed. Cir. 1984).  Tetra Tech has failed to do so.

A preliminary injunction would be catastrophic to Pavemetrics.  *See Ill. Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 683 (Fed. Cir. 1990) ("The hardship on a preliminarily enjoined manufacturer who must withdraw its product from the market before trial can be devastating.").  Pavemetrics has invested about $5-6 million over the past decade into its rail inspection technology.  Laurent ¶ 64.  This is a substantial investment for a company with less than $15 million in annual revenue.  *Id.*  An injunction would cause Pavemetrics to lose about 40% of its current revenue stream, forcing

Pavemetrics to layoff at least five of its 22 employees. *Id.* ¶¶ 64-65. Moreover, Pavemetrics would be unable to fulfill its existing sales contracts with CSX. *Id.* ¶ 64. Such facts demonstrate severe hardship. *See Litton*, 750 F.2d at 960-61.

On the other hand, Tetra Tech provided no evidence or argument that denying an injunction would have a material effect on it. *See* Br. at 29. Instead, Tetra Tech argues that denying an injunction would (1) cause Tetra Tech to lose the value of its patent, and (2) disrupt the status quo. *Id.* But the abundance of prior art shows Tetra Tech's patent is of little if any value. And the status quo favors Pavemetrics. "The status quo to be preserved is that state of affairs existing immediately before filing of the litigation . . . ." *Litton*, 750 F.2d at 961. When this litigation was filed, Pavemetrics had been selling its rail inspection systems for almost a decade. Laurent ¶¶ 17-18. An injunction would drastically alter the status quo rather than preserving it. *See Litton*, 750 F.2d at 961. Tetra Tech's reliance on *Windsurfing* is misplaced because that case involved a ***permanent*** injunction and not the potential destruction of Pavemetrics "***without*** its day in court." *Ill. Tool*, 906 F.2d at 683-84 (distinguishing *Windsurfing*). Thus, the balance of hardships tips sharply against granting a preliminary injunction.

**D.**   **The Public Interest Would be Harmed by an Injunction**

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24. Here, railway track conditions are an important public safety consideration. Ex. 14 at 579 (669 track-caused accidents in 2011). Consequently, the federal government has extensive regulations for inspecting rail tracks. *See, e.g.*, 49 C.F.R. §§ 213.231-241. Moreover, the Federal Railroad Administration has awarded Pavemetrics multiple contracts to help further develop Pavemetrics' rail inspection technology. Laurent ¶¶ 49-53.

Because of these important safety considerations, the public would be disserved by removing Pavemetrics' technology from the market. Other courts have made similar findings. *Westinghouse Air Brake Techs. Corp. v. Siemens Indus., Inc.*, 2018 WL 3655782, at *1 (D. Del. 2018) (denying preliminary injunction against a train control system because of "the interests of public safety (reflected in the Rail Safety Improvements Act)" and "the railroads' demonstrated desire for mitigating the risk created by reliance on a sole supplier" of the technology at issue); *Wavetronix LLC v. Iteris, Inc.*, 2015 WL 300726, at *9 (W.D. Tex. 2015) (finding an injunction would not serve public interest because it could deprive public from an important transportation safety device used by municipalities).

Tetra Tech argues that its system can perform railroad inspections and thus the public will not be harmed. Br. at 30. But one important customer, CSX, has already chosen Pavemetrics over Tetra Tech due, in large part, to capabilities of Pavemetrics' system unrelated to features recited in Claim 1. Laurent ¶¶ 67–70, Ex. 48. Moreover, the LRAIL hardware has a proven track record, with more than 550 sensors deployed in 45 countries since 2010 to inspect transportation infrastructure, including railway tracks. *Id.* An injunction would disserve the public.

