Donald L. Ridge (State Bar No. 132171)
**CLARK HILL LLP**
1055 West Seventh Street, 24th Floor
Los Angeles, California 90017
Telephone: (213) 891-9100
Facsimile: (213) 488-1178
DRidge@clarkhill.com

Aaron L. Parker (*pro hac vice*)
*aaron.parker@finnegan.com*
David C. Reese (*pro hac vice*)
*david.reese@finnegan.com*
Nicholas A. Cerulli (*pro hac vice*)
*nicholas.cerulli@finnegan.com*
Ryan T. Davies (SBN : 330922)
*ryan.davies@finnegan.com*
**FINNEGAN, HENDERSON, FARABOW,**
 **GARRETT & DUNNER, L.L.P.**
901 New York Avenue, N.W.
Washington, D.C. 20001-4413
Telephone: (202) 408-4000
Facsimile: (202) 408-4400

*Attorneys for Defendant and Counterclaim Plaintiffs*
*TETRA TECH, INC. AND TETRA TECH TAS INC.*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PAVEMETRICS SYSTEMS, INC. | CASE NO.: 2:21-CV-1289 MCS-MMA |
| Plaintiffs, | |
| v. | **TETRA TECH'S REPLY IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION** |
| TETRA TECH, INC. | |
| Defendants. | **[Honorable Mark. C. Scarsi]** |
| | Date: April 19, 2021 |
| | Time: 9:00 a.m. |
| AND RELATED COUNTERCLAIMS. | Courtroom: 7C, First Street Courthouse |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................. iii

I.  INTRODUCTION ................................................................................... 1

II.  ARGUMENT........................................................................................... 1

    A.  Tetra Tech Has Shown That It is Likely to Succeed on the Merits ...... 1

        1.  The '293 Patent Will Withstand an Invalidity Challenge .......... 1

        2.  Pavemetrics § 273 Defense Fails (And It Was Abandoned) ...... 4

        3.  Pavemetrics' LRAIL Infringes Claim 1 of the '293 Patent ........ 5

    B.  Tetra Tech Will Be Irreparably Harmed Absent an Injunction ............ 7

        1.  Business Harms by Direct Competitor ....................................... 7

        2.  Tetra Tech Demonstrated Nexus ................................................ 8

        3.  Timing Does Not Show Unreasonable Delay.............................. 8

        4.  The Parties' Relative Size Does Not Negate Irreparable Harm ...................................................................................... 9

    C.  The Balance of Hardships Favors Tetra Tech.................................... 10

    D.  The Public Interest Favors Tetra Tech ............................................. 10

III.  CONCLUSION ................................................................................... 10

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*Apple Inc. v. Samsung Elecs. Co.*,

4
    678 F.3d 1314 (Fed. Cir. 2012) ............................................................8

5

*Apple Inc. v. Samsung Elecs. Co.*,

6
    809 F.3d 633 (Fed. Cir. 2015) ..............................................................8

7

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,

    664 F.3d 922 (Fed. Cir. 2012) ..............................................................9

8

9

*EcoNova Inc. v. DPS Utah, 2012*

    WL 5944257 (D. Utah Nov. 28, 2012)...................................................9

10

*Henkel Corp. v. Coral, Inc.*,

11
    754 F. Supp. 1280 (N.D. Ill. 1990) .......................................................9

12

*Metalcraft of Mayville, Inc. v. Toro Co.*,

13
    848 F.3d 1358 (Fed. Cir. 2017) ............................................................8

14

*Novozymes v. Genecor Int'l, Inc.*,

15
    474 F. Supp. 2d 592 (D. Del. 2007) ......................................................7

16

*Pfizer, Inc. v. Teva Pharm., USA, Inc.*,

17
    429 F.3d 1364 (Fed. Cir. 2005) ............................................................8

18

*Playboy Enters., Inc. v. Netscape Commnc'ns Corp.*,

19
    55 F. Supp. 2d 1070 (C.D. Cal. 1999) ..................................................9

20

*Valeo Intellectual Prop. Inc. v. Data Depth Corp.*,

21
    368 F. Supp. 2d 1121 ..........................................................................9

