Donald Ridge, Esq. (State Bar No. 132171)
**CLARK HILL LLP**
1055 West Seventh Street, Suite 2400
Los Angeles, CA 90017
Telephone: (213) 891-9100
Facsimile: (213) 488-1178
DRidge@clarkhill.com

Aaron L. Parker (*Pro Hac Vice*)
aaron.parker@finnegan.com
David C. Reese (*Pro Hac Vice*)
david.reese@finnegan.com
Nicholas A. Cerulli (*Pro Hac Vice*)
nicholas.cerulli@finnegan.com
Ryan T. Davies (SBN: 330922)
ryan.davies@finnegan.com
**FINNEGAN, HENDERSON, FARABOW,**
 **GARRETT & DUNNER, LLP**
901 New York Avenue NW
Washington, D.C. 20001-4413
Telephone:   (202) 408-4000
Facsimile:    (202) 408-4400

*Attorneys for Defendant and Counterclaim Plaintiffs*
*TETRA TECH, INC. AND TETRA TECH TAS INC.*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAVEMETRICS SYSTEMS, INC.<br><br>              Plaintiff,<br>       v.<br><br>TETRA TECH, INC.<br><br>              Defendant.<br><br>AND RELATED COUNTERCLAIMS. | CASE NO.: 2:21-CV-1289 MCS-MMA<br><br>**DECLARATION OF NIKOS PAPANIKOLOPOULOS, PH.D. IN SUPPORT OF TETRA TECH'S REPLY IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**<br><br>**[Honorable Mark. C. Scarsi]**<br><br>Date: April 19, 2021<br>Time: 9:00 a.m.<br>Courtroom: 7C, First Street Courthouse |

1

I, Nikos Papanikolopoulos, Ph.D., declare as follows:

1.     My name is Nikos Papanikolopoulos. I have personal knowledge of the statements contained in this declaration and could and would testify competently to these statements to the best of my knowledge, information, and belief if called upon to do so. I am submitting this declaration on behalf of Tetra Tech, Inc. and Tetra Tech TAS Inc. (together "Tetra Tech") in the litigation identified on the foregoing page. I understand that Tetra Tech has accused Pavemetrics Systems, Inc., of infringing certain claims of Tetra Tech's United States Patent No. 10,362,293 (the "'293 Patent"). My compensation does not depend on the content of this declaration or the outcome of this litigation.

2.     My extensive experience with machine vision in the transportation industry is applicable to analyzing the '293 patent. For almost 30 years I have been involved in computer vision systems, sensors, and lasers which are directly applicable to analyzing the '293 patent. I am qualified to reach the opinions and conclusions stated in this declaration. I have been asked to respond to the opinions set forth in Dr. Frakes' declaration, including his opinions that "Automatic Track Inspection Using 3D Laser Profilers to Improve Rail Transit Asset Condition Assessment and State of Good Repair - A Preliminary Study" ("UL-TRB2014") allegedly anticipates or renders obvious claim 1 of the '293 patent. I have also been asked to respond to Mr. Laurent's opinions that any Pavemetrics' commercial inspection systems have continuously practiced every element of claim 1 since at least one year prior to the '293 patent's February 2015 effective filing date. And finally, I have been asked to respond to Dr. Frakes' opinions that Pavemetrics' LRAIL does not infringe claim 1 of the '293 patent. My opinions are set forth below.

3.     I understand that further expert discovery may occur at a later stage in this case, including the submission of expert reports on the infringement and validity of the asserted patents. I reserve my right to update my opinions in this declaration through any further expert reports and/or testimony that I may provide in this case.

**A.     Background and Expertise in Computer Vision Systems**

4.     I am currently employed as the McKnight Presidential Endowed Professor of Computer Science and Engineering at the University of Minnesota in Minneapolis, Minnesota. I am also the Director of the Minnesota Robotics Institute at the University of Minnesota.

5.     I have been involved with the design and evaluation of computer vision systems, sensors, and lasers for approximately 30 years. My academic research has been in the areas of computer vision, robotics, intelligent transportation systems, sensor networks, object recognition, and sensor-based control in transportation systems. To avoid confusion, the terms "computer vision" and "machine vision" are used in this document interchangeably although there are some subtle differences. I have also been involved in consulting work since 1997 involving computer vision algorithms for vehicle tracking, camera calibration, inspection, object recognition, vehicle monitoring systems, and motion control devices. I have authored or co-authored several book chapters and numerous peer-reviewed technical papers in these areas. My current curriculum vitae (CV) is included as Exhibit T.

