1
2
3
4
5
6
7
8                       UNITED STATES DISTRICT COURT

9                      CENTRAL DISTRICT OF CALIFORNIA

10   Pavemetrics Systems, Inc.,              Case No. 2:21-cv-01289-MCS-MAA
11                                            REDACTED
            Plaintiff,                       **ORDER DENYING MOTION FOR**
12                                            **PRELIMINARY INJUNCTION [17]**
13            v.

14   Tetra Tech, Inc.,

15
            Defendant.
16

17
     Tetra Tech, Inc.,
18
19          Counterclaim Plaintiff,

20   Tetra Tech TAS Inc.,
21
            Third-Party Counterclaim
22          Plaintiff,
23
24   v.

25   Pavemetrics Systems, Inc.,

26
            Counterclaim Defendant.
27

28

Defendant and Counterclaimant Tetra Tech, Inc. and Third-party Counterclaimant Tetra Tech TAS Inc. (collectively, "Tetra Tech") move for a preliminary injunction enjoining Plaintiff Pavemetrics Systems, Inc. ("Pavemetrics") from importing, using, and selling its "Laser Rail Inspection System" ("LRAIL") products. ("Mot.," ECF Nos. 17, 30 (sealed version).) Pavemetrics filed a response. ("Opp.," ECF No. 37.) Tetra Tech filed a reply. ("Reply," ECF No. 46.)

The Court deems this matter appropriate for decision without oral argument. *See* Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15. The Court takes off calendar the hearing set for April 19, 2021. For the following reasons, the Court **DENIES** the motion for preliminary injunction.[1]

## I.   BACKGROUND

### A.   Tetra Tech's Background

Founded in 1966, Tetra Tech, Inc. provides "worldwide consulting and engineering products and services" to "help clients address their water, environment, infrastructure, transportation, resource management, energy, and international development challenges." (*See* "Answer," ECF No. 12 ¶ 12; "Keyes Decl.," ECF No. 30-1 (sealed) ¶ 2.) Tetra Tech, Inc. has "20,000 associates in 450 worldwide offices[.]" (*See* Answer ¶ 12.) "Tetra Tech TAS Inc., a subsidiary of Tetra Tech, Inc., provides a complete range of innovative products and services in the railroad transportation sector." (*See id*.) To address various needs for railway track inspection, Tetra Tech began developing an "innovative three-dimensional track assessment system ('3DTAS')" "around 2015," which provides "a robust and reliable system for quickly

---

[1] Portions of the briefs were filed under seal. Within seven days of the issuance of this Order, the parties shall file a joint statement as to whether any matter stated in this Order is information that one or more contend should remain under seal. Thereafter, a determination will be made as to whether any portions of this Order should be redacted in the version filed on the public docket, with a corresponding, non redacted version filed under seal.

and accurately identifying railway track features and associated measured parametric data at high speeds[.]" (*See id.* ¶¶ 13–15; Opp. at 9; Keyes Decl. ¶ 33.) "Tetra Tech primarily marketed its 3DTAS through a product called RailAI™, an unmanned, fully autonomous real-time track inspection platform." (Opp. at 9; Keyes Decl. ¶ 35).

### B.    The '293 Patent

On February 20, 2015, Tetra Tech, Inc. filed Provisional Application No. 62/118,600 ("the Provisional Application"). On May 29, 2015, Tetra Tech, Inc. filed a non-provisional application claiming priority to the Provisional Application that eventually issued as the '293 Patent. The '293 Patent, titled "3D Track Assessment System and Method" issued on July 23, 2019 and generally relates to "railway track inspection and assessment systems." '293 Patent at 1:16–17. According to the '293 Patent, the claimed invention provides "a robust and reliable system for analyzing and processing data collected during and/or after a high speed assessment of a railway track" and "is able to quickly and accurately identify railway track features and associate measured parametric data with those features." '293 Patent at 1:49–54. Claim 1 of the '293 Patent recites:

