1    Donald Ridge, Esq. (SBN: 132171)
2    **CLARK HILL LLP**
      1055 West Seventh Street, Suite 2400
3    Los Angeles, CA 90017
      Telephone: (213) 891-9100
4    Facsimile: (213) 488-1178
      DRidge@clarkhill.com
5

6
      Aaron L. Parker (*pro hac vice*)
7    aaron.parker@finnegan.com
      Daniel G. Chung (*pro hac vice*)
8    daniel.chung@finnegan.com
9    Nicholas A. Cerulli (*pro hac vice*)      Jency J. Mathew (*pro hac vice*)
      nicholas.cerulli@finnegan.com         jency.mathew@finnegan.com
10   **FINNEGAN, HENDERSON,**        **FINNEGAN, HENDERSON,**
11   **FARABOW, GARRETT &**          **FARABOW, GARRETT &**
      **DUNNER, LLP**                **DUNNER, LLP**
12   901 New York Avenue NW       1875 Explorer Street, Suite 800
13   Washington, D.C. 20001-4413     Reston, Virginia 20190-6023
      Telephone:  (202) 408-4000        Telephone:  (571) 203-2700
14   Facsimile:  (202) 408-4400         Facsimile:  (571) 203-2777
15

16   *Attorneys for Defendant and Counterclaim Plaintiffs*

17               **UNITED STATES DISTRICT COURT**

18              **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 19   PAVEMETRICS SYSTEMS, INC. | CASE NO. 2:21-cv-1289 MCS-MMA |
| 20 | |
| 21             Plaintiff, | **TETRA TECH'S OPENING CLAIM CONSTRUCTION BRIEF** |
| 22      v. | |
| 23   TETRA TECH, INC. | **Honorable Mark C. Scarsi** |
| 24 | **Date: November 15, 2021** |
| 25           Defendant. | **Time: 9:00 a.m.** |
| 26 | **Courtroom: 7C** |
| 27   AND RELATED COUNTERCLAIMS. | |
| 28 | |

1

# **TABLE OF CONTENTS**

2

3    I.      INTRODUCTION ................................................................1

4    II.     OVERVIEW OF THE ASSERTED PATENTS ...........................1

5    III.    LEGAL STANDARDS ........................................................3

6    IV.    MOST SIGNIFICANT DISPUTED CLAIM TERMS OF '293 PATENT ....4

7            A.    "Appropriate Gradient Neighborhood" ................................4

8            B.    "2D Track Section Over Which Differential Vertical

9                  Measurements Are Calculated" ........................................6

10           C.    "Sliding Window" ......................................................8

11           D.    "Moving the Gradient Neighborhood Like a Sliding Window Over

12                 the 3D Elevation Data" ...............................................10

13           E.    "Identifying" ..........................................................12

14           F.    "Is Configured To Run An Algorithm" ...............................14

15           G.    "Comprising The Steps Of:" a, b, c, d ...............................16

16   V.     MOST SIGNIFICANT DISPUTED CLAIM TERMS OF '557 PATENT ..18

17           A.    "Tie Surface Plane Model" ...........................................18

18           B.    "Tie Bounding Box" ...................................................19

19   VI.    ADDITIONAL DISPUTED CLAIM TERMS ...............................20

20           A.    "Track Elevation Map" ('293 Patent) ................................20

21           B.    "Three Dimensional Elevation Map" ('293 Patent)....................22

22           C.    "Small Area" and "Small Length" ('557 Patent)......................23

23   VII.   CONCLUSION .............................................................25

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*Altiris, Inc. v. Symantec Corp.*,
4   318 F.3d 1363 (Fed. Cir. 2003) ............................................................ 16

5

*Am. Med. Sys., Inc. v. Biolitec, Inc.*,
6   618 F.3d 1354 (Fed. Cir. 2010) ............................................................ 21

7

*Cont'l Circuits LLC v. Intel Corp.*,
8   915 F.3d 788 (Fed. Cir. 2019) .............................................................. 4

9

*EcoServices, LLC v. Certified Aviation Servs., LLC*,
   312 F. Supp. 3d 830 (C.D. Cal. 2018) .................................................. 24
10

*Edwards Lifesciences LLC v. Cook Inc.*,
11   582 F.3d 1322 (Fed. Cir. 2009) ............................................................ 4

12

*Elan Microelectronics Corp. v. Apple, Inc.*,
13   2010 WL 4510909, at *1 (N.D. Cal. 2010) .......................................... 12

14

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
15   234 F.3d 558 (Fed. Cir. 2000) .............................................................. 24

16

*Grupo Bimbo, S.A. B. De C.V. v. Snak King Corp.*,
17   2014 WL 12591935, at *1 (C.D. Cal. Dec. 2, 2014) ............................ 23

18

*Hill-Rom Services, Inc. v. Stryker Corp.*,
19   755 F.3d 1367 (Fed. Cir. 2014) ............................................................ 23

20

*Hockerson-Halberstadt, Inc. v. Converse Inc.*,
21   183 F.3d 1369 (Fed. Cir. 1999) ............................................................ 9

22

*i4i Ltd. P'ship v. Microsoft Corp.*,
23   598 F.3d 831 (Fed. Cir. 2010) .............................................................. 11

24

*IGT v. Bally Gaming Int'l, Inc.*,
   659 F.3d 1109 (Fed. Cir. 2011) ......................................................... 8, 9
25

*In re Koninklijke Philips Pat. Litig.*,
26   2020 WL 7392868, at *1 (N.D. Cal. Apr. 13, 2020) ............................ 24

27

*Interactive Gift Exp., Inc. v. Compuserve Inc.*,
28   256 F.3d 1323 (Fed. Cir. 2001) ............................................................ 16

*KCJ Corp. v. Kinetic Concepts, Inc.*,
    223 F.3d 1351 (Fed. Cir. 2000) ..................................................................22, 23

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    358 F.3d 898 (Fed. Cir. 2004) ...........................................................3, 11, 19, 20

*Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*,
    75 F.3d 1545 (Fed. Cir. 1996) ...............................................................................24

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014)................................................................................................24

*Nevro Corp. v. Bos. Sci. Corp.*,
    955 F.3d 35 (Fed. Cir. 2020) ................................................................................16

*Nuance Commun., Inc. v. Abbyy Software House, Inc.*,
    2011 WL 3816908, at *1 (N.D. Cal. Jun. 15, 2011) ..............................................12

*Oatey Co. v. IPS Corp.*,
    514 F.3d 1271 (Fed. Cir. 2008) ......................................................................11, 19

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ..........................................................................3, 4

*Polaris PowerLED Tech., LLC v. VIZIO, Inc.*,
    2019 WL 13043592, at *1 (C.D. Cal. Nov. 26, 2019) ...........................................15

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
    378 F.3d 1396 (Fed. Cir. 2004) .............................................................................13

*Realtime Adaptive Streaming LLC v. Adobe Sys. Inc.*,
    2019 WL 13039644, at *1 (C.D. Cal. July 25, 2019) ............................................15

