# EXHIBIT H

1   Donald Ridge, Esq. (SBN: 132171)
2   **CLARK HILL LLP**
    1055 West Seventh Street, Suite 2400
3   Los Angeles, CA 90017
    Telephone: (213) 891-9100
4   Facsimile: (213) 488-1178
    DRidge@clarkhill.com
5

6
    Aaron L. Parker (*pro hac vice*)
7   aaron.parker@finnegan.com
    Daniel G. Chung (*pro hac vice*)
8   daniel.chung@finnegan.com
9   Nicholas A. Cerulli (*pro hac vice*)      Jency J. Mathew (*pro hac vice*)
    nicholas.cerulli@finnegan.com             jency.mathew@finnegan.com
10  **FINNEGAN, HENDERSON,**                  **FINNEGAN, HENDERSON,**
11  **FARABOW, GARRETT &**                    **FARABOW, GARRETT &**
    **DUNNER, LLP**                           **DUNNER, LLP**
12  901 New York Avenue NW                    1875 Explorer Street, Suite 800
13  Washington, D.C. 20001-4413               Reston, Virginia 20190-6023
    Telephone:  (202) 408-4000                Telephone:  (571) 203-2700
14  Facsimile:  (202) 408-4400                Facsimile:  (571) 203-2777
15

16  *Attorneys for Defendant and Counterclaim Plaintiffs*

17              **UNITED STATES DISTRICT COURT**

18            **CENTRAL DISTRICT OF CALIFORNIA**

19  PAVEMETRICS SYSTEMS, INC.          CASE NO. 2:21-cv-1289 MCS-MMA

20              Plaintiff,             **DECLARATION OF DR.**
21                                     **VASSILIOS MORELLAS IN**
                                       **SUPPORT OF TETRA TECH'S**
22          v.                         **OPENING CLAIM**
                                       **CONSTRUCTION BRIEF**
23  TETRA TECH, INC.

24              Defendant.
25  AND RELATED COUNTERCLAIMS.

26

27

28

1  **<u>TABLE OF CONTENTS</u>**

2  I.    INTRODUCTION ....................................................................................4

3  II.   BACKGROUND AND EXPERTISE IN COMPUTER VISION

4        SYSTEMS ............................................................................................5

5  III.  MATERIALS CONSIDERED ................................................................10

6  IV.   LEVEL OF ORDINARY SKILL IN THE ART .......................................10

7  V.    LEGAL STANDARDS ..........................................................................11

8        A.    Claim Construction ....................................................................11

9        B.    Indefiniteness Under 35 U.S.C. § 112 ........................................12

10 VI.   THE ASSERTED PATENTS ...................................................................13

11       A.    Overview of the Asserted Patents ...............................................13

12       B.    Prosecution Histories of the Asserted Patents ...........................15

13 VII.  DISPUTED CLAIM TERMS OF THE '293 PATENT..............................16

14       A.    "Appropriate Gradient Neighborhood"......................................16

15       B.    "2D Track Section Over Which Differential Vertical

16             Measurements Are Calculated" ...........................................17

17       C.    "Sliding Window"......................................................................19

18       D.    "Moving the Gradient Neighborhood Like A Sliding Window Over

19             the 3D Elevation Data" ..............................................................21

20       E.    "Identifying"..............................................................................22

21       F.    "Is Configured To Run An Algorithm" ......................................25

22       G.    "Comprising The Steps Of:" a, b, c, d ................................26

23 VIII. DISPUTED CLAIM TERMS OF THE '557 PATENT..............................28

24       A.    "Tie Surface Plane Model" ........................................................28

25       B.    "Tie Bounding Box" ..................................................................30

26 IX.   ADDITIONALLY DISPUTED TERMS ...................................................31

27       A.    "Track Elevation Map" ('293 Patent) ........................................31

28       B.    "Three Dimensional Elevation Map" ('293 Patent)...........................32

1

        C.     "Small Area" and "Small Length" ('557 Patent)................................34

2   X.     CONCLUSION ..............................................................................................35

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.    INTRODUCTION

1.    I, Vassilios Morellas, Ph.D., submit this declaration to state my opinions on the matter described below. I am over eighteen years of age, and I would be competent to testify as to the matters set forth herein if I am called upon to do so.

2.    I have been retained by Tetra Tech, Inc. and Tetra Tech TAS Inc. ("Tetra Tech"), as an independent expert in this proceeding before the United States District Court for the Central District of California. Although I am being compensated at my usual and customary rate of $500.00 per hour, no part of my compensation depends on the outcome of this proceeding, and I have no other interest in this proceeding.

3.    I understand that Tetra Tech has accused Pavemetrics Systems, Inc. ("Pavemetrics") of infringing certain claims in Tetra Tech's United States Patent No. 10,362,293 ("the '293 patent") (Exhibit A) and U.S. Patent No. 10,616,557 ("the '557 patent") (Exhibit B) (collectively, "the Asserted Patents").

4.    My extensive experience with computer and machine vision in the transportation industry is applicable to analyzing the Asserted Patents. For almost 30 years I have been involved in computer vision systems, sensors, and lasers which are directly applicable to analyzing the Asserted Patents. I am qualified to reach the opinions and conclusions stated in this declaration. I have been asked to consider how one of ordinary skill in the art to which the Asserted Patents are directed would have understood certain terms of the Asserted Patents in the early 2015-time frame. My opinions are set forth below.

5.    This declaration sets forth the opinions I have formed in this matter and the bases for those opinions through my independent evaluation and analysis. My opinions are based on the information available to me as of the date that I am submitting this declaration. If additional information becomes available to me either by production by the parties or third parties, or otherwise, I may, if permitted to do so, offer additional opinions. I may also, if requested and permitted to do so, provide further opinions to rebut any testimony, declarations, or opinions offered by Pavemetrics' witnesses (expert

1  or otherwise). I reserve my right to update my opinions in this declaration through any

2  further expert declarations and/or testimony that I may provide in this case.

3  **II.      BACKGROUND AND EXPERTISE IN COMPUTER VISION SYSTEMS**

4          6.      I am currently employed as a Research Professor of Electrical and

5  Computer Engineering at the University of Minnesota, Twin Cities, Minnesota. I am

6  also currently the Director of the National Science Foundation ("NSF") Center on

7  Robots & Sensors for Human Well Being at the University of Minnesota.

8          7.      I believe that I am well qualified to serve as a technical expert in this matter

9  based upon my educational and work experience, and specifically, in the field of

10  computer or machine vision. I have been involved with the design and evaluation of

11  computer vision systems, sensors, and lasers for approximately 25 years. My academic

12  research has been in the areas of computer vision, robotics, intelligent transportation

13  systems, sensor networks, object recognition, and sensor-based control in transportation

14  systems. To avoid confusion, the terms "computer vision" and "machine vision" are

15  used in this document interchangeably although there are some subtle differences. I

16  have also been involved in work since 1995 involving computer vision algorithms for

17  vehicle tracking, camera calibration, inspection, object recognition, vehicle monitoring

18  systems, and motion control devices. I have authored or co-authored several book

19  chapters and numerous peer-reviewed technical papers in these areas. My curriculum

20  vitae (CV) is attached as Exhibit G. It details my degrees, employment history, teaching

21  experience, publication list, scholarly accomplishments, professional contributions,

22  grants, honors, and awards.

