Joseph R. Re (SBN 134,479)
joe.re@knobbe.com
Christy G. Lea (SBN 212,060)
christy.lea@knobbe.com
Nicholas M. Zovko (SBN 238,248)
nicholas.zovko@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Phone: (949) 760-0404
Facsimile: (949) 760-9502

Payne McQueen Montgomery (*Pro Hac Vice*)
mack.montgomery@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
1717 Pennsylvania Ave. N.W., Ste. 900
Washington D.C. 20006
Phone: (202) 640-6400
Facsimile: (202) 640-6401
*Attorneys for Plaintiff/Counterclaim Defendant*
PAVEMETRICS SYSTEMS, INC.

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| PAVEMETRICS SYSTEMS, INC., <br><br> Plaintiff, <br><br> v. <br><br> TETRA TECH, INC., <br><br> Defendant. <br><br> AND RELATED COUNTERCLAIMS | Case No. 2:21-cv-1289-MCS-MMA <br><br> **PAVEMETRICS' RESPONSIVE CLAIM CONSTRUCTION BRIEF** <br><br><br> Honorable Mark C. Scarsi <br> Honorable Maria A. Audero |

# TABLE OF CONTENTS

**Page No.**

I.      INTRODUCTION ..................................................................1

II.     MOST SIGNIFICANT CLAIM TERMS ................................2

    A.      "Track Elevation Map" | "Three Dimensional Elevation Map" ('293 Patent) ....................................2

    B.      "Identifying" ('293 Patent) ........................................5

    C.      "Appropriate Gradient Neighborhood" ('293 Patent) .................................................................7

    D.      "2D Track Section Over Which Differential Vertical Measurements Are Calculated" ('293 Patent) ..................................................................10

    E.      "Sliding Window" ('293 Patent).................................11

    F.      "Moving the Gradient Neighborhood Like a Sliding Window Over the 3D Elevation Data" ('293 Patent)..................................................................13

    G.      "Is Configured To Run An Algorithm" ('293 Patent) ..................................................................15

    H.      "Comprising The Steps Of:" a, b, c, d ('293 Patent) ...................18

    I.      "Tie Surface Plane Model" ('557 Patent) ....................................21

    J.      "Tie Bounding Box" ('557 Patent) .................................................23

III.    INDEFINITE CLAIM TERMS ..............................................23

    A.      "Small Area" and "Small Length" ('557 Patent)..........................23

# TABLE OF AUTHORITIES

**Page No(s).**

*Apple, Inc. v. Ameranth, Inc.*,
  842 F.3d 1229 (Fed. Cir. 2016) ..................................................................... 21

*Bd. of Regents of the Univ. of Texas Sys. v. BENQ Am. Corp.*,
  533 F.3d 1362 (Fed. Cir. 2008) ..................................................................... 21

*Centripetal Networks, Inc. v. Cisco Sys., Inc.*,
  2020 WL 863976 (E.D. Va. 2020) .......................................................... 16, 17

*Finjan, Inc. v. Secure Computing Corp.*,
  626 F.3d 1197 (Fed. Cir. 2010) .............................................................. 16, 17

*Function Media, L.L.C. v. Google, Inc.*,
  708 F.3d 1310 (Fed. Cir. 2013) ..................................................................... 18

*Huawei Techs. Co. v. Verizon Commc'ns Inc.*,
  2021 WL 150442 (E.D. Tex. 2021) ............................................................... 16

*Immunex Corp. v. Sanofi-Aventis U.S. LLC*,
  977 F.3d 1212 (Fed. Cir. 2020) ..................................................................... 12

*Intellectual Ventures I LLC v. AT&T Mobility LLC*,
  2016 WL 4363485 (D. Del. 2016), *vacated in part on other
  grounds*, 902 F.3d 1372 (Fed. Cir. 2018) ..................................................... 25

*Interval Licensing LLC v. AOL, Inc.*,
  766 F.3d 1364 (Fed. Cir. 2014) ..................................................................... 24

*Loral Fairchild Corp. v. Sony Elecs. Corp.*,
  181 F.3d 1313 (Fed. Cir. 1998) ..................................................................... 20

*Mantech Envtl. Corp. v. Hudson Envtl. Serv., Inc.*,
  152 F.3d 1368 (Fed. Cir. 1998) .............................................................. 19, 20

*Mformation Techs., Inc. v. Research in Motion Ltd.*,
  764 F.3d 1392 (Fed. Cir. 2014) ..................................................................... 18

*MyMedicalRecords, Inc. v. Walgreen Co.*,
  2014 WL 7338822 (C.D. Cal. 2014) .............................................................. 24

# TABLE OF AUTHORITIES
## (*cont'd*)

**Page No(s).**

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   572 U.S. 898 (2014) ........................................................ 24

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
   521 F.3d 1351 (Fed. Cir. 2008) ................................. 1, 10

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ...................................... 5

*Sulzer Textil A.G. v. Picanol N.V.*,
   358 F.3d 1356 (Fed. Cir. 2004) ...................................... 8

*TALtech Ltd. v. Esquel Apparel, Inc.*,
   279 Fed. App'x 974 (Fed. Cir. 2008) ........................... 18

*Tempo Lighting, Inc. v. Tivoli, LLC*,
   742 F.3d 973 (Fed. Cir. 2014) ................................. 12, 13

*Uni-Systems, LLC v. United States Tennis Assoc.*,
   2020 WL 3960841 (E.D.N.Y. 2020) ............................. 25

## OTHER AUTHORITIES

Oxford English Dictionary Online (September 2021) ....................................... 10

# TABLE OF EXHIBITS

| Declaration of Aaron Parker (ECF 86-1) | |
|---|---|
| **Title** | **Exhibit** |
| U.S. Patent No. 10,362,293 | A |
| U.S. Patent No. 10,616,557 | B |
| BERND JÄHNE ET AL., HANDBOOK OF COMPUTER VISION AND APPLICATIONS: VOLUME 2 SIGNAL PROCESSING AND PATTERN RECOGNITION (1st ed. 1999) | C |
| INTEL, INTEL INTEGRATED PERFORMANCE PRIMITIVES FOR INTEL ARCHITECTURE REFERENCE MANUAL, VOLUME 2: IMAGE AND VIDEO PROCESSING (Mar. 2009) | D |
| ROBERT B. FISHER ET AL., DICTIONARY OF COMPUTER VISION AND IMAGE PROCESSING (2d ed. 2014) | E |
| DOUGLAS E. DOWNING ET AL., DICTIONARY OF COMPUTER & INTERNET TERMS (10th ed. 2009) | F |
| Declaration of Dr. Vassilios Morellas in Support of Tetra Tech's Opening Claim Construction Brief | H |
| **Declaration of David Frakes, Ph.D** | |
| **Title** | **Exhibit** |
| Curriculum Vitae of Dr. David Frakes | I |
| **Declaration of Payne M. Montgomery** | |
| **Title** | **Exhibit** |
| Excerpts from the prosecution history of U.S. Patent No. 10,362,293 | J |
| THE MATHWORKS, IMAGE PROCESSING TOOLBOX FOR USE WITH MATLAB: USER'S GUIDE VERSION 5 (2004) | K |
| Robert M. Haralick & Linda G. Shapiro, *Glossary of Computer Vision Terms*, 24 PATTERN RECOGNITION 69 (1991) | L |

