Attorney Docket No. 06.00995.0042

CLAIMS

What is claimed is:

1.      A system for assessing a railway track bed, the system comprising:

a power source;

a light emitting apparatus powered by the power source for emitting light energy toward a railway track;

a data storage apparatus in communication with at least one processor;

at least one sensor for sensing reflected light that was emitted from the light emitting apparatus and acquiring three dimensional image data of the railway track to be stored in the data storage apparatus, wherein the plurality of sensors are in communication with the at least one processor; and

the at least one processor wherein the at least one processor is configured to run an algorithm for processing three-dimensional elevation data gathered from the plurality of sensors and saved in the data storage apparatus, the algorithm comprising the steps of:

a.   acquiring three dimensional data representative of a segment of railway track bed;

b.   generating a track elevation map based on the acquired three dimensional data;

c.   identifying a railway track bed feature from the track elevation map; and

d.   storing information corresponding to the identified railway track bed feature in the data storage apparatus.

2. The system of claim 1 wherein the algorithm step of identifying a railway track bed feature further comprises the step of identifying a rail head edge by detecting significant vertical gradient edges over a two dimensional area wherein such vertical gradient edges are greater than a minimum rail height threshold.

3. The system of claim 2 wherein the algorithm step of identifying a railway track bed feature further comprises the step of identifying a rail base edge by detecting significant vertical gradient edges over a two dimensional area adjacent the detected rail head edge wherein such vertical gradient edges are greater than a minimum rail base height threshold.

Page 47 of 56

Attorney Docket No. 06.00995.0042

30    4. The system of claim 2 wherein the algorithm further comprises the step of removing data corresponding to the rail head from the elevation map, thereby enhancing the detection of other smaller vertical components of the railway track bed.

35    5. The system of claim 4 wherein the algorithm step of identifying a railway track bed feature further comprises the step of detecting surfaces with surface normal values greater than a planar region surface normal value threshold and that are proximate to one another by less than a maximum proximity threshold.

40    6. The system of claim 5 wherein the algorithm step of identifying a railway track bed feature further comprises the step of defining an approximate tie surface plane based on the detected surfaces with surface normal values greater than the planar region surface normal value threshold that are proximate to one another by less than the maximum proximity threshold.

45    7. The system of claim 6 wherein the algorithm step of identifying a railway track bed feature further comprises the step of assigning a tie bounding box around the perimeter of the tie surface plane based at least on one measured parameter of the tie surface plane.

50    8. The system of claim 7 wherein the algorithm step of identifying a railway track bed feature further comprises the step of assigning an approximate tie length, an approximate tie width, and an approximate tie skew angle based on the bounding box assigned around the perimeter of the tie surface plane.

55    9. The system of claim 6 wherein the algorithm step of identifying a railway track bed feature further comprises the step of identifying and measuring surface cracks that are deeper than a minimum crack depth threshold and that are longer than a minimum crack length threshold based on the track elevation map.

Attorney Docket No. 06.00995.0042

10. The system of claim 9 wherein data corresponding to the measured surface cracks are saved to the data storage apparatus on a per tie basis so that the same tie can be re-examined at a later date to determine whether the measured surface cracks have changed.

11. The system of claim 9 wherein the algorithm step of identifying a railway track bed feature further comprises a step of assigning a severity value to each measured crack based on at least the measured length and measured width of the crack.

12. The system of claim 6 wherein the algorithm step of identifying a railway track bed feature further comprises the step of identifying and measuring a surface feature that is higher than a minimum tie height threshold.

13. The system of claim 12 wherein data corresponding to the measured surface feature are saved to the data storage apparatus on a per tie basis so that the same tie can be re-examined at a later date to determine whether the measured surface feature has changed.

14. The system of claim 6 wherein the algorithm step of identifying a railway track bed feature further comprises the step of detecting a broken tie based on an abrupt elevation shift along the tie surface plane.

15. The system of claim 1 wherein the algorithm step of identifying a railway track bed feature further comprises the step of comparing at least a portion of the track elevation map to a plurality of three dimensional features saved in a feature library to determine a best fit between the at least a portion of the track elevation map and the plurality of three dimensional features to properly identify the railway track bed feature.

16. The system of claim 15 wherein the step of comparing further comprises the step of applying a minimum correlation threshold so that a railway track bed feature will not be identified as a particular three dimensional feature from the feature library unless the minimum correlation threshold is met.

Attorney Docket No. 06.00995.0042

90    17. The system of claim 6 wherein the algorithm step of identifying a railway track bed feature
      further comprises the step of determining a shoulder ballast volume adjacent a tie based at least
      in part on the approximate tie surface plane defined for the tie.


      18. The system of claim 7 wherein the algorithm step of identifying a railway track bed feature
      further comprises the step of defining a surface area region adjacent the tie bounding box,
95    measuring the surface elevation of the surface area region, and determining the difference
      between the surface elevation of the surface area region and the surface elevation of the
      approximate tie surface plane to determine whether a positive volume or negative volume is
      present at the surface area region.


100   19. The system of claim 15 wherein the algorithm step of identifying a railway track bed feature
      further comprises the step of  making a plurality of elevation measurements along and around an
      identified railway track bed feature and recording the measurements and the locations of the
      measurements in the data storage apparatus.


105   20. The system of claim 19 wherein the algorithm step of identifying a railway track bed feature
      further comprises the step of assigning a condition to the identified railway track bed feature
      based on the plurality of elevation measurements.


      21.  The system of claim 1 wherein the algorithm step of identifying a railway track bed feature
110   further comprises the step of measuring the length of a joint bar candidate, determining whether
      the length of the joint bar candidate falls between a minimum joint bar length threshold and a
      maximum joint bar length threshold, and identifying the joint bar candidate as a joint bar if the
      length measurement of the joint bar candidate falls between a minimum joint bar length
      threshold and a maximum joint bar length threshold.

115
      22. A system for assessing a railway track bed, the system comprising:
            a power source;

Attorney Docket No. 06.00995.0042

a light emitting apparatus powered by the power source for emitting light energy toward a railway track;

120    a data storage apparatus in communication with at least one processor;

at least one sensor for sensing reflected light that was emitted from the light emitting apparatus and acquiring three dimensional image data of the railway track to be stored in the data storage apparatus, wherein the plurality of sensors are in communication with the at least one processor; and

125    the at least one processor wherein the at least one processor includes an algorithm for extracting railway track bed surface elevation data to define new railway track bed components for a three dimensional track feature library, the algorithm comprising the steps of:

    a. acquiring three dimensional data representative of a segment of railway track bed;

    b. generating a track elevation map based on the acquired three dimensional data;

130        c. identifying a railway track feature from the track elevation map that does not match any previously defined track features saved in a track feature library;

    d. extracting three dimensional data from the track elevation map corresponding to the identified railway track feature;

    e. assigning a feature name to the extracted three dimensional data; and

135        f. saving in the data storage apparatus the extracted three dimensional data associated with the feature name as a new track feature to be included in the track feature library.


23. A method of building a virtual three dimensional railway track bed component library, the

140    method comprising the steps of:

    a. emitting a light along a track bed surface;

    b. sensing some of the emitted light after it has reflected off of the track bed surface;

    c. defining a three dimensional elevation map based on the sensed light reflected from the track bed surface;

145        d. storing the elevation map in a data storage apparatus;

Attorney Docket No. 06.00995.0042

    e.   identifying a railway track bed feature from the three dimensional elevation map that does not match any previously defined track bed features saved in a track component library;

    f.   extracting three dimensional data from the track elevation map corresponding to the identified railway track bed feature;

150

    g.   assigning a component name to the extracted three dimensional data; and

    h.   saving the extracted three dimensional data associated with the component name in a data storage apparatus as a new track bed feature to be included in the track component library.

155

24. A method of assessing a railway track bed, the method comprising the steps of:

    a.   defining a three dimensional elevation map based on data gathered by a sensor sensing reflected light from a track bed surface;

    b.   storing the elevation map in a data storage apparatus;

160

    c.   identifying a railway track bed feature from the elevation map; and

    d.   storing information corresponding to the identified railway track bed feature in the data storage apparatus.

25. The method of claim 24 wherein the step of identifying a railway track bed feature further

165   comprises the step of identifying a rail head edge by detecting significant vertical gradient edges over a two dimensional area wherein such vertical gradient edges are greater than a minimum rail height threshold.

26. The method of claim 25 wherein the step of identifying a railway track bed feature further

170   comprises the step of identifying a rail base edge by detecting significant vertical gradient edges over a two dimensional area adjacent the detected rail head edge wherein such vertical gradient edges are greater than a minimum rail base height threshold.

Attorney Docket No. 06.00995.0042

175   27. The method of claim 26 further comprising the step of removing data corresponding to the rail head from the elevation map, thereby enhancing the detection of other smaller vertical components of the railway track bed.

180   28. The method of claim 24 wherein the method further comprises the step of detecting surfaces with surface normal values greater than a planar region surface normal value threshold and that are proximate to one another by less than a maximum proximity threshold.

185   29. The method of claim 28 wherein the method further comprises the step of defining an approximate tie surface plane based on the detected surfaces with surface normal values greater than the planar region surface normal value threshold that are proximate to one another by less than the maximum proximity threshold.

190   30. The method of claim 29 wherein the method further comprises the step of assigning a tie bounding box around the perimeter of the tie surface plane based at least on one measured parameter of the tie surface plane.

31. The method of claim 30 wherein the method further comprises the step of assigning an approximate tie length, an approximate tie width, and an approximate tie skew angle based on the bounding box assigned around the perimeter of the tie surface plane.

195   32. The method of claim 31 wherein the method further comprises the step of identifying and measuring surface cracks that are deeper than a minimum crack depth threshold and that are longer than a minimum crack length threshold based on the track elevation map.

200   33. The method of claim 32 wherein the method further comprises the step of saving data corresponding to the measured surface cracks to the data storage apparatus on a per tie basis so that the same tie can be re-examined at a later date to determine whether the measured surface cracks have changed.

Attorney Docket No. 06.00995.0042

34. The method of claim 33 wherein the method further comprises a step of assigning a severity value to each measured crack based on at least the measured length and measured width of the crack.

35. The method of claim 34 wherein the method further comprises the step of identifying and measuring a surface feature that is higher than a minimum tie height threshold.

36. The method of claim 35 wherein the method further comprises the step of saving data corresponding to the measured surface feature to the data storage apparatus on a per tie basis so that the same tie can be re-examined at a later date to determine whether the measured surface feature has changed.

37. The method of claim 31 wherein the method further comprises the step of detecting a broken tie based on an abrupt elevation shift along the tie surface plane.

38. The method of claim 24 wherein the step of identifying a railway track bed feature further comprises the step of comparing at least a portion of the track elevation map to a plurality of three dimensional features saved in feature library to determine a best fit to properly identify the railway track bed feature.

39. The method of claim 38 wherein the step of comparing further comprises the step of applying a minimum correlation threshold so that a railway track bed feature will not be identified as a particular three dimensional feature from the feature library unless the minimum correlation threshold is met.

40. The method of claim 31 wherein the method further comprises the step of determining a shoulder ballast volume adjacent a tie based at least in part on the approximate tie surface plane defined for the tie.

Attorney Docket No. 06.00995.0042

41. The method of claim 31 wherein the method further comprises the step of defining a surface area region adjacent the tie bounding box, measuring the surface elevation of the surface area region, and determining the difference between the surface elevation of the surface area region and the surface elevation of the approximate tie surface plane to determine whether a positive volume or negative volume is present at the surface area region.

42. The method of claim 38 wherein the method further comprises the step of making a plurality of elevation measurements along and around an identified railway track bed feature and recording the measurements and the locations of the measurements in the data storage apparatus.

43. The method of claim 42 wherein the method further comprises the step of assigning a condition to the identified railway track bed feature based on the plurality of elevation measurements.

44. The method of claim 24 wherein the step of identifying a railway track bed feature further comprises the step of measuring the length of a joint bar candidate, determining whether the length of the joint bar candidate falls between a minimum joint bar length threshold and a maximum joint bar length threshold, and identifying the joint bar candidate as a joint bar if the length measurement of the joint bar candidate falls between a minimum joint bar length threshold and a maximum joint bar length threshold.

## UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/725,490 | 05/29/2015 | Darel Mesher | 06.00995.0042 | 4258 |

| | |
|---|---|
| 117642          7590          03/30/2017 | EXAMINER |
| Robinson IP Law, PLLC | HASAN, MAINUL |
| 9724 Kingston Pike | |
| Suite 1403 | |
| Knoxville, TN 37922 | |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2489 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 03/30/2017 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

rrobinson@robinsoniplaw.com
docketing@robinsoniplaw.com

| **Office Action Summary** | Application No. 14/725,490 | Applicant(s) MESHER, DAREL |
|---|---|---|
| | Examiner MAINUL HASAN | Art Unit 2489 | AIA (First Inventor to File) Status Yes |

| -- The MAILING DATE of this communication appears on the cover sheet with the correspondence address -- |

## Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) months from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

## Status

1) ☒ Responsive to communication(s) filed on <u>02/14/2017</u>.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a) ☐ This action is **FINAL.**    2b) ☒ This action is non-final.

3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____ ; the restriction requirement and election have been incorporated into this action.

4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

## Disposition of Claims*

5) ☒ Claim(s) <u>1-44</u> is/are pending in the application.
   5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6) ☐ Claim(s) _____ is/are allowed.

7) ☒ Claim(s) <u>1-44</u> is/are rejected.

8) ☐ Claim(s) _____ is/are objected to.

9) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

## Application Papers

10) ☒ The specification is objected to by the Examiner.

11) ☒ The drawing(s) filed on <u>05/29/2015</u> is/are: a) ☒ accepted or b) ☐ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

## Priority under 35 U.S.C. § 119

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   a) ☐ All   b) ☐ Some**  c) ☐ None of the:
      1. ☐ Certified copies of the priority documents have been received.
      2. ☐ Certified copies of the priority documents have been received in Application No. _____.
      3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)

2) ☒ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date _____.

3) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____ .

4) ☐ Other: _____.

Exhibit 1
12

Application/Control Number: 14/725,490                                                    Page 2
Art Unit: 2489

## DETAILED ACTION

### Notice of Pre-AIA or AIA Status

The present application, filed on or after March 16, 2013, is being examined under the

first inventor to file provisions of the AIA. There are a total of 44 claims and claims 1-44 are

pending.

### Information Disclosure Statement

The information disclosure statement filed 02/26/2016 fails to comply with the provisions

of 37 CFR 1.97, 1.98 and MPEP § 609 because the first entry under the NPL Documents

(Russian Patent and Trademark Office grant decision) and the fifth entry titled "European Patent

Office, Supplementary European Search Report" were not found attached. Also the contents of

2nd and 3rd entries of NPL Documents titled "International Searching Authority, International

search report" were not legible due to poor scanning quality. These four NPL documents of the

aforementioned IDS have not been considered and therefore have been striked out.

### Specification

Applicant is reminded of the proper language and format for an abstract of the disclosure.

The abstract should be in narrative form and generally limited to a single paragraph on a
separate sheet within the range of 50 to 150 words. The form and legal phraseology often used
in patent claims, such as "means" and "said," should be avoided. The abstract should describe
the disclosure sufficiently to assist readers in deciding whether there is a need for consulting the
full patent text for details.

Application/Control Number: 14/725,490                                           Page 3
Art Unit: 2489

The language should be clear and concise and should not repeat information given in the title.  It should avoid using phrases which can be implied, such as, "The disclosure concerns," "The disclosure defined by this invention," "The disclosure describes," etc.

The abstract of the disclosure is objected to because it contains a phrase that can be implied ("A 3D track assessment system is **disclosed** …").

Appropriate correction is required. Also see MPEP 608.01(b), Paragraph C – "Language and Format".

### Claim Objections

Claims 1, 22 are objected to because of the following informalities:

Claims 1, 22, 5th element recites " … *and **the at least one processor** wherein the at least one processor* …". Since the "at least one processor" has already been declared in the previous limitation, reiterating it again does not put any weightage to the wherein clause. Moreover, it creates ambiguity in the limitation. The Examiner believes the claimed limitation should be recited as following " … *and wherein the at least one processor* …".

Appropriate correction is required.

### Claim Rejections - 35 USC § 102

The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the basis for the rejections under this section made in this Office action:

A person shall be entitled to a patent unless –

(a)(1) the claimed invention was patented, described in a printed publication, or in public use, on sale or otherwise available to the public before the effective filing date of the claimed invention.

Application/Control Number: 14/725,490                                     Page 4

Art Unit: 2489

**Claims 1-16, 18-21, 24-39, 41-44 are rejected under AIA 35 U.S.C. 102(a)(1) as being anticipated by Kainer et al. (US PGPub 2013/0191070 A1).**

Regarding claim **1**, **Kainer et al.** disclose *a system for assessing a railway track bed* (**[0036], L5-6**)*, the system comprising:*

*a power source* (**[0046], L14-17**)*;*

*a light emitting apparatus powered by the power source for emitting light energy toward a railway track* (**[0012], L2-6; Fig. 1** and **2,** reference numeral **40**)*;*

*a data storage apparatus* (**Fig. 1,** reference numeral **62**) *in communication with at least one processor* (**Fig. 1,** reference numeral **54, 60**)*;*

*at least one sensor for sensing reflected light that was emitted from the light emitting apparatus* (**Fig. 1** and **2,** reference numeral **50**) *and acquiring three dimensional image data of the railway track* (**[0029]**)*) to be stored in the data storage apparatus* (**Fig. 1** shows the communicative coupling between the camera and the storage device **62**)*, wherein the plurality of sensors* (**Fig. 2,** reference numeral **50** shows two cameras) *are in communication with the at least one processor* (**Fig. 1** shows communicative coupling between the camera **50** and the processor **54**)*; and*

*the at least one processor wherein the at least one processor is configured to run an algorithm* (**[0012], L10-13**) *for processing three-dimensional elevation data* (**Figs. 11-12** represent a 3D track elevation map) *gathered from the plurality of sensors* (**Fig. 2,** reference numeral **50** shows two cameras) *and saved in the data storage apparatus* (**Fig. 1** shows the

Application/Control Number: 14/725,490                                                    Page 5
Art Unit: 2489

communicative coupling between the camera and the storage device **62**), *the algorithm comprising the steps of:*

   *a. acquiring three dimensional data representative of a segment of railway track bed* (**[0047], L14-18**);

   *b. generating a track elevation map based on the acquired three dimensional data* (**[0082], L18-20; Figs. 11-12** represent a 3D track elevation map where different parameters, e.g. elevations, height, cracks, splits, orientations, etc. can be measured as disclosed in **[0056], L7-17**);

   *c. identifying a railway track bed feature from the track elevation map* (**[0083], L1-5; [0087], L10-15**); *and*

   *d. storing information corresponding to the identified railway track bed feature in the data storage apparatus* (**[0046], L5-13**).

   Regarding claim **2**, **Kainer et al.** disclose *the system of claim 1 wherein the algorithm step of identifying a railway track bed feature further comprises the step of identifying a rail head edge by detecting significant vertical gradient edges over a two dimensional area wherein such vertical gradient edges are greater than a minimum rail height threshold* (**[0059], Fig. 5;** It discloses calculating the gradient of the rail head edge **12** with respect to the tie plate. Since the computer analysis checks the angles of tie plates with respect to rail heads and determines either a worn out rail head/base plate or not, it is understood that there is a threshold involved in determining the worn condition).

Application/Control Number: 14/725,490                                                Page 6
Art Unit: 2489

Regarding claim **3**, **Kainer et al.** disclose *the system of claim 2 wherein the algorithm step of identifying a railway track bed feature further comprises the step of identifying a rail base edge by detecting significant vertical gradient edges over a two dimensional area adjacent the detected rail head edge wherein such vertical gradient edges are greater than a minimum rail base height threshold* (**[0059], Fig. 5;** It discloses calculating the gradient of the rail head edge **12** with respect to the tie plate edge **10**. Since the computer analysis checks the angles of tie plates with respect to rail heads and determines either a worn out rail head/tie plate or not, it is understood that there is a threshold involved in determining the worn condition).

Regarding claim **4**, **Kainer et al.** disclose *the system of claim 2 wherein the algorithm further comprises the step of removing data corresponding to the rail head from the elevation map, thereby enhancing the detection of other smaller vertical components of the railway track bed* (**[0091], L7-11;** It discloses filtering out non-tie surfaces while analyzing the tie condition, meaning enhancing the tie condition determination by removing/filtering out other non-essential elements from the image data. **[0052], L10-23; [0053];** It discloses discarding some of the captured image frames to achieve desired frame spacing and reduce data storage, because as disclosed in **[0095], L1-10,** identifying some of the smaller spacings, widths, lengths, etc. requires second pass of data acquiring and processing image data again thereby requiring more storage space).

