Joseph R. Re (SBN 134,479)
joe.re@knobbe.com
Christy G. Lea (SBN 212,060)
christy.lea@knobbe.com
Nicholas M. Zovko (SBN 238,248)
nicholas.zovko@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Phone: (949) 760-0404
Facsimile: (949) 760-9502

Payne McQueen Montgomery (*Pro Hac Vice*)
mack.montgomery@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
1717 Pennsylvania Ave. N.W., Ste. 900
Washington D.C. 20006
Phone: (202) 640-6400
Facsimile: (202) 640-6401
*Attorneys for Plaintiff/Counterclaim Defendant*
PAVEMETRICS SYSTEMS, INC.

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| PAVEMETRICS SYSTEMS, INC., <br><br> Plaintiff, <br><br> v. <br><br> TETRA TECH, INC., <br><br> Defendant. <br><br> AND RELATED COUNTERCLAIMS | Case No. 2:21-cv-1289-MCS-MMA <br><br> **DECLARATION OF DAVID FRAKES, PHD, IN SUPPORT OF PAVEMETRICS' RESPONSIVE CLAIM CONSTRUCTION BRIEF** <br><br> Honorable Mark C. Scarsi <br> Honorable Maria A. Audero |

TABLE OF CONTENTS

I. BACKGROUND ........................................................................................... 1

    A.    EXPERIENCE AND QUALIFICATIONS ........................................ 1

    B.    MATERIALS CONSIDERED ........................................................... 3

    C.    LEGAL STANDARDS ..................................................................... 4

    D.    PERSON OF ORDINARY SKILL IN THE ART .............................. 6

II. THE ASSERTED PATENTS AND DISPUTED CLAIM TERMS ................... 7

III. OPINIONS ............................................................................................... 8

    A.    "Identifying" ('293 Patent) ............................................................ 8

    B.    "Appropriate Gradient Neighborhood" ('293 Patent) ......................... 9

    C.    "2D Track Section Over Which Differential Vertical Measurements Are Calculated" ('293 Patent) ....................... 12

    D.    "Sliding Window" ('293 Patent) ................................................... 13

    E.    "Moving the Gradient Neighborhood Like a Sliding Window Over the 3D Elevation Data" ('293 Patent) ....................... 15

    F.    "Comprising The Steps Of:" a, b, c, d ('293 Patent) ......................... 16

    G.    "Tie Surface Plane Model" ('557 Patent) ........................................ 17

    H.    "Tie Bounding Box" ('557 Patent) ................................................. 18

    I.    "Small Area" and "Small Length" ('557 Patent) .............................. 18

I, David Frakes, declare and state as follows:

1.     I am currently a Distinguished Faculty Fellow at the Georgia Institute of Technology, where I am a jointly appointed Associate Professor in the Wallace H. Coulter Department of Biomedical Engineering and the School of Electrical and Computer Engineering.  I submit this Declaration in support of the answering claim construction brief of Pavemetrics Systems, Inc.

2.     I am being compensated at my standard hourly rate of $500 per hour for my time.  My compensation does not depend on the content of this declaration or the outcome of this proceeding.  I have no financial interest in this case or the products in this case.

## I. BACKGROUND

### A.     EXPERIENCE AND QUALIFICATIONS

3.     Attached as Exhibit I is a true and correct copy of my curriculum vitae (CV).

4.     I am a Distinguished Faculty Fellow at the Georgia Institute of Technology, where I am a jointly appointed Associate Professor in the Wallace H. Coulter Department of Biomedical Engineering and the School of Electrical and Computer Engineering.  I am the principal investigator of the Georgia Tech Applied Vision Lab.  I also maintain adjunct professor appointments at Arizona State University and the Mayo Clinic.

5.     I also currently consult for Google, writing code for camera and sensor fusion applications.  Prior to joining the faculty at Georgia Tech and consulting for Google, I worked in industry at Apple, Google, and various startups, including roles in the field of computer or machine vision for numerous years.  I also served on the faculty, including as a professor, at various higher learning institutions, including Arizona State University.

6.     I hold a Ph.D. in Bioengineering and a Masters in Electrical Engineering that I earned in 2003 from Georgia Tech.  In 2002, I earned a

Masters in Mechanical Engineering from Georgia Tech. In 1998, I graduated with a Bachelor of Science in Electrical Engineering (High Honors) from Georgia Tech.

