1
2
3
4
5
6
7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10   Pavemetrics Systems, Inc.,          |   Case No. 2:21-cv-01289-MCS-MAA

11          Plaintiff,                    |   **CLAIM CONSTRUCTION ORDER**

12

13          v.

14   Tetra Tech, Inc.,

15

16          Defendant.

17   _____

18   Tetra Tech, Inc.,

19          Counterclaim Plaintiff,

20   Tetra Tech TAS Inc.,

21

22          Third-Party Counterclaim
            Plaintiff,

23

24   v.

25   Pavemetrics Systems, Inc.,

26          Counterclaim Defendant.

27   _____

28

In this action, Tetra Tech, Inc. and Tetra Tech TAS Inc. (collectively, "Tetra Tech") allege that Pavemetrics Systems, Inc. ("Pavemetrics") has infringed U.S. Patent Nos. 10,362,293 (the "'293 Patent") and 10,616,557 (the "'557 Patent") (collectively, "the Patents-in-Suit"). First Amended Counterclaim ("FAC," ECF No. 79.)

The parties have filed a Joint Claim Construction and Prehearing Statement ("JCCPS"). (ECF No. 85.) Tetra Tech filed an opening claim construction brief, two declarations, and seven exhibits. (*See* "Opening Br.," ECF No. 86; *see also* "Parker Decl.," ECF No. 86-1; "Morellas Decl." ECF No. 86-9; ECF Nos. 86-2 – 86-8.) Pavemetrics filed a responsive claim construction brief, two declarations, and three exhibits. (*See* "Resp. Br.," ECF No. 87; *see also* "Montgomery Decl." ECF No. 87-1; "Frakes Decl.," ECF No. 88; ECF Nos. 87-2 – 87-4, 88-1.) Tetra Tech filed a reply brief, and Pavemetrics filed a sur-reply brief. *See* ECF No. 59 (Plaintiff's Opening Brief ("Pl. OB")); ECF No. 89 (Tetra Tech's Reply Brief ("Reply")); ECF No. 92 (Pavemetrics's Sur-Reply Brief ("Sur-reply")). Finding the parties' disputes suitable for resolution without oral argument, the Court **VACATED** the hearing set for November 15, 2021. (Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15.)

The disputed claim terms are **CONSTRUED** as set forth in this Order.[1]

# I.    BACKGROUND

## A.    The '293 Patent

On February 20, 2015, Tetra Tech, Inc. filed Provisional Application No. 62/118,600 ("the Provisional Application"). On May 29, 2015, Tetra Tech, Inc. filed a non-provisional application that claimed priority to the Provisional Application and eventually issued as the '293 Patent. The '293 Patent, titled "3D Track Assessment

---

[1]    The Court declines to consider Pavemetrics's indefiniteness arguments as Pavemetrics did not identify these arguments in its ten most significant disputed terms list, it did not ask the Court to construe more than ten terms prior to filing its briefs, and its indefiniteness arguments pertain only to dependent Claim 10 of the '557 Patent.

System and Method" issued on July 23, 2019 and generally relates to "railway track inspection and assessment systems." ('293 Patent at 1:16–17.) According to the '293 Patent, the claimed invention provides "a robust and reliable system for analyzing and processing data collected during and/or after a high speed assessment of a railway track" and "is able to quickly and accurately identify railway track features and associate measured parametric data with those features." ('293 Patent at 1:49–54.)

Figure 1 of the '293 Patent (reproduced below) "shows a basic embodiment of a three-dimensional (3D) railway track assessment system ('3DTAS') **10** including a processor **12** in communication with a light line projector **14** (e.g., a laser) and one or more 3D sensors **16** for detecting light from the light line projector **14** that is reflected from a railway track bed":



FIG. 1

('293 Patent at Fig. 1, 8:64–9:2.) "The sensors **16** detect elevation and intensity data and the data is stored in a data storage apparatus **18** in communication with the processor **12**." (*Id*. at 9:2–5.) A set of sensors **16A** and **16B** may be used "for both rails [on a railway track bed] to provide a full elevation and intensity profile of the full width of a railway track bed[,]" called a "3D elevation maps." (*Id*. at 9:15–21.)

The '293 Patent defines "track," "railway track," "track bed," and "railway track bed" as "a section of railway including the rails, ties [also referred to as 'crossties'], components holding the rails to the ties, components holding the rails together, and ballast material." (*Id*. at 8:49–52; *see also id*. at 9:31–33.) Figure 3 of the '293 Patent (reproduced below) "shows a cross-sectional view of a rail and associated parts":



FIG. 3

(*Id*. at Fig. 3, 6:62–63.) The '293 Patent further explains that "rails include rail heads **22** (normally the highest elevation in the track bed structure), joint bars **24** [i.e., metal bars that are bolted to the ends of two rails to joint them together in a track] (for jointed rail sections of track), and the rail base **26** as shown for example in Fig. 3." (*Id*. 9:37–40; 26:44–45.) According to the '293 Patent, "Once a rail head has been identified and located, the search regions for the other rail components and features can be efficiently minimized based on proximity to the rail head." (*Id*. at 9:40–43.)

Figure 14 (reproduced below) depicts a "section of track bed" including "three wooden ties **148**, with the rails removed from the data":



FIG.14

(*Id*. at 14:37–3, Fig 14.) The '293 Patent discloses that the ties may alternatively be made out of concrete. (*See, e.g.*, *id*. at 7:44–45, 8:19–20, 16:62–66.) Other components of the track disclosed in the '293 Patent include: "tie spikes," "tie fastening clips," "rail anchors," "tie plates," and "tie fasteners." (*See generally id*.)

Claim 1 of the '293 Patent recites:

> 1.     A system for assessing a railway track bed, the system comprising:
>
> a power source;
>
> a light emitting apparatus powered by the power source for emitting light energy toward a railway track;
>
> a data storage apparatus in communication with at least one processor;
>
> at least one sensor for sensing reflected light that was emitted from the light emitting apparatus and acquiring three dimensional surface elevation and intensity image data of the railway track to be stored in the data storage apparatus, wherein the at least one sensor is in communication with the at least one processor; and
>
> wherein the at least one processor is configured to run an algorithm for processing three-dimensional surface elevation and intensity data gathered from the at least one sensor and saved in the data storage apparatus, the algorithm comprising the steps of:

a. acquiring three dimensional surface elevation and intensity data representative of an area segment of railway track bed;

b. generating a track elevation map based on the acquired three dimensional data;

c. identifying a railway track bed feature from the track elevation map further including the steps of:

    i. defining an appropriate gradient neighborhood representing a small 2D track section over which differential vertical measurements are calculated and

    ii. moving the gradient neighborhood like a sliding window over the 3D elevation data using the processor; and

d. storing information corresponding to the identified railway track bed feature in the data storage apparatus.

'293 Patent, Claim 1.

**B.     The '557 Patent**

On July 19, 2019, Tetra Tech filed a continuation application that claimed priority to the Provisional Application and the non-provisional application that issued as the '293 Patent. On April 7, 2020, the continuation application issued as the '557 Patent, titled "3D Track Assessment Method." Claim 8 of the '557 Patent recites:

1.     A method of detecting railroad tie distress using a system for assessing a railway track bed, the method comprising the steps of:

a. inputting elevation data, longitudinal and transverse elevation map sample resolution data, rail base edge feature coordinates, detected tie bounding box data, and approximate tie surface plane data to a processor wherein significant elevations due to the rail heads for each rail have been removed from the elevation data;

b. comparing ties in the elevation data with a tie surface plane model by calculating the difference between the tie surface elevation data and the tie surface plane model using the processor;

c. identifying tie surface regions with elevations less than a tie surface plane minus a crack depth threshold as tie crack targets using the processor; and

d. determining physical parameters of crack targets using the processor.

'557 Patent, Claim 8.

## II.   LEGAL STANDARDS

Claim construction is the process of determining the meaning and scope of the patent claims. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). It is a matter for the court. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015).

"[T]he words of a claim are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (internal citations and quotations omitted). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. "In such circumstances, general purpose dictionaries may be helpful. In many cases that give rise to litigation, however, determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art." *Id.*

"Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to

mean.'" *Id*. (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)). "Those sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Id*.

