Application/Control Number: 14/725,490                                                    Page 19

Art Unit: 2489

Regarding claim **32** (Currently Amended), **Kainer et al.** and **Farritor** teach *the method of claim 31 wherein the method further comprises the step of identifying and measuring surface cracks <u>in an identified tie</u> that are deeper than a minimum crack depth threshold and that are longer than a minimum crack length threshold based on the track elevation map* (**Kainer et al.; [0063];** It teaches determining width, length and depth of cracks based on whether the defective portions **D, D'** fall within or outside a region of interest, meaning certain threshold values).

Regarding claim **33** (Original), **Kainer et al.** and **Farritor** teach *the method of claim 32 wherein the method further comprises the step of saving data corresponding to the measured surface cracks to the data storage apparatus on a per tie basis so that the same tie can be re-examined at a later date to determine whether the measured surface cracks have changed* (**Kainer et al.; [0062], L22-25;** It teaches determining rail wears by comparing image frames taken at different times but in the same location of the track bed, meaning the storage device **62** is capable of storing data for the same track bed features for the same location at different times so that the wear and tear can be compared over a time).

Regarding claim **34** (Original), **Kainer et al.** and **Farritor** teach *the method of claim 33 wherein the method further comprises a step of assigning a severity value to each measured crack based on at least the measured length and measured width of the crack* (**Kainer et al.; [0083]; Fig. 13,** step **212** shows assigning a tie conditioning score after measuring different features associated with the ties to create a tie replacement plan, meaning the score will tell one

EXHIBIT 2
153

Application/Control Number: 14/725,490                                                          Page 20
Art Unit: 2489

how severe the condition of the tie is and if it needs immediate replacement or not. The same

severity matrix is also described in **[0114]**).


Regarding claim **35** (Currently Amended), **Kainer et al.** and **Farritor** teach *the method*

*of claim 34 wherein the method further comprises the step of identifying and measuring a*

*surface feature* <u>*other than a rail head*</u> *that is higher than a minimum tie height threshold* (**Kainer**

**et al.; [0062], L12-21, Fig. 7A-B;** It teaches a height **LD** of the surface of the rail **12** with

respect to the tie plate for successive frames where the height **LD** is showing smaller in the later

frame than the earlier frame indicating a wear and tear of the surface. As cited earlier in **[0065],**

**L1-6,** in view of **Fig. 8,** it teaches that a height of ballast **18**, which is a surface feature other than

the rail head, can be measured with respect to the crosstie **10**).


Regarding claim **36** (Original), **Kainer et al.** and **Farritor** teach *the method of claim 35*

*wherein the method further comprises the step of saving data corresponding to the measured*

*surface feature to the data storage apparatus on a per tie basis so that the same tie can be re-*

*examined at a later date to determine whether the measured surface feature has changed*

(**Kainer et al.; [0062], L22-25;** It teaches determining rail wears by comparing image frames

taken at different times but in the same location of the track bed, meaning the storage device **62**

is capable of storing data for the same track bed features for the same location at different times

so that the wear and tear can be compared over a time).

EXHIBIT 2
154

Application/Control Number: 14/725,490                                                      Page 21
Art Unit: 2489

Regarding claim **37** (Original), **Kainer et al.** and **Farritor** teach *the method of claim 31*

*wherein the method further comprises the step of detecting a broken tie based on an abrupt*

*elevation shift along the tie surface plane* (**Kainer et al.; [0099]**).

Regarding claim **38** (Currently Amended), **Kainer et al.** and **Farritor** teach *the method*

*of claim 24 wherein the step of identifying a railway track bed feature further comprises the step*

*of comparing at least a portion of the track elevation map to a plurality of three dimensional*

*features saved in* <u>*a feature library to determine a best fit to properly identify the railway track*</u>

*bed feature* (**Kainer et al.; [0059], Fig. 5;** It teaches a best fit curve determination of two feature

lines **L1** and **L2** corresponding to rail head **12** and the crosstie **10** which are then averaged over a

several of the previously stored image frames so that the computer can analyze and determine the

angular relationship between these lines **L1-L2** to determine the tie angle with respect to the rail,

where the tie angle is the feature being identified after averaging over plurality of previously

stored image frames).

Regarding claim **39** (Currently Amended), **Kainer et al.** and **Farritor** teach *the method*

*of claim 38 wherein the step of comparing further comprises the step of applying a minimum*

*correlation threshold so that a railway track bed feature* <u>*other than a railroad tie*</u> *will not be*

*identified as a particular three dimensional feature from the feature library unless the minimum*

*correlation threshold is met* (**Kainer et al.; [0014];** It teaches applying a correlation between the

tie features, e.g. spacing and the tie condition grading above/below a threshold to determine the

tie replacement plan, meaning if the correlation is not met the tie grading will not be identified as

<u>EXHIBIT 2</u>
155

Application/Control Number: 14/725,490                                                    Page 22

Art Unit: 2489

needing replacement. As cited earlier in **[0065], L1-6,** in view of **Fig. 8,** it teaches that a height

of ballast **18,** which is a surface feature other than the rail head, can be measured with respect to

the crosstie **10**).

Regarding claim **41** (Original), **Kainer et al.** and **Farritor** teach *the method of claim 31*

*wherein the method further comprises the step of defining a surface area region adjacent the tie*

*bounding box, measuring the surface elevation of the surface area region, and determining the*

*difference between the surface elevation of the surface area region and the surface elevation of*

*the approximate tie surface plane to determine whether a positive volume or negative volume is*

*present at the surface area region* (**Kainer et al.; [0092];** It teaches the system identifying the tie

surface area with respect to the non-tie surface area and how much of the tie area surface is

covered by the ballast and therefore cannot be scored, which is equivalent of positive volume

(60%) and negative volume (40%)).

Regarding claim **42** (Currently Amended), **Kainer et al.** and **Farritor** teach *the method*

*of claim 38 wherein the method further comprises the step of making a plurality of elevation*

*measurements along and around an identified railway track bed feature <u>other than a railroad tie</u>*

*and recording the measurements and the locations of the measurements in the data storage*

*apparatus* (**Kainer et al.; [0056]; Fig. 11** and **12** show plurality of compiled image data showing

the track bed features. Also **Figs. 4A-C** show three consecutive image frames **Z1-Z3** meaning

the system is taking multiple elevation measurements. Since the system is equipped with a

storage device **62,** it is understood that the plurality of elevation measurements are stored in the

EXHIBIT 2
156

Application/Control Number: 14/725,490                                          Page 23
Art Unit: 2489

storage device. As cited earlier in **[0065], L1-6,** in view of **Fig. 8,** it teaches that a height of

ballast **18**, which is a surface feature other than the rail head, can be measured with respect to the

crosstie **10**).

Regarding claim **43** (Original), **Kainer et al.** and **Farritor** teach *the method of claim 42*

*wherein the method further comprises the step of assigning a condition to the identified railway*

*track bed feature based on the plurality of elevation measurements* (**Kainer et al.;** In **[0114],** it

discloses assigning four conditions based on the determination of the rail track features, e.g.

good (1), marginal (2), bad (3), or failed (4)).

