Donald Ridge, Esq. (SBN: 132171)
**CLARK HILL LLP**
555 South Flower Street, 24th Floor
Los Angeles, CA 90071
Telephone: (213) 891-9100
Facsimile: (213) 488-1178
DRidge@clarkhill.com

Aaron L. Parker (*pro hac vice*)
aaron.parker@finnegan.com
Daniel G. Chung (*pro hac vice*)
daniel.chung@finnegan.com
Nicholas A. Cerulli (*pro hac vice*)
nicholas.cerulli@finnegan.com
Kelly S. Horn (*pro hac vice*)
kelly.horn@finnegan.com
**FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP**
901 New York Avenue NW
Washington, D.C. 20001-4413
Telephone:   (202) 408-4000
Facsimile:   (202) 408-4400

Jency J. Mathew (*pro hac vice*)
jency.mathew@finnegan.com
**FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP**
1875 Explorer Street, Suite 800
Reston, Virginia 20190-6023
Telephone:   (571) 203-2700
Facsimile:   (571) 203-2777

*Attorneys for Defendant and Counterclaim Plaintiffs*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PAVEMETRICS SYSTEMS, INC.<br><br>Plaintiff,<br><br>v.<br><br>TETRA TECH, INC.<br><br>Defendant.<br><br>AND RELATED COUNTERCLAIMS. | CASE NO. 2:21-cv-1289 MCS-MMA<br><br>**[REDACTED] TETRA TECH'S MEMORANDUM IN OPPOSITION TO PAVEMETRICS' MOTION FOR PARTIAL SUMMARY JUDGMENT NO. 3 OF NO DAMAGES UNDER THE '293 PATENT FOR THREE SALES MADE BEFORE JANUARY 5, 2021**<br><br>**Honorable Mark C. Scarsi**<br><br>**Date: May 9, 2022**<br>**Time: 9:00 a.m.**<br>**Courtroom: 7C** |

<a>
</a>

# TABLE OF CONTENTS

I. INTRODUCTION ..................................................................................1

II. LEGAL STANDARDS ..........................................................................1

III. ARGUMENT..........................................................................................2

    A. A Genuine Issue of Material Fact Exists as to Whether Pavemetrics Engaged in Post-Notice Infringing Sales Activity to AID ....................5

    B. A Genuine Issue of Material Fact Exists as to Whether Pavemetrics Engaged in Post-Notice Infringing Sales Activity to CSX ..................7

IV. CONCLUSION ....................................................................................11

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ............................................................................................. 1, 5

*Avalos v. Baca*,
   No. 05–CV–07602–DDP, 2006 WL 2294878 (C.D. Cal. Aug. 7, 2006) ............................................................................................................................ 2

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985) ................................................................................................. 3

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ................................................................................................. 1

*Dowagiac Mfg. Co. v. Minnesota Moline Plow Co.*,
   235 U.S. 641 (1915) ................................................................................................. 2

*N. Am. Philips Corp. v. Am. Vending Sales, Inc.*,
   35 F.3d 1576 (Fed. Cir. 1994) .................................................................................. 2

*Nike, Inc. v. Wal-Mart Stores, Inc.*,
   138 F.3d 1437 (Fed. Cir. 1998) ................................................................................ 5

*Quality Tubing, Inc. v. Precision Tube Holdings Corp.*,
   75 F. Supp. 2d 613 (S.D. Tex. 1999) ....................................................................... 3

*Scott v. Harris*,
   550 U.S. 372 (2007) ................................................................................................. 1

*Tesco Corp. v. Weatherford Int'l, Inc.*,
   722 F. Supp. 2d 755 (S.D. Tex. 2010) ................................................................. 4, 5

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*,
   617 F.3d 1296 (Fed. Cir. 2010) ................................................................................ 4

*Vivid Techs. Inc. v. Am. Sci. & Eng'g, Inc.*,
  200 F.3d 795 (Fed. Cir. 1999) ................................................................................ 2

**Statutes**

35 U.S.C. § 271 ............................................................................................. *passim*

35 U.S.C. § 287 ........................................................................................... 1, 3, 4

**Other Authorities**

Federal Rule of Civil Procedure 56 .................................................................. 1, 2

## I. INTRODUCTION

Pavemetrics attempts to immunize itself from damages based on its continuing acts of infringement of the '293 patent in connection with one sale to AID and two sales to CSX, alleging that the sales occurred after it was noticed of infringement. While Pavemetrics purports to base its motion on the marking statute, 35 U.S.C. § 287, its motion disregards the statutory language, which expressly provides that damages may be recovered against a defendant that "continued to infringe" after receiving notice of infringement.

