UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

PAVEMETRICS SYSTEMS, INC.,

Plaintiff,

v.

TETRA TECH, INC.,

Defendant.

Case No. 2:21-cv-01289-MCS-MAA

**REDACTED ORDER RE: MOTIONS FOR SUMMARY JUDGMENT (ECF NOS. 148, 154, 157) AND MOTION TO STRIKE (ECF NO. 160)**

**UNREDACTED VERSION FILED UNDER SEAL (ECF No. 209)**

Plaintiff Pavemetrics Systems, Inc. filed several motions for summary judgment and a motion to strike expert testimony. Indirect Infringement MSJ, ECF No. 149; Damages MSJ, ECF No. 155; Immunity MSJ, ECF No. 158; MTS, ECF No. 161.[1] Defendant Tetra Tech, Inc. opposed these motions. Indirect Infringement Opp'n, ECF No. 178-1 (filed under seal); Damages Opp'n, ECF No. 178-3 (filed under seal); Immunity Opp'n, ECF No. 178-4 (filed under seal); MTS Opp'n, ECF No. 175. Plaintiff filed replies to these motions. Indirect Infringement Reply, ECF No. 191; Damages Reply, ECF No. 192; Immunity Reply, ECF No. 193; MTS Reply, ECF No. 194. The

---

[1] Plaintiff withdrew a fifth motion seeking summary judgment on noninfringement of one of the patents-in-suit. ECF No. 204.

1

Court deems the motions appropriate for decision without oral argument. Fed. R. Civ. P. 78(b); C.D. Cal. R. 7-15.

## I.     BACKGROUND

Plaintiff brought this action against Defendant for a declaratory judgment that its LRAIL product does not infringe Patent No. 10,362,293 ("the '293 Patent"). Compl. ¶¶ 14–22, ECF No. 1. Defendant filed two counterclaims alleging: (i) that Plaintiff's LRAIL product infringes claims 1, 15–16, 19–22, 36–37, and 40–42 of the '293 Patent; and (ii) that Plaintiff's LRAIL product infringes claims 8–10 and 14 of Patent No. 10,616,557 ("the '557 Patent"). Def.'s First Am. Countercl. ¶¶ 33–51, ECF No. 79. Plaintiff added counterclaims seeking declaratory judgment that its LRAIL product does not infringe the '557 patents and that the '293 and '557 patents are invalid. Pl.'s First Am. Countercl. ¶¶ 12–29, ECF No. 83.

Plaintiff's LRAIL system uses laser triangulation technology to collect data on railway tracks and uses software to process that data and evaluate the conditions of railway track components, such as rails, ties, ballasts, and fasteners. The Court previously construed several terms in the '293 Patent. Claim Construction Order, ECF No. 103. The Court has also previously resolved a summary judgment motion relating to infringement of the '293 Patent. Order Re: MSJ, ECF No. 189.

## II.    LEGAL STANDARD

### A.    Motion for Summary Judgment

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). A fact is material when, under the governing law, the resolution of that fact might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The burden of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex*, 477 U.S. at 322–23, and the court must view the facts

and draw reasonable inferences in the light most favorable to the nonmoving party, *Scott v. Harris*, 550 U.S. 372, 378 (2007). To meet its burden, "[t]he moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos*., 210 F.3d 1099, 1106 (9th Cir. 2000). Once the moving party satisfies its burden, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). There is no genuine issue for trial where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party. *Id*. at 587.

## B.   Motion to Strike Expert Testimony

Federal Rule of Evidence 702 authorizes "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" to provide an opinion if the expert's specialized knowledge "will help the trier of fact to understand the evidence or to determine a fact in issue." For an expert's opinion to be admissible, the expert's opinion must be "based on sufficient facts or data," the testimony must be the "product of reliable principles and methods," and the expert must have "applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. Federal courts have a gatekeeping responsibility to engage in objective screening to ensure that evidence "is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (clarifying that the gatekeeping obligation "applies not only to testimony based on 'scientific knowledge,' but also to testimony based on 'technical' and 'other specialized' knowledge"). Courts also exercise this responsibility to prevent "a patent law expert" from testifying about "markedly incorrect law." *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1117 (Fed. Cir. 1996). The proponent of the expert testimony bears the burden of

proving its admissibility. *United States v. 87.98 Acres of Land*, 530 F.3d 899, 904 (9th Cir. 2008).

## III.  DISCUSSION

The parties have made evidentiary objections. *See, e.g.*, Plaintiff's Evidentiary Objections, ECF No. 195. The Court overrules objections to any evidence it cites. The Court denies all other objections as moot.

### A.  Indirect Infringement

Plaintiff seeks partial summary judgment on the basis that it has not indirectly infringed the '293 or '557 Patents. Specifically, it argues that Defendant cannot demonstrate Plaintiff knew the LRAIL system infringed the '293 and '557 Patents and that Defendant cannot contradict Plaintiff's good faith belief it did not infringe the '293 and '557 Patents. *See generally* Indirect Infringement MSJ.

"Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). "[L]iability for inducing infringement attaches only if the defendant knew of the patent and that 'the induced acts constitute patent infringement.'" *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 639 (2015) (quoting *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011)). Actual knowledge of or willful blindness to the fact that the induced acts constitute patent infringement demonstrates the knowledge requirement for induced infringement. *Global-Tech*, 563 U.S. at 769. A party's belief about the validity of a patent, however, is irrelevant to the induced infringement analysis. *Commil*, 575 U.S at 643–44. Parties may prove induced infringement using circumstantial evidence. *Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed. Cir. 1988).

Plaintiff argues that it cannot be liable for indirect infringement before Defendant gave it notice of the patents-in-suit, January 5, 2021 for the '293 Patent and July 22, 2021 for the '557 Patent. Indirect Infringement MSJ 6–7. Plaintiff also argues it cannot be liable for indirect infringement for sales made after the notice of infringement because it had a genuine belief its LRAIL systems did not infringe the patents-in-suit

and that this good faith belief was confirmed when the Court denied Defendant's motion for a preliminary injunction. *Id.* at 7–8 (citing ECF No. 51).[2]

Defendant argues that there is significant circumstantial pre-suit evidence Plaintiff had direct knowledge of or was willfully blind to the asserted patents. Indirect Infringement Opp'n 4–10. Defendant also argues that Plaintiff did not and does not have a good faith belief its products do not infringe the patents-in-suit. *Id.* at 10–14.

Defendant presents substantial evidence establishing a dispute of material fact regarding the knowledge elements of indirect infringement. For example, Defendant adduces evidence that Plaintiff has opined on ██████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[2] Plaintiff also obliquely references that it "sought legal advice" regarding whether the LRAIL system infringes the patents-in-suit. Indirect Infringement MSJ 2. Plaintiff does not cite evidence showing it sought a legal opinion regarding infringement in its nine-page motion, so the Court does not consider this argument as it is not adequately developed. *See Hibbs v. Dep't of Human Res.*, 273 F.3d 844, 873 n.34 (9th Cir. 2001) (declining to address an "argument . . . too undeveloped to be capable of assessment").



Defendant has established strong circumstantial evidence that Plaintiff was aware of the patents-in-suit.

Plaintiff contends that none of this evidence definitely establishes that it knew about the '293 and '557 Patents. Indirect Infringement Reply 2–6. The Court must follow the precedent permitting circumstantial evidence as proof of indirect infringement. *Water Techs.*, 850 F.2d at 668. Thus, Defendant

establishes a genuine dispute of material fact regarding whether Plaintiff knew of the '293 and '557 Patents.

Defendant argues the same evidence demonstrates a genuine dispute about Plaintiff's willful blindness to the existence of the patents. Willful blindness requires (1) a subjective belief that there is a high probability a fact exists and (2) deliberate actions to avoid of learning that fact. *Global-Tech*, 563 U.S. at 769. The evidence viewed in the light most favorable to Defendant easily demonstrates both elements.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ demonstrates both a subjective belief of a high probability that Defendant holds patents covering Plaintiff's LRAIL system and deliberate actions to avoid learning about the '293 and '557 Patents. Defendant thus establishes a genuine dispute of material fact regarding Plaintiff's willful blindness.

Defendant also provides enough evidence to demonstrate a triable issue that Plaintiff lacks a good faith belief that its LRAIL product does not infringe the patents-in-suit. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████ Plaintiff also deleted specific algorithms from LRAIL source code to avoid disputes about the features in light of this lawsuit. Parker Decl. Ex. 43, at 132, 134, ECF No. 186-7 (filed under seal) (removing crack detection of wooden tie and neural network code because Defendant identified this code as infringing and because Plaintiff wanted to "avoid any disputes about these features"). Taken in the light most favorable to Defendant, this circumstantial evidence shows Plaintiff did not have a good faith belief these or other features did not infringe the patents-in-suit. *Water Techs.*, 850 F.2d at 668. Plaintiff disputes this evidence, pointing toward the Court's ruling in its favor on the preliminary

injunction motion. Indirect Infringement Reply 7–10. While the Court ruling in its favor does give support to a good faith belief of noninfringement, the Court must view the evidence in the light most favorable to the nonmoving party. *Scott*, 550 U.S. at 378. Plaintiff remains free to convince a jury that it has a good faith belief its LRAIL does not infringe the patents-in-suit.

The Court **DENIES** the motion for summary judgment relating to indirect infringement. ECF No. 148.

**B.     Pre-Notice Sales**

Plaintiff seeks partial summary judgment on the ground that Defendant cannot seek damages for three of its LRAIL sales. Specifically, Plaintiff argues that it sold three of the six LRAIL systems at issue in this case before Defendant provided actual notice of alleged infringement to Plaintiff. Damages MSJ 3–5.

Patentees "offering for sale, or selling within the United States any patented article for or under them" must mark that product with the patent. 35 U.S.C. § 287(a). Failure to do so means that "no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such a notice." *Id.* These notice provisions typically do not apply where the patent is directed to a process or method. *Bandag, Inc. v. Gerrard Tire Co., Inc.*, 704 F.2d 1578, 1581 (Fed. Cir. 1983). When a patent contains both apparatus and method claims, however, to the extent there is a tangible item to mark, a patentee must do so to comply with the notice requirements of § 287(a). *Am. Med. Sys., Inc. v. Med. Eng'g Corp.*, 6 F.3d 1523, 1538–39 (Fed. Cir. 1993). This statute "serves three related purposes: (1) helping to avoid innocent infringement; (2) encouraging patentees to give public notice that the article is patented; and (3) aiding the public to identify whether an article is patented." *Arctic Cat Inc. v. Bombadier Recreational Prods. Inc.*, 876 F.3d 1350, 1366 (Fed. Cir. 2017).

