Donald Ridge, Esq. (SBN: 132171)
**CLARK HILL LLP**
555 South Flower Street, 24th Floor
Los Angeles, CA 90071
Telephone: (213) 891-9100
Facsimile: (213) 488-1178
DRidge@clarkhill.com

James R. Barney (*pro hac vice*)
james.barney@finnegan.com
Aaron L. Parker (*pro hac vice*)
aaron.parker@finnegan.com
Daniel G. Chung (*pro hac vice*)
daniel.chung@finnegan.com
Nicholas A. Cerulli (*pro hac vice*)
nicholas.cerulli@finnegan.com
Kelly S. Horn (*pro hac vice*)
kelly.horn@finnegan.com
**FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP**
901 New York Avenue NW
Washington, D.C. 20001-4413

Telephone:   (202) 408-4000
Facsimile:   (202) 408-4400

Jency J. Mathew (*pro hac vice*)
jency.mathew@finnegan.com
**FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP**
1875 Explorer Street, Suite 800
Reston, Virginia 20190-6023
Telephone:   (571) 203-2700
Facsimile:   (571) 203-2777

*Attorneys for Defendant and Counterclaim Plaintiffs*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

PAVEMETRICS SYSTEMS, INC.

Plaintiff,

v.

TETRA TECH, INC.

Defendant.

AND RELATED COUNTERCLAIMS.

CASE NO. 2:21-cv-1289 MCS-MMA

**MEMORANDUM IN SUPPORT OF TETRA TECH'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW REGARDING INVALIDITY AND MOTION FOR NEW TRIAL**

**Honorable Mark C. Scarsi**
**Date: October 17, 2022**
**Time: 9:00 a.m.**
**Courtroom: 7C**

1

# **TABLE OF CONTENTS**

2

3   I.      INTRODUCTION ....................................................................................1

4   II.     LEGAL STANDARDS ...........................................................................1

5   III.    NO REASONABLE JURY COULD HAVE FOUND THE CLAIMS

6           INVALID BASED ON THE EVIDENCE PRESENTED AT TRIAL...........3

7           A.     Pavemetrics failed to show that the critical source code portion of

8                  UML Sale and Support constitutes prior art ........................................4

9           B.     Pavemetrics failed to address several claim limitations at trial............9

10                 1.      Claims 1 and 21 of the '293 Patent ........................................10

11                 2.      Claim 8 of the '557 Patent ......................................................12

12  IV.     THE MISCONDUCT OF PAVEMETRICS' COUNSEL WARRANTS A

13          NEW TRIAL ..........................................................................................14

14          A.     Pavemetrics' Counsel Injected Irrelevant and Excluded Evidence

15                 Into the Case to Confuse the Jury.......................................................14

16          B.     Pavemetrics' Counsel Attempted to Make this Case About

17                 Discovery Disputes, Not Facts ...........................................................16

18          C.     Pavemetrics' Counsel Repeatedly Tried to Introduce Evidence Not

19                 in the Case to Influence the Jury and Prejudice Tetra Tech...............17

20          D.     Pavemetrics' Presentation of Noninfringement Theories Contrary

21                 to the Law Prejudiced Tetra Tech .......................................................19

22  V.      CONCLUSION ......................................................................................25

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4    *Allied Chem. Corp. v. Daiflon, Inc.,*

5        449 U.S. 33 (1980)..............................................................2

6    *Anheuser–Busch Inc. v. Nat. Beverage Distribs.,*

7        69 F.3d 337 (9th Cir. 1995).......................................2, 14, 25

8    *BASF Corp. v. SNF Holding Co.,*

9        955 F.3d 958 (Fed. Cir. 2020) ....................................3, 4, 6

10   *Cadorna v. City & Cnty. of Denver, Colorado,*

11       245 F.R.D. 490 (D. Colo. 2007) ..........................................19

12   *Callicrate v. Wadsworth Mfg., Inc.,*

13       427 F.3d 1361 (Fed. Cir. 2005) ............................................1

14   *Centricut, LLC v. Esab Grp., Inc.,*

15       390 F.3d 1361 (Fed. Cir. 2004) ...............................12, 13, 14

16   *Chicago B & Q.R. Co. v. Kelly,*

17       74 F.2d 80 (8th Cir. 1934)..................................................19

18   *Cole v. Kimberly–Clark Corp.,*

19       102 F.3d 524 (Fed. Cir. 1996) ............................................21

20   *Cones v. Cnty. of Los Angeles,*

21       2016 WL 7438817 (C.D. Cal. Sept. 28, 2016) .....................2, 3

22   *County of Maricopa v. Maberry,*

23       555 F.2d 207 (9th Cir. 1977)..............................................16

24   *Deering v. Winona Harvester Works,*

25       155 U.S. 286 (1894)............................................................7

26   *Ericsson, Inc. v. Harris Corp.,*

27       352 F.3d 1369 (Fed. Cir. 2003) ............................................1

28

*Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*,

   762 F.3d 829 (9th Cir. 2014)..................................................................2

*Finnigan Corp. v. Int'l Trade Comm'n*,

   180 F.3d 1354 (Fed. Cir. 1999)............................................................7

*Fresnius USA, Inc. v. Baxter Int'l, Inc.*,

   582 F.3d 1288 (Fed. Cir. 2009)...............................................3, 10, 11

*Gilbrook v. City of Westminster*,

   177 F.3d 839 (9th Cir. 1999)...............................................................1

*Hemmings v. Tidyman's Inc.*,

   285 F.3d 1174 (9th Cir. 2002)..............................................................2

*Juicy Whip, Inc. v. Orange Bang, Inc.*,

   292 F.3d 728 (Fed. Cir. 2002)...........................................................7, 9

*Kode v. Carlson*,

   596 F.3d 608 (9th Cir. 2010)...............................................................2

*Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC*,

   381 F.3d 1142 (Fed. Cir. 2004).............................................10, 12, 13

*Lacks Indus., Inc. v. McKechnie Vehicle Components USA, Inc.*,

   322 F.3d 1335 (Fed. Cir. 2003).............................................................8

*Microsoft Corp. v. I4I Ltd. P'ship*,

   564 U.S. 91 (2011)...............................................................................3

*Moody v. Ford Motor Co.*,

   506 F. Supp. 2d 823 (N.D. Okla. 2007)...............................................3

*Murphy v. City of Long Beach*,

   914 F.2d 183 (9th Cir. 1990)................................................................2

*NTP, Inc. v. Research in Motion, Ltd.*,

   418 F.3d 1282 (Fed. Cir. 2005)..........................................................19

*Pfaff v. Wells Elecs., Inc.*,

   525 U.S. 55 (1998)...............................................................................4

iii

*Proveris Sci. Corp. v. Innovasystems, Inc.*,

   536 F.3d 1256 (Fed. Cir. 2008) .................................................................. 12, 13, 14

*SRI Intern. v. Matsushita Elec. Corp. of America*,

   775 F.2d 1107 (Fed. Cir. 1985) ......................................................................... 22

*TechSearch, L.L.C. v. Intel Corp.*,

   286 F.3d 1360 (Fed. Cir. 2002) ......................................................................... 21

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors*

   *USA, Inc.*,

   617 F.3d 1296 (Fed. Cir. 2010) ................................................................... 19, 20

*UCB, Inc. v. Watson Labs., Inc.*,

   927 F.3d 1272 (Fed. Cir. 2019) ........................................................................... 4

*Volterra Semiconductor Corp. v. Primarion, Inc.*,

   799 F. Supp. 2d 1092 (N.D. Cal. 2011) .............................................................. 3

*Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed-Wire Co.*,

   143 U.S. 275 (1892) ............................................................................................. 7

*Wharf v. Burlington N. R. Co.*,

   60 F.3d 631 (9th Cir. 1995) ................................................................................. 3

*Woodland Tr. V. Flowertree Nursery, Inc.*,

   148 F.3d 1368 (Fed. Cir. 1998) ........................................................................... 8

**Statutes**

35 U.S.C. § 271(a) ................................................................................................. 19

35 U.S.C. § 282 ....................................................................................................... 3

