# EXHIBIT 1

UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

- - -

HONORABLE MARK C. SCARSI
UNITED STATES DISTRICT JUDGE PRESIDING

- - -

PAVEMETRICS SYSTEMS, INC., )
)
PLAINTIFF, )
)
VS. ) CASE NO.:
) CV 21-01289-MCS
TETRA TECH, INC., )
)
DEFENDANT. )
)
________________________________)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

WEDNESDAY, AUGUST 17, 2022

LOS ANGELES, CALIFORNIA

LAURA MILLER ELIAS, CSR 10019
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, ROOM 4455
LOS ANGELES, CALIFORNIA 90012
PH: (213)894-0374

APPEARANCES OF COUNSEL:

ON BEHALF OF PLAINTIFF:

KNOBBE, MARTENS, OLSON & BEAR, LLP
BY: CHRISTY LEA, ESQ.
JOSEPH RE, ESQ.
NICHOLAS ZOVKO, ESQ.
ALAN LAQUER, ESQ.
2040 MAIN STREET
14TH FLOOR
IRVINE, CA 92614

ON BEHALF OF DEFENDANT:

FINNEGAN HENDERSON
BY: JAMES BARNEY, ESQ.
AARON PARKER, ESQ.
NICHOLAS CERULLI, ESQ.
JENCY MATHEW, ESQ.
DANIEL CHUNG, ESQ.
901 NEW YORK AVENUE NW
WASHINGTON, DC 20001

INDEX

| PROCEEDINGS | PAGE |
|---|---|
| PRELIMINARY MATTERS | 4 |
| PRELIMINARY INSTRUCTIONS | 13 |
| OPENING STATEMENTS | |
| BY: MR. BARNEY | 29 |
| BY: MS. LEA | 51 |

WITNESSES FOR TETRA TECH:

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| KEYES, GARY | | | | |
| BY: MR. PARKER | 67 | | 105 | |
| BY: MS LEA | | 91 | | |

| EXHIBITS | ADMITTED |
|---|---|
| 51 | 67 |
| 839 | 67 |
| 840 | 67 |
| 842 | 67 |
| 846 | 67 |
| 847 | 67 |
| 864 | 67 |
| 867 | 67 |
| 910 | 67 |
| 966 | 67 |
| 178 | 91 |

LOS ANGELES, CALIFORNIA; WEDNESDAY, AUG. 17, 2022; 9:09 A.M.

- - -

THE CLERK: Calling Item No. 1.

Case No. CV 21-1289.

Pavemetrics Systems, Inc. versus Tetra Tech, Inc.

Counsel, please state your appearances.

MS. LEA: Good morning. Christy Lea on behalf of Pavemetrics Systems. With me is Joseph Re and Nick Zovko.

THE COURT: Good morning.

MR. BARNEY: Good morning, Your Honor.

James Barney with the Finnegan law firm. With me today -- on behalf of Tetra Tech. With me today, Aaron Parker, Dan Chung, Nick Cerulli, Jency Mathew, and our local counsel, Don Ridge.

THE COURT: Good morning. So I had a chance to look at the Omega case and some of the information there. It does look like what the Federal Circuit is saying is that a lay witness can talk about their basis for their belief of noninfringement or invalidity.

There's a footnote that says that courts are correct in excluding testimony that sort of crosses the line into expert areas. And so I think the best way to handle it is to allow the witnesses testify as to their belief of noninfringement, but, you know, to the extent witnesses try to explain technical details as facts to the jury or as

technical opinions, we'll have to curb it there. So we'll just take it as it goes.

MR. RE: Understood, Your Honor.

THE COURT: Okay. And anything else the parties want to discuss before the jury gets here?

MR. ZOVKO: Yesterday, Your Honor, parties exchanged demonstratives for opening statements this morning, and Pavemetrics has objections to five slides in Tetra Tech's opening statements or demonstratives for opening statements.

Mr. Barney, do you have a copy for the Court? We just received an updated version of slides this morning so about 15 minutes ago.

THE COURT: Okay.

MR. Zovko: So far, Your Honor, several of the slides have irrelevant, extremely prejudicial and misleading information. I'd like to start with Slide 15. It's a time line that Tetra Tech is proposing. If you go to Slide 15, there's two entries. One in 2017, there's a quote you might be interested to see Daryl's list of patents. And then 2018, there's a quote if we get sued, it's your fault.

The implication is these relate to the patents in suit and it's related to this lawsuit. The fact is they do not. Daryl's list of patents in 2017 could not be asserted patents because the patents issued years later, both asserted patents in this case.

The next quote if we get sued, your fault is not talking about this lawsuit. It's talking about a different competitor, G Rex, who was involved in a lawsuit with Tetra Tech at the time. And this time line follows several slides talking about the patents, what the patents contained, it leads into the accused products, and having this information in this time line is extremely -- it's irrelevant.

And if you recall, we only had ten hours on each side to present this case, and Your Honor instructed the parties to stick to the facts of this case so these sideshows we think are inappropriate and highly prejudicial.

THE COURT: Okay. Let me hear from Tetra Tech why -- is these statements aren't referring to the patents in suit, why are they relevant?

MR. BARNEY: Your Honor, the -- as you know, part of our willfulness and induced infringements case depends on the knowledge of the patents. And as you know from reading our briefs in the summary judgment motion, we intend to put on a circumstantial case of that.

Um, for certain, the fact that they were interested in Daryl's patents regardless of the time frame is -- is relevant to that inquiry because they knew about Darel Mesher, they knew he was having patents, and at least at some point in time, they were directed to go look at his list of patents. That definitely fists into a circumstantial pattern

of following along with Tetra Tech's patent files.

With respect to if we get sued, it's your fault, Your Honor, that goes to state of mind. It's irrelevant to which patent or which concern they had at the time. It goes to their state of mind that they knew they were doing something that could lead to, uh, them getting sued for the patent infringement. And they had a plan to try to avoid that, and it's relevant to exactly the code that was put into their system that ended up infringing our patent.

We think it's relevant to willfulness, state of mind, and it's relevant to knowledge of patents because it shows again part of this circumstantial pattern. They were well aware of patents. They -- as I think you might have said, they are sophisticated at some times, very sophisticated, following along other competitors' patents, looking at their patents, you know, identifying patent risks of infringement and figuring out ways to try to minimize that, and yet at the same time, they claim they had absolutely no knowledge of our patents.

This circumstantial evidence is our case. This is what we intend to present to the jury to convince them that that is not a credible argument.

THE COURT: Okay. Um, I think I'll -- I will allow this as circumstantial evidence. And then obviously, on cross-examination or argument, counsel for Pavemetrics can

explain why it's not particularly probative.

MR. ZOVKO: Your Honor, may I approach?

THE COURT: Please.

MR. ZOVKO: Slide 3 purports to talk about Tetra Tech's awards and recognitions, none that have to do with this case. There's awards stated here for small business, environmental issues, diversity. Um, we think this is irrelevant and misleading and prejudicial. And, again, this is a sideshow.

So if they're gonna put up awards of their environmental prowess, there are public proceedings where Tetra Tech has been sued multiple times on environmental issues, and we don't want to have to go into these sideshows in this is a short trial. So we'd respectfully request these slides be struck.

MR. BARNEY: May I be heard, Your Honor?

THE COURT: Yes, please.

MR. BARNEY: Your Honor, I think this is pretty conventional, opening material. We intend to present our client as a good corporate citizen. This goes to general credibility and character of not only the client, but as corporate witnesses and therefore relevant as character evidence. We certainly don't intend to dwell at length on any of these awards. Mr. Keyes, our first corporate witness, will address them so they will be discussed during the

evidence.

THE COURT: So yeah, my first reaction to this is this is pretty standard and fine. What's gonna be your response if counsel, for example, brings up, you know, some issues that might curb some of this recognition such as lawsuits filed against Tetra Tech? Wouldn't that be fair?

MR. BARNEY: Your Honor, if the witness testifies as to, you know, environmental awards, and they want to use their cross-examination time delving into other past lawsuits, um, I think that would be fair.

THE COURT: Okay. Okay, then on that basis, this can come in.

MR. ZOVKO: Your Honor, Pavemetrics also has an objection to the next slide. Um, I believe it's the fourth slide titled Tetra Tech TAS, the last bullet is what Pavemetrics objects to. It states awarded 17 patents for 3DTAS including the --

THE COURT REPORTER: I'm sorry, Counsel.

I can't hear you.

THE COURT: And, again, when you're reading, we'll just -- I'll remind everybody of that. Whenever we read something, we tend to read fast cause we all have a copy of it except for the court reporter so. . .

MR. ZOVKO: Thank you.

THE COURT: Sure.

MR. ZOVKO: Okay. The last bullet on Slide 4 says awarded 17 patents for 3DTAS including the two patents asserted in this case. We're okay with Tetra Tech mentioning the two patents asserted in this case, but we think it's irrelevant and prejudicial and misleading to get into 17 other purported patents that he may or may not have that are not at issue in this case.

THE COURT: Okay. Yeah, I think this can come in. I think this is pretty standard stuff in so I think it's fine.

MR. ZOVKO: Pavemetrics next objection is on Slide 16. Pavemetrics objects to Slide 16 because it violates the Court's summary judgment order. So on the top, it purports to show information, sales to CSX, and the October 2020 notation on this time line with a particular software version here R10323. That sale, what we call Sale A, was -- is out of this case.

The Court ruled that was prior to notice, and the first two sales as you recall to CSX are not an issue for trial. And so this time line we believe with that is inappropriate because that's not a relevant issue for this case, and it's misleading and prejudicial to have the discussion of thus particular software version of Sale A in this time line.

THE COURT: And so Sale A is not in the case

because it was done before notice; correct?

MR. ZOVKO: Correct.

THE COURT: And so to speak about, though, why is that prejudicial? Just you think it's just confusing? Or what's the issue?

MR. ZOVKO: We're not litigating whether Sale A is infringement and what software version Sale A has and what the specifics of that software version are. That's not an issue for trial. So we think that's irrelevant, misleading, and again it's gonna get into issues that are not part of this trial.

THE COURT: And you believe that this is the incorrect software version for Sale A? Is that the issue? Or do -- you just don't want to mention Sale A.

MR. ZOVKO: I'll let my colleague speak.

MS. LEA: Thank you.

So the software version here is the software version that was licensed with Sale A, and that is pre-notice sale, and you can see that the software was delivered before notice here.

What they're trying to do is they're trying to tie it to Sales 2, 3 and 4 to CSX that are at issue in this suit, and they're gonna say oh, well, CSX, you had this software so somehow magically it relates to these later sales even though they have no evidence of that and even though it was licensed

for Sale A.

So we won on summary judgment that Sale A with that software was pre-notice, and it's out of the case, and now they're trying to bring that software back into the case with later sales that they know were ultimately assembled with different software.

THE COURT: Let me hear from Tetra Tech on this.

MR. BARNEY: Your Honor, this just goes to the parties' fundamental disagreements and the reason we're taking this case to trial. They have a different view of the evidence than we do.

That software was licensed in October of 2020, and they're not disputing that that license remains in effect all the way until December of 2021. Our theory of the case -- and my colleague says that we think it's magic or that we have no evidence. We have quite a bit of evidence. We have declarations from their witnesses saying that at the time of this sale in March '21, that was a turnkey sale that included both hardware and software. And the software that was available to the client at the time to load on to that system was this software, was this R10323.

I know they disagree with it. I mean, obviously, they disagree with it. That's why we're here and taking this issue to the jury. But this is what we think the evidence is going to present, and this is what we would like to tell the

jury, that we're previewing the evidence. This is how we view the evidence. If they view it differently, that's fine, they can preview it differently.

THE COURT: Okay. I think I'll let this in, and parties can deal with it on cross.

Next -- next objection?

MR. ZOVKO: Pavemetrics' last objection is to Slide 20, captioned verdict. This in Pavemetrics' view not an appropriate slide for opening. This would be perhaps for closing, but to talk what Tetra Tech has proved before any evidence is inappropriate.

THE COURT: Yeah, I -- I agree. I'd like the parties just to stick to previewing the evidence and not making any arguments.

MR. BARNEY: Understood, Your Honor, thank you.

THE COURT: Anything else before the jurors get here?

MS. LEA: No, Your Honor.

THE COURT: Okay. We are generating the jury list for the parties, and you should have those momentarily, and the jury should be here soon.

(Jury voir dire not transcribed.)

THE CLERK: Stand and raise your right hand.

(Jury sworn.)

THE COURT: Please have a seat. So I'm gonna read

you some preliminary jury instructions, and then I think we also have a video we're going to be showing you that goes through the patent process a bit to give you a little bit of background on that. And then we will move on to opening statements.

You'll have a copy of these instructions with you in the jury deliberations room so you don't need to jot all this down, but obviously you're perfectly free to take notes.

So how about I go through the instructions? The instruction are something we work on with the parties before the trial, sometimes during the trial to make sure that everyone sort of has agreement or at least they were able to lodge objections to them so I read them because it's just important that we sort of negotiated some of this language, and I want to make sure that it's given to you exactly so that's why I'm reading them to you.

So Instruction No. 1. Members of the jury, you are now the jury in this case. It is my duty to instruct you on the law. These instructions are preliminary instructions to help you understand the principles that apply to civil trials and help you understand the evidence as you listen to it.

You will be allowed to keep this set of instructions -- well, actually, we're going to give you these instructions to have in the jury deliberations room at the end of the trial.

It's your duty to find the facts from all of the evidence in this case. To those facts, you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not. You must not be influenced by any personal likes or dislikes, opinions, prejudices or sympathy.

This means that you must decide the case solely based on the evidence before you. You will recall you took an oath to do so. Please do not read into these instructions or anything I may say or do that I have an opinion regarding the evidence in this case or what your verdict should be.

Now, when a party has the burden of proving any claim or affirmative defense by a preponderance of the evidence, that's one of those evidentiary standards we talked about, it means that you must be persuaded by the evidence that the claim or affirmative defense is more probably true than not. You should base your decision on all the evidence regardless of which party presented it.

Now, we're also gonna have some issues that need to be proven by clear and convincing evidence. When a party has the burden of proving any claim or defense by clear and convincing evidence, it means that the party must present evidence that leaves you with a firm belief or conviction that it is highly probable that the factual contentions of the claim or defense are true. This is a higher standard of

proof than proof by a preponderance of the evidence, but it does not require proof beyond a reasonable doubt.

So we talked about the reasonable doubt standard in criminal cases, the preponderance standard in civil cases, and this is between those two standards, clear and convincing evidence.

Now, what is evidence? The evidence you are to consider in deciding what the facts are consists of:

(1) the sworn testimony of any witnesses;

(2) the exhibits that are admitted into evidence;

(3) any facts to which the lawyers have agreed; and

(4) any facts I may instruct you to accept as true.

What is not evidence?

In reaching your verdict, you may consider only the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you.

Arguments and statements by the lawyers are not evidence. The lawyers are not witnesses. What they have said -- what they will say in their opening statements, closing arguments or at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory controls.

Questions and objections by the lawyers are not

evidence. Attorneys have a duty to their client to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the Court's ruling on it.

Testimony that is excluded or stricken or that you have been instructed to disregard is not evidence and must not be considered.

In addition, some evidence will be received only for a limited purpose. When I have instructed you to consider certain evidence only for a limited purpose, you must do so not and may not consider that evidence for any other purpose.

Anything you may have seen or heard when the court was not in session is not evidence. You are to decide the case solely on the evidence received at trial.

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact such as testimony by a witness about what the witness personally saw or heard or did. Circumstantial evidence is proof of one or more facts from which you could find another fact. You should consider both kinds of evidence. The law makes no distinction between the weight to be given to direct or circumstantial evidence. It is for you to decide how much weight you give to any evidence.

By way of example, if you wake up in the morning

and see that the sidewalk is wet, you may find from that fact that it rained during the night. However, other evidence such as a turned on garden hose may provide a different explanation for the presence of water on the sidewalk. Therefore, before you decide if facts have been proved by circumstantial evidence, you must consider all the evidence in light of reason, experience and common sense.

Now, the rules of evidence. There are rules of evidence that control what can be received in evidence. When a lawyer asks a question or offers an exhibit into evidence, and the lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object.

If I overrule the objection, the question may be answered or the exhibit may be received. If I sustain the objection, the question cannot be answered, and the exhibit cannot be received. When I sustain an objection to a question, you must ignore the question and must not guess what the answer might have been.

Sometimes I may order that evidence be stricken from the record, and that you must disregard or ignore the evidence. That means when you are deciding the case, you must not consider that evidence for any purpose.

In deciding the facts of the case, you may have to decide which witness to believe and which testimony to believe and which testimony not to believe. You may believe

everything a witness says or part of it or none of it.

In considering the testimony of any witness, you may take into account:

(1) the opportunity and ability of the witness to see or hear or know the things testified to;

(2) the witness's memory;

(3) the witness's manner while testifying;

(4) the witness's interest in the outcome of the case, if any;

(5) the witness' bias or prejudice, if any;

(6) whether other evidence contradicted the witness's testimony;

(7) the reasonableness of the witness's testimony in light of all the evidence; and

(8) any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently.

You may consider these differences, but do not decide the testimony is untrue just because it differs from other testimony. However, if you decide that a witness has deliberately testified untruthfully about something

important, you may choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were and how much weight you think their testimony deserves.

Conduct of the jury. I'll now say a few words about your conduct as jurors. First, keep an open mind throughout the trial, and do not decide what the verdict should be until you and your fellow jurors have completed your deliberations at the end of the case.

Second, because you must decide this case based on only the evidence received in the case and my instructions as to the law that applies, you must not be exposed to any other information about the case or to the issues it involves during the course of your jury duty.

Thus until the end of the case or until I tell you otherwise, do not communicate with anyone in any way, and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This includes discussing the case in person, in writing, by phone, tablet or computer or any other electronic means via email, text

messaging or any Internet chat room, blog, website or application including but not limited to Facebook, YouTube, Twitter, Instagram, LinkedIn, Snapchat, TikTok and any other forms of social media.

This applies communicating with your fellow jurors until I give you the case for deliberations. And it applies to communicating with everyone else including your family members, your employer, the media or press and the people involved in the trial although you may notify your family and your employer that you've been seated as a juror in the case and how long you expect the trial to last.

If you are asked or approached in any way about jury service or anything about the case, you must respond that you've been ordered not to discuss the matter and report the conduct to the Court.

Because you will receive all the evidence and legal instruction you may properly consider to return a verdict, do not read, watch or listen to any news or media accounts or commentary about the case or anything to do with it. Do not do any research such as consulting dictionaries, searching the Internet or using any other reference materials. And do not make any investigation or in any other way try to learn about the case on your own.

Do not visit or view anyplace discussed in the case. Do not use Internet programs or any other resource to

search for or view anyplace discussed during the trial. Also, do not any research about the case, the law or the people involved including the parties, the witnesses or the lawyers until you have been excused as jurors. If you happen read or hear anything touching upon the case in the media, turn away and report to me as soon as possible.

These rules protect each party's right to have this case decided only on the evidence that has been presented in court. Witnesses here in court take an oath to tell the truth, and the accuracy of their testimony is tested through the trial process. If you do any research or investigation outside the courtroom or gain any information through improper communication, then your verdict may be influenced by inaccurate, incomplete or misleading information that has not been tested by a trial process.

Each of the parties is entitled to a fair trial by an impartial jury. If you decide the case based on information not presented in court, you will have denied the parties a fair trial. You have taken an oath to follow these rules, and it is very important that you do follow them.

A juror who violates these restrictions jeopardizes the fairness of the proceedings, and a mistrial could result that would require the entire trial process to start over. If any juror is exposed to any outside information, please notify the Court immediately.

Now, I urge you to pay close attention to the testimony. During deliberations, you will not have a transcript with you so you have to pay attention to it as it's given to you.

If you wish, you may take notes to help you remember the evidence. If you do take notes, please keep them to yourself until you go to the jury room to decide the case. Do not let note taking distract you. When you leave, your notes should be left on your seats. No one will read your notes. Whether or not you take notes, you should rely on your own memory of the evidence. Notes are only to assist your memory. You should not be overly influenced by your notes or the notes of other jurors.

Now, from time to time during the trial, it may be necessary for me to talk with the attorneys out of the hearing of the jury either by having a conference at the bench when the jury is present like we did over here or by calling a recess. Please understand that while you're waiting, we are working. The purpose of these conferences is not to keep relevant information from you, but to decide how evidence is to be treated under the Rules of Evidence and to avoid confusion and error.

Of course we will do what we can to keep the number and length of these conferences at a minimum. I may not always grant an attorney's request for a conference. Do not

consider my granting or denying the request for a conference as any indication of my opinion of the case or what your verdict should be.

We'll try to keep those side bar conferences to a minimum. The lawyers get here early in the morning, long before you do in case there's any issues to discuss, just so we don't waste any of your time. So we're very aware that your time is valuable, and we'll what we can to make sure we don't keep you waiting.

Now, a deposition is a sworn testimony of a witness taken before trial. The witness is placed under oath and is sworn to tell the truth. And lawyers for each party may ask questions. The questions and answers are recorded. When a person is unavailable to testify at trial, the deposition of that person may be used at trial instead. Insofar as possible, you should consider deposition testimony presented to you in court in lieu of live testimony in the same way as if the witness was testifying live.

Evidence may be presented to you in the form of written answers of one of parties to written interrogatories submitted by the other side. These answers were given in writing and under oath before the trial in response to questions that were submitted under established court procedures. You should consider the answers insofar as possible the same way if they were made from the witness

stand.

Now, you may hear testimony from expert witnesses who will testify to opinions and the reason for their opinions. The opinion testimony is allowed because of their education or experience of these witnesses. Such opinion testimony should be judged like any other testimony. You may accept it or reject it and give it as much weight as you think it deserves considering the witness's education and experience, the reasons given for the opinion and all the other evidence in the case.

Certain charts and summaries not admitted into evidence may be shown to you in order to help explain the contents of books, records or documents or other evidence in the case. Charts and summaries are only as good as the underlying evidence that supports them. You should therefore give 'em only such weight as you think the underlying evidence deserves.

Certain charts and summaries may be admitted into evidence to illustrate information brought out in trial. Again, charts and summaries are only as good as the testimony or other admitted evidence that supports them. You should therefore give them only such weight as you think the underlying evidence deserves.

Now, this case involves the dispute related to a United States patent. There are actually two patents.

Before summarizing the position of the parties and the issues involved in the dispute, let me take a moment to play a video that will explain what a patent is and how one is obtained. It will also explain why you are being asked to decide this dispute.

So we're gonna cue up the video and allow you to see that now.

(Patent video played for the jury.)

THE COURT: Now, that's the video, and I apologize you I didn't have the sample patent with you, but I think you get the idea.

So moving on with the preliminary jury instructions, the trial will now begin. First, each side may make an opening statement. An opening statement is not evidence. It's simply an outline to help you understand what the party expects the evidence will show. Presentation of evidence will then begin. Witnesses will take the witness stand, and the documents will be offered and admitted into evidence.

There are two standards of proof for you to apply to the evidence depending on the issues you are deciding. On some issues, you must decide whether something is true by a preponderance of the evidence. On other issues, you must use a higher standard of proof to decide whether something is true by clear and convincing evidence.

Tetra Tech will present its evidence on its contention that some of the claims of the asserted patents have been infringed by Pavemetrics, and that the infringement has been willful.

Witnesses will be questioned by Tetra Tech's counsel in what is called direct examination. After direct examination of a witness is completed, the opposing side has an opportunity to cross-examine the witness. Finally, Tetra Tech's counsel has the opportunity to question the witness one more time in what's called redirect examination.

After Tetra Tech has presented its witnesses, Pavemetrics will call its witness who will also be examined and subject to cross-examine and redirect. Pavemetrics will present its evidence that the asserted claims of the asserted patents are invalid. In addition to presenting its evidence and validity, Pavemetrics will put on evidence responding to Tetra Tech's infringement and willfulness contentions.

Tetra Tech will then return and will put on evidence responding to Pavemetrics' contention that the asserted claims of the asserted patents are invalid. Tetra Tech will also have the option to put on what is called rebuttal evidence to any evidence offered by Pavemetrics of noninfringement or lack of willfulness.

Finally, Pavemetrics will have the option to put on rebuttal evidence to any evidence offered by Tetra Tech on

the validity in the asserted claims of the asserted patents.

Because the evidence is introduced piecemeal, you need to keep an open mind as to the evidence as the evidence comes in and wait for all the evidence before you make any decisions. In other words, you should keep an open mind throughout the entire trial.

Parties may present the testimony of a witness by reading from his or her deposition transcript, playing a deposition transcript, um, or playing a video tape of the witness's deposition testimony. A deposition is the sworn testimony of a witness before the trial and is entitled to the same considerations as if the witness testified at trial.

After the evidence has been presented, I will give you final instructions on the law that applies to the case, and the attorneys will make closing arguments. Closing arguments are not evidence either. After the instructions and closing arguments, you will decide the case.

In a moment, the parties will begin their opening statements. Tetra Tech will give its opening statement first, and then Pavemetrics will give its opening statement second.

As I previously mentioned, Pavemetrics filed this suit for declaration that does not infringe. While the party who filed suit typically presents first, Tetra Tech will go first because it has the burden of proving infringement. So

I will leave it to Tetra Tech to make an opening statement.

Go ahead, Counsel.

MR. BARNEY: May I take a moment to get the technology set up?

THE COURT: Sure.

MR. BARNEY: May I proceed, Your Honor?

THE COURT: Please.

MR. BARNEY: Good afternoon, ladies and gentlemen. This case is about automated railroad track inspection systems. Now, you may not be familiar with those types of systems, but they're actually very important cause they help ensure that the railroad tracks that we all use for passenger travel and freight rail are safe to operate on. These systems save lives.

Now, my client, Tetra Tech, invented a new and better railroad inspection system that operates better and faster than what came before. They put a lot of time and money and effort into inventing this new system. And when they were done, the Patent Office rewarded that hard work and that innovation with more than a dozen U.S. patents. Despite that, Pavemetrics, the accused infringer in this case, took our inventions and refused to pay. And that's wrong, and that's why we're here today.

Now, let me tell you a little bit about the parties in the case. Tetra Tech is the inventor. They are the

patentee. They invented the technology that this case is about.

Now, today Tetra Tech is a global provider with consulting and engineering services with 21,000 employees in 450 offices around the world. But they weren't always so big. In fact, Tetra Tech has humble roots. They were founded back in 1966 right down the road in Pasadena, and their headquarters are still located their today.

Now, back then they were just a small engineering firm working on projects involving waterways and ocean areas and harbors, and they still work on those types of projects today, but now they do a whole lot more. Today they support global clients focused on water, environment, renewable energy, sustainable infrastructure, engineering and international development. That's not bad for a little company from Pasadena.

My name is James Barney, and I'm proud to represent Tetra Tech in this case along with my team: Aaron Parker, Daniel Chung, Nick Cerulli and Jency Mathew.

Now, ladies and gentlemen, you don't get to be a company of this size and reputation by cutting corners or doing things the wrong way. Tetra Tech's motto is leading with science, and that's what they do. They apply scientific principles and engineering know-how to solve some of the world's toughest problems. And that's why year after year,

they receive awards and recognitions for their contributions to the environment and to the community.

And you're gonna hear about some of these awards and recognitions later, but let me just focus on one for now. Just last year in 2021, Newsweek magazine named Tetra Tech one of America's most responsible companies. Now, think about that. There are thousands and thousands of companies in America, and Tetra Tech was just one of a handful to receive that prestigious honor.

Now, I told you this case is about railroad track inspection systems, but in the portion of Tetra Tech's business that handles that is a subsidiary called Tetra Tech TAS. TAS stands for Track Assessment Services.

Now, we have with us today Mr. Gary Keyes. He's sitting back here. Could you please stand up, Mr. Keyes? And he is the Vice-President of Tetra Tech, and you're gonna be hearing from him in a little bit.

And Mr. Keyes is gonna tell you about the history of Tetra Tech and about their business. He's also gonna tell you how important these automated railroad track inspection systems are to railroad operators, especially to the big railroad operators that are called Class 1, Class 1 operators. There's only about a half dozen of these in North America, and they control ten of thousands of miles of railroad track.

And he's gonna explain that back in 2015, the engineers at Tetra Tech TSA developed a new system called the Three-Dimensional Track Assessment System. And that system to date has been awarded 17 patents by the U.S. Patent Office including the '293 and the '557 patents which are the patents at issue in this case.

You're also gonna hear from Dr. Darel Mesher. Dr. Mesher is the Chief Technical Officer at Tetra Tech TAS, and he's the inventor of the patents that are at issue in the case. Now, Dr. Mesher has a PhD in Electrical Engineering and over 25 years of experience in roads and railway systems, and he's been named the inventor on 29 U.S. patents.

Dr. Mesher is a licensed professional engineer, and he's what I would like to call or what I would call an engineer's engineer. By that, I mean, he loves engineering. He loves nothing more than to solve difficult engineering problems. He's been doing it his whole career. Remember Tetra Tech's motto, leading with science. That fits Dr. Mesher to a T.

And he's gonna explain how he came up with his invention, and he's gonna explain why it's better than what came before. And in particular, he's gonna explain that the hardware component of his invention actually has its roots in systems that were used for inspecting paved roads, inspecting paved road for cracks and potholes.

But he's going to explain that as these big Class 1 railroad operators kept demanding faster and more accurate assessment systems, the software that was used for inspecting paved roads just could not keep up. It wasn't good enough. It couldn't do what these Class 1 operators wanted. And so Dr. Mesher set about trying to invent a better system, and he did that in the Three-Dimensional Track Assessment System.

Now, you heard in the video that you just watched that patent rights in this country derive from the U.S. Constitution. The founders -- excuse me. The framers of the constitution believed that patent rights were so important to this country that they put a special provision right in the constitution that says Congress shall have the power to promote the science and useful arts by securing for limited times to authors and inventors the exclusive right to their prospective writings and discoveries.

And the key there is exclusive right because as you learned from that video, when the United States Patent Office grants you a patent, and you become the owner of a U.S. patent, that gives you the exclusive right to practice the invention that's in that patent for the life of the patent. Nobody else can practice your -- your invention without your permission. And if they do, that's called patent infringement, and you're entitled to damages, money damages for that infringement.

Now, let's take a look at the two patents that are at issue in this case. In real life, they -- they look like paper documents, and you'll eventually get to see those and handle those before you begin your jury deliberations. But in the meantime, let me just explain some of the information that you'll find in those patents.

On the upper right-hand corner of each patent if the full patent number. Now, we usually just refer to the last three numbers to make it simpler. So we're gonna refer to the top patent as the '293 patent, and we're gonna refer to the bottom patent as the '557 patent. And you can see over on the left-hand side that the inventor of these patents is Dr. Mesher. And you can see that the applicant is Tetra Tech.

Now, think back to how -- from that video how difficult it is to get a patent issued from the Patent Office. You have to put together a lot of technical information. You submit it to the Patent Office as an application, and then it's examined by an examiner who has special training and skill in that particular area of technology.

And the examiners are also trained to make sure that the patents that they're examining are good enough to actually issue as official United States patents. And after that entire process, the Patent Office decided that Dr.

Mesher was entitled to these two patents.

So let's take a closer look at what's in the patents. They both begin with a background section. And the background section explains the state of the art at the time that Dr. Mesher was working on his invention and explains what the problems were that he was trying to solve. And back then there was a desire to improve rail safety cause remember these railroad track inspection systems are all about rail safety. They're out there trying to detect defects, broken welds or cracked ties that might lead to a train derailment.

And so there was a need and a desire to improve rail safety in a climate of increasing annual rail traffic volumes and increasing regulatory reporting requirements. And what was desired was objective, repeatable and accurate track inventory information. And what was specifically needed was a robust and reliable system for analyzing and processing data collected during and/or after a high speed assessment of a railroad track.

Dr. Mesher's gonna explain that railroads are very busy. They carry a lot of traffic back and forth on the rails. And these railroad inspection systems actually travel on the tracks as they're picking up that data, as they're gathering the data. And if the railroad inspection system is running too slowly, it clogs up traffic.

And so the big Class 1 railroad operators, what

they wanted were railroad inspection systems that actually moved at the same speed as the trains, very fast. But it turns out trying to do that causes a lot of issues. And what Dr. Mesher found is that trying to use the old software from those pavement inspection systems didn't work. It couldn't keep up. It wasn't good enough. So he had to invent a system, and what he was looking to do was invent a rail inspection system that was objective, repeatable, accurate, robust and reliable, all while working at high speed. And that was no easy task.

Now, one of the things that Dr. Mesher did to solve that problem is he came up with a new algorithm. And you're gonna hear that word a lot in this case. Algorithm is really just a fancy word for software. So he came up with new software, a new software routine.

And this is the algorithm that's claimed in the '293 patent, and it has four steps.

In Step A, the system requires three dimensional track elevation and intensity data. And our technical expert, Dr. Morellas, who's an expert in this field is gonna explain to you what that means and these two different types of data are.

In Step B, the system generates what's called a track elevation map based on that acquired three dimensional data. And you can see an example of that map under column B

there.

In Step C, the system takes that data and uses a special technique that involves something called a gradient neighborhood, and it uses a sliding window technique to slide that gradient window over the data to detect track defects. And again, Dr. Morellas who is an more expert in this field is gonna explain exactly what that means and how it works.

And finally, in Step D, the information is stored, and the data is stored so that it can be accessed later.

Now, you're looking here at Claim 1 of the '293 patent. Remember back when you watched that video, the claims of a patent are like the deed to your property. They define the meets and bounds of the property right that the U.S. government has granted in the form of a patent.

And again, Dr. Morellas, our technical expert, will explain each and every one of these limitations to you, but what you can see in the algorithm portion of the claim are those same four steps that I just went through: A, B, C and D. Tetra Tech owns the exclusive right to that algorithm. Nobody else can use that algorithm without Tetra Tech's permission.

Now, another problem that the patent talks about in the background section was the need for a system that will quickly and accurately identify railway track features and associate measured parametric data with those features.

And by the way, the features that are being referred to there are small defects in the track, things like cracks on the railroad ties that are very small and actually hard to pick up because they're so low down on the track bed. And especially when you're moving at high speed, it's hard to detect those small, little defects.