## IV.  CONCLUSION

For the foregoing reasons, the Court should preserve the status quo and deny Tetra Tech's Motion. Moreover, Tetra Tech neither addressed the requirement of a bond, nor submitted a proposed order. *See* Fed. R. Civ. P. 65(c); L.R. 7-20, 52-4.1. For these reasons as well, this Court should deny Tetra Tech's Motion.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  March 22, 2021    By:  */s/ Christy G. Lea*
                               Joseph R. Re
                               Christy G. Lea
                               Nicholas M. Zovko

                          Attorneys for Plaintiff/Counterclaim Defendant,
                          PAVEMETRICS SYSTEMS, INC.

# Addendum A
# Pavemetrics' Opposition to
# Tetra Tech's Motion for Preliminary Injunction

## Exhibits filed by Counter-Plaintiffs Tetra Tech on March 3, 2021

| Exhibit | Declaration | Title of Exhibit |
|---------|-------------|------------------|
| Exh. A | Mesher (ECF 17-1) | Curriculum Vitae of Darel Mesher. |
| Exh. B | Mesher (ECF 17-1) | FRA Report Entitled "Laser Triangulation for Track Change and Defect Detection," reflecting LRAIL testing in 2017 |
| Exh. C | Mesher (ECF 17-1) | Pavemetrics Laser Rail Inspection System (LRAIL$^{TM}$) Webpage, dated 02/23/2021. |
| Exh. D | Mesher (ECF 17-1) | Pavemetrics "LRAIL AI-Enhanced Railway Inspection System" Data Sheet. |
| Exh. E | Mesher (ECF 17-1) | Pavemetrics "LRAIL Automated Inspection System" Data Sheet. |
| Exh. F | Mesher (ECF 17-1) | U.S. Department of Transportation Federal Railroad Administration Report titled "Extended Field Trials of LRAIL for Automated Track Change Detection." |
| Exh. G | Mesher (ECF 17-1) | Railmetrics "LRAIL Deep Neural Network Railway Inspection and Change Detection" Presentation. |
| Exh. H | Mesher (ECF 17-1) | Federal Laboratory Consortium of Technology Transfer news article, titled "FRA Report Confirms Utility of AI-based Railway Inspection System" and dated May 1, 2020. |
| Exh. I | Mesher (ECF 17-1) | "Use of Laser Triangulation and Deep Neural Networks (DNNs) for Railway Track Safety Inspections" Product Introduction and Update Presentation dated October 16, 2019. |

**Addendum A**
**Pavemetrics' Opposition to**
**Tetra Tech's Motion for Preliminary Injunction**

| Exhibit | Declaration | Title of Exhibit |
|---------|-------------|------------------|
| Exh. J | Mesher (ECF 17-1) | Railway Age article titled "Ballast Maintenance, Delivered" by Marybeth Luczak, dated November 6, 2020. |
| Exh. K | Mesher (ECF 17-1) | Railmetrics "Use of Deep Neural Networks for Railroad Inspection" Presentation |
| Exh. L | Mesher (ECF 17-1) | Article titled "Deep Learning for Railroad Inspection" by Richard Fox-Ivey, Mario Talbot, and John Laurent. |
| Exh. M | Parker (ECF 17-14) | Letter from Pavemetrics' counsel Christy G. Lea of Knobbe Martens via email on February 12, 2021. |
| Exh. N | Parker (ECF 17-14) | Document titled Pavement Asset Management Program, with Appendix B dated February 12, 2014. |
| Exh. O | Parker (ECF 17-14) | Printout obtained from Pavemetrics' website for LCMS located at http://www.pavemetrics.com/applications/road-inspection/lcms2-en/ on February 25, 2021. |
| Exh. P | Parker (ECF 17-14) | Status of Trademark Serial No. 90296509. |
| Exh. Q (SEALED) | Keyes (ECF 19-2) | Tetra Tech TAS "RailAI™ Autonomous Track Assessment System" Proposal presented to CSX, dated April 6, 2020. |
| Exh. R (SEALED) | Keyes (ECF 19-2) | Tetra Tech TAS "RailAI™ Autonomous Track Assessment System" Lease and Purchase Proposal, dated July 20, 2020. |
| Exh. S (SEALED) | Keyes (ECF 19-2) | Letter from Darel Mesher to Lee Moss of CSX Transportation dated November 23, 2020. |