**Statutes**

22

23
35 U.S.C. § 273...................................................................1, 4, 5, 7

24
35 U.S.C. § 282............................................................................1

25

26

27

28

# I.   INTRODUCTION

Pavemetrics has not overcome Tetra Tech's showing that a preliminary injunction should be granted. Tetra Tech has shown it is likely to succeed on the merits, and Pavemetrics' arguments lack merit and fail to raise a substantial question regarding invalidity, § 273, or infringement. The '293 patent will withstand any invalidity challenge, including over the purported UL-TRB2014 publication, which is the only reference Pavemetrics asserts against the '293 patent. And, after seeking a declaratory judgment of noninfringement based solely on § 273, Pavemetrics has now seemingly abandoned it. Finally, Pavemetrics has failed to overcome Tetra Tech's showing that the current LRAIL infringes claim 1.

Tetra Tech will be irreparably harmed absent an injunction. Tetra Tech acted promptly after discovering that its significant sales opportunity with CSX was usurped by Pavemetrics' infringing LRAIL and has reason to believe additional LRAILs are pending delivery to CSX (and others). And Tetra Tech filed this motion less than three weeks after Pavemetrics initiated this case (and before service). Finally, the balance of hardships and the public interest favors Tetra Tech, which seeks to only enjoin Pavemetrics' currently infringing LRAIL. Tetra Tech has shown a reasonable likelihood of success on the merits, that it will suffer irreparable harm in the absence of an injunction, that the balance of hardships tips in favor of granting the injunction, and that doing so is in the public interest.

# II.   ARGUMENT

## A.   Tetra Tech Has Shown That It is Likely to Succeed on the Merits

### 1.   The '293 Patent Will Withstand an Invalidity Challenge

In opposition, Pavemetrics ignores the '293 patent's presumption of validity. 35 U.S.C. § 282 ("A patent shall be presumed valid."). Pavemetrics could have initiated suit with a declaratory judgment of invalidity, but it did not; thus, the validity of the '293 patent was undisputed when Tetra Tech filed its motion. Pavemetrics passes judgment on the '293 patent's prosecution history (ECF 37, 9), but the Examiner's

comprehensive examination only further strengthens the '293 patent's ability to withstand an invalidity challenge. Indeed, during prosecution, the Examiner allowed the '293 patent over <u>400 references</u>, including references raised in previous litigation. Ex. 2; '293 Patent, pp. 1-4. Pavemetrics alleges that Tetra Tech has "ignored the mountain of prior art detailed in [its opposition] brief and in the Frakes and Laurent declarations." ECF 37, 13. Yet, Pavemetrics only contends that the purported "UL-TRB2014" publication (which it has not shown to be prior art) allegedly anticipates and renders obvious claim 1. But it does not. Worse, it plainly conflicts with the record evidence.

a. **UL-TRB2014 Does Not Anticipate or Render Obvious Claim 1 of the '293 Patent**

Pavemetrics contends that UL-TRB2014's discussion of "Sobel kernels" (or Sobel filter/operator), equates with the claimed gradient neighborhood. ECF 37, 14 (Ex. 10, 421-422). But Pavemetrics' expert, Dr. Frakes, admits that "the claim requires a very specific algorithm for identifying the features of the rail track bed and <u>cannot cover use of known operators</u> for calculating differential vertical measurements <u>such as Sobel filters</u> or other known differential operators." Frakes, ¶ 83 (emphasis added).

Dr. Frakes' admission that the Sobel filter and other known operators (e.g., Prewitt and Canny) are insufficient to meet claim 1's specific and sophisticated algorithm for identifying rail track bed features is not surprising. Nikos, ¶ 43. Indeed, consistent with the plain language of claim 1, the '293 specification explains that a processor "defines" "an appropriate gradient neighborhood" representing "a small 2D track section" "over which differential vertical measurements" for the identification of specific railway track bed features are "calculated" from 3D elevation data of a 3D track elevation map as the gradient neighborhood is "mov[ed]" like a sliding window over the 3D elevation data." '293 Patent, 10:21-35 (discussing rail head detection), 11:12-25, 11:45-63 (rail base detection), 13:15-26, 13:49-61 (rail weld detection), 14:18-27, 15:23-35 (planar regions and tie bounding boxes), FIGS. 5-6, 7-8, 12-13; Nikos, ¶ 43.