6.     I received my Diploma of Engineering in Electrical and Computer Engineering from the National Technical University of Athens in Greece in 1987. I obtained my Masters and Ph.D. in Electrical and Computer Engineering from Carnegie Mellon University in 1988 and 1992, respectively. My research at the time was in robotics, computer vision and control, computer integrated manufacturing, and software engineering, and my Ph.D. thesis was titled "Controlled Active Vision." The work revolved around the use of images from a camera mounted on a robot manipulator to detect features on objects, track them, recognize the objects, and possibly grasp them. Some of the features used included edges, object profiles, and corners. The work's ultimate objective was an accurate 3D reconstruction of the target object and the surrounding space.

///

3

7.     After receiving my Ph.D., I began my career as a full-time Assistant Professor at the University of Minnesota, transitioning to an Associate Professor in the fall of 1996, and becoming a full Professor in the fall of 2001. During my time at these positions, I have taught courses in Computer Vision, Artificial Intelligence, Algorithms and Data Structures, and Readings in Computational Vision. The courses in Computer Vision and Readings in Computational Vision cover a variety of topics that include 3D construction, extraction of depth, inspection, tracking, light striping, lasers, structured light, structure from motion, occlusions, edge detection, and basic image processing. I also developed and introduced a course titled "Introduction to Intelligent Robotic Systems" beginning in 1994, that I continue to teach. My academic research has continued in the fields of computer vision systems, sensors, and lasers, with primary specialties in robotics, intelligent transportation systems, and sensor-based control in transportation applications. I currently work in the Center for Distributed Robotics and the Minnesota Robotics Institute.

8.     I have received research grants for various projects involving computer vision as applied to the transportation industry, including assessing truck parking, detection of pedestrians, and obstacle avoidance. My industrial experience includes founding a robotics company in 2005 named ReconRobotics Inc. that develops different robotic platforms. I have also been a consultant since 1997 for numerous companies and provided technical expertise in developing computer vision algorithms for vehicle tracking, camera calibration, inspection, precision agriculture, human tracking, object recognition, and fingerprint recognition. In one of my consulting assignments, I had to develop computer vision algorithms for inspection of industrial parts by using different illumination sources (Banner Engineering). I have licensed my algorithms to several industries with the most recent one being Sentera Inc., which is using computer vision for precision agriculture.

9.     I have written extensively about computer vision and robotic visual servoing, having written numerous book chapters, peer-reviewed journal articles (more

4

than eighty), and conference papers (more than two hundred ninety), a list of which is included as part of my CV. Some relevant works include "Robust Target Detection and Tracking Through Integration of Color, Motion, and Geometry", published in Computer Vision and Image Understanding in August 2006, "3D Reconstruction of Periodic Motion from a Single View", published in the International Journal of Computer Vision in October 2010, "Clustering of Vehicle Trajectories", published in the IEEE Transactions on Intelligent Transportation Systems in September 2010, and "Optimal Image-Based Euclidean Calibration of Structured Light Systems in General Scenes", published in the IEEE Transactions on Automation Science and Engineering in October 2011. My paper "Detection and Classification of Vehicles", published in the IEEE Transactions on Intelligent Transportation Systems in March 2002, is one of the most cited papers in the history of this journal (more than a thousand citations). I also have eight patents in pertinent areas. One should note that the majority of these papers deal with detection of cars, pedestrians, trucks, etc. by using a variety of techniques which were all based on computer vision. The October 2011 paper deals with structured light systems.

10.    Our research work has been funded by several government agencies. For example, we have received funding from the Department of Homeland Security to monitor threats at Mass Transit Sites like the 30th Street Station in Philadelphia, PA, and the Light Rail Station in the Minneapolis-Saint Paul International Airport. Monitoring the rail tracks and other associated rail components was an essential task for which we developed a variety of computer vision algorithms and tools.

11.    Throughout my career, I also have served as chair, member, editor, and advisor in several divisions and committees of IEEE and am a Fellow of IEEE. For example, I have been involved with the IEEE Robotics and Automation Society (RAS) as an Editor of the RAS Conference Editorial Board from 2006 to 2009, Vice President for Conferences from 2010 to 2013, and Chair of the Publication Ethics Committee since 2015. I was also Chairman of the IEEE Robotics and Automation Technical

Committee on Robot Vision from 2000 to 2006. I have also been either Program Chair or General Chair of the IEEE Int. Conference on Robotics and Automation numerous years. Since 2003, I have been an editor of the IEEE Transactions on Intelligent Transportation Systems Journal, first as an Associate Editor (since 2003) and then a Senior Editor since 2016. This is one of top journals in the field, and I handled the majority of the papers in computer vision with emphasis on various application domains including railroads. I have also been an Associate Editor of the Journal of Intelligent and Robotic Systems between 2006 and 2019.