> 1.    A system for assessing a railway track bed, the system comprising:
>
> a power source;
>
> a light emitting apparatus powered by the power source for emitting light energy toward a railway track;
>
> a data storage apparatus in communication with at least one processor;
>
> at least one sensor for sensing reflected light that was emitted from the light emitting apparatus and acquiring three dimensional surface elevation and intensity image data of the railway track to be stored in the data storage apparatus, wherein the at least one sensor is in communication with the at least one processor; and

wherein the at least one processor is configured to run an algorithm for processing three-dimensional surface elevation and intensity data gathered from the at least one sensor and saved in the data storage apparatus, the algorithm comprising the steps of:

a. acquiring three dimensional surface elevation and intensity data representative of an area segment of railway track bed;

b. generating a track elevation map based on the acquired three dimensional data;

c. identifying a railway track bed feature from the track elevation map further including the steps of:

i. defining an appropriate gradient neighborhood representing a small 2D track section over which differential vertical measurements are calculated and

ii. moving the gradient neighborhood like a sliding window over the 3D elevation data using the processor; and

d. storing information corresponding to the identified railway track bed feature in the data storage apparatus.

'293 Patent, Claim 1.

Figure 1 of the '293 Patent (reproduced below) "shows a basic embodiment of a three-dimensional (3D) railway track assessment system ('3DTAS') **10** including a processor **12** in communication with a light line projector **14** (e.g., a laser) and one or more 3D sensors **16** for detecting light from the light line projector **14** that is reflected from a railway track bed":



FIG. 1

'293 Patent at Fig. 1, 8:64–9:2. "The sensors **16** detect elevation and intensity data and the data is stored in a data storage apparatus **18** in communication with the processor **12**," *Id.* at 9:2–5. A set of sensors **16A** and **16B** may be used "for both rails [on a railway track bed] to provide a full elevation and intensity profile of the full width of a railway track bed[,]" called a "3D elevation maps." *Id.* at 9:15–21.

Figure 3 of the '293 Patent (reproduced below) "shows a cross-sectional view of a rail and associated parts":



FIG. 3

*Id*. at Fig. 3, 6:62–63. The '293 Patent further explains that "rails include rail heads **22** (normally the highest elevation in the track bed structure), joint bars **24** (for jointed rail sections of track), and the rail base **26** as shown for example in Fig. 3." *Id*. 9:37–40. According to the '293 Patent, "Once a rail head has been identified and located, the search regions for the other rail components and features can be efficiently minimized based on proximity to the rail head." *Id*. at 9:40–43.

### C.  Pavemetrics's Background

Pavemetrics, a Canadian company with 22 employees located in Quebec, was founded in 2009 as an effort to commercialize technology developed at Canada's National Optics Institute ("INO"), an industrial technology research center. (*See* Opp. at 3–4; "Laurent Decl.," ECF No. 33 ¶¶ 3, 5, 13, 65; "Compl.," ECF No. 1 ¶ 1 (under Section II).) Specifically, INO developed the "Laser Rut Measurement System" ("LRMS"), a system for measuring ruts in the road using "3D laser triangulation," which the INO first sold in 2001. (*See* Opp. at 3 (stating that "3D laser triangulation" "captures 3-dimensional measurements by pairing a laser light with a camera sensor to create a triangle with a target or surface to be scanned"); Laurent Decl. ¶¶ 11–12.)

In order to broaden the applications of its "3D laser triangulation technology," INO began working on the "Laser Crack Measurement System" ("LCMS") "around 2002." (*See* Opp. at 3; Laurent Decl. ¶ 12.) At least initially, the LCMS used "3D laser profilers" mounted on a vehicle to detect cracks in a road as the vehicle traveled along the road. (*See* Opp. at 4 (explaining that the "3D laser profilers consist[] of two high-speed camera sensors and line lasers placed at the rear of the vehicle"); Laurent Decl. ¶¶ 9, 13; "Exhibit 11," ECF No. 31-11 (J. Laurent et. al, *Implementation and validation of a new 3D automated pavement cracking measurement equipment* (undated)) at 423–433.)

In 2012, Pavemetrics started to advertise the LCMS for rail inspection and first sold its LCMS in the United States to the University of Massachusetts ("UML"). (*See*

Opp. at 5; Laurent Decl. ¶¶ 17, 19–23; "Exhibit 16," ECF No. 33-1 (09/27/2012 invoice for the LCMS); "Exhibit 19," ECF No. 33-4 at 59.) On January 15, 2013, UML submitted a report describing how it purchased "two 3D laser profilers" from Pavemetrics to develop "An Automated System for Rail Transit Infrastructure Inspection." (*See* "Exhibit 25," ECF No. 33-10 at 77, 86.)