*Shire Dev., LLC v. Watson Pharm., Inc.*,
    787 F.3d 1359 (Fed. Cir. 2015) ...............................................................................3

*Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*,
    753 F.3d 1291 (Fed. Cir. 2014) ...............................................................................6

*Thorner v. Sony Comp. Entm't Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) ....................................................................passim

*Versa Corp. v. Ag-Bag Int'l Ltd.*,
    392 F.3d 1325 (Fed. Cir. 2004) ......................................................................13, 14

iii

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) ............................................................3, 4, 6

*Wistron Corp. v. Samsung Elecs. Co.*,
  2008 WL 5055545, at *1 (N.D. Cal. Nov. 25, 2008) ..............................15

**Statutes**

35 U.S.C. § 112 ................................................................................................23

## I.   INTRODUCTION

The parties' claim construction disputes present a common question for resolution by the Court—whether extraneous limitations should be read into the claims without any basis to do so in the claims, specifications, or prosecution histories of U.S. Patent Nos. 10,362,293 ("the '293 patent") (Exhibit A) and 10,616,557 ("the '557 patent") (Exhibit B) (collectively, "the Asserted Patents"). The answer is no. Pavemetrics' proposed constructions improperly inject numerous unclaimed limitations that do not reflect the intrinsic evidence and are divorced from the plain language of the claims. The Court should therefore reject Pavemetrics' attempts to rewrite the claims.

By importing additional limitations that ignore the intrinsic evidence and various canons of claim construction, it is difficult to reach any conclusion other than that Pavemetrics' proposed claim constructions are a litigation-derived attempt to avoid infringement by its Laser Rail Inspection System ("LRAIL"). Indeed, Pavemetrics seeks to import additional language into more than 10 claim terms from just the asserted independent claims alone, many of which have commonly understood meanings that need no further construction (e.g., "identifying," "configured to," and "comprising the steps of") or otherwise have concise and clear claim language. But a party cannot rewrite claims to manufacture noninfringement positions under the guise of claim construction. Instead, the goal of claim construction is to properly interpret the meaning of a particular term or phrase in a claim. It is not an opportunity to add extraneous limitations, as Pavemetrics attempts to do here. At bottom, the Court should reject these unsupported and improper constructions and find that no term requires further construction under its plain and ordinary meaning in view of the intrinsic evidence.

## II.   OVERVIEW OF THE ASSERTED PATENTS

The Asserted Patents describe a track inspection system and methods for assessing a railway track bed. '293 patent, 8:64-9:2; '557 patent (same). The inspection system includes a light line projector, such as a laser, for emitting light energy toward a railway track bed, and one or more sensors for sensing light reflected from the railway

1

1   track bed that was emitted from the light line projector and configured to acquire three
2   dimensional surface elevation and intensity data of the railway track bed. '293 patent,
3   8:64-9:5. A track elevation map is then generated based on the acquired elevation and/or
4   intensity data. *Id.*, 7:10-13, 9:17-21, FIGS. 2, 10, 11.

5         The '293 patent claims specific algorithms implemented by the track inspection
6   system to identify railway track bed features from the track elevation map. *Id.*, 9:22-30.
7   For example, the system identifies a feature from the track elevation map by defining
8   an appropriate gradient neighborhood representing a small 2D track section over which
9   differential vertical measurements are calculated and moving the gradient neighborhood
10  like a sliding window over the elevation data of the track elevation map. *Id.*, 10:21-35,
11  11:12-25, 11:45-63, 13:49-14:1, 15:23-35, FIGS. 5-8, 12-13, 18. As the gradient
12  neighborhood is moved like a sliding window over the elevation data, differential
13  vertical measurements are calculated on the elevation data located within the
14  neighborhood to identify various railroad track bed features such as, e.g., rail heads and
15  bases, tie distress, ballast level anomalies, joint bars, and rail base welds. *Id.*

16        The '557 patent is a continuation of the '293 patent and claims additional
17  algorithms implemented by the track inspection system, including algorithms for
18  detecting railroad tie distress and detecting railway track bed features. For example, the
19  '557 patent's railroad tie distress algorithm compares ties in the elevation data with a
20  tie surface plane model, identifies tie surface regions with elevations less than a tie
21  surface plane minus a crack depth threshold as tie crack targets, and determines physical
22  parameters of the crack targets. '557 patent, 17:7-67, FIG. 25. The '557 patent's railway
23  track bed feature detection algorithm tests each of a plurality of railway track bed
24  features in a 3D feature library against feature targets in the elevation data, eliminates
25  feature template matching scores for feature targets which are less than a 3D feature
26  correlation threshold, and calculates and stores physical parameters for a plurality of
27  feature targets. *Id.*, 19:13-20:20, FIG. 33.

28

2

### III.   LEGAL STANDARDS

"[T]he words of a claim are generally given their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). "The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313. "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* Accordingly, claim construction focuses on the intrinsic evidence, which consists of the claims, the specification, and the prosecution history. *Id.* at 1314.

"Quite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.* at 1312. In this regard, "the context in which a term is used in an asserted claim can be highly instructive." *Id.* at 1314. In addition to the claims, the specification "is always highly relevant to the claim construction analysis. Usually it is dispositive." *Id.* at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Shire Dev., LLC v. Watson Pharm., Inc.*, 787 F.3d 1359, 1364 (Fed. Cir. 2015).

As a general rule, however, the particular examples or embodiments discussed in the specification are not to be read into the claims as limitations. *See Thorner v. Sony Comp. Entm't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012) ("We do not read limitations from the specification into claims; we do not redefine words. Only the patentee can do that."); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004) ("[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited."). There are two exceptions to this rule: lexicography and disavowal. *Thorner*, 669 F.3d

3

at 1365. "To act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning" and "clearly express an intent to redefine the term." *Id*. Disavowal requires "a clear and unmistakable disclaimer." *Id*. at 1366-67. The specification must make clear that the invention does not include a particular feature or is limited to a particular embodiment. *See Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1333 (Fed. Cir. 2009).

"[E]xtrinsic evidence, which consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises" is "secondary to the intrinsic evidence." *Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 799 (Fed. Cir. 2019) (quoting *Phillips*, 415 F.3d at 1317). Extrinsic evidence is "less significant than the intrinsic record in determining the legally operative meaning of disputed claim language" and "less reliable" than the intrinsic evidence. *Id.* (quoting *Phillips*, 415 F.3d at 131). While extrinsic evidence may be used "to help the court come to the proper understanding of the claims," "it may not be used to vary or contradict the claim language." *Vitronics*, 90 F.3d at 1584.