23          8.      I received my Diploma of Engineering in Electrical and Computer

24  Engineering from the National Technical University of Athens in Greece in 1983. I

25  obtained my Master of Science degree in Mechanical Engineering from the Columbia

26  University in New York, New York in 1989. And in 1995, I received my Ph.D. in

27  Mechanical Engineering from the University of Minnesota. My research at the time was

28  in robotics, computer vision and control, computer integrated manufacturing, and

software engineering, and my Ph.D. thesis was titled "A Neuro-computational Mobile Robot Architecture for Mapping Localization and Navigation." The work revolved around the use of neural networks and a suite of ultrasonic sensors to accomplish place recognition and autonomous navigation for a mobile robot.

9.     After receiving my Doctorate degree, from 1995-1998, I was employed as a Research Associate at the Department of Mechanical Engineering at the University of Minnesota. My work as a research associate concerned autonomous driving of a tractor trailer using a combination of cameras, Differential Geographic Position Systems (DGPS), and magnetometers along with speed and steering control algorithms to achieve the aforementioned objectives. Autonomous driving of this vehicle was successfully demonstrated at a testing facility of the Minnesota Department of Transportation (MnDOT).

10.     Starting in 2003, and until 2014, I was an instructor at the Department of Mechanical Engineering at the University of Minnesota. As an instructor, I taught classes related to robotics and computer vision. I also conducted research and oversaw projects directed to camera-based security and surveillance. Network camera surveillance and tracking was field deployed at Philadelphia's train station.

11.     From 2019 until the present, I have served as a Research Professor of Electrical and Computer Engineering at the University of Minnesota. While in this role, I have advised and mentored students related to image-based cancer recognition, precision agriculture automation, and vision-based techniques for early detection of autism spectrum disorders. I have mentored and advised student research related to Computer Vision, Artificial Intelligence, Algorithms and Data Structures, and Readings in Computational Vision. These cover a variety of topics that include 3D reconstruction, extraction of depth, inspection, tracking, light striping, lasers, structured light, structure from motion, occlusions, edge detection, and basic image processing. My academic research has continued in the fields of computer vision systems, sensors, and lasers,

with primary specialties in robotics, intelligent transportation systems, and sensor-based control in transportation applications.

12.     From 2006-2019, I was the Program Director of the Computer Science & Engineering of the University of Minnesota. While in this role, I continued research on various types of automation involving the integration of sensors of different phenomenologies with electro-mechanical platforms.

13.     I have received research grants for various projects involving computer vision as applied to the transportation industry, including the development of a camera-based solution to the Truck Parking Availability problem that uses 3D reconstruction of truck park stops.

14.     In terms of my industrial experience, from 1998-2005, I was employed as a Principle Research Scientist, in the Advanced Technology Labs of Honeywell International Inc. From 2005-2006, I was employed as a Senior Principle Research Scientist, also in the Advanced Technology Labs of Honeywell. During my time at Honeywell, my work was primarily concerned with systems that enhanced security and surveillance. The pinnacle of this work was a demonstration of secure gate access of vehicles at a naval base, using a custom developed multi-spectrum camera and face recognition technologies.

15.     From 2007-2014, I served as a Co-PI for the NSF Research Center on Safety, Security and Rescue at the University of Minnesota. While there, I was tasked with directing the University of Minnesota site research on various research topics of interest to industrial partners that chose to join our center paying an annual fee.

16.     From 2014 until the present, I have acted as the Director of the NSF center on Robots & Sensors for Human Well Being at the University of Minnesota. In this role, my work concerns organizing the center's activities attracting industrial financial support and directing research in intelligent transportation, medical research (cancer recognition, mental health disorders), precision agriculture, and robotics.

17.   I am listed as an inventor on numerous patents issued in the United States and foreign countries. My inventions concern technologies including computer and machine vision technologies. Examples of my issued U.S. patents include:

- US Pat. No. 9,858,816, titled "Determining Parking Space Occupancy Using a 3D Representation"

- US Pat. No. 7,907,750, titled "System and Method for Autonomous Object Tracking"

- US Pat. No. 7,602,942, titled "Infrared and Visible Fusion Face Recognition System"

- US Pat. No. 7,149,325, titled "Cooperative Camera Network"

- US Pat. No. 7,806,604, titled "Face Detection and Tracking in a Wide Field of View"

- US Pat. No. 7,606,425, titled "Unsupervised Learning of Events in a Video Sequence"

18.   I have authored or co-authored over 130 articles or conference presentations, including numerous papers and presentations concerning computer or machine vision technologies. Of particular interest may be the following papers and presentations:

- Video Analytics for Security and Transportation Applications, Keynote talk at the 4th IEEE Computer Vision and Pattern Recognition Workshop on Object Tracking & Classification Beyond the Visible Spectrum (OTCBVS 2007), June 22, 2007

- Between the Lines: A Driver-Assistive Technology for Staying in the Lane, GPS World, Vol. 9, 1988

- Accurate 3D ground plane estimation from a single image, IEEE International Conference on Robotics and Automation, 2009

19.     I have been actively involved in multiple technical communities, including the IEEE Society, and NSF Review panels. I have served in the organizing committee of many technical conferences, including, for example:

- Associate Editor, IEEE/RSJ International Conference on Intelligent Robots and Systems, 2019

- Technical Committee, 22nd International Conference on Pattern Recognition, ICPR 2014

- Program Area Chair, 5th IEEE International Conference on Advanced Video and Signal Based Surveillance, 2008

20.     My research has been recognized by multiple organizations, universities, and institutions. The following is a small set of honors and awards that I have received:

- Center for Transportation Studies: CTS Research Partnertship Award, 2016

- Best Student Paper Award, IEEE International Conference on Image Processing (ICIP), 2012

- Technical Achievement Award, for Technical Excellence in the area of "People Tracking in Camera Networks", Highest Honorary Distinction from Automation and Control Solutions (ACS) of Honeywell International Inc., April 2003

21.     Overall, I have used my education, industry, teaching, writing, and membership and service experiences in the computer vision field, and my understanding of the knowledge, creativity, and experience of a person having ordinary skill in the art in forming the opinions expressed in this declaration, as well as any other materials discussed herein. My extensive experience with machine vision in the transportation industry is applicable to analyzing the Asserted Patents. For almost 25 years I have been involved in computer vision systems, sensors, and lasers which are directly applicable to analyzing the Asserted Patents.

## III.   MATERIALS CONSIDERED

22.     In preparing my declaration, I have reviewed and considered the Asserted Patents, the prosecution histories of the Asserted Patents, and the proposed claim constructions of each party with citations to intrinsic and extrinsic evidence. I have also relied upon my knowledge, skill, experience, education, industry, teaching, mentoring, writing, and membership and service experiences in the Electrical and Computer Science and Engineering fields. I reserve the right to consider and rely on, as well as supplement, this declaration in view of additional information that is provided to me in this litigation, including information considered by Pavemetrics' experts.