# I. **INTRODUCTION**

Tetra Tech proposes no constructions.  It hopes this Court never decides the meaning of the disputed terms.  Its intent is clear though, to have unfettered rein to argue infringement to the jury under whatever broad version of the "ordinary" meaning is necessary.  This Court should reject Tetra Tech's attempt to have the jury decide the claims' scope.  This is particularly true here, because the asserted claims contain numerous terms of art in the field of computer vision.  A lay jury would not know the meaning of such terms, including "gradient neighborhood" and "sliding window."  Nor would the jury know the particular meanings Tetra Tech gave the terms in obtaining the patents.

The standard for whether to construe a term is whether the parties have a genuine dispute as to its meaning that affects claim scope.  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008).  Here the parties dispute the meaning of numerous terms.  Tetra Tech's infringement contentions show it is departing from the ordinary meaning and from definitions in the intrinsic file when applying much broader meanings of the claims onto Pavemetrics' algorithms.

In arguing for "no further construction," Tetra Tech argues that "a [POSA] would understand the term." *See, e.g.*, Br. at 8.  But that is the wrong legal standard.  This Court should decide the claim scope when jurors cannot be expected to understand the meaning.  If a POSA would not understand the term, the claims would be indefinite.

Finally, Tetra Tech seeks to avoid construction of two terms by refusing to treat them as "most significant."  But any fair construction of those terms shows Pavemetrics cannot infringe any claim in the '293 patent.  Tetra Tech defined both of those terms ("track elevation map" and "three dimensional elevation map") in its patent and throughout the intrinsic record.  This Court should give those terms that same meaning.

## II.  MOST SIGNIFICANT CLAIM TERMS

**A.**   **"Track Elevation Map" | "Three Dimensional Elevation Map" ('293 Patent)**

| Disputed Term | Tetra Tech's Proposed Construction | Pavemetrics' Proposed Construction |
|---|---|---|
| "track elevation map" (claims 1, 15, 36)  "three dimensional elevation map" (claim 22) | "Plain and ordinary meaning. No further construction by the Court is necessary." | "representation of both the height(elevation) and intensity of reflected laser light (intensity) at each data point within an area across the entire width of the railway track bed" |

The parties disagree on whether the "track elevation map" and "three dimensional elevation map" (hereinafter both terms referred to as the "3D map") must include both elevation and intensity data.[1]  Even though the claims expressly recite that the 3D map is based on "three dimensional surface elevation **and** intensity data," Tetra Tech argues that the 3D map can be based on either elevation **or** intensity data.  Br. at 21-23.  Because Tetra Tech knows Pavemetrics does not identify features from a 3D map based on elevation **and** intensity data, Tetra Tech is hoping to eliminate this claim limitation altogether. In so doing, Tetra Tech ignores the language of the claims, an express definition in the specification, and the prosecution history.  Indeed, it amended the claims to require both elevation and intensity data to overcome the prior art.

### 1.   The Intrinsic Evidence Defines the 3D Map Terms

The '293 claims expressly recite that the 3D map is generated or defined based on "surface elevation **and** intensity data."  Claim 1 requires an algorithm that includes the step of "acquiring three dimensional surface elevation and

---

[1] The '293 patent uses the term "track elevation map" and "three dimensional elevation map" interchangeably.  *Compare* Claim 22 ("defining a three dimensional elevation map," *with* its dependent Claim 36 ("comparing at least a portion of the track elevation map").

intensity data representative of an area segment of railway track bed." Ex. A, 29:41-43.[2]   The next algorithm step is "generating a track elevation map based on the acquired three dimensional data." *Id.*, 29:44-45.  The acquired 3D data is the 3D "surface elevation ***and*** intensity data" from the acquiring step. Similarly, Claim 22 requires "defining a three dimensional elevation map based on surface elevation ***and*** intensity data representative of an area segment of the railway track bed." *Id.*, 31:45-47 (emphasis added).

In the specification, the patentee defined "3D elevation maps":

The data is then combined for both rails to provide a full elevation ***and*** intensity profile of the full width of a railway track bed as shown for example in FIG. 2.  The full profiles ***are also referred to as 3D elevation maps***.

Ex. A, 9:17-21 (emphasis added).  Even the Abstract explains the invention is a "3D track assessment system for identifying and assessing features of a railway track bed based on 3D elevation ***and*** intensity data gathered from the railway track bed." Ex. A, Abstract (emphasis added).

During prosecution, Tetra Tech amended the claims to require that the algorithm process both elevation ***and*** intensity data.  Original Claim 1 did not require processing intensity data at all.  It merely required processing "three-dimensional elevation data." Ex. J at 2.  The examiner rejected all claims over a prior art reference that did "not explicitly teach capturing the intensity image data." *Id.* at 15, 65.  Tetra Tech responded by amending Claim 1 to require processing "three dimensional <u>surface</u> elevation <u>and intensity</u> data." *Id.* at 40

---

[2] Exhibits A-H (ECF 86-2 to 86-9) are attached to the Declaration of Aaron Parker in Support of Tetra Tech's Opening Claim Construction Brief (ECF 86-1).   Exhibit I is attached to the Declaration of David Frakes, and Exhibits J-L are attached to the Declaration of Payne McQueen Montgomery in Support of this Responsive Claim Construction Brief.

(underlined words added by Tetra Tech).  In its remarks, Tetra Tech argued that the claims require both elevation and intensity data.  *Id.* at 50.  Tetra Tech argued the prior art did not disclose creating "3D surface elevation and intensity data models" from which to identify true 3D features.  *Id.* at 50, 51, 57.

## 2. This Court Should Reject Tetra Tech's Attempt to Rewrite the Intrinsic Evidence

Tetra Tech argues that "surface elevation and intensity data" means "surface elevation *or* intensity data, *or* both."  Br. at 21 (emphasis added).  But Tetra Tech's attempt to rewrite "and" to mean "and/or" should be rejected in view of the intrinsic evidence explained above.