Regarding claim **5**, **Kainer et al.** disclose *the system of claim 4 wherein the algorithm step of identifying a railway track bed feature further comprises the step of detecting surfaces*

Application/Control Number: 14/725,490                                    Page 7
Art Unit: 2489

*with surface normal values greater than a planar region surface normal value threshold and that*
*are proximate to one another by less than a maximum proximity threshold* (**[0092], L15-20;** It
discloses determining the tie surface based on some threshold value with respect to the ballast
level to determine whether accurate condition can be measured or not. In **[0093], L1-6,** it also
discloses a proximity threshold by disclosing an expected tie-to-tie distance).

Regarding claim **6**, **Kainer et al.** disclose *the system of claim 5 wherein the algorithm*
*step of identifying a railway track bed feature further comprises the step of defining an*
*approximate tie surface plane based on the detected surfaces with surface normal values greater*
*than the planar region surface normal value threshold that are proximate to one another by less*
*than the maximum proximity threshold* (**[0092], L15-20;** It discloses determining the tie surface
based on some threshold value with respect to the ballast level to determine whether accurate
condition can be measured or not. In **[0093], L1-6,** it also discloses a proximity threshold by
disclosing an expected tie-to-tie distance).

Regarding claim **7**, **Kainer et al.** disclose *the system of claim 6 wherein the algorithm*
*step of identifying a railway track bed feature further comprises the step of assigning a tie*
*bounding box around the perimeter of the tie surface plane based at least on one measured*
*parameter of the tie surface plane* (**[0012], L10-13;** Also **Fig. 14** shows the flowchart of finding
the 4 edges of the tie boundaries which is equivalent of finding the bounding box around a tie
surface plane).

Application/Control Number: 14/725,490                                      Page 8
Art Unit: 2489

Regarding claim **8**, **Kainer et al.** disclose *the system of claim 7 wherein the algorithm step of identifying a railway track bed feature further comprises the step of assigning an approximate tie length, an approximate tie width, and an approximate tie skew angle based on the bounding box assigned around the perimeter of the tie surface plane* (**[0101], L1-5**).

Regarding claim **9**, **Kainer et al.** disclose *the system of claim 6 wherein the algorithm step of identifying a railway track bed feature further comprises the step of identifying and measuring surface cracks that are deeper than a minimum crack depth threshold and that are longer than a minimum crack length threshold based on the track elevation map* (**[0063];** It discloses determining width, length and depth of cracks based on whether the defective portions **D, D'** fall within or outside a region of interest, meaning certain threshold values).

Regarding claim **10**, **Kainer et al.** disclose *the system of claim 9 wherein data corresponding to the measured surface cracks are saved to the data storage apparatus on a per tie basis so that the same tie can be re-examined at a later date to determine whether the measured surface cracks have changed* (**[0062], L22-25;** It discloses determining rail wears by comparing image frames taken at different times but in the same location of the track bed, meaning the storage device **62** is capable of storing data for the same track bed features for the same location at different times so that the wear and tear can be compared over a time).

Regarding claim **11**, **Kainer et al.** disclose *the system of claim 9 wherein the algorithm step of identifying a railway track bed feature further comprises a step of assigning a severity*

Application/Control Number: 14/725,490                                                    Page 9
Art Unit: 2489

*value to each measured crack based on at least the measured length and measured width of the crack* (**[0083]; Fig. 13,** step **212** shows assigning a tie conditioning score after measuring different features associated with the ties to create a tie replacement plan, meaning the score will tell one how severe the condition of the tie is and if it needs immediate replacement or not. The same severity matrix is also described in **[0114]**).

Regarding claim **12**, **Kainer et al.** disclose *the system of claim 6 wherein the algorithm step of identifying a railway track bed feature further comprises the step of identifying and measuring a surface feature that is higher than a minimum tie height threshold* (**[0062], L12-21, Fig. 7A-B;** It discloses a height **LD** of the surface of the rail **12** with respect to the tie plate for successive frames where the height **LD** is showing smaller in the later frame than the earlier frame indicating a wear and tear of the surface).

Regarding claim **13**, **Kainer et al.** disclose *the system of claim 12 wherein data corresponding to the measured surface feature are saved to the data storage apparatus on a per tie basis so that the same tie can be re-examined at a later date to determine whether the measured surface feature has changed* (**[0062], L22-25;** It discloses determining rail wears by comparing image frames taken at different times but in the same location of the track bed, meaning the storage device **62** is capable of storing data for the same track bed features for the same location at different times so that the wear and tear can be compared over a time).

Application/Control Number: 14/725,490                                           Page 10
Art Unit: 2489

Regarding claim **14**, **Kainer et al.** disclose *the system of claim 6 wherein the algorithm step of identifying a railway track bed feature further comprises the step of detecting a broken tie based on an abrupt elevation shift along the tie surface plane* (**[0099]**).

Regarding claim **15**, **Kainer et al.** disclose *the system of claim 1 wherein the algorithm step of identifying a railway track bed feature further comprises the step of comparing at least a portion of the track elevation map to a plurality of three dimensional features saved in a feature library to determine a best fit between the at least a portion of the track elevation map and the plurality of three dimensional features to properly identify the railway track bed feature* (**[0059], Fig. 5;** It discloses a best fit curve determination of two feature lines **L1** and **L2** corresponding to rail head **12** and the crosstie **10** which are then averaged over a several of the previously stored image frames so that the computer can analyze and determine the angular relationship between these lines **L1-L2** to determine the tie angle with respect to the rail, where the tie angle is the feature being identified after averaging over plurality of previously stored image frames).

Regarding claim **16**, **Kainer et al.** disclose *the system of claim 15 wherein the step of comparing further comprises the step of applying a minimum correlation threshold so that a railway track bed feature will not be identified as a particular three dimensional feature from the feature library unless the minimum correlation threshold is met* (**[0014];** It discloses applying a correlation between the tie features, e.g. spacing and the tie condition grading above/below a threshold to determine the tie replacement plan, meaning if the correlation is not met the tie grading will not be identified as needing replacement).

Application/Control Number: 14/725,490                                    Page 11
Art Unit: 2489

Regarding claim **18**, **Kainer et al.** disclose *the system of claim 7 wherein the algorithm step of identifying a railway track bed feature further comprises the step of defining a surface area region adjacent the tie bounding box, measuring the surface elevation of the surface area region, and determining the difference between the surface elevation of the surface area region and the surface elevation of the approximate tie surface plane to determine whether a positive volume or negative volume is present at the surface area region* (**[0092];** It discloses the system identifying the tie surface area with respect to the non-tie surface area and how much of the tie area surface is covered by the ballast and therefore cannot be scored, which is equivalent of positive volume (60%) and negative volume (40%)).

Regarding claim **19**, **Kainer et al.** disclose *the system of claim 15 wherein the algorithm step of identifying a railway track bed feature further comprises the step of making a plurality of elevation measurements along and around an identified railway track bed feature and recording the measurements and the locations of the measurements in the data storage apparatus* (**[0056];** **Fig. 11** and **12** show plurality of compiled image data showing the track bed features. Also **Figs. 4A-C** show three consecutive image frames **Z1-Z3** meaning the system is taking multiple elevation measurements. Since the system is equipped with a storage device **62,** it is understood that the plurality of elevation measurements are stored in the storage device).

Regarding claim **20**, **Kainer et al.** disclose *the system of claim 19 wherein the algorithm step of identifying a railway track bed feature further comprises the step of assigning a condition*

Application/Control Number: 14/725,490                                              Page 12
Art Unit: 2489

*to the identified railway track bed feature based on the plurality of elevation measurements* (In **[0114],** it discloses assigning four conditions based on the determination of the rail track features, e.g. good (1), marginal (2), bad (3), or failed (4)).

Regarding claim **21**, **Kainer et al.** disclose *the system of claim 1 wherein the algorithm step of identifying a railway track bed feature further comprises the step of measuring the length of a joint bar candidate, determining whether the length of the joint bar candidate falls between a minimum joint bar length threshold and a maximum joint bar length threshold, and identifying the joint bar candidate as a joint bar if the length measurement of the joint bar candidate falls between a minimum joint bar length threshold and a maximum joint bar length threshold* (**[0122], L6-10;** It discloses determining the edge outlines of the joint bar from two consecutive rail top edges and then comparing the shape against a standard joint bar shape, meaning thresholding different edges to determine whether it is a joint bar or not).

Regarding claim **24**, **Kainer et al.** disclose *a method of assessing a railway track bed* (**[0036], L5-6**), *the method comprising the steps of:*

    *a. defining a three dimensional elevation map* (**[0047], L14-18**) *based on data gathered by a sensor* (**Fig. 1** and **2,** reference numeral **50**) *sensing reflected light from a track bed surface* (**[0012], L2-6; Fig. 1** and **2,** reference numeral **40**)*;*

    *b. storing the elevation map in a data storage apparatus* (**[0046], L5-13**)*;*

    *c. identifying a railway track bed feature from the elevation map* (**[0083], L1-5; [0087], L10-15**)*; and*

Application/Control Number: 14/725,490                                    Page 13
Art Unit: 2489

   *d. storing information corresponding to the identified railway track bed feature in the*

*data storage apparatus* (**[0046], L5-13**).


   Regarding claim **25**, **Kainer et al.** disclose *the method of claim 24 wherein the step of*

*identifying a railway track bed feature further comprises the step of identifying a rail head edge*

*by detecting significant vertical gradient edges over a two dimensional area wherein such*

*vertical gradient edges are greater than a minimum rail height threshold* (**[0059], Fig. 5;** It

discloses calculating the gradient of the rail head edge **12** with respect to the tie plate. Since the

computer analysis checks the angles of tie plates with respect to rail heads and determines either

a worn out rail head/base plate or not, it is understood that there is a threshold involved in

determining the worn condition).


   Regarding claim **26**, **Kainer et al.** disclose *the method of claim 25 wherein the step of*

*identifying a railway track bed feature further comprises the step of identifying a rail base edge*

*by detecting significant vertical gradient edges over a two dimensional area adjacent the*

*detected rail head edge wherein such vertical gradient edges are greater than a minimum rail*

*base height threshold* (**[0059], Fig. 5;** It discloses calculating the gradient of the rail head edge

**12** with respect to the tie plate edge **10**. Since the computer analysis checks the angles of tie

plates with respect to rail heads and determines either a worn out rail head/tie plate or not, it is

understood that there is a threshold involved in determining the worn condition).

Application/Control Number: 14/725,490                                                Page 14
Art Unit: 2489

Regarding claim **27**, **Kainer et al.** disclose *the method of claim 26 further comprising the step of removing data corresponding to the rail head from the elevation map, thereby enhancing the detection of other smaller vertical components of the railway track bed* (**[0091]**, **L7-11;** It discloses filtering out non-tie surfaces while analyzing the tie condition, meaning enhancing the tie condition determination by removing/filtering out other non-essential elements from the image data. **[0052]**, **L10-23; [0053];** It discloses discarding some of the captured image frames to achieve desired frame spacing and reduce data storage, because as disclosed in **[0095]**, **L1-10,** identifying some of the smaller spacings, widths, lengths, etc. requires second pass of data acquiring and processing image data again thereby requiring more storage space).

Regarding claim **28**, **Kainer et al.** disclose *the method of claim 24 wherein the method further comprises the step of detecting surfaces with surface normal values greater than a planar region surface normal value threshold and that are proximate to one another by less than a maximum proximity threshold* (**[0092]**, **L15-20;** It discloses determining the tie surface based on some threshold value with respect to the ballast level to determine whether accurate condition can be measured or not. In **[0093]**, **L1-6,** it also discloses a proximity threshold by disclosing an expected tie-to-tie distance).

Regarding claim **29**, **Kainer et al.** disclose *the method of claim 28 wherein the method further comprises the step of defining an approximate tie surface plane based on the detected surfaces with surface normal values greater than the planar region surface normal value threshold that are proximate to one another by less than the maximum proximity threshold*

Application/Control Number: 14/725,490                                    Page 15
Art Unit: 2489

(**[0092], L15-20;** It discloses determining the tie surface based on some threshold value with respect to the ballast level to determine whether accurate condition can be measured or not. In **[0093], L1-6,** it also discloses a proximity threshold by disclosing an expected tie-to-tie distance).

Regarding claim **30**, **Kainer et al.** disclose *the method of claim 29 wherein the method further comprises the step of assigning a tie bounding box around the perimeter of the tie surface plane based at least on one measured parameter of the tie surface plane* (**[0012], L10-13;** Also **Fig. 14** shows the flowchart of finding the 4 edges of the tie boundaries which is equivalent of finding the bounding box around a tie surface plane).

Regarding claim **31**, **Kainer et al.** disclose *the method of claim 30 wherein the method further comprises the step of assigning an approximate tie length, an approximate tie width, and an approximate tie skew angle based on the bounding box assigned around the perimeter of the tie surface plane* (**[0101], L1-5**).

Regarding claim **32**, **Kainer et al.** disclose *the method of claim 31 wherein the method further comprises the step of identifying and measuring surface cracks that are deeper than a minimum crack depth threshold and that are longer than a minimum crack length threshold based on the track elevation map* (**[0063];** It discloses determining width, length and depth of cracks based on whether the defective portions **D, D'** fall within or outside a region of interest, meaning certain threshold values).

Application/Control Number: 14/725,490                                                    Page 16
Art Unit: 2489

Regarding claim **33**, **Kainer et al.** disclose *the method of claim 32 wherein the method further comprises the step of saving data corresponding to the measured surface cracks to the data storage apparatus on a per tie basis so that the same tie can be re-examined at a later date to determine whether the measured surface cracks have changed* (**[0062], L22-25;** It discloses determining rail wears by comparing image frames taken at different times but in the same location of the track bed, meaning the storage device **62** is capable of storing data for the same track bed features for the same location at different times so that the wear and tear can be compared over a time).

Regarding claim **34**, **Kainer et al.** disclose *the method of claim 33 wherein the method further comprises a step of assigning a severity value to each measured crack based on at least the measured length and measured width of the crack* (**[0083]; Fig. 13,** step **212** shows assigning a tie conditioning score after measuring different features associated with the ties to create a tie replacement plan, meaning the score will tell one how severe the condition of the tie is and if it needs immediate replacement or not. The same severity matrix is also described in **[0114]**).

Regarding claim **35**, **Kainer et al.** disclose *the method of claim 34 wherein the method further comprises the step of identifying and measuring a surface feature that is higher than a minimum tie height threshold* (**[0062], L12-21, Fig. 7A-B;** It discloses a height **LD** of the surface of the rail **12** with respect to the tie plate for successive frames where the height **LD** is showing smaller in the later frame than the earlier frame indicating a wear and tear of the surface).

Application/Control Number: 14/725,490                                                    Page 17
Art Unit: 2489

Regarding claim **36**, **Kainer et al.** disclose *the method of claim 35 wherein the method further comprises the step of saving data corresponding to the measured surface feature to the data storage apparatus on a per tie basis so that the same tie can be re-examined at a later date to determine whether the measured surface feature has changed* (**[0062], L22-25;** It discloses determining rail wears by comparing image frames taken at different times but in the same location of the track bed, meaning the storage device **62** is capable of storing data for the same track bed features for the same location at different times so that the wear and tear can be compared over a time).

Regarding claim **37**, **Kainer et al.** disclose *the method of claim 31 wherein the method further comprises the step of detecting a broken tie based on an abrupt elevation shift along the tie surface plane* (**[0099]**).

Regarding claim **38**, **Kainer et al.** disclose *the method of claim 24 wherein the step of identifying a railway track bed feature further comprises the step of comparing at least a portion of the track elevation map to a plurality of three dimensional features saved in feature library to determine a best fit to properly identify the railway track bed feature* (**[0059], Fig. 5;** It discloses a best fit curve determination of two feature lines **L1** and **L2** corresponding to rail head **12** and the crosstie **10** which are then averaged over a several of the previously stored image frames so that the computer can analyze and determine the angular relationship between these lines **L1-L2**

Application/Control Number: 14/725,490                                       Page 18
Art Unit: 2489

to determine the tie angle with respect to the rail, where the tie angle is the feature being

identified after averaging over plurality of previously stored image frames).


Regarding claim **39**, **Kainer et al.** disclose *the method of claim 38 wherein the step of*

*comparing further comprises the step of applying a minimum correlation threshold so that a*

*railway track bed feature will not be identified as a particular three dimensional feature from the*

*feature library unless the minimum correlation threshold is met* (**[0014];** It discloses applying a

correlation between the tie features, e.g. spacing and the tie condition grading above/below a

threshold to determine the tie replacement plan, meaning if the correlation is not met the tie

grading will not be identified as needing replacement).


Regarding claim **41**, **Kainer et al.** disclose *the method of claim 31 wherein the method*

*further comprises the step of defining a surface area region adjacent the tie bounding box,*

*measuring the surface elevation of the surface area region, and determining the difference*

*between the surface elevation of the surface area region and the surface elevation of the*

*approximate tie surface plane to determine whether a positive volume or negative volume is*

*present at the surface area region* (**[0092];** It discloses the system identifying the tie surface area

with respect to the non-tie surface area and how much of the tie area surface is covered by the

ballast and therefore cannot be scored, which is equivalent of positive volume (60%) and

negative volume (40%)).

Application/Control Number: 14/725,490                                    Page 19
Art Unit: 2489

Regarding claim **42**, **Kainer et al.** disclose *the method of claim 38 wherein the method further comprises the step of making a plurality of elevation measurements along and around an identified railway track bed feature and recording the measurements and the locations of the measurements in the data storage apparatus* (**[0056]; Fig. 11** and **12** show plurality of compiled image data showing the track bed features. Also **Figs. 4A-C** show three consecutive image frames **Z1-Z3** meaning the system is taking multiple elevation measurements. Since the system is equipped with a storage device **62,** it is understood that the plurality of elevation measurements are stored in the storage device).

Regarding claim **43**, **Kainer et al.** disclose *the method of claim 42 wherein the method further comprises the step of assigning a condition to the identified railway track bed feature based on the plurality of elevation measurements* (In **[0114],** it discloses assigning four conditions based on the determination of the rail track features, e.g. good (1), marginal (2), bad (3), or failed (4)).

Regarding claim **44**, **Kainer et al.** disclose *the method of claim 24 wherein the step of identifying a railway track bed feature further comprises the step of measuring the length of a joint bar candidate, determining whether the length of the joint bar candidate falls between a minimum joint bar length threshold and a maximum joint bar length threshold, and identifying the joint bar candidate as a joint bar if the length measurement of the joint bar candidate falls between a minimum joint bar length threshold and a maximum joint bar length threshold* (**[0122], L6-10;** It discloses determining the edge outlines of the joint bar from two consecutive

Application/Control Number: 14/725,490                                                Page 20
Art Unit: 2489

rail top edges and then comparing the shape against a standard joint bar shape, meaning

thresholding different edges to determine whether it is a joint bar or not).


### *Claim Rejections - 35 USC § 103*

The following is a quotation of AIA 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set
> forth in section 102 of this title, if the differences between the subject matter sought to be patented and
> the prior art are such that the subject matter as a whole would have been obvious at the time the
> invention was made to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was made.