7. While working on my masters and Ph.D. at Georgia Tech from 1999 to 2003, I served as a Graduate Research Assistant in the Georgia Tech Cardiovascular Fluid Mechanics Laboratory and the Georgia Tech Center for Signal and Image Processing (CSIP).

8. After receiving my Ph.D., from 2003 to 2008, I founded and served as the Chief Technology Officer of 4-D Imaging, Inc., a start-up company focused on the computer vision space. During my time there, I managed teams of software engineers and research scientists creating computer vision algorithms and other products for the biomedical industry and also completed a number of awards and contracts for the United States Armed Forces.

9. From 2003 to 2005, I also served as a Postdoctoral Fellow in the Georgia Tech/Emory School of Biomedical Engineering where I conducted NIH-funded basic and clinical research in cardiovascular bioengineering, biomedical imaging, and image processing.

10. In 2008, I became a jointly appointed Assistant Professor at Arizona State University in both the School of Biological and Health Systems Engineering and the School of Electrical, Computer, and Energy Engineering. In 2014, I was promoted to Associate Professor with tenure, and in 2015, I was named the Fulton Entrepreneurial Professor for the Ira A. Fulton Schools of Engineering at Arizona State University. While at Arizona State University, I led the Image Processing Applications Laboratory, which applied image and video processing and computer vision, among other technologies.

11. From 2015 to 2017, I was the Technical Lead and Manager of Mobile Vision in the Google Advanced Technologies and Projects (ATAP) Group. I led a team of approximately 100 engineers creating new computer

vision products in mobile hardware/software and immersive commerce via the DARPA innovation model.

12.     From 2017 to 2019, I was the Technical Lead and Manager of Lens Labs at Google Daydream where I led research teams (about 30 engineers) behind Google Lens, an engine that lets you "search what you see."  I was also responsible for teams creating augmented reality and computer vision-based features in AR Core and Google Lens.

13.     From 2019 to 2020, I was the Lead of Camera Software at Apple, leading a team that creates camera software, including image processing software, for the iPhone.

14.     I served for several years as an Associate Editor of the IEEE Transactions on Image Processing and served multiple times on the Organizing Committee for the IEEE International Conference on Image Processing.

15.     Since 2003, I have published more than 30 peer-reviewed journal articles relating to computer vision, as well as many more peer-reviewed conference papers.  I have also published multiple books and/or book chapters relating to computer vision.

16.     I am also an inventor on more than 10 patents and patent applications in the computer vision space.

17.     Based on my education and experience, I am an expert in the field of computer vision.  I have used my education, years of experience in this field, and my understanding of the knowledge, creativity, and experience of a person of ordinary skill in the art, to form the opinions expressed in this declaration.

**B.     <u>MATERIALS CONSIDERED</u>**

18.     In formulating my opinions, I have reviewed a variety of materials and made use of my own experience, including my years of reviewing and writing computer vision code, researching and teaching in computer vision, launching computer vision companies, and managing computer vision

-3-

engineers.  I have identified the materials I relied on in the table below, and their corresponding exhibit number, if marked as an exhibit.  I understand that Exhibits A–H (ECF 86-2 to 86-9) were attached to the Declaration of Aaron Parker in Support of Tetra Tech's Opening Claim Construction Brief (ECF 86-1).  I understand that Exhibit I will be attached to this declaration, and that Exhibits J–L will be attached to the Declaration of Payne McQueen Montgomery in Support of Pavemetrics' Responsive Claim Construction Brief.