Claim construction "begins and ends" with the words of the claims. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "Quite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. "[T]he context in which a term is used in the asserted claim can be highly instructive." *Id*. In addition to the words of the claim(s) being construed, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term. Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id*. (citations omitted). "Differences among claims can also be a useful guide in understanding the meaning of particular claim terms." *Id*. "For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id*. at 1314-5. However, "[c]laim differentiation is a guide, not a rigid rule. If a claim will bear only one interpretation, similarity will have to be tolerated." *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991) (quoting *Autogiro Co. of Am. v. United States*, 384 F.2d 391, 404 (Ct. Cl. 1967)).

"[C]laims must be construed so as to be consistent with the specification, of which they are a part." *Merck & Co. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003). "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. "[T]he specification 'is always highly relevant to the claim construction analysis.

Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

"[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. To be a lexicographer, the inventor must "clearly express and intent to redefine the term." *Thorner v. Sony Computer Entertainment America, LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). "In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor. In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive." *Phillips*, 415 F.3d at 1316. The inventor must demonstrate intent by "representing a clear disavowal of claim scope" in the specification. *Thorner*, 669 F.3d at 1366.

Despite the importance of a specification, limitations of the described embodiments of the invention must not be read into the claims. The Federal Circuit "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Phillips* at 1323. Conversely, "an interpretation [which excludes a preferred embodiment] is rarely, if ever, correct and would require highly persuasive evidentiary support." *Vitronics*, 90 F.3d at 1583. Overall, limitations from the specification should not be read into claims. *Thorner*, 669 F.3d at 1366-67.

The prosecution history is also relevant intrinsic evidence. "[T]he prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation" and for this reason "often lacks the clarity of the specification." *Phillips*, 415 F.3d at 1317. However, it can nonetheless "often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution,

making the claim scope narrower than it would otherwise be." *Id.*

"Although [the Federal Circuit has] emphasized the importance of intrinsic evidence in claim construction, [it has] also authorized district courts to rely on extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" *Id.* (quoting *Markman*, 52 F.3d at 980). The use of "technical words or phrases not commonly understood" may give rise to a factual dispute, the determination of which will precede the ultimate construction. *Teva*, 574 U.S. at 326.

## III.   DISCUSSION

### A.   Disputed Claim Terms

#### a. "Appropriate Gradient Neighborhood" ('293 Patent, Claims 1 & 22)

| Tetra Tech's Proposed Construction | Pavemetrics's Proposed Construction |
|---|---|
| No construction | "zone of limited area of predetermined size and shape containing numbers used to calculate railway track bed height change at a certain point, based on the points within the zone" |

The parties dispute whether the term "appropriate gradient neighborhood" should include "a zone of 'predetermined size and shape,'" "containing numbers," "used to calculate a 'height change at a certain point,'" and "the calculations 'based on the points within the zone.'" (*See* Opening Br. at 4.)

Tetra Tech argues that the claims already recite that the "appropriate gradient neighborhood represent[s] a small 2D track section over which differential vertical measurements are calculated." (*Id.* at 5.) Thus, Tetra Tech asserts that no further context is necessary for the term. (*Id.*) Tetra Tech also argues that the specification does not support further narrowing the term, as the Court previously found in its Order on Tetra Tech's Motion for Preliminary Injunction. (*Id.* (citing "PI Order," ECF No. 61 at 11–13).) Additionally, Tetra Tech argues that Pavemetrics's cited extrinsic evidence

"does not reflect the limitation that the claimed 'appropriate gradient neighborhood' *must* be a 'predetermined size and shape,' as Pavemetrics proposes." (*Id*. at 6 (emphasis in original) (citing "Exhibit C," ECF No. 86-4 at 95, "Exhibit D," ECF No. 86-5 at 66; Morellas Decl. ¶ 43).)

Pavemetrics argues that its construction conforms with the plain and ordinary meaning of the term "appropriate gradient neighborhood." (Resp. Br. at 7.) Specifically, Pavemetrics argues that a person of ordinary skill in the art ("POSITA") would know that a "sliding gradient neighborhood operator" "works by applying a block, typically a rectangle, to a set of pixels in a 2D image." (*Id*. at 8 (citing Frakes Decl. ¶¶ 45, 46).) Further, "The block contains coefficients (numbers) to calculate the gradient at each pixel as it slides from pixel to pixel." (*Id*.) Pavemetrics asserts that this conforms with the intrinsic evidence. (*Id*. at 8–9 (citing '293 Patent at 9:50–56 (defining "neighborhood" as a "zone of limited area" "that is applied in a sequential sliding and exhaustive fashion over the entire region to be processed"), 10:26–31, 11:51–56, Claim 1).) According to Pavemetrics, the word "appropriate" in the claim term supports construing the term to be of "predetermined size and shape." (*Id*. at 9.) Pavemetrics also argues that "'gradient' in the context of the claims means a 'railway track bed height change at a point.'" (*Id*. (citing Frakes Decl. ¶¶ 42–45; '293 Patent at 10:28–31, 11:53–56).) Finally, Pavemetrics argues that Tetra Tech's infringement contentions asserting that a "comparison of elevation values" meets the limitation effectively reads out the limitation and "leaves the jury to grasp at its technical concepts." (*Id*. at 8–10.)

In its reply, Tetra Tech argues that the term "appropriate" should be construed "consistent with its ordinary meaning as 'suitable,'" and the intrinsic evidence does not support construing the term to mean "of predetermined size and shape." (Reply at 4.) As Tetra Tech also argues, "that a term is not commonly used by a juror does not justify rewriting the term and adding unclaimed limitations." (*Id*. at 5.) Finally, Tetra Tech argues there is no support for the remainder of Pavemetrics's limitations. (*Id*.)

In its sur-reply, Pavemetrics argues that "the specification's limited description

of 'appropriate gradient neighborhood' does not fully reflect how a POSA would have understood the term." (Sur-reply at 5.) As Pavemetrics asserts, the specification indicates that an "appropriate" or "suitable" gradient neighborhood would have "a certain size and shape," and "[i]n computer vision, that size and shape is predetermined." (*Id.* (citing '293 Patent at 9:54–56; Frakes Decl. ¶ 46).) Pavemetrics also argues that the term "appropriate gradient neighborhood" "is not a commonly understood term," and the Court needs to construe the term for the jury. (*Id.* at 4–5.)

As the Court found in the PI Order, the intrinsic evidence uses the term "appropriate gradient neighborhood" according to its plain and ordinary meaning understood by those of skill in the art. (*See* PI Order at 11–13.) The '293 Patent defines a "neighborhood" as a "zone of limited area," but otherwise does not provide an explicit definition for the term. ('293 Patent at 9:50–54.) Figure 5, reproduced below, "shows an image including rails and ties and a sliding neighborhood [**30**] used for track bed analysis":



FIG. 5

('293 Patent, Fig. 5, 6:66–67.) The '293 Patent states that the claimed invention detects the rail head of a railway track bed "based on the detection of significant (large vertical component) longitudinal edges over a 2D area." (*See id.* at 9:44–46.) The '293 Patent also discloses that the edge analysis for 3DTAS "calculates 3D gradient measures over [a neighborhood (for example neighborhood **30** in Figure 5)] that is applied in a sequential sliding and exhaustive fashion over the entire region to be processed." (*See*

1    *id*. at 9:46–56.)

2    Similarly, with regard to the "processing steps for the 3DTAS rail head edge

3    detection" in Figure 6, the '293 Patent discloses that "[a]n appropriate gradient

4    neighborhood, is defined for vertical raid head edge features." (*See id*. at 10:21–22,

5    10:26–28.) The '293 Patent explains that "[t]his rail head edge neighborhood represents

6    a small 2D track bed surface area over which differential vertical measurements are

7    calculated" and "is moved like a window sequentially and completely for each position

8    in the [3D] railway track bed elevation data[.]" (*See id*. at 10:28–35.) According to the

9    '293 Patent, a similar technique is used to detect the "rail base edges." (*See id*., Fig. 8,

10   11:12–17; 11:45–63.)