Regarding claim **44** (Original), **Kainer et al.** and **Farritor** teach *the method of claim 24*

*wherein the step of identifying a railway track bed feature further comprises the step of*

*measuring the length of a joint bar candidate, determining whether the length of the joint bar*

*candidate falls between a minimum joint bar length threshold and a maximum joint bar length*

*threshold, and identifying the joint bar candidate as a joint bar if the length measurement of the*

*joint bar candidate falls between a minimum joint bar length threshold and a maximum joint bar*

*length threshold* (**Kainer et al.; [0122], L6-10;** It teaches determining the edge outlines of the

joint bar from two consecutive rail top edges and then comparing the shape against a standard

joint bar shape, meaning thresholding different edges to determine whether it is a joint bar or

not).

EXHIBIT 2
157

Application/Control Number: 14/725,490                                         Page 24

Art Unit: 2489

**Claims 22-23 are rejected under AIA 35 U.S.C. 103(a) as being unpatentable over
Kainer et al. (US PGPub 2013/0191070 A1) in view of Farritor (US PGPub 2012/0300060
A1) and further in view of Szwilski et al. (US PGPub 2010/0026551 A1).**

Regarding claim **22** (Currently Amended), **Kainer et al.** teach *a system for assessing a
railway track bed* (**[0036], L5-6**)*, the system comprising:*

*a power source* (**[0046], L14-17**)*;*

*a light emitting apparatus powered by the power source for emitting light energy toward
a railway track* (**[0012], L2-6; Fig. 1** and **2,** reference numeral **40**)*;*

*a data storage apparatus* (**Fig. 1,** reference numeral **62**) *in communication with at least
one processor* (**Fig. 1,** reference numeral **54, 60**)*;*

*at least one sensor for sensing reflected light that was emitted from the light emitting
apparatus* (**Fig. 1** and **2,** reference numeral **50**) *and acquiring three dimensional <u>surface
elevation and intensity </u>image data of the railway track* (**[0029]. Figs. 11** and **12** show the
perspective three-dimensional image showing the elevation of rail head, tie plate, tie surface etc.
In **[0105]** it describes how the elevation of different rail track features are measured using the
image. On the other hand, in **[0071],** it teaches illuminating the rail track with certain light
intensity, e.g. 0.15 watts/in and receiving the reflected light from the track surface using one or
more camera, which means the captured images contain intensity of light) *to be stored in the
data storage apparatus* (**Fig. 1** shows the communicative coupling between the camera and the
storage device **62**)*, wherein the plurality of sensors are in communication with the at least one*

EXHIBIT 2
158

Application/Control Number: 14/725,490                                             Page 25

Art Unit: 2489

*processor* (**Fig. 1** shows communicative coupling between the camera **50** and the processor **54**)*; and*

     *wherein the at least one processor includes an algorithm* (**[0012], L10-13**) *for extracting railway track bed surface elevation data to define new railway track bed components for a three dimensional track feature library* (**[0015], L12-15.** The Examiner interprets the track feature library as the database for storing track features, which is being done by storing the track features into the storage device as disclosed in **[0046], L5-13**)*, the algorithm comprising the steps of:*

     *a. acquiring three dimensional <u>surface elevation and intensity</u> data* (**Figs. 11** and **12** show the perspective three-dimensional image showing the elevation of rail head, tie plate, tie surface etc. In **[0105]** it describes how the elevation of different rail track features are measured using the image. On the other hand, in **[0071]**, it teaches illuminating the rail track with certain light intensity, e.g. 0.15 watts/in and receiving the reflected light from the track surface using one or more camera, which means the captured images contain intensity of light) *representative of <u>an area</u> segment of railway track bed* (**[0047], L14-18**)*;*

     *b. generating a track elevation map based on the acquired three dimensional data* (**[0082], L18-20; Figs. 11-12** represent a 3D track elevation map where different parameters, e.g. elevations, height, cracks, splits, orientations, etc. can be measured as disclosed in **[0056], L7-17**)*;*

     *c. identifying a railway track feature from the track elevation map that does not match any previously defined track features saved in a track feature library* (**[0083], L1-5;** It teaches identifying tie plate features to compute different condition metrics of the tie plates. Now in **[0102], [0087], L10-15,** it teaches different tie plate features, e.g. widths, slope, spikes, etc.

EXHIBIT 2
159

Application/Control Number: 14/725,490                                                Page 26
Art Unit: 2489

where it states "Once these features have been found, the system calculates plate cut by finding

the edges …". Which means as the features are being found, that were not defined or used

previously, are being used now to locate tie plates)*;*

      *d. extracting three dimensional surface elevation and intensity data* (**Figs. 11** and **12**

show the perspective three-dimensional image showing the elevation of rail head, tie plate, tie

surface etc. In **[0105]** it describes how the elevation of different rail track features are measured

using the image. On the other hand, in **[0071]**, it teaches illuminating the rail track with certain

light intensity, e.g. 0.15 watts/in and receiving the reflected light from the track surface using

one or more camera, which means the captured images contain intensity of light) *from the track*

*elevation map corresponding to the identified railway track feature* (**[0047], L14-18**)*;*

      *e. assigning a feature name to the extracted three dimensional data* (Since the system is

storing all the 3D information data into storage device **62** for retrieving the data at a later time

(**[0046], L7-9;** It teaches both read/write operation), it is imperative that each data is tagged with

unique identifier for later reading and analysis)*; and*

      *f. saving in the data storage apparatus the extracted three dimensional data associated*

*with the feature name as a new track feature to be included in the track feature library* (**[0046],**

**L5-13**).

      Although, **Kainer et al.** teach storing 3D information into storage device for both

read/write purpose, but it does not explicitly teach tagging each feature with a unique

name/ID/tag.

EXHIBIT 2
160

Application/Control Number: 14/725,490                                      Page 27
Art Unit: 2489

However, **Szwilski et al.** teach a railroad surveying and monitoring system where it tags
all the acquired data about the rail track including the camera data with a position location and
stores it in the storage device (**Szwilski et al.; [0065], L6-12**).

It would have been obvious for one of ordinary skill in the art at the time the invention
was made to combine **Kainer et al**'s invention of inspecting railroad ties to include **Szwilski et
al**'s usage of data tagging and storing, because in doing so one can carry out comparative
analysis of the acquired data for a subsequent track inspection data with respect to the previously
tagged track inspection data (**Szwilski et al.; [0066], L1-17**).

Although, **Kainer et al.** teach capturing perspective three-dimensional image showing
the elevation of rail head, tie plate, tie surface etc. as shown in **Figs. 11, 12** and also illuminating
the rail track with certain light intensity, e.g. 0.15 watts/in and receiving the reflected light from
the track surface using one or more camera as described in **[0071]**, which means the captured
images contain intensity of light, but it does not explicitly teach capturing the intensity image
data.

However, **Farritor** teaches a system of rail road deflection measurement using visioning
means which is in the same field of endeavor, where it teaches calculating image intensities from
the captured image data as described in **[0043]**.