Since Pavemetrics must admit that it received notice of infringement of the '293 patent on January 5, 2021, it attempts to contort the facts to make the conclusory allegation that one LRAIL "sale" to AID and two LRAIL "sales" to CSX "occurred" before the notice date. *See* Mot. at 5-6. But the only way it reaches the unsupported conclusion that these "sales" occurred entirely pre-notice is by assuming that an invoice date begins and ends a 35 U.S.C. § 271 sale. The caselaw is clear that "sell[ing] any patented invention" in the context of § 271 encompasses a broad range of sales activities, not just sending an invoice. *See infra* Section III. As explained below, numerous factual disputes evidence Pavemetrics' post-notice sales activity in connection with the three sales to AID and CSX, precluding Pavemetrics' request for summary judgment of no damages with respect to these sales.

## II. LEGAL STANDARDS

Federal Rule of Civil Procedure 56(a) requires "the movant show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A genuine issue of material fact will exist "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, the Court must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

The initial burden of establishing the absence of a genuine issue of material fact

1

lies with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant bears this burden even "[w]hen the moving party does not have the burden of proof on the issue that is the subject of the summary judgement motion." *Vivid Techs. Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 806–07 (Fed. Cir. 1999). Because summary judgment is a "drastic device" cutting off a party's right to present its case to a jury, the moving party bears a "heavy burden" of demonstrating the absence of any triable issue of material fact. *See Avalos v. Baca*, No. 05–CV–07602–DDP, 2006 WL 2294878 (C.D. Cal. Aug. 7, 2006) (quoting *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*, 182 F.3d 157, 160 (2d Cir.1999)). Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. *See* F.R.C.P. 56.

### III. ARGUMENT

Pavemetrics' bold allegation that "Tetra Tech cannot recover damages" for certain LRAIL sales "[b]ecause Pavemetrics sold three of those systems before January 5, 2021" rests on factually and legally untenable premises. Pavemetrics first assumes that a "sale" freezes at a single point in time—the date it invoiced each of its customers. Mot. at 6 (alleging that the "sales" occurred on ▮▮▮▮▮▮▮▮▮▮▮▮, the dates of the invoices to those customers). This unsupported assertion belies logic, as Pavemetrics could "sell" its product merely by offering a price irrespective of whether payment or acceptance by the other party ever occurs. Pavemetrics has not even attempted to present any factual support that any of these invoices matured into a contract for sale prior to when it was notified of infringement. And the evidence Pavemetrics does present strongly suggests that the invoices cannot be considered sales contracts.

Pavemetrics also overlooks that the prohibition against "sell[ing] any patented invention" in the patent infringement statute captures **all** sales activities, not just initially sending an invoice or contracting for the sale. 35 U.S.C. § 271; *see, e.g.*, *Dowagiac Mfg. Co. v. Minnesota Moline Plow Co.*, 235 U.S. 641, 650 (1915) (sales activity included

physical delivery of products); *N. Am. Philips Corp. v. Am. Vending Sales, Inc.*, 35 F.3d 1576, 1579 (Fed. Cir. 1994) (finding that "the 'selling' of an infringing article has both a physical and a conceptual dimension to it"); *Quality Tubing, Inc. v. Precision Tube Holdings Corp.*, 75 F. Supp. 2d 613, 621 (S.D. Tex. 1999) ("a 'sale' presupposes not merely an agreement to sell, but performance of that agreement."); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985) (noting "the need for a 'highly realistic' approach that recognizes that a 'contract' is 'ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction.'") (citations omitted).

Pavemetrics wrongly attempts to immunize itself from damages based on its continuing acts of infringement after the notice date merely because it sent an invoice a few months (or even a few days) prior to receiving notice of infringement. *See* Mot. at 5-6. While Pavemetrics purports to find a basis for such immunity in 35 U.S.C. § 287, the statute expressly contemplates damages for acts of infringement **continuing** post-notice:

> Patentees . . . may give notice to the public that the [article] is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent . . . . In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, ***except on proof that the infringer was notified of the infringement and continued to infringe thereafter***, in which event damages may be recovered only for infringement occurring after such notice.