/ / /

Here, the parties do not dispute that Defendant did not mark its 3DTAS product practicing the patents-in-suit. The parties also do not dispute that Defendant gave Plaintiff notice of the alleged infringement on January 5, 2021. What the parties do dispute is whether a patentee can recover damages for infringing sales that begin before actual notice but that have portions occurring after actual notice. A patentee cannot recover damages from an offer to sell an infringing product when the offer occurs before actual notice. *See Am. Med. Sys.*, 6 F.3d at 1538. While the Federal Circuit has not squarely addressed the issue, district courts come down on both sides of the question of whether the delivery of an infringing product or other actions completing a sale can be considered a continuing act of infringement under § 287(a). One court held that delivery of an accused product falls within the scope of an infringing sale, even if it is not the only point where infringement occurs. *Tesco Corp. v. Weatherford Int'l Inc.*, 722 F. Supp. 2d 755, 772 (S.D. Tex. 2010) (citing *N. Am. Philips v. Am. Vending Sales, Inc.*, 35 F.3d 1576, 1579 (Fed. Cir. 1994)). The *Tesco* court determined that the putative infringer was "not entitled to damages immunity" for infringing products "that were delivered after" the putative infringer "received actual notice of the alleged infringement" because the delivery "constituted post-notice continuing infringement." *Id.* at 772–73. Another court, however, held that "[t]he determinative question is whether or not a contract had been entered into for the sale" of the infringing products "prior to the actual notice." *In re TransData, Inc. Smart Meters Patent Litig.*, No. 12-ml-2309-C, 2015 WL 5098310, at *2 (W.D. Okla. Aug. 28, 2015). The *TransData* court held that "[b]ecause a binding contract existed prior to the time of . . . notice of infringement, the Court finds that there can be no damages for [infringing products] included within that contract." *Id.*

Federal Circuit opinions addressing the definition of "sale" in other parts of patent law have resisted bright-line rules. One Federal Circuit panel addressing the definition of sale held "that a contract between two U.S. companies for the sale of the patented invention with delivery and performance in the U.S. constitutes a sale under

§ 271(a) as a matter of law." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1310 (Fed. Cir. 2010).[3] The *Transocean* court did not engage in formalistic analysis surrounding the time of entering a contract. The court stated that "[a] sale does not occur at a 'single point where some legally operative act took place.'" *Id.* at 1310 (quoting *Litecubes, LLC v. N. Light Prods., Inc.*, 523 F.3d 1353, 1369–70 (Fed. Cir. 2008)). The *Transocean* court also adopted the interpretation of sale that resulted in broader liability.

The Federal Circuit has also offered a definition of sale in 19 U.S.C. § 1337(a)(1)(B), which grants International Trade Commission ("ITC") jurisdiction over "the sale for importation" of articles that infringe a valid and enforceable United States patent. The Federal Circuit determined that the ITC reasonably interpreted the statute when it determined that a contract for sale was covered by the statutory language "the sale for importation." *Enercon GmbH v. ITC*, 151 F.3d 1376, 1382–83 (Fed. Cir. 1998). Importantly, the Federal Circuit did not interpret the statute *de novo* but instead applied *Chevron* deference. *Id.* The Federal Circuit also noted that this interpretation conflicted with the definition of "on sale bar" in the pre–America Invents Act 35 U.S.C. § 102(b), which required parties to give and pass rights of property for consideration to be considered a sale. *Id.* at 1382 (citing *In re Caveney*, 761 F.2d 671, 676 (Fed. Cir. 1985)). In *Enercon*, the Federal Circuit once again avoided a restrictive and formalistic interpretation of the term sale by following Congress's intent to give the ITC broader jurisdiction than it had in the past. *Id.* at 1382–83. Like in *Transocean*, the *Enercon* court adopted a definition of sale that broadened patent infringement liability.

In light of *Transocean* and *Enercon*, the Court concludes that the *Tesco* court has the better analysis: while an offer to sell an infringing product before actual notice cannot result in damages, acts taken to complete a sale after actual notice constitute

---

[3] 35 U.S.C. § 271(a) imposes liability on anyone who infringes a valid patent by selling or offering to sell an infringing good.

continuing acts of infringement under § 287(a) that can result in damages for patent infringement. This is in line with the flexible and broad approach the Federal Circuit has taken toward defining a sale, as the Federal Circuit has repeatedly adopted definitions that broaden infringement liability. Additionally, this comports with the aim of the statute to prevent liability for innocent infringement. Once a seller of a possibly infringing good is on notice, a seller who completes a sale is no longer an innocent infringer but instead is someone who knows that infringement is a possibility. *See Arctic Cat*, 876 F.3d at 1366.