**Rules**

Fed. R. Civ. P. 50 .................................................................................................... 1

Fed. R. Civ. P. 50(a) ........................................................................................... 1, 9

Fed. R. Civ. P. 50(b) ......................................................................................... 1, 25

Fed. R. Civ. P. 59 .............................................................................................. 1, 2

Fed. R. Civ. P. 59(a) ............................................................................................... 2

## I.     INTRODUCTION

Tetra Tech respectfully requests that the Court enter judgment as a matter of law that claims 1 and 21 of the '293 patent and claim 8 of the '557 patent are not invalid under Fed. R. Civ. P. 50(b). At trial, Pavemetrics failed to meet its burden to prove by clear and convincing evidence that these asserted claims are invalid, and thus, the jury's invalidity findings were erroneous as a matter of law.

Tetra Tech also respectfully requests that the Court vacate the judgment (Dkt. 320) and set a new trial on infringement and damages under Fed. R. Civ. P. 59 because the repeated misconduct by Pavemetrics' counsel at trial substantially prejudiced Tetra Tech and confused the jury. At every turn, Pavemetrics' counsel made this case about irrelevant discovery squabbles, argued misstatements of law and facts, and discouraged the jury from weighing the actual facts of the case. Thus, a new trial is warranted.

## II.    LEGAL STANDARDS

Judgment as a matter of law is appropriate when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). If the Court does not grant the motion at trial, the motion may be renewed after trial. Fed. R. Civ. P. 50(b).

The Court must "determine whether viewing the evidence in the light most favorable to the non-moving party, and giving the non-movant the benefit of all reasonable inferences, there is sufficient evidence of record to support a jury verdict in favor of the non-movant." *Ericsson, Inc. v. Harris Corp.*, 352 F.3d 1369, 1373 (Fed. Cir. 2003); *Gilbrook v. City of Westminster*, 177 F.3d 839, 864 (9th Cir. 1999). The verdict must be supported by substantial evidence. *Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1366 (Fed. Cir. 2005) (applying Ninth Circuit law). In ruling on a renewed motion for judgment as a matter of law, the court may order a new trial or direct entry of judgment as a matter of law. Fed. R. Civ. P. 50(b).

"Unlike a Rule 50 determination, a Rule 59 motion for a new trial does not require

1

the district court judge to 'view the trial evidence in the light most favorable to the verdict. Instead, the district court can weigh the evidence and assess the credibility of the witnesses.'" *Cones v. Cnty. of Los Angeles*, 2016 WL 7438817, at *7 (C.D. Cal. Sept. 28, 2016) (citing *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014)). "The court may, on motion, grant a new trial on all or some of the issues. . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action of law in federal court." Fed. R. Civ. P. 59(a). Courts have the discretion to set aside a verdict if the trial was not fair to the moving party. *Kode v. Carlson*, 596 F.3d 608, 611 (9th Cir. 2010) ("A Rule 59 motion for a new trial is confided to the discretion of the district court, whose decision will be overturned on appeal only for abuse of discretion."); *see also Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980) ("The authority to grant a new trial ... is confided almost entirely to the exercise of discretion on the part of the trial court.").

To evaluate prejudice from attorney misconduct, courts in the Ninth Circuit consider "the totality of circumstances," which includes "the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case, and verdict itself." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1193 (9th Cir. 2002). Indeed, the district judge has the right, and the duty, to set aside the jury's verdict, regardless of substantial evidence, if in his opinion doing so would prevent a miscarriage of justice. *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990). This is because the district court is "in a superior position to gauge the prejudicial impact of counsel's conduct during the trial." *Anheuser–Busch Inc. v. Nat. Beverage Distribs.*, 69 F.3d 337, 346 (9th Cir. 1995).

Generally, misconduct by trial counsel results in a new trial if the "flavor of misconduct sufficiently permeate[s] an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict." *Anheuser–Busch*, 69 F.3d at 346. A clear example of misconduct, necessitating a new trial, is

misrepresenting untrue facts to the jury during argument. *Wharf v. Burlington N. R. Co.*, 60 F.3d 631, 637 (9th Cir. 1995). And, "[w]here attorneys have tried to get in the 'back-door' what they could not get into evidence, courts have protected against harm to the opposing party by granting a new trial." *Cones*, 2016 WL 7438817 at *8 (citing *Moody v. Ford Motor Co.*, 506 F. Supp. 2d 823, 833-834 (N.D. Okla. 2007)).

### III.   NO REASONABLE JURY COULD HAVE FOUND THE CLAIMS INVALID BASED ON THE EVIDENCE PRESENTED AT TRIAL

The '293 and '557 patents are presumed valid. 35 U.S.C. § 282; ECF 307 at 36 (Instruction No. 31 of Jury Instructions given to jury on August 24, 2022). The accused infringer must therefore prove invalidity by clear and convincing evidence. *BASF Corp. v. SNF Holding Co.*, 955 F.3d 958, 963 (Fed. Cir. 2020) (citing *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 95 (2011)). Accordingly, a court may grant judgment as a matter of law that a patent is not invalid where, as here, the accused infringer did not present sufficient evidence for a jury to find clear and convincing evidence of invalidity. *See Fresnius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1300 (Fed. Cir. 2009) (affirming the district court's grant of judgment as a matter of law on the issue of validity); *Volterra Semiconductor Corp. v. Primarion, Inc.*, 799 F. Supp. 2d 1092, 1100 (N.D. Cal. 2011) (granting judgment as a matter of law on the issues of validity where defendant failed to show that all the claim limitations were present in the prior art).

At trial, Pavemetrics presented several obviousness grounds based on two primary pieces of alleged prior art: (1) Pavemetrics' alleged prior system and use, i.e., "UML Sale and Support," and (2) a printed publication, i.e., "UML-TRB2014." But Pavemetrics' presentation of these obviousness grounds failed for a number of reasons.

First, the UML Sale and Support includes excerpts of source code that Pavemetrics failed to establish as prior art. The source code itself was hidden from the public, and Pavemetrics provided no evidence that it was ever used or sold as part of a commercial product. Instead, Pavemetrics relied on uncorroborated testimony from interested witnesses to fill in the gaps, but this is legally insufficient to establish by clear

and convincing evidence that the source code is prior art. Thus, any finding of invalidity based on UML Sale and Support should be vacated.

Moreover, in analyzing the alleged prior art, Pavemetrics and its expert failed to address several limitations from claims 1 and 21 of the '293 patent and claim 8 of the '557 patent. The record is therefore devoid of any evidence or testimony explaining why those limitations are disclosed by the alleged prior art or would have been obvious in view of the alleged prior art's teachings. Thus, even when viewed in the light most favorable to Pavemetrics, no reasonable jury could have found that the claims were obvious in view of the alleged prior art. Therefore, as a matter of law, the Court should find that claims 1 and 21 of the '293 patent and claim 8 of the '557 patent are not invalid.