What Dr. Mesher discovered is that by removing the data corresponding to the railhead from the elevation data, the system can actually better detect the small defects down on the track bed. And if you look at Figure 3, that's a cross section of a railroad track. And the railhead is at the top. That's the part of the railroad where the wheel of the train actually rides across that railhead.

And if I could have the next slide, please?

Dr. Mesher again came up with a new algorithm, and this is the algorithm that's claimed in the '557 patent. In Step A of this algorithm, the algorithm removes the railhead data from the elevation data. So you can see in the pictures below, column a, in the top picture, it has the railhead, and then in the bottom picture, the railhead's been removed.

Now, rest assured that the railhead is still out there on the railroad tracks. It's not physically removed, but it's removed digitally in the data because it helps improve the system.

In Step B, that data is compared to what's called a

rail tie surface plain model. And Dr. Morellas, our technical expert, again, he's gonna explain what that means and how it's used.

In Step C, by doing that comparison step, the system was able to detect cracks in the railway tie. The railway ties are those wooden or concrete slabs that go across, uh, between the rails. And so it identify cracks in the railway ties as you can see in the picture.

And then in Step D, the system determines parameters of the track so these are things like surface depth, length, orientation and location. And you're gonna find out that it's very important for these Class 1 operators. Believe it or not, even with ten of thousands of miles of track in their inventory, they want to keep track of every single crack in every single tie because a single crack in a single tie anywhere could lead to a train derailment. So this technology is very important.

And, again, we have a Claim 8 of the '557 patent. This defines the property right that Tetra Tech was granted by the United States Patent Office. You can see those same four steps that I just went through, and, again, Tetra Tech has the exclusive right to practice this algorithm that Dr. Mesher invented.

So far I've talked about my client, Tetra Tech, and I've talked about the patents. Now I'll talk about

Pavemetrics. Pavemetrics is the accused infringer in this case, and the accused product is what they call a laser rail inspection system or LRAIL for short.

Now, Pavemetrics is a small company. It was founded about 13 years ago in Quebec, Canada, and today it has approximately 22 employees. And as you can see from its logo and its name, Pavemetrics was originally founded as a company that focused on pavement, paved roads. That's why their name is Pavemetrics, and that's why their logo to this day has that dashed line that you can see and we typically see on a road.

And after it was founded around 2013, it had a system that they called a Laser Crack Measurement System or LCMS for short, and that system is used to detect cracks in paved roads, cracks and potholes. And they were selling that system in Canada, in the U.S. and around the world.

But around 2010 or so, in the early 2010s, they decided that wanted to try to start selling that LCMS system as a railroad inspection system, and they later rebranded it as LRAIL. Their plan or their hope was to be able to break into this new market and begin selling their system to those big Class 1 railroads, the big boys, and so they wanted to get into the big leagues. The problem is they didn't know how to do it. They didn't know how to do it.

And so what they did is they partnered with the

University of Massachusetts in 2012, and they actually sold the hardware components of one their LCMS systems to the University of Massachusetts for the purpose of conducting research. So it was a collaboration. They collaborated with these academics at the University of Massachusetts for the purpose of trying to figure out how to create algorithms that could be use make the LCMS system work as a railroad inspection system.

But even after that collaboration and that academic research, they still did not have the algorithms they needed to make their system competitive, to make it competitive in the U.S. for those Class 1 railroads. How do we know that? Just look at their sales. You will see this information during the trial.

After they made that first sale in 2012 to the University of Massachusetts, in 2013, they sold zero LRAILs in the United States. In 2014, zero LRAILs in the United States. Zero in 2015, zero in 2016 and so on until 2020 when they finally made their first two commercial sales in the United States. And that wasn't for lack of trying. They were a marketing system. They were trying to sell to the Class 1 railroads. None of them were buying until 2020.

So what happened in 2020 to change their luck? Ladies and gentlemen, that's when they started infringing our patents. They took our algorithms, and they put it into

their software, and suddenly, they had a competitive system that was competing for those Class 1 railroad sales.

So let's take a look at the time line. I'd like to orient you back to 2014 on the left-hand side. Tetra Tech is at the top. Pavemetrics is at the bottom. So in 2014, Pavemetrics had their LRAIL system on the U.S. market, but they had essentially no U.S. sales. They were trying to sell it to the Class 1 railroads. Nobody was buying it.

Why is that? From their own documents, you're gonna see this, they didn't have the algorithms. They just didn't have the software and the algorithms they needed to make it competitive, to make it actually something that these Class 1 railroads wanted.

Meanwhile up at Tetra Tech, Dr. Mesher was hard at work on the three dimensional track assessment system technology system that he invented. He filed a patent protection in February of 2015, and shortly thereafter, Tetra Tech launched the 3D TAS system as a commercial product.

2015 goes by, and Pavemetrics is still not making any U.S. sales of its LRAIL product. 2016 goes by, and they still are not making any U.S. sales. And so at the end of 2016, the President of Pavemetrics convenes all his engineers, his salespeople and his marketing people at the end of that year and says why aren't we selling this product? What is wrong?

And what they concluded was they still didn't have what they called a killer app. You'll see it in their documents. By killer app, they mean they didn't have the software. They didn't have the algorithms. They had the hardware, but they did not have the software and the algorithms they needed to make that system competitive.

Meanwhile Dr. Mesher's patent applications were beginning to publish because remember the video you watched, 18 months after you file a patent application in the U.S., it automatically publishes. And at that point, the whole world can see what's in your patent application. They can see the innovations that you're working on. And so when Dr. Mesher's patents began publishing, the whole world could see the Three-Dimensional Track Assessment System that he was developing.

And one company we know for sure was paying attention to Dr. Mesher's patents was Pavemetrics. How do we know that? Because we have their emails. In 2017, in October of 2017, a man named Richard Fox-Ivey, and you're gonna hear that name in this case quite a bit as well, he is Tetra Tech's Chief Marketing Consultant, and he sent an email to the President and CEO of Pavemetrics, Mr. Habel, and he said you might be interested to see Darel's list of patents. Ladies and gentlemen, that's Dr. Darel Mesher. That's Pavemetrics' -- excuse me, Tetra Tech TAS's Chief Technology

Officer and the inventor of the patents in suit.

So what happened next? Well, not much longer after that in 2018, Pavemetrics began influencing new algorithms into their software by using what is known as convolutional neural networks. You're gonna hear a lot about convolutional neural networks in this case.

And at the time that Pavemetrics was coming up, trying to put these algorithms into its software, they knew there were potential legal problems. They knew that putting those algorithms into their software could create legal problems. And so they had a plan or at least they had a theory.

And their theory was if we put these algorithms into a neural network, and we use artifical intelligence, nobody will ever be able to figure out how it's working. It'll be so far down into our neural network that nobody will be able to figure out what's going on with those algorithms, and therefore, nobody can ever accuse us of infringing a patent.

They thought that by putting these algorithms into a neural network, it would make them immune from patent infringement. And I know that sounds a little odd, and, in fact, even their own executives didn't believe it. You're gonna see in May of 2018, one of the own executives wrote an email to Mr. Fox-Ivey and said if we get sued, it's your

fault. Pretty much tells you everything you need to know about their state of mind.

Now, fast forward to 2020. Tetra Tech is competing -- is -- is, uh, negotiating with CSX, a big Class 1 operator, an important potential customer. And you're gonna hear from Mr. Keyes how important that customer was and how much time and effort Tetra Tech put into those negotiations. They went through three rounds of negotiations with CSX to sell the 3D TAS technology.

And they were very close to closing a deal when suddenly, they found out that CSX had just purchased two LRAIL systems from Pavemetrics. It was quite a surprise because Pavemetrics up to that point had not sold a single commercial LRAIL system in eight straight years of trying. And so it was a surprise which quickly turned into disappointment when they realized that the system they were selling to CSX infringed the patents, infringed our patents.

So we wrote them a letter in January 2021, and we went put them on notice of the infringement, and we said you're infringing our patent. You need to stop. We asked them to stop infringing our patents. They ignored it. They ignored our letter. In fact, the very next month, they delivered an infringing LRAIL system to a company called AID, Advance Infrastructure Design, AID. And a month after that, they sold three more infringing LRAIL systems to CSX.

So ladies and gentlemen, in this case, we're gonna be focusing on the activities of Pavemetrics, the accused activities that took place after we put them on notice of the infringement. And so what are those activities? Well, it's the three LRAILs that they sold to CSX in March of 2021.

And, of course, that sale of those three LRAILs was proceeded by an offer for sale because in order to have a sale, you first have to have an offer for sale. If I offer to sell you my car, you agree to buy my car, and now you've purchased my car. So there's an offer for sale, and then there's a sale, and both of those are acts of infringement. And also, the delivery of one LRAIL system to AID in February of 2021. So those are the acts that we're gonna be focusing on in this case.

Now, at the time of these sales, these sales are called turnkey sales, that's what Pavemetrics calls them, and you're gonna see lots of documents about these sales. These sales include hardware, and they include software. That's why they're called turnkey because they include everything that was needed for an operational LRAIL system.

And at the time -- the evidence is gonna show at the time of the CSX sale, the software that was available and licensed to CSX to operate on those systems was a version of software that included an algorithm called Fake3D, that's what they called it, that's what Pavemetrics called it,

Fake3D so Fake Three-Dimensional, Fake3D process using a deep convolutional neural network. That's the accused algorithm in this case. That's the algorithm that we believe infringed our patents.

Dr. Morellas who's our technical expert and an expert in this field is gonna explain point by point and limitation by limitation why that algorithm infringes our patents. And that same algorithm was used in the software that was provided to AID when it -- when the, um, system was delivered to them in February of 2021 along with instructions for use of how to use the system.

Now, it turns out that after those sales and after the delivery to AID, Pavemetrics updated its software just like your iPhone gets updated all the time. They updated the software after the sales, and they updated it to something called Mixed Image. So they replaced the Fake3D with Mixed Image, but the processing is still the same. It's still being done in one of these deep convolutional neural networks.

Now, for purposes of infringement, that software update makes no difference whatsoever because the infringement occurred when they offered for sale, and they sold those products to CSX and when they delivered an infringing product to AID. That's the infringement. So the fact that they updated the software later, not relevant. But

nonetheless, our expert, Dr. Morellas, inspected that software, and guess what? It still infringes. They changed it, but they changed it in a way that still infringes so it doesn't matter.

So in this case, we're gonna prove four things, ladies and gentlemen. First, Pavemetrics directly infringed Claims 1 of 21 to the '293 patent by offering to sell and then selling LRAIL systems in the United States with the Fake3D data processed by a convolutional neural network.

Second, Pavemetrics indirectly infringed Claim 8, that's a method claim. So they indirectly infringed Claim 8 of the '557 patent by delivering an LRAIL system to AID in the United States with instructions for how to use that system in an infringing manner.

Third, their infringement was willful. We asked them to stop. We put them on notice and asked them to stop infringing our patent, and they ignored it. They went right ahead and kept infringing, and that's willfulness.

And finally, Tetra Tech is entitled to damages, money damages, monetary damages because of Pavemetrics' infringement. And Mr. Schoettelkotte is our economics expert, and he's gonna testify and explain to you exactly how much money is necessary to compensate Tetra Tech for the infringement that Pavemetrics committed.

We're not asking for anything other than what's

fair. We're asking for the lost profits, the profits we would have made had we made those three sales to CSX that they made, and we're asking for a reasonable royalty on the sale and the delivery of the LRAIL system to AID. And that's fair.

Now, Pavemetrics has defenses so what are they gonna argue? Well, first, they're gonna argue that our patents are invalid. They're gonna say the Patent Office made a mistake when they issued the patents, but the evidence isn't gonna support that.

First, they're gonna argue that the claims are obvious based on Pavemetrics' old LCMS pavement inspection system. Well, we know that's not true because remember their sales. They had eight straight years of no commercial sales of the LRAIL system in the United States. If it was so obvious all that time, they would have made that change earlier and made sales, and they didn't, and that doesn't support an obviousness argument.

They're also gonna argue that Claim 8 of the '557 is invalid because of Tetra Tech's own offer for sale of the tie assessment system years ago. And the problem with that argument is that tie assessment system wasn't a patented system. It wasn't the invention because at that time, Dr. Mesher wasn't done with his invention. His invention wasn't ready for patenting, and so that earlier sale is

irrelevant.

Now, they're also gonna argue they have noninfringement arguments.

The first noninfringement argument they're gonna make is that despite the fact that these sales that they made to CSX and to AID were referred o as turnkey sales, that's their term, turnkey sales, and despite the invoices show that those sales included hardware and software, and despite the fact that we have documents from their own executives describing those sales as turnkey sales that included hardware and software, they're gonna try to argue that actually, those sales didn't include software.

They were just hardware sales, and that the software somehow came later. The facts aren't gonna support that. That's nothing more than an excuse for their infringement.

They're also gonna argue that that post-sale software update somehow gets them off the hook for infringement. It does not as I've already explained.

And finally, they're gonna argue that various parts of their source code don't match to the claim limitations. But, again, our expert, Dr. Morellas who is an expert in this field, is gonna explain point by point, element by element where each claim limitation is found in their source code.

THE COURT: Counsel, I think your half hour is

almost done.

MR. BARNEY: I -- I have one more sentence, but, uh --

THE COURT: There you go.

MR. BARNEY: Okay. So ladies and gentlemen, thank you very much for your time. We look forward to presenting our case to you, and we think it's an honor to be able to do -- to do so. Thank you.

THE COURT: Thank you, Counsel.

Counsel, you can proceed when you're ready.

MS. LEA: Just a moment, Your Honor. We are setting up two boards if you don't mind.

THE COURT: Sure.

MS. LEA: May I proceed?

THE COURT: Please.

MS. LEA: Good afternoon. My name Christy Lea, and I am proud to represent Pavemetrics Systems.

This is an important case for Pavemetrics. Pavemetrics brought this lawsuit. They brought this lawsuit because they wanted you to decide whether they infringed these patents because they know they don't infringe these patents. They also know that these patents are invalid. And that is why you are here today to decide the infringement question, and that's these patents are invalid.

Now, it's true that Pavemetrics is a very small

Canadian company located in Quebec so why would they come here to the United States to file this lawsuit? And the reason is because they had to stand up to the bully, Tetra Tech.

You see Tetra Tech was Pavemetrics' long time customer. They were our customer for ten years. They were our colleagues and our friends. They purchased our road inspection product. They purchased our sensors. They purchased our software. They purchased our raw data.

And then when they lost a sale to a major railroad because that railroad reached out to Pavemetrics because they're the leader in the field, then the bully came out, and they had these lawyers send my client threatening letters. On January 5th, 2021, that was the first letter threatening to sue Pavemetrics in U.S. Federal Court. And they kept sending letters, another letter threatening to enjoin Pavemetrics. That means make them stop selling LRAIL.

Tetra Tech couldn't compete in the marketplace. They couldn't get the sale so they sent letters to my client trying to intimidate them, thinking that Pavemetrics was so small, they wouldn't be able to stand up to the bully, and they would have to just go away and stop selling so Tetra Tech could take over the market after learning from Pavemetrics.

But we are here today so that you do not let that

happen. We are here to get a noninfringement judgment and an invalidity judgment and to stop the bullying.

Now, today I'm going to talk about four things that the evidence will show. So the evidence will show that Pavemetrics was the first to use the technology. The technology is actually 3D lasers, using those 3D lasers to scan the transportation services. Whether it's roads or railroads, it's 3D laser technology. Pavemetrics pioneered this industry. They were first.

Then I will talk about how Tetra Tech's patents are on old technology. They're on the old algorithms that Pavemetrics was doing ten years ago. And Pavemetrics does not infringe because Pavemetrics uses artificial intelligence. The industry has moved on to artificial intelligence, neuro networks, and I'll explain what that is in a moment.

And these patents that they are accusing against Pavemetrics neural network, they don't say AI, and they don't say artificial intelligence. They don't neural networks. They don't say convolutional neural network. They don't say machine learning. They don't say deep learning. They don't use any words that in any way suggests artificial intelligence. You will not see those words in these patents.

So I will also talk about why we are here, and I already told you. We're here because CSX, a major railroad,

reached out to Pavemetrics because they heard about all of their great work in the industry, they heard about their great product and how proven it was, and they wanted to buy from Pavemetrics because it was a low cost solution.

So let's -- let's dive in with each of these points. So the first point was that Pavemetrics was first.

Back before 2000, in Canada at the National Optical Institute, it's a major research center, um, our client, Pavemetrics, John Laurent, he is the Vice-President of Business Development at Pavemetrics, but back then before 2000, he was working at INO is the name of that research center, and that that's where he developed 3D laser technology for inspecting roads. He designed the sensors that are used to inspect the roads, and they're the same sensors that do railroads.

Now, he was first. And he traveled the globe. He's on these flights where he'd go all the way around the globe because he goes to so many conferences and speaks about the technology. He was pioneering the technology and leading the industry.

At INO, he also met Dr. Jean-Francois Hebert who is the Vice-President of Research and Development at Pavemetrics, and at INO, he was programming software. And he has a PhD in neural networks. So in 2009 -- maybe I can get my time line here. In 2009, those two men, Dr. Laurent --

Mr. Laurent and Dr. Hebert, along with Richard Habel, the President of Pavemetrics, they came together to found Pavemetrics to commercialize the 3D laser technology for inspecting roads.

And then -- and at that time, they were a three-person company, and they have now grown to a 22-person company. Then in 2012, Pavemetrics applied the same 3D laser technology to railroads using the same sensors, the same processors on their computers and the same software.

And they partnered with universities in the United States and the federal government to prove the technology. And so they partnered with the University of Massachusetts at Lowell. They sold UML a device, and they worked with them to teach them the software and to further develop the software, and they had the algorithms at that time. Tetra Tech's patents are standard techniques, and Pavemetrics had it at that time.

Now, there was a lot of meetings and a lot of meeting reports, lot of meeting minutes, and because this is research with the U.S. government, it's all public. It's available online. People can read it. At these meetings where the algorithms were discussed, Pavemetrics would send its software programmer to these meetings to discuss the algorithm in detail.

Present at those meetings was the Department of

Transportation. Most states use Pavemetrics technology. The federal Railroad Administration of the United States government was there, and members of NASA were also there to learn about this technology.

And not only did these meetings happen and presentations at conferences, but Pavemetrics in conjunction with UML published the results of the study. There's a transportation research board that oversees this type of thing in the United States, and Pavemetrics published an article in connection with this transportation research board conference in 2014 where they laid out the algorithms, the standard algorithms that are in Tetra Tech's patents.

All of this is before Tetra Tech's ever filed for its patents in 2015. So Pavemetrics was doing this in 2012, 2014. That makes Pavemetrics's article prior art. It makes Tetra Tech's sale to -- I mean Pavemetrics sale to UML prior art. All of that is prior art and can invalidate Tetra Tech's patents because it came first.

Now, I know you all saw the Patent Office video, and you may have heard it say that you -- that sometimes the Patent Office makes mistakes because they don't get all the prior art. Well, this is one of those cases. They did not have any of Pavemetrics' prior art. They didn't have the TRB 2014 article. They didn't have Pavemetrics's prior sale.

Tetra Tech didn't tell the Patent Office about

Pavemetrics. It didn't tell the Patent Office about LRAIL even though the inventor on the patent, Dr. Mesher, had an LRAIL brochure and other LRAIL materials. Remember the video said he had a duty of candor. If he knew anything that might be relevant to these patents, he had a duty to disclose it, and he did not.

The video also said that you, the jury, will be the first to review these patents and the first to decide the question of invalidity. And that's one reason we brought this suit so you could make that determination because we believe these patents are invalid for obviousness.

Now, I'd like to look at the TRB 2014 article, the prior art article. And if we could go to the next slide, please?

Well, first, this is what LRAIL looked like back in 2012. You could see that this is a truck on a railroad, and it has these sensors are the gray boxes that are overhanging the railroad, and they're going to send laser light down with a camera so they can take -- uh, they can measure data, take images of the railroad.

We can go to the next slide. So this is the 2014 article published in conjunction with the transportation research board. These are photos from that article. On the left, you can see the 3D lasers, again the gray boxes. Pavemetrics made those boxes. And they point the laser

lights down to the railroad with a camera to measure the railroad data.

On the right, we can see the images that result from that. We see first have an intensity image. Intensity image is similar to what you take with your iPhone or with a camera, just measuring the reflected light. The range image is measuring the distance from the sensors to the ground or the elevation data. And then the 3D merged image is created from intensity using range data as well.

And that is the image that Pavemetrics' programmers call Fake3D in their source code. That's what they're accusing of infringing. Pavemetrics has been generating that image since 2010. It's published in their prior art 2014 article that 3D merged, that Fake3D right there. And as a result, this article invalidates these patents and renders them obvious.

Now, Pavemetrics' patents are on an old technology. They are on an old algorithm, an old technique. It's an algorithm created by a human who's writing the instructions who's coding. If you've ever heard about coders or writing code, that's what the algorithm is on. It's on a specific code instruction.

Well, it's not on artificial intelligence. I already mentioned before AI is not in these patents, but Tetra Tech is pretending like its patents cover AI because

that's what Pavemetrics and the industry have moved on to now. Even Tetra Tech itself has moved on to AI. It calls its product RailAI.

The evidence will show that Pavemetrics does not infringe because AI works like your brain. It has been trained to recognize images just like your brain was. You were taught as a child to distinguish between red and blue. You might not quite know how your brain does it, but it does it because it learned it.

But with -- with the computer, it does the same thing with AI. It's not told what to do by a human programmer. It has been trained, and the computer decides what calculations and what steps its going to take to differentiate between the features in the images. So that's what AI is doing.

And you have probably encountered AI in your life when you go on your iPhone, and go to your camera roll, and you can see that sometimes you have the option of clicking on a loved one's face, your husband's face or your kid's face, and it'll bring up all the pictures with their faces in it. That's the computer distinguishing between those faces using AI to do that.

Now, it is important how Pavemetrics convolutional neural network works, and you should know how it works. So we are going to tell you. Dr. Hebert himself, the

Vice-President of Research and Development at Pavemetrics, he will testify, and he will tell you how his neural network works.

But we also have Dr. David Frakes. Dr. Frakes is a former professor at Georgia Tech University in Computer Vision and Neural Network. He's also a current Apple employee, and he's a former Google employee. And at Google, he lead a programming project of about two dozen programmers that used the same neural network engine that Pavemetrics uses so he knows it like the back of his hand. And not only that, but he's looked at Pavemetrics neural network, and he will tell you how it works, and that it does not infringe these old standard techniques in Tetra Tech's patents.

Now, it's Tetra Tech's burden to prove infringement of each and every sale. They're accusing four sales of infringement, and they have to show infringement for each one. Now, none of them infringed because of all of them use AI. But there's other reasons they don't infringe, too, and the reasons are different for each sale because each sale included different software. So as the software changed over time, Pavemetrics would send the software at the time that the product was assembled and installed.

So another thing about these claims is these claims each -- you saw the long claim that Mr. Barney had. Each and every word of that claim has to be present in the devices

sold, and these claims require a connected system with software. And so this is a little bit like when you order something from Amazon, and it comes, and the components are not connected, and you have to put it together.

LRAIL is not sold. They like to call it a turnkey system because we sell everything that you need for the system, but they're not connected when they're sent to the customers. The sensors are shipped in a special carrying case designed for the sensors. And a lot of times, the components are sent at different times when the customer is ready for them. And so the processor or the computer might be sent later than the sensors.

And in this case with CSX, the processor did not include any software when it was sent. So the software is only sent later when the customer needs it and when the device is assembled, and -- and so the software that applies will be the software that is actually installed later. So please pay attention. When the witnesses talk, please pay attention as to which sale they're talking about. Is it Sale 1, 2, 3 or 4? And what software is involved?

And by the way, the chart that Mr. Barney had about Pavemetrics' sale, that we had one sale in 2012 and didn't have any until the past couple of years, that is just the U.S. sales. Pavemetrics is a Canadian company. It has a worldwide business. It makes sales around the world.

Mr. Barney left out the sales in the rest of the world. But also, Pavemetrics has been doing the work over the past ten years. It's been doing the work with the United States government, the Federal Railroad Association to prove the devices and prove how well they work on the railroads.

Now, I want to go back to Tetra Tech and its bullying. In 2012, Tetra Tech bought a 3D laser system for roads from Pavemetrics. They bought our sensors, same sensors we use today. They bought our software. And they're the only private company to ever ask for our raw data. What was Tetra Tech doing with our raw data? Why did they need that? Pavemetrics, very trusting, agreed to sell Tetra Tech our raw data. Each year, Tetra Tech paid for a license to our software and for access to our raw data all before these patents were ever filed and before they were ever issued.

So you can imagine my client's shock when they got that letter from these attorneys on January 5th, 2021 accusing them of infringing a patent that Tetra Tech had never mentioned to my client in any of their customer relations or in any of their conversations ever.

And I want to address some things on Mr. Barney's slide. This whole business of if we get sued, it's your fault, um, that was on his slide, let me tell you where that comes from cause that has nothing to do with this lawsuit.

Uh, so Tetra Tech was sued by a competitor called

G Rex several years ago for patent infringement. And Tetra Tech's asked Pavemetrics to help them in that lawsuit. They asked Mr. Habel, the President of Pavemetrics to serve as an expert witness in that lawsuit. They asked Pavemetrics to provide prior art to help invalidate G Rex's patents.

And they succeeded. They invalidated five of G Rex's patents for obviousness with the help of our client. So imagine our surprise on January 5th, 2021 when we receive a letter from these attorneys accusing Pavemetrics of infringing Tetra Tech's patents, their customers, their friends, their colleagues. It was a shock.

So Pavemetrics read the patent that was attached to the letter. They huddled together, these three men, and they can tell instantly that they did not infringe, and you'll hear from them about that.

And then they contacted me and my partner, and they asked us to bring this lawsuit, to help them stand up to the bully and get a determination that they do not infringe these patents, and that these patents are invalid for obvious just like G Rex's patents.

Now, let's talk about what prompted the dispute. Uh, Pavemetrics typically sold its sensors to engineering firms, and then one day, CSX, a major railroad, reached out to Pavemetrics. They had heard about all of Pavemetrics' work with the FRA, the United States government. They had

heard how well the device performed. And so they asked Pavemetrics to submit a bid. They were replacing their current vendor for inspecting their railroads, and they asked for a bid. They also got bids from Tetra Tech and from other companies as well.

Well, they decided to go with Pavemetrics's proven system, and that made Tetra Tech mad. And that made Gary Keyes, their Vice-President, view Pavemetrics as a competitive threat that was a problem. And instead of competing in the marketplace, they decided to call their lawyers and dig up patents, and two months later, they started sending threatening letters.

Now, don't just take it from me. Let's look at a key exhibit in this case. This is Exhibit 178. This is Tetra Tech internal email dated October 2020, a few months before we started receiving the threatening letters.

And Bill Larson, he was a former CSX employee that Tetra Tech hired in order to build up its relationship with CSX, and he's reporting to his boss, Gary Keyes, the Vice-President, and he's saying Pavemetrics is a problem, a problem for Tetra Tech because Pavemetrics provides a low cost solution. Pavemetrics' products cost less than ten percent what Tetra Tech's rail AI costs. CSX would buy five of these. Can you imagine with Tetra Tech costing 90 percent more times five? Easy choice for CSX.

He also said Pavemetrics has conducted a successful trial with the FRA, and that matters to CSX.

And finally, he said our agreement with CN, that's Canadian National Railroad, not to release data is preventing us from showing any concrete system advantages. Guys, Tetra Tech has had one customer, one customer, CN. And they made a bad deal with that customer. They agreed to keep all the data confidential so they can't show it to CSX. They can't show that their device, it works. So CSX turned to Pavemetrics' low cost solution and proven data.

And you know what? In this case, you're also going to get to hear from CSX. So it's not quite common in patent cases that you get to hear from the customers themselves. There's two customers, CSX and AID. Both of them have already given their testimony, it's on video, and you will see it in this trial.

If we can go to the next slide? Brad Spencer from CSX, the customer, will testify that CSX purchased Pavemetrics' LRAIL over Tetra Tech's RailAI because it was much lower cost. He had the budget. LRAIL had proven data, and LRAIL had more capabilities than the 3DTAS product that Tetra Tech was selling. So that is why CSX decided to buy from Tetra Tech. So it's -- from Pavemetrics. Thank you for correcting me, Mr. Laurent. I appreciate that.

So after you have seen all the evidence in the

case, we will ask you to return a verdict in favor of Pavemetrics, a verdict of noninfringement and a verdict that these patents are invalid for obviousness. Please help us stop the bullying. We're tired of the intimidation, and we're grateful for our day in court. Thank you very much.

THE COURT: Thank you, Counsel. Why don't we take a ten-minute break. We'll come back at quarter after 3, and we'll go to about 4:30 just so everyone knows. Thank you.

THE CLERK: All rise. You can leave your pads on your chair.

(Jury not present.)

THE COURT: Get back at 3:15. And Tetra Tech will put on its first witness at that primary functionality.

MR. BARNEY: Yes, Your Honor.

THE COURT: Thank you.

(Recess taken.)

THE CLERK: All rise.

(Jury present.)

THE COURT: Okay. Counsel for Tetra Tech, you can call your first witness.

MR. PARKER: Thank you, Your Honor.

Tetra Tech calls Mr. Gary Keyes.

THE CLERK: Stand here for me and raise your right hand.

(Witness sworn.)

THE COURT: Will you please state and spell your full name for the record.

THE WITNESS: Gary Keyes.

MR. PARKER: Tetra Tech has ten exhibits not objected to would like to move into evidence.

THE COURT: Give me the numbers.

MR. PARKER: 501, 839, 842, 846, 847, 864, 867, 910 and 966.

THE COURT: Any objection to those being put into evidence, counsel?

MS. LEA: No objection Your Honor.

THE COURT: So Exhibits 51, 839, 840, 842, 846, 847, 864, 867, 910 and 966 are now admitted and you may publish them to the jury at anytime.

(Exhibits 51, 839, 840, 842, 846, 847, 864, 867, 910, 966 admitted.)

MR. PARKER: Thank you, Your Honor.

THE COURT: Please proceed.

DIRECT EXAMINATION

BY MR. PARKER:

Q. Good afternoon, Mr. Keyes.

Please introduce yourself to the jury.

A. Good afternoon. My name is Gary Keyes.

Q. And where do you work, and what is your role?

A. I work at Tetra Tech. I'm a vice president at our

corporate group, uh, out of Pasadena.

Q. And how long have you been at Tetra Tech?

A. Uh, 21 years.

Q. And what is Tetra Tech?

A. Tetra Tech is a consulting engineering company. Um, we apply science and engineering to problems that commercial and governmental clients have. We started in Pasadena with four scientists and engineers back in 1966. We've grown with emphasis on high-end technology. Our motto is Leading With Science. And from that we've grown to over 21,000 people today in 450 offices around the world still headquartered here in Pasadena.

Q. And can you please provide an overview of Tetra Tech's business?

A. Yeah, so Tetra Tech, um, applies the science and engineering capabilities in the areas of water, environment, infrastructure, sustainability, renewable energy, transportation, um, infrastructure and international development.

Q. And has Tetra Tech been recognized for its efforts in those industries?

A. Yeah, we've received awards quite a bit over the years. Up to this time this year, um, we have received I think half a dozen awards. So we've received two awards from the Climate Change Business Journal. Uh, one for greenhouse gas

mitigation work we've done with the Port of Los Angeles and the Port of Long Beach.

We also received another award from the Climate Change Business Journal for our work with the United States Agency for International Development for trying to prevent plastics from getting into the oceans.

Uh, received a couple awards from the Environmental Business Journal. One for our work trying to prevent PFAS chemicals from going into the water supply for a local water agency.

We also received an award, um, for, um, with the U.S. Small Business Administration for our excellence of our small businesses subcontracting program and this provides opportunities to disadvantaged small businesses, to women-owned small businesses and to veteran-owned small businesses.

Also, we received an award last year. We were included on the Newsweek 2021 List of Most Respected Companies.

Q. Now, does Tetra Tech invest in scientific development and innovation?

A. Uh, yes, quite a bit. So this has very much been, I mean, part of our culture. Right now I'm involved with the Research and Development on ways to treat PFAS chemicals in ground water.

We recently developed a new technology for designing the foundation for wind towers, these wind towers and the wind turbine generators can be bigger so that renewable energy can be more efficient. And we've invested very substantially in this area of railroad track assessment.

Q. And does Tetra Tech protect its innovations with patents?

A. Yes. So we have 42 patents, uh, worldwide. 34 patents in the United States and of those 34 patents, 28 are for our railroad track inspection technologies and 17 are either for or directly related to our 3DTAS technology.

Q. So you mentioned railroad inspection sector patents. Is there a group within Tetra Tech that focuses on the railroad track inspection sector?

A. Yeah, we set up a subsidiary in Edmonton, Canada called Tetra Tech, TAS stands for Track Assessment Services and that's where we do most of our R& D there. We also have some employees in the United States.

Q. And do you understand Tetra Tech, Inc. and Tetra Tech TSA, Inc. are both parties to this lawsuit?

A. Yes.

Q. And would it be okay if we referred to them collectively as Tetra Tech throughout this trial?

A. Yes.

Q. Now, does Tetra Tech list its U.S. patents on its

website?

A. Yes. So we, um, on our railai.tetratech.com website, we have a page where we list patents and we've made that go live on February 22nd of 2021, and we keep that up to date.

Q. And does Tetra Tech license any of its patents to third parties?

A. No.

Q. Could you describe the railroad track inspection industry for the jury?

A. Yeah, so it's really critical for the safety and efficiency of the railroad track -- of the railroad in North America. In North America the Class 1 railroads which are the seven large ones, they own their own track and so it's both because they need to for their own needs, but also for the requirements by the Federal Railroad Administration, they have to test that track a lot.

So in lot of cases, they'll test the track even more than once a week over and over again to try to make sure there are not defects that cause safety issues.

Q. And can you identify the Class 1 railroads for the jury?

A. Yeah, so there's two big ones which is Union Pacific and BNSF, and then there is Canadian National, Norfolk Southern, CSX, Canadian Pacific and Kansas City Southern. And at the time of these issues, there were seven, and now Canadian Pacific and KCS are joining together which will perhaps

happen, perhaps close in just a few months.