**Addendum A**
**Pavemetrics' Opposition to**
**Tetra Tech's Motion for Preliminary Injunction**

**Exhibits filed by Counter-Defendant Pavemetrics on March 22, 2021**

| Exhibit | Declaration | Title of Exhibit |
|---|---|---|
| Exh. 1 | Zovko (ECF 31) | **U.S. Patent No. 10,362,293** |
| Exh. 2 | Zovko (ECF 31) | Prosecution history of U.S. Patent No. 10,362,293 (excerpts) |
| Exh. 3 | Zovko (ECF 31) | U.S. Patent No. 4,040,738 to Wagner (1977) |
| Exh. 4 | Zovko (ECF 31) | Chapter 6, "Principles of Filter Design" from Vol. 2, "Handbook of Computer Vision and Applications" (1999) |
| Exh. 5 | Zovko (ECF 31) | "Automated Railhead Surface Flaw Inspection" by Sue McNeil, et al. (1991) |
| Exh. 6 | Zovko (ECF 31) | Dissertation titled "Visual Inspection of Railroad Tracks," by Pavel Babenko (2009) |
| Exh. 7 | Zovko (ECF 31) | "Automated Visual Inspection/Detection of Railroad Track," by Dr. Mubarak Shah (2010) |
| Exh. 8 | Zovko (ECF 31) | Farritor:  U.S. Patent Pub. No. 2012/0300060 A1 (2012) |
| Exh. 9 | Zovko (ECF 31) | Kainer: U.S. Patent Pub. No. 2013/0191070 A1 (2013) |
| Exh. 10 | Zovko (ECF 31) | **"UL-TRB2014" prior art article**<br><br>"Automatic Track Inspection Using 3D Laser Profilers to Improve Rail Transit Asset Condition Assessment and State of Good Repair – A |

A3

## Addendum A
## Pavemetrics' Opposition to
## Tetra Tech's Motion for Preliminary Injunction

| Exhibit | Declaration | Title of Exhibit |
|---------|-------------|------------------|
|  |  | Preliminary Study" submitted on November 11, 2013 |
| Exh. 11 | Zovko (ECF 31) | Laurent early LCMS article (2010) |
| Exh. 12 | Zovko (ECF 31) | Final Written Decision (August 25, 2020) in Tetra Tech/GREX IPR proceeding |
| Exh. 13 | Zovko (ECF 31) | 2020 Annual Report for Tetra Tech, Inc. (excerpts) |
| Exh. 14 | Zovko (ECF 31) | FRA Track Safety Standards Fact Sheet |
| Exh. 15 | Frakes (ECF 32) | Curriculum Vitae of David Frakes, Ph.D. |
| Exh. 16 | Laurent (ECF 33) | Pavemetrics Invoice for LCMS sale to UML (2012) |
| Exh. 17 | Laurent (ECF 33) | Pavemetrics Invoices for Consulting for UML (2012) |
| Exh. 18 | Laurent (ECF 33) | UML Research Group 1st Quarterly Report (2012) |
| Exh. 19 | Laurent (ECF 33) | Pavemetrics RPUG 2012 Conference Presentation Slides |
| Exh. 20 | Laurent (ECF 33) | YouTube screenshot, "High-speed 2D Imaging of rail" (October 2012) |
| Exh. 21 | Laurent (ECF 33) | YouTube video, "High-speed 2D Imaging of rail" (October 2012) |
| Exh. 22 | Laurent (ECF 33) | Email from Fox-Ivey to Laurent re: CN demo data preview (Dec. 14, 2014) |