Annotated FIG. 12 below demonstrates an example of the processor defining an

1   appropriate gradient neighborhood 122 (red) representing a small 2D track section over

2   which differential vertical measurements suitable for detecting rail welds 120 (green)

3   are calculated, and the gradient neighborhood 122 is moved like a sliding window over

4   the 3D elevation data (red/yellow) of the 3D track elevation map. '293 Patent, 13:15-

5   21, 13:51-62. Nikos, ¶ 43.



FIG. 12

14      Unsurprisingly, UL-TRB2014's "Sobel kernels" are not defined or applied this

15   way. Nikos, ¶ 44. Instead, Sobel operators are unsophisticated, fixed, and limited sized

16   operators typically used to detect sharp changes in intensity between pixels of two-

17   dimensional intensity images. *Id.* ("applying a Sobel operator to 3D elevation data

18   would not provide meaningful 3D elevation gradients in the general case because the

19   Sobel operator would produce too much noise, have problems with corners, localization

20   issues, and require extensive tuning rendering the extraction of edges problematic.").

21   Even UL-TRB2014 recognizes the Sobel kernel's deficiencies and relies on additional

22   methods and modules to extract feature image information—and even then, the

23   extracted image includes "discontinuities." Ex. 10, 422. Nikos, ¶ 44 (discussing

24   drawbacks associated with the Canny operator and "Blob Coloring module.").

25      The UL-TRB2014's "Sobel kernels" cannot equate with claim 1's defined

26   "appropriate gradient neighborhood" for the additional reason that they are not applied

27   to calculate differential vertical measurements from 3D elevation data of a 3D track

28   elevation map. Nikos, ¶ 45. Instead, as demonstrated below by Pavemetrics' own 2013

evidence (Ex. 26)—relied on by Pavemetrics as describing its use of a Sobel filter (*see* ECF, 12, citing Ex. 26, 105, 110; Ex. 10 (UL-TRB2014), 422)—any rail head edge calculations are made with respect to intensity data of a 2D profile (see orange and purple boxes) of an individual scan line of the railway track bed, not 3D elevation data of a 3D track elevation map, as shown above in annotated FIG. 12 of the '293 patent. Ex. 26, 113 (annotated). *See also* Ex. 10, 427 (discussing collection and analysis of UL-TRB2014's "rail profiles."). Nikos, ¶ 45.



And Pavemetrics' final assertion that "[a]t a minimum, [UL-TRB2014] shows the claimed invention would have been obvious" (ECF 37, 14) also misses the mark, as Dr. Frakes (¶¶ 126-129) adds nothing to the fact that UL-TRB2014's unsophisticated "Sobel kernels" do not equate with the claimed gradient neighborhood. Nikos, ¶ 46.

### 2.    Pavemetrics § 273 Defense Fails (And It Was Abandoned)

After seeking a declaratory judgment of noninfringement based solely on § 273, Pavemetrics barely addresses it in opposition. ECF 37, 13. Pavemetrics and Mr. Laurent (¶¶ 17-18) briefly mention Exhibits 17 and 18, but neither articulates with any specificity how the exhibits support any of Pavemetrics' commercial inspection systems having continuously practiced every element of claim 1 since at least one year prior to the '293 patent's February 2015 effective filing date, as required by 35 U.S.C. § 273.

Nikos, ¶ 48. And to the extent Pavemetrics relies on UL-TRB2014 as purportedly describing operation of any of its prior use commercial systems, that argument would fail for the same reasons discussed above, i.e., that UL-TRB2014 fails to anticipate claim 1. *Id*. Additionally, Pavemetrics purports that it no longer practices claim 1. ECF 37, 11 ("Pavemetrics significantly changed how LRAIL processes data in 2019, when it switched to detecting missing features by using deep neural networks ["DNNs"]. … [DNNs] do not use gradient or any other neighborhood operator programmed by Pavemetrics."). Thus, even if Pavemetrics could prove it practiced claim 1 at least one year prior to February 2015, its § 273 defense fails because it allegedly abandoned practicing the claimed invention. *See* 35 U.S.C. § 273(e)(4).