12.    I have received numerous honors and awards for my research and contributions. I have been a Distinguished McKnight University Professor at the University of Minnesota since 2007 and have been a McKnight Presidential Endowed Professor in Computer Science since 2016. Also, in 2007, I was nominated and became an IEEE Fellow. In 2016, I received the IEEE RAS George Saridis Leadership Award in Robotics and Automation as well as the Center for Transportation Studies Research Partnership Award. I have also received the IEEE VTS 2001 Best Land Transportation Paper Award for the paper "A Novel Method for Tracking and Counting Pedestrians in Real-Time Using a Single Camera" (with Osama Masoud).

13.    Overall, I have used my education, industry, teaching, writing, and membership and service experiences in the computer vision field, and my understanding of the knowledge, creativity, and experience of a person having ordinary skill in the art in forming the opinions expressed in this report, as well as any other materials discussed herein. My extensive experience with machine vision in the transportation industry is applicable to analyzing the '293 patent. For almost 30 years I have been involved in computer vision systems, sensors, and lasers which are directly applicable to analyzing the '293 patent.

   **B.    Materials Considered**

14.    In forming my opinions, I read and considered the '293 patent and its prosecution history, as well as Tetra Tech's memorandum in support of its motion for

preliminary injunction, the declaration of Darel Mesher, Ph.D. and Exhibits A-L cited therein, Pavemetrics opposition to the motion for preliminary injunction, the declaration of David Frakes, Ph.D., and the declaration of John Laurent and the exhibits cited therein. I have also used my education, industry, teaching, mentoring, writing, and membership and service experiences in the Electrical and Computer Science and Engineering fields, and my understanding of the knowledge and experience of a person having ordinary skill in the art in forming the opinions expressed in this report, as well as any other materials discussed herein.

**C.    Legal Standards**

### 1.    Infringement

15.    I understand that 35 U.S.C. § 271 governs patent infringement and that Tetra Tech has accused Pavemetrics' LRAIL system of infringing under § 271, which states: "(1) Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." I generally understand that if an accused device or system contains or includes all elements of an asserted claim, then there is infringement. I also generally understand that if an accused device or system does not contain or include all elements of the asserted claim, then there is no infringement.

### 2.    Invalidity

16.    I understand that a person cannot obtain a patent on an invention if someone else had already made the same invention or if the invention would have been obvious to a person having ordinary skill in the art.

#### a.    Anticipation

17.    It is my understanding that there are two ways that prior art references can render a patent claim unpatentable: anticipation and obviousness based on 35 U.S.C. §§ 102 and 103, respectively.

///

18.     I understand that for a claim to be anticipated under § 102, every limitation of the claimed invention must be found in a single prior art reference. I also understand that there is a set process as follows: a) the claims of a patent are properly construed, b) then, you must compare the claim language to the prior art on a limitation-by-limitation basis. I understand that an anticipatory reference does not have to recite word for word what is in the anticipated claims. Rather, anticipation can occur when a claimed limitation is "inherent" in the relevant reference. I have been advised that if the prior art necessarily functions in accordance with, or includes, the claims limitations, it can anticipate even though the limitation is not expressly recited.

### b.     Obviousness

19.     I further understand that under 35 U.S.C. § 103(a), an invention is obvious when the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time of the invention to a person having ordinary skill in the art. For this reason, I have been asked to consider the level of ordinary skill in the field that someone would have had at the time of the claimed invention. I have also been told and understand that whether a prior art reference renders a patent claim unpatentable as obvious is determined from the perspective of a person of ordinary skill in the art. I also understand that, while there is no requirement that the prior art contain an express suggestion to combine known elements to achieve the claimed invention, a suggestion to combine known elements to achieve the claimed invention may come from the prior art as a whole or individually, as filtered through the knowledge of one skilled in the art. I further understand that the inferences and creative steps a person of ordinary skill in the art would employ are also relevant to the determination of obviousness.

20.     Counsel has instructed me that in an obviousness determination the factors to consider are: (1) the scope and content of the prior art, (2) the differences between the prior art and the asserted claims, (3) the level of ordinary skill in the pertinent art, and (4) the existence of secondary considerations of nonobviousness. Secondary

considerations include: a long-felt need, commercial success, unexpected results, praise of the invention, licensing, copying, failure of others, and skepticism by experts.

21.     Counsel has also instructed me that an obviousness inquiry may involve assessing the motivation of a person of ordinary skill to combine references. The prior art references themselves may provide a suggestion, motivation, or reason to combine, but other sources may also support a rationale for combining two or more prior art references. I have also been told that there is no rigid rule that a reference or combination of references must contain a "teaching, suggestion, or motivation" to combine references. But I also have been told that the "teaching, suggestion, or motivation" test can be a useful guide in establishing a rationale for combining elements of the prior art. I have been told that this test poses the question as to whether there is an expressed or implied teaching, suggestion, or motivation to combine prior art elements in a way that realizes the claimed invention, and that it seeks to counter impermissible hindsight analysis.