"In 2014, Pavemetrics rebranded its LCMS technology for inspecting railway tracks under the name 'Laser Rail Inspection System'" ("LRAIL"). (*See* Opp. at 7; Laurent Decl. ¶¶ 40–41, 43 (*citing* "Exhibit 34," ECF No. 33-19; "Exhibit 35," ECF No. 33-20; "Exhibit 36," ECF No. 33-21).) Reproduced below is a photo of the mounted LRAIL:



("Exhibit F," ECF No. 17-7 (*Extended Field Trials of LRAIL for Automated Track Change Detection*, Federal Railroad Administration (Final Report Apr. 2020)) at 1.) Since then, Pavemetrics has continued to market and sell the LRAIL. (*See generally* Opp. at 7; Laurent Decl. ¶¶ 45, 47–54.) Beginning in 2018, however, "Pavemetrics started developing AI-based deep learning algorithms using convolutional neural networks[,]" which would "gradually replace the more traditional template-based fastener and anchor detection techniques." (*See* Laurent Decl. ¶ 51.) Since at least

mid-2019, the LRAIL has used these "convolutional" or "deep" neural networks "to identify defects in railway tracks[.]" (*See* Opp. at 7; Laurent Decl. ¶¶ 52–54 (*citing* "Exhibit K," ECF No. 17-12; "Exhibit L," ECF No. 17-13); *see also* Exhibit F (detailing use of LRAIL with deep neural network from Sept. 13, 2018 to Dec. 31, 2019); "Exhibit G," ECF No. 17-8 (presentation by Railmetrics titled "LRAIL Deep Neural Network Railway Inspection and Change Detection" listing "Timeline" as "May 2019 → October 2020 (live)").)

### D.   Actions Leading to This Suit

---

[2] Neither party defines what a "Class I" railroad company is.

5    On January 5, 2021, Tetra Tech sent a letter to Pavemetrics accusing the LRAIL

6    of infringing at least Claim 1 of the '293 Patent, citing Pavemetrics's recent sale of the

7    LRAIL to CSX. (*See* Compl. ¶¶ 6–7 (*citing* ECF No. 1-1, Ex. B).) After a series of

8    letters exchanged by the parties, Pavemetrics filed the present suit on February 11,

9    2021 seeking a declaratory judgment that it does not infringe the '293 Patent or that it

10   has a complete defense to any infringement under 35 U.S.C. § 273. (*See generally id.*)

11   On March 3, 2021, Tetra Tech filed its Answer along with a counterclaim alleging that

12   Pavemetrics infringes "at least Claims 1, 15, 16, 19-22, 36, 37, and 40-42 of the '293

13   patent by bidding and contracting for, offering to sell, selling, using, testing, and

14   importing the LRAIL in the United States." (*See* Answer ¶ 29.) The same day, Tetra

15   Tech moved for a preliminary injunction enjoining Pavemetrics from importing,

16   using, and selling its "Laser Rail Inspection System" ("LRAIL") products. (*See*

17   *generally* Mot.)

18   **II.   LEGAL STANDARDS**

19

20   A preliminary injunction is an "extraordinary remedy." *Winter v. Nat. Res. Def.*

21   *Council, Inc.*, 555 U.S. 7, 22 (2008). As such, in patent cases like in other cases, "[a]

22   plaintiff seeking a preliminary injunction must establish that he is likely to succeed on

23   the merits, that he is likely to suffer irreparable harm in the absence of preliminary

24   relief, that the balance of equities tips in his favor, and that an injunction is in the public

25   interest." *Id.* at 20. "Furthermore, a patentee must establish a causal nexus between the

26   infringement and the alleged harm." *Luminara Worldwide, LLC v. Liown Elecs. Co.*,

27   814 F.3d 1343, 1352 (Fed. Cir. 2016).

28   "With regard to the first factor—establishing a likelihood of success on the

merits—the patentee seeking a preliminary injunction in a patent infringement suit must show that it will likely prove infringement, and that it will likely withstand challenges, if any, to the validity of the patent." *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2009). "If the accused infringer 'raises a substantial question concerning either infringement or validity,' then the patentee has not established that it is likely to succeed on the merits, and a preliminary injunction is not appropriate." *LifeScan Scotland, Ltd. v. Shasta Techs., LLC*, 734 F.3d 1361, 1366 (Fed. Cir. 2013).