## IV.    MOST SIGNIFICANT DISPUTED CLAIM TERMS OF '293 PATENT

### A.    "Appropriate Gradient Neighborhood"

| Disputed Term | Tetra Tech's Construction | Pavemetrics' Construction |
|---|---|---|
| "appropriate gradient neighborhood" (Claims 1, 22) | Plain and ordinary meaning. No further construction by the Court is necessary. | "zone of limited area of predetermined size and shape containing numbers used to calculate railway track bed height change at a certain point, based on the points within the zone" |

The parties' dispute concerns Pavemetrics' proposal to narrow the scope of "appropriate gradient neighborhood" by adding a number of unclaimed limitations, including (1) a zone of "predetermined size and shape," (2) "containing numbers," (3) used to calculate a "height change at a certain point," and (4) the calculations "based on the points within the zone." But there is no basis to impose these limitations, and Pavemetrics' attempt to rewrite the claims should be rejected.

Claims 1 and 22 recite "defining an appropriate gradient neighborhood *representing* a small 2D track section over which differential vertical measurements are calculated." Thus, the plain language of the claims themselves already provides context for and describes the meaning of "appropriate gradient neighborhood" without the need to import additional limitations. And this meaning aligns with the specification's description of "appropriate gradient neighborhood." In an embodiment for rail head edge detection, the specification describes that an "appropriate gradient neighborhood, is defined for vertical rail head edge features," and that this "neighborhood represents a small 2D track bed surface area over which differential vertical measurements are calculated." '293 patent, 10:26-31. Likewise, in an embodiment for detecting rail base edges, the specification describes that an "appropriate gradient neighborhood, is defined for vertical rail base edge features," and this "neighborhood represents a small 2D track bed surface area over which differential vertical measurements are calculated." *Id.*, 11:51-56; *see also id.*, 9:50-54, 12:44-46, 13:49-51, 15:23-25, 29:48-50, FIGS. 5-8, 12-13, and 18. The intrinsic record does not support any further narrowing of "appropriate gradient neighborhood" beyond the language of the claims. Indeed, this outcome is consistent with the Court's previous claim construction analysis of "gradient neighborhood." ECF No. 61, 11-13 (declining to construe "gradient neighborhood" and finding no basis to further narrow the term).

Nevertheless, Pavemetrics seeks to rewrite "appropriate gradient neighborhood" with additional limitations that lack support in the intrinsic record. But nowhere does the specification mandate that "appropriate gradient neighborhood" deviate from the language of the claims and *must*, as Pavemetrics contends: (1) be a zone of "a predetermined size and shape," (2) "contain[] numbers," (3) be used to calculate a "height change at a certain point," and (4) have the calculations "based on the points within the zone." *See Thorner*, 669 F.3d at 1365; Declaration of Dr. Vassilios Morellas (Exhibit H) ("Morellas Decl."), ¶¶40-42. Here, the specification does not even recite the specific language Pavemetrics seeks to inject into the claims. *See Source Vagabond*

*Sys. Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291, 1299 (Fed. Cir. 2014) ("Instead of looking to the words themselves, [appellant] added language without support from the specification or prosecution history, altering otherwise unambiguous claim language, a practice this court has repeatedly rejected").

Any attempt by Pavemetrics to rely on extrinsic evidence is also unavailing. Because the intrinsic record is clear, the Court need not consult the extrinsic evidence, particularly where the extrinsic evidence is used to vary or contradict the claim language. *Vitronics*, 90 F.3d at 1584. The intrinsic record does not reflect the additional limitations Pavemetrics proposes, and Pavemetrics cannot use extrinsic evidence to vary the plain language of the claims. Yet, extrinsic evidence that Pavemetrics itself has identified does not even support its construction. Pavemetrics has identified purported technical publications describing that, in some applications, the neighborhood may "take any shape," and in other applications, the neighborhood is "normally" or "typically" a rectangular shape. Exhibit C, 95; *see also* Exhibit D, 66; Morellas Decl., ¶43. This does not reflect the limitation that the claimed "appropriate gradient neighborhood" *must* be a "predetermined size and shape," as Pavemetrics proposes. Accordingly, the Court should reject Pavemetrics' attempt to unnecessarily import limitations created by Pavemetrics that ignores the plain language of the claims and specification and are not even supported by its own extrinsic evidence.

**B.    "2D Track Section Over Which Differential Vertical Measurements Are Calculated"**

| Disputed Term | Tetra Tech's Construction | Pavemetrics' Construction |
|---|---|---|
| "2D track section over which differential vertical measurements are calculated" (Claims 1, 22) | Plain and ordinary meaning. No further construction by the Court is necessary. | "area of the railway track bed selected for calculating changes in railway track bed height over the area" |

Pavemetrics once again asks the Court to rewrite the claims by altering "2D track section over which differential vertical measurements are calculated" to mean an "*area of the railway track bed selected for calculating changes in railway track bed height*

*over the area*." But, as discussed above, the phrase "2D track section over which differential vertical measurements are calculated" serves to provide context for and describe the meaning of "appropriate gradient neighborhood," consistent with the description in the specification. Thus, there is no need to further construe this term, and the Court should otherwise reject Pavemetrics' attempt to rewrite the plain language of the claims with additional unclaimed limitations.

The specification describes in detail defining an appropriate gradient neighborhood representing a small 2D track section to identify different railway track bed features and associated measured parametric data. '293 patent, 9:44-50, 10:28-30 (describing use of a neighborhood that represents a small 2D surface area over which elevation measurements suitable for rail head edges are calculated), 11:12-17, 11:53-55, 12:46-48 (describing use of a neighborhood that represents a small 2D surface area over which elevation measurements suitable for rail base are calculated), 13:51-53 (describing use of a "neighborhood [that] represents a small 2D surface area over which elevation measurements suitable for weld detection are calculated"), 15:25-:26 (describing use of a "neighborhood [that] represents a small 2D surface area over which elevation measurements suitable for planar surface detection are calculated"), claims 2, 3, 23, and 24 (reciting vertical gradient edge detection), claims 2, 3, 5, 6, 9, 12, 16, 21, 23, 24, 26, 27, 30, 33, 37, 42 (reciting elevation threshold comparisons), and claims 15, 16, 36, and 37 (reciting comparison to 3D features saved in a feature library); Morellas Decl., ¶46 (citing *id.*). The intrinsic record does not support any rewriting of this term beyond the plain language of the claims.

Nor does the intrinsic record mandate the additional limitations Pavemetrics seeks to inject into the claims, namely that the 2D track section over which differential vertical measurements are calculated must be "*selected for calculating* changes in railway track bed height over the area." *Thorner*, 669 F.3d at 1365. In connection with identifying railway track bed features, the specification describes "***defin[ing]***" "[a]n appropriate gradient neighborhood" that "represents a small 2D track bed surface area

7

over which differential vertical measurements are calculated," and then "***appl[ying]***" "[t]he gradient neighborhood." '293 patent, 10:26-35, 11:51-63, 12:44-55 (emphasis added). Consistent with the specification, the claims themselves recite "***defining*** an appropriate gradient neighborhood ***representing*** a small 2D track section over which differential vertical measurements are calculated." The specification does not describe the further functional step of "selected for calculating" as Pavemetrics proposes, and there otherwise is no basis to add this additional functional language to the claims. Nor is there any basis to rewrite "differential vertical measurements" to "changes in railway track bed height." As Dr. Morellas explains, "a person of ordinary skill in the art would understand the term '2D track section over which differential vertical measurements are calculated' to mean exactly what it says, consistent with the surrounding claim language and specification, as it is intended to describe the meaning of 'an appropriate gradient neighborhood.'" Morellas Decl., ¶47. Therefore, the Court should reject Pavemetrics' improper attempt to import additional terms not required by the claims.