## IV.   LEVEL OF ORDINARY SKILL IN THE ART

23.     It is my understanding that I must address the issues set forth in this declaration from the viewpoint of "a person of ordinary skill in the art" (or POSA) at the time of the invention to which the Asserted Patents pertains. I understand that a POSA is a hypothetical person who is presumed to be aware of pertinent art and knowledge in the art, thinks along the lines of conventional wisdom in the art, and is a person of ordinary creativity, among other things. I also understand that such a person has the normal skills and knowledge of a person in a given technical field at the time of the invention. I further understand that certain factors may be considered in determining the level of ordinary skill in the art, including: (1) the education level of the inventor; (2) the types of problems encountered in the art; (3) the prior art solutions to those problems; (4) the rapidity with which innovations are made; (5) the sophistication of the technology; and (6) the education level of active workers in the field.

24.     I have been asked to consider the state of the art for each Asserted Patent as of February 20, 2015, which I understand is the earliest effective priority date of each Asserted Patent.

25.     In my opinion, a POSA at the time of the invention to which the Asserted Patents pertains would have a bachelor's degree in electrical engineering, computer engineering, mechanical engineering, computer science, physics, or a related field, and

at least four years of experience (or the academic equivalent) in the field of computer or machine vision. Additional education could substitute for professional experience and significant work experience could substitute for formal education. Although I surpass this definition of one of ordinary skill in the art now and at the priority date of the Asserted Patents, my analysis regarding the Asserted Patents has been based on the perspective of one ordinary skill in the art as of each priority date of the Asserted Patents. I am also familiar with the knowledge of the person of ordinary skill in the art as of the priority date of each of the Asserted Patents. I am able to opine on how the person of ordinary skill in the art would have understood the disclosure and claims of the Asserted Patents.

## V.    LEGAL STANDARDS

### A.    Claim Construction

26.    I understand that the claims define the invention. I also understand that an unpatentability analysis is a two-step process. First, the claims of the patent are construed to determine their meaning and scope. Second, after the claims are construed, the content of the prior art is compared to the construed claims.

27.    I have been instructed by counsel that claim construction is for the Court to decide as a matter of law. I am informed that claim terms should be given their ordinary and customary meaning within the context of the patent in which the terms are used, i.e., the meaning that the term would have to a POSA, at the time of the invention, in light of what the patent teaches.

28.    I understand that, to determine how a POSA would understand a claim term, one should look to those sources available that show what a person of skill in the art would have understood disputed claim language to mean. Such sources include the words of the claims themselves, the remainder of the patent's specification, the prosecution history of the patent (each considered "intrinsic" evidence), and in certain circumstances, "extrinsic" evidence (evidence external to the patent and the prosecution

history) concerning relevant scientific principles, the meaning of technical terms, and the state of the art.

29.    I understand that, in construing a claim term, one looks primarily to the intrinsic patent evidence. I understand that extrinsic evidence may also be useful in interpreting patent claims when the intrinsic evidence itself is insufficient. However, I am informed that extrinsic evidence cannot be relied upon to construe a claim term if that extrinsic evidence contradicts the intrinsic evidence.

30.    I understand that the usual and customary meaning of a claim term can be altered by the patent applicant if he chooses to act as his own "lexicographer" and clearly sets forth in the patent a meaning for a claim term that is different from its usual and customary meaning.

### B.    Indefiniteness Under 35 U.S.C. § 112

31.    I understand that the patent specification must conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention. I also understand that a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention. I further understand that a claim may be indefinite when it contains words or phrases whose meaning is unclear in describing and defining the claimed invention.

32.    I also understand that the claims must provide objective boundaries for a person of ordinary skill and that indefiniteness may arise if the claim language could mean several different things (or the claim fails to distinguish between multiple possible interpretations). A patent specification presenting specific working examples that provide points of comparison could potentially avoid indefiniteness by providing an objective standard of the claim's scope.

# VI.   THE ASSERTED PATENTS

## A.   Overview of the Asserted Patents

33.   I have been informed by counsel and understand that the '293 patent was filed on May 29, 2015, and the '557 patent was filed on July 19, 2019. I have also been informed by counsel and understand that each patent claims priority to a provisional application filed on February 20, 2015.

34.   The Asserted Patents are directed to automated railway track assessment systems and methods. As the Asserted Patents explain, objective and automated systems address the time consuming and subjective nature of manual track inspection, improve rail safety in an environment of increasing annual rail traffic volumes and regulatory reporting requirements, and facilitate track component deterioration models to yield significant economic benefits in the operation, maintenance, and capital planning of rail networks. '293 patent, 1:21-34. The claims of the Asserted Patents recite algorithms to help quickly and accurately identify, from acquired railway track bed three-dimensional data, railway track bed features and associated measured parametric data such as rail heads, rail bases, tie distress, ballast level anomalies, joint bars, rail base welds, and rail head distortion at high speeds. '293 patent, 1:58-2:10.

35.   Specifically, the specifications of the Asserted Patents describe a track inspection system and method for assessing a railway track bed. '293 patent, 8:64-9:2; '557 patent (same). The inspection system includes a light line projector, such as a laser, for emitting light energy toward a railway track bed. '293 patent, 8:64-9:5. The system includes one or more sensors for sensing light reflected from the railway track bed that was emitted from the light line projector and configured to acquire three-dimensional surface elevation and intensity image data of the railway track bed. '293 patent, 8:67-9:3. The specifications further explain that the processor processes the acquired data to generate a three-dimensional track elevation map representative of the inspected railway track bed. '293 patent, 9:17-21. Figure 10, reproduced below, shows an exemplary "elevation map of a portion of a railway." '293 patent, 7:11-12.



FIG. 10

36.     The '293 patent claims specific algorithms implemented by the track inspection system to identify railway track bed features from the track elevation map. '293 patent, 9:22-28; *see also* '293 patent, 9:28-30 ("The identification of features is based on the definition and identification of unique 3D feature attributes of a railway track bed."). Specifically, the system identifies a feature from the track elevation map by defining an appropriate gradient neighborhood representing a small 2D track section over which differential vertical measurements are calculated and moving the gradient neighborhood like a sliding window over the three-dimensional data. '293 patent, 10:21-35, 11:12-25, 11:45-63, 13:49-14:1, 15:23-35, FIGS. 5-8, 12-13, 18. As the gradient neighborhood is moved like a sliding window over the 3D elevation data, differential vertical measurements are calculated on the 3D elevation data located within the neighborhood to identify various railroad track bed features such as, for example, rail heads, rail bases, tie distress, ballast level anomalies, joint bars, rail base welds, and rail head distortion at high speeds. *See* '293 patent, 10:21-35, 11:12-25, 11:45-63, 13:49-14:1, 15:23-35, FIGS. 5-6, 7-8, 12-13, 18.

37.     In one example associated with detecting rail heads, as shown below in annotated FIG. 5, the specifications describe that "[a]n appropriate gradient neighborhood [30, red], is defined for vertical rail head edge features [green]. This rail head edge neighborhood represents a small 2D track bed surface area over which

differential vertical measurements are calculated." '293 patent, 10:26-30. The gradient neighborhood is applied to the 3D elevation data and the neighborhood is moved like a sliding window over the 3D elevation data. '293 patent, 10:31-35; *see also*, 9:54-56 ("A suitable neighborhood 30 [red] as shown in FIG. 5."), FIG. 6.