Tetra Tech relies heavily on the claim term "based on" to rewrite "and" to mean "and/or."  Tetra Tech argues that "'based on' does not mandate any particular type of data be included in a track elevation map."  Br. at 21.  But Tetra Tech ignores that its own claims, specification, and prosecution history did mandate a particular type of data be included in the 3D map when they repeatedly used (and emphasized) the conjunctive "and" to explain that such a map includes elevation *and* intensity data.  *See*, *e.g.*, Ex. J at 100.

Tetra Tech's argument that the claim "encompasses defining more than one" 3D map is totally beside the point.  Br. at 22-23.  The issue is whether one of those maps includes both elevation and intensity data as the claims requires.

Tetra Tech argues that the specification discloses "*multiple* three dimensional elevation maps."  Br. at 23.  Indeed, multiple 3D maps are needed, because each 3D map represents only an "area segment" of the track.  Ex. A., Claims 1, 22.  But each 3D map contains elevation *and* intensity data for a "segment" of track.

Tetra Tech's arguments about Figure 10 containing only elevation data also have no relevance and cannot be used to depart from the express definition of 3D map.  The patent refers to Figure 10 as merely an "elevation map" and

1   never as a "track elevation map" or a "three dimensional elevation map."  Ex. A,

2   7:10-11.  In contrast, the patent refers to Figure 2 as "a full track width elevation

3   and intensity profile" and a "3D elevation map." *Id.*, 6:60-61, 9:17-21; *see also*

4   7:31-32 (referring to Figure 19 as "a 3D elevation map for a section of track

5   bed").  Both Figures 2 and 19 are different than Figure 10.  It also makes sense

6   that the patent does not refer to Figure 10 as a "track elevation map," because it

7   does not have the required intensity data.

8   Finally, Tetra Tech cannot rely on extrinsic evidence (i.e., an expert

9   declaration) to depart from the express definition of 3D map provided

10  throughout the intrinsic evidence.  *See Phillips v. AWH Corp.*, 415 F.3d 1303,

11  1316 (Fed. Cir. 2005).  Accordingly, this Court should reject the testimony of

12  Tetra Tech's retained expert and apply the definition set forth in the '293 patent

13  and the prosecution history.

14  **B.    "Identifying" ('293 Patent)**

| Disputed Term | Tetra Tech's Proposed Construction | Pavemetrics' Proposed Construction |
|---|---|---|
| "identifying" (claims 1, 2, 15, 19, 20, 21, 22, 23, 36, 42) | "Plain and ordinary meaning. No further construction by the Court is necessary." | "assigning a class to a portion of the track elevation map [three dimensional elevation map] based on a predetermined rule or model" |

20  The parties dispute the scope of "identifying" because Tetra Tech does

21  not apply a "plain and ordinary meaning" of the term in its infringement

22  contentions.    For example, in its infringement contentions, Tetra Tech

23  characterizes an algorithm fine-tuning an ***already identified*** rail head feature by

24  filtering out data belonging to the rail base to be ***identifying*** a rail head.[3]  Frakes

25  ¶39.  But a POSA would not have considered filtering out data artifacts from an

---

[3] Pavemetrics has not submitted Tetra Tech's infringement contentions, because they contain Pavemetrics' highly confidential source code.  If the Court prefers to review the contentions, Pavemetrics will submit them under seal.

existing identification of a railway track bed feature to be "identifying" that feature. *Id.* ¶40. And even though Tetra Tech asserts that "identifying" is a "commonly understood" term, it never mentions that common understanding. Br. at 12. Tetra Tech's silence leaves Pavemetrics, the Court, and the jury to speculate about Tetra Tech's view of the scope of "identifying."

The '293 patent does not define "identifying," instead relying on a POSA to understand its plain meaning. *See* Frakes ¶34. A POSA would have understood "identifying" in the '293 patent to mean "assigning a class to a portion of the [3D map] based on a predetermined rule or model." *Id*. As Dr. Frakes explains, the *Glossary of Computer Vision Terms* confirms this definition. *Id.* ¶37. It defines "identified" as "if the decision rule is able to assign it to some category from the set of given categories." Ex. L at 122. The *Glossary* definition recognizes the logical steps a computer would use to "identify" a feature. It clarifies the differences between mathematical techniques computers use to "identify" a feature and the way humans visually identify a feature. *See* Frakes ¶¶35-38. Tetra Tech does not dispute that Pavemetrics' definition reflects how a POSA would have understood "identifying." *See* Br. at 12-14. And, contrary to Tetra Tech's arguments, *see* Br. at 13, this ordinary meaning is entirely consistent with the intrinsic record.

For example, the claims and the specification support Pavemetrics' construction because they set forth predetermined rules to identify railway track bed features. Figure 5, block 56, illustrates how portions of the track elevation map are assigned the class of "rail head edge" if they meet the predetermined rule of the 3D gradient exceeding a rail height threshold. *See also, e.g.*, Ex. A, Claim 2 (reciting that rail head edges are identified if "significant vertical gradient edges" "are greater than a minimum rail height threshold"). Similarly, portions of the track elevation map are assigned the class of "rail base edge" if they meet the predetermined rule of "3D Gradient >

RailBaseGradientThreshold." Ex. A, Fig. 8; *see also, e.g.*, Claim 3. Unless the claimed algorithm identifies railway track bed features randomly or arbitrarily, it must use predetermined rules or models to do so. *See* Frakes ¶38.

Tetra Tech argues that the claims "provide a clear delineation between identification and assignment/classification," but never offers that delineation. Br. at 13. Tetra Tech admits, however, that "identifying" should be given its ordinary meaning, Br. at 13, and that ordinary meaning includes "assigning." That a dependent claim might require further "assigning a condition" to "the identified railway track bed feature" does not change the ordinary meaning of identifying. Tetra Tech also argues that the '293 patent uses "identification" and "classification" as distinct terms, but never identifies a difference between those terms. Br. at 13. Rather, the specification suggests that "identifying" and "classifying" are intended to have similar meanings. *See* Ex. A, 18:42-44, 14:16-18.

C.   **"Appropriate Gradient Neighborhood" ('293 Patent)**

| Disputed Term | Tetra Tech's Proposed Construction | Pavemetrics' Proposed Construction |
|---|---|---|
| "appropriate gradient neighborhood" (claims 1, 22) | "Plain and ordinary meaning. No further construction by the Court is necessary." | "zone of limited area of predetermined size and shape containing numbers used to calculate railway track bed height change at a certain point, based on the points within the zone" |

Pavemetrics agrees with Tetra Tech that a POSA reading the '293 patent would have understood the meaning of "appropriate gradient neighborhood." *See* Ex. H ¶40. But that does not eliminate the need to construe the term, because it contains computer vision terms not readily understood by a lay juror, and the parties dispute its scope. "[T]he district court must instruct the jury on the meanings to be attributed to all disputed terms . . . so that the jury will be able to intelligently determine the questions presented." *Sulzer Textil A.G. v.*

1  *Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004) (internal quotations
2  omitted).