**Claims 22-23 are rejected under AIA 35 U.S.C. 103(a) as being unpatentable over**

**Kainer et al. (US PGPub 2013/0191070 A1) in view of Szwilski et al. (US PGPub**

**2010/0026551 A1).**


Regarding claim **22**, **Kainer et al.** teach *a system for assessing a railway track bed*

*(*[**0036**], **L5-6***), the system comprising:*

*a power source (*[**0046**], **L14-17***);*

*a light emitting apparatus powered by the power source for emitting light energy toward*

*a railway track (*[**0012**], **L2-6; Fig. 1** and **2,** reference numeral **40***);*

*a data storage apparatus (***Fig. 1,** reference numeral **62***) in communication with at least*

*one processor (***Fig. 1,** reference numeral **54, 60***);*

*at least one sensor for sensing reflected light that was emitted from the light emitting*

*apparatus (***Fig. 1** and **2,** reference numeral **50***) and acquiring three dimensional image data of*

*the railway track (*[**0029**]*) to be stored in the data storage apparatus (***Fig. 1** shows the

Application/Control Number: 14/725,490                                          Page 21
Art Unit: 2489

communicative coupling between the camera and the storage device **62**), *wherein the plurality of*

*sensors are in communication with the at least one processor* (**Fig. 1** shows communicative

coupling between the camera **50** and the processor **54**); *and*

    *the at least one processor wherein the at least one processor includes an algorithm*

(**[0012], L10-13**) *for extracting railway track bed surface elevation data to define new railway*

*track bed components for a three dimensional track feature library* (**[0015], L12-15.** The

Examiner interprets the track feature library as the database for storing track features, which is

being done by storing the track features into the storage device as disclosed in **[0046], L5-13**),

*the algorithm comprising the steps of:*

    *a. acquiring three dimensional data representative of a segment of railway track bed*

(**[0047], L14-18**);

    *b. generating a track elevation map based on the acquired three dimensional data*

(**[0082], L18-20; Figs. 11-12** represent a 3D track elevation map where different parameters, e.g.

elevations, height, cracks, splits, orientations, etc. can be measured as disclosed in **[0056], L7-**

**17**);

    *c. identifying a railway track feature from the track elevation map that does not match*

*any previously defined track features saved in a track feature library* (**[0083], L1-5;** It teaches

identifying tie plate features to compute different condition metrics of the tie plates. Now in

**[0102], [0087], L10-15,** it teaches different tie plate features, e.g. widths, slope, spikes, etc.

where it states "Once these features have been found, the system calculates plate cut by finding

the edges …". Which means as the features are being found, that were not defined or used

previously, are being used now to locate tie plates);

Application/Control Number: 14/725,490                                    Page 22
Art Unit: 2489

    *d. extracting three dimensional data from the track elevation map corresponding to the identified railway track feature* (**[0047], L14-18***);*

    *e. assigning a feature name to the extracted three dimensional data* (Since the system is storing all the 3D information data into storage device **62** for retrieving the data at a later time (**[0046], L7-9;** It teaches both read/write operation), it is imperative that each data is tagged with unique identifier for later reading and analysis)*; and*

    *f. saving in the data storage apparatus the extracted three dimensional data associated with the feature name as a new track feature to be included in the track feature library* (**[0046], L5-13***).*

    Although, **Kainer et al.** teach storing 3D information into storage device for both read/write purpose, but it does not explicitly teach tagging each feature with a unique name/ID/tag.

    However, **Szwilski et al.** teach a railroad surveying and monitoring system where it tags all the acquired data about the rail track including the camera data with a position location and stores it in the storage device (**Szwilski et al.; [0065], L6-12**).

    It would have been obvious for one of ordinary skill in the art at the time the invention was made to combine **Kainer et al**'s invention of inspecting railroad ties to include **Szwilski et al**'s usage of data tagging and storing, because in doing so one can carry out comparative analysis of the acquired data for a subsequent track inspection data with respect to the previously tagged track inspection data (**Szwilski et al.; [0066], L1-17**).

Application/Control Number: 14/725,490                                           Page 23
Art Unit: 2489

Regarding claim **23**, **Kainer et al.** teach *a method of building a virtual three dimensional railway track bed component library* (**[0047], L14-18**)*, the method comprising the steps of:*

*a. emitting a light along a track bed surface* (**[0012], L2-6; Fig. 1** and **2,** reference numeral **40**)*;*

*b. sensing some of the emitted light after it has reflected off of the track bed surface* (**Fig. 1** and **2,** reference numeral **50**)*;*

*c. defining a three dimensional elevation map based on the sensed light reflected from the track bed surface* (**[0082], L18-20; Figs. 11-12** represent a 3D track elevation map where different parameters, e.g. elevations, height, cracks, splits, orientations, etc. can be measured as disclosed in **[0056], L7-17**)*;*

*d. storing the elevation map in a data storage apparatus* (**Fig. 1** shows the communicative coupling between the camera and the storage device **62**)*;*

*e. identifying a railway track bed feature from the three dimensional elevation map that does not match any previously defined track bed features saved in a track component library* (**[0083], L1-5;** It teaches identifying tie plate features to compute different condition metrics of the tie plates. Now in **[0102], [0087], L10-15,** it teaches different tie plate features, e.g. widths, slope, spikes, etc. where it states "Once these features have been found, the system calculates plate cut by finding the edges …". Which means as the features are being found, that were not defined or used previously, are being used now to locate tie plates)*;*

*f. extracting three dimensional data from the track elevation map corresponding to the identified railway track bed feature* (**[0047], L14-18**)*;*

Application/Control Number: 14/725,490                                        Page 24
Art Unit: 2489

> g. assigning a component name to the extracted three dimensional data (Since the system
is storing all the 3D information data into storage device **62** for retrieving the data at a later time
(**[0046], L7-9;** It teaches both read/write operation), it is imperative that each data is tagged with
unique identifier for later reading and analysis); and

> h. saving the extracted three dimensional data associated with the component name in a
data storage apparatus as a new track bed feature to be included in the track component library
(**[0046], L5-13**).

Although, **Kainer et al.** teach storing 3D information into storage device for both
read/write purpose, but it does not explicitly teach tagging each feature with a unique
name/ID/tag.

However, **Szwilski et al.** teach a railroad surveying and monitoring system where it tags
all the acquired data about the rail track including the camera data with a position location and
stores it in the storage device (**Szwilski et al.; [0065], L6-12**).

It would have been obvious for one of ordinary skill in the art at the time the invention
was made to combine **Kainer et al**'s invention of inspecting railroad ties to include **Szwilski et
al**'s usage of data tagging and storing, because in doing so one can carry out comparative
analysis of the acquired data for a subsequent track inspection data with respect to the previously
tagged track inspection data (**Szwilski et al.; [0066], L1-17**).

**Claims 17, 40 are rejected under AIA 35 U.S.C. 103(a) as being unpatentable over
Kainer et al. (US PGPub 2013/0191070 A1) in view of Landes et al. (US PGPub
2013/0096739 A1).**

Application/Control Number: 14/725,490                                      Page 25
Art Unit: 2489

Regarding claim **17**, **Kainer et al.** teach *the system of claim 6.*

Although **Kainer et al.** teach determining the ballast height from the difference in levels
of the ballast and the crosstie and ballast stone size as described in **[0065],** but it does not
exclusively teach determining the ballast volume.

However, **Landes et al.** teach a system for automatic rail track surveying using camera
and laser lights which determines the ballast volume from the acquired data (**Landes et al.;
[0009], L1-5**).

It would have been obvious for one of ordinary skill in the art at the time the invention
was made to combine **Kainer et al**'s invention of inspecting railroad ties to include **Landes et
al**'s determination of ballast volume from the acquired data by the system, because since ballast
beneath and between the ties stabilizes the positions of the ties, keeps the rails level, and
provides some cushioning of the composite structure for loads imposed by rail traffic, any
dislodging of the ballast over time could cause rail track deterioration and safety hazards.
Therefore, periodic monitoring of ballast volume and replacement thereof will ensure rail track
safety and integrity (**Landes et al.; [0005], L6-15**).

Regarding claim **40**, **Kainer et al.** teach *the method of claim 31.*

Although **Kainer et al.** teach determining the ballast height from the difference in levels
of the ballast and the crosstie and ballast stone size as described in **[0065],** but it does not
exclusively teach determining the ballast volume.

Application/Control Number: 14/725,490                                      Page 26
Art Unit: 2489

However, **Landes et al.** teach a system for automatic rail track surveying using camera and laser lights which determines the ballast volume from the acquired data (**Landes et al.; [0009], L1-5**).

It would have been obvious for one of ordinary skill in the art at the time the invention was made to combine **Kainer et al**'s invention of inspecting railroad ties to include **Landes et al**'s determination of ballast volume from the acquired data by the system, because since ballast beneath and between the ties stabilizes the positions of the ties, keeps the rails level, and provides some cushioning of the composite structure for loads imposed by rail traffic, any dislodging of the ballast over time could cause rail track deterioration and safety hazards. Therefore, periodic monitoring of ballast volume and replacement thereof will ensure rail track safety and integrity (**Landes et al.; [0005], L6-15**).

### Conclusion

The prior art made of record and not relied upon is considered pertinent to applicant's disclosure.

1. "TILT CORRECTION SYSTEM AND METHOD FOR RAIL SEAT ABRASION" – Villar et al., US PGPub 2009/0319197 A1.

2. "RAIL STRESS DETECTION SYSTEM AND METHOD" – Snead, US PGPub 2013/0070083 A1.

3. "VIDEO INSPECTION SYSTEM FOR INSPECTION OF RAIL COMPONENTS AND METHOD THEREOF" – Nejikovsky et al., US PGPub 2004/0263624 A1.

Application/Control Number: 14/725,490                                    Page 27
Art Unit: 2489

    4. "SYSTEMS AND METHODS FOR OBTAINING IMPROVED ACCURACY MEASUREMENTS OF MOVING ROLLING STOCK COMPONENTS" – Kilian et al., US PGPub 2007/0211145 A1.

    5. "OPTICAL RAIL GAGE/WEAR SYSTEM" – Thurston, US Pat 4,915,504.

    6. "APPARATUS FOR MONITORING THE RAILS OF A RAILWAY OR TRAMWAY LINE" – Casagrande, US PGPub 2003/0140509 A1.

    7. "RAIL VEHICLE MOUNTED RAIL MEASUREMENT SYSTEM" – Chung, US PGPub 2008/0007724 A1.

    8. "DISTANCE IMAGE OBTAINING SYSTEM FOR TRACK" – Enomoto et al., US PGPub 2012/0062731 A1.


    Any inquiry concerning this communication or earlier communications from the examiner should be directed to MAINUL HASAN whose telephone number is (571)272-0422. The examiner can normally be reached on MON-FRI: 8AM-5PM, Alternate FRIDAYS, EST.

    If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, JORGE L. ORTIZ-CRIADO can be reached on (571)272-7624.  The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

    Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system.  Status information for published applications may be obtained from either Private PAIR or Public PAIR.  Status information for unpublished applications is available through Private PAIR only.  For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR

Application/Control Number: 14/725,490                                           Page 28
Art Unit: 2489

system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would

like assistance from a USPTO Customer Service Representative or access to the automated

information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/M. H./
Examiner, Art Unit 2489

/JORGE L ORTIZ CRIADO/
Supervisory Patent Examiner, Art Unit 2489

**AMENDMENTS TO THE CLAIMS:**

This listing of claims will replace all prior versions and listings of claims in the application:

**Listing of Claims:**

1.      (Currently Amended) A system for assessing a railway track bed, the system comprising:

a power source;

a light emitting apparatus powered by the power source for emitting light energy toward a railway track;

a data storage apparatus in communication with at least one processor;

at least one sensor for sensing reflected light that was emitted from the light emitting apparatus and acquiring three dimensional surface elevation and intensity image data of the railway track to be stored in the data storage apparatus, wherein the plurality of sensors are in communication with the at least one processor; and

the at least one processor wherein the at least one processor is configured to run an algorithm for processing three-dimensional surface elevation and intensity data gathered from the plurality of sensors and saved in the data storage apparatus, the algorithm comprising the steps of:

   a.   acquiring three dimensional surface elevation and intensity data representative of [[a]]an area segment of railway track bed;

   b.   generating a track elevation map based on the acquired three dimensional data;

   c.   identifying a railway track bed feature from the track elevation map; and

   d.   storing information corresponding to the identified railway track bed feature in the data storage apparatus.

2. (Original) The system of claim 1 wherein the algorithm step of identifying a railway track bed feature further comprises the step of identifying a rail head edge by detecting significant vertical gradient edges over a two dimensional area wherein such vertical gradient edges are greater than a minimum rail height threshold.

3. (Original) The system of claim 2 wherein the algorithm step of identifying a railway track bed feature further comprises the step of identifying a rail base edge by detecting significant vertical gradient edges over a two dimensional area adjacent the detected rail head edge wherein such vertical gradient edges are greater than a minimum rail base height threshold.

4. (Original) The system of claim 2 wherein the algorithm further comprises the step of removing data corresponding to the rail head from the elevation map, thereby enhancing the detection of other smaller vertical components of the railway track bed.

5. (Original) The system of claim 4 wherein the algorithm step of identifying a railway track bed feature further comprises the step of detecting surfaces with surface normal values greater than a planar region surface normal value threshold and that are proximate to one another by less than a maximum proximity threshold.

6. (Original) The system of claim 5 wherein the algorithm step of identifying a railway track bed feature further comprises the step of defining an approximate tie surface plane based on the detected surfaces with surface normal values greater than the planar region surface normal value threshold that are proximate to one another by less than the maximum proximity threshold.

7. (Original) The system of claim 6 wherein the algorithm step of identifying a railway track bed feature further comprises the step of assigning a tie bounding box around the perimeter of the tie surface plane based at least on one measured parameter of the tie surface plane.

8. (Original) The system of claim 7 wherein the algorithm step of identifying a railway track bed feature further comprises the step of assigning an approximate tie length, an approximate tie width, and an approximate tie skew angle based on the bounding box assigned around the perimeter of the tie surface plane.

9. (Original) The system of claim 6 wherein the algorithm step of identifying a railway track bed feature further comprises the step of identifying and measuring surface cracks that are deeper

than a minimum crack depth threshold and that are longer than a minimum crack length
threshold based on the track elevation map.

10. (Original) The system of claim 9 wherein data corresponding to the measured surface cracks
are saved to the data storage apparatus on a per tie basis so that the same tie can be re-examined
at a later date to determine whether the measured surface cracks have changed.

11. (Original) The system of claim 9 wherein the algorithm step of identifying a railway track
bed feature further comprises a step of assigning a severity value to each measured crack based
on at least the measured length and measured width of the crack.

12. (Currently amended) The system of claim 6 wherein the algorithm step of identifying a
railway track bed feature further comprises the step of identifying and measuring a surface
feature other than a rail head that is higher than a minimum tie height threshold.

13. (Original) The system of claim 12 wherein data corresponding to the measured surface
feature are saved to the data storage apparatus on a per tie basis so that the same tie can be re-
examined at a later date to determine whether the measured surface feature has changed.

14. (Original) The system of claim 6 wherein the algorithm step of identifying a railway track
bed feature further comprises the step of detecting a broken tie based on an abrupt elevation shift
along the tie surface plane.

15. (Original) The system of claim 1 wherein the algorithm step of identifying a railway track
bed feature further comprises the step of comparing at least a portion of the track elevation map
to a plurality of three dimensional features saved in a feature library to determine a best fit
between the at least a portion of the track elevation map and the plurality of three dimensional
features to properly identify the railway track bed feature.

16. (Currently amended) The system of claim 15 wherein the step of comparing further comprises the step of applying a minimum correlation threshold so that a railway track bed feature other than a railroad tie will not be identified as a particular three dimensional feature from the feature library unless the minimum correlation threshold is met.

17. (Original) The system of claim 6 wherein the algorithm step of identifying a railway track bed feature further comprises the step of determining a shoulder ballast volume adjacent a tie based at least in part on the approximate tie surface plane defined for the tie.

18. (Original) The system of claim 7 wherein the algorithm step of identifying a railway track bed feature further comprises the step of defining a surface area region adjacent the tie bounding box, measuring the surface elevation of the surface area region, and determining the difference between the surface elevation of the surface area region and the surface elevation of the approximate tie surface plane to determine whether a positive volume or negative volume is present at the surface area region.

19. (Currently amended) The system of claim 15 wherein the algorithm step of identifying a railway track bed feature further comprises the step of making a plurality of elevation measurements along and around an identified railway track bed feature other than a railroad tie and recording the measurements and the locations of the measurements in the data storage apparatus.

20. (Original) The system of claim 19 wherein the algorithm step of identifying a railway track bed feature further comprises the step of assigning a condition to the identified railway track bed feature based on the plurality of elevation measurements.

21. (Original) The system of claim 1 wherein the algorithm step of identifying a railway track bed feature further comprises the step of measuring the length of a joint bar candidate, determining whether the length of the joint bar candidate falls between a minimum joint bar length threshold and a maximum joint bar length threshold, and identifying the joint bar

candidate as a joint bar if the length measurement of the joint bar candidate falls between a minimum joint bar length threshold and a maximum joint bar length threshold.

22. (Currently amended) A system for assessing a railway track bed, the system comprising:

a power source;

a light emitting apparatus powered by the power source for emitting light energy toward a railway track;

a data storage apparatus in communication with at least one processor;

at least one sensor for sensing reflected light that was emitted from the light emitting apparatus and acquiring three dimensional surface elevation and intensity image data of the railway track to be stored in the data storage apparatus, wherein the plurality of sensors are in communication with the at least one processor; and

~~the at least one processor~~ wherein the at least one processor includes an algorithm for extracting railway track bed surface elevation data to define new railway track bed components for a three dimensional track feature library, the algorithm comprising the steps of:

a. acquiring three dimensional surface elevation and intensity data representative of [[a]]an area segment of the railway track bed;

b. generating a track elevation map based on the acquired three dimensional data;

c. identifying a railway track feature from the track elevation map that does not match any previously defined track features saved in a track feature library;

d. extracting three dimensional surface elevation and intensity data from the track elevation map corresponding to the identified railway track feature;

e. assigning a feature name to the extracted three dimensional data; and

f. saving in the data storage apparatus the extracted three dimensional data associated with the feature name as a new track feature to be included in the track feature library.

23. (Currently amended) A method of building a virtual three dimensional railway track bed component library, the method comprising the steps of:

a. emitting a light along a track bed surface;

b.  sensing some of the emitted light after it has reflected off of the track bed surface;

c.  defining a three dimensional elevation map <u>using surface elevation and intensity data representative of an area segment of the track bed</u> based on the sensed light reflected from the track bed surface;

d.  storing the elevation map in a data storage apparatus;

e.  identifying a railway track bed feature from the three dimensional elevation map that does not match any previously defined track bed features saved in a track component library;

f.  extracting three dimensional data from the track elevation map corresponding to the identified railway track bed feature;

g.  assigning a component name to the extracted three dimensional data; and

h.  saving the extracted three dimensional data associated with the component name in a data storage apparatus as a new track bed feature to be included in the track component library.

24. (Currently amended) A method of assessing a railway track bed, the method comprising the steps of:

a.  defining a three dimensional elevation map based on <u>surface elevation and intensity data representative of an area segment of the railway track bed, the data</u> gathered by a sensor sensing reflected light from a track bed surface;

b.  storing the elevation map in a data storage apparatus;

c.  identifying a railway track bed feature from the elevation map; and

d.  storing information corresponding to the identified railway track bed feature in the data storage apparatus.

25. (Original) The method of claim 24 wherein the step of identifying a railway track bed feature further comprises the step of identifying a rail head edge by detecting significant vertical gradient edges over a two dimensional area wherein such vertical gradient edges are greater than a minimum rail height threshold.

26. (Original) The method of claim 25 wherein the step of identifying a railway track bed feature further comprises the step of identifying a rail base edge by detecting significant vertical gradient edges over a two dimensional area adjacent the detected rail head edge wherein such vertical gradient edges are greater than a minimum rail base height threshold.

27. (Original) The method of claim 26 further comprising the step of removing data corresponding to the rail head from the elevation map, thereby enhancing the detection of other smaller vertical components of the railway track bed.

28. (Original) The method of claim 24 wherein the method further comprises the step of detecting surfaces with surface normal values greater than a planar region surface normal value threshold and that are proximate to one another by less than a maximum proximity threshold.

29. (Original) The method of claim 28 wherein the method further comprises the step of defining an approximate tie surface plane based on the detected surfaces with surface normal values greater than the planar region surface normal value threshold that are proximate to one another by less than the maximum proximity threshold.

30. (Original) The method of claim 29 wherein the method further comprises the step of assigning a tie bounding box around the perimeter of the tie surface plane based at least on one measured parameter of the tie surface plane.

31. (Original) The method of claim 30 wherein the method further comprises the step of assigning an approximate tie length, an approximate tie width, and an approximate tie skew angle based on the bounding box assigned around the perimeter of the tie surface plane.

32. (Currently amended) The method of claim 31 wherein the method further comprises the step of identifying and measuring surface cracks in an identified tie that are deeper than a minimum crack depth threshold and that are longer than a minimum crack length threshold based on the track elevation map.

33. (Original) The method of claim 32 wherein the method further comprises the step of saving data corresponding to the measured surface cracks to the data storage apparatus on a per tie basis so that the same tie can be re-examined at a later date to determine whether the measured surface cracks have changed.

34. (Original) The method of claim 33 wherein the method further comprises a step of assigning a severity value to each measured crack based on at least the measured length and measured width of the crack.

35. (Currently amended) The method of claim 34 wherein the method further comprises the step of identifying and measuring a surface feature other than a rail head that is higher than a minimum tie height threshold.

36. (Original) The method of claim 35 wherein the method further comprises the step of saving data corresponding to the measured surface feature to the data storage apparatus on a per tie basis so that the same tie can be re-examined at a later date to determine whether the measured surface feature has changed.