| Title | Exhibit |
|---|---|
| U.S. Patent No. 10,362,293 | A |
| U.S. Patent No. 10,616,557 | B |
| BERND JÄHNE ET AL., HANDBOOK OF COMPUTER VISION AND APPLICATIONS: VOLUME 2 SIGNAL PROCESSING AND PATTERN RECOGNITION  (1st ed. 1999) | C |
| INTEL, INTEL INTEGRATED PERFORMANCE PRIMITIVES FOR INTEL ARCHITECTURE REFERENCE MANUAL, VOLUME 2: IMAGE AND VIDEO PROCESSING (MARCH 2009) | D |
| ROBERT B. FISHER ET AL., DICTIONARY OF COMPUTER VISION AND IMAGE PROCESSING (2d ed. 2014) | E |
| DOUGLAS E. DOWNING ET AL., DICTIONARY OF COMPUTER & INTERNET TERMS (10th ed. 2009) | F |
| Declaration of Dr. Vassilios Morellas in Support of Tetra Tech's Opening Claim Construction Brief | H |
| Curriculum Vitae of Dr. David Frakes | I |
| Excerpts from the prosecution history of U.S. Patent No. 10,362,293 | J |
| THE MATHWORKS, IMAGE PROCESSING TOOLBOX FOR USE WITH MATLAB: USER'S GUIDE VERSION 5 (2004) | K |
| ROBERT M. HARALICK & LINDA G. SHAPIRO, GLOSSARY OF COMPUTER VISION TERMS, 24 PATTERN RECOGNITION 69 (1991) | L |
| Ex. A  to Tetra Tech's First Supplemental Infringement Contentions | N/A |
| Tetra Tech's Opening Claim Construction Brief | N/A |

## C.   LEGAL STANDARDS

19.   I am informed by counsel that the parties in this litigation disagree regarding the proper interpretation of certain claim limitations in the '293 and '557 patents.  I have been asked to provide my opinion about how a person of ordinary skill in the art would have understood the disputed limitations.

20.    I am an engineer by training and profession.  The opinions I am expressing in this declaration involve the application of my education, training, and technical knowledge and experience to evaluate certain technical documents with respect to the '293 patent.

21.    Although I am a named inventor on patents and familiar with them, I am not an attorney or an expert in patent law.  Therefore, counsel have advised me of certain principles of patent law applicable that I have used in arriving at my determinations and opinions.   The paragraphs below express my understanding of how I must apply these principles in forming my opinions, based on information provided to me by Pavemetrics' counsel.

22.    As I understand from counsel, claim construction is the process by which a court determines the scope and meaning of terms used in the claims of a patent.  I further understand that the goal of this process is to give claim terms the ordinary and customary meaning they would have had to a person of ordinary skill in the art at the time of the invention, taking into account the entire patent and prosecution history.

23.    I further understand that the patent specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise have to a person of ordinary skill in the art.  In such cases, I understand that the patentee's definition controls.

24.    I understand that the prosecution history of a patent can inform the meaning of the claim language and must be considered in construing the claims.

25.    I understand that a court may consider extrinsic evidence, such as technical dictionaries, treatises, and expert opinions to understand the underlying technology and the way in which claim terms would have been understood by a person of ordinary skill in the art at the relevant time.  However, such extrinsic evidence has lesser weight than the intrinsic evidence.

26.    I understand that the purpose of a patent claim is to set forth the

boundaries of a patentee's claimed invention, such that a person of ordinary skill in the art would understand what falls inside and outside the scope of the claimed monopoly.  I also understand that claims of a patent, taken in context with the specification and prosecution history, must inform those of skill in the art about the scope of the invention with reasonable certainty.  To that end, claims must be precise enough to provide clear notice of what is claimed and what is still open.  Stated differently, from a scientific and engineering perspective, the claim should provide sufficient guidance to permit one of skill in the art to design, produce, and/or manufacture a product within or outside the scope of a claim as desired (or at least determine definitely what would fall within or outside the parameters of a claim).

27.   I understand that a patent claim term is deemed "indefinite" if, when viewed in light of the specification and prosecution history, the term fails to inform with reasonable certainty those skilled in the art about the scope of the invention.  I further understand that definiteness is to be evaluated from the perspective of one with skill in the relevant art at the time the patent was filed ("POSA").  For the purpose of this declaration, I understand the time of alleged invention to be around 2015.  My opinions set forth herein are from the perspective of a POSA at the time of the alleged invention.

**D.    PERSON OF ORDINARY SKILL IN THE ART**

28.   It is my understanding that when interpreting the claims of the '293 patent, I must do so based on the perspective of a POSA at the relevant priority date.  I understand that the earliest claimed priority date is February 20, 2015.