11   Claim 1 of the '293 Patent recites "defining an appropriate gradient neighborhood

12   representing a small 2D track section over which differential vertical measurements are

13   calculated." (*Id*., Claim 1.) This matches the description of the "gradient neighborhood"

14   in the specification, *i.e.*, "a small 2D track section over which differential vertical

15   measurements are calculated." Further, although this limitation may have been added

16   to distinguish the cited prior art references during the prosecution of the '293 Patent,

17   the applicant's remarks do not further narrow the term "gradient neighborhood." (*See*

18   "Prosecution History," ECF No. 31-2 at 116.) Thus, although the Court will construe

19   the term "neighborhood" to mean a "zone of a limited area," the intrinsic evidence does

20   not support limiting the term 'appropriate gradient neighborhood" beyond its plain and

21   ordinary meaning.

22   The Court disagrees that in the context of the '293 Patent, a POSITA would

23   understand the term "appropriate" to mean " of *predetermined* size and area." As

24   Pavemetrics's own responsive brief shows, the specification discloses that the "gradient

25   neighborhood" at most must be "suitable," not that it must be determined in advance as

26   suggested by the term "predetermined." (*See* Resp. Br. at 8–9; '293 Patent at 9:50–56.)

27   Pavemetrics's expert, Dr. David Frakes, opines that "the neighborhood must be defined

28   according to pre-determined *criteria* for the acceptable sizes and shapes," not that the

"size and shapes" need to be "predetermined." (*See* Frakes Decl. ¶ 46 (emphasis added).) Pavemetrics does not otherwise provide any evidentiary support for replacing the word "appropriate" with "predetermined," and the Court declines to adopt this language.

The Court also declines to adopt the remainder of Pavemetrics's construction, which effectively rewrites the claim without justification. Much of Pavemetrics's construction appears to rewrite the claim language for the sake of clarifying the language for the jury, but without clearly raising a dispute as to the meaning of the term. Without an appropriate dispute as to the meaning of the term, the Court will not construe the term for the sole sake of clarification. Further, it is not clear to the Court whether the language "containing numbers used to calculate railway track bed height change at a certain point, based on the points within the zone" changes the scope of the term "appropriate gradient neighborhood" beyond the term's plain and ordinary meaning. To the extent it does, this change is unsupported by the intrinsic evidence.

Accordingly, the Court construes the term "neighborhood" to mean "zone of a limited area," and otherwise declines to construe the term "appropriate gradient neighborhood."

### b. "2D Track Section Over Which Differential Vertical Measurements Are Calculated" ('293 Patent, Claims 1 & 22)

| Tetra Tech's Proposed Construction | Pavemetrics's Proposed Construction |
| --- | --- |
| No construction | "area of the railway track bed selected for calculating changes in railway track bed height over the area" |

Tetra Tech argues that there is no reason to define the term beyond the plain and ordinary meaning of the words of the claim. (Opening Br. at 6–7.) Specifically, Tetra Tech argues that there is no intrinsic support for the phrase "*selected for calculating changes in railway track bed height over the area*." (*Id.* at 7–8 (emphasis in original).)

14

1  Further, Tetra Tech argues that there is no "basis to rewrite 'differential vertical
2  measurements' to 'changes in railway track bed height.'" (*Id.* at 8.)

3       Pavemetrics responds that although a POSITA may understand what "differential
4  vertical measurements" are, a jury may not. (Resp. Br. at 10–11.) Pavemetrics argues
5  that a POSITA would know that a "2D track section" is an "area of the railway track
6  bed" and "differential vertical measurements" are "changes in railway track bed
7  height," which Tetra Tech does not contest. (*Id.* at 11 (citing Frakes Decl. ¶¶ 49, 50).)
8  Further, according to Pavemetrics, "differential vertical measurements 'are calculated'
9  'over' the 2D track section," and thus, "the 2D track section is the area 'selected for
10  calculating' the changes in railway track bed height over that area." (*Id.* (citing Frakes
11  Decl. ¶ 51).)

12       Tetra Tech argues in its reply that neither Pavemetrics's citation to the
13  specification nor Pavemetrics's argument about jury clarification justifies
14  Pavemetrics's construction. (Reply at 5–6.) Pavemetrics argues in its sur-reply that
15  Tetra Tech has previously used the term consistent with Pavemetrics's construction.
16  (Sur-reply at 6.)

17       The Court does not understand the parties' dispute. Again, Pavemetrics's
18  construction appears to rewrite the claim language for the sole purpose of clarifying the
19  meaning for the jury. This does not justify rewriting the language of the claims.
20  Although Pavemetrics is entitled to explain the meaning of the claim language for the
21  jury, such as what "differential vertical measurements" are, the Court declines to
22  construe these terms without a concrete dispute.

23       Accordingly, the Court declines to construe the term "2D track section over
24  which differential vertical measurements are calculated."

25
26
27
28

c.  **"Sliding Window"** ('293 Patent, Claims 1 & 22)

| Tetra Tech's Proposed Construction | Pavemetrics's Proposed Construction |
|---|---|
| No construction | "component of an image-processing algorithm in which a calculation is based on a neighborhood or window of data about a pixel, and after the calculation at that pixel, the neighborhood (window) moves (slides) to an adjacent pixel for a calculation at the adjacent pixel" |

The parties dispute whether the term "sliding window" must move to an adjacent pixel.

Tetra Tech argues that Pavemetrics's construction seeks to replace the term with 41 additional words unsupported by the intrinsic evidence and, specifically, the context of the claim language, which recites "***moving*** the gradient neighborhood ***like*** a sliding window over the 3D elevation data[.]" (Opening Br. at 8–9 (emphasis in original).) Tetra Tech also argues that there is no intrinsic evidence to support "that movement of the gradient neighborhood 'like a sliding window' *must* be 'about a single pixel' and subsequently 'to an adjacent pixel for calculation at the adjacent pixel,' as Pavemetrics proposes." (*Id*. at 9–10 (emphasis in original) (citing Morellas Decl. ¶ 51).) Further, Tetra Tech argues that Pavemetrics's cited dictionary definition does not require movement "to an adjacent pixel." (*Id*. at 10 (citing "Exhibit E," ECF No. 86-6 at 264; Morellas Decl. ¶ 52).)

Pavemetrics responds that the term "sliding window" "is a term of art in computer vision," and should be construed accordingly. (Resp. Br. at 12.) Pavemetrics argues that its construction comes from a "straightforward definition" in a "computer vision dictionary." (*Id*. (citing Exhibit E at 209 (defining "sliding window" as "[a] common component of an image-processing (and signal-processing) algorithm whereby the calculation is based on a neighborhood or window of data about the current point. After the calculation is done at the given point, the calculation typically moves to an adjacent

point and the neighborhood (window) moves (slides) to that adjacent point")).)
Pavemetrics also argues that this technical definition is consistent with the specification,
which discloses that the gradient neighborhood must move to an adjacent pixel. (*Id*. at
12–13 (citing '293 Patent at 10:33–35 (stating that the gradient neighborhood is "moved
like a window sequentially and completely for each position in the railway track bed
elevation data"), 11:15–17, 11:61–63; Frakes Decl. ¶¶ 58, 59).)

In reply, Tetra Tech argues that Dr. Frakes contradicts Pavemetrics's construction
as he opines that Pavemetrics's cited "dictionary definition does not require that the
'sliding window' move to an adjacent pixel because it 'allow[s] for unusual or atypical
edge cases.'" (Reply at 6 (citing Frakes Decl. ¶ 55).) In its sur-reply, Pavemetrics argues
that the jury could not "possibly be expected to understand the technical term 'sliding
window' with *any* construction from the Court." (Sur-reply at 6–7 (emphasis in
original).)

The Court agrees with Tetra Tech that the term "sliding window" requires no
construction. Claim 1 recites, inter alia, "moving the gradient neighborhood *like* a
sliding window over the 3D elevation data." ('293 Patent, Claim 1 (emphasis added).)
The claim language suggests that the term "sliding window" is used as a simile to
describe the movement of the "gradient neighborhood." This is consistent with the
specification, which also uses the term "window" as a simile to describe the "gradient
neighborhood" and its movement. (*Id*. at 10:31–35 ("the area is moved like a window");
11:12–17 ("using a defined neighborhood **30** as a sliding window"); 11:59–63 ("the
area is moved like a window"); 12:52–55 ("The neighborhood area is moved
sequentially and completely, like a window …"); 13:57–61 (same); 15:32–35 (same).)
Although Pavemetrics's cited dictionary definition for the term "sliding window" also
appears to be consistent with this usage, Pavemetrics's construction for the term
"sliding window" would make much of the surrounding claim language redundant.
Pavemetrics's arguments are better addressed in construing the full limitation, i.e.,
"moving the gradient neighborhood like a sliding window over the 3D elevation data."