It would have been obvious for one of ordinary skill in the art at the time the invention
was made to combine **Kainer et al**'s invention of inspecting railroad ties to include **Farritor**'s
usage of image intensity data capturing, because this technique can be used in identifying the
edges of the rail, and thereby the slope of the rail in the image (**Farritor; [0043]**).

EXHIBIT 2
161

Application/Control Number: 14/725,490                                        Page 28

Art Unit: 2489

Regarding claim **23** (Currently Amended), **Kainer et al.** teach *a method of building a virtual three dimensional railway track bed component library* (**[0047], L14-18**)*, the method comprising the steps of:*

*a. emitting a light along a track bed surface* (**[0012], L2-6; Fig. 1** and **2,** reference numeral **40**)*;*

*b. sensing some of the emitted light after it has reflected off of the track bed surface* (**Fig. 1** and **2,** reference numeral **50**)*;*

*c. defining a three dimensional elevation map <u>using surface elevation and intensity data</u>* (**Figs. 11** and **12** show the perspective three-dimensional image showing the elevation of rail head, tie plate, tie surface etc. In **[0105]** it describes how the elevation of different rail track features are measured using the image. On the other hand, in **[0071],** it teaches illuminating the rail track with certain light intensity, e.g. 0.15 watts/in and receiving the reflected light from the track surface using one or more camera, which means the captured images contain intensity of light) <u>*representative of an area segment of the track bed*</u> (**[0047], L14-18**) *based on the sensed light reflected from the track bed surface* (**[0082], L18-20; Figs. 11-12** represent a 3D track elevation map where different parameters, e.g. elevations, height, cracks, splits, orientations, etc. can be measured as disclosed in **[0056], L7-17**)*;*

*d. storing the elevation map in a data storage apparatus* (**Fig. 1** shows the communicative coupling between the camera and the storage device **62**)*;*

*e. identifying a railway track bed feature from the three dimensional elevation map that does not match any previously defined track bed features saved in a track component library* (**[0083], L1-5;** It teaches identifying tie plate features to compute different condition metrics of

EXHIBIT 2
162

Application/Control Number: 14/725,490                                                                                    Page 29
Art Unit: 2489

the tie plates. Now in **[0102], [0087], L10-15,** it teaches different tie plate features, e.g. widths,

slope, spikes, etc. where it states "Once these features have been found, the system calculates

plate cut by finding the edges …". Which means as the features are being found, that were not

defined or used previously, are being used now to locate tie plates)*;*

    *f. extracting three dimensional data from the track elevation map corresponding to the*

*identified railway track bed feature* **([0047], L14-18)***;*

    *g. assigning a component name to the extracted three dimensional data* (Since the system

is storing all the 3D information data into storage device **62** for retrieving the data at a later time

(**[0046], L7-9;** It teaches both read/write operation), it is imperative that each data is tagged with

unique identifier for later reading and analysis)*; and*

    *h. saving the extracted three dimensional data associated with the component name in a*

*data storage apparatus as a new track bed feature to be included in the track component library*

**([0046], L5-13)**.

    Although, **Kainer et al.** teach storing 3D information into storage device for both

read/write purpose, but it does not explicitly teach tagging each feature with a unique

name/ID/tag.

    However, **Szwilski et al.** teach a railroad surveying and monitoring system where it tags

all the acquired data about the rail track including the camera data with a position location and

stores it in the storage device (**Szwilski et al.; [0065], L6-12**).

    It would have been obvious for one of ordinary skill in the art at the time the invention

was made to combine **Kainer et al**'s invention of inspecting railroad ties to include **Szwilski et

al**'s usage of data tagging and storing, because in doing so one can carry out comparative

EXHIBIT 2
163

Application/Control Number: 14/725,490                                                Page 30

Art Unit: 2489

analysis of the acquired data for a subsequent track inspection data with respect to the previously

tagged track inspection data (**Szwilski et al.; [0066], L1-17**).

Although, **Kainer et al.** teach capturing perspective three-dimensional image showing

the elevation of rail head, tie plate, tie surface etc. as shown in **Figs. 11, 12** and also illuminating

the rail track with certain light intensity, e.g. 0.15 watts/in and receiving the reflected light from

the track surface using one or more camera as described in **[0071]**, which means the captured

images contain intensity of light, but it does not explicitly teach capturing the intensity image

data.

However, **Farritor** teaches a system of rail road deflection measurement using visioning

means which is in the same field of endeavor, where it teaches calculating image intensities from

the captured image data as described in **[0043]**.

It would have been obvious for one of ordinary skill in the art at the time the invention

was made to combine **Kainer et al**'s invention of inspecting railroad ties to include **Farritor**'s

usage of image intensity data capturing, because this technique can be used in identifying the

edges of the rail, and thereby the slope of the rail in the image (**Farritor; [0043]**).


**Claims 17, 40 are rejected under AIA 35 U.S.C. 103(a) as being unpatentable over**

**Kainer et al. (US PGPub 2013/0191070 A1) in view of Farritor (US PGPub 2012/0300060**

**A1) and further in view of Landes et al. (US PGPub 2013/0096739 A1).**


Regarding claim **17** (Original), **Kainer et al.** and **Farritor** teach *the system of claim 6.*

EXHIBIT 2

164

Application/Control Number: 14/725,490                                            Page 31

Art Unit: 2489

Although **Kainer et al.** teach determining the ballast height from the difference in levels

of the ballast and the crosstie and ballast stone size as described in **[0065]**, but **Kainer et al.** or

**Farritor** do not exclusively teach determining the ballast volume.

However, **Landes et al.** teach a system for automatic rail track surveying using camera

and laser lights which determines the ballast volume from the acquired data (**Landes et al.;**

**[0009], L1-5**).

It would have been obvious for one of ordinary skill in the art at the time the invention

was made to combine **Kainer et al**'s invention of inspecting railroad ties to include **Landes et**

**al**'s determination of ballast volume from the acquired data by the system, because since ballast

beneath and between the ties stabilizes the positions of the ties, keeps the rails level, and

provides some cushioning of the composite structure for loads imposed by rail traffic, any

dislodging of the ballast over time could cause rail track deterioration and safety hazards.

Therefore, periodic monitoring of ballast volume and replacement thereof will ensure rail track

safety and integrity (**Landes et al.; [0005], L6-15**).


Regarding claim **40** (Original), **Kainer et al.** and **Farritor** teach *the method of claim 31*.

Although **Kainer et al.** teach determining the ballast height from the difference in levels

of the ballast and the crosstie and ballast stone size as described in **[0065]**, but **Kainer et al.** or

**Farritor** do not exclusively teach determining the ballast volume.

However, **Landes et al.** teach a system for automatic rail track surveying using camera

and laser lights which determines the ballast volume from the acquired data (**Landes et al.;**

**[0009], L1-5**).

EXHIBIT 2

165

Application/Control Number: 14/725,490                                            Page 32

Art Unit: 2489

It would have been obvious for one of ordinary skill in the art at the time the invention

was made to combine **Kainer et al**'s invention of inspecting railroad ties to include **Landes et**

**al**'s determination of ballast volume from the acquired data by the system, because since ballast

beneath and between the ties stabilizes the positions of the ties, keeps the rails level, and

provides some cushioning of the composite structure for loads imposed by rail traffic, any

dislodging of the ballast over time could cause rail track deterioration and safety hazards.