35 U.S.C. § 287(a) (emphasis added).

Pavemetrics admits that it received notice of the '293 patent on January 5, 2021, but argues that under § 287, it is not liable for any damages based on its infringing

3

activities with respect to LRAILs that were invoiced prior to receiving notice of the patent. Mot. at 5-9. Yet even assuming that the invoices constituted sales contracts, Pavemetrics ignores that it **continued** to engage in infringing sales activity with respect to these LRAILs **after** being put on notice of the '293 patent. As explained below, it shipped and/or delivered some or all components of the infringing systems to AID and/or CSX after it received notice of infringement. Pavemetrics thus continued to "sell" the infringing LRAILs after the notice date by shipping, delivering, and/or installing their components. Liability and damages rightfully attach to these separate and continued acts of infringement under the express terms of § 287.

Pavemetrics' only legal support for its motion aside from § 287 itself is a case in which the Federal Circuit held that "a contract between two U.S. companies for the sale of the patented invention with delivery and performance in the U.S. constitutes a sale under § 271(a) as a matter of law." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1310 (Fed. Cir. 2010); *see* Mot. at 8. But while this holding embraced sales contracting as infringing activity, it did not limit infringing sales activity to **only** the formation of the contract. Indeed, it took a more inclusive view of what constitutes selling a product under § 271: "[a] 'sale' is not limited to the transfer of tangible property; a sale may also be the agreement by which such a transfer takes place." *Id.* at 1311. That is, *TransOcean* does not stand for the proposition that a sales contract is the only activity falling within the scope of a § 271 sale; the "sale" includes property transfer.

Moreover, courts in other districts have rejected the same argument Pavemetrics makes here: that damages cannot attach to post-notice sales activity if the sales contracts preceded notice. *Tesco Corp. v. Weatherford Int'l, Inc.*, 722 F. Supp. 2d 755, 771-74 (S.D. Tex. 2010). In *Tesco*, the court evaluated "the point or points at which Tesco's patent was (allegedly) actually infringed upon" to then determine "whether this infringement occurred before or after notice." *Id.* at 772. The Court concluded that even if "infringement initially occurred at the point at which the sale contract was made, the

1. case law makes abundantly clear that delivery of goods in question at the very least constitutes *continuing* infringement which subjects [defendant] to liability." *Id.* In short, "delivery of an accused product does fall within the scope of an infringing sale" and is a continuing act of infringement under § 271. *Id.* The defendants in *Tesco* were therefore "not entitled to summary judgment as to their direct liability" with respect to these ongoing infringement activities. *Id.* at 773. For the same reasons, Pavemetrics may not assert a failure to mark defense to immunize itself from damages claims arising from activities constituting "post-notice continuing infringement." *See id.* at 772-73. For all three "sales" that Pavemetrics would carve out of the damages analysis, its continuing acts of infringement that post-date its notice rightfully subject it to liability.

Moreover, accepting Pavemetrics legal theory is contrary to a purpose of the marking statute, namely, "helping to avoid innocent infringement." *Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1443 (Fed. Cir. 1998). Reading the marking statute to excuse Pavemetrics' knowing acts of infringement post-notice would not further this purpose. Once Pavemetrics was put on notice of infringement, its continuing and subsequent acts cannot be said to be "innocent infringement." In short, because Pavemetrics' infringing activities with respect to the AID and CSX sales continued post-notice, it is liable for damages based on that continuing infringement. And genuine issues of material fact exist as to when Pavemetrics' infringing sales activities started and ended, precluding a grant of summary judgment. *See Anderson*, 477 U.S. at 248.

### A. A Genuine Issue of Material Fact Exists as to Whether Pavemetrics Engaged in Post-Notice Infringing Sales Activity to AID

Pavemetrics presents the conclusory assertion that "[o]ne sale to AID" occurred ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Mot. at 6. However, this date—just under ▉▉▉▉▉ before the notice date—is merely the date of the invoice from Pavemetrics to AID. Laurent Ex. 34 at 27. That an LRAIL system was invoiced on this date does not conclusively demonstrate that it functioned as an acceptance on the part of AID or resulted in the formation of a sales contract. Indeed, the invoice itself suggests the opposite, as it's

5

1 ███████████████████████████████████████████████
2 ████████████████████████████████. *Id.*