Defendant argues that actions that would constitute continuing acts of infringement under this analysis occurred after it provided Plaintiff actual notice of this suit on January 5, 2021. Damages Opp'n 5–10. Plaintiff initiated LRAIL sales to two different entities before January 5, 2021: a sale to Advanced Infrastructure Design, Inc. ("AID") started on December 23, 2020, and two sales to CSX Transportation, Inc. started on October 23, 2020. A December 23, 2020 invoice from Plaintiff to AID shows that Plaintiff charged AID ████████ for a Turnkey LRAIL and a Laser Crack Measurement System ("LCMS"). Laurent Decl. Ex. 34, at 27, ECF No. 166-4 (filed under seal). The invoice states that it is "Payable on Receipt," suggesting delivery did not occur on December 23, 2020. *Id.* In fact, Plaintiff delivered the LRAIL to AID in February 2021. Hébert Decl. ¶ 23, ECF No. 120-1 (under seal) ("In February 2021, Pavemetrics delivered to [AID] LRAIL software . . . ."); *see also* Parker Decl. Ex. 102, ECF No. 178-62 (filed under seal) ("We will be ready to ship the LRAIL equipment [to AID] on Monday February 8th."). Defendant thus demonstrates a genuine dispute of material fact about whether Plaintiff engaged in continuing acts of infringement after January 5, 2021 by delivering an LRAIL to AID.

/ / /

/ / /

11

Two October 23, 2020 invoices from Plaintiff to CSX[4] show that Plaintiff charged CSX ▮▮▮▮ for a Turnkey LRAIL and ▮▮▮▮ for an LCMS-2. Laurent Decl. Ex. 32, ECF No. 166-4 (filed under seal). Unlike with AID, these invoices do not state when payment is required; instead, Plaintiff and CSX entered a goods contract governing the sale and delivery. Laurent Decl. Ex. 33 ("Goods Agreement"), ECF No. 166-4 (filed under seal). The term of the Goods Agreement began on "the Effective Date" and ended on "4 November 2021." *Id.* ¶ 2. Under the "Inspection and Acceptance" clause, CSX could "at its option, inspect a sample of the Goods at Seller's [Plaintiff's] facilities before full production and report any defects or deficiencies to Seller." *Id.* ¶ 6. CSX could also "inspect each separate lot of the Goods at Seller's facilities upon completion of production of such Goods." *Id.* An October 22, 2020 price quotation stated Plaintiff would deliver the LRAIL and LCMS systems to CSX "2 to 4 weeks After receiving pre-shipment payme [sic]." *Id.* at 23. CSX had to "remit payment to Seller within sixty (60) days of receipt of Seller's invoice," the date of which was the entry of the invoice into Oracle. *Id.* app. ¶ 2. CSX received the invoice on or after October 23, 2020, Laurent Decl. Ex. 32, and CSX did not sign the Goods Agreement until December 10, 2020, Goods Agreement 19. Defendant argues there is a dispute about whether any activities that would constitute continuing acts of infringement occurred after January 5, 2021. Because CSX received the invoice on October 23, 2020 at the earliest, CSX had until December 22, 2020 at the earliest to pay Plaintiff for the LRAIL and LCMS-2 systems. Because CSX did not sign the Goods Agreement until December 10, 2020, Defendant argues it is unlikely that CSX paid Plaintiff before December 10. Two to four weeks for delivery after a payment date of December 10 would be between December 23, 2020 and January 7, 2021. Thus, Defendant claims it

---

[4] The invoices are addressed to Seaboard Coast Line Railway Supplies, but both parties describe this invoice as representing a sale to CSX. The Court follows the parties in their description of the evidence.

is possible that Plaintiff delivered the LRAIL and LCMS-2 systems to CSX after January 5, 2021.

Demonstrating a genuine dispute of material fact requires more. Plaintiff produces a declaration from John Laurent, a co-owner of Plaintiff, that delivery of both LRAIL systems to CSX occurred in 2020. Laurent Decl. ¶ 4, ECF No. 162. Defendant does not contradict this declaration directly. Instead, Defendant's evidence raises the inference that some activities related to sale occurred *could have* occurred after Defendant gave actual notice on January 5, 2021. In light of the Laurent Declaration, however, Defendant's argument that Plaintiff possibly committed continuing acts of infringement after January 5, 2021 rests entirely on "metaphysical doubt." *Matsushita*, 475 U.S. at 586. The Court thus concludes that the undisputed record shows that Plaintiff did not engage in continuing acts of infringement by delivering the LRAIL and LCMS to CSX.