### A. Pavemetrics failed to show that the critical source code portion of UML Sale and Support constitutes prior art

Pavemetrics contends that UML Sale and Support is prior art because it was publicly known or used, on sale, or otherwise made available to the public before the February 20, 2015 priority date of the '293 and '557 patents. For UML Sale and Support, Pavemetrics relied on invoices and manuals from a 2012 sale of its Laser Crack Measurement System ("LCMS") to the University of Massachusetts-Lowell ("UML"), select publications that allegedly discussed their work with the University of Massachusetts-Lowell, and excerpts of source code from a 2014 source code version (r8320) and an undated MATLAB script. The source code is critical to the invalidity analysis for UML Sale and Support as Pavemetrics depends on it to allegedly meet the algorithm steps recited in the claims, and thus, Pavemetrics cannot prove invalidity without establishing the source code as prior art.

To qualify as prior art, a prior system must have been sold or offered for sale, in public use, or otherwise known to the public. *See e.g., UCB, Inc. v. Watson Labs., Inc.*, 927 F.3d 1272, 1289 (Fed. Cir. 2019); *BASF*, 955 F.3d at 964–70; *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67–68 (1998). Consistent with the relevant case law, the jury was instructed at trial:

> An invention is known when the information about it was reasonably accessible to the public on that date. An invention was publicly used when it was either accessible to the public or commercially exploited. An invention was sold or offered for sale when it was offered commercially and what was offered was ready to be patented, i.e., it was reduced to practice or it had been described such that a person having ordinary skill in the field of the technology could have made and used the claimed invention, even if it was not yet reduced to practice or publicly disclosed.

ECF 307 at 37 (Instruction No. 32).

It is undisputed that the 2014 source code was not part of the 2012 sale to the University of Massachusetts-Lowell, as Pavemetrics' witness most familiar with its source code, Dr. Jean-François Hébert, admitted at trial. Day 4 Trial Tr. (Parker Ex. 4) at 147:10-12 ("**Q.** So that 2014 source code couldn't possibly be part of that sale that occurred in 2012? **A.** That's correct"). It is also undisputed that the undated MATLAB script was not part of the 2012 sale. Day 4 Trial Tr. at 146:18-20 (Dr. Hébert admitting that Pavemetrics "did not deliver a processing software" as part of the 2012 sale). Indeed, at no point during trial did Pavemetrics present an argument that it offered to sell or sold a system that met all of the limitations of the asserted claims.

It is also undisputed that the 2014 source code and the undated MATLAB script were never known to the public. Instead, the source code was kept confidential and only in Pavemetrics' possession. Dr. Hébert confirmed this during his testimony at trial:

> **Q.** Now, this 2014 source code was stored in Pavemetrics' repository; correct?
>
> **A.** Correct.
>
> **Q.** And only Pavemetrics had access to the repository?
>
> **A.** Correct.
>
> **Q.** And Pavemetrics never published the 2014 source code online;

1     correct?

2     **A.** That's correct.

3     **Q.** And never disseminated it to the public?

4     **A.** That's correct.

5     **Q.** So only Pavemetrics and Pavemetrics alone had access to that

6     2014 source code.

7     **A.** That's correct.

8 Day 4 Trial Tr., 147:23-148:10; 150:2-151:2 (similar answers when discussing the

9 undated MATLAB script).

10   Thus, Pavemetrics does not have an argument that its prior system was sold,

11 offered for sale, or was known to the public, prior to the February 20, 2015 priority date.

12 Instead, Pavemetrics relies on public use. But, to prove that, Pavemetrics was required

13 to show that the 2014 source code and the undated MATLAB script were "accessible

14 to the public or commercially exploited" before the priority date. ECF 307 at 37.

15 Pavemetrics failed to show either by clear and convincing evidence at trial.

16   Neither the 2014 source code nor the undated MATLAB script were

17 commercially exploited because, as Pavemetrics admitted, the 2012 sale did not include

18 processing software. Day 4 Trial Tr. at 146:18-20; *see also* 147:10-12. Pavemetrics also

19 failed to present any evidence that it ever received any money or other compensation

20 from the alleged use of the 2014 source code or the undated MATLAB script.

21   Moreover, neither the 2014 source code nor the undated MATLAB script was

22 publicly accessible as it was solely in the possession of Pavemetrics. Day 4 Trial Tr.,

23 147:23-148:10; 150:2-151:2. "Prior knowledge or use that is not accessible to the public

24 upon reasonable inquiry [] confers no benefit on the public, and thus does not suffice as

25 a defense under § 102(a). . . . [W]here the prior user has successfully concealed his work

26 from the public, such prior knowledge or use is unavailable as prior art because the prior

27 user has 'not contributed to the store of knowledge' in the art." *BASF*, 955 F.3d at 965.

28   When pressed about what records Pavemetrics had to support that the 2014

source code or undated MATLAB script were actually used or shared with others, Dr. Hébert claimed to have "emails" but admitted that none of those emails were in evidence. Day 4 Trial Tr., 148:11-149:7; 150:2-10. Dr. Hébert further alleged on redirect that there were "meetings" with the University of Massachusetts-Lowell where they were "explaining step-by-step what were the algorithms." Day 4 Trial Tr., 154:17-155:3. But neither Dr. Hébert nor any other Pavemetrics witness provided any proof that the 2014 source code or the undated MATLAB script were shared at these meetings.

Thus, the only evidence that Pavemetrics has that the 2014 source code or undated MATLAB script were ever used or shared with others is uncorroborated testimony of an interested witness. But this is insufficient because uncorroborated testimony from an interested witness alone cannot satisfy the clear and convincing standard necessary to invalidate a patent. Indeed, while a witness may testify regarding the public use of a prior system, it is a general rule that "oral testimony of prior public use must be corroborated in order to invalidate a patent." *Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 737–38 (Fed. Cir. 2002) (citing *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1366-68 (Fed. Cir. 1999)). This corroboration requirement for prior public use arises from a long-held reluctance by the courts to invalidate patents "on the basis of mere testimonial evidence absent other evidence that corroborates that testimony." *Finnigan*, 180 F.3d at 1366 (extending corroboration requirement to all subsections of Section 102). Indeed, oral testimony of prior public use has been viewed with "grave suspicion" for over 130 years due to forgetfulness of the witness, personal bias, or general incentive to color the testimony in the interest of the party calling the witness. *Deering v. Winona Harvester Works*, 155 U.S. 286, 300–01 (1894); Wash*burn & Moen Mfg. Co. v. Beat 'Em All Barbed-Wire Co.*, 143 U.S. 275, 284–85 (1892).

The fact that other Pavemetrics witnesses may have testified about the use of the 2014 source code or the undated MATLAB script does not cure this deficiency. This is because cross-corroboration across multiple witnesses alone is insufficient to show corroboration; independent documentary evidence is needed. *Lacks Indus., Inc. v.*

*McKechnie Vehicle Components USA, Inc.*, 322 F.3d 1335, 1349 (Fed. Cir. 2003). As a result, patent challengers, like Pavemetrics, bear a very heavy burden when the only evidence of corroboration is the oral testimony of their employees on long-past events. *Woodland Tr. V. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1372–73 (Fed. Cir. 1998). Here, Dr. Hébert and Mr. John Laurent are interested parties because they are co-owners and founders of Pavemetrics and their testimony relates to activities that occurred 8-10 years ago. Their testimony alone is therefore insufficient to establish that the 2014 source code and the undated MATLAB script are prior art.