Q. Does Tetra Tech believe inspecting railroad track is important?

A. Yeah, so it's super critical. I mean obviously, you know, a derailment is huge from the standpoint of both cost and safety. But in addition to that, the railroads use the track inspection information to try and predict when their assets, uh, need to be repaired or replaced so that hopefully they can replace them before they break.

Q. Has the railroad track assessment industry evolved over time?

A. Yeah, very much so. There's been a lot of technology advancement. It used to be, uh, that you'd have someone walking along the tracks with a clipboard and, of course, there would be obviously problems with respect to how much you can do. It's typically like maybe five miles a day, but the other issue is just repeatability.

So progressively the railroad companies have been wanting to go more autonomous because it's faster, it's more repeatable, it's more accurate. And when I say repeatable, it allows them to do this run-over-run comparison so they can look at how things are progressing to try and, uh, prevent something from breaking before it happens.

Q. So you would -- did Tetra Tech believe that automated inspection systems are, uh, there are advantages to those?

A. Yeah, and what we have focused on is not just the autonomous approach, but also high speed. So we try -- we've kind of designed our systems to try and address the needs of particularly these Class 1 railroads. And so they operate their trains at roughly 60, 70 miles an hour, and so our system is designed to fit into essentially a freight train so it can go right along with the train and not be a special separate inspection vehicle.

Q. So you mentioned Tetra Tech's system. What sorts of railroad products and services does Tetra Tech provide?

A. So we call our system RailAI and then that is sort of a suite of sensor systems and then within that we have different products.

Q. Mr. Keyes, could you turn to Trial Exhibit 966 in your binder? Does that look familiar to you?

A. Yes, although on the screen, I can only see the top half of it.

Q. Thank you. How's that?

A. Much better.

Q. What is it?

A. So this is our brochure, our RailAI brochure and so it says unmanned fully autonomous --

THE COURT: So we talked about this with the lawyers. Whenever we're reading something, we tend to read it quickly because we have it in front of us or everybody

else has it front of us, but the court reporter doesn't so please slow down when you're reading.

THE WITNESS: Thank you.

THE COURT: Yeah, sure. We all do it.

THE WITNESS: The RailAI brochure says on the top Unmanned Fully Autonomous Track Inspection Platform.

BY MR. PARKER:

Q. Does the RailAI system include multiple subcomponents?

A. It does. And so if you switch the screen back so we can see the whole thing, in the lower left-hand corner, you can see the 3DTAS which is the 3D Track Assessment System, next to it is the RailWEB system. And then up in the upper right, you'll see the CrossVU Rail Corridor LiDAR System and down on the lower part is the RailAI Controller.

We consider these to be our four key proprietary technologies for which we have patents on these. The rest are mostly support systems, some of which we also have patents on. And then you can see it's all depicted associated with a boxcar, the boxcar platform is one that the customers really like because it's very rugged and it can be put into a freight train.

Q. You mentioned the 3DTAS. What is that system?

A. So that system, you can actually see it mounted underneath the boxcar and it looks down onto the railroad ties and the railroad tracks. And one of most important

things that it does is, uh, evaluation of the railroad ties. Railroad ties represent a little bit more than half of the costs that railroads spend each year. They spend over a billion dollars a year, quite often more, particularly UP or BNSF on their maintenance and their capital plans and a lot of that is associated with railroad ties.

It does a lot of things these inventions here so I'll just say them so we can put them into the record. One is fastener inventory, rail joint inventory, railhead defect, but I think in my opinion the most important one is the tie condition assessment.

Q. Mr. Keyes, could you turn to Trial Exhibit 910 in your binder, please? Do you recognize that document?

A. Yes. This is a page from our railai.tetratech.com website and it addresses the Three-Dimensional Railroad Track Assessment System or 3DTAS.

Q. Do you see two smaller images part way down the page?

A. Yes.

Q. Look at the one on the left. Can you please read the caption underneath that image?

A. Yes. 3DTAS is a fully integrated and turnkey track assessment system that collects full width high resolution 3D track service profile data at track speed.

Q. Is that description accurate?

A. Yes.

Q. What does the word turnkey in that sentence mean?

A. Uh, it means that it has all the parts that you need to make it work so it has all the hardware, has software. Actually, has a computer system inside it.

Q. You mentioned earlier that 3DTAS is one of the key components of RailAI boxcar. Why is that?

A. Well, I think that, um, as I mentioned, railroad ties represent one of the biggest expenditures for the railroads and this is unique in being able to provide this at track speed and, uh, so yes, it's a very strong value proposition.

Q. Does Tetra Tech offer the 3DTAS system to customers and potential customers?

A. Yes. We have had interest in both just having components that railroads would add on to their systems and also we've offered it combined into that entire rail car.

Q. And does Tetra Tech consider the North American Class 1 railroads as their customers and potential customers?

A. Yes, very much so. The Class 1 railroads represent a little more than half of all the railroad track miles in North America. You also have transit agencies and short lines, but the Class 1s are the main customers.

Q. How often do opportunities arise for Tetra Tech to sell their systems, their railroad systems to the Class 1 railroads?

A. Well, each sale is a big deal. These, uh, these systems

when they're mounted on a high-speed platform say like 60, 70 miles an hour, they can often do over 100,000 miles a year and these railroads each one has maybe 20,000 miles for say the lower four tier and then say 32,000 miles, route miles for the two larger one. So 100,000 miles can really cover a lot of ground.

So we think that maybe there's a market somewhere in the ballpark of maybe 50 of these types of units. We're not totally sure, but that's a rough guess. So each sale is a big percentage of the total market.

Q. Are there any characteristics of the customers within the North American Class 1 railroads that maybe are somewhat unique to that industry?

A. Yeah. So when you sell a track assessment system to a major railroad, they actually have adapt what we call their back office. And so this is their computer systems, their communication systems, their asset management systems. So once they incorporate a particular vendor's product in the technology, they tend to stick with it. We call them state customers.

It's somewhat similar to maybe how Southwest Airlines stuck with the 737 throughout generations. Once someone makes a sale of this type of technology, there's a strong motivation for them to stay with that vendor with that technology.

Q. So based on those characteristics is each sale of a system like the 3DTAS important?

A. Oh, very much so. I mean each sale is big, it's expensive, big investment. Although, I would point out that it's the first sales are sometimes even the most important ones because you have then all those maintenance support, you have the software support, you have this long term kind of commitment that happens with the customers.

Q. Has Tetra Tech sold its 3DTAS systems to any Class 1 railroads?

A. Yes. So we sold five, uh, to the Canadian National Railway that started in 2015, and we still have that relationship. We have all their type of stuff, maintenance, support, and then they want more of them.

Q. Would you turn to Trial Exhibit 867 in your binder, please? Do you recognize that document?

A. Yeah, this is a tally of the revenue that we've received from Canadian National Railway for just the 3DTAS. The column right here with all the numbers, it adds up to a little more than $7 million and this is just for the 3DTAS. So this doesn't include, um, the other systems that I've pointed out and also support, maintenance, things like that.

Q. And is that relationship with Canadian National ongoing?

A. Yes. I mean they love it. They want more of these.

Q. Has Tetra Tech had any negotiations with any other

Class 1 railroads regarding the sale of 3DTAS or RailAI systems?

A. Yes, we have.

Q. With whom?

A. Yeah, so we have spoken to a number of railroads. Uh, one is Kansas City Southern which we leased our boxcar to, but also we had extensive negotiations with CSX. So as I mentioned, CSX had about roughly 20,000 miles, one of those large Class 1s. And so my colleague, Dr. Mesher and myself we met with CSX on March 12th of 2020 just before COVID kind of shut things down and we presented our RailAI technologies. And we felt they were very interested, very enthusiastic.

What they were interested in was applying the individual systems to the ATAC cars, the autonomous track assessment cars that they were already building. So then after that, we provided them with a proposal that was responsive to what they were interested in.

Q. Could you please turn to Trial Exhibit 839 in your binder? Do you recognize that document?

A. Yes.

Q. What is it?

A. This is a proposal that we provided on April 6th of 2020 for the RailAI Autonomous Track Assessment System to CSX.

Q. And what was the scope of that?

A. So this a budgetary proposal responsive to their

interest and applying, um, some of our individual systems or possibly all of our systems to their ATAC cars.

Q. And what was the price of that, uh, initial proposal that was provided in that initial proposal?

A. We provided a menu of prices and the total was $4,147,000 for everything. Again, this is all being added on to their boxcars. They were still gonna provide car modifications, the assembly or the installation of these systems onto their boxcars.

Q. Mr. Keyes, are you reading from page 10 of that proposal?

A. Yes, I am.

Q. Now, was there a break down, was there a cost or price for the 3DTAS listed in that proposal?

A. Yeah, on the second row the 3DTAS was priced at $1.1 million for the equipment and the Tetra Tech installation plus $25,000 of design to, um, incorporate it into their boxcars that they were in the process of building.

Q. So after that April proposal sent to CSX were there additional discussions between Tetra Tech and CSX?

A. Yeah, so Mr. Bill Larson who was CSX's point person for procuring these systems interacted quite a bit. We had phone calls and emails. They were wanting to understand what they needed to do in modifying their design in order to incorporate our systems. And so they wanted to get the

layout, they have questions with respect to weight distribution. We answered their questions I think to their satisfaction.

Q. So after you answered their questions to their satisfaction, when was the next communication with CSX about purchase of 3DTAS or RailAI systems?

A. Well, we had a conference call in early July. Well, actually, just before that, so as you recall in the pandemic, there was a big recession. The railroads, um, their freight went down 20 percent. They had layoffs. Mr. Larson was part of several other people in the engineering group that were laid off and this was in mid-June.

We hired Mr. Larson on July 2nd, um, and he then handled a fair amount of the subsequent communications with his former colleagues at CSX. So in early July, I had -- I participated in a Teams call with Mr. Brad Spencer of CSX, um, and also Mr. Larson and some others of our group. And what Mr. Spencer was interested in was figuring out how to tryout our systems before making a purchase.

So we came up with the idea of doing a lease arrangement and not only doing a lease arrangement, sort of lease option to buy, but also to provide performance assurances, uh, for the lease so if the lease didn't work, they wouldn't have to pay. So we felt we were just trying to be responsive to their concern about wanting to make sure

that they knew what they were going to be purchasing.

Q. So those changes in your approach were so that you could be receptive to CSX's needs?

A. Yes.

Q. Could you please turn to Exhibit 846 in your binder? I believe you mentioned a proposal after that early July meeting. Is that the case that Tetra Tech sent another proposal to CSX?

A. Yes. So, uh, this is the RailAI Autonomous Track Assessment System lease and purchase proposal dated July 20, 2020, and this was responsive to what we felt they needed.

Q. So what happened after you sent that proposal on July 20, 2020 to Brad Spencer at CSX?

A. Well, we had follow-up right away. We had a Teams call on July 23rd with Mr. Spencer and a colleague. And, um, I think the response was very enthusiastic. I think they thought it was fantastic.

Q. What was your impression based on?

A. I was taking notes, um, as I was having the call with Mr. Spencer.

Q. Could you please turn to Trial Exhibit 864?

Do you recognize that document?

A. Yes. These are my handwritten notes that I was taking during the call dated July 23rd, 2020 and, uh, it's regarding the CSX lease option to buy proposal.

Q. And do these notes reflect what you were perceiving while on the call with Mr. Spencer?

A. Yes.

Q. Could you please read the highlighted portion starting the third paragraph down Brad?

A. Uh, yes. It says Brad, that means Brad Spencer, it says quote "system sounds fantastic" unquote.

Q. And what did you understand -- those are your notes. What did system refer to?

A. Well, he had asked for -- our impression what they were asking for was that lease option to buy proposal, but also it was the, um, I think it was the RailAI complete system they were referring to.

Q. Were there additional meetings between CSX and Tetra Tech following July 23rd, 2020?

A. We had follow-up calls with a number of decision makers within CSX. I remember that on August 11th, we had another call. In that call a senior decision maker, Lee Moss, who was the Chief Engineer of Maintenance and Way - South for CSX participated and, again, a lot of enthusiasm. There was a lot of discussion about how many we could provide and how soon.

The idea was that if the lease worked well, then they would buy it and they were interested in another one as well. And so -- but at the same time, they said we need to

do as much as we can to try and reduce price and so we said we'll do that. We need to work with our vendors to figure out how to do that and so we immediately proceeded to work on, um, providing a subsequent follow-up proposal.

Q. So based on what you perceived to be CSX's desire to purchase multiple RailAI and boxcars with 3DTAS, did Tetra Tech take any further steps?

A. Yes. So we reached out to our vendors. Um, we reached out to vendors for modifying a used boxcar, looked around for purchasing boxcars, purchasing used boxcars. By the way, it's difficult to buy new boxcars. You generally have to buy old ones and refurbish them.

We looked into how many we could build in a certain period of time. We also looked into how many 3DTAS systems we could build because, again, CSX originally asked for adding their systems, adding their components on to their ATAC cars so we thought that was still an important thing.

We found out that we could probably do three to five in the subsequent year of their full-blown RailAI boxcars and we thought we could probably do about ten or so of the 3DTAS systems.

Q. So at that time August and September of 2020, were you under the impression that CSX was considering purchasing railroad track inspection systems from other vendors?

A. No. So in June of 2020, um, an individual who is a

contract employee reached out to me and told me about, uh, what he learned about the Pavemetrics LRAIL system. By that time I think the demonstration that he attended with CSX was for mounted on to a truck, mounting on to a hi-rail vehicle.

That wasn't really what we were focusing on because a hi-rail vehicle generally does maybe 30, 40 miles a day whereas the high speed car can go about maybe, um, as much as 500 miles a day.

Q. Now, did your impression change at some point thereafter?

A. Yeah. So I progressively started to learn more about Pavemetrics as potentially a threat to us. Probably the biggest one, though is that on October 20th, Mr. Larson sent me an email where he advised me that Pavemetrics was selling two of its LRAIL systems to CSX and to be mounted on to the exterior of the CSX ATAC cars.

Q. So did Tetra Tech stop pursuing the sale of its components of its systems to CSX at that time?

A. No. I mean it was clear to us that CSX was still wanting our revised proposal and we also felt that the installation on the exterior boxcar was not as good as our installation underneath the bottom of the boxcar. We also knew that it would take time to install those systems and so we thought it was important to try and see if we could get CSX to accept our lease proposal before that happened.

Q. So then did Tetra Tech ever deliver that or deliver a third proposal to CSX?

A. Yes. So on November 23rd, we provided a proposal that was responsive to their needs that we had perceived from the August 11th Teams meeting.

Q. Can you please turn to Exhibit 840 in your binder? It's on the screen now I think. Do you recognize that document?

A. Yes. This is the November 23rd, 2020 revised proposal for Tetra Tech RailAI Autonomous Track Assessment System to the attention of Lee Moss of CSX.

Q. So after providing that third proposal on November 23rd, 2020 to CSX, were there any further discussions between the companies?

A. There was, but towards, just about before the end of the year, Mr. Larson, uh, learned that CSX was not going to purchase or lease our systems for the RailAI boxcar.

Q. And were you surprised by that decision?

A. Uh, yeah. I mean first of all, we learned that it was because of the sale of the two LRAIL systems. We were surprised because, um, we had incorporated the feedback that we got from the August 11th Teams call into the financial plan for the Tetra Tech TSA operating unit where we actually assumed we would lease and sell one unit and possibly another one in fiscal year 2021.

We were surprised because we had spent eight months

and three proposals working with CSX. We knew they thought the system was fantastic. We knew that it provided a terrific value proposition for them much better than what they were previously doing. We were very much surprised by losing that sale.

Q. Was losing that sale significant to Tetra Tech?

A. Uh, yeah, I mean it caused that business -- that operating unit to not make its plan. We knew that it likely, uh, meant that it would be a really big barrier to us getting in with CSX because the reason why these customers tend to be sticky. And was a big blow because, of course, you know, we put a lot of investment into the technology.

(Confidential transcript.)

BY MR. PARKER:

Q. Mr. Keyes, could you turn to Exhibit 847 in your binder please. Do you recognize that document?

A. Yes. This is an internal presentation that my colleague Bernie Toifola and myself presented to our CEO and our president, uh, titled the RailAI FY21 Acceleration Plan.

Q. Can you turn to page 2, please? What is that chart intended to identify?

A. This chart was what we call an aspirational plan so we developed multiple plans. So this is even, uh, more aspirational than our base plan which I mentioned assumed the lease of one car plus the sale of one car and maybe the sale

of a second car to CSX. This one actually anticipated the sale of three cars to CSX plus also the sale and lease of another car to another customer.

Q. Could you turn to page 9, please? And read the title of that slide.

A. Economics of RailAI Boxcar Sale.

Q. And what information does this slide provide?

A. Uh, this is presented to our COF as I mentioned to try and show that the support systems and the build out of the boxcar really is not, um, almost we really don't make any money on that. But also it provided a price break out for the four key main proprietary patented technologies that, uh, where we had put all of our R & D into.

Q. And does it provide a price break out for the 3DTAS?

A. Yes, so it is, the price 1,166,000.

Q. Could a customer have purchased the 3DTAS alone?

A. They could have. I mean, it would have been a manual system, but really all the customers now are looking for autonomous systems. They want these systems to be autonomous and also high speed. And the RailAI control system is what provides that functionality and it has it a price here of $496,000.

Q. Mr. Keyes, could you turn to Exhibit 842 in your binder, please?

MR. PARKER: Your Honor, before I move on, I'd like

to mark this portion of the transcript confidential, please.

THE COURT: Okay. And is there gonna be confidential testimony? Should we clear the courtroom?

MR. PARKER: No, we don't need to clear the courtroom. It's okay. It's just the discussion of 842 and 847.

THE COURT: Okay.

BY MR. PARKER:

Q. And what is this document, Mr. Keyes?

A. This is a spreadsheet, actually, an Excel workbook that I put together on November 20th, three days before we submitted that proposal to CSX. What I was doing here was breaking out the, um, our raw cost and the markup on the raw cost for each of the major components and then the sub-systems. Then I broke it up into four columns that corresponded to the four different offerings that we put into the November 23rd proposal to CSX.

Q. So what does that raw cost term include?

A. So I was using the term raw cost to distinguish that it did not include research and development. It did not include software. It did not include SG & A which is sales, general administrative costs. Um, it was just the raw cost of the server, the sensors, the project management, installation of just those things.

So yeah, I mean a significant thing about it is

that within this, we had to figure out where we were going to capture or recoup our costs for both the research and development and the software system.

(Confidential portion ends.)

BY MR. PARKER:

Q. So Mr. Keyes, looking back, what reasons do you attribute to Tetra Tech losing that sale of your systems 3DTAS to CSX, losing it to Pavemetrics LRAIL system?

A. Well, we thought a lot about that. I mean, we knew we were providing a really good value proposition, um, much better than what CSX had previously been doing. We, uh, we were very responsive to their needs and wanting to try to figure out how to see it before purchasing it and providing performance guarantees as well. I think it really came down to the differential in price between, uh, the LRAIL system and the 3DTAS or the 3DTAS combined with the control system.

Q. Mr. Keyes, can you turn to Exhibit 51 -- it's on the screen.

THE COURT: Are we done with the confidential portion?

MR. PARKER: Yes, Your Honor.

Q. Before you look at that document, Mr. Keyes, so did Tetra Tech contact Pavemetrics after losing the sale to CSX?

A. Yes. So we sent a letter to Pavemetrics, um, identifying -- by that time I had already, uh, looked into

the issue of possible infringement so I had some idea about that. And so I asked Finnegan's firm to send a letter to Richard Habel of Pavemetrics.

Q. And is that the letter, Exhibit 51?

A. Yes. So this is January 5, 2021 letter to Mr. Richard Habel at Pavemetrics identifying our '293 patent and expressing our belief that they were infringing our patent.

MR. PARKER: Thank you, Mr. Keyes.

No further questions.

THE COURT: Counsel, do you have any cross-examination?

MS. LEA: I do, Your Honor.

THE COURT: Please proceed.

MS. LEA: Your Honor, I'd like to pre-admit one exhibit.

THE COURT: Sure. What exhibit is that?

MS. LEA: Exhibit 178.

THE COURT: Any objection, Counsel?

MR. PARKER: No, Your Honor.

THE COURT: 178 is in evidence.

(Exhibit 178 admitted.)

CROSS-EXAMINATION

BY MS. LEA:

Q. Good afternoon, Mr. Keyes.

A. Good afternoon.

Q. Now, Tetra Tech has used Pavemetrics' 3D laser system for inspecting roads for many years; correct?

A. That's my understanding.

Q. And in fact Pavemetrics is a long-time and well regarded vendor to Tetra Tech; correct?

A. Correct.

Q. And in June 2020 Tetra Tech TAS met with Pavemetrics to learn more about LRAIL; correct?

A. Ms. Lea, could you repeat that date?

Q. June of 2020.

A. Yes, correct.

Q. And Tetra Tech TAS received a quote for LRAIL in June 2020.

A. Yes.

Q. Rob Olenosky of Tetra Tech consultant requested that quote on behalf of Tetra Tech; correct?

A. That's my understanding.

Q. And Mr. Olenosky sent you that quote; correct?

A. Correct.

Q. And Mr. Olenosky learned that an LRAIL was being delivered to CSX and went to look at it in June of 2020; correct?

A. Correct.

Q. And he took pictures of the LRAIL at CSX; correct?

A. That's correct.

Q. And he sent those pictures to you.
A. That's correct.
Q. And in July 2020, you hired Bill Larson, a former CSX employee.
A. Ms. Lea, could you repeat the date?
Q. July of 2020.
A. Yeah, July 2nd.
Q. And hiring Bill Larson gave you access to more information about CSX and Pavemetrics LRAIL; correct?
A. Yes, I think he was able to, uh, provide us insights with respect to CSX's understandings of the marketplace.
Q. Insights. So Mr. Larson learned from CSX that LRAIL was significantly less expensive than Tetra Tech's system; correct?
A. That's correct.
Q. If we could show Exhibit 178.
THE COURT: Is it in evidence, Counsel?
MS. LEA: Yes, this is one that we pre-admitted, Your Honor.
Q. And this is an email from Mr. Larson to you on October 20, 2020; correct?
A. That's correct.
Q. And if we could go to the second page of the email, the paragraph that starts Pavemetrics is a problem.
Now, Mr. Larson called Pavemetrics LRAIL a low cost

solution; correct?
A. That's correct.
Q. And he told you about how Pavemetrics had completed a successful trial with the FRA; correct?
A. Correct.
Q. And how Tetra Tech's confidentiality agreement with CN Canadian National was preventing Tetra Tech from showing any concrete advantages.
A. That's what he said.
Q. And nowhere in this email did it mention anything about Tetra Tech's patents or Pavemetrics allegedly copying Tetra Tech or anything like that; correct?
A. No, it doesn't.
Q. And all of this information provided by Mr. Larson and that you had been collecting lead you to perceive Pavemetrics as a competitive threat; correct?
A. Yes, this email was an important part of other communications that I had with Mr. Larson, and I think it was this email that made it clear that Pavemetrics was a clear threat to the sale of our systems for the CSX ATAC cars.
Q. A clear and competitive threat; right?
A. I'm sorry. What was the question?
Q. This lead you to believe that Pavemetrics was clear and competitive threat; correct?
A. Yes.

Q. And in October 2020 you contacted your patent attorneys about doing an infringement analysis against Pavemetrics; correct?
A. That's correct.
Q. And then you had Tetra Tech's lawyers send a letter accusing Pavemetrics of patent infringement on January 5, 2021; correct?
A. Correct.
Q. And that letter accused Pavemetrics of infringing the '293 patent; correct?
A. Correct.
Q. And it demanded that Pavemetrics stop selling its LRAIL device; correct?
A. Correct.
Q. Now, that letter didn't mention the other patent that's in this suit the '557 patent; right?
A. That's correct.
Q. And you are aware that Pavemetrics filed this lawsuit seeking a declaration that it does not infringe the '293 patent; correct?
A. That's correct.
Q. And Tetra Tech only raised the '557 patent after Pavemetrics filed this lawsuit; correct?
A. I think it was due to what we learned during discovery.
Q. Okay. But it was after the lawsuit; right?

A. It was after.
Q. And I believe you testified earlier that on February 22nd, 2021, that was the first time Tetra Tech listed its patents on its website?
A. That's correct.
Q. And that was after Tetra Tech sent the January 5th, 2021 letter to Pavemetrics; correct?
A. Correct.
Q. And that was after Pavemetrics filed this lawsuit on February 12, 2021; correct?
A. Correct.
Q. Now, in all of your meetings and your calls with CSX before this lawsuit, Tetra Tech's patents never came up; correct?
A. I'm not aware of it.
Q. And you never discussed the '293 patent with anyone at CSX before this lawsuit; correct?
A. I don't recall doing it.
Q. And you never discussed the '557 patent with anyone at CSX before this lawsuit; correct?
A. Correct.
Q. And you have no understanding of what the patented features are in the '293 patent; correct?
A. That's generally correct. I'm not as technically aware of it as Mr. Mesher.

Q. I understand you're not as technically aware. You don't have any understanding how the '293 patent relates to 3DTAS from either a technical or a legal perspective; correct?
A. I would agree with that.
Q. And the same is true for the '557 patent.
A. Yes.
Q. Now, RailAI stands for rail artificial intelligence; correct?
A. Well, it's just a brand name.
Q. AI stands for artificial intelligence?
A. Well, we have a suite of trademarks that --
Q. I asked you if AI stands for artifical intelligence.
MR. PARKER: Objection, Your Honor. She's cutting off the witness.
THE COURT: Can you answer counsel's question?
THE WITNESS: Ms. Lea, can you repeat the question?
BY MS. LEA:
Q. AI stands for artificial intelligence; correct, in RailAI?
A. Yes.
Q. Now, Tetra Tech first used the RailAI branding in the spring of 2020; correct?
A. I don't recall the date of that.
Q. So let's refresh your recollection. Let's go to your deposition. Do you have -- your deposition should be in your

cross-binder. If we could go to page 173. And do you see lines 22 through 24?
It says, "When did Tetra Tech first begin promoting the RailAI when it was branded as the RailAI?
"I don't recall the specific date.
"Do you have an estimate?
"I think the first instance of it would have been in one of our proposals, and it may have been as early as the first CSX proposal in spring of 2020."
Did I read that correctly?
A. Yes.
THE COURT: So that's not necessarily impeaching of his answer. Just going forward on using a deposition to impeach, let me look at it first and determine whether or not it should come in as impeachment and then we'll let you read it. So give me page and lines.
And so that deposition testimony will not come into evidence so the jury should disregard it. If you want to ask another question and try to impeach it with different testimony, you can.
BY MS. LEA:
Q. And did that refresh your recollection that Tetra Tech first used the RailAI branding in the spring of 2020?
A. Well, that was my recollection.
Q. And Tetra Tech didn't have the RailAI brand at the time

it sold to Canadian National in 2015, 2017, 2019; correct?
A. That's correct.
Q. And so I think you heard testify earlier that you had five sales to CN Railroad.
A. That's correct.
Q. And I don't know you were here for opening; right, when your counsel made fun of Pavemetrics for only having seven U.S. sales. Did you hear that?
A. I did.
Q. And yet Tetra Tech has five sales; right?
A. That's correct.
Q. Now, the first time Tetra Tech ever mentioned RailAI in its annual report to shareholders was in 2020; correct?
A. I'm not aware of what.
Q. You're not aware of your annual report to your shareholders?
A. I sometimes attend, uh, our quarterly, uh, I sometimes listen in on our quarterly analyst calls, but I usually don't read all of our annual reports. They're pretty big documents.
Q. Right. I understand. So in over two years promoting the RailAI Tetra Tech has not made a single sale of a RailAI boxcar; correct?
A. What date did you mention?
Q. Two years, the past two years.

A. That's correct.
Q. And Tetra Tech has never marketed 3DTAS separate from marketing RailAI; correct?
A. Ms. Lea, could you repeat the question?
Q. Tetra Tech has never marketed 3DTAS separate from marketing RailAI.
A. I don't know if that's true. So it's important --
Q. Can you remember any time that Tetra Tech has marketed 3DTAS separate from marketing RailAI?
A. So we have marketed the 3DTAS to CN separate from the RailAI name.
Q. And that was before you had RailAI; correct?
A. That's correct. And even --
Q. Now, Tetra Tech has never made a sale of 3DTAS --
MR. PARKER: Your Honor.
THE COURT: I'm sorry, counsel. Let me have the witness finish his answer.
MS. LEA: I'm sorry, Your Honor. Just trying to keep up with the time.
THE COURT: I'm sorry?
MS. LEA: I was just trying to stay within our allotted time.
THE COURT: So you were apologizing?
MS. LEA: Yes, I apologize.
THE COURT: You don't need to apologize.

When I make a ruling, we'll just let the witness answer the question and move on from there. We shouldn't be going back and forth like that.

Did you want to complete your answer?

THE WITNESS: I forgot the question.

THE COURT: Okay. Can you reask the question or let me do this. Let me strike the answer to the last question and I'll have you ask it again.

BY MS. LEA:

Q. Tetra Tech never marketed 3DTAS separate from marketing RailAI; correct?

A. Yeah, so we marketed -- so it's not correct because we did market the 3DTAS to CN separate from the RailAI. And the RailAI name sometimes has been applied to the individual components as sort of a suite of options and sometimes we've used the RailAI name to represent the whole boxcar where everything is put on to a common platform.

Q. Now, Tetra Tech has never made a sale of just 3DTAS combined with the RailAI Controller; correct?

A. That's correct.

Q. And Tetra Tech has never done any analysis of what the market size is for just the 3DTAS separate from RailAI.

A. I think we have done some analysis. It wasn't as specific as that, but it did look at the components separate as opposed to all combined.

MS. LEA: Your Honor, I would like to read his testimony page 174 lines 10 through 13.

THE COURT: I think you can read it.

Any objection?

MR. PARKER: No, Your Honor.

THE COURT: You can go ahead and read.

MS. LEA: "Q. Has Tetra Tech done any analysis of what the market size is for just the 3DTAS separate from the RailAI?

"A. No."

Q. Is that the question and answer that you gave?

A. Yes.

Q. And you never provided a quote to anyone for just the 3DTAS separate from the RailAI; correct?

A. That's correct.

Q. And in fact Tetra Tech offered CSX the complete RailAI package; right?

A. Ms. Lea, could you ask the question again?

Q. Tetra Tech offered CSX the complete RailAI package; correct?

A. The answer is correct, but we also offered other proposals that -- such as in April that offered the components individually.

Q. Well, Tetra Tech never actually offered just the 3DTAS to CSX; correct?

A. It was provided as a menu of choices so they could have chosen what they needed to add on to their ATAC car.

Q. A menu of choices within the RailAI boxcar; correct?

A. Well, at that time it was not a RailAI boxcar. At that time they were building ATAC cars so they didn't need the boxcar. So that's the reason why they were asking for a menu of our various different components to decide what they might want to add on to it. And I think that they understood that in order for the 3DTAS to be autonomous that it needed to have the RailAI Controller.

Q. And in that, uh, Tetra Tech's first written proposal to CSX in which CSX was going to provide the boxcar, Tetra Tech offered the RailAI for more than $4 million; right?

A. Ms. Lea, could you repeat the question?

Q. In Tetra Tech's first written proposal to CSX, Tetra Tech offered the RailAI for more than $4 million; right?

A. So when you say the RailAI, remember the April 6th proposal was not for the RailAI boxcar and so it was not the. It was not one thing. It was a menu of options.

Q. And that menu added up to $4,147,000; correct?

A. Correct. Plus the $287,000 for design to incorporate all those elements into CSX ATAC cars.

Q. Okay. Thank you for including that.

In Tetra Tech's second written proposal to CSX, Tetra Tech offered the RailAI for purchase for about

5.6 million; correct?

A. That's correct.

Q. And in its third written proposal to CSX Tetra Tech offered the complete RailAI for purchase for almost 5.4 million; right?

A. Yes. So there's four proposals, four options in that proposal. One of which was for the purchase of the first one which was for the price that you mentioned, Ms. Lea. And then there was other options, um, one of which was for us to provide the components to CSX to add on to their ATAC boxcar and then another option for them to actually build their own RailAI boxcar using our design under license where they could buy most of the components and then we would help them build it. And each of those last two provided very substantial cost reductions.

Q. Now, the difference in price between -- let's show Exhibit 840, please. So here on the front page, this is your Tetra Tech exhibit; right? Your proposal, your third proposal to CSX. We can see, if we go down, that the price in the July 2020 second proposal is about 5.6 million; right?

A. That's correct.

Q. And then the revised proposal, we're now down to $5,383,000; correct?

A. That's correct.

Q. So about four percent discount; right?

A. Yes.
Q. And you were aware that Brad Spencer at CSX was very conscious about price and budget; right?
A. Yes.
Q. And CSX expressed to Tetra Tech that price was a concern for Tetra Tech's RailAI; correct?
A. Yes. And this is the reason why we provided those other two options at the end which were substantially less expensive.
Q. But you had submitted three proposals that ranged from 4 million to $5.6 million for the purchase of RailAI; correct?
A. Those proposals had a significant range of options, um, and so I think what you're comparing are the most expensive amounts of each of those proposals.
MS. LEA: Thank you, Mr. Keyes.
THE COURT: Any redirect, Counsel?
MR. PARKER: Yes. Briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. PARKER:
Q. Mr. Keyes, could you put Exhibit 178 up, please? This is the email from Bill Larson to you that Ms. Lea was questioning you about. Just to be clear, what was the date on this email?
A. October 20th, 2020.