# Addendum A
## Pavemetrics' Opposition to
## Tetra Tech's Motion for Preliminary Injunction

| Exhibit | Declaration | Title of Exhibit |
|---------|-------------|------------------|
| Exh. 23 | Laurent (ECF 33) | YouTube screenshot, "Pavemetrics LCMS for Rail Inspection" (December 2012) |
| Exh. 24 | Laurent (ECF 33) | YouTube video "Pavemetrics LCMS for Rail Inspection" (December 2012) |
| Exh. 25 | Laurent (ECF 33) | UML Research Group 2nd Quarterly Report (2012/2013) |
| Exh. 26 | Laurent (ECF 33) | UML Research Group 3rd Quarterly Meeting Minutes and Pavemetrics presentation slides (2013) |
| Exh. 27 | Laurent (ECF 33) | UML Research Group 5th Quarterly Report (2013) |
| Exh. 28 | Laurent (ECF 33) | Agenda for RPUG 2013 Conference |
| Exh. 29 | Laurent (ECF 33) | Pavemetrics presentation slides for RPUG 2013 (excerpts) |
| Exh. 30 | Laurent (ECF 33) | Pavemetrics presentation slides for ERPUG 2013 (excerpts) |
| Exh. 31 | Laurent (ECF 33) | Pavemetrics-ULM presentation slides for TRB 2014 |
| Exh. 32 | Laurent (ECF 33) | EuroConsult TRB 2014 paper |
| Exh. 33 | Laurent (ECF 33) | Pavemetrics presentation slides for RPUG 2014 (excerpts) |
| Exh. 34 | Laurent (ECF 33) | LRAIL data sheet |

# Addendum A
## Pavemetrics' Opposition to
## Tetra Tech's Motion for Preliminary Injunction

| Exhibit | Declaration | Title of Exhibit |
|---------|-------------|------------------|
| Exh. 35 | Laurent (ECF 33) | Customer inquiry about LRAIL after APTA 2014 |
| Exh. 36 | Laurent (ECF 33) | Pavemetrics website December 2014 |
| Exh. 37 | Laurent (ECF 33) | Pavemetrics LRAIL website February 2015 |
| Exh. 38 | Laurent (ECF 33) | GREX Notice Letter re LRAIL (February 2016) |
| Exh. 39 | Laurent (ECF 33) | Pavemetrics Response to GREX Notice Letter (February 2016) |
| Exh. 40 | Laurent (ECF 33) | Tetra Tech LCMS Rental Invoice (June 2012) |
| Exh. 41 | Laurent (ECF 33) | Email from Hebert to Mesher re LCMS parameters (October 2012) |
| Exh. 42 (REDACTED AND SEALED) | Laurent (ECF 33) | Tetra Tech LCMS emails and invoice reflecting LCMS purchase (October 2012) **CONFIDENTIAL** |
| Exh. 43 | Laurent (ECF 33) | Email from Laurent to Mesher re GREX prior art (January 2015) |
| Exh. 44 | Laurent (ECF 33) | Email from Fox-Ivey to Mesher re LRAIL algorithm progress (November 2015) |
| Exh. 45 | Laurent (ECF 33) | Email from Fox-Ivey to Mesher re new algorithms for Pavemetrics rail inspection system (December 2015) |
| Exh. 46 (REDACTED AND SEALED) | Laurent (ECF 33) | LRAIL quotation for Tetra Tech (June 2020) **CONFIDENTIAL** |

A6

**Addendum A**
**Pavemetrics' Opposition to**
**Tetra Tech's Motion for Preliminary Injunction**

| Exhibit | Declaration | Title of Exhibit |
|---|---|---|
| Exh. 47 | Laurent (ECF 33) | Tetra Tech LRAIL purchase inquiry emails (June 2020) |
| Exh. 48 (REDACTED AND SEALED) | Laurent (ECF 33) | Pavemetrics and CSX Concept Paper for FRA (May 2020) **HIGLY CONFIDENTIAL – AEO** |