### 3. Pavemetrics' LRAIL Infringes Claim 1 of the '293 Patent

As explained in Tetra Tech's opening brief and supported by the testimony of Dr. Mesher, Pavemetrics' LRAIL executes the claimed algorithmic steps including defining an appropriate gradient neighborhood. As shown below (left) in <u>non</u>-annotated FIG. 17 (Ex. B, 41-42), the LRAIL defines an appropriate gradient neighborhood representing a small 2D track section (red rectangle), over which differential vertical measurements for the identification of specific track bed features (e.g., anchors) are calculated from 3D elevation data of a 3D track elevation map, and the neighborhood is moved like a sliding window over the 3D elevation data. The LRAIL's neighborhoods are similar to neighborhoods 122 (red) shown below (right) in annotated FIG. 12 of the '293 patent.



Figure 17 – Anchor Change Detection



FIG. 12

In opposition, Pavemetrics argues that "Exhibit B uses template matching to detect fasteners and anchors." ECF 37, 12. But Pavemetrics ignores that gradient neighborhood calculations occur in furtherance of, and/or in parallel with template matching feature identification. Nikos, ¶ 50. Indeed, Pavemetrics' own evidence confirms the practice of using more than one and/or parallel feature detection methods. *See, e.g.*, Ex. 27, 130 (discussing identifying existing fastener models before applying template matching); Ex. 10, 422 (UL-TRB2014 appreciating use of more than one detection method); Ex. 26, 105. Nikos, ¶ 50.

Pavemetrics also purports that Exhibit B "reflects use of an LRAIL system in 2017, two years before the '293 patent issued," and that "Pavemetrics significantly changed how LRAIL processes data in 2019, when it switched to detecting missing features by using deep neural networks ["DNNs"]. … [DNNs] do not use gradient or any other neighborhood operator programmed by Pavemetrics."), ECF 37, 11. But Pavemetrics provides no credible reason supporting this claim other than Mr. Laurent's and Dr. Frakes' conclusory and unsupported opinions. Laurent, ¶¶ 51-54; Frakes, ¶ 107.

First, contrary to Pavemetrics' assertion, Mr. Laurent testifies that the LRAIL's change to DNNs would be gradual and would continue to use other detection techniques. Laurent, ¶ 51 ("Pavemetrics began implementing these new algorithms to gradually replace the more traditional template-based fastener and anchor detection techniques.") (emphasis added). Moreover, Pavemetrics ignores the fact that DNNs, by their nature, require gradient neighborhood calculations. Nikos, ¶ 51. Indeed, deep learning methodologies involve gradient-based processing at their lowest levels to build up at higher levels more complex features. *Id.* Without this information, the neural networks would fail to produce the desirable recognition outcomes. *Id.*

Accordingly, Pavemetrics has failed to overcome Tetra Tech's showing that the LRAIL infringes claim 1. And together with the failure (and abandonment) of Pavemetrics' § 273 defense, and Tetra Tech's showing that claim 1 will withstand an invalidity challenge, Tetra Tech has shown that it is likely to succeed on the merits.

6

**B.      Tetra Tech Will Be Irreparably Harmed Absent an Injunction**

**1.      Business Harms by Direct Competitor**

In seeking to frame this dispute between David v. Goliath, Pavemetrics misleadingly focuses on the difference in size between Tetra Tech, Inc. and Pavemetrics. However, Pavemetrics directly competes with Tetra Tech <u>TAS Inc.</u> (a wholly owned subsidiary of Tetra Tech, Inc.), which lost a substantial sales opportunity with CSX due to Pavemetrics' sale of its infringing LRAIL. Keyes, ¶¶ 21, 28. Further, lost sales of a wholly owned subsidiary of a patent owner inherently harm the patent owner. *Novozymes v. Genecor Int'l, Inc.*, 474 F. Supp. 2d 592, 612-13 (D. Del. 2007).