22.     It is also my understanding through counsel that the combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results. It is further my understanding that a proper obviousness analysis focuses on what was known or obvious to a person of ordinary skill in the art, not just the patentee. I have also been told that, when a work is available in one field, design alternatives and other market forces can prompt variations of it, either in the same field or in another. I have also been told that if a person of ordinary skill in the art can implement a predictable variation and would see the benefit of doing so, that variation is likely to be obvious. I have been told that in many fields, there may be little discussion of obvious combinations, and in these fields market demand, not scientific literature, may drive design trends.

### 3.     Section § 273 Defense

23.     I understand that Pavemetrics is relying on 35 U.S.C. § 273, which is a defense to infringement based on prior commercial use. 35 U.S.C. § 273 states: A

9

person shall be entitled to a defense under section 282(b) with respect to subject matter consisting of a process, or consisting of a machine, manufacture, or composition of matter used in a manufacturing or other commercial process, that would otherwise infringe a claimed invention being asserted against the person if—(1) such person, acting in good faith, commercially used the subject matter in the United States, either in connection with an internal commercial use or an actual arm's length sale or other arm's length commercial transfer of a useful end result of such commercial use; and (2) such commercial use occurred at least 1 year before the earlier of either—(A) the effective filing date of the claimed invention; or (B) the date on which the claimed invention was disclosed to the public in a manner that qualified for the exception from prior art under section 102(b).

24.    I generally understand that if use of a prior device or system that discloses each and every element of an asserted claim, at least 1 year before the effective filing date of the assert patent, then a defense under Section 273 may exist. I also generally understand that if use of a prior device or system does not disclose each and every element of an asserted claim, at least 1 year before the effective filing date of the asserted patent, or, if use of the prior device or system discloses each and every element of an asserted claim, but such use was not at least 1 year before the effective filing date, then a defense under Section 273 may not exist.

### D.    Person of Ordinary Skill in the Art

25.    I understand that a person of ordinary skill in the art (or "POSITA") is a hypothetical person that is considered to have the normal skills of a person in a certain technical field. I understand that factors that may help establish the level of skill in the art include: (1) the education level of those working in the field, including the inventor; (2) the types of problems encountered in the art; (3) the prior art solutions to those problems; (4) rapidity with which innovations in this art are made; and (5) the sophistication of the technology.

///

10

26.   It is my understanding that I must address the issues set forth in this declaration from the viewpoint of a person of ordinary skill in the art at the time of the invention to which the '293 patent pertains. I understand that Dr. Frakes submits that one of ordinary skill in the art would have been a person having a bachelor's degree in electrical engineering, computer engineering, mechanical engineering, computer science, physics, or a related field, and at least two years of experience (or the academic equivalent) in the field of computer or machine vision, including an understanding of algorithms used to process data for image processing. I agree with Dr. Frakes' definition, except that, in my opinion, a person of ordinary skill in the art would have had at least four years of experience (or the academic equivalent), not just two years of experience, as Dr. Frakes opines. I arrived at my proposed level of skill in the art by considering the factors discussed above for establishing the level of skill in the art.

27.   Under both my and Dr. Frakes' definitions provided above, I was at least a person having ordinary skill in the art at the time of the alleged invention. By 2015, I had a Diploma of Engineering in Electrical and Computer Engineering and a Masters and Ph.D. in Electrical and Computer Engineering. By 2015, I had also more than 25 years of experience in the field of computer or machine vision, including an understanding of algorithms used to process data for image processing. For example, I had been teaching classes in computer vision, conducting computer vision research funded by numerous government agencies, publishing numerous pertinent papers in prestigious venues like the IEEE Trans. on Intelligent Transportation Systems and IEEE Trans. on Pattern Analysis and Machine Intelligence, and supervising the thesis work of a large number of M.S. and Ph.D. students in this area. By 2015, I also had the academic equivalent of at least four years of experience.

///

///

///

///

**E.      The '293 Patent**

      **1.      Overview of the '293 Patent**

28.      The '293 patent is titled "3D Track Assessment System and Method." '293 Patent, Title. I understand that the '293 patent was filed on May 29, 2015 and claims priority to a provisional application filed on February 20, 2015.

29.      As shown below in FIG. 1, the '293 specification describes a track inspection system 10 (red) for assessing a railway track bed. '293 Patent, 8:65-65, FIG. 1. The inspection system includes a light line projector (orange), such as lasers 14A and 14B, for emitting light energy toward a railway track bed. *Id.*, 8:66-67. The system includes one or more sensors 16A and 16B (green) for sensing light reflected from the railway track bed that was emitted from the light line projector and acquires three-dimensional surface elevation and intensity image data of the railway track bed. *Id.*, 8:67-9:3. In one example, the acquired data may be stored in a data storage apparatus 18 (blue) in communication with a processor 12 (purple). *Id.*, 9:3-4.