Additionally, when considering the *Winter* factors, a preliminary injunction may only be awarded "upon a clear showing" of evidence that supports each relevant preliminary injunction factor. *Winter*, 555 U.S. at 22. "This 'clear showing' requires factual support beyond the allegations of the complaint, but the evidence need not strictly comply with the Federal Rules of Evidence." *CI Games S.A. v. Destination Films*, No. 2:16-CV-05719-SVW (JCx), 2016 WL 9185391, at *11 (C.D. Cal. Oct. 25, 2016) (citing *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)).

## III. DISCUSSION

### A. Likelihood of Success on the Merits

#### a. Legal Framework

Under the first preliminary injunction factor, likelihood of success on the merits, Tetra Tech must "prove that success in establishing infringement is more likely than not." *Trebro Mfg., Inc. v. Firefly Equipment*, LLC, 748 F.3d 1159, 1166 (Fed. Cir. 2014) (internal quotation marks and citation omitted). As part of this analysis, if Pavemetrics "raises a substantial question concerning either infringement or validity, *i.e.*, asserts an infringement or invalidity defense that the patentee cannot prove lacks substantial merit, the preliminary injunction should not issue." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001) (internal quotation marks omitted); *see also Abott Labs. v. Andrx Pharmas., Inc.*, 473 F.3d 1196, 1201 (Fed. Cir. 2007).

**b.  Claim Construction**

"To determine likelihood of success on the patent infringement issue, the court may construe disputed claim language as a matter of law." *Sofamor Danek Grp., Inc. v. DePuy-Motech, Inc.*, <u>74 F.3d 1216, 1220</u> (Fed. Cir. 1996). "The court then determines whether the accused device is likely to fall within the scope of the claims." *Id.* The "words of a claim are generally given their ordinary and customary meaning." *Phillips v. AWH Corp.*, <u>415 F.3d 1303, 1312</u> (Fed. Cir. 2005) (quotation marks omitted). The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention[.]" *Id.* at 1313. "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

According to Tetra Tech, "Claim 1 of the '293 patent does not require construction because it uses clear terms that should be accorded their plain and ordinary meaning." (*See* Mot. at 14.) Pavemetrics does not explicitly seek a construction of any term in Claim 1 of the '293 Patent, but highlights that Tetra Tech offers no construction for the "gradient neighborhood" limitations added during prosecution. (*See* Opp. at 11.) Because Pavemetrics's non-infringement defense depends on the meaning of the term "gradient neighborhood," the Court looks to the intrinsic evidence to construe this term.

The '293 Patent defines a "neighborhood" as a "zone of limited area." '293 Patent at 9:50–54. Figure 5, reproduced below, "shows an image including rails and ties and a sliding neighborhood [**30**] used for track bed analysis":

1
2
3
4
5
6
7
8



FIG. 5

9  '293 Patent, Fig. 5, 6:66–67. The '293 Patent states that the claimed invention detects
10  the rail head of a railway track bed "based on the detection of significant (large vertical
11  component) longitudinal edges over a 2D area." *See id*. at 9:44–46. The '293 Patent also
12  discloses that the edge analysis for 3DTAS "calculates 3D gradient measures over [a
13  neighborhood (for example neighborhood **30** in Figure 5)] that is applied in a sequential
14  sliding and exhaustive fashion over the entire region to be processed." *See id*. at
15  9:46–56.

16      Similarly, with regard to the "processing steps for the 3DTAS rail head edge
17  detection" in Figure 6, the '293 Patent discloses that "[a]n appropriate gradient
18  neighborhood, is defined for vertical raid head edge features." *See id*. at 10:21–22,
19  10:26–28. The '293 Patent explains that "[t]his rail head edge neighborhood represents
20  a small 2D track bed surface area over which differential vertical measurements are
21  calculated" and "is moved like a window sequentially and completely for each position
22  in the [3D] railway track bed elevation data[.]" *See id*. at 10:28–35. According to the
23  '293 Patent, a similar technique is used to detect the "rail base edges." *See id*., Fig. 8,
24  11:12–17; 11:45–63.

25      Claim 1 of the '293 Patent recites "defining an appropriate gradient neighborhood
26  representing a small 2D track section over which differential vertical measurements are
27  calculated." *Id*., Claim 1. This matches the description of the "gradient neighborhood"

28

in the specification, *i.e.*, "a small 2D track section over which differential vertical measurements are calculated." Further, although this limitation may have been added to distinguish the cited prior art references during the prosecution of the '293 Patent, the applicant's remarks do not further narrow the term "gradient neighborhood." (*See* "Prosecution History," ECF No. 31-2 at 116.)