### C.    "Sliding Window"

| Disputed Term | Tetra Tech's Construction | Pavemetrics' Construction |
|---|---|---|
| "sliding window" (Claims 1, 22) | Plain and ordinary meaning. No further construction by the Court is necessary. | "component of an image-processing algorithm in which a calculation is based on a neighborhood or window of data about a pixel, and after the calculation at that pixel, the neighborhood (window) moves (slides) to an adjacent pixel for a calculation at the adjacent pixel" |

It is well-settled that a claim term must be "construed in the context of the claim in which it appears." *IGT v. Bally Gaming Int'l, Inc.*, 659 F.3d 1109, 1117 (Fed. Cir. 2011). But here, Pavemetrics isolates the "sliding window" term and seeks to replace it with 41 additional words that amount to extraneous limitations not recited in the claims or even the specification. This approach is improper and would lead to an incorrect claim construction if adopted because it ignores the context of the claims—the term "sliding window" is used to describe the movement of the gradient neighborhood, *i.e.*,

8

"*moving* the gradient neighborhood *like* a sliding window over the 3D elevation data"—and imports unclaimed and unsupported limitations for "sliding window" without regard for the surrounding language. *Hockerson-Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1374 (Fed. Cir. 1999) ("Proper claim construction, however, demands interpretation of the entire claim in context, not a single element in isolation"); *IGT*, 659 F.3d at 1117. Tellingly, Pavemetrics' proposed construction for the full "moving" phrase in which the "sliding window" term appears does not even incorporate Pavemetrics' proposed construction for "sliding window." *See* Section V.D., *infra*.

Furthermore, Pavemetrics' attempt to rewrite the claims and impose additional limitations to "sliding window" lacks any basis in the intrinsic record, let alone Pavemetrics' own identified extrinsic evidence, and should be rejected. A person of ordinary skill in the art would have readily understood the term "sliding window" without any further construction, as evidenced by the use of the term in the claims and specification to describe the type of motion of a gradient neighborhood, i.e., "like" a sliding window. Morellas Decl., ¶¶50-51. In one example, shown below in annotated FIG. 5, the specification describes that "[a]n appropriate gradient neighborhood [30, red], is defined for vertical rail head edge features [green]. This rail head edge neighborhood represents a small 2D track bed surface area over which differential vertical measurements are calculated." '293 patent 10:26-31. The gradient neighborhood is "applied to *the 3D elevation data*" and the neighborhood is "moved like a window" over 3D elevation data. *Id.*, 10:31-35 (emphasis added); *see also id.*, 9:54-56, FIG. 6.



FIG. 5

9

But nowhere does the specification describe, much less provide, a clear requirement or definition mandating that movement of the gradient neighborhood "like a sliding window" *must* be "about a single pixel" and subsequently "to an adjacent pixel for calculation at the adjacent pixel," as Pavemetrics proposes. Morellas Decl., ¶51.

Pavemetrics seemingly derives its proposed construction directly from a purported dictionary definition of "sliding window." Much like its analysis of the claim term, however, Pavemetrics ignores the full context of the purported definition and omits certain parts that are not favorable to its construction. Indeed, the cited dictionary definition does not establish that a "sliding window," much less movement "like a sliding window," *requires* movement "to an adjacent pixel." Exhibit E, 264 ("After the calculation is done at [a] given point, the calculation *typically* moves to an adjacent point.") (emphasis added). Morellas Decl., ¶52 (citing *id.* and further noting that the image depicted in Pavemetrics' cited dictionary definition does not show movement of the window to an adjacent pixel). Accordingly, Pavemetrics' attempt to ignore the context of "sliding window" and impose additional limitations without any support in the record should be rejected by the Court.

### D.   "Moving the Gradient Neighborhood Like a Sliding Window Over the 3D Elevation Data"

| Disputed Term | Tetra Tech's Construction | Pavemetrics' Construction |
|---|---|---|
| "moving the gradient neighborhood like a sliding window over the 3D elevation data" (Claims 1, 22) | Plain and ordinary meaning. No further construction by the Court is necessary. | "sequentially and completely applying the gradient neighborhood to the 3D elevation data and calculating differential vertical measurements for each position" |

The parties' dispute for this term concerns Pavemetrics' attempt to import additional unclaimed limitations—namely "sequentially and completely" into the claims. There is no basis for reading in these additional limitations and further narrowing the term beyond the plain language of the claims. Pavemetrics' construction should be rejected.

10

The words "sequentially and completely" do not appear anywhere in the claims. Thus, the claim language itself, and particularly the omission of "sequentially and completely," confirms that these limitations should not be read into the "moving the gradient neighborhood like a sliding window over the 3D elevation data" term. *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 843 (Fed. Cir. 2010) ("Had the inventors intended this limitation, they could have drafted the claims to expressly include it."). Although the specification discloses embodiments that describe moving the gradient neighborhood "sequentially and completely" (*see, e.g.*, '293 patent, 12:52-55), there is no requirement to limit the claims to these embodiments. *See, e.g., Thorner*, 669 F.3d at 1366; *Liebel-Flarsheim*, 358 F.3d at 913.

Further, the specification describes defining an appropriate gradient neighborhood and applying the neighborhood "over the entire region to be processed," not necessarily to the complete set of acquired data. Morellas Decl., ¶55 (citing, *e.g.*, '293 patent, 9:52-54). Indeed, nowhere does the specification mandate the sequential and exhaustive application of the gradient neighborhood over all of the acquired data. Instead, in one embodiment for detecting rail base surfaces, which are sections of the track bed bounded by the rail head edges and rail base edges, the specification explains that the "neighborhood is applied by the processor to the 3D elevation data for each of the four rail base surface zones." '293 patent, 13:54-56, FIG. 12. The specification goes on to describe that "[t]he neighborhood area [122] is moved sequentially and completely, like a window, for each position in the **four rail base zones** [118] and the lowest elevation measure for each neighborhood is determined at each position." '293 patent, 13:49-61 (emphasis added), FIG. 12; *see also id.*, 12:44-55. Morellas Decl., ¶55 (explaining that the specification's description of the analysis of "zones" is not referring to completely analyzing all acquired data). Therefore, adopting Pavemetrics' proposed construction would otherwise exclude disclosed embodiments. *See Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276 (Fed. Cir. 2008) ("We normally do not interpret claim terms in a way that excludes embodiments disclosed in the specification.").