FIG. 5

38.     The '557 patent claims additional algorithms implemented by the track inspection system, including algorithms for detecting railroad tie distress and detecting railway track bed features. For example, the '557 patent's railroad tie distress algorithm compares ties in the elevation data with a tie surface plane model, identifies tie surface regions with elevations less than a tie surface plane minus a crack depth threshold as tie crack targets, and determines physical parameters of the crack targets. '557 patent, 17:7-67, FIG. 25. The '557 patent's railway track bed feature detection algorithm tests each of a plurality of railway track bed features in a 3D feature library against feature targets in the elevation data, eliminates feature template matching scores for feature targets which are less than a 3D feature correlation threshold, and calculates and stores physical parameters for a plurality of feature targets. '557 patent, 19:13-20:20, FIG. 33.

## B.    Prosecution Histories of the Asserted Patents

39.     I have reviewed the prosecution histories of the applications that led to the Asserted Patents. Nothing in the prosecution histories changes my opinions expressed in this declaration.

# VII.   DISPUTED CLAIM TERMS OF THE '293 PATENT

## A.   "Appropriate Gradient Neighborhood"

| Disputed Claim Term | Tetra Tech's Proposed Construction | Pavemetrics' Proposed Construction |
|---|---|---|
| "appropriate gradient neighborhood" (Claims 1, 22) | Plain and ordinary meaning. No further construction by the Court is necessary. | "zone of limited area of predetermined size and shape containing numbers used to calculate railway track bed height change at a certain point, based on the points within the zone" |

40.     The claims recite "defining an appropriate gradient neighborhood *representing* a small 2D track section over which differential vertical measurements are calculated." Thus, in my opinion, the plain language of the claims already provides context for and describes the meaning of "appropriate gradient neighborhood." It is also my opinion that this meaning aligns with the specification's description of "appropriate gradient neighborhood." Accordingly, in my opinion, no further construction by the Court is necessary for a POSA to understand the meaning of this term.

41.     In one example associated with rail head edge detection, the specification describes that an "appropriate gradient neighborhood, is defined for vertical rail head edge features," and that this "neighborhood represents a small 2D track bed surface area over which differential vertical measurements are calculated." '293 patent, 10:26-31. Likewise, for detecting rail base edges, the specification describes that an "appropriate gradient neighborhood, is defined for vertical rail base edge features," and this "neighborhood represents a small 2D track bed surface area over which differential vertical measurements are calculated." '293 patent, 11:51-56; *see also* '293 patent, 9:50-54, 12:44-46, 13:49-51, 15:23-25, 29:48-50, FIGS. 5-8, 12-13, and 18.

42.     In my opinion, based the intrinsic evidence, a POSA would not understand the '293 specification to require that "an appropriate gradient neighborhood" deviate from the language of the claims themselves and *must*, as Pavemetrics suggests: (1) have "a predetermined size and shape," (2) "contain[] numbers," (3) be used to calculate a

1    "height change at a certain point," or (4) that its related calculations be "based on

2    []points within" the appropriate gradient neighborhood, as Pavemetrics proposes.

3        43.    In my opinion, Pavemetrics' extrinsic evidence citations also do not

4    support its proposed construction. Pavemetrics' proposed construction requires that the

5    appropriate gradient neighborhood, among other proposed limitations, have a

6    "predetermined size and shape," but I note that Pavemetrics' extrinsic evidence states

7    that neighborhood operations may be performed on "*any shape*" and a neighborhood is

8    "*normally*" defined by a rectangular shape. Exhibit C, 95; Exhibit D, 66 (stating that a

9    neighborhood is "*typically*" defined by a rectangular shape) (emphasis added).

10       44.    Accordingly, in my opinion, no further construction by the Court is

11   necessary for a POSA to understand the meaning of this term.

12   **B.    "2D Track Section Over Which Differential Vertical Measurements**

13   **Are Calculated"**

| Disputed Claim Term | Tetra Tech's Proposed Construction | Pavemetrics' Proposed Construction |
|---|---|---|
| "2D track section over which differential vertical measurements are calculated" (Claims 1, 22) | Plain and ordinary meaning. No further construction by the Court is necessary. | "area of the railway track bed selected for calculating changes in railway track bed height over the area" |

19       45.    Further to my discussion above, this term's limitation of "2D track section

20   over which differential vertical measurements are calculated" serves to provide context

21   for and describe the meaning of "appropriate gradient neighborhood," consistent with

22   the description in the specification. Thus, in my opinion, no further construction by the

23   Court is necessary for a POSA to understand the meaning of this term.

24       46.    It is my opinion that a POSA would understand that the '293 specification

25   describes, generally, defining an appropriate gradient neighborhood representing a

26   small 2D track section to identify different railway track bed features and associated

27   measured parametric data. *See, e.g.*, '293 patent, 9:44-50, 10:28-30 (describing use of

28   a neighborhood that represents a small 2D surface area over which elevation

measurements suitable for rail head edges are calculated), 11:12-17, 11:53-55, 12:46-48 (describing use of a neighborhood that represents a small 2D surface area over which elevation measurements suitable for rail base are calculated), 13:51-53 (describing use of a "neighborhood [that] represents a small 2D surface area over which elevation measurements suitable for weld detection are calculated"), 15:25-:26 (describing use of a "neighborhood [that] represents a small 2D surface area over which elevation measurements suitable for planar surface detection are calculated"), claims 2, 3, 23, and 24 (reciting vertical gradient edge detection), claims 2, 3, 5, 6, 9, 12, 16, 21, 23, 24, 26, 27, 30, 33, 37, 42 (reciting elevation threshold comparisons), and claims 15, 16, 36, and 37 (reciting comparison to 3D features saved in a feature library).

47.     It is further my opinion, a POSA would not find the '293 specification, including the portions cited by Pavemetrics, to provide a requirement or definition mandating that the 2D track section over which differential vertical measurements are calculated must be "selected for calculating changes in railway track bed height over the area," as Pavemetrics proposes. In my opinion, a POSA would understand the term "2D track section over which differential vertical measurements are calculated" to mean exactly what it says, consistent with the surrounding claim language and specification, as it is intended to describe the meaning of "an appropriate gradient neighborhood." I note that in connection with identifying railway track bed features, the '293 specification describes "defin[ing]" "[a]n appropriate gradient neighborhood" that "represents a small 2D track bed surface area over which differential vertical measurements are calculated," and then "*appl[ying]*" "[t]he gradient neighborhood … for each position in the railway track bed elevation data." '293 patent, 10:26-35, 11:51-63, 12:44-55) (emphasis added). The specification does not describe the further functional step of "selecting for calculating" as Pavemetrics proposes, nor is there a reason to add this additional functional language to the claims. There is also no need to rewrite "differential vertical measurements" to "changes in railway track bed height."

48.    Accordingly, in my opinion, no further construction by the Court is necessary for a POSA to understand the meaning of this term.