3      Here, Tetra Tech's infringement contentions show the parties dispute the
4  meaning of "gradient neighborhood." Tetra Tech identifies algorithms lacking
5  any "gradient" calculation as satisfying that limitation. Rather, Tetra Tech
6  asserts a mere comparison of elevation values meets the claims. Frakes ¶47. In
7  effect, Tetra Tech is attempting to read "appropriate gradient neighborhood" out
8  of the claims. The Court should reject that attempt and adopt Pavemetrics'
9  construction.

10     A POSA would have been familiar with a sliding gradient neighborhood
11  operator. *See* Frakes ¶¶45-46; Ex. K at 118. Such an operator works by
12  applying a block, typically a rectangle, to a set of
13  pixels in a 2D image. *Id.* The block contains
14  coefficients (numbers) to calculate the gradient at
15  each pixel as it slides from pixel to pixel. *Id.*



16     As Dr. Frakes explains, the '293 patent uses
17  "appropriate gradient neighborhood" consistently
18  with a POSA's understanding of a sliding gradient neighborhood operator. *See*
19  Frakes ¶45. The claims recite "defining an appropriate gradient neighborhood
20  representing a small 2D track section." Ex. A, Claim 1. Per the claim language,
21  the gradient neighborhood calculates "differential vertical measurements" over
22  that small 2D track section by "moving the gradient neighborhood like a sliding
23  window." *Id.*

24     The specification also explains how a gradient neighborhood is used to
25  calculate gradients over a region:

26         This edge analysis method calculates 3D gradient measures over
27         zone of limited area referred to as a 'neighborhood' that is applied
28         in a sequential sliding and exhaustive fashion over the entire region

to be processed.  A suitable neighborhood **30** as shown in FIG. 5 is preferably a 10 mm×30 mm gradient area.

Ex. A, 9:50-56; *see also* 10:26-31; 11:51-56.  Thus, the specification confirms that an "appropriate gradient neighborhood" is a "zone of limited area," having a "suitable" size and shape, such as 10 mm x 30 mm, used for calculating "3D gradient measures."

Tetra Tech objects to using "predetermined" in the construction, but it ignores the word "appropriate" in the claim.  Br. at 5.  A POSA also would have understood that an "appropriate" neighborhood has a "predetermined" size and shape.  This predetermination is a technical necessity—the size and shape of the neighborhood must be decided before the gradient neighborhood may be defined.  Frakes ¶46.  Moreover, "appropriate" connotes some criteria for acceptability, limiting the possible sizes and shapes to a predetermined set of sizes and shapes meeting the criteria (such as the specification's 10mm x 30mm rectangle) to be "appropriate."  *Id.*  But "predetermined" could encompass various shapes and sizes, not just the rectangular shape and the particular sizes of the preferred embodiments.

Finally, a POSA would have understood that "gradient" in the context of the claims means a "railway track bed height change at a point."  Frakes ¶¶42-45.  The intrinsic evidence reflects that the gradient neighborhood represents an area for calculating "differential vertical measurements."  Ex. A, 10:28-31, 11:53-56; Ex. J at 110 (None of the cited prior art references teaches "the process of defining an appropriate gradient neighborhood of a 2D track section *for* calculating differential vertical measurements . . . .") (emphasis added).  Thus, Pavemetrics' proposed construction is the meaning a POSA would have ascribed to "appropriate gradient neighborhood."

In contrast, Tetra Tech does not say how a POSA would have understood "appropriate gradient neighborhood."  Rather it leaves the jury to grasp at its

technical concepts and conjure up the limits on the scope of the term.  But the Court must determine the scope of the asserted claims, not the jury.  *O2 Micro*, 521 F.3d at 1361.

Rather than propose a construction, Tetra Tech argues that the surrounding claim language "provides context for and describes the meaning of" appropriate gradient neighborhood.  Br. at 5.  The claim language Tetra Tech relies on merely states that the appropriate gradient neighborhood "***represents***[4] a small 2D track section over which differential vertical measurements are calculated."  Tetra Tech is effectively seeking to read out of the claim "appropriate gradient neighborhood."  It ignores the specification's explicit disclosure regarding the meaning of neighborhood and that it must be used in calculating ***gradients*** over an area.  The claim language may provide context for "appropriate gradient neighborhood," but it does not provide a definition.

**D.   "2D Track Section Over Which Differential Vertical Measurements Are Calculated" ('293 Patent)**

| Disputed Term | Tetra Tech's Proposed Construction | Pavemetrics' Proposed Construction |
|---|---|---|
| "2D track section over which differential vertical measurements are calculated" (claims 1, 22) | "Plain and ordinary meaning. No further construction by the Court is necessary." | "area of the railway track bed selected for calculating changes in railway track bed height over the area" |

Tetra Tech asserts that there is no basis "to rewrite 'differential vertical measurements'" to "changes in railway track bed height."  Br. at 8.  But this purported "rewriting" is nothing but the ordinary claim construction process, in which the court defines the scope of the claims for the jury.  "Differential

---

[4] "To depict, portray."  Oxford University Press, *Represent*, Oxford English Dictionary Online (September 2021), available at https://tinyurl.com/w5fh879j.

vertical measurements" may be understandable to a POSA reading the patent, but it is not a part of the average juror's vocabulary.

Pavemetrics' construction correctly defines how a POSA would have understood the phrase in view of the intrinsic record. A "2D track section" is an "area of the railway track bed." Frakes ¶49. "Differential vertical measurements" are "changes in railway track bed height." Frakes ¶50. The differential vertical measurements "are calculated" "over" the 2D track section. In other words, the 2D track section is the area "selected for calculating" the changes in railway track bed height over that area. Frakes ¶51. At no point does Tetra Tech assert that these definitions are incorrect. *See* Ex. H ¶ 47. Nor does Tetra Tech identify how the intrinsic record contradicts Pavemetrics' definition of how a POSA would have understood the term. *See* Br. at 7-8.

Tetra Tech's disagreement with Pavemetrics' construction boils down to nothing more than an objection to Pavemetrics explaining the term in words that do not quote the claims. But Tetra Tech fundamentally misunderstands the purpose of claim construction and the appropriate standard for when to construe terms. Accordingly, the Court should adopt Pavemetrics' construction.