37. (Original) The method of claim 31 wherein the method further comprises the step of detecting a broken tie based on an abrupt elevation shift along the tie surface plane.

38. (Currently amended) The method of claim 24 wherein the step of identifying a railway track bed feature further comprises the step of comparing at least a portion of the track elevation map to a plurality of three dimensional features saved in a feature library to determine a best fit to properly identify the railway track bed feature.

39. (Currently amended) The method of claim 38 wherein the step of comparing further comprises the step of applying a minimum correlation threshold so that a railway track bed

feature <u>other than a railroad tie</u> will not be identified as a particular three dimensional feature from the feature library unless the minimum correlation threshold is met.

40. (Original) The method of claim 31 wherein the method further comprises the step of determining a shoulder ballast volume adjacent a tie based at least in part on the approximate tie surface plane defined for the tie.

41. (Original) The method of claim 31 wherein the method further comprises the step of defining a surface area region adjacent the tie bounding box, measuring the surface elevation of the surface area region, and determining the difference between the surface elevation of the surface area region and the surface elevation of the approximate tie surface plane to determine whether a positive volume or negative volume is present at the surface area region.

42. (Currently amended) The method of claim 38 wherein the method further comprises the step of making a plurality of elevation measurements along and around an identified railway track bed feature <u>other than a railroad tie</u> and recording the measurements and the locations of the measurements in the data storage apparatus.

43. (Original) The method of claim 42 wherein the method further comprises the step of assigning a condition to the identified railway track bed feature based on the plurality of elevation measurements.

44. (Original) The method of claim 24 wherein the step of identifying a railway track bed feature further comprises the step of measuring the length of a joint bar candidate, determining whether the length of the joint bar candidate falls between a minimum joint bar length threshold and a maximum joint bar length threshold, and identifying the joint bar candidate as a joint bar if the length measurement of the joint bar candidate falls between a minimum joint bar length threshold and a maximum joint bar length threshold.

<u>**REMARKS**</u>

Claims 1-44 are currently pending.  Claims 1 and 22-24 are the pending independent claims.  Claims 1-16, 18-21, 24-39 and 41-44 are rejected under 35 U.S.C. § 102 over U.S. Patent Application Publication Number 2013/0191070 to Kainer et al. ("Kainer").  Claims 22 and 23 are rejected under 35 U.S.C. § 103 over Kainer in view of U.S. Patent Application Publication Number 2010/0026551 to Szwilski et al. ("Szwilski"). Claims 17 and 40 are rejected under 35 U.S.C. § 103 over Kainer in view of U.S. Patent Application Publication Number 2013/0096739 to Landes et al. ("Landes"). Claims 1, 12, 19, 22, 23, 24, 32, 35, 38, 39 and 42 have been amended. No new matter has been introduced by the amendments, which are supported by the disclosure of the original claims and the specification.  Reconsideration and allowance of the claims are requested.

Each of the foregoing rejections is respectfully traversed and favorable reconsideration is requested in view of the above amendments and following remarks.

### I. Specification Objection

Applicant has submitted an amended Abstract to obviate the objection raised in the Office Action.

### II. Objection to Claims 1 and 22

Claims 1 and 22 have been amended in accordance with the Examiner's recommendation to obviate the objection to these claims raised in the Office Action.

### III. § 102 Rejections of claims 1-16, 18-21, 24-39 and 41-44

Claims 1-16, 18-21, 24-39 and 41-44 are rejected under 35 U.S.C. § 102 over Kainer.  "A claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference." *Verdegaal Bros. v. Union Oil Co. of California*, 814 F.2d 628, 631, 2 USPQ2d 1051, 1053 (Fed. Cir. 1987).

Application No. 14/725,490
July 31, 2017
Reply to Office Action of March 30, 2017

### A.  Claims 1-16, 18-21

Independent claim 1, as amended, claims, *inter alia*, a system for assessing a railway track bed including a processor running one or more algorithms wherein the algorithm steps include (a) acquiring three dimensional **surface elevation and intensity data representative of an area segment of railway track bed**; (b) generating a track elevation map based on the acquired three dimensional data; and (c) identifying a railway track bed feature from the track elevation map. *See, e.g.*, Applicant's Application, ⁋ [0007].

### 1.  Claim 1

Applicant's system and method for generating a 3D model is very different from the approach described in Kainer. In Kainer, a very large number of slices or "frames" across the track surface are taken (about 633,600 per mile) and variations in height profile of each slice are used together to identify features of interest in each profile. *See* Kainer, ⁋ [0048]. These slices are compiled to arrive at a 3D image. *See* Kainer, ⁋ [0056]. In contrast, Applicant's system and method describes 3D surface elevation and intensity data models (the elevations for an *area* of the track surface) to identify features of interest. Kainer does not teach or suggest combining 3D slices to create a surface from which to identify true 3D features (elevations over an area). As such, Kainer does not teach or suggest each and every limitation of Applicant's claim 1. Reconsideration and allowance of claim 1 as amended are respectfully requested.

Dependent claims 2-16 and 18-21 depend from independent claim 1, and contain additional important aspects of the invention.  Therefore, dependent claims 2-16 and 18-21 patentably define over Kainer.  Reconsideration and allowance of dependent claims 2-16 and 18-21 are respectfully requested.

### 2.  Claim 12

Applicant's claim 12 has been amended to expressly exclude rail heads. As disclosed in FIG. 13 of Applicant's Application, the prominent rail head features of a scan are purposefully removed to allow for detection of other, subtler features based on height deviations (e.g., weld artifacts). *See* Applicant's Application, ⁋ [00106]. The section relied on in the Office Action in Kainer is specifically referring to rail height and detecting rail wear. *See* Kainer, FIG. 7A. As such, because Applicant's claim 12 is not referring to rail height or rail erosion and in fact

Exhibit J
50

Application No. 14/725,490
July 31, 2017
Reply to Office Action of March 30, 2017

removes rail heads from the calculations being performed, Kainer does not meet each and every limitation of Applicant's claim 12, as amended. Reconsideration and allowance of claim 12, as amended, are respectfully requested.

### 3.   Claim 15

The limitations from claim 15 were correlated with Kainer paragraph [0059] in the Office Action. This portion of Kainer discusses determining the angle of crossties with respect to adjacent rails. Here, Kainer is not concerned with identifying a feature. The identities of the features are already known (i.e., crossties and rails). Rather, Kainer is concerned with determining the relative positioning between crossties and rails. In contrast, Applicant's amended claim 1 describes a feature library which includes a plurality of 3D railroad track features such as, for example, plates, plate holes, spikes, anchors, and tie fasteners (e.g., fastening clips). As the track elevation map is gathered (via the three dimensional surface elevation and intensity data), the map is analyzed and features in the map are cross-referenced with the library of 3D features to help identify the features. Kainer does not teach or suggest this technology. As such, each and every element of claim 15 is not met by Kainer. Thus, claim 15 patentably defines over Kainer.  Reconsideration and allowance of claim 15 are respectfully requested.

### 4.   Claim 16

Applicant's claim 16, as amended, addresses 3D features of a railroad track that do *not* include rails or railroad ties. *See* Applicant's Application, FIGS. 27-30 and ¶¶ [00120]-[00123]. The sections in Kainer that are relied on in the Office Action deal exclusively with tie measurements. Kainer does not teach or suggest a correlation threshold for 3D objects on the railroad track other than rails and railroad ties. As such, Kainer does not disclose each and every limitation of claim 16, as amended. Therefore, Applicant's claim 16 is patentable over Kainer. Reconsideration and allowance of claim 16 are respectfully requested.

### 5.   Claim 19

Applicant's claim 19, as amended, addresses 3D features of a railroad track that do *not* include rails or railroad ties. *See* Applicant's Application, FIGS. 27-30 and ¶¶ [00120]-[00123]. The sections in Kainer that are relied on in the Office Action deal exclusively with tie

Application No. 14/725,490
July 31, 2017
Reply to Office Action of March 30, 2017

measurements. Kainer does not teach or suggest making a plurality of elevation measurements along and around an identified railway track bed feature *other than a railroad tie* and recording the measurements and the locations of the measurements in a data storage apparatus. As such, Kainer does not disclose each and every limitation of claim 19, as amended. Therefore, Applicant's claim 19 is patentable over Kainer. Reconsideration and allowance of claim 19 are respectfully requested.

### B.  Claims 24-39 and 41-44

Independent claim 24, as amended, claims a method of assessing a railway track bed including, *inter alia*, the steps of (a) defining a three dimensional elevation map based on ***surface elevation and intensity data representative of an area segment of the railway track bed***, the gathered by a sensor sensing reflected light from a track bed surface; (b) storing the elevation map in a data storage apparatus; and (c) identifying a railway track bed feature from the elevation map.

#### 1.  Claim 24

The arguments set forth in section III.(A.)(1.) are incorporated herein by reference. Based on such arguments, Kainer does not teach or suggest a step of defining a three dimensional elevation map based on ***surface elevation and intensity data representative of an area segment of the railway track bed*** and, therefore, does not meet each and every limitation of Applicant's claim 24.

Dependent claims 25-39 and 41-44 depend from independent claim 24, and contain additional important aspects of the invention.  Therefore, dependent claims 25-39 and 41-44 patentably define over Kainer.  Reconsideration and allowance of dependent claims 25-39 and 41-44 are respectfully requested.

#### 2.  Claim 35

The arguments as set forth in section III.(A.)(2.) above are incorporated herein by reference. Because Applicant's claim 35 is not referring to rail height or rail erosion and in fact removes rail heads from the calculations being performed, Kainer does not meet each and every

Application No. 14/725,490
July 31, 2017
Reply to Office Action of March 30, 2017

limitation of Applicant's claim 35, as amended. Reconsideration and allowance of claim 35, as amended, are respectfully requested.

### 3.   Claim 38

The limitations from claim 38 were correlated with Kainer paragraph [0059] in the Office Action. This portion of Kainer discusses determining the angle of crossties with respect to adjacent rails. Here, Kainer is not concerned with identifying a feature. The identification of the features are already known (i.e., crossties and rails). Rather, Kainer is concerned with determining the relative positioning between crossties and rails. In contrast, Applicant's amended claim 1 describes a feature library which includes a plurality of 3D railroad track features such as, for example, plates, plate holes, spikes, anchors, and tie fasteners (e.g., fastening clips). As the track elevation map is gathered (via the three dimensional surface elevation and intensity data), the map is analyzed and features in the map are cross-referenced with the library of 3D features to help identify the features. Kainer does not teach or suggest this technology. As such, each and every element of claim 38 is not met by Kainer. Thus, claim 38 patentably defines over Kainer.  Reconsideration and allowance of claim 38 are respectfully requested.

### 4.   Claims 39

The arguments as set forth in section III.(A.)(4.) above are incorporated herein by reference. Kainer does not teach or suggest a correlation threshold for 3D objects on the railroad track other than rails and railroad ties. As such, Kainer does not disclose each and every limitation of claim 39, as amended. Therefore, Applicant's claim 39 is patentable over Kainer. Reconsideration and allowance of claim 39 are respectfully requested.

### 5.   Claim 42

The arguments as set forth in section III.(A.)(5.) above are incorporated herein by reference. Kainer does not teach or suggest making a plurality of elevation measurements along and around an identified railway track bed feature *other than a railroad tie* and recording the measurements and the locations of the measurements in a data storage apparatus. As such, Kainer does not disclose each and every limitation of claim 42, as amended. Therefore,

Application No. 14/725,490
July 31, 2017
Reply to Office Action of March 30, 2017

Applicant's claim 42 is patentable over Kainer. Reconsideration and allowance of claim 42 are respectfully requested.

### IV. § 103 Rejections of Claims 22 and 23

Claims 22 and 23 are rejected under 35 U.S.C. § 103 over Kainer in view Szwilski. If the sum of references cited against an application is deficient as to the same element or combination of elements required by a rejected claim, then such claim is patentable over the cited references. See *Velander v. Garner*, 348 F.3d 1359, 1363, 68 USPQ2d 1769, 1772 (Fed. Cir. 2003). This requirement is separate and distinct from the Federal Circuit's Teaching, Suggestion, Motivation (TSM) Test analyzed in *KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398 (2007) and remains good law. See *Abbott Laboratories v. Sandoz, Inc.*, 500 F.Supp.2d 846, 852 (N.D. Ill. 2007) (quoted with approval in *Abbott Laboratories v. Sandoz, Inc.*, 544 F.3d 1341, 1351 (Fed. Cir. 2008)).

### A. Claim 22

Independent claim 22, as amended, claims a system for assessing a railway track bed including a processor running one or more algorithms for extracting railway track bed surface elevation data *to define new railway track bed components for a three dimensional track feature library*, the algorithm comprising the steps of: (a) acquiring three dimensional *surface elevation and intensity data representative of an area segment of railway track bed*; (b) generating a track elevation map based on the acquired three dimensional data; (c) identifying a railway track feature from the track elevation map that does not match any previously defined track features saved in a track feature library; (d) extracting three dimensional data from the track elevation map corresponding to the identified railway track feature; (e) assigning a feature name to the extracted three dimensional data; and (f) saving in the data storage apparatus the extracted three dimensional data associated with the feature name as a new track feature to be included in the track feature library. The arguments set forth in section III.(A.)(1.) are incorporated herein by reference. Based on such arguments, Kainer does not teach or suggest each and every limitation of Applicant's claim 22. Szwilski does not compensate for the deficiencies of Kainer. As such, claim 22 is patentable over Kainer in view of Szwilski.

Exhibit J
54

Application No. 14/725,490
July 31, 2017
Reply to Office Action of March 30, 2017

Additionally, claim 22 specifically states the 3D data is extracted "to define *new* railway track components *for a three dimensional track feature library*." The Office Action cites paragraph [0015] in Kainer which has no teaching or suggestion of such a feature whatsoever. There is nothing in Kainer regarding the system defining new, previously unknown track components and saving those newly-defined components for future reference. Paragraph [0083] in Kainer does not compensate for this deficiency. In paragraph [0083], Kainer teaches analyzing ties. Ties are a known basic feature of a railroad track. In Kainer there is no defining *new*, previously unknown railway track components and then storing those components in a feature library for future use at identifying the new feature in the future.

The Office Action places reliance on paragraph [0102] of Kainer that states the following:

> Pattern matching algorithms are used to identify spikes and joint bars. Once these features have been found, the system calculates plate cut by finding the edges of tie plates and the surface of the tie, and uses this information to contribute to the tie condition assessment and grading.

No mention is made here of identifying a railway track feature from the track elevation map that *does not* match any previously defined track features saved in a track feature library. In Kainer, any matches are made based on what is previously defined in the system (i.e., "Pattern matching algorithms are used . . ."). In order to use a pattern matching algorithm, the pattern must already be known to the system. Therefore, Kainer does not teach or suggest a system that locates and defines new track features that were previously unknown to the system and assigns a feature name to the new feature. Thus, Kainer is deficient as to the same element or combination of elements required by claim 22. As such, claim 22 is patentable over Kainer.

As for Szwilski, it appears to teach tagging data related to known rail components. However, it does not compensate for the limitations of claim 22 wherein new, previously unknown track features are found and such features are assigned a new feature name. Therefore, the combination of Kainer and Szwilski is deficient as to the same element or combination of elements required by claim 22. As such, claim 22 is patentable over Kainer in view of Szwilski. Reconsideration and allowance of claim 22 are respectfully requested.

Application No. 14/725,490
July 31, 2017
Reply to Office Action of March 30, 2017

### B.  Claim 23

Independent claim 23 claims a method of building a virtual three dimensional railway track bed component library including the steps of: defining a three dimensional elevation map ***using surface elevation and intensity data representative of an area segment of the track bed*** based on the sensed light reflected from the track bed surface; storing the elevation map in a data storage apparatus; identifying a railway track bed feature from the three dimensional elevation map that does not match any previously defined track bed features saved in a track component library; extracting three dimensional data from the track elevation map corresponding to the identified railway track bed feature; assigning a component name to the extracted three dimensional data; and ***saving the extracted three dimensional data associated with the component name in a data storage apparatus as a new track bed feature to be included in the track component library***.

 The arguments set forth above in section IV.(A.) regarding claim 22 are incorporated herein by reference. To summarize, neither Kainer nor Szwilski teach a method including the step of defining a three dimensional elevation map ***using surface elevation and intensity data representative of an area segment of the track bed*** based on the sensed light reflected from the track bed surface. Additionally, neither Kainer nor Szwilski teach a method of ***building*** a virtual three dimensional railway track bed component library. The teachings of both of these prior art references cover a system that relies solely on prior-defined data and associated features. No new features are located, identified and assigned a name. Therefore, the combination of Kainer and Szwilski is deficient as to the same element or combination of elements required by claim 23. As such, claim 23 is patentable over Kainer in view of Szwilski. Reconsideration and allowance of claim 23 are respectfully requested.

### V. 103 Rejections of Claims 17 and 40

Claims 17 and 40 are rejected under 35 U.S.C. § 103 over Kainer in view Landes. If the sum of references cited against an application is deficient as to the same element or combination of elements required by a rejected claim, then such claim is patentable over the cited references. See *Velander v. Garner*, 348 F.3d 1359, 1363, 68 USPQ2d 1769, 1772 (Fed. Cir. 2003).  This requirement is separate and distinct from the Federal Circuit's Teaching, Suggestion, Motivation (TSM) Test analyzed in *KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398 (2007) and remains good

Exhibit J
56

Application No. 14/725,490
July 31, 2017
Reply to Office Action of March 30, 2017

law.  See *Abbott Laboratories v. Sandoz, Inc.*, 500 F.Supp.2d 846, 852 (N.D. Ill. 2007) (quoted with approval in *Abbott Laboratories v. Sandoz, Inc.*, 544 F.3d 1341, 1351 (Fed. Cir. 2008)).

## A.  Claim 17

Certain important elements of claim 1 are discussed above in section III.(A.) and III.(A.)(1.). Kainer does not teach or suggest an algorithm step of acquiring three dimensional *surface elevation and intensity data representative of an area segment of railway track bed*. Landes does not compensate for the deficiencies of Kainer as it does not teach or suggest such feature either. Therefore, claim 1, as amended, is patentable over Kainer in view of Landes. "If an independent claim is nonobvious under 35 U.S.C. 103, then any claim depending therefrom is nonobvious." M.P.E.P. § 2143.03 (citing *In re Fine*, 837 F.2d 1071, 5 U.S.P.Q.2d 1596 (Fed. Cir. 1988)).  Dependent claim 17 depends from independent claim 1, and contains additional important aspects of the invention.  Therefore, dependent claim 17 patentably defines over Kainer in view of Landes.  Reconsideration and allowance of dependent claim 17 are respectfully requested.

## B.  Claim 40

Certain important elements of claim 24 are discussed above in section III.(B.). Kainer does not teach or suggest defining a three dimensional elevation map based on *surface elevation and intensity data representative of an area segment of the railway track bed*. Landes does not compensate for the deficiencies of Kainer as it does not teach or suggest such feature either. Therefore, claim 24, as amended, is patentable over Kainer in view of Landes. "If an independent claim is nonobvious under 35 U.S.C. 103, then any claim depending therefrom is nonobvious." M.P.E.P. § 2143.03 (citing *In re Fine*, 837 F.2d 1071, 5 U.S.P.Q.2d 1596 (Fed. Cir. 1988)).  Dependent claim 40 depends from independent claim 24, and contains additional important aspects of the invention.  Therefore, dependent claim 40 patentably defines over Kainer in view of Landes.  Reconsideration and allowance of dependent claim 40 are respectfully requested.

Exhibit J
57

Application No. 14/725,490
July 31, 2017
Reply to Office Action of March 30, 2017

In light of the foregoing, Applicant respectfully requests the Examiner reconsider the application, withdraw the rejections, and issue a notice of allowance at the earliest possible convenience.