29.   I understand that Tetra Tech's expert, Dr. Morellas, opined that a POSA would have had a bachelor's degree in electrical engineering, computer engineering, mechanical engineering, computer science, physics, or a related field, and at least four years of experience (or the academic equivalent) in the field of computer vision.  Ex. H ¶25.  I agree with Dr. Morellas, but would add

that the POSA would have had an understanding of algorithms used to process data for image processing.

30.     Although I exceeded the qualifications for a POSA in 2015, I am familiar with the knowledge of a POSA in 2015 because by 2015, I had written and read numerous research papers and much software code relating to algorithms used for image processing.  I had also taught many students about image processing algorithms and worked with, trained, and supervised numerous engineers writing such algorithms for computer vision applications. Based on this experience, I know very well how a POSA would have interpreted and understood the claims of the '293 and '557 patents.

## II.  THE ASSERTED PATENTS AND DISPUTED CLAIM TERMS

31.     I understand that Tetra Tech has filed the present lawsuit against Pavemetrics, and alleges infringement of the following claims:

| Patent | Asserted Claims |
|--------|-----------------|
| '293 | 1, 2, 4, 15, 16, 19–22, 23, 25, 36, 37, 40–42, 43 |
| '557 | 8–10, 14 |

32.     I have been asked to consider the definition and scope of the following terms used in the '293 and '557 patents:

| Claim Term or Phrase | Patent |
|----------------------|--------|
| "identifying" | '293 |
| "appropriate gradient neighborhood" | '293 |
| "2D track section over which differential vertical measurements are calculated" | '293 |
| "sliding window" | '293 |
| "moving the gradient neighborhood like a sliding window over the 3D elevation data" | '293 |
| "comprising the steps of:" a, b, c, d | '293 |
| "tie surface plane model" | '557 |
| "tie bounding box" | '557 |
| "small area" | "small length" | '557 |

### III.  OPINIONS

**A.  "Identifying" ('293 Patent)**

33.  The '293 patent contains numerous claim limitations reciting "identifying" a railway track bed feature.  For example, Claim 1 requires "identifying a railway track bed feature from the track elevation map."

34.  The '293 patent does not define or describe "identifying." Therefore, I believe a POSA would have understood "identifying" in the '293 patent to denote the ordinary meaning as used in computer vision.  A POSA reading the '293 patent would have understood "identifying" to mean "assigning a class to a portion of the [3D map] based on a predetermined rule or model."

35.  "Identifying" an object from image data, even 3D data, is considerably more complicated for a computer than for a human.  To quote a colleague in the field of computer vision, humans "perceive the three-dimensional structure of the world around us with apparent ease."  RICHARD SZELISKI, COMPUTER VISION: ALGORITHMS AND APPLICATIONS 3 (Aug. 2010 preprint draft), available at http://szeliski.org/Book/drafts/SzeliskiBook _20100903_draft.pdf.  Humans can intuitively identify objects with little to no conscious effort.

36.  In contrast, computers must rely on mathematical descriptions of reality and mathematical techniques for "understanding" those descriptions of reality.  In my opinion, Pavemetrics' definition of "identifying" correctly makes explicit the mathematical underpinnings of how a computer can "identify" an object.  For example, a human may not consciously define a relationship between a particular object to its visual representation.  However, a computer must do so—it must assign the visual representation a particular identification, i.e., a class.

37.  The definition from the *Glossary of Computer Vision Terms* cited by Pavemetrics clarifies the difference between human and computer

-8-

perception, reflecting how a POSA would have understood "identifying."  *See* Ex. L at 122.  In my opinion, this confirms the accuracy of Pavemetrics' definition.

38.    Unlike a human's ability to intuit what an object might be, computers traditionally require pre-programmed logical rules to interpret an image.  Without instructions from a human, a computer has no context to relate the image data to what a human would understand that image data to represent—its "identification" could only be random or arbitrary.  Accordingly, "identifying" requires that the process be "based on a pre-determined rule or model," reflecting the common-sense basics of how computer vision works.

39.    I have reviewed Tetra Tech's First Supplemental Infringement Contentions.  Tetra Tech alleges that Pavemetrics' LRAIL identifies a railway track bed feature from the track elevation map when an LRAIL algorithm "applies an elevation threshold to filter out data."  But the source code comments explain that the function works to "revise" and "fine-tune" the "rail mask" to eliminate pixels mistakenly identified as part of the rail.  I understand that the "rail mask" is a data structure representing the pixels previously identified as part of the rail.