Pavemetrics's construction also incorporates a "pixel" requirement, which is not supported by the intrinsic evidence or by Pavemetrics's extrinsic evidence.

Accordingly, the Court declines to construe the term "sliding window."

#### d. "Moving the Gradient Neighborhood Like a Sliding Window Over the 3D Elevation Data" ('293 Patent, Claims 1 & 22)

| Tetra Tech's Proposed Construction | Pavemetrics's Proposed Construction |
| --- | --- |
| No construction | "sequentially and completely applying the gradient neighborhood to the 3D elevation data and calculating differential vertical measurements for each position" |

The parties dispute whether "moving the gradient neighborhood like a sliding window over the 3D elevation data" must be "sequential" and "complete."

Tetra Tech argues that there is no support in the intrinsic evidence for adding the limitation "sequentially and completely." (Opening Br. at 10–11.) Rather, Tetra Tech argues that "the specification describes defining an appropriate gradient neighborhood and applying the neighborhood 'over the entire region to be processed,' not necessarily to the complete set of acquired data." (*Id*. at 11 (citing Morellas Decl. ¶ 55; '293 Patent at 9:52–54).) Tetra Tech highlights that in one embodiment, the specification discloses that the elevation is measured only in the "four rail base zones" and not the complete set of data to be processed. (*Id*. (citing '293 Patent at 13:49–61, Fig. 12; Morellas Decl. ¶ 55).) Thus, Tetra Tech asserts that Pavemetrics's construction would exclude this embodiment, contrary to well-established law. (*Id*. (citing *Oatey Co. v. IPS Corp*., 514 F.3d 1271, 1276 (Fed. Cir. 2008) ("We normally do not interpret claim terms in a way that excludes embodiments disclosed in the specification.")).) Finally, Tetra Tech reasserts that the sliding window does not need to move sequentially. (*Id*. at 12.)

Pavemetrics argues that its construction is in response to Tetra Tech's assertion that "looping from pixel to pixel in a group of pixels identified as the rail head to retrieve the elevation at the pixel counts as 'moving the gradient neighborhood like a sliding

window over the 3D elevation data.'" (Resp. Br at 14 (citing Frakes Decl. ¶ 64).) According to Pavemetrics, a POSITA would understand from the specification that the "appropriate gradient neighborhood" would need to move sequentially to move "like a sliding window over the 3D elevation data" to calculate the "differential vertical measurements." (*Id.* at 14. (citing '293 Patent at 10:26–37, 11:59–63, Fig. 6).) Pavemetrics also asserts that whenever the specification describes the neighborhood as moving "like a window" it discloses that it is moved "sequentially and completely." (*Id.* at 14–15 (citing '293 Patent at 10:31–35, 11:59–63, 12:52–55, 13:57–61, 15:32–35).) Finally, Pavemetrics argues that the intrinsic evidence Tetra Tech cites refers to "a more general 'neighborhood,'" which is separate from the claimed "gradient neighborhood." (*Id.* at 15 (citing '293 Patent at 9:50–54, 10:26–37, 13:49–61).)

Tetra Tech replies that Pavemetrics does not present a claim construction dispute, but rather a factual dispute of infringement concerning this term. (Reply at 6–7 (citing *NeoMagic Corp. v. Trident Microsystems, Inc*., 287 F.3d 1062, 1074 (Fed. Cir. 2002) ("[C]laims may not be construed by reference to the accused device"); *Am. Piledriving Equip., Inc. v. Geoquip, Inc*., 637 F.3d 1324, 1331 (Fed. Cir. 2011)).) Additionally, according to Tetra Tech, Pavemetrics's arguments are contradicted by Pavemetrics's arguments for the construction of the term "appropriate gradient neighborhood." (*Id.* at 7 (citing Resp. Br at 8–9, 15).)

Pavemetrics argues in its sur-reply that "when a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term 'by implication.'" (Sur-reply at 7 (quoting *Bell Atl. Network Servs. v. Covad Commc'ns Grp.*, 262 F.3d 1258, 1271 (Fed. Cir. 2001)).) Further, Pavemetrics argues that the specification uses the term consistent with the technical meaning of the term, as evidenced by its extrinsic evidence. (*Id.*)

The Court agrees with Pavemetrics that "moving the gradient neighborhood like a sliding window" requires moving the gradient neighborhood "sequentially and completely." The word "sliding" suggests continuous movement. Thus, for the gradient

19

1    neighborhood to move "like a sliding window," it must move sequentially.

2         Pavemetrics's construction is also supported by the specification, which

3    consistently describes moving or "sliding" the neighborhood "like a window," i.e.,

4    "sequentially," "completely," and "exhaustively." ('293 Patent at 9:50–54 ("This edge

5    analysis method calculates 3D gradient measures over zone of limited area referred to

6    as a 'neighborhood' that is applied in a sequential sliding and exhaustive fashion over

7    the entire region to be processed.); 10:31–35 ("the area is moved like a window

8    sequentially and completely for each position in the railway track bed elevation data");

9    11:12–17 ("using a defined neighborhood **30** as a sliding window applied exhaustively

10   across the rail base search area in the elevation data"); 11:59–63 ("the area is moved

11   like a window sequentially and completely for each position in the railway track bed

12   elevation data"); 12:52–55 ("The neighborhood area *is moved sequentially and*

13   *completely, like a window*, for each position in the four rail base zones…") (emphasis

14   added); 13:57–61 (same); 15:32–35 ("The neighborhood area *is moved sequentially and*

15   *completely, like a window*, for each position…") (emphasis added); *see also id*. at

16   18:31–38 ("Using the processor **244**, each appropriate 3D feature from the 3DTAS

17   feature library **252** is automatically template matched against an entire surface elevation

18   map for the applicable region of the track bed.").)

19        Tetra Tech's argument that Pavemetrics's construction would read out disclosed

20   embodiments in the specification is unpersuasive. Tetra Tech argues that the gradient

21   neighborhood does not need to move over the entire set of acquired data but rather the

22   "entire region to be processed,"  citing the specification's disclosure that in one

23   embodiment "[t]he neighborhood area [122] is moved sequentially and completely, like

24   a window, for each position in the ***four rail base zones*** [118]." (Opening Br. at 11

25   (emphasis in original) (citing '293 Patent at 12:44–55, 13:49–61, Fig. 12)). But the

26   claim language indicates that the "entire region to be processed" using the gradient

27   neighborhood is the "three dimensional surface elevation and intensity data

28   representative of *an area segment of railway track bed*" acquired in step (a). (*Id*., Claim

1 (emphasis added).) Thus, the gradient neighborhood need not be applied to the entire set of "three-dimensional surface elevation and intensity data" representative of the entire railway track bed as Tetra Tech implies. Pavemetrics's construction does not exclude embodiments that only apply the gradient neighborhood to the data representative of the "area segment of railway track bed" limited to the "rail base zones."

Although the Court agrees with Pavemetrics that the "gradient neighborhood" must be moved "sequentially and completely," the Court finds the language "and calculating differential vertical measurements for each position" unnecessary. Accordingly, the Court construes the term "moving the gradient neighborhood like a sliding window over the 3D elevation data" to mean "sequentially and completely applying the gradient neighborhood to the 3D elevation."

### e. "Identifying" ('293 Patent, Claims 1, 2, 15, 19–23, 36, & 42)

| Tetra Tech's Proposed Construction | Pavemetrics's Proposed Construction |
|---|---|
| No construction | "assigning a class to a portion of the track elevation map [three dimensional elevation map] based on a predetermined rule or model" |

The parties dispute whether "identifying" requires "assigning a class… based on a predetermined rule or model."