Therefore, periodic monitoring of ballast volume and replacement thereof will ensure rail track

safety and integrity (**Landes et al.; [0005], L6-15**).

### *Response to Arguments*

Applicant's arguments filed on 07/31/2017, page 12 – 21, with respect to the rejection(s)

of independent claim(s) 1, 17, 24, 40 under 102(a)(1) have been fully considered but are moot

because the arguments do not apply to any of the references being used in the current rejection.

However, the Examiner would like to reiterate that in **[0029]** and in view of **Figs. 11** and **12**,

**Kainer et al.** show the perspective three-dimensional image showing the elevation of rail head,

tie plate, tie surface etc. In **[0105]** it describes how the elevation of different rail track features

are measured using the image. On the other hand, in **[0071],** it teaches illuminating the rail track

with certain light intensity, e.g. 0.15 watts/in and receiving the reflected light from the track

surface using one or more camera, which means the captured images contain intensity of light.

But since **Kainer et al.** do not explicitly teach capturing intensity image, the Examiner brings in

the reference of **Farritor** which is in the same field of endeavor and explicitly teach the intensity

image capturing.

EXHIBIT 2

166

Application/Control Number: 14/725,490                                      Page 33
Art Unit: 2489

Applicant argues regarding claim 12, 16, 19, 35, 39, 42 by stating that "Applicant's claim

12 has been amended to expressly exclude rail heads. As disclosed in FIG. 13 of Applicant's

Application, the prominent rail head features of a scan are purposefully removed to allow for

detection of other, subtler features based on height deviations (e.g.,

weld artifacts). See Applicant's Application, [00106]. The section relied on in the Office Action

in Kainer is specifically referring to rail height and detecting rail wear. See Kainer, FIG. 7A.

As such, because Applicant's claim 12 is not referring to rail height or rail erosion and in fact

removes rail heads from the calculations being performed. Kainer does not meet each and every

limitation of Applicant's claim 12, as amended. Reconsideration and allowance of claim 12,

as amended, are respectfully requested".

The examiner cannot concur with the applicant and respectfully disagrees and kindly

points out that **Kainer et al.** in fact teach the surface feature measurement other than a track rail

head as described in **[0065], L1-6,** in view of **Fig. 8,** where it teaches that a height of ballast **18,**

which is a surface feature other than the rail head, can be measured with respect to the crosstie

**10**.


Applicant argues regarding claims 15, 38 by stating that "The limitations from claim 15

were correlated with Kainer paragraph [0059] in the Office Action. This portion of Kainer

discusses determining the angle of crossties with respect to adjacent rails. Here, Kainer is not

concerned with identifying a feature. The identities of the features are already known (i.e.,

crossties and rails). Rather, Kainer is concerned with determining the relative positioning

EXHIBIT 2
167

Application/Control Number: 14/725,490                                          Page 34
Art Unit: 2489

between crossties and rails. In contrast, Applicant's amended claim 1 describes a feature library

which includes a plurality of 3D railroad track features such as, for example, plates, plate holes,

spikes, anchors, and tie fasteners (e.g., fastening clips). As the track elevation map is gathered

(via the three dimensional surface elevation and intensity data), the map is analyzed and features

in the map are cross-referenced with the library of 3D features to help identify the features.

Kainer does not teach or suggest this technology. As such, each and every element of claim 15 is

not met by Kainer. Thus, claim 15 patentably defines over Kainer. Reconsideration and

allowance of claim 15 are respectfully requested".

     The examiner cannot concur with the applicant and respectfully disagrees and kindly

points out that first of all the original or amended claim 1 never discloses a feature library which

includes a plurality of 3D track features such as plates, plate holes, spikes, anchors, etc. as

allegedly being argued. The arguments presented here in favor of the limitations were never

disclosed in claim 1 originally or amended. In claim 15, the disclosure is about a feature library

containing features that are being compared against the captured image data to identify the track

feature. The Examiner interprets the feature library as nothing more than a storage area where the

feature data, e.g. rail/tie width, length, height, tie angle, etc. are being stored. Therefore, in view

of **[0059]** and **Fig. 5**, it teaches a best fit curve determination of two feature lines **L1** and **L2**

corresponding to rail head **12** and the crosstie **10** which are then averaged over a several of the

previously stored image frames so that the computer can analyze and determine the angular

relationship between these lines **L1-L2** to determine the tie angle with respect to the rail, where

the tie angle is the feature being identified after averaging over plurality of previously stored

image frames. Also in **[0102]**, **[0087]**, **L10-15,** it teaches different tie plate features, e.g. widths,

EXHIBIT 2
168

Application/Control Number: 14/725,490                                        Page 35
Art Unit: 2489

slope, spikes, etc. where it states "Once these features have been found, the system calculates

plate cut by finding the edges …". Which means as the features are being found, that were not

defined or used previously, are being used now to locate tie plates. These teachings clearly

anticipates the limitations in claim 15 and 38.


        Applicant argues regarding claims 22, 23 by stating that "Additionally, claim 22

specifically states the 3D data is extracted "to define new railway track components for a three

dimensional track feature library". The Office Action cites paragraph [0015] in Kainer which has

no teaching or suggestion of such a feature whatsoever. There is nothing in Kainer regarding the

system defining new, previously unknown track components and saving those newly-defined

components for future reference. Paragraph [0083] in Kainer does not compensate for this

deficiency. In paragraph [0083], Kainer teaches analyzing ties. Ties are a known basic feature of

a railroad track. In Kainer there is no defining new, previously unknown railway track

components and then storing those components in a feature library for future use at identifying

the new feature in the future".

        The examiner cannot concur with the applicant and respectfully disagrees and kindly

points out that the alleged definition of previously unknown railway track components is not

what is disclosed in the claimed limitations and therefore the prior art need not address the

argument at hand. However, as mentioned earlier, Examiner interprets the feature library as

nothing more than a storage area where the feature data, e.g. rail/tie width, length, height, tie

angle, etc. are being stored. Therefore, in view of **[0059]** and **Fig. 5**, it teaches a best fit curve

determination of two feature lines **L1** and **L2** corresponding to rail head **12** and the crosstie **10**

EXHIBIT 2
169

Application/Control Number: 14/725,490                                    Page 36
Art Unit: 2489

which are then averaged over a several of the previously stored image frames so that the

computer can analyze and determine the angular relationship between these lines **L1-L2** to

determine the tie angle with respect to the rail, where the tie angle is the feature being identified

after averaging over plurality of previously stored image frames. Also in **[0102], [0087], L10-15,**

it teaches different tie plate features, e.g. widths, slope, spikes, etc. where it states "Once these

features have been found, the system calculates plate cut by finding the edges …". Which means

as the features are being found, that were not defined or used previously, are being used now to

locate tie plates. Therefore, the Examiner believes the teachings of **Kainer et al.** in view of

**Farritor** and **Szwilski et al.** teach all the limitations of claims 22 and 23.


*Conclusion*

**THIS ACTION IS MADE FINAL.** Applicant is reminded of the extension of time

policy as set forth in 37 CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action.  In the event a first reply is filed within TWO

MONTHS of the mailing date of this final action and the advisory action is not mailed until after

the end of the THREE-MONTH shortened statutory period, then the shortened statutory period

will expire on the date the advisory action is mailed, and any extension fee pursuant to 37

CFR 1.136(a) will be calculated from the mailing date of the advisory action.  In no event,

however, will the statutory period for reply expire later than SIX MONTHS from the mailing

date of this final action.