3 None of the other evidence cited by Pavemetrics resolves this critical factual question. For example, the Laurent Declaration makes the conclusory allegation that "█████████, we also sold an LRAIL system to AID," but fails to cite any supporting evidence beyond the invoice itself. ECF 162 at ¶ 5. Pavemetrics also contends that "Tetra Tech's damages expert, Todd Schoettelkotte, used these dates when listing the six sales of the LRAIL." Mot. at 6 (citing Laquer Ex. 6 at Schedule 6B; Laquer Ex. 19 at 75-76). However, neither of these "uses" of the invoice date conclusively establish that any sales activity occurred on the invoice date. Schedule 6B is an attachment to Mr. Schoettelkotte's expert report that clearly lists the date as an "Invoice Date," saying nothing about whether the sale occurred on that date. Laquer Ex. 6 at Schedule 6B. Mr. Schoettelkotte's subsequent testimony also confirmed that these were "invoice dates." Laquer Ex. 19 at 75:20-76:7. While Mr. Schoettelkotte testified that it was his "understanding" that this was the sales date, this is merely a layperson's understanding of what it means to be a "sales date," as Mr. Schoettelkotte, a damages expert, is not qualified, nor was he asked, to make a legal determination as to what constitutes a sale under § 271 or whether the AID invoice constituted a legally binding contract. *See id.* at 152:21-159:22 (explaining that he has not opined on legal or technical issues beyond the scope of his economic expertise). Accordingly, Pavemetrics has presented insufficient evidence for this Court to conclude that there is no genuine issue of material fact as to whether a sales contract occurred between Pavemetrics and AID on ████████████.

Further, Pavemetrics' own discovery responses have created an issue of fact as to whether Pavemetrics post-notice actions with respect to the LRAIL provided to AID constituted a continuing act of infringement. Pavemetrics represented in its verified discovery responses that ████████████████████████████████████████████████████████████████████████████████

██████ Parker Ex. 101 at 803; *see also* Parker Ex. 102 at 809 (indicating that ██████████████████████████████████████); ECF 120-1 (1/9/22 Hebert Decl.) at ¶ 23 ████████████████████████████████████████████████████████████████████████████████████ That is, evidence shows that delivery of the infringing goods likely occurred **after** Pavemetrics was put on notice of infringement of the '293 patent on January 5, 2021.

In view of these unresolved factual issues surrounding whether the sales activities under § 271 occurred before or after the notice date, Pavemetrics is not entitled to summary judgment of no damages with respect to the sale to AID.

### B. A Genuine Issue of Material Fact Exists as to Whether Pavemetrics Engaged in Post-Notice Infringing Sales Activity to CSX

Pavemetrics has similarly failed to establish sufficient evidence conclusively showing when the sales activity surrounding the "[t]wo sales to CSX," for which it alleges no liability, occurred. Mot. at 6. Here again, Pavemetrics lifts the date, ████████████, from the two relevant invoices to CSX, and then presents the conclusory assertion that the sales thus "occurred" on this date. Mot. at 6; Laurent Ex. 32 at 4, 5. The fact that an LRAIL system was invoiced to CSX on this date does not, however, conclusively demonstrate that it functioned as an acceptance on the part of CSX or resulted in the formation of a sales contract. Indeed, the invoices suggest the opposite, as they provide ████████████████████████████████████████████████████████████████████. *Id*. Moreover, while the self-serving Laurent Declaration makes the conclusory allegation that Pavemetrics "████████████████████████████████████████████████████████," he cites no additional evidence to support a legal conclusion of a "sale" or "contract for sale" for purposes of § 271. ECF 162 at ¶ 4. In fact, Mr. Laurent is not qualified to make a legal determination as to what constitutes a sale under § 271.

Still further, Pavemetrics ignores the parts of its evidence that strongly suggest that the CSX invoices cannot be considered sales contracts. Namely, several provisions

7

in a subsequent "██████████████████████████████ ██████████████████████ was not a point of sale. First, the term of the ████ ███████████████████████████████████████████████—spanning a pre-notice to post-notice period. Laurent Ex. 33 at ¶ 2. Further, it included an ████ ████████████████████████████████████████████████████████████ ████████████████████████. *Id.* at ¶ 6. And the ██████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ █████████████████████ *Id.* at Appendix. It also provided for ██████ ████████████. *Id.* And the ████████████████████████████████████ ████████████████████████████████" Laurent Ex. 33 at 23. Since the ████ ████████████████████████████████████████████, these provisions raise serious factual questions as to when a sales contract was entered into and what continuing infringing activities (e.g., delivery) might have occurred post-notice.