Defendant also argues that September 2021 sales and upgrades to CSX's LRAILs are continuing acts of infringement. Damages Opp'n 8–10. A September 20, 2021 Goods Agreement between Plaintiff and CSX involved the purchase of Autonomous Machine Vision Change Detection ("AMVCD") software. Parker Decl. Ex. 70 ("AMV Goods Agreement"), ECF No. 186-32 (filed under seal). Upon delivery, Plaintiff modified the two systems it sold to CSX in 2020 by reconfiguring the systems to use the AMVCD software. Parker Decl. Ex. 103, ECF No. 186-64 (filed under seal). Plaintiff argues that this is a permissible upgrade. In *Fonar Corp. v. General Electric Co.*, the Federal Circuit held that "[o]ne is entitled to repair that which is sold free of liability from infringement." 107 F.3d 1543, 1555 (Fed. Cir. 1997). Plaintiff argues a subsequent modification, like a subsequent repair, cannot constitute infringement. Damages Reply 9. Plaintiff is correct. As the Supreme Court has recognized, "[w]here use infringes, repair does also, for it perpetuates the infringing use." *Aro Mfg. Co., Inc. v. Convertible Top Replacement Co., Inc.*, 377 U.S. 476, 484 (1964). Applying *Fonar* makes sense where the underlying use of the product would not constitute infringement,

13

like when a patentee fails to mark its competing product. *See Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, No. Civ. A. 03–927–GMS, 2005 WL 1331216, at *3 (D. Del. June 6, 2005). Here, Plaintiff sold the LRAIL and LCMS to CSX free of liability. Thus,  the September 2021 upgrade of these systems is not a continuing act of infringement.

The Court **GRANTS** the motion for summary judgment for no damages as to the two 2020 CSX sales and **DENIES** the motion for summary judgment for no damages as to the AID sale. ECF No. 154.

### C.    Product Use

Plaintiff argues it did not indirectly infringe the patents-in-suit because its CSX did not directly infringe the patents-in-suit. Immunity MSJ 4. Any entity who uses any patented invention within the United States or who imports into the United States any patented invention without authority infringes the patent. 35 U.S.C. § 271(a). A patentee must demonstrate that an infringer uses each and every element of a claimed system to demonstrate infringement through use. *Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1284 (Fed. Cir. 2011).

Plaintiff's argument hinges on its assertion that CSX did not infringe the patents-in-suit because CSX did not process the data itself. Immunity MSJ 4. Defendant produces ample evidence demonstrating a genuine dispute of material fact regarding whether CSX processed its own data. First, all five LRAIL systems Plaintiff sold to CSX were Turnkey LRAILs that included LRAIL hardware, acquisition software, and processing software. Hébert Decl. ¶ 4, ECF No. 114-1 (filed under seal). CSX obtained the required licenses that enabled it to execute the LRAIL software without any other restrictions. Parker Decl. Ex. 101, at 805, ECF No. 186-62 (filed under seal) ("Both CSX and AID were required to obtain a license from Pavemetrics before executing the LRAIL source code and are required to maintain their licenses to continue executing the LRAIL source code."). Plaintiff also instructed CSX on the steps to download and install the LRAIL inspection software so CSX could analyze its data. Parker Decl. Ex. 110, ECF No. 186-70 (filed under seal). Plaintiff even sent CSX user manuals. Parker

14

Decl. Ex. 72, ECF No. 186-33 (filed under seal) (titled LRAIL Analyser Library: User Manual); Parker Decl. Ex. 107, ECF No. 186-67 (filed under seal) (providing link to data format manual). These manuals instruct users how to operate LRAIL and perform all the relevant steps in the system. Laquer Decl. Ex. 1 ¶ 620, ECF No. 166-6 (filed under seal). ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████

The circumstantial evidence here demonstrates that CSX used the LRAIL software. As one of Defendant's experts opines, this infringes the patents-in-suit. *See* Laquer Decl. Ex. 1 ¶ 620. Plaintiff argues that no direct evidence demonstrates CSX used the LRAIL processing software. Immunity Reply 1–3. The circumstantial evidence, however, demonstrates an intent to download the software and progress by at least one person at CSX toward using the LRAIL software. This is enough to establish a genuine dispute of material fact. *Scott*, 550 U.S. at 578. Thus, the Court **DENIES** the portion of the summary judgment motion relating to no direct infringement by CSX. ECF No. 157.

### D.    Product Importation

Plaintiff argues that CSX did not directly infringe the patents-in-suit by importing data files analyzed by Plaintiff. Immunity MSJ 4–6; Immunity Reply 3–6. Plaintiff argues that there is no evidence demonstrating that CSX imported data files necessary to operate the LRAIL system and that any files used by the LRAIL system would not be products that can be imported under patent law.

Any entity that without authority imports into the United States a product which is made by a process patented in the United States shall also be liable as an infringer. 35 U.S.C. § 271(g). The Federal Circuit has determined that any product made by a patented process "must have been a physical article that was 'manufactured' and that

the production of information is not covered." *Bayer AG v. Housey Pharms., Inc.*, 340
F.3d 1367, 1377 (Fed. Cir. 2003). It is not enough to gather information from a physical
good through a patented process—the process must result in the manufacture of the
physical article. *Id.*