Pavemetrics would need to identify contemporaneous documents to corroborate the testimony of its interested employees. But, as Dr. Hébert described during his testimony at trial, Pavemetrics provided no contemporaneous documents to support the alleged public use or accessibility of the 2014 source code and undated MATLAB script. Specifically, after testifying that Pavemetrics sent emails containing results from Pavemetrics' alleged use of the 2014 source code, Dr. Hébert conceded the absence of corroborating evidence. Day 4 Trial Tr., 148:11-149:7; 150:2-10.

Pavemetrics' interested employees attempted to identify certain publications that allegedly discussed their work with the University of Massachusetts-Lowell. *See* Trial Exs. 26, 565, and 566 (Parker Exs. 6, 8, and 9). However, these documents are all from 2013—before the 2014 source code even existed—and none of the documents identify the 2014 source code or the undated MATLAB script, let alone suggest that the source code was publicly available or publicly used. Instead, these documents actually show that, in 2014, Pavemetrics' rail inspection algorithms were still under development and not ready for commercialization. For instance, the 3rd Quarterly Meeting Minutes in May 2013 provided that future work needed to be done, including "estimating gauge width; detecting rail fasteners; detecting missing features; and detecting cross ties." Trial Ex. 565 at 3. Further, the 5th Quarterly Report in October 2013 states that "Future Plans" include "[d]evelop[ing] algorithms and software tools to interpret the 3D laser data: The team will continue to develop the laser algorithms. User interfaces will be

developed to automate the laser algorithms." Trial Ex. 566 at 19-20. Thus, the documents demonstrate that the algorithms were still undergoing development and were not yet ready for commercialization. Any contrary testimony offered by Pavemetrics' interested employees that the source code was publicly available or used is insufficient to satisfy the clear and convincing evidence standard. *Juicy Whip*, 292 F.3d at 737–38.

Therefore, Tetra Tech is entitled to judgment as a matter of law that the 2014 source code and undated MATLAB script do not qualify as prior art. And, without the source code as part of UML Sale and Support, Pavemetrics cannot, as a matter of law, show that the asserted claims were obvious in view of that prior art. Thus, the jury's findings of invalidity based on UML Sale and Support should be vacated.

## B. Pavemetrics failed to address several claim limitations at trial

Regardless of whether UML Sale and Support included the source code discussed above, Pavemetrics failed to carry its burden of demonstrating by clear and convincing evidence that claims 1 and 21 of the '293 patent and claim 8 of the '557 patent were obvious in view of the prior art. In asserting obviousness, as opposed to anticipation, Pavemetrics concedes that no single reference alone discloses every limitation in the asserted claims. Instead, Pavemetrics' invalidity analysis depends on multiple references and its expert to fill in the gaps in the alleged prior art. But at trial, Pavemetrics failed to put forth sufficient evidence for a reasonable jury to find that the claims were obvious. Specifically, Pavemetrics neglected to address several limitations in the asserted claims and simply relied on conclusory statements by its expert to try to meet its proofs for these limitations. In doing so, Pavemetrics left the record devoid of any testimony or explanation establishing how particular claim limitations were disclosed by a piece of prior art or would have been obvious in view of its teachings.

When Tetra Tech initially raised this motion under Fed. R. Civ. P. 50(a) at trial, Pavemetrics' counsel suggested that, regardless of the deficiencies of its expert's testimony, the documentary evidence supports its invalidity case. Day 5 Trial Tr. (Parker Ex. 5) at 159:9-24. But this is not legally sufficient. *See e.g.*, *Fresenius USA*

1    *Inc. v. Baxter Intern., Inc.*, 582 F.3d 1288, 1300 (Fed. Cir. 2009) (affirming the district

2    court's grant of judgment as a matter of law and finding that it was the patent

3    challenger's "burden to clearly disclose, discuss, and identify for the jury the supporting

4    evidence upon which it was relying to prove that the claim limitation was present in the

5    prior art"); *Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1151-52 (Fed.

6    Cir. 2004) (holding that a challenger failed to meet its burden of proving a prior art

7    reference anticipated the patent claims when it "failed to provide any testimony or other

8    evidence that would demonstrate to the jury how that reference met the limitations of

9    the claims").

10        This is particularly true here where the documents on their face are not sufficient

11   for a reasonable jury to find the claims invalid, and there are several necessary links

12   between the references and explanations that were completely omitted from

13   Pavemetrics' presentation at trial. Because of this clear failure of proof, no reasonable

14   jury could have found that the asserted claims were invalid under the clear and

15   convincing evidence standard. As a result, Tetra Tech is entitled to judgment as a matter

16   of law that claims 1 and 21 of the '293 patent and claim 8 of the '557 patent are not

17   invalid.

18        **1.    Claims 1 and 21 of the '293 Patent**

19        Claim 1 (and claim 21 due to its dependence from claim 1) requires, among other

20   things, an algorithm including steps (c) and (d):

21            c. identifying a railway track bed feature from the track

22            elevation map further including the steps of: i. defining an

23            appropriate gradient neighborhood representing a small 2D track

24            section over which differential vertical measurements are

25            calculated and ii. moving the gradient neighborhood like a sliding

26            window over the 3D elevation data using the processor; and

27            d. storing information corresponding to the identified

28            railway track bed feature in the data storage apparatus.

10

During its case-in-chief, Pavemetrics completely failed to address these two limitations, let alone explain to the jury which of the many references it was relying on disclose those limitations or how the teachings of any of those references would have rendered the claims obvious. The only remote mention of step (c) in its invalidity analysis was when Pavemetrics' expert discussed generally what Sobel kernels and the Canny method were. Day 4 Trial Tr. at 223:1-20. He also tangentially addressed step (c) when he stated that it would have been obvious to combine UML Sale and Support or UML-TRB2014 with a secondary reference, EC-TRB2014. Day 4 Trial Tr. at 223:21-224:15. But the analysis stopped there. There was no explanation of which parts of the references were being relied upon for which claim limitation in step (c). *See generally,* 218:8-224:15. And there was no explanation of how limitations were allegedly met or obvious in view of those teachings. *Id.* This is significant because, after purporting to combine UML Sale and Support or UML-TRB2014 with EC-TRB2014, the record is silent regarding which parts of those references in the hypothetical combination is being relied upon to disclose or render obvious step (c). A reasonable jury would have simply been left guessing what evidence Pavemetrics was relying on to render obvious the various limitations in step (c). Thus, even if Pavemetrics' expert had established a proper motivation to combine the references (which he did not), he failed to present any evidence about how the proposed combination of references renders obvious step (c) of claim 1.

Similarly, Pavemetrics and its expert also completely failed to mention step (d) of the algorithm recited in claim 1. *See generally,* 218:8-224:15. Thus, the jury was again forced to play the role of an expert and figure out Pavemetrics' obviousness position themselves. This is not the role of a jury. And no reasonable jury could come to such a conclusion on their own. *Fresenius*, 582 F.3d at 1300 (affirming the district court's grant of judgment as a matter of law and stating that "even if the [manual submitted to the jury] disclosed a stepper motor for delivering an anticoagulant, it was Fresenius's burden to clearly disclose, discuss, and identify for the jury the supporting

11

1    evidence upon which it was relying to prove that the claim limitation was present in the
2    prior art"); *Koito*, 381 F.3d at 1152 ("General and conclusory testimony . . . does not
3    suffice as substantial evidence of invalidity. . . . This is so even when the reference has
4    been submitted into evidence before the jury. Because Koito failed to articulate how the
5    JP '082 reference anticipates or makes obvious the '268 patent, it has not presented
6    sufficient evidence for the jury with respect to the JP '082 reference").