Q. And that's about the time -- that's the time that you testified earlier when you became aware of the sales by Pavemetrics to CSX; isn't that correct?
A. Yes. Actually, it was this email that, um, kind of culminated, uh, uh, sort of increasing awareness of the threat of Pavemetrics to the sale or lease of either the 3DTAS or the full RailAI boxcar to CSX.
Q. Can we go down to the second page that Ms. Lea was showing? There was highlighting. Now, it's not highlighted here, but I think you were pointing out that Pavemetrics is a problem. And then after that, we didn't get to read the rest of that, but it says we offer much more capability. What is Mr. -- in your impression, what was Mr. Larson referring to there?
A. Um, it was our impression that both the 3DTAS was -- had more capability, particularly when it was coupled with the RailAI Controller because it was fully autonomous. It also was able to provide alerts on a realtime basis, and that was perceived to be very valuable for not only CSX but also other railroads. So I think that's what he's referring to.
Q. So in your experience, would this require realtime processing or allowing for realtime processing cost more than one that doesn't?
A. Absolutely. I don't think there's any system that does realtime. So the reason why realtime is so important is

because obviously, if there is a safety defect, being able to report it away from the inspection vehicle as fast as possible allows the railroad to respond quickly and solve the problem.
Traditionally, even today, most systems, the data has to come off the car or off the vehicle, and a human has to review the information, make sure that there are no mistakes in there, and they issue a report maybe like a day later. A day after is a pretty long time to have, you know, lots and lots of trains going by.
Q. Mr. Keyes, Ms. Lea also pointed to the next paragraph where it says our agreement with CN to not release data is preventing us from showing any concrete system advantages. How -- is that something that CSX, I think you testified to this, but addressed or commented to you on? And if so, did you have any response for them?
A. Well, this is the whole reason why we provided the lease option to purchase arrangement. This is what we felt was a way of satisfying the issue that CN loved their system so much that they didn't want to disclose to CSX how well they were doing. So we thought okay, we can't do that. We'll do the lease option to purchase arrangement and provide performance assurances. So I thought we were being responsive in providing a good option.
Q. Last question. Did you hire Mr. Larson specifically to

negotiate with CSX?
A. No. I mean, Mr. Larson has 13 years, I think, experience in the railroad industry. Um, before that, I think he was -- before that, uh, he was a Navy captain. Uh, we do quite a bit of work for the Navy. And in fact, he had currently two roles. So he also does a lot of work out of our Jacksonville office and does a lot of work with the Navy. And he's involved with marketing in the Jacksonville area often to former or to current members of the military or others associated with the military. So he's been a great employee.
MR. PARKER: Thank you, Mr. Keyes.
No further questions, Your Honor.
THE COURT: Counsel, any additional cross?
MS. LEA: No, Your Honor.
THE COURT: Witness may be excused.
We'll break for the day five minutes earlier than I said, and we'll start up tomorrow morning right at 9:00. Like I said, the lawyers get here really early to make sure we resolve all the issues so that we're ready to go at 9:00. So if you can all try be here a little bit before 9:00, quarter of or so, just to make sure we can start on time, and we can make the most of the day. Thank you very much.
Remember don't talk about the case with anyone, and don't do any research. Thanks.

THE CLERK: All rise. Leave your pads.

(Jury not present.)

THE COURT: Please have a seat. So we'll start up at 8:30 tomorrow, handle any issues we've got. We should have closing jury instructions available sometime tomorrow to give to you but in line with what we discussed the other day.

Does anybody know of any issues we need to resolve before we start up tomorrow?

MS. LEA: None, Your Honor.

THE COURT: Okay.

MR. BARNEY: No, Your Honor.

THE COURT: Okay. But, again, we'll still meet at 8:30 in case something comes up over the night that we may need to talk about in the morning.

Jury seems pretty good. They seem like they're paying attention. You know, they seem attentive. I thought both sides did a great job in their opening to, you know, set out a story that the jury could follow. And, you know, let's keep 'em interested in the case. I think they'll definitely do a better job. So I'll see everybody tomorrow at 8:30.

Thank you very much.

THE CLERK: This court is in recess.

(Proceedings were concluded at 4:27 p.m.)

CERTIFICATE OF REPORTER

COUNTY OF LOS ANGELES )
) SS.
STATE OF CALIFORNIA )

I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION OF MY STENOGRAPHIC NOTES.

DATE: AUGUST 17, 2022

/s/ LAURA MILLER ELIAS

LAURA MILLER ELIAS, CSR 10019

FEDERAL OFFICIAL COURT REPORTER

**$**

**$25,000** [1] - 80:17
**$287,000** [1] - 103:21
**$4,147,000** [2] - 80:6, 103:20
**$496,000** [1] - 88:22
**$5,383,000** [1] - 104:23

**'**

**'21** [1] - 12:18
**'293** [11] - 32:5, 34:10, 36:17, 37:10, 48:7, 91:6, 95:10, 95:19, 96:16, 96:23, 97:2
**'557** [10] - 32:5, 34:11, 38:16, 39:18, 48:12, 49:19, 95:16, 95:22, 96:19, 97:5
**'em** [2] - 25:16, 109:19

**/**

**/s** [1] - 110:20

**1**

**1** [29] - 4:3, 14:17, 16:9, 19:4, 31:22, 33:1, 33:5, 35:25, 37:10, 39:12, 40:22, 41:12, 41:22, 42:2, 42:8, 42:13, 45:5, 48:7, 61:20, 71:12, 71:20, 73:4, 76:16, 76:18, 76:23, 77:12, 78:9, 79:1
**1,166,000** [1] - 88:15
**1.1** [1] - 80:16
**10** [2] - 80:10, 102:2
**100,000** [2] - 77:2, 77:5
**10019** [2] - 1:22, 110:21
**105** [1] - 3:17
**11th** [3] - 83:17, 86:5, 86:21
**12** [1] - 96:10
**12th** [1] - 79:10
**13** [4] - 3:8, 40:5, 102:2, 108:2
**14TH** [1] - 2:10
**15** [3] - 5:12, 5:16, 5:17
**16** [2] - 10:12
**17** [8] - 1:15, 4:1, 9:16, 10:2, 10:5, 32:4, 70:10, 110:18
**173** [1] - 98:1
**174** [1] - 102:2
**178** [7] - 3:25, 64:14, 91:17, 91:20, 91:21, 93:16, 105:21
**18** [1] - 43:9
**1966** [2] - 30:7, 68:8
**1s** [2] - 76:21, 79:9
**1ST** [1] - 1:23

**2**

**2** [5] - 11:22, 16:10, 19:6, 61:20, 87:20
**20** [5] - 13:8, 81:10, 82:10, 82:13, 93:21
**20,000** [2] - 77:3, 79:8
**2000** [2] - 54:7, 54:11
**20001** [1] - 2:21
**2009** [2] - 54:24, 54:25
**2010** [2] - 40:17, 58:13
**2010s** [1] - 40:17
**2012** [7] - 41:1, 41:15, 55:7, 56:14, 57:16, 61:22, 62:7
**2013** [2] - 40:12, 41:16
**2014** [9] - 41:17, 42:4, 42:5, 56:11, 56:15, 56:24, 57:12, 57:21, 58:13
**2015** [7] - 32:1, 41:18, 42:17, 42:19, 56:14, 78:12, 99:1
**2016** [3] - 41:18, 42:20, 42:22
**2017** [5] - 5:18, 5:23, 43:18, 43:19, 99:1
**2018** [3] - 5:19, 44:3, 44:24
**2019** [1] - 99:1
**2020** [31] - 10:15, 12:12, 41:19, 41:22, 41:23, 45:3, 64:15, 79:10, 79:22, 82:11, 82:13, 82:24, 83:15, 84:22, 84:25, 86:8, 86:12, 92:7, 92:10, 92:13, 92:21, 93:3, 93:6, 93:21, 95:1, 97:22, 98:9, 98:23, 99:13, 104:20, 105:25
**2021** [17] - 12:14, 31:5, 45:18, 46:5, 46:13, 47:10, 52:14, 62:17, 63:8, 69:18, 71:4, 86:24, 91:5, 95:7, 96:3, 96:6, 96:10
**2022** [3] - 1:15, 4:1, 110:18
**2040** [1] - 2:9
**20th** [3] - 85:13, 89:11, 105:25
**21** [2] - 48:7, 68:3
**21,000** [2] - 30:4, 68:10
**21-01289-MCS** [1] - 1:9
**21-1289** [1] - 4:4
**213)894-0374** [1] - 1:24
**22** [2] - 40:6, 98:2
**22-person** [1] - 55:6
**22nd** [2] - 71:4, 96:3
**23rd** [7] - 82:15, 82:24, 83:15, 86:3, 86:8, 86:11, 89:17
**24** [1] - 98:2
**25** [1] - 32:11
**28** [1] - 70:9
**29** [2] - 3:11, 32:12
**2nd** [2] - 81:13, 93:7

**3**

**3** [7] - 8:4, 11:22, 16:11, 19:7, 38:10, 61:20, 66:7
**30** [1] - 85:6
**32,000** [1] - 77:4
**34** [2] - 70:8, 70:9
**350** [1] - 1:23
**3:15** [1] - 66:12
**3D** [15] - 42:18, 45:9, 53:6, 53:8, 54:12, 55:3, 55:7, 57:24, 58:8, 58:14, 62:7, 74:11, 75:22, 92:1
**3DTAS** [42] - 9:17, 10:2, 65:21, 70:11, 74:11, 74:22, 75:16, 75:21, 76:5, 76:11, 78:2, 78:9, 78:18, 78:20, 79:1, 80:14, 80:15, 81:6, 84:6, 84:14, 84:21, 88:14, 88:16, 90:8, 90:16, 97:2, 100:2, 100:5, 100:9, 100:10, 100:14, 101:10, 101:13, 101:18, 101:22, 102:8, 102:14, 102:24, 103:9, 106:7, 106:15

**4**

**4** [9] - 3:6, 10:1, 11:22, 16:12, 19:8, 61:20, 103:13, 103:16, 105:11
**40** [1] - 85:6
**42** [1] - 70:8
**4455** [1] - 1:23
**450** [2] - 30:5, 68:11
**4:27** [1] - 109:23
**4:30** [1] - 66:8

**5**

**5** [3] - 19:10, 91:5, 95:6
**5.4** [1] - 104:5
**5.6** [3] - 104:1, 104:20, 105:11
**50** [1] - 77:8
**500** [1] - 85:8
**501** [1] - 67:7
**51** [6] - 3:12, 3:19, 67:12, 67:15, 90:17, 91:4
**5th** [4] - 52:14, 62:17, 63:8, 96:6

**6**

**6** [1] - 19:11
**60** [2] - 73:5, 77:1
**67** [11] - 3:17, 3:19, 3:20, 3:20, 3:21, 3:21, 3:22, 3:23, 3:23, 3:24, 3:24
**6th** [2] - 79:22, 103:17

**7**

**7** [2] - 19:13, 78:20
**70** [2] - 73:5, 77:1
**737** [1] - 77:22

**8**

**8** [5] - 19:15, 39:18, 48:10, 48:11, 49:19
**839** [5] - 3:20, 67:7, 67:12, 67:15, 79:18
**840** [5] - 3:20, 67:12, 67:15, 86:6, 104:17
**842** [6] - 3:21, 67:7, 67:12, 67:15, 88:23, 89:5
**846** [5] - 3:21, 67:7, 67:12, 67:15, 82:5
**847** [6] - 3:22, 67:7, 67:13, 67:15, 87:15, 89:6
**864** [5] - 3:23, 67:7, 67:13, 67:15, 82:21
**867** [5] - 3:23, 67:7, 67:13, 67:15, 78:15
**8:30** [3] - 109:4, 109:13, 109:20

**9**

**9** [1] - 88:4
**90** [1] - 64:24
**90012** [1] - 1:24
**901** [1] - 2:20
**91** [2] - 3:17, 3:25
**910** [5] - 3:24, 67:7, 67:13, 67:15, 75:12
**92614** [1] - 2:11
**966** [5] - 3:24, 67:8, 67:13, 67:15, 73:14
**9:00** [3] - 108:18, 108:20, 108:21
**9:09** [1] - 4:1

**A**

**A.M** [1] - 4:1
**AARON** [1] - 2:16
**Aaron** [2] - 4:12, 30:18
**ability** [1] - 19:4
**able** [11] - 14:12, 39:5, 40:20, 44:15, 44:17, 51:7, 52:21, 76:9, 93:10, 106:18, 107:1
**absolutely** [2] - 7:19, 106:24
**academic** [1] - 41:9
**academics** [1] - 41:5
**Acceleration** [1] - 87:19
**accept** [4] - 16:12, 20:4, 25:7, 85:25
**access** [2] - 62:14, 93:8
**accessed** [1] - 37:9
**account** [1] - 19:3
**accounts** [1] - 21:18
**accuracy** [1] - 22:10
**accurate** [5] - 33:2, 35:14, 36:8, 72:20, 75:24
**accurately** [1] - 37:24
**accuse** [1] - 44:18
**accused** [7] - 6:6, 29:21, 40:1, 40:2, 46:2, 47:2, 95:9
**accusing** [6] - 53:17, 58:12, 60:15, 62:18, 63:9, 95:6
**acquired** [1] - 36:24
**activities** [3] - 46:2, 46:3, 46:4
**acts** [2] - 46:11, 46:13
**adapt** [1] - 77:15
**add** [4] - 76:14, 103:2,

103:8, 104:10
**added** [2] - 80:6, 103:20
**adding** [2] - 84:16
**addition** [3] - 17:8, 27:15, 72:6
**additional** [3] - 80:20, 83:14, 108:14
**address** [3] - 8:25, 62:21, 73:3
**addressed** [1] - 107:15
**addresses** [1] - 75:15
**adds** [1] - 78:19
**Administration** [3] - 56:2, 69:12, 71:15
**administrative** [1] - 89:22
**admit** [1] - 91:14
**admitted** [9] - 16:10, 25:11, 25:18, 25:21, 26:18, 67:13, 67:16, 91:21, 93:18
**ADMITTED** [1] - 3:18
**Advance** [1] - 45:24
**advancement** [1] - 72:13
**advantages** [4] - 65:5, 72:25, 94:8, 107:13
**advised** [1] - 85:14
**afternoon** [6] - 29:8, 51:16, 67:21, 67:23, 91:24, 91:25
**agencies** [1] - 76:20
**Agency** [1] - 69:5
**agency** [1] - 69:10
**ago** [5] - 5:12, 40:5, 49:21, 53:12, 63:1
**agree** [4] - 13:12, 15:4, 46:9, 97:4
**agreed** [3] - 16:11, 62:12, 65:7
**agreement** [4] - 14:12, 65:3, 94:6, 107:12
**ahead** [3] - 29:2, 48:18, 102:6
**AI** [14] - 53:18, 58:24, 58:25, 59:2, 59:5, 59:11, 59:15, 59:16, 59:22, 60:18, 64:23, 97:10, 97:12, 97:18
**AID** [10] - 45:23, 45:24, 46:12, 47:9, 47:13, 47:24, 48:12, 49:4, 50:6, 65:14
**AIDED** [1] - 110:13
**Airlines** [1] - 77:22
**ALAN** [1] - 2:8
**alerts** [1] - 106:18
**algorithm** [19] - 36:12, 36:16, 37:17, 37:19, 37:20, 38:15, 38:16, 38:17, 39:22, 46:24, 47:2, 47:3, 47:7, 47:8, 55:24, 58:18, 58:19, 58:21
**Algorithm** [1] - 36:13
**algorithms** [18] - 41:6, 41:10, 41:25, 42:10, 42:11, 43:4, 43:6, 44:3, 44:8, 44:10, 44:13, 44:17, 44:20, 53:11, 55:15, 55:22, 56:11, 56:12
**allegedly** [1] - 94:11
**allotted** [1] - 100:22
**allow** [3] - 4:23, 7:23, 26:6
**allowed** [2] - 14:22, 25:4
**allowing** [1] - 106:22
**allows** [2] - 72:21, 107:3
**almost** [3] - 51:1, 88:10, 104:4
**alone** [1] - 88:16
**Amazon** [1] - 61:3
**AMERICA** [1] - 1:1
**America** [5] - 31:8, 31:24, 71:12, 76:20
**America's** [1] - 31:6
**American** [2] - 76:16, 77:12
**amount** [1] - 81:14
**amounts** [1] - 105:15
**analysis** [4] - 95:2, 101:21, 101:23, 102:7
**analyst** [1] - 99:18
**analyzing** [1] - 35:16
**AND** [4] - 110:8, 110:11, 110:13, 110:14
**Angeles** [1] - 69:1
**ANGELES** [4] - 1:16, 1:24, 4:1, 110:4
**annual** [4] - 35:12, 99:13, 99:15, 99:19
**answer** [9] - 18:18, 97:15, 98:13, 100:17, 101:2, 101:4, 101:7, 102:11, 102:21
**answered** [4] - 18:14, 18:15, 81:2, 81:4
**answers** [4] - 24:13, 24:20, 24:21, 24:24
**anticipated** [1] - 88:1
**anyplace** [2] - 21:24, 22:1
**anytime** [1] - 67:14
**apologize** [3] - 26:9, 100:24, 100:25
**apologizing** [1] - 100:23
**app** [2] - 43:2, 43:3
**appearances** [1] - 4:6
**APPEARANCES** [1] - 2:1
**Apple** [1] - 60:6
**applicant** [1] - 34:13
**application** [4] - 21:2, 34:19, 43:9, 43:11
**applications** [1] - 43:7
**applied** [2] - 55:7, 101:14
**applies** [6] - 20:17, 21:5, 21:6, 28:14, 61:16, 68:15
**apply** [5] - 14:20, 15:2, 26:20, 30:23, 68:6
**applying** [2] - 79:13, 80:1
**appreciate** [1] - 65:24
**approach** [3] - 8:2, 73:2, 82:2
**approached** [1] - 21:12
**appropriate** [1] - 13:9
**April** [4] - 79:22, 80:19, 102:22, 103:17
**area** [3] - 34:20, 70:5, 108:8
**areas** [3] - 4:22, 30:10, 68:16
**argue** [8] - 49:7, 49:11, 49:19, 50:2, 50:11, 50:17, 50:20
**argument** [5] - 7:22, 7:25, 49:18, 49:22, 50:4
**arguments** [7] - 13:14, 16:18, 16:21, 28:15, 28:16, 28:17, 50:3
**arise** [1] - 76:22
**arrangement** [4] - 81:21, 107:18, 107:22
**art** [9] - 35:4, 56:15, 56:17, 56:22, 56:23, 57:13, 58:13, 63:5
**article** [9] - 56:10, 56:15, 56:24, 57:12, 57:13, 57:22, 57:23, 58:14, 58:15
**artifical** [2] - 44:14, 97:12
**artificial** [8] - 53:13, 53:14, 53:19, 53:22, 58:23, 97:7, 97:10, 97:18
**arts** [1] - 33:14
**aspirational** [2] - 87:22, 87:24
**assembled** [3] - 12:5, 60:22, 61:16
**assembly** [1] - 80:8
**asserted** [11] - 5:23, 5:24, 10:3, 10:4, 27:2, 27:14, 27:20, 28:1
**assessment** [11] - 33:3, 35:18, 42:15, 49:21, 49:22, 70:5, 72:10, 75:11, 75:22, 77:14, 79:15
**Assessment** [10] - 31:13, 32:3, 33:7, 43:14, 70:16, 74:11, 75:16, 79:23, 82:10, 86:9
**asset** [1] - 77:17
**assets** [1] - 72:8
**assist** [1] - 23:11
**associate** [1] - 37:25
**associated** [3] - 74:19, 75:6, 108:10
**Association** [1] - 62:4
**assumed** [2] - 86:23, 87:24
**assurances** [2] - 81:23, 107:23
**assured** [1] - 38:21
**AT** [1] - 110:11
**ATAC** [9] - 79:14, 80:2, 84:17, 85:16, 94:20, 103:2, 103:5, 103:22, 104:10
**attached** [1] - 63:12
**attend** [1] - 99:17
**attended** [1] - 85:3
**attention** [7] - 23:1, 23:3, 43:17, 61:18, 61:19, 86:10, 109:16
**attentive** [1] - 109:16
**attorney's** [1] - 23:25
**attorneys** [6] - 17:1, 23:15, 28:15, 62:17, 63:9, 95:1
**attribute** [1] - 90:7
**AUG** [1] - 4:1
**AUGUST** [2] - 1:15, 110:18
**August** [4] - 83:17, 84:22, 86:5, 86:21
**authors** [1] - 33:15
**automated** [3] - 29:9, 31:20, 72:24
**automatically** [1] - 43:10
**autonomous** [8] - 72:19, 73:2, 73:22, 79:14, 88:19, 103:9, 106:17
**Autonomous** [4] - 74:6, 79:23, 82:9, 86:9
**available** [4] - 12:20, 46:22, 55:21, 109:5
**AVENUE** [1] - 2:20
**avoid** [2] - 7:7, 23:22
**award** [3] - 69:3, 69:11, 69:17
**awarded** [3] - 9:16, 10:2, 32:4
**awards** [11] - 8:5, 8:6, 8:10, 8:24, 9:8, 31:1, 31:3, 68:22, 68:24, 69:7
**aware** [10] - 7:13, 24:7, 95:18, 96:15, 96:24, 97:1, 99:14, 99:15, 105:2, 106:2
**awareness** [1] - 106:5

**B**

**background** [4] - 14:4, 35:3, 35:4, 37:23
**bad** [2] - 30:15, 65:7
**ballpark** [1] - 77:8
**bar** [1] - 24:4
**Barney** [6] - 4:11, 5:10, 30:17, 60:24, 61:21, 62:1
**BARNEY** [16] - 2:15, 3:11, 4:10, 6:15, 8:16, 8:18, 9:7, 12:8, 13:15, 29:3, 29:6, 29:8, 51:2, 51:5, 66:14, 109:11
**Barney's** [1] - 62:21
**barrier** [1] - 87:9
**base** [2] - 15:17, 87:24
**based** [8] - 15:8, 20:15, 22:17, 36:24, 49:12, 78:1, 82:18, 84:5
**basis** [3] - 4:18, 9:11, 106:18
**Beach** [1] - 69:2
**bear** [1] - 19:15
**BEAR** [1] - 2:4
**became** [1] - 106:2
**become** [1] - 33:19
**bed** [2] - 38:4, 38:10
**began** [2] - 43:13, 44:3

**begin** [7] - 26:13, 26:17, 28:18, 34:4, 35:3, 40:21, 98:3
**beginning** [1] - 43:8
**behalf** [3] - 4:7, 4:12, 92:16
**BEHALF** [2] - 2:3, 2:13
**belief** [4] - 4:18, 4:23, 15:23, 91:7
**believability** [1] - 19:15
**believable** [1] - 20:8
**below** [1] - 38:19
**bench** [1] - 23:17
**Bernie** [1] - 87:18
**best** [1] - 4:22
**better** [9] - 29:16, 32:21, 33:6, 38:9, 73:19, 87:3, 90:11, 109:20
**between** [11] - 16:5, 17:21, 39:7, 59:7, 59:14, 59:21, 80:20, 83:14, 86:12, 90:15, 104:16
**beyond** [1] - 16:2
**bias** [1] - 19:10
**bid** [2] - 64:2, 64:4
**bids** [1] - 64:4
**big** [17] - 30:6, 31:21, 33:1, 35:25, 40:22, 40:23, 45:4, 71:21, 76:25, 77:10, 78:3, 78:4, 81:9, 87:9, 87:11, 99:19
**bigger** [1] - 70:3
**biggest** [2] - 76:8, 85:13
**bill** [1] - 80:21
**Bill** [4] - 64:17, 93:3, 93:8, 105:22
**billion** [1] - 75:4
**binder** [9] - 73:15, 75:13, 78:15, 79:19, 82:5, 86:6, 87:15, 88:23, 98:1
**bit** [13] - 12:16, 14:3, 29:24, 31:17, 43:20, 61:2, 68:22, 69:22, 75:2, 80:22, 108:5, 108:21
**blog** [1] - 21:1
**blow** [1] - 87:11
**blown** [1] - 84:19
**blue** [1] - 59:7
**BNSF** [2] - 71:22, 75:5
**board** [3] - 56:8, 56:10, 57:23
**boards** [1] - 51:12
**books** [1] - 25:13
**boss** [1] - 64:19
**bottom** [4] - 34:11, 38:20, 42:5, 85:22
**bought** [3] - 62:7, 62:8, 62:9
**bounds** [1] - 37:13
**Boxcar** [1] - 88:6
**boxcar** [20] - 74:19, 74:24, 76:6, 79:6, 84:9, 85:21, 85:22, 86:16, 88:10, 99:23, 101:16, 103:3, 103:4, 103:6, 103:12, 103:18, 104:10, 104:12, 106:7
**boxcars** [8] - 80:7, 80:9, 80:18, 84:6, 84:10, 84:11, 84:20
**boxes** [3] - 57:17, 57:24, 57:25
**boys** [1] - 40:22
**brad** [2] - 65:17, 81:16
**Brad** [5] - 82:13, 83:5, 83:6, 105:2
**brain** [3] - 59:5, 59:6, 59:8
**brand** [2] - 97:9, 98:25
**branded** [1] - 98:4
**branding** [2] - 97:21, 98:23
**break** [7] - 40:20, 66:7, 72:9, 80:13, 88:11, 88:14, 108:17
**breaking** [2] - 72:23, 89:13
**briefly** [1] - 105:18
**briefs** [1] - 6:18
**bring** [3] - 12:4, 59:20, 63:17
**brings** [1] - 9:4
**brochure** [4] - 57:3, 73:21, 74:5
**broke** [1] - 89:15
**broken** [1] - 35:9
**brought** [4] - 25:19, 51:19, 57:9
**budget** [2] - 65:20, 105:3
**budgetary** [1] - 79:25
**build** [6] - 64:18, 84:13, 84:15, 88:9, 104:11, 104:13
**building** [3] - 79:15, 80:18, 103:5
**bullet** [2] - 9:15, 10:1
**bully** [4] - 52:3, 52:12, 52:21, 63:18
**bullying** [3] - 53:2, 62:7, 66:4
**burden** [4] - 15:12, 15:21, 28:25, 60:14
**business** [7] - 8:6, 31:12, 31:19, 61:25, 62:22, 68:14, 87:7
**Business** [5] - 54:10, 68:25, 69:4, 69:8, 69:12
**businesses** [4] - 69:13, 69:14, 69:15, 69:16
**busy** [1] - 35:20
**buy** [11] - 46:9, 54:3, 64:23, 65:22, 81:22, 82:25, 83:11, 83:24, 84:11, 104:13
**buying** [2] - 41:22, 42:8
**BY** [17] - 2:5, 2:15, 3:11, 3:12, 3:17, 3:17, 67:20, 74:7, 87:14, 89:8, 90:5, 91:23, 97:17, 98:21, 101:9, 105:20, 110:13

**C**

**CA** [1] - 2:11
**calculations** [1] - 59:13
**CALIFORNIA** [6] - 1:2, 1:16, 1:24, 4:1, 110:6, 110:9
**camera** [4] - 57:19, 58:1, 58:6, 59:17
**Canada** [4] - 40:5, 40:16, 54:7, 70:15
**Canadian** [11] - 52:1, 61:24, 65:4, 71:22, 71:23, 71:24, 78:11, 78:18, 78:23, 94:7, 99:1
**candor** [1] - 57:4
**cannot** [2] - 18:15, 18:16
**capabilities** [2] - 65:21, 68:16
**capability** [2] - 106:12, 106:16
**capital** [1] - 75:5
**captain** [1] - 108:4
**caption** [1] - 75:20
**captioned** [1] - 13:8
**capture** [1] - 90:2
**car** [12] - 46:9, 46:10, 76:15, 80:7, 85:7, 87:25, 88:1, 88:3, 103:2, 107:6
**career** [1] - 32:17
**carry** [1] - 35:20
**carrying** [1] - 61:8
**cars** [9] - 79:14, 79:15, 80:2, 84:17, 85:16, 88:2, 94:20, 103:5, 103:22
**CASE** [1] - 1:8
**Case** [1] - 4:4
**case** [79] - 4:16, 5:25, 6:9, 6:10, 6:16, 6:19, 7:20, 8:6, 10:3, 10:4, 10:7, 10:17, 10:22, 10:25, 12:3, 12:4, 12:10, 12:14, 14:18, 15:2, 15:7, 15:11, 17:15, 18:21, 18:23, 19:9, 20:14, 20:15, 20:16, 20:18, 20:20, 20:23, 20:24, 21:6, 21:10, 21:13, 21:19, 21:23, 21:25, 22:2, 22:5, 22:8, 22:17, 23:8, 24:2, 24:6, 25:10, 25:14, 25:24, 28:14, 28:17, 29:9, 29:21, 29:25, 30:1, 30:18, 31:10, 32:6, 32:10, 34:2, 36:13, 40:2, 43:20, 44:6, 46:1, 46:14, 47:3, 48:5, 51:7, 51:18, 61:9, 61:13, 64:14, 65:11, 66:1, 82:7, 108:24, 109:13, 109:19
**cases** [5] - 16:4, 56:22, 65:13, 71:17
**caused** [1] - 87:7
**causes** [1] - 36:3
**center** [2] - 54:8, 54:12
**CENTRAL** [2] - 1:2, 110:9
**CEO** [2] - 43:22, 87:18
**certain** [6] - 6:20, 16:15, 17:10, 25:11, 25:18, 84:13
**certainly** [1] - 8:23
**CERTIFICATE** [1] - 110:2
**CERTIFY** [2] - 110:10, 110:14
**Cerulli** [2] - 4:13, 30:19
**CERULLI** [1] - 2:17
**chair** [1] - 66:10
**chance** [1] - 4:15
**change** [3] - 41:23, 49:16, 85:9
**Change** [2] - 68:25, 69:4
**changed** [3] - 48:2, 48:3, 60:20
**changes** [1] - 82:2
**character** [2] - 8:21, 8:22
**characteristics** [2] - 77:11, 78:1
**chart** [3] - 61:21, 87:20, 87:22
**charts** [4] - 25:11, 25:14, 25:18, 25:20
**chat** [1] - 21:1
**chemicals** [2] - 69:9, 69:24
**Chief** [4] - 32:8, 43:21, 43:25, 83:19
**child** [1] - 59:7
**choice** [1] - 64:25
**choices** [2] - 103:1, 103:3
**choose** [1] - 20:1
**chosen** [1] - 103:2
**Christy** [2] - 4:7, 51:16
**CHRISTY** [1] - 2:5
**CHUNG** [1] - 2:19
**Chung** [2] - 4:13, 30:19
**Circuit** [1] - 4:17
**circumstantial** [9] - 6:19, 6:25, 7:12, 7:20, 7:24, 17:16, 17:19, 17:22, 18:6
**citizen** [1] - 8:20
**City** [2] - 71:23, 79:6
**civil** [2] - 14:20, 16:4
**Claim** [5] - 37:10, 39:18, 48:10, 48:11, 49:19
**claim** [11] - 7:18, 15:13, 15:16, 15:21, 15:25, 37:17, 48:11, 50:21, 50:24, 60:24, 60:25
**claimed** [2] - 36:16, 38:16
**Claims** [1] - 48:7
**claims** [9] - 27:2, 27:14, 27:20, 28:1, 37:12, 49:11, 60:23, 61:1
**Class** [24] - 31:22, 33:1, 33:5, 35:25, 39:12, 40:22, 41:12, 41:22, 42:2, 42:8, 42:13, 45:5, 71:12, 71:20, 73:4, 76:16, 76:18, 76:21, 76:23, 77:12, 78:9, 79:1, 79:9