Pavemetrics speciously states that "Tetra Tech[, Inc.]'s Annual Report identifies its 18 'principal competitors,' and Pavemetrics is not identified." ECF 37, 16. But Pavemetrics' focus on Tetra Tech, Inc. is deceptive and self-serving. Rather, the proper comparison for Pavemetrics should be with co-Counterclaim Plaintiff, Tetra Tech TAS Inc., which directly competes with Pavemetrics. Keyes Reply, ¶¶ 3-7. Moreover, Pavemetrics fails to acknowledge (or rebut) clear evidence that Tetra Tech TAS Inc. lost significant sales to CSX directly due to Pavemetrics' unauthorized infringement.

Pavemetrics also asserts that "there are more than 600 railroad companies in the United States, and Pavemetrics targets dozens of them." ECF 37, 17; Laurent, ¶ 66. But Mr. Laurent's testimony is spurious. Keyes Reply, ¶¶ 13-14. Regardless of whether Pavemetrics targets other companies besides the Class I railroads, it is the Class I railroads that have the majority of route miles and inspection needs in the U.S., and thus, present the most meaningful sales opportunities. *See* Keyes, ¶ 26. Pavemetrics' infringement is therefore harming Tetra Tech TAS Inc.'s business by targeting the companies that Tetra Tech TAS Inc. targets. Tetra Tech TAS Inc.'s harm is not speculative but is supported by uncontroverted testimony of Gary Keyes. *Id.*

Pavemetrics disputes Tetra Tech TAS Inc.'s contention that many customers in the rail inspection industry are sticky customers, yet Pavemetrics' own exhibits cut against it. Ex. 48, 242 ("If this technology can be proven as a viable addition to existing

autonomous test cars it is anticipated that the majority of the rail industry would adopt it."). Thus, Tetra Tech TAS Inc.'s lost business opportunities are not "miniscule." ECF 37, 17. Indeed, the damage of losing CSX, not to mention the other Class I railroads, as potential lifelong customers is "impossible to quantify" as some customers "prefer to purchase an entire line of products from the manufacturer for consistency." *Metalcraft of Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1368 (Fed. Cir. 2017).

### 2.    Tetra Tech Demonstrated Nexus

Tetra Tech has established the causal nexus between Pavemetrics' infringement and Tetra Tech's irreparable harm. Even in cases where a product is multi-featured, a causal nexus exists so long as the infringing feature "drive[s] the demand" for the product. *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1324 (Fed. Cir. 2012).

Pavemetrics asserts that Tetra Tech failed to show the required nexus between any alleged harm and the patented features of claim 1. ECF 37, 15. That is not so. In its opening brief, Tetra Tech sufficiently demonstrated a connection between the features of claim 1 of the '293 patent and the demand for the infringing products. *Apple, Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 641 (Fed. Cir. 2015). Tetra Tech specifically pointed to Pavemetrics' marketing materials demonstrating CSX's demand for 3DTAS and LRAIL was driven by CSX's desire to leverage the feature of identifying railway track bed features from a track elevation map accurately at high speeds, which is made possible using the algorithm recited in claim 1 of the '293 patent. Keyes, ¶¶ 6-23; Keyes Reply, ¶¶ 15-17; '293 patent at 1:49-60, 2:11-14, 2:63-3:6; Ex. C, 51; Ex. D, 53-54.

### 3.    Timing Does Not Show Unreasonable Delay

Contrary to Pavemetrics' assertion, Tetra Tech has not waited too long to notify Pavemetrics of its concerns. ECF 37, 22. Nor has Pavemetrics met its burden of establishing that Tetra Tech has unreasonably delayed. *Pfizer, Inc. v. Teva Pharms., USA, Inc*., 429 F.3d 1364, 1381-82 (Fed. Cir. 2005). Tetra Tech has not delayed at all.