FIG. 1

30.     The '293 specification further explains that the processor processes the three-dimensional data gathered by the sensor to generate a three-dimensional track elevation map representative of the inspected railway track bed. *Id.*, 9:17-21. Figure 10, reproduced below, shows an exemplary "elevation map of a portion of a railway." *Id.*, 7:11-12.



FIG. 10

31.     The '293 further explains that the processor may identify a railway track bed feature from the three-dimensional track elevation map. *Id.*, 9:22-28; *see also id.*, 9:28-30 ("The identification of features is based on the definition and identification of unique 3D feature attributes of a railway track bed."). Specifically, the processor identifies a feature from the three-dimensional track elevation map by defining an appropriate gradient neighborhood representing a small 2D track section over which differential vertical measurements are calculated and moving the gradient neighborhood like a sliding window over the three-dimensional data. *Id.*, 10:21-35, 11:12-25, 11:45-63, 13:49-14:1, 15:23-35, FIGS. 5-6, 7-8, 12-13, 18. Differential vertical measurements are calculated on the 3D elevation data of the 3D track elevation map located within the gradient neighborhood. *See id.* As one example, a vertical gradient calculation of greater than 80 mm may indicate one type of railroad track bed feature. *Id.*, 9:56-60 ("Rail head

edges 32 are identified as those features with significant vertical gradient edges (e.g., a gradient greater than about 80 mm), with an elevation greater than a minimum height (e.g., about 100 mm) above the estimated plane of the tie surface 28.”). As the processor moves the gradient neighborhood like a sliding window over the 3D elevation data of the 3D track elevation map, differential vertical measurements, or 3D gradient measures, are repeatedly calculated on the 3D elevation data of the 3D track elevation map located within the neighborhood to identify various railroad track bed features, including for example, rail heads, rail bases, rail welds, planar regions, crossties, tie fastener, and anchors. *Id.*, 10:21-35, 11:12-25, 11:45-63, 13:49-14:1, 15:23-35, 19:13-14, FIGS. 5-6, 7-8, 12-13, 18.

32.    For example, when detecting rail heads, as shown below in annotated FIG. 5, the '293 patent describes that “[a]n appropriate gradient neighborhood [30, red], is defined for vertical rail head edge features [green]. This rail head edge neighborhood represents a small 2D track bed surface area over which differential vertical measurements are calculated [], the example given herein is an area of 10 mm x 30 mm.” *Id.*, 10:26-31. “The gradient neighborhood is applied to the 3D elevation data and the area is moved like a window sequentially and complete for each position in the railway track bed elevation data.” *Id.*, 10:31-35; *see also id.*, 9:54-56 (“A suitable neighborhood 30 [red] as shown in FIG. 5 is preferably a 10 mm x 30 mm gradient area.”), FIG. 6.



FIG. 5

33.     To detect rail bases, as shown below in annotated FIG. 7, the '293 patent similarly explains that "[a]n appropriate gradient neighborhood [30, red], is defined for vertical rail base edge features. This rail base edge neighborhood represents a small 2D track bed surface area over which differential vertical measurements are calculated [], the example given herein is an area of 10 mm x 30 mm." *Id.*, 11:51-56. "A rail base edge feature search zone [74, 76, green] is defined [] based on the rail head edge coordinates and maximum rail base widths, resulting in field and gage maximum offset distances from the rail head." *Id.*, 11: 56-59. "The gradient neighborhood is applied by the processor to the 3D elevation data and the area is moved like a window sequentially and completely for each position in the railway track bed elevation data." *Id.*, 11:60-63; *see also id.*, 11:11-17 ("Similar to the approach used to locate the rail head edges the rail base detection uses 3D gradient detection and identifying vertical gradients greater than a specified height (about 25 mm for example) using a defined neighborhood 30 as a sliding window applied exhaustively across the rail base search area in the elevation data."), *id.*, 11:21-25 ("Field and gauge (left and right) rail base edge targets are identified for both rails including a left rail field base edge region 74 [green], a left rail gage base edge region 76 [green], a right rail field base edge region 78, and a right rail gage base edge region 80."), FIG. 8.