Accordingly, the Court declines to construe the term "gradient neighborhood."

### c. Infringement

"To show literal infringement of a patent, a patentee must supply sufficient evidence to prove that the accused product or process meets every element or limitation of a claim." *Rohm & Haas Co. v. Brotech Corp.*, 127 F.3d 1089, 1092 (Fed. Cir. 1997).

Tetra Tech and Tetra Tech TAS Inc.'s Chief Technical Officer Dr. Darel Mesher provide an element-by-element infringement analysis explaining how the accused LRAIL product infringes Claim 1 of the '293 Patent. (*See* Mot. at 15–20; "Mesher Decl.," ECF No. 17-1 ¶¶ 14–23.) Specifically regarding the "moving the gradient neighborhood like a sliding window over the 3D elevation data using the processor" limitation, Tetra Tech and Dr. Mesher identify the "region of interest" ("ROI") as the "gradient neighborhood." (*See* Mot. at 19; Mesher Decl. ¶ 21 (*citing* "Exhibit B," ECF No. 17-3 at 41–42).) They also assert that "the ROI gradient neighborhood is moved like a sliding window over the 3D elevation data using the processor in order to identify track features[.]" (*See id.*)

Pavemetrics responds that the only support Tetra Tech relies on for the "gradient neighborhood" limitations "reflects use of an LRAIL system in 2017, two years before the '293 patent issued." (*See* Opp. at 11 (*citing* Exhibit B at 27 (explaining that the research performed under the contract was between "March and December 2017")).) According to Pavemetrics, it "significantly changed how LRAIL processes data in 2019, when it switched to detecting missing features using deep neural networks." (*See* Opp. at 11 (*citing* ECF Nos. 17-4 – 17-13).) Pavemetrics and its expert Dr. David Frakes

highlight Figure 3 of Exhibit L to show how the "deep neural network" is currently integrated in the LRAIL:



(*See* Opp. at 7; "Frakes Decl.," ECF No. 32 ¶ 107 (*citing* "Exhibit L," ECF No. 17-13 at 244).) Dr. Frakes explains that "a deep neural network develops its own neighborhood operators and does not utilize gradient or any other neighborhood operators programmed by Pavemetric[,]" "[n]or would [it] be expected to use a moving gradient neighborhood to calculate differential vertical measurements." (*See* "Frakes Decl.," ECF No. 32 ¶ 107.)

Pavemetrics also argues that even if its current LRAIL systems used the technology described in Exhibit B to detect features, Exhibit B is "too general and vague" to meet the "moving the gradient neighborhood like a sliding window over the 3D elevation data using the processor" limitation recited in Claim 1. (*See* Opp. at 12.) As Pavemetrics and Dr. Frakes explain, from 2013 to 2017 the LRAIL used various forms of "template matching," "an approach used in computer vision to compare one image (the template) to another image to determine if the two match," to detect the fasteners and anchors as shown in Exhibit B. (*See* Opp. at 12; Frakes Decl. ¶ 102; *see also* Laurent Decl. ¶ 50 ("The fastener and anchor change detection illustrated in Exhibit B used a 3D template-matching approach to detect fasteners and anchors.").) Dr. Frakes further explains that the ROIs identified by Tetra Tech are not used to calculate "differential vertical measurements" and do not "slide" as recited in Claim 1. (*See*

Frakes Decl. ¶¶ 97–103 (*citing* Exhibit B at 41 ("Each ROI is then inspected for the presence of fasteners using a three-dimensional model."), 42 ("For change detection of anchors, each ROI was inspected for the presence of anchors using a 3-dimensional model …")).)

By contrast, Pavemetrics asserts that the LRAIL used either a "Sobel filter" or "the Canny method" to detect rail edges. (*See* Opp. at 5 (*citing* Laurent Decl. ¶¶ 34–35; "Exhibit 10," ECF No. 31-10 at 422), 12 (*citing* "Exhibit 26," ECF No. 33-11 at 105, 110); *see also* Frakes Decl. *¶¶* 48–50 (explain how a "Sobel filter" works), 52–56 (explaining how the "Canny method" works).) Thus, Pavemetrics asserts that Tetra Tech's infringement analysis is flawed because "it is unknown which algorithm is the basis of the infringement claim." (*See* Opp. at 12.)