Further, as discussed above, Pavemetrics' purported dictionary definition of "sliding window" states that "[a]fter the calculation is done at [a] given point, the calculation *typically* moves to an adjacent point." Exhibit E, 264 (emphasis added). In other words, even according to Pavemetrics' extrinsic evidence, a sliding window may be moved to different portions of captured elevation data, without necessarily having to analyze its entirety in a sequential and exhaustive fashion. Morellas Decl., ¶56 (further citing the image provided in Pavemetrics' dictionary definition depicting non-sequential and non-complete movement of a sliding window in an image). Thus, for at least these reasons, the Court should reject Pavemetrics' proposed construction.

**E.    "Identifying"**

| Disputed Term | Tetra Tech's Construction | Pavemetrics' Construction |
|---|---|---|
| "identifying" (Claims 1, 2, 15, 19, 20, 21, 22, 23, 36, 42) | Plain and ordinary meaning. No further construction by the Court is necessary. | "assigning a class to a portion of the track elevation map [three dimensional elevation map] based on a predetermined rule or model" |

Here, Pavemetrics attempts to rewrite the single, commonly understood term "identifying" to require: "*assigning a class* to a portion of the track elevation map [three dimensional elevation map] *based on a predetermined rule or model*." There is no basis to further construe "identifying" beyond its plain language, and accordingly, Pavemetrics' proposed construction should be rejected. *See, e.g.*, *Elan Microelectronics Corp. v. Apple, Inc.*, 2010 WL 4510909, at *6 (N.D. Cal. 2010) ("The term 'identify' will not be given a construction beyond its plain and ordinary meaning"); *Nuance Commun., Inc. v. Abbyy Software House, Inc*., 2011 WL 3816908, at *6 (N.D. Cal. Jun. 15, 2011) ("The Court does not find it persuasive to limit the construction of the term to only either feature analysis of template analysis. Accordingly, the Court construes the term 'identifying' to mean: 'identifying'").

Nothing in the plain language of the claims requires reading into the claim the additional limitations Pavemetrics seeks. Had the inventors intended to limit "identifying" to require "assigning a class," "they could have drafted the claims to

expressly include it." *i4i*, 598 F.3d at 843. Instead, the claims of the '293 patent provide a clear delineation between identification and assignment/classification. *Compare, e.g.*, claims 1-3, 5-9, 11-12, 14-15, 17-24, 30, 33, 36, and 42 (reciting "identifying") *with* claims 7-8, 11, 20, 28-29, 32, and 41 (reciting an "assigning" step (e.g., "assigning a condition"). *Versa Corp. v. Ag-Bag Int'l Ltd.*, 392 F.3d 1325, 1330 (Fed. Cir. 2004) ("The doctrine of claim differentiation creates a presumption that each claim in a patent has a different scope"); *see also Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004) ("[I]nterpretations that render some portion of the claim language superfluous are disfavored"). Moreover, several claims recite that the "identifying" step *comprises* an "assigning" step. *See* claim 20 ("wherein the algorithm step of *identifying* a railway track bed feature further comprises the step of *assigning* a condition to the identified railway track bed feature"); *see also* claims 7, 8, and 11. Under Pavemetrics' proposed construction, claim 20's "assigning" step would be rendered superfluous because the identification step would necessarily involve assigning a class, in this case a condition, to a railway track bed feature. Morellas Decl., ¶59; *Power Mosfet*, 378 F.3d at 1410.

Furthermore, the specification does not mandate additional limitations for "identifying" beyond its plain and ordinary meaning. Morellas Decl., ¶60. The specification refers to "identifying" throughout the specification but does not require a specific process or technique. See, e.g., '293 patent, 9:44-46 ("The methodology for the identification of the rail head 22 is based on the detection of significant (large vertical component) longitudinal edges over a 2D area"). Moreover, the '293 specification uses the terms "identification" and "classification" as distinct terms, not interchangeably, and to differentiate assignment of a class from simple identification of a feature. For example, when describing the specific functionality of using a three dimensional feature model library, which in its particular context requires classification of a railway track bed feature into one of the various three dimensional models, the specification explains that "[t]here is a minimum correlation threshold which must be exceeded for any target

13

to be ***identified and classified*** as a specific rail feature." '293 patent, 18:42-44 (emphasis added). Moreover, when describing the specific functionality of analyzing manmade features such as weld features, the specification states that "[t]he ability to identify planar regions [as] required for manmade feature ***identification and classification***." *Id.*, 14:16-18 (emphasis added). Morellas Decl., ¶60.

The intrinsic record also does not reflect the "based on a predetermined rule or model" limitation Pavemetrics proposes. *Id.*, ¶61. The word "rule" only appears in the '293 specification three times, where it is used in a general sense and not to describe specific functionalities. '293 patent, 2:19-24 ("The extensibility of the rule-based expert system architecture used for interpretation during processing allows the refinement of existing parameters and/or the development of rules and physical parameters as new features or track components are encountered"), 16:49-50 ("The severity determination includes additional rules for penalizing end break cracks"). The term "model" appears in connection with specific functionalities that naturally necessitate comparison to feature models, such as "3D model matching," (*see, e.g.,* '293 patent, 18:45-20:6, 25:25-28:51, FIGS. 27-30, 33, 46-47), and tie distress (e.g., crack) detection using "tie Surface Plane models" (*see id.* at 17:7-67, FIG. 25). But these specific functionalities utilizing model comparisons are captured in dependent claims 15-16 and 36-37 (reciting use of "three dimensional features saved in a feature library") and claims 6-8, 14, 17-18, 27-29, 35, and 38-39 (reciting steps utilizing a "tie surface plane"). It is incorrect to read in these specific functionalities, especially for a plainly understood word like "identifying," under the guise of claim construction. *See Versa Corp*, 392 F.3d at 1330.

**F.    "Is Configured To Run An Algorithm"**

| Disputed Term | Tetra Tech's Construction | Pavemetrics' Construction |
|---|---|---|
| "is configured to run an algorithm" (Claim 1) | Plain and ordinary meaning. No further construction by the Court is necessary.<br><br>If the Court believes further construction in accordance with the plain and ordinary | "is set up to run the algorithmic steps without modification" |

14

| | meaning is necessary, Tetra Tech proposes: "is programmed to run an algorithm" | |
|---|---|---|

"The meaning of … 'configured' … [is] easily understood by those with ordinary skill in the art and even by lay persons and judges," and therefore "[t]he term does not need further construction because there is a commonly understood and apparent meaning which can be applied." *Wistron Corp. v. Samsung Elecs. Co*., 2008 WL 5055545, at *16 (N.D. Cal. Nov. 25, 2008); *see also Polaris PowerLED Tech., LLC v. VIZIO, Inc.*, 2019 WL 13043592, at *18 (C.D. Cal. Nov. 26, 2019), order clarified, 2020 WL 1060363 (C.D. Cal. Jan. 21, 2020) (declining to further construe the term "configured to"); *Realtime Adaptive Streaming LLC v. Adobe Sys. Inc.*, 2019 WL 13039644, at *24 (C.D. Cal. July 25, 2019) (declining to further construe the terms "one or more processors configured to" and "a processor configured"). Similarly, here, the term "is configured to run an algorithm" does not require any further construction beyond its plain language.