### C.    "Sliding Window"

| Disputed Claim Term | Tetra Tech's Proposed Construction | Pavemetrics' Proposed Construction |
|---|---|---|
| "sliding window" (Claims 1, 22) | Plain and ordinary meaning. No further construction by the Court is necessary. | "component of an image-processing algorithm in which a calculation is based on a neighborhood or window of data about a pixel, and after the calculation at that pixel, the neighborhood (window) moves (slides) to an adjacent pixel for a calculation at the adjacent pixel" |

49.    In my opinion, a POSA would understand the term "sliding window" to define movement of the gradient neighborhood, *i.e.*, "moving the gradient neighborhood *like* a sliding window over the 3D elevation data," and should be given its plain and ordinary meaning consistent with the '293 patent's description. In my opinion, no further construction by the Court is necessary for a POSA to understand the meaning of this term.

50.    In my opinion, a POSA would readily understand the term "sliding window" without any further construction, as evidenced by the '293 specification's use of the term to define the type of motion of a gradient neighborhood, i.e., "like" a sliding window. '293 patent, 10:31-35, 11:59-63, 12:52-55, 13:57-61, 15:32-35. Based on this description and the fact that the term "sliding window" is commonly known in the art, I find no support for Pavemetrics' lengthy definition, which includes several limitations not described in the claims or specification.

51.    For instance, in one example shown below in annotated FIG. 5, the '293 specification describes that "[a]n appropriate gradient neighborhood [30, red], is defined for vertical rail head edge features [green]. This rail head edge neighborhood represents a small 2D track bed surface area over which differential vertical measurements are calculated." '293 patent 10:26-31. "The gradient neighborhood is

applied to *the 3D elevation data* and the area is moved like a window sequentially and complete for each position in the railway track bed elevation data." '293 patent, 10:31-35 (emphasis added); *see also* '293 patent, 9:54-56, FIG. 6. In my opinion, the specification does not describe, let alone mandate, a requirement that movement of the gradient neighborhood "like a sliding window" *must* be "about a single pixel" and subsequently "to an adjacent pixel for calculation at the adjacent pixel," as Pavemetrics proposes.



FIG. 5

52. Pavemetrics' proposed construction appears to come from a dictionary definition, but its proposed construction omits key language from that definition that makes it inconsistent with that definition and the knowledge and experience of those having ordinary skill in the art. The cited dictionary definition does not *require* movement "to an adjacent pixel." Exhibit E, 264 ("After the calculation is done at [a] given point, the calculation *typically* moves to an adjacent point.") (emphasis added). I note that the dictionary definition also provides the below image, which does not show movement of the window to an adjacent pixel.



53.     Accordingly, in my opinion, no further construction by the Court is necessary for a POSA to understand the meaning of this term.

### D.     "Moving the Gradient Neighborhood Like A Sliding Window Over the 3D Elevation Data"

| Disputed Claim Term | Tetra Tech's Proposed Construction | Pavemetrics' Proposed Construction |
|---|---|---|
| "moving the gradient neighborhood like a sliding window over the 3D elevation data" (Claims 1, 22) | Plain and ordinary meaning. No further construction by the Court is necessary. | sequentially and completely applying the gradient neighborhood to the 3D elevation data and calculating differential vertical measurements for each position |

54.     Further to my analysis above, in my opinion, a POSA would understand that the plain language of the claims explains that the gradient neighborhood is moved over the 3D elevation data "*like* a sliding window," consistent with the description in the '293 patent.

55.     Additionally, in my opinion, a POSA would not find support in the '293 patent to bring into the claims the additional limitations Pavemetrics proposes, namely the requirement of "*sequentially and completely* applying the gradient neighborhood to the 3D elevation data." The claims themselves do not recite the words "sequentially and completely." Further, in my opinion, a POSA would understand that the '293 specification describes defining an appropriate gradient neighborhood and applying the neighborhood "over the entire region to be processed," not necessarily to the complete set of acquired data. '293 patent, 9:52-54. Instead, as shown below in annotated FIG. 12, in an example associated with detecting rail base surfaces, which are sections of the track bed bounded by the rail head edges and rail base edges, the '293 specification explains that the "neighborhood is applied by the processor to the 3D elevation data for each of the four rail base surface zones." '293 patent, 13:54-56, FIG. 12. The specification further explains that "[t]he neighborhood area [122] is moved sequentially

1   and completely, like a window, for each position in the *four rail base zones* [118] and

2   the lowest elevation measure for each neighborhood is determined at each position."

3   '293 patent, 12:44-55. By describing the analysis of "zones," a person of ordinary skill

4   in the art would understand that the specification is not referring to analyzing all

5   acquired data. *See* '293 patent, 12:44-55. And even if the '293 specification did refer to

6   processing all the acquired data, a POSA would not understand the specification as

7   limiting the claims to this embodiment or example, even if a preferred one.

8       56.    In my opinion, Pavemetrics' extrinsic evidence citations also does not

9   support its proposed construction. Pavemetrics dictionary definition of "sliding

10  window" states that "[a]fter the calculation is done at [a] given point, the calculation

11  ***typically*** moves to an adjacent point." Exhibit E, 264 (emphasis added). In other words,

12  a sliding window may be moved to different portions of captured elevation data, without

13  necessarily having to analyze its entirety in a sequential and exhaustive fashion. Such

14  non-sequential and non-complete movement of a sliding window in an image is also

15  depicted in the image below (also provided in Pavemetrics' dictionary definition).



22      57.    Accordingly, in my opinion, no further construction by the Court is

23  necessary for a POSA to understand the meaning of this term.

24      **E.    "Identifying"**

| Disputed Claim Term | Tetra Tech's Proposed Construction | Pavemetrics' Proposed Construction |
|---|---|---|
| "identifying" | Plain and ordinary meaning. No further | "assigning a class to a portion of the track elevation map [three |

| (Claims 1, 2, 15, 19, 20, 21, 22, 23, 36, 42) | construction by the Court is necessary. | dimensional elevation map] based on a predetermined rule or model" |
|---|---|---|

58.     In my opinion, the term "identifying" is readily comprehensible, and therefore a POSA would understand it under its plain and ordinary meaning. *See, e.g.*, '293 patent, 9:28-36, 9:40-41, 9:44-46, 9:56, 9:61-64, 11:21-22, 13:25-26, 16:28-30, 16:56-57, 17:1-2, 17:29, 18:12-13, 18:44, 18:65-67, 19:23, 26:48-50, 27:17. In my opinion, no further construction by the Court is necessary for a POSA to understand the meaning of this term.

59.     I understand that Pavemetrics' definition would interpret an otherwise well-known term as requiring: "*assigning a class* to a portion of the track elevation map [three dimensional elevation map] *based on a predetermined rule or model*." In my opinion, a POSA would not understand any of the additional italicized elements are part of the term "identifying" as used in the '293 patent. In my opinion, a POSA, upon review the claims of the '293 patent, would understand the terms "identifying" and "assigning" as being separate and distinct. Compare, for example, claims 1-3, 5-9, 11-12, 14-15, 17-24, 30, 33, 36, and 42 (reciting "identifying") with claims 7-8, 11, 20, 28-29, 32, and 41 (reciting an "assigning" step (e.g., "assigning a condition"); *see also* claim 20 ("wherein the algorithm step of *identifying* a railway track bed feature further comprises the step of *assigning* a condition to the identified railway track bed feature") (emphasis added). As one example, claim 20 would be superfluous under Pavemetrics' proposed construction, because the identification step would necessarily involve assigning a class, in this case a condition, to a railway track bed feature.