**E.    "Sliding Window" ('293 Patent)**

| Disputed Term | Tetra Tech's Proposed Construction | Pavemetrics' Proposed Construction |
|---|---|---|
| "sliding window" (claims 1, 22) | "Plain and ordinary meaning. No further construction by the Court is necessary." | "component of an image-processing algorithm in which a calculation is based on a neighborhood or window of data about a pixel, and after the calculation at that pixel, the neighborhood (window) moves (slides) to an adjacent pixel for a calculation at the adjacent pixel" |

/ / /

1    "Sliding window" is a term of art in computer vision. Pavemetrics
2    submits that it should be construed according to its technical definition and use
3    in the '293 patent. Tetra Tech contends that the term needs no construction
4    because a POSA would understand its meaning. But again, that is not the
5    standard for construing terms. A lay jury cannot be expected to have the
6    knowledge of a POSA, and the ordinary meaning of "sliding window" as
7    apparent to a POSA is not readily apparent to a layperson. A juror may see a
8    "sliding window" as a window in their home that slides to open and close, rather
9    than a "common component" of an image-processing algorithm. *See* Ex. E
10   at 209. Moreover, nothing supports Tetra Tech's argument that every claim
11   construction must use only words found in the specification.

12   Pavemetrics adapted a straightforward definition of "sliding window"
13   from a computer vision dictionary. *See id*. This is an example of extrinsic
14   evidence being permissibly used to "illuminate a well-understood technical
15   meaning," *Immunex Corp. v. Sanofi-Aventis U.S. LLC*, 977 F.3d 1212, 1221
16   (Fed. Cir. 2020), not "to vary, contradict, expand, or limit the claim language."
17   *Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 977 (Fed. Cir. 2014).
18   Moreover, the specification uses "sliding window" consistent with this
19   definition. Ex. A, 11:15-17 (to detect the rail base, the alleged invention
20   identifies vertical gradients "using a defined neighborhood as a sliding window
21   applied exhaustively across the rail base search in the elevation data").

22   Pavemetrics correctly adapted the dictionary definition to conform with
23   the specification. For example, the technical dictionary states that the sliding
24   window "typically moves to an adjacent" pixel. Ex. E at 209.[5] Consistent with

---

25   [5] Tetra Tech and its expert claim that Pavemetrics' definition of "sliding
26   window," which requires movement to an adjacent pixel, is inconsistent with
     the cited technical dictionary. Br. at 10. According to Dr. Morellas, the
27   dictionary definition provides an image that "does not show the movement of
28   the window to an adjacent pixel." Ex. H ¶52. The image does not depict any

the typical usage, the specification provides that the gradient neighborhood is "moved like a window *sequentially and completely* for each position in the railway track bed elevation data." Ex. A, 10:33-35 (emphasis added); 11:61-63. Moving "sequentially and completely for each position" requires the neighborhood to move to an adjacent pixel.  To move "completely for each position," the neighborhood must move to each pixel in the railway track bed elevation data—no pixels may be skipped.  Frakes ¶58.  Moving "sequentially" dictates that the window moves in sequence to the next, adjacent pixel in the railway track bed elevation data.  *Id.*  Accordingly, the specification confirms that the sliding window referenced in claims 1 and 22 is a typical sliding window, in which the window moves to an adjacent pixel.  *Id.* ¶59.  Thus, Pavemetrics did not include "typically" in its construction to avoid contradicting the intrinsic record.

Accordingly, Pavemetrics' definition reflects how a POSA having read the '293 patent would have understood "sliding window."  As explained further below with respect to the next term, Tetra Tech's real complaint with Pavemetrics' construction is that correctly clarifying the scope of the term for the jury will hurt Tetra Tech's infringement case.

**F.** **"Moving the Gradient Neighborhood Like a Sliding Window Over the 3D Elevation Data" ('293 Patent)**

| Disputed Term | Tetra Tech's Proposed Construction | Pavemetrics' Proposed Construction |
|---|---|---|
| "moving the gradient neighborhood like a sliding window over the 3D elevation data" | "Plain and ordinary meaning. No further construction by the Court is necessary." | "sequentially and completely applying the gradient neighborhood to the 3D elevation data and calculating differential vertical measurements for each position" |

pixels, making it impossible for the image to show (or not show) movement to an adjacent pixel.  Frakes ¶¶60-61.

1   The parties dispute the scope of "moving the gradient neighborhood like a
2   sliding window over the 3D elevation data" because Tetra Tech's infringement
3   contentions do not apply an ordinary meaning of the term.  For example, Tetra
4   Tech asserts that looping from pixel to pixel in a group of pixels identified as
5   the rail head to retrieve the elevation at the pixel counts as "moving the gradient
6   neighborhood like a sliding window over the 3D elevation data."  Frakes ¶64,
7   39.  But POSAs, applying their understanding of the ordinary meaning of this
8   phrase, would not agree.  Frakes ¶64.  Pavemetrics therefore seeks to define a
9   POSA's understanding of the term in view of the intrinsic record.

10   The specification repeatedly teaches that the processor applies the
11   gradient neighborhood "to the 3D elevation data and the area is moved like a
12   window sequentially and completely for each position in the railway track bed
13   elevation data (block **88**)."  Ex. A, 10:31-36; 11:59-63.  Pavemetrics'
14   construction of the term closely tracks this description in the specification.

15   A POSA also would have understood that, as the gradient neighborhood
16   moves, "differential vertical measurements" are calculated.  Frakes ¶63.  Tetra
17   Tech does not appear to dispute that the calculations are made as the
18   neighborhood moves, *see* Br. at 10-12, and this understanding is consistent with
19   the specification.  The specification explains that the gradient neighborhood
20   moves like a window to yield a "vertical gradient map" that "represents the
21   maximum 3D gradient at each elevation map measurement point."  *See* Ex. A
22   10:26-37 (citing Figure 6).  Calculations must be performed to yield the vertical
23   gradient map.  *See* Frakes ¶63.  Indeed, Figure 6 illustrates the step of
24   "Calculat[ing] 3D Gradient Using Sliding Neighborhood Window" in block **46**.

25   Pavemetrics' construction does not impermissibly import limitations
26   from a single embodiment as Tetra Tech argues.  Br. at 10-11.  Every time the
27   specification describes moving a neighborhood "like a window," the
28   neighborhood is "moved sequentially and completely, like a window" or

-14-

"moved like a window sequentially and completely."  Ex. A, 10:31-35; 11:59-63; 12:52-55; 13:57-61; 15:32-35.