In the event this response is not timely filed, Applicant hereby petitions for the appropriate extension of time and requests that the fee for the extension along with any other fees which may be due with respect to this paper be charged to our **Deposit Account No. 506209.**

Respectfully submitted,

ROBINSON IP LAW, PLLC

By: *Michael E. Robinson*

Michael E. Robinson
Registration No. 58,947

Date: July 31, 2017
9724 Kingston Pike, Suite 1403
Knoxville, TN 37922
(865) 978-6480

Exhibit J
58

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/725,490 | 05/29/2015 | Darel Mesher | 06.00995.0042 | 4258 |

| | |
|---|---|
| 117642    7590    08/16/2017 | **EXAMINER** |
| Robinson IP Law, PLLC | HASAN, MAINUL |
| 9724 Kingston Pike | |
| Suite 1403 | |
| Knoxville, TN 37922 | |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2489 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 08/16/2017 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

rrobinson@robinsoniplaw.com
docketing@robinsoniplaw.com

PTOL-90A (Rev. 04/07)

Exhibit J
59

<table>
<tr><td rowspan="2"><b>Office Action Summary</b></td><td><b>Application No.</b><br>14/725,490</td><td><b>Applicant(s)</b><br>MESHER, DAREL</td></tr>
<tr><td><b>Examiner</b><br>MAINUL HASAN</td><td><b>Art Unit</b><br>2489</td><td><b>AIA (First Inventor to File)</b><br><b>Status</b><br>Yes</td></tr>
</table>

| | Application No. 14/725,490 | Applicant(s) MESHER, DAREL |
|---|---|---|
| **Office Action Summary** | Examiner MAINUL HASAN | Art Unit 2489 / AIA (First Inventor to File) Status Yes |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --**

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a).  In no event, however, may a reply be timely filed after SIX (6) months from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment.  See 37 CFR 1.704(b).

**Status**

1) ☒ Responsive to communication(s) filed on <u>07/31/2017</u>.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a) ☒ This action is **FINAL**.    2b) ☐ This action is non-final.

3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5) ☒ Claim(s) <u>1-44</u> is/are pending in the application.
   5a) Of the above claim(s) _____ is/are withdrawn from consideration.
6) ☐ Claim(s) _____ is/are allowed.
7) ☒ Claim(s) <u>1-44</u> is/are rejected.
8) ☐ Claim(s) _____ is/are objected to.
9) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

**Application Papers**

10) ☐ The specification is objected to by the Examiner.
11) ☐ The drawing(s) filed on _____ is/are: a) ☐ accepted or b) ☐ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance.  See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   a) ☐ All   b) ☐ Some**  c) ☐ None of the:
   1. ☐ Certified copies of the priority documents have been received.
   2. ☐ Certified copies of the priority documents have been received in Application No. _____.
   3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**
1) ☒ Notice of References Cited (PTO-892)
2) ☒ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date _____.
3) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____ .
4) ☐ Other: _____.

Application/Control Number: 14/725,490                                              Page 2
Art Unit: 2489

## DETAILED ACTION

### *Response to Amendment*

The amendment filed on 07/31/2017 has been entered. Claims 1-44 remain pending in the application. Applicant's amendments are in response to the Non-Final Office Action mailed on 03/30/2017.

### *Information Disclosure Statement*

The information disclosure statement filed 02/26/2016 fails to comply with the provisions of 37 CFR 1.97, 1.98 and MPEP § 609 because the first entry under the NPL Documents (Russian Patent and Trademark Office grant decision) and the fifth entry titled "European Patent Office, Supplementary European Search Report" were not found attached. Also the contents of 2nd and 3rd entries of NPL Documents titled "International Searching Authority, International search report" were not legible due to poor scanning quality. These four NPL documents of the aforementioned IDS have not been considered and therefore have been stroked out.

### *Claim Rejections - 35 USC § 112*

The following is a quotation of the first paragraph of 35 U.S.C. 112(a):

(a) IN GENERAL.—The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same,  and shall set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention.

The following is a quotation of the first paragraph of pre-AIA 35 U.S.C. 112:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person

Application/Control Number: 14/725,490                                          Page 3
Art Unit: 2489

> skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

Claims 12-13, 16, 19-20, 35-36, 39, 42-43 are rejected under 35 U.S.C. 112(a) or

35 U.S.C. 112 (pre-AIA), first paragraph, as failing to comply with the written description

requirement.  The claim(s) contains subject matter which was not described in the specification

in such a way as to reasonably convey to one skilled in the relevant art that the inventor or a joint

inventor, or for pre-AIA the inventor(s), at the time the application was filed, had possession of

the claimed invention.

The aforementioned claims recite "*measuring a surface feature **other than a rail head***

...". The claimed limitation now includes measurement of each and every other features of a rail

track "other than a rail head" with respect to a tie height. The claim limitation has broadened the

scope of the invention by including the measurement process of each and every other features of

a rail track "other than a rail head" with respect to a tie height. However, the originally filed

specification lacks the written description of how each and every features of a rail track is being

measured against a tie height. For written description, the specification as filed must describe the

claimed invention in sufficient detail so that one of ordinary skill in the art can reasonably

conclude that the inventor had possession of the claimed invention. A claim may lack written

description when the claim defines the invention in functional language specifying a desired

result but the specification does not sufficiently identify **how** the inventor has devised the

function to be performed or result achieved. For software, this can occur when the algorithm or

steps/procedure for performing the computer function are not explained at all or are not

explained in sufficient detail.

Application/Control Number: 14/725,490                                    Page 4
Art Unit: 2489

### *Claim Rejections - 35 USC § 103*

The following is a quotation of AIA 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

**Claims 1-16, 18-21, 24-39, 41-44 are rejected under AIA 35 U.S.C. 103(a) as being**

**unpatentable over Kainer et al. (US PGPub 2013/0191070 A1) in view of Farritor (US**

**PGPub 2012/0300060 A1).**

Regarding claim **1** (Currently Amended), **Kainer et al.** teach *a system for assessing a*

*railway track bed* (**[0036], L5-6**)*, the system comprising:*

*a power source* (**[0046], L14-17**)*;*

*a light emitting apparatus powered by the power source for emitting light energy toward*

*a railway track* (**[0012], L2-6; Fig. 1** and **2,** reference numeral **40**)*;*

*a data storage apparatus* (**Fig. 1,** reference numeral **62**) *in communication with at least*

*one processor* (**Fig. 1,** reference numeral **54, 60**)*;*

*at least one sensor for sensing reflected light that was emitted from the light emitting*

*apparatus* (**Fig. 1** and **2,** reference numeral **50**) *and acquiring three dimensional <u>surface</u>*

*<u>elevation and intensity </u>image data of the railway track* (**[0029]. Figs. 11** and **12** show the

perspective three-dimensional image showing the elevation of rail head, tie plate, tie surface etc.

In **[0105]** it describes how the elevation of different rail track features are measured using the

Application/Control Number: 14/725,490                                                    Page 5
Art Unit: 2489

image. On the other hand, in **[0071],** it teaches illuminating the rail track with certain light intensity, e.g. 0.15 watts/in and receiving the reflected light from the track surface using one or more camera, which means the captured images contain intensity of light) *to be stored in the data storage apparatus* (**Fig. 1** shows the communicative coupling between the camera and the storage device **62**)*, wherein the plurality of sensors* (**Fig. 2,** reference numeral **50** shows two cameras) *are in communication with the at least one processor* (**Fig. 1** shows communicative coupling between the camera **50** and the processor **54**)*; and*

   *wherein the at least one processor is configured to run an algorithm* (**[0012], L10-13**) *for processing three-dimensional surface elevation and intensity data* (**Figs. 11** and **12** show the perspective three-dimensional image showing the elevation of rail head, tie plate, tie surface etc. In **[0105]** it describes how the elevation of different rail track features are measured using the image. On the other hand, in **[0071],** it teaches illuminating the rail track with certain light intensity, e.g. 0.15 watts/in and receiving the reflected light from the track surface using one or more camera, which means the captured images contain intensity of light) *gathered from the plurality of sensors* (**Fig. 2,** reference numeral **50** shows two cameras) *and saved in the data storage apparatus* (**Fig. 1** shows the communicative coupling between the camera and the storage device **62**)*, the algorithm comprising the steps of:*

   *a. acquiring three dimensional surface elevation and intensity* (**Figs. 11** and **12** show the perspective three-dimensional image showing the elevation of rail head, tie plate, tie surface etc. In **[0105]** it describes how the elevation of different rail track features are measured using the image. On the other hand, in **[0071],** it teaches illuminating the rail track with certain light intensity, e.g. 0.15 watts/in and receiving the reflected light from the track surface using one or

more camera, which means the captured images contain intensity of light) *data representative of* *an area segment of railway track bed* (**[0047], L14-18**)*;*

    *b. generating a track elevation map based on the acquired three dimensional data* (**[0082], L18-20; Figs. 11-12** represent a 3D track elevation map where different parameters, e.g. elevations, height, cracks, splits, orientations, etc. can be measured as disclosed in **[0056], L7-17**)*;*

    *c. identifying a railway track bed feature from the track elevation map* (**[0083], L1-5;** **[0087], L10-15**)*; and*

    *d. storing information corresponding to the identified railway track bed feature in the* *data storage apparatus* (**[0046], L5-13**)*.*

    Although, **Kainer et al.** teach capturing perspective three-dimensional image showing the elevation of rail head, tie plate, tie surface etc. as shown in **Figs. 11, 12** and also illuminating the rail track with certain light intensity, e.g. 0.15 watts/in and receiving the reflected light from the track surface using one or more camera as described in **[0071]**, which means the captured images contain intensity of light, but it does not explicitly teach capturing the intensity image data.

    However, **Farritor** teaches a system of rail road deflection measurement using visioning means which is in the same field of endeavor, where it teaches calculating image intensities from the captured image data as described in **[0043]**.

    It would have been obvious for one of ordinary skill in the art at the time the invention was made to combine **Kainer et al**'s invention of inspecting railroad ties to include **Farritor's**

Application/Control Number: 14/725,490                                                    Page 7
Art Unit: 2489

usage of image intensity data capturing, because this technique can be used in identifying the

edges of the rail, and thereby the slope of the rail in the image (**Farritor; [0043]**).


Regarding claim **2** (Original), **Kainer et al.** and **Farritor** teach *the system of claim 1*

*wherein the algorithm step of identifying a railway track bed feature further comprises the step*

*of identifying a rail head edge by detecting significant vertical gradient edges over a two*

*dimensional area wherein such vertical gradient edges are greater than a minimum rail height*

*threshold* (**Kainer et al.; [0059], Fig. 5;** It teaches calculating the gradient of the rail head edge

**12** with respect to the tie plate. Since the computer analysis checks the angles of tie plates with

respect to rail heads and determines either a worn out rail head/base plate or not, it is understood

that there is a threshold involved in determining the worn condition).


Regarding claim **3** (Original), **Kainer et al.** and **Farritor** teach *the system of claim 2*

*wherein the algorithm step of identifying a railway track bed feature further comprises the step*

*of identifying a rail base edge by detecting significant vertical gradient edges over a two*

*dimensional area adjacent the detected rail head edge wherein such vertical gradient edges are*

*greater than a minimum rail base height threshold* (**Kainer et al.; [0059], Fig. 5;** It teaches

calculating the gradient of the rail head edge **12** with respect to the tie plate edge **10**. Since the

computer analysis checks the angles of tie plates with respect to rail heads and determines either

a worn out rail head/tie plate or not, it is understood that there is a threshold involved in

determining the worn condition).

Application/Control Number: 14/725,490                                    Page 8
Art Unit: 2489

Regarding claim **4** (Original), **Kainer et al.** and **Farritor** teach *the system of claim 2 wherein the algorithm further comprises the step of removing data corresponding to the rail head from the elevation map, thereby enhancing the detection of other smaller vertical components of the railway track bed* (**Kainer et al.; [0091], L7-11;** It teaches filtering out non-tie surfaces while analyzing the tie condition, meaning enhancing the tie condition determination by removing/filtering out other non-essential elements from the image data. **[0052], L10-23; [0053];** It teaches discarding some of the captured image frames to achieve desired frame spacing and reduce data storage, because as disclosed in **[0095], L1-10,** identifying some of the smaller spacings, widths, lengths, etc. requires second pass of data acquiring and processing image data again thereby requiring more storage space).

Regarding claim **5** (Original), **Kainer et al.** and **Farritor** teach *the system of claim 4 wherein the algorithm step of identifying a railway track bed feature further comprises the step of detecting surfaces with surface normal values greater than a planar region surface normal value threshold and that are proximate to one another by less than a maximum proximity threshold* (**Kainer et al.; [0092], L15-20;** It teaches determining the tie surface based on some threshold value with respect to the ballast level to determine whether accurate condition can be measured or not. In **[0093], L1-6,** it also teaches a proximity threshold by disclosing an expected tie-to-tie distance).

Regarding claim **6** (Original), **Kainer et al.** and **Farritor** teach *the system of claim 5 wherein the algorithm step of identifying a railway track bed feature further comprises the step*

Application/Control Number: 14/725,490                                                    Page 9
Art Unit: 2489

*of defining an approximate tie surface plane based on the detected surfaces with surface normal*

*values greater than the planar region surface normal value threshold that are proximate to one*

*another by less than the maximum proximity threshold* (**Kainer et al.; [0092], L15-20;** It teaches

determining the tie surface based on some threshold value with respect to the ballast level to

determine whether accurate condition can be measured or not. In **[0093], L1-6,** it also teaches a

proximity threshold by disclosing an expected tie-to-tie distance).

Regarding claim **7** (Original), **Kainer et al.** and **Farritor** teach *the system of claim 6*

*wherein the algorithm step of identifying a railway track bed feature further comprises the step*

*of assigning a tie bounding box around the perimeter of the tie surface plane based at least on*

*one measured parameter of the tie surface plane* (**Kainer et al.; [0012], L10-13;** Also **Fig. 14**

shows the flowchart of finding the 4 edges of the tie boundaries which is equivalent of finding

the bounding box around a tie surface plane).

Regarding claim **8** (Original), **Kainer et al.** and **Farritor** teach *the system of claim 7*

*wherein the algorithm step of identifying a railway track bed feature further comprises the step*

*of assigning an approximate tie length, an approximate tie width, and an approximate tie skew*

*angle based on the bounding box assigned around the perimeter of the tie surface plane* (**Kainer**

**et al.; [0101], L1-5**).

Regarding claim **9** (Original), **Kainer et al.** and **Farritor** teach *the system of claim 6*

*wherein the algorithm step of identifying a railway track bed feature further comprises the step*

Application/Control Number: 14/725,490                                               Page 10
Art Unit: 2489

*of identifying and measuring surface cracks that are deeper than a minimum crack depth*

*threshold and that are longer than a minimum crack length threshold based on the track*

*elevation map* (**Kainer et al.; [0063]**; It teaches determining width, length and depth of cracks

based on whether the defective portions **D, D'** fall within or outside a region of interest, meaning

certain threshold values).


Regarding claim **10** (Original), **Kainer et al.** and **Farritor** teach *the system of claim 9*

*wherein data corresponding to the measured surface cracks are saved to the data storage*

*apparatus on a per tie basis so that the same tie can be re-examined at a later date to determine*

*whether the measured surface cracks have changed* (**Kainer et al.; [0062], L22-25;** It teaches

determining rail wears by comparing image frames taken at different times but in the same

location of the track bed, meaning the storage device **62** is capable of storing data for the same

track bed features for the same location at different times so that the wear and tear can be

compared over a time).


Regarding claim **11** (Original), **Kainer et al.** and **Farritor** teach *the system of claim 9*

*wherein the algorithm step of identifying a railway track bed feature further comprises a step of*

*assigning a severity value to each measured crack based on at least the measured length and*

*measured width of the crack* (**Kainer et al.; [0083]; Fig. 13,** step **212** shows assigning a tie

conditioning score after measuring different features associated with the ties to create a tie

replacement plan, meaning the score will tell one how severe the condition of the tie is and if it

needs immediate replacement or not. The same severity matrix is also described in **[0114]**).

Application/Control Number: 14/725,490                                                    Page 11
Art Unit: 2489

Regarding claim **12** (Currently Amended), **Kainer et al.** and **Farritor** teach *the system of claim 6 wherein the algorithm step of identifying a railway track bed feature further comprises the step of identifying and measuring a surface feature other than a rail head that is higher than a minimum tie height threshold* (**Kainer et al.; [0062], L12-21, Fig. 7A-B;** It teaches a height **LD** of the surface of the rail **12** with respect to the tie plate for successive frames where the height **LD** is showing smaller in the later frame than the earlier frame indicating a wear and tear of the surface. Additionally, in **[0065], L1-6,** in view of **Fig. 8,** it teaches that a height of ballast **18,** which is a surface feature other than the rail head, can be measured with respect to the crosstie **10**).

Regarding claim **13** (Original), **Kainer et al.** and **Farritor** teach *the system of claim 12 wherein data corresponding to the measured surface feature are saved to the data storage apparatus on a per tie basis so that the same tie can be re-examined at a later date to determine whether the measured surface feature has changed* (**Kainer et al.; [0062], L22-25;** It teaches determining rail wears by comparing image frames taken at different times but in the same location of the track bed, meaning the storage device **62** is capable of storing data for the same track bed features for the same location at different times so that the wear and tear can be compared over a time).

Regarding claim **14** (Original), **Kainer et al.** and **Farritor** teach *the system of claim 6 wherein the algorithm step of identifying a railway track bed feature further comprises the step*

Application/Control Number: 14/725,490                                                    Page 12
Art Unit: 2489

*of detecting a broken tie based on an abrupt elevation shift along the tie surface plane* (**Kainer
et al.; [0099]**).

        Regarding claim **15** (Original), **Kainer et al.** and **Farritor** teach *the system of claim 1*
*wherein the algorithm step of identifying a railway track bed feature further comprises the step*
*of comparing at least a portion of the track elevation map to a plurality of three dimensional*
*features saved in a feature library to determine a best fit between the at least a portion of the*
*track elevation map and the plurality of three dimensional features to properly identify the*
*railway track bed feature* (**Kainer et al.; [0059], Fig. 5;** It teaches a best fit curve determination
of two feature lines **L1** and **L2** corresponding to rail head **12** and the crosstie **10** which are then
averaged over a several of the previously stored image frames so that the computer can analyze
and determine the angular relationship between these lines **L1-L2** to determine the tie angle with
respect to the rail, where the tie angle is the feature being identified after averaging over plurality
of previously stored image frames).

        Regarding claim **16** (Currently Amended), **Kainer et al.** and **Farritor** teach *the system of*
*claim 15 wherein the step of comparing further comprises the step of applying a minimum*
*correlation threshold so that a railway track bed feature* <u>*other than a railroad tie*</u> *will not be*
*identified as a particular three dimensional feature from the feature library unless the minimum*
*correlation threshold is met* (**Kainer et al.; [0014];** It teaches applying a correlation between the
tie features, e.g. spacing and the tie condition grading above/below a threshold to determine the
tie replacement plan, meaning if the correlation is not met the tie grading will not be identified as

Application/Control Number: 14/725,490                                                    Page 13
Art Unit: 2489

needing replacement. As cited earlier in **[0065], L1-6,** in view of **Fig. 8,** it teaches that a height

of ballast **18,** which is a surface feature other than the rail head, can be measured with respect to

the crosstie **10**).

Regarding claim **18** (Original), **Kainer et al.** and **Farritor** teach *the system of claim 7*

*wherein the algorithm step of identifying a railway track bed feature further comprises the step*

*of defining a surface area region adjacent the tie bounding box, measuring the surface elevation*

*of the surface area region, and determining the difference between the surface elevation of the*

*surface area region and the surface elevation of the approximate tie surface plane to determine*

*whether a positive volume or negative volume is present at the surface area region* (**Kainer et**

**al.; [0092];** It teaches the system identifying the tie surface area with respect to the non-tie

surface area and how much of the tie area surface is covered by the ballast and therefore cannot

be scored, which is equivalent of positive volume (60%) and negative volume (40%)).

Regarding claim **19** (Currently Amended), **Kainer et al.** and **Farritor** teach *the system of*

*claim 15 wherein the algorithm step of identifying a railway track bed feature further comprises*

*the step of making a plurality of elevation measurements along and around an identified railway*

*track bed feature* <u>*other than a railroad tie*</u> *and recording the measurements and the locations of*

*the measurements in the data storage apparatus* (**Kainer et al.; [0056]; Fig. 11** and **12** show

plurality of compiled image data showing the track bed features. Also **Figs. 4A-C** show three

consecutive image frames **Z1-Z3** meaning the system is taking multiple elevation measurements.

Since the system is equipped with a storage device **62,** it is understood that the plurality of

Application/Control Number: 14/725,490                                Page 14
Art Unit: 2489

elevation measurements are stored in the storage device. As cited earlier in **[0065], L1-6,** in view of **Fig. 8,** it teaches that a height of ballast **18**, which is a surface feature other than the rail head, can be measured with respect to the crosstie **10**).

Regarding claim **20** (Original), **Kainer et al.** and **Farritor** teach *the system of claim 19 wherein the algorithm step of identifying a railway track bed feature further comprises the step of assigning a condition to the identified railway track bed feature based on the plurality of elevation measurements* (**Kainer et al.;** In **[0114],** it teaches assigning four conditions based on the determination of the rail track features, e.g. good (1), marginal (2), bad (3), or failed (4)).