40.    A POSA would not have understood the ordinary meaning of "identifying" a feature to include filtering data artifacts from an existing identification of the rail.  A POSA would have understood this refinement as a separate process from feature identification.

**B.    "Appropriate Gradient Neighborhood" ('293 Patent)**

41.    Claims 1 and 22 of the '293 patent require "defining an appropriate gradient neighborhood."  "Appropriate gradient neighborhood" is not a phrase I have seen used in computer vision, but "gradient" and "neighborhood" are computer vision terms.

42.    A POSA would have understood "gradient" in a mathematical

sense, referring to the rate of change of a quantity over a certain distance in a particular direction.  For instance, the mathematical "gradient" operator refers to a calculation of the derivative of a function across multiple dimensions.   In three-dimensional space, the result of this calculation is a vector indicating the magnitudes and directions of changes in the function at a point.

43.    Gradient calculations are common in image processing and computer vision.  For example, gradient calculations are frequently used as a part of edge detection algorithms.  Edge detection is a fundamental component of most image processing and computer vision algorithms.

44.    In the context of the '293 patent, a POSA would have understand "gradient" as used in "appropriate gradient neighborhood" to mean a "railway track bed height change at a point."   The specification of the '293 patent explains that "appropriate gradient neighborhood" is applied "to the 3D elevation data" of the railway track bed, and the "resulting vertical gradient map represents the maximum 3D gradient at each elevation map measurement point." *See, e.g.*, Ex. A, 10:26–37.  A POSA would have therefore understood the gradient of the 3D elevation data at particular point in the railway track bed as the magnitude and direction of the elevation (i.e., height) change at that point.

45.    When calculating gradients in image processing and computer vision applications, POSAs often rely on neighborhood operators.  A POSA would have understood "neighborhood" in "appropriate gradient neighborhood" in this familiar and commonly used context of calculating a gradient using a neighborhood operator.  Neighborhood operators work by first defining a set of pixels based on their locations relative to a given pixel in an input image.  Then, a mathematical function is applied to the values of the pixels in the neighborhood, and the result of that function is set as the value of the given pixel in the output image.  A POSA would have accordingly understood that a "gradient neighborhood" includes numbers representing the coefficients of the

mathematical function that are applied to neighborhood pixels in the image to calculate the gradient.

46.     To calculate a gradient using a neighborhood operator, the neighborhood must first be defined.   Numerous sizes and shapes of neighborhoods may be used in computer vision.   As to size, in my opinion, a POSA would have understood that a neighborhood always includes more than one pixel.   As to shape, typically neighborhoods are rectangular shaped.  *See* Ex. D at 196.   Regardless of which size and shape are chosen, to define the neighborhood, a size and shape must be chosen.   Since different sizes and shapes of neighborhoods have different advantages and disadvantages, in my opinion, a POSA would have understood that the neighborhood must be defined according to pre-determined criteria for the acceptable sizes and shapes.   This is supported by the specification of the '293 patent, which sets forth specific examples of acceptable sizes and shapes for the neighborhoods discussed within the specification. *See, e.g.*, Ex. A, 9:54–56 ("A suitable neighborhood 30 as shown in FIG. 5 is preferably a 10 mmx30 mm gradient area."), 10:28–31 ("This rail head edge neighborhood represents a small 2D track bed surface area over which differential vertical measurements are calculated (block 44), the example given herein is an area of 10 mmx30 mm."), 11:53–56 ("This rail base edge neighborhood represents a small 2D track bed surface area over which differential vertical measurements are calculated (block 84), the example given herein is an area of 10 mmx30 mm."), 12:46–49 ("This rail base surface neighborhood represents a small 2D surface area over which statistical measurements are calculated (block 108), for example, an area of 10 mmx75 mm.").   Accordingly, a POSA would have understood the ordinary meaning of "neighborhood" to reflect that the neighborhood has a predetermined size and shape.

47.     Tetra Tech asserts in its infringement contentions that an algorithm

it characterizes as comparing "[t]he elevation value of the area defined by each 2D window" "to the mean value of the rail head's surface plus the elevation threshold" meets the "appropriate gradient neighborhood" limitation.  A POSA would not have understood a comparison of the mean elevation value of the rail head's surface plus a fixed tolerance threshold to the elevation of a point on a rail as being a "gradient."