Tetra Tech argues that the term "identifying" is well-understood and needs no construction. (Opening Br. at 12.) Tetra Tech asserts that the claims clearly delineate "between identification and assignment/classification," and "several claims recite that the 'identifying' step *comprises* an 'assigning' step." (*Id*. at 12–13 (emphasis in original) (citing '293 Patent, Claims 1–3, 5–9, 11, 12, 14, 15, 17–24, 28–30, 32, 33, 36, 41 42).) Tetra Tech also argues that the specification does not limit the "identifying" step to a "specific process or technique," does not use the terms "identification" and "classification" interchangeably. (*Id*. at 13–14 (citing '293 Patent at 9:44–46, 14:16–18,

18:24–44; Morellas Decl. ¶ 60).) Finally, Tetra Tech argues that the "based on a predetermined rule or model" limitation is found in the dependent claims, as shown by the specification, and should not be imported into the independent claims. (*Id*. at 14 (citing '293 Patent at 2:19–24, 16:49–50, 17:7–67, 18:45–20:6, 25:25–28:51, Figs. 25, 27–30, 33, 46, 47, Claims 6–8, 14–18, 27–29, 35–39).)

Pavemetrics argues that its construction is in response to Tetra Tech's assertion that "an algorithm fine-tuning an ***already identified*** rail head feature by filtering out data belonging to the rail base [is] ***identifying*** a rail head." (Resp. Br. at 5–6 (emphasis in original) (citing Frakes Decl. ¶¶ 39, 40).) Pavemetrics asserts that a POSITA would understand that the term "identifying" is a technical term in the field of computer vision. (*Id*. at 6 (citing Frakes Decl. ¶¶ 34–38; "Exhibit L," ECF No. 87-4 at 122).) Pavemetrics argues that the intrinsic evidence supports this technical definition "because [it] set[] forth predetermined rules to identify railway track bed features." (*Id*. at 6–7 ('293 Patent, Figs. 5, 8, Claims 2, 3; Frakes Decl. ¶ 38).) Pavemetrics also argues that the additional limitations in the dependent claims do not change the ordinary meaning of the term "identifying," and the specification uses the terms interchangeably. (*Id*. (citing '293 Patent at 14:16–18, 18:42–44).)

Tetra Tech replies that Pavemetrics does not present a claim construction dispute, but rather a factual dispute of infringement concerning this term. (Reply at 3 (citing *NeoMagic*, 287 F.3d at 1074; *Geoquip*, 637 F.3d at 1331).) Tetra Tech also reemphasizes that nothing in the intrinsic record supports limiting the "identifying" step to "assigning." (*Id*. at 3–4.)

Pavemetrics reasserts in its sur-reply that Tetra Tech's infringement contentions contradict the plain and ordinary meaning of the term "identifying" and the intrinsic evidence makes clear that "identifying" must be "based on a predetermined rule or model." (Sur-reply at 3–4.)

The Court agrees with Tetra Tech that the term "identifying" requires no construction. Pavemetrics does not contest that the '293 Patent uses the term

"identifying" according to its plain and ordinary meaning and has not identified a clear dispute as to what the plain and ordinary meaning of the term is to a POSITA. Rather, as Tetra Tech asserts,  Pavemetrics's arguments are better addressed as factual determinations regarding the application of the term "identifying" for the purposes of infringement rather than disputes about the meaning of the term. Further, the specification discloses that the "unfamiliar features" may be identified and then assigned "a component name to the extracted three dimensional data" related to the newly identified feature. (*See* '293 Patent at 2:11–24; 4:65–5:7.) Thus, rather than assigning these "unfamiliar features" classes based on a "predetermined rule or model," the classes are defined to include "rules or models" after the unfamiliar feature is identified.

Accordingly, the Court declines to construe the term "identifying."

### f.  "Is Configured to Run an Algorithm" ('293 Patent, Claim 1)

| Tetra Tech's Proposed Construction | Pavemetrics's Proposed Construction |
|---|---|
| No construction. Alternatively, "is programmed to run an algorithm" | "is set up to run the algorithmic steps without modification" |

The parties dispute whether the processor of Claim 1 must be capable of running the algorithm without modification or if it only needs to be programmed with the algorithm.

Tetra Tech argues that the term "configured to" is a well-understood term and there is no support to add the limitation "without modification." (Opening Br. at 15 (citing *Wistron Corp. v. Samsung Elecs. Co.*, 2008 WL 5055545, at *16 (N.D. Cal. Nov. 25, 2008); *Polaris PowerLED Tech., LLC v. VIZIO, Inc.*, 2019 WL 13043592, at *18 (C.D. Cal. Nov. 26, 2019), order clarified, 2020 WL 1060363 (C.D. Cal. Jan. 21, 2020); *Realtime Adaptive Streaming LLC v. Adobe Sys. Inc.*, 2019 WL 13039644, at *24 (C.D. Cal. July 25, 2019).) Tetra Tech emphasizes that the specification's references to

"configured to run an algorithm" use the term according to its plain and ordinary meaning. (*Id*. at 15–16 (citing '293 Patent at 8:53–59, 10:21–24, 11:45–48, 12:32–35, 13:39–43, 15:10–15, 17:7–10, 19:13–16. 20:21–24, 23:10–14, 25:25–29, 27:66–28:3; Morellas Decl. ¶ 63).) Tetra Tech also argues that Pavemetrics's cited dictionary definition does not support the limitation "without modification." (*Id*. at 16 (citing "Exhibit F," ECF No. 86-7 at 111).) Additionally, Tetra Tech argues that Pavemetrics's construction improperly imports a negative limitation into the term. (*Id*.) Finally, Tetra Tech argues that should the Court choose to construe the term, the Court should construe the term to mean "is programmed to run an algorithm" consistent with the intrinsic evidence. (*Id*. (citing '293 Patent at 8:53–59; *Nevro Corp. v. Bos. Sci. Corp.*, 955 F.3d 35, 42 (Fed. Cir. 2020) (construing "configured to" to mean "programmed to"); Morellas Decl., ¶65).)

Pavemetrics responds that its construction is necessary because Tetra Tech accuses disabled "template matching algorithms in Pavemetrics' master source code" of being the relevant "algorithm." (Resp. Br. at 16.) Thus, according to Pavemetrics, the software settings on the accused device would need to be modified for the algorithm to run. (*Id*.) Pavemetrics argues that courts have distinguished claims that require software to be "*configured* in a particular way to infringe" from broader claims that require "only that [the software] be *programmed* for performing the claimed steps." (*Id*. (emphasis in original) (quoting *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204 (Fed. Cir. 2010)) (citing *Huawei Techs. Co. v. Verizon Commc'ns Inc.*, No. 2:20-cv-30-JRG, 2021 WL 150442, at *18-20 (E.D. Tex. 2021); *Centripetal Networks, Inc. v. Cisco Sys., Inc.,* No. 2:18-cv-94-HCM (LRLx), 2020 WL 863976, at *7-8 (E.D. Va. 2020)).) Pavemetrics also asserts that the specification discloses that "the system is set up to run algorithms without modification to identify such features." (*Id*. at 17 (citing '293 Patent at 7:47–49, 18:11–23, Fig. 26).) Further, Pavemetrics cites the following dictionary definition from a technical dictionary to support its construction: "to *set up* a computer or program to be used *in a particular way*." (*Id*. (emphasis in original)

(quoting Exhibit F at 216).) Finally, Pavemetrics argues that Tetra Tech's references to the specification are inapposite because those portions disclosed that the processor "is capable of performing" tasks or the steps were "carried out by a program," not that the processor is "configured to run an algorithm." (*Id*.)

Tetra Tech replies that "Pavemetrics' proposed 'construction' should be rejected because it raises a factual dispute of infringement and not the proper meaning of the term." (Reply at 7.) Tetra Tech also argues that nothing in the intrinsic or extrinsic evidence supports construing the term to require "the processor to run algorithms without modification." (*Id*. at 7–8.) Finally, Tetra Tech argues that Pavemetrics's cited cases are inapplicable here.

In its sur-reply, Pavemetrics argues that Tetra Tech misinterprets Pavemetrics's cited cases. (Sur-reply at 8.)