EXHIBIT 2
170

Application/Control Number: 14/725,490                                        Page 37
Art Unit: 2489

Any inquiry concerning this communication or earlier communications from the examiner should be directed to MAINUL HASAN whose telephone number is (571)272-0422. The examiner can normally be reached on MON-FRI: 10AM-6PM, Alternate FRIDAYS, EST.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, JORGE ORTIZ-CRIADO can be reached at (571)272-7624.  The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system.  Status information for published applications may be obtained from either Private PAIR or Public PAIR.  Status information for unpublished applications is available through Private PAIR only.  For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/M. H./
Examiner, Art Unit 2489

EXHIBIT 2
171

## REMARKS

Claims 1-44 are currently pending.  Claims 1 and 22-24 are the pending independent claims.  Claims 1-16, 18-21, 24-39 and 41-44 are rejected under 35 U.S.C. § 103 over U.S. Patent Application Publication Number 2013/0191070 to Kainer et al. ("Kainer") in view of U.S. Patent Application Publication Number 2012/0300060 to Farritor ("Farritor").  Claims 22 and 23 are rejected under 35 U.S.C. § 103 over Kainer in view Farritor and further in view of U.S. Patent Application Publication Number 2010/0026551 to Szwilski et al. ("Szwilski"). Claims 17 and 40 are rejected under 35 U.S.C. § 103 over Kainer in view of Farritor and further in view of U.S. Patent Application Publication Number 2013/0096739 to Landes et al. ("Landes").  Claims 12, 16, 19, 23, 35, 39 and 42 have been amended. No new matter has been introduced by the amendments, which are supported by the disclosure of the original claims and the specification.

In response to the final office action mailed on August 16, 2017, Applicant, pursuant to 37 CFR   1.114, requests continued examination by filing the submission of amendments to the claims (above), new claims, and filing the appropriate fee under 37 CFR   1.17(e).  No new matter has been added by the amendments and/or new claims.  Form sb0030 is filed herewith which includes details of this RCE. Each of the foregoing rejections is respectfully traversed and favorable reconsideration is requested in view of the above amendments and following remarks.

### I.   § 112(a) Rejections of claims 12-13, 16, 19-20, 35-36, 39, and 42-43

Claims 12-13, 16, 19-20, 35-36, 39, and 42-43 are rejected under 35 U.S.C. § 112(a) for allegedly failing to comply with the written description requirement. The issue appears to center around the addition of the phrase "other than a rail head" in the prior amendment. These claims have been amended further to remove the phrase "other than a rail head" to obviate this particular refusal.

### II.   § 103 Rejections of claims 1-16, 18-21, 24-39 and 41-44

Claims 1-16, 18-21, 24-39 and 41-44 are rejected under 35 U.S.C. § 103 over Kainer in view of Farritor.  If the sum of references cited against an application is deficient as to the same element or combination of elements required by a rejected claim, then such claim is patentable over the cited references.  See *Velander v. Garner*, 348 F.3d 1359, 1363, 68 USPQ2d 1769, 1772

EXHIBIT 2
172

Application No. 14/725,490
January 15, 2018
Reply to Office Action of August 16, 2017

(Fed. Cir. 2003). This requirement is separate and distinct from the Federal Circuit's Teaching, Suggestion, Motivation (TSM) Test analyzed in *KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398 (2007) and remains good law. See *Abbott Laboratories v. Sandoz, Inc.*, 500 F.Supp.2d 846, 852 (N.D. Ill. 2007) (quoted with approval in *Abbott Laboratories v. Sandoz, Inc.*, 544 F.3d 1341, 1351 (Fed. Cir. 2008)).

### A.  Claims 1-16, 18-21

Independent claim 1, as amended, claims, *inter alia*, a system for assessing a railway track bed including a processor running one or more algorithms wherein the algorithm steps include (a) acquiring three dimensional *surface elevation and intensity data representative of an area segment of railway track bed*; (b) generating a track elevation map based on the acquired three dimensional data; and (c) identifying a railway track bed feature from the track elevation map. *See, e.g.*, Applicant's Application, ⁋ [0007]. Claim 1 also discusses the use of at least *one* sensor which implies that a single sensor in the simplest configuration would have to be capable of acquiring three dimensional surface elevation and intensity data for a specific viewing area.

Applicant's system and method for generating a 3D model is very different from the approach described in Kainer. In Kainer, a very large number of slices or "frames" across the track surface are taken (about 633,600 per mile) and variations in height profile of each slice are used together to identify features of interest in each profile. *See* Kainer, ⁋ [0048]. These slices are compiled to arrive at a 3D image. *See* Kainer, ⁋ [0056]. In contrast, Applicant's system and method describes 3D surface elevation and intensity data models (the elevations for an *area* of the track surface) to identify features of interest. Kainer does not teach or suggest combining 3D slices to create a surface from which to identify true 3D features (elevations over an area). As such, Kainer does not teach or suggest each and every limitation of Applicant's claim 1.

Farritor does not compensate for the deficiencies of Kainer. Farritor describes the use of different machine vision techniques to detect edges including the location of a rail. See Farritor, ⁋ [0043]. This edge detection technique "can be used to examine features of groups of pixels such as the intensity and/or color of each pixel in two dimensions. *Id*. In order to get data of a different quality, a second machine vision instrument can be used so that both instruments operate stereoscopically. *Id*. However, this enhanced data acquisition requires at least two sensors. Applicant's claimed invention in claim 1 operates using "at least *one* sensor for sensing

Page 12 of 20

EXHIBIT 2
173

Application No. 14/725,490
January 15, 2018
Reply to Office Action of August 16, 2017

reflected light that was emitted from the light emitting apparatus and *acquiring three dimensional surface elevation **and** intensity image data* of the railway track to be stored in the data storage apparatus" (emphasis added). The machine vision device described in Farritor cannot accomplish what is required by the simplest embodiment of Applicant's claim 1, namely, the use of *one* sensor for obtaining surface elevation *and* intensity data. If the apparatus described in Kainer were combined with the apparatus described in Farritor, at least *two* image gathering devices would be necessary. The sensor device used in Kainer could potentially be used to obtain some sense of elevation data while the sensor device used in Farritor could be used to gather intensity data. However, two sensing devices would be required. Applicant's embodiment claimed in claim 1 does not require at least two sensors—it requires at least one for each viewing area. For this reason, even a combination of Kainer and Farritor does not meet each and every limitation of Applicant's claim 1. Therefore, Applicant's claim 1 is patentable over the combination of Kainer and Farritor. Reconsideration and allowance of claim 1 are respectfully requested.