    Moreover, Pavemetrics attempts to dismiss its sale of real-time processing hardware units, which undisputedly occurred pursuant to a ████████████████ ████████████████, as irrelevant to whether sales activity involving two CSX sales occurred post-notice. *See* Parker Ex. 70; Mot. at 7-8. But the evidence overwhelmingly shows that this ████████████████████████████████████████████████████ ████████████████████████████████████████████████████, belying Pavemetrics' assertion that it "never sold any real-time data processing hardware for the earlier three sales at issue in this motion." *See* Mot. at 8[1]; Parker Ex. 70 at 406 (Annex 1).

    First, testimony from CSX's witness, Brad Spencer, confirms that ████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

---

[1] While Pavemetrics refers to the earlier three sales at issue in this motion, the ████████████████████████████████ was sold to CSX, not AID, implicating only the two earlier sales to CSX.

8

1 ███████████████████████████████████████████████████████. Parker Ex.
2 48 at 38:6-40:19. He further specified that ████████████████████
3 █████████████████████████████████████████████████████████████████
4 ███████████████████████████████ *Id*. at 40:20-41:21.
5     Moreover, it would have been superfluous for the real-time hardware sold
6 █████████████████████████████████████████████████████████████████
7 ████████████████████████████████████████████████████████████████.
8 Specifically, the three LRAILs sold in ███████████████████████████
9 █████████████████████████████████████████████████████████████████
10 ██████████████████████████████████████████████ Laurent Ex. 35
11 at p. 16 (Appendix). The first two LRAILs, on the other hand, █████
12 ████████████████████████████████████████ Laurent Ex. 33 at pp. 15-19
13 (Appendix). This ████████████████████████████████████████████████
14 █████████████████████████████████████████████████████████████████
15 ████████████████ Parker Ex. 70 at 405. The scope of the ██████████
16 █████████████████████████████████████████████████████████████████
17 █████████████████████████████████████████████████████████████████
18 █████████████████████████████████████████████████████████████████
19 ██████████████████████████████████████ *Id.* at 407.
20     Pavemetrics' communications to CSX also confirm that ██████████
21 ████████████████████████████████████████████████. For example, in an
22 █████████████████████████████████████████████████████████████████
23 █████████████████████████████████████████████████████████████████
24 ██████████████████████████████████ Parker Ex. 103 (emphases added).
25 He explained that ███████████████████████████████████████████████
26 █████████████████████████████████████████████████████████████████
27 █████████████████████████████████████████████████████████████████
28 ████████████████████████████████████████████████████████████ *Id.*

1  The conclusion that the real-time hardware was intended for use with the earliest two sales to CSX is also consistent with Pavemetrics' ██████████ ██████████████████████████████████████. Parker Ex. 104; Parker Ex. 105. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Parker Ex. 105. Pavemetrics proposed that ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *Id.* at 819.

Further, it is inapposite that "Tetra Tech accuses processing done well after acquiring data of constituting an infringing act" or that "real-time capabilities are unnecessary for an accused sale to have occurred," as Pavemetrics alleges. Mot. at 8. It is undisputed that Tetra Tech accused certain data processing (and their systems) as infringing activity covered by the claims of the '293 patent. When the non-real-time data processing of the original systems was **upgraded** with the sale of real-time processing hardware in ████████, additional completed infringing systems were created. Even if the factual disputes are resolved such that an earlier "sale" of the non-real-time systems occurred pre-notice, the subsequent outfitting of those systems with the subsequent sale of the real-time hardware constituted a post-notice continuing act of infringement by Pavemetrics, and Tetra Tech is entitled to damages to compensate for that infringement.

In view of these unresolved factual issues surrounding whether the sales activities under § 271 occurred before or after the notice date, Pavemetrics is not entitled to summary judgment of no damages with respect to the two sales to CSX.

10

## IV. CONCLUSION

For the foregoing reasons, Tetra Tech respectfully requests that the Court deny Pavemetrics' motion.

Dated: April 25, 2022

**CLARK HILL LLP**

By: /s/ Donald L. Ridge

Donald L. Ridge

Aaron L. Parker (*pro hac vice*)
Daniel G. Chung (*pro hac vice*)
Nicholas A. Cerulli (*pro hac vice*)
Kelly S. Horn (*pro hac vice*)
Jency J. Mathew (*pro hac vice*)
**FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP**

*Attorneys for Defendant and Counterclaim Plaintiffs*
TETRA TECH, INC. AND TETRA TECH TAS INC.

11