Courts applying *Bayer* to digital technologies have broadened the term physical
article to include digital files that a patented process creates. Thus, when a patented
process creates a new digital product, courts have determined that *Bayer*'s exclusion of
the production of information from § 271(g) does not apply. *See, e.g.*, *McRo, Inc. v.
Namco Bandai Games Am., Inc.*, 23 F. Supp. 3d 1113, 1121–23 (C.D. Cal. 2013)
(method for automatically animating lip synchronization and facial expressions of
animated characters used to make a video game); *Ormco Corp. v. Align Tech., Inc.*, 609
F. Supp. 2d 1057, 1076–77 (C.D. Cal. 2009) (method for creating a 3D digital model
used to create clear plastic aligners in lieu of traditional braces to move a patient's teeth
into desired positions); *CNET Networks, Inc. v. Etilize, Inc.*, 528 F. Supp. 2d 985, 993–
94 (N.D. Cal. 2007) (method for creating a digital product catalog). The *CNET* court
reasoned that a digital product "can be thought of as having a physical, tangible
embodiment once it is expressed and stored on computer readable media in the form of
magnetic fields on a hard drive or etchings on a CD-ROM." *CNET*, 528 F. Supp. 2d at
994. When a patented process does not produce a new digital article but instead
generates or transmits information about an already existing digital article, courts have
held that *Bayer* bars a finding of indirect infringement under § 271(g). *See, e.g.*, *NTP,
Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1323 (Fed. Cir. 2005) (method of
creating wireless electronic mail), *abrogated on other grounds as recognized in Univ.
of Mass. V. L'Oréal S.A.*, __ F.4th __, 2022 WL 2111840, at *4 (Fed. Cir. June 13,
2022); *Yangaroo Inc. v. Destiny Media Techs. Inc.*, 720 F. Supp. 2d 1034, 1038 (E.D.
Wis. 2010) (method of distributing encrypted digital music). The proper gloss on these
cases is that *Bayer* prohibits a finding of indirect infringement under § 271(g) when a
patented process does not generate something new but instead generates information

about a product that already exists. *Bayer* does not, however, preclude a finding of indirect infringement under § 271(g) when a patented process creates something new, even if the physical realization of that something new is in a digital medium.

Applying this reasoning, the output files that demonstrate the results of using the LRAIL system are products that CSX can import. These files are the generated reports from the analysis and are output in XML and JPEG formats. Parker Decl. Ex. 72, at 429; Parker Decl. Ex. 73, at 453, 466, ECF No. 186-34 (filed under seal). These files do not contain mere ancillary information about something that is the created by a process not described by the patent; instead, the files are the new product created by the patented method. Thus, Plaintiff can succeed on its importation argument only by demonstrating there is no dispute of material fact that CSX did not import this product. However, Defendant produces evidence demonstrating that Plaintiff sent CSX a Dropbox link to CSX's processed data that included JPEG images, optional LAS-format files, and XML files. Parker Decl. Ex. 114, ECF No. 186-74 (filed under seal). Plaintiff asserts that no one at CSX ever downloaded these files. Immunity MSJ 5 (citing testimony by Brad Spencer).

Viewed in the light most favorable to Defendant, *Scott*, 550 U.S. at 578, there is a reasonable inference that CSX imported a product into the United States in an infringing manner by downloading the files from the Dropbox link. Thus, the Court **DENIES** the portion of the motion for summary judgment related to product importation by CSX. ECF No. 157.

17

**E.    Governmental Immunity**

Plaintiff argues it is immune from suit for using the LRAIL to perform its obligations under a contract with the Federal Railroad Administration ("FRA"). Immunity MSJ 6–7.

28 U.S.C. § 1498(a) provides:

> Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without the license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture.

Under this section, a contractor of the United States is immune from suit if it can show (1) that the use of the infringing article is for the government and (2) that the use is with the authorization and consent of the government. *Sevenson Env't Servs., Inc. v. Shaw Env't, Inc.*, 477 F.3d 1361, 1365 (Fed. Cir. 2007). A use is for the government if it occurs pursuant to a contract with the government and for the benefit of the government. *Id.* at 1365–66. Where a government contract contains an explicit authorization and consent clause, the scope of the government's authorization and consent to liability naturally hinges on the language of that clause. *Id.* at 1366–67. Summary judgment on this issue is inappropriate, however, when there are factual disputes about the scope of governmental versus nongovernmental uses. *See Madey v. Duke Univ.*, 307 F.3d 1351, 1363–64 (Fed. Cir. 2002).

Plaintiff argues that it processed data using LRAIL as a government contractor. Immunity MSJ 5. Plaintiff also argues the broad authorization and consent clause in the contract covers its use of the LRAIL for the government, warranting immunity for the instances where it processed data for the FRA. *Id.* at 6–7. Defendant argues that Plaintiff

processed data for CSX outside of the scope of CSX's FRA contract and questions whether Plaintiff processed any data for CSX for end use by the government. Immunity Opp'n 13–15.

Plaintiff points to a contract the FRA awarded Plaintiff on October 1, 2020 to report how the LRAIL system could be used to improve how changes in railway conditions and structural integrity are evaluated. Laurent Decl. ¶¶ 9–12. This contract was modified to include CSX as an industry partner in June 2021. *Id.* ¶ 12. Plaintiff identifies two instances of data processing it performed pursuant to the FRA contract: July 21, 2021 and October 7 and 8, 2021 processing jobs done on data collected by CSX. Hébert Decl. ¶¶ 17–20, ECF No. 166-2 (filed under seal). Plaintiff also identifies the consent clauses in the contracts. Laurent Decl. Ex. 39, at 73, ECF No. 162-1; Laurent Decl. Ex. 40, at 99, ECF No. 162-1. The contracts Plaintiff produces only identify by number a regulation in the Code of Federal Regulations. *Id.* Plaintiff argues the inclusion of these numbers incorporates the relevant regulations into the contract, Immunity MSJ 7, and Defendant does not dispute this point. Per 48 C.F.R. § 52.227-1(a), as incorporated in the contract, "[t]he Government authorizes and consents to all use and manufacture, in performing this contract or any subcontract at any tier, of any invention described in and covered by a United States patent."