7           This is particularly true here where the documents being relied upon as alleged
8    prior art contain source code, which most jurors cannot understand on their own. *See*
9    *e.g., Proveris Sci. Corp. v. Innovasystems, Inc.*, 536 F.3d 1256, 1267 (Fed. Cir. 2008)
10   (holding that expert testimony was required to establish invalidity on grounds of
11   anticipation and obviousness where the subject matter is sufficiently complex to fall
12   beyond the grasp of an ordinary layperson); *Centricut, LLC v. Esab Grp., Inc.*, 390 F.3d
13   1361, 1369–70 (Fed. Cir. 2004) (requiring expert testimony to establish infringement
14   because "expert testimony regarding matters beyond the comprehension of laypersons
15   is sometimes essential," particularly in cases involving complex technology).

16          Finally, despite the clear deficiencies in its expert's analysis and a lack of
17   evidence, Pavemetrics' counsel failed to fill in the gaps in closing or at any other point
18   at trial. Thus, in the end, Pavemetrics failed to prove by clear and convincing evidence
19   that claims 1 and 21 of the '293 patent are invalid, and the Court should vacate the jury's
20   verdict and find claims 1 and 21 of the '293 patent not invalid.

21                  **2.      Claim 8 of the '557 Patent**

22          For claim 8 of the '557 patent, Pavemetrics' invalidity analysis for the UML Sale
23   and Support ground boiled down to a mere three questions:

24                  **Q.** Is it your opinion that UML sale and support invalidates
25                  Claim 8 of the '557 patent as obvious?
26                  **A.** Yes, it is.
27   Day 4 Trial Tr. at 213:19-21.
28                  **Q.** Have you reviewed the MATLAB cracks files?

                                              12

1                 **A.** I have.

2                 **Q.** And what is your opinion regarding invalidity of Claim

3                 8 of the '557 based on the UML system using that file?

4                 **A.** Um, my opinion is that a person of ordinary skill in the

5                 art would find that claim obvious based on the UML sale.

6  Day 5 Trial Tr. at 8:12-17.

7       No reasonable jury could have found claim 8 obvious in view of these conclusory

8  opinions by Pavemetrics' expert. First, as discussed above, mere conclusory statements

9  are not enough to prove invalidity. *Koito*, 381 F.3d at 1152. Second, the "MATLAB

10  cracks files" are purely source code, which the average juror could not possibly interpret

11  by themselves. *Proveris*, 536 at 1267; *Centricut*, 390 F.3d at 1361. And third, the

12  MATLAB code by itself fails to disclose or render obvious all of the features of claim

13  8 of the '557 patent. Indeed, the MATLAB code says nothing about "significant

14  elevations due to the rail heads for each rail have been removed from the elevation

15  data," as recited in claim 8. *See* Trial Ex. 508 (Parker Ex. 7) at 86-89. Thus, Pavemetrics

16  cannot reasonably dispute that it failed to present sufficient evidence for a reasonable

17  jury to find claim 8 obvious in view of UML Sale and Support.

18       For the UML-TRB2014 ground, Pavemetrics addressed its invalidity analysis in

19  a single, conclusory question:

20                 **Q.** Do you believe UML-TRB2014 invalidates Claim 8 of

21                 the '557 patent as obvious?

22                 **A.** Yes, I do.

23  Day 4 Trial Tr. at 213:22-24.

24       Again, such conclusory statements by an expert are not even close to the

25  substantial evidence required for Pavemetrics to meet its burden to show invalidity by

26  clear and convincing evidence. *Koito*, 381 F.3d at 1152. And in case there was any

27  doubt, the UML-TRB2014 publication is also completely silent regarding "significant

28  elevations due to the rail heads for each rail have been removed from the elevation

data," as recited in claim 8. *See* Trial Ex. 26 (Parker Ex. 6). Thus, as a matter of law, no reasonable jury could have found claim 8 obvious in view of UML-TRB2014.

As mentioned above with respect to claims 1 and 21 of the '293 patent, when Tetra Tech raised this motion at trial, Pavemetrics' counsel suggested that the documentary evidence in the record was sufficient to support its invalidity position for claim 8 of the '557 patent. But because that evidence primarily consists of source code, which the average juror cannot understand, a reasonable jury could not possibly have reached these conclusions on their own. *Proveris*, 536 F.3d at 1267; *Centricut*, 390 F.3d at 1369–70. Moreover, Pavemetrics' counsel failed to cure its expert's deficiencies in closing or at any other point at trial.

Therefore, because no limitation of claim 8 was ever addressed in Pavemetrics' case-in-chief on invalidity, a reasonable jury could not have found claim 8 obvious based on either UML Sale and Support or UML-TRB2014. Therefore, the Court should vacate the jury's verdict and find claim 8 of the '557 patent not invalid.

## IV.   THE MISCONDUCT OF PAVEMETRICS' COUNSEL WARRANTS A NEW TRIAL

Tetra Tech is entitled to a new trial because the misconduct of Pavemetrics' counsel unfairly prejudiced Tetra Tech. Unfortunately, the actions of Pavemetrics' counsel were not isolated occurrences, and their repeated wrongdoing permeated the entire trial from opening to closing. *Anheuser–Busch Inc.*, 69 F.3d at 346. Even if the individual acts alone do not warrant a new trial, when viewed in the aggregate, the misconduct was prejudicial and rendered the trial unfair.

### A.   Pavemetrics' Counsel Injected Irrelevant and Excluded Evidence Into the Case to Confuse the Jury

Pavemetrics repeatedly violated the Court's instructions and confused the jury with irrelevant, prejudicial, and unreliable evidence and arguments. In its rulings on motions *in limine*, the Court agreed that evidence regarding why Dr. Morellas could or could not review the neural network files "ha[d] little relevance and would be a

1    distracting issue" before the jury. ECF 287 at 5.

2         Despite this instruction and ruling, Pavemetrics' counsel repeatedly argued and

3    inflated this discovery dispute to the jury. On multiple occasions, counsel attempted to

4    argue that Dr. Morellas did not complete a comprehensive source code review because

5    he did not review Pavemetrics' neural network files. Day 3 Trial Tr. (Parker Ex. 3) at

6    57:11-66:5. This was the exact argument that the Court deemed distracting and of little

7    relevance. ECF No. 287 at 5. But Pavemetrics disregarded the Court's authority and

8    sought to distract the jury from the reality—that it did not provide Dr. Morellas with the

9    neural network code during his inspections.

10        Pavemetrics' counsel improperly used this irrelevant and inadmissible evidence

11   as character assassination, attempting to pin Pavemetrics' own faults on Dr. Morellas,

12   despite Dr. Morellas having nothing to do with the parties' discovery dispute. Day 3

13   Trial Tr. at 61:5-10 ("This is a discovery dispute between the parties and they should

14   not pin it on Dr. Morellas [that] he did something wrong. They've opened the door and

15   I'm not exactly sure how to cure the character assassination."). And the Court agreed.

16   Day 3 Trial Tr. at 62:16-21 and 65:12-14 (stating that anything beyond the expert's

17   understanding is a discovery dispute). Pavemetrics' counsel inappropriately appealed

18   to the bias and prejudice of the jury, and its actions were uncurable. Thus, the jury was

19   left with the impression that Dr. Morellas did not review the code and Tetra Tech was

20   hiding something behind its warranted objections.