**clear** [12] - 15:20, 15:21, 16:5, 26:25, 85:19, 89:3, 89:4, 94:19, 94:21, 94:23, 105:23
**CLERK** [7] - 4:3, 13:23, 66:9, 66:17, 66:23, 109:1, 109:22
**clicking** [1] - 59:18
**client** [11] - 8:20, 8:21, 12:20, 17:1, 29:15, 39:24, 52:13, 52:19, 54:8, 62:19, 63:7
**client's** [1] - 62:16
**clients** [2] - 30:13, 68:7
**Climate** [2] - 68:25, 69:3
**climate** [1] - 35:12
**clipboard** [1] - 72:14
**clogs** [1] - 35:24
**close** [3] - 23:1, 45:10, 72:1
**closer** [1] - 35:2
**closing** [7] - 13:10, 16:21, 28:15, 28:17, 45:10, 109:5
**CN** [8] - 65:3, 65:6, 94:6, 99:4, 100:10, 101:13, 107:12, 107:19
**code** [6] - 7:8, 50:21, 50:24, 58:11, 58:21, 58:22
**coders** [1] - 58:20
**coding** [1] - 58:20
**COF** [1] - 88:8
**collaborated** [1] - 41:4
**collaboration** [2] - 41:4, 41:9
**colleague** [5] - 11:15, 12:15, 79:9, 82:15, 87:17
**colleagues** [3] - 52:7, 63:11, 81:15
**collected** [1] - 35:17
**collecting** [1] - 94:15
**collectively** [1] - 70:22
**collects** [1] - 75:22
**column** [3] - 36:25, 38:19, 78:19
**columns** [1] - 89:15
**combined** [4] - 76:15, 90:16, 101:19, 101:25
**coming** [1] - 44:7
**commentary** [1] - 21:19
**commented** [1] - 107:15
**commercial** [5] - 41:19, 42:18, 45:14, 49:14, 68:6
**commercialize** [1] - 55:3
**commitment** [1] - 78:8
**committed** [1] - 48:24
**common** [3] - 18:7, 65:12, 101:17
**communicate** [2] - 20:21, 20:22
**communicating** [2] - 21:5, 21:7
**communication** [3] - 22:13, 77:17, 81:5
**communications** [2] - 81:14, 94:18
**community** [1] - 31:2
**Companies** [1] - 69:19
**companies** [5] - 31:6, 31:7, 64:5, 72:18, 86:13
**company** [12] - 30:16, 30:21, 40:4, 40:8, 43:16, 45:23, 52:1, 55:6, 55:7, 61:24, 62:10, 68:5
**compared** [1] - 38:25
**comparing** [1] - 105:14
**comparison** [2] - 39:4, 72:21
**compensate** [1] - 48:23
**compete** [1] - 52:18
**competing** [3] - 42:2, 45:4, 64:10
**competitive** [9] - 41:11, 42:1, 42:12, 43:6, 64:9, 94:16, 94:21, 94:24
**competitor** [2] - 6:3, 62:25
**competitors'** [1] - 7:15
**complete** [5] - 83:12, 101:4, 102:16, 102:19, 104:4
**completed** [3] - 20:13, 27:7, 94:3
**component** [1] - 32:23
**components** [14] - 41:2, 61:3, 61:10, 76:6, 76:14, 84:16, 85:18, 89:14, 101:15, 101:24, 102:23, 103:7, 104:10, 104:13
**COMPUTER** [1] - 110:13
**computer** [7] - 20:25, 59:10, 59:12, 59:21, 61:11, 76:4, 77:16
**Computer** [1] - 60:5
**COMPUTER-AIDED** [1] - 110:13
**computers** [1] - 55:9
**concern** [3] - 7:4, 81:25, 105:5
**concluded** [2] - 43:1, 109:23
**concrete** [4] - 39:6, 65:5, 94:8, 107:13
**condition** [1] - 75:11
**conduct** [3] - 20:10, 20:11, 21:15
**conducted** [1] - 65:1
**conducting** [1] - 41:3
**conference** [5] - 23:16, 23:25, 24:1, 56:11, 81:7
**conferences** [5] - 23:19, 23:24, 24:4, 54:18, 56:6
**Confidential** [1] - 87:13
**confidential** [5] - 65:8, 89:1, 89:3, 90:4, 90:19
**confidentiality** [1] - 94:6
**confusing** [1] - 11:4
**confusion** [1] - 23:22
**Congress** [1] - 33:13
**conjunction** [2] - 56:6, 57:22
**connected** [3] - 61:1, 61:4, 61:7
**connection** [1] - 56:10
**conscious** [1] - 105:3
**consider** [15] - 16:8, 16:14, 16:16, 17:10, 17:11, 17:20, 18:6, 18:22, 19:22, 21:17, 24:1, 24:16, 24:24, 74:15, 76:16
**considerations** [1] - 28:12
**considered** [1] - 17:7
**considering** [3] - 19:2, 25:8, 84:23
**consistent** [1] - 19:17
**consists** [1] - 16:8
**Constitution** [1] - 33:10
**constitution** [2] - 33:11, 33:13
**Consultant** [1] - 43:21
**consultant** [1] - 92:15
**consulting** [3] - 21:20, 30:4, 68:5
**contact** [1] - 90:23
**contacted** [2] - 63:16, 95:1
**contained** [1] - 6:5
**contention** [2] - 27:2, 27:19
**contentions** [2] - 15:24, 27:17
**contents** [1] - 25:13
**contract** [1] - 85:1
**contradicted** [1] - 19:11
**contributions** [1] - 31:1
**control** [4] - 18:9, 31:24, 88:20, 90:16
**Controller** [4] - 74:14, 101:19, 103:10, 106:17
**controls** [1] - 16:24
**convenes** [1] - 42:22
**conventional** [1] - 8:19
**conversations** [1] - 62:20
**conviction** [1] - 15:23
**convince** [1] - 7:21
**convincing** [4] - 15:20, 15:22, 16:5, 26:25
**convolutional** [7] - 44:4, 44:5, 47:2, 47:18, 48:9, 53:20, 59:23
**copy** [3] - 5:10, 9:22, 14:6
**copying** [1] - 94:11
**corner** [2] - 34:7, 74:10
**corners** [1] - 30:21
**corporate** [4] - 8:20, 8:22, 8:24, 68:1
**correct** [85] - 4:21, 11:1, 11:2, 92:2, 92:5, 92:6, 92:8, 92:11, 92:16, 92:18, 92:19, 92:22, 92:23, 92:24, 92:25, 93:2, 93:9, 93:14, 93:15, 93:21, 93:22, 94:1, 94:2, 94:4, 94:5, 94:12, 94:16, 94:24, 95:3, 95:4, 95:7, 95:8, 95:10, 95:11, 95:13, 95:14, 95:17, 95:20, 95:21, 95:23, 96:5, 96:7, 96:8, 96:10, 96:11, 96:14, 96:17, 96:20, 96:21, 96:23, 96:24, 97:3, 97:8, 97:18, 97:22, 99:1, 99:2, 99:5, 99:11, 99:13, 99:23, 100:1, 100:3, 100:12, 100:13, 101:11, 101:12, 101:19, 101:20, 102:14, 102:15, 102:20, 102:21, 102:25, 103:3, 103:20, 103:21, 104:1, 104:2, 104:21, 104:23, 104:24, 105:6, 105:12, 106:3
**CORRECT** [1] - 110:14
**correcting** [1] - 65:24
**correctly** [1] - 98:10
**corresponded** [1] - 89:16
**corresponding** [1] - 38:8
**Corridor** [1] - 74:13
**cost** [15] - 54:4, 64:22, 65:10, 65:20, 72:5, 80:13, 89:13, 89:14, 89:18, 89:19, 89:22, 93:25, 104:15, 106:22
**costing** [1] - 64:24
**costs** [4] - 64:23, 75:3, 89:22, 90:2
**counsel** [14] - 4:6, 4:14, 7:25, 9:4, 27:6, 27:9, 50:25, 51:10, 66:19, 67:10, 91:10, 99:7, 100:16, 108:14
**COUNSEL** [1] - 2:1
**Counsel** [7] - 9:18, 29:2, 51:9, 66:6, 91:18, 93:17, 105:17
**counsel's** [1] - 97:15
**country** [2] - 33:9, 33:12
**COUNTY** [1] - 110:4
**couple** [2] - 61:23, 69:7
**coupled** [1] - 106:16
**course** [5] - 20:19, 23:23, 46:6, 72:14, 87:11
**COURT** [70] - 1:1, 1:23, 4:9, 4:15, 5:4, 5:13, 6:12, 7:23, 8:3, 8:17, 9:2, 9:11, 9:18, 9:20, 9:25, 10:8, 10:25, 11:3, 11:12, 12:7, 13:4, 13:12, 13:16, 13:19, 13:25,

26:9, 29:5, 29:7, 50:25, 51:4, 51:9, 51:13, 51:15, 66:6, 66:12, 66:15, 66:19, 67:1, 67:6, 67:9, 67:12, 67:18, 73:23, 74:4, 89:2, 89:7, 90:19, 91:10, 91:13, 91:16, 91:18, 91:20, 93:17, 97:15, 98:12, 100:16, 100:20, 100:23, 100:25, 101:6, 102:3, 102:6, 105:17, 108:14, 108:16, 109:3, 109:10, 109:12, 110:9, 110:22
**court** [10] - 9:23, 17:13, 22:9, 22:18, 24:17, 24:23, 66:5, 74:1, 109:22
**Court** [5] - 5:10, 10:18, 21:15, 22:25, 52:15
**Court's** [2] - 10:13, 17:4
**courtroom** [3] - 22:12, 89:3, 89:5
**courts** [1] - 4:20
**cover** [2] - 58:25, 77:5
**COVID** [1] - 79:10
**crack** [2] - 39:15
**Crack** [1] - 40:13
**cracked** [1] - 35:10
**cracks** [6] - 32:25, 38:3, 39:5, 39:7, 40:14, 40:15
**create** [2] - 41:6, 44:10
**created** [2] - 58:8, 58:19
**credibility** [1] - 8:21
**credible** [1] - 7:22
**criminal** [1] - 16:4
**critical** [2] - 71:10, 72:4
**cross** [9] - 7:25, 9:9, 13:5, 27:8, 27:13, 38:11, 91:11, 98:1, 108:14
**CROSS** [2] - 3:15, 91:22
**cross-binder** [1] - 98:1
**CROSS-EXAMINATION** [1] - 91:22
**cross-examination** [3] - 7:25, 9:9, 91:11
**cross-examine** [2] - 27:8, 27:13
**crosses** [1] - 4:21
**CrossVU** [1] - 74:13
**CSR** [2] - 1:22, 110:21
**CSX** [96] - 10:14, 10:19, 11:22, 11:23, 45:4, 45:9, 45:11, 45:17, 45:25, 46:5, 46:22, 46:23, 47:23, 49:2, 50:6, 53:25, 61:13, 63:23, 64:17, 64:19, 64:23, 64:25, 65:2, 65:8, 65:9, 65:12, 65:14, 65:18, 65:22, 71:23, 79:7, 79:8, 79:10, 79:23, 80:19, 80:20, 81:5, 81:15, 81:16, 82:8, 82:13, 82:25, 83:14, 83:17, 83:19, 84:15, 84:23, 85:3, 85:15, 85:16, 85:18, 85:19, 85:25, 86:2, 86:10, 86:12, 86:15, 87:1, 87:10, 88:1, 88:2, 89:12, 89:17, 90:8, 90:11, 90:23, 92:21, 92:24, 93:3, 93:9, 93:12, 94:20, 96:12, 96:17, 96:20, 98:9, 102:16, 102:19, 102:25, 103:12, 103:15, 103:22, 103:24, 104:3, 104:10, 104:19, 105:2, 105:5, 106:3, 106:7, 106:19, 107:14, 107:20, 108:1
**CSX's** [4] - 80:21, 82:3, 84:5, 93:11
**cue** [1] - 26:6
**culminated** [1] - 106:5
**culture** [1] - 69:23
**curb** [2] - 5:1, 9:5
**current** [3] - 60:6, 64:3, 108:9
**customer** [13] - 45:5, 45:6, 52:6, 61:10, 61:15, 62:19, 65:6, 65:7, 65:18, 88:3, 88:16
**customers** [15] - 61:8, 63:10, 65:13, 65:14, 74:20, 76:11, 76:12, 76:17, 76:21, 77:11, 77:20, 78:8, 87:10, 88:18
**cutting** [2] - 30:21, 97:13
**CV** [2] - 1:9, 4:4

**D**

**damages** [5] - 33:24, 48:19, 48:20
**Dan** [1] - 4:13
**Daniel** [1] - 30:19
**DANIEL** [1] - 2:19
**Darel** [3] - 6:22, 32:7, 43:24
**Darel's** [1] - 43:23
**Daryl's** [3] - 5:19, 5:23, 6:21
**dashed** [1] - 40:10
**data** [33] - 35:17, 35:22, 35:23, 36:19, 36:22, 36:25, 37:2, 37:5, 37:9, 37:25, 38:8, 38:18, 38:23, 38:25, 48:9, 52:9, 57:19, 58:2, 58:8, 58:9, 62:10, 62:11, 62:13, 62:14, 65:4, 65:8, 65:10, 65:20, 75:23, 107:5, 107:12
**DATE** [1] - 110:18
**date** [8] - 32:4, 71:4, 92:9, 93:5, 97:23, 98:5, 99:24, 105:23
**dated** [3] - 64:15, 82:10, 82:24
**David** [1] - 60:4
**days** [1] - 89:11
**DC** [1] - 2:21
**deal** [4] - 13:5, 45:10, 65:7, 76:25
**December** [1] - 12:14
**decide** [20] - 15:7, 17:14, 17:23, 18:5, 18:24, 19:23, 19:24, 20:12, 20:15, 22:17, 23:7, 23:20, 26:4, 26:22, 26:24, 28:17, 51:20, 51:23, 57:8, 103:7
**decided** [6] - 22:8, 34:25, 40:18, 64:6, 64:10, 65:22
**decides** [1] - 59:12
**deciding** [5] - 16:8, 16:17, 18:21, 18:23, 26:21
**decision** [4] - 15:17, 83:16, 83:18, 86:17
**decisions** [1] - 28:5
**declaration** [2] - 28:23, 95:19
**declarations** [1] - 12:17
**deed** [1] - 37:12
**deep** [3] - 47:1, 47:18, 53:21
**defect** [2] - 75:9, 107:1
**defects** [6] - 35:9, 37:5, 38:2, 38:6, 38:9, 71:19
**DEFENDANT** [2] - 1:10, 2:13
**defense** [4] - 15:13, 15:16, 15:21, 15:25
**defenses** [1] - 49:6
**define** [1] - 37:13
**defines** [1] - 39:19
**definitely** [2] - 6:25, 109:19
**deliberately** [1] - 19:25
**deliberations** [6] - 14:7, 14:24, 20:14, 21:6, 23:2, 34:4
**deliver** [2] - 86:1
**delivered** [5] - 11:19, 45:23, 47:10, 47:23, 92:21
**delivering** [1] - 48:12
**delivery** [3] - 46:12, 47:13, 49:4
**delving** [1] - 9:9
**demanded** [1] - 95:12
**demanding** [1] - 33:2
**demonstration** [1] - 85:3
**demonstratives** [2] - 5:7, 5:9
**denied** [1] - 22:18
**denying** [1] - 24:1
**Department** [1] - 55:25
**depicted** [1] - 74:18
**deposition** [11] - 24:10, 24:14, 24:16, 28:8, 28:9, 28:10, 97:25, 98:13, 98:17
**depth** [1] - 39:11
**derailment** [3] - 35:10, 39:16, 72:5
**derive** [1] - 33:9
**describe** [1] - 71:8
**describing** [1] - 50:10
**description** [1] - 75:24
**deserves** [4] - 20:9, 25:8, 25:17, 25:23
**design** [4] - 80:17, 80:24, 103:21, 104:12
**Design** [1] - 45:24
**designed** [4] - 54:13, 61:9, 73:3, 73:6
**designing** [1] - 70:2
**desire** [3] - 35:7, 35:11, 84:5
**desired** [1] - 35:14
**despite** [4] - 29:20, 50:5, 50:7, 50:8
**detail** [1] - 55:24
**details** [1] - 4:25
**detect** [6] - 35:9, 37:5, 38:6, 38:9, 39:5, 40:14
**determination** [2] - 57:10, 63:18
**determine** [1] - 98:14
**determines** [1] - 39:9
**develop** [1] - 55:14
**developed** [4] - 32:2, 54:12, 70:1, 87:23
**developing** [1] - 43:15
**development** [5] - 30:15, 68:19, 69:20, 89:20, 90:3
**Development** [5] - 54:10, 54:22, 60:1, 69:5, 69:24
**device** [5] - 55:13, 61:16, 64:1, 65:9, 95:13
**devices** [2] - 60:25, 62:5
**dictionaries** [1] - 21:20
**differ** [1] - 16:23
**difference** [2] - 47:21, 104:16
**differences** [1] - 19:22
**different** [14] - 6:2, 12:6, 12:10, 18:3, 19:18, 36:21, 60:19, 60:20, 61:10, 73:13, 89:16, 98:19, 103:7
**differential** [1] - 90:15
**differentiate** [1] - 59:14
**differently** [3] - 13:2, 13:3, 19:21
**differs** [1] - 19:23
**difficult** [3] - 32:16, 34:16, 84:11
**dig** [1] - 64:11
**digitally** [1] - 38:23
**dimensional** [3] - 36:18, 36:24, 42:15
**Dimensional** [5] - 32:3, 33:7, 43:14, 47:1, 75:15
**dire** [1] - 13:22
**direct** [6] - 17:16, 17:17, 17:22, 27:6
**DIRECT** [2] - 3:15, 67:19
**directed** [1] - 6:24

**directly** [2] - 48:6, 70:11
**disadvantaged** [1] - 69:14
**disagree** [2] - 12:22, 12:23
**disagreements** [1] - 12:9
**disappointment** [1] - 45:16
**disclose** [2] - 57:5, 107:20
**discount** [1] - 104:25
**discovered** [1] - 38:7
**discoveries** [1] - 33:16
**discovery** [1] - 95:24
**discuss** [4] - 5:5, 21:14, 24:6, 55:23
**discussed** [7] - 8:25, 21:24, 22:1, 55:22, 96:16, 96:19, 109:6
**discussing** [1] - 20:24
**discussion** [3] - 10:23, 83:21, 89:5
**discussions** [2] - 80:20, 86:12
**dislikes** [1] - 15:5
**dispute** [4] - 25:24, 26:2, 26:5, 63:21
**disputing** [1] - 12:13
**disregard** [3] - 17:6, 18:20, 98:18
**distance** [1] - 58:7
**distinction** [1] - 17:21
**distinguish** [2] - 59:7, 89:19
**distinguishing** [1] - 59:21
**distract** [1] - 23:8
**distribution** [1] - 81:2
**DISTRICT** [5] - 1:1, 1:2, 1:4, 110:9
**dive** [1] - 54:5
**diversity** [1] - 8:7
**DIVISION** [1] - 1:2
**DO** [2] - 110:10, 110:13
**document** [8] - 75:13, 78:16, 79:19, 82:22, 86:7, 87:16, 89:9, 90:22
**documents** [8] - 25:13, 26:18, 34:3, 42:9, 43:3, 46:17, 50:9, 99:20
**dollars** [1] - 75:4
**Don** [1] - 4:14
**done** [10] - 11:1, 29:19, 47:18, 49:24, 51:1, 69:1, 90:19, 101:21, 101:23, 102:7
**doubt** [2] - 16:2, 16:3
**down** [19] - 14:8, 30:7, 38:4, 38:9, 44:16, 57:18, 58:1, 74:2, 74:13, 74:24, 75:17, 79:11, 80:13, 81:10, 83:5, 90:14, 104:19, 104:22, 106:8
**dozen** [4] - 29:20, 31:23, 60:8, 68:24
**Dr** [35] - 32:7, 32:8, 32:10, 32:13, 32:19, 33:6, 34:13, 34:25, 35:5, 35:19, 36:4, 36:11, 36:20, 37:6, 37:15, 38:7, 38:15, 39:1, 39:23, 42:14, 43:7, 43:12, 43:17, 43:24, 47:5, 48:1, 49:24, 50:22, 54:21, 54:25, 55:1, 57:2, 60:4, 79:9
**dr** [1] - 59:25
**due** [1] - 95:24
**during** [11] - 8:25, 14:11, 18:2, 20:19, 22:1, 23:2, 23:14, 35:17, 41:14, 82:24, 95:24
**duty** [6] - 14:18, 15:1, 17:1, 20:19, 57:4, 57:5
**dwell** [1] - 8:23

**E**

**early** [7] - 24:5, 40:17, 81:7, 81:15, 82:6, 98:8, 108:19
**easy** [2] - 36:10, 64:25
**economics** [2] - 48:21, 88:6
**Edmonton** [1] - 70:15
**education** [2] - 25:5, 25:8
**effect** [1] - 12:13
**efficiency** [1] - 71:11
**efficient** [1] - 70:4
**effort** [2] - 29:18, 45:7
**efforts** [1] - 68:20
**eight** [3] - 45:14, 49:14, 86:25
**either** [5] - 23:16, 28:16, 70:10, 97:3, 106:6
**Electrical** [1] - 32:10
**electronic** [1] - 20:25
**element** [2] - 50:23
**elements** [1] - 103:22
**elevation** [5] - 36:19, 36:24, 38:8, 38:18, 58:8
**ELIAS** [4] - 1:22, 110:8, 110:20, 110:21
**email** [13] - 20:25, 43:21, 44:25, 64:15, 85:14, 93:20, 93:23, 94:10, 94:17, 94:19, 105:22, 105:24, 106:4
**emails** [2] - 43:18, 80:23
**emphasis** [1] - 68:9
**employee** [6] - 60:7, 64:17, 85:1, 93:4, 108:11
**employees** [3] - 30:4, 40:6, 70:18
**employer** [2] - 21:8, 21:10
**encountered** [1] - 59:16
**end** [8] - 14:25, 20:14, 20:20, 42:21, 42:24, 68:9, 86:14, 105:8
**ended** [1] - 7:9
**ends** [1] - 90:4
**energy** [3] - 30:14, 68:17, 70:4
**engine** [1] - 60:9
**engineer** [2] - 32:13, 32:15
**Engineer** [1] - 83:19
**engineer's** [1] - 32:15
**engineering** [11] - 30:4, 30:9, 30:14, 30:24, 32:15, 32:16, 63:22, 68:5, 68:6, 68:16, 81:11
**Engineering** [1] - 32:10
**engineers** [3] - 32:2, 42:23, 68:8
**enjoin** [1] - 52:16
**ensure** [1] - 29:12
**enthusiasm** [1] - 83:20
**enthusiastic** [2] - 79:12, 82:16
**entire** [4] - 22:23, 28:6, 34:25, 76:15
**entitled** [5] - 22:16, 28:11, 33:24, 35:1, 48:19
**entries** [1] - 5:18
**environment** [3] - 30:13, 31:2, 68:16
**environmental** [4] - 8:7, 8:11, 8:12, 9:8
**Environmental** [1] - 69:7
**equipment** [1] - 80:16
**error** [1] - 23:22
**especially** [2] - 31:21, 38:5
**ESQ** [9] - 2:5, 2:6, 2:7, 2:8, 2:15, 2:16, 2:17, 2:18, 2:19
**essentially** [2] - 42:7, 73:6
**established** [1] - 24:23
**estimate** [1] - 98:6
**evaluation** [1] - 75:1
**event** [1] - 19:20
**eventually** [1] - 34:3
**evidence** [110] - 7:20, 7:24, 8:23, 9:1, 11:25, 12:11, 12:16, 12:24, 13:1, 13:2, 13:11, 13:13, 14:21, 15:2, 15:8, 15:11, 15:14, 15:15, 15:17, 15:20, 15:22, 15:23, 16:1, 16:6, 16:7, 16:10, 16:13, 16:15, 16:16, 16:19, 16:22, 17:1, 17:3, 17:6, 17:8, 17:10, 17:11, 17:14, 17:15, 17:16, 17:17, 17:19, 17:21, 17:22, 17:24, 18:2, 18:6, 18:8, 18:9, 18:10, 18:12, 18:19, 18:21, 18:22, 19:11, 19:14, 20:6, 20:16, 21:16, 22:8, 23:6, 23:11, 23:21, 24:19, 25:10, 25:12, 25:13, 25:15, 25:17, 25:19, 25:21, 25:23, 26:15, 26:16, 26:17, 26:19, 26:21, 26:23, 26:25, 27:1, 27:14, 27:15, 27:16, 27:19, 27:22, 27:25, 28:2, 28:3, 28:4, 28:13, 28:16, 46:21, 49:9, 53:4, 59:4, 65:25, 67:5, 67:10, 91:20, 93:17, 98:18
**Evidence** [1] - 23:21
**evidentiary** [1] - 15:14
**evolved** [1] - 72:10
**exactly** [4] - 7:8, 14:15, 37:7, 48:22
**EXAMINATION** [3] - 67:19, 91:22, 105:19
**examination** [6] - 7:25, 9:9, 27:6, 27:7, 27:10, 91:11
**examine** [2] - 27:8, 27:13
**examined** [2] - 27:12, 34:19
**examiner** [1] - 34:19
**examiners** [1] - 34:22
**examining** [1] - 34:23
**example** [3] - 9:4, 17:25, 36:25
**Excel** [1] - 89:10
**excellence** [1] - 69:12
**except** [1] - 9:23
**exchanged** [1] - 5:7
**excluded** [1] - 17:5
**excluding** [1] - 4:21
**exclusive** [5] - 33:15, 33:17, 33:20, 37:19, 39:22
**excuse** [3] - 33:10, 43:25, 50:15
**excused** [2] - 22:4, 108:16
**executives** [3] - 44:23, 44:24, 50:9
**exhibit** [7] - 18:10, 18:14, 18:15, 64:14, 91:15, 91:16, 104:18
**Exhibit** [17] - 64:14, 73:14, 75:12, 78:15, 79:18, 82:5, 82:21, 86:6, 87:15, 88:23, 90:17, 91:4, 91:17, 91:21, 93:16, 104:17, 105:21
**EXHIBITS** [1] - 3:18
**Exhibits** [2] - 67:12, 67:15
**exhibits** [3] - 16:10, 16:15, 67:4
**expect** [1] - 21:11
**expects** [1] - 26:16
**expenditures** [1] - 76:8
**expensive** [4] - 78:4, 93:13, 105:9, 105:14
**experience** [6] - 18:7, 25:5, 25:9, 32:11, 106:21, 108:3
**expert** [14] - 4:22, 25:2, 36:20, 37:6, 37:15, 39:2, 47:5, 47:6, 48:1, 48:22, 50:22, 63:4
**explain** [20] - 4:25, 8:1, 25:12, 26:3,

Exhibit 1
31

26:4, 32:1, 32:20, 32:21, 32:22, 33:1, 34:5, 35:19, 36:21, 37:7, 37:16, 39:2, 47:6, 48:22, 50:23, 53:15
**explained** [1] - 50:19
**explains** [2] - 35:4, 35:5
**explanation** [1] - 18:4
**exposed** [2] - 20:17, 22:24
**expressed** [1] - 105:5
**expressing** [1] - 91:7
**extensive** [1] - 79:7
**extent** [1] - 4:24
**exterior** [2] - 85:16, 85:21
**extremely** [2] - 5:15, 6:7

**F**

**face** [3] - 59:19
**Facebook** [1] - 21:2
**faces** [2] - 59:20, 59:21
**fact** [15] - 5:22, 6:20, 17:17, 17:20, 18:1, 20:6, 30:6, 44:23, 45:22, 47:25, 50:5, 50:9, 92:4, 102:16, 108:5
**factors** [1] - 19:15
**facts** [13] - 4:25, 6:10, 15:1, 15:2, 16:8, 16:11, 16:12, 16:17, 16:22, 17:19, 18:5, 18:23, 50:14
**factual** [1] - 15:24
**fair** [7] - 9:6, 9:10, 22:16, 22:19, 49:1, 49:5, 81:14
**fairness** [1] - 22:22
**Fake** [1] - 47:1
**Fake3D** [7] - 46:24, 47:1, 47:16, 48:9, 58:11, 58:14
**familiar** [2] - 29:10, 73:15
**family** [2] - 21:7, 21:9
**fancy** [1] - 36:14
**fantastic** [3] - 82:17, 83:7, 87:2
**far** [3] - 5:14, 39:24, 44:16
**fast** [4] - 9:22, 36:2, 45:3, 107:2
**fastener** [1] - 75:9
**faster** [3] - 29:17, 33:2, 72:19
**fault** [5] - 5:20, 6:1, 7:2, 45:1, 62:23
**favor** [1] - 66:1
**features** [5] - 37:24, 37:25, 38:1, 59:14, 96:23
**February** [6] - 42:17, 46:12, 47:10, 71:4, 96:3, 96:10
**federal** [2] - 55:11, 56:2
**Federal** [4] - 4:17, 52:15, 62:4, 71:15
**FEDERAL** [2] - 1:23, 110:22
**feedback** [1] - 86:20
**fellow** [2] - 20:13, 21:5
**felt** [5] - 79:12, 81:24, 82:11, 85:20, 107:18
**few** [3] - 20:10, 64:15, 72:1
**field** [5] - 36:20, 37:6, 47:6, 50:23, 52:12
**Figure** [1] - 38:10
**figure** [6] - 41:6, 44:15, 44:17, 84:2, 90:1, 90:13
**figuring** [2] - 7:17, 81:18
**file** [2] - 43:9, 52:2
**filed** [9] - 9:6, 28:22, 28:24, 42:16, 56:13, 62:15, 95:18, 95:23, 96:9
**files** [1] - 7:1
**final** [1] - 28:14
**finally** [7] - 27:8, 27:24, 37:8, 41:19, 48:19, 50:20, 65:3
**financial** [1] - 86:21
**fine** [3] - 9:3, 10:10, 13:2
**finish** [1] - 100:17
**FINNEGAN** [1] - 2:14
**Finnegan** [1] - 4:11
**Finnegan's** [1] - 91:2
**firm** [4] - 4:11, 15:23, 30:10, 91:2
**firms** [1] - 63:23
**first** [41] - 8:24, 9:2, 10:19, 20:11, 26:13, 28:20, 28:24, 28:25, 41:15, 41:19, 46:8, 48:6, 49:7, 49:11, 50:4, 52:14, 53:5, 53:9, 54:6, 54:16, 56:18, 57:8, 57:15, 58:4, 66:13, 66:20, 78:5, 86:18, 96:3, 97:21, 98:3, 98:7, 98:9, 98:14, 98:23, 99:12, 103:11, 103:15, 104:7
**fiscal** [1] - 86:24
**fists** [1] - 6:25
**fit** [1] - 73:6
**fits** [1] - 32:18
**five** [10] - 5:8, 63:6, 64:23, 64:25, 72:16, 78:11, 84:19, 99:4, 99:10, 108:17
**flights** [1] - 54:17
**FLOOR** [1] - 2:10
**focus** [1] - 31:4
**focused** [3] - 30:13, 40:8, 73:1
**focuses** [1] - 70:13
**focusing** [3] - 46:2, 46:13, 85:5
**follow** [7] - 15:3, 22:19, 22:20, 82:14, 83:16, 84:4, 109:18
**follow-up** [3] - 82:14, 83:16, 84:4
**following** [3] - 7:1, 7:15, 83:15
**follows** [1] - 6:4
**footnote** [1] - 4:20
**FOR** [3] - 3:14, 110:8, 110:9
**FOREGOING** [1] - 110:11
**forget** [1] - 19:19
**forgot** [1] - 101:5
**FORM** [1] - 110:13
**form** [2] - 24:19, 37:14
**former** [6] - 60:5, 60:7, 64:17, 81:15, 93:3, 108:9
**forms** [1] - 21:4
**forth** [2] - 35:20, 101:3
**FORTH** [1] - 110:12
**forward** [3] - 45:3, 51:6, 98:13
**foundation** [1] - 70:2
**founded** [4] - 30:7, 40:5, 40:7, 40:12
**founders** [1] - 33:10
**four** [15] - 36:17, 37:18, 39:21, 48:5, 53:3, 60:15, 68:7, 74:15, 77:4, 88:12, 89:15, 89:16, 104:6, 104:25
**fourth** [1] - 9:14
**Fox** [2] - 43:19, 44:25
**Fox-Ivey** [2] - 43:19, 44:25
**FRA** [3] - 63:25, 65:2, 94:4
**Frakes** [2] - 60:4
**frame** [1] - 6:21
**framers** [1] - 33:10
**Francois** [1] - 54:21
**free** [1] - 14:8
**freight** [4] - 29:13, 73:6, 74:21, 81:9
**friends** [2] - 52:7, 63:11
**front** [3] - 73:25, 74:1, 104:17
**full** [5] - 34:8, 67:2, 75:22, 84:19, 106:7
**full-blown** [1] - 84:19
**fully** [3] - 73:22, 75:21, 106:17
**Fully** [1] - 74:6
**fun** [1] - 99:7
**functionality** [2] - 66:13, 88:21
**fundamental** [1] - 12:9
**FURTHER** [1] - 110:14
**FY21** [1] - 87:19

**G**

**gain** [1] - 22:12
**garden** [1] - 18:3
**Gary** [6] - 31:14, 64:7, 64:19, 66:22, 67:3, 67:23
**GARY** [1] - 3:16
**gas** [1] - 68:25
**gathering** [1] - 35:23
**general** [2] - 8:20, 89:21
**generally** [3] - 84:11, 85:6, 96:24
**generates** [1] - 36:23
**generating** [2] - 13:19, 58:12
**generations** [1] - 77:22
**generators** [1] - 70:3
**gentlemen** [7] - 29:8, 30:20, 41:24, 43:24, 46:1, 48:6, 51:5
**Georgia** [1] - 60:5
**given** [6] - 14:15, 17:22, 23:4, 24:21, 25:9, 65:15
**global** [2] - 30:3, 30:13
**globe** [2] - 54:16, 54:18
**gonna** [51] - 8:10, 9:3, 11:10, 11:23, 13:25, 15:19, 26:6, 31:3, 31:16, 31:18, 31:19, 32:1, 32:7, 32:20, 32:21, 32:22, 34:9, 34:10, 35:19, 36:13, 36:20, 37:7, 39:2, 39:11, 42:10, 43:20, 44:5, 44:24, 45:6, 46:1, 46:13, 46:17, 46:21, 47:6, 48:5, 48:22, 49:7, 49:8, 49:10, 49:11, 49:19, 50:2, 50:4, 50:11, 50:14, 50:17, 50:20, 50:23, 80:7, 89:2
**Google** [2] - 60:7
**government** [6] - 37:14, 55:11, 55:20, 56:3, 62:4, 63:25
**governmental** [1] - 68:7
**gradient** [2] - 37:3, 37:5
**grant** [1] - 23:25
**granted** [2] - 37:14, 39:19
**granting** [1] - 24:1
**grants** [1] - 33:19
**grateful** [1] - 66:5
**gray** [2] - 57:17, 57:24
**great** [4] - 54:2, 54:3, 108:10, 109:17
**greenhouse** [1] - 68:25
**ground** [3] - 58:7, 69:25, 77:6
**group** [4] - 68:1, 70:13, 81:11, 81:17
**grown** [3] - 55:6, 68:8, 68:10
**guarantees** [1] - 90:14
**guess** [3] - 18:17, 48:2, 77:9
**guys** [1] - 65:5

**H**

**Habel** [5] - 43:22, 55:1, 63:3, 91:3, 91:6
**half** [6] - 31:23, 50:25, 68:23, 73:16, 75:2, 76:19
**hand** [8] - 13:23, 20:2, 34:7, 34:12, 42:4, 60:10, 66:24, 74:10
**handful** [1] - 31:8
**handle** [3] - 4:22, 34:4, 109:4
**handled** [1] - 81:14
**handles** [1] - 31:12
**handwritten** [1] -