The '293 patent issued on July 23, 2019, but Tetra Tech only became aware that it lost a potential sales opportunity to CSX due to Pavemetrics' infringing LRAIL at the

end of 2020. Keyes, ¶ 23; Keyes Reply, ¶¶ 18-19. Tetra Tech acted promptly thereafter and sent Pavemetrics multiple communications in January and February 2021. *See* ECF 1, ¶¶ 6-11. Pavemetrics cites *Playboy* and *Valeo* as examples of delay, but these cases are distinguishable from the facts here. ECF 37, 22. Here, <u>Pavemetrics</u> filed the lawsuit on February 11, 2021, and Tetra Tech filed its motion for preliminary injunction on March 3, 2021. Thus, there was no delay. In fact, courts have granted preliminary injunctions with longer timelines. *E.g., Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922 (Fed. Cir. 2012) (affirming preliminary injunction on product sold since 2008 where patent issued in 2009, and the injunction was sought in 2010).

Additionally, courts have recognized that reasonable and explainable delays do not weigh against irreparable harm to prevent a preliminary injunction. *See, e.g.*, *EcoNova Inc. v. DPS Utah*, 2012 WL 5944257 at *14 (D. Utah Nov. 28, 2012) (nine-month delay not unreasonable because of, in part, plaintiff's explanation that it was not aware of any actual sales of the allegedly infringing product). Here, CSX continued to negotiate with Tetra Tech TAS Inc. for its RailAI™ boxcar incorporating 3DTAS until being told at the end of 2020 that CSX would not be purchasing RailAI™ in favor of Pavemetrics' LRAIL. Keyes Reply, ¶¶ 18-19. Tetra Tech almost immediately notified Pavemetrics of its infringement, and within weeks after Pavemetrics initiated this action, Tetra Tech filed its motion for preliminary injunction.

### 4.    The Parties' Relative Size Does Not Negate Irreparable Harm

The relative size of a patent infringer should not alone serve as a basis for refusing to enjoin continued infringement by that infringer. *Henkel Corp. v. Coral, Inc.*, 754 F. Supp. 1280, 1322 (N.D. Ill. 1990). Still, Pavemetrics is not as small as it claims. Importantly, Pavemetrics only stated its full-year revenue for 2020, a year in which the North American railroad industry suffered revenue declines of approximately 20% due to Covid-19. Keyes, ¶ 10. And Pavemetrics' claim that LRAIL accounts for "40% of Pavemetrics' revenue" is based only on one quarter of the year, indeed at a time when Pavemetrics directly stole business with CSX away from Tetra Tech TAS Inc. Laurent,

¶ 64. Moreover, Tetra Tech <u>TAS Inc.</u>—not Tetra Tech, Inc.—is Pavemetrics' direct competitor and is similar in size to Pavemetrics, also having 22 employees and less than $15 million in annual revenue. Keyes Reply, ¶¶ 5-7.

## C.   The Balance of Hardships Favors Tetra Tech

Pavemetrics argues that granting the preliminary injunction would be "catastrophic" to its business because it would lose 40% of its revenue stream (which it only achieved in one quarter) and would force the company to lay off workers. ECF 37, 23. This argument implies that Pavemetrics would be unable to continue sales of all of its rail inspection technology. But a preliminary injunction would maintain the status quo of allowing Tetra Tech to continue benefitting from its right to exclude products that infringe the '293 patent, and Pavemetrics could continue to conduct business activities in transportation infrastructure inspection, and even railroad inspection, that do not rely on the infringing algorithms developed by Tetra Tech. Keyes Reply, ¶¶ 5-7.

## D.   The Public Interest Favors Tetra Tech

While Pavemetrics correctly states that railway track conditions are an important public safety consideration, ECF 37, 24, it fails to appreciate that removing its infringing product from the market would not impede safety considerations or create a reliance on a sole supplier for only one product for track inspection. Keyes Reply, ¶ 23. Thus, the public interest still favors Tetra Tech.

## III.   CONCLUSION

For the foregoing reasons, the Court should grant this motion and enjoin Pavemetrics' continued infringement of the '293 patent. In accordance with this Court's Standing Order, a proposed order was not submitted. ECF 11, 6.

Dated:  April 5, 2021

**CLARK HILL LLP**

By:  /s/ Donald L. Ridge

Donald L. Ridge

*Attorneys for Defendant and Counterclaim Plaintiffs*
*TETRA TECH, INC. AND TETRA TECH TAS INC.*