FIG. 7

34.     In another example associated with rail weld detection, as shown below in annotated FIG. 12, the '293 patent likewise explains that "[a]n appropriate sliding neighborhood [122, red], is defined for the rail base surface zones. This rail base surface analysis neighborhood represents a small 2D surface area over which elevation measurements suitable for weld detection [green] are calculated [], for example, an area of 10 mm x 75 mm. The rail base surface neighborhood is applied by the processor to the 3D elevation data for each of the four rail base surface zones, one located on each side of both rails. The neighborhood area is moved sequentially and completely, like a window for each position in the four rail base zones (see red/yellow) and the lowest elevation measure for each neighborhood is determined at each position. This process calculates the 2D neighborhood surface minimum for each rail base zone."). *Id.*, 13:49-62; *see also id.*, 13:15-26 ("A planar surface approximation is calculated as the surface generated from the collection of minimum elevation values for a sliding neighborhood 122 [red] (shown in FIG. 12) moving along the rail base surface region with a length greater than the feature of interest (for example 75 mm representing a length 3 to 4 times longer than typical rail base weld features)."), FIG. 13 (step 132, "Define Rail Base 2D Sliding Neighborhood," Step 134 ("Calculate Lowest Elevation using a Sliding Neighborhood for Field and Gage Rail Base Regions for Both Rails.").



FIG. 12

16

35.    And in another example associated with detecting and defining planar regions and for defining crossties, the '293 patent describes that "[a]n appropriate sliding neighborhood, is defined for the smooth surface analysis. This rail smooth surface analysis neighborhood represents a small 2D surface area over which elevation measurements suitable for planar surface detection are calculated [], for example, an area of 15 mm x 15 mm. The smooth surface neighborhood is applied by the processor to the 3D elevation data with the rail region removed, to calculate the vertical deviation in each neighborhood. The neighborhood area is moved sequentially and completely, like a window, for each position and the elevation gradient for each neighborhood is determined at each position." *Id.*, 15:23-35; *see also id.*, 15:10-13, FIG. 18.

### 2.    Prosecution History of the '293 Patent

36.    I have reviewed the prosecution history of the application that led to the '293 patent. Ex. 2. I understand that the Examiner, in the Notice of Allowance stated that "**none of them** [i.e., prior art including Kainer et al., US Patent Application Publication No. 2013/0191070 A1 and Farritor, US Patent Application Publication No. 2012/0300060 A1] **teaches the process of defining an appropriate gradient neighborhood of a 2D track section for calculating differential vertical measurements by moving the gradient neighborhood as a sliding window over the 3D elevation data.** As a result, **Kainer et al.** alone or in combination with **Farritor** fail(s) to teach all the elements of the independent claim 1 and therefore stands allowable." Ex. 2, 122-123 (emphasis in the original). Nothing in the prosecution history changes my opinions expressed in this declaration.

### F.    Claim Construction

37.    I have been instructed by counsel that claim construction is for the Court to decide as a matter of law. I am informed that claim terms should be given their ordinary and customary meaning within the context of the patent in which the terms are used, i.e., the meaning that the term would have to a POSITA, at the time of the invention, in light of what the patent teaches.

38.     I understand that, to determine how a POSITA would understand a claim term, one should look to those sources available that show what a person of skill in the art would have understood disputed claim language to mean. Such sources include the words of the claims themselves, the remainder of the patent's specification, the prosecution history of the patent (each considered "intrinsic" evidence), and "extrinsic" evidence (evidence external to the patent and the prosecution history) concerning relevant scientific principles, the meaning of technical terms, and the state of the art.

39.     I understand that, in construing a claim term, one looks primarily to the intrinsic patent evidence. I understand that extrinsic evidence may also be useful in interpreting patent claims when the intrinsic evidence itself is insufficient. However, I am informed that extrinsic evidence cannot be relied upon to construe a claim term if that extrinsic evidence contradicts the intrinsic evidence. I understand that the usual and customary meaning of a claim term can be altered by the patent applicant if he chooses to act as his own "lexicographer" and clearly sets forth in the patent a meaning for a claim term that is different from its usual and customary meaning. For the purposes of this declaration, I have used the plain and ordinary meaning of the terms recited in claim 1.

40.     In his declaration, Dr. Frakes states that "[a] person of ordinary skill, after reviewing the specification and prosecution history, would have understood the claim phrase 'gradient neighborhood' to mean a zone of limited area used for calculating differential vertical measurements. A differential vertical measurement is the change in vertical elevation calculated from data measured by the sensor from a first location (e.g. on the rail head edge) to another location (e.g. on the ground)." Dr. Frakes Declaration, ¶87 (citing '293 patent, 9:50-56, 10:21-35, FIGS. 5-6). I disagree with Dr. Frakes' interpretation of the plain and ordinary meaning of this term. In my opinion, no further construction of the term "gradient neighborhood," is necessary because the plain language of claim 1 clearly "defin[es] an appropriate gradient neighborhood," as "representing a small 2D track section over which differential vertical measurements

18

are calculated and ii. moving the gradient neighborhood like a sliding window over the 3D elevation data using the processor." '293 patent, claim 1 (emphasis added).