Additionally, Pavemetrics argues that the LRAIL has used the Sobel filter to detect rails since 2012. (*See* Opp. at 12 (*citing* Laurent Decl. ¶ 18; Exhibit 10 at 422, 427; "Exhibit 18," ECF No. 33-3 at 39).) Thus, to the extent the Sobel filter meets the "moving the gradient neighborhood like a sliding window over the 3D elevation data using the processor" limitation recited in Claim 1, Pavemetrics asserts that it is shielded from liability under the "prior-use" statute. (*See* Opp. at 13 (*citing* 35 U.S.C. § 273).)

Tetra Tech replies that Pavemetrics's "prior-use" defense fails because neither the "Sobel filter" nor the "Canny method" meet the "appropriate gradient neighborhood" limitation as "they are not applied to calculate differential vertical measurements from 3D elevation data of a 3D track elevation map." (*See* Reply at 3–5.) Tetra Tech describes the Sobel operators as "unsophisticated, fixed, and limited size operators typically used to detect sharp changes in intensity between pixels of two-dimensional intensity images." (*See id*. at 3 (*citing* "Nikos Decl.," ECF No. 46-1 ¶ 44).) According to Tetra Tech, Pavemetrics's evidence shows that the LRAIL used Sobel filters to detect rail head edges by making calculations "with respect to intensity data of a 2D profile … of an individual scan line of the railway track bed, not 3D elevation data of a 3D track elevation map[.]" (*See* Reply at 3–4.) Tetra Tech also asserts that

1  Pavemetrics's "§ 273 defense fails because it allegedly abandoned practicing the
2  claimed invention" when it switched to using deep neural networks. (*See id*. at 5.)

3       Regarding Pavemetrics's assertion that the LRAIL now uses deep neural
4  networks instead of the accused ROIs, Tetra Tech responds that Pavemetrics only relies
5  on "conclusory and unsupported opinions." (*See id*. at 6.) Tetra Tech highlights
6  Pavemetrics's Vice President of Business Development and Chief Technology Officer,
7  Mr. John Laurent's testimony that "LRAIL's change to [deep neural networks] would
8  be gradual and would continue to use other detection techniques." (*See id*.) Thus, Tetra
9  Tech argues that Pavemetrics has not shown that its LRAILs have discontinued to use
10 the accused ROIs. Finally, Tetra Tech argues that these deep neural networks "by their
11 very nature, require gradient neighborhood calculations … at their lowest levels to build
12 up at higher levels more complex features." (*See id*. (*citing* Nikos Decl. ¶ 51).)

13      Pavemetrics has shown that there is a substantial question regarding
14 infringement. The Court agrees with Pavemetrics that there is no evidence that the "deep
15 neural network" incorporated into the current LRAIL meets the "moving the gradient
16 neighborhood like a sliding window over the 3D elevation data using the processor"
17 limitation recited in Claim 1. Tetra Tech only cites the references to the ROI in Exhibit
18 B for this limitation, which are entirely absent from any of the material discussing the
19 LRAIL incorporating the "deep neural network." Further, there is no evidence that the
20 LRAIL incorporating the "deep neural network" includes a "gradient neighborhood" or
21 "moving a gradient neighborhood like a sliding window."

22      Tetra Tech argues that Pavemetrics has not shown that the LRAILs incorporating
23 deep neural networks do not infringe, but it is Tetra Tech's burden to prove the
24 likelihood of its success on its infringement claim. To support its claim, Tetra Tech only
25 cites its expert Dr. Nikos Papanikolopoulos testimony that "[d]eep learning
26 methodologies involve gradient-based processing at their lowest levels to build up at
27 higher levels more complex features." (*See* Reply at 6 (*citing* Nikos Decl. ¶ 51).) But
28 Dr. Papanikolopoulos provides no evidentiary support for his conclusion and does not

1  address whether this "gradient-based processing" uses gradient neighborhoods to

2  calculate "differential vertical measurements" or moves these gradient neighborhoods

3  "like a sliding window over the 3D elevation data." (*See* Nikos Decl. ¶ 51.) Tetra Tech's

4  attorney argument and conclusory expert testimony are insufficient to prove that Tetra

5  Tech is likely to succeed on its infringement claim.

6      The Court also agrees with Pavemetrics and Dr. Frakes that to the extent

7  Pavemetrics uses ROIs to detect railway features, there is no evidence that the ROIs

8  identified "move[] … like a sliding window over the 3D elevation data" as Claim 1

9  requires. Tetra Tech's employee Dr. Mesher asserts that Pavemetrics's public

10 information shows that "the ROI gradient neighborhood is moved like a sliding window

11 over the 3D elevation data using the processor in order to identify track features, such

12 as, for example, a fastener … or an anchor," citing Exhibit B. (*See* Mesher Decl. ¶ 21.)