Pavemetrics attempts to improperly add the limitation "without modification" into the claim without any record support. The specification does not recite the words "without modification" or similar language when describing the disclosed algorithms. Nor does the specification impart any particular meaning to the "is configured to run an algorithm" term beyond its plain and ordinary meaning that a person of ordinary skill in the art would have readily understood. *See, e.g.*, '293 patent, 8:53-59 (defining a processor to include a processing unit capable of performing the tasks described), 10:21-24, 11:45-48, 12:32-35, 13:39-43 (discussing rail head edge, rail base edge, and rail base weld detection processing steps being carried out by a program stored on a computer readable medium in communication with a processor); *see also id.*, 12:32-35 (rail head elimination), 15:10-15 (defining planar regions and tie boundary boxes), 17:7:10 (tie distress detection), 19:13-16 (tie anchor and fastener detection), 20:21-24 (shoulder volume calculation), 23:10:14 (ballast volume calculation), 25:25-29 (determining pad thickness, rail seat abrasion, and insulator thickness), and 27:66-28:3

15

(joint bar processing); Morellas Decl., ¶63. Nor does Pavemetrics' cited extrinsic evidence otherwise support reading these additional limitations into the claim. Instead, the cited evidence simply defines "configure" as "to set up a computer or program to be used in a particular way"—and does not mention the words "without modification." Exhibit F, 111.

Pavemetrics' attempt to impose negative limitations on the claims, without any support in the record is improper, and the Court should reject the proposed construction. Should the Court find it necessary to provide a construction for the term "is configured to run an algorithm," Tetra Tech proposes that the term be construed to mean "is programmed to run an algorithm," which is consistent in the context of the '293 patent, which describes a processor that is programmed to execute one or more algorithms. *See, e.g.*, '293 patent, 8:53-59; *see also Nevro Corp. v. Bos. Sci. Corp.*, 955 F.3d 35, 42 (Fed. Cir. 2020) (construing "configured to" to mean "programmed to"); Morellas Decl., ¶65.

### G.    "Comprising The Steps Of:" a, b, c, d

| Disputed Claim Term | Tetra Tech's Proposed Construction | Pavemetrics' Proposed Construction |
|---|---|---|
| "the algorithm comprising the steps of:" a, b, c, d (Claim 1)<br><br>"the method comprising the steps of:" a, b, c, d (Claim 22) | Plain and ordinary meaning. No further construction by the Court is necessary. | "the algorithm must be configured to run the steps in the recited order"<br><br>"the method steps must be performed in the recited order" |

It is well-established that a list of method claim steps is generally not required to be performed in the recited order, unless there is clear language to the contrary. *Interactive Gift Exp., Inc. v. Compuserve Inc*., 256 F.3d 1323, 1342 (Fed. Cir. 2001) ("Unless the steps of a method actually recite an order, the steps are not ordinarily construed to require one"); *Altiris, Inc. v. Symantec Corp*., 318 F.3d 1363, 1369–70 (Fed. Cir. 2003) ("First, we look to the claim language to determine if, as a matter of logic or grammar, they must be performed in the order written. … If not, we next look to the rest of the specification to determine whether it 'directly or implicitly requires

1    such a narrow construction'"").

2       Here, the record is clear. The language of claim 1 (and corresponding language

3    of claim 22) does not require each recited step to be performed in the recited order. Step

4    (c)(i), for example, recites the step of "defining an appropriate gradient neighborhood

5    representing a small 2D track section over which differential vertical measurements are

6    calculated." There is no requirement in the claim or the specification that this step be

7    performed in any particular order with respect to the other steps of claim 1. As Dr.

8    Morellas explains, "based on the plain language of the claims and the supporting

9    disclosure of the '293 patent, a system and corresponding method may define an

10   appropriate gradient neighborhood as a first step and, e.g., as part of an initial set up

11   sequence before any acquisition or processing steps. In such a case, Step (c)(i) would

12   take place before the acquisition of data (Step (a), generation of a track elevation map

13   (Step (b), and identification of a railway track bed feature (Step (c)." Morellas Decl.,

14   ¶67 (citing '293 patent, 2:55-62, 5:8-15, 29:39-55, 31:43-61).

15      As another example, Step (d) recites the step of "storing information

16   corresponding to the identified railway track bed feature in the data storage apparatus."

17   A system and corresponding method may store information after acquiring three

18   dimensional data (Step (a)), but before generating a track elevation map (Step (b))

19   and/or identifying a railway track bed feature (Step (c)). Morellas Decl., ¶68 (citing *id.*).

20   While Step (d) requires the storage of data corresponding to the "identified railway track

21   bed feature," a system and corresponding method may store information corresponding

22   to an entire railway track bed prior to identification, and subsequently ensuring that

23   information associated with an identified railway track bed feature (e.g., a fastener)

24   remains stored after identification. *Id*. The '293 specification contemplates the same,

25   explaining that "sensors 16 detect elevation and intensity data and the data is stored in

26   a data storage apparatus 18 in communication with the processor 12." '293 patent, 9:2-

27   5. Morellas Decl., ¶68 (further explaining that information associated with railway track

28   bed features may be stored immediately after acquisition of data, which would take

17

place before generation of a track elevation map and identification of railway track bed features). As yet another example, in claim 22, based on the plain language of the claim and the supporting specification, step (b)'s "storing the elevation map" can occur after step (c)'s "identifying a railway track bed feature from the elevation map" and step (d)'s "storing information corresponding to the identified railway track bed feature." Morellas Decl., ¶69 (discussing additional examples related to claim 22 as well).

Thus, there is no basis to support Pavemetrics' attempt to deviate from the plain language of these commonly used transitional phrases and the Court should reject reading in the requirement that the claimed steps be performed in the recited order.

## V.   MOST SIGNIFICANT DISPUTED CLAIM TERMS OF '557 PATENT

### A.   "Tie Surface Plane Model"

| Disputed Term | Tetra Tech's Construction | Pavemetrics' Construction |
|---|---|---|
| "tie surface plane model" (Claim 8) | Plain and ordinary meaning. No further construction by the Court is necessary. | "an approximation of the like-new surface of the entire tie based on an industry standard tie model" |

Claim 8 recites "comparing ties in the elevation data with *a tie surface plane model* by calculating the difference between the tie surface elevation data and *the tie surface plane model* using the processor," as well as identifying tie crack targets with "elevations less than a tie surface plane minus a crack depth threshold." The claimed comparing step is consistent with the description in the '557 specification regarding use of a tie surface plane model. *See, e.g.*, '557 patent, 15:67-16:3 (describing "an approximation for a like-new tie surface which is used to calculate tie physical parameters and to assess tie condition"); Morellas Decl., ¶71.