60.     In my opinion, a POSA, upon review the specification of the '293 patent, would not interpret the term beyond its plain and ordinary meaning, since the specification does not describe, must less mandate, any requirements or definitions that compel a finding to the contrary. The specification refers to "identifying" throughout the specification but does not require a specific process or technique. *See, e.g.*, '293 patent, 9:44-46 ("The methodology for the identification of the rail head 22 is based on

the detection of significant (large vertical component) longitudinal edges over a 2D area"). In my opinion, a POSA would also understand the terms "assigning" and "classifying" to describe separate and distinct functions in view of the specification of the '293 patent. *See, e.g.*, '293 patent, 18:42-44 (when describing specific functionality of using a three-dimensional feature model library, which in its particular context requires classification of a railway track bed feature into one of the various three-dimensional models, the specification explains: "[t]here is a minimum correlation threshold which must be exceeded for any target to be *identified and classified* as a specific rail feature.") (emphasis added), 14:16-18 (when describing the specific functionality of analyzing manmade features such as weld features, the specification states: "[t]he ability to identify planar regions [as] required for manmade feature *identification and classification*.")).

61.    In my opinion, moreover, a POSA would not interpret the term "identifying" as requiring the use of "a predetermined rule or model" upon reviewing the '293 patent. I note that the word "rule" only appears in the '293 specification sparingly, and it is used in a general sense and not to describe specific functionalities. '293 patent, 2:19-24 ("The extensibility of the rule-based expert system architecture used for interpretation during processing allows the refinement of existing parameters and/or the development of rules and physical parameters as new features or track components are encountered"), 16:49-50 ("The severity determination includes additional rules for penalizing end break cracks"). The term "model" is used in the '293 patent but in connection with specific functionalities that naturally necessitate comparison to feature models, such as "3D model matching," (*see, e.g.,* '293 patent, 18:45-20:6, 25:25-28:51, FIGS. 27-30, 33, 46-47), and tie distress (e.g., crack) detection using "tie Surface Plane models" (*see* '293 patent, 17:7-67, FIG. 25). But these specific functionalities utilizing model comparisons are captured in dependent claims 15-16 and 36-37 (reciting use of "three dimensional features saved in a feature library") and claims 6-8, 14, 17-18, 27-29, 35, and 38-39 (reciting steps utilizing a "tie surface plane").

62.     Accordingly, in my opinion, no further construction by the Court is necessary for a POSA to understand the meaning of this term.

**F.      "Is Configured To Run An Algorithm"**

| Disputed Claim Term | Tetra Tech's Proposed Construction | Pavemetrics' Proposed Construction |
|---|---|---|
| "is configured to run an algorithm" (Claim 1) | Plain and ordinary meaning. No further construction by the Court is necessary. <br><br> If the Court believes further construction in accordance with the plain and ordinary meaning is necessary, Tetra Tech proposes: "is programmed to run an algorithm" | "is set up to run the algorithmic steps without modification" |

63.     In my opinion, a POSA would understand the term "is configured to run an algorithm" without any further construction, since it is another easily understood term. In my opinion, a POSA, upon reviewing the '293 patent, would not include Pavemetrics' addition that a configuration must be "without modification." The specification does not impart any particular meaning to the words in the claim beyond the plain and ordinary meaning that a person of ordinary skill in the art would have readily understood. *See, e.g.*, '293 patent, 8:53-59 (defining a processor to include a processing unit capable of performing the tasks described), 10:21-24, 11:45-48, 12:32-35, 13:39-43 (discussing rail head edge, rail base edge, and rail base weld detection processing steps being carried out by a program stored on a computer readable medium in communication with a processor); *see also*, 12:32-35 (rail head elimination), 15:10-15 (defining planar regions and tie boundary boxes), 17:7:10 (tie distress detection), 19:13-16 (tie anchor and fastener detection), 20:21-24 (shoulder volume calculation), 23:10:14 (ballast volume calculation), 25:25-29 (determining pad thickness, rail seat abrasion, and insulator thickness), and 27:66-28:3 (joint bar processing). I note that the '293 specification is silent with respect to "without modification" or similar language when describing the disclosed algorithms. And Pavemetrics' extrinsic definition of

1  "configure" as "to set up a computer or program to be used in a particular way" does
2  not make any mention of "without modification." Exhibit F, 111.

3     64.     Accordingly, in my opinion, no further construction by the Court is
4  necessary for a POSA to understand the meaning of this term.

5     65.     Furthermore, if the Court does construe the term "is configured to run an
6  algorithm," in my opinion, it should be construed to mean "is programmed to run an
7  algorithm," which is consistent in the context of the '293 patent, which describes a
8  processor that is programmed to execute one or more algorithms. *See e.g.*, '293 patent,
9  8:53-59.

10    **G.     "Comprising The Steps Of:" a, b, c, d**

| Disputed Claim Term | Tetra Tech's Proposed Construction | Pavemetrics' Proposed Construction |
|---|---|---|
| "the algorithm comprising the steps of:" a, b, c, d (Claim 1)<br><br>"the method comprising the steps of:" a, b, c, d (Claims 1, 22) | Plain and ordinary meaning. No further construction by the Court is necessary. | "the algorithm must be configured to run the steps in the recited order"<br><br>"the method steps must be performed in the recited order" |

17    66.     In my opinion, neither the language of the claims, the specification, or
18  logic would the steps in the claims of the '293 patent to be performed in the recited
19  order.

20    67.     In fact, there are several ways for the steps of claim 1 (and corresponding
21  language of claim 22) of the '293 patent to be performed in an order other than the one
22  recited therein. Step (c)(i), for example, recites the step of "defining an appropriate
23  gradient neighborhood representing a small 2D track section over which differential
24  vertical measurements are calculated." Nothing in the language of the claims require
25  this step to be performed in any particular order with respect to the other steps of claim
26  1. A POSA would understand for example, based on the plain language of the claims
27  and the supporting disclosure of the '293 patent, a system and corresponding method
28  may define an appropriate gradient neighborhood as a first step and, e.g., as part of an

initial set up sequence before any acquisition or processing steps. In such a case, Step (c)(i) would take place before the acquisition of data (Step (a), generation of a track elevation map (Step (b), and identification of a railway track bed feature (Step (c)). '293 patent, 2:55-62; 5:8-15; 29:39-55; 31:43-61.

68.     As another example, Step (d) recites the step of "storing information corresponding to the identified railway track bed feature in the data storage apparatus." In my opinion, a POSA would understand that a system and corresponding method may store information after acquiring three dimensional data (Step (a)), but before generating a track elevation map (Step (b)) and/or identifying a railway track bed feature (Step (c)). '293 patent, 2:55-62; 5:8-15; 29:39-55; 31:43-61. While Step (d) requires the storage of data corresponding to the "identified railway track bed feature," a system and corresponding method may store information corresponding to an entire railway track bed prior to identification, and subsequently ensuring that information associated with an identified railway track bed feature (e.g., a fastener) remains stored after identification. The '293 specification contemplates the same, explaining that "sensors 16 detect elevation and intensity data and the data is stored in a data storage apparatus 18 in communication with the processor 12." '293 patent, 9:2-5. In other words, information associated with railway track bed features may be stored immediately after acquisition of data, which would take place before generation of a track elevation map and identification of railway track bed features.