The specification and the claim both require applying the gradient neighborhood to "the 3D elevation data."  Ex. A, 10:31-35; 11:59-63 (the gradient neighborhood is "moved like a window sequentially and completely *for each position in the railway track bed elevation data*." (emphasis added)).  Tetra Tech argues that the specification applies the neighborhood "'over the entire region to be processed,' not necessarily to the complete set of acquired data."  Br. at 11 (quoting Ex. A, 9:52-54).  But this quotation does not refer to the claimed "appropriate gradient neighborhood."  It refers to a more general "neighborhood."  *Compare* Ex. A, 9:50-54, *with id.*, 10:26-37.

Tetra Tech points to embodiments not relevant to the "gradient neighborhood" in Claims 1 and 22 when arguing that Pavemetrics' construction excludes embodiments.  *See* Br. at 11.  Tetra Tech's argument relies on an embodiment directed to an "appropriate sliding neighborhood."  S*ee* Ex. A, 13:49-61.  But Claims 1 and 22 recite moving a "*gradient* neighborhood," not just a "neighborhood," and the specification's use of different terms shows that Tetra Tech intended a distinction between these concepts.  Thus, the Court should adopt Pavemetrics' construction.

## G.  "Is Configured To Run An Algorithm" ('293 Patent)

| Disputed Term | Tetra Tech's Proposed Construction | Pavemetrics' Proposed Construction |
|---|---|---|
| "is configured to run an algorithm" (claim 1) | "Plain and ordinary meaning. No further construction by the Court is necessary." <br><br> If the Court believes further construction is accordance with the plain and ordinary meaning is necessary, Tetra Tech proposes "is programmed to run an algorithm" | "is set up to run the algorithmic steps without modification" |

1    Claim 1 requires at least one processor that "*is configured to run an*
2  *algorithm* for processing" 3D elevation and intensity data.  The parties dispute
3  the meaning of "is configured to run an algorithm" and thus need the Court to
4  construe this term.  In its infringement contentions, Tetra Tech relies on
5  template matching algorithms in Pavemetrics' master source code that the
6  processor would not run because Pavemetrics' has disabled those algorithms.
7  The software is not "configured to" run them.  For the processor to run those
8  algorithms, Pavemetrics would have to modify the software settings to allow
9  them to run.  Pavemetrics seeks to clarify that the claim requires the processor
10 "is set up to run the algorithmic steps without modification."

11   Tetra Tech argues that the term needs no construction but proposes an
12 alternative construction.  Br. at 16.  Tetra Tech argues that "configured to"
13 means "is programmed to run an algorithm."  *Id.*  Tetra Tech seeks this broad
14 construction so it can argue that any software that includes code for template
15 matching, even if the template matching algorithm is disabled from working,
16 satisfies the claim.

17   The Federal Circuit has distinguished claims that require software to be
18 "*configured* in a particular way to infringe" from broader claims that require
19 "only that [the software] be *programmed* for performing the claimed steps."
20 *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204 (Fed. Cir. 2010)
21 (emphases added).  District courts have done the same.  *E.g.*, *Huawei Techs. Co.*
22 *v. Verizon Commc'ns Inc.*, 2021 WL 150442, at *18-20 (E.D. Tex. 2021)
23 ("configured to" requires "structure that is in a state to perform the functions"
24 and "does not encompass structure that may be modified to perform that
25 function but is not in that modified state"); *Centripetal Networks, Inc. v. Cisco*
26 *Sys., Inc.,* 2020 WL 863976, at *7-8 (E.D. Va. 2020) (construing "configured
27 to" as "[p]lain and ordinary meaning, which requires being actually configured,
28 not merely capable of being configured").  Pavemetrics' proposed construction

-16-

clarifies that the claimed processor must be set up to run the algorithmic steps without modifying the software settings, not merely capable of running the algorithmic steps, *if* modified.

The specification also supports Pavemetrics' proposed construction. The specification explains that Figure 26 shows a 3D track assessment system "*configured to* carry out a method for identifying and analyzing 3D features along a railway track bed." Ex. A, 7:47-49, 18:11-13 (emphasis added). The specification describes a 3D block matching technique used to identify and analyze track bed features. *See id.* 18:13-23. This indicates the system is set up to run algorithms without modification to identify such features.

Extrinsic evidence also supports Pavemetrics' construction. The *Dictionary of Computer & Internet Terms* defines "configure" as: "to *set up* a computer or program to be used *in a particular way*." Ex. F at 216 (emphases added). This definition tracks Pavemetrics' construction and is consistent with the Federal Circuit's guidance in *Finjan*.

Tetra Tech asserts that the word "configured" is easily understood and does not require construction. Br. at 15. But Tetra Tech ignores that its infringement contentions raise a fundamental dispute over this term. Moreover, none of the three district court cases that Tetra Tech cites involve the same issue presented here, i.e., whether "configured to" requires being actually configured, not merely capable of being configured.

Tetra Tech also relies on parts of the specification, but no part involves the phrase "configured to." Br. at 15-16. Rather, most state that the processor "is capable of performing" certain tasks or the "process steps are carried out by a program." The cites are inapposite because Claim 1 is more specific, requiring that the processor "is *configured to* run an algorithm." Additionally, Tetra Tech's assertion that Pavemetrics is imposing negative limitations without support is misplaced. Br. at 16. Pavemetrics has proposed a construction

supported by the evidence and case law, which will resolve the parties' fundamental dispute over the meaning of this term.

## H.   "Comprising The Steps Of:" a, b, c, d ('293 Patent)

| Disputed Term | Tetra Tech's Proposed Construction | Pavemetrics' Proposed Construction |
|---|---|---|
| "the algorithm comprising the steps of:" a, b, c, d (claim 1)<br><br>"the method of comprising the steps of:" a, b, c, d (claim 22) | "Plain and ordinary meaning. No further construction by the Court is necessary." | "the algorithm must be configured to run the steps in the recited order"<br><br>"the method steps must be performed in the recited order" |

Claims 1 and 22 of the '293 patent each recite the algorithmic steps of a, b, c, and d.  In its infringement contentions, Tetra Tech reads the claims on algorithmic steps, regardless of their order.  For example, Claim 1 requires generating a 3D map (Step a) before identifying a railway track bed feature from the 3D map (Step c).  But Tetra Tech points to an alleged 3D map that is generated, if at all, *after* the system identifies a railway track bed feature, not before.  Thus, the parties dispute whether the claimed steps must be performed in the recited order.