Regarding claim **21** (Original), **Kainer et al.** and **Farritor** teach *the system of claim 1 wherein the algorithm step of identifying a railway track bed feature further comprises the step of measuring the length of a joint bar candidate, determining whether the length of the joint bar candidate falls between a minimum joint bar length threshold and a maximum joint bar length threshold, and identifying the joint bar candidate as a joint bar if the length measurement of the joint bar candidate falls between a minimum joint bar length threshold and a maximum joint bar length threshold* (**Kainer et al.; [0122], L6-10;** It teaches determining the edge outlines of the joint bar from two consecutive rail top edges and then comparing the shape against a standard joint bar shape, meaning thresholding different edges to determine whether it is a joint bar or not).

Application/Control Number: 14/725,490                                           Page 15
Art Unit: 2489

Regarding claim **24** (Currently Amended), **Kainer et al.** teach *a method of assessing a railway track bed* (**[0036], L5-6**)*, the method comprising the steps of:*

*a. defining a three dimensional elevation map* (**[0047], L14-18**) *based on <u>surface elevation and intensity </u>data* (**Figs. 11** and **12** show the perspective three-dimensional image showing the elevation of rail head, tie plate, tie surface etc. In **[0105]** it describes how the elevation of different rail track features are measured using the image. On the other hand, in **[0071],** it teaches illuminating the rail track with certain light intensity, e.g. 0.15 watts/in and receiving the reflected light from the track surface using one or more camera, which means the captured images contain intensity of light) <u>*representative of an area segment of the railway track bed* </u>(**[0047], L14-18**)<u>*, the data* </u>*gathered by a sensor* (**Fig. 1** and **2,** reference numeral **50**) *sensing reflected light from a track bed surface* (**[0012], L2-6; Fig. 1** and **2,** reference numeral **40**)*;*

*b. storing the elevation map in a data storage apparatus* (**[0046], L5-13**)*;*

*c. identifying a railway track bed feature from the elevation map* (**[0083], L1-5; [0087], L10-15**)*; and*

*d. storing information corresponding to the identified railway track bed feature in the data storage apparatus* (**[0046], L5-13**)*.*

Although, **Kainer et al.** teach capturing perspective three-dimensional image showing the elevation of rail head, tie plate, tie surface etc. as shown in **Figs. 11, 12** and also illuminating the rail track with certain light intensity, e.g. 0.15 watts/in and receiving the reflected light from the track surface using one or more camera as described in **[0071]**, which means the captured images contain intensity of light, but it does not explicitly teach capturing the intensity image data.

Application/Control Number: 14/725,490                                            Page 16
Art Unit: 2489

However, **Farritor** teaches a system of rail road deflection measurement using visioning means which is in the same field of endeavor, where it teaches calculating image intensities from the captured image data as described in **[0043]**.

It would have been obvious for one of ordinary skill in the art at the time the invention was made to combine **Kainer et al**'s invention of inspecting railroad ties to include **Farritor**'s usage of image intensity data capturing, because this technique can be used in identifying the edges of the rail, and thereby the slope of the rail in the image (**Farritor; [0043]**).

Regarding claim **25** (Original), **Kainer et al.** and **Farritor** teach *the method of claim 24 wherein the step of identifying a railway track bed feature further comprises the step of identifying a rail head edge by detecting significant vertical gradient edges over a two dimensional area wherein such vertical gradient edges are greater than a minimum rail height threshold* (**Kainer et al.; [0059], Fig. 5;** It teaches calculating the gradient of the rail head edge **12** with respect to the tie plate. Since the computer analysis checks the angles of tie plates with respect to rail heads and determines either a worn out rail head/base plate or not, it is understood that there is a threshold involved in determining the worn condition).

Regarding claim **26** (Original), **Kainer et al.** and **Farritor** teach *the method of claim 25 wherein the step of identifying a railway track bed feature further comprises the step of identifying a rail base edge by detecting significant vertical gradient edges over a two dimensional area adjacent the detected rail head edge wherein such vertical gradient edges are greater than a minimum rail base height threshold* (**Kainer et al.; [0059], Fig. 5;** It teaches

Application/Control Number: 14/725,490                                          Page 17
Art Unit: 2489

calculating the gradient of the rail head edge **12** with respect to the tie plate edge **10**. Since the

computer analysis checks the angles of tie plates with respect to rail heads and determines either

a worn out rail head/tie plate or not, it is understood that there is a threshold involved in

determining the worn condition).


Regarding claim **27** (Original), **Kainer et al.** and **Farritor** teach *the method of claim 26*

*further comprising the step of removing data corresponding to the rail head from the elevation*

*map, thereby enhancing the detection of other smaller vertical components of the railway track*

*bed* (**Kainer et al.; [0091], L7-11;** It teaches filtering out non-tie surfaces while analyzing the tie

condition, meaning enhancing the tie condition determination by removing/filtering out other

non-essential elements from the image data. **[0052], L10-23; [0053];** It teaches discarding some

of the captured image frames to achieve desired frame spacing and reduce data storage, because

as disclosed in **[0095], L1-10,** identifying some of the smaller spacings, widths, lengths, etc.

requires second pass of data acquiring and processing image data again thereby requiring more

storage space).


Regarding claim **28** (Original), **Kainer et al.** and **Farritor** teach *the method of claim 24*

*wherein the method further comprises the step of detecting surfaces with surface normal values*

*greater than a planar region surface normal value threshold and that are proximate to one*

*another by less than a maximum proximity threshold* (**Kainer et al.; [0092], L15-20;** It teaches

determining the tie surface based on some threshold value with respect to the ballast level to

Application/Control Number: 14/725,490                                   Page 18
Art Unit: 2489

determine whether accurate condition can be measured or not. In **[0093], L1-6,** it also discloses a

proximity threshold by disclosing an expected tie-to-tie distance).


Regarding claim **29** (Original), **Kainer et al.** and **Farritor** teach *the method of claim 28*

*wherein the method further comprises the step of defining an approximate tie surface plane*

*based on the detected surfaces with surface normal values greater than the planar region surface*

*normal value threshold that are proximate to one another by less than the maximum proximity*

*threshold* (**Kainer et al.; [0092], L15-20;** It teaches determining the tie surface based on some

threshold value with respect to the ballast level to determine whether accurate condition can be

measured or not. In **[0093], L1-6,** it also teaches a proximity threshold by disclosing an expected

tie-to-tie distance).


Regarding claim **30** (Original), **Kainer et al.** and **Farritor** teach *the method of claim 29*

*wherein the method further comprises the step of assigning a tie bounding box around the*

*perimeter of the tie surface plane based at least on one measured parameter of the tie surface*

*plane* (**Kainer et al.; [0012], L10-13;** Also **Fig. 14** shows the flowchart of finding the 4 edges of

the tie boundaries which is equivalent of finding the bounding box around a tie surface plane).


Regarding claim **31** (Original), **Kainer et al.** and **Farritor** teach *the method of claim 30*

*wherein the method further comprises the step of assigning an approximate tie length, an*

*approximate tie width, and an approximate tie skew angle based on the bounding box assigned*

*around the perimeter of the tie surface plane* (**Kainer et al.; [0101], L1-5**).

Application/Control Number: 14/725,490                                                Page 19
Art Unit: 2489

Regarding claim **32** (Currently Amended), **Kainer et al.** and **Farritor** teach *the method of claim 31 wherein the method further comprises the step of identifying and measuring surface cracks in an identified tie that are deeper than a minimum crack depth threshold and that are longer than a minimum crack length threshold based on the track elevation map* (**Kainer et al.; [0063];** It teaches determining width, length and depth of cracks based on whether the defective portions **D, D'** fall within or outside a region of interest, meaning certain threshold values).

Regarding claim **33** (Original), **Kainer et al.** and **Farritor** teach *the method of claim 32 wherein the method further comprises the step of saving data corresponding to the measured surface cracks to the data storage apparatus on a per tie basis so that the same tie can be re-examined at a later date to determine whether the measured surface cracks have changed* (**Kainer et al.; [0062], L22-25;** It teaches determining rail wears by comparing image frames taken at different times but in the same location of the track bed, meaning the storage device **62** is capable of storing data for the same track bed features for the same location at different times so that the wear and tear can be compared over a time).

Regarding claim **34** (Original), **Kainer et al.** and **Farritor** teach *the method of claim 33 wherein the method further comprises a step of assigning a severity value to each measured crack based on at least the measured length and measured width of the crack* (**Kainer et al.; [0083]; Fig. 13,** step **212** shows assigning a tie conditioning score after measuring different features associated with the ties to create a tie replacement plan, meaning the score will tell one

Application/Control Number: 14/725,490                                                    Page 20
Art Unit: 2489

how severe the condition of the tie is and if it needs immediate replacement or not. The same

severity matrix is also described in **[0114]**).


Regarding claim **35** (Currently Amended), **Kainer et al.** and **Farritor** teach *the method*

*of claim 34 wherein the method further comprises the step of identifying and measuring a*

*surface feature* <u>*other than a rail head*</u> *that is higher than a minimum tie height threshold* (**Kainer**

**et al.; [0062], L12-21, Fig. 7A-B;** It teaches a height **LD** of the surface of the rail **12** with

respect to the tie plate for successive frames where the height **LD** is showing smaller in the later

frame than the earlier frame indicating a wear and tear of the surface. As cited earlier in **[0065],**

**L1-6,** in view of **Fig. 8,** it teaches that a height of ballast **18**, which is a surface feature other than

the rail head, can be measured with respect to the crosstie **10**).


Regarding claim **36** (Original), **Kainer et al.** and **Farritor** teach *the method of claim 35*

*wherein the method further comprises the step of saving data corresponding to the measured*

*surface feature to the data storage apparatus on a per tie basis so that the same tie can be re-*

*examined at a later date to determine whether the measured surface feature has changed*

(**Kainer et al.; [0062], L22-25;** It teaches determining rail wears by comparing image frames

taken at different times but in the same location of the track bed, meaning the storage device **62**

is capable of storing data for the same track bed features for the same location at different times

so that the wear and tear can be compared over a time).

Application/Control Number: 14/725,490                                    Page 21
Art Unit: 2489

Regarding claim **37** (Original), **Kainer et al.** and **Farritor** teach *the method of claim 31 wherein the method further comprises the step of detecting a broken tie based on an abrupt elevation shift along the tie surface plane* (**Kainer et al.; [0099]**).

Regarding claim **38** (Currently Amended), **Kainer et al.** and **Farritor** teach *the method of claim 24 wherein the step of identifying a railway track bed feature further comprises the step of comparing at least a portion of the track elevation map to a plurality of three dimensional features saved in <u>a</u> feature library to determine a best fit to properly identify the railway track bed feature* (**Kainer et al.; [0059], Fig. 5;** It teaches a best fit curve determination of two feature lines **L1** and **L2** corresponding to rail head **12** and the crosstie **10** which are then averaged over a several of the previously stored image frames so that the computer can analyze and determine the angular relationship between these lines **L1-L2** to determine the tie angle with respect to the rail, where the tie angle is the feature being identified after averaging over plurality of previously stored image frames).

Regarding claim **39** (Currently Amended), **Kainer et al.** and **Farritor** teach *the method of claim 38 wherein the step of comparing further comprises the step of applying a minimum correlation threshold so that a railway track bed feature <u>other than a railroad tie</u> will not be identified as a particular three dimensional feature from the feature library unless the minimum correlation threshold is met* (**Kainer et al.; [0014];** It teaches applying a correlation between the tie features, e.g. spacing and the tie condition grading above/below a threshold to determine the tie replacement plan, meaning if the correlation is not met the tie grading will not be identified as

Application/Control Number: 14/725,490                                           Page 22
Art Unit: 2489

needing replacement. As cited earlier in **[0065], L1-6,** in view of **Fig. 8,** it teaches that a height

of ballast **18**, which is a surface feature other than the rail head, can be measured with respect to

the crosstie **10**).


Regarding claim **41** (Original), **Kainer et al.** and **Farritor** teach *the method of claim 31*

*wherein the method further comprises the step of defining a surface area region adjacent the tie*

*bounding box, measuring the surface elevation of the surface area region, and determining the*

*difference between the surface elevation of the surface area region and the surface elevation of*

*the approximate tie surface plane to determine whether a positive volume or negative volume is*

*present at the surface area region* (**Kainer et al.; [0092];** It teaches the system identifying the tie

surface area with respect to the non-tie surface area and how much of the tie area surface is

covered by the ballast and therefore cannot be scored, which is equivalent of positive volume

(60%) and negative volume (40%)).


Regarding claim **42** (Currently Amended), **Kainer et al.** and **Farritor** teach *the method*

*of claim 38 wherein the method further comprises the step of making a plurality of elevation*

*measurements along and around an identified railway track bed feature <u>other than a railroad tie</u>*

*and recording the measurements and the locations of the measurements in the data storage*

*apparatus* (**Kainer et al.; [0056]; Fig. 11** and **12** show plurality of compiled image data showing

the track bed features. Also **Figs. 4A-C** show three consecutive image frames **Z1-Z3** meaning

the system is taking multiple elevation measurements. Since the system is equipped with a

storage device **62,** it is understood that the plurality of elevation measurements are stored in the

Application/Control Number: 14/725,490                                      Page 23
Art Unit: 2489

storage device. As cited earlier in **[0065], L1-6,** in view of **Fig. 8,** it teaches that a height of

ballast **18**, which is a surface feature other than the rail head, can be measured with respect to the

crosstie **10**).


Regarding claim **43** (Original), **Kainer et al.** and **Farritor** teach *the method of claim 42*

*wherein the method further comprises the step of assigning a condition to the identified railway*

*track bed feature based on the plurality of elevation measurements* (**Kainer et al.;** In **[0114],** it

discloses assigning four conditions based on the determination of the rail track features, e.g.

good (1), marginal (2), bad (3), or failed (4)).


Regarding claim **44** (Original), **Kainer et al.** and **Farritor** teach *the method of claim 24*

*wherein the step of identifying a railway track bed feature further comprises the step of*

*measuring the length of a joint bar candidate, determining whether the length of the joint bar*

*candidate falls between a minimum joint bar length threshold and a maximum joint bar length*

*threshold, and identifying the joint bar candidate as a joint bar if the length measurement of the*

*joint bar candidate falls between a minimum joint bar length threshold and a maximum joint bar*

*length threshold* (**Kainer et al.; [0122], L6-10;** It teaches determining the edge outlines of the

joint bar from two consecutive rail top edges and then comparing the shape against a standard

joint bar shape, meaning thresholding different edges to determine whether it is a joint bar or

not).

Application/Control Number: 14/725,490                                      Page 24
Art Unit: 2489

**Claims 22-23 are rejected under AIA 35 U.S.C. 103(a) as being unpatentable over Kainer et al. (US PGPub 2013/0191070 A1) in view of Farritor (US PGPub 2012/0300060 A1) and further in view of Szwilski et al. (US PGPub 2010/0026551 A1).**

Regarding claim **22** (Currently Amended), **Kainer et al.** teach *a system for assessing a railway track bed* (**[0036], L5-6**)*, the system comprising:*

*a power source* (**[0046], L14-17**)*;*

*a light emitting apparatus powered by the power source for emitting light energy toward a railway track* (**[0012], L2-6; Fig. 1** and **2,** reference numeral **40**)*;*

*a data storage apparatus* (**Fig. 1,** reference numeral **62**) *in communication with at least one processor* (**Fig. 1,** reference numeral **54, 60**)*;*

*at least one sensor for sensing reflected light that was emitted from the light emitting apparatus* (**Fig. 1** and **2,** reference numeral **50**) *and acquiring three dimensional <u>surface elevation and intensity</u> image data of the railway track* (**[0029]. Figs. 11** and **12** show the perspective three-dimensional image showing the elevation of rail head, tie plate, tie surface etc. In **[0105]** it describes how the elevation of different rail track features are measured using the image. On the other hand, in **[0071],** it teaches illuminating the rail track with certain light intensity, e.g. 0.15 watts/in and receiving the reflected light from the track surface using one or more camera, which means the captured images contain intensity of light) *to be stored in the data storage apparatus* (**Fig. 1** shows the communicative coupling between the camera and the storage device **62**)*, wherein the plurality of sensors are in communication with the at least one*

Application/Control Number: 14/725,490                                          Page 25
Art Unit: 2489

*processor* (**Fig. 1** shows communicative coupling between the camera **50** and the processor **54**)*; and*

> *wherein the at least one processor includes an algorithm* (**[0012], L10-13**) *for extracting railway track bed surface elevation data to define new railway track bed components for a three dimensional track feature library* (**[0015], L12-15.** The Examiner interprets the track feature library as the database for storing track features, which is being done by storing the track features into the storage device as disclosed in **[0046], L5-13**)*, the algorithm comprising the steps of:*

> *a. acquiring three dimensional <u>surface elevation and intensity</u> data* (**Figs. 11** and **12** show the perspective three-dimensional image showing the elevation of rail head, tie plate, tie surface etc. In **[0105]** it describes how the elevation of different rail track features are measured using the image. On the other hand, in **[0071],** it teaches illuminating the rail track with certain light intensity, e.g. 0.15 watts/in and receiving the reflected light from the track surface using one or more camera, which means the captured images contain intensity of light) *representative of <u>an area</u> segment of railway track bed* (**[0047], L14-18**)*;*

> *b. generating a track elevation map based on the acquired three dimensional data* (**[0082], L18-20; Figs. 11-12** represent a 3D track elevation map where different parameters, e.g. elevations, height, cracks, splits, orientations, etc. can be measured as disclosed in **[0056], L7-17**)*;*

> *c. identifying a railway track feature from the track elevation map that does not match any previously defined track features saved in a track feature library* (**[0083], L1-5;** It teaches identifying tie plate features to compute different condition metrics of the tie plates. Now in **[0102], [0087], L10-15,** it teaches different tie plate features, e.g. widths, slope, spikes, etc.

Application/Control Number: 14/725,490                                      Page 26
Art Unit: 2489

where it states "Once these features have been found, the system calculates plate cut by finding

the edges …". Which means as the features are being found, that were not defined or used

previously, are being used now to locate tie plates)*;*

    *d. extracting three dimensional surface elevation and intensity data* (**Figs. 11** and **12**

show the perspective three-dimensional image showing the elevation of rail head, tie plate, tie

surface etc. In **[0105]** it describes how the elevation of different rail track features are measured

using the image. On the other hand, in **[0071]**, it teaches illuminating the rail track with certain

light intensity, e.g. 0.15 watts/in and receiving the reflected light from the track surface using

one or more camera, which means the captured images contain intensity of light) *from the track*

*elevation map corresponding to the identified railway track feature* (**[0047], L14-18**)*;*

    *e. assigning a feature name to the extracted three dimensional data* (Since the system is

storing all the 3D information data into storage device **62** for retrieving the data at a later time

(**[0046], L7-9;** It teaches both read/write operation), it is imperative that each data is tagged with

unique identifier for later reading and analysis)*; and*

    *f. saving in the data storage apparatus the extracted three dimensional data associated*

*with the feature name as a new track feature to be included in the track feature library* (**[0046],**

**L5-13**).

    Although, **Kainer et al.** teach storing 3D information into storage device for both

read/write purpose, but it does not explicitly teach tagging each feature with a unique

name/ID/tag.

Application/Control Number: 14/725,490                                                          Page 27
Art Unit: 2489

However, **Szwilski et al.** teach a railroad surveying and monitoring system where it tags all the acquired data about the rail track including the camera data with a position location and stores it in the storage device (**Szwilski et al.; [0065], L6-12**).

It would have been obvious for one of ordinary skill in the art at the time the invention was made to combine **Kainer et al**'s invention of inspecting railroad ties to include **Szwilski et al**'s usage of data tagging and storing, because in doing so one can carry out comparative analysis of the acquired data for a subsequent track inspection data with respect to the previously tagged track inspection data (**Szwilski et al.; [0066], L1-17**).

Although, **Kainer et al.** teach capturing perspective three-dimensional image showing the elevation of rail head, tie plate, tie surface etc. as shown in **Figs. 11, 12** and also illuminating the rail track with certain light intensity, e.g. 0.15 watts/in and receiving the reflected light from the track surface using one or more camera as described in **[0071]**, which means the captured images contain intensity of light, but it does not explicitly teach capturing the intensity image data.

However, **Farritor** teaches a system of rail road deflection measurement using visioning means which is in the same field of endeavor, where it teaches calculating image intensities from the captured image data as described in **[0043]**.