## C.   <u>"2D Track Section Over Which Differential Vertical Measurements Are Calculated" ('293 Patent)</u>

48.   Claims 1 and 22 of the '293 patent require that the appropriate gradient neighborhood represents "a small 2D track section over which differential vertical measurements are calculated."  A POSA would have understood this to mean an "area of the railway track bed selected for calculating changes in railway track bed height over the area."

49.   A POSA reading the '293 patent would have understood that a "2D track section" means "area of the railway track bed."  I believe this because the specification explains that "'Track', 'Railway track', 'track bed' or 'railway track bed' is defined herein to mean **a section of railway** including the rails, ties, components holding the rails to the ties, components holding the rails together, and ballast material." Ex. A, 8:49–52 (emphasis added).  Furthermore, a POSA would have understood a "2D section" to mean an "area."

50.   A POSA reading the '293 patent also would have understood that "differential vertical measurements" means "changes in railway track bed height."  A POSA would have understood that "differential measurements" refer to the calculation of a difference, i.e., a change over time or space.  In the context of the '293 patent, in which elevation of the railway track bed is measured, a POSA would have understood these "differential *vertical* measurements" to be changes in railway track bed height.

51.   Furthermore, a POSA reading the '293 patent would have

understood that the 2D track section is the area "selected for calculating" the changes in railway track bed height over that area.  Claims 1 and 22 require that the differential vertical measurements are calculated "over" the 2D track section.  A POSA would have considered making differential vertical measurements "over" an area to mean selecting that area for calculating differential vertical measurements.

**D.    "Sliding Window" ('293 Patent)**

52.    Claims 1 and 22 of the '293 patent contain claim limitations reciting a "sliding window."  Defining "sliding window" as a "component of an image-processing algorithm in which a calculation is based on a neighborhood or window of data about a pixel, and after the calculation at that pixel, the neighborhood (window) moves (slides) to an adjacent pixel for a calculation at the adjacent pixel" accurately reflects how as POSA would have understood "sliding window" when reading the claims of the '293 patent.

53.    I understand that Dr. Morellas opined that "the term 'sliding window' is commonly known in the art."  Ex. H ¶50.  I agree with Dr. Morellas.  In my opinion, "sliding window" is a term of art in computer vision referring to a particular algorithmic method for performing certain types of calculations, such as convolving an image filter with an image.  The technical dictionary definition cited by Pavemetrics accurately reflects how a POSA would have understood the term "sliding window."  *See* Ex. E at 209 ("A common component of an image-processing (and signal-processing) algorithm whereby the calculation is based on a neighborhood or window of data about the current point.  After the calculation is done at the given point, the calculation typically moves to an adjacent point and the neighborhood (window) moves (slides) to that adjacent point.").

54.    I understand that Dr. Morellas opined that "the specification does not describe, let alone mandate, a requirement that movement of the gradient

neighborhood 'like a sliding window' must be 'about a single pixel' and subsequently 'to an adjacent pixel for calculation at the adjacent pixel[.]'" Ex. H ¶51.

55.    First, I disagree with Dr. Morellas about the relevance of his assertion.  Even if the specification shed no light on this point, a POSA would have understood that sliding windows ordinarily involve calculations based on a neighborhood of data "about a single pixel" and ordinarily move "to an adjacent pixel for calculation."  When the dictionary definition refers to the calculation "typically" moving to an adjacent pixel, it is allowing for unusual or atypical edge cases.  *See* Ex. E at 209.  Ordinarily, a "sliding window" must move to the adjacent pixel to properly function.  In my opinion, a POSA would have understood that a sliding window ordinarily moves to an adjacent pixel.

56.    Second, I disagree with Dr. Morellas's assertions that the specification does not describe a calculation "about a pixel" or the movement of a "sliding window" to an adjacent pixel.

57.    As to the former, a POSA would have understood the calculations to be "about a pixel" because a *neighborhood* is being moved like a sliding window, and, for the reasons I stated previously, neighborhoods involve two-dimensional sets of pixels including coefficients for making calculations "about a pixel."