The Court finds that the term "configured to" means "is programmed to run an algorithm without the need to rebuild, rewrite or recompile the code for, or redesign any of that hardware or software." The decision in *TQ Delta LLC v. Adtran, Inc.* is instructive. No. 1:14-cv-954-RGA, 2021 WL 1200595 (D. Del. Mar. 30, 2021). There, the court interpreted the Federal Circuit's decision in *Finjan*, discussed by both parties here, to find that the plain and ordinary meaning of the term "configured to" means "includes the necessary hardware and software for performing the functionality recited in the claim without the need to rebuild, rewrite or recompile the code for, or redesign any of that hardware or software." *See id*. at *4–5 (citing 626 F.3d at 1205). In doing so, the court rejected the argument that "configured to" meant "that the device can perform the claimed functions without further configuration by the user," noting that "[t]urning certain functions on or off (e.g. enabling or disabling [the accused functionality]) does not require modification to the code." *Id*.

Similarly, Pavemetrics proposes its "without modification" language here because it argues that the term "configured to run an algorithm" should not include embodiments where the algorithm needs to be enabled. The Court finds persuasive *TQ*

*Delta*'s analysis that enabling a particular functionality does not require modifying the underlying code. Thus, although the Court agrees with Pavemetrics that the claimed processor must be "set up" or "programmed" to run the algorithm "without modification," the Court adopts the construction from *TQ Delta* to clarify the meaning of "without modification."[2]

Accordingly, the Court construes the term "is configured to run an algorithm" to mean "is programmed to run an algorithm without the need to rebuild, rewrite or recompile the code for, or redesign any of that hardware or software."

### g. "Comprising the Steps of: a, b, c, d" ('293 Patent, Claims 1 & 22)

| Tetra Tech's Proposed Construction | Pavemetrics's Proposed Construction |
| --- | --- |
| No construction | "the algorithm must be configured to run the steps in the recited order" and "the method steps must be performed in the recited order" |

The parties dispute whether the steps must be run in the order recited in Claims 1 and 22.

According to Tetra Tech, "It is well-established that a list of method claim steps is generally not required to be performed in the recited order, unless there is clear language to the contrary." (Opening Br. at 16–17 (citing *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001) ("Unless the steps of a method actually recite an order, the steps are not ordinarily construed to require one"); *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369–70 (Fed. Cir. 2003) ("First, we look to the claim language to determine if, as a matter of logic or grammar, they must be performed in the order written. … If not, we next look to the rest of the specification to determine

---

[2]    The Court, however, notes that by adopting this construction, it is not making a determination as to Tetra Tech's infringement contentions, which may be distinguishable from the facts in *TQ Delta*.

whether it 'directly or implicitly requires such a narrow construction.'")).) Tetra Tech argues that nothing in the intrinsic evidence requires that the steps be performed in order, citing as examples steps (c)(i), i.e., "defining an appropriate gradient neighborhood…," and (d), i.e., "storing information…." (*Id*. at 17 (citing Morellas Decl. ¶¶ 67, 68; '293 Patent at 2:55–62, 5:8–15, 9:2–5, 29:39–55, 31:43–61).)

The Court finds that the claimed steps in Claims 1 and 22 must be run in their recited order as evidenced by the plain language of the claims. For instance, step (a) of Claim 1 recites "acquiring three dimensional surface elevation and intensity data representative of an area segment of railway track bed" and step (b) recites "generating a track elevation map *based on the acquired three dimensional data*." ('293 Patent, Claim 1 (emphasis added).) Step (c) then recites, inter alia, "identifying a railway track bed feature *from the track elevation map*" and step (d) recites "storing information *corresponding to the identified railway track bed feature* in the data storage apparatus." (*Id*. (emphasis added).) Thus, each step references information obtained in the previous step, indicating that the algorithm must perform the steps in the recited order "as a matter of logic or grammar." *Altiris*, 318 F.3d at 1369–70. Further, although sub-step (c)(1) does not reference information obtained in the previous steps, sub-step (c)(1) is a sub-step of step (c), which does reference previously obtained information, and sub-step (c)(2) recites moving the "gradient neighborhood" defined in sub-step (c)(1). *Id*. Finally, the Court finds unpersuasive Tetra Tech's argument that the algorithm can store information "corresponding to the identified railway track bed feature," as recited in step (d), before actually "identifying a railway track bed feature," as recited in step (c), because it could store information corresponding to the entire area segment of railway track bed.[3]

Accordingly, the Court construes Claims 1 and 22 of the '293 Patent to require

---

[3]   Tetra Tech also argues that step (b) of Claim 22 indicates that the steps need not be performed in order, (Opening Br. at 18 (citing Morellas Decl. ¶ 69)), but for similar reasons as stated, the Court disagrees.

the claimed steps to be run in their recited orders.

### h. "Track Elevation Map" ('293 Patent, Claims 1, 15, 36) / "Three Dimensional Elevation Map" ('293 Patent, Claim 22)

| Tetra Tech's Proposed Construction | Pavemetrics's Proposed Construction |
|---|---|
| No construction | "representation of both the height (elevation) and intensity of reflected laser light (intensity) at each data point within an area across the entire width of the railway track bed" |

The parties dispute whether the "maps" in both terms must represent both "three dimensional surface elevation" data and "three dimensional surface intensity" data.[4]

Tetra Tech argues that neither term requires the claimed "map" to represent both "elevation" and "intensity" data because the claims recite that the "map" is generated "based on" this data. (Opening Br. at 21, 22 (citing Morellas Decl. ¶¶ 79, 80, 82; '293 Patent at 6:60–61, 7:10–14, 12:65–13:3, Figs. 2, 10, 11; *Am. Med. Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1361 (Fed. Cir. 2010) (noting that "based upon" is not as strong as "is" or "means" in determining limitations of a claim term)).) According to Tetra Tech, the use of the phrase "based on" suggests that the "map" could be generated from a subset of the data, such as either the "elevation" data or the "intensity" data. (*Id.*) For instance, Tetra Tech emphasizes that Figure 10 depicts "an elevation map," which does not include "intensity" data. (*Id.* at 21 (citing '293 Patent at 7:10–11, Fig. 10).) Tetra Tech further argues that the use of the indefinite "a" before the "map" terms indicates that there may be multiple maps, and each map does not need to represent both the "elevation" and "intensity" data. (*Id.* at 22–23 (citing *KCJ Corp. v. Kinetic Concepts,*

---

[4]     Tetra Tech also argues that the terms should not be construed together, but does not provide any reason why they should be construed separately other than that they use different words, and it provides the same support for both terms. The Court also finds that Tetra Tech has not shown that Claim 36's recitation of a "track elevation map" is a clear drafting error. The Court thus construes the terms together given the similarities of the terms in the claims and the parties' dispute for each term.

*Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000) ("This court has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising'"); '293 Patent at 9:17–21, 12:15–17; Morellas Decl. ¶¶ 80, 83).)

Pavemetrics responds with four arguments why the intrinsic evidence unambiguously discloses that the "3D map terms" must be based on both "three dimensional surface elevation ***and*** intensity data." (*See* Resp. Br. at 2 (emphasis in original).) *First*, Pavemetrics highlights that both Claims 1 and 22 recite that the "map" terms are based on elevation "and" intensity data, not "or." (*Id*. at 2–3 (citing '293 Patent, Claims 1, 22).) *Second*, Pavemetrics asserts that the specification expressly defines "3D elevation maps" as "data … combined for both rails to provide a full elevation ***and*** intensity profile of the full width of a railway track bed as shown for example in FIG. 2." (*Id*. at 3 (emphasis in original) (quoting '293 Patent at 9:17–21).) *Third*, Pavemetrics argues that the Abstract emphasizes that the "railway track bed" "features" are "identif[ied]" and "assess[ed]" "based on 3D elevation ***and*** intensity data gathered from the railway track bed." (*Id*. (emphasis in original) (citing '293 Patent, Abstract).) *Finally*, Pavemetrics argues that Tetra Tech amended the claims during prosecution of the '293 Patent to claim that the "map" was based on both "elevation" data and "intensity" data as opposed to just "elevation" data to distinguish the claimed invention from the prior art. (*Id*. at 3–4 (citing "Exhibit J," ECF No. 87-2 at 2, 15, 40, 50, 51, 57, 65).)