"If an independent claim is nonobvious under 35 U.S.C. 103, then any claim depending therefrom is nonobvious." M.P.E.P. § 2143.03 (citing *In re Fine*, 837 F.2d 1071, 5 U.S.P.Q.2d 1596 (Fed. Cir. 1988)). Dependent claims 2-16 and 18-21 depend from independent claim 1, and contain additional important aspects of the invention. Therefore, dependent claims 2-16 and 18-21 patentably define over Kainer in view of Farritor. Reconsideration and allowance of dependent claims 2-16 and 18-21 are respectfully requested.

**B.  Claims 24-39 and 41-44**

Independent claim 24, as amended, claims a method of assessing a railway track bed including, *inter alia*, the steps of (a) defining a three dimensional elevation map based on ***surface elevation and intensity data representative of an area segment of the railway track bed***, gathered by ***a sensor*** sensing reflected light from a track bed surface; (b) storing the elevation map in a data storage apparatus; and (c) identifying a railway track bed feature from the elevation map.

Applicant's system and method for generating a 3D model is very different from the approach described in Kainer. In Kainer, a very large number of slices or "frames" across the track surface are taken (about 633,600 per mile) and variations in height profile of each slice are

EXHIBIT 2
174

Application No. 14/725,490
January 15, 2018
Reply to Office Action of August 16, 2017

used together to identify features of interest in each profile. *See* Kainer, ¶ [0048]. These slices are compiled to arrive at a 3D image. *See* Kainer, ¶ [0056]. In contrast, Applicant's system and method describes 3D surface elevation and intensity data models (the elevations for an *area* of the track surface) to identify features of interest. Kainer does not teach or suggest combining 3D slices to create a surface from which to identify true 3D features (elevations over an area). As such, Kainer does not teach or suggest each and every limitation of Applicant's claim 24.

Farritor does not compensate for the deficiencies of Kainer. Farritor describes the use of different machine vision techniques to detect edges including the location of a rail. See Farritor, ¶ [0043]. This edge detection technique "can be used to examine features of groups of pixels such as the intensity and/or color of each pixel in two dimensions. *Id.* In order to get data of a different quality, a second machine vision instrument can be used so that both instruments operate stereoscopically. *Id.* However, this enhanced data acquisition requires at least two sensors. Applicant's claimed invention in claim 24 operates by, *inter alia,* "defining a three dimensional elevation map based on surface elevation *and* intensity data representative of an area segment of the railway track bed, the data gathered by *a sensor* sensing reflected light from a track bed surface" (emphasis added). The machine vision device described in Farritor cannot accomplish what is required by Applicant's claim 24, namely, the use of a single sensor for obtaining surface elevation *and* intensity data for a given area. If the apparatus described in Kainer were combined with the apparatus described in Farritor, at least *two* image gathering devices would be necessary. The sensor device used in Kainer could potentially be used to obtain some sense of elevation data while the sensor device used in Farritor could be used to gather intensity data. However, two sensing devices would be required. Applicant's embodiment claimed in claim 24 does not require at least two sensors—it only requires one sensor for each viewing area. For this reason, even a combination of Kainer and Farritor does not meet each and every limitation of Applicant's claim 24. Therefore, Applicant's claim 24 is patentable over the combination of Kainer and Farritor. Reconsideration and allowance of claim 24 are respectfully requested.

"If an independent claim is nonobvious under 35 U.S.C. 103, then any claim depending therefrom is nonobvious." M.P.E.P. § 2143.03 (citing *In re Fine*, 837 F.2d 1071, 5 U.S.P.Q.2d 1596 (Fed. Cir. 1988)). Dependent claims 25-39 and 41-44 depend from independent claim 24, and contain additional important aspects of the invention. Therefore, dependent claims 25-39

EXHIBIT 2
175

Application No. 14/725,490
January 15, 2018
Reply to Office Action of August 16, 2017

and 41-44 patentably define over Kainer in view of Farritor. Reconsideration and allowance of
dependent claims 25-39 and 41-44 are respectfully requested.

### III. § 103 Rejections of Claims 22 and 23

Claims 22 and 23 are rejected under 35 U.S.C. § 103 over Kainer in view of Farritor and
in further view of Szwilski. If the sum of references cited against an application is deficient as to
the same element or combination of elements required by a rejected claim, then such claim is
patentable over the cited references. See *Velander v. Garner*, 348 F.3d 1359, 1363, 68 USPQ2d
1769, 1772 (Fed. Cir. 2003). This requirement is separate and distinct from the Federal Circuit's
Teaching, Suggestion, Motivation (TSM) Test analyzed in *KSR Intern. Co. v. Teleflex Inc.*, 550
U.S. 398 (2007) and remains good law. See *Abbott Laboratories v. Sandoz, Inc.*, 500 F.Supp.2d
846, 852 (N.D. Ill. 2007) (quoted with approval in *Abbott Laboratories v. Sandoz, Inc.*, 544 F.3d
1341, 1351 (Fed. Cir. 2008)).

### A. Claim 22

Independent claim 22, as amended, claims a system for assessing a railway track bed
including **at least one sensor** and a processor running one or more algorithms for extracting
railway track bed surface elevation data using the at least one sensor to define new railway track
bed components for a three dimensional track feature library, the algorithm comprising the steps
of: (a) acquiring three dimensional **surface elevation and intensity data representative of an
area segment of railway track bed**; (b) generating a track elevation map based on the acquired
three dimensional data; (c) identifying a railway track feature from the track elevation map that
does not match any previously defined track features saved in a track feature library; (d)
extracting three dimensional data from the track elevation map corresponding to the identified
railway track feature; (e) assigning a feature name to the extracted three dimensional data; and
(f) saving in the data storage apparatus the extracted three dimensional data associated with the
feature name as a new track feature to be included in the track feature library.

Applicant's system and method for generating a 3D model is very different from the
approach described in Kainer. In Kainer, a very large number of slices or "frames" across the
track surface are taken (about 633,600 per mile) and variations in height profile of each slice are
used together to identify features of interest in each profile. *See* Kainer, ¶ [0048]. These slices

EXHIBIT 2
176

Application No. 14/725,490
January 15, 2018
Reply to Office Action of August 16, 2017

are compiled to arrive at a 3D image. *See* Kainer, ¶ [0056]. In contrast, Applicant's system and method describes 3D surface elevation and intensity data models (the elevations for an *area* of the track surface) to identify features of interest. Kainer does not teach or suggest combining 3D slices to create a surface from which to identify true 3D features (elevations over an area). As such, Kainer does not teach or suggest each and every limitation of Applicant's claim 22.