Defendant disputes that Plaintiff processed this data for the Government. Defendant, however, only identifies evidence demonstrating that Plaintiff possibly analyzed data for CSX's Autonomous Boxcar Project and for CSX's Deployment of Autonomous LRAIL Inspection Systems on ATAC Platforms project. Immunity Opp'n 14–15. This evidence only creates a "metaphysical doubt" that Plaintiff did not process the LRAIL data for the FRA on July 21 and October 7 and 8. *Matsushita*, 475 U.S. at 586.

The Court thus concludes the undisputed facts show that Plaintiff processed LRAIL data for the government on July 21, 2021 and October 7 and 8, 2021. Per the consent clause, the government authorized Plaintiff's use of LRAIL. This use meets

both prongs of the test for § 1498(a) immunity. *Sevenson*, 477 F.3d at 1365. The Court thus **GRANTS** the motion as to immunity from suit for the July 21, 2021 and October 7 and 8, 2021 data processing jobs. ECF No. 157.

The Court does not rule on any other unidentified acts. Plaintiff claims that "[a]ny processing of LRAIL data on behalf of CSX during or after June 2021 was pursuant to an FRA contract." Tetra Tech's Statement of Genuine Disputes of Material Fact § I(B)(6), ECF No. 184. The evidence Plaintiff cites for this proposition, as discussed above, only references the July 21 and October 7 and 8 data processing jobs. The Court declines to hunt through the record for evidence establishing that Plaintiff only processed data for CSX pursuant to its FRA contract during or after June 2021. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam) ("Judges are not like pigs, hunting for truffles buried in briefs.").

## F.    Motion to Strike

Plaintiff moves to strike portions of the infringement report of Plaintiff's expert, Dr. Morellas. Plaintiff asks the Court to strike paragraphs 120, 617, 618, and 619 of the report. MTS 5–6. Plaintiff also wants to strike "those portions of Dr. Morellas' opinions [that] are based on a legally incorrect view of the claim scope," *id.* at 7, but the Court declines Plaintiff's invitation to identify portions of the 467-page expert report Plaintiff might find offensive. It is not the role of the Court to make Plaintiff's arguments for it. *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003).

Plaintiff first argues the Court should strike paragraph 120 from Dr. Morellas's report because it contains an incorrect interpretation of claim 1 of the '293 Patent. Claim 1 of the '293 Patent covers:

> 1. A system for assessing a railway track bed, the system comprising:
>
> . . .
>
> a data storage apparatus in communication with *at least one processor*;

1                 at least one sensor for sensing reflected light that was

2                 emitted from the light emitting apparatus and acquiring

3                 three dimensional surface elevation and intensity

4                 image data of the railway track to be stored in the data

5                 storage apparatus, wherein the at least one sensor is in

6                 communication with *the at least one processor*; and

7                 wherein *the at least one processor* is configured to run

8                 an algorithm for processing three-dimensional surface

9                 elevation and intensity data gathered from the at least

10                one sensor and saved in the data storage apparatus, the

11                algorithm comprising the steps of:

12                            . . .

13                   ii. moving the gradient neighborhood like a

14                   sliding window over the 3D elevation data using

15                   *the processor* . . . .

16  '293 Patent at 29:23–53 (emphasis added). Dr. Morellas opines that:

17             [C]laim 1 requires "at least one processor" and therefore can

18             include multiple processors, each of which may alone or

19             collectively be in communication with the data storage

20             apparatus and the at least one sensor, and be configured to

21             identify railway track bed features. This understanding is

22             consistent with embodiments within the '293 patent's

23             specification, which explains that "analysis can be performed

24             by the processor 12 or *a separate processor* separate from the

25             system 10 by taking the data gathered by the system 10 and

26             analyzing it." '293 patent, 9:25–28. Thus, according to the

27             '293 patent, and consistent with the language in claim 1, there

28             can be a single or multiple processors that, individually or

1          collectively, are in communication with the at least one sensor

2          and data storage apparatus, and are configured to identify

3          railway track bed features.

4    Laquer Decl. Ex. 1 ¶ 120.

5          Plaintiff argues that Morellas incorrectly ignores that "the at least one processor"

6    and "the processor" referenced in claim 1 are the same processor as the "at least one

7    processor" at the beginning of the claim. MTS 7. Defendant argues that the "at least one

8    processor" referenced at the beginning of claim 1 can refer to several different possible

9    processors. MTS Opp'n 6–9.

10         A court may use intrinsic evidence like the prosecution history and the

11   specification language to interpret a claim term in a patent. *Phillips v. AWH Corp.*, 415

12   F.3d 1303, 1314 (Fed. Cir. 2005) (en banc). This is because an inventor is free to be

13   their own lexicographer and to define terms and specify the claim scope in a patent. *Id.*

14   at 1316; *see also id.* at 1317 ("It is therefore entirely appropriate for a court, when

15   conducting claim construction, to rely heavily on the written description for guidance

16   as to the meaning of the claims.").