21        To make matters worse, Pavemetrics' counsel doubled-down and disparaged Dr.

22   Morellas in closing arguments, presenting assertions not in evidence. Specifically,

23   Pavemetrics' counsel insinuated before the jury that Pavemetrics had the neural network

24   code available in its office and that Dr. Morellas was free to come and look at it

25   whenever he wanted. Day 5 Trial Tr. at 228:11-24. Not only was this improper and

26   unsupported by any evidence, it was also untrue. The Court had to admonish

27   Pavemetrics' counsel and provide a curative instruction to the jury after the closing

28   argument. Day 5 Trial Tr. at 238:24-240:2, 242:5-20. But the damage was already done.

15

The damage was also done when Pavemetrics' own expert, Dr. Frakes, testified that he actually did review the neural network files, Day 5 Trial Tr. 28:20-31:16, despite the fact that he did not do so in the course of discovery and had previously testified that he did not review the neural network files. Day 5 Trial Tr. 30:20-22. As it turns out, Dr. Frakes only sought to review the files *after* the close of fact and expert discovery, well after his deposition and exchange of his reports in this case. Day 5 Trial Tr. at 28:20-31:16. Thus, this clearly inadmissible and improper testimony was nothing more than another attempt by Pavemetrics to tarnish Dr. Morellas, creating the implication that Dr. Morellas did not review the files but Dr. Frakes did.

Because the jury did not know about the parties' discovery dispute, the motion *in limine*, or the reason for the exclusion of the clearly irrelevant, improper, and inadmissible evidence, Tetra Tech's objections created the appearance that it had something to hide when it did not. It also created the misperception that Dr. Morellas was not as knowledgeable or credible as Dr. Frakes.

In *County of Maricopa v. Maberry*, a comparably unfair case, counsel committed plain misconduct jeopardizing a fair trial when repeatedly and impermissibly eliciting testimony and making reference to matters previously ruled inadmissible "with the sole purpose of bringing to the jury something it should not have heard." 555 F.2d 207, 219 (9th Cir. 1977). A new trial was appropriate in that case, and the same result should follow here. Indeed, Pavemetrics' repeated contravention of prior rulings necessitates a new trial because Pavemetrics' misconduct severely prejudiced Tetra Tech and affected the jury's verdict.

**B.  Pavemetrics' Counsel Attempted to Make this Case About Discovery Disputes, Not Facts**

In addition to the unavailable neural network code, Pavemetrics' counsel continued to deliberately disregard the Court's instruction to present this case on the facts and not to reference discovery squabbles. Day 2 Trial Tr. (Parker Ex. 2) at 10:7-22 (The Court: "Again, I'm not interested in your fights with each other."). During

16

closing, Pavemetrics' counsel focused on discovery disputes not before the jury, and its counsel intimated that Tetra Tech was somehow a wrongful actor by subpoenaing Pavemetrics' customers and filing a motion to compel. Day 5 Trial Tr. at 238:1-239:14 and 242:5-20. Although the Court correctly intervened and provided a curative instruction, the jury was already tainted by the damaging and legally irrelevant argument, and was left with the impression that Tetra Tech did something wrong during the proceedings in this case.

The prejudicial misrepresentation of discovery issues by Pavemetrics' counsel also occurred during witness examination, well before closing argument. Indeed, multiple times, Pavemetrics' counsel made reference to versions of demonstratives that were exchanged by the parties the prior evening, which had been updated after counsel had conferred on objections. Day 3 Trial Tr. at 224:7-13 and 229:17-230:1. Again, the Court had to admonish Pavemetrics' counsel in front of the jury (*id.*), but the jury had already been led to believe that Tetra Tech had done something nefarious.

The repeated injection of these irrelevant discovery disputes at trial had no purpose other than to stoke bias and prejudice in the jury, attempting to insinuate that Tetra Tech was hiding something or was somehow being dishonorable. Indeed, this alleged "dishonorable" behavior was the clear theme of Pavemetrics' closing. Day 5 Trial Tr. at 206:21-208:1, 212:11-15, 230:24-231:4. And while untrue, even the implication of impropriety unfairly prejudiced Tetra Tech at trial.

## C. Pavemetrics' Counsel Repeatedly Tried to Introduce Evidence Not in the Case to Influence the Jury and Prejudice Tetra Tech

Pavemetrics' counsel intentionally chose to improperly influence the jury with suggestions contrary to and unsupported by the facts of this case. Even in its opening argument, Pavemetrics' counsel made inappropriate and blatantly false suggestions that the inventor, Dr. Mesher, committed inequitable conduct by failing to submit information on Pavemetrics' LRAIL to the Patent Office. Day 1 Trial Tr. (Parker Ex. 1) at 56:25-57:6 ("Tetra Tech didn't tell the Patent Office about Pavemetrics. It didn't

17

1    tell the Patent Office about LRAIL even though the inventor on the patent, Dr. Mesher,

2    had an LRAIL brochure and other LRAIL materials. Remember the video said he had

3    a duty of candor. If he knew anything that might be relevant to these patents, he had a

4    duty to disclose it, and he did not."); *see also* Day 2 Trial Tr. at 4:22-13:2.

5         But inequitable conduct was never part of this case. Pavemetrics did not plead it,

6    and there was no jury instruction about it. Regardless, Pavemetrics' counsel sought to

7    malign Tetra Tech's witnesses before the jury despite the lack of truth or legality of

8    counsel's arguments. Again, the Court agreed this was improper conduct on

9    Pavemetrics' behalf, but no curative instruction was provided. Day 2 Trial Tr. at 12:2-

10   7 and 12:21-13:2; *see also id.* at 74:18-75:6. Instead, the jury was left with the

11   implication that Dr. Mesher committed inequitable conduct when that was never part of

12   this case and was unsupported by any evidence.

13        Pavemetrics also repeatedly and willfully scoffed at this Court's authority and

14   violated its rulings. For instance, after hearing the Court's clear ruling that Pavemetrics'

15   damages expert could not opine on an award of lost profits, Pavemetrics' counsel and

16   its expert attempted an end run around the Court's ruling to present to the jury that lost

17   profits should be $0. Day 4 Trial Tr. at 166:20-24. The Court again had to admonish

18   counsel in front of the jury (*id.* at 167:7-15), but the damage was already done.

19        Likewise, Pavemetrics' technical expert, Dr. Frakes, repeatedly tried to testify

20   beyond his report and deposition. For instance, Pavemetrics' counsel and expert tried

21   to disregard the Court's instructions that the UML Sale and Support and the UML-

22   TRB2014 references should be dealt with as separate pieces of prior art—the way they

23   were discussed in Dr. Frakes' report. Day 4 Trial Tr. at 208:11-209:13; 211:15-18;

24   212:3-24; 216:3-217:9. Again, Pavemetrics blatantly disregarded the Court's rulings,

25   requiring Tetra Tech to object in front of the jury, prejudicing Tetra Tech and giving

26   the jury the impression that Tetra Tech had something to hide, even though it did not.