82:23
**harbors** [1] - 30:11
**hard** [4] - 29:19, 38:4, 38:5, 42:14
**hardware** [9] - 12:19, 32:23, 41:2, 43:5, 46:18, 50:8, 50:11, 50:13, 76:3
**headquartered** [1] - 68:11
**headquarters** [1] - 30:8
**hear** [16] - 6:12, 9:19, 12:7, 19:5, 22:5, 25:2, 31:3, 32:7, 36:13, 43:20, 44:5, 45:6, 63:15, 65:12, 65:13, 99:8
**heard** [11] - 8:16, 17:13, 17:18, 33:8, 54:1, 54:2, 56:20, 58:20, 63:24, 64:1, 99:3
**hearing** [2] - 23:16, 31:17
**Hebert** [3] - 54:21, 55:1, 59:25
**help** [13] - 14:20, 14:21, 16:21, 23:5, 25:12, 26:15, 29:11, 63:2, 63:5, 63:7, 63:17, 66:3, 104:13
**helps** [1] - 38:23
**HENDERSON** [1] - 2:14
**HEREBY** [1] - 110:10
**HEREINBEFORE** [1] - 110:11
**hi** [2] - 85:4, 85:6
**hi-rail** [2] - 85:4, 85:6
**high** [9] - 35:17, 36:9, 38:5, 68:9, 73:2, 75:22, 77:1, 85:7, 88:20
**high-end** [1] - 68:9
**high-speed** [1] - 77:1
**higher** [2] - 15:25, 26:24
**highlighted** [2] - 83:4, 106:9
**highlighting** [1] - 106:9
**highly** [2] - 6:11, 15:24
**himself** [1] - 59:25
**hire** [1] - 107:25
**hired** [3] - 64:18, 81:13, 93:3
**hiring** [1] - 93:8
**history** [1] - 31:18
**Honor** [37] - 4:10, 5:3, 5:6, 5:14, 6:9, 6:15, 7:3, 8:2, 8:16, 8:18, 9:7, 9:13, 12:8, 13:15, 13:18, 29:6, 51:11, 66:14, 66:21, 67:11, 67:17, 88:25, 90:21, 91:12, 91:14, 91:19, 93:19, 97:13, 100:15, 100:18, 102:1, 102:5, 105:18, 108:13, 108:15, 109:9, 109:11
**honor** [2] - 31:9, 51:7
**HONORABLE** [1] - 1:4
**hook** [1] - 50:18
**hope** [1] - 40:20
**hopefully** [1] - 72:8
**hose** [1] - 18:3
**hour** [3] - 50:25, 73:5, 77:2
**hours** [1] - 6:8
**huddled** [1] - 63:13
**huge** [1] - 72:5
**human** [3] - 58:19, 59:11, 107:6
**humble** [1] - 30:6
**husband's** [1] - 59:19

**I**

**idea** [4] - 26:11, 81:20, 83:23, 91:1
**identify** [4] - 37:24, 39:7, 71:20, 87:21
**identifying** [3] - 7:16, 90:25, 91:6
**ignore** [3] - 18:17, 18:20, 20:5
**ignored** [3] - 45:21, 45:22, 48:17
**illustrate** [1] - 25:19
**image** [7] - 58:4, 58:5, 58:6, 58:8, 58:10, 58:13, 75:20
**Image** [2] - 47:16, 47:17
**images** [5] - 57:20, 58:3, 59:6, 59:14, 75:17
**imagine** [3] - 62:16, 63:8, 64:24
**immediately** [2] - 22:25, 84:3
**immune** [1] - 44:21
**impartial** [1] - 22:17
**impeach** [2] - 98:14, 98:19
**impeaching** [1] - 98:12
**impeachment** [1] - 98:15
**implication** [1] - 5:21
**important** [23] - 14:14, 20:1, 20:8, 22:20, 29:11, 31:20, 33:11, 39:12, 39:17, 45:5, 45:6, 51:18, 59:23, 72:3, 74:25, 75:10, 78:2, 78:5, 84:17, 85:24, 94:17, 100:7, 106:25
**impression** [6] - 82:18, 83:10, 84:23, 85:9, 106:13, 106:15
**improper** [2] - 17:2, 22:13
**improve** [3] - 35:7, 35:11, 38:24
**IN** [1] - 110:8
**inaccurate** [1] - 22:14
**inappropriate** [3] - 6:11, 10:21, 13:11
**INC** [2] - 1:6, 1:9
**Inc** [4] - 4:5, 70:19, 70:20
**include** [11] - 46:18, 46:19, 50:12, 61:14, 74:8, 78:21, 89:18, 89:20, 89:21
**included** [6] - 12:18, 46:24, 50:8, 50:10, 60:20, 69:18
**includes** [1] - 20:23
**including** [7] - 9:17, 10:2, 21:2, 21:7, 22:3, 32:5, 103:23
**incomplete** [1] - 22:14
**incorporate** [4] - 77:18, 80:17, 80:25, 103:21
**incorporated** [1] - 86:20
**incorrect** [1] - 11:13
**increasing** [3] - 35:12, 35:13, 106:5
**INDEX** [1] - 3:2
**indication** [1] - 24:2
**indirectly** [2] - 48:10, 48:11
**individual** [4] - 79:14, 80:1, 84:25, 101:14
**individually** [1] - 102:23
**induced** [1] - 6:16
**industries** [1] - 68:21
**industry** [9] - 53:9, 53:14, 54:2, 54:20, 59:1, 71:9, 72:10, 77:13, 108:3
**influenced** [4] - 15:5, 17:3, 22:13, 23:12
**influencing** [1] - 44:3
**information** [21] - 4:16, 5:16, 6:6, 10:14, 20:18, 22:12, 22:14, 22:18, 22:24, 23:20, 25:19, 34:5, 34:18, 35:15, 37:8, 41:13, 72:7, 88:7, 93:9, 94:14, 107:7
**Infrastructure** [1] - 45:24
**infrastructure** [3] - 30:14, 68:17, 68:18
**infringe** [9] - 28:23, 51:21, 53:13, 59:5, 60:12, 60:18, 63:14, 63:18, 95:19
**infringed** [9] - 27:3, 45:17, 47:3, 48:6, 48:10, 48:11, 51:20, 60:17
**infringement** [28] - 7:7, 7:17, 11:7, 27:3, 27:17, 28:25, 33:24, 33:25, 44:22, 45:19, 46:4, 46:11, 47:20, 47:22, 47:24, 48:15, 48:21, 48:24, 50:16, 50:19, 51:23, 60:14, 60:16, 63:1, 91:1, 95:2, 95:6
**infringements** [1] - 6:16
**infringer** [2] - 29:21, 40:1
**infringes** [3] - 47:7, 48:2, 48:3
**infringing** [16] - 7:9, 41:24, 44:18, 45:20, 45:21, 45:23, 45:25, 47:24, 48:14, 48:17, 48:18, 58:12, 62:18, 63:10, 91:7, 95:9
**initial** [2] - 80:3, 80:4
**innovation** [2] - 29:20, 69:21
**innovations** [2] - 43:12, 70:6
**INO** [3] - 54:11, 54:21, 54:23
**inquiry** [1] - 6:22
**inside** [1] - 76:4
**insights** [2] - 93:10, 93:12
**insofar** [2] - 24:15, 24:24
**inspect** [1] - 54:14
**inspected** [1] - 48:1
**inspecting** [8] - 32:24, 33:3, 54:13, 55:4, 64:3, 72:2, 92:2
**Inspection** [1] - 74:6
**inspection** [24] - 29:9, 29:16, 31:11, 31:20, 35:8, 35:21, 35:23, 36:1, 36:5, 36:8, 40:3, 40:19, 41:8, 49:12, 52:8, 70:10, 70:12, 70:14, 71:8, 72:7, 72:25, 73:8, 84:24, 107:2
**Instagram** [1] - 21:3
**install** [1] - 85:23
**installation** [5] - 80:8, 80:17, 85:21, 85:22, 89:23
**installed** [2] - 60:22, 61:17
**instance** [1] - 98:7
**instantly** [1] - 63:14
**instead** [2] - 24:15, 64:9
**Institute** [1] - 54:8
**instruct** [2] - 14:18, 16:12
**instructed** [3] - 6:9, 17:6, 17:9
**instruction** [3] - 14:10, 21:17, 58:22
**Instruction** [1] - 14:17
**INSTRUCTIONS** [1] - 3:8
**instructions** [16] - 14:1, 14:6, 14:9, 14:19, 14:23, 14:24, 15:9, 20:16, 26:13, 28:14, 28:16, 47:10, 48:13, 58:19, 109:5
**integrated** [1] - 75:21
**intelligence** [10] - 44:14, 53:14, 53:15, 53:19, 53:23, 58:23, 97:7, 97:10, 97:12, 97:18
**intend** [4] - 6:18, 7:21, 8:19, 8:23
**intended** [2] - 16:21, 87:21
**intensity** [4] - 36:19, 58:4, 58:9
**interacted** [1] - 80:22
**interest** [3] - 19:8, 76:13, 80:1
**interested** [9] - 5:19, 6:20, 43:23, 79:12, 79:13, 79:17, 81:18, 83:24, 109:19

**internal** [2] - 64:15, 87:17
**International** [1] - 69:5
**international** [2] - 30:15, 68:18
**Internet** [3] - 21:1, 21:21, 21:25
**interpret** [1] - 16:22
**interrogatories** [1] - 24:20
**intimidate** [1] - 52:20
**intimidation** [1] - 66:4
**introduce** [1] - 67:22
**introduced** [1] - 28:2
**invalid** [9] - 27:15, 27:20, 49:8, 49:20, 51:22, 51:24, 57:11, 63:19, 66:3
**invalidate** [2] - 56:17, 63:5
**invalidated** [1] - 63:6
**invalidates** [1] - 58:15
**invalidity** [3] - 4:19, 53:2, 57:9
**invent** [3] - 33:6, 36:6, 36:7
**invented** [4] - 29:15, 30:1, 39:23, 42:16
**inventing** [1] - 29:18
**invention** [8] - 32:21, 32:23, 33:21, 33:22, 35:5, 49:23, 49:24
**inventions** [2] - 29:22, 75:7
**inventor** [6] - 29:25, 32:9, 32:12, 34:12, 44:1, 57:2
**inventors** [1] - 33:15
**inventory** [4] - 35:15, 39:14, 75:9
**invest** [1] - 69:20
**invested** [1] - 70:4
**investigation** [2] - 21:22, 22:11
**investment** [2] - 78:4, 87:12
**invoices** [1] - 50:7
**involved** [7] - 6:3, 21:9, 22:3, 26:2, 61:20, 69:23, 108:8
**involves** [3] - 20:18, 25:24, 37:3
**involving** [1] - 30:10
**iPhone** [3] - 47:14, 58:5, 59:17
**irrelevant** [7] - 5:15, 6:7, 7:3, 8:8, 10:5, 11:9, 50:1
**IRVINE** [1] - 2:11
**IS** [1] - 110:14
**issue** [16] - 10:7, 10:19, 10:21, 11:5, 11:9, 11:13, 11:22, 12:24, 32:6, 32:9, 34:2, 34:24, 72:17, 91:1, 107:8, 107:19
**issued** [4] - 5:24, 34:16, 49:9, 62:15
**issues** [17] - 8:7, 8:13, 9:5, 11:10, 15:19, 20:18, 24:6, 26:1, 26:21, 26:22, 26:23, 36:3, 71:19, 71:24, 108:20, 109:4, 109:7
**it'll** [2] - 44:16, 59:20
**Item** [1] - 4:3
**itself** [1] - 59:2
**Ivey** [2] - 43:19, 44:25

**J**

**Jacksonville** [2] - 108:7, 108:8
**James** [2] - 4:11, 30:17
**JAMES** [1] - 2:15
**January** [7] - 45:18, 52:14, 62:17, 63:8, 91:5, 95:6, 96:6
**Jean** [1] - 54:21
**Jean-Francois** [1] - 54:21
**JENCY** [1] - 2:18
**Jency** [2] - 4:13, 30:19
**jeopardizes** [1] - 22:21
**job** [2] - 109:17, 109:20
**John** [1] - 54:9
**joining** [1] - 71:25
**joint** [1] - 75:9
**JOSEPH** [1] - 2:6
**Joseph** [1] - 4:8
**jot** [1] - 14:7
**Journal** [3] - 68:25, 69:4, 69:8
**JUDGE** [1] - 1:4
**judged** [1] - 25:6
**judgment** [5] - 6:18, 10:13, 12:2, 53:1, 53:2
**July** [13] - 81:7, 81:13, 81:15, 82:6, 82:10, 82:13, 82:15, 82:24, 83:15, 93:3, 93:6, 93:7, 104:20
**June** [6] - 81:12, 84:25, 92:7, 92:10, 92:13, 92:21
**juror** [3] - 21:10, 22:21, 22:24
**jurors** [6] - 13:16, 20:11, 20:13, 21:5, 22:4, 23:13
**jury** [35] - 4:25, 5:5, 7:21, 12:24, 13:1, 13:19, 13:21, 13:24, 14:1, 14:7, 14:17, 14:18, 14:24, 20:10, 20:19, 21:13, 22:17, 23:7, 23:16, 23:17, 26:8, 26:12, 34:4, 57:7, 66:11, 66:18, 67:14, 67:22, 71:9, 71:20, 98:18, 109:2, 109:5, 109:15, 109:18
**Jury** [1] - 13:22

**K**

**Kansas** [2] - 71:23, 79:6
**KCS** [1] - 71:25
**keep** [16] - 14:22, 20:11, 23:6, 23:20, 23:23, 24:4, 24:9, 28:3, 28:5, 33:4, 36:6, 39:14, 65:7, 71:4, 100:19, 109:19
**kept** [3] - 33:2, 48:18, 52:15
**key** [5] - 33:17, 64:14, 74:15, 76:5, 88:12
**Keyes** [26] - 8:24, 31:14, 31:15, 31:18, 45:6, 64:8, 64:19, 66:22, 67:3, 67:21, 67:23, 73:14, 75:12, 80:10, 87:15, 88:23, 89:9, 90:6, 90:17, 90:22, 91:8, 91:24, 105:16, 105:21, 107:11, 108:12
**KEYES** [1] - 3:16
**kid's** [1] - 59:19
**killer** [2] - 43:2, 43:3
**kind** [4] - 73:3, 78:7, 79:10, 106:4
**kinds** [1] - 17:21
**KNOBBE** [1] - 2:4
**know-how** [1] - 30:24
**knowledge** [3] - 6:17, 7:11, 7:19
**known** [1] - 44:4
**knows** [2] - 60:10, 66:8

**L**

**lack** [2] - 27:23, 41:20
**ladies** [7] - 29:8, 30:20, 41:24, 43:24, 46:1, 48:6, 51:5
**laid** [2] - 56:11, 81:12
**language** [1] - 14:14
**LAQUER** [1] - 2:8
**large** [2] - 71:13, 79:9
**larger** [1] - 77:5
**Larson** [18] - 64:17, 80:21, 81:10, 81:13, 81:17, 85:13, 86:15, 93:3, 93:8, 93:12, 93:20, 93:25, 94:14, 94:18, 105:22, 106:13, 107:25, 108:2
**laser** [9] - 40:2, 53:8, 54:12, 55:3, 55:7, 57:18, 57:25, 62:7, 92:1
**Laser** [1] - 40:13
**lasers** [3] - 53:6, 57:24
**last** [10] - 9:15, 10:1, 13:7, 21:11, 31:5, 34:9, 69:17, 101:7, 104:14, 107:25
**launched** [1] - 42:18
**LAURA** [4] - 1:22, 110:8, 110:20, 110:21
**Laurent** [4] - 54:9, 54:25, 55:1, 65:24
**law** [8] - 4:11, 14:19, 15:3, 17:21, 20:17, 22:2, 28:14
**lawsuit** [18] - 5:22, 6:2, 6:3, 51:19, 52:2, 62:24, 63:2, 63:4, 63:17, 70:20, 95:18, 95:23, 95:25, 96:9, 96:13, 96:17, 96:20
**lawsuits** [2] - 9:6, 9:10
**lawyer** [3] - 18:10, 18:11, 18:12
**lawyers** [13] - 16:11, 16:18, 16:19, 16:23, 16:25, 22:4, 24:5, 24:12, 52:13, 64:11, 73:24, 95:5, 108:19
**lay** [1] - 4:18
**layoffs** [1] - 81:10
**layout** [1] - 81:1
**LCMS** [5] - 40:14, 40:18, 41:2, 41:7, 49:12
**LEA** [26] - 2:5, 3:12, 3:17, 4:7, 11:16, 13:18, 51:11, 51:14, 51:16, 67:11, 91:12, 91:14, 91:17, 91:23, 93:18, 97:17, 98:21, 100:18, 100:21, 100:24, 101:9, 102:1, 102:7, 105:16, 108:15, 109:9
**Lea** [6] - 4:7, 51:16, 92:9, 97:16, 100:4, 102:18
**lea** [6] - 93:5, 103:14, 104:8, 105:22, 106:8, 107:11
**lead** [6] - 7:6, 35:10, 39:16, 60:8, 94:15, 94:23
**leader** [1] - 52:12
**Leading** [1] - 68:9
**leading** [3] - 30:22, 32:18, 54:19
**leads** [1] - 6:6
**leagues** [1] - 40:23
**learn** [4] - 21:22, 56:4, 85:11, 92:8
**learned** [8] - 33:18, 59:9, 85:2, 86:15, 86:18, 92:20, 93:12, 95:24
**learning** [3] - 52:23, 53:21
**lease** [17] - 81:20, 81:21, 81:22, 81:23, 82:10, 82:25, 83:11, 83:23, 85:25, 86:16, 86:23, 87:25, 88:2, 106:6, 107:17, 107:22
**leased** [1] - 79:6
**least** [3] - 6:23, 14:12, 44:11
**leave** [4] - 23:8, 29:1, 66:9, 109:1
**leaves** [1] - 15:23
**Lee** [2] - 83:18, 86:10
**left** [7] - 23:9, 34:12, 42:4, 57:24, 62:1, 74:10, 75:19
**left-hand** [3] - 34:12, 42:4, 74:10
**legal** [4] - 21:16, 44:9, 44:10, 97:3
**length** [3] - 8:23, 23:24, 39:11
**less** [3] - 64:22, 93:13, 105:8
**letter** [15] - 45:18, 45:22, 52:14, 52:16, 62:17, 63:9, 63:13,

90:24, 91:2, 91:4, 91:5, 95:5, 95:9, 95:15, 96:7
**letters** [5] - 52:13, 52:16, 52:19, 64:12, 64:16
**license** [4] - 12:13, 62:13, 71:5, 104:12
**licensed** [5] - 11:18, 11:25, 12:12, 32:13, 46:23
**LiDAR** [1] - 74:13
**lieu** [1] - 24:17
**life** [3] - 33:21, 34:2, 59:16
**light** [4] - 18:7, 19:14, 57:18, 58:6
**lights** [1] - 58:1
**likely** [1] - 87:8
**limitation** [3] - 47:7, 50:24
**limitations** [2] - 37:16, 50:21
**limited** [4] - 17:9, 17:10, 21:2, 33:14
**line** [11] - 4:21, 5:17, 6:4, 6:7, 10:15, 10:20, 10:24, 40:10, 42:3, 54:25, 109:6
**lines** [4] - 76:21, 98:2, 98:16, 102:2
**LinkedIn** [1] - 21:3
**List** [1] - 69:18
**list** [8] - 5:19, 5:23, 6:24, 13:19, 16:17, 43:23, 70:25, 71:3
**listed** [2] - 80:14, 96:4
**listen** [3] - 14:21, 21:18, 99:18
**litigating** [1] - 11:6
**live** [3] - 24:17, 24:18, 71:3
**lives** [1] - 29:14
**LLP** [1] - 2:4
**load** [1] - 12:20
**local** [2] - 4:13, 69:9
**located** [2] - 30:8, 52:1
**location** [1] - 39:11
**lodge** [1] - 14:13
**logo** [2] - 40:7, 40:9
**long-time** [1] - 92:4
**look** [19] - 4:16, 4:17, 6:24, 34:1, 34:2, 35:2, 38:10, 41:13, 42:3, 51:6, 57:12, 64:13, 72:22, 73:15, 75:19, 90:22, 92:21, 98:14, 101:24
**looked** [6] - 57:15, 60:11, 84:9, 84:13, 84:14, 90:25
**looking** [5] - 7:16, 36:7, 37:10, 88:18, 90:6
**looks** [1] - 74:24
**Los** [1] - 69:1
**LOS** [4] - 1:16, 1:24, 4:1, 110:4
**losing** [5] - 87:5, 87:6, 90:7, 90:8, 90:23
**lost** [2] - 49:1, 52:10
**love** [1] - 78:24
**loved** [2] - 59:19, 107:19
**loves** [2] - 32:15, 32:16
**low** [5] - 38:4, 54:4, 64:21, 65:10, 93:25
**Lowell** [1] - 55:13
**lower** [4] - 65:20, 74:10, 74:14, 77:4
**LRAIL** [36] - 40:3, 40:20, 42:6, 42:20, 45:12, 45:14, 45:23, 45:25, 46:12, 46:20, 48:8, 48:12, 49:4, 49:15, 52:17, 57:1, 57:3, 57:15, 61:5, 65:19, 65:20, 65:21, 85:2, 85:15, 86:19, 90:8, 90:15, 92:8, 92:12, 92:20, 92:24, 93:9, 93:12, 93:25, 95:12
**LRAILs** [4] - 41:16, 41:17, 46:5, 46:6
**luck** [1] - 41:23

**M**

**machine** [1] - 53:21
**mad** [1] - 64:7
**magazine** [1] - 31:5
**magic** [1] - 12:15
**magically** [1] - 11:24
**main** [2] - 76:21, 88:12
**MAIN** [1] - 2:9
**Maintenance** [1] - 83:19
**maintenance** [4] - 75:5, 78:6, 78:13, 78:22
**major** [6] - 52:10, 53:25, 54:8, 63:23, 77:15, 89:14
**maker** [1] - 83:18
**makers** [1] - 83:16
**man** [1] - 43:19
**management** [2] - 77:17, 89:23
**manner** [2] - 19:7, 48:14
**manual** [1] - 88:17
**map** [2] - 36:24, 36:25
**March** [3] - 12:18, 46:5, 79:10
**MARK** [1] - 1:4
**mark** [1] - 89:1
**market** [8] - 40:21, 42:6, 52:23, 77:7, 77:10, 101:13, 101:22, 102:8
**marketed** [6] - 100:2, 100:5, 100:8, 100:10, 101:10, 101:12
**marketing** [7] - 41:21, 42:23, 100:3, 100:6, 100:9, 101:10, 108:8
**Marketing** [1] - 43:21
**marketplace** [3] - 52:18, 64:10, 93:11
**markup** [1] - 89:13
**MARTENS** [1] - 2:4
**Massachusetts** [5] - 41:1, 41:3, 41:5, 41:16, 55:12
**match** [1] - 50:21
**material** [1] - 8:19
**materials** [2] - 21:21, 57:3
**Mathew** [2] - 4:13, 30:19
**MATHEW** [1] - 2:18
**matter** [2] - 21:14, 48:4
**matters** [1] - 65:2
**MATTERS** [1] - 3:6
**mean** [16] - 12:22, 32:15, 43:3, 56:16, 69:23, 72:4, 76:1, 78:3, 78:24, 85:19, 86:18, 87:7, 88:17, 89:25, 90:9, 108:2
**MEANS** [1] - 110:13
**means** [11] - 15:7, 15:15, 15:22, 18:21, 20:25, 36:21, 37:7, 39:2, 52:17, 76:2, 83:6
**meant** [1] - 87:9
**meantime** [1] - 34:5
**meanwhile** [2] - 42:14, 43:7
**measure** [2] - 57:19, 58:1
**measured** [1] - 37:25
**Measurement** [1] - 40:13
**measuring** [2] - 58:6, 58:7
**media** [4] - 21:4, 21:8, 21:18, 22:5
**meet** [1] - 109:12
**meeting** [4] - 55:19, 82:7, 86:5
**meetings** [7] - 55:18, 55:21, 55:23, 55:25, 56:5, 83:14, 96:12
**meets** [1] - 37:13
**members** [4] - 14:17, 21:8, 56:3, 108:9
**memory** [4] - 16:24, 19:6, 23:11, 23:12
**men** [2] - 54:25, 63:13
**mention** [4] - 11:14, 94:10, 95:15, 99:24
**mentioned** [14] - 28:22, 58:24, 62:19, 70:12, 73:9, 74:22, 76:5, 76:7, 79:8, 82:6, 87:24, 88:8, 99:12, 104:8
**mentioning** [1] - 10:3
**menu** [6] - 80:5, 103:1, 103:3, 103:6, 103:19, 103:20
**merged** [2] - 58:8, 58:14
**merits** [1] - 20:23
**Mesher** [20] - 6:23, 32:7, 32:8, 32:10, 32:13, 32:19, 33:6, 34:13, 35:1, 35:5, 36:4, 36:11, 38:7, 38:15, 39:23, 42:14, 43:24, 49:24, 57:2, 79:9
**mesher** [1] - 96:25
**Mesher's** [4] - 35:19, 43:7, 43:12, 43:17
**messaging** [1] - 21:1
**met** [3] - 54:21, 79:10, 92:7
**method** [1] - 48:11
**mid** [1] - 81:12
**mid-June** [1] - 81:12
**might** [10] - 5:18, 7:13, 9:5, 18:18, 35:10, 43:23, 57:4, 59:8, 61:11, 103:7
**miles** [14] - 31:24, 39:14, 72:16, 73:5, 76:19, 77:2, 77:3, 77:4, 77:5, 79:8, 85:6, 85:8
**military** [2] - 108:9, 108:10
**MILLER** [3] - 1:22, 110:20, 110:21
**million** [9] - 78:20, 80:16, 103:13, 103:16, 104:1, 104:5, 104:20, 105:11
**mind** [8] - 7:3, 7:5, 7:11, 20:11, 28:3, 28:5, 45:2, 51:12
**minimize** [1] - 7:17
**minimum** [2] - 23:24, 24:5
**minute** [1] - 66:7
**minutes** [3] - 5:12, 55:19, 108:17
**misleading** [6] - 5:15, 8:8, 10:5, 10:22, 11:9, 22:14
**mistake** [1] - 49:9
**mistakes** [3] - 19:19, 56:21, 107:8
**mistrial** [1] - 22:22
**mitigation** [1] - 69:1
**Mixed** [2] - 47:16
**model** [1] - 39:1
**modifications** [1] - 80:8
**modifying** [2] - 80:24, 84:9
**moment** [5] - 26:2, 28:18, 29:3, 51:11, 53:16
**momentarily** [1] - 13:20
**monetary** [1] - 48:20
**money** [5] - 29:18, 33:24, 48:20, 48:23, 88:11
**month** [2] - 45:22, 45:24
**months** [5] - 43:9, 64:11, 64:15, 72:1, 86:25
**Morellas** [7] - 36:20, 37:6, 37:15, 39:1, 47:5, 48:1, 50:22
**morning** [10] - 4:7, 4:9, 4:10, 4:15, 5:7, 5:11, 17:25, 24:5, 108:18, 109:14
**Moss** [2] - 83:18, 86:10
**most** [10] - 31:6, 56:1, 70:17, 74:25, 75:10, 78:5, 104:13, 105:14, 107:5, 108:23
**Most** [1] - 69:18
**mostly** [1] - 74:17
**motion** [1] - 6:18

**motivation** [1] - 77:24
**motto** [3] - 30:22, 32:18, 68:9
**mounted** [4] - 74:23, 77:1, 85:4, 85:15
**mounting** [1] - 85:4
**move** [4] - 14:4, 67:5, 88:25, 101:2
**moved** [4] - 36:2, 53:14, 59:1, 59:2
**moving** [2] - 26:12, 38:5
**MR** [49] - 3:11, 3:17, 4:10, 5:3, 5:6, 5:14, 6:15, 8:2, 8:4, 8:16, 8:18, 9:7, 9:13, 9:24, 10:1, 10:11, 11:2, 11:6, 11:15, 12:8, 13:7, 13:15, 29:3, 29:6, 29:8, 51:2, 51:5, 66:14, 66:21, 67:4, 67:7, 67:17, 67:20, 74:7, 87:14, 88:25, 89:4, 89:8, 90:5, 90:21, 91:8, 91:19, 97:13, 100:15, 102:5, 105:18, 105:20, 108:12, 109:11
**MS** [25] - 3:12, 3:17, 4:7, 11:16, 13:18, 51:11, 51:14, 51:16, 67:11, 91:12, 91:14, 91:17, 91:23, 93:18, 97:17, 98:21, 100:18, 100:21, 100:24, 101:9, 102:1, 102:7, 105:16, 108:15, 109:9
**multiple** [4] - 8:12, 74:8, 84:6, 87:23
**must** [17] - 15:3, 15:4, 15:7, 15:15, 15:22, 17:6, 17:11, 18:6, 18:17, 18:20, 18:22, 20:15, 20:17, 21:13, 26:22, 26:23
**MY** [1] - 110:15

**N**

**name** [12] - 30:17, 40:7, 40:9, 43:20, 51:16, 54:11, 67:2, 67:23, 97:9, 100:11, 101:14, 101:16
**named** [3] - 31:5, 32:12, 43:19
**NASA** [1] - 56:3
**National** [8] - 54:7, 65:4, 71:22, 78:11, 78:18, 78:23, 94:7, 99:1
**Navy** [3] - 108:4, 108:5, 108:7
**necessarily** [2] - 20:7, 98:12
**necessary** [2] - 23:15, 48:23
**need** [19] - 14:7, 15:19, 28:3, 35:11, 37:23, 45:1, 45:20, 61:6, 62:11, 71:14, 72:8, 76:2, 83:25, 84:2, 89:4, 100:25, 103:5, 109:7, 109:14
**needed** [9] - 35:16, 41:10, 42:11, 43:6, 46:20, 80:24, 82:11, 103:2, 103:9
**needs** [6] - 61:15, 71:14, 73:3, 82:3, 86:4, 90:12
**negotiate** [1] - 108:1
**negotiated** [1] - 14:14
**negotiating** [1] - 45:4
**negotiations** [4] - 45:8, 78:25, 79:7
**neighborhood** [1] - 37:4
**Network** [1] - 60:6
**network** [11] - 44:14, 44:16, 44:21, 47:2, 48:9, 53:18, 53:20, 59:24, 60:2, 60:9, 60:11
**networks** [6] - 44:5, 44:6, 47:19, 53:15, 53:19, 54:24
**Neural** [1] - 60:6
**neural** [16] - 44:5, 44:6, 44:14, 44:16, 44:21, 47:2, 47:18, 48:9, 53:18, 53:19, 53:20, 54:24, 59:24, 60:2, 60:9, 60:11
**neuro** [1] - 53:15
**never** [12] - 62:19, 96:13, 96:16, 96:19, 100:2, 100:5, 100:14, 101:10, 101:18, 101:21, 102:13, 102:24
**NEW** [1] - 2:20
**new** [11] - 29:15, 29:18, 32:2, 36:12, 36:14, 36:15, 38:15, 40:21, 44:3, 70:1, 84:11
**news** [1] - 21:18
**Newsweek** [2] - 31:5, 69:18
**next** [14] - 6:1, 9:14, 10:11, 13:6, 38:14, 44:2, 45:22, 57:13, 57:21, 65:17, 74:11, 81:5, 107:11
**NICHOLAS** [2] - 2:7, 2:17
**Nick** [3] - 4:8, 4:13, 30:19
**night** [2] - 18:2, 109:13
**NO** [1] - 1:8
**nobody** [6] - 33:22, 37:20, 42:8, 44:15, 44:16, 44:18
**none** [5] - 8:5, 19:1, 41:22, 60:17, 109:9
**nonetheless** [1] - 48:1
**noninfringement** [7] - 4:19, 4:24, 27:23, 50:3, 50:4, 53:1, 66:2
**Norfolk** [1] - 71:22
**North** [6] - 31:24, 71:12, 76:16, 76:20, 77:12
**notation** [1] - 10:15
**note** [1] - 23:8
**NOTES** [1] - 110:15
**notes** [13] - 14:8, 23:5, 23:6, 23:9, 23:10, 23:11, 23:13, 82:19, 82:23, 83:1, 83:8
**nothing** [3] - 32:16, 50:15, 62:24
**notice** [8] - 10:18, 11:1, 11:18, 11:20, 12:3, 45:19, 46:3, 48:16
**notify** [2] - 21:9, 22:25
**November** [5] - 86:3, 86:8, 86:11, 89:11, 89:17
**nowhere** [1] - 94:10
**number** [5] - 20:7, 23:23, 34:8, 79:5, 83:16
**numbers** [3] - 34:9, 67:6, 78:19
**NW** [1] - 2:20

**O**

**oath** [5] - 15:9, 22:9, 22:19, 24:11, 24:22
**object** [2] - 17:1, 18:12
**objected** [1] - 67:5
**objection** [13] - 9:14, 10:11, 13:6, 13:7, 17:3, 18:13, 18:15, 18:16, 67:9, 67:11, 91:18, 97:13, 102:4
**objections** [3] - 5:8, 14:13, 16:25
**objective** [2] - 35:14, 36:8
**objects** [2] - 9:16, 10:12
**obtained** [1] - 26:3
**obvious** [4] - 49:12, 49:16, 58:16, 63:19
**obviously** [6] - 7:24, 12:22, 14:8, 72:4, 72:15, 107:1
**obviousness** [4] - 49:18, 57:11, 63:7, 66:3
**occurred** [1] - 47:22
**ocean** [1] - 30:10
**oceans** [1] - 69:6
**October** [8] - 10:15, 12:12, 43:19, 64:15, 85:13, 93:21, 95:1, 105:25
**odd** [1] - 44:22
**OF** [12] - 1:1, 1:2, 1:14, 2:1, 2:3, 2:13, 110:2, 110:4, 110:6, 110:9, 110:13, 110:15
**offer** [7] - 46:7, 46:8, 46:10, 49:20, 76:11, 106:12
**offered** [14] - 26:18, 27:22, 27:25, 47:22, 76:15, 102:16, 102:19, 102:21, 102:22, 102:24, 103:13, 103:16, 103:25, 104:4
**offering** [1] - 48:7
**offerings** [1] - 89:16
**offers** [1] - 18:10
**Office** [12] - 29:19, 32:4, 33:18, 34:17, 34:18, 34:25, 39:20, 49:8, 56:19, 56:21, 56:25, 57:1
**office** [2] - 77:16, 108:7
**Officer** [2] - 32:8, 44:1
**offices** [2] - 30:5, 68:11
**official** [1] - 34:24
**OFFICIAL** [3] - 1:23, 110:8, 110:22
**often** [5] - 19:19, 75:4, 76:22, 77:2, 108:9
**old** [9] - 36:4, 49:12, 53:11, 58:17, 58:18, 60:13, 84:12
**Olenosky** [3] - 92:15, 92:18, 92:20
**OLSON** [1] - 2:4
**Omega** [1] - 4:16
**ON** [2] - 2:3, 2:13
**once** [3] - 71:18, 77:18, 77:22
**one** [53] - 5:18, 15:14, 17:19, 23:9, 24:20, 26:3, 27:10, 31:4, 31:6, 31:8, 36:11, 37:16, 41:2, 43:16, 44:24, 46:12, 47:18, 51:2, 56:22, 57:9, 60:17, 61:22, 63:23, 65:6, 68:25, 69:8, 74:19, 74:25, 75:8, 75:10, 75:19, 76:5, 76:8, 77:3, 77:5, 79:6, 79:8, 83:24, 85:13, 86:23, 86:24, 87:25, 88:1, 91:14, 93:18, 98:8, 103:19, 104:7, 104:9, 106:23
**one's** [1] - 59:19
**ones** [4] - 71:13, 71:21, 78:6, 84:12
**ongoing** [1] - 78:23
**online** [1] - 55:21
**open** [3] - 20:11, 28:3, 28:5
**opening** [15] - 5:7, 5:9, 8:19, 13:9, 14:4, 16:20, 26:14, 28:18, 28:19, 28:20, 29:1, 99:6, 109:17
**OPENING** [1] - 3:10
**operate** [3] - 29:13, 46:23, 73:4
**operates** [1] - 29:16
**operating** [2] - 86:22, 87:8
**operational** [1] - 46:20
**operator** [1] - 45:5
**operators** [7] - 31:21, 31:22, 31:23, 33:2, 33:5, 35:25, 39:13
**opinion** [6] - 15:10, 24:2, 25:4, 25:5, 25:9, 75:10
**opinions** [4] - 5:1, 15:5, 25:3, 25:4
**opportunities** [2] - 69:14, 76:22
**opportunity** [3] - 19:4,