### G.   Opinions

#### 1.   Validity of the '293 Patent Over UL-TRB2014

41.   I have been asked to respond to Dr. Frakes' opinion that a purported publication entitled "Automatic Track Inspection Using 3D Laser Profilers to Improve Rail Transit Asset Condition Assessment and State of Good Repair - A Preliminary Study" ("UL-TRB2014") (Ex. 10) allegedly anticipates or renders obvious claim 1 of the '293 patent. In my opinion, it does not.

42.   Claim 1 of the '293 patent recites a railroad track assessment system that identifies a railway track bed feature from a three-dimensional ("3D") track elevation map including the specific algorithmic steps of: "i. defining an appropriate gradient neighborhood representing a small 2D track section over which differential vertical measurements are calculated and ii. moving the gradient neighborhood like a sliding window over the 3D elevation data using the processor." Pavemetrics contends that UL-TRB2014's discussion of "Sobel kernels" equates with the claimed gradient neighborhood. ECF 37, 14 (citing Ex. 10, 421-422; Frakes ¶¶118-24, 49-50). I disagree.

43.   As an initial matter, I note that Pavemetrics' expert, Dr. Frakes, admits that "the claim requires a very specific algorithm for identifying the features of the rail track bed and cannot cover use of known operators for calculating differential vertical measurements such as Sobel filters or other known differential operators." Frakes, ¶83. I do not find surprising (and in fact agree with) Dr. Frakes' admission that the Sobel filter and other known operators (e.g., Prewitt filter and the Canny method) are insufficient to meet claim 1's specific and sophisticated algorithm for identifying rail track bed features. Consistent with the plain language of claim 1, the '293 specification explains that a processor "defines" "an appropriate gradient neighborhood" representing "a small 2D track section" "over which differential vertical measurements" for the identification of specific railway track bed features are "calculated" from 3D

19

1   elevation data of a 3D track elevation map as the gradient neighborhood is "mov[ed]

2   like a sliding window over the 3D elevation data." '293 Patent, 10:21-35 (discussing

3   rail head detection), 11:12-25, 11:45-63 (rail base detection), 13:15-26, 13:49-61 (rail

4   weld detection), 14:18-27, 15:23-35 (planar regions and bounding boxes), FIGS. 5-6,

5   7-8, 12-13, 18. Annotated FIG. 12 below demonstrates an example of the processor

6   defining an appropriate gradient neighborhood 122 (red) representing a small 2D track

7   section over which differential vertical measurements suitable for detecting rail welds

8   120 (green) are calculated, and the gradient neighborhood 122 is moved like a sliding

9   window over the 3D elevation data (red/yellow) of the 3D track elevation map. '293

10  Patent, 13:15-21, 13:51-62.



FIG. 12

21      44.     In my opinion, UL-TRB2014's "Sobel kernels" are unsurprisingly not

22  defined or applied this way. Sobel operators are unsophisticated, fixed, and limited size

23  operators typically used to detect sharp changes in intensity between pixels of two-

24  dimensional intensity images. In addition, applying a Sobel operator to 3D elevation

25  data would not provide meaningful 3D elevation gradients in the general case because

26  the Sobel operator would produce too much noise, have problems with corners,

27  localization issues, and require extensive tuning with threshold parameters rendering

28  the extraction of edges problematic. To provide some reasoning, look at the case of 3D

elevation data which often contains many fine elevation variations (resulting in small intensity changes in the image). Applying the Sobel operator will yield noisy results that render the extraction of edges problematic. I note that even UL-TRB2014 recognizes the Sobel kernel's deficiencies and relies on additional methods and modules to extract feature image information—and even then, the extracted image includes "discontinuities." Ex. 10 at 422. UL-TRB2014's additional referenced Canny operator has similar drawbacks including, for example: (i) a large number of parameters requiring tuning based on the type of images involved, (ii) localization issues due to the Gaussian smoothing, and (iii) problems with corners and junctions. UL-TRB2014 also talks about a "Blob Coloring module" which is a region-based method for segmentation. In sum, UL-TRB2014 highlights the use of a variety of computer vision tools to reach its objectives since all of them (either individually or together) fail to produce satisfactory results, especially when one considers the challenging domain of railway track inspection.