13 Tetra Tech's expert Dr. Papanikolopoulos similarly cites to Exhibit B for this limitation.

14 (*See* Nikos Decl. ¶ 49.) But  neither declarant explains where in Exhibit B this is shown.

15 As Dr. Frakes explains, Exhibit B states that the "fastener change detection" process

16 "first detects the ties and rails, then defines four regions of interest (ROI) *at each*

17 *intersection* (two on the gauge side and two on the field side). (*See* Frakes Decl. ¶ 100;

18 Exhibit B at 41 (emphasis added).) Thus, instead of showing that the ROI is moved

19 "like a sliding window," Exhibit B only suggests that the LRAIL creates separate ROIs

20 and inspects each individually.[3]

21     Finally, the Court agrees with Pavemetrics that to the extent its LRAIL infringes

22 Claim 1 of the '293 Patent, Pavemetrics is shielded from liability under 35 U.S.C. §

23 273. Section 273 creates a prior-user defense for a defendant that "commercially used"

24

25 _____

26 [3] Exhibit B does suggest that the ROI is used to calculate "differential vertical
   measurements," however. Specifically, in describing the "spike change detection"
27 process, Exhibit B states that "average spike height was reported for each ROI" and
   that process detected "the raising and lowering of spikes" when compared "against the
28 3-dimensional model for a genuine spike[.]" (*See* Exhibit B at 39–40.)

a claimed "process" or "machine, manufacture, or composition of matter used in a manufacturing or other commercial process" "at least 1 year" before the earlier of the effective filing date of the claimed invention or a previous disclosure thereof. § 273. Pavemetrics has shown that it "commercially used" the claimed "system for assessing a railway track bed" over a year before the February 20, 2015 effective filing date for the '293 Patent.[4]

Pavemetrics provided evidence that its LRAIL has been the same materially since at least 2013 when it was still branded as the LCMS. UML and the U.S. Department of Transportation released a "2nd Quarterly Report for Project Titled 'An Automated System for Rail Transit Infrastructure Inspection'" dated January 15, 2013 describing the work completed on the project from October 1, 2012 to December 31, 2012. (*See* Exhibit 25 at 77.) Tasks 10 and 11 of the report describe the use of the LCMS to "collect laser data" and "develop algorithms and software tools to interpret 3D laser data." (*See id*. at 86–91.) Under Task 11, the report states that the "research work completed during this period mainly deal with the detection and recognition of rails in order to" identify ROIs to detect ties and fasteners, that the LCMS used "a differential operator-based edge detector," and that the LCMS used "a template-matching algorithm to pinpoint features of interest" and "relies on the computation of cross-correlation image between templates and rail data." (*See id*. at 89–91.) Further, a presentation at the Transportation Research Board (TRB) 93rd Annual Meeting, dated January 12–15, 2014, describes using the LCMS for track inspection and feature detection based on range and intensity data and using "Sobel kernels … applied for edge detection[,]" "[t]he Canny method … applied in order to extract the rail head contour[,]" and identifying ROIs "to detect and recognize … tie-plates and fasteners." (*See* Exhibit 10.) Thus, Pavemetrics has shown that it is a "prior-user" under § 273 and shielded from liability.

---

[4] Neither party disputes that the effective filing date is the filing date of the Provisional Application, February 20, 2015.

1    Tetra Tech argues that Pavemetrics cannot be a "prior user" because its LCMS
2    "is for pavement inspection, not 'a system for assessing railway track bed,' as recited
3    in claim 1 of the '293 patent." (*See* Mot. at 21 (*citing* Mesher Decl. ¶ 25; ECF No.
4    17-17).) According to Dr. Mesher, Pavemetrics's CEO, Richard Habel, told him that
5    Pavemetrics had no desire to enter the railroad inspection business in 2015. (*See* Mot.
6    at 21; Mesher Decl. ¶¶ 24–25.) Nevertheless, Dr. Mesher's statements are both hearsay
7    and contradicted by the evidence presented above. Tetra Tech also argues that
8    Pavemetrics only recently applied for the trademark "Railmetrics," but the evidence
9    presented shows that the LCMS was already used for railway inspection prior to
10   Pavemetrics's application.