Pavemetrics asks the Court to impermissibly require that the claimed model must be based on an approximation of the like-new surface: (1) "of the *entire tie*" and (2) "*based on an industry standard* tie model." The Court should reject Pavemetrics' attempt to rewrite the plain language of the claims.

Neither the claims nor the specification of the '557 patent recite the words "entire

18

tie." Instead, the specification specifically contemplates eliminating tie areas covered by a rail (which cover portions of each tie, as shown, for example in Figure 1) when estimating a tie surface plane model: "A[n] estimate of the crosstie surface elevation between the rails is calculated (block 50) … using typical rail dimensions to eliminate regions of the track bed surface which are outside expected tie surface elevations (too high or low)." '557 patent, 10:40-46 (emphasis added); *see also id.*, 16:16-17 (further explaining, in connection to FIG. 20, that "[t]he tie surface plane 192 ***preferably excludes the rail and tie plate surfaces***.") (emphasis added). Morellas Decl., ¶72. Therefore, the introduction of the words "entire tie" plainly contradicts the specification and should not be introduced into the claims. *See Oatey*, 514 F.3d at 1276.

Imposing the limitation of "an industry-standard tie model" into the claims likewise lacks intrinsic record support. The specification describes the use of an "industry standard" tie model only once, and in connection with "bounding box definition method" and for a specific set of circumstances—one in which a tie is damaged or broken. '557 patent, 15:5-9; Morellas Decl., ¶73. The specification states that "industry standard tie models [] assist in correctly defining and orienting the bounding box ***in cases where the tie is damaged or broken***." '557 patent, 15:7-9 (emphasis added). Nothing in the specification, however, requires the industry standard tie model limitation, and it would be improper to read into the claims the "industry standard" embodiment from the specification. *See, e.g., Thorner*, 669 F.3d at 1366; *Liebel-Flarsheim*, 358 F.3d at 913. Accordingly, Pavemetrics' attempt to rewrite the claims in a way that contradicts the specification must be rejected.

**B.    "Tie Bounding Box"**

| Disputed Term | Tetra Tech's Construction | Pavemetrics' Construction |
|---|---|---|
| "tie bounding box" (Claims 8, 14) | Plain and ordinary meaning. No further construction by the Court is necessary. | "the physical edge boundaries of a tie, defined by matching the elevation data to industry standard tie models" |

Claim 8 recites "inputting" data including "detected tie bounding box data" to a processor. This term would have been readily understood at the time of the invention in view of the '557 specification by a person of ordinary skill in the art without any further construction. The specification describes a tie bounding box as "the physical edge boundaries of each detected tie." '557 patent, 15:3-4, FIGS. 17, 20, 22, 35, 38, 39, and 48 (showing exemplary tie bounding boxes). Pavemetrics' proposed construction, however, seeks to impermissibly add the limitation that a tie bounding box *must* be "defined by matching the elevation data to industry standard tie models," despite this language not appearing in the claims or specification. The Court should reject Pavemetrics' proposed construction.

As discussed above, the '557 specification describes the use of industry standard tie models only in a specific set of circumstances—in cases where a tie is damaged or broken. '557 patent, 15:7-9. In other embodiments, the '557 specification describes matching tie models in connection with tie bounding boxes, but it does not describe using *industry standard* tie models, contrary to Pavemetrics' proposed construction. '557 patent, 15:57-59 ("Best Fit processing (block 176) of all available crosstie models are completed for each clustered planar region to define the best match tie model"). Morellas Decl., ¶75-76. Nothing in the specification mandates the industry standard tie model limitation, and it would be improper to read into the claims the "industry standard" embodiment. *See, e.g.*, *Thorner*, 669 F.3d at 1366; *Liebel-Flarsheim*, 358 F.3d at 913. Accordingly, the Court should reject Pavemetrics' proposed construction.

## VI.   ADDITIONAL DISPUTED CLAIM TERMS

### A.   "Track Elevation Map" ('293 Patent)

| Disputed Term | Tetra Tech's Construction | Pavemetrics' Construction |
|---|---|---|
| "track elevation map" (Claims 1, 15, 36) | Plain and ordinary meaning. No further construction by the Court is necessary. | "representation of both the height (elevation) and intensity of reflected laser light (intensity) at each data point within an area across the entire width of the railway track bed" |

20

1    Claim 1 recites "acquiring three dimensional surface elevation and intensity data
2    representative of an area segment of railway track bed; [and] generating *a track*
3    *elevation map based on* the acquired three dimensional data" (emphasis added). Thus,
4    claim 1 requires generation of a track elevation map "based on the acquired three
5    dimensional data." In other words, the track elevation map can be generated from either
6    three dimensional surface elevation or intensity data, or both. This meaning naturally
7    aligns with the '293 patent's disclosure. *Compare* '293 patent, 6:60-61 ("FIG. 2 shows
8    an image of a full track width *elevation and intensity* profile."), *with* 7:10-14, 12:65-
9    13:3 ("FIG. 10 shows an *elevation* map of a portion of a railway track bed…FIG. 11
10   shows the same section of track after the rail head elevation have been modified")
11   (emphasis added). Morellas Decl., ¶79 (citing to FIGS. 2 and 10, shown below).





FIG. 2                                          FIG. 10

18   Pavemetrics ignores the term "based on" to require a single track elevation map
19   to be a "representation of *both* the height (elevation) and intensity of reflected laser light
20   (intensity) at each data point within an area across the entire width of the railway track
21   bed." This construction is unduly limiting, and the Court should reject it. First, the term
22   "based on" does not mandate any particular type of data be included in a track elevation
23   map, let alone that all data must be included in the track elevation map. *Cf. Am. Med.*
24   *Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1361 (Fed. Cir. 2010) (noting that "based
25   upon" is not as strong as "is" or "means" in determining limitations of a claim term).
26   Nor does the claim term recite generating a track elevation map that is a representation
27   of *both* the three dimensional surface elevation *and* intensity data. Instead, claim 1
28   simply requires generation of a track elevation map "based on the acquired three

dimensional data." Thus, the "based on" language denotes that a track elevation map is generated from the broader category of "the acquired three dimensional data," including the entirety of the acquired three dimensional data, but also a portion or subset of the acquired data, i.e., surface elevation data, intensity data, *or* both. Morellas Decl., ¶80. Claim 1 does not require anything more. This is consistent with the use of the indefinite article "a" in the term "a track elevation map," which is understood to mean "one or more track elevation maps." *KCJ Corp. v. Kinetic Concepts, Inc*., 223 F.3d 1351, 1356 (Fed. Cir. 2000) ("This court has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising'"). Thus, the scope of the claim encompasses generating more than one "track elevation map," and the generated *maps* are "based on the acquired three dimensional data." This does not mandate that each map is a representation of both surface elevation and intensity data. Morellas Decl., ¶80.