69.     Similarly, for claim 22, the plain language of the claims and the specification allow for steps to be performed out of the recited order.  For example, Step (c)(i) recites the step of "defining an appropriate gradient neighborhood representing a small 2D track section over which differential vertical measurements are calculated," which could be performed as an initial set up sequence before any acquisition or processing steps, including the "defining" process of Step (a), "identifying" process of Step (c), and/or the "storing" processes of Steps (b) and (d). And, consistent with the description above, Step (d)'s "storing information corresponding to the identified

railway track bed feature in the data storage apparatus" could be performed prior to the "identifying" process of Step (c). As yet another example, Step (b)'s "storing the elevation map" could occur after Step (c)'s "identifying a railway rack bed feature from the elevation map," and Step (d)'s "storing information corresponding to the identified railway track bed feature." As a non-limiting example, a system or process could be set up to perform identification of features, saving information of those features, and lastly storing the elevation map corresponding to the detected features.  Nothing in the claim language precludes this order.

70.    Accordingly, in my opinion, no further construction by the Court is necessary for a POSA to understand the meaning of this term.

## VIII.  DISPUTED CLAIM TERMS OF THE '557 PATENT

### A.    "Tie Surface Plane Model"

| Disputed Claim Term | Tetra Tech's Proposed Construction | Pavemetrics' Proposed Construction |
|---|---|---|
| "tie surface plane model" (Claim 8) | Plain and ordinary meaning. No further construction by the Court is necessary. | "an approximation of the like-new surface of the entire tie based on an industry standard tie model" |

71.    In my opinion, a POSA would understand the term "tie surface plane model" under its plain and ordinary meaning. The claim language itself, for instance, explains how a tie surface plane model is used. *See* claim 8 (reciting "comparing ties in the elevation data with *a tie surface plane model* by calculating the difference between the tie surface elevation data and *the tie surface plane model* using the processor," as well as identifying tie crack targets with "elevations less than a tie surface plane minus a crack depth threshold.") The specification of the '557 patent also describes a tie surface plane model. *See, e.g.*, '557 patent, 15:67-16:3 (explaining what a tie surface plane model represents, namely "an approximation for a like-new tie surface which is used to calculate tie physical parameters and to assess tie condition"). In my opinion, no further construction by the Court is necessary for a POSA to understand the meaning of this term.

72.     In my opinion, Pavemetrics' proposed construction unnecessarily attempts to narrow this term by requiring that a model be (1) "of the *entire tie*" and (2) "*based on an industry standard* tie model." I note that the specification of the '293 patent does not recite the words "entire tie." Instead, it specifically contemplates defining a tie surface plane model only with respect to areas where ties are visible by eliminating tie areas covered by a rail. '557 patent, 10:40-46 ("A estimate of the crosstie surface elevation between the rails is calculated (block 50) … using typical rail dimensions to eliminate regions of the track bed surface which are outside expected tie surface elevations (too high or low)"); *see also* '557 patent, 16:16-17 (further explaining, in connection to FIG. 20, that the "[t]he tie surface plane 192 *preferably excludes the rail and tie plate surfaces*") (emphasis added).

73.     I also note that the specification of the '557 patent uses the term "industry-standard tie model" only once, and in connection with "bounding box definition method" and for a specific set of circumstances—one in which a tie is damaged or broken. It states that "industry standard tie models [] assist in correctly defining and orienting the bounding box *in cases where the tie is damaged or broken*." '557 patent, 15:7-9 (emphasis added). Using an industry-standard tie model in this specific circumstance makes sense from the perspective of a person having ordinary skill in the art, since a damaged or broken tie may not be able to be used to approximate a tie surface plane model because of an uneven tie surface. Nevertheless, despite the fact that the specification of the '557 patent describes this specific embodiment, I understand that it would be improper to read this particular example into the claims under claim construction principles.

74.     Accordingly, in my opinion, no further construction by the Court is necessary for a POSA to understand the meaning of this term.

## B. "Tie Bounding Box"

| Disputed Claim Term | Tetra Tech's Proposed Construction | Pavemetrics' Proposed Construction |
|---|---|---|
| "tie bounding box" (Claims 8, 14) | Plain and ordinary meaning. No further construction by the Court is necessary. | "the physical edge boundaries of a tie, defined by matching the elevation data to industry standard tie models" |

75. Claim 8 recites "inputting" data including "detected tie bounding box data" to a processor. In my opinion, a POSA would also understand the term "tie bounding box" under its plain and ordinary meaning. The specification of the '557 patent describes a tie bounding box, describing it as "the physical edge boundaries of each detected tie." '557 patent, 15:3-4, FIGS. (17, 20, 22, 35, 38, 39, and 48 showing exemplary tie bounding boxes). In my opinion, no further construction by the Court is necessary for a POSA to understand the meaning of this term.

76. I understand Pavemetrics' proposed construction to explicitly require a tie bounding box to be "defined by matching the elevation data to industry standard tie models." I find no support in the '557 patent for this requirement. As explained before, the specification of the '557 patent uses the term "industry-standard tie model" only in a very specific circumstance, in cases where a tie is damaged or broken. '557 patent, 15:7-9 ("industry standard tie models [] assist in correctly defining and orienting the bounding box *in cases where the tie is damaged or broken*") (emphasis added). As discussed before, using an industry-standard tie model in this specific circumstance makes sense from the perspective of a person having ordinary skill in the art, since a damaged or broken tie may not be able to be used to approximate a tie surface plane model because of an uneven tie surface. Further, while the '557 specification describes matching tie models in connection with tie bounding boxes, it does not describe using *industry standard* tie models. '557 patent, 15:57-59 ("Best Fit processing (block 176) of all available crosstie models are completed for each clustered planar region to define the best match tie model"). Nevertheless, despite the fact that the specification of the

'557 patent describes these specific embodiments, I understand that it would be improper to read this particular example into the claims under claim construction principles.

77.     Accordingly, in my opinion, no further construction by the Court is necessary for a POSA to understand the meaning of this term.

## IX.    ADDITIONALLY DISPUTED TERMS

### A.    "Track Elevation Map" ('293 Patent)

| Disputed Claim Term | Tetra Tech's Proposed Construction | Pavemetrics' Proposed Construction |
|---|---|---|
| "track elevation map" (Claims 1, 15, 36) | Plain and ordinary meaning. No further construction by the Court is necessary. | "representation of both the height (elevation) and intensity of reflected laser light (intensity) at each data point within an area across the entire width of the railway track bed" |

78.     In my opinion, a POSA would understand the term "track elevation map" without any further construction. The claim language describes how a track elevation map is generated, reciting "acquiring three dimensional surface elevation and intensity data representative of an area segment of railway track bed; [and] generating *a track elevation map based on* the acquired three dimensional data" (emphasis added). Claim 1 thus explains that a track elevation map is generated "based on" "the acquired three dimensional data," i.e., three dimensional surface elevation, intensity data, *or* both. This understanding naturally aligns with the '293 patent's disclosure.