A "claim requires an ordering of steps when the claim language, as a matter of logic or grammar, requires that the steps be performed in the order written, or the specification directly or implicitly requires" an order. *Mformation Techs., Inc. v. Research in Motion Ltd.*, 764 F.3d 1392, 1398-1400 (Fed. Cir. 2014) ("a mailbox must be established before the contents of said mailbox can be transmitted"); *Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1319-20 (Fed. Cir. 2013) (where a claim recites that processing is done to an electronic advertisement, it necessarily "follows that the creation of the ad must happen before the processing begins"); *TALtech Ltd. v. Esquel Apparel, Inc.*, 279 Fed. App'x 974, 978 (Fed. Cir. 2008) (method steps requiring presence of "bonding element" necessarily follow step of "placing a bonding element").

Here, both the express claim language and the logical relationships among claim limitations require the claimed steps occur in the recited order. Claim 1 recites four main algorithmic steps:

- Step (a) requires "***acquiring three dimensional*** surface elevation and intensity ***data*** representative of an area segment of railway track bed."

- Step (b) requires "generating a track elevation map based on ***the acquired three dimensional data***."

As shown by the bolded and italicized words above, step (b) must occur after step (a) because step (b) requires generating a track elevation map based on ***the*** acquired three dimensional data obtained in step (a).

- Step (c) requires "**identifying a railway track bed feature** from the track elevation map . . . ."

As shown by the underlined words above, step (c) must occur after step (b) because step (c) requires identifying a railway track bed feature from ***the*** track elevation map generated in step (b).[6]

- Step (d) requires "storing information corresponding to **the identified railway track bed feature** . . . ."

As shown by the bolded words, step (d) must occur after step (c) because step (d) requires storing information corresponding to ***the*** identified railway track bed feature from step (c). The analysis is similar for Claim 22, where the 3D map must be defined in step (a) before it can be stored in step (b) or before a feature can be identified from it in step (c).

Claims 1 and 22 are similar to the claims in *Mantech Environmental Corp. v. Hudson Environmental Services, Inc.*, 152 F.3d 1368, 1375-76 (Fed. Cir. 1998). There, the Federal Circuit held that "the sequential nature of

---

[6] This logical order also applies to substeps (c)(i) and (c)(ii). Step (c)(ii) must occur after step (c)(i) because step (c)(ii) requires moving "***the*** gradient neighborhood" defined in step (c)(i).

-19-

the claim steps is apparent from the plain meaning of the claim language and nothing in the written description suggests otherwise." *Id.* at 1376; *see also Loral Fairchild Corp. v. Sony Elecs. Corp.*, 181 F.3d 1313, 1321 (Fed. Cir. 1998) (claim language indicated steps had to be performed in order because the second step required aligning a second structure with a first structure formed by the prior step).

The specification confirms the claimed order of steps, and nothing suggests otherwise. The specification describes a "basic embodiment" of a 3D railway track assessment system in Columns 8 and 9. It explains: "***Following generation*** of full width 3D elevation maps, ***analysis*** including automated processing ***is completed*** to extract objective, repeatable, and accurate measures ***for detected features of interest***." Ex. A, 9:22-25 (emphases added). This passage indicates that the system identifies railway track bed features ***after*** generating a track elevation map, consistent with Claims 1 and 22. *See also* Ex. A, 9:2-5 (detecting elevation and intensity data and then storing it), 9:17-21 (combining data to create a 3D elevation map), 9:33-36 ("3DTAS analysis approach is preferably hierarchical").

The prosecution history also confirms the claimed order of steps. When allowing the '293 patent, the examiner indicated that the system identifies the track bed features from the track elevation map and thus, by definition, the system generates the track elevation map first. Ex. J at 109. Additionally, the examiner used the word "[f]inally" when describing the claimed steps, suggesting that the steps are performed in written order. *Id.* The patentee never disputed the examiner's characterization of the claims.

Tetra Tech relies on three examples to argue that the claimed steps need not be performed in written order. Br. at 17-18. First, Tetra Tech identifies step (c)(i) in Claim 1 and asserts that step could occur before any of steps (a), (b), or (c). *Id.* at 17. Tetra Tech's assertion is illogical and baseless. Step (c)(i) cannot

occur before step (c) because it is part of step (c).  Step (c)(i) also cannot occur before steps (a) and (b) based on the plain and logical language of the claims, as explained above.

Second, Tetra Tech identifies step (d) in Claim 1 and asserts that step could occur before steps (b) or (c).  Again, Tetra Tech's assertion is illogical and baseless.  As explained above, step (d) requires storing information about "the identified railway track bed feature," which cannot occur until after step (c).  If the system has not identified a railway track bed feature according to the claims, then there is nothing to store.

Third, Tetra Tech identifies step (b) of Claim 22.  To identify a railway track bed feature from the elevation map as required by step (c), the elevation map must first be stored in a data storage apparatus as required by step (b). Frakes ¶66.  The '293 patent defines "data storage apparatus" to include both volatile and non-volatile memory—all of the types of memory in which the elevation map could be stored so that it could be processed to identify a railway track bed feature.  Ex. A, 9:5-8.

## I.   "Tie Surface Plane Model" ('557 Patent)

| Disputed Term | Tetra Tech's Proposed Construction | Pavemetrics' Proposed Construction |
|---|---|---|
| "tie surface plane model" (claim 8) | "Plain and ordinary meaning. No further construction by the Court is necessary." | "an approximation of the like-new surface of the entire tie based on an industry standard tie model" |

Claim 8 of the '557 patent recites both a "tie surface plane model" and a "tie surface plane."  Tetra Tech urges the Court not to construe "tie surface plane model."  But "tie surface plane *model*" should be construed to mean something different than "tie surface plane."  "Different claim terms are presumed to have different meanings," *Bd. of Regents of the Univ. of Texas Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1371 (Fed. Cir. 2008), and "[i]deally, claim constructions give meaning to all of a claim's terms," *Apple, Inc. v. Ameranth,*

*Inc.*, 842 F.3d 1229, 1237 (Fed. Cir. 2016).   To avoid this presumption, Tetra Tech argues for no construction.  It plans to argue at trial that "tie surface plane model" (used in step (b) of Claim 8) has the same meaning as "tie surface plane" (used in step (c) of Claim 8).   *See* Br. at 18-19, Ex. H ¶72 (citing passages from the specification describing a "tie surface plane" or "the crosstie surface elevation between the rails" for the construction of "tie surface plane model").

"Tie surface plane model" does not have a commonly understood meaning to a POSA.  Frakes ¶68.  Nonetheless, a POSA would have understood it to mean something different than "tie surface plane."  Frakes ¶69.  The only time the specification uses "tie surface plane model" is in the following passage:

> In order to objectively assess the condition of each crosstie, the current condition of the tie is compared to ***an as-new tie condition***. This comparison is accomplished by calculating the difference between the high resolution 3D elevation map data for each crosstie and **the new crosstie surface approximation provided by the Tie Surface Plane models** calculated for each crosstie surface bounded by the corresponding tie bounding box (block 222).