It would have been obvious for one of ordinary skill in the art at the time the invention was made to combine **Kainer et al**'s invention of inspecting railroad ties to include **Farritor**'s usage of image intensity data capturing, because this technique can be used in identifying the edges of the rail, and thereby the slope of the rail in the image (**Farritor; [0043]**).

Application/Control Number: 14/725,490                                    Page 28
Art Unit: 2489

Regarding claim **23** (Currently Amended), **Kainer et al.** teach *a method of building a virtual three dimensional railway track bed component library* (**[0047], L14-18**), *the method comprising the steps of:*

*a. emitting a light along a track bed surface* (**[0012], L2-6; Fig. 1** and **2,** reference numeral **40**)*;*

*b. sensing some of the emitted light after it has reflected off of the track bed surface* (**Fig. 1** and **2,** reference numeral **50**)*;*

*c. defining a three dimensional elevation map* <u>using surface elevation and intensity data</u> (**Figs. 11** and **12** show the perspective three-dimensional image showing the elevation of rail head, tie plate, tie surface etc. In **[0105]** it describes how the elevation of different rail track features are measured using the image. On the other hand, in **[0071],** it teaches illuminating the rail track with certain light intensity, e.g. 0.15 watts/in and receiving the reflected light from the track surface using one or more camera, which means the captured images contain intensity of light) <u>*representative of an area segment of the track bed*</u> (**[0047], L14-18**) *based on the sensed light reflected from the track bed surface* (**[0082], L18-20; Figs. 11-12** represent a 3D track elevation map where different parameters, e.g. elevations, height, cracks, splits, orientations, etc. can be measured as disclosed in **[0056], L7-17**)*;*

*d. storing the elevation map in a data storage apparatus* (**Fig. 1** shows the communicative coupling between the camera and the storage device **62**)*;*

*e. identifying a railway track bed feature from the three dimensional elevation map that does not match any previously defined track bed features saved in a track component library* (**[0083], L1-5;** It teaches identifying tie plate features to compute different condition metrics of

Application/Control Number: 14/725,490                                      Page 29

Art Unit: 2489

the tie plates. Now in **[0102], [0087], L10-15,** it teaches different tie plate features, e.g. widths,

slope, spikes, etc. where it states "Once these features have been found, the system calculates

plate cut by finding the edges …". Which means as the features are being found, that were not

defined or used previously, are being used now to locate tie plates*);*

 *f. extracting three dimensional data from the track elevation map corresponding to the*

*identified railway track bed feature* (**[0047], L14-18**)*;*

 *g. assigning a component name to the extracted three dimensional data* (Since the system

is storing all the 3D information data into storage device **62** for retrieving the data at a later time

(**[0046], L7-9;** It teaches both read/write operation), it is imperative that each data is tagged with

unique identifier for later reading and analysis)*; and*

 *h. saving the extracted three dimensional data associated with the component name in a*

*data storage apparatus as a new track bed feature to be included in the track component library*

(**[0046], L5-13**).

 Although, **Kainer et al.** teach storing 3D information into storage device for both

read/write purpose, but it does not explicitly teach tagging each feature with a unique

name/ID/tag.

 However, **Szwilski et al.** teach a railroad surveying and monitoring system where it tags

all the acquired data about the rail track including the camera data with a position location and

stores it in the storage device (**Szwilski et al.; [0065], L6-12**).

 It would have been obvious for one of ordinary skill in the art at the time the invention

was made to combine **Kainer et al**'s invention of inspecting railroad ties to include **Szwilski et**

**al**'s usage of data tagging and storing, because in doing so one can carry out comparative

Application/Control Number: 14/725,490                                      Page 30
Art Unit: 2489

analysis of the acquired data for a subsequent track inspection data with respect to the previously

tagged track inspection data (**Szwilski et al.; [0066], L1-17**).

Although, **Kainer et al.** teach capturing perspective three-dimensional image showing

the elevation of rail head, tie plate, tie surface etc. as shown in **Figs. 11, 12** and also illuminating

the rail track with certain light intensity, e.g. 0.15 watts/in and receiving the reflected light from

the track surface using one or more camera as described in **[0071]**, which means the captured

images contain intensity of light, but it does not explicitly teach capturing the intensity image

data.

However, **Farritor** teaches a system of rail road deflection measurement using visioning

means which is in the same field of endeavor, where it teaches calculating image intensities from

the captured image data as described in **[0043]**.

It would have been obvious for one of ordinary skill in the art at the time the invention

was made to combine **Kainer et al**'s invention of inspecting railroad ties to include **Farritor**'s

usage of image intensity data capturing, because this technique can be used in identifying the

edges of the rail, and thereby the slope of the rail in the image (**Farritor; [0043]**).

**Claims 17, 40 are rejected under AIA 35 U.S.C. 103(a) as being unpatentable over
Kainer et al. (US PGPub 2013/0191070 A1) in view of Farritor (US PGPub 2012/0300060
A1) and further in view of Landes et al. (US PGPub 2013/0096739 A1).**

Regarding claim **17** (Original), **Kainer et al.** and **Farritor** teach *the system of claim 6.*

Case 2:21-cv-01289-MCS-MAA   Document 87-2   Filed 10/18/21   Page 89 of 110   Page ID
#:4107

Application/Control Number: 14/725,490                                         Page 31
Art Unit: 2489

Although **Kainer et al.** teach determining the ballast height from the difference in levels
of the ballast and the crosstie and ballast stone size as described in **[0065]**, but **Kainer et al.** or
**Farritor** do not exclusively teach determining the ballast volume.

However, **Landes et al.** teach a system for automatic rail track surveying using camera
and laser lights which determines the ballast volume from the acquired data (**Landes et al.;**
**[0009], L1-5**).

It would have been obvious for one of ordinary skill in the art at the time the invention
was made to combine **Kainer et al**'s invention of inspecting railroad ties to include **Landes et**
**al**'s determination of ballast volume from the acquired data by the system, because since ballast
beneath and between the ties stabilizes the positions of the ties, keeps the rails level, and
provides some cushioning of the composite structure for loads imposed by rail traffic, any
dislodging of the ballast over time could cause rail track deterioration and safety hazards.
Therefore, periodic monitoring of ballast volume and replacement thereof will ensure rail track
safety and integrity (**Landes et al.; [0005], L6-15**).


Regarding claim **40** (Original), **Kainer et al.** and **Farritor** teach *the method of claim 31*.

Although **Kainer et al.** teach determining the ballast height from the difference in levels
of the ballast and the crosstie and ballast stone size as described in **[0065]**, but **Kainer et al.** or
**Farritor** do not exclusively teach determining the ballast volume.

However, **Landes et al.** teach a system for automatic rail track surveying using camera
and laser lights which determines the ballast volume from the acquired data (**Landes et al.;**
**[0009], L1-5**).

Exhibit J
90

Application/Control Number: 14/725,490                                    Page 32
Art Unit: 2489

It would have been obvious for one of ordinary skill in the art at the time the invention

was made to combine **Kainer et al**'s invention of inspecting railroad ties to include **Landes et**

**al**'s determination of ballast volume from the acquired data by the system, because since ballast

beneath and between the ties stabilizes the positions of the ties, keeps the rails level, and

provides some cushioning of the composite structure for loads imposed by rail traffic, any

dislodging of the ballast over time could cause rail track deterioration and safety hazards.

Therefore, periodic monitoring of ballast volume and replacement thereof will ensure rail track

safety and integrity (**Landes et al.; [0005], L6-15**).

### *Response to Arguments*

Applicant's arguments filed on 07/31/2017, page 12 – 21, with respect to the rejection(s)

of independent claim(s) 1, 17, 24, 40 under 102(a)(1) have been fully considered but are moot

because the arguments do not apply to any of the references being used in the current rejection.

However, the Examiner would like to reiterate that in **[0029]** and in view of **Figs. 11** and **12**,

**Kainer et al.** show the perspective three-dimensional image showing the elevation of rail head,

tie plate, tie surface etc. In **[0105]** it describes how the elevation of different rail track features

are measured using the image. On the other hand, in **[0071],** it teaches illuminating the rail track

with certain light intensity, e.g. 0.15 watts/in and receiving the reflected light from the track

surface using one or more camera, which means the captured images contain intensity of light.

But since **Kainer et al.** do not explicitly teach capturing intensity image, the Examiner brings in

the reference of **Farritor** which is in the same field of endeavor and explicitly teach the intensity

image capturing.

Application/Control Number: 14/725,490                                             Page 33
Art Unit: 2489

Applicant argues regarding claim 12, 16, 19, 35, 39, 42 by stating that "Applicant's claim 12 has been amended to expressly exclude rail heads. As disclosed in FIG. 13 of Applicant's Application, the prominent rail head features of a scan are purposefully removed to allow for detection of other, subtler features based on height deviations (e.g., weld artifacts). See Applicant's Application, [00106]. The section relied on in the Office Action in Kainer is specifically referring to rail height and detecting rail wear. See Kainer, FIG. 7A. As such, because Applicant's claim 12 is not referring to rail height or rail erosion and in fact removes rail heads from the calculations being performed. Kainer does not meet each and every limitation of Applicant's claim 12, as amended. Reconsideration and allowance of claim 12, as amended, are respectfully requested".

The examiner cannot concur with the applicant and respectfully disagrees and kindly points out that **Kainer et al.** in fact teach the surface feature measurement other than a track rail head as described in **[0065], L1-6,** in view of **Fig. 8,** where it teaches that a height of ballast **18,** which is a surface feature other than the rail head, can be measured with respect to the crosstie **10**.

Applicant argues regarding claims 15, 38 by stating that "The limitations from claim 15 were correlated with Kainer paragraph [0059] in the Office Action. This portion of Kainer discusses determining the angle of crossties with respect to adjacent rails. Here, Kainer is not concerned with identifying a feature. The identities of the features are already known (i.e., crossties and rails). Rather, Kainer is concerned with determining the relative positioning

Application/Control Number: 14/725,490                                    Page 34
Art Unit: 2489

between crossties and rails. In contrast, Applicant's amended claim 1 describes a feature library

which includes a plurality of 3D railroad track features such as, for example, plates, plate holes,

spikes, anchors, and tie fasteners (e.g., fastening clips). As the track elevation map is gathered

(via the three dimensional surface elevation and intensity data), the map is analyzed and features

in the map are cross-referenced with the library of 3D features to help identify the features.

Kainer does not teach or suggest this technology. As such, each and every element of claim 15 is

not met by Kainer. Thus, claim 15 patentably defines over Kainer. Reconsideration and

allowance of claim 15 are respectfully requested".

      The examiner cannot concur with the applicant and respectfully disagrees and kindly

points out that first of all the original or amended claim 1 never discloses a feature library which

includes a plurality of 3D track features such as plates, plate holes, spikes, anchors, etc. as

allegedly being argued. The arguments presented here in favor of the limitations were never

disclosed in claim 1 originally or amended. In claim 15, the disclosure is about a feature library

containing features that are being compared against the captured image data to identify the track

feature. The Examiner interprets the feature library as nothing more than a storage area where the

feature data, e.g. rail/tie width, length, height, tie angle, etc. are being stored. Therefore, in view

of **[0059]** and **Fig. 5**, it teaches a best fit curve determination of two feature lines **L1** and **L2**

corresponding to rail head **12** and the crosstie **10** which are then averaged over a several of the

previously stored image frames so that the computer can analyze and determine the angular

relationship between these lines **L1-L2** to determine the tie angle with respect to the rail, where

the tie angle is the feature being identified after averaging over plurality of previously stored

image frames. Also in **[0102], [0087], L10-15,** it teaches different tie plate features, e.g. widths,

Application/Control Number: 14/725,490                                              Page 35
Art Unit: 2489

slope, spikes, etc. where it states "Once these features have been found, the system calculates

plate cut by finding the edges …". Which means as the features are being found, that were not

defined or used previously, are being used now to locate tie plates. These teachings clearly

anticipates the limitations in claim 15 and 38.


Applicant argues regarding claims 22, 23 by stating that "Additionally, claim 22

specifically states the 3D data is extracted "to define new railway track components for a three

dimensional track feature library". The Office Action cites paragraph [0015] in Kainer which has

no teaching or suggestion of such a feature whatsoever. There is nothing in Kainer regarding the

system defining new, previously unknown track components and saving those newly-defined

components for future reference. Paragraph [0083] in Kainer does not compensate for this

deficiency. In paragraph [0083], Kainer teaches analyzing ties. Ties are a known basic feature of

a railroad track. In Kainer there is no defining new, previously unknown railway track

components and then storing those components in a feature library for future use at identifying

the new feature in the future".

The examiner cannot concur with the applicant and respectfully disagrees and kindly

points out that the alleged definition of previously unknown railway track components is not

what is disclosed in the claimed limitations and therefore the prior art need not address the

argument at hand. However, as mentioned earlier, Examiner interprets the feature library as

nothing more than a storage area where the feature data, e.g. rail/tie width, length, height, tie

angle, etc. are being stored. Therefore, in view of **[0059]** and **Fig. 5**, it teaches a best fit curve

determination of two feature lines **L1** and **L2** corresponding to rail head **12** and the crosstie **10**

Application/Control Number: 14/725,490                                        Page 36
Art Unit: 2489

which are then averaged over a several of the previously stored image frames so that the computer can analyze and determine the angular relationship between these lines **L1-L2** to determine the tie angle with respect to the rail, where the tie angle is the feature being identified after averaging over plurality of previously stored image frames. Also in **[0102], [0087], L10-15,** it teaches different tie plate features, e.g. widths, slope, spikes, etc. where it states "Once these features have been found, the system calculates plate cut by finding the edges …". Which means as the features are being found, that were not defined or used previously, are being used now to locate tie plates. Therefore, the Examiner believes the teachings of **Kainer et al.** in view of **Farritor** and **Szwilski et al.** teach all the limitations of claims 22 and 23.

### *Conclusion*

**THIS ACTION IS MADE FINAL.** Applicant is reminded of the extension of time policy as set forth in 37 CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE MONTHS from the mailing date of this action.  In the event a first reply is filed within TWO MONTHS of the mailing date of this final action and the advisory action is not mailed until after the end of the THREE-MONTH shortened statutory period, then the shortened statutory period will expire on the date the advisory action is mailed, and any extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of the advisory action.  In no event, however, will the statutory period for reply expire later than SIX MONTHS from the mailing date of this final action.

Application/Control Number: 14/725,490                                              Page 37
Art Unit: 2489


Any inquiry concerning this communication or earlier communications from the

examiner should be directed to MAINUL HASAN whose telephone number is (571)272-0422.

The examiner can normally be reached on MON-FRI: 10AM-6PM, Alternate FRIDAYS, EST.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, JORGE ORTIZ-CRIADO can be reached at (571)272-7624.  The fax phone number

for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent

Application Information Retrieval (PAIR) system.  Status information for published applications

may be obtained from either Private PAIR or Public PAIR.  Status information for unpublished

applications is available through Private PAIR only.  For more information about the PAIR

system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR

system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would

like assistance from a USPTO Customer Service Representative or access to the automated

information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/M. H./
Examiner, Art Unit 2489

## REMARKS

Claims 1-44 are currently pending.  Claims 1 and 22-24 are the pending independent claims.  Claims 1-16, 18-21, 24-39 and 41-44 are rejected under 35 U.S.C. § 103 over U.S. Patent Application Publication Number 2013/0191070 to Kainer et al. ("Kainer") in view of U.S. Patent Application Publication Number 2012/0300060 to Farritor ("Farritor").  Claims 22 and 23 are rejected under 35 U.S.C. § 103 over Kainer in view Farritor and further in view of U.S. Patent Application Publication Number 2010/0026551 to Szwilski et al. ("Szwilski"). Claims 17 and 40 are rejected under 35 U.S.C. § 103 over Kainer in view of Farritor and further in view of U.S. Patent Application Publication Number 2013/0096739 to Landes et al. ("Landes"). Claims 12, 16, 19, 23, 35, 39 and 42 have been amended. No new matter has been introduced by the amendments, which are supported by the disclosure of the original claims and the specification.

In response to the final office action mailed on August 16, 2017, Applicant, pursuant to 37 CFR  1.114, requests continued examination by filing the submission of amendments to the claims (above), new claims, and filing the appropriate fee under 37 CFR  1.17(e).  No new matter has been added by the amendments and/or new claims.  Form sb0030 is filed herewith which includes details of this RCE. Each of the foregoing rejections is respectfully traversed and favorable reconsideration is requested in view of the above amendments and following remarks.

## I.  § 112(a) Rejections of claims 12-13, 16, 19-20, 35-36, 39, and 42-43

Claims 12-13, 16, 19-20, 35-36, 39, and 42-43 are rejected under 35 U.S.C. § 112(a) for allegedly failing to comply with the written description requirement. The issue appears to center around the addition of the phrase "other than a rail head" in the prior amendment. These claims have been amended further to remove the phrase "other than a rail head" to obviate this particular refusal.

## II.  § 103 Rejections of claims 1-16, 18-21, 24-39 and 41-44

Claims 1-16, 18-21, 24-39 and 41-44 are rejected under 35 U.S.C. § 103 over Kainer in view of Farritor.  If the sum of references cited against an application is deficient as to the same element or combination of elements required by a rejected claim, then such claim is patentable over the cited references.  See *Velander v. Garner*, 348 F.3d 1359, 1363, 68 USPQ2d 1769, 1772

(Fed. Cir. 2003).  This requirement is separate and distinct from the Federal Circuit's Teaching, Suggestion, Motivation (TSM) Test analyzed in *KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398 (2007) and remains good law.  See *Abbott Laboratories v. Sandoz, Inc.*, 500 F.Supp.2d 846, 852 (N.D. Ill. 2007) (quoted with approval in *Abbott Laboratories v. Sandoz, Inc.*, 544 F.3d 1341, 1351 (Fed. Cir. 2008)).

### A.  Claims 1-16, 18-21

Independent claim 1, as amended, claims, *inter alia*, a system for assessing a railway track bed including a processor running one or more algorithms wherein the algorithm steps include (a) acquiring three dimensional ***surface elevation and intensity data representative of an area segment of railway track bed***; (b) generating a track elevation map based on the acquired three dimensional data; and (c) identifying a railway track bed feature from the track elevation map. *See, e.g.*, Applicant's Application, ¶ [0007]. Claim 1 also discusses the use of at least ***one*** sensor which implies that a single sensor in the simplest configuration would have to be capable of acquiring three dimensional surface elevation and intensity data for a specific viewing area.

Applicant's system and method for generating a 3D model is very different from the approach described in Kainer. In Kainer, a very large number of slices or "frames" across the track surface are taken (about 633,600 per mile) and variations in height profile of each slice are used together to identify features of interest in each profile. *See* Kainer, ¶ [0048]. These slices are compiled to arrive at a 3D image. *See* Kainer, ¶ [0056]. In contrast, Applicant's system and method describes 3D surface elevation and intensity data models (the elevations for an *area* of the track surface) to identify features of interest. Kainer does not teach or suggest combining 3D slices to create a surface from which to identify true 3D features (elevations over an area). As such, Kainer does not teach or suggest each and every limitation of Applicant's claim 1.

Farritor does not compensate for the deficiencies of Kainer. Farritor describes the use of different machine vision techniques to detect edges including the location of a rail. See Farritor, ¶ [0043]. This edge detection technique "can be used to examine features of groups of pixels such as the intensity and/or color of each pixel in two dimensions. *Id*. In order to get data of a different quality, a second machine vision instrument can be used so that both instruments operate stereoscopically. *Id*. However, this enhanced data acquisition requires at least two sensors. Applicant's claimed invention in claim 1 operates using "at least ***one*** sensor for sensing

Application No. 14/725,490
January 15, 2018
Reply to Office Action of August 16, 2017

reflected light that was emitted from the light emitting apparatus and *acquiring three dimensional surface elevation **and** intensity image data* of the railway track to be stored in the data storage apparatus" (emphasis added). The machine vision device described in Farritor cannot accomplish what is required by the simplest embodiment of Applicant's claim 1, namely, the use of *one* sensor for obtaining surface elevation *and* intensity data. If the apparatus described in Kainer were combined with the apparatus described in Farritor, at least *two* image gathering devices would be necessary. The sensor device used in Kainer could potentially be used to obtain some sense of elevation data while the sensor device used in Farritor could be used to gather intensity data. However, two sensing devices would be required. Applicant's embodiment claimed in claim 1 does not require at least two sensors—it requires at least one for each viewing area. For this reason, even a combination of Kainer and Farritor does not meet each and every limitation of Applicant's claim 1.  Therefore, Applicant's claim 1 is patentable over the combination of Kainer and Farritor.  Reconsideration and allowance of claim 1 are respectfully requested.