58.    As to the latter, the specification describes that the gradient neighborhood is "moved like a window sequentially and completely for each position in the railway track bed elevation data."  Ex. A, 10:33–35, 11:61–63.  In my opinion, a POSA would have understood that to move a sliding window "completely for each position" in the elevation data, the sliding window must move to each pixel of elevation data without skipping any pixels.  Further, a POSA would have understood from the neighborhood being moved "sequentially" implies that the window moves from one pixel to a consecutive

-14-

pixel.

59.    Accordingly, a POSA would have understood the claims and specification of the '293 patent to support a definition of sliding window in which "a calculation is based on a neighborhood or window of data about a pixel" and "the neighborhood (window) moves (slides) to an adjacent pixel for a calculation at the adjacent pixel."

60.    I understand that Dr. Morellas opined that the dictionary definition for "sliding window," Ex. E at 209, includes an image that "does not show movement of the [sliding] window to an adjacent pixel."   Ex. H ¶52.   Dr. Morellas is incorrect.



61.    A POSA would have understood that this image illustrates a sliding window as one box, representing the "window," with an arrow to another box, representing the "sliding" of the window to a new position.   The dictionary definition of "sliding window" explains that "the calculation is based on a neighborhood or window of data about the current point."   Ex. E at 209. As I explain above, a POSA would have understood that a "neighborhood" or "window of data" includes multiple pixels.   Since the "window" in the image does not include any representation of the pixels within the window or within the image, it is misleading to characterize the image as not showing movement of the sliding window to an adjacent pixel.

**E.    "Moving the Gradient Neighborhood Like a Sliding Window Over the 3D Elevation Data" ('293 Patent)**

62.    Claims 1 and 22 of the '293 patent require the step of "moving the gradient neighborhood like a sliding window over the 3D elevation data using the processor" to identify a railway track bed feature from the track elevation

map. A POSA reading the patent would have understood this phrase to mean "sequentially and completely applying the gradient neighborhood to the 3D elevation data and calculating differential vertical measurements for each position."

63. A POSA would have understood when calculations are made using a sliding window application of a gradient neighborhood, the gradient is calculated for the center pixel based on each pixel in the window before the neighborhood slides to the next center pixel. Claims 1 and 22 of the '293 patent require only that the gradient neighborhood be defined once before being applied to the data and moved like a sliding window. Accordingly, a POSA would have understood that "differential vertical measurements" are calculated as the gradient neighborhood moves like a sliding window, not only when the gradient neighborhood is defined. Otherwise, the gradient would be calculated only at a single pixel, which a POSA would not have understood as calculating a "vertical gradient map" that represents the gradient "at each elevation map measurement point." Ex. A, 10:35–37.

64. Tetra Tech's infringement contentions repeatedly equate functions iterating through a stationary array pixel-by-pixel with "moving the gradient neighborhood like a sliding window over the 3D elevation data." A POSA would not have understood iterating through an array of elevation data pixel-by-pixel as "moving a gradient neighborhood like a sliding window."

**F.   "Comprising The Steps Of:" a, b, c, d ('293 Patent)**

65. Claims 1 and 22 of '293 patent require that a processor be configured to run an algorithm comprising four steps. In my opinion, a POSA would have understood that the claimed steps must be performed in order for the invention to function.

66. For example, in my opinion, a POSA would have understood that step (b) of Claim 22, "storing the elevation map in a data storage apparatus,"

must be performed before step (c), "identifying a railway track bed feature from the elevation map."  A POSA would have understood that to identify a feature from the elevation map, algorithms must process the elevation map.  For algorithms to process the elevation map, the elevation map must be stored in the computer's memory.  If the elevation map were not retained in the computer's memory in some fashion, the algorithms would have no data to process.  The specification defines a "data storage apparatus" to include both volatile and non-volatile memory. Ex. A, 9:5–6.  A POSA would have therefore understood the storage of the elevation map in memory as required to process the elevation map to identify a railway track bed feature from it to be "storing the elevation map in a data storage apparatus."  Accordingly, a POSA would have understood that step (b) of Claim 22 must be performed before step (c).

**G.    "Tie Surface Plane Model" ('557 Patent)**

67.    Claim 8 of the '557 patent requires "comparing ties in the elevation data with a tie surface plane model by calculating the difference between the tie surface elevation data and the tie surface plane model using the processor."  A POSA reading the '293 patent would have understood "tie surface plane model" to mean "an approximation of the like-new surface of the entire tie based on an industry standard tie model."