Pavemetrics also responds that Tetra Tech's attempts to rewrite the "and" in the claims to mean "and/or" should be rejected. (*See id*. at 4–5.) Pavemetrics argues that Tetra Tech's argument regarding the phrase "based on" in the claim language ignores the conjunctive "and," which according to Pavemetrics, shows that the "map" must be based on both "elevation" and "intensity" data. (*Id*. at 4.) Pavemetrics also agrees that the specification discloses the use of multiple "maps," but argues that these "maps" represent different "area segments" of the track and each "contains elevation ***and***

intensity data for a 'segment' of track." (*Id*. (emphasis in original).) Addressing Figure 10, Pavemetrics argues that the specification only describes Figure 10 as an "elevation map" as opposed to a "track elevation map" or "three dimensional elevation map," and thus would not include "intensity" data, unlike the claimed "map" terms. (*Id*. at 4–5 (citing '293 Patent at 7:10–11).) By contrast, Pavemetrics highlights that the specification discloses that Figures 2 and 19 depict "3D elevation map[s]," and Figure 2 specifically depicts "a full track width elevation and intensity profile." (*Id*. at 5 (citing '293 Patent at 6:60–61, 7:31–32, 9:17–21, Figs. 2, 19).)

In its reply, Tetra Tech argues that the specification does not provide sufficient notice to define the "map" terms beyond its plain and ordinary meaning as Pavemetrics suggests. (Reply at 1–2 (citing *Medicines Co. v. Mylan, Inc.*, 853 F.3d 1296, 1306 (Fed. Cir. 2017); *Baxalta Inc. v. Genentech, Inc.*, 972 F.3d 1341, 1349 (Fed. Cir. 2020)).) Tetra Tech also argues that the Abstract does not "explain the invention" or discuss the "map" terms. (*Id*. at 2.) Additionally, Tetra Tech argues that it distinguished the cited prior art not on the ground that it did not include a "map" without "intensity" data, but on the ground that the prior art taught "compiling 'slices' of elevation data as opposed to describing 'elevations for an area of the track surface[.]'" (*Id*. (citing Exhibit J at 50).) Finally, Tetra Tech reemphasizes that Pavemetrics's construction would exclude Figure 10, and Pavemetrics admits that the terms "elevation map" and "3D elevation map" are interchangeable. (*Id*. at 3.)

In its sur-reply, Pavemetrics argues that the specification does not need to provide an express definition to reinforce the clear claim language. (Sur-reply at 2.) Pavemetrics also argues that "Tetra Tech's arguments about the 3D map contradict its earlier representations in this case," because Tetra Tech previously suggested that the "map" terms always include elevation data. (*Id*. at 3.)

The Court agrees with Pavemetrics that the terms "track elevation map" and "three dimensional elevation map" must be based on both "elevation" and "intensity" data. As Pavemetrics emphasizes, the use of the conjunctive "and" in the claims

30

suggests that the "map" terms are based on both the "elevation" and "intensity" data. The Court does not understand Tetra Tech's argument that the phrase "based on" somehow suggests that either the "elevation" or "intensity" data can be excluded from the map. Rather, for the "map" to be "based on" the "three dimensional elevation and intensity data," it must incorporate information from both sets of data. Further, contrary to Tetra Tech's assertion, the specification clearly defines the term "3D elevation maps" as including both "elevation" and "intensity" data. ('293 Patent at 9:17–21; *see Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001) ("[A] claim term may be clearly redefined without an explicit statement of redefinition. … In other words, the specification may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents.") (internal quotation marks omitted).) Additionally, unlike the "elevation" map of Figure 10, which only depicts "elevation" data, a "3D elevation map" necessarily requires "intensity" data as well. (*Compare id*. at 7:10–11, Fig. 10 (depicting "elevation map" with "elevation data"), *with id*. at 6:60–61, 7:31–32, 9:17–21, Figs. 2, 19 (depicting "3D elevation map" with "elevation" and "intensity" data).)[5]

Finally, to the extent the claim language and specification were not explicit, Tetra Tech disclaimed the scope of the "map" terms by amending the claims to require the "map" terms to be based on both "elevation" and "intensity" data. (*See* Exhibit J at 2, 15, 40, 50, 51, 57, 65; *see also Tech. Props. Ltd. v. Huawei Techs. Co*., 849 F.3d 1349, 1357 (Fed. Cir. 2017) ("Prosecution disclaimer can arise from both claim amendments and arguments."); *Vita-Mix Corp. v. Basic Holding, Inc*., 581 F.3d 1317, 1324 (Fed. Cir. 2009) ("A patentee may, through a clear and unmistakable disavowal in the prosecution history, surrender certain claim scope to which he would otherwise have an exclusive right by virtue of the claim language.").) Although Tetra Tech distinguished

---

[5]     Although it is not entirely clear whether Figure 19 depicts "intensity" data, Tetra Tech does not dispute this point in its reply brief and thus appears to concede that it does.

the prior art on the ground that it analyzed "slices" instead of "elevations over an area" of track surface, Tetra Tech also argued that "the track elevation map is gathered []via the three dimensional surface elevation and intensity data[.]" (*See* Exhibit J at 50, 51.) Thus, Tetra Tech argued that both the "3D surface elevation and intensity data models" are necessary to analyze "the elevations for an *area* of the track surface." (*Id.* at 50 (emphasis in original); *see also id.* at 52 ("Kainer does not teach or suggest a step of defining a three dimensional elevation map based on ***surface elevation and intensity data representative of an area segment of the railway track bed***.") (emphasis in original), 53, 57, 65 (recognizing that prior art reference did not "explicitly teach capturing the intensity image data"), 98, 100 (distinguishing prior art on the ground that it did not disclose "the use of a single sensor for obtaining surface elevation *and* intensity data for a given area" to define "a three dimensional elevation map" based on both "surface elevation ***and*** intensity data") (emphasis in original), 105.)

Accordingly, the Court construes the terms "track elevation map" and "three dimensional elevation map" to mean "representation of both the height (elevation) and intensity of reflected laser light (intensity) at each data point within an area across the entire railway track bed."

### i.   "Tie Surface Plane Model" ('557 Patent, Claim 8)

| Tetra Tech's Proposed Construction | Pavemetrics's Proposed Construction |
| --- | --- |
| No construction | "an approximation of the like-new surface of the entire tie based on an industry standard tie model" |

The parties dispute whether the "tie surface plane model" must be "an approximation of the like-new surface of the *entire* tie" and "based on an industry standard tie model."

Tetra Tech argues that the "tie surface plane model" does not need to be "an approximation of the like-new surface of the *entire* tie." (Opening Br. at 18–19.)

According to Tetra Tech, "the specification specifically contemplates eliminating tie areas covered by a rail (which cover portions of each tie, as shown, for example in Figure 1) when estimating a tie surface plane model[.]" (*Id*. (citing '557 Patent at 10:40–46, 16:16–17; Morellas Decl. ¶ 72).) Tetra Tech also argues that there is no support for importing an "industry standard tie model" limitation. (*Id*. at 19.) Tetra Tech argues that the specification only discloses the use of an "industry standard tie model" in one embodiment, which does not support limiting the claimed "tie surface plane model." (*Id*. (citing '557 Patent at 15:5–9; Morellas Decl. ¶ 73; *Thorner*, 669 F.3d at 1366; *Liebel-Flarsheim Co. v. Medrad, Inc*., 358 F.3d 898, 913 (Fed. Cir. 2004)).)

Pavemetrics responds that Claim 8 recites both a "tie surface plane" and a "tie surface plane model," and the scope of the two terms must be different. (Resp. Br. at 21–22 (citing *Bd. of Regents of the Univ. of Texas Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1371 (Fed. Cir. 2008) ("Different claim terms are presumed to have different meanings"); *Apple, Inc. v. Ameranth, Inc*., 842 F.3d 1229, 1237 (Fed. Cir. 2016) ("[i]deally, claim constructions give meaning to all of a claim's terms")).) Pavemetrics argues that the specification only references the "tie surface plane *models*" once, as seen below:

> In order to objectively assess the condition of each crosstie, the current condition of the tie is compared to ***an as-new tie condition***. This comparison is accomplished by calculating the difference between the high resolution 3D elevation map data for each crosstie and **the new crosstie surface approximation provided by the Tie Surface Plane models** calculated for each crosstie surface bounded by the corresponding tie bounding box (block 222).