Farritor does not compensate for the deficiencies of Kainer. Farritor describes the use of different machine vision techniques to detect edges including the location of a rail. See Farritor, ¶ [0043]. This edge detection technique "can be used to examine features of groups of pixels such as the intensity and/or color of each pixel in two dimensions. *Id*. In order to get data of a different quality, a second machine vision instrument can be used so that both instruments operate stereoscopically. *Id*. However, this enhanced data acquisition requires at least two sensors. Applicant's claimed invention in claim 22 operates using "at least **one** sensor for sensing reflected light that was emitted from the light emitting apparatus and *acquiring three dimensional surface elevation **and** intensity image data* of the railway track to be stored in the data storage apparatus" (emphasis added). The machine vision device described in Farritor cannot accomplish what is required by the simplest embodiment of Applicant's claim 22, namely, the use of *one* sensor for obtaining surface elevation *and* intensity data. If the apparatus described in Kainer were combined with the apparatus described in Farritor, at least *two* image gathering devices would be necessary. The sensor device used in Kainer could potentially be used to obtain some sense of elevation data while the sensor device used in Farritor could be used to gather intensity data. However, two sensing devices would be required. Applicant's embodiment claimed in claim 22 does not require at least two sensors—it requires at least one for each viewing area. For this reason, even a combination of Kainer and Farritor does not meet each and every limitation of Applicant's claim 22.  Therefore, Applicant's claim 22 is patentable over the combination of Kainer and Farritor. As for Szwilski, it appears to teach tagging data related to known rail components. Szwilski does not compensate for the deficiencies of Kainer or Farritor. As such, claim 22 is patentable over Kainer in view of Farritor and further in view of Szwilski. Reconsideration and allowance of claim 22 are respectfully requested.

EXHIBIT 2
177

Application No. 14/725,490
January 15, 2018
Reply to Office Action of August 16, 2017

### B.  Claim 23

Independent claim 23, as amended, claims a method of building a virtual three dimensional railway track bed component library using *a sensor*, the method including the steps of: defining a three dimensional elevation map ***using surface elevation and intensity data representative of an area segment of the track bed*** based on the sensed light reflected from the track bed surface; storing the elevation map in a data storage apparatus; identifying a railway track bed feature from the three dimensional elevation map that does not match any previously defined track bed features saved in a track component library; extracting three dimensional data from the track elevation map corresponding to the identified railway track bed feature; assigning a component name to the extracted three dimensional data; and saving the extracted three dimensional data associated with the component name in a data storage apparatus as a new track bed feature to be included in the track component library.

Applicant's system and method for generating a 3D model is very different from the approach described in Kainer. In Kainer, a very large number of slices or "frames" across the track surface are taken (about 633,600 per mile) and variations in height profile of each slice are used together to identify features of interest in each profile. *See* Kainer, ¶ [0048]. These slices are compiled to arrive at a 3D image. *See* Kainer, ¶ [0056]. In contrast, Applicant's system and method describes 3D surface elevation and intensity data models (the elevations for an *area* of the track surface) to identify features of interest. Kainer does not teach or suggest combining 3D slices to create a surface from which to identify true 3D features (elevations over an area). As such, Kainer does not teach or suggest each and every limitation of Applicant's claim 23.

Farritor does not compensate for the deficiencies of Kainer. Farritor describes the use of different machine vision techniques to detect edges including the location of a rail. See Farritor, ¶ [0043]. This edge detection technique "can be used to examine features of groups of pixels such as the intensity and/or color of each pixel in two dimensions. *Id*. In order to get data of a different quality, a second machine vision instrument can be used so that both instruments operate stereoscopically. *Id*. However, this enhanced data acquisition requires at least two sensors. Applicant's claimed invention in claim 23 operates using the steps of b. sensing some of the emitted light using *a sensor* after the light has reflected off of the track bed surface; and c. defining a three dimensional elevation map using ***surface elevation and intensity data*** representative of an area segment of the track bed based on the sensed light reflected from the

EXHIBIT 2
178

Application No. 14/725,490
January 15, 2018
Reply to Office Action of August 16, 2017

track bed surface. The machine vision device described in Farritor cannot accomplish what is required by the simplest embodiment of Applicant's claim 23, namely, the use of *one* sensor for obtaining surface elevation *and* intensity data. If the apparatus described in Kainer were combined with the apparatus described in Farritor, at least *two* image gathering devices would be necessary. The sensor device used in Kainer could potentially be used to obtain some sense of elevation data while the sensor device used in Farritor could be used to gather intensity data. However, two sensing devices would be required. Applicant's embodiment claimed in claim 23 does not require at least two sensors—it requires at least one for each viewing area. For this reason, even a combination of Kainer and Farritor does not meet each and every limitation of Applicant's claim 23.  Therefore, Applicant's claim 23 is patentable over the combination of Kainer and Farritor. Szwilski teaches tagging data related to known rail components. Szwilski does not compensate for the deficiencies of Kainer or Farritor. As such, claim 23 is patentable over Kainer in view of Farritor and further in view of Szwilski. Reconsideration and allowance of claim 23 are respectfully requested.

### V. 103 Rejections of Claims 17 and 40

Claims 17 and 40 are rejected under 35 U.S.C. § 103 over Kainer in view of Farritor and in further view of Landes. If the sum of references cited against an application is deficient as to the same element or combination of elements required by a rejected claim, then such claim is patentable over the cited references.  See *Velander v. Garner*, 348 F.3d 1359, 1363, 68 USPQ2d 1769, 1772 (Fed. Cir. 2003).  This requirement is separate and distinct from the Federal Circuit's Teaching, Suggestion, Motivation (TSM) Test analyzed in *KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398 (2007) and remains good law.  See *Abbott Laboratories v. Sandoz, Inc.*, 500 F.Supp.2d 846, 852 (N.D. Ill. 2007) (quoted with approval in *Abbott Laboratories v. Sandoz, Inc.*, 544 F.3d 1341, 1351 (Fed. Cir. 2008)).

### A.  Claim 17

Certain important elements of claim 1 are discussed above in section II.(A.) and the arguments set forth in section II.(A.) are incorporated herein by reference. The combination of Kainer and Farritor does not teach a system using at least *one* sensor for acquiring three dimensional **surface elevation and intensity data representative of an area segment of railway**

EXHIBIT 2
179

Application No. 14/725,490
January 15, 2018
Reply to Office Action of August 16, 2017

*track bed*. Landes does not compensate for the deficiencies of the combination of Kainer and
Landes as it does not teach or suggest such combination of such features either. Therefore, claim
1, as amended, is patentable over Kainer in view of Farritor and in further view of Landes. "If an
independent claim is nonobvious under 35 U.S.C. 103, then any claim depending therefrom is
nonobvious." M.P.E.P. § 2143.03 (citing *In re Fine*, 837 F.2d 1071, 5 U.S.P.Q.2d 1596 (Fed.
Cir. 1988)). Dependent claim 17 depends from independent claim 1, and contains additional
important aspects of the invention. Therefore, dependent claim 17 patentably defines over
Kainer in view of Farritor and in further view of Landes. Reconsideration and allowance of
dependent claim 17 are respectfully requested.

**B. Claim 40**

Certain important elements of claim 24 are discussed above in section II.(B.) and the
arguments set forth in section II.(B.) are incorporated herein by reference. Kainer does not teach
or suggest using a single sensor to define a three dimensional elevation map for a specific area
based on *surface elevation and intensity data representative of the area segment of the railway
track bed*. Landes does not compensate for the deficiencies of the combination of Kainer and
Farritor as it does not teach or suggest such combination of features either. Therefore, claim 24,
as amended, is patentable over Kainer in view of Farritor in further view of Landes. "If an
independent claim is nonobvious under 35 U.S.C. 103, then any claim depending therefrom is
nonobvious." M.P.E.P. § 2143.03 (citing *In re Fine*, 837 F.2d 1071, 5 U.S.P.Q.2d 1596 (Fed.
Cir. 1988)). Dependent claim 40 depends from independent claim 24, and contains additional
important aspects of the invention. Therefore, dependent claim 40 patentably defines over
Kainer in view of Farritor and in further view of Landes. Reconsideration and allowance of
dependent claim 40 are respectfully requested.