17         The specification of the '293 Patent discloses an embodiment of a 3DTAS system

18   which includes "a processor **12** in communication with a light line projector **14** (e.g., a

19   laser) and one or more 3D sensors **16** for detecting light from the line projector **14** that

20   is reflected from the railway track bed. The sensors **16** detect elevation and intensity

21   data and the data is stored in a data storage apparatus **18** in communication with the

22   processor **12**." '293 Patent at 8:66–9:5. After the 3DTAS system uses this data to

23   generate "full width 3D elevation maps, analysis including automated processing is

24   completed to extract objective, repeatable, and accurate measures for detected features

25   of interest. This analysis can be performed by the processor **12** or by a separate

26   processor separate from the system **10** by taking the data gathered by the system **10** and

27   analyzing it." *Id.* at 9:22–28.

28

These numbers used in the specification refer to the following figure:



FIG. 1

'293 Patent at Sheet 1.

The specification and figure support Morellas's interpretation of the claim language. Whenever a patent uses the phrase "at least one," the plain and ordinary meaning of this term is to indicate that there can be only one or more than one of the thing referenced. *Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed. Cir. 1999). Whenever a claim limitation appears later in a claim prefaced by the word "the," the antecedent basis for that later reference is found earlier in the claim. *Tech. Consumer Prods., Inc. v. Lighting Sci. Grp. Corp.*, 955 F.3d 16, 22 (Fed. Cir. 2022). Thus, claim 1 requires that there be at least one processor in communication with a data storage apparatus, illustrated by **12** in Figure 1. At least one of these processors must be in communication

with a sensor, illustrated by **16**, and at least one of these processors must be configured to run an algorithm where the processor running the algorithm moves a gradient window like a sliding neighborhood over 3D elevation data.

Importantly, the processor connected to the sensor and the processor running the algorithm do not need to be the same processor. Since the first reference to the processor is that it is in communication with a data storage apparatus, the processors referenced later in claim 1 must share this trait in common. Whenever a patent uses the claim limitation "the" to refer to a claim limitation previously defined with "at least one," all instances of the claim limitation described by "at least one" do not have to meet the subsequent limitation following "the." *See Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1344 (Fed. Cir. 2008). Plaintiff argues that any at least one processor must meet each claim limitation in claim 1 because the references to "the at least one processor" and to "the processor" indicate the antecedent rule must be followed. MTS Reply 1–4. The Federal Circuit has rejected Plaintiff's argument as contrary to plain and ordinary meaning in *Howmedica*. In *Howmedica*, a patent for an orthopedic implant required that a femoral component "include 'at least one condylar element,' which the district court correctly understood to mean 'one or more.' The claim then require[d] that 'the condylar element' meet the specified geometric limitations." *Howmedica*, 540 F.3d at 1344. The accused infringer in *Howmedica* argued that any embodiment with two condylar elements required both condylar elements to meet the geometric limitations of the patent. *Id.* The Federal Circuit disagreed, noting that:

> If the patentee had intended both condyles in a bicondylar prosthesis to meet these limitations, he could have drafted claim 15 to require that "both condylar elements" do so. The more natural way of drafting the claim language to achieve that result would be to require "*each* condylar element," rather than "*the* condylar element," to conform to the constant-radius geometry.

*Id.* Because claim 1 of the '293 Patent refers to "the processor" and "the at least one processor" rather than "each processor," the Court concludes that each processor does not need to meet each limitation in claim 1. Instead, a different processor may meet each different claim limitation, so long as at least one processor meets each claim limitation. Dr. Morellas thus offers a proper opinion that may be helpful to the jury.

Plaintiff also moves to strike paragraphs 617, 618, and 619, where Morellas states the facts he assumes about Plaintiff's knowledge of the patents. Laquer Decl. Ex. 1 ¶¶ 617–19. Plaintiff's motion misses the mark. These paragraphs do not disclose any opinion by Morellas but instead state the facts Morellas assumes to render other opinions. An expert may reach a hypothetical opinion based on assumed facts. *See Skydive Ariz., Inc. v. Quattrocchi*, No. CV 05-2656-PHX-MHM, 2009 WL 2515616, at *2 (D. Ariz. Aug. 13, 2009). The Court will not strike these paragraphs as an expert's statements of assumed facts used for later hypothetical analysis are helpful to the jury.

The Court **DENIES** the motion to strike. ECF No. 160.

## IV.   CONCLUSION

The Court **GRANTS IN PART** Plaintiff's motion for summary judgment relating to governmental immunity and Plaintiff's motion for summary judgment relating to no damages for CSX sales. ECF Nos. 154, 157. The Court **DENIES** all other motions.

The Court provisionally seals this Order. Within seven days of the issuance of this Order, the parties shall file a joint statement as to whether any matter stated in this Order is information that should remain under seal. Thereafter, the Court will determine whether any portions of this Order should be redacted in the version filed on the public docket.

**IT IS SO ORDERED.**

Dated: July 6, 2022

_____
MARK C. SCARSI
UNITED STATES DISTRICT JUDGE