27        Moreover, misconduct by Pavemetrics' counsel continued when it repeatedly

28   tried to introduce evidence beyond the scope of Dr. Frakes' report and deposition. *See*

18

1    Day 4 Trial Tr. at 222:14-24; 227:12-228:20. This resulted in even more avoidable
2    objections from Tetra Tech's counsel, which were sustained by the Court. *Id.*

3         Tetra Tech expects that Pavemetrics may argue that the Court offered curative
4    instructions in response to some of Pavemetrics' misconduct. But curative instructions
5    here were not enough. Indeed, "cautionary instructions are effective only up to a certain
6    point . . . . [A]fter repeated exposure of a jury to prejudicial information, . . . cautionary
7    instructions will have little, if any, effect in eliminating prejudicial harm." *Cadorna v.*
8    *City & Cnty. of Denver, Colorado*, 245 F.R.D. 490, 495 (D. Colo. 2007); *see also*
9    *Chicago B & Q.R. Co. v. Kelly*, 74 F.2d 80, 86 (8th Cir. 1934) ("The mere putting of a
10    question which conveys to the jury improper information, and which tends to render the
11    trial unfair, should ordinarily entitle the opposing party to a new trial.").

12    **D.    Pavemetrics' Presentation of Noninfringement Theories Contrary to**
13         **the Law Prejudiced Tetra Tech**

14         Pavemetrics' presentation of evidence and arguments in support of its theory that
15    the accused products Pavemetrics "offered for sale" or "sold" did not infringe because
16    the LRAIL systems were shipped in separate boxes, contradicts the law on what
17    constitutes an infringing offer for sale or sale. In *Transocean Offshore Deepwater*
18    *Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296 (Fed. Cir. 2010), the
19    Federal Circuit addressed the issue of what constitutes infringement under the "offer to
20    sell" language of 35 U.S.C. § 271(a). The Federal Circuit explained that an "offer to
21    sell is a distinct act of infringement separate from an actual sale," and that "an offer to
22    sell need not be accepted to constitute an act of infringement." *Id.* at 1308-09. In
23    *Transocean*, the Court also addressed the issue of what constitutes a "sale" under 35
24    U.S.C. § 271(a). The Federal Circuit explained that "[a] 'sale' is not limited to the
25    transfer of tangible property; a sale may also be the agreement by which such transfer
26    takes place." *Transocean*, 617 F.3d at 1311. Indeed, "precedent establishes that a
27    contract can constitute a sale to trigger infringement liability." *Id.* (citing *NTP, Inc. v.*
28    *Research in Motion, Ltd.*, 418 F.3d 1282, 1319 (Fed. Cir. 2005)). In rejecting

19

1    defendants' argument that it did not infringe because it modified the accused product to

2    a non-infringing design prior to delivering it to its customer, the Federal Circuit

3    reasoned that "[t]he potentially infringing article" was the unmodified version sold in

4    the contract—not the altered version ultimately delivered to the customer. *Transocean*,

5    617 F.3d at 1311.

6        Tetra Tech presented unrebutted evidence that on February 15, 2021, Pavemetrics

7    sent to CSX a quotation offering three LRAIL systems for sale. *See* Trial Ex. 811

8    (Quotation) (Parker Ex. 10); Day 4 Trial Tr. at 81:1-82:15. Tetra Tech also presented

9    unrebutted evidence that on March 15, 2021, Pavemetrics entered into a goods

10   agreement with CSX for the sale of the three LRAIL systems. *See* Trial Ex. 844 (Good

11   Agreement) (Parker Ex. 11); Day 4 Trial Tr. at 84:4-7. The quotation Pavemetrics sent

12   to CSX on February 15, 2021 constituted an offer for sale of the accused LRAIL

13   systems and the goods agreement executed by CSX and Pavemetrics on March 15, 2021

14   constituted a sale. *Transocean*, 617 F.3d at 1311. It is undisputed that the prevailing

15   commercially available software in February-March 2021 contained the accused

16   Fake3D functionalities, and that the quotation and goods agreement show that the three

17   units offered for sale/sold consisted of "LRAIL sensors, acquisition software, and

18   processing software." Day 4 Trial Tr. at 81:16-24, 82:12-15, 84:8-12.

19       Ignoring this, Pavemetrics repeatedly misrepresented the law to the jury by

20   urging them to consider the arrangement of the accused product's components and

21   software version at delivery and installation, which was undoubtedly intended to shift

22   the jury's focus away from what was offered for sale/sold in February/March 2021.

23   Counsel for Pavemetrics misrepresented the law when it argued to the jury in

24   summation that "what is sold is what you get in the box. In this case it is unconnected

25   components." Day 5 Trial Tr. at 206:22-24; *see also id.* at 206:21-22 ("There's nothing

26   honorable about [Tetra Tech's counsel] telling you that what is sold is not what is in the

27   box."), 224:4-13 ("[Y]ou would have to look at what was actually offered for sale and

28   what was actually sold" by "looking to the actual sale" and "what was sold is in a box.");

224:22 ("We look at what was sold, what was delivered.").

Counsel for Pavemetrics also presented its unsupported non-infringement theory to the jury in its opening. Day 1 Trial Tr. at 61:5-17 ("LRAIL is not sold. They like to call it a turnkey system because we sell everything you need for the system, but they're not connected when they're sent to the customers. . . the software that applies will be the software that is actually installed later."). And when examining witnesses, counsel for Pavemetrics continued to incite prejudice by repeatedly referring to the arrangement of the accused products' components at delivery:

> **Q.** Dr. Morellas, these LRAIL sales are sold in a matter where the sensors are disconnected from the processor; correct?
>
> **A.** I do not know.
>
> **Q.** Okay. But you know that it's Tetra Tech's burden to prove infringement; correct?
>
> **A.** Yes

Day 3 Trial Tr. at 76:12-20; *see also* Day 4 Trial Tr. at 67:11-17.

Pavemetrics' repeated urging of the jury to evaluate a potentially infringing "sale" **at the time of delivery** is wholly unsupported by any legal authority and was unquestionably intended to prejudice Tetra Tech by confusing the jury as to the issue of whether the accused product offered for sale in February 2021 and sold in March 2021 infringed.

Pavemetrics also misrepresented the law when it presented arguments based on an unsupported theory that software using artificial intelligence could not infringe the asserted patents. There is no categorical defense to infringement based on the use of artificial intelligence. Rather, the test for literal infringement is whether all the elements of the claim, as correctly construed, are present in the accused system. *TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1371 (Fed. Cir. 2002) (citing *Cole v. Kimberly–Clark Corp.*, 102 F.3d 524, 532 (Fed. Cir. 1996)). That the '293 and '557 patents do not describe a specific embodiment using artificial intelligence has no legal consequence

1    on whether the accused products infringe. Indeed, the law "does not require that an
2    applicant describe in his specification every conceivable and possible future
3    embodiment of his invention." *SRI Intern. v. Matsushita Elec. Corp. of America*, 775
4    F.2d 1107, 1121–22 (Fed. Cir. 1985).

5        Pavemetrics' contention that the accused software could not infringe the asserted
6    patents because it used artificial intelligence is thus contrary to law and intended to
7    confuse the jury about the proper infringement inquiry. Pavemetrics' counsel argued in
8    its opening that "Pavemetrics does not infringe because Pavemetrics uses artificial
9    intelligence." Day 1 Trial Tr. at 53:12-14; *see also id.* at 59:4-5 ("The evidence will
10   show that Pavemetrics does not infringe because AI works like your brain.").

11       Pavemetrics' repeated reference to the asserted patents' lack of an explicit
12   recitation of artificial intelligence in support of its non-infringement defense was
13   therefore prejudicial because it had no legal significance and was instead intended to
14   confuse the jury about claim scope. Pavemetrics also repeatedly examined witnesses
15   about claim scope and the alleged non-infringing nature of artificial intelligence ("AI")
16   despite lacking any legal authority in support of this view:

17           **Q.** And when did you first think that your AI networks were even
18           at issue in this case?