27:8, 27:9
**opposed** [1] - 101:25
**opposing** [1] - 27:7
**Optical** [1] - 54:7
**option** [10] - 27:21, 27:24, 59:18, 81:22, 82:25, 83:11, 104:11, 107:18, 107:22, 107:24
**options** [6] - 101:15, 103:19, 104:6, 104:9, 105:8, 105:13
**order** [8] - 10:13, 18:19, 25:12, 46:7, 61:2, 64:18, 80:24, 103:9
**ordered** [1] - 21:14
**orient** [1] - 42:4
**orientation** [1] - 39:11
**originally** [2] - 40:7, 84:15
**otherwise** [1] - 20:21
**outcome** [1] - 19:8
**outline** [1] - 26:15
**outside** [2] - 22:12, 22:24
**overhanging** [1] - 57:17
**overly** [1] - 23:12
**overrule** [1] - 18:13
**oversees** [1] - 56:8
**overview** [1] - 68:13
**own** [11] - 21:23, 23:11, 42:9, 44:23, 44:24, 49:20, 50:9, 71:13, 71:14, 104:11
**owned** [2] - 69:15
**owner** [1] - 33:19
**owns** [1] - 37:19

**P**

**p.m** [1] - 109:23
**Pacific** [3] - 71:21, 71:23, 71:25
**package** [2] - 102:17, 102:19
**pads** [2] - 66:9, 109:1
**PAGE** [1] - 3:4
**page** [12] - 71:3, 75:14, 75:17, 80:10, 87:20, 88:4, 93:23, 98:1, 98:16, 102:2, 104:17, 106:8
**paid** [1] - 62:13
**pandemic** [1] - 81:8
**paper** [1] - 34:3
**paragraph** [3] - 83:5, 93:24, 107:11
**parameters** [1] - 39:10
**parametric** [1] - 37:25
**Parker** [2] - 4:13, 30:18
**PARKER** [22] - 2:16, 3:17, 66:21, 67:4, 67:7, 67:17, 67:20, 74:7, 87:14, 88:25, 89:4, 89:8, 90:5, 90:21, 91:8, 91:19, 97:13, 100:15, 102:5, 105:18, 105:20, 108:12
**part** [11] - 6:15, 7:12, 11:10, 19:1, 20:4, 38:12, 69:23, 74:14, 75:17, 81:10, 94:17
**participated** [2] - 81:16, 83:20
**particular** [5] - 10:15, 10:23, 32:22, 34:20, 77:18
**particularly** [4] - 8:1, 73:4, 75:4, 106:16
**parties** [17] - 5:4, 5:6, 6:10, 13:5, 13:13, 13:20, 14:10, 22:3, 22:16, 22:19, 24:20, 26:1, 28:7, 28:18, 29:24, 70:20, 71:6
**parties'** [1] - 12:9
**partner** [1] - 63:16
**partnered** [3] - 40:25, 55:10, 55:12
**parts** [2] - 50:20, 76:2
**party** [7] - 15:12, 15:18, 15:20, 15:22, 24:12, 26:16, 28:23
**party's** [1] - 22:7
**Pasadena** [5] - 30:7, 30:16, 68:1, 68:7, 68:12
**passenger** [1] - 29:12
**past** [4] - 9:9, 61:23, 62:2, 99:25
**Patent** [12] - 29:19, 32:4, 33:18, 34:16, 34:18, 34:25, 39:20, 49:8, 56:19, 56:21, 56:25, 57:1
**patent** [60] - 7:1, 7:4, 7:7, 7:9, 7:16, 14:3, 25:25, 26:3, 26:8, 26:10, 33:9, 33:11, 33:19, 33:20, 33:21, 33:23, 34:7, 34:8, 34:10, 34:11, 34:16, 36:17, 37:11, 37:12, 37:14, 37:22, 38:16, 39:18, 42:16, 43:7, 43:9, 43:11, 44:19, 44:21, 45:20, 48:7, 48:12, 48:17, 57:2, 62:18, 63:1, 63:12, 65:12, 91:6, 91:7, 95:1, 95:6, 95:10, 95:15, 95:16, 95:20, 95:22, 96:16, 96:19, 96:23, 97:2, 97:5
**patented** [3] - 49:22, 88:12, 96:22
**patentee** [1] - 30:1
**patenting** [1] - 49:25
**patents** [95] - 5:19, 5:21, 5:23, 5:24, 5:25, 6:5, 6:13, 6:17, 6:21, 6:23, 6:25, 7:11, 7:13, 7:15, 7:16, 7:19, 9:16, 10:2, 10:4, 10:6, 25:25, 27:2, 27:15, 27:20, 28:1, 29:20, 32:4, 32:5, 32:9, 32:12, 34:1, 34:6, 34:12, 34:23, 34:24, 35:1, 35:3, 39:25, 41:25, 43:13, 43:17, 43:23, 44:1, 45:17, 45:21, 47:4, 47:8, 49:8, 49:9, 51:21, 51:22, 51:24, 53:10, 53:17, 53:23, 55:16, 56:12, 56:14, 56:18, 57:5, 57:8, 57:11, 58:15, 58:17, 58:24, 58:25, 60:13, 62:15, 63:5, 63:7, 63:10, 63:19, 63:20, 64:11, 66:3, 70:7, 70:8, 70:9, 70:12, 70:25, 71:3, 71:5, 74:16, 74:18, 94:11, 96:4, 96:13
**pattern** [2] - 6:25, 7:12
**paved** [5] - 32:24, 32:25, 33:4, 40:8, 40:15
**pavement** [3] - 36:5, 40:8, 49:12
**PAVEMETRICS** [1] - 1:6
**Pavemetrics** [129] - 4:5, 4:8, 5:8, 7:25, 9:13, 9:16, 10:11, 10:12, 27:3, 27:12, 27:13, 27:16, 27:22, 27:24, 28:20, 28:22, 29:21, 40:1, 40:4, 40:7, 40:9, 42:5, 42:6, 42:19, 42:22, 43:17, 43:22, 44:3, 44:7, 45:12, 45:13, 46:2, 46:16, 46:25, 47:13, 48:6, 48:10, 48:24, 49:6, 51:17, 51:18, 51:19, 51:25, 52:11, 52:15, 52:17, 52:20, 52:24, 53:5, 53:8, 53:12, 53:13, 53:18, 54:1, 54:4, 54:6, 54:9, 54:10, 54:23, 55:2, 55:3, 55:7, 55:16, 55:22, 56:1, 56:6, 56:9, 56:14, 56:16, 57:1, 57:25, 58:12, 59:1, 59:4, 59:23, 60:1, 60:9, 60:11, 60:21, 61:24, 62:2, 62:8, 62:12, 63:2, 63:3, 63:4, 63:9, 63:12, 63:22, 63:24, 64:2, 64:8, 64:20, 64:21, 65:1, 65:23, 66:2, 85:2, 85:12, 85:14, 90:8, 90:23, 90:24, 91:3, 91:6, 92:4, 92:7, 93:9, 93:24, 93:25, 94:3, 94:11, 94:15, 94:19, 94:23, 95:2, 95:6, 95:9, 95:12, 95:18, 95:23, 96:7, 96:9, 99:7, 106:3, 106:6, 106:10
**Pavemetrics'** [16] - 13:7, 13:8, 27:19, 43:25, 48:20, 49:12, 52:5, 56:23, 58:10, 58:17, 61:22, 63:24, 64:22, 65:10, 65:19, 92:1
**Pavemetrics's** [3] - 56:15, 56:24, 64:6
**pay** [6] - 23:1, 23:3, 29:22, 61:18, 81:24
**paying** [2] - 43:16, 109:16
**people** [8] - 19:19, 19:20, 21:8, 22:3, 42:23, 55:21, 68:10, 81:11
**perceive** [1] - 94:15
**perceived** [3] - 84:5, 86:4, 106:19
**perceiving** [1] - 83:1
**percent** [4] - 64:23, 64:24, 81:10, 104:25
**percentage** [1] - 77:10
**perfectly** [1] - 14:8
**performance** [3] - 81:22, 90:14, 107:23
**performed** [1] - 64:1
**perhaps** [3] - 13:9, 71:25, 72:1
**period** [1] - 84:14
**permission** [2] - 33:23, 37:21
**permitted** [1] - 18:12
**person** [5] - 20:24, 24:14, 24:15, 55:6, 80:21
**personal** [1] - 15:5
**personally** [1] - 17:18
**perspective** [1] - 97:3
**persuaded** [1] - 15:15
**PFAS** [2] - 69:8, 69:24
**PH** [1] - 1:24
**PhD** [2] - 32:10, 54:24
**phone** [2] - 20:24, 80:22
**photos** [1] - 57:23
**physically** [1] - 38:22
**pick** [1] - 38:4
**picking** [1] - 35:22
**picture** [3] - 38:19, 38:20, 39:8
**pictures** [4] - 38:18, 59:20, 92:24, 93:1
**piecemeal** [1] - 28:2
**pioneered** [1] - 53:8
**pioneering** [1] - 54:19
**place** [1] - 46:3
**PLACE** [1] - 110:11
**placed** [1] - 24:11
**plain** [1] - 39:1
**PLAINTIFF** [2] - 1:7, 2:3
**Plan** [1] - 87:19
**plan** [7] - 7:7, 40:20, 44:11, 86:22, 87:8, 87:22, 87:24
**plans** [2] - 75:5, 87:23
**plastics** [1] - 69:6
**Platform** [1] - 74:6
**platform** [3] - 74:19, 77:1, 101:17
**play** [1] - 26:2
**played** [1] - 26:8
**playing** [2] - 28:8, 28:9
**plus** [4] - 80:17, 87:25, 88:2, 103:21
**point** [12] - 6:24, 43:10, 45:13, 47:6, 50:23, 54:6, 57:25, 78:4, 80:21, 85:9
**pointed** [2] - 78:22, 107:11
**pointing** [1] - 106:10
**points** [1] - 54:6

**Port** [2] - 69:1, 69:2
**portion** [6] - 31:11, 37:17, 83:4, 89:1, 90:4, 90:20
**position** [1] - 26:1
**possible** [5] - 22:6, 24:16, 24:25, 91:1, 107:3
**possibly** [2] - 80:2, 86:23
**post** [1] - 50:17
**post-sale** [1] - 50:17
**potential** [4] - 44:9, 45:5, 76:12, 76:17
**potentially** [1] - 85:12
**potholes** [2] - 32:25, 40:15
**power** [1] - 33:13
**practice** [3] - 33:20, 33:22, 39:22
**pre** [4] - 11:18, 12:3, 91:14, 93:18
**pre-admit** [1] - 91:14
**pre-admitted** [1] - 93:18
**pre-notice** [2] - 11:18, 12:3
**predict** [1] - 72:7
**prejudice** [1] - 19:10
**prejudices** [1] - 15:6
**prejudicial** [6] - 5:15, 6:11, 8:8, 10:5, 10:22, 11:4
**PRELIMINARY** [2] - 3:6, 3:8
**preliminary** [3] - 14:1, 14:19, 26:12
**preponderance** [4] - 15:13, 16:1, 16:4, 26:23
**presence** [1] - 18:4
**present** [14] - 6:9, 7:21, 8:19, 12:25, 15:22, 23:17, 27:1, 27:14, 28:7, 55:25, 60:25, 66:11, 66:18, 109:2
**presentation** [2] - 26:16, 87:17
**presentations** [1] - 56:6
**presented** [10] - 15:18, 22:8, 22:18, 24:16, 24:19, 27:11, 28:13, 79:11, 87:18, 88:8
**presenting** [2] - 27:15, 51:6
**presents** [1] - 28:24
**President** [10] - 31:16, 42:22, 43:22, 54:9, 54:22, 55:2, 60:1, 63:3, 64:8, 64:20
**president** [2] - 67:25, 87:19
**PRESIDING** [1] - 1:4
**press** [1] - 21:8
**prestigious** [1] - 31:9
**pretending** [1] - 58:25
**pretty** [7] - 8:18, 9:3, 10:9, 45:1, 99:19, 107:9, 109:15
**prevent** [3] - 69:5, 69:8, 72:22
**preventing** [3] - 65:4, 94:7, 107:13
**preview** [1] - 13:3
**previewing** [2] - 13:1, 13:13
**previously** [3] - 28:22, 87:4, 90:11
**price** [13] - 80:3, 80:13, 84:1, 88:11, 88:14, 88:15, 88:21, 90:15, 104:8, 104:16, 104:19, 105:3, 105:5
**priced** [1] - 80:15
**prices** [1] - 80:5
**primary** [1] - 66:13
**principles** [2] - 14:20, 30:24
**private** [1] - 62:10
**probable** [1] - 15:24
**probative** [1] - 8:1
**problem** [10] - 36:12, 37:22, 40:23, 49:21, 64:9, 64:20, 64:21, 93:24, 106:11, 107:4
**problems** [7] - 30:25, 32:17, 35:6, 44:9, 44:11, 68:6, 72:15
**procedures** [1] - 24:24
**proceed** [5] - 29:6, 51:10, 51:14, 67:18, 91:13
**proceeded** [2] - 46:7, 84:3
**PROCEEDINGS** [3] - 1:14, 3:4, 110:11
**proceedings** [3] - 8:11, 22:22, 109:23
**process** [7] - 14:3, 22:11, 22:15, 22:23, 34:25, 47:1, 80:18
**processed** [1] - 48:9
**processing** [4] - 35:17, 47:17, 106:22
**processor** [2] - 61:11, 61:13
**processors** [1] - 55:9
**procuring** [1] - 80:22
**product** [11] - 40:2, 42:18, 42:20, 42:24, 47:24, 52:8, 54:3, 59:3, 60:22, 65:21, 77:18
**products** [5] - 6:6, 47:23, 64:22, 73:10, 73:13
**professional** [1] - 32:13
**professor** [1] - 60:5
**profile** [1] - 75:23
**profits** [2] - 49:1
**program** [1] - 69:13
**programmer** [2] - 55:23, 59:12
**programmers** [2] - 58:10, 60:8
**programming** [2] - 54:23, 60:8
**programs** [1] - 21:25
**progressing** [1] - 72:22
**progressively** [2] - 72:18, 85:11
**project** [2] - 60:8, 89:23
**projects** [2] - 30:10, 30:11
**promote** [1] - 33:14
**promoting** [2] - 98:3, 99:21
**prompted** [1] - 63:21
**proof** [7] - 16:1, 16:2, 17:17, 17:19, 26:20, 26:24
**properly** [1] - 21:17
**property** [3] - 37:12, 37:13, 39:19
**proposal** [34] - 79:16, 79:22, 79:25, 80:3, 80:4, 80:11, 80:14, 80:19, 82:6, 82:8, 82:10, 82:12, 82:25, 83:11, 84:4, 85:20, 85:25, 86:2, 86:3, 86:8, 86:11, 89:12, 89:17, 98:9, 103:11, 103:15, 103:18, 103:24, 104:3, 104:7, 104:18, 104:19, 104:20, 104:22
**proposals** [7] - 87:1, 98:8, 102:22, 104:6, 105:10, 105:13, 105:15
**proposing** [1] - 5:17
**proposition** [3] - 76:10, 87:3, 90:10
**proprietary** [2] - 74:15, 88:12
**prospective** [1] - 33:16
**protect** [2] - 22:7, 70:6
**protection** [1] - 42:17
**proud** [2] - 30:17, 51:17
**prove** [5] - 48:5, 55:11, 60:14, 62:4, 62:5
**proved** [2] - 13:10, 18:5
**proven** [5] - 15:20, 54:3, 64:6, 65:10, 65:20
**provide** [15] - 18:3, 63:5, 68:13, 73:10, 76:9, 80:7, 81:22, 83:21, 88:7, 88:14, 93:10, 103:12, 104:10, 106:18, 107:22
**provided** [14] - 47:9, 79:16, 79:22, 80:4, 80:5, 86:3, 87:2, 88:11, 94:14, 102:13, 103:1, 104:14, 105:7, 107:17
**provider** [1] - 30:3
**provides** [3] - 64:21, 69:13, 88:21
**providing** [5] - 84:4, 86:11, 90:10, 90:13, 107:24
**proving** [3] - 15:12, 15:21, 28:25
**provision** [1] - 33:12
**prowess** [1] - 8:11
**public** [2] - 8:11, 55:20
**publish** [2] - 43:8, 67:14
**published** [4] - 56:7, 56:9, 57:22, 58:13
**publishes** [1] - 43:10
**publishing** [1] - 43:13
**purchase** [11] - 81:6, 81:19, 82:10, 84:6, 86:16, 103:25, 104:4, 104:7, 105:11, 107:18, 107:22
**purchased** [8] - 45:11, 46:10, 52:7, 52:8, 52:9, 65:18, 88:16
**purchasing** [5] - 82:1, 84:10, 84:23, 90:13
**purported** [1] - 10:6
**purports** [2] - 8:4, 10:14
**purpose** [7] - 17:9, 17:10, 17:12, 18:22, 23:19, 41:3, 41:6
**purposes** [1] - 47:20
**pursuing** [1] - 85:17
**put** [28] - 6:18, 7:8, 8:10, 27:16, 27:18, 27:21, 27:24, 29:17, 33:12, 34:17, 41:25, 44:8, 44:13, 45:7, 45:19, 46:3, 48:16, 61:4, 66:13, 67:9, 74:21, 75:8, 87:12, 88:13, 89:11, 89:16, 101:17, 105:21
**putting** [2] - 44:9, 44:20

**Q**

**quarter** [2] - 66:7, 108:22
**quarterly** [2] - 99:17, 99:18
**Quebec** [2] - 40:5, 52:1
**questioned** [1] - 27:5
**questioning** [1] - 105:23
**questions** [9] - 16:25, 24:13, 24:23, 81:1, 81:2, 81:4, 91:9, 108:13
**quickly** [4] - 37:24, 45:15, 73:25, 107:3
**quite** [10] - 12:16, 43:20, 45:12, 59:8, 65:12, 68:22, 69:22, 75:4, 80:22, 108:5
**quote** [8] - 5:18, 5:20, 6:1, 83:7, 92:12, 92:16, 92:18, 102:13

**R**

**R10323** [2] - 10:16, 12:21
**Rail** [1] - 74:13
**rail** [14] - 29:13, 35:7, 35:8, 35:12, 36:7, 39:1, 40:2, 64:23, 75:9, 76:15, 85:4, 85:6, 97:7
**RailAI** [60] - 59:3, 65:19, 73:11, 73:21, 74:5, 74:8, 74:14,

76:6, 79:1, 79:11, 79:23, 81:6, 82:9, 83:12, 84:6, 84:19, 86:9, 86:16, 87:19, 88:6, 88:20, 97:7, 97:19, 97:21, 98:4, 98:23, 98:25, 99:12, 99:22, 100:3, 100:6, 100:9, 100:11, 100:12, 101:11, 101:13, 101:14, 101:16, 101:19, 101:22, 102:9, 102:14, 102:16, 102:19, 103:3, 103:4, 103:10, 103:13, 103:16, 103:17, 103:18, 103:25, 104:4, 104:12, 105:6, 105:11, 106:7, 106:17
**railai.tetratech.com** [2] - 71:2, 75:14
**railhead** [7] - 38:8, 38:11, 38:13, 38:17, 38:19, 38:21, 75:9
**railhead's** [1] - 38:20
**Railroad** [6] - 56:2, 62:4, 65:4, 71:15, 75:15, 99:4
**railroad** [54] - 29:9, 29:12, 29:16, 31:10, 31:20, 31:21, 31:22, 31:25, 33:2, 35:8, 35:18, 35:21, 35:23, 35:25, 36:1, 38:3, 38:11, 38:12, 38:22, 40:19, 41:7, 42:2, 52:10, 52:11, 53:25, 57:16, 57:18, 57:20, 58:1, 58:2, 63:23, 70:5, 70:10, 70:12, 70:13, 71:8, 71:11, 72:2, 72:10, 72:18, 73:10, 74:24, 74:25, 75:1, 75:2, 75:6, 76:7, 76:19, 76:23, 77:15, 84:24, 107:3, 108:3
**railroads** [28] - 35:19, 40:22, 41:12, 41:22, 42:8, 42:13, 53:8, 54:15, 55:8, 62:5, 64:3, 71:12, 71:20, 72:6, 73:4, 75:3, 76:8, 76:14, 76:17, 76:18, 76:24, 77:3, 77:12, 78:10, 79:1, 79:5, 81:9, 106:20
**rails** [2] - 35:21, 39:7
**railway** [5] - 32:11, 37:24, 39:5, 39:6, 39:8
**Railway** [2] - 78:12, 78:18
**RailWEB** [1] - 74:12
**rained** [1] - 18:2
**raise** [2] - 13:23, 66:23
**raised** [1] - 95:22
**range** [3] - 58:6, 58:9, 105:13
**ranged** [1] - 105:10
**raw** [10] - 52:9, 62:10, 62:11, 62:13, 62:14, 89:13, 89:18, 89:19, 89:22
**Re** [1] - 4:8
**RE** [2] - 2:6, 5:3
**reached** [6] - 52:11, 54:1, 63:23, 84:8, 85:1
**reaching** [1] - 16:14
**reaction** [1] - 9:2
**read** [21] - 9:21, 9:22, 13:25, 14:13, 15:9, 21:18, 22:5, 23:9, 55:21, 63:12, 73:24, 75:19, 83:4, 88:4, 98:10, 98:15, 99:19, 102:1, 102:3, 102:6, 106:11
**reading** [7] - 6:17, 9:20, 14:16, 28:8, 73:24, 74:2, 80:10
**ready** [4] - 49:25, 51:10, 61:11, 108:20
**real** [1] - 34:2
**realized** [1] - 45:16
**really** [12] - 36:13, 71:10, 74:20, 77:5, 85:5, 87:9, 88:10, 88:18, 90:10, 90:14, 108:19
**realtime** [5] - 106:18, 106:21, 106:22, 106:25
**reask** [1] - 101:6
**reason** [10] - 12:9, 18:7, 25:3, 52:3, 57:9, 87:10, 103:6, 105:7, 106:25, 107:17
**reasonable** [3] - 16:2, 16:3, 49:3
**reasonableness** [1] - 19:13
**reasons** [4] - 25:9, 60:18, 60:19, 90:6
**rebranded** [1] - 40:19
**rebuttal** [2] - 27:22, 27:25
**receive** [4] - 21:16, 31:1, 31:9, 63:8
**received** [17] - 5:11, 16:15, 17:8, 17:15, 18:9, 18:14, 18:16, 20:16, 68:22, 68:23, 68:24, 69:3, 69:7, 69:11, 69:17, 78:17, 92:12
**receiving** [1] - 64:16
**recently** [1] - 70:1
**receptive** [1] - 82:3
**recess** [3] - 23:18, 66:16, 109:22
**recession** [1] - 81:9
**recognition** [1] - 9:5
**recognitions** [3] - 8:5, 31:1, 31:4
**recognize** [7] - 59:6, 75:13, 78:16, 79:19, 82:22, 86:7, 87:16
**recognized** [1] - 68:20
**recollection** [3] - 97:24, 98:22, 98:24
**record** [3] - 18:20, 67:2, 75:8
**recorded** [1] - 24:13
**records** [1] - 25:13
**recoup** [1] - 90:2
**RECROSS** [1] - 3:15
**red** [1] - 59:7
**redirect** [3] - 27:10, 27:13, 105:17
**REDIRECT** [2] - 3:15, 105:19
**reduce** [1] - 84:1
**REDUCED** [1] - 110:12
**reductions** [1] - 104:15
**refer** [4] - 34:8, 34:9, 34:10, 83:9
**reference** [1] - 21:21
**referred** [3] - 38:2, 50:6, 70:22
**referring** [4] - 6:13, 83:13, 106:13, 106:20
**reflect** [1] - 83:1
**reflected** [1] - 58:6
**refresh** [2] - 97:24, 98:22
**refurbish** [1] - 84:12
**refused** [1] - 29:22
**regarded** [1] - 92:4
**regarding** [3] - 15:10, 79:1, 82:24
**regardless** [2] - 6:21, 15:18
**regulatory** [1] - 35:13
**reject** [1] - 25:7
**relate** [1] - 5:21
**related** [3] - 5:22, 25:24, 70:11
**relates** [2] - 11:24, 97:2
**relations** [1] - 62:20
**relationship** [3] - 64:18, 78:13, 78:23
**release** [2] - 65:4, 107:12
**relevant** [10] - 6:14, 6:22, 7:8, 7:10, 7:11, 8:22, 10:21, 23:20, 47:25, 57:5
**reliable** [2] - 35:16, 36:9
**rely** [1] - 23:10
**remains** [1] - 12:13
**remember** [14] - 16:23, 19:20, 19:21, 23:6, 32:17, 35:7, 37:11, 43:8, 49:13, 57:3, 83:17, 100:8, 103:17, 108:24
**remind** [1] - 9:21
**removed** [3] - 38:20, 38:22, 38:23
**removes** [1] - 38:17
**removing** [1] - 38:7
**renders** [1] - 58:15
**renewable** [3] - 30:13, 68:17, 70:4
**repaired** [1] - 72:8
**repeat** [5] - 92:9, 93:5, 97:16, 100:4, 103:14
**repeatability** [1] - 72:17
**repeatable** [4] - 35:14, 36:8, 72:20
**replace** [1] - 72:9
**replaced** [2] - 47:16, 72:8
**replacing** [1] - 64:2
**report** [6] - 21:14, 22:6, 99:13, 99:15, 107:2, 107:8
**REPORTED** [1] - 110:10
**REPORTER** [5] - 1:23, 9:18, 110:2, 110:8, 110:22
**reporter** [2] - 9:23, 74:1
**REPORTER'S** [1] - 1:14
**reporting** [2] - 35:13, 64:19
**reports** [2] - 55:19, 99:19
**represent** [6] - 30:17, 51:17, 75:2, 76:8, 76:18, 101:16
**reputation** [1] - 30:21
**request** [3] - 8:14, 23:25, 24:1
**requested** [1] - 92:15
**require** [4] - 16:2, 22:23, 61:1, 106:21
**requirements** [2] - 35:13, 71:15
**requires** [1] - 36:18
**research** [14] - 21:20, 22:2, 22:11, 41:4, 41:10, 54:8, 54:11, 55:20, 56:8, 56:10, 57:23, 89:20, 90:2, 108:25
**Research** [3] - 54:22, 60:1, 69:24
**resolution** [1] - 75:22
**resolve** [2] - 108:20, 109:7
**resource** [1] - 21:25
**respect** [4] - 7:2, 72:15, 81:1, 93:11
**Respected** [1] - 69:18
**respectfully** [1] - 8:14
**respond** [2] - 21:13, 107:3
**responding** [2] - 27:16, 27:19
**response** [4] - 9:4, 24:22, 82:16, 107:16
**responsible** [1] - 31:6
**responsive** [7] - 79:17, 79:25, 81:25, 82:11, 86:4, 90:12, 107:24
**rest** [5] - 20:5, 38:21, 62:1, 74:16, 106:11
**restrictions** [1] - 22:21
**result** [3] - 22:22, 58:3, 58:15
**results** [1] - 56:7
**return** [3] - 21:17, 27:18, 66:1
**revenue** [1] - 78:17
**review** [2] - 57:8, 107:7
**revised** [3] - 85:20, 86:8, 104:22
**rewarded** [1] - 29:19
**Rex** [2] - 6:3, 63:1
**Rex's** [3] - 63:5, 63:7, 63:20
**Richard** [4] - 43:19, 55:1, 91:3, 91:5

**Exhibit 1**
**33**

**rides** [1] - 38:13
**Ridge** [1] - 4:14
**right-hand** [1] - 34:7
**rights** [2] - 33:9, 33:11
**rise** [3] - 66:9, 66:17, 109:1
**risks** [1] - 7:16
**road** [4] - 30:7, 32:25, 40:11, 52:7
**roads** [11] - 32:11, 32:24, 33:4, 40:8, 40:15, 53:7, 54:13, 54:14, 55:4, 62:8, 92:2
**rob** [1] - 92:15
**robust** [2] - 35:16, 36:9
**role** [1] - 67:24
**roles** [1] - 108:6
**roll** [1] - 59:17
**room** [4] - 14:7, 14:24, 21:1, 23:7
**ROOM** [1] - 1:23
**roots** [2] - 30:6, 32:23
**rough** [1] - 77:9
**roughly** [2] - 73:5, 79:8
**rounds** [1] - 45:8
**route** [1] - 77:4
**routine** [1] - 36:15
**row** [1] - 80:15
**royalty** [1] - 49:3
**rugged** [1] - 74:20
**ruled** [1] - 10:18
**rules** [6] - 17:2, 18:8, 18:12, 22:7, 22:20
**Rules** [1] - 23:21
**ruling** [2] - 17:4, 101:1
**run** [2] - 72:21
**run-over-run** [1] - 72:21
**running** [1] - 35:24

**S**

**safe** [1] - 29:13
**safety** [7] - 35:7, 35:9, 35:12, 71:10, 71:19, 72:6, 107:1
**sale** [49] - 10:16, 11:19, 12:18, 41:15, 46:6, 46:7, 46:8, 46:10, 46:11, 46:22, 47:22, 49:4, 49:20, 49:25, 50:17, 52:10, 52:19, 56:16, 56:24, 60:15, 60:19, 61:19, 61:22, 76:25, 77:9, 77:23, 78:1, 78:3, 79:1, 85:17, 86:19, 87:5, 87:6, 87:25, 88:2, 90:7, 90:23, 94:20, 99:22, 100:14, 101:18, 106:6
**Sale** [12] - 10:17, 10:23, 10:25, 11:6, 11:7, 11:13, 11:14, 11:18, 12:1, 12:2, 61:19, 88:6
**Sales** [1] - 11:22
**sales** [39] - 10:14, 10:19, 11:24, 12:5, 41:13, 41:19, 42:2, 42:7, 42:20, 42:21, 46:15, 46:16, 46:17, 46:18, 47:12, 47:15, 49:2, 49:14, 49:17, 50:5, 50:6, 50:7, 50:8, 50:10, 50:12, 50:13, 60:15, 61:24, 61:25, 62:1, 78:5, 89:21, 99:4, 99:8, 99:10, 106:2
**salespeople** [1] - 42:23
**SAME** [1] - 110:12
**sample** [1] - 26:10
**satisfaction** [2] - 81:3, 81:5
**satisfying** [1] - 107:19
**save** [1] - 29:14
**saw** [3] - 17:18, 56:19, 60:24
**scan** [1] - 53:7
**SCARSI** [1] - 1:4
**Schoettelkotte** [1] - 48:21
**Science** [1] - 68:10
**science** [5] - 30:23, 32:18, 33:14, 68:6, 68:15
**scientific** [2] - 30:23, 69:20
**scientists** [1] - 68:8
**scope** [1] - 79:24
**screen** [4] - 73:16, 74:9, 86:7, 90:18
**search** [1] - 22:1
**searching** [1] - 21:20
**seat** [2] - 13:25, 109:3
**seated** [1] - 21:10
**seats** [1] - 23:9
**second** [9] - 20:15, 28:21, 48:10, 80:15, 88:1, 93:23, 103:24, 104:20, 106:8
**section** [4] - 35:3, 35:4, 37:23, 38:11
**sector** [2] - 70:12, 70:14
**securing** [1] - 33:14
**see** [46] - 5:19, 11:19, 18:1, 19:5, 19:20, 26:7, 34:3, 34:11, 34:13, 36:25, 37:17, 38:18, 39:8, 39:20, 40:6, 40:10, 40:11, 41:13, 42:10, 43:2, 43:11, 43:13, 43:23, 44:24, 46:17, 52:5, 53:23, 57:16, 57:24, 58:3, 58:4, 59:18, 65:16, 73:16, 74:10, 74:11, 74:13, 74:18, 74:23, 75:17, 85:24, 90:13, 98:1, 104:19, 109:20
**seeking** [1] - 95:19
**seem** [2] - 109:15, 109:16
**sell** [10] - 41:21, 42:7, 45:9, 46:9, 48:7, 61:6, 62:12, 76:22, 77:14, 86:23
**selling** [11] - 40:15, 40:18, 40:21, 42:24, 45:17, 48:8, 52:17, 52:22, 65:22, 85:14, 95:12
**send** [6] - 52:13, 55:22, 57:18, 60:21, 91:2, 95:5
**sending** [2] - 52:16, 64:12
**senior** [1] - 83:18
**sense** [1] - 18:7
**sensor** [1] - 73:12
**sensors** [13] - 52:8, 54:13, 54:15, 55:8, 57:17, 58:7, 61:8, 61:9, 61:12, 62:8, 62:9, 63:22, 89:23
**sent** [15] - 43:21, 52:19, 61:7, 61:10, 61:12, 61:14, 61:15, 80:19, 82:7, 82:12, 85:13, 90:24, 92:18, 93:1, 96:6
**sentence** [2] - 51:2, 76:1
**separate** [11] - 73:8, 100:2, 100:5, 100:9, 100:10, 101:10, 101:13, 101:22, 101:24, 102:8, 102:14
**September** [1] - 84:22
**serve** [1] - 63:3
**server** [1] - 89:23
**service** [2] - 21:13, 75:23
**services** [3] - 30:4, 53:7, 73:10
**Services** [2] - 31:13, 70:16
**session** [1] - 17:14
**set** [5] - 14:22, 29:4, 33:6, 70:15, 109:17
**SET** [1] - 110:11
**setting** [1] - 51:12
**seven** [3] - 71:13, 71:24, 99:7
**several** [4] - 5:14, 6:4, 63:1, 81:11
**SG** [1] - 89:21
**shall** [1] - 33:13
**shareholders** [2] - 99:13, 99:16
**shipped** [1] - 61:8
**shock** [2] - 62:16, 63:11
**short** [4] - 8:14, 40:3, 40:14, 76:20
**shortly** [1] - 42:17
**show** [13] - 10:14, 26:16, 46:21, 50:7, 53:4, 59:4, 60:16, 65:8, 65:9, 88:9, 93:16, 104:16
**showing** [5] - 14:2, 65:5, 94:7, 106:9, 107:13
**shown** [1] - 25:12
**shows** [1] - 7:12
**shut** [1] - 79:11
**side** [8] - 6:9, 18:11, 24:4, 24:21, 26:13, 27:7, 34:12, 42:4
**sides** [1] - 109:17
**sideshow** [1] - 8:9
**sideshows** [2] - 6:10, 8:13
**sidewalk** [2] - 18:1, 18:4
**significant** [3] - 87:6, 89:25, 105:13
**significantly** [1] - 93:13
**similar** [2] - 58:5, 77:21
**simpler** [1] - 34:9
**simply** [1] - 26:15
**single** [6] - 39:15, 39:16, 45:13, 99:22
**sitting** [1] - 31:15
**size** [3] - 30:21, 101:22, 102:8
**skill** [1] - 34:20
**slabs** [1] - 39:6
**Slide** [6] - 5:16, 5:17, 10:1, 10:12, 13:8
**slide** [13] - 8:4, 9:14, 9:15, 13:9, 37:4, 38:14, 57:13, 57:21, 62:22, 62:23, 65:17, 88:5, 88:7
**slides** [5] - 5:8, 5:11, 5:15, 6:4, 8:15
**sliding** [1] - 37:4
**slow** [1] - 74:2
**slowly** [1] - 35:24
**Small** [1] - 69:12
**small** [13] - 8:6, 30:9, 38:2, 38:3, 38:6, 38:9, 40:4, 51:25, 52:21, 69:13, 69:14, 69:15
**smaller** [1] - 75:17
**Snapchat** [1] - 21:3
**social** [1] - 21:4
**software** [63] - 10:16, 10:23, 11:7, 11:8, 11:13, 11:17, 11:19, 11:23, 12:3, 12:4, 12:6, 12:12, 12:19, 12:21, 33:3, 36:4, 36:14, 36:15, 42:1, 42:11, 43:4, 43:5, 44:4, 44:8, 44:10, 46:18, 46:22, 46:24, 47:8, 47:13, 47:15, 47:20, 47:25, 48:2, 50:8, 50:11, 50:12, 50:14, 50:18, 52:9, 54:23, 55:9, 55:14, 55:23, 60:20, 60:21, 61:2, 61:14, 61:16, 61:17, 61:20, 62:9, 62:14, 76:3, 78:7, 89:21, 90:3
**sold** [13] - 41:1, 41:16, 45:13, 45:25, 46:5, 47:23, 55:13, 61:1, 61:5, 63:22, 78:9, 78:11, 99:1
**solely** [2] - 15:7, 17:15
**solution** [4] - 54:4, 64:22, 65:10, 94:1
**solve** [5] - 30:24, 32:16, 35:6, 36:11, 107:3
**someone** [2] - 72:13, 77:23
**sometime** [1] - 109:5
**sometimes** [11] - 14:11, 18:19, 19:16, 19:17, 56:20, 59:18, 78:5, 99:17, 101:14, 101:15