45.    In my opinion, the "Sobel kernel[]" discussed in UL-TRB2014 cannot equate with the defined "appropriate gradient neighborhood" for the additional reason that they are not applied to calculate differential vertical measurements from 3D elevation data of a 3D track elevation map. Instead, as demonstrated below by Pavemetrics' own 2013 evidence (Ex. 26) relied on by Pavemetrics as describing its use of a Sobel filter (*see* ECF 37, citing Ex. 26, 105, 110; Ex. 10 (UL-TRB2014), 422), any rail head edge calculations are made with respect to intensity data of a 2D profile (see orange and purple boxes) of an individual scan line of the railway track bed, not 3D elevation data of a 3D track elevation map, as shown above in annotated FIG. 12 of the '293 patent. Ex. 26, 113 (annotated).  *See also* Ex. 10, 427 (discussing collection and analysis of UL-TRB2014's "rail profiles.").

///

///

///



46. Accordingly, for these reasons, in my opinion, UL-TRB2014 does not anticipate claim 1 of the '293 patent.

47. I also disagree with Pavemetrics' and Dr. Frakes' assertion that "[a]t a minimum, [UL-TRB2014] shows the claimed invention would have been obvious." ECF 37, 14. In my opinion, Dr. Frakes' discussion in paragraphs 126-129 adds nothing to the fact that UL-TRB2014's unsophisticated "Sobel kernels" do not equate with the claimed gradient neighborhood, as I discuss above. Thus, in my opinion, UL-TRB2014 does not anticipate or render obvious claim 1 of the '293 patent.

**2.     Pavemetrics §273 Defense**

48.     I have also been asked to respond to Mr. Laurent's opinions that any Pavemetrics' commercial inspection systems have continuously practiced every element of claim 1 since at least one year prior to the '293 patent's February 2015 effective filing date. I have reviewed paragraphs 17-18 of John Laurent's declaration, and exhibits 17 and 18. In my opinion, exhibits 17 and 18 do not disclose or suggest how any of Pavemetrics' commercial inspection systems have continuously practiced every element of claim 1. And to the extent Pavemetrics relies on UL-TRB2014 as purportedly describing operation of any of its prior use commercial systems, in my

1  opinion, that argument would fail for the same reasons I discuss above, i.e., that UL-

2  TRB2014 does not anticipate claim 1.

3           **3.      Infringement of Pavemetrics' LRAIL**

4           49.     As discussed in Tetra Tech's opening brief and supported by the testimony

5  of Dr. Mesher, I agree that Pavemetrics' LRAIL executes the claimed algorithmic steps

6  including defining an appropriate gradient neighborhood. As shown below (left) in non-

7  annotated FIG. 17 (Ex. B, 41-42), the LRAIL defines an appropriate gradient

8  neighborhood representing a small 2D track section (red rectangle), over which

9  differential vertical measurements for the identification of specific track bed features

10 (e.g., anchors) are calculated from 3D elevation data of a 3D track elevation map, and

11 the neighborhood is moved like a sliding window over the 3D elevation data. I note that

12 the neighborhoods shown below (left) in FIG. 17 are similar to neighborhoods 122 (red)

13 shown below (right) in annotated FIG. 12 of the '293 patent.



14

15

16

17

18

19

20

21

22

23          50.     In opposition, Pavemetrics argues that "Exhibit B uses template matching

24 to detect fasteners and anchors." ECF 37, 12. But, in my opinion, Pavemetrics ignores

25 the fact that gradient neighborhood calculations occur in furtherance of, and/or in

26 parallel with template matching feature identification. Pavemetrics' own evidence

27 confirms the practice of using more than one and/or parallel feature detection methods.

28 *See, e.g.*, Ex. 27, 130 (discussing identifying existing fastener models before applying

1  template matching); Ex. 10, 422 (UL-TRB2014 appreciating use of more than one

2  detection method); Ex. 26, 105.

3       51.    Pavemetrics also argues that Exhibit B "reflects use of an LRAIL system

4  in 2017, two years before the '293 patent issued," and that "Pavemetrics significantly

5  changed how LRAIL processes data in 2019, when it switched to detecting missing

6  features by using deep neural networks ["DNNs"]. … [DNNs] do not use gradient or

7  any other neighborhood operator programmed by Pavemetrics."), ECF 37, 11. In my

8  opinion, Pavemetrics and Dr. Frakes ignore the fact that DNNs, by their nature, require

9  gradient neighborhood calculations. Deep learning methodologies involve gradient-

10 based processing at their lowest levels to build up at higher levels more complex

11 features. Without this information, the neural networks would fail to produce the

12 desirable recognition outcomes. Thus, it is my opinion that gradient neighborhood

13 calculations occur in furtherance of, and/or in parallel with DNN.

14      52.    I declare under penalty of perjury under the laws of the United States that

15 the foregoing is true and correct. Executed this 5th day of April 2021.

16

17

18                                          _____

19                                               Nikos Papanikolopoulos, Ph.D.

20

21

22

23

24

25

26

27

28