11   Finally, even assuming the Sobel filter and Canny method do not meet the
12   limitations of Claim 1, the evidence shows that over a year before the effective filing
13   date, the LCMS also used ROIs to detect and recognize tie-plates and fasteners just as
14   in Exhibit B. Thus, to the extent Pavemetrics continues to commercially use LRAILs
15   that use ROIs, Pavemetrics would be shielded from liability under § 273.

16   Because substantial questions remain about infringement, Tetra Tech cannot
17   demonstrate a likelihood of success on the merits, and the Court concludes that the
18   preliminary injunction must be denied as to the '293 Patent. *See Novo Nordisk of North*
19   *America, Inc. v. Genentech, Inc*., 77 F.3d 1364, 1371 (Fed. Cir. 1996) ("the clear
20   absence of infringement alone mandates that we vacate the preliminary injunction").

21                              **d.  Invalidity**

22    The Court also finds that Pavemetrics raises a substantial question of invalidity.
23   "A patent is invalid for anticipation if a single prior art reference discloses each and
24   every limitation of the claimed invention." *Schering Corp. v. Geneva Pharm. Inc.*, 339
25   F.3d 1373, 1377 (Fed. Cir. 2003) (internal citation omitted). A patent is invalid for
26   obviousness "if the differences between the subject matter sought to be patented and
27   the prior art are such that the subject matter as a whole would have been obvious at the

28

time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). "[W]here the challenger fails to identify any persuasive evidence of invalidity, the very existence of the patent satisfies the patentee's burden of the validity issue." *Canon Computer Systems, Inc. v. Nu-Kote Intern., Inc.*, 134 F.3d 1085, 1088 (Fed. Cir. 1998). "If the alleged infringer raises a substantial question concerning validity," however, the presumption of validity is rebutted and the preliminary injunction should not issue. *Helifix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1351 (Fed. Cir. 2000).

For the same reasons underlying its "prior-use" defense, Pavemetrics asserts that its LCMS anticipates Claim 1 of the '293 Patent. Specifically, Pavemetrics argues that the Sobel filter includes "the algorithm sub-steps of defining and 'moving the gradient neighborhood.'" (*See* Opp. at 13.) As the Court explained above regarding Pavemetrics's "prior-use" defense, Pavemetrics has demonstrated that it commercially used the LCMS over a year before the effective filing date of the '293 Patent and in a way that anticipates Claim 1 of the '293 Patent under Tetra Tech's theory of infringement.[5] Thus, Pavemetrics has raised a substantial question of invalidity to rebut the presumption of validity.

Because substantial questions remain about invalidity, Tetra Tech cannot demonstrate a likelihood of success on the merits, and the Court concludes that the preliminary injunction must be denied as to the '293 Patent. *See, e.g.*, *Vascular Sols., Inc. v. Bos. Sci. Corp.*, 562 F. App'x 967 (Fed. Cir. 2014) ("too many unresolved issues at this stage of the case," including on "ultimate validity to warrant the grant of a preliminary injunction").

---

[5] Tetra Tech's argument that it was unaware of Pavemetrics's invalidity defense is belied by the fact that it knew of Pavemetrics's "prior-use" defense, which is essentially identical to its invalidity defense.

1

**B.    Remaining Factors**

2

3

Because Pavemetrics has shown that there is a substantial question regarding both

infringement and invalidity, the Court need not address the remaining factors. *See e.g.,*

4

*Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 982 (9th Cir. 2011); *Reebok Int'l Ltd. v.*

5

*J. Baker, Inc.*, 32 F.3d 1552, 1556 (Fed. Cir. 1994) ("we specifically decline today to

6

require a district court to articulate findings on the third and fourth factors when the

7

court denies a preliminary injunction because a party fails to establish either of the two

8

critical factors").

9

10

**IV.    CONCLUSION**

11

The Court **DENIES** the motion for preliminary injunction.

12

13

**IT IS SO ORDERED.**

14

15

Dated: April 15, 2021

16

MARK C. SCARSI
UNITED STATES DISTRICT JUDGE

17

18

19

20

21

22

23

24

25

26

27

28

21