**B.     "Three Dimensional Elevation Map" ('293 Patent)**

| Disputed Term | Tetra Tech's Construction | Pavemetrics' Construction |
|---|---|---|
| "three dimensional elevation map" (Claim 22) | Plain and ordinary meaning. No further construction by the Court is necessary. | "representation of both the height (elevation) and intensity of reflected laser light (intensity) at each data point within an area across the entire width of the railway track bed" |

Claim 22 recites "defining a three dimensional elevation map *based on* surface elevation and intensity data representative of an surface elevation and intensity data representative of an area segment of the railway track bed" (emphasis added). Thus, the plain language of the claim describes that a three dimensional elevation map is "based on surface elevation and intensity data"—but does not necessarily require that a single three dimensional elevation map must be a "representation of *both*" surface elevation and intensity data, as contemplated by Pavemetrics' proposed construction. Morellas Decl., ¶82. Instead, because of the use of the article "a," the term "*a* three dimensional elevation map" is understood to mean "one or more three dimensional elevation maps."

*KCJ*, 223 F.3d at 1356. Accordingly, the scope of the claim encompasses defining more than one "three dimensional elevation map," and the ***maps*** are "based on surface elevation and intensity data." This does not mandate that each map is a representation of both surface elevation and intensity data. The specification is consistent with this meaning and explains, for example, that *multiple* three dimensional elevation maps are created from captured elevation and intensity data: "The data is [] combined for both rails to provide a full elevation and intensity profile of the full width of a railway track bed …. These full ***profiles*** are also referred to as 3D elevation ***maps***." '293 patent, 9:17-21 (emphases added). In other words, a person of ordinary skill in the art would understand that the captured elevation data from each sensor may be combined into a single three dimensional elevation map, and the captured intensity data from each sensor may likewise be combined into a single three dimensional elevation map. Morellas Decl., ¶83. Likewise, the '293 specification discusses performing operations, such as rail head removal, from the *multiple* three-dimensional elevation maps. '293 patent, 12:15-17 ("it is preferable to remove rail head features from the 3D elevation ***maps***") (emphasis added); Morellas Decl., ¶83.

### C.   "Small Area" and "Small Length" ('557 Patent)

| Disputed Terms | Tetra Tech's Construction | Pavemetrics' Construction |
|---|---|---|
| "small area" (Claim 10) | Plain and ordinary meaning. No further construction by the Court is necessary. | Indefinite as relative terms with no definition or exemplary disclosure in the specification. |
| "small length" (Claim 10) | Plain and ordinary meaning. No further construction by the Court is necessary. | Indefinite as relative terms with no definition or exemplary disclosure in the specification. |

While courts may sometimes at the claim construction stage decide issues of claim definiteness under 35 U.S.C. § 112, "[c]ourts should be cautious not to allow claim construction to morph into a minitrial on validity." *See, e.g.*, *Grupo Bimbo, S.A. B. De C.V. v. Snak King Corp.*, 2014 WL 12591935, at *12 (C.D. Cal. Dec. 2, 2014) (citing *Hill-Rom Services, Inc. v. Stryker Corp.*, 755 F.3d 1367, 1374 (Fed. Cir. 2014). Here, Pavemetrics seeks indefiniteness rulings for two non-significant (and non-

dispositive) claim terms found in a dependent claim of the '557 patent. But these indefiniteness issues for non-significant claim terms should be deferred and revisited, if necessary, after the record has been more fully developed. Even if these issues are addressed now, Pavemetrics has failed to establish by clear and convincing evidence that the terms "small area" and "small length" are indefinite under § 112.

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). Here, the '557 specification provides an objective basis for a person of ordinary skill in the art to determine whether an area is "small" and whether a length is "small." Morellas Decl., ¶¶85-86. *See EcoServices, LLC v. Certified Aviation Servs., LLC*, 312 F. Supp. 3d 830, 842–44 (C.D. Cal. 2018) *aff'd in relevant part*, No. 2019-1602, 830 F. App'x 634, 636 (Fed. Cir. 2020) (finding the term "small quantities" to be definite); *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1557 (Fed. Cir. 1996), *abrogated on other grounds by Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 234 F.3d 558 (Fed. Cir. 2000) (affirming a finding that the term "relatively small hydraulic diameter" was definite); *see also In re Koninklijke Philips Pat. Litig.*, 2020 WL 7392868, at *18 (N.D. Cal. Apr. 13, 2020) (refusing to find the term "substantially small" display as indefinite).

Claim 10 recites the step of "eliminating small area and small length tie crack targets," and relates to identifying tie surface cracks by eliminating tie crack targets having a small area or length. When read in light of the '557 specification, a person of ordinary skill in the art would have been able to determine with reasonable certainty the scope of these terms without any further construction as corresponding to an area and length sufficiently small to warrant not being identified as a tie crack. Morellas Decl., ¶85 (citing '557 patent, 15:67-16:63, 17:7-67, FIGS. 20-22, 25). Indeed, the specification explains that the area and length associated with tie cracks, among other parameters, may be used to identify and categorize tie cracks and "establish an accurate

and objective severity and extent distress measures for each crack." '557 patent, 16:47-49. The specification describes tie crack area as "the area defined by the number of connected surface elevation measurement points forming the crack in its entirety" and tie crack length as "measured along the path of the crack." *Id.*, 16:35-47. The specification further describes comparing area and length tie crack measurements to minimum tie crack area and length thresholds for inclusion as potential tie crack target candidates. *See, e.g., id.*, 16:26-33 ("The 3DTAS tie condition assessment method described herein identifies, locates and measures all surface cracks (voids) deeper than a minimum crack depth threshold and ***longer than a minimum crack length (extent) threshold***.") (emphasis added), 17:33-40 ("Negative elevation difference regions, with a magnitude greater than Crack Depth Threshold, represent Crosstie Crack Targets (block 226). ***Crosstie Crack Targets are 3D features having length, width and depth. Crack Targets having a short length or small surface area are eliminated from further analysis***") (emphasis added). Parameters not eliminated are "used to define and/or modify crack severity and extent values assigned to each crack." *Id.*, 17:43-45. Accordingly, the '557 specification provides an objective basis, e.g., through the use of thresholds, for a person of ordinary skill in the art to ascertain whether a given tie crack area or length represents a small area or length. Morellas Decl., ¶86.

## VII.   CONCLUSION

For the foregoing reasons, Tetra Tech respectfully requests that no term requires further construction and the Court should reject Pavemetrics' proposed constructions.

Dated: October 4, 2021                     **CLARK HILL LLP**


By:   */s/ Donald L. Ridge*
                    Donald L. Ridge

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Aaron L. Parker (*pro hac vice*)
Daniel G. Chung (*pro hac vice*)
Nicholas A. Cerulli (*pro hac vice*)
Jency J. Mathew (*pro hac vice*)
**FINNEGAN, HENDERSON, FARABOW,**
**GARRETT & DUNNER, LLP**

*Attorneys for Defendant and Counterclaim*
*Plaintiffs*
*TETRA TECH, INC. AND TETRA TECH TAS*
*INC.*