79.     For example, FIG. 2 "shows an image of a full track width *elevation and intensity profile*." '293 patent, 6:60-61.  FIGS. 10 and 11, on the other hand, both show "an *elevation* map of a portion of a railway track bed." '293 patent, 7:12-14; *see also*, 12:65-13:3. ("FIG. 10 shows an elevation map of a portion of a railway track bed … FIG. 11 shows the same section of track after the rail head elevation have been modified"). This illustrates how the '293 patent contemplates using intensity maps, elevation maps, and/or combined elevation and intensity maps.



FIG. 2

FIG. 10

80.    I again note that this understanding aligns with the claim language, which recites that a track elevation map is generated "based on" the acquired three dimensional data. Therefore, the claim allows use of the entirety of the acquired three dimensional data, or only a portion thereof. This aligns with the understanding of those having ordinary skill in the art, in my opinion, since an elevation map could be defined, for example, using only surface elevation data, intensity data, *or* both. In practice, it often makes sense to process one type of data at a time, and thus, have separate track elevation maps for surface elevation and intensity. It is also possible to create combined representations of elevation and intensity data for additional analysis and presentation. Thus, in my opinion, consistent with the plain language of the claims and consistent with the descriptions in the '293 specification, a POSA would appreciate the benefits in flexibility associated with generating and analyzing one or more track elevation maps based on the different types of three dimensional data acquired.

81.    Accordingly, in my opinion, no further construction by the Court is necessary for a POSA to understand the meaning of this term.

**B.    "Three Dimensional Elevation Map" ('293 Patent)**

| Disputed Claim Term | Tetra Tech's Proposed Construction | Pavemetrics' Proposed Construction |
|---|---|---|
| "three-dimensional elevation map"<br><br>(Claim 22) | Plain and ordinary meaning. No further construction by the Court is necessary. | "representation of both the height (elevation) and intensity of reflected laser light (intensity) at each data point within an area |

|  |  | across the entire width of the railway track bed" |
|---|---|---|

82.     Similarly, in my opinion, a POSA would understand the term "three dimensional elevation map" without any further construction. The claim language describes how a three dimensional elevation map is generated, reciting "defining a three dimensional elevation map *based on* surface elevation and intensity data representative of an area segment of the railway track bed." Thus, the claim language explains that a three dimensional elevation map is "based on" "surface elevation and intensity data representative of an area segment of the railway track bed." Therefore, this term encompasses defining more than one "three-dimensional elevation map," and the maps are "based on surface elevation and intensity data." This does not require that each three-dimensional elevation map is a representation of *both* surface elevation and intensity data, as in Pavemetrics' proposed construction.

83.     Similar to the discussion above, importantly, the three-dimensional elevation map is "based on" surface elevation and intensity data. Therefore, the claim allows use of surface elevation, intensity data, *or* both. This aligns with the previous discussion that, it often makes sense to have separate three-dimensional elevation maps for surface elevation and intensity. The specification of the '293 patent supports this, as it explains that *multiple* three-dimensional elevation maps are created from captured elevation and intensity data: "The data is [] combined for both rails to provide a full elevation and intensity profile of the full width of a railway track bed …. These full profiles are also referred to as 3D elevation *maps*." '293 patent, 9:17-21 (emphasis added). In other words, the captured elevation data from each sensor may be combined into a single three-dimensional elevation map, and the captured intensity data from each sensor may likewise be combined into a singular three-dimensional elevation map. Moreover, the '293 patent describes performing operations, such as rail head removal, from *multiple* three-dimensional elevation maps: "[I]t is preferable to remove rail head features from the 3D elevation *maps*." '293 patent, 12:17-18 (emphasis added). This

again aligns with the understanding of a POSA, in my opinion, since a processor can only generally perform an operation on one type of data at a time.

84.   Accordingly, in my opinion, no further construction by the Court is necessary for a POSA to understand the meaning of this term.

**C.   "Small Area" and "Small Length" ('557 Patent)**

| Disputed Claim Term | Tetra Tech's Proposed Construction | Pavemetrics' Proposed Construction |
|---|---|---|
| "small area" (Claim 10) | Plain and ordinary meaning. No further construction by the Court is necessary. | Indefinite as relative terms with no definition or exemplary disclosure in the specification. |
| "small length" (Claim 10) | Plain and ordinary meaning. No further construction by the Court is necessary. | Indefinite as relative terms with no definition or exemplary disclosure in the specification. |

85.   Claim 10 recites the step of "eliminating small area and small length tie crack targets," and relates to identifying tie surface cracks by eliminating tie crack targets having a small area or length. In my opinion, a POSA would understand the terms "small area" and "small length" under their plain and ordinary meaning within the specific context of detecting "tie crack targets," as recited in claim 10 of the '557 patent. That is, in my opinion, the terms "small area" and "small length" informs a POSA, with reasonable certainty, about the scope of the invention, particularly in view of the specification of the '557 patent, which provides an objective basis for a POSA to determine whether a given area and length sufficiently small to warrant not being identified as a tie crack. '557 patent, 15:67-16:63, 17:7-67, FIGS. 20-22, 25. Accordingly, in my opinion, these terms are definite and no further construction by the Court is necessary for a POSA to understand the meaning of these terms.

86.   For example, the specification explains that the area and length associated with tie cracks, among other parameters, may be used to identify and categorize tie cracks and "establish an accurate and objective severity and extent distress measures for each crack." '557 patent, 16:47-49. The specification apprises a POSA of what a tie

crack area and length represent, describing the tie crack area as "the area defined by the number of connected surface elevation measurement points forming the crack in its entirety," and tie crack length as "measured along the path of the crack." '557 Patent, 16:36-38, 41. The specification further explains how the area and length are used in detecting tie crack targets, i.e., by eliminating those that do not have a minimum area and length. *See, e.g.,* '557 patent, 16:26-33 ("The 3DTAS tie condition assessment method described herein identifies, locates and measures all surface cracks (voids) deeper than a minimum crack depth threshold and *longer than a minimum crack length (extent) threshold*.") (emphasis added), 17:33-40 ("Negative elevation difference regions, with a magnitude greater than Crack Depth Threshold, represent Crosstie Crack Targets (block 226). *Crosstie Crack Targets are 3D features having length, width and depth. Crack Targets having a short length or small surface area are eliminated from further analysis*") (emphasis added). This description, in my opinion, provides an objective basis for a POSA to ascertain whether a given tie crack area or length area and length represents a small area and length, such as through the use of minimum area and length thresholds.

## X.    CONCLUSION

87.    My current opinions are set forth in this declaration. However, my analysis is continuing, and I thus reserve the right to supplement or amend my declaration and to rely on additional documents, or discovery or testimony that may come to my attention.

88.    Moreover, I may make additions, deletions, or modifications to this declaration and my opinions in the future that would be reflected in additional declarations that I may be asked to submit in this case. I also reserve the right to rely on all other expert declarations submitted in this case. I reserve the right to respond to additional arguments or analyses proffered by expert witnesses and/or the Pavemetrics, and I understand that I may be asked to give rebuttal testimony on matters not covered in this declaration.

1        I hereby declare that all statements made herein of my own knowledge are true

2    and that all statements made on information and belief are believed to be true; and

3    further that these statements were made with the knowledge that willful false statements

4    and the like so made are punishable by fine or imprisonment, or both, under Section

5    1001 of Title 18 of the United States Code.

Dated: October 4, 2021        By: _____

                            Vassilios Morellas, Ph.D.