Ex. B, 17:16-23.

The specification defines the tie surface plane models as providing a "new crosstie surface approximation" to be used in comparing the current condition of the tie to "an as-new tie condition."   *See id.*   Pavemetrics' construction incorporates this as "an approximation of the like new-surface." The specification also describes that the "Tie Surface Plane models" are calculated for the "crosstie surface bounded by the corresponding tie bounding box."   *See id.*   The specification further explains that the tie surface plane models are calculated for the surface bounded by "the physical edge boundaries of the tie."   *Id.*, 15:3-4.   Pavemetrics has synthesized this information and

incorporated it into its construction in jury-friendly terms as the "entire tie." Finally, the specification describes tie bounding boxes as defined "based on best fit tie models." *E.g.*, *id.*, Claim 5. A POSA would have inferred from the '557 patent specification that these "best fit tie models" are the same as "standard tie physical models," *id.*, 15:2, or "industry standard tie models," *id.*, 15:7. Frakes ¶71. Accordingly, the Court should adopt Pavemetrics' construction.

**J.** **"Tie Bounding Box" ('557 Patent)**

| Disputed Term | Tetra Tech's Proposed Construction | Pavemetrics' Proposed Construction |
|---|---|---|
| "tie bounding box" (claims 8, 14) | "Plain and ordinary meaning. No further construction by the Court is necessary." | "the physical edge boundaries of a tie, defined by matching the elevation data to industry standard tie models" |

Tetra Tech appears to agree that the patent defines "tie bounding box" to mean the "physical edge boundaries of a tie." Br. at 20; *see* Ex. B, 15:3-4. Tetra Tech also admits that "the '557 specification describes matching tie models in connection with tie bounding boxes." *Id.* Accordingly, Tetra Tech seems to disagree only with Pavemetrics' inclusion of "industry standard." But the specification does not explain the distinction between "industry standard tie models," Ex. B, 15:7, "standard tie physical models," *id.*, 15:2, or "all available crosstie models," *id.*, 15:57-58. A POSA would have understood from the specification that the terms are interchangeable. *See* Frakes ¶71.

**III.  INDEFINITE CLAIM TERMS**

**A.** **"Small Area" and "Small Length" ('557 Patent)**

| Disputed Term | Tetra Tech's Proposed Construction | Pavemetrics' Proposed Construction |
|---|---|---|
| "small area" "small length" (claim 10) | "Plain and ordinary meaning. No further construction by the Court is necessary." | "Indefinite as relative terms with no definition or exemplary disclosure in the specification." |

Tetra Tech asks the Court to defer ruling on indefiniteness.  Br. at 23-24.  But there is no reason to do so.  *See MyMedicalRecords, Inc. v. Walgreen Co.*, 2014 WL 7338822, at *2 (C.D. Cal. 2014) ("Indefiniteness is a question of law resolvable during claim construction.").  Unlike the case Tetra Tech relies on, *Grupo Bimbo*, Pavemetrics raised this issue at the outset and there is no need to develop the record any further.  *See* ECF 85 at 4.

A patent claim is invalid for indefiniteness, if its language, when read in view of the specification and prosecution history, "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).  When a claim includes a term of degree, such as "small area" and "small length," a patent must (1) identify an objective standard to measure the relative term, and (2) reasonably identify an objective boundary.  *See Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).  The '557 patent does neither.

Claim 10 requires "the step of eliminating **small area** and **small length** tie crack targets using the processor."  But the '557 patent barely mentions "small area" and "small length" tie crack targets, let alone provide any objective standards and boundaries for these claim terms.  The specification refers to "small" in this context only twice.  First, when describing a tie distress detection method shown in Figure 25: "Crack Targets having a short length or small surface area are eliminated from further analysis (block 228)." Ex. B, 17:36-38.  Second, Figure 25 itself states: "Eliminate Small Area and Small Length Tie Crack Targets." Fig. 25, Block 228.  That is it.  The specification never defines or explains what constitutes a "small area" or "small length."  It never provides any numeric guidance or concrete examples.  Nor does the prosecution history.  Thus, the '557 patent fails to inform a POSA with reasonable certainty about the scope of "small area" and "small length."  Frakes ¶¶72-76.

/ / /

1   Courts have held that terms of degree are indefinite in similar
2   circumstances. *See, e.g.*, *Uni-Systems, LLC v. United States Tennis Assoc.*,
3   2020 WL 3960841, at *28-30 (E.D.N.Y. 2020) (claim indefinite that used "very
4   small side load" where patent mentioned term only once and provided no
5   specific meaning); *Intellectual Ventures I LLC v. AT&T Mobility LLC*, 2016
6   WL 4363485, at *16-17 (D. Del. 2016), *vacated in part on other grounds*, 902
7   F.3d 1372 (Fed. Cir. 2018) (claim indefinite that used "large" and "small").

8   Tetra Tech's cases are distinguishable. *See* Br. at 24. In those cases, the
9   intrinsic record provided objective standards and boundaries for the claim terms.
10  In *EcoServices*, "small quantities" was not indefinite because a POSA would
11  define that term as a flow rate and the patent described a flow rate of 2 to 60
12  liters per minute. In *Modine*, "relatively small" was not indefinite because the
13  patent provided a preferred range of "about 0.015-0.040" inches. In *In re
14  Koninklijke Philips*, a handheld device with a display having a "substantially
15  small size" was not indefinite because the patent gave several concrete examples
16  of such handheld devices. The '557 patent does no such thing.

17  Tetra Tech also fails to identify any objective standard or boundaries. Br.
18  at 24-25. Instead, Tetra Tech asserts that the specification explains tie crack
19  areas and lengths below a minimum threshold are excluded. But that begs the
20  question: What is that threshold? Neither the specification nor the prosecution
21  history answers this question. Dr. Morellas' conclusory declaration is unhelpful
22  and adds nothing. Ex. H ¶ 86.

23  Respectfully Submitted,

24  KNOBBE, MARTENS, OLSON & BEAR, LLP

25  Dated:  October 18, 2021          By: /s/ *Christy G. Lea*
                                          Joseph R. Re
26                                        Christy G. Lea
                                          Nicholas M. Zovko
27                                        Payne McQueen Montgomery

                                       *Attorneys for Plaintiff/Counterclaim Defendant*,
28                                      PAVEMETRICS SYSTEMS, INC.

-25-