"If an independent claim is nonobvious under 35 U.S.C. 103, then any claim depending therefrom is nonobvious."  M.P.E.P. § 2143.03 (citing *In re Fine*, 837 F.2d 1071, 5 U.S.P.Q.2d 1596 (Fed. Cir. 1988)).  Dependent claims 2-16 and 18-21 depend from independent claim 1, and contain additional important aspects of the invention.  Therefore, dependent claims 2-16 and 18-21 patentably define over Kainer in view of Farritor.  Reconsideration and allowance of dependent claims 2-16 and 18-21 are respectfully requested.

### B.  Claims 24-39 and 41-44

Independent claim 24, as amended, claims a method of assessing a railway track bed including, *inter alia*, the steps of (a) defining a three dimensional elevation map based on *surface elevation and intensity data representative of an area segment of the railway track bed*, gathered by *a sensor* sensing reflected light from a track bed surface; (b) storing the elevation map in a data storage apparatus; and (c) identifying a railway track bed feature from the elevation map.

Applicant's system and method for generating a 3D model is very different from the approach described in Kainer. In Kainer, a very large number of slices or "frames" across the track surface are taken (about 633,600 per mile) and variations in height profile of each slice are

Application No. 14/725,490
January 15, 2018
Reply to Office Action of August 16, 2017

used together to identify features of interest in each profile. *See* Kainer, ¶ [0048]. These slices are compiled to arrive at a 3D image. *See* Kainer, ¶ [0056]. In contrast, Applicant's system and method describes 3D surface elevation and intensity data models (the elevations for an *area* of the track surface) to identify features of interest. Kainer does not teach or suggest combining 3D slices to create a surface from which to identify true 3D features (elevations over an area). As such, Kainer does not teach or suggest each and every limitation of Applicant's claim 24.

Farritor does not compensate for the deficiencies of Kainer. Farritor describes the use of different machine vision techniques to detect edges including the location of a rail. See Farritor, ¶ [0043]. This edge detection technique "can be used to examine features of groups of pixels such as the intensity and/or color of each pixel in two dimensions. *Id.* In order to get data of a different quality, a second machine vision instrument can be used so that both instruments operate stereoscopically. *Id.* However, this enhanced data acquisition requires at least two sensors. Applicant's claimed invention in claim 24 operates by, *inter alia*, "defining a three dimensional elevation map based on surface elevation *and* intensity data representative of an area segment of the railway track bed, the data gathered by *a sensor* sensing reflected light from a track bed surface" (emphasis added). The machine vision device described in Farritor cannot accomplish what is required by Applicant's claim 24, namely, the use of a single sensor for obtaining surface elevation *and* intensity data for a given area. If the apparatus described in Kainer were combined with the apparatus described in Farritor, at least *two* image gathering devices would be necessary. The sensor device used in Kainer could potentially be used to obtain some sense of elevation data while the sensor device used in Farritor could be used to gather intensity data. However, two sensing devices would be required. Applicant's embodiment claimed in claim 24 does not require at least two sensors—it only requires one sensor for each viewing area. For this reason, even a combination of Kainer and Farritor does not meet each and every limitation of Applicant's claim 24.  Therefore, Applicant's claim 24 is patentable over the combination of Kainer and Farritor. Reconsideration and allowance of claim 24 are respectfully requested.

"If an independent claim is nonobvious under 35 U.S.C. 103, then any claim depending therefrom is nonobvious."  M.P.E.P. § 2143.03 (citing *In re Fine*, 837 F.2d 1071, 5 U.S.P.Q.2d 1596 (Fed. Cir. 1988)).  Dependent claims 25-39 and 41-44 depend from independent claim 24, and contain additional important aspects of the invention.  Therefore, dependent claims 25-39

Exhibit J
100

and 41-44 patentably define over Kainer in view of Farritor.  Reconsideration and allowance of dependent claims 25-39 and 41-44 are respectfully requested.

### III. § 103 Rejections of Claims 22 and 23

Claims 22 and 23 are rejected under 35 U.S.C. § 103 over Kainer in view of Farritor and in further view of Szwilski. If the sum of references cited against an application is deficient as to the same element or combination of elements required by a rejected claim, then such claim is patentable over the cited references.  See *Velander v. Garner*, 348 F.3d 1359, 1363, 68 USPQ2d 1769, 1772 (Fed. Cir. 2003).  This requirement is separate and distinct from the Federal Circuit's Teaching, Suggestion, Motivation (TSM) Test analyzed in *KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398 (2007) and remains good law.  See *Abbott Laboratories v. Sandoz, Inc.*, 500 F.Supp.2d 846, 852 (N.D. Ill. 2007) (quoted with approval in *Abbott Laboratories v. Sandoz, Inc.*, 544 F.3d 1341, 1351 (Fed. Cir. 2008)).

### A.  Claim 22

Independent claim 22, as amended, claims a system for assessing a railway track bed including ***at least one sensor*** and a processor running one or more algorithms for extracting railway track bed surface elevation data using the at least one sensor to define new railway track bed components for a three dimensional track feature library, the algorithm comprising the steps of: (a) acquiring three dimensional ***surface elevation and intensity data representative of an area segment of railway track bed***; (b) generating a track elevation map based on the acquired three dimensional data; (c) identifying a railway track feature from the track elevation map that does not match any previously defined track features saved in a track feature library; (d) extracting three dimensional data from the track elevation map corresponding to the identified railway track feature; (e) assigning a feature name to the extracted three dimensional data; and (f) saving in the data storage apparatus the extracted three dimensional data associated with the feature name as a new track feature to be included in the track feature library.

Applicant's system and method for generating a 3D model is very different from the approach described in Kainer. In Kainer, a very large number of slices or "frames" across the track surface are taken (about 633,600 per mile) and variations in height profile of each slice are used together to identify features of interest in each profile. *See* Kainer, ℙ [0048]. These slices

Application No. 14/725,490
January 15, 2018
Reply to Office Action of August 16, 2017

are compiled to arrive at a 3D image. *See* Kainer, ₱ [0056]. In contrast, Applicant's system and method describes 3D surface elevation and intensity data models (the elevations for an *area* of the track surface) to identify features of interest. Kainer does not teach or suggest combining 3D slices to create a surface from which to identify true 3D features (elevations over an area). As such, Kainer does not teach or suggest each and every limitation of Applicant's claim 22.

Farritor does not compensate for the deficiencies of Kainer. Farritor describes the use of different machine vision techniques to detect edges including the location of a rail. See Farritor, ₱ [0043]. This edge detection technique "can be used to examine features of groups of pixels such as the intensity and/or color of each pixel in two dimensions. *Id*. In order to get data of a different quality, a second machine vision instrument can be used so that both instruments operate stereoscopically. *Id*. However, this enhanced data acquisition requires at least two sensors. Applicant's claimed invention in claim 22 operates using "at least *one* sensor for sensing reflected light that was emitted from the light emitting apparatus and *acquiring three dimensional surface elevation **and** intensity image data* of the railway track to be stored in the data storage apparatus" (emphasis added). The machine vision device described in Farritor cannot accomplish what is required by the simplest embodiment of Applicant's claim 22, namely, the use of *one* sensor for obtaining surface elevation *and* intensity data. If the apparatus described in Kainer were combined with the apparatus described in Farritor, at least *two* image gathering devices would be necessary. The sensor device used in Kainer could potentially be used to obtain some sense of elevation data while the sensor device used in Farritor could be used to gather intensity data. However, two sensing devices would be required. Applicant's embodiment claimed in claim 22 does not require at least two sensors—it requires at least one for each viewing area. For this reason, even a combination of Kainer and Farritor does not meet each and every limitation of Applicant's claim 22.  Therefore, Applicant's claim 22 is patentable over the combination of Kainer and Farritor. As for Szwilski, it appears to teach tagging data related to known rail components. Szwilski does not compensate for the deficiencies of Kainer or Farritor. As such, claim 22 is patentable over Kainer in view of Farritor and further in view of Szwilski. Reconsideration and allowance of claim 22 are respectfully requested.

Exhibit J
102

Application No. 14/725,490
January 15, 2018
Reply to Office Action of August 16, 2017

### B. Claim 23

Independent claim 23, as amended, claims a method of building a virtual three dimensional railway track bed component library using *a sensor*, the method including the steps of: defining a three dimensional elevation map *using surface elevation and intensity data representative of an area segment of the track bed* based on the sensed light reflected from the track bed surface; storing the elevation map in a data storage apparatus; identifying a railway track bed feature from the three dimensional elevation map that does not match any previously defined track bed features saved in a track component library; extracting three dimensional data from the track elevation map corresponding to the identified railway track bed feature; assigning a component name to the extracted three dimensional data; and saving the extracted three dimensional data associated with the component name in a data storage apparatus as a new track bed feature to be included in the track component library.

Applicant's system and method for generating a 3D model is very different from the approach described in Kainer. In Kainer, a very large number of slices or "frames" across the track surface are taken (about 633,600 per mile) and variations in height profile of each slice are used together to identify features of interest in each profile. *See* Kainer, ¶ [0048]. These slices are compiled to arrive at a 3D image. *See* Kainer, ¶ [0056]. In contrast, Applicant's system and method describes 3D surface elevation and intensity data models (the elevations for an *area* of the track surface) to identify features of interest. Kainer does not teach or suggest combining 3D slices to create a surface from which to identify true 3D features (elevations over an area). As such, Kainer does not teach or suggest each and every limitation of Applicant's claim 23.

Farritor does not compensate for the deficiencies of Kainer. Farritor describes the use of different machine vision techniques to detect edges including the location of a rail. See Farritor, ¶ [0043]. This edge detection technique "can be used to examine features of groups of pixels such as the intensity and/or color of each pixel in two dimensions. *Id.* In order to get data of a different quality, a second machine vision instrument can be used so that both instruments operate stereoscopically. *Id.* However, this enhanced data acquisition requires at least two sensors. Applicant's claimed invention in claim 23 operates using the steps of b. sensing some of the emitted light using *a sensor* after the light has reflected off of the track bed surface; and c. defining a three dimensional elevation map using *surface elevation and intensity data* representative of an area segment of the track bed based on the sensed light reflected from the

Application No. 14/725,490
January 15, 2018
Reply to Office Action of August 16, 2017

track bed surface. The machine vision device described in Farritor cannot accomplish what is required by the simplest embodiment of Applicant's claim 23, namely, the use of *one* sensor for obtaining surface elevation *and* intensity data. If the apparatus described in Kainer were combined with the apparatus described in Farritor, at least *two* image gathering devices would be necessary. The sensor device used in Kainer could potentially be used to obtain some sense of elevation data while the sensor device used in Farritor could be used to gather intensity data. However, two sensing devices would be required. Applicant's embodiment claimed in claim 23 does not require at least two sensors—it requires at least one for each viewing area. For this reason, even a combination of Kainer and Farritor does not meet each and every limitation of Applicant's claim 23.  Therefore, Applicant's claim 23 is patentable over the combination of Kainer and Farritor. Szwilski teaches tagging data related to known rail components. Szwilski does not compensate for the deficiencies of Kainer or Farritor. As such, claim 23 is patentable over Kainer in view of Farritor and further in view of Szwilski. Reconsideration and allowance of claim 23 are respectfully requested.

### V. 103 Rejections of Claims 17 and 40

Claims 17 and 40 are rejected under 35 U.S.C. § 103 over Kainer in view of Farritor and in further view of Landes. If the sum of references cited against an application is deficient as to the same element or combination of elements required by a rejected claim, then such claim is patentable over the cited references.  See *Velander v. Garner*, 348 F.3d 1359, 1363, 68 USPQ2d 1769, 1772 (Fed. Cir. 2003).  This requirement is separate and distinct from the Federal Circuit's Teaching, Suggestion, Motivation (TSM) Test analyzed in *KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398 (2007) and remains good law.  See *Abbott Laboratories v. Sandoz, Inc.*, 500 F.Supp.2d 846, 852 (N.D. Ill. 2007) (quoted with approval in *Abbott Laboratories v. Sandoz, Inc.*, 544 F.3d 1341, 1351 (Fed. Cir. 2008)).

### A.  Claim 17

Certain important elements of claim 1 are discussed above in section II.(A.) and the arguments set forth in section II.(A.) are incorporated herein by reference. The combination of Kainer and Farritor does not teach a system using at least *one* sensor for acquiring three dimensional ***surface elevation and intensity data representative of an area segment of railway***

Application No. 14/725,490
January 15, 2018
Reply to Office Action of August 16, 2017

*track bed*. Landes does not compensate for the deficiencies of the combination of Kainer and Landes as it does not teach or suggest such combination of such features either. Therefore, claim 1, as amended, is patentable over Kainer in view of Farritor and in further view of Landes. "If an independent claim is nonobvious under 35 U.S.C. 103, then any claim depending therefrom is nonobvious." M.P.E.P. § 2143.03 (citing *In re Fine*, 837 F.2d 1071, 5 U.S.P.Q.2d 1596 (Fed. Cir. 1988)). Dependent claim 17 depends from independent claim 1, and contains additional important aspects of the invention. Therefore, dependent claim 17 patentably defines over Kainer in view of Farritor and in further view of Landes. Reconsideration and allowance of dependent claim 17 are respectfully requested.

### B.  Claim 40

Certain important elements of claim 24 are discussed above in section II.(B.) and the arguments set forth in section II.(B.) are incorporated herein by reference. Kainer does not teach or suggest using a single sensor to define a three dimensional elevation map for a specific area based on *surface elevation and intensity data representative of the area segment of the railway track bed*. Landes does not compensate for the deficiencies of the combination of Kainer and Farritor as it does not teach or suggest such combination of features either. Therefore, claim 24, as amended, is patentable over Kainer in view of Farritor in further view of Landes. "If an independent claim is nonobvious under 35 U.S.C. 103, then any claim depending therefrom is nonobvious." M.P.E.P. § 2143.03 (citing *In re Fine*, 837 F.2d 1071, 5 U.S.P.Q.2d 1596 (Fed. Cir. 1988)). Dependent claim 40 depends from independent claim 24, and contains additional important aspects of the invention. Therefore, dependent claim 40 patentably defines over Kainer in view of Farritor and in further view of Landes. Reconsideration and allowance of dependent claim 40 are respectfully requested.

In light of the foregoing, Applicant respectfully requests the Examiner reconsider the application, withdraw the rejections, and issue a notice of allowance at the earliest possible convenience.

Application No. 14/725,490
January 15, 2018
Reply to Office Action of August 16, 2017


Applicant has petitioned for a two-month extension within which to file this response. Payment for the two-month extension has been made through the EFS. Form sb0022 is included herewith with details regarding the extension request.

In the event this response is not timely filed, Applicant hereby petitions for the appropriate extension of time and requests that the fee for the extension along with any other fees which may be due with respect to this paper be charged to our **Deposit Account No. 506209.**


Respectfully submitted,

ROBINSON IP LAW, PLLC

By: *Michael E. Robinson*

Michael E. Robinson
Registration No. 58,947

Date: January 15, 2018
9724 Kingston Pike, Suite 1403
Knoxville, TN 37922
(865) 978-6480

Exhibit J
106

| *Notice of Allowability* | Application No.<br>14/725,490 | Applicant(s)<br>Mesher, Darel | |
|---|---|---|---|
| | Examiner<br>MAINUL HASAN | Art Unit<br>2489 | AIA Status<br>Yes |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--**
All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☑ This communication is responsive to 7/24/2018.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☑ The allowed claim(s) is/are 1-21 and 24-45 . As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information , please see **http://www.uspto.gov/patents/init_events/pph/index.jsp** or send an inquiry to **PPHfeedback@uspto.gov.**

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   a) ☐All      b) ☐ Some      *c) ☐ None of the:
      1. ☐ Certified copies of the priority documents have been received.
      2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
      3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).
   * Certified copies not received: _____ .

   Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application.
   **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.
   ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of
      Paper No./Mail Date _____ .
   **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**
1. ☑ Notice of References Cited (PTO-892)
2. ☑ Information Disclosure Statements (PTO/SB/08),
   Paper No./Mail Date _____
3. ☐ Examiner's Comment Regarding Requirement for Deposit
   of Biological Material _____ .
4. ☑ Interview Summary (PTO-413),
   Paper No./Mail Date. _____ .

5. ☑ Examiner's Amendment/Comment
6. ☑ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____ .

| /MAINUL HASAN/<br>Examiner, Art Unit 2489 | /GIMS S PHILIPPE/<br>Primary Examiner, Art Unit 2489 |
|---|---|

Application/Control Number: 14/725,490                                      Page 2
Art Unit: 2489

# DETAILED ACTION

## *Notice of Pre-AIA or AIA Status*

The present application, filed on or after March 16, 2013, is being examined under the first inventor to file provisions of the AIA.

# EXAMINER'S AMENDMENT

An Examiner's amendment to the record appears below. Should the changes and/or additions be unacceptable to Applicant, an amendment may be filed as provided by 37 CFR 1.312. To ensure consideration of such an amendment, it MUST be submitted no later than the payment of the issue fee.

Applicant's Representative, Michael E. Robinson, during a telephone interview on September 14, 2018, gave the Examiner an authorization to fix the typographical error (from Previously Presented to Currently Amended) of the identifier in claim 24 designation as follows:

## *In the claim*

Claim 24. (<u>Currently Amended</u>)  A method of assessing a railway track bed, the method comprising the steps of:

a. defining a three dimensional elevation map based on surface elevation and intensity data representative of an area segment of the railway track bed, the data gathered by a sensor sensing reflected light from a track bed surface;

b. storing the elevation map in a data storage apparatus;

c. identifying a railway track bed feature from the elevation map using a processor, further comprising the sub-steps of:

Application/Control Number: 14/725,490                                                                 Page 3
Art Unit: 2489

i. defining an appropriate gradient neighborhood representing a small 2D track section over which differential vertical measurements are calculated and

ii. moving the gradient neighborhood like a sliding window over the 3D elevation data using the processor; and

d. storing information corresponding to the identified railway track bed feature in the data storage apparatus.

### *Allowable Subject Matter*

Claims 1-21, 24-45 are allowed.

The following is an examiner's statement of reasons for allowance:

Claim 1 discloses a system of assessing a railway track bed consisting of a power source, light source, data storage unit, a processor and at least a sensor for capturing reflected lights from the track bed for acquiring three-dimensional surface elevation and intensity data, wherein the processor executes an algorithm to carry out the steps of acquiring 3D surface elevation data and intensity data, generating track elevation map and identifying track bed feature from the elevation map by defining an appropriate gradient neighborhood of a 2D track section for calculating differential vertical measurements by moving the gradient neighborhood as a sliding window over the 3D elevation data and finally storing the identified track bed feature into the storage unit.

The reference of **Kainer et al. (US PGPub 2013/0191070 A1)** teaches a railway bed feature measurement system having power source, light source, storage unit, processor and plurality of image sensors which captures the reflected lights from the railway track for determining 3D elevation map of the railway track for storage into the storage unit. On the other

Application/Control Number: 14/725,490                                         Page 4
Art Unit: 2489

hand, **Farritor (US PGPub 2012/0300060 A1)** teaches a system in the same field of endeavor, where it describes calculating image intensities from the captured image data, none of them teaches the process of defining an appropriate gradient neighborhood of a 2D track section for calculating differential vertical measurements by moving the gradient neighborhood as a sliding window over the 3D elevation data. As a result **Kainer et al.** alone or in combination with **Farritor** fail(s) to teach all the elements of the independent claim 1 and therefore stands allowable. For the same reason as mentioned above, the independent claim 24, which is a method claim of the corresponding system claim 1 stand allowable. Rest of the claims are directly or indirectly dependent on the independent claims and therefore stand allowable.

Any comments considered necessary by applicant must be submitted no later than the payment of the issue fee and, to avoid processing delays, should preferably accompany the issue fee. Such submissions should be clearly labeled "Comments on Statement of Reasons for Allowance."

*Conclusion*

Any inquiry concerning this communication or earlier communications from the examiner should be directed to MAINUL HASAN whose telephone number is (571)272-0422. The examiner can normally be reached on MON-FRI: 10AM-6PM, Alternate FRIDAYS, EST.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, JORGE L. ORTIZ-CRIADO can be reached on (571)272-7624.  The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system.  Status information for published applications

Application/Control Number: 14/725,490                                                    Page 5
Art Unit: 2489

may be obtained from either Private PAIR or Public PAIR.  Status information for unpublished

applications is available through Private PAIR only.  For more information about the PAIR

system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR

system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would

like assistance from a USPTO Customer Service Representative or access to the automated

information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/M. H./

Examiner, Art Unit 2489




/GIMS S PHILIPPE/
Primary Examiner, Art Unit 2489