68.    I am unaware of a commonly understood meaning of "tie surface plane model" used in computer vision.

69.    Further, although a POSA might have understood "surface plane model" to mean an idealized or assumed depiction of a plane representing the surface as an object, the '557 patent uses the terms "tie surface plane approximation," Ex. B, 16:4–5, "approximating tie surface plane," *id.*, 16:12, "approximated tie surface plane," *id.*, 16:14, and "approximate tie surface plane," *id.*, 17:15, for example.  Because the '557 patent describes an approximation of a plane representing the surface of a tie in these ways, a POSA

-17-

would have understood that "tie surface plane model" must have meant something different than "tie surface plane" or an approximation of the "tie surface plane."

H.   **"Tie Bounding Box" ('557 Patent)**

70.   The '557 patent contains claim limitations reciting a "tie bounding box."  A POSA reading the specification would have understood the patent to define "tie bounding box" to mean "the physical edge boundaries of a tie, defined by matching the elevation data to industry standard tie models."

71.   A POSA would have understood from the specification that "industry standard tie models," Ex. B, 15:7, "standard tie physical models," *id.*, 15:2, or "all available crosstie models," *id.*, 15:57–58, are interchangeable.  The specification explains that "standard tie physical models" are used to "produce the physical edge boundaries of each detected tie (a tie bounding box 154) as shown in FIG. 17," *id.*, 15:2–4, that "industry standard tie models" "assist in correctly defining" the tie bounding box, *id.*, 15:7–8, and that the "best fit tie bounding box" is defined after calculating the best match of "all available cross tie models" to the elevation data, *id.* 15:57–63.  Because each of these three instances of models are all used to define the tie bounding box and the specification does not express any difference between the three, in my opinion, a POSA would have understood them to refer to the same models of a tie.

I.   **"Small Area" and "Small Length" ('557 Patent)**

72.   Claim 10 of the '557 patent requires "eliminating small area and small length tie crack targets using the processor."  The '557 patent fails to inform a POSA with reasonable certainty about the scope of "small area" and "small length."

73.   "Small" does not have a commonly understood meaning in computer vision.  A POSA's general knowledge of computer vision would not have provided adequate information to determine whether a railroad tie crack

target has a "small area" or "small length."

74.     Further, a POSA in computer vision would ordinarily provide software or algorithmic solutions to identify features of interest but would not necessarily understand which features would be of interest to the end user.  For example, in my opinion, a POSA in the field of computer vision would not have understood the size of crack in a railroad tie that would be significant enough to report as a track defect.

75.     Nor does the '293 patent or its file history provide sufficient information to clarify with reasonable certainty when a tie crack target has a "small area" or "small length."  I understand that Dr. Morellas opined that the "specification apprises a POSA of what a tie crack area and length represent," and "further explains how the area and length are used in detecting tie crack targets" and that for Dr. Morellas, this "provides an objective basis for a POSA to ascertain whether a given tie crack area or length area and length represents a small area and length, such as through the use of minimum area and length thresholds."  Ex. H ¶86.  I disagree with Dr. Morellas.  The portions of the specification he cites provide an objective basis to understand crack *area* or *length*, but explaining that the claim involves "the use of minimum area and length thresholds" and how those thresholds might be calculated still misses one important piece of information—where to set the threshold.  Unlike other thresholds described in the specification of the '557 patent, such as the minimum height threshold, the specification does not provide an exemplary size of the "minimum crack depth threshold" or "minimum crack length (extent) threshold."  *Compare* Ex. B, 9:61–65, *with* 16:28–33.

76.     Knowledge that a minimum crack length threshold exists does not resolve whether a 10mm long crack would be a "small" crack failing to meet that minimum length threshold.  Without this information, a POSA would have not understood with reasonable certainty whether the eliminating of certain

1  cracks by an allegedly infringing method meets the claim or not.

2         I declare under penalty of perjury that the foregoing is true and correct.

3  Executed on October 18, 2021 at Atlanta, Georgia.

4

5                              /s/

                              David Frakes, Ph.D

6  54391878

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-20-