(*Id*. at 22 (emphasis in original) (citing '557 Patent at 17:16–23).) Pavemetrics asserts that its proposed "entire tie" limitation comes from the specification's disclosure that the "tie surface plane models" are "calculated for the 'crosstie surface bounded by the corresponding tie bounding box[,]'" and "calculated for the surface bounded by 'the physical edge boundaries of the tie.'" (*Id*. (citing

'557 Patent at 15:3–4, 17:16–23).) Pavemetrics also argues that its proposed "industry standard tie model" limitation comes from the disclosure that the "tie bounding box" is defined "based on best fit tie models," which Pavemetrics argues a POSITA would know to mean "standard tie physical models" or "industry standard tie models." (*Id*. at 23 (citing '557 Patent at 15:2,15:7, Claim 5; Frakes Decl. ¶ 71).)

Tetra Tech replies that "the specification specifically contemplates that portions of the tie are excluded." (Reply at 9.) Tetra Tech also replies that "Pavemetrics conflates its description concerning a 'bounding box definition method' with the 'tie surface plane model' and 'tie bounding box' and otherwise equates 'best fit models,' 'standard tie physical models,' and 'industry standard tie models' as all the same, despite the terms being different and lacking any support in the specification." (*Id*. at 9–10.)

Pavemetrics argues in its sur-reply that Tetra Tech's arguments eliminate the distinction between "tire surface plane model" and "tie surface plane. (Sur-reply at 9–10.)

The Court agrees with Tetra Tech that the term "tie surface plane model" requires no construction. Figure 4, reproduced below, depicts "an elevation and intensity profile including rails and an approximated tie surface plane [**28**]":



FIG. 4

('557 Patent at 6:66–67, 9:46–50, Fig. 4.) As cited by Pavemetrics, the specification discloses that at least in the preferred embodiment, this "approximated tie surface plane" is "provided by the Tie Surface Plane models calculated for each crosstie surface bounded by the corresponding tie bounding box." (*Id*. at 17:16–23.) The specification also discloses in this same passage that the "tie surface plane model" and "approximated tie surface plane" are only necessary to establish a set elevation level to compare against the measured elevation level of each detected tie. (*See id*. at 17:7–67, Fig. 25.) This matches steps (b) and (c) in Claim 8 of the '557 Patent, which recite, inter alia, "calculating the difference between the tie surface elevation data and the tie surface plane model" and  "identifying tie surface regions with elevations less than a tie surface plane minus a crack depth threshold as tie crack targets," respectively. (*Id*., Claim 8.) Thus, the specification's description of the "tie surface plane model" or "approximated tie surface plane" does not require the "tie surface plane model" to be based on "industry standard tie models" or on an entire tie.

Further, the specification distinguishes between tie models that may be used to define the "tie bounding box" and the "tie surface plane models" used to detect features in the tie. (*Compare id*. at 14:66–9; 15:56–63 (describing using "standard tie physical models" and "best match tie model" to define the "tie bounding box"), *with id*. at 17:7–67 (describing using a "tie surface plane model" to provide the "approximated tie surface plane").) Although the tie model may require an approximation of the surface of an entire tie to define the "tie bounding box," the "tie surface plane model" need only establish a single elevation level.

Accordingly, the Court declines to construe the term "tie surface plane model."

### j. "Tie Bounding Box" ('557 Patent, Claims 8 & 14)

| Tetra Tech's Proposed Construction | Pavemetrics's Proposed Construction |
| --- | --- |
| No construction | "the physical edge boundaries of a tie, defined by matching the elevation data to industry standard tie models" |

The parties dispute whether the "tie bounding box" must be defined in relation to "industry standard tie models."

As Tetra Tech highlights, "The specification describes a tie bounding box as 'the physical edge boundaries of each detected tie.'" (Opening Br. at 20 (citing '557 Patent at 15:3–4, Figs. 17, 20, 22, 35, 38, 39, 48).) Tetra Tech contests that the "tie bounding box" is defined "by matching the elevation data to industry standard tie models," however. (*Id.*) For reasons similar to its arguments for the term "tie surface plane model," Tetra Tech argues that although the specification discloses using industry standard tie models "in a specific set of circumstances—in cases where a tie is damaged or broken[—]" that does not justify importing this limitation into Claims 8 and 14. (*Id.* (citing '557 Patent at 15:7–9, 15:57–59; Morella Decl. ¶¶ 75, 76; *Thorner*, 669 F.3d at 1366; *Liebel-Flarsheim*, 358 F.3d at 913).) Pavemetrics responds that each of Tetra Tech's citations to the specification disclose terms that a POSITA would know are interchangeable with the term "industry standard tie models." (Resp. Br. at 23 (citing '557 Patent at 15:2 ("standard tie physical models"), 15:7 ("industry standard tie models"); 15:57–58 ("all available crosstie models"); Frakes Decl. ¶ 71).) Tetra Tech replies that those terms only describe embodiments "where the tie is damaged or broken." (Reply at 10.) Pavemetrics argues in is sur-reply that the specification "suggests that the tie bounding box definition method *always* includes industry standard tie models, even if those tie models are *used* only when needed to assist in correctly defining and orienting the bounding box." (Sur-reply at 10 (emphasis in original) (citing

1   '557 Patent at 15:5–9).)

2       The Court agrees with Tetra Tech that the claimed "tie bounding box" does

3   not need to be defined in relation to "industry standard models." Figure 38,

4   reproduced below, depicts an exemplary "tie bounding box **460**" for "tie **464**":



FIG. 38

('557 Patent at 22:34–38, Fig. 38.) The specification discloses that to produce the

"physical edge boundaries of each detected tie," i.e., "a tie bounding box," "the

consolidated planar regions are *preferably* combined with [a] surface plane

approximation … and standard tie physical models (length and width parameters)[.]"

(*Id*. at 14:66–15:4 (emphasis added).) Further, as Tetra Tech emphasizes, the

specification discloses that the use of "industry standard tie models" is used "to assist

in correctly defining and orienting the bounding box in cases where the tie is damaged

or broken." (*Id*. at 15:5–9.) Thus, the specification does not require the use of "industry

standard tie models" to define the "tie bounding box," and the Court sees no reason to

import this limitation into the claims. Further, unlike Claims 8 and 14, Claim 5 explicitly

recites that the "tie bounding box" is defined based on "best fit tie models," suggesting

that the term "tie bounding box" is not so limited. (*See id*., Claim 5.)

       Accordingly, the Court declines to construe the term "tie bounding box."

37

# IV.   CONCLUSION

For the reasons stated above, the Court **CONSTRUES** the disputed terms as follows:

| Term (Claim) | Court's Construction |
| --- | --- |
| "appropriate gradient neighborhood" ('293 Patent, Claims 1 & 22) | "neighborhood" – "zone of a limited area" |
| "2D track section over which differential vertical measurements are calculated" ('293 Patent, Claims 1 & 22) | No construction |
| "sliding window" ('293 Patent, Claims 1 & 22) | No construction |
| "moving the gradient neighborhood like a sliding window over the 3D elevation data" ('293 Patent, Claims 1 & 22) | "sequentially and completely applying the gradient neighborhood to the 3D elevation data" |
| "identifying" ('293 Patent, Claims 1, 2, 15, 19–23, 36, & 42) | No construction |
| "is configured to run an algorithm" ('293 Patent, Claim 1) | "is programmed to run an algorithm without the need to rebuild, rewrite or recompile the code for, or redesign any of that hardware or software" |
| Comprising the Steps of: a, b, c, d ('293 Patent, Claims 1 & 22) | "the algorithm must be configured to run the steps in the recited order" and "the method steps must be performed in the recited order" |
| "track elevation data" ('293 Patent, Claims 1, 15, 36) / "three dimensional elevation map" ('293 Patent, Claim 22) | "representation of both the height (elevation) and intensity of reflected laser light (intensity) at each data point within |

| | an area across the entire width of the railway track bed" |
|---|---|
| "tie surface plane model" ('557 Patent, Claim 8) | No construction |
| "tie bounding box" ('557 Patent, Claims 8 and 14) | No construction |

**IT IS SO ORDERED.**

Dated: December 1, 2021

MARK C. SCARSI
UNITED STATES DISTRICT JUDGE

39