In light of the foregoing, Applicant respectfully requests the Examiner reconsider the
application, withdraw the rejections, and issue a notice of allowance at the earliest possible
convenience.

EXHIBIT 2
180

Application No. 14/725,490
January 15, 2018
Reply to Office Action of August 16, 2017


Applicant has petitioned for a two-month extension within which to file this response. Payment for the two-month extension has been made through the EFS. Form sb0022 is included herewith with details regarding the extension request.

In the event this response is not timely filed, Applicant hereby petitions for the appropriate extension of time and requests that the fee for the extension along with any other fees which may be due with respect to this paper be charged to our **Deposit Account No. 506209.**


Respectfully submitted,

ROBINSON IP LAW, PLLC

By: *Michael E. Robinson*

Michael E. Robinson
Registration No. 58,947

Date: January 15, 2018
9724 Kingston Pike, Suite 1403
Knoxville, TN 37922
(865) 978-6480

EXHIBIT 2
181

| *Notice of Allowability* | Application No. 14/725,490 | Applicant(s) Mesher, Darel | |
|---|---|---|---|
| | Examiner MAINUL HASAN | Art Unit 2489 | AIA Status Yes |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☑ This communication is responsive to 7/24/2018.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☑ The allowed claim(s) is/are 1-21 and 24-45 . As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information , please see **http://www.uspto.gov/patents/init_events/pph/index.jsp** or send an inquiry to **PPHfeedback@uspto.gov**.

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   a) ☐All    b) ☐ Some    *c) ☐ None of the:
      1. ☐ Certified copies of the priority documents have been received.
      2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
      3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).
   * Certified copies not received: _____ .

   Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file areply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application.
   **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.
   ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____ .
   **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**
1. ☑ Notice of References Cited (PTO-892)
2. ☑ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date _____ .
3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material _____ .
4. ☑ Interview Summary (PTO-413), Paper No./Mail Date. _____ .
5. ☑ Examiner's Amendment/Comment
6. ☑ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____ .

| /MAINUL HASAN/ Examiner, Art Unit 2489 | /GIMS S PHILIPPE/ Primary Examiner, Art Unit 2489 |
|---|---|

EXHIBIT 2
182

Application/Control Number: 14/725,490            Page 2
Art Unit: 2489

## DETAILED ACTION

### *Notice of Pre-AIA or AIA Status*

The present application, filed on or after March 16, 2013, is being examined under the first inventor to file provisions of the AIA.

### EXAMINER'S AMENDMENT

An Examiner's amendment to the record appears below. Should the changes and/or additions be unacceptable to Applicant, an amendment may be filed as provided by 37 CFR 1.312. To ensure consideration of such an amendment, it MUST be submitted no later than the payment of the issue fee.

Applicant's Representative, Michael E. Robinson, during a telephone interview on September 14, 2018, gave the Examiner an authorization to fix the typographical error (from Previously Presented to Currently Amended) of the identifier in claim 24 designation as follows:

### *In the claim*

Claim 24. (<u>Currently Amended</u>)  A method of assessing a railway track bed, the method comprising the steps of:

a. defining a three dimensional elevation map based on surface elevation and intensity data representative of an area segment of the railway track bed, the data gathered by a sensor sensing reflected light from a track bed surface;

b. storing the elevation map in a data storage apparatus;

c. identifying a railway track bed feature from the elevation map using a processor, further comprising the sub-steps of:

EXHIBIT 2
183

Application/Control Number: 14/725,490                                    Page 3
Art Unit: 2489

    i. defining an appropriate gradient neighborhood representing a small 2D track section

over which differential vertical measurements are calculated and

    ii. moving the gradient neighborhood like a sliding window over the 3D elevation data

using the processor; and

    d. storing information corresponding to the identified railway track bed feature in the data

storage apparatus.

*Allowable Subject Matter*

    Claims 1-21, 24-45 are allowed.

    The following is an examiner's statement of reasons for allowance:

    Claim 1 discloses a system of assessing a railway track bed consisting of a power source,

light source, data storage unit, a processor and at least a sensor for capturing reflected lights from

the track bed for acquiring three-dimensional surface elevation and intensity data, wherein the

processor executes an algorithm to carry out the steps of acquiring 3D surface elevation data and

intensity data, generating track elevation map and identifying track bed feature from the

elevation map by defining an appropriate gradient neighborhood of a 2D track section for

calculating differential vertical measurements by moving the gradient neighborhood as a sliding

window over the 3D elevation data and finally storing the identified track bed feature into the

storage unit.

    The reference of **Kainer et al. (US PGPub 2013/0191070 A1)** teaches a railway bed

feature measurement system having power source, light source, storage unit, processor and

plurality of image sensors which captures the reflected lights from the railway track for

determining 3D elevation map of the railway track for storage into the storage unit. On the other

EXHIBIT 2
184

Application/Control Number: 14/725,490                                          Page 4
Art Unit: 2489

hand, **Farritor (US PGPub 2012/0300060 A1)** teaches a system in the same field of endeavor,

where it describes calculating image intensities from the captured image data, none of them

teaches the process of defining an appropriate gradient neighborhood of a 2D track section for

calculating differential vertical measurements by moving the gradient neighborhood as a sliding

window over the 3D elevation data. As a result **Kainer et al.** alone or in combination with

**Farritor** fail(s) to teach all the elements of the independent claim 1 and therefore stands

allowable. For the same reason as mentioned above, the independent claim 24, which is a method

claim of the corresponding system claim 1 stand allowable. Rest of the claims are directly or

indirectly dependent on the independent claims and therefore stand allowable.

Any comments considered necessary by applicant must be submitted no later than the

payment of the issue fee and, to avoid processing delays, should preferably accompany the issue

fee. Such submissions should be clearly labeled "Comments on Statement of Reasons for

Allowance."

### *Conclusion*

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to MAINUL HASAN whose telephone number is (571)272-0422.

The examiner can normally be reached on MON-FRI: 10AM-6PM, Alternate FRIDAYS, EST.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, JORGE L. ORTIZ-CRIADO can be reached on (571)272-7624.  The fax phone

number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent

Application Information Retrieval (PAIR) system.  Status information for published applications

EXHIBIT 2
185

Application/Control Number: 14/725,490                                          Page 5
Art Unit: 2489

may be obtained from either Private PAIR or Public PAIR.  Status information for unpublished

applications is available through Private PAIR only.  For more information about the PAIR

system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR

system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would

like assistance from a USPTO Customer Service Representative or access to the automated

information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/M. H./

Examiner, Art Unit 2489



/GIMS S PHILIPPE/
Primary Examiner, Art Unit 2489

EXHIBIT 2
186