19           **A.** Oh, wow. Okay. The patent is 70 pages long. I read it.
20           Nowhere in the patent it mentions artificial intelligence.
21           Nowhere in the patent it mentions neural network. I was
22           convinced that this was all about conventional algorithms.
23           Furthermore, our artificial intelligence engine uses publicly
24           available neural networks so I couldn't see it.

25   Day 3 Trial Tr. at 154:5-13.

26       Outside the presence of the jurors, and in response to the suggestion by Tetra
27   Tech's counsel that Pavemetrics' fact witnesses lacked the competence needed to
28   perform a proper non-infringement analysis, Pavemetrics' counsel appeared to concede

22

indifference as to whether or not its witness's view of non-infringement was supported by law. Day 5 Trial Tr. at 162:25-163:3 ("Mr. Habel could be mentally retarded and conclude there's no infringement."). While these remarks related to the basis for Pavemetrics' alleged good faith belief of non-infringement, counsel for Pavemetrics demonstrated the same indifference to the correct law on infringement during its cross-examination of Tetra Tech's witnesses. *See* Day 3 Trial Tr. at 51:8-22; Day 2 Trial Tr. at 50:1-21.

Pavemetrics also presented testimony from its own fact witnesses and experts, based on incorrect law, about the scope of the patents to support its non-infringement theories. *See* Day 4 Trial Tr. at 184:20-185:20 ("I mean when we look at the patent in the context of artificial intelligence, we heard Dr. Mesher say they don't list artificial intelligence anywhere and they don't list machine learning anywhere or convolution neural networks or deep learning."); *id.* at 53:6-19 ("[I]f you can't describe what exactly it's doing even, you can't patent it or say it's infringing."); *id.* at 162:4-11 ("I understand that the '293 patent doesn't cover artificial intelligence.").

Pavemetrics' expert even presented unsupported testimony about a "word-for-word" test for infringement that was unsupported by law:

> **Q.** And what is your understanding of how this claim limitation is affected by the requirements for literal patent infringement as Tetra Tech is alleging here?
>
> **A.** All right. Well, as I understand literal infringement and as it was explained to us earlier in the trial, that means that every word has to be accounted for. So even if it's a minor implication maybe in the larger context of the product, every word must be accounted for it to literally infringe. Those are the rules so that's how I understand it.

Day 4 Trial Tr. at 198:20-199:3. This testimony about the "word-for-word" test for infringement was so egregiously contrary to law that the Court had to provide a curative

1   instruction the following day when the witness referred to the test once again. Day 5
2   Trial Tr. at 22:2-7, 22:14-23:2 ("There's been some discussion about a word-for-word
3   test for infringement, and there was just some testimony that the test for obviousness and
4   infringement might be different. I want you to ignore all the advice from the lawyers and
5   the witnesses with respect to what the standards are, what the legal test is for
6   infringement, this word for word stuff or a different test.").

7        Pavemetrics presented misleading evidence and arguments to support its baseless
8   non-infringement theories, intending to confuse the jury about the proper scope of the
9   claims and provoke an improper emotional response that would unfairly influence the
10  verdict. Day 5 Trial Tr. at 221:1-4 ("Okay. So let's talk about how Pavemetrics uses
11  artificial intelligence and not the patents. Again, these patents are not on artificial
12  intelligence. I know you now [sic] that by now."), 221:21-24 ("[Tetra Tech is] trying to
13  keep the entire industry from using AI so that they can be the only ones to use AI when
14  they didn't invent AI. They didn't invent AI for a railroad. They didn't invent the
15  convolutional neural network."), 211:22-212:15 ("We're not here because of three sales
16  to CSX. I mean, look at all these lawyers that they're paying for to be here about three
17  sales on CSX. I don't think so. This is about [Tetra Tech] wanting to control the market.
18  They are going to set the tone for this market by golly. They're going to do it any way
19  that they can. . . . They want to increase prices. They want inflation. And what happens
20  when prices are kept high like that? Well, then it affects all of us. All of us who ride
21  trains, all of us who buys products from Amazon, all of us because those prices will
22  come back to us.").

23        In response to these misleading and inflammatory remarks by Pavemetrics'
24  counsel, Tetra Tech's counsel tried to remind the jury that they were required to follow
25  the law provided in the jury instructions. Day 5 Trial Tr. at 171:17-172:12
26  ("[Pavemetrics'] overarching theory or argument is that because they're using artificial
27  intelligence and because the patent doesn't specifically describe artificial intelligence
28  that somehow that gets them off the hook for infringement. . . . You're not gonna see

24

anything like that in the jury instructions. The jury instructions tell you what the law actually is."), *id.* at 172:13-173:3 ("As Dr. Morellas explained, it is true that our patent doesn't talk about AI and doesn't talk about neural networks because our patent is about a specific algorithm that's used in railroad detection. And as Dr. Morellas explained, you can use that algorithm, you can use AI to perform that algorithm or you cannot use AI to perform that algorithm. . . . It doesn't matter what you use to perform the algorithm, if you're performing the algorithm, and if you're performing every single one of these steps, you infringe the claim. That's the law. That's infringement.").

And at Tetra Tech's request and in response to Pavemetrics' improper closing arguments, the Court again provided a curative instruction to the jury. Day 5 Trial Tr. at 242:5-12 ("I just wanted to clarify a couple things . . . that came up in the closing argument. There was some talk about this case is not about the three sales, it's about something else. This case is about the three sales. You're here to decide infringement based on the sales that were made. All these . . . other things that counsel spoke about are not part of this case and not relevant to your determination of infringement. You're to follow the law and the facts."). Unfortunately, even the Court's curative instruction was insufficient to remedy the harm because the jury was "necessarily prejudiced" by Pavemetrics' deliberately inappropriate misconduct. *Anheuser-Busch*, 69 F.3d at 346.

Thus, Tetra Tech was repeatedly prejudiced by Pavemetrics' purposeful attorney misconduct, from the beginning to the end of the trial, all directed to influence the jury with inadmissible, irrelevant, and improper evidence. Therefore, under these circumstances, a new trial is warranted.

## V.    CONCLUSION

For the foregoing reasons, Tetra Tech respectfully requests that the Court vacate the jury's invalidity findings (ECF 309 at 6-7) and find claims 1 and 21 of the '293 patent and claim 8 of the '557 patent not invalid as a matter of law under Federal Rule of Civil Procedure 50(b). Additionally, Tetra Tech respectfully requests that the Court set aside the verdict and order a new trial on infringement and damages.

1    Dated: September 14, 2022                    **CLARK HILL LLP**

2                                                 By:

3

4    _____

                                                      Donald L. Ridge

5

6                                                 James R. Barney (*pro hac vice*)

                                                  Aaron L. Parker (*pro hac vice*)

7                                                 Daniel G. Chung (*pro hac vice*)

                                                  Nicholas A. Cerulli (*pro hac vice*)

8                                                 Kelly S. Horn (*pro hac vice*)

                                                  Jency J. Mathew (*pro hac vice*)

9                                                 **FINNEGAN, HENDERSON, FARABOW,**

10                                                **GARRETT & DUNNER, LLP**

11

12                                                *Attorneys for Defendant and Counterclaim Plaintiffs*

                                                  *TETRA TECH, INC. AND TETRA TECH TAS INC.*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28