**somewhat** [2] - 77:12, 77:21
**somewhere** [1] - 77:7
**soon** [3] - 13:21, 22:6, 83:22
**sophisticated** [2] - 7:14, 7:15
**sorry** [5] - 9:18, 94:22, 100:16, 100:18, 100:20
**sort** [7] - 4:21, 14:12, 14:14, 73:11, 81:21, 101:15, 106:5
**sorts** [1] - 73:9
**sounds** [2] - 44:22, 83:7
**source** [3] - 50:21, 50:24, 58:11
**South** [1] - 83:19
**Southern** [3] - 71:22, 71:23, 79:6
**Southwest** [1] - 77:21
**speaks** [1] - 54:18
**special** [5] - 33:12, 34:20, 37:3, 61:8, 73:7
**specific** [3] - 58:21, 98:5, 101:24
**specifically** [2] - 35:15, 107:25
**specifics** [1] - 11:8
**speed** [10] - 35:17, 36:2, 36:9, 38:5, 73:2, 75:23, 76:10, 77:1, 85:7, 88:20
**spell** [1] - 67:1
**Spencer** [9] - 65:17, 81:16, 81:18, 82:13, 82:15, 82:20, 83:2, 83:6, 105:2
**spend** [2] - 75:3
**spent** [1] - 86:25
**spoken** [1] - 79:5
**spreadsheet** [1] - 89:10
**spring** [3] - 97:22, 98:9, 98:23
**SS** [1] - 110:5
**stand** [8] - 13:23, 25:1, 26:18, 31:15, 52:3, 52:21, 63:17, 66:23
**standard** [9] - 9:3, 10:9, 15:25, 16:3, 16:4, 26:24, 55:16, 56:12, 60:13
**standards** [3] - 15:14, 16:5, 26:20
**standpoint** [1] - 72:5
**stands** [6] - 31:13, 70:16, 97:7, 97:10, 97:12, 97:18
**start** [7] - 5:16, 22:23, 40:18, 108:18, 108:22, 109:3, 109:8
**started** [6] - 41:24, 64:12, 64:16, 68:7, 78:12, 85:11
**starting** [1] - 83:4
**starts** [1] - 93:24
**state** [8] - 4:6, 7:3, 7:5, 7:10, 35:4, 45:2, 67:1, 77:19
**STATE** [1] - 110:6
**statement** [5] - 26:14, 28:19, 28:20, 29:1
**STATEMENTS** [1] - 3:10
**statements** [8] - 5:7, 5:9, 6:13, 14:5, 16:18, 16:20, 28:19
**STATES** [4] - 1:1, 1:1, 1:4, 110:9
**States** [19] - 25:25, 33:18, 34:24, 39:20, 41:17, 41:18, 41:20, 48:8, 48:13, 49:15, 52:2, 55:11, 56:2, 56:9, 62:3, 63:25, 69:4, 70:9, 70:18
**states** [2] - 9:16, 56:1
**stay** [2] - 77:24, 100:21
**STENOGRAPHIC** [1] - 110:15
**STENOGRAPHICALLY** [1] - 110:10
**Step** [8] - 36:18, 36:23, 37:2, 37:8, 38:17, 38:25, 39:4, 39:9
**step** [1] - 39:4
**steps** [5] - 36:17, 37:18, 39:21, 59:13, 84:7
**stick** [3] - 6:10, 13:13, 77:19
**sticky** [1] - 87:11
**still** [17] - 30:8, 30:11, 38:21, 41:10, 42:19, 42:21, 43:1, 47:17, 48:2, 48:3, 68:11, 78:12, 80:7, 84:17, 85:19, 109:12
**stop** [10] - 45:20, 45:21, 48:16, 52:17, 52:22, 53:2, 66:4, 85:17, 95:12
**stored** [2] - 37:8, 37:9
**story** [1] - 109:18
**straight** [2] - 45:14, 49:14
**STREET** [2] - 1:23, 2:9
**stricken** [2] - 17:5, 18:19
**strike** [1] - 101:7
**strong** [2] - 76:10, 77:24
**struck** [1] - 8:15
**stuck** [1] - 77:22
**study** [1] - 56:7
**stuff** [2] - 10:9, 78:13
**sub** [1] - 89:15
**sub-systems** [1] - 89:15
**subcomponents** [1] - 74:8
**subcontracting** [1] - 69:13
**subject** [1] - 27:13
**submit** [2] - 34:18, 64:2
**submitted** [4] - 24:21, 24:23, 89:12, 105:10
**subsequent** [3] - 81:14, 84:4, 84:19
**subsidiary** [2] - 31:12, 70:15
**substantial** [1] - 104:14
**substantially** [2] - 70:5, 105:8
**succeeded** [1] - 63:6
**successful** [2] - 65:1, 94:4
**suddenly** [2] - 42:1, 45:11
**sue** [1] - 52:15
**sued** [8] - 5:20, 6:1, 7:2, 7:6, 8:12, 44:25, 62:22, 62:25
**suggests** [1] - 53:22
**suit** [8] - 5:22, 6:14, 11:22, 28:23, 28:24, 44:1, 57:10, 95:16
**suite** [3] - 73:12, 97:11, 101:15
**summaries** [4] - 25:11, 25:14, 25:18, 25:20
**summarizing** [1] - 26:1
**summary** [3] - 6:18, 10:13, 12:2
**super** [1] - 72:4
**supply** [1] - 69:9
**support** [10] - 30:12, 49:10, 49:18, 50:14, 74:17, 78:6, 78:7, 78:14, 78:22, 88:9
**supports** [2] - 25:15, 25:21
**surface** [2] - 39:1, 39:10
**surprise** [3] - 45:12, 45:15, 63:8
**surprised** [4] - 86:17, 86:20, 86:25, 87:4
**sustain** [2] - 18:14, 18:16
**sustainability** [1] - 68:17
**sustainable** [1] - 30:14
**switch** [1] - 74:9
**sworn** [6] - 13:24, 16:9, 24:10, 24:12, 28:10, 66:25
**sympathy** [1] - 15:6
**system** [85] - 7:9, 12:20, 29:16, 29:18, 32:2, 32:3, 33:6, 35:16, 35:23, 36:7, 36:8, 36:18, 36:23, 37:2, 37:23, 38:9, 38:24, 39:5, 39:9, 40:3, 40:13, 40:14, 40:16, 40:18, 40:19, 40:21, 41:7, 41:8, 41:11, 41:21, 42:1, 42:6, 42:15, 42:16, 42:18, 43:6, 45:14, 45:16, 45:23, 46:12, 46:20, 47:9, 47:11, 48:12, 48:14, 49:4, 49:13, 49:15, 49:21, 49:22, 49:23, 61:1, 61:6, 61:7, 62:7, 64:7, 65:5, 73:6, 73:9, 73:11, 74:8, 74:12, 74:22, 74:23, 75:22, 76:4, 76:11, 77:14, 78:2, 83:7, 83:9, 83:12, 85:2, 87:2, 88:18, 88:20, 90:3, 90:8, 90:15, 90:16, 92:1, 93:13, 106:24, 107:13, 107:19
**System** [10] - 32:3, 33:7, 40:13, 43:14, 74:11, 74:13, 75:16, 79:23, 82:10, 86:9
**SYSTEMS** [1] - 1:6
**Systems** [3] - 4:5, 4:8, 51:17
**systems** [55] - 29:10, 29:11, 29:14, 31:11, 31:21, 32:11, 32:24, 33:3, 35:8, 35:21, 36:1, 36:5, 41:2, 45:12, 45:25, 46:23, 48:8, 72:25, 73:3, 73:12, 74:17, 76:14, 76:23, 76:25, 77:16, 77:17, 78:9, 78:21, 79:2, 79:14, 80:1, 80:2, 80:9, 80:22, 80:25, 81:6, 81:19, 84:14, 84:16, 84:21, 84:24, 85:15, 85:18, 85:23, 86:16, 86:19, 88:9, 88:19, 89:15, 90:7, 94:20, 107:5

**T**

**tablet** [1] - 20:24
**talks** [1] - 37:22
**tally** [1] - 78:17
**tape** [1] - 28:9
**TAS** [9] - 9:15, 31:13, 32:8, 42:18, 45:9, 70:16, 92:7, 92:12
**TAS's** [1] - 43:25
**task** [1] - 36:10
**taught** [1] - 59:7
**teach** [1] - 55:14
**team** [1] - 30:18
**Teams** [4] - 81:16, 82:14, 86:5, 86:21
**Tech** [142] - 4:5, 4:12, 5:17, 6:4, 6:12, 8:12, 9:6, 9:15, 10:3, 12:7, 13:10, 27:1, 27:11, 27:18, 27:21, 27:25, 28:19, 28:24, 29:1, 29:15, 29:25, 30:3, 30:6, 30:18, 31:5, 31:8, 31:12, 31:16, 31:19, 32:2, 32:8, 34:14, 37:19, 39:19, 39:21, 39:24, 42:4, 42:14, 42:18, 43:25, 45:3, 45:7, 48:19, 48:23, 52:4, 52:5, 52:18, 52:23, 56:25, 58:25, 59:2, 60:5, 62:6, 62:7, 62:11, 62:12, 62:13, 62:18, 62:25, 64:4, 64:7, 64:15, 64:18, 64:21, 64:24, 65:6, 65:22, 65:23, 66:12, 66:19, 66:22, 67:4, 67:25, 68:2, 68:4, 68:5, 68:15, 68:20, 69:20, 70:6, 70:13, 70:16, 70:19, 70:23, 70:25, 71:5, 72:2, 72:24, 73:10, 76:11, 76:16, 76:22, 78:9, 78:25, 80:16, 80:20, 82:7, 83:15, 84:7, 85:17, 86:1, 86:9, 86:22, 87:6, 90:7, 90:23, 92:1, 92:5, 92:7, 92:12, 92:15, 92:16, 94:7, 94:12, 95:22, 96:3, 96:6, 97:21, 98:3, 98:22, 98:25, 99:10, 99:12, 99:22, 100:2, 100:5, 100:8, 100:14, 101:10, 101:18, 101:21, 102:7, 102:16, 102:19, 102:24, 103:12, 103:16, 103:25, 104:3, 104:18, 105:5
**TECH** [2] - 1:9, 3:14
**Tech's** [35] - 5:8, 7:1, 8:5, 27:5, 27:9, 27:17, 30:22, 31:11, 32:18, 37:20, 43:21, 49:20, 53:10, 55:15, 56:12, 56:13, 56:16, 56:18, 60:13, 60:14, 63:2, 63:10, 64:23, 65:19, 68:13, 73:9, 93:13, 94:6, 94:11, 95:5, 96:13, 103:11, 103:15, 103:24, 105:6
**Technical** [1] - 32:8
**technical** [8] - 4:25, 5:1, 34:17, 36:19, 37:15, 39:2, 47:5, 97:3
**technically** [2] - 96:24, 97:1
**technique** [3] - 37:3, 37:4, 58:18
**techniques** [2] - 55:16, 60:13
**technologies** [4] - 70:10, 74:16, 79:11, 88:12
**technology** [27] - 29:4, 30:1, 34:21, 39:17, 42:16, 45:9, 53:5, 53:6, 53:8, 53:11, 54:13, 54:19, 55:3, 55:8, 55:11, 56:1, 56:4, 58:17, 68:9, 70:1, 70:11, 72:12, 77:19, 77:23, 77:25, 87:12
**Technology** [1] - 43:25
**ten** [10] - 6:8, 31:24, 39:13, 52:6, 53:12, 62:2, 64:22, 66:7, 67:4, 84:20
**ten-minute** [1] - 66:7
**tend** [4] - 9:22, 73:24, 77:19, 87:10
**term** [4] - 50:7, 78:7, 89:18, 89:19
**terrific** [1] - 87:3
**test** [2] - 71:16, 71:17
**tested** [2] - 22:10, 22:15
**testified** [7] - 19:5, 19:25, 20:3, 28:12, 96:2, 106:2, 107:14
**testifies** [1] - 9:7
**testify** [8] - 4:23, 20:7, 24:14, 25:3, 48:22, 60:2, 65:18, 99:3
**testifying** [2] - 19:7, 24:18
**testimony** [31] - 4:21, 16:9, 16:15, 17:5, 17:17, 18:24, 18:25, 19:2, 19:12, 19:13, 19:23, 19:24, 20:9, 22:10, 23:2, 24:10, 24:16, 24:17, 25:2, 25:4, 25:6, 25:20, 28:7, 28:10, 28:11, 65:15, 89:3, 98:17, 98:20, 102:2
**tetra** [1] - 27:20
**TETRA** [2] - 1:9, 3:14
**Tetra** [175] - 4:5, 4:12, 5:8, 5:17, 6:3, 6:12, 7:1, 8:4, 8:12, 9:6, 9:15, 10:3, 12:7, 13:10, 27:1, 27:5, 27:8, 27:11, 27:17, 27:18, 27:25, 28:19, 28:24, 29:1, 29:15, 29:25, 30:3, 30:6, 30:18, 30:22, 31:5, 31:8, 31:11, 31:12, 31:16, 31:19, 32:2, 32:8, 32:18, 34:13, 37:19, 37:20, 39:19, 39:21, 39:24, 42:4, 42:14, 42:17, 43:21, 43:25, 45:3, 45:7, 48:19, 48:23, 49:20, 52:3, 52:5, 52:18, 52:22, 53:10, 55:15, 56:12, 56:13, 56:16, 56:17, 56:25, 58:25, 59:2, 60:13, 60:14, 62:6, 62:7, 62:11, 62:12, 62:13, 62:18, 62:25, 63:1, 63:10, 64:4, 64:7, 64:15, 64:18, 64:21, 64:23, 64:24, 65:5, 65:19, 65:22, 65:23, 66:12, 66:19, 66:22, 67:4, 67:25, 68:2, 68:4, 68:5, 68:13, 68:15, 68:20, 69:20, 70:6, 70:13, 70:16, 70:19, 70:23, 70:25, 71:5, 72:2, 72:24, 73:9, 73:10, 76:11, 76:16, 76:22, 78:9, 78:25, 80:16, 80:20, 82:7, 83:14, 84:6, 85:17, 86:1, 86:9, 86:22, 87:6, 90:7, 90:23, 92:1, 92:5, 92:7, 92:12, 92:15, 92:16, 93:13, 94:6, 94:7, 94:11, 95:5, 95:22, 96:3, 96:6, 96:13, 97:21, 98:3, 98:22, 98:25, 99:10, 99:12, 99:22, 100:2, 100:5, 100:8, 100:14, 101:10, 101:18, 101:21, 102:7, 102:16, 102:19, 102:24, 103:11, 103:12, 103:15, 103:24, 103:25, 104:3, 104:18, 105:5, 105:6
**text** [1] - 20:25
**THAT** [3] - 110:10, 110:12, 110:14
**THE** [83] - 4:3, 4:9, 4:15, 5:4, 5:13, 6:12, 7:23, 8:3, 8:17, 9:2, 9:11, 9:18, 9:20, 9:25, 10:8, 10:25, 11:3, 11:12, 12:7, 13:4, 13:12, 13:16, 13:19, 13:23, 13:25, 26:9, 29:5, 29:7, 50:25, 51:4, 51:9, 51:13, 51:15, 66:6, 66:9, 66:12, 66:15, 66:17, 66:19, 66:23, 67:1, 67:3, 67:6, 67:9, 67:12, 67:18, 73:23, 74:3, 74:4, 74:5, 89:2, 89:7, 90:19, 91:10, 91:13, 91:16, 91:18, 91:20, 93:17, 97:15, 97:16, 98:12, 100:16, 100:20, 100:23, 100:25, 101:5, 101:6, 102:3, 102:6, 105:17, 108:14, 108:16, 109:1, 109:3, 109:10, 109:12, 109:22, 110:8, 110:9, 110:10, 110:11, 110:12
**themselves** [1] - 65:13
**theory** [3] - 12:14, 44:12, 44:13
**thereafter** [2] - 42:17, 85:10
**THEREAFTER** [1] - 110:12
**therefore** [5] - 8:22, 18:5, 25:15, 25:22, 44:18
**thinking** [1] - 52:20
**thinks** [1] - 18:11
**third** [7] - 48:15, 71:5, 83:5, 86:2, 86:11, 104:3, 104:18
**THIS** [1] - 110:14
**thousands** [4] - 31:7, 31:24, 39:13
**threat** [7] - 64:9, 85:12, 94:16, 94:20, 94:21, 94:24, 106:6
**threatening** [5] - 52:13, 52:14, 52:16, 64:12, 64:16
**three** [16] - 34:9, 36:18, 36:24, 42:15, 45:8, 45:25, 46:5, 46:6, 49:2, 55:6, 63:13, 84:18, 87:1, 88:2, 89:11, 105:10
**Three** [5] - 32:3, 33:7, 43:14, 47:1, 75:15
**Three-Dimensional** [5] - 32:3, 33:7, 43:14, 47:1, 75:15
**three-person** [1] - 55:6
**throughout** [4] - 20:12, 28:6, 70:23, 77:22
**tie** [8] - 11:21, 39:1, 39:5, 39:15, 39:16, 49:21, 49:22, 75:10
**tier** [1] - 77:4
**ties** [9] - 35:10, 38:3, 39:6, 39:8, 74:25, 75:1, 75:2, 75:6, 76:7
**TikTok** [1] - 21:3
**TIME** [1] - 110:11
**tired** [1] - 66:4
**title** [1] - 88:4
**titled** [2] - 9:15, 87:19
**TO** [1] - 110:12
**today** [15] - 4:12, 29:23, 30:3, 30:8, 30:12, 31:14, 40:5, 51:23, 52:25, 53:3, 62:9, 68:11, 107:5
**together** [6] - 34:17, 55:2, 61:4, 63:13, 71:25, 89:11
**Toifola** [1] - 87:18
**tomorrow** [5] - 108:18, 109:4, 109:5, 109:8, 109:20
**took** [5] - 15:8, 29:21, 41:25, 46:3, 92:24
**top** [7] - 10:13, 34:10, 38:12, 38:19, 42:5, 73:16, 74:5
**total** [2] - 77:10, 80:5
**totally** [1] - 77:9
**touching** [1] - 22:5
**toughest** [1] - 30:25
**towards** [1] - 86:14
**towers** [2] - 70:2
**track** [38] - 29:9, 31:10, 31:20, 31:25, 35:8, 35:15, 35:18, 36:19, 36:24, 37:5, 37:24, 38:2, 38:4, 38:10, 38:11, 39:10, 39:14, 42:15, 70:5, 70:10, 70:14, 71:8, 71:11, 71:13, 71:16, 71:17, 72:2, 72:7, 72:10, 75:21, 75:23, 76:9, 76:19, 77:14, 79:14, 84:24
**Track** [11] - 31:13, 32:3, 33:7, 43:14, 70:16, 74:6, 74:11, 75:15, 79:23, 82:9, 86:9
**tracks** [5] - 29:12, 35:22, 38:22, 72:14, 74:25
**trademarks** [1] - 97:11
**traditionally** [1] - 107:5
**traffic** [3] - 35:12, 35:20, 35:24
**train** [6] - 35:10, 38:13, 39:16, 73:6, 73:7, 74:21
**trained** [3] - 34:22, 59:6, 59:12
**training** [1] - 34:20
**trains** [3] - 36:2, 73:5, 107:10
**transcribed** [1] - 13:22

**transcript** [5] - 23:3, 28:8, 28:9, 87:13, 89:1
**TRANSCRIPT** [1] - 1:14
**TRANSCRIPTION** [2] - 110:13, 110:14
**transit** [1] - 76:20
**transportation** [5] - 53:7, 56:8, 56:10, 57:22, 68:18
**Transportation** [1] - 56:1
**travel** [2] - 29:13, 35:21
**traveled** [1] - 54:16
**TRB** [2] - 56:23, 57:12
**treat** [1] - 69:24
**treated** [1] - 23:21
**Trial** [5] - 73:14, 75:12, 78:15, 79:18, 82:21
**trial** [33] - 8:14, 10:20, 11:9, 11:11, 12:10, 14:11, 14:25, 17:15, 20:12, 21:9, 21:11, 22:1, 22:11, 22:15, 22:16, 22:19, 22:23, 23:14, 24:11, 24:14, 24:15, 24:22, 25:19, 26:13, 28:6, 28:11, 28:12, 41:14, 65:2, 65:16, 70:23, 94:4
**trials** [1] - 14:20
**truck** [2] - 57:16, 85:4
**TRUE** [1] - 110:14
**true** [10] - 15:16, 15:25, 16:12, 20:4, 26:22, 26:25, 49:13, 51:25, 97:5, 100:7
**trusting** [1] - 62:12
**truth** [3] - 20:3, 22:10, 24:12
**try** [18] - 4:24, 7:7, 7:17, 21:22, 24:4, 40:18, 50:11, 71:18, 72:7, 72:22, 73:2, 73:3, 84:1, 85:24, 88:8, 90:12, 98:19, 108:21
**trying** [20] - 11:21, 12:4, 33:6, 35:6, 35:9, 36:3, 36:4, 41:6, 41:20, 41:21, 42:7, 44:8, 45:14, 52:20, 69:5, 69:8, 81:24, 100:18, 100:21
**tryout** [1] - 81:19
**TSA** [3] - 32:2, 70:20, 86:22
**turbine** [1] - 70:3
**turn** [13] - 22:6, 73:14, 75:12, 78:15, 79:18, 82:5, 82:21, 86:6, 87:15, 87:20, 88:4, 88:23, 90:17
**turned** [3] - 18:3, 45:15, 65:9
**turnkey** [9] - 12:18, 46:16, 46:19, 50:6, 50:7, 50:10, 61:5, 75:21, 76:1
**turns** [2] - 36:3, 47:12
**Twitter** [1] - 21:3
**two** [30] - 5:18, 10:2, 10:4, 10:19, 16:5, 19:20, 25:25, 26:20, 34:1, 35:1, 36:21, 41:19, 45:11, 51:12, 54:25, 60:8, 64:11, 65:14, 68:24, 71:21, 75:17, 77:5, 85:15, 86:19, 99:21, 99:25, 104:14, 105:8, 108:6
**type** [3] - 56:8, 77:23, 78:13
**types** [4] - 29:10, 30:11, 36:21, 77:8
**TYPEWRITTEN** [1] - 110:12
**typically** [4] - 28:24, 40:10, 63:22, 72:16

**U**

**U.S** [19] - 29:20, 32:4, 32:12, 33:9, 33:19, 37:14, 40:16, 41:12, 42:6, 42:7, 42:20, 42:21, 43:9, 52:15, 55:20, 61:24, 69:12, 70:25, 99:8
**ultimately** [1] - 12:5
**UML** [3] - 55:13, 56:7, 56:16
**unavailable** [1] - 24:14
**under** [8] - 17:2, 23:21, 24:11, 24:22, 24:23, 36:25, 84:23, 104:12
**underlying** [3] - 25:15, 25:16, 25:23
**underneath** [3] - 74:24, 75:20, 85:22
**understandings** [1] - 93:11
**understood** [3] - 5:3, 13:15, 103:8
**Union** [1] - 71:21
**unique** [2] - 76:9, 77:13
**unit** [3] - 86:22, 86:23, 87:8
**UNITED** [4] - 1:1, 1:1, 1:4, 110:8
**United** [19] - 25:25, 33:18, 34:24, 39:20, 41:17, 41:18, 41:20, 48:8, 48:13, 49:15, 52:2, 55:10, 56:2, 56:9, 62:3, 63:25, 69:4, 70:9, 70:18
**units** [1] - 77:8
**universities** [1] - 55:10
**University** [6] - 41:1, 41:3, 41:5, 41:16, 55:12, 60:5
**unmanned** [1] - 73:22
**Unmanned** [1] - 74:6
**unquote** [1] - 83:7
**untrue** [1] - 19:23
**untruthfully** [2] - 19:25, 20:3
**up** [44] - 7:9, 8:10, 9:4, 17:25, 26:6, 29:4, 31:15, 32:20, 33:4, 35:22, 35:24, 36:6, 36:12, 36:14, 38:4, 38:15, 42:14, 44:7, 45:13, 51:12, 52:3, 52:21, 59:20, 63:17, 64:11, 64:18, 68:23, 70:15, 71:4, 74:12, 78:19, 81:20, 82:14, 83:16, 84:4, 89:15, 96:13, 100:19, 103:20, 105:21, 108:18, 109:3, 109:8, 109:13
**UP** [1] - 75:4
**update** [2] - 47:21, 50:18
**updated** [6] - 5:11, 47:13, 47:14, 47:15, 47:25
**upper** [2] - 34:7, 74:12
**urge** [1] - 23:1
**useful** [1] - 33:14
**uses** [4] - 37:2, 37:4, 53:13, 60:10

**V**

**validity** [2] - 27:16, 28:1
**valuable** [2] - 24:8, 106:19
**value** [3] - 76:10, 87:3, 90:10
**various** [2] - 50:20, 103:7
**vehicle** [5] - 73:8, 85:4, 85:6, 107:2, 107:6
**vendor** [3] - 64:3, 77:24, 92:5
**vendor's** [1] - 77:18
**vendors** [4] - 84:2, 84:8, 84:9, 84:24
**verdict** [10] - 13:8, 15:11, 16:14, 20:12, 21:17, 22:13, 24:3, 66:1, 66:2
**version** [9] - 5:11, 10:16, 10:23, 11:7, 11:8, 11:13, 11:17, 11:18, 46:23
**versions** [1] - 19:18
**versus** [1] - 4:5
**veteran** [1] - 69:15
**veteran-owned** [1] - 69:15
**via** [1] - 20:25
**Vice** [6] - 31:16, 54:9, 54:22, 60:1, 64:8, 64:20
**vice** [1] - 67:25
**Vice-President** [6] - 31:16, 54:9, 54:22, 60:1, 64:8, 64:20
**video** [15] - 14:2, 26:2, 26:6, 26:8, 26:9, 28:9, 33:8, 33:18, 34:15, 37:11, 43:8, 56:19, 57:3, 57:7, 65:15
**view** [7] - 12:10, 13:2, 13:8, 21:24, 22:1, 64:8
**violates** [2] - 10:13, 22:21
**Vision** [1] - 60:6
**visit** [1] - 21:24
**voir** [1] - 13:22
**volumes** [1] - 35:13
**VS** [1] - 1:8

**W**

**wait** [1] - 28:4
**waiting** [2] - 23:19, 24:9
**wake** [1] - 17:25
**walking** [1] - 72:14
**WAS** [1] - 110:12
**WASHINGTON** [1] - 2:21
**waste** [1] - 24:7
**watch** [1] - 21:18
**watched** [3] - 33:8, 37:11, 43:8
**water** [6] - 18:4, 30:13, 68:16, 69:9, 69:25
**waterways** [1] - 30:10
**ways** [2] - 7:17, 69:24
**website** [5] - 21:1, 71:1, 71:2, 75:15, 96:4
**WEDNESDAY** [2] - 1:15, 4:1
**week** [1] - 71:18
**weight** [8] - 17:22, 17:23, 20:6, 20:9, 25:7, 25:16, 25:22, 81:1
**welds** [1] - 35:10
**WEST** [1] - 1:23
**WESTERN** [1] - 1:2
**wet** [1] - 18:1
**whatsoever** [1] - 47:21
**wheel** [1] - 38:12
**whereas** [1] - 85:7
**whole** [8] - 30:12, 32:17, 43:10, 43:13, 62:22, 74:10, 101:16, 107:17
**width** [1] - 75:22
**willful** [2] - 27:4, 48:15
**willfulness** [5] - 6:16, 7:10, 27:17, 27:23, 48:18
**wind** [3] - 70:2, 70:3
**window** [2] - 37:4, 37:5
**wish** [1] - 23:5
**WITNESS** [5] - 67:3, 74:3, 74:5, 97:16, 101:5
**witness** [33] - 4:18, 8:24, 9:7, 17:18, 18:24, 19:1, 19:2, 19:4, 19:16, 19:24, 20:2, 24:10, 24:11, 24:18, 24:25, 26:17, 27:7, 27:8, 27:9, 27:12, 28:7, 28:11, 28:12, 63:4, 66:13, 66:20, 66:25, 97:14, 100:17, 101:1, 108:16
**witness'** [1] - 19:10
**witness's** [7] - 19:6, 19:7, 19:8, 19:12, 19:13, 25:8, 28:10
**witnesses** [17] - 4:23, 4:24, 8:22, 12:17, 16:9, 16:19, 19:18,

Exhibit 1
34

20:7, 20:8, 22:3, 22:9, 25:2, 25:5, 26:17, 27:5, 27:11, 61:18
**WITNESSES** [1] - 3:14
**women** [1] - 69:15
**women-owned** [1] - 69:15
**won** [1] - 12:2
**wooden** [1] - 39:6
**word** [4] - 36:13, 36:14, 60:25, 76:1
**words** [4] - 20:10, 28:5, 53:22, 53:23
**workbook** [1] - 89:10
**works** [7] - 37:7, 59:5, 59:24, 60:3, 60:12, 65:9
**world** [7] - 30:5, 40:16, 43:10, 43:13, 61:25, 62:1, 68:11
**world's** [1] - 30:25
**worldwide** [2] - 61:25, 70:8
**writing** [4] - 20:24, 24:22, 58:19, 58:20
**writings** [1] - 33:16
**written** [6] - 24:20, 103:11, 103:15, 103:24, 104:3
**wrote** [2] - 44:24, 45:18

Y

**year** [13] - 30:25, 31:5, 42:24, 62:13, 68:23, 69:17, 75:3, 75:4, 77:2, 84:19, 86:15, 86:24
**years** [18] - 5:24, 32:11, 40:5, 45:14, 49:14, 49:21, 52:6, 53:12, 61:23, 62:3, 63:1, 68:3, 68:22, 92:2, 99:21, 99:25, 108:2
**yesterday** [1] - 5:6
**YORK** [1] - 2:20
**yourself** [2] - 23:7, 67:22
**YouTube** [1] - 21:2

Z

**zero** [4] - 41:16, 41:17, 41:18
**Zovko** [2] - 4:8, 5:14
**ZOVKO** [12] - 2:7, 5:6, 8:2, 8:4, 9:13, 9:24, 10:1, 10:11, 11:2, 11:6, 11:15, 13:7