# EXHIBIT 4

1

```
 1              UNITED STATES OF AMERICA
              UNITED STATES DISTRICT COURT
 2            CENTRAL DISTRICT OF CALIFORNIA
                    WESTERN DIVISION
 3                      - - -
 4          HONORABLE MARK C. SCARSI
       UNITED STATES DISTRICT JUDGE PRESIDING
 5                      - - -
 6
     PAVEMETRICS SYSTEMS, INC.,      )
 7                                   )
              PLAINTIFF,             )
 8                                   )
     VS.                             )  CASE NO.:
 9                                   )  CV 21-01289-MCS
     TETRA TECH, INC.,               )
10                                   )
              DEFENDANT.             )
11                                   )
12   _____)
13
14          REPORTER'S TRANSCRIPT OF PROCEEDINGS
15            TUESDAY, AUGUST 23, 2022
16            LOS ANGELES, CALIFORNIA
17
18
19
20
21
22
23          LAURA MILLER ELIAS, CSR 10019
            FEDERAL OFFICIAL COURT REPORTER
24          350 WEST 1ST STREET, ROOM 4455
            LOS ANGELES, CALIFORNIA 90012
25             PH:  (213) 894-0374
```

UNITED STATES DISTRICT COURT

2

```
 1   APPEARANCES OF COUNSEL:
 2
 3   ON BEHALF OF PLAINTIFF:
 4       KNOBBE, MARTENS, OLSON & BEAR, LLP
 5       BY: CHRISTY LEA, ESQ.
 6           JOSEPH RE, ESQ.
 7           NICHOLAS ZOVKO, ESQ.
 8           ALAN LAQUER, ESQ.
 9       2040 MAIN STREET
10       14TH FLOOR
11       IRVINE, CA 92614
12
13   ON BEHALF OF DEFENDANT:
14       FINNEGAN HENDERSON
15       BY: JAMES BARNEY, ESQ.
16           AARON PARKER, ESQ.
17           NICHOLAS CERULLI, ESQ.
18           JENCY MATHEW, ESQ.
19           DANIEL CHUNG, ESQ.
20       901 NEW YORK AVENUE NW
21       WASHINGTON, DC 20001
22
23
24
25
```

UNITED STATES DISTRICT COURT

3

```
 1                    INDEX
 2   WITNESSES FOR
     PAVEMETRICS:
 3
                 DIRECT   CROSS   REDIRECT   RECROSS
 4
 5   BRAD SPENCER
     (VIDEO 24)
 6   BERNARD TEUFELE
     (VIDEO 24)
 7
 8   ROBERT OLENOSKI
     (VIDEO 24)
 9
10   LAURENT, JOHN
     BY: MS. LEA      26
11   BY: MR. PARKER              78
     HEBERT, JEAN
12   BY: MS. LEA      110              154
13   BY: MR. CERULLI        144
     TREGELLIS, CHRISTIAN
14   BY: MR. ZOVKO    156
     FRAKES, DAVID
15   BY: MR. LAQUER   169
16
17   BY: THE COURT
     (192, 194)
18
19
20
21
22
23
24
25
```

UNITED STATES DISTRICT COURT

4

```
 1   LOS ANGELES, CALIFORNIA; TUESDAY, AUG. 23, 2022; 8:36 A.M.
 2                      - - -
 3          THE CLERK:  Calling Item No. 1.
 4          Case No. C.V.  21-1289.
 5          Pavemetrics Systems, Inc. versus Tetra Tech, Inc.
 6          Counsel, please state your appearances.
 7          (Appearance as heretofore noted.)
 8          THE COURT:  Good morning, everybody.  I understand
 9   there was quite a line outside so I applaud you all for being
10   able to get here on time.  What issues do we need to discuss
11   before the jury comes in?
12          MR. LU:  Good morning, Your Honor.
13          THE COURT:  Good morning.
14          MR. LU:  Pavemetrics objects to certain of Tetra
15   Tech's designations of the deposition transcript of Robert
16   Olenoski.
17          THE COURT:  Okay.  And these are -- this is a
18   deposition that -- well, tell me a little bit about this
19   deposition.
20          MR. LU:  This is a deposition of a Tetra Tech
21   consultant who -- that we plan to play today for the jury,
22   and we are objecting to lines regarding certain out-of-court
23   statements b CSX regarding LRAIL's abilities to use railway
24   geometry which is not something in this case.
25          THE COURT:  So you're playing this deposition today
```

UNITED STATES DISTRICT COURT

Exhibit 4
172

5

```
1    of Mr. Olenoski, and Tetra Tech has identified
2    counter-designations, and you're objecting to those?
3              MR. LU:  Correct, Your Honor.
4              THE COURT:  Okay.  Do you have a copy for me?
5              Can you identify for the designations that you're
6    objecting to?
7              MR. LU:  Yes, Your Honor.  The first one is page 71
8    line 24 to 72, line 4, and the second portion is page 89,
9    line 10 to 89, line 20.
10             THE COURT:  And those are the two?
11             MR. LU:  Yes, sir.  Or yes -- yes, Your Honor.
12             THE COURT:  Okay.  And your objection is hearsay
13   and relevance?
14             MR. LU:  Hearsay and relevance.  Yes, Your Honor.
15             THE COURT:  Okay.  Let me hear from Tetra Tech.
16   And let's start out with 71, line 24 to 72, line 4.
17             MR. PARKER:  Thank you, Your Honor.  We're not
18   offering those statements for the truth of the matter
19   asserted that CSX actually believed.  That is we believe that
20   the statements are relevant that directly respond to the
21   question above that Pavemetrics has designated into Tetra
22   Tech end buying in LRAIL.  On page 71, line 18, the question
23   asks, and did Tetra Tech end up buying in LRAIL.
24             So we believe that that response that we've
25   counter-designated, Your Honor, responds directly to that
```

UNITED STATES DISTRICT COURT

6

```
1    question or is, you know, a follow-up on the answer to that
2    question.
3              THE COURT:  Mr. Olenoski works for -- he's the
4    Tetra Tech consultant?
5              MR. PARKER:  Yes, Your Honor.
6              THE COURT:  And so I guess you're offering this to
7    show Mr. Olenoski's understanding of a reason that Tetra Tech
8    ended up not buying an LRAIL system; is that right?
9              MR. PARKER:  Correct.
10             THE COURT:  And why is that relevant?
11             MR. PARKER:  Um, it's our view that it's relevant.
12   They marked the question, and did Tetra Tech end up buying in
13   LRAIL as relevant so to the extent that that questions's
14   relevant, we believe that the answer is also relevant.
15             THE COURT:  So for completeness purposes.
16             MR. PARKER:  Yes, Your Honor.
17             THE COURT:  Okay.  Let's look at 89, line 10
18   through 89, line 20.
19             MR. PARKER:  And we have the exact same situation
20   where they have designated or testimony or testimony has been
21   designated lines 10 through 20 on page 89.  They're just a
22   continuation of Mr. Olenoski's answer to the above questions
23   that have not been objected to by Pavemetrics.  And for the
24   same reason, we're not offering the CSX statements for the
25   truth of the mattered asserted, just Mr. Olenoski's
```

UNITED STATES DISTRICT COURT

7

```
1    impression.
2              THE COURT:  Okay.  Thanks.  Let me hear back from
3    counsel for Pavemetrics.  Why isn't this -- why shouldn't
4    this come in for completeness sake?  Because there does seem
5    to be a hook here, and did Tetra Tech end up buying LRAIL.
6              MR. LU:  Well, Your Honor, we're not objecting on
7    the grounds that it's not responsive to certain designations
8    by Pavemetrics, but I guess just because it's the next
9    question down doesn't make the testimony itself relevant.
10   Railway geometry is not at issue in this case, it hasn't been
11   discussed at all, the jury is not going to know what it
12   means, and we would object on those grounds.
13             THE COURT:  Okay.  I think it's fair game for
14   completeness sake so I'm gonna allow that testimony.
15             MR. LU:  Yes, Your Honor.
16             THE COURT:  Okay.  Anything else we need to
17   discuss?
18             MR. CERULLI:  Yes, Your Honor.  We had a few
19   objections to Dr. Frakes' demonstratives.  We'd like to
20   approach just to hand you some materials.
21             THE COURT:  Please.
22             MR. CHUNG:  May I approach, Your Honor?
23             THE COURT:  Yes.  Is it appropriate to have
24   witnesses here during this or what are the parties view on
25   that?
```

UNITED STATES DISTRICT COURT

8

```
1              MR. CERULLI:  I think we're okay with it.
2              MS. LEA:  It's expert related.
3              MR. CERULLI:  Yes.
4              THE COURT:  Okay.  Okay.
5              MR. CERULLI:  So our first objection is slides 26
6    to 28, and we'll pull them up for you.  So Dr. Frakes never
7    opined on the infringement with respect to Claim 21.  He
8    provided no opinions in his expert report.  And so slides 26
9    to 28 provide for the first time opinions with respect to
10   features contained in Claim 21.  So this is clearly beyond
11   the scope of his expert report.
12             And now counsel yesterday told us that this was in
13   response to Dr. Morellas' opinions that he provided Thursday
14   and Friday, but they never objected as it being outside the
15   scope of his report.  So, you know, this is sort of an end
16   around way for them to add new opinions with respect to Claim
17   21 that were never provided previously.
18             THE COURT:  Okay.  And I've got his report in front
19   of me; right?
20             MR. CERULLI:  Yes.  It's the rebuttal report, and
21   it's page 66.  You'll see beyond the arguments with respect
22   to Claim 1, there was no additional arguments raised with
23   respect to Claim 21.
24             THE COURT:  And what I'm looking at page 66 is the
25   sum total of his opinions on Claim 21?
```

UNITED STATES DISTRICT COURT

**Exhibit 4**
**173**

9

```
1          MR. CERULLI:  It is, Your Honor.
2          THE COURT:  Okay.  And is this the singular issue
3   or are there other issues with the slides?
4          MR. CERULLI:  We have other issues with the slides
5   as well.
6          THE COURT:  Okay.  So we'll deal with this one
7   first.  So it looks like in these slides, he's expressing an
8   opinion that the infringement proof put on by Tetra Tech is
9   inaccurate cause it relies on different software versions.
10  Were those -- that testimony on the different versions that
11  was put on, was that in your expert's report?
12         MR. CERULLI:  It was, Your Honor.  He only provided
13  excerpts of one version of code as representative of all the
14  other versions of code.  There was many versions, I believe,
15  five or so that were analyzed by Dr. Morellas.  And so for
16  brevity, he only included one versions of code in his
17  analysis.
18         THE COURT:  Okay.  Let me hear from Pavemetrics
19  then.
20         MR. LAQUER:  Good morning, Your Honor.  Alan
21  Laquer.
22         These demonstratives from Dr. Frakes do not address
23  the substance of the claim limitations of Claim 21.  They go
24  to respond to Dr. Morellas' opinion stated in his direct that
25  any of the versions of software he addressed are
```

UNITED STATES DISTRICT COURT

10

```
1   representative of all other versions.
2          That opinion does not appear in Dr. Morellas'
3   report.  I did object when Dr. Morellas raised that.  That
4   was in Day 2 of the transcript beginning at page 156.  That
5   objection is still outstanding.
6          So Your Honor may, of course, sustain that
7   objection and strike Dr. Morellas' opinion with respect to
8   respectiveness.  However, if Dr. Morellas is permitted to
9   introduce new testimony regarding representativeness, then
10  Dr. Frakes should be permitted to respond and state the
11  software versions are not representative.
12         THE COURT:  Okay, so he's saying the versions are
13  different.
14         MR. LAQUER:  Yes.  And on pages 27 and 28, he
15  identifies specific lines of source code from the version
16  that Dr. Morellas relies upon showing substantive differences
17  from the very section that Dr. Morellas relies upon.
18         This is specific and particular to Claim 21 here
19  because Claim 21 depends on Claim 1.  For Claim 1,
20  Dr. Morellas relied upon one version of code.  For Claim 21,
21  he relies upon a different version of code.
22         So Dr. Morellas has failed to present a single
23  system that even in his opinion satisfies every limitation of
24  Claim 21.  This is what Dr. Frakes is explaining in these
25  demonstratives.
```

UNITED STATES DISTRICT COURT

11

```
1          THE COURT:  And, I guess, why didn't Dr. Frakes
2   make these -- or describe these opinions in his report?
3          MR. LAQUER:  Well, simply because the opinion that
4   Dr. Morellas provided in his report was -- or that Dr.
5   Morellas presented in his testimony was not in his report.
6   Counsel for Tetra Tech said that Dr. Morellas identified
7   certain versions of code.  He didn't make a representation or
8   an opinion regarding representativeness.
9          During the meet and confer, I asked for counsel to
10  direct me to such an opinion in Dr. Morellas' report, and no
11  identification was given.  That's why I objected during
12  Dr. Morellas' testimony when he claimed for the first time
13  that these versions are representative of each other.
14         THE COURT:  And I guess my question is so
15  Dr. Morellas used -- just to make it simple, Dr. Morellas
16  used a version of software in his report to opine on his
17  infringement opinions with respect to Claim 21; correct?
18         MR. LAQUER:  For the added limitation of Claim 21,
19  he identified a version of a code, yes.
20         THE COURT:  Okay.  And, um, that was in his report?
21         MR. LAQUER:  Um, well, allow me to clarify.  He
22  included block citations for many of his citations to code so
23  he was not very specific on -- he would sometimes provide an
24  excerpt from one version, and then have a big string cite
25  which is a very different presentation than the way he
```

UNITED STATES DISTRICT COURT

12

```
1   addressed the code in his direct testimony.
2          THE COURT:  Okay.  And -- but so why didn't
3   Dr. Frakes opine in his report that the version that
4   Dr. Morellas was referring to in his report, um -- didn't
5   include the functionality he said?
6          MR. LAQUER:  Well, again, for this reason, that
7   Dr. Morellas used large block string cites that appeared to
8   rely upon several versions of code whereas now for the first
9   time in his direct, he relied upon a single version for
10  Claim 21.
11         THE COURT:  So the crux of the issue you
12  have is that the specifics of what Dr. Morellas was relying
13  on were not apparent from the report?
14         MR. LAQUER:  Yes, Your Honor.
15         THE COURT:  But they became apparent in the
16  testimony.
17         MR. LAQUER:  Yes.  Not only did it become apparent,
18  but during the direct testimony, Dr. Morellas changed from
19  large block citations for different, um, limitations to a
20  wide range of versions to suddenly picking individual
21  versions per limitation or claim and adding a new concept of
22  representation which was not presented in his report.
23         THE COURT:  Okay.  Let me hear from Tetra Tech.
24  What say you about this?
25         MR. CERULLI:  Your Honor, the -- the same code is
```

UNITED STATES DISTRICT COURT

**Exhibit 4**
**174**

13

```
1   fund in multiple versions of code, and the string sites that
2   the counsel referred to clearly were -- you know, again, we
3   cited one excerpt from one piece of code and then a string
4   site to refer to the other versions of code rather than, you
5   know, put in five different excerpts that all contain the
6   same code.  And so this --
7           And Dr. Morellas explains early in his report that
8   he is referring to an example of source code that, you know,
9   is representative of multiple versions of code.  So, again,
10  Dr. Frakes could have raised this issue in his rebuttal
11  report, but he did not.
12          THE COURT:  Is it clear -- so looking at this slide
13  we've got on the screen, the accused LRAIL version is not
14  representative, it says here, uh, Dr. Morellas relied on
15  r10323 for Claim 1, but on for 4.78.6.0 for Claim 21.  Um,
16  did Dr. Morellas identify his report that he relied on for
17  4.78.6.0 for Claim 21?
18          MR. CERULLI:  He did, Your Honor.  And I believe he
19  also included a citation to the r10323 version as well.  And
20  I don't believe there's any dispute that it's also contained
21  in the r10323 version.  Otherwise, you know, Dr. Frakes could
22  have pointed that out in his rebuttal report.
23          THE COURT:  Counsel indicates that this was unclear
24  from Dr. Morellas' report that this is what he was doing.
25  Can you point me to where Dr. Morellas identifies these
```

UNITED STATES DISTRICT COURT

14

```
1   versions in his report?
2           MR. CERULLI:  I don't have the -- Dr. Morellas's
3   report with me here.  I do believe he sets forth the -- to
4   make clear that it is -- you know, he's -- there's multiple
5   versions of code, and he is citing to excerpts of a
6   particular version of code.
7           And I believe what we have here is a situation
8   where he for Claim 1 had mapped to that r10323 version and
9   then also contained an excerpt from the Version 4.78 but also
10  made clear that through a string site that was it also
11  contained in the r10323 version.
12          THE COURT:  Okay.  What about counsel's argument
13  that Dr. Morellas was kind of vague in his report and got
14  specific -- more specific on the stand, and therefore --
15  therefore, it's sort of fair game to, um, have Dr. Frakes
16  take those specificities on.
17          MR. CERULLI:  You know, I think they're focusing on
18  the word representative.  But again, the string cite to make
19  clear that it's -- the same code is contained in multiple
20  versions of code.  It is pretty clear.  And he was just
21  explaining for the jury sake that when we cite to -- you know
22  we're talking about multiple versions of code.  When we cite
23  to one version, it is simply exemplary.  And I believe
24  Dr. Morellas opines that he also reviewed multiple,
25  additional versions of code also confirmed that the code was
```

UNITED STATES DISTRICT COURT

15

```
1   found in those versions as well.
2           THE COURT:  These charts I'm looking at, this comes
3   from Dr. Morellas' direct; correct?
4           MR. CERULLI:  Yes.
5           THE COURT:  This sort of callouts of the code, were
6   these in his report?
7           MR. CERULLI:  They were, Your Honor.
8           THE COURT:  Including the version numbers?
9           MR. CERULLI:  Yes.
10          THE COURT:  Okay.  Let me ask counsel for
11  Pavemetrics, if these callouts were in his numbers including
12  these version numbers, and arguments weren't made in the
13  rebuttal that this was somehow the wrong code, why should we
14  allow Dr. Frakes do it now?
15          MR. LAQUER:  Because Dr. Morellas never presented
16  an opinion on representativeness.  We've -- I've asked where
17  in that report counsel believes it exists.  It does not.
18          Importantly, counsel's now relying on statements
19  multiple times that it's supposedly the same code across
20  these versions.  If you could look at Slide 28 which is the
21  code here, at least in that example we're identifying, it's
22  different code.  There's different code in the items that
23  counsel -- or that Dr. Morellas string cited in his report.
24          Here we can see R10323 doesn't even include the
25  Fake3D code that Dr. Morellas is opining forms the basis of
```

UNITED STATES DISTRICT COURT

16

```
1   his infringement opinion.  There are differences 4.8, 4.78
2   R10323, and Dr. Morellas' report having a large block of
3   string sites for each of these limitations is insufficient to
4   now claim their one version is representative of another,
5   particularly when you drill in after having seen when he
6   testified in court and see that the code is different.
7           THE COURT:  What's on the Slide 28?
8           Walk me through it.
9           MR. LAQUER:  Yes, Your Honor.  This is a part of
10  the LRAIL source code called LCMS Rail Analyzer.  This is
11  the.cpp file.  And we can see that there's a highlighting of
12  a particular function for joint bar detection which is a
13  limitation and a concept at issue in Claim 21.
14          So we can see in the 4.80 version, there is the
15  joint bar detection function.  We see that again in the 4.78
16  version.  In the same file in the r10323 version at the
17  bottom right, that function is not present.
18          And so, again this, goes to an interplay between
19  Claim 1 and Claim 23 -- I'm sorry, Claim 21, I correct
20  myself.  In Claim 21, this joint bar concept is addressed and
21  the underlying Fake3D allegation is absent in r10323.  So to
22  rely on that version for Claim 21 is a fundamental
23  inconsistency with Dr. Morellas' opinion on Claim 21 first
24  laid bare in his direct testimony, Your Honor.
25          THE COURT:  Okay.  Let me ask Tetra Tech what is
```

UNITED STATES DISTRICT COURT

**Exhibit 4**
**175**

17

```
1   the harm with letting Dr. Frakes make these points?  Is there
2   anything -- I mean, can't you just clear up any issues on
3   your rebuttal case?
4        MR. CERULLI:  You know, Your Honor, I think that he
5   has not presented any opinions in his report on Claim 21, and
6   so again, this is kind of them trying to find very
7   inconsequential differences in order to make an argument with
8   respect to Claim 21 now, and we think that's inappropriate.
9        THE COURT:  Okay.  What other objections?  Is there
10  other topics of objections you have?
11       MR. CERULLI:  Yeah, we have two more, Your Honor.
12       THE COURT:  Okay.  Let's go through those.
13       MR. CERULLI:  Okay.  The second objection we have
14  is there are a range of slides that take two grounds from
15  Dr. Frakes' invalidity report and essentially merge them and
16  pick and choose from -- from two different grounds.
17            Now, in Dr. Frakes's rebuttal -- sorry, opening
18  report, if you just go to the Table of Contents, you will see
19  that there is one ground for the UML sale and support.
20  That's Roman Numeral VII A.  And then if you look at 8B, it
21  refers to this printed publication which is UML TRB 2014.
22  And these are two separate grounds for invalidity that
23  Dr. Frakes raises.
24            And in the slides, Dr. Frakes goes back and forth
25  between the UML article and the UML sale and support which
```

UNITED STATES DISTRICT COURT

18

```
1   really relies on a prior system and relies on the source
2   code.  And never in Dr. Frakes' report does he, you know talk
3   about combining those two references and those two grounds,
4   and, you know, so this is -- this is now new opinions outside
5   the scope of his report.
6        THE COURT:  Okay.  So looking at Roman VII, is he
7   making an anticipation argument on the UML sale and support?
8        MR. CERULLI:  Um, I believe it's -- you know, due
9   to narrowing the issues in this case.  I believe it's now on
10  obviousness ground.
11       THE COURT:  Obviousness ground?
12       MR. CERULLI:  Yeah.
13       THE COURT:  And with respect to the UML TRB 2014,
14  he's doing an obviousness analysis with respect to that
15  reference.
16       MR. CERULLI:  Correct.
17       THE COURT:  But he never does an obviousness
18  analysis by combining the references.
19       MR. CERULLI:  Correct.
20       THE COURT:  Okay.
21       So let me hear from counsel on that.
22       MR. LAQUER:  Your Honor, in the verdict form that
23  Tetra Tech proposed, they combined the URB sale and support
24  with the U, um -- I'm sorry, UML sale and support with the
25  URB-TRB2014.  It's not surprising these are the same system.
```

UNITED STATES DISTRICT COURT

19

```
1   This is a document talking about the system.  This is
2   document talking about a device.
3            And so the jury will be presented in Question 6
4   with the question as to whether or not the UML sale and
5   support and/or -- here we have it right here, and/or UML TRB
6   2014 render obvious Claim 8 of the '557 patent.
7            Rather than spend twice as much time going over the
8   same system twice, once based on the source code and once
9   based on a document describing that system, Dr. Frakes in his
10  direct is presenting the information in the same format as it
11  will be presented to the jury on the jury -- on the verdict
12  form.
13       THE COURT:  So he's not combining the references;
14  right?
15       MR. LAQUER:  Well, they're already distinct.  It's
16  the same system.  So it's really not a question of obvious to
17  combine when the things are describing the same thing.
18  Obviously, the expert report has unlimited pages and
19  unlimited time, and they're really not a constraint in terms
20  of efficiency, but for purposes of presenting the information
21  to the jury in a format that the jury is able to understand
22  and relate to the verdict form, it's already the same thing.
23       THE COURT:  Okay.  So he's not combining the
24  references.  He's just talking about them at the same time?
25       MR. LAQUER:  Well, it's -- it's Pavemetrics early
```

UNITED STATES DISTRICT COURT

20

```
1   work with UML.  So it's already the case that the UML TRB
2   document is informative as to the sale and support when you
3   have a document talking about the system.
4        THE COURT:  Okay.
5        Okay, let me hear the third issue.
6        MR. CERULLI:  Thank you, Your Honor.
7            The third issue is with respect to Slides 81 and
8   82, and this concerns the Marking Statute.  So the Marking
9   Statute requires that if you practice your invention, you
10  need to mark your product.
11            And earlier in this case, Your Honor found that
12  that two sales that were prior notice were excluded from this
13  case.  And so under the law of the case, Tetra Tech practices
14  its patent cause if Tetra Tech did not practice its patent,
15  then those two sales would still be at issue.
16            Now, Dr. Frakes is presenting an opinion that's
17  contrary to the law of the case which is that Tetra Tech does
18  not practice its invention.  And now, essentially, you know,
19  we have some tension here, and effectively, if Tetra Tech
20  does not practice its invention, then those two prior
21  prenotice sales would be back in the case.
22            Now, we don't suggest that those two sales come
23  back in now, but for Dr. Frakes to present opinions that the
24  3DTAS does not practice his invention would be contrary to
25  the law of the case.
```

UNITED STATES DISTRICT COURT

Exhibit 4
176

21

```
1          THE COURT:  And is that opinion in Dr. Frakes'
2   report?
3          MR. CERULLI:  Uh, it is, Your Honor.
4          THE COURT:  Okay.  And so the two systems that were
5   excluded were -- tell me a little bit more about that.
6   Refresh my memory on what we're talking about.
7          MR. CERULLI:  Yes.  So -- so Tetra Tech sent a
8   letter in January 2021.  And so there was a summary judgment
9   motion with respect to two sales that occurred in
10  October 2020.  And so Your Honor found that those -- you
11  know, under the Marking Statute, there was a requirement.
12  There was no notice provided.  And the notice was first
13  provided in January 2021 so those prior notice sales were,
14  uh, excluded by Your Honor.
15         THE COURT:  Okay.
16         Let me hear from Pavemetrics on that.
17         MR. LAQUER:  Your Honor, Pavemetrics explained that
18  in view of Tetra Tech's contention that its products practice
19  its patents, the Marking Statute does apply based on its
20  view, based on its position, and, of course, that's an issue
21  for it to prove.
22         Dr. Morellas in his testimony opined that he
23  believes he had carried that burden.  Here and in his report,
24  Dr. Frakes is simply pointing out that Dr. Morellas failed to
25  carry his burden.  Dr. Frakes is not stating that 3DTAS does
```

UNITED STATES DISTRICT COURT

22

```
1   not practice the invention.  Instead because Dr. Morellas
2   failed to look at Tetra Tech's neural network files,
3   Dr. Frakes has explained that Dr. Morellas is unable to show
4   one way or the other whether it practices the '293 patent
5   because Dr. Morellas himself opines that the neural network
6   is responsible for performing the claim.
7          THE COURT:  Okay.  So this is -- these are the
8   rulings.
9          With respect to the first issue, I don't think
10  Dr. Frakes has an opinion on Claim 21 in his report so I
11  don't think he's allowed to talk about that.  From the
12  report, it just seems like he's saying if Claim 1, um --
13  Claim 21 follows Claim 1.  So there's no infringement on
14  Claim 1, there's no infringement on Claim 21 so I don't think
15  he can opine specifically about the infringement issues with
16  respect to Claim 21.
17         With respect to the issue on the prior art, the UML
18  sales and UML TRB 2014, I think that -- as long as he's not
19  making an argument about combining those two references, I
20  think it's fair game for him to talk about them together.
21         And with respect to this last issue, I think he can
22  opine on Dr. Morellas' analysis with respect to 3DTAS and
23  whether it practices the patent.
24         MR. LAQUER:  Understood.
25         THE COURT:  Are we ready for the jury to come out?
```

UNITED STATES DISTRICT COURT

23

```
1          MS. LEA:  We just have issues on jury instructions
2   that could be saved for later or done now?
3          THE COURT:  Why don't we do that on a break and
4   have the jury come out.
5          THE CLERK:  All rise.
6          (Jury present.)
7          THE COURT:  Welcome back to the jurors.  Thanks for
8   getting here on time.  Sorry we kept you waiting a little
9   bit.  I understand there was long lines outside today so
10  thanks for all you do to get here and manage that.  We will
11  get started.  We had just finished up with an expert witness
12  when we completed things on Friday.
13         Where are we now?
14         MS. LEA:  Your Honor, Pavemetrics will call its
15  next witness.
16         THE COURT:  Okay.  Please do.
17         MS. LEA:  I will ask Mr. Lu to do so.
18         MR. LU:  We're going to start the day with three
19  witnesses by video deposition.  First Pavemetrics calls
20  Mr. Bradford Spencer on behalf of CSX Transportation by video
21  deposition taken on January 20th, 2022.  It'll be about 26
22  minutes long.  And at this time, Pavemetrics would move to
23  admit Exhibits 464 and 465.  Counsel, any objection to 464
24  and 465?
```

UNITED STATES DISTRICT COURT

24

```
1          MR. PARKER:  No, Your Honor.
2          THE COURT:  464 and 465 are in evidence.
3          (Exhibit 464 and 465 admitted.)
4          THE COURT:  And go ahead play the video deposition
5   of Mr. Bradford Spencer.
6          (Video deposition played.)
7          MR. LU:  Next Pavemetrics will call Bernard Teufele
8   by video deposition.  It will be about six minutes.  And I
9   would just like to move into evidence Exhibit 231.
10         THE COURT:  Okay.  Counsel, any objections to
11  Exhibit 231?
12         MR. PARKER:  No, Your Honor.
13         THE COURT:  Okay, Exhibit 231 is in evidence.
14         (Exhibit 231 admitted.)
15         THE COURT:  And you can go ahead and play the video
16  of Mr. Bernard Teufele.
17         (Video deposition played.)
18         MR. LU:  Next Pavemetrics calls Robert Olenoski by
19  video deposition.  This will be about 14 minutes, and we'd
20  like to admit Exhibits 189, 192, 193, and 194.
21         THE COURT:  Okay.  Counsel, any objection to the
22  exhibits?
23         MR. PARKER:  No, Your Honor.
24         THE COURT:  Okay.  Exhibits 189, 192, 193 and 194
25  are now in evidence.
```

UNITED STATES DISTRICT COURT

**Exhibit 4**
**177**

25

```
1              (Exhibits 189, 192, 193, 194 admitted.)
2         THE COURT:  And you can now go ahead and play the
3  video deposition of Mr. Robert Olenoski.
4              (Video deposition played.)
5         THE COURT:  Go ahead and call your next witness.
6         MS. LEA:  Pavemetrics calls John Laurent.
7         THE CLERK:  Please raise your right hand.
8              (Witness sworn.)
9         THE CLERK:  Please be seated.
10        MS. LEA:  It looks like Mr. Laurent has a book in
11 his hand.  We have an official witness book to provide him.
12 That might be a better idea?
13        THE COURT:  Okay.
14        MS. LEA:  Counsel for Tetra Tech has asked that
15 Dr. Hebert leave the room.
16        THE COURT:  Okay.
17        THE CLERK:  Will you please state and spell your
18 full name for the record?
19        THE WITNESS:  My name is John Laurent.  So it's
20 spelled J-o-h-n L-a-u-r-e-n-t.
21        THE CLERK:  Thank you.
22        MS. LEA:  And Your Honor, I have a few exhibits to
23 preadmit?
24        THE COURT:  Whenever you're ready.
25        MS. LEA:  Exhibit 26, Exhibit 86-1, 189, 193.
```

UNITED STATES DISTRICT COURT

26

```
1         THE CLERK:  Are they the same exhibits that were
2  used in Olenoski?
3         MS. LEA:  They might have been.
4         THE COURT:  Okay.  189 and 193 are already in
5  evidence.
6         MS. LEA:  452?  510, 526, 527, 555, 558, 565, 566,
7  572, 763, 811.  And I will have one that I'll admit during
8  the testimony, Your Honor.
9         THE COURT:  Okay.  Any objection to these exhibits,
10 Counsel?
11        MR. PARKER:  No objection, Your Honor.
12        THE COURT:  Okay.  So Exhibits 26, 86-1, 452, 510,
13 526, 527, 555, 558, 565, 566, 572, 763 and 811 are in
14 evidence.
15        You can proceed, Counsel.
16        MS. LEA:  All right.
17              DIRECT EXAMINATION
18 BY MR. LEA:
19 Q.  Good morning, Mr. Laurent.
20 A.  Good morning.
21 Q.  How long have you been in the transportation field?
22 A.  I would say my whole professional career.
23 Q.  And how old are you?
24 A.  I am 58.
25 Q.  As of when?
```

UNITED STATES DISTRICT COURT

27

```
1  A.  As of today.
2  Q.  Well, Happy Birthday.
3  A.  Thank you.
4  Q.  Great way to spend your birthday, I guess?
5  A.  Yeah, it must be fate.
6  Q.  Can you tell us your profession, please?
7  A.  So okay.  I am Vice-President and CTO, Vice-President
8  for Business Development and CTO at Pavemetrics.
9  Q.  And what is your educational background?
10 A.  So I started off by doing a Bachelor's degree in Physics
11 Engineering, and then I did a Master's in Electrical
12 Engineering.  The specialization was using neural networks
13 for imagining process at LaValle University.
14 Q.  And what did you do after you received your Master's in
15 electrical engineering?
16 A.  So when I finished my Masters, I went to work for the
17 National Optics Institute of Canada.  Their acronym is INO.
18 And I have a job as a researcher.  So I started off as a
19 researcher, and after a few years, they named me Head of the
20 Machine Division in 3D Sensors Group at INO.
21 Q.  And how long did you lead that group?
22 A.  I worked there for 18 years.
23 Q.  And what technology did your group develop?
24 A.  So we mainly developed 3D sensors and software for
25 applications mostly applied to the transportation industry.
```

UNITED STATES DISTRICT COURT

28

```
1         MS. LEA:  If we could please show slide one?
2  Q.  Can you explain what is shown on demonstrative slide
3  one?
4  A.  Yes.  So that was the main technology we were using.  We
5  were using for the laser triangulation.  So basically, what
6  you see here is a laser.  The laser is projecting a line onto
7  the surface.  That line is gonna contour the object.  So the
8  camera looks at the shape of the line, the laser line, to get
9  the contour of the object, and that gives you the shape of
10 the object.
11        And then the distance is calculated using
12 triangulations of basic high school geometry, you know, the
13 distance between the camera and the laser.  You calculate the
14 angle alpha, and then you use the inversus tan operation, and
15 you can get the distance from the laser to the surface.
16        THE COURT:  If you're going through technical
17 materials, Mr. Laurent, just go a bit slower and make sure
18 the court reporter hears.
19        THE WITNESS:  Sure thing.
20 BY MS. LEA:
21 Q.  Did you publish on your work at INO?
22 A.  Yes.  INO is a research center.  We did a lot of
23 publications in I have published in my career over 30
24 articles, and I've presented at least over a hundred times at
25 the different conferences around the world, mostly on the
```

UNITED STATES DISTRICT COURT

**Exhibit 4**
**178**

**29**

1  subject of using 3D technology and lasers for, uh -- for
2  measuring the condition of transportation infrastructures.
3  Q.   And I understand you've done around the world flights
4  multiple times to attend these conferences?
5  A.   Yes.  Been around for a while, almost a million miles.
6  Q.   And why have you published so extensively?
7  A.   Well, it's good for two things.  One, it shares with the
8  community so people -- you know, the people will be
9  interested in what we have to show them, and it's good for --
10  it's good for the people who have infrastructures because
11  they can see what we can do with our technologies so they're
12  more interested in purchasing our systems.  So the more
13  people know what we can do, the better it is for us.
14  Q.   And when did you found Pavemetrics?
15  A.   So Pavemetrics was founded in 2009, and that's when I
16  left INO to found Pavemetrics with my colleagues.  And you
17  got to remember, a research center is an R and D center.
18  It's not good for commercializing technology.  So we felt we
19  were ready to commercialize the technology that was developed
20  at INO so we started Pavemetrics.
21  Q.   And what was your first commercial product called when
22  you founded Pavemetrics?
23  A.   So when we started Pavemetrics, that was when we
24  announced the LCMS system.  That's an acronym that's for
25  Laser Crack Measurement System.

UNITED STATES DISTRICT COURT

**30**

1  Q.   And what did it do?
2  A.   Oh, it -- it was applied to measuring roads.  So
3  basically, you could travel at 60 miles per hour and use
4  these sensors to measure cracks and to measure ruts and to
5  measure all kinds of features with a road surface.  The
6  cracks you can detect at six miles per hour were about a 16th
7  of an inch.
8  Q.   And this was in 2009?
9  A.   This was in 2009, yeah.
10  Q.   And what exactly is the LCMS system?
11  A.   Well, it's basically two 3D laser profilers that explain
12  the principle.  And they're placed about six feet over the
13  road surface or whatever surface you want to scan.  And using
14  those sensors, you can see a full 12-meter width profile.  So
15  it sees a very wide profile because we can put them very
16  high.  If you have to keep the sensor low, then you can't see
17  very wide.
18  Q.   And what did the sensors measure?
19  A.   So the sensors measure two kinds of data.  The first
20  data is elevation data so it's the distance between the
21  sensor and the object that's elevation or we also call it
22  range data.  And there's the intensity data.  The intensity
23  is basically the amount of light that's reflected back to the
24  sensor so it's like taking an image with an ordinary camera.
25  Q.   And sometimes in this case, we hear the intensity called

UNITED STATES DISTRICT COURT

**31**

1  2D data; is that right?
2  A.   That's correct, that's 2D data.
3  Q.   And sometimes the elevation range is called 3D data?
4  A.   3D data, that's correct.
5  Q.   And why is it important to measure both 2D intensity and
6  3D elevation or range data?
7  A.   Well, you use them to detect different things.  For
8  example, the 3D data, we definitely use that to detect the
9  cracks because the cracks are gonna be deeper than the
10  surface of the pavement so by measuring the depth of the
11  crack, we know that it's below the surface pavement, and it's
12  a crack.
13       But there are things like lane markings.  Lane
14  markings are just paint on the asphalt surface so, you know,
15  there's no elevation difference between a lane marking and a
16  pavement surface.  So you see the lane marking's white.
17  That's in the intensity image.  And the asphalt will be
18  black.  So wherever you see a white stripe, you have your
19  lane marking.
20  Q.   What did the inspection processing software do in 2009?
21  A.   Well, we, uh -- we were using traditional machine image
22  processing algorithms to detect cracks.  We were using it to
23  detect rutting, to detect texture of the road, all kinds of
24  things.
25  Q.   And -- and did it do that from both range and intensity

UNITED STATES DISTRICT COURT

**32**

1  images?
2  A.   Yeah, we would process both those kinds of data.
3  Q.   And how many LCMS systems has Pavemetrics sold?
4  A.   So we're really the world leader in this field.  We have
5  sold over 400 systems in about 45 different countries.  This
6  technology in the USA has been used in virtually every state
7  to measure the roads.  CalTrans in California uses our
8  technology to measure the condition of your roads.
9       And I would say on a typical year, last year, we
10  probably scanned about five million miles of roads.  So no
11  one could ever dream of that, but if you want a picture,
12  five million miles is 200 times around the circumference of
13  the world.
14  Q.   And what surfaces did Pavemetrics market the LCMS system
15  as inspecting?
16  A.   So we did our marketing based on all kinds of
17  transportation infrastructures.  So we tell our customers we
18  can use these sensors because we did use them for different
19  applications.  We were marketing them for roads, for
20  airports, airport runways.  We were using it for rail.  And
21  we were also using it to scan tunnel linings, you know,
22  inside a lot of rail tunnels.
23  Q.   You can use the same sensors for inspecting roads and
24  railroads?
25  A.   Correct.

UNITED STATES DISTRICT COURT

**Exhibit 4**
**179**

33

```
1    Q.   Did you ever publically promote the use of LCMS for
2    inspecting rails?
3    A.   Oh, yeah, we did a lot of that.  We started -- in 2012,
4    we started doing some demonstrations with the technology with
5    railways, and we started presenting information on our system
6    at conferences.
7    Q.   And was one of those conferences the RPUG conference?
8    A.   Yes, that's one of the first conferences.
9    Q.   And what does Rpug stand for?
10   A.   RPUG is an acronym for Road Profiler User Group.
11   Q.   If we can turn to Exhibit 558?  And what is Exhibit 558?
12   A.   So that's one the presentations that I did.  This one is
13   the presentation I did at RPUG 2012.
14   Q.   If we could go to page 3?  What is shown on page 3 of
15   your RPUG 2012 presentation?
16   A.   Well, there's two other products there.  Those are
17   legacy products that we had, LRMS and LRIS.  One was just for
18   running, the other one was just for imagining, but what we
19   were really talking about in this presentation is the LCMS.
20   And I explained to the people there that those sensors could
21   be used, of course, for road inspection but also for
22   airports, tunnels, rail inspection.
23   Q.   And did Pavemetrics ever sell an LCMS system for
24   inspecting railroad?
25   A.   Uh, well, yeah, we sold several.  The first, you know,
```

34

```
1    couple of LCMS systems we sold that were used for rail
2    inspection was in 2010.  We sold three systems to a company
3    called EuroConsult in Spain.
4    Q.   And what does EuroConsult use the system for?
5    A.   Well, they use them for both tunnel -- scan tunnels
6    lines and for rail inspection.
7    Q.   And did EuroConsult publish a paper describing their use
8    of the LCMS system for railways?
9    A.   Yeah, that is correct.  They published a paper at a
10   conference called TRB in 2014 that described the use of the
11   LCMS sensors for rail inspections.
12   Q.   And is that a paper that you are familiar with and have
13   seen?
14   A.   Yeah.  They sent me the paper so I could review it, and
15   they asked my permission to use some of the illustrations
16   that was in the paper.
17   Q.   If we could show Exhibit 510, please?  Is Exhibit 510
18   the EuroConsult paper?
19   A.   It is.
20   Q.   And when, and where was this published?
21   A.   TRB 2014, January 2014.  And TRB is in Washington D.C.
22   It's the Transportation Research Board meeting.  That's a
23   group that's part of the National Academy of Sciences and
24   Engineering and Medicine in the U.S.
25   Q.   And the title is Detection of Range Based Rail Gauge and
```

35

```
1    Missing Rail Fasteners.  And was that detection done with
2    your device?
3    A.   Uh, correct, we were using our LCMS sensors.
4    Q.   And it says use of high resolution two and three
5    dimensional images.  And those were collected with your
6    device?
7    A.   Again, yes.
8    Q.   Okay.  Now, did Pavemetrics ever sell an LCMS system for
9    inspecting railroads in the United States?
10   A.   Uh, we did.  In 2012, we sold the sytem to the
11   University Massachusetts Lowell, an LCMS system, that was
12   used for rail inspection purposes.
13   Q.   If we could show Exhibit 526?  So what is Exhibit 526?
14   A.   Uh, I believe that's the purchase order.  So it's a
15   purchase order from UML.  And as you can see the description,
16   it says two 3D laser profiling sensors so those are the LCMS
17   3D sensors with the lasers and cameras.  And it's got all the
18   cables and -- and the, uh, software and the frame grabbers
19   and controllers.
20   Q.   And if we could just scroll back up, the purchase order
21   is dated September 17th, 2012?
22   A.   That's correct.
23   Q.   Now, if we could go to Exhibit 555?  What is
24   Exhibit 555?
25   A.   So that would be the invoice we sent UML for the
```

36

```
1    purchase of their system.
2    Q.   And what is it dated?
3    A.   It's dated the 27th of September, 2012.
4    Q.   Again, European dating there?
5    A.   Yeah, it's our French background.
6    Q.   Thank you.  Okay.  And let's see.  So it shows the LCMS
7    system was listed there as being invoiced?
8    A.   Yeah.
9    Q.   Okay.  If we could go to Exhibit 527?  What is
10   Exhibit 527?
11   A.   So that's a copy -- whoops.  Okay.  That's a copy of the
12   LCMS Hardware and Software Installation Manual dated
13   August 2012 that was sent to UML with the sensors.
14   Q.   If we could go to page 28?  Do see Figure 9 at the top
15   of the page that shows a left image and a right image?
16   A.   Yes.
17   Q.   And what is Figure 9 showing?
18   A.   So basically, those two images are -- are the images
19   coming from each of the sensors.  So the left image is the
20   data from the left sensor and the right from the right
21   sensor.
22   Q.   And they give four options for displaying the data.  It
23   says intensity, range, rectified range and 3D.  Do you see
24   that?
25   A.   Yes.
```

Exhibit 4
180

37

1   Q.   Okay.  And I think we've covered this, but briefly, what
2   is the intensity image?
3   A.   So the intensity is the 2D information reflected in use
4   of pavement in this case.
5   Q.   And the range image?
6   A.   The range is the distance between the vertical elevation
7   data so the distance between the sensor and the surface.
8   Q.   And the rectified range?
9   A.   So the rectified range is just like a zoom in on a part
10  of the range.  So it allows you to see better the details,
11  for example, to see the cracks.  Otherwise, if you're too far
12  away, then you can't see the cracks.
13  Q.   And what is the 3D image?
14  A.   Um, the 3D image is the same as the intensity image
15  except we -- we added shadows to the intensity image so that
16  there's contrast like to see the cracks.  You can see those
17  cracks better in the intensity images.
18  Q.   As we go down to the fourth bullet point on that same
19  page, it describes the 3D image, and it says the 3D image is
20  resulting from the merging of the both the intensity and
21  range images.  The 3D effect is created by positioning two
22  artificial lighting sources over the image.  The result is
23  similar to the 3D images that's created the LCMS data viewer
24  3D software.  Can you explain what is meant by a merging of
25  both the intensity and range images?

UNITED STATES DISTRICT COURT

38

1   A.   Um, well, yeah, I can explain.  It's basically saying
2   that, um, we project a light on the -- well, we use the 3D to
3   calculate the angles of the images to see how the light would
4   reflect off the surface.  So depending on where the surface
5   points to, the shape and where the actual light source is,
6   then you're gonna get more or less light coming back to you.
7   So it's the way that we calculate where we should be putting
8   the shadows in the images.
9   Q.   And do you understand that -- first, let me ask you,
10  what does Pavemetrics call this image and its source code?
11  A.   So this is the image that we call Fake3D.
12  Q.   And so -- and you understand in this case, Tetra Tech is
13  accusing Pavemetrics current -- is currently accusing
14  Pavemetrics of infringing by using Fake3D; correct?
15  A.   That's correct.
16  Q.   And Pavemetrics had the Fake3D image in 2012; correct?
17  A.   Yeah, even in 2010.
18  Q.   All right.  And what did UML do with the LCMS that it
19  purchased?
20  A.   So, um, UML was interested in demonstrating how this
21  technology can be used to inspect rail.  So we -- we used the
22  sensors to collect data on rail, and that way we could
23  demonstrate that we were capable of detecting the features on
24  the rail.
25  Q.   And what did Pavemetrics do with the results from the

UNITED STATES DISTRICT COURT

39

1   UML project?
2   A.   So the results were presented at quarterly meetings.
3   Q.   And did Pavemetrics require UML to sign any type of
4   confidentiality agreement to maintain the secrecy of
5   Pavemetrics's technology or algorithm?
6   A.   No.  This was a project funded by the Department of
7   Transportation so all the information was public, and we
8   intended to publish papers on it.
9   Q.   If you can turn to Exhibit 565?  Do you recognize
10  Exhibit 565?
11  A.   Those are the third quarterly meeting minutes from the
12  UML project.
13  Q.   And what are they dated?
14  A.   Um, yeah.  May 14th, 2013.
15  Q.   And what was your role on the UML research project?
16  A.   Oh.  I was Project Leader for Pavemetrics.
17  Q.   And in general, who were the attendees at this
18  particular meeting?
19  A.   So we see there are several people from the FRA, and
20  that's the Federal Railroad Administration.  We even have
21  Mr. Nelson from NASA and several different university
22  professors from different universities and some graduate
23  students.  And we have -- we have two developers from
24  Pavemetrics so Mr. Metari and Talbot.
25  Q.   And were they vice-presidents of Pavemetrics?

UNITED STATES DISTRICT COURT

40

1   A.   Yeah, I think they got a promotion for this meeting.
2   No, they -- they were developers.
3   Q.   And by developers, you mean software programmers?
4   A.   Yes.
5   Q.   And what did the meeting minutes relate to?
6   A.   So they would describe the work we did analyzing the
7   rail data for UML.
8   Q.   If we could go to page 8, please, of Exhibit 565?  And
9   what is shown on page 8 of Exhibit 565?
10  A.   So it describes the algorithm that we used to detect the
11  rail edges.
12  Q.   Now, Step 4 says applied the Canny method for rail edge
13  detection.  What is the Canny method?
14  A.   So it's a very old, traditional method for computer
15  vision.  It basically calculates vertical gradients over an
16  entire image using a sliding window.
17  Q.   If we could go to slide 13?  What's shown on slide 13?
18  A.   So those are the 3D data, the images of 3D data.
19  Q.   Is it the Fake3D image?
20  A.   That's correct, it's the Fake3D.
21  Q.   If we could go to slide 14?  And what is shown in slide
22  14?
23  A.   So that's the Fake3D that's been merged together, right
24  and left side, and you see the results of the edge rail
25  detection on -- on that image.

UNITED STATES DISTRICT COURT

**Exhibit 4**
**181**

41

1   Q.   If we could go to slide 15?  What's being discussed on
2   slide 15?
3   A.   Well, it basically describes the next steps, next thing
4   that we're gonna be working on for the UML project.  So we
5   were gonna continue -- we had already detected the rails.
6   Now we're gonna continue for detecting fasteners, missing
7   fasteners, and detecting the cross ties.
8   Q.   And did you develop algorithms to detect those features?
9   A.   Yes, we did.
10  Q.   If we could go to Exhibit 565?  What is Exhibit 565?
11  A.   So that's. . .
12  Q.   566, I'm sorry.
13  A.   Yeah, that's what I was wondering.
14  Q.   My fault.  What is 566?
15  A.   So that's the fifth quarterly report.  We're nearing the
16  end of the project here.
17  Q.   The fifth quarterly report for the UML project?
18  A.   Yes, that's correct.
19  Q.   And if we could go to page 17?  Sorry.  Let's go to
20  page 19.  At the top of page 19, it refers to Task 20,
21  published papers and make presentations.  What's being
22  discussed in this paragraph?
23  A.   So what's being discussed here is we had prepared a
24  presentation for the 2014 TRB annual meeting, and you have to
25  send those papers in advance, and we had received very

UNITED STATES DISTRICT COURT

42

1   positive comments on that paper.
2   Q.   It calls it a laser paper?
3   A.   Yeah, it's a laser paper.  That's the use of the LCMS
4   sensors for the rail inspection application.
5   Q.   And if se could go to Exhibit 26?  What is Exhibit 26?
6   A.   So that is the paper that was presented at the TRB 2014
7   conference.
8   Q.   And you are an author on this paper; correct?
9   A.   I am.
10  Q.   See that there.  And the title is Automatic Track
11  Inspection Using 3D Laser Profilers to Improve Rail Transit,
12  Asset Condition Assessment and State of Good Repair, a
13  preliminary study.  Why was it called a preliminary study?
14  A.   Well, it was the first time we presented anything on
15  this topic so we knew there was gonna be a lot more work to
16  do and a lot more things to present going forward.
17  Q.   And what are the 3D laser profilers discussed in this
18  article?
19  A.   Again, they are the LCMS sensors that Pavemetrics
20  provides.
21  Q.   If we go to the abstract on page 2?
22       THE COURT:  Counsel, before we get into that, why
23  don't we take our morning break.  So we'll take ten minutes
24  and come back at 10:40.
25       THE CLERK:  All rise.

UNITED STATES DISTRICT COURT

43

1                    (Jury not present.)
2            THE COURT:  Okay.  We'll resume at 10:40.
3                    (Recess taken.)
4            THE CLERK:  All rise.
5                    (Jury present.)
6            THE CLERK:  This court's again in session.
7            THE COURT:  Okay.  Counsel, you may proceed.
8            MS. LEA:  We were on Exhibit 26, the UML-TRB paper.
9   If we can pull that back up, please?  And we are in the
10  abstract on page 2, and I'd like to read line 60.
11       "Based on the 3D depth map generated by the LCMS,
12  new methods have been developed for measuring rail gauge,
13  detecting missing or broken fastener and identifying cracks
14  in concrete ties."
15  Q.   Now, were all of those features of a railroad identified
16  by the Pavemetrics LCMS from the 3D depth map?
17  A.   Uh, yes, that is correct.
18  Q.   Okay.  If we can look at page 3, page 3, line 118, it
19  says the LCMS sensor has been used around the world for high
20  speed highway inspection, and then it says the LCMS is
21  capable of collecting extremely precise and detailed data at
22  speeds of up to 100 kilometers per hour.  How many miles per
23  hour is that?
24  A.   Uh, that's 60 miles per hour.
25  Q.   And if we could go to page 4, there's a section 2,

UNITED STATES DISTRICT COURT

44

1   hardware configuration.  What hardware is described here?
2   A.   So you see there the 3D laser profilers that were used.
3   You can see we have the high power lasers and the cameras
4   that in the sensors.  And there's a controller.
5   Q.   And when you refer to 3D laser profilers, is that
6   another name for sensors?
7   A.   Profilers, sensors, yes.
8   Q.   And let's see.  If we can look at lines 140 through 141
9   just a little in this section.  And I believe -- does this
10  also refer to processing by a high performance computer?
11  A.   That's correct.
12  Q.   And if we turn to page 5 of Exhibit 26, Section 3,
13  automatic inspection of railroad, what is shown in Figure 3?
14  A.   So that figure is representing the fact that we have the
15  two sensors and each of the two sensors seeing half of the
16  rail.  There's an overlap sensor area in the center, and that
17  allows us to stitch everything together into one profile.
18  Q.   So you have a complete view of the entire cross section
19  of the railroad track?
20  A.   Yes, uh, up to 12 feet wide.
21  Q.   If we could go to page 6, Figure 4?  What is the image
22  in Figure 4 showing?
23  A.   So that would be a 3D map acquired by the LCMS so it's a
24  combination of 2D and 3D data together.
25  Q.   And on page -- if we could go to page 6, please?  I'm

UNITED STATES DISTRICT COURT

Exhibit 4
182

45

1    sorry, let's stay right there and look at that highlighted
2    section.  It states LCMS sensors simultaneously acquire both
3    range and intensity images of the scanned surfaces by merging
4    the range and intensity data.  3D profiles of the scanned
5    surfaces can be obtained.  Is this also referring to the
6    Fake3D image?
7    A.  Uh, yes, the last one.  The last part, yes.
8    Q.  And if we could turn to Figure 5 in Exhibit 26?  Can you
9    explain to the jury what is shown in Figure 5?
10   A.  So Figure 5, again, is a picture of you have on the left
11   side the just standard intensity image.  Then in the middle,
12   it's range or elevation data.  And on the right, you have the
13   merged Fake3D images where the shadows have been added to the
14   intensity image.
15   Q.  And if we could look at page 7?  I believe we're on
16   Section 3.1, rail gauge estimation.  At around line 188, it
17   refers to this algorithm utilizes the 3D range data from the
18   LCMS sensor as follows.  And then what are these steps that
19   are laid out in general?
20   A.  This is basically an algorithm to detect the edges of
21   the rails.  So it'll detect the edge of the left and right
22   rail, and the gauge is basically the distance between the two
23   rails.
24   Q.  And I believe the algorithm goes over to the next page.
25   And there's Step 4 that refers to a Sobel kernel being

46

1    applied for edge detection and Step 5, the Canny method, is
2    applied in order to extract the rail head contour.  What
3    is -- the Sobel kernel and the Canny method, what are they
4    doing?
5    A.  Again, those are very traditional machine vision
6    techniques.  They calculate vertical gradient over the entire
7    image and use a sliding window.
8    Q.  Now, we've been talking about LCMS for rail in 2014.
9    When did Pavemetrics change the name to LRAIL?
10   A.  In 2014.
11   Q.  Was that shortly after this -- this paper published?
12   A.  Yeah.  It was after the TRB conference, yes.
13   Q.  If we could see Exhibit 572?  What is Exhibit 572?
14   A.  So that would be the first LRAIL flyer that we
15   distributed commercially and put on our website.
16   Q.  And when was that?
17   A.  I believe it was around October, November 2014.
18   Q.  And I'd like to change topics.  When did Pavemetrics get
19   its first project directly from the FRA that's funded by the
20   FRA?
21   A.  So we submitted a project proposal in 2016, I believe,
22   and we were awarded a project in 2017.
23   Q.  Okay.  And what was the purpose of that project?
24   A.  Oh.  It was for a change detection.  So change detection
25   is basically you look at changes over time.  So you'll scan

47

1    the rail once, and then you go back six months later, and you
2    scan it again, and then you try to detect what changed over
3    time.
4         So remember Brad Spencer, he was saying if there's
5    flooding, you could have problems.  So if there's flooding,
6    you could have ballast levels that fall, and that would
7    indicate that, you know, that would be a problem with your
8    structure.  So basically, that's what we were doing.
9    Q.  So previously, you had been identifying features, and
10   this is the next step in detecting changes over time in
11   features.
12   A.  Yeah.  So it's more difficult cause you have to both
13   identify features and then compare them over different times.
14   Q.  Okay.  And I believe you told us that you submitted a
15   proposal in March 2017?
16   A.  We submitted in '16.  We were awarded the project in
17   2017.
18   Q.  Thank you.  And how did Pavemetrics detect the changes?
19   A.  Uh, well, we -- we started off with the traditional
20   machine vision algorithms, and eventually, we used AI for --
21   for that task.
22   Q.  So you started with the traditional computer vision
23   techniques that you had previously published on in your TRB
24   2014 paper?
25   A.  Yeah, those were the same type of algorithm for sure.

48

1    Q.  Okay.  And did you complete the contract with the FRA?
2    A.  Yes, we did.  Uh, we completed the contract, and I
3    believe it was published in 2020.
4    Q.  And what was published in 2020?
5    A.  Oh, the -- final report.
6    Q.  Now, let's talk about when Pavemetrics started
7    transitioning to artificial intelligence and deep neural
8    networks.  When was that?
9    A.  In 2018, we started -- we started experimenting with
10   neural networks for rail applications.
11   Q.  And what are some of the advantages of using a neural
12   network?
13   A.  Well, in 2018, it was the time where they become very
14   popular.  We could see people using those things for facial
15   recognition, for self-driving cars and even detecting cancer
16   cells so we figured we could train a neural network to detect
17   features in the railway.  And the way -- the way it's done is
18   instead of having to program complex algorithms, you just
19   show an image of what you want the computer to learn, and it
20   can tell what it is, and it will learn it.  So much easier to
21   train a neural network than to program a computer on a step
22   by step algorithm.
23   Q.  Okay.  And in general, what was the experiment that you
24   did?
25   A.  So for -- so what we were experimenting with in 2018 and

**Exhibit 4**
**183**

49

1    2019 is simply training the neural network by showing them
2    images of -- of different components.  So we showed images of
3    ties, and we showed images of ballast.  We'd show images of
4    actually wooden ties and concrete ties and images of the
5    fasteners.  And then we would tell the neural network what
6    they were, and we would train them on the training set, and
7    then we would test them on another set called a testing set,
8    and that would tell us how well the neural network was
9    recognizing these features.
10   Q.   And how well did it work?
11   A.   Oh, it was working really good.  We were very close to
12   even 100 percent recognition on the testing set.
13   Q.   And did you publish on your neural network experiment?
14   A.   Oh, yeah.  We published at papers on our experiments in
15   2018 at Arema and at in 2019 at Arema again.  And we also
16   published a paper at WCRR in Japan in 2019.
17   Q.   And what does WCRR stand for?  World Congress on Railway
18   Research?
19   A.   Yeah.
20   Q.   So many acronyms.  If we could go to Exhibit 117,
21   please?  Do you recognize Exhibit 117?
22   A.   Yeah, that's the paper we presented at WCRR.
23   Q.   And you are author of --
24   A.   Yeah, I -- I'm one of the authors, yeah.
25   Q.   And this was presented in Tokyo in 2019?

UNITED STATES DISTRICT COURT

50

1    A.   Yes, it was.
2    Q.   Now, the title says Development of an Artificial
3    Intelligence, a Deep Neural Network for the Automation of
4    Railway Maintenance and Safety Inspections.  Why was it
5    titled development?
6    A.   Well, it was a summary of the experiments that we were
7    doing with the neural networks during the last two years in
8    2018 and '19.
9    Q.   If we could go to page 4, Section 3.3, overview of track
10   inspection DNN, and DNN stands for Deep Neural Network;
11   correct?
12   A.   That's correct.
13   Q.   Okay.  It says the image classification algorithm
14   developed in prior work is a seven layer supervised machine
15   learning algorithm based on deep CNET.  What is deep CNET?
16   A.   Deep CNET is -- it's a type of neural network.  It's one
17   of the models that are available, uh -- that are available in
18   the public domain.
19   Q.   And did you use deep CNET in your experimentation in
20   2018 and 2019?
21   A.   Uh, yes, we did.
22   Q.   And was the deep CNET neural network added to
23   Pavemetrics' LRAIL software?
24   A.   No, it wasn't.  It was just used for experimental
25   purposes.

UNITED STATES DISTRICT COURT

51

1    Q.   And so did you ever implement it into your source code
2    library or any software for a customer?
3    A.   No.  Uh, we never implemented this into the LRAIL
4    software.
5    Q.   And why not?
6    A.   Well, when we were ready to use AI in our LRAIL, we had
7    better neural networks available to us so we used different
8    ones.
9    Q.   And what neural network did you use in the software with
10   customers?
11   A.   So it was a neural network based on the tensor flow.
12   Q.   And it was not the deep CNET described in Exhibit 117?
13   A.   No, it wasn't.
14   Q.   Now, were you in the courtroom when Dr. Morellas
15   testified?
16   A.   Yes, I was.
17   Q.   And he's the technical expert for Tetra Tech?
18   A.   That's correct.
19   Q.   Did you hear him testify that he based his infringement
20   analysis on the deep CNET in Exhibit 117?
21   A.   Yes, I saw that.
22   Q.   And -- but Pavemetrics never used deep CNET with a
23   customer; correct?
24   A.   No, we didn't.
25   Q.   You just used it for experimenting for the results in

UNITED STATES DISTRICT COURT

52

1    this paper; correct?
2    A.   Yes, this paper and the other two papers we presented.
3    Q.   Okay.  So -- so does Exhibit 117 describe the neural
4    network used with the four sales at issue in this case?
5    A.   No, it does not.
6    Q.   And what neural network was used with the four sales at
7    issue in this case?
8    A.   Another network, another neural network based on the
9    tensor flow engine.
10   Q.   And does Pavemetrics' neural network model with tensor
11   flow operate differently than the deep CNET neural network
12   described in Exhibit 117?
13   A.   Yes, it does.  All the different neural networks have
14   different structures and operate differently.
15   Q.   If we could go to page 8 of Exhibit 117, your Tokyo 2019
16   paper and highlight the last paragraph.  I'll read the first
17   sentence.  It says one interesting observation from the
18   researchers is that much like every human brain, each neural
19   network is unique due to its specific combinations of nodes,
20   layers and connections as well as the constant evolution of
21   those same factors.  Did you write those words in 2019?
22   A.   Well, I participated.  I was one of the authors in the
23   paper.  I don't know wrote if I wrote those exact words
24   myself, but I certainly believe that those words are true.  I
25   believe that every neural network is different.  They

UNITED STATES DISTRICT COURT

Exhibit 4
184

## 53

1  different structures, different number of neurons.  The
2  interconnections are different.  And even they change over
3  time because we continue training these over time with new
4  fasteners and -- and new things, new images all the time so,
5  you know, they're in constant evolution.
6  Q.  And then the next sentence says this quality makes it
7  impossible to define the exact methodology of any given and
8  has the interesting implication of preventing a neural
9  network from being patented as well as preventing a neural
10  network from infringing upon an existing patent.  Was that
11  your belief about neural networks in 2019?
12  A.  Yes, it was.  When you look at patent claims, they
13  usually describe the very precise algorithms where you have
14  to do step a, b, c, d, e, f, but that's not how a neural
15  network works.  Everything's happening in parallel, and we
16  don't know exactly how they're configured because the neural
17  network configures itself.  So if you can't describe what
18  exactly it's doing even, you can't patent it or say it's
19  infringing.
20  Q.  Okay.  I'd like to shift gears now and talk about
21  something else.  So after presenting on using a neural
22  network to inspect railroad in 2018 and 2019, what happened
23  with respect to your LRAIL business?
24  A.  Oh.  So people loved the AI stuff.  I would have dozens
25  of people come to see me after my presentation and say he,

## 54

1  this is great.  This is really interesting.  You know, they
2  would love to see, hear more about it, and it was a really
3  popular subject back then.  And also, people were talking
4  about all the work we were doing with FRA and Amtrak.  So
5  yeah, we were getting a lot of interest from this work.
6  Q.  Okay.  So let's look at Exhibit 907 since you just
7  mentioned your FRA work.  What is Exhibit 907?
8  A.  So this is a news report that -- I guess that announces
9  the -- you know, when the report was made public by the FRA
10  for the results of our studies so the FRA report that
11  confirms how, you know, AI based algorithms can be used for
12  rail inspection.
13  Q.  And it's talking about your AI based algorithms and
14  LRAILs; correct?
15  A.  Yeah, that's correct.  That's the result of several
16  years of studies with the FRA.
17  Q.  Okay.  And the paragraph being shown right now says
18  LRAIL change measurements were determined to be highly
19  repeatable.  Is that your understanding?
20  A.  Yes.  They are very repeatable in 99 percent so
21  that's -- that's a pretty good score.
22  Q.  And -- and let's make sure we have the date.  What was
23  the date on this news release?
24  A.  The date is May 1st, 2020.
25  Q.  And it's talking about your FRA report dated what?

## 55

1  A.  It would be around that same time, I guess.
2  Q.  Your April 2020 FRA report?
3  A.  Probably.  Uh, I don't see the date on this.
4  Q.  Okay.  Let's see, I know it's in there.  Let's go with
5  it was around this time.  And let's talk about your LRAIL
6  sales in 2020 and 2021.  If we could put up the demonstrative
7  slide 2?  How many sales in the United States did you have
8  for LRAIL in 2020 and 2021?
9  A.  Well, 2020, 2021, we see here there's six, uh, six
10  sales.
11  Q.  And why did you have more sales in 2020 and 2021 than
12  you had had in the past for LRAIL?
13  A.  Um, well, there are several reasons.  First of all, we
14  had switched to AI, and customers were very interested in
15  those kinds of features.
16       And basically, the AI algorithms worked better.
17  They were more accurate and were faster than what we were
18  using in the past.
19       And there's another thing.  We heard a lot about
20  the GREX patents, and they were invalidated in 2020.  And FRA
21  paper was published also we saw in April, May 2020.  So all
22  those things really gave us -- gave the people a lot of
23  interest in our products, and that's why -- and that's one of
24  the major reasons CSX bought our products.
25       And another thing that's happened is the computing

## 56

1  power was there.  And for neural networks, we could use the
2  GPUs from graphic cards that would increase the speed of our
3  calculations as well.  You know, all those factors.
4  Q.  What's a GPU?
5  A.  A Graphical Processor Unit.
6  Q.  And does that give you the ability to process faster?
7  A.  Uh, yeah, because neural networks are parallel type
8  operations, and GPUs do the same kind of operations in their
9  own networks.  They do calculations in parallel.
10  Q.  Now, last week, Tetra Tech's counsel showed a 2016 LRAIL
11  market review that suggested in the prior art, the older
12  LRAIL was slow.  If we could see Exhibit 46 at page 5?  Do
13  you recognize this -- this presentation?
14  A.  Yeah, I -- I did.  I saw that.
15  Q.  And now, the third bullet point that they highlighted
16  says we haven't done realtime processing yet.  What is
17  realtime processing?
18  A.  So realtime processing would mean that you can process
19  the data as fast as you collect it.
20  Q.  And then it says you need to process at 60 miles per
21  hour, but currently only 7.2 kilometers so six PCs needed.
22  What's that referring to?
23  A.  Well, we were capable of acquiring the data at 60 miles
24  per hour, but in order to process the data at 60 miles per
25  hour, we needed to use six PCs.

Exhibit 4
185

57

```
 1    Q.   What's a PC?
 2    A.   Uh, well, personal computers.
 3    Q.   You needed more computers.
 4    A.   Yeah, that's correct.  That's what we use actually for
 5    CSX.  We have about six PCs with the graphic cards in them.
 6    Q.   Not different algorithms; correct?
 7    A.   No.  We didn't need to change algorithms for that, no.
 8    Q.   Okay.  So what was your market plan for LRAIL?
 9    A.   Oh, okay.  So initially, we never -- we never really
10    looked at the boxcar applications.  We had developed our
11    LRAIL system to go on hi-rail vehicles.  So the thing is
12    there's a few boxcars I think 50 was the number that we were
13    using, but hi-rails for inspections, there's hundreds and
14    hundreds of them.  There's 600 short line rail in the U.S.
15    And all the inspectors have to drive -- use hi-rail vehicles
16    to drive, and they have to drive the tracks on a weekly
17    basis.  So we saw that as a huge market potential, much
18    bigger market for us than the boxcars.
19    Q.   And a hi-rail vehicle, that's a truck?
20    A.   Yeah.  It's a truck that can go on the rail and on the
21    road so they use 'em a lot for maintenance.
22    Q.   And who do you typically sell hi-rail trucks to?
23    A.   Okay.  So our business model is to sell the integrators.
24    So we sell the sensors, they put 'em on the trucks, and they
25    go to inspect the roads.  And we were wanting to do the same
```

58

```
 1    thing.  Say okay, we would sell an LRAIL system to
 2    integrators.  They would put on hi-rail vehicles and go
 3    inspect the rails.  So that was our business model.
 4    Q.   And so how did it come to be that you're -- you're
 5    suddenly submitting a proposal to a major railroad like CSX
 6    in early 2020?
 7    A.   Well, they contacted us.  They had heard about the
 8    results we had from the FRA so Brad Spencer contacted us, and
 9    he wanted to know more about the LRAIL.
10    Q.   And did Pavemetrics submit a proposal to CSX?
11    A.   Yes, we did.  We submitted a proposal to CSX for -- so
12    they could acquire some LRAIL systems.
13    Q.   And was the proposal successful?
14    A.   Um, yes.  They, uh, acquired a first LRAIL in 2020, and
15    it was to be installed on one of their hi-rail vehicles so
16    they could do testing with it.
17    Q.   And so how many -- how many total sales to CSX have you
18    made -- or had you made in 2020 and 2021?
19    A.   Okay.  That's five to CSX, yeah.
20    Q.   And if we could show slide 2 again?  Okay.  What is Sale
21    A on slide 2?
22    A.   So Sale A is that first sale that was installed on the
23    hi-rail.
24    Q.   And that one was sold in October 2020?
25    A.   Well, yeah.  It was delivered before that because
```

59

```
 1    they first -- at first, they leased it, and then later they
 2    decided to -- to purchase it.
 3    Q.   And then what is Sale B on this chart?
 4    A.   It's the second system that we sold to CSX.  That one
 5    was to be installed on a boxcar.
 6    Q.   And that was sold in October 2020?
 7    A.   Yeah, same date.
 8    Q.   And you understand that Sales A and B are not at issue
 9    in this case because they were sold before January 5th, 2020;
10    correct?
11    A.   Yes, that's correct.
12    Q.   Okay.  If we could go to slide three, please?  I would
13    like to focus on Sale A for a few minutes.  Can you please
14    walk us through Sale A?  And we have the slide to help you.
15    A.   Okay.  So the dates are there.  The quotation we sent to
16    CSX was April 7th, 2020.  And then we actually shipped the
17    hardware to them in June 2020.  We invoiced them on
18    October 23, 2020.  And we sent them the license for the
19    software on October 30th, 2020.  Then we had to sign a goods
20    agreement with them, and that was signed on November 5th,
21    2020.
22    Q.   I would like to look at a few of these documents.  For
23    the first one, the quotation, I think this is an old version
24    of the slides, we're gonna use Exhibit 40.  It's the same as
25    Exhibit 162.  They're both in evidence.  But let's turn to
```

60

```
 1    the April 2020 quotation to CSX for Sale A.  We have here
 2    Exhibit 40.  Do you recognize Exhibit 40?
 3    A.   Yes, that's the quotation we sent to CSX.
 4    Q.   And what is the date?
 5    A.   April 7th, 2020.
 6    Q.   Okay.  And I notice the quote is for a turnkey LRAIL
 7    inspection system.  What does that mean?
 8    A.   So the turnkey LRAIL would be the LCMS sensors, the
 9    LRAIL software and basically all the other components you
10    need.  So there would be the acquisition computer and the GPS
11    system and everything you need to operate on a hi-rail
12    vehicle.
13    Q.   And this quote ultimately resulted in a sale to CSX;
14    correct?
15    A.   That's correct.
16    Q.   Okay.  And if we could go to page 2, and we're gonna
17    blow up the third bullet point, please.  It says note that
18    the included data processing software is nontransferable, and
19    its use is limited to processing data from the included
20    sensors.  It cannot be used to process data from other
21    sensors.  Does that accurately reflect how Pavemetrics'
22    software license works?
23    A.   Yeah.  All our software licenses are the same.  When you
24    buy software, it only works with the sensors of the hardware
25    that you purchased.  So we checked the serial numbers of the
```

**Exhibit 4**
**186**

61

```
1   hardware, and you can only operate the software with those
2   particular units.
3   Q.   Let's turn in your book to Exhibit 658.  We won't
4   publish it just yet until we lay a foundation.  Do you have
5   Exhibit 658?
6   A.   I do.
7   Q.   And what is Exhibit 658?
8   A.   So Exhibit 658 is the software is the keys, license keys
9   that we would have sent to CSX so they could use the
10  processing software with their sensors.
11  Q.   Okay.  And what sensors is the key in Exhibit 658 for?
12  A.   They're for sensors F 625 and F 626.
13  Q.   And those are the sensors in Sale A; correct?
14  A.   That's correct.
15       MS. LEA:  Okay.  Your Honor, I would like to
16  publish and admit 658?
17       THE COURT:  Any objection?
18       MR. PARKER:  No, Your Honor.
19       THE COURT:  658 is in evidence.
20            (Exhibit 658 admitted.)
21       MS. LEA:  I'm going to show it to the jury.
22  Q.   And can you please again explain what 658 is?
23  A.   So that's the software key.  It's an enclosed -- an
24  encrypted key bunch of a set of numbers.  And you can see SNF
25  625 and SNF 626.  Those are serial numbers of the sensors.
```

UNITED STATES DISTRICT COURT

62

```
1   So basically, you need those keys to operate the processing
2   software.
3   Q.   Okay.  If we can go back to slide three, what software
4   version was licensed for Sensors F 625 and F 626?
5   A.   So the software version was r10323.
6   Q.   And what was the term of that license?
7   A.   So that license would have expired one year later.
8   Q.   And so we have r10323 was licensed for those sensors.
9   And those sensors are on one unit; right?  Two sensors on one
10  unit?
11  A.   Yeah.  For Sale A, yeah, two sensors.
12  Q.   And so could version r10323 be used with Pavemetrics'
13  other sensors sold to CSX in Sales 2, 3 or 4?
14  A.   No.
15  Q.   Why not?
16  A.   Well, because they wouldn't have the license key.
17  Q.   Now, after CSX purchased Sales A and B in 2020, did they
18  purchase any more LRAIL systems?
19  A.   Yes, they did.
20  Q.   And how many?
21  A.   Uh, three more.
22  Q.   Okay.  Let's look at those sales.  If we could go to
23  slide five?  Can you walk us through the sale of Sales 2, 3
24  and 4 here?
25  A.   So February 15th, we sent the quotation for all three.
```

UNITED STATES DISTRICT COURT

63

```
1   March 15th, we got the goods agreement, the contract signed
2   with CSX.
3   Q.   Let me ask you, the goods agreement, is that a
4   Pavemetrics' document?
5   A.   No, that's CSX document.  It was all the terms and
6   conditions they want us to comply with.
7   Q.   Okay.  And then what happened?
8   A.   Um, well, we actually, uh -- they -- well, we invoiced
9   the -- they wanted to buy the system with the goods agreement
10  so then they invoiced the sale on April 21st.
11  Q.   And when was the hardware shipped for those three sales?
12  A.   So the hardware was shipped in August 2021.
13  Q.   And did the hardware include software when it was
14  shipped?
15  A.   No, it didn't.  Not in August, no.
16  Q.   And when was the software delivered to CSX?
17  A.   So the software was delivered December 9, 2021.
18  Q.   And what units -- and what version of software was it?
19  A.   So 480.20-C4E9AA15F.
20  Q.   And what units was -- was that software licensed for?
21  A.   So it was licensed for only for Sale 2 and 3, F705,
22  F706, F707, and F708.
23  Q.   And so was it licensed for Sale 4?
24  A.   No, it wasn't.
25  Q.   And sometimes in this case, have we referred to that
```

UNITED STATES DISTRICT COURT

64

```
1   software version as 480 for short?
2   A.   Yes.
3   Q.   Now, let's go to slide six.  And using this timeline,
4   can you explain why you did not provide a license to software
5   version 480 for Sale 4?
6   A.   Okay.  Well, let's start with the invoice on April.  So
7   the invoice was for all three systems; Sales 1, 2 and 3.
8   Then we ship the hardware for all three systems, Sales 2, 3
9   and 4 in August.  And then in September, the hardware was
10  installed but only for Sales 2 and 3.  We could not -- we
11  could not do anything with Sale 4 because the boxcar wasn't
12  ready.
13  Q.   Okay.  And then in December 2021, what happened?
14  A.   In December 2021, the software was installed for 2 and 3
15  but not on 4 because the boxcar wasn't ready.
16  Q.   Now, let's look at the quotation for completeness.  If
17  we can go to Exhibit 811, what is Exhibit 811?
18  A.   That's the quotation to CSX in February 2021.
19  Q.   And it was for what?
20  A.   It was for three LRAIL systems.
21  Q.   And did this quote result in the sale of Sales 2, 3 and
22  4 to CSX?
23  A.   Yes, it did.
24  Q.   Now, I notice it doesn't say turnkey.  Why is that?
25  A.   Well, the turnkey -- turnkey applies to when we install
```

UNITED STATES DISTRICT COURT

Exhibit 4
187

65

```
1   systems on hi-rail vehicles.  So this was a boxcar.  We don't
2   provide all the components needed to run a system on a boxcar
3   so it can't be a turnkey system.
4   Q.   By the way, what was the price on these LRAILs?
5   A.   $350,000 each.
6   Q.   And towards the bottom of the page, there's a note.  It
7   says note, LRAIL software license is valid only for the pair
8   of sensors with which it was purchased.  Is non-transferable
9   and cannot be used with any other sensors.  Does that
10  accurately reflect how Pavemetrics' software license worked
11  for Sales 2 and 3 and 4?
12  A.   Um, yes.  All our -- our systems are sold that way.
13  Q.   All right.  We'll go back to slide five.  I think we
14  beat this to death, but what version was licensed for Sales 2
15  and 3?
16  A.   So -- the software version?
17  Q.   Yeah.
18  A.   480.
19  Q.   And was 480 licensed for Sale 4?
20  A.   No, it wasn't.
21  Q.   And has the license to version 480 for Sales 2 and 3
22  expired?
23  A.   Yes.  Uh, it expired after three months.
24  Q.   Okay.  And why was it such a short-term license?
25  A.   Oh, because we were continually up -- updating this
```

UNITED STATES DISTRICT COURT

66

```
1   software.
2   Q.   Okay.  Let's go to Exhibit 28.  What is Exhibit 28?
3   A.   So that's the LCMS.  Those are the sensors we used, uh,
4   LCMS two hardware software installation manual.
5   Q.   And for road and rail applications dated
6   March 2021?
7   A.   That is correct.
8   Q.   And is the manual you provided to CSX with Sales 2, 3
9   and 4?
10  A.   Yes, that would be the case.
11  Q.   Let's go to page 30, please?  And in Section 4.3.1, it
12  says LCMS road inspect.  Does this section imply a rail
13  inspection, too?
14  A.   Yes, but our processing software works the same way.
15  Q.   Now, if we look at the last sentence of that section, it
16  says a valid license file is required to activate the
17  different processing modules.  What does that mean?
18  A.   Well, that means depending on the customer, some people
19  will have access to algorithms, for example, to detect cracks
20  in roads, and some people, it will be to detect ties and
21  rails.  So depending on what the client purchased or needed,
22  we would activate certain processing modules, and others
23  would be deactivated.
24  Q.   And if we can go to page 14 of the same manual, what is
25  the photo shown on page 14?
```

UNITED STATES DISTRICT COURT

67

```
1   A.   So that's the shipping case, the carrying case that we
2   provide the customers when we ship the sensors to them.
3   Q.   And so when it says laser profilers two, is that the
4   sensors?
5   A.   Yeah, those are the sensors on the right and left sides.
6   Q.   And nothing's connected in this box; correct?
7   A.   Nothing is connected, no.
8   Q.   And where is the processing computer?
9   A.   So if we were to provide a processing computer, it would
10  have been shipped in a different box.
11  Q.   So when you ship Sales 2, 3 and 4 to CSX, were the
12  sensors connected to a processing computer?
13  A.   No, they were not.
14  Q.   And was it possible for the sensors shipped to CSX to
15  communicate with the processing computer when they are not
16  connected?
17  A.   No, it's not possible.
18  Q.   And did the processing computer shipped to CSX for Sales
19  2, 3 and 4 have software on it?
20  A.   No, they did not.
21  Q.   Okay.  Let's switch gears again.  When did you first
22  learn about the '293 patent at issue in this case?
23  A.   The '293 patent?  We heard about it when we received the
24  notice of infringement letter on January 9th, 2021.
25  Q.   Okay.  Was that January 5th, 2021?
```

UNITED STATES DISTRICT COURT

68

```
1   A.   Yeah, right, on January 5th.
2   Q.   And what was your reaction?
3   A.   Well, it came as a bit of a shock, especially coming
4   from Tetra Tech.  We had a long-term relationship with them.
5   We -- we provided them with sensors and equipment and
6   software over, I think, like a ten-year period of time.  And
7   I was used to communicating with Darel Mesher about certain
8   things.
9        We would call each other.  I would call him.  I
10  remember calling him when they invalidated the GREX patents.
11  I congratulated them cause it was good work.  So I was
12  surprised to get a letter like that from a lawyer with no
13  head's up.
14  Q.   And Dr. Mesher had never raised any patents with you?
15  A.   No, nothing Tetra Tech owned.
16  Q.   And what did you do after receiving the letter about the
17  '293?
18  A.   So we started analyzing the patent, the '293 patent, my
19  colleagues and Jeff and Richard and others.  And as we
20  started analyzing, we realized well, we could not be
21  infringing on that patent.  I mean, most of what was
22  disclosed in the patent, everything that was there, we
23  figured we thought we were doing the same thing.  And we had
24  disclosed that in our 2014 TRB paper; right?
25        And also we were using neural networks now, and you
```

UNITED STATES DISTRICT COURT

Exhibit 4
188

69

```
1    know, neural networks were not described anywhere in that
2    patent so we didn't see how that could, you know, affect us.
3    And when we started looking at the details of the claim
4    construction, the way they constructed their 3D map with the
5    need to have both elevation and intensity data at each point,
6    we weren't doing that either.
7    Q.   Now, we've heard about Tetra Tech buying LCMS systems
8    and software and raw data from Pavemetrics.  When did they
9    start doing that?
10   A.   Excuse me.  Can you repeat that question?
11   Q.   We've heard about Tetra Tech buying LCMS systems from
12   Pavemetrics and software and raw data.  When did Tetra Tech
13   start doing that?
14   A.   So the first system we sold to Tetra Tech was in 2012
15   for road inspection.
16   Q.   And did Pavemetrics ever tell Tetra Tech about LRAIL?
17   A.   Oh, yes.  We communicated multiple times with Darel to
18   tell him about our progress and what we were doing with the
19   LRAIL.  The last time we did that was in May, I believe, May
20   or June 2020.  We had a discussion about it again.
21   Q.   Okay.  And did you give any type of technical
22   presentation to Tetra Tech about LRAIL in 2020?
23   A.   Yes.  We gave a complete presentation of everything we
24   could do with the system at that time.
25   Q.   And who did you present to at Tetra Tech?
```

UNITED STATES DISTRICT COURT

70

```
1    A.   It was Darel Mesher, and it was Robert Olenoski.
2    Q.   And what happened after the presentation?
3    A.   The day after, I received a request from Robert Olenoski
4    to -- well, he had a few questions, and he wanted a quotation
5    for the system.
6    Q.   And did Pavemetrics send an LRAIL quote to Rob Olenoski
7    and Darel Mesher at Tetra Tech?
8    A.   Yes, we -- we sent them a quotation because we didn't
9    think at that time they were a competitor.
10   Q.   And during the presentation or after the technical
11   presentation or immediately after, did Mr. Olenoski or
12   Dr. Mesher ever mention that Tetra Tech had patents that
13   might cover LRAIL?
14   A.   No, they didn't.
15   Q.   Let's look at Exhibit 189, please.  Do you recognize
16   Exhibit 189?
17   A.   Yes.  That's the email from Robert Olenoski.  It's an
18   email exchange with Robert Olenoski, uh, Richard Fox-Ivey,
19   Darel Mesher.
20   Q.   Let's look at the first email at the bottom of the
21   chain, the earliest email, and this one's dated June 9th,
22   2020.  Is -- is that the date that Pavemetrics sent a quote
23   for LRAIL to Tetra Tech?
24   A.   That's correct.
25   Q.   Okay.  And that's shown in this email; correct?
```

UNITED STATES DISTRICT COURT

71

```
1    A.   Yes.
2    Q.   And if we can go to the next email, see what happened
3    next.  Did Mr. Olenoski write back the next day?
4    A.   Yes.  That's the email where he's writing back to us.
5    Q.   On June 10th, 2020?
6    A.   Yes.
7    Q.   Okay.  And he has questions; correct?
8    A.   That's correct.
9    Q.   And Number one says I see the software will only work
10   with the sensors that come with the unit.  Was he right about
11   that?
12   A.   That's correct.
13   Q.   And so Tetra Tech knew before this lawsuit that LRAIL
14   software will only work with the sensors that come with the
15   unit; correct?
16   A.   Correct.
17   Q.   Then he says in number two, if Tetra Tech needed
18   multiple systems, would Pavemetrics do anything for a
19   discount?  What did you think about that question?
20   A.   That's my favorite client catch question.  So I love --
21   I love those kinds of questions.
22   Q.   You were excited that Tetra Tech was considering buying
23   multiple systems?
24   A.   Yeah, we were -- we were very happy.
25   Q.   Number three, John, is that you?
```

UNITED STATES DISTRICT COURT

72

```
1    A.   That's me, yes.
2    Q.   John had mentioned that we could possibly see the CSX
3    system in action and possibly be at the track when the system
4    is delivered in Gainesville, Florida.  Did you -- did you
5    mention that?
6    A.   Yeah, I -- I did.  Since they were interested in the
7    system, and I knew we were -- they were -- I think Robert
8    lives very close to that, and he's in Tampa Bay, I think, so
9    I mentioned he could go over and look at the system so he
10   could see how -- how it looked like installed on hi-rail.
11   Q.   And that's your LRAIL system.
12   A.   Yes, it's ours.  Yes.
13   Q.   And then further down in the email, he says it is great
14   to see the progress you have made, and we are interested in
15   seeing how the system can perform.  How did that make you
16   feel?
17   A.   Well, um, it's always nice to get praise from people in
18   the industry.  I agree with him.  With the AI algorithms that
19   we were using, we were -- we were really -- really having
20   great results.
21   Q.   Now, did Mr. Olenoski say anything about patents in his
22   email?
23   A.   I don't see the word patent anywhere in that email.
24   Q.   And did Mr. Olenoski go see the -- the CSX LRAIL system?
25   A.   Oh, yeah, he went.  He went to see it, yes.
```

UNITED STATES DISTRICT COURT

**Exhibit 4**
**189**

73

```
 1   Q.   When?
 2   A.   Uh, he went on the day of commissioning of the system to
 3   CSX.
 4   Q.   Is that the day it was delivered?
 5   A.   Yes.
 6   Q.   And did Mr. Olenoski or anyone at Tetra Tech ever say
 7   anything about Tetra Tech's patents to you after seeing LRAIL
 8   in July 2020?
 9   A.   Nobody did, no.
10   Q.   And when did you first hear of 3DTAS?
11   A.   So as you saw in -- in the pictures this morning, Brad
12   Spencer was at the commissioning of the LRAIL in Florida, and
13   so he met Robert Olenoski there.  And a couple weeks later, I
14   think we were discussing, and he wanted to know what our
15   relationship was with Tetra Tech because he said they're
16   bidding on this project, too.
17        So at that point, we knew that something wasn't
18   right.  So we started looking at the Internet to find what kind
19   of information we could find on the 3DTAS system and hi-rail
20   AI stuff, and we couldn't find anything, anything at all.
21   There was nothing published.  So we asked Brad if he had any
22   marketing material that would be public that he could share
23   with us, and he shared just the one brochure on the RailAI
24   system.
25   Q.   On RailAI.
```

UNITED STATES DISTRICT COURT

74

```
 1   A.   Yeah.
 2   Q.   Now, had you ever seen Tetra Tech present at any
 3   conferences on 3DTAS?
 4   A.   No.  Um, I go to dozens and dozens of these conferences.
 5   I have never seen anything presented concerning the Tetra
 6   Tech system at any real conference.  I've never seen them
 7   have a commercial booth and present marketing material at any
 8   conferences during all this time.  And basically, I couldn't
 9   learn anything on their system.
10   Q.   And you never sat in a presentation of Dr. Mesher's
11   and took notes and then took them back and presented to your
12   customers on his presentation?
13   A.   I didn't even know if they were commercializing the
14   system at that point until Brad told me that he had received
15   a bid from them.
16   Q.   And did you ever search for 3DTAS again?
17   A.   Yeah, we did.  When we received the letter, notice of
18   infringement, in January 5th of 2021, we went back on the
19   Internet to try to find out more information about it, and,
20   again, we found nothing.  Nothing was on the Internet
21   concerning that product.
22   Q.   Did your view of no infringement ever change since
23   receiving the January 5th, 2021 letter?
24   A.   No, it didn't.  And it won't.
25   Q.   And before the January letter from the Tetra Tech
```

UNITED STATES DISTRICT COURT

75

```
 1   lawyers, you were not aware of the patents; correct?
 2   A.   That's correct.
 3   Q.   Now, who did you consider to be competitors of
 4   Pavemetrics' LRAIL?
 5   A.   So the competitors that we were auctioning, GREX.  GREX
 6   had a similar system to us with two 3D laser profilers.  And
 7   they were actually already doing a tie evaluation for CSX so
 8   they were definitely a competitor.
 9        There's a bunch of other companies.  Several
10   of them were -- have 3D systems as well.  So there's Rail
11   Vision.  In the UK there's BEDSIS.  There's Sherman.  There's
12   Mermec that's Italian, but they do have offices in the U.S.
13   And there's Ensco.  And we heard of Balford Beatty also has
14   systems.
15   Q.   And which of the companies sell systems with 3D sensors
16   and cameras?
17   A.   Well, most of 'em have at least some kind of 3D sensor
18   and have imaging systems as well.
19   Q.   And when did you first learn of the '557 patent, the
20   other patent at issue in this case?
21   A.   Oh.  So that's when the Tetra Tech lawyers brought it up
22   again.  I think it was in July 2021.
23   Q.   And that's the first time Tetra Tech brought it up;
24   correct?
25   A.   I believe so, yes.
```

UNITED STATES DISTRICT COURT

76

```
 1   Q.   It was not in that January 5th, 2021 letter.
 2   A.   No, it wasn't.
 3   Q.   Now, did you ever believe that you infringed the '557
 4   patent?
 5   A.   Um, no, I didn't.  That's the one, I think, with the
 6   cracks on the ties.  So we had been doing crack detection for
 7   almost 20 years already so those are things that we had been
 8   doing for a long, long period of time.  And when we looked at
 9   the description of the algorithm, we could see things that we
10   were doing that was different.
11   Q.   And did CSX ever inquire about this lawsuit?
12   A.   Oh, CSX?  Yeah.  At some point, they had heard about the
13   lawsuit so they asked us about it.
14   Q.   And if we could go to Exhibit 86-1?  Do you recognize
15   Exhibit 86-1?
16   A.   I do.  It's an email I sent to Colin Connor which is the
17   in-house attorney for CSX.
18   Q.   Okay.  So sometimes large corporations have attorneys
19   that are employees of the company; correct?
20   A.   Yes, that's the case.
21   Q.   And so you wrote to Mr. Connor, an attorney at CSX.  And
22   why did you do that?
23   A.   Well, we wanted to reassure him that we were taking this
24   litigation seriously, and that we had filed what we call a
25   declaratory judgment action.  So yeah, that was this case
```

UNITED STATES DISTRICT COURT

**Exhibit 4**
**190**

77

```
1   here.
2   Q.   And it says I am pleased to update you concerning our
3   patent case with Tetra Tech.  We filed that suit in Los
4   Angeles to show that Tetra Tech's patent infringement threats
5   were without merit.  Is that right?
6   A.   That's correct.
7   Q.   And then in the next paragraph, you said if you would
8   like exact details concerning the case, please feel free to
9   speak directly with our patent litigation team at Knobbe
10  Martens in Irvine, California.  And then you mention Joseph
11  Re who's here today; correct?
12  A.   Yeah, that bald guy over there.
13  Q.   Yes.  And you mentioned my name, Christy Lea; correct?
14  A.   Yeah.
15  Q.   And then you gave out our direct dial phone numbers?
16  A.   Yes, I did.
17  Q.   And why did you do that?
18  A.   Well, I wanted them to know that we have -- we have
19  hired very competent attorneys, and that we were going to
20  solve -- solve this case in court if we needed to.
21       MS. LEA:  Thank you very much.  Pass the witness.
22       THE COURT:  Cross-examination, Counsel?
23       MR. PARKER:  Yes, Your Honor.
24
25
```

UNITED STATES DISTRICT COURT

78

```
1                  CROSS-EXAMINATION
2   BY MR. PARKER:
3   Q.   Good almost afternoon, Mr. Laurent, and Happy Birthday.
4   A.   Thank you.
5   Q.   I'm Aaron Parker with Tetra Tech.  So I wanted to go
6   back to testimony you just gave about your knowledge of Tetra
7   Tech's rail inspection systems.  I think you testified that
8   you didn't learn about their systems until midway
9   through 2021 after those conversations with -- or your
10  meetings with Mr. Olenoski; is that correct?
11  A.   Um, are you sure about your dates?
12  Q.   When were you -- when did you first learn about Tetra
13  Tech's rail inspection systems?
14  A.   So the only information -- well, I think you're asking
15  about 2020, not 2021.  Could that be the case?
16  Q.   Uh, yeah, you're correct.
17  A.   All right.  So yes.
18  Q.   So mid-2020?
19  A.   Yes.
20  Q.   But you mentioned you were aware of the GREX litigation
21  in which GREX filed a patent infringement suit against Tetra
22  Tech; is that right?
23  A.   Yes.
24  Q.   And you understand that was for a patent infringement
25  relating to a rail inspection system, inf fact, the 3DTAS
```

UNITED STATES DISTRICT COURT

79

```
1   system; correct?
2   A.   Yes, it was for -- there was litigation, but I'm not
3   sure I knew for exactly the name of the system or that, no.
4   Q.   But as of 2017, 2018, you obviously knew that Tetra Tech
5   had rail inspection systems that GREX believed were
6   infringing their patents, and you were well aware of the GREX
7   patent?  That's true, isn't it?
8   A.   I'm sorry, that question goes way too fast for me to
9   process it.
10  Q.   That's fine.  You were well aware of the GREX patent.
11  That's correct?
12  A.   Yeah, we were.
13  Q.   And you'd been tracking -- Pavemetrics had been tracking
14  the GREX patents and had had concerns about those patents and
15  potential infringement?
16  A.   A lot of legal terms in there, but we had received
17  letter of notice from GREX.  So a letter of notice is where
18  they send you a letter, and they mention hey, we have this,
19  this, this and this and that patent so kind of, you know, to
20  warn you, to warn you that if you do, uh, if you -- you know,
21  so that you know what they have patented so you cannot
22  infringe on it.  They even ask us if we infringe.  And we
23  looked at it, and we figured we were not infringing on these
24  patents.
25  Q.   Using legal terms I'm throwing out here, but you
```

UNITED STATES DISTRICT COURT

80

```
1   testified earlier that DNN can't be infringing.  You're not a
2   patent attorney; right?
3   A.   Gosh, no.
4   Q.   Yeah.  And you have not had any training in evaluating
5   patent claims to determine infringement?
6   A.   Well, aside from the last year, no.
7   Q.   You have not submitted an expert report in this case
8   about whether DNN can infringe.  That's correct?
9   A.   I'm not the one that's doing the expertise.  That's
10  Dr. Frakes.
11  Q.   You also testified that after you received the letter in
12  2021 regarding infringement of the '293 patent that you
13  didn't think you infringed, but you just admitted you're not
14  a patent attorney.  You don't have any formal training
15  regarding evaluating patents.
16  A.   Well, you got me there, yeah.
17  Q.   I'd like to pull up your timeline, slide six.  Thank
18  you.  You're missing some dates, relevant dates from this
19  timeline.  Am I correct?
20  A.   Perhaps you could tell me which ones?
21  Q.   Okay.  So those two dates prior to your April 2021
22  invoice dates.  And, in fact, you actually talked about
23  quotation from February 15th of 2021.  You talked about that;
24  correct?
25  A.   Could you repeat that question, sorry?
```

UNITED STATES DISTRICT COURT

Exhibit 4
191

81

1   Q.   Yeah.  You -- you -- we saw the quotation from
2   February 15, 2021 in which Pavemetrics offered to sell CSX
3   three LRAIL systems.  Do you recall that?
4   A.   I'm trying to figure out the timeline.  So that would be
5   before. . .
6   Q.   It's the dot on the left all the way over there,
7   February 15th offer for sale?
8   A.   Okay.  I don't remember these documents, but perhaps you
9   can show them to me, I guess.
10  Q.   Can you pull up Exhibit 811, please?  This is the
11  quotation that your counsel brought on the screen and
12  highlighted in a few places where --
13  A.   Oh, okay.  Okay, yes.
14  Q.   And just to run through it, this was a quotation --
15  A.   I thought it was an invoice.  Okay, sorry.
16  Q.   Yeah.  So this is the quote.  The offer for sale of
17  three LRAIL systems; is that correct?
18  A.   Yes, it is.
19  Q.   And those LRAIL systems included LRAIL sensors?
20  A.   Yes.
21  Q.   Acquisition software?
22  A.   Yes.
23  Q.   And processing software; correct?
24  A.   Yes.
25  Q.   There's also a line further down that says one year of

UNITED STATES DISTRICT COURT

82

1   software updates and technical support.  It's down toward the
2   bottom, and it's highlighted.  Do you see that?
3   A.   Well, yes, that's standard as well.
4   Q.   Yeah.  And then below, I think your counsel pointed out
5   the note, LRAIL software license is valid.  Can you read
6   that?  Am I correct?
7   A.   Yes, that's correct.
8   Q.   Okay.  And then if you go up to the upper right-hand
9   corner above the gray line, it says Pavemetrics reserves the
10  right to revoke the license in case of payment default?
11  A.   Yeah, that's correct.
12  Q.   You were offering to sell CSX an LRAIL that came with
13  software and the license that came with hardware and that
14  came with LRAIL sensors; is that correct?
15  A.   That's correct.
16  Q.   So after you sent that quotation, you testified that
17  that quotation was tied to a goods agreement, is that
18  correct, in which the parties agreed to that sale, to that
19  quotation or offer for sale?
20  A.   Yeah.  It's the terms and conditions, yeah.
21  Q.   And that's a goods agreement.  Can you pull up
22  Exhibit 844, please?  Does this look familiar?
23  A.   Uh, it looks familiar, yes.
24  Q.   Okay.  And that's the goods agreement between CSX and
25  Pavemetrics dated March 15th, 2021?

UNITED STATES DISTRICT COURT

83

1   A.   Yeah, that's correct.
2   Q.   So Pavemetrics did sell three LRAIL systems to CSX at
3   that time on that date; correct?
4   A.   How did you finish your question?  I'm sorry.
5   Q.   I'm sorry.  That date reflects the sale of three LRAIL
6   systems from Pavemetrics to CSX, that ones we discussed in
7   the quotation?
8   A.   Well, it reflects the date that we signed the agreement,
9   I guess?
10  Q.   Okay.  Well, in this case, you submitted several
11  declarations, do you recall doing that, under penalty of
12  perjury?
13  A.   Sure.
14  Q.   Can you pull up Exhibit 995, please?
15       MR. PARKER:  Your Honor, we'd like to enter into
16  evidence his declaration, Exhibit 995?
17       THE COURT:  What part of the declaration?
18       MR. PARKER:  Paragraph 6.
19       Any objections, Counsel?
20       MS. LEA:  Yes, Your Honor.  Improper impeachment.
21       MR. PARKER:  Your Honor, I can walk -- I can walk
22  through some questions.
23       THE COURT:  The closer you can get to the actual
24  language, the better.
25       MR. PARKER:  Sure.  Appreciate it.

UNITED STATES DISTRICT COURT

84

1   Q.   So isn't it true that Pavemetrics sold three LRAIL
2   systems to CSX in 2021?
3   A.   Yes.
4   Q.   And isn't it true that CSX and Pavemetrics entered into
5   a goods agreement on March 15th, 2021 for the sale of three
6   LRAIL systems?
7   A.   Yes.
8   Q.   And isn't it true that Annex 1 which is a March 15th, 2021
9   Goods Agreement shows that three units consisting of LRAIL
10  sensors, acquisition software and processing software were
11  sold?
12  A.   I would agree with that, yes.
13  Q.   Now, you were here for your counsel's opening argument.
14  It's been a while, but that was last Wednesday, I believe; is
15  that correct?
16  A.   That was the day, yeah.
17  Q.   And we've actually been through it today, but Ms. Lea
18  pulled up an image, Figure 5, from page 7 of Trial
19  Exhibit 26.  This is the image, we'll get there, um, that
20  has -- on the right, the image has -- to the left, it has
21  intensity, and the range was in the center, and then you have
22  3D merged on the right.  Do you recall this image?
23  A.   I do.
24  Q.   Now, the 3D merged image on the right in Figure 5,
25  that's just intensity; right?

UNITED STATES DISTRICT COURT

Exhibit 4
192

85

1   A.   It's the intensity image that has been enhanced with
2   the -- with the shadows, yeah.
3   Q.   And you gave a deposition in this case; correct?
4   A.   I did.
5   Q.   That was also under the penalty of perjury?
6   A.   I swear -- I swore that at my deposition as well, yeah.
7        MR. PARKER:   Your Honor, I'd like to direct him to
8   a portion of his deposition transcript that relates to the
9   answers to the last question.
10       THE COURT:   Okay.  Can you point me to his
11  deposition transcript?
12       MR. PARKER:   Yeah.  It's page 95, lines. . .
13       THE COURT:   19 through 21?
14       MR. PARKER:   Yes.  Yes, Your Honor.
15       THE COURT:   And is this the same image shown at the
16  deposition?
17       MR. PARKER:   Yes, Your Honor.
18       THE COURT:   You can play it.
19  BY MR. PARKER:
20  Q.   At your deposition, you testified relating to
21  Figure 5 -- okay, so the scanned image in Figure 5, that's
22  just -- the 3D scanned image in Figure 5, that's just
23  intensity, and you answered yes.
24  A.   Well, Figure 5 has a -- has just the intensity image in
25  it so. . .  oh, and it has both.  It has the Fake3D, it has

UNITED STATES DISTRICT COURT

86

1   intensity, and it has a range.  It has all three.
2   Q.   So the 3D merged on the right so that's just intensity.
3   That's what you testified to in your deposition.
4   A.   It's a 2D image.  It's a 2D image.  A Fake3D is a 2D
5   image with shadows.
6   Q.   But --
7   A.   There's no elevation data in a Fake3D image if that's
8   your question.
9   Q.   Thank you.  So Mr. Laurent, would you turn to
10  Exhibit 416 in your binder, please.
11  A.   In my binder?
12  Q.   Yeah.  Are you there?  It's also on the screen.  This is
13  an email chain with the subject line, LRAIL shipping, and
14  it's between Pavemetrics and its client, AID.  Is that
15  correct?
16  A.   Yeah, it looks to be an email chain.
17  Q.   And in the bottom email, it's dated February 12th of
18  2021.
19  A.   That's what's written.
20       THE COURT:   Counsel, I just want to confirm.
21  This is in evidence?
22       MR. PARKER:   Yes, Your Honor.
23       THE COURT:   Thank you.
24  BY MR. PARKER:
25  Q.   And it says I just want to let you know that everything

UNITED STATES DISTRICT COURT

87

1   is ready for your new equipment shipping planned for next
2   Monday; right?  Did I read that correctly?
3   A.   Yes.
4   Q.   So isn't it right that Pavemetrics shipped the LRAIL to
5   AID on February 15th, 2021 which is the Monday following that
6   project February 12th?
7   A.   Yeah.  In three different boxes, yes.
8   Q.   And that's just days after Pavemetrics filed the lawsuit
9   against Tetra Tech in this case which was filed on
10  February 11th?
11  A.   Oh, sorry.  Okay.  Um, yeah.  Sorry.  The AID sale, we
12  shipped the sensors, all the sensors.  And you know what you
13  saw in the box, the picture you saw in the box with the
14  sensors and controllers and all that, that was shipped on
15  January 4th, 2021.  And what was shipped on February 12th,
16  that was like the structures, the mechanical structures and a
17  few other components.  So that's what he's talking about.
18  Q.   Could you turn to Exhibit 985 in your binder, please?
19  This is another email string between Pavemetrics and AID.  I
20  believe you were copied on these emails.
21       MR. PARKER:   Your Honor, I'd like to move
22  Exhibit 985 into evidence?
23       THE COURT:   Any objection, Counsel?
24       MS. LEA:   No objection, Your Honor.
25       THE COURT:   Okay.  985 can come into evidence.

UNITED STATES DISTRICT COURT

88

1        (Exhibit 985 admitted.)
2        THE COURT:   And it can be published.
3   BY MR. PARKER:
4   Q.   Did you see the email at the bottom of the first page?
5   It's on the screen.
6   A.   Yes.  Oh, yes I see it, but I'm trying to read it.
7   Q.   That email from Pavemetrics to AID says I just saw that
8   you received the LRAIL crates yesterday.  Did I read that
9   correctly?
10  A.   Yes.
11  Q.   But the response from Mr. Hakis at AID on February 23,
12  2021 at the top of the page says we did receive the LRAIL
13  yesterday, and everything looks good.  We will start
14  assembling the LRAIL soon.  Did I read that correctly?
15  A.   That's correct.
16  Q.   So Mr. Laurent, you understand that Pavemetrics filed
17  this lawsuit against Tetra Tech; right?
18  A.   Absolutely.
19  Q.   And you also understand that despite Pavemetrics being
20  the one to initiate this lawsuit, it was Pavemetrics that was
21  trying to hide this lawsuit from its own customers.
22  A.   No, I wouldn't say that.
23  Q.   If you could look at Exhibit 48 in your binder, please?
24  This is an email that you sent on March 26, 2021 to
25  Mr. Fox-Ivey and Mr. Hebert of Pavemetrics?

UNITED STATES DISTRICT COURT

Exhibit 4
193

## 89

```
1    A.   Which one, sorry?
2    Q.   Exhibit 48.
3    A.   Okay.
4    Q.   And this is internal Pavemetrics email; correct?
5    A.   That's correct.
6    Q.   And it's kept in the ordinary course of business at
7    Pavemetrics, and it bears a Pavemetrics' Bates number at the
8    bottom; is that correct?
9    A.   Yes, it is.
10        MR. PARKER:  Your Honor, I'd like to move
11   Exhibit 48 into evidence, please?
12        THE COURT:  Any objection, Counsel?
13        MS. LEA:  No objection, Your Honor.
14        THE COURT:  Okay.  Exhibit 48 is in evidence.
15             (Exhibit 48 admitted.)
16   BY MR. PARKER:
17   Q.   So Mr. Laurent, in your words at the email at the top
18   says I think we should avoid giving visibility to AID with
19   the TT stuff going on.  Does it say that?
20   A.   That's what it says.
21   Q.   An AID is a customer of Pavemetrics; right?
22   A.   Yes, they are.
23   Q.   And the reference to TT stuff going on, that's a
24   reference to Tetra Tech and this lawsuit; isn't that right?
25   A.   That's correct.
```

UNITED STATES DISTRICT COURT

## 90

```
1    Q.   So you wanted to keep Tetra Tech from finding out that
2    you had sold an LRAIL to AID; isn't that correct?
3    A.   Can you repeat the question, sorry?
4    Q.   You -- you, Pavemetrics --
5    A.   Yes.
6    Q.   -- wanted to keep Tetra Tech from learning about your
7    sale to AID on March 26, 2021?
8    A.   I would say that's a fair assessment.
9    Q.   And you were in the courtroom last week when Mr. Hafiz
10   testified by video; is that correct?
11   A.   Yes I was.
12   Q.   And you heard Mr. Hafiz say that the first time he heard
13   of Tetra Tech was when he was subpoenaed in this case in
14   November 2021; is that right?
15   A.   Yes.
16   Q.   But Pavemetrics never told AID about this lawsuit, did
17   they.
18   A.   No, we figured, uh, we weren't infringing so there's
19   need to do that.
20   Q.   So you want to keep them in the dark.
21   A.   We -- we basically wanted to keep them out of this
22   lawsuit.
23        THE COURT:  Counsel, this is a good time to break
24   for lunch now.  So we'll go ahead and break for lunch, and
25   we'll ask the jurors to come back at 1 o'clock.  Thank you.
```

UNITED STATES DISTRICT COURT

## 91

```
1         THE CLERK:  All rise.
2              (Jury not present.)
3         THE COURT:  So we'll come back here at 12:45, and
4    it'll give us some time to talk about jury instructions so
5    I'll ask you to come back at 12:45 for discussion.
6         You're in the middle of cross so please don't have
7    any conversations with your counsel that in any way relate to
8    your testimony.
9         Anything else we need to do before we break for
10   lunch?
11        MS. LEA:  No, Your Honor.
12        MR. BARNEY:  No, Your Honor.
13        THE COURT:  Thank you.
14   We'll see you at 12:45.  Thank you.
15        THE CLERK:  This court's in recess.
16             (Lunch recess.)
17        THE COURT:  Okay.
18   Where are we on jury instructions?
19        MR. RE:  Making great progress, Your Honor.
20        THE COURT:  Great.
21        MR. RE:  I have a red line copy that I sent to
22   counsel yesterday, copies of both the verdict form and the
23   proposed jury instructions with some red lines.
24        THE COURT:  Great.
25        MR. RE:  We might want to start with the verdict
```

UNITED STATES DISTRICT COURT

## 92

```
1    form only because it's much simpler.
2         THE COURT:  Okay.
3         MR. RE:  The first suggestion and proposal is in
4    Question No. 1.  And obviously, Your Honor, I'm not repeating
5    anything where the Court has already made rulings.  I'm
6    trying to seek improvement only.  We propose that the
7    preposition to CSX be included somewhere in Question 1 to
8    contrast it with Question 2 which is AID.  This way, it's
9    very, very clear that CSX is the only alleged sale to be part
10   of the direct infringement question.
11        THE COURT:  Okay.  And is there an objection to
12   that?
13        MR. CHUNG:  Uh, no objection, Your Honor.
14        THE COURT:  Okay.  So we can go ahead and add that,
15   that's fine.
16        MR. RE:  You'll be very pleased to hear that we
17   agreed to eliminate Questions 7 and 8.
18        THE COURT:  Great.  No objection to that?
19        MR. CHUNG:  No objection, Your Honor.
20        THE COURT:  Okay.  And I see in the new Question 7
21   to CSX, any objection to that?
22        MR. CHUNG:  No objection, Your Honor.
23        THE COURT:  Okay.  The verdict form's done then;
24   right?
25        MR. CHUNG:  That's it.
```

UNITED STATES DISTRICT COURT

**Exhibit 4**
**194**

93

1  THE COURT: Okay, jury instructions.
2  MR. RE: Well, in view of the verdict form getting
3  trimmed down, it helps on the jury instructions. Jury
4  Instruction No. 26, you might remember we had a discussion
5  that we would propose a revision? And so revised in lines 3
6  and 4 of the redline.
7  THE COURT: Okay. Any objection to the revision in
8  lines 3 and 4?
9  MR. CHUNG: No objection, Your Honor.
10  THE COURT: Okay.
11  MR. RE: The next thing we propose is this
12  discussion about dependent and independent claims could be
13  greatly simplified given the fact that we have only one
14  dependent claim in the case, and I have rewritten it so that
15  it makes it clear that Claim 21 is the dependent claim. And
16  it takes out a lot of the confusion when there's such a
17  simple number of claims at issue.
18  THE COURT: Okay. Any objection to that?
19  MR. CHUNG: No objection, Your Honor.
20  THE COURT: So Instruction 26 as amended looks
21  good.
22  MR. RE: This my favorite one. Eliminate jury
23  Instruction No. 32 in its entirety.
24  THE COURT: Okay. Any objection with that?
25  MR. CHUNG: No objection, Your Honor.

UNITED STATES DISTRICT COURT

94

1  THE COURT: And 33 as well?
2  MR. CHUNG: No objection there, Your Honor.
3  THE COURT: Okay. So 32 and 33 are gone.
4  Let's look at 34.
5  MR. RE: 34 you will remember came up in our
6  discussion that now, there is no longer a challenge that UML
7  TRB 2014 is prior art. This has been rewritten to make that
8  clear that it's not disputed. Also, since we eliminated the
9  arguments related to Tetra Tech's 3D tie assessment, we've
10  eliminated any reference to that piece of alleged prior art.
11  And I believe that is the reasons for all the
12  changes in Instruction No. 34.
13  THE COURT: And any objection to those changes?
14  MR. CHUNG: No objection, Your Honor.
15  THE COURT: Okay, 34 looks good. 35 looks good
16  cause we're getting rid of anticipation?
17  MR. RE: Correct.
18  THE COURT: Okay.
19  MR. RE: Boy, we're making progress. 39. As your
20  discussion last week with Ms. Lea over the simultaneous and
21  independently created the same invention claimed in the
22  patents is now placed separate and apart from the rest of the
23  list, and I believe that takes care of any ambiguity.
24  THE COURT: It does take care of ambiguity.
25  Any objection to Instruction 39?

UNITED STATES DISTRICT COURT

95

1  MR. CHUNG: No objection, Your Honor.
2  THE COURT: Okay, 39 is done. Is that it?
3  MR. RE: There is one more, Instruction No. 51.
4  This one is just a -- two slight little changes to
5  fix any defect in 51. Obviously, we preserve all prior
6  arguments, but I mean, given the Court's rulings, the
7  ambiguity was the lack of a proper basis to lines 6 and 7 to
8  make it clear that Tetra Tech gave notice on January 5th, not
9  that we agree that what the infringement began.
10  THE COURT: Yeah, that looks good to me.
11  Any objection to that, Counsel?
12  MR. CHUNG: No objection, Your Honor.
13  THE COURT: So 51 is done.
14  MR. RE: And one more word, the word whichever is
15  first should be whichever is later on line 12.
16  THE COURT: Yes, that seems correct.
17  Any objection?
18  MR. CHUNG: Uh, no objection, Your Honor, but I
19  will note for the record that I think for the Fed Circuit
20  Model instructions, it does say whichever is first, but I
21  think Mr. Re is right that it should be later.
22  THE COURT: Okay. We'll make it later.
23  Okay. Anything else?
24  MR. RE: That's it, Your Honor, thank you.
25  THE COURT: Okay, thank you.

UNITED STATES DISTRICT COURT

96

1  And thank you to the parties for working on that.
2  MR. CHUNG: And Your Honor, we do have one minor
3  correction to the jury instructions as well.
4  THE COURT: Okay.
5  MR. CHUNG: It was, Your Honor, to Instruction No.
6  21? If you may recall, on line 22 relating to damages of the
7  asserted patents, we proposed inserting any claim of the '293
8  patent or '557 patent has not been infringed and not invalid.
9  And then I do believe that Mr. Re may have said that the
10  various versions of the product in lines 15 through 18 would
11  be shelved for later. I don't know if that is something we
12  want to resolve today or if you want to meet and confer on
13  that and have a finalized Instruction No. 21 for tomorrow.
14  THE COURT: If you could meet and confer on that,
15  that would make sense. And then Mr. Re, adding the '557
16  patent, that would be consistent with the Court's ruling;
17  correct?
18  MR. RE: Yes. That is our objection, Your Honor.
19  THE COURT: Okay. So subject to the objections of
20  Pavemetrics, we'll include that, if you decide that any claim
21  of the '293 or '557 patent have been infringed. Okay.
22  MS. MATHEW: Your Honor? There's also an issue
23  with their damages demonstrative, and we understand that
24  witness will be presented. If we have a few minute, we'd
25  like to address that now if you're okay.

UNITED STATES DISTRICT COURT

**Exhibit 4**
**195**

97

1  THE COURT:  Okay.  Let me just ask Mr. Re, anything
2  else in the jury instructions?
3  MR. RE:  No.  I have just one little housekeeping
4  issue that will take me 15 seconds?
5  THE COURT:  Okay.
6  MR. RE:  Per the instructions of Mr. Kerr, I want
7  to make it clear on the record there are two redacted
8  exhibits that have been entered.  I have copies in the
9  redacted form.  They are now being referred to as
10  Exhibits 85-1 and 86-1.  These are the two redacted emails
11  concerning the preliminary injunction, and I have copies for
12  the book and the Court.
13  THE COURT:  Thank you.  Thank you very much.  Okay.
14  So we have a damages instruction -- I'm sorry, a damages
15  witness coming up, and you've got some objections to their
16  slides.
17  MS. MATHEW:  Yes, Your Honor.
18  THE COURT:  And just let me ask because we didn't
19  cover this, in Instruction 22, there was some text taken out
20  and some simplification made.  Is that objected to by either
21  party?  Instruction 22?  I would simply it to take
22  out anticipation.  Is that okay with everyone?
23  MR. CHUNG:  No objection from Tetra Tech, Your
24  Honor.
25  THE COURT:  Okay.

UNITED STATES DISTRICT COURT

98

1  MR. RE:  Well, what's reflected in red line, I
2  guess I must have skipped it.  The two sided document?  Yes,
3  we have that deleted as shown on page 25, overview of
4  applicable law Instruction No.  22.
5  THE COURT:  Okay, great.  I just want to make sure
6  we're all in agreement.  Great.  Thank you.
7  Okay.  Counsel?
8  MS. MATHEW:  Yes, Your Honor.  Yesterday
9  Pavemetrics exchanged their demonstratives that they plan to
10  present their damages expert.  In it includes two slides, no
11  lost profits, and if you could pull slide number four.  Tetra
12  Tech objects to this slide to the extent that it's raising a
13  new theory of outside the scope of his report.
14  Nowhere in Mr. Tregellis' report does he opine that
15  Tetra Tech is not entitled to lost profits nor does he offer
16  any opinion as to what the amount should be, and so we
17  believe that he should not be permitted to testify about
18  this.
19  In addition, when we asked Mr. Tregellis during his
20  deposition about whether he was opining whether Tetra Tech's
21  entitled to lost profits or whether the amount is zero, he
22  denied it multiple times, and so this is a new theory that
23  should be kept out.
24  THE COURT:  So you're arguing in damages for lost
25  profits on the sales to CSX and reasonable royalty on the

UNITED STATES DISTRICT COURT

99

1  other sale; correct?
2  MS. MATHEW:  Correct, Your Honor.
3  THE COURT:  And the Pavemetrics' damages expert has
4  not opined on the appropriate measure of lost profits for
5  sales to CSX.
6  MS. MATHEW:  He has not, Your Honor.
7  THE COURT:  Okay.
8  Let me hear from counsel for Pavemetrics.
9  MR. ZOVKO:  Your Honor, Nick Zovko for Pavemetrics.
10  That's incorrect.  Pavemetrics' damages expert
11  addressed lost profits, paragraphs 102 to 118 of his expert
12  report.  He explained that Tetra Tech is only entitled to
13  lost profits if Mr. Schoettkotte and Tetra Tech can
14  establish the four Panduit factors are met.
15  In his report, he has an entire section on why
16  there are no in his opinion there are no acceptable
17  noninfringing alternatives shown by Tetra Tech, and
18  therefore, lost profits have not been shown by Tetra Tech,
19  and Tetra Tech's not entitled to lost profits.  So that's the
20  fundamental part of his report.
21  THE COURT:  So he goes through the factors then?
22  MR. ZOVKO:  He discusses the factors and focuses on
23  Panduit Factor 2 and concludes that it has not been
24  established.
25  THE COURT:  Okay.  Counsel in light of that, what's

UNITED STATES DISTRICT COURT

100

1  the issue?
2  MS. MATHEW:  Your Honor, we're not saying that
3  Mr. Tregellis cannot opine about lost profits, just
4  specifically that Tetra Tech is not entitled to lost profits.
5  He walks through Panduit factors, but for the Panduit factors
6  on an infringement alternative, he doesn't offer an opinion
7  that there is a non-infringing alternative that would be
8  acceptable here.
9  And I have a copy of the transcript that I think
10  that would help elucidate this so I could read it into the
11  record?
12  THE COURT:  Well, yeah.  It's just is it short?
13  MS. MATHEW:  I could read a portion of it that
14  would be short.
15  THE COURT:  Okay.
16  MS. MATHEW:  So the question that we asked is in
17  your opinion, there should be zero lost profits or it should
18  be limited by a certain amount based on availability of
19  acceptable noninfringing alternatives?  And in response, he
20  responded no, I think you misunderstand my opinion.  It is
21  above my pay grade to call balls and strikes and make
22  decisions about whether there should be award of lost
23  profits.  I'm not offering legal opinion, and ultimately, I
24  think that that is a legal opinion about whether there should
25  an award of lost profits.

UNITED STATES DISTRICT COURT

Exhibit 4
196

101

```
1   THE COURT:  Okay.  And so he's saying that the idea
2   about whether there's going to be an award of lost profits or
3   not is a legal issue, and he's just testifying about damage
4   information; is that correct?
5        MS. MATHEW:  Correct, Your Honor.  But he also goes
6   on to say ultimately, I'm not saying that lost profits should
7   be zero, so he also doesn't offer any opinions about the
8   amount that that should be.
9        THE COURT:  Okay.  So if he's saying he's not
10  indicating that lost profits should be zero, your objection
11  to the slide is the slide says lost profits should be zero.
12       MS. MATHEW:  Correct, Your Honor.
13       THE COURT:  Yeah.  Well, that does seem
14  inconsistent, Counsel.  Do you have a response?
15       MR. ZOVKO:  Yes, Your Honor.  I believe
16  Mr. Schoettelkotte is referring to he has to rely on this
17  technical expert here, Dr. Frakes, for the existence of
18  noninfringing alternatives, and he goes through the analysis
19  in his report.  And he just concluded in it that Tetra Tech
20  has not established Panduit Factor 2 so the logical
21  assumption is lost profits don't apply.
22       THE COURT:  Yeah.  I don't think, though -- in
23  light of his deposition testimony, I think he can say he
24  didn't think they established Panduit Factor No. 2.  But I
25  don't think he can make that legal jump.  You can make that
```

UNITED STATES DISTRICT COURT

102

```
1   legal jump in closing, but I don't think he can make it in
2   his testimony in light of his deposition.
3        MR. ZOVKO:  Thank you.
4        THE COURT:  Okay.
5        Do we have the jurors back from lunch?
6        MS. MATHEW:  Just one more thing, Your Honor.  The
7   following slide, Slide 5 has a heading that also says no lost
8   profits, and so we just ask that they -- one suggestion would
9   be to eliminate no, just lost profits.
10       THE COURT:  Yeah, and I think in light of his
11  deposition testimony, I agree with you, and obviously, these
12  are legal arguments that counsel can make.
13       MR. ZOVKO:  May I be heard, Your Honor?
14       THE COURT:  Um, sure.  Did you have something that
15  addresses the specific conflict that seems to be here.  I
16  mean, if he says he's not testifying that there should be no
17  lost profits in his deposition, how can he now on his slide
18  say there's no lost profits?
19       MR. ZOVKO:  Yeah.  I'm not sure the context of that
20  deposition testimony, and we don't have the whole transcript
21  but --
22       THE COURT:  Well, you have the transcript; right?
23       I mean, you've -- you've looked at it; right.
24       MR. ZOVKO:  I -- I have looked at it.  I wasn't
25  aware that this was the specific objection that was gonna be
```

UNITED STATES DISTRICT COURT

103

```
1   raised today.  He has an entire section in his report that
2   Mr. Schoettelkotte has not established Panduit Factor 2, and
3   therefore, lost profits has not been established.  Half of
4   his report is on no lost profits.  The other half is
5   assessing the reasonable royalty.
6        THE COURT:  Do you have a copy of his report you
7   can point me to?
8        MR. ZOVKO:  Yes, Your Honor.
9        THE CLERK:  Your Honor, may I bring 'em in?
10       THE COURT:  Yes.
11       Okay.  We can pick this up at our next break, but
12  for now, the Court's rulings stands the way it is.  I don't
13  think he should say no lost profits in light of that
14  deposition testimony.  Thank you.
15       THE CLERK:  All rise.
16            (Jury present.)
17       THE COURT:  Okay.  Welcome back from lunch to the
18  jurors.  Please have a seat, and we'll get started.  We had a
19  witness on the stand.  He's coming back, and we'll pick up
20  right where we left off.
21       I believe we're on cross-examination, Counsel, so
22  please proceed.
23       CROSS-EXAMINATION (CONTINUED)
24  BY MR. PARKER:
25  Q.   Welcome back, Mr. Laurent.  So earlier you testified
```

UNITED STATES DISTRICT COURT

104

```
1   that you travel around the world attending conferences and
2   speaking at conferences; is that right?
3   A.   That's part of my job, yes.
4   Q.   And attending trade shows as well; right?  Many of those
5   trade shows and conferences relate to the rail inspection
6   industry; is that correct?
7   A.   Yes.
8   Q.   And Pavemetrics authorizes and finances those trips?
9   A.   I would say I do that.
10  Q.   And many of those trips are for speaking opportunities?
11  A.   Yes.
12  Q.   And also opportunities for Pavemetrics to promote and
13  market their products; is that right?
14  A.   That's why we do that at the same time, yeah.
15  Q.   It also provides an opportunity for Pavemetrics to spy
16  on their competitors; is that right?
17  A.   I wouldn't say that, no.
18  Q.   Would you please take a look at Exhibit 49 in your
19  binder, please?  You have it?
20  A.   Yeah, I do.
21  Q.   That's an email exchange between you and Mr. Fox-Ivey at
22  Pavemetrics; is that correct?
23  A.   Yes, it is.
24  Q.   And it's a corporate record that's been produced by
25  Pavemetrics in this case; is that correct?
```

UNITED STATES DISTRICT COURT

Exhibit 4
197

105

```
1    A.   Yes, that's the case.
2             MS. MATHEW:  Your Honor, we'd like to move Exhibit
3    49 into evidence?
4             THE COURT:  Any objection?
5             MS. LEA:  No objection, Your Honor.
6             THE COURT:  Exhibit 49 is in evidence.
7             (Exhibit 49 admitted.)
8             THE COURT:  It can be published.
9    BY MR. PARKER:
10   Q.   So this is an email exchange we've established between
11   you and Mr. Fox-Ivey, and it relates to companies who meet at
12   AREMA.
13   A.   Yes, that's right.
14   Q.   And AREMA is a railroad conference?
15   A.   Yes, the biggest one in the U.S.  It's scheduled for
16   this weekend, actually.
17   Q.   Okay.  But the bottom of the email, Mr. Fox-Ivey is
18   identifying a list of competitors; right?  And he calls them
19   a hit list?
20   A.   Um, they're not all competitors, but you see the FRA
21   there, they're definitely not a competitor.  Frugo is one of
22   our clients.  And a lot of these other people we're talking
23   with have interest, actually, in integrating our technology.
24   Q.   So can you move up to the top email, please?  In that
25   email, Mr. Fox-Ivey suggests we need to spy on them; is that
```

UNITED STATES DISTRICT COURT

106

```
1    correct?
2    A.   Well, just below that, you see GREX where I mention
3    GREX.
4    Q.   So it's okay to spy on GREX?
5    A.   No, that was a joke, you know, that's a joke.  We don't
6    spy on people at conferences.  We go and meet people.  We
7    learn about their products.  Even with competitors, we go and
8    talk to them and ask 'em how they're doin', I mean, and how
9    their sales are going and so on.  I don't think that's
10   spying.
11   Q.   You testified that publishing papers is important;
12   right?  Important to let the public know what Pavemetrics is
13   doing; is that right?
14   A.   Yeah.  I think that's one of our main marketing
15   opportunities.
16   Q.   Please turn to Exhibit 20 in your binder.  If you need
17   to look through it, you can take a second.  Do you recognize
18   this document?
19   A.   Give me a second.
20            MR. PARKER:  It's already in evidence, Your Honor.
21            THE WITNESS:  Well, yeah, I think I recognize the
22   subject matter at least.
23   BY MR. PARKER:
24   Q.   Okay.  This is an email exchange between you and
25   Mr. Fox-Ivey on that first page; correct?  And it relates to
```

UNITED STATES DISTRICT COURT

107

```
1    a publication that refers to LRAIL algorithms; is that right?
2    A.   So it wasn't a publication yet.  That -- I think that's
3    the third report that was in '21.  Yeah.  So that's the
4    report we were preparing for the next phase of the FRA work
5    we were doing.  So it would be the report that was -- would
6    be the report that we're gonna publish, the one after
7    March 2020.  So it would have been on the work that we'd done
8    since then.
9    Q.   But the date is March 2021; is that correct?  You said
10   2020.  It just wanted to make sure the record --
11   A.   Okay.  What I was saying, the report before that was
12   March 2020.  So this is a report that actually I'm not even
13   sure it's been published yet.
14   Q.   You see down at the bottom, the third email on the
15   pages, it says regarding mention of LRAIL to algorithms.  Do
16   you see that?
17   A.   Yeah.
18   Q.   And then bottom line, Mr. Fox-Ivey sent this email to
19   you, and he says there are 15 uses of the word algorithm.
20   Let me know if any of these need to be edited.  Did I read
21   that correctly?
22   A.   Um, yes.
23   Q.   So he was reviewing this draft for, you know, the
24   discussion of algorithms regarding -- within the LRAIL
25   system; is that correct?
```

UNITED STATES DISTRICT COURT

108

```
1    A.   Yeah, that's the case.
2    Q.   In the email above that, you also looked at this draft,
3    is that correct, and you stated these references look all too
4    vague, that it would be hard for anyone to point to a
5    specific point and claim it infringes on a specific patented
6    algorithm so I think we are okay here.  Did I read that
7    correctly?
8    A.   That's the way, yeah, it's written.
9    Q.   So you wanted to keep the references about the LRAIL
10   algorithm vague so the patentholders couldn't read this
11   report, this publication and accuse you of infringement; is
12   that correct?
13   A.   Okay.  So that's a long sentence.  So what is here is we
14   were in the middle of a lawsuit, right, that we're in now?
15   And yeah, you have to be careful.  We learned that in these
16   reports, and we learned that unfortunately, scientific papers
17   can be taken out of context, and then they can be used
18   against you to bring on a lawsuit.
19   Q.   So you wanted to hide from Tetra Tech and your other
20   competitors what the algorithms in the LRAIL were actually
21   doing.
22   A.   Well, at least we were publishing.  This is -- this is
23   an FRA paper, right, so that's a public document.  And, uh, I
24   haven't seen anything from Tetra Tech.  Were you guys hiding
25   from GREX?
```

UNITED STATES DISTRICT COURT

Exhibit 4
198



109

1    MR. PARKER:  I'll pass the witness, Your Honor.
2    THE COURT:  Okay.  And let me just tell him this.
3    You're here to answer questions.
4    THE WITNESS:  Excuse me?
5    THE COURT:  I'm trying to get your attention.
6    THE WITNESS:  Oh.
7    THE COURT:  You're here to answer questions, not
8    ask them so please refrain from that.
9    Any redirect, Counsel?
10   MS. LEA:  No, Your Honor.
11   Have a happy birthday, Mr. Laurent.
12   THE COURT:  Okay.  The witness is excused.
13   Please call your next witness.
14   MS. LEA:  Our witness is being brought back in the
15   courtroom.  While waiting would you like for me to pre-admit
16   exhibits?
17   THE COURT:  We can do it now.
18   MS. LEA:  Okay.  I'd like to pre-admit Exhibits 31,
19   508, 517, 528, 553, 618, 619, 657, 674, 676 and 678.
20   THE COURT:  Any objections, Counsel?
21   MR. CERULLI:  No objection, Your Honor.
22   THE COURT:  Okay.  Exhibits 31, 508, 517, 528, 553,
23   618, 619, 657, 674, 676 and 678 are now in evidence.
24   And you can go ahead and call your next witness
25   then.

UNITED STATES DISTRICT COURT

110

1    MS. LEA:  Yes.  I would like to call
2    Dr. Jean-Francois Hebert.
3    THE CLERK:  Please raise your right hand.
4    (Witness sworn.)
5    THE CLERK:  Please be seated.
6    Will you please state and spell your full name for
7    the record?
8    THE WITNESS:  Jean-Francois Hebert, J-e-a-n
9    F-r-a-n-c-o-i-s  H-e-b-e-r-t.
10   THE CLERK:  Thank you.
11   DIRECT EXAMINATION
12   BY MS. LEA:
13   Q.  Good afternoon, Mr. Hebert.
14   A.  Good afternoon.
15   Q.  What is your position at Pavemetrics?
16   A.  I am Vice President of Research and Development.
17   Q.  What is your educational background?
18   A.  I have a degree in Actuarial Science.  I have a Master's
19   Degree in Statistics and I also have a PhD degree in
20   Electrical Engineering and Computer Engineering with a
21   specialization in neural networks.
22   Q.  And what did you do after obtaining your PhD?
23   A.  So a few months before I got my PhD, I started working
24   with INO which is National Optical Institute in Canada.
25   Q.  And is INO the same organization that John Laurent

UNITED STATES DISTRICT COURT

111

1    previously worked at?
2    A.  Yes, and this is where I met John Laurent.
3    Q.  And did you work with Mr. Laurent at INO?
4    A.  Yes, we were working together.  We were developing 3D
5    sensors for road inspection.  So that would mean collecting
6    data from the road, and then performing the detection of
7    different defects on the road like cracks and potholes and
8    other defects.
9    Q.  And what was your role in the LCMS project?
10   A.  At that time I was a software developer and my role was
11   to develop the algorithms for performing the detection of
12   distress in the images.
13   Q.  And when did you leave INO?
14   A.  I left INO in 2009 when John Laurent and Richard Habel
15   and I started Pavemetrics Systems.
16   Q.  And at that time what was your role at Pavemetrics?
17   A.  Well, in the very beginning, we were a very small team.
18   In fact, it was the only three of us.  So my role was to
19   continue the development of the algorithms for our road
20   inspections systems.
21   Q.  Did you personally draft the code for Pavemetrics' LCMS?
22   A.  Well, yes.  In fact I wrote most of the algorithms that
23   were used for our road inspection system.
24   Q.  And what are the software components for the LCMS
25   sensors?

UNITED STATES DISTRICT COURT

112

1    A.  So there are two main components.  First, you have the
2    acquisition software that will collect the data on the road
3    and then there is the processing software that will read the
4    data and will perform the analysis for detection of the
5    different defects.
6    Q.  And does Pavemetrics have different types of processing
7    software depending on the application?
8    A.  Yes.  We have a single processing library, but the
9    processing library can be interfaced with different software
10   depending on the application.  So if the application is for
11   an LRAIL system, for example, it will be a stand alone
12   software that can used at the office for processing the data,
13   but if the sensors are to be mounted on a boxcar, then there
14   will be multiple computers and it will be a different
15   software interface with our library.
16   Q.  Okay.  So the hi-rail truck the data that is collected,
17   and then the processing software is on a computer at an
18   office somewhere not in the truck.
19   A.  Exactly.
20   Q.  And that's different with a boxcar.
21   A.  Yes.  For the boxcar processing computers are
22   mounted within the boxcar as well as the acquisition
23   computer.  And there are multiple computers so the interface
24   between our library is different.  So it's exactly the same
25   algorithms, but with different software interface.

UNITED STATES DISTRICT COURT

Exhibit 4
199

113

1   Q.   And when did Pavemetrics begin developing software for
2   rail inspections?
3   A.   That was in 2012.  At that time we sold the LCMS system
4   to University Massachusetts Lowell, UML.  They were involved
5   in a research project for automated railroad inspection.  So
6   as part of the contract that we signed with UML, we were
7   developing the algorithms for identify different railway
8   track bed features from the images.
9   Q.   And what was your role in the UML Project?
10  A.   Well, at that time our team was getting a little bit
11  bigger.  We had hired a few more software developers.  So my
12  role was to supervise, uh, the development of the algorithms
13  by the developers associated with this project.
14  Q.   Who were the two Pavemetrics developers on the UML
15  Project?
16  A.   So that was Samy Metari and Mario Talbot.
17  Q.   And does Pavemetrics have any records of the development
18  that Mr. Talbot and Mr. Metari did for the UML Project?
19  A.   Yes.  All our source code is saved in a repository.  So
20  a repository is sort of a database that can keep track of the
21  changes over time.  So from the repository, we can go back in
22  time and retrieve the older versions that were used at the
23  time for the UML Project.
24  Q.   Okay.  Let's look at Exhibit 508 and we'll take this
25  slowly.  Do you recognize Exhibit 508?

UNITED STATES DISTRICT COURT

114

1   A.   Yes.  This is a compilation of some excerpts from our
2   earlier source code that was used for the UML Project.
3   Q.   And what software version excerpt is shown on pages 2
4   through 85?
5   A.   So the software version in case is r8320.
6   Q.   And when was the software version created?
7   A.   So this specific software version was saved in the
8   repository in May 2014.
9   Q.   And was it done for the UML Project?
10  A.   Yes, exactly.
11  Q.   And we're gonna go to page 90 of this exhibit.  And
12  again, what software version is shown on pages 90 to 119?
13  A.   Uh, r8320.
14  Q.   The same one.
15  A.   The same one.  Again, from 2014 in May.
16  Q.   In the upper right-hand corner, there's some typed
17  language.  What does it say in the upper right-hand corner?
18  A.   Well, there you can find the name of the creator of the
19  file.  What that means it was Samy Metari.  It also says that
20  the file was created September 2012.  And the name of the
21  file is Rail Detector meaning that this specific file would
22  perform the detection of the positions of the rail in the
23  images.
24  Q.   Now, does this version of the software identify features
25  of a railroad?

UNITED STATES DISTRICT COURT

115

1   A.   Yes, exactly.  For instance, it detect the position of
2   the rails from LCMS images.
3   Q.   How does this version of the software identify features?
4   A.   Using both the intensity and range images that are saved
5   by our sensors.
6   Q.   Now, let's go to page 93, same exhibit.  And near the
7   bottom of that page of code, we'll look at line 222.  What
8   does this line of code mean?
9   A.   Well, this line of code is the beginning of a function.
10  In that case the name of the function is process so that
11  means that the following lines will actually do the detection
12  of the defects in the images.  In this case, uh, because the
13  name of the class is rail detector, this is actually the
14  first function that will perform the detection of the
15  position of the rails in the image.
16  Q.   Let's go to page 98.  And on page 98, are we still in
17  the same rail detector function?
18  A.   Yes.
19  Q.   And on, let's see, line 455, there's a comment.  That's
20  a comment; right?
21  A.   Yeah, it's a comment.  It says that we will apply the
22  Canny method.  That means after that comment, the source code
23  will perform the Canny method for detecting the position of
24  the rails in the images.
25  Q.   And what is the Canny method?

UNITED STATES DISTRICT COURT

116

1   A.   It's a very traditional method that is used in Computer
2   Vision.  In fact, it's probably the first thing you start
3   learning when you take courses in Computer Vision algorithm.
4   It will detect the edges in the images.
5   Q.   And how does the Canny method work?
6   A.   So it uses filters that is pre-defined and filter will
7   be moved completely and sequentially over the image for
8   measuring gradient measurements.
9   Q.   And are those vertical gradient measurements?
10  A.   Yes.
11  Q.   And is that an algorithm?
12  A.   Yes, it's an algorithm.
13  Q.   And remind me, again, the date of this?
14  A.   That was May 2014.
15  Q.   Now, were you in the courtroom -- do you understand that
16  Tetra Tech is pointing to the Fake3D images as being an
17  infringing image in this case?
18  A.   Yes, I do.
19  Q.   Now, did LRAIL generate Fake3D images in the UML 2015
20  source code?
21  A.   Yes.
22  Q.   I said 2015.  I meant 2014.  Let me do that again.
23       Did LRAIL generate Fake3D images in the UML 2014
24  source code?
25  A.   Yes.

UNITED STATES DISTRICT COURT

**Exhibit 4**
**200**

117

1  Q.   And in general how is the Fake3D image generated?
2  A.   Well, the Fake3d image, it's an intensity image over
3  which we will add shadows to make it appear like it is a
4  3D image.  It uses the elevation data for determining where
5  to add the shadows in the intensity image.
6  Q.   Okay.  And if we can go to Exhibit 517.
7             What is the Exhibit 517?
8  A.   This is an excerpt of the source code from 2014 that was
9  used for the UML Project.  And this is the source code that
10 will actually compute the Fake3D image.  If you look at
11 line 18 for instance, you can see that the LCMS Fake3d
12 function will receive different input and two of those input
13 are the range data PrangeZ and also the intensity data that
14 will be Pintensity.
15 Q.   And this Exhibit 517 is an excerpt from r8320, the same
16 version of code we just looked at; right?
17 A.   Yes, from 2014.
18 Q.   And do you understand that Tetra Tech's expert contends
19 that your 2014 Fake3D image is different than the Fake3D
20 image in your later versions of software.
21 A.   Yes, I understand.
22 Q.   Is that correct?
23 A.   No, that's not correct.
24 Q.   Now, do you understand Dr. Morellas points to the
25 GetPosition function?

UNITED STATES DISTRICT COURT

118

1  A.   Yes.
2  Q.   And he says that shows Fake3d does not use any range
3  data.
4  A.   Yes, but he's wrong.  If you look at the definition of
5  the GetPosition function.
6  Q.   If we can go to page 2 line 66.
7  A.   Yes.  You can see that the GetPosition function actually
8  returns at 3D points and the third coordinate of the point is
9  the range data.  So that means that the Fake3D function from
10 2014 was also using the range elevation data.
11 Q.   And what does that show in basic English?
12 A.   Well, it shows that Fake3D from 2014 is the same
13 algorithm that we use now today.  It uses both intensity and
14 range.
15 Q.   But how does it use the range?
16 A.   It uses the range to determine the orientation of the
17 surface and the orientation of the surface is compared to the
18 orientation of an artificial lighting source.  So this is how
19 we use the range data in the Fake3D version of 2014.
20 Q.   Now, you just mentioned that something about using
21 Fake3D today.  Does Pavemetrics use Fake3D today in its
22 source code?
23 A.   No, not any more.
24 Q.   Then we'll talk about that in a moment, but I wanted to
25 clarify that for the record.

UNITED STATES DISTRICT COURT

119

1             What about the LCMS for road inspection that you
2  sold to Tetra Tech?  Did it generate Fake3D images also?
3  A.   Uh, yes.  In 2012 for the system that they purchased
4  from us, it has the Fake3D function.
5  Q.   And how would Tetra Tech have known that?
6  A.   Well, when they start the software, the main processing
7  software, the user has different options to display a
8  different image type and Fake3D is one of these image type.
9  Q.   Those are the four image types:  Intensity, range,
10 rectified range, 3D?
11 A.   Yes.  The software says 3D, but in the source code it's
12 related to Fake3D.
13 Q.   Okay.  We need to shift a little bit and talk about the
14 '557 patent.  That's a different algorithm; right?
15 A.   Yes.
16 Q.   Okay.  Let's look at Trial Exhibit 508.  This is the
17 exhibit we looked at earlier; right on r8320?
18 A.   Yes.
19 Q.   And you understand that Tetra Tech accuses Pavemetrics
20 of inducing AID to infringe Claim 8 of the '557 patent that
21 talked about a method for detecting cracks on ties.
22 A.   Yes, that's correct.
23 Q.   Now, did Pavemetrics develop software that detected
24 cracks on ties for the UML Project?
25 A.   Yes.  In 2013 we wrote the paper that was presented at

UNITED STATES DISTRICT COURT

120

1  TRB in 2014.  TRB is Transportation Research Board.  And in
2  that paper we were presenting the results of an algorithm
3  that we had developed for detecting cracks on wooden ties.
4  Q.   Go to page 86 of Exhibit 508.  And what's shown on
5  pages 86 to 89 of Exhibit 508?
6  A.   Well, this is the algorithm that was developed for
7  detecting cracks on wooden ties.
8  Q.   And now were the results of the UML Project ever
9  published?
10 A.   Yes, they were published at TRB in 2014.
11 Q.   Now, I'd like to shift gears and talk about
12 Pavemetrics's development of the software after the UML
13 Project so after the publication of the UML TRB 2014 paper.
14            Did you continue developing your software after
15 that project?
16 A.   Yes.  In 2015 we hired a new software developer that was
17 Mr. Nguyen and his job was to develop the algorithms for the
18 rail inspection system.
19 Q.   And how has the LRAIL software changed since the 2014
20 paper?
21 A.   Uh, it changes a lot.  The biggest change, uh, after
22 2014 is that we started using AI technique, uh, using neural
23 networks for detecting, uh, the railway track bed features.
24 Q.   And why did Pavemetrics start using AI instead of the
25 traditional image processing techniques that it published in

UNITED STATES DISTRICT COURT

Exhibit 4
201

121

```
 1  the TRB 2014 paper?
 2  A.   Well, the AI algorithms were much more faster than the
 3  traditional algorithm that we were using before, and the new
 4  speed that we were getting was allowing us to use, uh, to
 5  develop new application, for instance, for near real time
 6  application.
 7  Q.   And what is near real time application or near real time
 8  processing?
 9  A.   Near real time processing means that we collect the data
10  at the same time as we process the data.  So the acquisition
11  computer and the processing computers are both in the same
12  vehicle.  This is an application that we will use typically
13  for a boxcar.
14  Q.   And how fast can it move?
15  A.   60 miles per hour.
16  Q.   And what allows the LRAIL system on a boxcar to go so
17  fast?
18  A.   Well, one of the advantage with the neural network is
19  that it can perform a huge amount of computation in parallel
20  meaning at the same time and so that makes them very fast for
21  processing the data.  And another factor that makes them very
22  fast is that they can also skip pixels in the image so they
23  don't need to analyze the complete image.
24  Q.   Okay.  So neural network performs calculations in
25  parallel not in sequence.  Did I understand that?
```

UNITED STATES DISTRICT COURT

122

```
 1  A.   That's correct.
 2  Q.   And that's different than the traditional techniques?
 3  A.   Yes.
 4  Q.   Okay.  And how -- are there other ways that the neural
 5  network differs from the traditional processing techniques?
 6  A.   Well, they are also much easier to do with the tradition
 7  technique, the software developer has to write all the steps
 8  of the algorithm one after the other.  With neural network
 9  you don't need to do this.  Just present an image to the
10  neural network and it will detect automatically the features
11  of interest.
12  Q.   Now, did Pavemetrics develop its own neural network?
13  A.   No, we use neural networks that are available in the
14  public domain.
15  Q.   And can you tell us in general how the neural network
16  works and how it's trained?
17  A.   So the first thing you need to do if you want to use a
18  neural network is that you need to train it.  So you will
19  present to the neural network thousands of different images
20  for the object of interest.  Eventually, the neural network
21  will converge, it will be trained.  And when the neural
22  network is trained, you can present to the neural network a
23  new image that it has never seen in the past and it will be
24  able to detect the features.
25  Q.   And what tools does Pavemetrics use for implementing its
```

UNITED STATES DISTRICT COURT

123

```
 1  neural network into LRAIL?
 2  A.   So we use the Tensor Flow library.  It's an open source
 3  library that is available on the Internet for free.  It was
 4  created by Google in 2015.
 5  Q.   Okay.  So you use Google's Tensor Flow library.
 6  A.   That is correct.
 7  Q.   And that's available online.
 8  A.   Yes.
 9  Q.   You didn't invent that.
10  A.   No.
11  Q.   And Google published it in 2015?
12  A.   Well, the library was compiled in 2015 approximately,
13  yes.
14  Q.   Now, what type of neural network does LRAIL use?
15  A.   The type of neural network that we use are convolution
16  neural networks.  So a convolution neural network has several
17  layers.  We also call them Deep Neural Network.  The first
18  layers of the neural network will perform a convolution on
19  the image and the last layers will do the detection of the
20  features.
21  Q.   Okay.  And what is a convolution?
22  A.   A convolution is a series of calculations that are
23  applied to an image for modifying the image.
24  Q.   And how are the convolutional filters applied over the
25  image?
```

UNITED STATES DISTRICT COURT

124

```
 1  A.   Well, a good thing with the neural network is that it
 2  can do a lot of computation in parallel so. . .
 3  Q.   This is in the parallel thing again; right?
 4  A.   Right.
 5  Q.   And I believe you also mentioned that it skips every
 6  other pixel?
 7  A.   That is correct.
 8  Q.   And why does it do that?
 9  A.   Because in skipping pixels, you can get the results
10  faster so this is why we can use the neural networks for our
11  near real time application because they are very fast due to
12  their implementation.
13  Q.   So the convolutional filters are not applied to the
14  image sequentially or completely.
15  A.   No.
16  Q.   Why not?
17       MR. PARKER:  Objection, Your Honor.  Calls for
18  expert testimony.
19       THE COURT:  I think he can answer to his
20  understanding of the code.  You can ask him that.
21  BY MS. LEA:
22  Q.   Okay.  So based upon your understanding of the way your
23  neural network works, um, are the filters applied
24  sequentially or completely to the image?
25  A.   No, they are not.
```

UNITED STATES DISTRICT COURT

Exhibit 4
202

125

1   Q.   Why not?
2   A.   Because the neural network is a big structure.  The
3   computation can be done in parallel.  First instance, the
4   firstly type of neural network that we use are depth wise
5   convolution neural network.  So for that specific type of
6   convolution neural network, the filters are applied in
7   parallel to the three channel of the input image.
8   Q.   Okay.  So are the filters in Pavemetrics's neural
9   network flexible in size?
10  A.   No.  Their size is fixed.
11  Q.   Fixed.  Doesn't change?
12  A.   Doesn't change.
13  Q.   Okay.  All right.  Let's talk about LRAIL software.
14  What software is needed to process data collected by the
15  LRAIL system?
16  A.   There are different pieces of software that are needed.
17  Uh, we need a configuration file.  We need the object code.
18  We need neural networks that are trained on specific image
19  type and we also need a license file.
20  Q.   Okay.  What is a configuration file?
21  A.   A configuration file is a text file that a user can use
22  to rewrite some processing parameters in the object code
23  while the object code is executed in memory.
24  Q.   Okay.  And what's the object code?
25  A.   So the object code is what you get when you compile the

UNITED STATES DISTRICT COURT

126

1   source code.  So the programmer will write all the lines in
2   the source code, you will then use a compiler, and the
3   results of the compilation will be the object code.
4   Q.   Okay.  Is that like what we think of as software?
5   A.   The object code is actually the program that is running
6   on the computer.
7   Q.   And how does Pavemetrics organize its source code?
8   A.   So as I said earlier, our source code is saved in a
9   repository.  We have more than one million lines of source
10  code and the repository allows us to keep track of the
11  changes over time.
12  Q.   And is Pavemetrics continuing to develop new code?
13  A.   Yes, every day.  We now add a team of 10 to 15 software
14  developers and their job is to develop new code.  This is
15  what they do all day.  They will improve the existing
16  features of our library, but they will also test new ideas
17  using what we call R and D source code.
18  Q.   How does Pavemetrics handle R and D source code?
19  A.   There are different ways to do this, but if you want to
20  test something that is very easy to implement, we will
21  typically implement the R and D source code directly into our
22  main source code, but the software developer will protect the
23  R and D source code with confidential parameters such that
24  anyone else than him can use the R and D source code.
25  Q.   And why do you write the R and D source code into the

UNITED STATES DISTRICT COURT

127

1   same repository as your source code that you compile software
2   from?
3   A.   Because this is the easiest way to do if you want to do
4   a very simple test.
5   Q.   And is it easy to protect access to that R and D code?
6   A.   Yes, using, uh, the configuration file that we talked
7   earlier, uh, the programmer can define confidential
8   parameters.  So in that way that means that the users cannot
9   activate the R and D source code because they are not aware
10  of the confidential parameter.  Confidential parameter is not
11  documented in our software manual.
12  Q.   So how does Pavemetrics' programmers access the R and D
13  features in the code?
14  A.   Well, we are the only one to have access to the source
15  code.  We don't send the source code to the customers.
16  Q.   Now, you had said that the third software needed is a
17  neural network trained on an input image.  Why do you a
18  neural network trained on the input image type?
19  A.   Well, because the neural network are specialized to
20  recognize objects only for the image type that they have seen
21  in the past.  So if you train a neural network to detect
22  objects on intensity image, for instance, and then you
23  present to the neural network the range image, you will not
24  be able to detect any features because it has never seen that
25  type of image in the past.

UNITED STATES DISTRICT COURT

128

1   Q.   And does Pavemetrics train the LRAIL neural network?
2   A.   Yes.
3   Q.   And what is the result of training LRAIL's neural
4   network?
5   A.   The -- the learning defines the neural network's filter.
6   Q.   And was LRAIL's neural network trained using LRAIL
7   hardware or different hardware?
8   A.   It's a different hardware.  The LRAIL, uh, neural
9   network are trained in Canada on our processing computers.
10  Q.   And was LRAIL's neural network trained using software
11  that is included on LRAIL going to customers or on using
12  different software?
13  A.   It's a different software that we have at the office.
14  We do not send the software that trains the neural network to
15  customer.
16  Q.   Okay.  So where does Pavemetrics train its neural
17  network?
18  A.   At our office in Canada.
19  Q.   Okay.  So if I follow this, first, Pavemetrics trains
20  the neural network in Canada on different hardware and
21  different software; is that right?
22  A.   Yes.
23  Q.   And then LRAIL is sent to a customer that runs the
24  software that's different and on different hardware; is that
25  right?

UNITED STATES DISTRICT COURT

**Exhibit 4**
**203**

129

1  A.   That's correct.
2  Q.   So training is different than using.
3  A.   Yes.  The training software is not part of the LRAIL
4  software.  It's a software that is running on our computer in
5  Canada.
6  Q.   All right.  Does LRAIL redefine its filters after they
7  were pre-defined during training in Canada?
8  A.   No.  Once the neural networks are trained, the filters
9  are fixed and they never change.
10  Q.   And that happens before you ship the unit; right?
11  A.   Right.
12  Q.   And the fourth software piece is the license file.
13       What is that?
14  A.   So, uh, the software is licensed to be used only on a
15  specific pair of sensors that were purchased by the customer.
16  So the license file allows us to block the software to be
17  used on other pair of sensors.
18  Q.   Do you understand that Tetra Tech has accused four of
19  Pavemetrics sales as infringing?
20  A.   Yes.
21  Q.   And what is your role in LRAIL sales?
22  A.   I'm not involved in that business development on the
23  sales side.  So my role is to make sure that if a customer
24  buys a system from us, he will get the good software with a
25  valid license file and that he also receives all the

UNITED STATES DISTRICT COURT

130

1  technical support that he needs.
2  Q.   And in general what software version is included with
3  each sale?
4  A.   So it can take several months before the customer is
5  actually ready to use the sensors because they need to be
6  mounted on a vehicle.  This is not something that can be done
7  only in a few week.  So usually we will send them the latest
8  version that is available when they are ready to actually use
9  the equipment.
10  Q.   So it's common to send the hardware before software.
11  A.   It happens all the time.
12  Q.   And do you know, do you have personal knowledge of which
13  software versions were provided and licensed for each sale?
14  A.   Yes.
15  Q.   And do you understand that Tetra Tech claims that
16  Pavemetrics' sales to CSX infringed the '293 patent?
17  A.   Yes.
18  Q.   And when was the processing computer for Sales 2, 3 and
19  4 shipped to CSX?
20  A.   That was in August 2021.
21  Q.   And did the processing computer for Sales 2, 3 and 4
22  have software on it when it was shipped to CSX?
23  A.   No.
24  Q.   And was software provided to and licensed to CSX as part
25  of Sales 2 and 3?

UNITED STATES DISTRICT COURT

131

1  A.   Yes, we provided them with a software version 4.80 in
2  December 2021.
3  Q.   And do you understand that Tetra Tech contends that
4  Version 10323 delivered to CSX back in October 2020 was
5  available for CSX to use with Sales 2, 3 and 4?
6  A.   Yes, I understand.
7  Q.   Is that accurate?
8  A.   That is not possible.  Uh, first of all, the software
9  that sent to CSX was licensed only for their hi-rail vehicle
10  and also the software that was sent at that time was a stand
11  alone software that can be used on a desktop or a lap top in
12  their office.  The boxcar for Sale 2 and 3 and 4, the sensors
13  are mounted in a boxcar with multiple computers for it's a
14  different software interface.  Version r10323 wouldn't be
15  compatible with the boxcars.
16  Q.   And you referred to a hi-rail truck.  Is that Sale A?
17  A.   Sale B was a hi-rail truck.
18  Q.   Okay.  Let's look at software.  Let's turn to
19  Exhibit 619.  What is Exhibit 619?
20  A.   So this is an excerpt from our source code
21  Version 4.80.2.  This is the source code, the software that
22  was delivered to CSX in December 2021.
23  Q.   For Sales 2 and 3; right?
24  A.   For Sale 2 and 3, yeah.
25  Q.   Let's look at lines 65 to 68 on the top of the second

UNITED STATES DISTRICT COURT

132

1  page.  There we go.  Okay.  What did these lines mean?
2  A.   So these are the, uh, the parameters that will define
3  what image type will be used by the neural network for the
4  detection of different railway features.  In that case there
5  are four neural networks.  One is for the detection of the
6  fastener, uh, the tie plate, the sides and the joint bars.
7  Q.   And what image type will the neural network use for each
8  of these, um, in each of these cases?
9  A.   So by default the neural network use a range image.
10  Q.   Okay.  And a range image is an elevation image?
11  A.   That's correct.
12  Q.   And how do you know that the neural network will use a
13  range image?
14  A.   If you look at line 65, for instance, there's a comment.
15  It says 0: Range so that the means that the value zero is
16  assigned to the range image.  And before that comment, you
17  can see that the source code is actually using the value
18  zero.
19  Q.   So the first zero in the box that's the one that's
20  actually telling the source code what to image use?
21  A.   That's correct.
22  Q.   And everything after semicolon slash slash, those are
23  comments so that your programmers know what's happening?
24  A.   Exactly.
25  Q.   Okay.  And so it defines zero to be range; is that

UNITED STATES DISTRICT COURT

**Exhibit 4**
**204**

133

1  right?
2  A.    That's correct.
3  Q.    And then after some other definitions, there's a comment
4  the default is using normalized range image as the input for
5  neural network.  And NN is neural network; right?
6  A.    That's correct.
7  Q.    And why is this comment here?
8  A.    It indicates to the software developer that the default
9  value for the input of the neural network is the range image.
10 Q.    And why does Pavemetrics use a range image rather than
11 intensity image or an image that combines range and intensity
12 in the neural network here?
13 A.    So we try different image type and the range image is
14 what works the best for our application.
15 Q.    Now, I notice in the comment it says 1: not yet
16 assigned.  What does that mean?
17 A.    So for versions previous to this one uh, we tried -- we
18 were using the Fake3D image as an input for the neural
19 network.  This is something that we tested in 2020 and 2021,
20 but during summer 2021, we stopped using the Fake3D image as
21 an input because we realized that it was too slow for our
22 near real time application so we just decided to remove it
23 from the source code.
24 Q.    And did removing it have anything to do with this
25 litigation?

UNITED STATES DISTRICT COURT

134

1  A.    Well, we also knew that Tetra Tech was saying that the
2  Fake3d was a 3D elevation map.  So in order to avoid any
3  dispute, we just decided to remove it from the source code.
4  Q.    So did any of the CSX Sales 2 or 3 or 4 include Fake3d
5  in the source code for identifying features?
6  A.    No.
7  Q.    Now, Dr. Morellas testified that Fake3D image is used as
8  an input in Sales 2, 3 and 4; is that correct?
9  A.    No.
10 Q.    Okay.  And -- and you know that because?
11 A.    Because it's not available any more in the source code.
12 Q.    And if we can put the exhibit back up and let's talk
13 about the comment also has 2: mix image as the input for NN
14 neural network.  What is that comment referring to?
15 A.    So in summer 2021, we had a student intern that was
16 working with us and he had the idea to try combining
17 different type of sensors together intensity, range, edge and
18 different sensors.  One our software developer integrate some
19 R and D source code in the main software such as we can test
20 the R and D mixed image.  And we realized very soon that in
21 fact it was not working.  We near succeeded to train a neural
22 network using a mixed image.
23 Q.    And what would need to be done to enable the neural
24 network to analyzed a mixed image instead of the default
25 range image?

UNITED STATES DISTRICT COURT

135

1  A.    So you could rewrite the source code and recompile the
2  object code or you could use a configuration file that would
3  rewrite the default value in the object code.
4  Q.    And would anything else need to be done to enable the
5  neural network to analyze a mixed image instead of the
6  default range image?
7  A.    Yes.  You would also have to actually have a neural
8  network that is trained on mixed image and we never succeeded
9  to train such a network.
10 Q.    And did Pavemetrics ever send CSX a configuration file
11 for Sales 2, 3 and 4?
12 A.    Oh, yes.
13 Q.    And did that configuration file in any way have anything
14 to do with mixed image?
15 A.    No.
16 Q.    Okay.  And did Pavemetrics every send CSX a neural
17 network trained on mixed images?
18 A.    No.  Such a neural network doesn't exist.
19 Q.    And with CSX have even known about the R and D mixed
20 image?
21 A.    No.
22 Q.    And, um, did -- was the R and D mixed image available to
23 CSX for Sales 2, 3 or 4?
24 A.    No.
25 Q.    In December 2021 what software version was provided for

UNITED STATES DISTRICT COURT

136

1  Sale 4 to CSX?
2  A.    We didn't provide any software version for Sale 4.
3  Q.    And did Pavemetrics make any further other changes to
4  its source code in December 2021?
5  A.    Yes.  In December 2021, we removed the mixed image from
6  the source code.
7  Q.    So it's not even in there any more as a test image.
8  A.    No.
9  Q.    Now, if you could turn in your binder, we won't put it
10 up just yet, Exhibit 552-1.  What is Exhibit 552-1?
11 A.    Well, it's a piece of software from December 2021.  It's
12 a piece of software, uh, and it shows on page 2 that the only
13 input --
14        THE COURT:  Sorry.  Before you testify about what
15 it is or what it shows, you might want to put this in
16 evidence.
17 BY MS. LEA:
18 Q.    Okay.  So you do recognize the document?
19 A.    Yes.
20        MS. LEA:  I would like to move it into evidence.
21        THE COURT:  Any objection, Counsel?
22        MR. PARKER:  No objection.
23        THE COURT:  552-1 is in evidence and certainly the
24 witness can describe it.
25             (Exhibit 552-1 admitted.)

UNITED STATES DISTRICT COURT

Exhibit 4
205

137

1    MS. LEA:  Okay.
2    Q.   So you were telling us that 552-1 is a version of your
3    source code from December 2021 after mixed image was removed;
4    correct?
5    A.   That is correct.
6    Q.   Okay.  And let's just look where can we go to see the --
7    A.   That would be on page 2, yes, line 65.  You can see now
8    that, for instance, for the faster neural network, the only
9    image type that can be input is the range data.  It's the
10   same thing for the other neural networks.
11   Q.   And why did Pavemetrics remove the mixed image from the
12   code?
13   A.   It was never used.  Uh, we never succeeded to train a
14   neural network on mix image so we just decided to remove it
15   from the code.
16   Q.   Okay.  And how long did it take Pavemetrics to remove
17   the R and D mix image from the code?
18   A.   It was only a few lines of source code to delete so it
19   took less than half a day.
20   Q.   And who deleted it?
21   A.   Mr. Nguyen.
22   Q.   And what is Mr. Nguyen's salary for half a day?
23   A.   $200.
24   Q.   Now, let's talk about the '557 patent.  Do you
25   understand that Tetra Tech contends that AID has used LRAIL

UNITED STATES DISTRICT COURT

138

1    Sale 1 to infringe the method Claim 8 in the '557 patent?
2    A.   Yes.
3    Q.   Okay.  And which software versions were provided to AID
4    as part of Sale 1?
5    A.   Well, for Sale 1 at first we provided them with software
6    version 4.75 and that version was later updated to 4.78.
7    Q.   And why did AID receive two versions?
8    A.   Well, they found a big in 4.75 so we fixed the bug and
9    we sent a new version and that was 4.78.
10   Q.   And if we could turn to the Exhibit 618.
11        Do you recognize Exhibit 618?
12   A.   Yes, this is an excerpt from our source code for
13   Version 4.78.
14   Q.   And 4.78 we're using that as short form for
15   Version 4.78.6.0; right?
16   A.   That is correct.
17   Q.   Did 4.78 have the ability to detect cracks in wooden
18   ties?
19   A.   Yes.
20   Q.   Go to page 18, please.  And do you see Line 38621?
21   A.   Yes.
22   Q.   And what is on that line?
23   A.   So this is the beginning of the function detect wooden
24   tie cracks which will actually detect the cracks on the
25   wooden ties.

UNITED STATES DISTRICT COURT

139

1    Q.   And did you hear Dr. Morellas testify that your detect
2    wooden tie crack function inputs rail base coordinates to
3    detect cracks?
4    A.   Yes.
5    Q.   Is that correct?
6    A.   No, that's not correct.
7    Q.   And how do you know that?
8    A.   Well, if you look --
9         MR. PARKER:  Objection.
10        Your Honor, can we have a brief side bar?
11        THE COURT:  What's the objection you're making?
12        MR. PARKER:  Again, calls for expert testimony.
13   We're talking specifically about claim language inherent to
14   the accused code.
15        MS. LEA:  He's testifying about his code.
16        THE COURT:  Can you ask the question again,
17   Counsel?
18   BY MS. LEA:
19   Q.   Does your code input rail base coordinates into the
20   detect wooden tie crack function?
21   A.   No.  If you look at the list of inputs, there are quite
22   a lot of inputs, but none of them is related to a rail base
23   edge.  And the reason why that we actually don't have the
24   position of the rail base edge when we want to detect cracks
25   on wooden ties.  It's not relevant to that function so we are

UNITED STATES DISTRICT COURT

140

1    not using it in that function.
2    Q.   And did you hear Dr. Morellas testify that your detect
3    tie crack function inputs a tie bounding box to detect
4    cracks?
5    A.   Yes.
6    Q.   Is that correct?
7    A.   No, that is not correct.  The input that we use
8    regarding the detect ties is the contour of the tie.  So even
9    though the ties are typically rectangular when they are brand
10   new, uh, they get broken over time so some pieces of the ties
11   will be missing and there can also be ballast on the ties.
12   So our function will input the real contour of the tie that
13   is detected and this is why we use a mask and not a bounding
14   box.
15   Q.   Okay.  Can you remind the jury what ballast is?
16   A.   The ballast is the big rocks that are under the ties.
17   Sometimes they move and they can get over the ties.  So in
18   that case the algorithm that will detect the tie will not get
19   the full contour of the tie because it will not be visible
20   from our images so we do not detect a perfect rectangle.
21   Q.   And is the detect wooden tie crack function still in the
22   LRAIL software today?
23   A.   No, it has been replaced with AI-based algorithm.  So we
24   have neural network now that can detect cracks on wooden
25   ties.

UNITED STATES DISTRICT COURT

Exhibit 4
206

141

```
 1   Q.   Okay.  Shifting gears away from source code, were you
 2   aware that Pavemetrics received a letter on January 5, 2021
 3   from Tetra Tech's lawyers accusing Pavemetrics of infringing
 4   the '293 patent?
 5   A.   Yes, I was aware.
 6   Q.   And what was your reaction to receiving that letter from
 7   their lawyers?
 8   A.   I was very shocked.  Uh, Tetra Tech was a good customer
 9   for us.  I was personally giving them technical support on
10   their two road inspection systems.  I was the main contact
11   with their technical team so it was a real surprise for us.
12   Q.   And did you form any -- what did you do after you
13   received the letter?
14   A.   So I was on vacation at that time.  Uh, a few days after
15   we received the letter, my colleagues called me.  Uh, they
16   sent me by email a copy of the patent.  I reviewed the
17   patent.  I was very well aware of how our source code is
18   working and we were confident that we were not infringing the
19   '293 patent.
20        And one reason is that we do not combine the
21   intensity and the range data to form a 3D elevation map that
22   was one reason.  We also knew that we had sold a system to
23   UML in 2012 which was three years before the patent was filed
24   and all our algorithms were now using convolution neural
25   network or neural networks and there's no mention of any AI
```

UNITED STATES DISTRICT COURT

142

```
 1   or neural networks in the patent.
 2   Q.   Okay.  So just gave me three reasons.  So the first
 3   reason you said that LRAIL does not combine intensity and
 4   elevation data to form a 3D elevation map.  I'm a little
 5   confused.  So how -- how is that different than Fake3D?
 6   A.   Well, for me a 3D elevation map would be something that
 7   you could look in a 3D viewer.  The Fake3D image in my
 8   opinion, it's an intensity image that you add shadows.
 9   Q.   Does it have any elevation data in it?
10   A.   No.
11   Q.   And you also mentioned that you sold your system back in
12   2012; is that right?
13   A.   Right.
14   Q.   And that would be prior art to these patents?
15   A.   Yes, that's my understanding.
16   Q.   And as a result, what did that make you believe about
17   these patents?
18   A.   Well, as a result we thought that these patents were
19   invalid.
20   Q.   And I believe your third reason was the patent mentions
21   nothing about neural networks or AI; is that right?
22   A.   That's correct.
23   Q.   And have you maintained these beliefs to this day?
24   A.   Yes.
25   Q.   And when did you learn about the '557 patent?
```

UNITED STATES DISTRICT COURT

143

```
 1   A.   Uh, in summer 2021.
 2   Q.   Okay.  And how did you learn about that patent?
 3   A.   Uh, we got a letter from Finnegan.
 4   Q.   Okay.  So after the suit, after you filed the suit, you
 5   filed the suit?
 6   A.   Right.
 7   Q.   And then -- and that was back in February 2021?
 8   A.   That is correct.
 9   Q.   Then in summer of 2021 they sent another?
10   A.   That's correct.
11   Q.   Identifying the '557 patent.
12   A.   Yes.
13   Q.   And was that before or after you sold Sale 1 to AID?
14   A.   That was after.
15   Q.   It was before or after you delivered Sale 1 to AID?
16   A.   It was after.
17   Q.   Okay.  Did you ever believe that you infringed the '557
18   patent?
19   A.   No.
20   Q.   And why not?
21   A.   Because I'm well aware of how the crack detection
22   algorithms work in our software and it's quite different to
23   what is described in the patent.
24        MS. LEA:  Thank you.  I will pass the witness.
25        THE COURT:  Okay.  Any cross-examination, Counsel?
```

UNITED STATES DISTRICT COURT

144

```
 1        MR. CERULLI:  Yes, thank you, Your Honor.
 2               CROSS-EXAMINATION
 3   BY MR. CERULLI:
 4   Q.   Good afternoon, Dr. Hebert.
 5   A.   Good afternoon.
 6   Q.   Dr. Hebert, you're not a lawyer; correct?
 7   A.   Correct.
 8   Q.   And you're not trained in reading patents; is that
 9   right?
10   A.   That's right.
11   Q.   Um, and you reviewed the two patents at issue in this
12   case; is that right?
13   A.   That's right.
14   Q.   Um, and after you reviewed these patents, you didn't
15   have any conclusions; correct?
16   A.   After I reviewed these patents, I was convinced that we
17   were not infringing these two patents.
18        MR. CERULLI:  Your Honor, I would like to read in,
19   it's part of the depo transcript, it's page 25 line 23.
20        THE COURT:  Page 25.
21        MR. CERULLI:  Line 23 to page 26 line 4.
22        THE COURT:  Okay.  You can read that.
23   BY MR. CERULLI:
24   Q.   So Dr. Hebert, you were deposed in January of 2022?
25   A.   That's correct.
```

UNITED STATES DISTRICT COURT

**Exhibit 4**
**207**

145

```
1    Q.   And I'm gonna read lines from your testimony here.
2         "Q.  Did you analyze the patents prior to retaining
3    counsel?
4         "A.  We looked at different claims, yes.
5         "Q.  And what was your conclusion when you looked
6    at the patents before retaining counsel?
7         "A.  My conclusion personally?
8         "Q.  Yes.
9         "A.  I'm not, I'm not trained in reading patents.
10   I could just have opinions.  I didn't have any conclusion
11   myself."
12        Was that your testimony on January 2022?
13   A.   Yes.
14   Q.   So after reviewing the patents, you didn't have any
15   conclusions yourself.
16   A.   Myself, no.  I meant my colleagues John and Richard and
17   we discussed together.  And so we were convinced all together
18   we were not infringing the patent.
19   Q.   So they had opinions, but you didn't have any conclusion
20   yourself.
21   A.   My opinion was that we were not infringing the patent.
22   This was my opinion.
23   Q.   That's inconsistent with your testimony from January?
24        MS. LEA:  Objection, Your Honor.
25        THE COURT:  You can answer.
```

UNITED STATES DISTRICT COURT

146

```
1         THE WITNESS:  My opinion was that we were not
2    infringing the patent.
3    BY MR. CERULLI:
4    Q.   Now, I'd like to talk little bit about the 2012 sale to
5    UML.  So Pavemetrics sold its LCMS to University of
6    Massachusetts Lowell in 2012; is that right?
7    A.   Right.
8    Q.   And this sale was part of a research project with the
9    University of Massachusetts?
10   A.   That is correct.
11   Q.   And the sale included the LCMS sensors; is that right?
12   A.   Right.
13   Q.   And at that time Pavemetrics didn't deliver a processing
14   software as part of that sale; is that right?
15   A.   At that time we didn't deliver the processing software.
16   We had a contract with UML for delivering algorithms for rail
17   inspection.
18   Q.   Right.  So in 2012, again, you did not deliver a
19   processing software; correct?
20   A.   That is correct.
21   Q.   Okay.  And so you began developing algorithms as part of
22   this research project; is that right?
23   A.   That's right.
24   Q.   And as we saw earlier, um, Pavemetrics is pointing to a
25   2014 version of source code as prior art to Tetra Tech's
```

UNITED STATES DISTRICT COURT

147

```
1    patents; is that right?
2    A.   That's right.
3    Q.   Um, and this is referred to as Version r8320; is that
4    right?
5    A.   Right.
6    Q.   And that's dated May 2014; correct?
7    A.   That's correct.
8    Q.   So 2014 is two years after 2012; correct?
9    A.   That's correct.
10   Q.   So that 2014 source code couldn't possibly be part of
11   that sale that occurred in 2012?
12   A.   That's correct.
13   Q.   Now, Pavemetrics, you had mentioned that Pavemetrics
14   stores its source code in a repository; correct?
15   A.   Correct.
16   Q.   And just for clarification to the jury, a repository is
17   a database where you store different versions of code; is
18   that fair?
19   A.   Yes.
20   Q.   And you keep track of changes over the years; is that
21   right?
22   A.   That's right.
23   Q.   Now, this 2014 source code was stored in Pavemetrics'
24   repository; correct?
25   A.   Correct.
```

UNITED STATES DISTRICT COURT

148

```
1    Q.   And only Pavemetrics had access to the repository?
2    A.   Correct.
3    Q.   And Pavemetrics never published the 2014 source code
4    online; correct?
5    A.   That's correct.
6    Q.   And never disseminated it to the public?
7    A.   That's correct.
8    Q.   So only Pavemetrics and Pavemetrics alone had access to
9    that 2014 source code.
10   A.   That's correct.
11   Q.   Now, um, Pavemetrics doesn't have any records to support
12   that this 2014 version was actually used; correct?
13   A.   Yes, we have some records that it was actually used.
14   Q.   Okay.  And what are those records?
15   A.   Uh, just before that version was saved in the
16   repository, we sent an email with some results to UML and the
17   results were produced using that specific version.
18   Q.   And have we seen this email today?
19   A.   Sorry?
20   Q.   Have we seen this email today?
21   A.   Uh, no.
22   Q.   So it's not in evidence.
23   A.   It's not in evidence.
24   Q.   So other than this email that's not in evidence, you --
25   there's no other records to support that you used this 2014
```

UNITED STATES DISTRICT COURT

Exhibit 4
208

149

```
1    source code?
2    A.   So the UML Project was a research project with UML.  So
3    there a lot of emails exchanged with UML and we were sending
4    them some results on our research and our progress.
5    Q.   But, again, we haven't seen any of these emails today;
6    correct?
7    A.   That's correct.
8    Q.   Now, I'd like to pull up Exhibit 508.  And this is the
9    2014 source code we were discussing?
10   A.   Yes.
11   Q.   And the majority of this file includes a source coding
12   format known as C++; correct?
13   A.   That's correct.
14   Q.   Zoom in on the top line .cp at the kind of first line
15   there, that tells you it's C++ code; correct?
16   A.   Yes.
17   Q.   Now, if we skip to page 86, sort of buried within the
18   C++ code, we have and counsel showed this, it's a mat lab
19   script; correct?
20   A.   That is correct.
21   Q.   And again zoom in on the top line it ends in .m and that
22   tells you it's mat lab; correct?
23   A.   That's correct.
24   Q.   And mat lab's a different source code format than C++;
25   correct?
```

UNITED STATES DISTRICT COURT

150

```
1    A.   Correct.
2    Q.   And you notice there is no date on source code file;
3    correct?
4    A.   That's correct.
5    Q.   And you personally don't know the exact date of this mat
6    lab file?
7    A.   I know that this mat lab was created in 2013, but I
8    don't know the exact date.
9    Q.   But you don't have any records to support that.
10   A.   No.
11   Q.   And nothing in Pavemetrics's repository would tell you
12   the date of this mat lab script.
13   A.   No.
14   Q.   And that's because Pavemetrics doesn't even keep this
15   mat lab script in its repository?
16   A.   That's correct.
17   Q.   And, again, Pavemetrics never published this mat lab
18   script online; correct?
19   A.   Correct.
20   Q.   It never distributed it to the public?
21   A.   Oh, we published the results from that mat lab, that's
22   correct.
23   Q.   But the mat lab script itself was never published
24   online.
25   A.   No.
```

UNITED STATES DISTRICT COURT

151

```
1    Q.   It was never published to, uh, the public.
2    A.   No.
3    Q.   Now, I'd like to fast forward to 2021.  Um, we were
4    talking earlier about the letter that Pavemetrics received
5    from Tetra Tech; correct, accusing them of infringement?
6    A.   Correct.
7    Q.   And we heard from Mr. Habel on Friday that Pavemetrics
8    conducted an analysis; correct?
9    A.   That's correct.
10   Q.   Mr. Habel testified that he was very confident that
11   Pavemetrics did not infringe; correct?
12   A.   Correct.
13   Q.   And Mr. Habel also mentioned that Pavemetrics was so
14   confident it didn't infringe that it brought lawsuit; is that
15   right?
16   A.   Correct.
17   Q.   I don't believe you were here for Mr. Laurent's
18   testimony, but I can represent to you he also believes
19   strongly you did not infringe.
20        As we discussed earlier, you also reviewed the
21   patents; correct?
22   A.   Correct.
23   Q.   And as you testified in January 2022, you did reach any
24   conclusions?
25   A.   I have opinions at that time.
```

UNITED STATES DISTRICT COURT

152

```
1    Q.   Okay.  But you're not trained in patents?
2    A.   I can read a patent, but I'm not trained in patent law.
3    Q.   Mr. Habel has a telecommunication background; correct?
4    A.   Correct.
5    Q.   And you had testified earlier that you have a specialty
6    in neural networks; correct?
7    A.   In Computer Vision.
8    Q.   And if we could just pull up Exhibit 89.  So Exhibit 809
9    already in evidence is a series of emails.  And if we could
10   scroll down to the bottom, so these are emails between --
11   you're copied on these emails and you recognize Mr. Laurent,
12   Mr. Fox-Ivey, Mr. Talbot, yourself and Mr. Habel?
13   A.   Yes.
14   Q.   If you go to the line May 9, 2018 email and it starts
15   with BTW which stands for by the way, and I'm just gonna read
16   this, "by the way you might get arguments that DNNs can't be
17   patented in theory -- can be patented in theory."
18        Did I read that correctly?
19   A.   Yes.
20   Q.   And DNN stands for neural networks; correct?
21   A.   Deep neural networks.
22   Q.   Thank you.  If we can just zoom out, so nowhere if we
23   scrolled through the email, nowhere do you respond to
24   Mr. Laurent's comment.
25   A.   I think that this email was about a paper they wrote at
```

UNITED STATES DISTRICT COURT

**Exhibit 4**
**209**

153

```
1   a conference.  I don't think I was an author on that paper.
2   Q.   Fair to say you didn't chime in on this particular back
3   and forth?
4   A.   That's correct.
5   Q.   Now, several months after Pavemetrics brought suit, as
6   you discussed in your direct testimony, Pavemetrics removed
7   several of the accused functions from its source code; is
8   that right?
9   A.   That's right.
10  Q.   You testified yourself that Pavemetrics removed the code
11  because Tetra Tech was pointing to these features.
12  A.   It was one of the reasons.  The other reason is that the
13  code they were pointing to was not useful for our
14  application.  It was either too slow or it was not working.
15  Q.   So Doctor, it sounds like you yourself weren't very
16  confident that Pavemetrics was infringing.
17  A.   That is wrong.  As I said, the source code was not
18  working for us.  It took less than a day to remove the source
19  code so it was very easy to just remove the source code.
20  Q.   But you removed the code, didn't you, Doctor?
21  A.   We removed because we were not using.  There was no way
22  that we would need this code in the future.
23  Q.   And Pavemetrics was pointing to this as accused
24  functionalities; correct?
25  A.   Pavemetrics?
```

UNITED STATES DISTRICT COURT

154

```
1   Q.   Sorry.  Tetra Tech was pointing to this as accused
2   functionalities; correct?
3   A.   That's correct.
4   Q.   And you removed that code?
5   A.   That's correct.
6        MR. CERULLI:  No further questions.
7        THE COURT:  Any redirect, Counsel?
8        MS. LEA:  Yes.
9             REDIRECT EXAMINATION
10  BY MS. LEA:
11  Q.   Throughout the UML -- well, let me just ask you how long
12  did the UML Project last, what years?
13  A.   It was 2012, '13 and '14.
14  Q.   And you were developing algorithms during that project?
15  A.   I was supervising the software developers who were
16  writing the algorithm.
17  Q.   And is it your understanding that Pavemetrics shared
18  those algorithms with people at UML?
19  A.   We were discussing the content of these algorithms with
20  the people at UML.  There were several meetings and we were
21  explaining step-by-step what were the algorithms.
22  Q.   And did you send your programmers to those meetings?
23  A.   Yes.
24  Q.   And did they share details of the algorithms at those
25  meetings?
```

UNITED STATES DISTRICT COURT

155

```
1   A.   Yes, they present -- they did present and they were
2   sharing the different results of the algorithms that were
3   available when these meetings occurred.
4   Q.   And did people at Pavemetrics publish an article that
5   details the algorithm?
6   A.   Yes, we published a paper in 2014 at TRB conference.
7   Q.   And Dr. Hebert, is it your practice to chime in on
8   emails?
9   A.   No.
10  Q.   No?  Too busy writing code?
11  A.   Exactly.
12       MS. LEA:  Thank you.
13       THE COURT:  Any recross?
14       MR. CERULLI:  No, Your Honor.
15       THE COURT:  The witness is excused.
16       Please call your next.
17       MR. ZOVKO:  Your Honor, as its next witness
18  Pavemetrics calls Christian Tregellis.
19       THE CLERK:  Raise your right hand.
20            (Witness sworn.)
21       THE CLERK:  Please be seated.
22       Will you please state and spell your full name for
23  the record?
24       THE WITNESS:  Christian Dale Tregellis.
25  C-h-r-i-s-t-i-a-n middle name D-a-l-e last name
```

UNITED STATES DISTRICT COURT

156

```
1   T-r-e-g-e-l-l-i-s.
2        THE CLERK:  Thank you.
3             DIRECT EXAMINATION
4   BY MR. ZOVKO:
5   Q.   Good afternoon, Mr. Tregellis.
6        Where are you currently employed?
7   A.   I work for Hemming Morse.  I'm a partner at Hemming
8   Morse in our Los Angeles office.
9   Q.   What is your role at Hemming Morse?
10  A.   Uh, I lead a team and I perform financial accounting and
11  economic investigations sometimes in the contexts of legal
12  disputes, sometimes in other contexts.
13  Q.   What were you asked to do in this case?
14  A.   To do that kind of analysis.  To analyze financial
15  accounting and economic issues.  In the course of my career,
16  I tended to focus on damages and particularly intellectual
17  property damages and that's the work I did in this case.
18  Q.   Let's discuss your background.  Would you briefly
19  explain your education and employment relative this case?
20  A.   Sure.  I prepared some slides and thank you for pulling
21  up this one.  As I wrote here, I got an undergraduate degree
22  in Economics from Occidental College over in Eagle Rock.  And
23  then after working for what used to called First Interstate
24  Bank which is now part of Wells Fargo, I then went back to
25  graduate school and got an MBA in finance and accounting and
```

UNITED STATES DISTRICT COURT

Exhibit 4
210

157

1  graduated in March of 1993 so 29-and-a-half years ago or so.
2  Uh, and then I also have some professional credentials. I'm
3  a certified public accountant licensed in California and then
4  I have some credentials I listed there as well.
5  Q.  Have you been qualified to testify as an expert before
6  concerning financial matters?
7  A.  I have. I've testified in a little over 50 trials and
8  arbitrations.
9       MR. ZOVKO: Your Honor, at this time Pavemetrics
10  offers Mr. Tregellis as an expert in intellectual property
11  damages.
12       THE COURT: Any objection, Counsel?
13       MS. MATHEW: No objections, Your Honor.
14       THE COURT: The Court so recognizes the witness as
15  an expert and he can provide opinion testimony in the subject
16  areas.
17  BY MR. ZOVKO:
18  Q.  What did you do analyze Mr. Schoettelkotte's opinions
19  who was Tetra Tech's expert witness on financial matters?
20  A.  I started by looking at his analysis and I put the
21  summary slide here on this page. I also wanted to look at
22  backup information so I looked at the documents, uh, that I
23  had, uh, several documents that had been produced by the
24  parties in this case. I read deposition testimony from
25  representatives of Pavemetrics, Tetra Tech, CSX, AID, um, an

UNITED STATES DISTRICT COURT

158

1  independent contractor as well. So I looked at a lot of that
2  information.
3       I also did some research in the public domain. I
4  looked at Tetra Tech's financial statements as a publicly
5  traded company. I also spoke with Dr. Frakes, the technical
6  expert similar to Dr. Morellas. I spoke with the three
7  individuals from Pavemetrics who testified in the last day or
8  so, uh, and I think on Friday of last week. I attended the
9  trial today and last Friday. And I think I read the
10  testimony of Dr. Mesher from the first day. I think that
11  pretty much covers it.
12  Q.  Sounds like a lot of research. When doing your research
13  for this case, did you find any information on LRAIL and
14  3DTAS?
15  A.  I did. I looked up information about the history of
16  those. I found consistent with I think what the testimony
17  was today the LRAIL system had not -- really was an
18  adaptation of the LCMS system and then was originally
19  identified in late 2014 as the LRAIL system. And then I
20  think I saw also RailAI at a website on the Tetra Tech
21  website that showed up in 2021 and 3DTAS also started in
22  2021. I've seen mention of it going back to 2019, RailAI,
23  but like I said, I think the cite came up on the Tetra Tech
24  website in 2021.
25  Q.  So you didn't see anything about 3DTAS before 2021; is

UNITED STATES DISTRICT COURT

159

1  that fair?
2  A.  I think that's right.
3  Q.  Based on your review of that information as a whole,
4  have you reached any opinions in this matter?
5  A.  I have and they relate to the damages analysis of
6  Mr. Schoettelkotte which I've summarized relating to lost
7  profits where he's identified for the three sales to CSX that
8  he believed that those would have become profits to Tetra
9  Tech in what we damages experts call the but for world. A
10  world in which Pavemetrics had not infringed any patents and
11  in this case for the CSX damages, that is the '293 patent.
12       So if you could advance the slide. I put on two
13  additions there. The '293 patent is what I understand from
14  Dr. Morellas is associated with the lost profits units to
15  CSX, and then you have the reasonable royalty of $250,000 for
16  the one unit sale to AID which was Sale No. 1 and that's
17  covered by the '557 patent I understand from Tetra Tech.
18  Q.  I think you may have said Dr. Morellas. You may have
19  meant Mr. Schoettelkotte. Do you have any disagreement with
20  Mr. Schoettelkotte's analysis and opinions?
21  A.  I did, although it wasn't a mistake. I was referring to
22  Dr. Morellas who had testified about where, uh, which patents
23  aligned with which sales as I understood. But yes, I do have
24  some areas of disagreement and they relate to the lost
25  profits analysis based on the idea that in the but for world,

UNITED STATES DISTRICT COURT

160

1  those sales to CSX would have gone to Tetra Tech which is
2  something that I think the witnesses today have talked about,
3  and then I also have opinions about the reasonable royalty as
4  well.
5  Q.  Do you have an opinion on whether Pavemetrics has
6  infringed either of the patents in this suit?
7  A.  No, that's not my role. That's really their role. They
8  can consider all that information and the arguments by both
9  sides. I don't have an opinion on that. I've assumed
10  liability. I've assumed that Tetra Tech prevails for
11  purposes of my analysis on that question.
12  Q.  So if the jury were to find that Pavemetrics doesn't
13  infringe and/or the patents are invalid are your opinions
14  relevant at all?
15  A.  No.
16  Q.  Let's turn to Slide 3. What are you trying to explain
17  on Slide 3?
18  A.  I think the key issue I have with Mr. Schoettelkotte's
19  analysis is I think he ignored key evidence much of which
20  we've heard summarized today. And he in his lost profit
21  analysis and that's really what we're talking about here is
22  the lost profit piece first. He assume there is a two
23  supplier market and it really becomes a one supplier market
24  because according to Mr. Schoettelkotte, Pavemetrics would
25  not have been able to make any sale to CSX.

UNITED STATES DISTRICT COURT

**Exhibit 4**
**211**

161

```
 1          As he said, if you take Pavemetrics out of the
 2   market, all of the sales would go to Tetra Tech, but I don't
 3   think that's the right way of looking at it.  I think the
 4   evidence indicates that if Pavemetrics were to not be able to
 5   use the technology that Tetra Tech alleges is covered,
 6   Fake3D, mix images, in that case Pavemetrics would have still
 7   made those sales.  I think there's a great deal of evidence
 8   that supports that idea and that's not something that
 9   Mr. Schoettelkotte considered as possible.
10          So his two supplier theory I think ignores market
11   information and realities by assuming Fake3D and mix image
12   were useable and used.  I think while I'm not a technical
13   expert, I think that other evidence has come in showing they
14   were not usable and they were not used.  He assumes CSX must
15   buy a new system he being Mr. Schoettelkotte.  And finally I
16   think he ignored all of Tetra Tech's disadvantages compared
17   to LRAIL which I think Mr. Spencer talked about in the
18   testimony we heard this morning.
19   Q.   Let's move to Slide 4.  What question are you posing on
20   Slide 4?
21   A.   It's the one that frames the question of lost profits.
22   In the but for world, what would have happened if we had seen
23   a world in which Pavemetrics was not to use the technology
24   that Tetra Tech claimed is covered by their patents and in
25   particular for like I said the '293 patent for lost profits
```

162

```
 1   question, what would have happened?  Where would those sales
 2   have gone?  That's the right analysis and I think there's
 3   information like I said that relates to that.
 4   Q.   Turn to Slide 5.  What are you trying to explain on your
 5   Slide 5?
 6   A.   I think Mr. Schoettelkotte has inflated the patent
 7   technology.  When he testified on Friday, he talked about how
 8   there was value in using 2D and 3D images.  Well, I
 9   understand that the '293 patent doesn't cover artificial
10   intelligence.  Dr. Morellas testified to that.  Dr. Mesher
11   testified to that.  Mr. Schoettelkotte even agreed to that.
12          And similarly the use of 2D and 3D scanning had
13   predated the '293 patent.  Those three individuals also
14   agreed with that.  So it's not as if the '293 patent says you
15   can't use 2D and 3D images which is exactly the evidence that
16   Mr. Schoettelkotte said demonstrated the key and important
17   value of the patent, but that's not what I understand to be
18   covered by the patent.
19          Now, scientific experts and others are going to be
20   really testifying more to that, but based on my understanding
21   of the evidence, my understanding is that Mr. Schoettelkotte
22   overstated what the patents cover.
23   Q.   The next bullet on Slide 5, you refer to Dr. Morellas.
24   What are you trying to explain there?
25   A.   Well, as I wrote there, Dr. Morellas accused LRAIL based
```

163

```
 1   on Fake3D and mixed images despite the fact that those images
 2   were never used, and I think we just heard Dr. Hebert testify
 3   about that.  When I say never used, actually used by CSX in a
 4   unit delivered to CSX.  And so the Fake3D, I think Dr. Hebert
 5   just talked about that, it was removed in the versions that
 6   were sent to CSX.
 7          These particular units that we're talking about,
 8   the two, three, four units, the mixed image was not
 9   configured Dr. Hebert talked about that.  And Fake3D and
10   mixed images don't have value to CSX which has never used
11   them and in fact they perform worse than what is currently
12   used which is as I understand it range images using AI.
13   Q.   Did you consider why CSX actually chose to purchase
14   Pavemetrics LRAIL?
15   A.   I did, and I think that's very important information.
16   Q.   Why do you think it's important?
17   A.   Well, because as a damages expert, I have to, like I
18   said, put myself into this strange but for world.  It's a
19   counter-factual world.  What would have happened if the
20   accused infringer hadn't infringed.  Here I have a strange
21   sort of information available to tell me what would have
22   happened because we can see what actually did happen.
23          And what we can see actually happened is that
24   according to Mr. Spencer whose testimony we heard this
25   morning, the primary issue that he talked about that I heard
```

164

```
 1   at least was that 3DTAS was too expensive.  It's expensive
 2   and he was turned down and that Tetra Tech wasn't flexible on
 3   lowering their price.
 4          So here we have information from the purchaser at
 5   CSX, the person making the decision to tell us what's driving
 6   the decision.  That's very rare in a damages universe to be
 7   able to have that kind of information from a purchaser to
 8   tell us what was important to them as I tried to figure what
 9   would have happened in this but for world.
10   Q.   Now, in your experience testifying dozens of patent
11   infringement disputes, did you say that it's rare to get
12   direct testimony from a customer; is that correct?
13   A.   I did.  It's very rare.
14   Q.   What was the cost to CSX of a Tetra Tech purchase based
15   on your review of the evidence?
16   A.   Well, I think Mr. Spencer had testified to this today.
17   He was saying that by the time you considered all of the
18   purchases and things that were required, it was something in
19   the neighborhood of $2.4 million and that times five units is
20   a significant amount of money, $12 million.
21          And if you consider what I think he said about five
22   times the cost to go with Tetra Tech compared to Pavemetrics
23   that's a significant cash outlay and a big difference to buy
24   the five units that were being contemplated by CSX.
25          Especially in the context of 2020 with COVID and
```

**Exhibit 4**
**212**

165

1  supply chain problems and the railroads were not having good
2  financial performance at that time, layoffs including
3  Mr. Larson, uh, that's a situation in which I think it's --
4  it's important information that I think Mr. Schoettelkotte
5  should have looked at and I don't think he really did.
6  Q.   Is there anything else specific you wanted to convey on
7  Slide 6?
8  A.   Well, I think there was also a document, uh, I think
9  it's been referred to as Exhibit 178.  It's an email from
10  Mr. Larson to Mr. Keyes talking about the challenges of
11  trying to sell to CSX.  In there, again, we see the same
12  issues, too expensive.  I think there was one other issue as
13  well which is the importance of a proof of concept.
14       I have another slide on that.  I think if you
15  advance one more slide.  Mr. Teufel, I think that's the right
16  way he pronounced it, we heard in his testimony this morning,
17  that he had said there were constraints created by CN
18  Canadian National limitations and Canadian National saying
19  that Tetra Tech couldn't use their information to try to make
20  sales or for other purposes with other railroads so that's
21  also an issue that created limitations.
22       Again, I didn't see any evidence that
23  Mr. Schoettelkotte considered that, but it looks like that
24  was important in affecting the purchase decision by the folks
25  at CSX.

UNITED STATES DISTRICT COURT

166

1  Q.   Before we finish we lost profits, just briefly, very
2  briefly, what is Panduit Factor 2?
3  A.   Well, I talked earlier about this two supplier market
4  and Mr. Schoettelkotte referred to this Panduit Factor 2, the
5  one about noninfringing substitutes.  And it really deals
6  with the same issues, the same concepts.  So in the but for
7  world are there substitutes that CSX could have gone to get
8  the advantages CSX wanted?
9       And Mr. Schoettelkotte said we've removed
10  Pavemetrics, then the only thing that's left is Tetra Tech.
11  I don't think it's proper to remove Pavemetrics.  The
12  question is if Pavemetrics had not infringed according to
13  Tetra Tech's definition of what infringement is which I
14  recognize the jury may or may not agree with that, but I have
15  to take Tetra Tech's interpretation.  I have to assume Fake3D
16  infringes or mixed images are infringing.
17       If I take their assumption, what would have
18  happened?  And so here I think the evidence shows that those
19  sales still would have gone to Pavemetrics.
20  Q.   And so in this case have you seen substantial evidence
21  indicating that there should not be an award of lost profits?
22  A.   As I understand it, that's a legal question and it's
23  really a question for the jury, but I've seen significant
24  problems.
25       THE COURT:  Let me jump in.  I think you can

UNITED STATES DISTRICT COURT

167

1  testify to what was in your report, that you disagreed with
2  the Panduit factor, but as far as whether or not there is or
3  isn't lost profits, that's not something you covered in your
4  report.
5       THE WITNESS:  Exactly.  That's what I was trying to
6  avoid.
7       MR. ZOVKO:  Your Honor, can I simply reframe that
8  question?
9       THE COURT:  No.  And counsel, we talked about it.
10  Move on to the next question.  I don't want to hear any more
11  about lost profits with this witness especially after what we
12  talked about.  I don't think you addressed the Court's
13  concern in that question at all.
14       MR. ZOVKO:  May I have a brief side bar?
15       THE COURT:  No.  Move on.
16  BY MR. ZOVKO:
17  Q.   Let's move on to the next slide.  This addresses
18  reasonable royalty.  What did you do to evaluate
19  Mr. Schoettelkotte's opinions on reasonable royalty?
20  A.   Well, I started by reading his report and listening to
21  his testimony the other day and I also evaluated what the
22  factors were that he said were driving his conclusion about
23  that reasonable royalty on the sale to AID.  So there I saw a
24  lot of the same issues that I just talked about, about the
25  availability of an alternative, of an alternative that would

UNITED STATES DISTRICT COURT

168

1  be noninfringing.  If you can get something else for cheaper,
2  that could put a limitation on the value.
3       And I felt as though here, Mr. Schoettelkotte's
4  failure to consider the noninfringing alternative was an
5  important failure in his whole premise and the way he looked
6  at the value, here it's of the '557 patent for AID, but I
7  think that is an important failure and it's one that caused
8  him to conclude that Pavemetrics would be willing to pay all
9  of their profits on the system making $250,000 of profits and
10  pay them all as a royalty.  I think that's a faulty analysis
11  and it's not reasonable.
12  Q.   So what is your ultimate opinion on a reasonable royalty
13  in this case?
14  A.   Well, like I said here, why would pay for unused and
15  easily removed features and the unaccused alternatives offer
16  better results.  So I think that those indicate that a
17  $250,000 royalty is based on an improper
18  foundation and analysis.  I think it would be limited to the
19  cost of eliminating as Pavemetrics did the accused software
20  which I think Dr. Hebert said took about half a day with some
21  of the people who were on Pavemetrics' staff.
22       MR. ZOVKO:  Thank you, sir.
23       I pass the witness.
24       THE COURT:  Any cross-examination, Counsel?
25       MS. MATHEW:  No cross.

UNITED STATES DISTRICT COURT

**Exhibit 4**
**213**

169

```
1    THE COURT:  Okay.  Why don't we take our afternoon
2  break and come back at ten minutes to 3:00.
3                   (Recess taken.)
4    THE COURT:  Counsel, go ahead and call your next
5  witness.
6    MR. LAQUER:  Your Honor, Pavemetrics calls as its
7  next witness Dr. David Frakes.
8    THE CLERK:  Please raise your right hand.
9                   (Witness sworn.)
10    THE CLERK:  Please be seated.
11    Please state and spell your full name for the
12  record.
13    THE WITNESS:  Sure.  My full name is David Harold
14  Frakes.  D-a-v-i-d  H-a-r-o-l-d  F-r-a-k-e-s.
15    MR. LAQUER:  And Your Honor, I have a few exhibits
16  I would like to move into evidence.  The parties have met and
17  conferred on them.  Exhibits 507, 511 and 544.
18    THE COURT:  Any objections to 507, 511 and 544?
19    MR. CHUNG:  No objection, Your Honor.
20    THE COURT:  507, 511 and 544 are in evidence.
21    You can proceed, Counsel.
22                 DIRECT EXAMINATION
23  BY MR. LAQUER:
24  Q.   Good afternoon, Dr. Frakes.
25  A.   Good afternoon.
```

UNITED STATES DISTRICT COURT

170

```
1  Q.   Could you please introduce yourself to the jury?
2  A.   Yes, of course.  Hi, I'm David.  Nice to meet y'all.
3  Q.   And have you prepared slides for your testimony?
4  A.   I have.
5  Q.   All right.  Let's open those up, please and let's turn
6  to Slide No. 2.  Dr. Frakes, can you briefly summarize your
7  education?
8  A.   I got my B.S. in Electrical Engineering in 1998 from
9  Georgia Tech.  I went on the get an M.S. in Mechanical
10  Engineering and Electrical Engineering, and finally, my PhD
11  is in Bioengineering, um, all from the Georgia Institute of
12  Technology or Georgia Tech.
13  Q.   Let's go on to your next slide.  Could you briefly
14  describe your career history?
15  A.   Okay, yes, my career.  Well, so believe it or not, my
16  first job out of college was actually playing football in the
17  NFL for the team that's now the Washington Commanders, but I
18  didn't last very long.  I didn't make it through preseason so
19  it was back to grad school for me.
20    After I finished my PhD, I, uh, first started my
21  first small business, my first startup, 4D Imaging and it was
22  a tiny company that used Computer Vision and machine learning
23  to provide software solutions to the biomedical and military
24  sectors.  Um, it's not the most successful of the startups
25  that I've founded, but 20 years later, it still exists and
```

UNITED STATES DISTRICT COURT

171

```
1  people have worked their whole careers there so I'm really
2  proud of that small business.
3    I went on from there to be a faculty member at
4  Arizona State University where I became a tenured associate
5  professor and holder of an endowed chair on the Fulton School
6  of Engineering Entrepreneurship Endowed Chair.  I was
7  professor their in electrical engineering and biomedical
8  engineering.  And again we did research mostly in Computer
9  Vision and artificial intelligence.
10    At the same time I also acquired an adjunct
11  appointment at Mayo Clinic.  I still have that appointment.
12  I work there with physicians to create new artificial
13  intelligence technology that's pointed toward detecting
14  disease states and images.
15    When I moved on from ASU, I went to Google and I
16  became a technical lead in Advanced Technologies and Projects
17  Group.  I worked on a lot of different projects there.  All
18  of them practically involving Computer Vision and machine
19  learning.  I collaborated with the Way Mo Team on
20  self-driving cars and the last project I last lead there was
21  something called Lens Labs.
22    If you've heard of Google Lens Project, it's their
23  visual search engine that let's you search what you see.  I
24  ran a team there that drove the research behind that product.
25  All in all, I lead teams of over a hundred engineers there
```

UNITED STATES DISTRICT COURT

172

```
1  over a number of years.
2    From Google I went on to Apple where I was Lead of
3  Camera Software for this first three camera iPhone that you
4  may remember.  And there we worked on a lot of projects using
5  machine learning for face detection, segmentation, all the
6  different modes you may enjoy on your iPhone like portrait
7  mode and panorama, those are the things that my team put
8  together.
9    I left Apple to go back to Georgia Tech because I
10  got an opportunity to go back to alma mater and be a
11  professor there and that was always kind of a dream of mine.
12  But shortly after getting to Atlanta, my wife and I got a big
13  surprise because we already had a young boy, and then we had
14  a twin boy and girl very shortly after.
15    So having three kids under three made things
16  complicated real quick and we decided we wanted to be back
17  out here with family.  So a couple months ago, I moved back
18  to Apple and I am leading the Camera Algorithms Group out of
19  San Diego where I'm once again Lead of Camera Software.
20  Q.   Let's turn on to next slide.  Could you briefly
21  summarize whether you've received any research grants,
22  publication and awards?
23  A.   Yeah, um, you know, being an academic a big part of is
24  acquiring grant funding.  I've had over 50 grant awards.  I
25  just got one a couple weeks ago for using artificial
```

UNITED STATES DISTRICT COURT

**Exhibit 4**
**214**

173

1  intelligence to learn about the real neural network, the
2  connection to the brain so that's exciting.
3          I have over 75 journal publications, 170 conference
4  proceedings.  I've been the subject of over 25 news reports
5  and media releases.  I've won a number of awards including
6  one I'm particularly proud of at Apple where I had one of the
7  Top Ten Projects for our Week of Code competition.  And
8  lastly, I have over ten patents relating to Computer Vision
9  and artificial intelligence.
10 Q.   Now, if you can just briefly look at Exhibit 544.  I
11 think we can pull it up here.  Do you recognize this?
12 A.   Yes.  It looks like a fairly up-to-date version of my
13 C.V.
14 Q.   All right.  We can take that down.  How does your
15 experience compare to the parties proposed definitions of a
16 person of ordinary skill in art?
17 A.   I feel like in both cases, I have considerably more
18 experience than the definition.
19 Q.   And when you say in both cases, are you referring to
20 both Pavemetrics' proposal for the definition of a person of
21 ordinary skill in the art as well as Tetra Tech's proposal
22 for that definition?
23 A.   That's correct.
24 Q.   And have you applied that definition in your work in
25 this case?  Let me rephrase.

UNITED STATES DISTRICT COURT

174

1          Have you -- do you believe that any differences
2  between those two definitions has any of consequence to your
3  analysis in this case?
4  A.   No, I don't.  And I also feel like for the person of
5  ordinary skill in the art in 2015, that's actually when I was
6  growing my team at Google so I was hiring people like crazy
7  and many of them were that person of ordinary skill in the
8  art so I feel very informed to apply that.
9  Q.   Let's go on to your next Slide No. 5.
10         You know what first, Your Honor, Pavemetrics offers
11 Dr. Frakes as an expert in artificial intelligence, neural
12 networks, Computer Vision, computer engineering and
13 electrical engineering.
14         THE COURT:  Any objection, Counsel?
15         MR. CHUNG:  No objection, Your Honor.
16         THE COURT:  The witness is so designated.  He can
17 testify and give his opinions on those topics.
18 BY MR. LAQUER:
19 Q.   Could give us a very brief overview of what topics you
20 plan to testify about here today?
21 A.   Absolutely.  So I'm gonna start off and talk a little
22 bit about the differences between AI, neural networks and
23 tradition Computer Vision.  I'm gonna cover Pavemetrics early
24 work.  Both patents, the '293 and the '557.
25         I'm gonna tell you why it is my opinion LRAIL does

UNITED STATES DISTRICT COURT

175

1  not infringe.  I'm also gonna tell you why it is my opinion
2  Pavemetrics early work invalidates Tetra Tech's claim.  I'm
3  gonna cover secondary considerations that confirm those
4  claims are obvious.  And then I'm going to talk about
5  nonaccused alternative systems and finally, I'll discuss how
6  Dr. Morellas did not show whether 3DTAS uses the asserted
7  claims.
8  Q.   Can you briefly summarize the materials that you
9  considered in forming your opinions here?
10 A.   Sure.  So first and foremost, I considered the LRAIL
11 neural network files which I looked at myself.  I looked at
12 the LRAIL source code for current and early versions.  I
13 looked at additional prior art.  I looked at Tetra Tech's
14 3DTAS source code.  I looked at patents, their file histories
15 and the Court's claim construction.
16         I had discussions John Laurent and Dr. Hebert who
17 we heard from earlier today.  I also looked at additional
18 technical documents, deposition testimony, discovery, expert
19 reports and other materials including those reviewed by
20 Dr. Morellas.
21 Q.   Dr. Frakes, is it possible to look inside a neural
22 network?
23 A.   Yes, it certainly is.
24 Q.   Can you explain?
25 A.   Well, in looking at the LRAIL neural network files, I

UNITED STATES DISTRICT COURT

176

1  really started by doing what anyone would do using a computer
2  which is opening a folder and figuring out where they are
3  because they live on a computer just like any other files
4  that you might be used to.  So I went into the TensorFlow
5  folder where those files live and I look at what files were
6  present there.
7          I also used a network visualizer that allows you to
8  take a .pd file from TensorFlow that describes the graph of the
9  actual neural network and it shows it to you in a way where
10 you can see how the parts are connected and which numbers are
11 used where.  And so I used that program to actually examine
12 Pavemetrics' neural network to see exactly how it worked.
13         And beyond that, I also probed specific values in
14 these filters that we keep talking about.  There are numbers
15 in there and you can use software to see what numbers are in
16 there.  I did that.
17 Q.   Can you describe your review of Pavemetrics' LRAIL
18 source code?
19 A.   Uh, yes.  So I spent several days at the Pavemetrics
20 counsel's office in California going over the source code and
21 looking at all the files from configuration files to source
22 files in multiple languages, et cetera.
23 Q.   And could you describe your review of Tetra Tech's 3DTAS
24 source code?
25 A.   Very similar.  I went to Tetra Tech's counsel's office

UNITED STATES DISTRICT COURT

**Exhibit 4**
**215**

177

1  in Washington, D.C., and again I spent several days reviewing
2  the source code that was made available to me there.
3  Q.   Based on hearing Dr. Morellas' testimony, how would you
4  describe the relevance of the materials that you have
5  considered in forming your opinions as compared to what he
6  has considered in forming his?
7  A.   Right.  Well, as you all know, Dr. Morellas is
8  contending that LRAIL infringes because it uses these two
9  types of images and because of what it does inside of a
10 neural network, but he never looked inside the neural
11 network.  I did that.  So I feel like I'm in a much better
12 position to provide an opinion about infringement.
13 Q.   Let's go on to Slide No. 7.  Can you summarize what the
14 differences are between traditional computer vision systems
15 and artificial intelligence neural networks?
16 A.   Yeah, sure.  You all have heard a lot about this
17 already.  I'm gonna try to keep it high level and provide
18 some useful examples.  When I think about the contrast
19 between traditional computer vision and now AI, um, with
20 traditional computer vision, the human being in the loop had
21 to do a lot of the work.  We had to write down all the rules.
22 We had to tell the computer exactly what to do.
23        Now, with AI it's very different because the
24 computer figures out a lot of it for itself.  So, you know, I
25 spent a lot of time in my previous work putting boxes around

178

1  things and cutting little images out to see if I could match
2  them in other places.  Now, artificial intelligence
3  eliminates those tedious and slow steps and it even figures
4  out things that you, you know, we couldn't even come up with
5  ourselves.
6  Q.   Let's go on to Slide No. 8.  Dr. Frakes, can you
7  describe your personal experience working with artificial
8  intelligence and neural network systems?
9  A.   Yeah, sure.  So, um, gosh, I first started working with
10 AI when I was in grad school so this is back in the '90s, and
11 we were working on building human operator models for
12 transportation conductors and construction operators so that
13 was very early days.
14        I really started first using computer vision in the
15 context of AI in my late grad school research and then at
16 that company I mentioned 4D imaging where we were providing
17 military and biomedical software solutions for those sectors.
18        At ASU I continued using AI in almost every part of
19 my research, but it was really when I got to Google that I
20 started doing the most with AI.  You see this TensorFlow logo
21 up here.  I know you've heard those two words a lot today and
22 throughout the trial.  As Dr. Hebert explained earlier,
23 TensorFlow is the AI platform that Pavemetrics uses.
24        And TensorFlow was released by Google in 2015.  I
25 was very fortunate to be working there when TensorFlow was

179

1  released.  But even better, I was fortunate to be at Google
2  before tense was released because I got to work with it
3  before the rest of the world even knew it existed and that
4  was very cool.
5        So working, you know, to the degree that I have
6  with TensorFlow has really shaped a lot of my career.  And I
7  think it's wonderful that Google built a tool like this and
8  made it available to the public domain for everyone to use.
9  Q.   Can you describe what the stages are of a TensorFlow
10 neural network engine?
11 A.   Sure.  Yeah, I mean, again, keeping it high level,
12 there's really the two stages that we've kind of heard about
13 already, but I'll do my best to explain them again to you
14 briefly.  There's the training stage upfront, and then
15 there's the inference stage after that.
16        So in training, you're basically taking this model
17 and you're giving it a whole lot of information so that it
18 can figure out to do something useful.  I really like to use
19 face detection as the example because a lot of people like
20 that on your phone, you know, where you can find all the
21 pictures of our friends and that happens through face
22 detection.  That's something I worked on at Apple.
23        So we would take a whole bunch of images, hundreds
24 of thousands of images that are annotated so that means they
25 have boxes drawn around the things we care about in this case

180

1  faces.  You feed those into a neural network and it figures
2  out how to find faces.  It's that simple or that complicated
3  depending on how you look at it, but that's what the network
4  does for you.  That's the training stage.
5        While you're training that network and it's seeing
6  all these different faces, it's figuring out what values
7  should be in the filters in the network.  You keep hearing
8  about the filters, too.  It's figuring out what should those
9  values be.  You see an example on the slide of these, you
10 know, kind of strange looking filters over here on the right.
11        Those are example of filters from a neural network.
12 So it's the kind of features that the network learns to put
13 in these filters do its job.  In this case finding faces.  So
14 that's Stage 1, the training.
15        Now, in the second stage, we get to inference.
16 Now, that model has pre-defined filters that its already
17 figured out in the training stage.  And we can now take it
18 and send it out to be a product and to go do something in the
19 world.  So the model's gotten smart, it's learned something
20 and now we can use it the real world to accomplish whatever
21 objective it is that we trained it to do.  And that's the
22 inference stage.
23        Now, the really cool part about the inference stage
24 is that you don't have to show it things its seen before.  It
25 just knows generally now what a face looks like so it can see

**Exhibit 4**
**216**

181

1  any face and it's gonna find it even though it's never seen
2  that specific face before.
3  Q.  And just turn over to Slide No. 9 here.  And could you
4  just briefly identify where the concepts you were talking
5  about are shown in the illustration we see here?
6  A.  Sure.  Yeah, I really like this graphic.  It does a good
7  job of breaking it down.  That untrained model is over there
8  on the left.  So it's just kind of that skeleton where we've
9  got some nodes and some connections, but it hasn't learned
10  anything yet so it's really just an architecture.  Doesn't
11  have any intelligence yet if you will.
12       Then we go through that training process which is
13  the second column.  That's where we feed in all those images.
14  Now, this example is using cats instead of faces, but the
15  process is very much the same.  And this, by the way, is a
16  special type of learning called deep learning that we're
17  talking about here.
18       So after that training operation, that's where we
19  get that trained model there in the third column so it now
20  knows something.  Its filters have been pre-defined.  They've
21  been established through training and now they're set and
22  ready to go out into the world.
23       And then that last stage inference that's where we
24  show the network new data it's never seen before, but it
25  helps us identify, again, in this case a cat or a face

UNITED STATES DISTRICT COURT

182

1  depending on the application we've trained it to support.
2  Q.  And how are the pre-defined TensorFlow filters used in
3  the inference stage?
4  A.  Well, they live in convolution neural networks and so
5  they're used in convolutions and basically, those fixed
6  numbers that live in these filters of fixed size and shape
7  are used to process the images that come in and tell us if
8  there is something interesting in the image.
9  Q.  So in the TensorFlow neural network, does the definition
10  of the filter change in the inference stage?
11  A.  No.  After training, the filters are -- are locked in.
12  Q.  And is the term applying a convolution neural network or
13  a filter a concept that you are' familiar with?
14  A.  Yes, I think so.
15  Q.  Can you explain where in the step we see here a filter
16  gets applied?
17  A.  Well, the filter would be applied in the inference stage
18  when it processes the data that come in.
19  Q.  All right.  Let's go on to the next slide.  Before we
20  get into a lot of details later in your discussion of
21  invalidity regarding Pavemetrics early work, could you
22  provide some high-level technical description what you
23  addressed and prepared an opinion on regarding Pavemetrics
24  early work?
25  A.  Yes.  So I reviewed Pavemetrics early work, of course,

UNITED STATES DISTRICT COURT

183

1  including a lot of the work products you see here over on the
2  right.  Instruction manuals, the code that shows how it
3  works, images showing the overall system architecture and
4  even meeting minutes and other documents from that early era,
5  that 2012 to 2014 era before the patents in question were
6  filed.
7       One of the things that I noticed was that the
8  algorithms in place then very much used traditional computer
9  vision based feature detection and also this Fake3D image
10  method which you keep hearing about.  Both of those things
11  were present in the early work.
12  Q.  And did you reach any conclusions based on your review
13  of Pavemetrics early work?
14  A.  I did.  I confirmed that Pavemetrics early automated
15  rail and road inspection activity and the associated
16  documents do invalidate the claims of the Tetra Tech patents.
17  Q.  Well, let's go on to the next slide and we'll address a
18  few other topics before we go into detail on the invalidity
19  issue.  Looking at Slide 11, could you just provide a
20  reminder of some high-level facts around the asserted patents
21  here, the '293 and '557 regarding their dates, titles and
22  claims?
23  A.  Absolutely.  So as I'm sure you'll recall, the two
24  patents in suit here are the '293 and '557.  The '293 patent
25  which is titled 3D Track Assessment System and Method was

UNITED STATES DISTRICT COURT

184

1  filed in 2015 and the '557 patent which is a continuation of
2  the '293 patent is titled 3D Track Assessment Method.  The
3  '293 patent has 43 claims.  The '557 patent has 16 claims.
4  Q.  Now, you heard Dr. Morellas present his belief that
5  Pavemetrics supposedly infringes just two of the claims of
6  '293 patent, Claims 1 and 21; correct?
7  A.  I did hear that.
8  Q.  And you also then heard his explanation as to why he
9  believes Pavemetrics supposedly infringes Claim 8 of the '557
10  patent; correct?
11  A.  I heard that also.
12  Q.  And based on that, what have you focused your analysis
13  on regarding the claims in these two patents?
14  A.  Those same claims.  Claim 1 and 21 of the '293 patent
15  and Claim 8 of the '557 patent.
16  Q.  So you're not presenting any opinion as to whether or
17  not the other claims of these patents are invalid; is that
18  correct?
19  A.  I am not.
20  Q.  What was your impression when you first read the
21  asserted patents?
22  A.  Well, I think the thing that jumped out at me most was
23  that they clearly describe very traditional computer vision
24  methods.  Um, the content talking about the gradient windows
25  and neighborhoods, these are concepts that have been around

UNITED STATES DISTRICT COURT

Exhibit 4
217

185

1  for a long time and that we've been using in traditional
2  image processing and computer vision for ages, you know,
3  really since the field was born in the '60s.  It felt very
4  traditional and conventional to me.  I think that's in stark
5  contrast to reading about things that are focused on
6  artificial intelligence.
7  Q.   And how do you believe one of ordinary skill in the art
8  would react in reading the asserted patents here?
9  A.   Clearly, the same way.  I mean when we look at the
10  patent in the context of artificial intelligence, we heard
11  Dr. Mesher say they don't list artificial intelligence
12  anywhere and they don't list machine learning anywhere or
13  convolution neural networks or deep learning.
14        And so none of those words that we used to
15  described these techniques are present anywhere in the
16  patent.  But even beyond the vocabulary, the fundamental
17  techniques that underlie artificial intelligence, just the
18  convolutional operator itself, you know, these things are
19  missing from the patents and it's pretty clear evidence that
20  they are discussing traditional computer vision.
21  Q.   Let's go on to your next Slide No. 12.  How many issues
22  would you like to discuss about Dr. Morellas' opinion that
23  LRAIL sales to CSX supposedly infringe Claims 1 and 21 of the
24  '293?
25  A.   There are four specific issues that I'm going to

UNITED STATES DISTRICT COURT

186

1  discuss.
2  Q.   And what's your impression based on knowing that there
3  are four different issues you've identified about that?
4  A.   Well, four is a big number.  I mean, when there are four
5  strong reasons like this for noninfringement, um, it sends me
6  a very clear signal that it's really not even close here.
7  Any one of these alone would prove noninfringement.
8        So the fact that there are four and even more
9  honestly, but we only have so much time to spend with each
10  other, it gives me a very good indication that there is
11  strong evidence for noninfringement here.
12  Q.   Before we go into detail on these four, could you
13  provide just a high-level overview of what these four
14  noninfringement issues address?
15  A.   Yes, I can.  First, I'm gonna point out that LRAIL sales
16  to CSX were configured for range only not Fake3D or mixed
17  image.
18  Q.   And what is the second reason that LRAIL sales don't
19  infringe the asserted claims of the '293 patent?
20  A.   No LRAIL algorithm for defining an appropriate gradient
21  neighborhood and moving it like a sliding window has ever
22  existed.
23  Q.   And what is the third reason that the accused LRAIL
24  sales do not infringe the asserted claims?
25  A.   Well, as shipped the system is sold without sensors in

UNITED STATES DISTRICT COURT

187

1  communication with a processor.
2  Q.   And could let us know the fourth reason is?
3  A.   Sure.  Even if Fake3D had been enabled which it was not,
4  LRAIL would not generate a track elevation map and calculate
5  differential vertical measurements.
6  Q.   We're running a little ahead of time so no reason to
7  rush.  All right.  We can go to Slide 13.  And this addresses
8  the first noninfringement reason you identified.  Now, can
9  you explain what claim requirement this relates to?
10  A.   Yes.  So this relates to Claim 1 which requires the
11  processor is configured to run an algorithm comprising the
12  Steps of A through D.
13  Q.   Over the right side, there are claim constructions
14  provided in a table.  Do you see that there?
15  A.   I do.
16  Q.   Did you apply the Court's claim constructions to all of
17  your analysis in this case?
18  A.   Absolutely.
19  Q.   Does LRAIL satisfy the configure to run requirement of
20  Claim 1?
21  A.   No, it does not.
22  Q.   And based on your review of LRAIL source code, were the
23  accused sales configured to run either Fake3D or mixed image?
24  A.   No, they were not configured to run either one of those
25  image types in any case.

UNITED STATES DISTRICT COURT

188

1  Q.   Let's go on to Slide No. 14.  For the versions of
2  software that had some Fake3D or mixed image software
3  present, did you assess whether the software configured LRAIL
4  to run those particular functions?
5  A.   I did.
6  Q.   And can you explain what we see on the source code here?
7  This is from Exhibit 619 and also references 618 and 552-1.
8  A.   Sure.  So I think Dr. Hebert did a good job explaining
9  some similar examples earlier.  What we see here that's
10  highlighted are these four different variable types:  Image
11  type of fastener NN or neural network, image type for tie
12  plate NN, image type for spike NN, and image type for joint
13  bar NN.
14        And in every case, you see immediately after those
15  variable names, the assignment is zero.  What does that mean?
16  It means that the neural network is going to run a range
17  image and a range image only.
18  Q.   And a range image is not accused of infringement in this
19  case; is that correct?
20  A.   It is not accused.
21  Q.   Let's go on to the next Slide No. 15.  This has an
22  excerpt from Exhibit 616.  Does this identify the same type
23  of information?
24  A.   It does.  And this is just another good example of that
25  variable being set to zero in every case.  And when that is

UNITED STATES DISTRICT COURT

**Exhibit 4**
**218**

189

```
1   the setting, the type of image that runs is a range image.
2   No Fake3D, no mixed image.
3   Q.   Let's go on to Slide 16.  This includes Dr. Morellas'
4   Slide 30 embedded within it.  How did Dr. Morellas address
5   the configure to run requirement of Claim 1?
6   A.   Right.  So Dr. Morellas in his analysis, um, he showed
7   this -- this picture of a product manual rather than LRAIL
8   software code and that was confusing to me because if you
9   want to look at how software is configured to run, you need
10  to look at the software.  The numbers that are assigned to
11  the variables in LRAIL dictate how it works.  It's that's
12  configuration that matters when it comes to how it runs so a
13  manual just isn't going to give you that level of
14  information.
15  Q.   Let's look at your next slide, Slide No. 17.  Could you
16  let us know what claim limitation this slide addresses?
17  A.   Yes.  So this addresses Claim 1 defining an appropriate
18  gradient neighborhood and moving the gradient neighborhood
19  like a sliding window over the 3D elevation data.
20  Q.   Does the accused LRAIL perform the limitation requiring
21  defining an appropriate gradient neighborhood and moving the
22  gradient neighborhood like a sliding window over the 3D
23  elevation data?
24  A.   It's a long phrase, but no, it does not.
25  Q.   Did you hear Dr. Morellas provide his opinion that in
```

UNITED STATES DISTRICT COURT

190

```
1   the context of these patents, an appropriate gradient
2   neighborhood is one that must be fixed in size -- sorry --
3   must be flexible in size?
4   A.   I did hear that.
5   Q.   Do you agree?
6   A.   I do.
7   Q.   Does that affect your opinion regarding infringement by
8   LRAIL?
9   A.   Well, absolutely because as I mentioned before, in the
10  context of the TensorFlow, Dr. Morellas accusing
11  these filters of being is inside the neural network.  Those
12  filters aren't flexible.  They are set in stone.  They are
13  one size and they never change.  One size, one shape, every
14  day of the week, every week of the month, every month of the
15  year.
16  Q.   And do you see the constructions on the right for moving
17  the gradient neighborhood and as well as neighborhood itself?
18  A.   I do.
19  Q.   And have you provided any analysis regarding the
20  construction of moving the gradient neighborhood like a
21  sliding window over the 3D elevation data?
22  A.   Yes, I have.  I think we talk about it on the next
23  slide, but I'll start getting into that.  What determines the
24  movement of that gradient neighborhood in TensorFlow is that
25  stride variable.  So when that stride variable is set to some
```

UNITED STATES DISTRICT COURT

191

```
1   number greater than one, it is skipping data and I think
2   we're gonna talk about.
3   Q.   Skip ahead and go to 19.  Let's go to 21.  All right.
4   This has some more discussion of stride value; is that right?
5   A.   It is.
6   Q.   So looking at Slide 21, we see Slide 44 on the left from
7   Dr. Morellas' presentation and then we also see the Karami
8   book Exhibit 689 in the center which Dr. Morellas provided as
9   the basis of his presentation on the left.
10       On the right side, we see the chapter from the
11  Karami book Chapter 5 that appeared immediately above that
12  figure reading but if the convolution stride is equal to two,
13  this means the filter slides through two consecutive elements
14  of the input layer.  The filter slides through the input data
15  by moving two elements per step i.e. skipping one element.
16       Dr. Frakes, what is your opinion of that
17  description by the Karami book?
18  A.   I think it's exactly right.  When using a stride value
19  of two, you are skipping one element.  And what that means
20  for Window operations like convolutions is that you're
21  actually skipping a whole group of pixels.  So, of course,
22  when you're skipping groups of pixels, you're not performing
23  the operation completely.
24  Q.   Can you give us a little bit more specificity on what
25  you mean when you say a Window element and skipping a group
```

UNITED STATES DISTRICT COURT

192

```
1   of pixels?
2   A.   Sure.  So if you look at the areas in green that are in
3   those figures, right, we see them moving here with a stride
4   value of two.  So that when the green window moves from
5   Step 1 to Step 2, it leaves two white columns behind it.  So
6   it didn't process the group of pixels that included the
7   Columns 2, 3 and 4.  It skipped that group and it went
8   straight on to 3, 4 and 5.  So, again, when skipping groups
9   of pixels that like, the operation is just not being
10  performed completely.
11             EXAMINATION
12  BY THE COURT:
13  Q.   All right.  Let me jump in because I had some questions
14  about this when the other expert was testifying.  If we're
15  looking at this diagram, right, you see the green area in
16  Box 1?
17  A.   I do.
18  Q.   And so those nine boxes in that green area are those
19  pixels?
20  A.   Yes.
21  Q.   They're meant to represent pixels.
22  A.   They are.
23  Q.   So in the first, I guess, iteration of this filter, it's
24  considering the first nine pixels in the upper left-hand
25  corner; correct?
```

UNITED STATES DISTRICT COURT

Exhibit 4
219

193

1   A.   I agree with that.

2   Q.   Then the filter moves on and now it's considering

3   another set of nine pixels; correct?

4   A.   That's also correct.

5   Q.   And each time the filter moves, it's considering the

6   number of pixels that's, I guess, consistent with the size of

7   the filter; right?

8   A.   Nine pixels each time, yes.

9   Q.   Because it's a nine pixel filter.

10  A.   Correct.

11          THE COURT:   Thank you.  I just wanted to make sure

12  I understood it.

13  By MR. LAQUER:

14  Q.   And Dr. Frakes, is there a difference between whether or

15  not a pixel is skipped and whether or not a group of pixels

16  are skipped?

17  A.   Yes, absolutely.  You can articulate it either way

18  really in trying to describe what's happening, but the end

19  effect is that group of pixels, um, that's in Columns 2, 3

20  and 4, when you skip from blue dot one to blue dot two here,

21  that group is never processed together.  You jump right over

22  and go to a new group.  So that group of pixels is simply not

23  processed here even if some of its members may be involved in

24  other math at some point in time.

25  Q.   And let's go back to the construction that was on

194

1   Slide 17.

2                       EXAMINATION

3   BY THE COURT:

4   Q.   Actually, can you go back for a second?  Can you put

5   that picture back up?

6          So you find it significant that, for example,

7   pixels, if we give these pixels numbers and letters with A

8   through A, B, C, D on the top and 1, 2, 3, 4 on the side, so

9   in the first iteration, we've got pixel A-1 is in the green

10  area; right?

11  A.   Correct.

12  Q.   As is B-1, C-1 and so on.  You find it significant that

13  when we move to Step 2, we're considering a group of nine

14  pixels and the specific group of pixels of, I guess,

15  Column 2, Column 3 and Column 4 is never considered together.

16  A.   That's correct because --

17  Q.   So that's the distinction you're making; right?

18  A.   It is because --

19  Q.   So even if we had a stride of one, then that wouldn't

20  happen; correct?

21  A.   No.  If we have a stride of one, then Columns 2, 3 and 4

22  get processed together.

23  Q.   Right, exactly.  That would be the difference between a

24  Stride 1 and a Stride 2.  But you'll agree with me if you had

25  a Stride 1 in the same scenario, you'd never consider the

195

1   upper left most pixel with the bottom right most pixel;

2   right?

3   A.   Oh, of course not, but if I can provide just a little

4   more clarity.

5          THE COURT:   I just want you to answer the question.

6   I'll turn it back to counsel.  I don't want to take up too

7   much time.

8   BY MR. LAQUER:

9   Q.   Dr. Frakes, could you explain your thoughts on this

10  discussion of groups of pixels?

11  A.   Yes.  Every unique combination of nine pixels will give

12  a different output for the filter.  So if you're not

13  considering all of the combinations with the filter, then

14  you're skipping a unique value that's going to be in the

15  output.  That's the point.  That the window of operation has

16  to address each group not just use some members and some math

17  operations to create output.  Each group has to be considered

18  for it to be complete.  When you use a stride value of two

19  that's not happening.

20          THE COURT:   But if you use a stride value of one,

21  that wouldn't happen either; right?

22          THE WITNESS:   Yes, it would.  With a stride value

23  of one, you would consider each adjacent group of nine

24  pixels.

25          THE COURT:   Each adjacent group of nine pixels.

196

1          THE WITNESS:   That's right.

2          THE COURT:   That's the qualification.  So you think

3   it's important to consider each adjacent group of nine

4   pixels.

5          THE WITNESS:   I do.

6   BY MR. LAQUER:

7   Q.   Dr. Frakes, does the fact we're addressing the term as

8   to whether the particular locations being addressed should be

9   adjacent or not?

10  A.   Absolutely.  Because it's the window that defines the

11  area that creates unique output.  If you skip to nonadjacent

12  windows, you're leaving an area behind that would have

13  contributed unique output to the mathematical operation.

14  You're just skipping right over it.

15  Q.   Let's turn back to Slide 17 whereas the construction is

16  provided for this claim term moving the gradient neighborhood

17  like a sliding window over the 3D elevation data.

18          And could you describe how one of ordinary skill in

19  the art would understand the term completely in that

20  definition to affect whether a stride value of two is a

21  complete or incomplete application?

22  A.   They would understand it to be carried out like a

23  standard convolution which uses a stride value of one.  It's

24  that simple.

25  Q.   Let's go on to next, Slide 18.  This has Dr. Morellas'

**Exhibit 4**
**220**

197

```
 1   Slide 41 embedded within it.  Can you identify what
 2   Dr. Morellas relied upon for his opinion that the LRAIL
 3   accused product satisfy this claim limitation?
 4   A.   Yeah.  So for his analysis of defining an appropriate
 5   gradient neighborhood, Dr. Morellas used this paper from the
 6   Tokyo conference that I think we've seen a couple times now.
 7   What's interesting about the paper, among other things, is
 8   that it focuses on using deep CNET as the neural network
 9   model that is used in the paper.
10          And as we learned earlier from Dr. Hebert, LRAIL
11   never used deep CNET.  It's completely different model.
12   LRAIL uses TensorFlow and that is not a deep CNET
13   implementation so it's really not relevant to the analysis.
14   Q.   Let's go on to the next Slide No. 18.  I'm sorry.
15   No. 19.  How did you assess whether LRAIL's neural network
16   applies its filter completely or incompletely regarding
17   stride value?
18   A.   So, again, I looked in the neural network and by doing
19   that, I used that visualization tool that I mentioned before.
20   It called out all the connections, the layers, shows how they
21   comes together.  It also lists out the parameters so one of
22   those parameters is the stride value and that value is listed
23   explicitly right there in the network.  It's very clear and
24   that's how I knew the value was two.
25   Q.   Let's look at Slide No. 20 in case that's relevant to
```

UNITED STATES DISTRICT COURT

198

```
 1   this discussion.  It has some excerpts from Exhibit 507.  Can
 2   you tell us what we're looking at on this slide?
 3   A.   The graphic there on the left that's the output of this
 4   visualization tool that I mentioned.  If you focus in on this
 5   top left layer here, depth wise, Conv2D native, it tells you
 6   what the filter size is there in that box.  And if you select
 7   that, then you get to see the dialogue that's over on the
 8   right side of the slide.
 9          There I've put a box around the stride values 1, 2,
10   2 and 1.  And in the context of TensorFlow, those two values
11   of two, those are the skipped values for going across and
12   going down.  So that's how you know that window is skipping
13   things in both directions.
14   Q.   All right.  We already looked at the next slide stride
15   value of two and go to Slide 22.  Can you let us know what
16   limitation of Claim 1 this addresses?
17   A.   Yes.  This addresses the limitation of being sold
18   without sensors in communication or that rather at least one
19   sensor be in communication with at least one processor.
20   Q.   And what is your understanding of how this claim
21   limitation is affected by the requirements for literal patent
22   infringement as Tetra Tech is alleging here?
23   A.   All right.  Well, as I understand literal infringement
24   and as it was explained to us earlier in the trial, that
25   means that every word has to be accounted for.  So even if
```

UNITED STATES DISTRICT COURT

199

```
 1   it's a minor implication maybe in the larger context of the
 2   product, every word must be accounted for it to literally
 3   infringe.  Those are the rules so that's how I understand it.
 4   Q.   Did you analyze the state of the accused LRAIL systems
 5   at the time they are sold as accused by Tetra Tech?
 6   A.   I did.
 7   Q.   Let's go on and look at your next Slide No. 23.  This
 8   shows Dr. Morellas' Slide 27 embedded within it.  Dr. Frakes,
 9   can you tell us what did Dr. Morellas analyze for the claim
10   requirement sensors in communication with the least one
11   processor?
12   A.   I believe this is another case where a manual was
13   consulted.
14   Q.   And could you let us know what you can see from the page
15   of the manual that Dr. Morellas included in his slides?
16   A.   Yes.  From this manual image that Dr. Morellas provided,
17   you can see these two blue plugs here which are highlighted
18   in yellow.  You may not be able to see the labels behind
19   those, but they say left sensor and right sensor.  As you can
20   tell, there's nothing plugged in there.  So it's very clear
21   in this state as sold, there is no sensor communicating with
22   the processor.
23   Q.   Now, let's go on to your next Slide No. 24.  This
24   addresses the track elevation map and calculating
25   differential vertical measurement requirement from Claim 1 of
```

UNITED STATES DISTRICT COURT

200

```
 1   the '293 patent.
 2          Dr. Frakes, what is your impression as to whether
 3   or not the accused LRAIL sales satisfy these claim
 4   requirements?
 5   A.   Well, I don't feel that they do.  Because even if, for
 6   example, our r10323 had applied Sales 2 through 4 and even if
 7   Fake3D had been enabled, LRAIL still would not generate a
 8   track elevation map.
 9   Q.   And we've heard some discussion of Fake3D.  Did you
10   review the Fake3D code in order to assess how Fake3D works?
11   A.   I did.
12   Q.   Could you just briefly summarize what you observed?
13   A.   Yeah, I think the clearest way to explain it is that the
14   Fake3D image is essentially just a flat 2D image that has
15   fake shadows on it.  So it doesn't really include any
16   elevation data in the image itself.  For example, you can't
17   tell what the elevation is at any point in that image.  It's
18   a just flat image with fake shadows and I know I'm repeating
19   myself now, but that's easiest way to explain it.
20   Q.   And what is your understanding of what the requirement
21   for calculate differential vertical measurements addresses?
22   A.   Well, I mean, that requirement makes it pretty explicit
23   that you have to measure some height difference; right?  A
24   differential vertical measurement.  There has to be some
25   height difference.  And if there's no height in the image in
```

UNITED STATES DISTRICT COURT

**Exhibit 4**

221

201

```
1    the first place, you can't measure a difference.  I don't see
2    how the image could satisfy that requirement.
3    Q.   Looking at your next Slide No. 25, can you briefly
4    summarize your opinion regarding whether the LRAIL's accused
5    sales infringe the asserted claims of the '293 patent?
6    A.   Sure.  Well, the accused LRAIL sales, the three to CSX,
7    do not infringe Claim 1 and thus dependent Claim 21 because
8    that depends on one of the '293 for at least these four
9    reasons we just talked about.
10        First, LRAIL was configured for range only.  It's
11   not mixed image or Fake3D and this is in all cases.
12        Second, LRAIL algorithm doesn't do defining an
13   appropriate gradient neighborhood and moving it like a
14   sliding window.  We talked about appropriateness and how that
15   means flexible and variable.  The filters in the neural
16   network are fixed.  They're set in stone.  They don't slide
17   completely any way.  They skip data.
18        Next, sales were of disconnected components.  We
19   just saw that clear example where the sensor ports were not
20   connected to anything at sale.
21        And lastly, Fake3D is not a track elevation map so
22   LRAIL doesn't calculate differential vertical measurements in
23   my opinion.
24   Q.   Let's go on to Slide No. 29.  This addresses the
25   allegation by Tetra Tech as to supposed induced infringement.
```

202

```
1         Dr. Frakes, did you hear Tetra Tech's counsel ask
2    Dr. Morellas questions about induced infringement and
3    subjective belief about infringement?
4    A.   I did.
5    Q.   And do you understand that those types of phrases get
6    added to questions about induced infringement because induced
7    infringement has an extra requirement beyond direct
8    infringement.  Is that your understanding?
9    A.   Yes, it is.
10   Q.   And so setting aside whether the subjective belief
11   requirement is satisfied for the '557 patent Claim 8, have
12   you looked at the claim language of the '557 patent Claim 8
13   to assess whether the operation of LRAIL itself would satisfy
14   that claim?
15   A.   Yes, I have and there's still no induced infringement
16   for these three reasons that I've said on the slide.
17   Q.   Can you identify what the first reason is?
18   A.   Yes.  So first of all, there's no inputting of detected
19   tie bounding box data.
20   Q.   And the second reason?
21   A.   There's also no inputting of rail base edge feature
22   coordinates.
23   Q.   And the third?
24   A.   The system does not compare ties and elevation data with
25   a tie surface plane model.
```

203

```
1    Q.   Let's go on to Slide 30.  Can you tell us what this
2    claim, well, I'll skip it ahead.  I'll note that you've
3    included some testimony from Dr. Morellas here.
4         Can you explain why?
5    A.   I just wanted to highlight this in the context of not
6    inputting tie bounding box data.
7    Q.   And so Dr. Morellas has identified his opinion that the
8    bounding box must be orthogonal.  Do you agree that a
9    bounding box must be orthogonal?
10   A.   I do, and it's very much like the name sounds.  It's a
11   box like any other you would imagine.
12   Q.   And do you agree or disagree that a mask can be
13   anything?
14   A.   Yeah, a mask is usually just a white blob of stuff on a
15   black background in image processing.  It could be one thing,
16   it could be multiple things.  It doesn't have any specific
17   shape, you know, associated with it.
18   Q.   And so is it your understanding that a mask can be
19   anything meaning any shape?
20   A.   Yes.
21   Q.   Okay.  Let's look at Slide 31 which has Dr. Morellas'
22   Slide 67 embedded in it.  How did Dr. Morellas attempt to
23   show that LRAIL supposedly meets the inputting detected tie
24   bounding box claim requirement?
25   A.   Yeah, so here he focused on this variable that we see
```

204

```
1    there.  It's pucl tie mask I believe is what it says.  It's
2    the one labeled detected tie bounding box data in the yellow
3    snippet.
4    Q.   And do you believe that this is detected tie bounding
5    box data?
6    A.   No.  I've looked at the source code.  Again, this is a
7    mask and it's a binary image that has white values and black
8    values and just some shape in it to indicate the presence of
9    some feature of interest.
10   Q.   What did Dr. Morellas show at the bottom of Slide 67?
11   A.   So those are tie bounding box data in the bottom there
12   on the right.  That's the output of the process.  The claim
13   requires the tie bounding box data are input.  This is not
14   input.  This is output.  So that's what we would look for on
15   the input to see if there's infringement.  It's not there.
16   If a mask is going in, the tie bounding box data are going
17   out.
18   Q.   Let's look at the at your next Slide 32.  This has
19   Dr. Morellas' Slide 66 embedded in it.  Can you tell us what
20   requirement from Claim 8 this slide addresses?
21   A.   It addresses inputting rail base edge feature
22   coordinates.
23   Q.   And how did Dr. Morellas attempt to show whether LRAIL
24   satisfies this limitation?
25   A.   Again, he's identified another mask variable.  This one
```

**Exhibit 4**
**222**

1  mpuc rail mask foot DS which is labeled in purple toward the
2  bottle as rail base edge feature key coordinates.
3  Q.  Do you believe that variable satisfies the claim
4  requirement?
5  A.  No, for the same reason we just discussed, that's a
6  mask.  It's not coordinates.
7  Q.  Let's go on to Slide 33.  This has Dr. Morellas'
8  Slide 71 embedded in it.  Can you tell us what claim
9  requirement this addresses?
10  A.  So this addresses comparing ties in the elevation data
11  with a tie surface plane model.
12  Q.  And what does Dr. Morellas address for that claim
13  requirement?
14  A.  Here he's looking at this variable add plane params and
15  contending that this identifies an approximate tie surface
16  plane.
17  Q.  Do you agree or disagree with his conclusion?
18  A.  I disagree because the way that Pavemetrics solves this
19  problem, they look at only half of a tie at a time.  They do
20  it in segments.  So this is not a tie surface plane model.
21  It's only half of the surface plane and half the tie is
22  not a tie so I don't see fulfilling the requirement.
23  Q.  Let's look at Slide 34.  Could you briefly let us know
24  your conclusion regarding whether Pavemetrics accused acts
25  have induced any infringement of the '557 patent?

UNITED STATES DISTRICT COURT

1  A.  So even if Pavemetrics had known of the '557 patent and
2  even if Pavemetrics had subjectively believed that LRAIL
3  infringed, there's still no induced infringement in my
4  opinion because LRAIL does not do inputting the detected tie
5  bounding box data, it does not do inputting the rail base
6  edge feature coordinates, and it does not compare ties in the
7  elevation data with the tie surface plane model.
8        And just as a reminder, any one of these means no
9  infringement, but they're all true.
10  Q.  We can go ahead and take the slide down and just briefly
11  like to turn to your invalidity analysis.  Dr. Frakes, what
12  is your ultimate conclusion regarding whether or not the
13  asserted claims here by Tetra Tech are valid or invalid?
14  A.  Based on everything I that reviewed, I feel they are
15  invalid.
16  Q.  And can you explain why?
17  A.  Sure.  Can we bring the slides up?
18  Q.  We can go on to Slide 35.
19  A.  So there's a lot of background that's relevant here.
20  First off Pavemetrics rail inspection systems were earlier
21  than the patents.  In 2010 Pavemetrics sold its sensors to
22  EuroConsult as we heard about earlier who developed software
23  for rail inspection.  Then in 2012 Pavemetrics made that
24  first sale of rail inspection system to the University of
25  Massachusetts at Lowell.

UNITED STATES DISTRICT COURT

1        Again, in 2014 both Pavemetrics and EuroConsult
2  published and presented papers on rail inspection using
3  Pavemetrics LCMS system at that TRB board meeting we've heard
4  about a couple times.  It was only in 2015 that Tetra Tech
5  filed for its patents.
6  Q.  So based on Pavemetrics early work, do you believe that
7  the asserted claims would have been obvious to one of the
8  ordinary skill in the art at the time of filing?
9  A.  I do.
10  Q.  Look at Slide 36, here.  When discussing Pavemetrics
11  early work for your invalidity analysis, can you let us know
12  what items you focused on?
13  A.  Yes.  So in looking at invalidity, I focused on the UML
14  sale and support.  This paper UML-TRB2014.  The EC-TRB2014
15  paper which was the second one we talked about being
16  published in the previous slide.  And also one other paper by
17  Gibet-Serra that adds a specific piece of functionality that
18  we'll discussion.
19  Q.  And for the record, the UML-TRB2014 document that you
20  referenced is Exhibit 26; is that correct?
21  A.  That's correct.
22  Q.  And the EC-TRB2014 is Exhibit 510; is that correct?
23  A.  That's also correct.
24  Q.  And the Gibet-Serra document that you used for the
25  dependent Claim 21 is Exhibit 511; is that correct?

UNITED STATES DISTRICT COURT

1  A.  That's correct.
2  Q.  And what is your opinion as to whether the UML sale and
3  support and/or UML-TRB2014 either alone or in combination
4  with EC-TRB2014 invalidates Claims 1 and 21 of the '293
5  patent as obvious?
6  A.  I believe that they do.
7  Q.  And what is your opinion as whether the UML sale and
8  support and/or UML-TRB2014 in combination with EC-TRB2014 and
9  Gibert-Serra invalidate Claim 21 of the '293 as obvious?
10  A.  I believe they do invalidate Claim 21.
11  Q.  And what is your opinion as to whether the UML sale and
12  support and/or UML-TRB2014 invalidate Claim 8 of the '557
13  patent as obvious?
14  A.  I believe they also invalidate Claim 8 as obvious.
15  Q.  So to save some words going forward, can we use the
16  phrase Pavemetrics' early work to mean UML sale and support
17  and/or UML-TRB2014?
18        MR. CHUNG:  Objection, Your Honor.  This goes to
19  what we discussed earlier today.
20        THE COURT:  When we talk about any invalidity with
21  obviousness, sometimes people will combine two things
22  together and say in light of these two things together, this
23  invention is obvious, and that's okay if there was a
24  motivation for someone to put them together.
25        Here as I understand the argument, Pavemetrics is

UNITED STATES DISTRICT COURT

Exhibit 4
223

209

```
 1   not arguing that these things together cause the patent to be
 2   obvious, but each one separately so one or the other would
 3   cause the patent to be obvious.  In talking about the early
 4   work, what counsel should have said that the UML sale and
 5   support or the UML-TRB2014, either of those by themselves,
 6   one or the other, would cause the patent to be obvious;
 7   right?
 8            MR. LAQUER:  Not exactly.
 9            THE COURT:  Are you combining them?
10            MR. LAQUER:  Well, they are the same system,
11   Your Honor and that is why it's described as and/or.
12            THE COURT:  Exactly what we talked about earlier.
13   Let's have a side bar conference to discuss this.
14        (The following proceedings were held at side bar:)
15            MR. CHUNG:  This is what we were worried about and
16   discussed this morning.  We're talking about specific
17   elements of the claim and we'll switch from article to source
18   code, back to article, back to source code, and it will
19   become confusing to the jury to figure out what grounds are
20   actually being tried.  And it's also outside the scope of
21   what was actually provided by that phrase.
22            THE COURT:  As I understand what counsel is saying,
23   this is one reference; right?  The prior system is one
24   reference in the publication that really describes it; is
25   that right?
```

210

```
 1            MR. LAQUER:  Yes, Your Honor.  We have significant
 2   foundation laid by Dr. Laurent, Dr. Hebert's documents of the
 3   system.  It's not uncommon to use source code and technical
 4   manuals.  It's all describing systems.
 5            THE COURT:  Was this point made clear in the expert
 6   report?
 7            MR. LAQUER:  I believe so.
 8            MS. LEA:  As well as contentions.
 9            MR. CHUNG:  If you go to the Table of Contents,
10   they are separate grounds, Your Honor.  It's called out
11   separately and without a combination between the source code
12   and article so there isn't any motivation to combine the two.
13   Also, they're different dates.  So to the extent they say the
14   same thing, I think that is no longer the case given
15   Dr. Hebert's testimony.  We're left with the combination of
16   two different dated pieces of prior art that by itself does
17   not invalidate a combination of prior art by obviousness.
18            MR. LAQUER:  The interior infringement theory looks
19   to some describe as hardware as well as software.
20            THE COURT:  I don't want to talk about this issue.
21   So the contention, tell me about the contentions.  Do they
22   describe this as one piece of prior art or as two pieces of
23   prior art?
24            MS. LEA:  Two pieces of prior art that can be
25   combined.  The UML paper is evidence that the entire UML sale
```

211

```
 1   and support expands two to three years.
 2            THE COURT:  So are they combined in the contentions
 3   as a combination?
 4            MS. LEA:  They are.
 5            THE COURT:  So if they're combined in the
 6   contentions, your issue really is just an expert report
 7   issue?
 8            MR. CHUNG:  That's correct, Your Honor.
 9        What's in the contentions, in the contentions is
10   the expert bringing in what's contained within the expert
11   report and deposition.  And here as provided by the Table of
12   Contents, these pieces of prior art that's a separate ground
13   and UML-TRB are a separate ground.  There's no combination of
14   the two.
15            THE COURT:  Yeah, that's what I thought we
16   understood this morning.  No combination of the two.  Deal
17   with them separately.  Deal with them as separate pieces of
18   prior art.
19            MS. LEA:  But in the case we can argue the
20   combination based upon the other factual testimony?
21            THE COURT:  You can argue the combination just
22   won't have an expert opinion on the combination.
23        Does that make sense?
24            MS. LEA:  Is this enough?  I just want to be
25   careful because some of the representations about the damages
```

212

```
 1   report were not correct.  I want to make sure we have
 2   sufficient time to respond to this.
 3            THE COURT:  I'm not sure what that means.  The
 4   expert can't combine them.  These two combined make it
 5   obvious wasn't in the report.  You can make argument.
 6            MR. LAQUER:  At least present them, though, making
 7   clear not argument or opinion being provided by the expert
 8   that these two just should be combined.
 9            THE COURT:  That's what I thought we said this
10   morning.
11            MR. CHUNG:  I guess the concern we have is that the
12   slides jump from presentation to article to the code and back
13   to the presentation and back to the code.  And I don't know
14   if that's going to be too confusing to the jury appearing to
15   be a combination of the two.
16            MS. LEA:  The testimony is it's the same project.
17            MR. LAQUER:  The presentation is designed based on
18   the verdict form.
19            THE COURT:  We talked about that this morning.
20   You're sort of working around the issue.  I need the parties
21   to kind of be straightforward with the Court.  Deal with
22   separate items of prior art with the expert because I think
23   it is unfair to have the expert to be combining if he didn't
24   do it in his report.  Thank you.
25        (Side bar concluded.)
```

**Exhibit 4**
**224**

213

```
 1          THE COURT:  Please proceed, Counsel.
 2   BY MR. LAQUER:
 3   Q.   Dr. Frakes, is it your opinion that UML sale and support
 4   on its own, alone or in combination with EC-TRB2014
 5   invalidates Claim 1 and 21 of the '293 patent as obvious?
 6   A.   Yes.
 7   Q.   And is it your opinion that UML-TRB2014 either alone or
 8   in combination with EC-TRB2014 invalidates Claim 1 and 21 of
 9   the '293 patent as obvious?
10   A.   Yes.
11   Q.   Is it your opinion that UML sale and support in
12   combination with EC-TRB2014 and Gilbert-Serra reference
13   invalidate Claim 21 of the '293 patent as obvious?
14   A.   Yes, it is.
15   Q.   And is it your opinion that UML-TRB2014 in combination
16   with EC-TRB2014 and Gilbert-Serra invalidate Claim 21 of the
17   '293 patent as obvious?
18   A.   Yes, it is.
19   Q.   Is it your opinion that UML sale and support invalidates
20   Claim 8 of the '557 patent as obvious?
21   A.   Yes, it is.
22   Q.   Do you believe UML-TRB2014 invalidates Claim 8 of the
23   '557 patent as obvious?
24   A.   Yes, I do.
25   Q.   All right.  Taking a little bit of a step back, could
```

UNITED STATES DISTRICT COURT

214

```
 1   you describe at a higher picture what your impression is of
 2   the Pavemetrics activities described by Dr. Hebert and by
 3   Mr. Laurent as compared to the LRAIL accused systems that you
 4   analyzed for noninfringement in particular with respect to
 5   differences of processing image type?
 6   A.   Yes.  Well, I looked at a number of the earlier versions
 7   of Pavemetrics code and, you know, they use traditional
 8   computer vision processing algorithms.  The Fake3D image that
 9   we've talked about a number of times is present in that code
10   and has been since the earliest versions that I've looked at
11   so that should provide some context.
12   Q.   Let's look at Slide 37.  Can you identify examples of
13   documents you've reviewed in forming your opinions as to
14   invalidity?
15   A.   Of course.  Some of the exhibits I've reviewed include
16   source code like Version r8320, um, I've purchase orders
17   including Exhibit 526, I've looked at the hardware and
18   software installation manuals and also the data acquisition
19   manual.  I've also reviewed UML Project meeting minutes,
20   invoices and additional UML documents.
21   Q.   And for the record is the source code you referenced
22   Exhibit 508?
23   A.   It is.
24   Q.   And is the purchase order Exhibit 526?
25   A.   That's correct.
```

UNITED STATES DISTRICT COURT

215

```
 1   Q.   And manual is exhibit, the hardware and software manual
 2   Exhibit 527?
 3   A.   Correct.
 4   Q.   And the data acquisition manual is Exhibit 528?
 5   A.   Also correct.
 6   Q.   So let's go to Slide 38.  Here we see the limitations of
 7   Claim 1 of the '293 patent and identification of hardware and
 8   software.  Do you see that?
 9   A.   I do.
10   Q.   I think we'll skip over an extremely longer process with
11   regard to going on these visually, but let's look at
12   Slide 39.  Can you let us know what additional documents
13   you -- can you describe just at a high level, we could zoom
14   in on the left side, this is the purchase order that we saw
15   addressed by Mr. Hebert; correct -- or Mr. Laurent; correct?
16   A.   Correct.
17   Q.   Let's just start discussing the claim limitations.
18   Let's go back to Slide 38.  Let's look at Slide 26.  Okay.
19   Sorry.  Slide 42.  And here we see a figure from Exhibit 26,
20   the UML-TRB2014.  Dr. Frakes, can you describe whether the
21   systems from Pavemetrics' early work are systems satisfying
22   the claim requirements shown here?
23   A.   Yes.  The image clearly shows a system for assessing a
24   railway track bed.
25   Q.   And so do you believe that this was available and
```

UNITED STATES DISTRICT COURT

216

```
 1   obvious to one of ordinary skill in the art as of the filing?
 2   A.   I do.
 3   Q.   Look at Slide 43.  Is there any dispute to your
 4   knowledge whether there was a power source included in the
 5   prior art Pavemetrics' work?
 6   A.   No, there is not.
 7          MR. CHUNG:  Objection, Your Honor.  This going back
 8   to what we discussed earlier.
 9          THE COURT:  Hang on one second.
10          So we're looking at an invoice from the system as
11   opposed to a publication.  Are we on publication or on the
12   system now?
13          MR. LAQUER:  We are discussing the system and the
14   purchase order describing the attributes of the system as
15   having a power source.
16          MR. CHUNG:  The previous slide was the publication.
17          THE COURT:  That's what I thought.
18          This is getting confusing and I apologize.
19          Essentially, what counsel is relying on are two
20   pieces of -- two items of prior art.  One is an actual system
21   and one is a publication relating to -- which may or may not
22   relate to that system.  As I understand it, they might have
23   different dates and things.  It's trying to keep in your mind
24   that when we're looking at whether the patent was obvious or
25   something, we're looking at the publication about the system
```

UNITED STATES DISTRICT COURT

**Exhibit 4**
**225**

217

1   and that's the thing that's called, what's the number?
2          MR. LAQUER:  UML-TRB2014.
3          THE COURT:  UML-TRB2014 that's a publication.  So
4   you'll be asked to determine whether the patent is obvious
5   because of that publication.  We're also looking at an actual
6   system and that system is just called the ULB system and
7   that's separate.  Try to do a better job when you're walking
8   through this, make it clear to the jury which one of those
9   we're talking about.
10         MR. LAQUER:  All right.
11  Q.   Let's look slide providing the hardware limitation offer
12  review.  We can back up to Slide 38.  Dr. Frakes, is it your
13  understanding that Tetra Tech has not raised any dispute that
14  all of the hardware limitations were satisfied by the UML
15  sale and support prior art system itself?
16  A.   That is my understanding.
17  Q.   So there's not even a dispute about the hardware based
18  on Pavemetrics prior system; correct?
19  A.   No.
20  Q.   Is it your understanding there's also not a dispute
21  raised by Tetra Tech that the UML-TRB2014 document satisfied
22  all of the hardware limitation requirements?
23  A.   That is my understanding.
24  Q.   And so to be clear is it your opinion that the UML sale
25  and support system made known to one of ordinary skill in the

218

1   art at the time of the filing of the patent applications that
2   all of these standard hardware, well-known hardware items
3   were already within that person's knowledge?
4   A.   That's correct.
5   Q.   Does that also apply to the document prior art reference
6   Exhibit 26?
7   A.   It does.
8   Q.   Now, going on to the algorithm, the first step in the
9   software, is it your understanding that Tetra Tech has argued
10  as to whether or not the Fake3D algorithm in the UML sale and
11  support system was supposedly different than the Fake3D
12  algorithm in the accused products?
13  A.   I believe I've heard that.
14  Q.   Is it your understanding that Tetra Tech has the same
15  argument against validity for UML-TRB2014 document?
16  A.   Yes.
17  Q.   Do you agree or disagree with Dr. Morellas' opinion that
18  there was somehow a difference with regard to Fake3D as it
19  relates to the following claim limitation:  Wherein at least
20  one processor is configured to run -- I'm sorry.  That would
21  be generating track a elevation map based on the acquired
22  three-dimensional data.
23  A.   Can we restate that question?
24  Q.   Absolutely.  Looking at the claim limitation generating
25  a track elevation map based on the acquired three-dimensional

219

1   data, do you agree or disagree with Dr. Morellas that there
2   is a difference in Fake3D today as compared to at the time
3   of -- rather in the UML sale and support system?
4   A.   I disagree with Dr. Morellas on that point.  I've looked
5   at code throughout the history of Pavemetrics from before and
6   after the patent.  Fake3D has not changed.
7   Q.   And is your opinion on that issue the same for the
8   UML-TRB2014 document?
9   A.   It is.
10  Q.   And do you believe that the sensors described in the UML
11  sale and support document and were physically present in the
12  system satisfy the first limitation of the software
13  limitations that wherein step?
14  A.   I do.
15  Q.   And so do you believe that one of ordinary skill in the
16  art at the time of the invention knowing of the UML sale and
17  support system would have realized such sensors could be
18  used?
19  A.   I agree with that.
20  Q.   And do you agree that the sensors would perform the
21  acquiring three-dimensional surface step, Step A shown here?
22  A.   Yes, we see that in all of the material.
23  Q.   Let's look at Exhibit 26, the UML-TRB reference, the
24  second page and the third page and let's go on to the fourth.
25  Do you see the sensors shown here on page 4 of Exhibit 26?

220

1   A.   Yes, I do.  I see the sensors there.
2   Q.   Let's go on to page 5 of this system.  Do you see the
3   document Exhibit 26 prior art UML-TRB2014 showing a system
4   for assessing railway track beds as visualized here?
5          MR. CHUNG:  Objection, Your Honor, leading.
6          THE COURT:  Why don't you rephrase it, please.
7          MR. LAQUER:  Sure.  Let me grab a binder.
8   Q.   Dr. Frakes, looking at Exhibit 26, does this inform your
9   opinion as to whether the UML prior art document discloses
10  the invention claimed in Claim 1 of the '293 patent software
11  limitation or rather hardware for acquisition?
12  A.   Yes, I see the system that's referenced in that claim.
13  Q.   Let's look at Exhibit 528.  Do you see this description
14  in the data acquisition manual of the prior art system
15  showing the sensors also present there?
16  A.   Yes, I see the sensors.
17  Q.   And looking at Exhibit 508, you know, let's go to
18  Slide 48 and zoom in on your slides on the text on the right.
19  Zooming in on the text on the right, is it your understanding
20  that the code shown here from Exhibit 508 is relevant for
21  acquisition?
22  A.   Yes, it is.  In particular I see variables that
23  reference both intensity and elevation data.  So the
24  variables up top for C1 is M_pucIntdata that represents
25  intensity data and below where we see multiple variables

**Exhibit 4**
**226**

221

```
 1   highlighted, one, for example is m_PfRangeC data that
 2   indicates range or elevation data.
 3   Q.   Let's look at Exhibit 26 at page 7.  This shows an image
 4   that we've seen before labeled with intensity left, range
 5   center and 3D merged right.  Do you see that, Dr. Frakes?
 6   A.   I do.
 7   Q.   Does this relate to your opinions of the Fake3D
 8   algorithm provided in the system prior art claim?
 9   A.   Right.  Well, you know, it's my opinion that the Fake3D
10   doesn't represent a track elevation map, but I can see how
11   reasonable minds differ on that point.  And if Tetra Tech is
12   correct that Fake3D is in fact a track elevation map, well,
13   we're seeing it here in this early work.
14   Q.   Now, if Tetra Tech is incorrect and Fake3D is not a
15   track elevation map, is it possible to invalidate a patent
16   claim as obvious even with a prior art reference that does
17   not exactly match that?
18   A.   It is.
19   Q.   And do you believe that if the finder of fact were to
20   agree with your opinion about Fake3D not actually being a
21   track elevation map, would it have been obvious for one of
22   ordinary skill in the art to create a track elevation map
23   knowing the Fake3D technique?
24   A.   I believe so because we're looking here at an image
25   where intensity and elevation data are being combined
```

UNITED STATES DISTRICT COURT

222

```
 1   together.  Now, I described Fake3D before as a flat image
 2   with fake shadows put on it, but we could think of doing the
 3   process somewhat in the opposite way.  Keeping the elevation
 4   data and allowing intensity values to affect those.  And of
 5   those elevation data are present in the image, well, is
 6   something that could be used to perform the patented claims.
 7   Q.   There was discussion of mat lab in respect to the
 8   earlier Pavemetrics system.  Do you recall that, Dr. Frakes?
 9   A.   Yes, I do.  It's one of my favorite languages.
10   Q.   And would it have been obvious to one of ordinary skill
11   in art to implement a system that runs on rail rather than
12   ina mat lab computer?
13   A.   I'm sorry.  I'm not sure I understand the question.
14   Q.   Suppose you had an algorithm implemented in mat lab.  Do
15   you believe that in the context of Claim 1 of the '293
16   patent, it would have been obvious to one of ordinary skill
17   in the art to implement in a different programming language
18   what had previously been implemented in mat lab?
19   A.   Oh, of course.
20        MR. CHUNG:  Outside the scope of this expert's
21   report and deposition.
22        THE COURT:  Is it outside the scope of the report?
23        MR. LAQUER:  I would need to double-check closely.
24        THE COURT:  Well, then I'll sustain the objection.
25   BY MR. LAQUER:
```

UNITED STATES DISTRICT COURT

223

```
 1   Q.   Let's look at page 58 of your presentation.  Let's look
 2   over on the right side.  This is the presentation from the
 3   UML document Exhibit 26 and we've highlighted here discussion
 4   of Sobel kernels and edge detection.  Can you let us know
 5   what are Sobel kernels?
 6   A.   So these are techniques widely used in image processing
 7   and computer vision for calculating gradients in images.
 8   They can be several different sizes, but essentially they're
 9   used in convolutional operations to find edges and again,
10   gradients in images.
11   Q.   And what's the Canny method?
12   A.   It's another method that uses filters like these for
13   edge detection and computer vision and image processing.
14   Q.   So how does your analysis of Pavemetrics' early
15   implementation of LRAIL compare to your analysis of the
16   accused artificial intelligence LRAIL systems?
17   A.   Oh, well, they're very different.  Obviously, when it
18   comes to the artificial intelligence product, it's doing
19   something, you know, very different than what we would
20   consider happening with Sobel kernels and Canny methods.
21   Q.   Let's look at your Slide No. 62.  With respect to the
22   UML system that Pavemetrics sold and supported, do you
23   believe that one of ordinary skill in the art would have a
24   motivation to combine that system with the other reference
25   including ECB-TRB2014 as you noted?
```

UNITED STATES DISTRICT COURT

224

```
 1   A.   Yeah, I do because when we look at what was present with
 2   the UML sale and support, we have all of these components
 3   already present.  The system is there, the sensors are there,
 4   there is a power source, acquiring 2D and 3D data.  Then when
 5   look at ECB-TRB2014 paper, it shows these track elevation
 6   maps.  So these are things in the same field.  They're very
 7   related in terms of content.  And so to me to use one of
 8   those track elevation maps with a system like that provided
 9   in the UML sale seems obvious.
10   Q.   And do you have the same opinion or a different opinion
11   with regard to the UML documentation and whether one of
12   ordinary skill in the art would have combined what was
13   disclosed in the UML document with then the, um, the other
14   prior art combinations?
15   A.   I have the same opinions.
16   Q.   Let's look at claim or your Slide 63.  This addresses
17   the dependent claim of the '293 patent, Claim 21.
18        Based on opinion of the dependent Claim 1 with
19   respect individually to the UML system and also the UML
20   document, what is your opinion as to whether the UML system
21   in combination with Gibert-Serra would render obvious
22   Claim 21?
23   A.   Right.  So in thinking about Claim 21, it is a dependent
24   claim.  So we already talked about Claim 1 and how I feel
25   that is invalid.  When you add the reference by Gibert-Serra,
```

UNITED STATES DISTRICT COURT

Exhibit 4
227

225

```
1    it talks very clearly about doing this process measuring
2    joint bar length and comparing it to different thresholds.
3    So when I see that reference, again, in the same field about
4    the same type of content and I consider that with the other
5    material, to me that becomes obvious.
6    Q.   Look at Exhibit 511 page 3.  Do you recognize this as
7    the Gibert-Serra prior art document?
8    A.   That's right.  As we see by the title A Machine Vision
9    System For Automated Joint Bar Inspection From a Moving Rail
10   Vehicle, so this underscores what I had brought up before.
11   This is even in the rail field and it's talking about looking
12   at joint bar lengths and making decisions accordingly so in
13   combination, I see the material as obvious.
14   Q.   And the abstract of Gibert-Serra begins broken joint
15   bars have been identified as one of the major causes of main
16   line derailments in the U.S.  On October 2006, the U.S.
17   Federal Railroad Administration issued a federal regulation
18   that mandates periodic inspections to detect cracks and other
19   indications of potential failures in CWR joints.
20        Do you see that, Dr. Frakes?
21   A.   I do.
22   Q.   And does this inform your opinion as to one of ordinary
23   skill in the art and whether they would have a motivation to
24   combine this reference when considering the joint bar
25   dependent Claim 21?
```

UNITED STATES DISTRICT COURT

226

```
1    A.   Absolutely.  Even the first sentence identifying broken
2    joint bars as one of the major causes of main line
3    derailments, clearly there is motivation to combine that with
4    other technology to solve the problem.
5    Q.   Could we look at the top of this prior art Gibert-Serra
6    document and just check the date.  You see March 13th
7    through 16 of 2007?
8    A.   That's right 2007.
9    Q.   Now, let's look at page 5 of Gibert-Serra.  Was your
10   consideration of the sensor hardware disclosed here in
11   Gibert-Serra also relevant to your analysis of obviousness of
12   the Claim 21 of the '293 patent?
13   A.   Yes.  Because, again, here's it's showing hardware that
14   performs similarly to, you know, a laser-based system for
15   measuring features on a railroad.  Highly relatable to the
16   other content that we would combine to show obviousness.
17   Q.   Let's look at the bottom right of this page where
18   there's a section Joint Bar Detection.  Can you read the
19   first sentence after joint bar detection?
20   A.   The latest version of the system does not use lasers but
21   relies on the software approach to detect the presence of
22   joint bars.
23   Q.   And what is your opinion as to whether one of ordinary
24   skill in the art would combine sensor techniques from one
25   reference with respect to another in the Gibert-Serra
```

UNITED STATES DISTRICT COURT

227

```
1    disclosure?
2    A.   Well, I think it pretty much lays out the steps here to
3    do exactly that.  Even if lasers are not used, it indicates
4    that software can be used to detect the presence of joint
5    bars so it weaves it all together very nicely.
6    Q.   Let's look over at the next page, page 6.  Can you
7    describe what is shown here at the top of page 6?
8    A.   Yes, so this is a picture of the rail head.  There are
9    other features indicated in the picture including a gap as
10   well as detected cracks and the center region is highlighted
11   for context.
12   Q.   And there's some text actually surrounds, starts a
13   little bit before this page at the bottom of the previous and
14   continues on under this figure that I'd like you to focus in
15   on.  If you could go back to page 5 of Gibert-Serra.
16        This reads a combination of both types of features
17   on joint bars of the same rail is used to robustly detect
18   them.  Each trigger is validated by checking the symmetry and
19   the length of the bar to remove false detections.
20        Dr. Frakes, can you explain what Gibert-Serra
21   teaches of one of ordinary skill in the art regarding
22   validating?
23   A.   Well, it teaches that both symmetry and length matter.
24   They're useful in identifying joint bars appropriately.  So
25   using, for example, minimum and maximum joint bar length
```

UNITED STATES DISTRICT COURT

228

```
1    thresholds to identify a joint bar candidate as being a joint
2    bar makes a lot of sense when you read this.
3    Q.   And would that be performed in software?
4    A.   It would.
5    Q.   Let's look at page 7 of Exhibit 511, the second
6    paragraph over on the left side towards the top.  That begins
7    once the joint bar is detected and segmented, a match filter
8    is applied within different segments to get a map of
9    locations where there are likely cracks.
10        Dr. Frakes, what is segmentation?
11   A.   Segmentation applies loosely to isolating something
12   within an image and identifying where its boundaries are.
13        MR. CHUNG:  Sorry for the belated objection, but
14   this is outside the scope of his expert report.
15        THE COURT:  Is this in his expert report?
16        MR. LAQUER:  I believe there is discussion of this
17   paragraph, but I would need to double-check that
18   specifically.
19        THE COURT:  If you can't point it to me, then I'll
20   sustain the objection.
21   BY MR. LAQUER:
22   Q.   Dr. Frakes, do you believe that one of ordinary skill in
23   the art would have motivation to combine Gibert-Serra with
24   the UML system you previously discussed?  Let's look at
25   Slide 65.
```

UNITED STATES DISTRICT COURT

**Exhibit 4**
**228**

229

```
 1    A.   Okay.  Now that we have the slide, can you ask the
 2    question again, please?
 3    Q.   What motivation would one of ordinary skill in the art
 4    have to combine the Gibert-Serra reference with the UML
 5    system disclosure?
 6    A.   Well, we saw that there is a motivation to combine in
 7    terms of the problem being very recognized in the field and
 8    important.  We also see from the Gibert-Serra paper and
 9    Pavemetrics' early work that there's a great deal of overlap
10    between both the hardware and the methods being used.
11         So this is something that people do in the field
12    when they're trying to solve a new problem.  They see what
13    else is going on and when they see a new solution out there,
14    they combine it and it's obvious.
15    Q.   Look at Slide 66.
16         THE COURT:  I will note it's 4:30.  Since we're at
17    a good stopping point, we'll break here for the night and
18    come back at 9:00.  The parties I've been keeping them on
19    like a clock so they only have so much time to put on their
20    case which is why they may be going faster as we gets towards
21    the end.
22         They only have two-and-a-half hours of testimony
23    left so we'll have that in the morning.  Then we'll do the
24    closing instructions.  We'll have lunch and then we'll have
25    closing arguments after that and then you can deliberate
```

UNITED STATES DISTRICT COURT

230

```
 1    after that.  That's what the day looks like.
 2         Okay.  Thank you.
 3              (Jury not present.)
 4         THE COURT:  So we will pick up tomorrow at 8:30.
 5    We can handle the one remaining issue with jury instructions.
 6              Anything else we need to talk about tomorrow, but I
 7    would like to get the jury instructions read before lunch so
 8    you have the lunch break to kind of get your closing stuff
 9    together.
10         Does that schedule work for everybody?
11         MR. BARNEY:  Yes, Your Honor.
12         THE COURT:  Thank you.  Have a good night.
13              (Proceedings were concluded at 4:30 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```

UNITED STATES DISTRICT COURT

231

```
 1
 2                    CERTIFICATE OF REPORTER
 3
 4    COUNTY OF LOS ANGELES      )
 5                               )  SS.
 6    STATE OF CALIFORNIA        )
 7
 8    I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED
 9    STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,
10    DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE
11    FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET
12    FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN
13    FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO
14    FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION
15    OF MY STENOGRAPHIC NOTES.
16
17
18    DATE:   AUGUST 24, 2022
19
20         /s/  LAURA MILLER ELIAS
21    LAURA MILLER ELIAS, CSR 10019
22    FEDERAL OFFICIAL COURT REPORTER
23
24
25
```

UNITED STATES DISTRICT COURT

232



UNITED STATES DISTRICT COURT

Exhibit 4
229

213:5, 213:8, 213:13, 213:16, 224:17, 224:22, 224:23, 225:25, 226:12
**21-01289-MCS** [1] - 1:9
**21-1289** [1] - 4:4
**213)894-0374** [1] - 1:24
**21st** [1] - 63:10
**22** [5] - 96:6, 97:19, 97:21, 98:4, 198:15
**222** [1] - 115:7
**23** [8] - 1:15, 4:1, 16:19, 59:18, 88:11, 144:19, 144:21, 199:7
**231** [4] - 24:9, 24:11, 24:13, 24:14
**24** [7] - 3:5, 3:7, 3:9, 5:8, 5:16, 199:23, 231:18
**25** [5] - 98:3, 144:19, 144:20, 173:4, 201:3
**26** [27] - 3:10, 8:5, 8:8, 23:21, 25:25, 26:12, 42:5, 43:8, 44:12, 45:8, 84:19, 88:24, 90:7, 93:4, 93:20, 144:21, 207:20, 215:18, 215:19, 218:6, 219:23, 219:25, 220:3, 220:8, 221:3, 223:3
**27** [2] - 10:14, 199:8
**27th** [1] - 36:3
**28** [8] - 8:6, 8:9, 10:14, 15:20, 16:7, 36:14, 66:2
**29** [1] - 201:24
**29-and-a-half** [1] - 157:1
**2D** [13] - 31:1, 31:2, 31:5, 37:3, 44:24, 86:4, 162:8, 162:12, 162:15, 200:14, 224:4

## 3

**3** [42] - 33:14, 43:18, 44:12, 44:13, 62:13, 62:23, 63:21, 64:7, 64:8, 64:10, 64:14, 64:21, 65:11, 65:15, 65:21, 66:8, 67:11, 67:19, 93:5, 93:8, 130:18, 130:21, 130:25, 131:5, 131:12, 131:23, 131:24, 134:4, 134:8, 135:11, 135:23, 160:16, 160:17, 192:7, 192:8, 193:19, 194:8, 194:15, 194:21, 225:6
**3.1** [1] - 45:16
**3.3** [1] - 50:9
**30** [4] - 28:23, 66:11, 189:4, 203:1
**30th** [1] - 59:19
**31** [3] - 109:18, 109:22, 203:21
**32** [3] - 93:23, 94:3, 204:18
**33** [3] - 94:1, 94:3, 205:7
**34** [5] - 94:4, 94:5, 94:12, 94:15, 205:23
**35** [2] - 94:15, 206:18
**350** [1] - 1:23
**36** [1] - 207:10
**37** [1] - 214:12
**38** [3] - 215:6, 215:18, 217:12
**38621** [1] - 138:20
**39** [4] - 94:19, 94:25, 95:2, 215:12
**3:00** [1] - 169:2
**3D** [62] - 27:20, 27:24, 29:1, 30:11, 31:3, 31:4, 31:6, 31:8, 35:16, 35:17, 36:23, 37:13, 37:14, 37:19, 37:21, 37:23, 37:24, 38:2, 40:18, 42:11, 42:17, 43:11, 43:16, 44:2, 44:5, 44:23, 44:24, 45:4, 45:17, 69:4, 75:6, 75:10, 75:15, 75:17, 84:22, 84:24, 85:22, 86:2, 94:9, 111:4, 117:4, 118:8, 119:10, 119:11, 134:2, 141:21, 142:4, 142:6, 142:7, 162:8, 162:12, 162:15, 183:25, 184:2, 189:19, 189:22, 190:21, 196:17, 221:5, 224:4
**3DTAS** [15] - 20:24, 21:25, 22:22, 73:10, 73:19, 74:3, 74:16, 78:25, 158:14, 158:21, 158:25, 164:1, 175:6, 175:14, 176:23

## 4

**4** [44] - 5:8, 5:16, 40:12, 43:25, 44:21, 44:22, 45:25, 50:9, 62:13, 62:24, 63:23, 64:5, 64:9, 64:11, 64:15, 64:22, 65:11, 65:19, 66:9, 67:11, 67:19, 93:6, 93:8, 130:19, 130:21, 131:5, 131:12, 134:4, 134:8, 135:11, 135:23, 136:1, 136:2, 144:21, 161:19, 161:20, 192:7, 192:8, 193:20, 194:8, 194:15, 194:21, 200:6, 219:25
**4.3.1** [1] - 66:11
**4.75** [2] - 138:6, 138:8
**4.78** [8] - 14:9, 16:1, 16:15, 138:6, 138:9, 138:13, 138:14, 138:17
**4.78.6.0** [3] - 13:15, 13:17, 138:15
**4.8** [1] - 16:1
**4.80** [2] - 16:14, 131:1
**4.80.2** [1] - 131:21
**40** [3] - 59:24, 60:2
**400** [1] - 32:5
**41** [1] - 197:1
**416** [1] - 86:10
**42** [1] - 215:19
**43** [2] - 184:3, 216:3
**44** [1] - 191:6
**4455** [1] - 1:23
**45** [1] - 32:5
**452** [2] - 26:6, 26:12
**455** [1] - 115:19
**46** [1] - 56:12
**464** [4] - 23:23, 23:24, 24:2, 24:3
**465** [4] - 23:23, 23:25, 24:2, 24:3
**48** [6] - 88:23, 89:2, 89:11, 89:14, 89:15, 220:18
**480** [5] - 64:1, 64:5, 65:18, 65:19, 65:21
**480.20-C4E9AA15F** [1] - 63:19
**49** [4] - 104:18, 105:3, 105:6, 105:7
**4:30** [2] - 229:16, 230:13
**4D** [2] - 170:21, 178:16
**4th** [1] - 87:15

## 5

**5** [23] - 44:12, 45:8, 45:9, 45:10, 46:1, 56:12, 84:18, 84:24, 85:21, 85:22, 85:24, 102:7, 141:2, 162:4, 162:5, 162:23, 174:9, 191:11, 192:8, 220:2, 226:9, 227:15
**50** [3] - 57:12, 157:7, 172:24
**507** [4] - 169:17, 169:18, 169:20, 198:1
**508** [11] - 109:19, 109:22, 113:24, 113:25, 119:16, 120:4, 120:5, 149:8, 214:22, 220:17, 220:20
**51** [3] - 95:3, 95:5, 95:13
**510** [5] - 26:6, 26:12, 34:17, 207:22
**511** [6] - 169:17, 169:18, 169:20, 207:25, 225:6, 228:5
**517** [5] - 109:19, 109:22, 117:6, 117:7, 117:15
**526** [6] - 26:6, 26:13, 35:13, 214:17, 214:24
**527** [5] - 26:6, 26:13, 36:9, 36:10, 215:2
**528** [4] - 109:19, 109:22, 215:4, 220:13
**544** [4] - 169:17, 169:18, 169:20, 173:10
**552-1** [6] - 136:10, 136:23, 136:25, 137:2, 188:7
**553** [2] - 109:19, 109:22
**555** [4] - 26:6, 26:13, 35:23, 35:24
**558** [4] - 26:6, 26:13, 33:11
**565** [8] - 26:6, 26:13, 39:9, 39:10, 40:8, 40:9, 41:10
**566** [4] - 26:6, 26:13, 41:12, 41:14
**572** [4] - 26:7, 26:13, 46:13
**58** [2] - 26:24, 223:1
**5th** [8] - 59:9, 59:20, 67:25, 68:1, 74:18, 74:23, 76:1, 95:8

## 6

**6** [8] - 19:3, 44:21, 44:25, 83:18, 95:7, 165:7, 227:6, 227:7
**60** [7] - 30:3, 43:10, 43:24, 56:20, 56:23, 56:24, 121:15
**600** [1] - 57:14
**616** [1] - 188:22
**618** [5] - 109:19, 109:23, 138:10, 138:11, 188:7
**619** [5] - 109:19, 109:23, 131:19, 188:7
**62** [1] - 223:21
**625** [3] - 61:12, 61:25, 62:4
**626** [3] - 61:12, 61:25, 62:4
**63** [1] - 224:16
**65** [4] - 131:25, 132:14, 137:7, 228:25
**657** [2] - 109:19, 109:23
**658** [9] - 61:3, 61:5, 61:7, 61:8, 61:11, 61:16, 61:19, 61:20, 61:22
**66** [5] - 8:21, 8:24, 118:6, 204:19, 229:15
**67** [2] - 203:22, 204:10
**674** [2] - 109:19, 109:23
**676** [2] - 109:19, 109:23
**678** [2] - 109:19, 109:23
**68** [1] - 131:25
**689** [1] - 191:8

## 7

**7** [8] - 45:15, 84:18, 92:17, 92:20, 95:7, 177:13, 221:3, 228:5
**7.2** [1] - 56:21
**71** [4] - 5:7, 5:16, 5:22, 205:8

**72** [2] - 5:8, 5:16
**75** [1] - 173:3
**763** [2] - 26:7, 26:13
**78** [1] - 3:11
**7th** [2] - 59:16, 60:5

## 8

**8** [17] - 19:6, 40:8, 40:9, 52:15, 92:17, 119:20, 138:1, 178:6, 184:9, 184:15, 202:11, 202:12, 204:20, 208:12, 208:14, 213:20, 213:22
**809** [1] - 152:8
**81** [1] - 20:7
**811** [5] - 26:7, 26:13, 64:17, 81:10
**82** [1] - 20:8
**844** [1] - 82:22
**85** [1] - 114:4
**85-1** [1] - 97:10
**86** [3] - 120:4, 120:5, 149:17
**86-1** [5] - 25:25, 26:12, 76:14, 76:15, 97:10
**89** [7] - 5:8, 5:9, 6:17, 6:18, 6:21, 120:5, 152:8
**8:30** [1] - 230:4
**8:36** [1] - 4:1
**8B** [1] - 17:20

## 9

**9** [5] - 36:14, 36:17, 63:17, 152:14, 181:3
**90** [2] - 114:11, 114:12
**90012** [1] - 1:24
**901** [1] - 2:20
**907** [2] - 54:6, 54:7
**92614** [1] - 2:11
**93** [1] - 115:6
**95** [1] - 85:12
**98** [2] - 115:16
**985** [4] - 87:18, 87:22, 87:25, 88:1
**99** [1] - 54:20
**995** [2] - 83:14, 83:16
**9:00** [1] - 229:18
**9th** [2] - 67:24, 70:21

## A

**A-1** [1] - 194:9
**A.M** [1] - 4:1
**AARON** [1] - 2:16
**Aaron** [1] - 78:5
**abilities** [1] - 4:23
**ability** [2] - 56:6, 138:17
**able** [8] - 4:10, 19:21, 122:24, 127:24, 160:25, 161:4, 164:7, 199:18
**absent** [1] - 16:21
**absolutely** [9] - 88:18, 174:21, 183:23, 187:18, 190:9, 193:17, 196:10, 218:24, 226:1
**abstract** [3] - 42:21, 43:10, 225:14
**academic** [1] - 172:23
**Academy** [1] - 34:23
**acceptable** [3] - 99:16, 100:8, 100:19
**access** [6] - 66:19, 127:5, 127:12, 127:14, 148:1, 148:8
**accomplish** [1] - 180:20
**according** [3] - 160:24, 163:24, 166:12
**accordingly** [1] - 225:12
**accountant** [1] - 157:3
**accounted** [2] - 198:25, 199:2
**accounting** [3] - 156:10, 156:15, 156:25
**accurate** [2] - 55:17, 131:7
**accurately** [2] - 60:21, 65:10
**accuse** [1] - 108:11
**accused** [24] - 13:13, 129:18, 139:14, 153:7, 153:23, 154:1, 162:25, 163:20, 168:19, 186:23, 187:23, 188:18, 188:20, 189:20, 197:3, 199:4, 199:5, 200:3, 201:4, 201:6, 205:24, 214:3, 218:12, 223:16
**accuses** [1] - 119:19
**accusing** [5] - 38:13, 141:3, 151:5, 190:10
**acquire** [2] - 45:2, 58:12
**acquired** [5] - 44:23, 58:14, 171:10, 218:21, 218:25
**acquiring** [4] - 56:23, 172:24, 219:21, 224:4
**acquisition** [11] - 60:10, 81:21, 84:10, 112:2, 112:22, 121:10, 214:18, 215:4, 220:11, 220:14, 220:21
**acronym** [3] - 27:17, 29:24, 33:10
**acronyms** [1] - 49:20
**action** [2] - 72:3, 76:25
**activate** [3] - 66:16, 66:22, 127:9
**activities** [1] - 214:2
**activity** [1] - 183:15
**acts** [1] - 205:24
**actual** [5] - 38:5, 83:23, 176:9, 216:20, 217:5
**Actuarial** [1] - 110:18
**adaptation** [1] - 158:18
**add** [8] - 8:16, 92:14, 117:3, 117:5, 126:13, 142:8, 205:14, 224:25
**added** [5] - 11:18, 37:15, 45:13, 50:22, 202:6
**adding** [2] - 12:21, 96:15
**addition** [1] - 98:19
**additional** [6] - 8:22, 14:25, 175:13, 175:17, 214:20, 215:12
**additions** [1] - 159:13
**address** [7] - 9:22, 96:25, 183:17, 186:14, 189:4, 195:16, 205:12
**addressed** [8] - 9:25, 12:1, 16:20, 99:11, 167:12, 182:23, 196:8, 215:15
**addresses** [15] - 102:15, 167:17, 187:7, 189:16, 189:17, 198:16, 198:17, 199:24, 200:21, 201:24, 204:20, 204:21, 205:9, 205:10, 224:16
**addressing** [1] - 196:7
**adds** [1] - 207:17
**adjacent** [4] - 195:23, 195:25, 196:3, 196:9
**adjunct** [1] - 171:10
**Administration** [2] - 39:20, 225:17
**admit** [6] - 23:23, 24:20, 26:7, 61:16, 109:15, 109:18
**admitted** [9] - 24:3, 24:14, 25:1, 61:20, 80:13, 88:1, 89:15, 105:7, 136:25
**advance** [3] - 41:25, 159:12, 165:15
**Advanced** [1] - 171:16
**advantage** [1] - 121:18
**advantages** [2] - 48:11, 166:8
**affect** [4] - 69:2, 190:7, 196:20, 222:4
**affected** [1] - 198:21
**affecting** [1] - 165:24
**afternoon** [9] - 78:3, 110:13, 110:14, 144:4, 144:5, 156:5, 169:1, 169:24, 169:25
**ages** [1] - 185:2
**ago** [3] - 157:1, 172:17, 172:25
**agree** [16] - 72:18, 84:12, 95:9, 102:11, 166:14, 190:5, 193:1, 194:24, 203:8, 203:12, 205:17, 218:17, 219:1, 219:19, 219:20, 221:20
**agreed** [4] - 82:18, 92:17, 162:11, 162:14
**agreement** [11] - 39:4, 59:20, 63:1, 63:3, 63:9, 82:17, 82:21, 82:24, 83:8, 84:5, 98:6
**Agreement** [1] - 84:9
**ahead** [12] - 24:4, 24:15, 25:2, 25:5, 90:24, 92:14, 109:24, 169:4, 187:6, 191:3, 203:2, 206:10
**AI** [24] - 47:20, 51:6, 53:24, 54:11, 54:13, 55:14, 55:16, 72:18, 73:20, 120:22, 120:24, 121:2, 140:23, 141:25, 142:21, 163:12, 174:22, 177:19, 177:23, 178:10, 178:15, 178:18, 178:20, 178:23
**AI-based** [1] - 140:23
**AID** [22] - 86:14, 87:5, 87:11, 87:19, 88:7, 88:11, 89:18, 89:21, 90:2, 90:7, 90:16, 92:8, 119:20, 137:25, 138:3, 138:7, 143:13, 143:15, 157:25, 159:16, 167:23, 168:6
**AIDED** [1] - 231:13
**airport** [1] - 32:20
**airports** [2] - 32:20, 33:22
**Alan** [1] - 9:20
**ALAN** [1] - 2:8
**algorithm** [34] - 39:5, 40:10, 45:17, 45:20, 45:24, 47:25, 48:22, 50:13, 50:15, 76:9, 107:19, 108:6, 108:10, 116:3, 116:11, 116:12, 118:13, 119:14, 120:2, 120:6, 121:3, 122:8, 140:18, 140:23, 154:16, 155:5, 186:20, 187:11, 201:12, 218:8, 218:10, 218:12, 221:8, 222:14
**Algorithms** [1] - 172:18
**algorithms** [36] - 31:22, 41:8, 47:20, 48:18, 53:13, 54:11, 54:13, 55:16, 57:6, 57:7, 66:19, 72:18, 107:1, 107:15, 107:24, 108:20, 111:11, 111:19, 111:22, 112:25, 113:7, 113:12, 120:17, 121:2, 141:24, 143:22, 146:16, 146:21, 154:14, 154:18, 154:19, 154:21, 154:24, 155:2, 183:8, 214:8
**aligned** [1] - 159:23
**allegation** [2] - 16:21, 201:25
**alleged** [2] - 92:9, 94:10

**alleges** [1] - 161:5
**alleging** [1] - 198:22
**allow** [3] - 7:14, 11:21, 15:14
**allowed** [1] - 22:11
**allowing** [2] - 121:4, 222:4
**allows** [6] - 37:10, 44:17, 121:16, 126:10, 129:16, 176:7
**alma** [1] - 172:10
**almost** [4] - 29:5, 76:7, 78:3, 178:18
**alone** [7] - 112:11, 131:11, 148:8, 186:7, 208:3, 213:4, 213:7
**alpha** [1] - 28:14
**alternative** [6] - 100:6, 100:7, 167:25, 168:4, 175:5
**alternatives** [4] - 99:17, 100:19, 101:18, 168:15
**ambiguity** [3] - 94:23, 94:24, 95:7
**amended** [1] - 93:20
**AMERICA** [1] - 1:1
**amount** [7] - 30:23, 98:16, 98:21, 100:18, 101:8, 121:19, 164:20
**Amtrak** [1] - 54:4
**analysis** [31] - 9:17, 18:14, 18:18, 22:22, 51:20, 101:18, 112:4, 151:8, 156:14, 157:20, 159:5, 159:20, 159:25, 160:11, 160:19, 160:21, 162:2, 168:10, 168:18, 174:3, 184:12, 187:17, 189:6, 190:19, 197:4, 197:13, 206:11, 207:11, 223:14, 223:15, 226:11
**analyze** [7] - 121:23, 135:5, 145:2, 156:14, 157:18, 199:4, 199:9
**analyzed** [3] - 9:15, 134:24, 214:4
**Analyzer** [1] - 16:10
**analyzing** [3] - 40:6, 68:18, 68:20
**AND** [4] - 231:8, 231:11, 231:13, 231:14
**ANGELES** [4] - 1:16, 1:24, 4:1, 231:4
**Angeles** [2] - 77:4, 156:8
**angle** [1] - 28:14
**angles** [1] - 38:3
**Annex** [1] - 84:8
**annotated** [1] - 179:24
**announced** [1] - 29:24
**announces** [1] - 54:8
**annual** [1] - 41:24
**answer** [8] - 6:1, 6:14, 6:22, 109:3, 109:7, 124:19, 145:25, 195:5
**answered** [1] - 85:23
**answers** [1] - 85:9
**anticipation** [3] - 18:7, 94:16, 97:22
**apart** [1] - 94:22
**apologize** [1] - 216:18
**apparent** [3] - 12:13, 12:15, 12:17
**appear** [2] - 10:2, 117:3
**appearance** [1] - 4:7
**APPEARANCES** [1] - 2:1
**appearances** [1] - 4:6
**appeared** [2] - 12:7, 191:11
**appearing** [1] - 212:14
**applaud** [1] - 4:9
**Apple** [5] - 172:2, 172:9, 172:18, 173:6, 179:22
**applicable** [1] - 98:4
**application** [14] - 42:4, 112:7, 112:10, 121:5, 121:6, 121:7, 121:12, 124:11, 133:14, 133:22, 153:14, 182:1, 196:21
**applications** [6] - 27:25, 32:19, 48:10, 57:10, 66:5, 218:1
**applied** [15] - 27:25, 30:2, 40:12, 46:1, 46:2, 123:23, 123:24, 124:13, 124:23, 125:6, 173:24, 182:16, 182:17, 200:6, 228:8
**applies** [3] - 64:25, 197:16, 228:11
**apply** [6] - 21:19, 101:21, 115:21, 174:8, 187:16, 218:5
**applying** [1] - 182:12
**appointment** [2] - 171:11
**appreciate** [1] - 83:25
**approach** [3] - 7:20, 7:22, 226:21
**appropriate** [8] - 7:23, 99:4, 186:20, 189:17, 189:21, 190:1, 197:4, 201:13
**appropriately** [1] - 227:24
**appropriateness** [1] - 201:14
**approximate** [1] - 205:15
**April** [8] - 55:2, 55:21, 59:16, 60:1, 60:5, 63:10, 64:6, 80:21
**arbitrations** [1] - 157:8
**architecture** [2] - 181:10, 183:3
**are'** [1] - 182:13
**area** [6] - 44:16, 192:15, 192:18, 194:10, 196:11, 196:12
**areas** [3] - 157:16, 159:24, 192:2
**AREMA** [2] - 105:12, 105:14
**Arema** [2] - 49:15
**argue** [2] - 211:19, 211:21
**argued** [1] - 218:9
**arguing** [2] - 98:24, 209:1
**argument** [9] - 14:12, 17:7, 18:7, 22:19, 84:13, 208:25, 212:5, 212:7, 218:15
**arguments** [9] - 8:21, 8:22, 15:12, 94:9, 95:6, 102:12, 152:16, 160:8, 229:25
**Arizona** [1] - 171:4
**art** [47] - 22:17, 56:11, 94:7, 94:10, 142:14, 146:25, 173:16, 173:21, 174:5, 174:8, 175:13, 185:7, 196:19, 207:8, 210:16, 210:17, 210:22, 210:23, 210:24, 211:12, 211:18, 212:22, 216:1, 216:5, 216:20, 217:15, 218:1, 218:5, 219:16, 220:3, 220:9, 220:14, 221:8, 221:16, 221:22, 222:11, 222:17, 223:23, 224:12, 224:14, 225:7, 225:23, 226:5, 226:24, 227:21, 228:23, 229:3
**article** [7] - 17:25, 42:18, 155:4, 209:17, 209:18, 210:12, 212:12
**articles** [1] - 28:24
**articulate** [1] - 193:17
**artificial** [18] - 37:22, 48:7, 118:18, 162:9, 171:9, 171:12, 172:25, 173:9, 174:11, 177:15, 178:2, 178:7, 185:6, 185:10, 185:11, 185:17, 223:16, 223:18
**Artificial** [1] - 50:2
**aside** [2] - 80:6, 202:10
**asphalt** [2] - 31:14, 31:17
**assembling** [1] - 88:14
**asserted** [12] - 5:19, 6:25, 96:7, 175:6, 183:20, 184:21, 185:8, 186:19, 186:24, 201:5, 206:13, 207:7
**assess** [4] - 188:3, 197:15, 200:10, 202:13
**assessing** [3] - 103:5, 215:23, 220:4
**Assessment** [3] - 42:12, 183:25, 184:2
**assessment** [2] - 90:8, 94:9
**Asset** [1] - 42:12
**assigned** [3] - 132:16, 133:16, 189:10
**assignment** [1] - 188:15
**associate** [1] - 171:4
**associated** [4] - 113:13, 159:14, 183:15, 203:17
**assume** [2] - 160:22, 166:15
**assumed** [2] - 160:9, 160:10
**assumes** [1] - 161:14
**assuming** [1] - 161:11
**assumption** [2] - 101:21, 166:17
**ASU** [2] - 171:15, 178:18
**AT** [1] - 231:11
**Atlanta** [1] - 172:12
**attempt** [2] - 203:22, 204:23
**attend** [1] - 29:4
**attended** [1] - 158:8
**attendees** [1] - 39:17
**attending** [2] - 104:1, 104:4
**attention** [1] - 109:5
**attorney** [4] - 76:17, 76:21, 80:2, 80:14
**attorneys** [2] - 76:18, 77:19
**attributes** [1] - 216:14
**auctioning** [1] - 75:5
**AUG** [1] - 4:1
**August** [5] - 36:13, 63:12, 63:15, 64:9, 130:20
**AUGUST** [2] - 1:15, 231:18
**author** [3] - 42:8, 49:23, 153:1
**authorizes** [1] - 104:8
**authors** [2] - 49:24, 52:22
**automated** [2] - 113:5, 183:14
**Automated** [1] - 225:9
**automatic** [1] - 44:13
**Automatic** [1] - 42:10
**automatically** [1] - 122:10
**Automation** [1] - 50:3
**availability** [2] - 100:18, 167:25
**available** [15] - 50:17, 51:7, 122:13, 123:3, 123:7, 130:8, 131:5, 134:11, 135:22, 155:3, 163:21, 177:2, 179:8, 215:25
**AVENUE** [1] - 2:20
**avoid** [3] - 89:18, 134:2, 167:6
**award** [4] - 100:22, 100:25, 101:2, 166:21
**awarded** [2] - 46:22, 47:16

**awards** [3] - 172:22, 172:24, 173:5
**aware** [10] - 75:1, 78:20, 79:6, 79:10, 102:25, 127:9, 141:2, 141:5, 141:17, 143:21

## B

**B-1** [1] - 194:12
**B.S** [1] - 170:8
**Bachelor's** [1] - 27:10
**background** [7] - 27:9, 36:5, 110:17, 152:3, 156:18, 203:15, 206:19
**backup** [1] - 157:22
**bald** [1] - 77:12
**Balford** [1] - 75:13
**ballast** [5] - 47:6, 49:3, 140:11, 140:15, 140:16
**balls** [1] - 100:21
**Bank** [1] - 156:24
**Bar** [2] - 225:9, 226:18
**bar** [18] - 16:12, 16:15, 16:20, 139:10, 167:14, 188:13, 209:13, 209:14, 212:25, 225:2, 225:12, 225:24, 226:19, 227:19, 227:25, 228:1, 228:2, 228:7
**bare** [1] - 16:24
**BARNEY** [3] - 2:15, 91:12, 230:11
**bars** [7] - 132:6, 225:15, 226:2, 226:22, 227:5, 227:17, 227:24
**base** [8] - 139:2, 139:19, 139:22, 139:24, 202:21, 204:21, 205:2, 206:5
**based** [36] - 19:8, 19:9, 21:19, 21:20, 32:16, 43:11, 50:15, 51:11, 51:19, 52:8, 54:11, 54:13, 100:18, 124:22, 140:23, 159:3, 159:25, 162:20, 162:25, 164:14, 168:17, 177:3, 183:9, 183:12, 184:12, 186:2, 187:22, 206:14, 207:6, 211:20, 212:17, 217:17, 218:21, 218:25, 224:18, 226:14
**Based** [1] - 34:25
**basic** [2] - 28:12, 118:11
**basis** [4] - 15:25, 57:17, 95:7, 191:9
**Bates** [1] - 89:7
**Bay** [1] - 72:8
**BEAR** [1] - 2:4
**bears** [1] - 89:7
**beat** [1] - 65:14
**Beatty** [1] - 75:13
**became** [3] - 12:15, 171:4, 171:16
**become** [4] - 12:17, 48:13, 159:8, 209:19
**becomes** [2] - 160:23, 225:5
**bed** [3] - 113:8, 120:23, 215:24
**beds** [1] - 220:4
**BEDSIS** [1] - 75:11
**began** [2] - 95:9, 146:21
**begin** [1] - 113:1
**beginning** [4] - 10:4, 111:17, 115:9, 138:23
**begins** [2] - 225:14, 228:6
**BEHALF** [2] - 2:3, 2:13
**behalf** [1] - 23:20
**behind** [4] - 171:24, 192:5, 196:12, 199:18
**belated** [1] - 228:13
**belief** [4] - 53:11, 184:4, 202:3, 202:10
**beliefs** [1] - 142:23
**believes** [4] - 15:17, 21:23, 151:18, 184:9
**below** [4] - 31:11, 82:4, 106:2, 220:25
**BERNARD** [1] - 3:6
**Bernard** [2] - 24:7, 24:16
**best** [2] - 133:14, 179:13
**better** [11] - 25:12, 29:13, 37:10, 37:17, 51:7, 55:16, 83:24, 168:16, 177:11, 179:1, 217:7
**between** [24] - 16:18, 17:25, 28:13, 30:20, 31:15, 37:6, 37:7, 45:22, 82:24, 86:14, 87:19, 104:21, 105:10, 106:24, 112:24, 152:10, 174:2, 174:22, 177:14, 177:19, 193:14, 194:23, 210:11, 229:10
**beyond** [5] - 8:10, 8:21, 176:13, 185:16, 202:7
**bid** [1] - 74:15
**bidding** [1] - 73:16
**big** [8] - 11:24, 125:2, 138:8, 140:16, 164:23, 172:12, 172:23, 186:4
**bigger** [2] - 57:18, 113:11
**biggest** [2] - 105:15, 120:21
**binary** [1] - 204:7
**binder** [8] - 86:10, 86:11, 87:18, 88:23, 104:19, 106:16, 136:9, 220:7
**Bioengineering** [1] - 170:11
**biomedical** [3] - 170:23, 171:7, 178:17
**Birthday** [2] - 27:2, 78:3
**birthday** [2] - 27:4, 109:11
**bit** [12] - 4:18, 21:5, 23:9, 28:17, 68:3, 113:10, 119:13, 146:4, 174:22, 191:24, 213:25, 227:13
**black** [3] - 31:18, 203:15, 204:7
**blob** [1] - 203:14
**block** [5] - 11:22, 12:7, 12:19, 16:2, 129:16
**blow** [1] - 60:17
**blue** [3] - 193:20, 199:17
**Board** [2] - 34:22, 120:1
**board** [1] - 207:3
**book** [7] - 25:10, 25:11, 61:3, 97:12, 191:8, 191:11, 191:17
**booth** [1] - 74:7
**born** [1] - 185:3
**bottle** [1] - 205:2
**bottom** [17] - 16:17, 65:6, 70:20, 82:2, 86:17, 88:4, 89:8, 105:17, 107:14, 107:18, 115:7, 152:10, 195:1, 204:10, 204:11, 226:17, 227:13
**bought** [1] - 55:24
**boundaries** [1] - 228:12
**bounding** [13] - 140:3, 140:13, 202:19, 203:6, 203:8, 203:9, 203:24, 204:2, 204:4, 204:11, 204:13, 204:16, 206:5
**Box** [1] - 192:16
**box** [21] - 67:6, 67:10, 87:13, 132:19, 140:3, 140:14, 198:6, 198:9, 202:19, 203:6, 203:8, 203:9, 203:11, 203:24, 204:2, 204:5, 204:11, 204:13, 204:16, 206:5
**boxcar** [14] - 57:10, 59:5, 64:11, 64:15, 65:1, 65:2, 112:13, 112:20, 112:21, 112:22, 121:13, 121:16, 131:12, 131:13
**boxcars** [3] - 57:12, 57:18, 131:15
**boxes** [4] - 87:7, 177:25, 179:25, 192:18
**boy** [3] - 94:19, 172:13, 172:14
**Brad** [5] - 47:4, 58:8, 73:11, 73:21, 74:14
**BRAD** [1] - 3:5
**Bradford** [2] - 23:20, 24:5
**brain** [2] - 52:18, 173:2
**brand** [1] - 140:9
**break** [9] - 23:3, 42:23, 90:23, 90:24, 91:9, 103:11, 169:2, 229:17, 230:8
**breaking** [1] - 181:7
**brevity** [1] - 9:16
**brief** [3] - 139:10, 167:14, 174:19
**briefly** [15] - 37:1, 156:18, 166:1, 166:2, 170:6, 170:13, 172:20, 173:10, 175:8, 179:14, 181:4, 200:12, 201:3, 205:23, 206:10
**bring** [3] - 103:9, 108:18, 206:17
**bringing** [1] - 211:10
**brochure** [1] - 73:23
**broken** [4] - 43:13, 140:10, 225:14, 226:1
**brought** [7] - 75:21, 75:23, 81:11, 109:14, 151:14, 153:5, 225:10
**BTW** [1] - 152:15
**bug** [1] - 138:8
**building** [1] - 178:11
**built** [1] - 179:7
**bullet** [4] - 37:18, 56:15, 60:17, 162:23
**bunch** [3] - 61:24, 75:9, 179:23
**burden** [2] - 21:23, 21:25
**buried** [1] - 149:17
**Business** [1] - 27:8
**business** [7] - 53:23, 57:23, 58:3, 89:6, 129:22, 170:21, 171:2
**busy** [1] - 155:10
**buy** [4] - 60:24, 63:9, 161:15, 164:23
**buying** [8] - 5:22, 5:23, 6:8, 6:12, 7:5, 69:7, 69:11, 71:22
**buys** [1] - 129:24
**BY** [40] - 2:5, 2:15, 3:10, 3:11, 3:12, 3:13, 3:14, 3:16, 3:17, 26:18, 28:20, 78:2, 85:19, 86:24, 88:3, 89:16, 103:24, 105:9, 106:23, 110:12, 124:21, 136:17, 139:18, 144:3, 144:23, 146:3, 154:10, 156:4, 157:17, 167:16, 169:23, 174:18, 192:12, 194:3, 195:8, 196:6, 213:2, 222:25, 228:21, 231:13

## C

**C-1** [1] - 194:12
**C.V** [2] - 4:4, 173:13

237

**C1** [1] - 220:24
**CA** [1] - 2:11
**cables** [1] - 35:18
**calculate** [7] - 28:13, 38:3, 38:7, 46:6, 187:4, 200:21, 201:22
**calculated** [2] - 28:11
**calculates** [1] - 40:15
**calculating** [2] - 199:24, 223:7
**calculations** [6] - 56:3, 56:9, 121:24, 123:22
**California** [4] - 32:7, 77:10, 157:3, 176:20
**CALIFORNIA** [4] - 1:2, 1:16, 1:24, 4:1, 231:6, 231:9
**callouts** [2] - 15:5, 15:11
**CalTrans** [1] - 32:7
**Camera** [2] - 172:3, 172:18, 172:19
**camera** [4] - 28:8, 28:13, 30:24, 172:3
**Canada** [7] - 27:17, 110:24, 128:9, 128:18, 128:20, 128:21, 163:15, 163:16
**Canadian** [2] - 165:18
**cancel** [1] - 48:15
**candidate** [1] - 228:1
**cannot** [5] - 60:20, 65:9, 79:21, 100:3, 127:8
**Canny** [10] - 40:12, 40:13, 46:1, 46:3, 115:22, 115:23, 115:25, 116:5, 223:11, 223:20
**capable** [3] - 38:23, 43:21, 56:23
**cards** [2] - 56:2, 57:5
**care** [3] - 94:23, 94:24, 179:25
**career** [2] - 26:22, 28:23, 156:15, 170:14, 170:15, 179:6
**careers** [1] - 171:1
**careful** [2] - 108:15, 211:25
**carefully** [1] - 205:9
**CALIFORNIA** [1] - 231:9
**carry** [1] - 21:25
**carrying** [1] - 67:1
**cases** [2] - 48:15,

**171**:20
**CASE** [1] - 1:8
**Case** [1] - 4:4
**case** [76] - 4:24, 7:10, 17:3, 18:9, 20:1, 20:11, 20:13, 20:17, 20:21, 20:25, 30:25, 37:4, 38:12, 52:4, 52:7, 59:9, 63:25, 66:10, 67:1, 67:22, 75:20, 76:20, 76:25, 77:3, 77:8, 77:20, 78:15, 80:7, 82:10, 83:10, 85:3, 87:9, 90:13, 93:14, 104:25, 105:1, 108:1, 114:5, 115:10, 115:12, 116:17, 132:4, 140:18, 144:12, 156:13, 156:17, 156:19, 156:23, 157:1, 157:5, 159:25, 174:3, 179:25, 180:13, 181:25, 181:17, 187:25, 188:18, 188:25, 189:25, 190:12, 210:14, 211:19, 229:20

**cases** [18] - 32:8, 173:17, 173:19, 201:11
**cash** [1] - 164:23
**cat** [1] - 181:25
**catch** [1] - 71:20
**cats** [1] - 181:14
**caused** [1] - 168:7
**causes** [2] - 225:15, 226:2
**cell** [2] - 48:16
**center** [8] - 28:22, 29:17, 44:16, 84:21, 191:8, 221:5, 227:10
**CENTRAL** [1] - 1:2, 231:9
**certain** [7] - 4:14, 4:22, 7:7, 11:7, 66:22, 68:7, 100:18
**certainly** [3] - 52:24, 73:17, 173:19, 201:11
**CHRISTY** [1] - 2:5
**CHUNG** [24] - 2:19, 7:22, 92:13, 92:19, 92:22, 92:25, 93:9, 93:19, 93:25, 94:2, 94:14, 95:1, 95:12, 95:18, 96:2, 96:5, 97:23, 169:19, 174:15, 208:18,

**8**:5, 8:20, 9:1, 9:4, 9:12, 12:25, 13:18, 14:2, 14:17, 15:4, 15:7, 15:9, 17:4, 17:11, 17:13, 18:8, 18:12, 18:16, 18:19, 20:6, 21:3, 21:7, 109:21, 144:1, 144:13, 144:18, 144:21, 144:23, 146:3, 156:6, 155:14
**cetera** [1] - 176:22
**chain** [4] - 75:21, 86:13, 86:16, 165:1
**chair** [2] - 171:5
**Chair** [1] - 171:6
**challenge** [1] - 94:6
**challenges** [1] - 165:10
**change** [14] - 40:9, 46:18, 46:24, 53:2, 54:18, 57:7, 74:22, 120:21, 125:11, 125:12, 129:9, 182:10, 190:13
**changed** [4] - 12:18, 47:2, 120:19, 219:6
**changes** [11] - 46:25, 47:10, 47:18, 94:12, 94:13, 95:4, 113:21, 120:20, 120:22, 120:25, 190:19, 196:5, 197:22, 197:23, 220:12
**channel** [1] - 125:7
**chapter** [1] - 191:10
**Chapter** [1] - 191:11
**chart** [1] - 99:3
**charts** [1] - 15:2
**cheaper** [1] - 168:1
**check** [3] - 222:23, 226:6, 226:17
**checked** [1] - 60:25
**checking** [1] - 227:18
**chime** [1] - 153:2, 155:7
**choose** [1] - 17:16
**chose** [1] - 163:13
**CHRISTIAN** [2] - 3:14, 155:25
**Christian** [1] - 155:18
**christian** [1] - 155:24
**CHRISTY** [1] - 2:5
**CHUNG** [24]

**209**:15, 210:9, 211:8, 212:11, 216:7, 216:16, 216:19, 220:5, 222:20, 228:13
**Circuit** [1] - 95:19
**circumference** [1] - 32:12
**citation** [1] - 133:19
**citations** [4] - 11:22, 12:19
**cite** [6] - 11:24, 14:18, 14:21, 14:22, 158:23
**cites** [1] - 12:7
**citing** [1] - 14:5
**Claim** [10] - 8:7, 8:10, 8:16, 8:22, 8:23, 8:25, 9:23, 10:18, 10:19, 10:20, 10:24, 11:10, 11:18, 16:20, 16:22, 17:21, 31:8, 31:15, 32:12, 32:13, 90:16, 90:22, 161:23, 171:5
**claim** [27] - 7:8, 8:12, 8:22, 8:25, 9:18, 10:7, 11:7, 13:15, 13:17, 14:9, 16:10, 16:19, 16:20, 16:22, 19:25, 20:17, 20:22, 20:25, 204:20, 207:25, 209:8, 209:18, 210:1, 210:9, 217:23, 217:24, 217:24
**CLERK** [22] - 4:3, 23:5, 25:7, 25:21, 26:1, 42:25, 43:4, 43:6, 91:1, 91:15, 103:9, 103:15, 110:3, 110:5, 103:15, 110:3, 110:5
**close** [3] - 49:11, 72:8, 166:6
**closely** [1] - 222:23
**closer** [1] - 83:23
**closing** [4] - 102:1,

**231**:22, 218:19, 218:24, 220:12, 221:8, 221:16, 224:14, 224:17, 224:24
**claimed** [1] - 11:12, 94:21, 161:24, 220:10
**claims** [30] - 53:12, 80:5, 93:12, 93:17, 130:15, 145:4, 175:4, 175:7, 183:16, 183:22, 184:3, 184:5, 184:13, 184:14, 184:17, 186:19, 186:24, 205:1, 206:13, 207:7, 207:9, 207:17, 207:23, 199:22, 201:7, 201:13, 201:19, 210:5, 207:23, 211:19, 216:25, 217:24, 217:24, 217:24, 227:24, 231:6

UNITED STATES DISTRICT COURT

238

**230**:8
**CN** [1] - 165:17
**CNET** [12] - 50:15, 50:16, 50:19, 50:22, 51:12, 51:20, 51:22, 52:11, 197:8, 197:11, 197:12, 197:12
**Code** [1] - 173:7
**code** [10] - 9:13, 9:14, 9:16, 10:15, 10:20, 10:21, 11:7, 11:19, 11:22, 12:1, 12:8, 12:25, 13:1, 13:2, 13:4, 13:8, 13:19, 14:5, 14:6, 14:19, 14:20, 14:25, 15:2, 15:10, 15:19, 15:21, 15:22, 15:24, 174:11, 174:16, 174:18, 174:19
**coded** [2] - 8:13, 9:12
**coding** [1] - 149:11
**Colin** [1] - 76:16
**collaborated** [1] - 171:19
**colleagues** [1] - 29:16, 68:19, 141:15, 146:16, 182:18
**collect** [2] - 56:19, 112:2, 121:9
**collected** [3] - 35:5, 112:16, 125:14
**collecting** [2] - 43:21, 113:19
**collection** [1] - 56:3
**College** [1] - 156:22
**college** [1] - 170:16
**colour** [1] - 221:16
**Column** [1] - 194:15
**column** [4] - 194:15, 194:19, 125:3, 125:7
**columns** [4] - 193:19, 194:21
**combination** [1] - 44:24, 218:11
**combine** [1] - 68:7, 199:21
**combined** [1] - 210:11, 210:15, 210:17, 211:3, 211:16, 211:23, 212:9, 218:24, 219:3, 219:12, 224:21, 225:13, 224:22, 225:13, 227:22, 228:6, 228:8, 226:20, 228:24, 228:25
**combinations** [3] - 52:19, 199:13, 224:14
**combine** [7] - 71:20, 140:14, 140:21, 141:20, 198:21, 210:7, 224:2, 226:24, 226:16, 226:24
**combining** [1] - 131:15
**competent** [1] - 77:19
**competing** [2] - 210:20, 211:2, 211:5, 212:4, 212:8, 221:25, 226:8
**competition** [2] - 206:10, 225:2
**competitive** [2] - 206:6, 229:16
**competitor** [1] - 70:9,

**combines** [1] - 133:11
**combines** [1] - 18:3, 18:18, 19:13, 19:23, 22:19, 134:16, 206:9, 212:23
**coming** [5] - 36:19, 38:6, 68:3, 97:15, 163:19
**Commander** [1] - 171:17
**command** [1] - 115:19, 115:20, 115:21, 115:22, 132:14, 132:16, 133:3, 133:7, 133:15, 134:13, 134:14, 152:24
**comments** [2] - 4:21, 132:23
**commercial** [2] - 29:18
**commercializing** [2] - 29:18, 74:13
**commission** [1] - 40:15
**commissioning** [1] - 73:2, 73:12
**commit** [1] - 197:12
**commitment** [1] - 6:15, 7:4, 7:14, 64:19
**committing** [1] - 76:4
**common** [10] - 121:19, 124:2, 125:3, 126:5, 126:7, 126:18, 126:19, 126:12, 126:14, 126:16, 126:18, 126:20, 126:22, 126:24, 126:25, 127:1, 127:5, 127:9, 127:13, 127:15, 131:20, 131:21, 132:1, 132:4, 132:5, 132:17, 132:19, 132:20, 133:1, 134:5, 134:11, 134:19, 135:1, 135:2, 135:3, 136:4, 135:8, 137:3, 137:12, 137:15, 137:17, 137:18, 138:12, 139:14, 139:15, 139:19, 141:1, 141:17, 146:25, 147:10, 147:14, 147:17, 147:23, 148:3, 149:5, 149:1, 149:8, 149:15, 149:18, 149:24, 150:2, 153:5, 153:8, 153:10, 153:13, 153:17, 153:20, 153:22, 154:4,

**75**:8, 105:21
**competitors** [5] - 75:3, 75:5, 104:16, 105:18, 105:20, 106:7, 108:20
**compilation** [2] - 114:1, 128:3
**compiled** [1] - 11:21
**compiler** [1] - 123:12
**compiler** [1] - 126:2
**complex** [5] - 48:1, 69:23, 121:23, 166:16, 166:18
**compiling** [1] - 55:25
**complete** [2] - 12:21, 16:13, 16:20
**completed** [2] - 23:12, 25:8
**completely** [1] - 116:7, 124:14
**completeness** [2] - 6:15, 7:4, 7:14, 44:24, 44:24
**completes** [1] - 116:4
**complexity** [2] - 161:16, 167:22, 200:6, 201:24
**comprehend** [1] - 121:19, 124:2, 125:3, 126:5, 126:7, 126:18, 126:19
**complicated** [2] - 172:16, 180:2
**comply** [1] - 63:9
**components** [1] - 49:2, 60:9, 65:2, 87:17, 111:24, 112:1, 201:18, 224:2
**comprising** [1] - 187:11
**computation** [1] - 157:24
**CFR** [1] - 1:23, 221:18, 212:24, 229:5
**computed** [1] - 181:18, 198:18, 40:21, 60:10, 67:6, 67:6, 67:12, 67:15, 67:18, 112:17, 112:23, 121:11, 126:6, 129:3, 130:18, 130:21, 174:12, 176:13, 176:5, 176:14, 176:17, 177:20, 177:22, 177:24, 178:14, 183:8, 184:23, 185:2, 185:20, 214:8, 222:12, 222:17, 222:18, 222:18, 223:1, 223:13
**COMPUTER** [2] - 131:15
**Computer** [1] - 110:20, 116:1, 116:3, 152:7,

**170**:22, 171:8, 171:18, 173:6
**COMPUTER-AIDED** [1] - 131:15
**computers** [1] - 52:2, 57:3, 112:14, 112:21, 112:23, 121:11, 121:23, 126:11, 128:9, 130:3
**computing** [1] - 55:25
**concept** [3] - 12:21, 16:13, 16:20, 163:13, 163:13, 163:13, 163:13, 163:13
**concepts** [2] - 156:6, 164:8, 164:25
**concern** [2] - 167:13, 212:11
**concerning** [3] - 74:6, 74:21, 77:2, 77:8, 97:11, 157:6
**conclude** [1] - 168:8
**concluded** [1] - 101:19, 212:25, 230:13
**conclusion** [3] - 145:5, 145:7, 146:10, 146:15, 167:20, 197:4, 169:18
**conclusions** [1] - 145:5, 145:13, 145:14, 145:22, 146:6, 167:22, 223:1, 223:3, 223:20
**concrete** [1] - 43:14
**condition** [2] - 29:2, 52:8
**Condition** [1] - 42:12
**conducted** [1] - 151:8
**conducting** [2] - 63:20, 82:20
**conducted** [1] - 151:8
**conducts** [1] - 178:12
**confer** [1] - 11:9, 96:12, 96:14
**conference** [1] - 28:25, 29:4, 33:6, 33:7, 33:8, 74:3, 74:8, 74:8, 74:14, 174:24, 174:6, 155:8, 155:8
**conferred** [1] - 169:17
**confident** [1] - 74:1

UNITED STATES DISTRICT COURT

239

**153**:10, 153:14, 153:16
**confidential** [4] - 126:23, 127:7, 127:10
**confidentially** [1] - 30:4
**configuration** [10] - 44:1, 125:17, 125:20, 125:21, 127:6, 135:2, 135:10, 135:13, 135:17, 135:19, 135:19, 135:23, 174:9, 195:13, 195:24
**consisting** [1] - 187:19, 189:5
**configured** [1] - 53:16, 163:9, 186:16, 187:11, 187:25, 188:3, 188:9, 189:2, 210:25
**configures** [1] - 53:17
**confirm** [1] - 54:1
**conflict** [1] - 102:15
**confused** [1] - 142:5
**confusing** [4] - 189:8, 209:19, 212:14, 218:18
**congratulate** [1] - 68:11
**Congress** [1] - 49:17
**connected** [6] - 67:8, 67:7, 67:12, 67:16, 176:10, 201:20
**connection** [1] - 172:3
**connections** [3] - 52:20, 181:9, 197:20, 76:21
**consecutive** [1] - 191:13
**consequence** [1] - 174:2
**consider** [10] - 75:3, 160:8, 163:13, 164:21, 168:4, 164:25, 166:23, 196:3, 223:20, 225:4
**considerable** [1] - 173:17
**consideration** [1] - 226:10
**considerations** [1] - 175:3
**considered** [9]

**161**:9, 164:17, 165:23, 175:9, 175:10, 177:13, 177:16, 179:1, 194:13, 196:13, 197:6, 204:15
**considering** [1] - 71:22, 192:24, 193:2, 193:3, 194:13, 195:5, 198:10
**continual** [1] - 71:22, 192:24, 193:3
**continually** [1] - 178:10, 178:14
**continue** [1] - 178:7
**continued** [1] - 172:12, 126:12
**CONTINUED** [1] - 3:3
**continues** [1] - 227:7
**continuing** [1] - 98:19, 126:12
**contour** [1] - 28:7, 28:9, 46:2, 140:12, 140:19
**contouring** [1] - 140:21
**contours** [1] - 45:21, 46:1, 115:5, 115:8, 115:14, 115:16, 115:24, 116:4
**contract** [2] - 37:16, 37:18, 37:22, 92:6, 180:3, 180:4, 180:5, 180:6, 196:12
**contracts** [1] - 71:10, 172:6
**contractor** [1] - 158:1, 175:10
**contrary** [3] - 20:17, 187:2, 218:22, 230:14
**contribute** [1] - 49:18, 79:25, 91:7, 91:9, 99:19, 167:24, 173:7, 173:7, 173:13, 92:22, 92:23, 94:21, 165:3, 98:19, 98:22, 174:9, 174:14, 174:16, 174:16, 174:17
**controller** [1] - 44:4
**controllers** [2] - 48:7, 48:11
**convention** [1] - 198:13
**conventions** [1] - 198:13
**convenience** [1] - 144:16, 145:17
**convolution** [1] - 115:22, 132:18, 132:19, 132:22, 133:2, 132:23, 222:20
**convoluted** [1] - 115:22
**coordinate** [1] - 30:17, 220:7
**coordinates** [1] - 139:2, 139:19, 202:22
**copied** [1] - 87:20, 152:11

**156**:12
**continually** [1] - 65:25
**continuation** [1] - 6:22, 164:1
**continue** [1] - 41:6, 53:3, 111:19
**continued** [4] - 178:18, 126:12
**CONTINUED** [1] - 3:3
**continues** [2] - 227:7
**continuing** [1] - 98:19, 126:12
**corporate** [1] - 104:24
**corporations** [1] - 76:18
**CORRECT** [1] - 221:14
**correct** [30] - 5:3, 6:9, 11:17, 15:1, 16:19, 18:16, 18:19, 31:2, 31:4, 32:25, 34:9, 35:3, 35:6, 38:24, 39:16, 39:21, 42:8, 51:8, 51:15, 51:20, 54:14, 54:15, 57:4, 57:6, 59:10, 59:11, 60:4, 60:15, 61:13, 61:14, 65:8, 66:22, 70:24, 70:25, 71:7, 71:19, 75:1, 75:6, 79:14, 79:16, 104:18, 106:13, 109:4, 112:14, 116:4, 131:18, 131:24, 135:21, 135:23, 136:1, 136:4, 136:5, 138:8, 138:10, 138:15, 138:16, 139:4, 139:10, 139:14, 139:15, 140:2, 140:3, 140:6, 140:18, 140:25, 143:17, 148:9, 149:24, 162:9, 163:21, 193:7, 193:10, 196:5, 197:7, 197:20, 199:21, 201:17, 203:7, 214:6, 215:2, 218:14, 218:20, 219:3, 231:4, 231:7
**corrected** [1] - 94:12, 95:4, 95:5
**correction** [2] - 96:3
**correctly** [4] - 87:2, 88:9, 88:14, 107:21, 107:22, 108:7, 152:18
**counsel** [9] - 14:12, 15:18, 60:15, 78:18, 104:5, 156:1, 156:3, 156:6, 166:1, 218:4, 221:12
**correctness** [1] - 95:4, 95:5

**147**:6, 147:7, 147:8, 147:9, 147:12, 147:14, 147:15, 147:24, 147:25, 148:2, 148:4, 148:5, 148:7, 148:10, 148:12, 149:6, 149:7, 149:22, 149:23, 149:25, 150:1, 152:18, 153:3, 150:4, 150:5, 150:16, 150:18, 150:19, 151:20, 151:25, 151:3, 152:9, 153:2, 153:23, 193:3, 193:4, 193:16, 194:13, 195:5, 198:10
**correspond** [1] - 131:18, 131:24, 135:21, 135:23, 136:1, 136:4, 136:5
**could** [30]

UNITED STATES DISTRICT COURT

240

**43**:7, 56:10, 81:11, 82:4, 86:20, 90:23, 91:7, 91:22, 99:8, 99:25, 102:12, 145:3, 145:6, 149:18, 167:9, 169:18, 167:9, 169:18, 188:6, 189:24, 199:6, 200:4, 209:22, 209:25, 210:3, 211:6, 211:9, 211:24, 211:24, 224:14
**couldn't** [4] - 14:12, 15:18, 15:19, 101:24
**counsel** [9] - 14:12, 15:18, 60:15, 78:18, 104:5, 156:1, 156:3, 156:6, 166:1, 218:4, 221:12
**counsel's** [2] - 16:8, 78:18
**count** [5] - 211:24, 211:24, 211:24, 224:14
**counter** [1] - 229:18
**counter-designated** [1] - 5:25
**counter-factual** [1] - 16:1
**countries** [1] - 32:5
**COUNTY** [1] - 231:4
**couple** [6] - 34:1, 73:13, 172:17, 172:25, 172:25, 229:9
**course** [11] - 10:9, 33:22, 39:5, 156:5, 170:13, 170:25, 190:4, 190:10, 227:2, 229:18
**Court** [9] - 4:3, 1:23, 3:17, 4:8, 4:13, 4:17, 31:7, 78:5, 188:10, 188:19, 231:21
**court** [4] - 4:22, 16:6, 28:18, 77:20
**court's** [2] - 43:6, 91:11, 95:19, 188:5, 230:15
**COURT** [5] - 1:1, 1:23, 3:17, 4:8, 4:13, 4:17, 91:11, 221:18, 229:5, 231:1, 231:6
**courtroom** [1] - 51:14, 90:9, 100:16, 116:18, 117:2, 133:13, 161:19, 177:6, 198:25
**cover** [3] - 158:11, 158:17, 169:19
**COVID** [1] - 164:25
**crack** [1] - 31:11
**create** [10] - 13:12, 51:23, 90:20, 110:21, 120:9, 120:18, 203:6, 209:14, 209:16
**created** [9] - 27:21, 37:23, 88:15, 119:18, 120:21, 125:17, 126:15, 126:16, 129:20, 133:6, 133:19, 181:11, 199:21, 214:7, 220:8, 220:15, 220:24, 221:3, 227:15, 230:5

**26**:9, 26:12, 26:16, 42:22, 43:2, 43:7, 61:17, 61:19, 77:22, 83:17, 83:23, 85:10, 85:13, 85:15, 85:16, 86:20, 86:22, 87:23, 87:25, 88:2, 89:12, 103:5, 109:3, 113:17, 123:20, 132:5, 132:9, 147:13, 147:18, 147:21, 148:2, 148:10, 148:11, 148:12, 149:7, 149:9, 149:22, 149:25, 165:19, 165:21, 210:18, 211:2, 213:16, 214:5, 214:16, 214:25, 220:4, 220:5, 220:6, 220:18, 221:13, 221:14, 221:25, 222:5, 222:6, 226:2, 226:10, 226:18, 226:25, 227:14, 229:16, 230:4
**court** [40] - 4:22, 16:6, 26:18, 77:20
**court's** [2] - 4:3
**COVID** [1] - 164:25
**COVID-19** [1] - 164:25
**crack** [1] - 31:11
**crazy** [1] - 174:5
**create** [12]
**CROSS** [1] - 3:10
**cross** [4] - 46:18, 77:22, 91:6, 91:11, 92:3, 92:6, 223:4, 223:14, 223:15
**CROSS** [1] - 3:3, 133:23, 144:2
**cross** [4] - 46:18, 91:6, 91:11, 92:3, 223:4
**cross-examination** [2] - 77:22, 91:6, 91:11, 92:3, 223:4, 223:14

**230**:12, 231:9
**court** [40] - 4:22, 26:18, 77:20
**court's** [2] - 43:6, 91:11
**courts** [2] - 43:6, 91:11
**cover** [3] - 158:11, 169:19, 169:19
**covers** [1] - 158:11
**COVID** [1] - 164:25
**crack** [1] - 31:11
**create** [12] - 13:12, 51:23, 90:20, 100:13, 110:23, 120:9, 120:18, 203:6, 209:14, 209:16
**created** [9] - 27:21, 37:23, 119:18, 120:21
**creates** [1] - 120:10
**creating** [2] - 119:16, 126:19
**creation** [1] - 119:20, 215:15
**creative** [1] - 119:16
**Creek** [1] - 157:2
**criteria** [1] - 198:18, 198:20
**critical** [1] - 42:20
**CROSS** [3] - 3:3, 77:22, 91:11, 133:23, 144:2
**cross** [4] - 46:18, 77:22, 91:6, 91:11, 92:3, 223:4, 223:14
**cross-examination** [2]
**CSR** [2] - 1:22, 231:21
**CSX** [9] - 42:3, 61:19, 158:3, 156:20, 156:22, 167:9, 174:9, 227:2
**cue** [1] - 118:19, 118:24, 179:9, 207:9, 207:10, 210:5, 210:9
**cure** [1] - 179:23
**current** [1] - 166:7, 229:2
**custom** [1] - 56:18, 66:1
**customer** [11] - 51:2, 51:23, 58:9, 58:9, 59:2, 59:13, 59:14, 59:23, 60:4, 60:20, 60:25, 61:6, 62:8, 62:22, 63:16, 63:18, 63:24, 64:2, 64:16, 66:3, 67:13, 68:3, 68:14, 68:15, 70:9, 70:10, 71:2, 71:9, 220:3
**customers** [9] - 75:5, 104:23, 105:20, 106:7, 107:13, 167:16, 168:3

**143**:25, 168:24
**damage** [1] - 101:3
**damages** [1] - 96:6, 96:23, 97:14, 98:10, 98:17, 99:3, 99:18
**damp** [1] - 156:18
**danger** [1] - 125:16, 150:4, 152:11, 168:14, 220:22
**DANIEL** [1] - 2:19
**Darel** [5] - 68:7, 69:17, 70:1, 70:7, 70:19
**dark** [1] - 90:20
**data** [40] - 30:25, 30:20, 30:22, 31:1, 31:6, 35:5, 35:5, 35:8, 35:14, 56:19, 62:5, 62:24, 66:22, 66:6, 66:11, 67:14, 67:18, 71:23, 72:4, 79:2, 79:4, 111:23, 112:2, 112:6, 112:9, 112:16, 113:19, 113:20, 121:7, 121:9, 121:23, 130:9, 164:25, 165:25, 168:18, 185:2, 188:25, 188:25
**database** [1] - 113:20
**day** [30] - 30:11, 54:20, 54:23, 54:24, 55:3, 55:7, 64:4, 82:21, 101:4, 108:4, 108:12, 124:9, 124:16, 159:16, 159:22, 161:25, 162:8, 171:14, 171:18, 179:8, 190:12, 191:17, 191:19, 197:2, 211:19, 231:17
**days** [2] - 54:20, 54:24, 159:3, 166:2, 173:2, 179:3
**DATE** [1] - 231:18
**date** [10] - 54:22, 71:25, 73:24, 100:9, 150:5, 150:8, 150:9, 150:11, 150:17, 150:19, 151:4, 150:25, 155:21, 153:23

**D**

**D.C** [3] - 34:21, 177:1
**Dale** [1] - 155:24

UNITED STATES DISTRICT COURT

**Exhibit 4**
**231**

150:12, 173:12, 226:6
**dated** [12] - 35:21, 36:2, 36:3, 36:12, 39:13, 54:25, 66:5, 70:21, 82:25, 86:17, 147:6, 210:16
**dates** [9] - 59:15, 78:11, 80:18, 80:21, 80:22, 183:21, 210:13, 216:23
**dating** [1] - 36:4
**DAVID** [2] - 3:15, 169:14
**David** [3] - 169:7, 169:13, 170:2
**days** [5] - 87:8, 141:14, 176:19, 177:1, 178:13
**DC** [1] - 2:21
**deactivated** [1] - 66:23
**deal** [6] - 9:6, 161:7, 211:16, 211:17, 212:21, 229:9
**deals** [1] - 166:5
**death** [1] - 65:14
**December** [10] - 63:17, 64:13, 64:14, 131:2, 131:22, 135:25, 136:4, 136:5, 136:11, 137:3
**decide** [1] - 96:20
**decided** [5] - 59:2, 133:22, 134:3, 137:14, 172:16
**decision** [3] - 164:5, 164:6, 165:24
**decisions** [2] - 100:22, 225:12
**declaration** [2] - 83:16, 83:17
**declarations** [1] - 83:11
**declaratory** [1] - 76:25
**Deep** [3] - 50:3, 50:10, 123:17
**deep** [16] - 48:7, 50:15, 50:16, 50:19, 50:22, 51:12, 51:20, 51:22, 52:11, 152:21, 181:16, 185:13, 197:8, 197:11, 197:12
**deeper** [1] - 31:9
**default** [7] - 82:10, 132:9, 133:4, 133:8, 134:24, 135:3, 135:6
**defect** [1] - 95:5
**defects** [4] - 111:7, 111:8, 112:5, 115:12
**DEFENDANT** [2] - 1:10, 2:13
**define** [3] - 53:7, 127:7, 132:2
**defined** [5] - 116:6, 129:7, 180:16, 181:20, 182:2
**defines** [3] - 128:5, 132:25, 196:10
**defining** [5] - 186:20, 189:17, 189:21, 197:4, 201:12
**definitely** [3] - 31:8, 75:8, 105:21
**definition** [8] - 118:4, 166:13, 173:18, 173:20, 173:22, 173:24, 182:9, 196:20
**definitions** [3] - 133:3, 173:15, 174:2
**degree** [5] - 27:10, 110:18, 110:19, 156:21, 179:5
**Degree** [1] - 110:19
**delete** [1] - 137:18
**deleted** [2] - 98:3, 137:20
**deliberate** [1] - 229:25
**deliver** [3] - 146:13, 146:15, 146:18
**delivered** [9] - 58:25, 63:16, 63:17, 72:4, 73:4, 131:4, 131:22, 143:15, 163:4
**delivering** [1] - 146:16
**demonstrate** [1] - 38:23
**demonstrated** [1] - 162:16
**demonstrating** [1] - 38:20
**demonstrations** [1] - 33:4
**demonstrative** [3] - 28:2, 55:6, 96:23
**demonstratives** [4] - 7:19, 9:22, 10:25, 98:9
**denied** [1] - 98:22
**Department** [1] - 39:6
**dependent** [9] - 93:12, 93:14, 93:15, 201:7, 207:25, 224:17, 224:18, 224:23, 225:25
**depo** [1] - 144:19
**deposed** [1] - 144:24
**deposition** [32] - 4:15, 4:18, 4:19, 4:20, 4:25, 23:19, 23:21, 24:4, 24:6, 24:8, 24:17, 24:19, 25:3, 25:4, 85:3, 85:6, 85:8, 85:11, 85:16, 85:20, 86:3, 98:20, 101:23, 102:2, 102:11, 102:17, 102:20, 103:14, 157:24, 175:18, 211:11, 222:21
**depth** [5] - 31:10, 43:11, 43:16, 125:4, 198:5
**derailments** [2] - 225:16, 226:3
**describe** [21] - 11:2, 40:6, 52:3, 53:13, 53:17, 136:24, 170:14, 176:17, 176:23, 177:4, 178:7, 179:9, 184:23, 193:18, 196:18, 210:19, 210:22, 214:1, 215:13, 215:20, 227:7
**described** [11] - 34:10, 44:1, 51:12, 52:12, 69:1, 143:23, 185:15, 209:11, 214:2, 219:10, 222:1
**describes** [5] - 37:19, 40:10, 41:3, 176:8, 209:24
**describing** [5] - 19:9, 19:17, 34:7, 210:4, 216:14
**description** [5] - 35:15, 76:9, 182:22, 191:17, 220:13
**designated** [5] - 5:21, 5:25, 6:20, 6:21, 174:16
**designations** [4] - 4:15, 5:2, 5:5, 7:7
**designed** [1] - 212:17
**desktop** [1] - 131:11
**despite** [2] - 88:19, 163:1
**detail** [2] - 183:18, 186:12
**detailed** [1] - 43:21
**details** [6] - 37:10, 69:3, 77:8, 154:24, 155:5, 182:20
**detect** [39] - 30:6, 31:7, 31:8, 31:22, 31:23, 40:10, 41:8, 45:20, 45:21, 47:2, 47:18, 48:16, 66:19, 66:20, 115:1, 116:4, 122:10, 122:24, 127:21, 127:24, 138:17, 138:23, 138:24, 139:1, 139:3, 139:20, 139:24, 140:2, 140:3, 140:8, 140:18, 140:20, 140:21, 140:24, 225:18, 226:21, 227:4, 227:17
**detected** [10] - 41:5, 119:23, 140:13, 202:18, 203:23, 204:2, 204:4, 206:4, 227:10, 228:7
**detecting** [12] - 38:23, 41:6, 41:7, 43:13, 47:10, 48:15, 115:23, 119:21, 120:3, 120:7, 120:23, 171:13
**detection** [26] - 16:12, 16:15, 35:1, 40:13, 40:25, 46:1, 46:24, 76:6, 111:6, 111:11, 112:4, 114:22, 115:11, 115:14, 123:19, 132:4, 132:5, 143:21, 172:5, 179:19, 179:22, 183:9, 223:4, 223:13, 226:19
**Detection** [2] - 34:25, 226:18
**detections** [1] - 227:19
**Detector** [1] - 114:21
**detector** [2] - 115:13, 115:17
**determine** [3] - 80:5, 118:16, 217:4
**determined** [1] - 54:18
**determines** [1] - 190:23
**determining** [1] - 117:4
**develop** [9] - 27:23, 41:8, 111:11, 119:23, 120:17, 121:5, 122:12, 126:12, 126:14
**developed** [8] - 27:24, 29:19, 43:12, 50:14, 57:10, 120:3, 120:6, 206:22
**developer** [6] - 111:10, 120:16, 122:7, 126:22, 133:8, 134:18
**developers** [8] - 39:23, 40:2, 40:3, 113:11, 113:13, 113:14, 126:14, 154:15
**developing** [6] - 111:4, 113:1, 113:7, 120:14, 146:21, 154:14
**Development** [3] - 27:8, 50:2, 110:16
**development** [6] - 50:5, 111:19, 113:12, 113:17, 120:12, 129:22
**device** [3] - 19:2, 35:2, 35:6
**diagram** [1] - 192:15
**dial** [1] - 77:15
**dialogue** [1] - 198:7
**dictate** [1] - 189:11
**Diego** [1] - 172:19
**differ** [1] - 221:11
**difference** [9] - 31:15, 164:23, 193:14, 194:23, 200:23, 200:25, 201:1, 218:18, 219:2
**differences** [7] - 10:16, 16:1, 17:7, 174:1, 174:22, 177:14, 214:5
**different** [88] - 9:9, 9:10, 10:13, 10:21, 11:25, 12:19, 13:5, 15:22, 16:6, 17:16, 28:25, 31:7, 32:5, 32:18, 39:21, 39:22, 47:13, 49:2, 51:7, 52:13, 52:14, 52:25, 53:1, 53:2, 57:6, 66:17, 67:10, 76:10, 87:7, 111:7, 112:5, 112:6, 112:9, 112:14, 112:20, 112:24, 112:25, 113:7, 117:12, 117:19, 119:7, 119:8, 119:14, 122:2, 122:19, 125:16, 126:19, 128:7, 128:8, 128:12, 128:13, 128:20, 128:21, 128:24, 129:2, 131:14, 132:4,

133:13, 134:17, 134:18, 142:5, 143:22, 145:4, 147:17, 149:24, 155:2, 171:17, 172:6, 177:23, 180:6, 186:3, 188:10, 195:12, 197:11, 210:13, 210:16, 216:23, 218:11, 222:17, 223:8, 223:17, 223:19, 224:10, 225:2, 228:8
**differential** [5] - 187:5, 199:25, 200:21, 200:24, 201:22
**differently** [2] - 52:11, 52:14
**differs** [1] - 122:5
**difficult** [1] - 47:12
**dimensional** [4] - 35:5, 218:22, 218:25, 219:21
**DIRECT** [5] - 3:3, 26:17, 110:11, 156:3, 169:22
**direct** [14] - 9:24, 11:10, 12:1, 12:9, 12:18, 15:3, 16:24, 19:10, 77:15, 85:7, 92:10, 153:6, 164:12, 202:7
**directions** [1] - 198:13
**directly** [5] - 5:20, 5:25, 46:19, 77:9, 126:21
**disadvantages** [1] - 161:16
**disagree** [6] - 203:12, 205:17, 205:18, 218:17, 219:1, 219:4
**disagreed** [1] - 167:1
**disagreement** [2] - 159:19, 159:24
**disclosed** [4] - 68:22, 68:24, 224:13, 226:10
**discloses** [1] - 220:9
**disclosure** [2] - 227:1, 229:5
**disconnected** [1] - 201:18
**discount** [1] - 71:19
**discovery** [1] - 175:18
**discuss** [7] - 4:10, 7:17, 156:18, 175:5, 185:22, 186:1, 209:13
**discussed** [14] - 7:11, 41:1, 41:22, 41:23, 42:17, 83:6, 145:17, 151:20, 153:6, 205:5, 208:19, 209:16, 216:8, 228:24
**discusses** [1] - 99:22
**discussing** [7] - 73:14, 149:9, 154:19, 185:20, 207:10, 215:17, 216:13
**discussion** [16] - 69:20, 91:5, 93:4, 93:12, 94:6, 94:20, 107:24, 182:20, 191:4, 195:10, 198:1, 200:9, 207:18, 222:7, 223:3, 228:16
**discussions** [1] - 175:16
**disease** [1] - 171:14
**display** [1] - 119:7
**displaying** [1] - 36:22
**dispute** [6] - 13:20, 134:3, 216:3, 217:13, 217:17, 217:20
**disputed** [1] - 94:8
**disputes** [2] - 156:12, 164:11
**disseminated** [1] - 148:6
**distance** [7] - 28:11, 28:13, 28:15, 30:20, 37:6, 37:7, 45:22
**distinct** [1] - 19:15
**distinction** [1] - 194:17
**distress** [1] - 111:12
**distributed** [2] - 46:15, 150:20
**DISTRICT** [5] - 1:1, 1:2, 1:4, 231:9
**Division** [1] - 27:20
**DIVISION** [1] - 1:2
**DNN** [5] - 50:10, 80:1, 80:8, 152:20
**DNNs** [1] - 152:16
**DO** [2] - 231:10, 231:13
**Doctor** [2] - 153:15, 153:20
**document** [26] - 19:1, 19:2, 19:9, 20:2, 20:3, 63:4, 63:5, 98:2, 106:18, 108:23, 136:18, 165:8, 207:19, 207:24, 217:21, 218:5, 218:15, 219:8, 219:11, 220:3, 220:9, 223:3, 224:13, 224:20, 225:7, 226:6
**documentation** [1] - 224:11
**documented** [1] - 127:11
**documents** [11] - 59:22, 81:8, 157:22, 157:23, 175:18, 183:4, 183:16, 210:2, 214:13, 214:20, 215:12
**doin'** [1] - 106:8
**domain** [4] - 50:18, 122:14, 158:3, 179:8
**done** [14] - 23:2, 29:3, 35:1, 48:17, 56:16, 92:23, 95:2, 95:13, 107:7, 114:9, 125:3, 130:6, 134:23, 135:4
**dot** [3] - 81:6, 193:20
**double** [2] - 222:23, 228:17
**double-check** [2] - 222:23, 228:17
**down** [14] - 7:9, 37:18, 72:13, 81:25, 82:1, 93:3, 107:14, 152:10, 164:2, 173:14, 177:21, 181:7, 198:12, 206:10
**dozens** [4] - 53:24, 74:4, 164:10
**dr** [1] - 195:9
**Dr** [162] - 7:19, 8:6, 8:13, 9:15, 9:22, 9:24, 10:2, 10:3, 10:7, 10:8, 10:10, 10:16, 10:17, 10:20, 10:22, 10:24, 11:1, 11:4, 11:6, 11:10, 11:12, 11:15, 12:3, 12:4, 12:7, 12:12, 12:18, 13:7, 13:10, 13:14, 13:16, 13:21, 13:24, 13:25, 14:2, 14:13, 14:15, 14:24, 15:3, 15:14, 15:15, 15:23, 15:25, 16:2, 16:23, 17:1, 17:15, 17:17, 17:23, 17:24, 18:2, 19:9, 20:16, 20:23, 21:1, 21:22, 21:24, 21:25, 22:1, 22:3, 22:5, 22:10, 22:22, 25:15, 51:14, 68:14, 70:12, 74:10, 80:10, 101:17, 110:2, 117:24, 134:7, 139:1, 140:2, 144:4, 144:6, 144:24, 155:7, 158:5, 158:6, 158:10, 159:14, 159:18, 159:22, 162:10, 162:23, 162:25, 163:2, 163:4, 163:9, 168:20, 169:7, 169:24, 170:6, 174:11, 175:6, 175:16, 175:20, 175:21, 177:3, 177:7, 178:6, 178:22, 184:4, 185:11, 185:22, 188:8, 189:3, 189:4, 189:6, 189:25, 190:10, 191:7, 191:8, 191:16, 193:14, 196:7, 196:25, 197:2, 197:5, 197:10, 199:8, 199:9, 199:15, 199:16, 200:2, 202:1, 202:2, 203:3, 203:7, 203:21, 203:22, 204:10, 204:19, 204:23, 205:7, 205:12, 206:11, 210:2, 210:15, 213:3, 214:2, 215:20, 217:12, 218:17, 219:1, 219:4, 220:8, 221:5, 222:8, 225:20, 227:20, 228:10, 228:22
**draft** [3] - 107:23, 108:2, 111:21
**drawn** [1] - 179:25
**dream** [2] - 32:11, 172:11
**drill** [1] - 16:5
**drive** [3] - 57:15, 57:16
**driving** [4] - 48:15, 164:5, 167:22, 171:20
**drove** [1] - 171:24
**DS** [1] - 205:1
**due** [3] - 18:8, 52:19, 124:11
**during** [12] - 7:24, 11:9, 11:11, 12:18, 26:7, 50:7, 70:10, 74:8, 98:19, 129:7, 133:20, 154:14

**E**

**Eagle** [1] - 156:22
**earliest** [2] - 70:21, 214:10
**early** [22] - 13:7, 19:25, 58:6, 174:23, 175:2, 175:12, 178:13, 182:21, 182:24, 182:25, 183:4, 183:11, 183:13, 183:14, 207:6, 207:11, 208:16, 209:3, 215:21, 221:13, 223:14, 229:9
**easier** [2] - 48:20, 122:6
**easiest** [2] - 127:3, 200:19
**easily** [1] - 168:15
**easy** [3] - 126:20, 127:5, 153:19
**EC** [8] - 207:14, 207:22, 208:4, 208:8, 213:4, 213:8, 213:12, 213:16
**EC-TRB2014** [8] - 207:14, 207:22, 208:4, 208:8, 213:4, 213:8, 213:12, 213:16
**ECB** [2] - 223:25, 224:5
**ECB-TRB2014** [2] - 223:25, 224:5
**economic** [2] - 156:11, 156:15
**Economics** [1] - 156:22
**edge** [13] - 40:12, 40:24, 45:21, 46:1, 134:17, 139:23, 139:24, 202:21, 204:21, 205:2, 206:6, 223:4, 223:13
**edges** [4] - 40:11, 45:20, 116:4, 223:9
**edited** [1] - 107:20
**education** [2] - 156:19, 170:7
**educational** [2] - 27:9, 110:17
**effect** [2] - 37:21, 193:19
**effectively** [1] - 20:19

**efficiency** [1] - 19:20
**either** [11] - 69:6, 97:20, 153:14, 160:6, 187:23, 187:24, 193:17, 195:21, 208:3, 209:5, 213:7
**Electrical** [4] - 27:11, 110:20, 170:8, 170:10
**electrical** [3] - 27:15, 171:7, 174:13
**element** [3] - 191:15, 191:19, 191:25
**elements** [3] - 191:13, 191:15, 209:17
**elevation** [45] - 30:20, 30:21, 31:3, 31:6, 31:15, 37:6, 45:12, 69:5, 86:7, 117:4, 118:10, 132:10, 134:2, 141:21, 142:4, 142:6, 142:9, 187:4, 189:19, 189:23, 190:21, 196:17, 199:24, 200:8, 200:16, 200:17, 201:21, 202:24, 205:10, 206:7, 218:21, 218:25, 220:23, 221:2, 221:10, 221:12, 221:15, 221:21, 221:22, 221:25, 222:3, 222:5, 224:5, 224:8
**ELIAS** [4] - 1:22, 231:8, 231:20, 231:21
**eliminate** [3] - 92:17, 93:22, 102:9
**eliminated** [2] - 94:8, 94:10
**eliminates** [1] - 178:3
**eliminating** [1] - 168:19
**elucidate** [1] - 100:10
**email** [38] - 70:17, 70:18, 70:20, 70:21, 70:25, 71:2, 71:4, 72:13, 72:22, 72:23, 76:16, 86:13, 86:16, 86:17, 87:19, 88:4, 88:7, 88:24, 89:4, 89:17, 104:21, 105:10, 105:17, 105:24, 105:25, 106:24, 107:14, 107:18, 108:2, 141:16, 148:16, 148:18, 148:20, 148:24, 152:14, 152:23, 152:25, 165:9
**emails** [8] - 87:20, 97:10, 149:3, 149:5, 152:9, 152:10, 152:11, 155:8
**embedded** [6] - 189:4, 197:1, 199:8, 203:22, 204:19, 205:8
**employed** [1] - 156:6
**employees** [1] - 76:19
**employment** [1] - 156:19
**enable** [2] - 134:23, 135:4
**enabled** [2] - 187:3, 200:7
**enclosed** [1] - 61:23
**encrypted** [1] - 61:24
**end** [8] - 5:22, 5:23, 6:12, 7:5, 8:15, 41:16, 193:18, 229:21
**ended** [1] - 6:8
**endowed** [1] - 171:5
**Endowed** [1] - 171:6
**ends** [1] - 149:21
**engine** [3] - 52:9, 171:23, 179:10
**Engineering** [9] - 27:11, 27:12, 34:24, 110:20, 170:8, 170:10, 171:6
**engineering** [5] - 27:15, 171:7, 171:8, 174:12, 174:13
**engineers** [1] - 171:25
**English** [1] - 118:11
**enhanced** [1] - 85:1
**enjoy** [1] - 172:6
**Ensco** [1] - 75:13
**enter** [1] - 83:15
**entered** [2] - 84:4, 97:8
**entire** [6] - 40:16, 44:18, 46:6, 99:15, 103:1, 210:25
**entirety** [1] - 93:23
**entitled** [5] - 98:15, 98:21, 99:12, 99:19, 100:4
**Entrepreneurship** [1] - 171:6
**equal** [1] - 191:12
**equipment** [3] - 68:5, 87:1, 130:9
**era** [2] - 183:4, 183:5
**especially** [3] - 68:3, 164:25, 167:11
**ESQ** [9] - 2:5, 2:6, 2:7, 2:8, 2:15, 2:16, 2:17, 2:18, 2:19
**essentially** [5] - 17:15, 20:18, 200:14, 216:19, 223:8
**establish** [1] - 99:14
**established** [7] - 99:24, 101:20, 101:24, 103:2, 103:3, 105:10, 181:21
**estimation** [1] - 45:16
**et** [1] - 176:22
**EuroConsult** [6] - 34:3, 34:4, 34:7, 34:18, 206:22, 207:1
**European** [1] - 36:4
**evaluate** [1] - 167:18
**evaluated** [1] - 167:21
**evaluating** [2] - 80:4, 80:15
**evaluation** [1] - 75:7
**eventually** [2] - 47:20, 122:20
**evidence** [40] - 24:2, 24:9, 24:13, 24:25, 26:5, 26:14, 59:25, 61:19, 83:16, 86:21, 87:22, 87:25, 89:11, 89:14, 105:3, 105:6, 106:20, 109:23, 136:16, 136:20, 136:23, 148:22, 148:23, 148:24, 152:9, 160:19, 161:4, 161:7, 161:13, 162:15, 162:21, 164:15, 165:22, 166:18, 166:20, 169:16, 169:20, 185:19, 186:11, 210:25
**evolution** [2] - 52:20, 53:5
**exact** [6] - 6:19, 52:23, 53:7, 77:8, 150:5, 150:8
**exactly** [20] - 30:10, 53:16, 53:18, 79:3, 112:19, 112:24, 114:10, 115:1, 132:24, 155:11, 162:15, 167:5, 176:12, 177:22, 191:18, 194:23, 209:8, 209:12, 221:17, 227:3
**examination** [4] - 77:22, 103:21, 143:25, 168:24
**EXAMINATION** [10] - 26:17, 78:1, 103:23, 110:11, 144:2, 154:9, 156:3, 169:22, 192:11, 194:2
**examine** [1] - 176:11
**example** [17] - 13:8, 15:21, 31:8, 37:11, 66:19, 112:11, 179:19, 180:9, 180:11, 181:14, 188:24, 194:6, 200:6, 200:16, 201:19, 221:1, 227:25
**examples** [3] - 177:18, 188:9, 214:12
**except** [1] - 37:15
**excerpt** [9] - 11:24, 13:3, 14:9, 114:3, 117:8, 117:15, 131:20, 138:12, 188:22
**excerpts** [5] - 9:13, 13:5, 14:5, 114:1, 198:1
**exchange** [4] - 70:18, 104:21, 105:10, 106:24
**exchanged** [2] - 98:9, 149:3
**excited** [1] - 71:22
**exciting** [1] - 173:2
**excluded** [3] - 20:12, 21:5, 21:14
**excuse** [2] - 69:10, 109:4
**excused** [2] - 109:12, 155:15
**executed** [1] - 125:23
**exemplary** [1] - 14:23
**exhibit** [5] - 114:11, 115:6, 119:17, 134:12, 215:1
**Exhibit** [122] - 24:3, 24:9, 24:11, 24:13, 24:14, 25:25, 33:11, 34:17, 35:13, 35:23, 35:24, 36:9, 36:10, 39:9, 39:10, 40:8, 40:9, 41:10, 42:5, 43:8, 44:12, 45:8, 46:13, 49:20, 49:21, 51:12, 51:20, 52:3, 52:12, 52:15, 54:6, 54:7, 56:12, 59:24, 59:25, 60:2, 61:3, 61:5, 61:7, 61:8, 61:11, 61:20, 64:17, 66:2, 70:15, 70:16, 76:14, 76:15, 81:10, 82:22, 83:14, 83:16, 84:19, 86:10, 87:18, 87:22, 88:1, 88:23, 89:2, 89:11, 89:14, 89:15, 104:18, 105:2, 105:6, 105:7, 106:16, 113:24, 113:25, 117:6, 117:7, 117:15, 119:16, 120:4, 120:5, 131:19, 136:10, 136:25, 138:10, 138:11, 149:8, 152:8, 165:9, 173:10, 188:7, 188:22, 191:8, 198:1, 207:20, 207:22, 207:25, 214:17, 214:22, 214:24, 215:2, 215:4, 215:19, 218:6, 219:23, 219:25, 220:3, 220:8, 220:13, 220:17, 220:20, 221:3, 223:3, 225:6, 228:5
**exhibits** [9] - 24:22, 25:22, 26:1, 26:9, 97:8, 109:16, 109:22, 169:15, 214:15
**Exhibits** [8] - 23:23, 24:20, 24:24, 25:1, 26:12, 97:10, 109:18, 169:17
**exist** [1] - 135:18
**existed** [2] - 179:3, 186:22
**existence** [1] - 101:17
**existing** [2] - 53:10, 126:15
**exists** [2] - 15:17, 170:25
**expands** [1] - 211:1
**expensive** [3] - 164:1, 165:12
**experience** [4] - 164:10, 173:15, 173:18, 178:7
**experiment** [2] - 48:23, 49:13
**experimental** [1] - 50:24
**experimentation** [1] -

50:19
**experimenting** [3] - 48:9, 48:25, 51:25
**experiments** [2] - 49:14, 50:6
**expert** [36] - 8:2, 8:8, 8:11, 19:18, 23:11, 51:17, 80:7, 98:10, 99:3, 99:10, 99:11, 101:17, 117:18, 124:18, 139:12, 157:5, 157:10, 157:15, 157:19, 158:6, 161:13, 163:17, 174:11, 175:18, 192:14, 210:5, 211:6, 211:10, 211:22, 212:4, 212:7, 212:22, 212:23, 228:14, 228:15
**expert's** [2] - 9:11, 222:20
**expertise** [1] - 80:9
**experts** [2] - 159:9, 162:19
**expired** [3] - 62:7, 65:22, 65:23
**explain** [22] - 28:2, 30:11, 37:24, 38:1, 45:9, 61:22, 64:4, 156:19, 160:16, 162:4, 162:24, 175:24, 179:13, 182:15, 187:9, 188:6, 195:9, 200:13, 200:19, 203:4, 206:16, 227:20
**explained** [6] - 21:17, 22:3, 33:20, 99:12, 178:22, 198:24
**explaining** [4] - 10:24, 14:21, 154:21, 188:8
**explains** [1] - 13:7
**explanation** [1] - 184:8
**explicit** [1] - 200:22
**explicitly** [1] - 197:23
**expressing** [1] - 9:7
**extensively** [1] - 29:6
**extent** [3] - 6:13, 98:12, 210:13
**extra** [1] - 202:7
**extract** [1] - 46:2
**extremely** [2] - 43:21, 215:10

**F**

**F-r-a-k-e-s** [1] - 169:14
**F705** [1] - 63:21
**F706** [1] - 63:22
**F707** [1] - 63:22
**F708** [1] - 63:22
**face** [7] - 172:5, 179:19, 179:21, 180:25, 181:1, 181:2, 181:25
**faces** [5] - 180:1, 180:2, 180:6, 180:13, 181:14
**facial** [1] - 48:14
**fact** [14] - 44:14, 78:25, 80:22, 93:13, 111:18, 111:22, 116:2, 134:21, 163:1, 163:11, 186:8, 196:7, 221:12, 221:19
**factor** [2] - 121:21, 167:2
**Factor** [6] - 99:23, 101:20, 101:24, 103:2, 166:2, 166:4
**factors** [8] - 52:21, 56:3, 99:14, 99:21, 99:22, 100:5, 167:22
**facts** [1] - 183:20
**factual** [2] - 163:19, 211:20
**faculty** [1] - 171:3
**failed** [3] - 10:22, 21:24, 22:2
**failure** [3] - 168:4, 168:5, 168:7
**failures** [1] - 225:19
**fair** [7] - 7:13, 14:15, 22:20, 90:8, 147:18, 153:2, 159:1
**fairly** [1] - 173:12
**fake** [3] - 200:15, 200:18, 222:2
**Fake3d** [71] - 15:25, 16:21, 38:11, 38:14, 38:16, 40:19, 40:20, 40:23, 45:6, 45:13, 85:25, 86:4, 86:7, 116:16, 116:19, 116:23, 117:1, 117:2, 117:10, 117:11, 117:19, 118:2, 118:9, 118:12, 118:19, 118:21, 119:2, 119:4, 119:8, 119:12, 133:18, 133:20, 134:2, 134:4, 134:7, 142:5, 142:7, 161:6, 161:11, 163:1, 163:4, 163:9, 166:15, 183:9, 186:16, 187:3, 187:23, 188:2, 189:2, 200:7, 200:9, 200:10, 200:14, 201:11, 201:21, 214:8, 218:10, 218:11, 218:18, 219:2, 219:6, 221:7, 221:9, 221:12, 221:14, 221:20, 221:23, 222:1
**fall** [1] - 47:6
**false** [1] - 227:19
**familiar** [4] - 34:12, 82:22, 82:23, 182:13
**family** [1] - 172:17
**far** [2] - 37:11, 167:2
**Fargo** [1] - 156:24
**fast** [8] - 56:19, 79:8, 121:14, 121:17, 121:20, 121:22, 124:11, 151:3
**fastener** [3] - 43:13, 132:6, 188:11
**Fasteners** [1] - 35:1
**fasteners** [4] - 41:6, 41:7, 49:5, 53:4
**faster** [6] - 55:17, 56:6, 121:2, 124:10, 137:8, 229:20
**fate** [1] - 27:5
**fault** [1] - 41:14
**faulty** [1] - 168:10
**favorite** [3] - 71:20, 93:22, 222:9
**feature** [6] - 183:9, 202:21, 204:9, 204:21, 205:2, 206:6
**features** [29] - 8:10, 30:5, 38:23, 41:8, 43:15, 47:9, 47:11, 47:13, 48:17, 49:9, 55:15, 113:8, 114:24, 115:3, 120:23, 122:10, 122:24, 123:20, 126:16, 127:13, 127:24, 132:4, 134:5, 153:11, 168:15, 180:12, 226:15, 227:9, 227:16
**February** [12] - 62:25, 64:18, 80:23, 81:2, 81:7, 86:17, 87:5, 87:6, 87:10, 87:15, 88:11, 143:7
**Fed** [1] - 95:19
**federal** [1] - 225:17
**FEDERAL** [2] - 1:23, 231:22
**Federal** [2] - 39:20, 225:17
**feed** [2] - 180:1, 181:13
**feet** [2] - 30:12, 44:20
**felt** [3] - 29:18, 168:3, 185:3
**few** [17] - 7:18, 25:22, 27:19, 57:12, 59:13, 59:22, 70:4, 81:12, 87:17, 96:24, 110:23, 113:11, 130:7, 137:18, 141:14, 169:15, 183:18
**field** [8] - 26:21, 32:4, 185:3, 224:6, 225:3, 225:11, 229:7, 229:11
**fifth** [2] - 41:15, 41:17
**figure** [8] - 44:14, 81:4, 164:8, 179:18, 191:12, 209:19, 215:19, 227:14
**Figure** [14] - 36:14, 36:17, 44:13, 44:21, 44:22, 45:8, 45:9, 45:10, 84:18, 84:24, 85:21, 85:22, 85:24
**figured** [5] - 48:16, 68:23, 79:23, 90:18, 180:17
**figures** [4] - 177:24, 178:3, 180:1, 192:3
**figuring** [3] - 176:2, 180:6, 180:8
**file** [24] - 16:11, 16:16, 66:16, 114:19, 114:20, 114:21, 125:17, 125:19, 125:20, 125:21, 127:6, 129:12, 129:16, 129:25, 135:2, 135:10, 135:13, 149:11, 150:2, 150:6, 175:14, 176:8
**filed** [12] - 76:24, 77:3, 78:21, 87:8, 87:9, 88:16, 141:23, 143:4, 143:5, 183:6, 184:1, 207:5
**files** [9] - 22:2, 175:11, 175:25, 176:3, 176:5, 176:21, 176:22
**filing** [3] - 207:8, 216:1, 218:1
**filter** [18] - 116:6, 128:5, 182:10, 182:13, 182:15, 182:17, 191:13, 191:14, 192:23, 193:2, 193:5, 193:7, 193:9, 195:12, 195:13, 197:16, 198:6, 228:7
**filters** [23] - 116:6, 123:24, 124:13, 124:23, 125:6, 125:8, 129:6, 129:8, 176:14, 180:7, 180:8, 180:10, 180:11, 180:13, 180:16, 181:20, 182:2, 182:6, 182:11, 190:11, 190:12, 201:15, 223:12
**final** [1] - 48:5
**finalized** [1] - 96:13
**finally** [3] - 161:15, 170:10, 175:5
**finance** [1] - 156:25
**finances** [1] - 104:8
**financial** [6] - 156:10, 156:14, 157:6, 157:19, 158:4, 165:2
**finder** [1] - 221:19
**fine** [2] - 79:10, 92:15
**finish** [2] - 83:4, 166:1
**finished** [3] - 23:11, 27:16, 170:20
**Finnegan** [1] - 143:3
**FINNEGAN** [1] - 2:14
**first** [77] - 5:7, 8:5, 8:9, 9:7, 11:12, 12:8, 16:23, 21:12, 22:9, 23:19, 29:21, 30:19, 33:8, 33:25, 38:9, 42:14, 46:14, 46:19, 52:16, 55:13, 58:14, 58:22, 59:1, 59:23, 67:21, 69:14, 70:20, 73:10, 75:19, 75:23, 78:12, 88:4, 90:12, 92:3, 95:15, 95:20, 106:25, 112:1, 115:14, 116:2, 122:17, 123:17, 125:3, 128:19, 131:8, 132:19, 138:5, 142:2, 149:14, 158:10,

160:22, 170:16, 170:20, 170:21, 172:3, 174:10, 175:10, 178:9, 178:14, 184:20, 186:15, 187:8, 192:23, 192:24, 194:9, 201:1, 201:10, 202:17, 202:18, 206:20, 206:24, 218:8, 219:12, 226:1, 226:19
**First** [1] - 156:23
**firstly** [1] - 125:4
**five** [10] - 9:15, 13:5, 32:10, 32:12, 58:19, 62:23, 65:13, 164:19, 164:21, 164:24
**fix** [1] - 95:5
**fixed** [8] - 125:10, 125:11, 129:9, 138:8, 182:5, 182:6, 190:2, 201:16
**flat** [3] - 200:14, 200:18, 222:1
**flexible** [5] - 125:9, 164:2, 190:3, 190:12, 201:15
**flights** [1] - 29:3
**flooding** [2] - 47:5
**FLOOR** [1] - 2:10
**Florida** [2] - 72:4, 73:12
**flow** [3] - 51:11, 52:9, 52:11
**Flow** [2] - 123:2, 123:5
**flyer** [1] - 46:14
**focus** [4] - 59:13, 156:16, 198:4, 227:14
**focused** [5] - 184:12, 185:5, 203:25, 207:12, 207:13
**focuses** [2] - 99:22, 197:8
**focusing** [1] - 14:17
**folder** [2] - 176:2, 176:5
**folks** [1] - 165:24
**follow** [2] - 6:1, 128:19
**follow-up** [1] - 6:1
**following** [5] - 87:5, 102:7, 115:11, 209:14, 218:19
**follows** [2] - 22:13, 45:18
**foot** [1] - 205:1
**football** [1] - 170:16
**FOR** [3] - 3:2, 231:8, 231:9
**FOREGOING** [1] - 231:11
**foremost** [1] - 175:10
**form** [12] - 18:22, 19:12, 19:22, 91:22, 92:1, 93:2, 97:9, 138:14, 141:12, 141:21, 142:4, 212:18
**FORM** [1] - 231:13
**form's** [1] - 92:23
**formal** [1] - 80:14
**format** [4] - 19:10, 19:21, 149:12, 149:24
**forming** [4] - 175:9, 177:5, 177:6, 214:13
**forms** [1] - 15:25
**FORTH** [1] - 231:12
**forth** [3] - 14:3, 17:24, 153:3
**fortunate** [2] - 178:25, 179:1
**forward** [3] - 42:16, 151:3, 208:15
**foundation** [3] - 61:4, 168:18, 210:2
**founded** [3] - 29:15, 29:22, 170:25
**four** [18] - 36:22, 52:4, 52:6, 98:11, 99:14, 119:9, 129:18, 132:5, 163:8, 185:25, 186:3, 186:4, 186:8, 186:12, 186:13, 188:10, 201:8
**fourth** [4] - 37:18, 129:12, 187:2, 219:24
**Fox** [9] - 70:18, 88:25, 104:21, 105:11, 105:17, 105:25, 106:25, 107:18, 152:12
**Fox-Ivey** [9] - 70:18, 88:25, 104:21, 105:11, 105:17, 105:25, 106:25, 107:18, 152:12
**FRA** [16] - 39:19, 46:19, 46:20, 48:1, 54:4, 54:7, 54:9, 54:10, 54:16, 54:25, 55:2, 55:20, 58:8, 105:20, 107:4, 108:23
**Frakes** [48] - 8:6, 9:22, 10:10, 10:24, 11:1, 12:3, 13:10, 13:21, 14:15, 15:14, 17:1, 17:23, 17:24, 19:9, 20:16, 20:23, 21:24, 21:25, 22:3, 22:10, 80:10, 101:17, 158:5, 169:7, 169:14, 169:24, 170:6, 174:11, 175:21, 178:6, 191:16, 193:14, 195:9, 196:7, 199:8, 200:2, 202:1, 206:11, 213:3, 215:20, 217:12, 220:8, 221:5, 222:8, 225:20, 227:20, 228:10, 228:22
**FRAKES** [1] - 3:15
**Frakes'** [4] - 7:19, 17:15, 18:2, 21:1
**Frakes's** [1] - 17:17
**frame** [1] - 35:18
**frames** [1] - 161:21
**Francois** [2] - 110:2, 110:8
**FRANCOIS** [1] - 110:9
**free** [2] - 77:8, 123:3
**French** [1] - 36:5
**Friday** [6] - 8:14, 23:12, 151:7, 158:8, 158:9, 162:7
**friends** [1] - 179:21
**front** [1] - 8:18
**Frugo** [1] - 105:21
**fulfilling** [1] - 205:22
**full** [7] - 25:18, 30:14, 110:6, 140:19, 155:22, 169:11, 169:13
**Fulton** [1] - 171:5
**function** [21] - 16:12, 16:15, 16:17, 115:9, 115:10, 115:14, 115:17, 117:12, 117:25, 118:5, 118:7, 118:9, 119:4, 138:23, 139:2, 139:20, 139:25, 140:1, 140:3, 140:12, 140:21
**functionalities** [2] - 153:24, 154:2
**functionality** [2] - 12:5, 207:17
**functions** [2] - 153:7, 188:4
**fund** [1] - 13:1
**fundamental** [3] - 16:22, 99:20, 185:16
**funded** [2] - 39:6, 46:19
**funding** [1] - 172:24
**FURTHER** [1] - 231:14
**future** [1] - 153:22

**G**

**Gainesville** [1] - 72:4
**game** [3] - 7:13, 14:15, 22:20
**gap** [1] - 227:9
**Gauge** [1] - 34:25
**gauge** [3] - 43:12, 45:16, 45:22
**gears** [4] - 53:20, 67:21, 120:11, 141:1
**general** [6] - 39:17, 45:19, 48:23, 117:1, 122:15, 130:2
**generally** [1] - 180:25
**generate** [5] - 116:19, 116:23, 119:2, 187:4, 200:7
**generated** [2] - 43:11, 117:1
**generating** [2] - 218:21, 218:24
**geometry** [3] - 4:24, 7:10, 28:12
**Georgia** [4] - 170:9, 170:11, 170:12, 172:9
**GetPosition** [3] - 117:25, 118:5, 118:7
**Gibert** [16] - 208:9, 213:12, 213:16, 224:21, 224:25, 225:7, 225:14, 226:5, 226:9, 226:11, 226:25, 227:15, 227:20, 228:23, 229:4, 229:8
**Gibert-Serra** [16] - 208:9, 213:12, 213:16, 224:21, 224:25, 225:7, 225:14, 226:5, 226:9, 226:11, 226:25, 227:15, 227:20, 228:23, 229:4, 229:8
**Gibet** [2] - 207:17, 207:24
**Gibet-Serra** [2] - 207:17, 207:24
**girl** [1] - 172:14
**given** [5] - 11:11, 53:7, 93:13, 95:6, 210:14
**gonna** [24] - 7:14, 28:7, 31:9, 38:6, 41:4, 41:5, 41:6, 42:15, 59:24, 60:16, 102:25, 107:6, 114:11, 145:1, 152:15, 174:21, 174:23, 174:25, 175:1, 175:3, 177:17, 181:1, 186:15, 191:2
**goods** [8] - 59:19, 63:1, 63:3, 63:9, 82:17, 82:21, 82:24, 84:5
**Goods** [1] - 84:9
**Google** [10] - 123:4, 123:11, 171:15, 171:22, 172:2, 174:6, 178:19, 178:24, 179:1, 179:7
**Google's** [1] - 123:5
**gosh** [2] - 80:3, 178:9
**GPS** [1] - 60:10
**GPU** [1] - 56:4
**GPUs** [2] - 56:2, 56:8
**grab** [1] - 220:7
**grabbers** [1] - 35:18
**grad** [3] - 170:19, 178:10, 178:15
**grade** [1] - 100:21
**gradient** [16] - 46:6, 116:8, 116:9, 184:24, 186:20, 189:18, 189:21, 189:22, 190:1, 190:17, 190:20, 190:24, 196:16, 197:5, 201:13
**gradients** [3] - 40:15, 223:7, 223:10
**graduate** [2] - 39:22, 156:25
**graduated** [1] - 157:1
**grant** [2] - 172:24
**grants** [1] - 172:21
**graph** [1] - 176:8
**graphic** [4] - 56:2, 57:5, 181:6, 198:3
**Graphical** [1] - 56:5
**gray** [1] - 82:9
**great** [12] - 27:4, 54:1, 72:13, 72:20, 91:19, 91:20, 91:24, 92:18, 98:5, 98:6, 161:7, 229:9
**greater** [1] - 191:1
**greatly** [1] - 93:13
**green** [5] - 192:2, 192:4, 192:15,

192:18, 194:9
**GREX** [15] - 55:20, 68:10, 75:5, 78:20, 78:21, 79:5, 79:6, 79:10, 79:14, 79:17, 106:2, 106:3, 106:4, 108:25
**ground** [5] - 17:19, 18:10, 18:11, 211:12, 211:13
**grounds** [8] - 7:7, 7:12, 17:14, 17:16, 17:22, 18:3, 209:19, 210:10
**Group** [4] - 27:20, 33:10, 171:17, 172:18
**group** [19] - 27:21, 27:23, 34:23, 191:21, 191:25, 192:6, 192:7, 193:15, 193:19, 193:21, 193:22, 194:13, 194:14, 195:16, 195:17, 195:23, 195:25, 196:3
**groups** [3] - 191:22, 192:8, 195:10
**growing** [1] - 174:6
**guess** [14] - 6:6, 7:8, 11:1, 11:14, 27:4, 54:8, 55:1, 81:9, 83:9, 98:2, 192:23, 193:6, 194:14, 212:11
**guy** [1] - 77:12
**guys** [1] - 108:24

**H**

**H-e-b-e-r-t** [1] - 110:9
**Habel** [6] - 111:14, 151:7, 151:10, 151:13, 152:3, 152:12
**Hafiz** [2] - 90:9, 90:12
**Hakis** [1] - 88:11
**half** [10] - 44:15, 103:3, 103:4, 137:19, 137:22, 168:20, 205:19, 205:21, 229:22
**hand** [10] - 7:20, 25:7, 25:11, 82:8, 110:3, 114:16, 114:17, 155:19, 169:8, 192:24
**handle** [2] - 126:18, 230:5
**hang** [1] - 216:9
**happy** [2] - 71:24, 109:11
**Happy** [2] - 27:2, 78:3
**hard** [1] - 108:4
**hardware** [32] - 44:1, 59:17, 60:24, 61:1, 63:11, 63:12, 63:13, 64:8, 64:9, 66:4, 82:13, 128:7, 128:8, 128:20, 128:24, 130:10, 210:19, 214:17, 215:1, 215:7, 217:11, 217:14, 217:17, 217:22, 218:2, 220:11, 226:10, 226:13, 229:10
**Hardware** [1] - 36:12
**harm** [1] - 17:1
**Harold** [1] - 169:13
**HAROLD** [1] - 169:14
**head** [2] - 46:2, 227:8
**Head** [1] - 27:19
**head's** [1] - 68:13
**heading** [1] - 102:7
**hear** [20] - 5:15, 7:2, 9:18, 12:23, 18:21, 20:5, 21:16, 30:25, 51:19, 54:2, 73:10, 92:16, 99:8, 139:1, 140:2, 167:10, 184:7, 189:25, 190:4, 202:1
**heard** [30] - 55:19, 58:7, 67:23, 69:7, 69:11, 75:13, 76:12, 90:12, 102:13, 151:7, 160:20, 161:18, 163:2, 163:24, 163:25, 165:16, 171:22, 175:17, 177:16, 178:21, 179:12, 184:4, 184:8, 184:11, 185:10, 200:9, 206:22, 207:3, 218:13
**hearing** [3] - 177:3, 180:7, 183:10
**hears** [1] - 28:18
**hearsay** [2] - 5:12, 5:14
**Hebert** [19] - 25:15, 88:25, 110:2, 110:8, 110:13, 144:4, 144:6, 144:24, 155:7, 163:2, 163:4, 163:9, 168:20, 175:16, 178:22, 188:8, 197:10, 214:2, 215:15
**HEBERT** [1] - 3:12
**Hebert's** [2] - 210:2, 210:15
**height** [3] - 200:23, 200:25
**held** [1] - 209:14
**help** [2] - 59:14, 100:10
**helps** [2] - 93:3, 181:25
**Hemming** [3] - 156:7, 156:9
**HENDERSON** [1] - 2:14
**HEREBY** [1] - 231:10
**HEREINBEFORE** [1] - 231:11
**heretofore** [1] - 4:7
**hi** [17] - 57:11, 57:13, 57:15, 57:19, 57:22, 58:2, 58:15, 58:23, 60:11, 65:1, 72:10, 73:19, 112:16, 131:9, 131:16, 131:17, 170:2
**hi-rail** [15] - 57:11, 57:15, 57:19, 57:22, 58:2, 58:15, 58:23, 60:11, 65:1, 72:10, 73:19, 112:16, 131:9, 131:16, 131:17
**hi-rails** [1] - 57:13
**hide** [2] - 88:21, 108:19
**hiding** [1] - 108:24
**high** [12] - 28:12, 30:16, 35:4, 43:19, 44:3, 44:10, 177:17, 179:11, 182:22, 183:20, 186:13, 215:13
**high-level** [3] - 182:22, 183:20, 186:13
**higher** [1] - 214:1
**highlight** [2] - 52:16, 203:5
**highlighted** [9] - 45:1, 56:15, 81:12, 82:2, 188:10, 199:17, 221:1, 223:3, 227:10
**highlighting** [1] - 16:11
**highly** [2] - 54:18, 226:15
**highway** [1] - 43:20
**himself** [1] - 22:5
**hired** [3] - 77:19, 113:11, 120:16
**hiring** [1] - 174:6
**histories** [1] - 175:14
**history** [3] - 158:15, 170:14, 219:5
**hit** [1] - 105:19
**holder** [1] - 171:5
**honestly** [1] - 186:9
**Honor** [116] - 4:12, 5:3, 5:7, 5:11, 5:14, 5:17, 5:25, 6:5, 6:16, 7:6, 7:15, 7:18, 7:22, 9:1, 9:12, 9:20, 10:6, 12:14, 12:25, 13:18, 15:7, 16:9, 16:24, 17:4, 17:11, 18:22, 20:6, 20:11, 21:3, 21:10, 21:14, 21:17, 23:14, 24:1, 24:12, 24:23, 25:22, 26:8, 26:11, 61:15, 61:18, 77:23, 83:15, 83:20, 83:21, 85:7, 85:14, 85:17, 86:22, 87:21, 87:24, 89:10, 89:13, 91:11, 91:12, 91:19, 92:4, 92:13, 92:19, 92:22, 93:9, 93:19, 93:25, 94:2, 94:14, 95:1, 95:12, 95:18, 95:24, 96:2, 96:5, 96:18, 96:22, 97:17, 97:24, 98:8, 99:2, 99:6, 99:9, 100:2, 101:5, 101:12, 101:15, 102:6, 102:13, 103:8, 103:9, 105:2, 105:5, 106:20, 109:1, 109:10, 109:21, 124:17, 139:10, 144:1, 144:18, 145:24, 155:14, 155:17, 157:9, 157:13, 167:7, 169:6, 169:15, 169:19, 174:10, 174:15, 208:18, 209:11, 210:1, 210:10, 211:8, 216:7, 220:5, 230:11
**HONORABLE** [1] - 1:4
**hook** [1] - 7:5
**hour** [9] - 30:3, 30:6, 43:22, 43:23, 43:24, 56:21, 56:24, 56:25, 121:15
**hours** [1] - 229:22
**house** [1] - 76:17
**housekeeping** [1] - 97:3
**huge** [2] - 57:17, 121:19
**human** [3] - 52:18, 177:20, 178:11
**hundred** [2] - 28:24, 171:25
**hundreds** [3] - 57:13, 57:14, 179:23

**I**

**i.e** [1] - 191:15
**idea** [5] - 25:12, 101:1, 134:16, 159:25, 161:8
**ideas** [1] - 126:16
**identification** [2] - 11:11, 215:7
**identified** [11] - 5:1, 11:6, 11:19, 43:15, 158:19, 159:7, 186:3, 187:8, 203:7, 204:25, 225:15
**identifies** [3] - 10:15, 13:25, 205:15
**identify** [13] - 5:5, 13:16, 47:13, 113:7, 114:24, 115:3, 181:4, 181:25, 188:22, 197:1, 202:17, 214:12, 228:1
**identifying** [9] - 15:21, 43:13, 47:9, 105:18, 134:5, 143:11, 226:1, 227:24, 228:12
**ignored** [2] - 160:19, 161:16
**ignores** [1] - 161:10
**illustration** [1] - 181:5
**illustrations** [1] - 34:15
**image** [153] - 30:24, 31:17, 31:21, 36:15, 36:19, 37:2, 37:5, 37:13, 37:14, 37:15, 37:19, 37:22, 38:10, 38:11, 38:16, 40:16, 40:19, 40:25, 44:21, 45:6, 45:11, 45:14, 46:7, 48:19, 50:13, 84:18, 84:19, 84:20, 84:22, 84:24, 85:1, 85:15, 85:21, 85:22, 85:24, 86:4, 86:5, 86:7, 115:15, 116:7, 116:17, 117:1,

117:2, 117:4, 117:5, 117:10, 117:19, 117:20, 119:8, 119:9, 120:25, 121:22, 121:23, 122:9, 122:23, 123:19, 123:23, 123:25, 124:14, 124:24, 125:7, 125:18, 127:17, 127:18, 127:20, 127:22, 127:23, 127:25, 132:3, 132:7, 132:9, 132:10, 132:13, 132:16, 132:20, 133:4, 133:9, 133:10, 133:11, 133:13, 133:18, 133:20, 134:7, 134:13, 134:20, 134:22, 134:24, 134:25, 135:5, 135:6, 135:8, 135:14, 135:20, 135:22, 136:5, 136:7, 137:3, 137:9, 137:11, 137:14, 137:17, 142:7, 142:8, 161:11, 163:8, 182:8, 183:9, 185:2, 186:17, 187:23, 187:25, 188:2, 188:10, 188:11, 188:12, 188:17, 188:18, 189:1, 189:2, 199:16, 200:14, 200:16, 200:17, 200:18, 200:25, 201:2, 201:11, 203:15, 204:7, 214:5, 214:8, 215:23, 221:3, 221:24, 222:1, 222:5, 223:6, 223:13, 228:12
**images** [52] - 32:1, 35:5, 36:18, 37:17, 37:21, 37:23, 37:25, 38:3, 38:8, 40:18, 45:3, 45:13, 49:2, 49:3, 49:4, 53:4, 111:12, 113:8, 114:23, 115:2, 115:4, 115:12, 115:24, 116:4, 116:16, 116:19, 116:23, 119:2, 122:19, 135:17, 140:20, 161:6, 162:8, 162:15, 163:1, 163:10, 163:12, 166:16, 171:14, 177:9, 178:1, 179:23, 179:24, 181:13, 182:7, 183:3, 223:7, 223:10
**imagine** [1] - 203:11
**imaging** [2] - 75:18, 178:16
**Imaging** [1] - 170:21
**imagining** [2] - 27:13, 33:18
**immediately** [3] - 70:11, 188:14, 191:11
**impeachment** [1] - 83:20
**implement** [5] - 51:1, 126:20, 126:21, 222:11, 222:17
**implementation** [3] - 124:12, 197:13, 223:15
**implemented** [3] - 51:3, 222:14, 222:18
**implementing** [1] - 122:25
**implication** [2] - 53:8, 199:1
**imply** [1] - 66:12
**importance** [1] - 165:13
**important** [13] - 31:5, 106:11, 106:12, 162:16, 163:15, 163:16, 164:8, 165:4, 165:24, 168:5, 168:7, 196:3, 229:8
**importantly** [1] - 15:18
**impossible** [1] - 53:7
**impression** [5] - 7:1, 184:20, 186:2, 200:2, 214:1
**improper** [2] - 83:20, 168:17
**improve** [1] - 126:15
**Improve** [1] - 42:11
**improvement** [1] - 92:6
**IN** [1] - 231:8
**in-house** [1] - 76:17
**ina** [1] - 222:12
**inaccurate** [1] - 9:9
**inappropriate** [1] - 17:8
**INC** [2] - 1:6, 1:9
**Inc** [2] - 4:5
**inch** [1] - 30:7
**include** [7] - 12:5, 15:24, 63:13, 96:20, 134:4, 200:15, 214:15
**included** [14] - 9:16, 11:22, 13:19, 60:18, 60:19, 81:19, 92:7, 128:11, 130:2, 146:11, 192:6, 199:15, 203:3, 216:4
**includes** [3] - 98:10, 149:11, 189:3
**including** [9] - 15:8, 15:11, 165:2, 173:5, 175:19, 183:1, 214:17, 223:25, 227:9
**incomplete** [1] - 196:21
**incompletely** [1] - 197:16
**inconsequential** [1] - 17:7
**inconsistency** [1] - 16:23
**inconsistent** [2] - 101:14, 145:23
**incorrect** [2] - 99:10, 221:14
**increase** [1] - 56:2
**independent** [2] - 93:12, 158:1
**independently** [1] - 94:21
**INDEX** [1] - 3:1
**indicate** [3] - 47:7, 168:16, 204:8
**indicated** [1] - 227:9
**indicates** [5] - 13:23, 133:8, 161:4, 221:2, 227:3
**indicating** [2] - 101:10, 166:21
**indication** [1] - 186:10
**indications** [1] - 225:19
**individual** [1] - 12:20
**individually** [1] - 224:19
**individuals** [2] - 158:7, 162:13
**induced** [7] - 201:25, 202:2, 202:6, 202:15, 205:25, 206:3
**inducing** [1] - 119:20
**industry** [3] - 27:25, 72:18, 104:6
**inf** [1] - 78:25
**inference** [8] - 179:15, 180:15, 180:22, 180:23, 181:23, 182:3, 182:10, 182:17
**inflated** [1] - 162:6
**inform** [2] - 220:8, 225:22
**information** [26] - 19:10, 19:20, 33:5, 37:3, 39:7, 73:19, 74:19, 78:14, 101:4, 157:22, 158:2, 158:13, 158:15, 159:3, 160:8, 161:11, 162:3, 163:15, 163:21, 164:4, 164:7, 165:4, 165:19, 179:17, 188:23, 189:14
**informative** [1] - 20:2
**informed** [1] - 174:8
**infrastructures** [3] - 29:2, 29:10, 32:17
**infringe** [16] - 79:22, 80:8, 119:20, 138:1, 151:11, 151:14, 151:19, 160:13, 175:1, 185:23, 186:19, 186:24, 199:3, 201:5, 201:7
**infringed** [11] - 76:3, 80:13, 96:8, 96:21, 130:16, 143:17, 159:10, 160:6, 163:20, 166:12, 206:3
**infringement** [41] - 8:7, 9:8, 11:17, 16:1, 22:13, 22:14, 22:15, 51:19, 67:24, 74:18, 74:22, 77:4, 78:21, 78:24, 79:15, 80:5, 80:12, 92:10, 95:9, 100:6, 108:11, 151:5, 164:11, 166:13, 177:12, 188:18, 190:7, 198:22, 198:23, 201:25, 202:2, 202:3, 202:6, 202:7, 202:8, 202:15, 204:15, 205:25, 206:3, 206:9, 210:18
**infringer** [1] - 163:20
**infringes** [5] - 108:5, 166:16, 177:8, 184:5, 184:9
**infringing** [19] - 38:14, 53:10, 53:19, 68:21, 79:6, 79:23, 80:1, 90:18, 100:7, 116:17, 129:19, 141:3, 141:18, 144:17, 145:18, 145:21, 146:2, 153:16, 166:16
**inherent** [1] - 139:13
**initiate** [1] - 88:20
**injunction** [1] - 97:11
**INO** [11] - 27:17, 27:20, 28:21, 28:22, 29:16, 29:20, 110:24, 110:25, 111:3, 111:13, 111:14
**input** [21] - 117:12, 125:7, 127:17, 127:18, 133:4, 133:9, 133:18, 133:21, 134:8, 134:13, 136:13, 137:9, 139:19, 140:7, 140:12, 191:14, 204:13, 204:14, 204:15
**inputs** [4] - 139:2, 139:21, 139:22, 140:3
**inputting** [7] - 202:18, 202:21, 203:6, 203:23, 204:21, 206:4, 206:5
**inquire** [1] - 76:11
**inserting** [1] - 96:7
**inside** [5] - 32:22, 175:21, 177:9, 177:10, 190:11
**inspect** [5] - 38:21, 53:22, 57:25, 58:3, 66:12
**inspecting** [5] - 32:15, 32:23, 33:2, 33:24, 35:9
**Inspection** [2] - 42:11, 225:9
**inspection** [31] - 31:20, 33:21, 33:22, 34:2, 34:6, 35:12, 42:4, 43:20, 44:13, 50:10, 54:12, 60:7, 66:13, 69:15, 78:7, 78:13, 78:25, 79:5, 104:5, 111:5, 111:23, 113:5, 119:1, 120:18, 141:10, 146:17, 183:15, 206:20, 206:23, 206:24, 207:2

**Inspections** [1] - 50:4
**inspections** [5] - 34:11, 57:13, 111:20, 113:2, 225:18
**inspectors** [1] - 57:15
**install** [1] - 64:25
**installation** [2] - 66:4, 214:18
**Installation** [1] - 36:12
**installed** [6] - 58:15, 58:22, 59:5, 64:10, 64:14, 72:10
**instance** [7] - 115:1, 117:11, 121:5, 125:3, 127:22, 132:14, 137:8
**instead** [6] - 22:1, 48:18, 120:24, 134:24, 135:5, 181:14
**Institute** [3] - 27:17, 110:24, 170:11
**instruction** [2] - 97:14, 183:2
**Instruction** [11] - 93:4, 93:20, 93:23, 94:12, 94:25, 95:3, 96:5, 96:13, 97:19, 97:21, 98:4
**instructions** [13] - 23:1, 91:4, 91:18, 91:23, 93:1, 93:3, 95:20, 96:3, 97:2, 97:6, 229:24, 230:5, 230:7
**insufficient** [1] - 16:3
**integrate** [1] - 134:18
**integrating** [1] - 105:23
**integrators** [2] - 57:23, 58:2
**intellectual** [2] - 156:16, 157:10
**intelligence** [17] - 48:7, 162:10, 171:9, 171:13, 173:1, 173:9, 174:11, 177:15, 178:2, 178:8, 181:11, 185:6, 185:10, 185:11, 185:17, 223:16, 223:18
**Intelligence** [1] - 50:3
**intended** [1] - 39:8
**intensity** [44] - 30:22, 30:25, 31:5, 31:17, 31:25, 36:23, 37:2, 37:3, 37:14, 37:15, 37:17, 37:20, 37:25, 45:3, 45:4, 45:11, 45:14, 69:5, 84:21, 84:25, 85:1, 85:23, 85:24, 86:1, 86:2, 115:4, 117:2, 117:5, 117:13, 118:13, 119:9, 127:22, 133:11, 134:17, 141:21, 142:3, 142:8, 220:23, 220:25, 221:4, 221:25, 222:4
**interconnections** [1] - 53:2
**interest** [6] - 54:5, 55:23, 105:23, 122:11, 122:20, 204:9
**interested** [6] - 29:9, 29:12, 38:20, 55:14, 72:6, 72:14
**interesting** [5] - 52:17, 53:8, 54:1, 182:8, 197:7
**interface** [4] - 112:15, 112:23, 112:25, 131:14
**interfaced** [1] - 112:9
**interior** [1] - 210:18
**intern** [1] - 134:15
**internal** [1] - 89:4
**Internet** [4] - 73:18, 74:19, 74:20, 123:3
**interplay** [1] - 16:18
**interpretation** [1] - 166:15
**Interstate** [1] - 156:23
**introduce** [2] - 10:9, 170:1
**invalid** [7] - 96:8, 142:19, 160:13, 184:17, 206:13, 206:15, 224:25
**invalidate** [9] - 183:16, 208:9, 208:10, 208:12, 208:14, 210:17, 213:13, 213:16, 221:15
**invalidated** [2] - 55:20, 68:10
**invalidates** [6] - 175:2, 208:4, 213:5, 213:8, 213:19, 213:22
**invalidity** [9] - 17:15, 17:22, 182:21, 183:18, 206:11, 207:11, 207:13, 208:20, 214:14
**invent** [1] - 123:9
**invention** [9] - 20:9, 20:18, 20:20, 20:24, 22:1, 94:21, 208:23, 219:16, 220:10
**inversus** [1] - 28:14
**investigations** [1] - 156:11
**invoice** [6] - 35:25, 64:6, 64:7, 80:22, 81:15, 216:10
**invoiced** [4] - 36:7, 59:17, 63:8, 63:10
**invoices** [1] - 214:20
**involved** [3] - 113:4, 129:22, 193:23
**involving** [1] - 171:18
**iPhone** [2] - 172:3, 172:6
**IRVINE** [1] - 2:11
**Irvine** [1] - 77:10
**IS** [1] - 231:14
**isolating** [1] - 228:11
**issue** [34] - 7:10, 9:2, 12:11, 13:10, 16:13, 20:5, 20:7, 20:15, 21:20, 22:9, 22:17, 22:21, 52:4, 52:7, 59:8, 67:22, 75:20, 93:17, 96:22, 97:4, 100:1, 101:3, 144:11, 160:18, 163:25, 165:12, 165:21, 183:19, 210:20, 211:6, 211:7, 212:20, 219:7, 230:5
**issued** [1] - 225:17
**issues** [15] - 4:10, 9:3, 9:4, 17:2, 18:9, 22:15, 23:1, 156:15, 165:12, 166:6, 167:24, 185:21, 185:25, 186:3, 186:14
**it'll** [3] - 23:21, 45:21, 91:4
**Italian** [1] - 75:12
**Item** [1] - 4:3
**items** [5] - 15:22, 207:12, 212:22, 216:20, 218:2
**iteration** [2] - 192:23, 194:9
**itself** [10] - 7:9, 53:17, 150:23, 177:24, 185:18, 190:17, 200:16, 202:13, 210:16, 217:15
**Ivey** [9] - 70:18, 88:25, 104:21, 105:11, 105:17, 105:25, 106:25, 107:18, 152:12

**J**

**JAMES** [1] - 2:15
**January** [19] - 21:8, 21:13, 23:21, 34:21, 59:9, 67:24, 67:25, 68:1, 74:18, 74:23, 74:25, 76:1, 87:15, 95:8, 141:2, 144:24, 145:12, 145:23, 151:23
**Japan** [1] - 49:16
**Jean** [1] - 110:2
**JEAN** [2] - 3:12, 110:8
**jean** [1] - 110:8
**Jean-Francois** [1] - 110:2
**jean-Francois** [1] - 110:8
**Jeff** [1] - 68:19
**JENCY** [1] - 2:18
**job** [9] - 27:18, 104:3, 120:17, 126:14, 170:16, 180:13, 181:7, 188:8, 217:7
**John** [9] - 25:6, 25:19, 71:25, 72:2, 110:25, 111:2, 111:14, 145:16, 175:16
**JOHN** [2] - 3:10, 25:20
**Joint** [2] - 225:9, 226:18
**joint** [19] - 16:12, 16:15, 16:20, 132:6, 188:12, 225:2, 225:12, 225:14, 225:24, 226:2, 226:19, 226:22, 227:4, 227:17, 227:24, 227:25, 228:1, 228:7
**joints** [1] - 225:19
**joke** [2] - 106:5
**JOSEPH** [1] - 2:6
**Joseph** [1] - 77:10
**journal** [1] - 173:3
**JUDGE** [1] - 1:4
**judgment** [2] - 21:8, 76:25
**July** [2] - 73:8, 75:22
**jump** [6] - 101:25, 102:1, 166:25, 192:13, 193:21, 212:12
**jumped** [1] - 184:22
**June** [4] - 59:17, 69:20, 70:21, 71:5
**jurors** [4] - 23:7, 90:25, 102:5, 103:18
**jury** [40] - 4:11, 4:21, 7:11, 14:21, 19:3, 19:11, 19:21, 22:25, 23:1, 23:4, 23:6, 43:1, 43:5, 45:9, 61:21, 91:2, 91:4, 91:18, 91:23, 93:1, 93:3, 93:22, 96:3, 97:2, 103:16, 140:15, 147:16, 160:12, 166:14, 166:23, 170:1, 209:19, 212:14, 217:8, 230:3, 230:5, 230:7

**K**

**Karami** [3] - 191:7, 191:11, 191:17
**keep** [15] - 30:16, 90:1, 90:6, 90:20, 90:21, 108:9, 113:20, 126:10, 147:20, 150:14, 176:14, 177:17, 180:7, 183:10, 216:23
**keeping** [3] - 179:11, 222:3, 229:18
**kept** [3] - 23:8, 89:6, 98:23
**kernel** [2] - 45:25, 46:3
**kernels** [3] - 223:4, 223:5, 223:20
**Kerr** [1] - 97:6
**key** [8] - 61:11, 61:23, 61:24, 62:16, 160:18, 160:19, 162:16, 205:2
**Keyes** [1] - 165:10
**keys** [3] - 61:8, 62:1
**kids** [1] - 172:15
**kilometers** [2] - 43:22, 56:21
**kind** [16] - 14:13, 17:6, 56:8, 73:18, 75:17, 79:19, 149:14, 156:14, 164:7, 172:11, 179:12, 180:10, 180:12, 181:8, 212:21, 230:8
**kinds** [7] - 30:5, 30:19, 31:23, 32:2, 32:16, 55:15, 71:21

Knobbe [1] - 77:9
KNOBBE [1] - 2:4
knowing [3] - 188:2, 219:16, 221:23
knowledge [4] - 78:6, 130:12, 216:4, 218:3
known [5] - 119:5, 135:19, 149:12, 206:1, 217:25, 218:2
knows [3] - 180:25, 181:20

**L**

L-a-u-r-e-n-t [1] - 35:17, 44:3, 226:20, 227:3
lab [13] - 149:18, 149:22, 150:6, 150:7, 150:12, 150:15, 150:17, 150:21, 150:23, 222:7, 222:12, 222:14, 222:18
lab's [1] - 149:24
labeled [2] - 204:2, 205:1, 221:4
labels [1] - 199:18
Labs [1] - 171:21
lack [1] - 95:7
laid [3] - 16:24, 45:19, 210:2, 224:22
lane [3] - 31:13, 31:15, 31:16, 31:19
language [5] - 83:24, 114:17, 139:13, 202:12, 222:17
languages [2] - 170:22, 222:9
lap [1] - 131:11
Laquer [1] - 9:21
LAQUER [41] - 2:8, 3:16, 9:20, 10:14, 11:3, 11:18, 11:21, 12:6, 12:14, 12:17, 15:15, 16:9, 18:22, 19:15, 19:25, 21:17, 22:24, 169:6, 169:15, 169:23, 195:13, 195:8, 196:6, 209:8, 209:10, 210:1, 210:7, 210:18, 211:22, 212:8, 212:13, 213:7, 217:12, 220:7, 222:23, 222:25, 228:16, 229:21
large [4] - 12:7, 12:19, 16:2, 76:18

larger [2] - 199:1
Larson [2] - 165:3, 165:10
laser [19] - 26:5, 28:6, 28:8, 28:13, 28:15, 30:11, 35:16, 42:2, 42:3, 42:17, 44:2, 44:5, 67:3, 75:6, 226:14
Laser [2] - 29:25, 42:11
laser-based [1] - 226:14
lasers [9] - 29:1, 35:17, 44:3, 226:20, 42:3, 42:9, 42:13, 42:16, 43:21, 44:5, 67:3, 75:6, 180:6, 84:14, 86:3, 86:6, 90:9, 94:20, 123:19, 154:12, 155:25, 158:7, 158:8, 158:9, 170:18, 171:20, 171:21
lastly [2] - 173:8, 201:21
late [2] - 158:19, 178:15
lated [1] - 130:7, 3:12, 6:2, 23:1, 23:14, 23:17, 25:6, 25:9, 26:14, 26:15, 26:24, 25:25, 26:3, 26:6, 26:16, 26:18, 28:1, 28:20, 43:8, 61:15, 61:21, 77:21, 83:20, 87:24, 89:13, 91:11, 105:5, 109:10, 109:14, 109:18, 110:1, 110:12, 124:21, 136:17, 136:20, 139:15, 139:18, 143:20, 143:24, 145:24, 148:6, 148:10, 150:12, 210:9, 211:6, 212:16, 212:19, 211:19, 212:6, 216:13, 219:5
lay [1] - 61:4

layer [5] - 50:14, 191:14, 198:5
layers [5] - 52:20, 123:17, 123:18, 123:19, 123:20
layoffs [1] - 165:2
lays [1] - 227:2
LCMS [46] - 10:10, 29:24, 30:10, 32:3, 32:14, 33:1, 33:19, 33:23, 34:1, 34:8, 34:11, 35:3, 35:8, 35:11, 35:16, 36:6, 36:12, 37:23, 38:18, 42:3, 42:19, 43:1, 44:5, 146:11, 146:13, 146:22, 147:11, 147:25, 148:1, 151:2, 26:24, 75:17, 106:22, 108:22, 109:10, 11:21, 111:24, 113:3, 115:2, 117:11, 119:1, 146:5, 146:11, 158:18, 207:3
Lea [1] - 77:13
ea [2] - 94:7, 94:24
LEA [9] - 2:5, 3:10, 3:12, 6:2, 23:1, 23:14, 23:17, 25:6, 25:9, 26:14, 25:25, 26:3, 26:6, 28:20, 43:8, 61:15, 61:21, 77:21, 83:20, 87:24, 89:13, 91:11, 105:5, 109:10, 109:14, 109:18, 110:1, 110:12, 124:21, 136:17, 136:20, 139:15, 143:24, 145:24, 148:6, 148:10, 150:12, 210:9, 211:6, 212:16, 219:5
leave [2] - 25:15, 111:13
leaves [1] - 192:5
leaving [1] - 196:12
led [25] - 29:16, 36:15, 36:19, 38:20, 40:24, 41:25, 81:6, 84:20, 103:20, 109:13, 114:24, 124:20, 126:21, 132:12, 156:11, 136:18, 139:10, 139:14, 143:24, 145:24, 154:12, 158:8, 158:18, 207:3
led's [2] - 94:7, 94:24
length [4] - 225:2, 227:15, 227:23
lengths [1] - 225:12
Lens [2] - 171:21, 172:19
less [5] - 38:6, 137:19, 148:20, 159:7, 172:16
Let's [18] - 138:20
letter [18] - 21:8, 67:24, 68:12, 68:16, 74:17, 74:22, 74:25, 75:1, 75:19, 77:24, 78:16, 80:11, 141:2, 141:6, 149:10, 143:13, 151:4
letters [1] - 194:7
letting [1] - 17:1
level [7] - 177:17, 179:11, 182:22, 137:7, 138:22

183:20, 189:13, 189:13, 215:13
levels [1] - 47:6
liability [1] - 160:10
library [15] - 51:2, 112:8, 112:9, 112:15, 112:24, 122:3, 123:3, 123:5, 123:8, 123:12, 126:16
license [15] - 59:18, 60:22, 61:6, 62:6, 62:7, 62:16, 64:4, 65:1, 65:21, 65:24, 66:16, 82:5, 82:10, 82:13, 126:19, 129:12, 129:16, 129:20
licensed [5] - 62:4, 62:8, 63:20, 63:21, 63:23, 65:14, 65:19, 66:15, 129:14, 130:13, 130:24, 131:9, 157:3
licenses [1] - 60:23
light [17] - 30:23, 38:2, 38:3, 38:5, 38:6, 99:25, 101:23, 102:2, 103:10, 108:22
lighting [3] - 37:22, 118:18
likely [2] - 228:9
limitation [10] - 10:23, 11:18, 12:21, 16:13, 168:2, 189:16, 189:20, 197:3, 198:16, 198:17, 198:21, 200:24, 207:12, 218:19, 217:22, 218:10, 219:12, 220:11
limitations [9] - 11:24, 12:19, 13:3, 16:16, 16:19, 182:4, 188:3, 189:10
line [9] - 138:20, 140:8, 140:9, 168:19, 168:23, 168:25, 5:16, 5:22, 6:17, 6:18, 28:6, 28:7, 28:8, 43:10, 43:18, 45:16, 57:14, 81:25, 82:9, 86:13, 91:21, 95:15, 96:6, 98:1, 107:18, 115:7, 115:8, 115:9, 115:18, 116:12, 116:13, 117:11, 118:6, 132:14, 137:7, 138:22

144:19, 144:21, 149:14, 149:21, 152:14, 225:16, 226:2
lines [14] - 4:22, 6:21, 10:15, 23:9, 34:6, 44:8, 85:12, 91:23, 93:5, 93:8, 95:7, 96:10, 115:11, 126:1, 126:5, 129:5, 131:25, 132:1, 137:19, 172:5, 172:16, 172:25, 172:17, 173:10, 183:15, 183:18, 183:24, 184:4, 196:25, 197:5, 197:8, 205:20, 206:2, 206:4, 223:15, 226:1, 228:5, 228:11, 228:16
locked [2] - 57:10, 72:10, 76:8, 79:23, 102:22, 102:24, 108:2, 117:18, 119:17, 146:6, 149:25, 150:3, 150:8, 151:7
lists [1] - 191:21
literal [2] - 198:21, 198:23
literally [2] - 199:2
litigation [6] - 78:24, 77:9, 78:20, 79:2, 133:25
live [4] - 176:3, 176:5, 182:4, 182:6
lives [1] - 72:8
LLP [1] - 2:4
located [3] - 53:9, 63:9, 182:19
location [14] - 10:23, 11:18, 12:21, 16:13, 181:20, 198:2, 198:10, 214:9, 214:10, 216:3, 216:8, 94:4, 104:18, 106:17, 168:3, 169:6, 169:23, 170:10, 173:6, 173:12, 178:15, 180:5, 189:10, 189:13, 190:22, 192:4, 204:8, 204:17, 205:9, 205:23, 207:10, 214:12

103:4, 103:13, 159:6, 159:14, 159:24, 160:20, 160:22, 161:21, 163:25, 165:1, 166:1, 166:21, 167:3
love [11] - 54:2, 71:20, 71:21
loved [1] - 53:24
low [2] - 48:5, 92:1
Lowell [4] - 35:11, 113:4, 146:6, 206:25
lowering [1] - 154:3
LRAIL [15] - 5:22, 5:23, 6:6, 6:13, 7:5, 13:13, 16:10, 46:9, 46:14, 50:23, 51:3, 51:4, 52:23, 54:18, 55:5, 55:8, 55:12, 55:17, 56:10, 56:12, 57:8, 57:11, 58:1, 58:9, 58:12, 58:14, 60:6, 60:8, 60:9, 62:18, 63:24, 64:20, 65:7, 69:16, 69:19, 69:22, 70:1, 70:13, 70:23, 71:13, 71:16, 72:24, 73:7, 73:12, 75:4, 81:3, 81:17, 81:19, 82:5, 82:9, 82:12, 84:14, 85:2, 85:13, 85:20, 86:2, 86:5, 87:3, 87:8, 87:22, 88:6, 88:12, 88:13, 89:1, 89:7, 90:2, 107:1, 107:15, 107:24, 108:3, 108:4, 109:24, 113:17, 118:1, 118:6, 118:8, 118:11, 119:3, 129:3, 129:6, 129:21, 137:25, 162:19, 162:21, 163:13, 163:19

199:4, 200:3, 200:7, 201:6, 201:10, 201:22, 202:11, 202:13, 203:23, 204:20, 206:2, 206:4, 214:3, 223:15, 222:18, 16
LRAIL's [4] - 4:23, 128:3, 128:6, 128:12, 128:10, 197:15, 197:14, 199:24, 200:8, 208:12, 218:25, 221:10, 221:12, 221:15, 221:21, 221:22, 228:8
LRB [1] - 199:21
LRMS [1] - 33:17
LU [2] - 4:2, 4:14, 46:14, 50:23, 51:3, 51:4, 52:23, 54:18, 55:5, 55:8, 55:12, 107:3, 107:14, 108:4
lunch [3] - 90:24, 91:10, 102:5, 103:17, 229:24, 230:7, 230:8
Lunch [1] - 91:16

**M**

M.S [1] - 170:9
m_PIRange [1] - 221:1
M_pucirdata [1] - 220:24
machine [4] - 31:21, 40:5, 47:20, 50:14, 170:22, 171:18, 172:5, 186:12
machine-learning [5] - 40:5, 31:21, 31:24, 40:6, 47:20, 50:14
Machines [1] - 170:22
machines [2] - 12:16, 31:19
marking's [1] - 31:16
markings [2] - 31:13, 31:16
MARTENS [1] - 2:4
Martens [1] - 77:10
mask [10] - 140:13, 203:1, 203:12, 203:14, 203:18, 204:8, 204:24, 205:1, 205:6
Massachusetts [1] - 35:11, 113:4, 146:6, 160:2

majority [1] - 41:18
main [20] - 43:11, 43:16, 44:23, 49:4, 134:2, 141:21, 142:4, 142:18, 149:19, 199:24, 200:8, 208:12, 218:25
Majesty [1] - 128:4
maintain [1] - 91:24
maintained [1] - 142:23
maintenance [1] - 57:7
Maintenance [1] - 57:4
major [1] - 50:24
make [42] - 5:8, 225:16, 226:2
makes [1] - 60:4
making [2] - 18:23
man [1] - 66:15
manage [1] - 23:10
mandated [1] - 225:18
manual [4] - 66:8, 66:24, 127:11, 189:7, 189:13

192:12, 199:15, 199:16, 214:19, 215:1, 215:6, 223:24, 224:14
Manual [4] - 183:2, 210:4, 214:18
map [20] - 43:11, 43:16, 44:23, 49:4, 134:2, 141:21, 142:4, 142:18, 199:24, 200:8, 208:12, 218:25, 221:10, 221:12, 221:15, 221:21, 221:22, 228:8
mapped [1] - 14:8
maps [2] - 224:6
Marc [1] - 3:5
March [13] - 47:15, 63:1, 66:6, 82:25, 84:5, 84:8, 88:24, 90:7, 107:9, 127:9, 137:18, 167:1, 167:6, 173:6, 178:25
Mario [1] - 113:16
mark [1] - 20:10
MARK [1] - 1:4
marked [3] - 51:3, 51:4, 52:23, 54:18, 55:5
market [12] - 32:14, 56:11, 57:8, 57:17, 57:18, 100:14, 100:20, 160:23, 161:2
marking [2] - 22:16, 32:19, 32:22, 74:7, 31:19
marks [2] - 28:22, 31:13, 31:16
MARTENS [1] - 2:4
Martens [1] - 77:10
mask [10] - 140:13, 203:1, 203:12, 203:14, 203:18, 204:8, 204:24, 205:1, 205:6
Massachusetts [1] - 35:11, 113:4, 146:6, 160:2
master [8] - 27:11, 27:14, 110:18
Masters [1] - 27:16
mat [14] - 149:18, 149:22, 150:6, 150:7, 150:15, 150:17

150:17, 150:21, 150:23, 222:7, 222:12, 222:14, 222:18
match [5] - 178:1, 221:17, 228:7
mater [1] - 172:10
material [5] - 73:22, 74:7, 219:22, 225:5
materials [2] - 7:20, 28:17, 175:8
matter [4] - 17:13, 176:19, 226:22, 227:23
mattered [2] - 6:25
matters [4] - 157:6, 157:19, 189:12
maximum [6] - 227:25
Mayo [2] - 171:11
MBA [2] - 156:25
mean [27] - 17:2, 40:3, 56:18, 60:7, 66:17, 68:21, 95:6, 102:16, 102:23, 106:9, 133:11, 133:12, 133:16, 159:14, 189:6, 190:14, 196:25, 200:22, 208:16, 227:23
mean-, [2] - 5:18, 106:22, 207:22
meaning [1] - 67:12
meanings [1] - 222:19
means [10] - 7:12, 66:18, 114:19, 114:22, 115:11, 115:22, 123:22, 189:18, 199:15, 206:8, 208:13
MEANS [1] - 231:13
meant [3] - 37:24, 116:22, 143:16, 187:6
meaning [1] - 30:3, 31:19, 31:16, 157:19
measure [1] - 30:4, 30:5, 30:9, 30:10, 33:15, 34:19, 31:1, 31:5, 31:8, 94:20, 201:23, 201:1

measurement [3] - 199:25, 200:24
Measurement [1] - 29:25
measurements [4] - 54:18, 118:8, 118:9, 187:5, 200:21, 201:22
measuring [7] - 29:2, 30:2, 31:10, 43:12, 116:8, 225:1, 226:15
Mechanical [1] - 170:9
mechanical [1] - 67:8
media [1] - 173:3
Medicine [1] - 34:24
meet [8] - 11:9, 96:12, 96:14, 105:11, 106:6, 170:2
meeting [8] - 34:22, 39:11, 39:16, 40:1, 40:5, 41:24, 183:4, 207:3, 214:19
meetings [5] - 39:2, 78:10, 134:20, 134:22, 154:25, 155:3
meets [1] - 203:23
member [1] - 171:3
members [3] - 193:3, 30:6, 32:10, 32:12
memory [6] - 4:22, 4:18, 125:23
mention [5] - 70:12, 72:3, 77:10, 79:18, 162:12, 141:2, 141:6, 149:10
mentioned [3] - 54:7, 72:5, 73:9, 77:13, 147:13, 181:13, 178:16, 178:19, 207:8, 175:13
menu [3] - 17:15, 126:11
merge [2] - 17:25
merged [6] - 40:23, 45:15, 84:22, 85:1, 85:3
merges [1] - 37:20
merging [6] - 37:20, 37:24, 45:3
merit [3] - 68:14, 170:17, 170:20
messed [5] - 58:17, 70:12, 70:19, 76:9, 76:13
Mesher's [1] - 14:10
met [10] - 73:13, 99:14
mix [9] - 134:13, 135:4, 134:14

134:22, 134:24, 135:5, 135:8, 135:20, 135:23, 136:3, 136:6, 136:12, 137:3, 137:5, 137:8, 138:12, 139:23, 145:22, 187:23, 188:2, 188:22, 191:17, 191:18, 197:5, 197:9
Metari [4] - 39:24, 113:16, 113:18, 114:19
Method [2] - 183:25, 184:2
method [13] - 40:12, 40:13, 40:14, 46:1, 46:3, 115:22, 115:23, 115:25, 116:1, 116:5, 124:21, 136:17, 136:20, 182:18, 183:6, 183:10, 223:12
methodologies [1] - 53:7
methods [4] - 43:12, 184:24, 223:20, 229:17, 229:18
mid-2020 [1] - 78:18
mid-level [1] - 45:11, 91:16, 108:16, 155:25, 162:15, 172:1
middle [10] - 43:16, 91:6, 108:16, 155:25, 162:15, 172:1
midsize [1] - 155:8
might [9] - 25:12, 26:3, 70:13, 91:25, 93:8, 137:19, 152:16, 176:4, 216:22
Mike [8] - 34:6, 35:2, 169:6, 213:14
MILLER [5] - 1:22, 231:20, 231:21
millions [2] - 4:2, 4:14
min [1] - 42:13, 32:10, 32:12, 195:6, 196:12, 122:6, 120:21, 136:1, 136:6, 136:10, 136:13, 136:15, 136:19, 136:21, 137:15, 181:1, 181:2
mind [3] - 125:23, 116:7, 187:4
mindset [1] - 72:16
mine [1] - 172:11
minus [2] - 45:11
minute [3] - 42:2, 42:13
minutes [18] - 23:22, 94:2, 21:24, 21:4, 22:3, 25:1, 41:17, 44:24, 144:1, 144:8, 144:16, 145:19, 203:12, 222:5
MISSING [1] - 23:1
miss [1] - 195:2
missed [1] - 118:7, 118:9
mistake [2] - 159:19, 159:21
misunderstand [1] - 100:20
mix [9] - 134:13, 135:4, 134:14

4:17, 4:20, 5:3, 5:7, 5:11, 5:14, 5:17, 6:5, 6:9, 6:11, 6:16, 6:19, 7:22, 7:25, 8:1, 8:3, 8:6, 8:20, 9:1, 9:14, 9:12, 91:6, 91:12, 9:20, 10:14, 11:3, 11:21, 12:6, 12:14, 12:17, 14:7, 14:10, 14:15, 14:16, 14:24, 16:13, 16:14, 17:13, 17:14, 17:15, 17:20, 17:23, 18:14, 18:16, 18:22, 19:15, 19:25, 21:17, 22:24, 23:2, 23:22, 24:4, 24:8, 24:12, 24:14, 25:5, 25:9, 26:14, 25:25, 26:3, 26:6, 26:16, 26:18, 28:1, 28:20, 43:8, 61:15, 61:21, 77:21, 83:20, 87:24, 89:13, 91:11, 105:5, 109:10, 109:14, 109:18, 110:1, 110:12, 124:21, 136:17, 136:20, 139:15, 143:24, 145:24, 148:6, 148:10, 150:12, 210:9, 211:6, 212:16, 219:5
mixed [1] - 134:20, 204:23, 205:12

210:18, 211:8, 211:21, 212:6, 212:17, 213:2, 216:7, 216:16, 216:19, 216:22, 216:24, 216:25, 217:7, 217:13, 218:1, 218:8, 219:7, 219:12, 219:14, 219:19, 219:25, 220:3, 220:13, 220:21, 221:4, 221:25, 222:5, 223:20, 224:2, 224:9, 225:25, 226:14, 227:5, 227:13, 228:7, 228:13, 229:20, 229:25
moment [3] - 89:6, 102:18, 116:7
moments [2] - 206:10, 206:12
money [3] - 16:14, 57:20, 158:16, 160:1, 160:10
monitor [1] - 44:20, 44:21, 59:14, 171:3, 90:23, 94:13
Monday [6] - 87:2, 87:6
money [19] - 154:24, 155:1, 155:18, 156:12, 158:12, 159:3, 159:5, 159:7, 159:9, 159:12, 160:1, 160:5, 160:8, 160:13
month [2] - 190:14, 207:10
months [4] - 47:1, 47:22, 48:21, 48:23, 228:23, 228:24, 228:25
mood [1] - 132:20
morning [3] - 4:6, 4:7, 102:5, 229:10
morning's [1] - 229:17
mosaic [1] - 42:13
most [21] - 24:15, 55:25, 55:12, 67:11, 73:17, 78:7, 107:16, 110:20, 116:11, 118:5, 123:21, 136:2, 136:5, 136:10, 136:11, 136:16, 136:22, 136:24, 137:3, 137:7
mostly [2] - 27:25, 28:25
motion [1] - 77:9, 77:13, 77:15
motivation [1] - 208:24, 207:8
mount [6] - 190:14

names [1] - 188:15
narrowing [1] - 189
NASA [1] - 39:21
National [6] - 27:17, 34:23, 110:24, 114:18, 165:18, 170:22, 227:25, 228:1, 228:3, 228:4, 228:5
native [1] - 190:5, 191:14
natively [2] - 191:8
nature [3] - 201:16, 5:12, 27:16, 53:22, 54:17, 55:16, 62:19, 65:13, 114:5, 142:25, 157:25
nearing [1] - 41:15
need [31] - 4:8, 5:6, 22:10, 22:12, 23:6, 23:20, 24:25, 25:14, 25:22, 38:2, 38:4, 72:5, 76:20, 88:13, 88:14, 88:19, 88:24, 89:1, 89:3, 89:18, 91:25, 93:2, 93:13, 93:25, 94:6, 94:11, 94:14, 94:15, 108:9, 108:10, 128:25, 155:6, 184:24, 222:4
needed [9] - 56:25, 61:1, 61:15, 61:21, 83:20, 87:24, 89:13, 91:11
needing [2] - 98:11, 109:6
needs [5] - 68:7, 96:14, 97:11, 98:21, 120:22, 191:4
negative [3] - 98:8, 98:11, 109:6
neighborhood [14] - 218:23, 219:21, 219:23, 220:2, 220:4, 220:10, 220:13, 220:19, 220:21, 221:6
neighborhoods [2] - 184:25, 191:4
Nelson [2] - 205:12
network [3] - 31:22, 31:24, 40:3, 40:6
never [22] - 31:24, 56:25, 58:8, 58:14, 62:16, 62:24, 62:25, 68:14, 74:13, 74:16, 87:8, 90:5, 90:7, 90:17, 90:20

53:21, 56:1, 56:7, 68:25, 69:14, 120:10, 120:22, 121:18, 122:5, 126:6, 126:9, 127:17, 127:18, 127:21, 127:22, 128:1, 128:2, 128:6, 128:7, 128:10, 128:12, 128:18, 134:2, 145:6, 145:8, 145:11, 194:23, 196:18, 196:25, 197:18, 202:4, 203:3, 205:16, 206:17, 130:5, 130:23, 131:4, 131:12, 145:11, 181:8, 181:12, 183:4, 197:13, 199:13, 199:16, 200:5, 202:5, 205:17, 205:18, 205:19
named [2] - 17:2, 77:10

**Exhibit 4**
**234**

253

1511, 163:2, 163:3, 163:10, 177:10, 181:1, 181:24, 190:13, 193:21, 194:15, 194:25, 197:11

**NEW** [1] - 2:20

next [1] - 8:16, 10:9, 12:21, 18:4, 43:12, 53:3, 53:4, 87:1, 92:20, 98:13, 98:22, 120:16, 121:3, 121:5, 122:23, 126:12, 126:14, 126:16, 138:9, 140:10, 161:15, 171:12, 181:24, 193:22, 229:12, 229:13

next [18] - 7:8, 23:15, 24:7, 24:18, 25:5, 41:3, 45:24, 47:10, 53:6, 71:2, 71:3, 77:7, 87:1, 93:11, 103:11, 107:4, 109:13, 109:24, 156:16, 155:17, 162:23, 167:10, 167:17, 169:4, 169:7, 170:13, 172:22, 174:9, 182:19, 183:17, 185:21, 188:21, 189:15, 190:22, 196:25, 197:14, 198:14, 199:7, 199:23, 201:5, 201:18, 204:18, 227:6

**NFL** [1] - 170:17

**Nguyen** [2] - 120:17, 137:21

**Nguyen's** [1] - 137:22

nice [2] - 72:17, 170:2

nicely [1] - 227:5

**NICHOLAS** [2] - 2:7, 2:17

**Nick** [1] - 90:19

night [1] - 229:17, 230:12

**Nick** [1] - 90:24, 193:3, 193:8, 193:9, 194:13, 195:11, 195:20, 195:25, 196:3

**NN** [4] - 133:5, 134:13, 188:11, 188:12

188:13

**NO** [1] - 1:8

nobody [1] - 73:9

nodes [2] - 52:19, 181:9

non [1] - 65:8, 100:7

non-infringing [1] - 100:7

non-nonaccusable [1] - 175:5

nonadjacent [1] - 175:5

none [2] - 139:22, 185:14

noninfringement [6] - 186:7, 186:11, 186:14, 187:8, 214:4

noninfringing [5] - 99:17, 100:19, 101:18, 168:5, 168:1, 168:4

nontransferable [1] - 60:18

normalized [1] - 133:4

note [7] - 60:17, 65:6, 65:7, 82:5, 95:19, 203:2, 229:16

noted [2] - 4:7, 223:25

notes [1] - 74:11

**NOTES** [1] - 231:15

nothing [6] - 67:7, 68:15, 73:21, 74:20, 142:21, 150:11, 199:20

nothing's [1] - 67:6

notice [13] - 20:12, 21:12, 21:13, 60:6, 64:24, 67:24, 74:17, 79:17, 95:8, 133:15, 228:20

objections [11] - 7:19, 17:9, 17:10, 24:10, 83:19, 96:19, 97:15, 109:20, 157:13, 169:18

objective [1] - 180:21

objects [4] - 4:14, 98:12, 127:20, 127:22

observed [1] - 200:12

obtained [1] - 45:5

obtaining [1] - 112:22

obvious [1] - 19:8, 19:16, 175:4, 207:7, 208:5, 208:9,

189:10, 194:7, 17:20

**NW** [1] - 2:20

**O**

o'clock [1] - 90:25

object [2] - 79:12, 10:3, 26:7, 28:9, 28:10, 30:21, 122:20, 125:17, 125:22, 125:23, 126:3, 126:5, 130:2, 135:3

objected [4] - 6:23, 8:14, 11:11, 97:20

objecting [3] - 4:2, 5:2, 5:6, 7:6

objection [16] - 5:12, 8:5, 10:5, 10:7, 17:13, 23:24, 24:21, 26:9, 26:11, 61:17, 87:23, 87:24, 89:12, 89:13, 92:11, 92:15, 92:18, 92:19, 92:20, 92:22, 93:7, 93:9, 93:18, 93:19, 93:24, 94:14, 94:25, 95:11, 95:12, 95:17, 96:11, 100:21, 101:10, 102:25, 103:6, 105:1, 105:4, 105:5, 109:21, 124:17, 136:6, 136:21, 139:9, 139:11, 139:14, 174:15, 208:18, 216:7, 220:5, 222:20, 228:24

objections [11] - 7:19, 17:9, 17:10, 24:10, 83:19, 96:19, 97:15, 109:20, 157:13, 169:18

208:13, 208:14, 208:23, 209:2, 213:5, 213:9, 213:13, 213:17, 213:20, 213:23, 216:1, 216:24, 217:4, 221:16, 221:21, 222:10, 222:16, 224:9, 224:21, 225:5, 225:6, 225:13, 225:14, 226:16, 227:6, 228:6, 229:17, 230:9

**OLENOSKI** [1] - 3:8

**Olenoski's** [1] - 6:7, 6:22, 6:25

**OLSON** [1] - 2:4

**ON** [2] - 2:3, 2:13

one [3] - 19:8, 47:1, 129:8, 172:19, 228:7

one [143] - 5:7, 9:6, 9:13, 9:16, 10:20, 11:24, 15:3, 14:23, 16:4, 19:19, 22:4, 26:7, 28:1, 28:3, 29:7, 32:11, 33:7, 33:8, 33:13, 33:18, 49:24, 50:16, 52:17, 57:8, 57:19, 70:12, 75:6, 77:12, 82:18, 98:6, 98:18, 98:25, 100:17, 123:17, 124:13, 141:22, 153:12, 156:25, 161:12, 162:23, 163:23, 169:18, 172:14, 174:9, 174:16, 181:8, 182:22, 188:17, 189:2, 189:9, 189:10, 196:12

211:21, 215:14, 217:25, 218:20, 219:15, 221:1,

**OFFICIAL** [1] - 1:23

offing [1] - 5:18, 6:8, 6:24, 82:12, 100:23

offers [3] - 157:10, 174:10

official [6] - 181:3, 122:8, 128:18, 131:12, 168:8, 176:23, 186:9

old [1] - 26:23, 40:14, 20:10

older [1] - 56:11, 112:23

**O'Neil** [1] - 4:16, 4:18

**ones** [1] - 51:8, 80:20, 203:5, 204:2,

72:24, 73:6, 73:13, 78:10

UNITED STATES DISTRICT COURT

254

221:21, 222:9, 222:12, 223:23, 224:7, 224:11, 225:15, 225:22, 226:23, 226:24, 227:21, 228:22, 229:3, 230:5

one's [1] - 70:21

ones [4] - 51:8, 80:20, 8:9, 8:13, 8:16, 8:25, 112, 11:17, 17:5, 18:4, 20:23, 101:17, 129:18, 129:19, 130:3

online [4] - 123:7, 148:4, 150:18

open [4] - 123:2, 170:5

opening [5] - 17:17, 84:13, 176:2

operate [5] - 52:11, 52:14, 60:11, 61:1, 62:1

operation [7] - 99:14, 187:13, 192:9, 195:15, 196:13, 202:13

operations [4] - 56:8, 191:20, 193:14

opine [5] - 11:16, 12:3, 22:15, 22:22, 56:16, 96:19, 203:7

opined [3] - 8:7, 21:22, 99:4

opines [2] - 14:24, 22:5

opining [2] - 15:25, 96:20

opinion [80] - 9:8, 9:24, 10:2, 10:7, 10:23, 11:3, 11:8, 11:10, 11:16, 11:19, 18:23, 36:11, 61:17, 86:8, 86:12, 91:3, 86:18, 96:7, 139:21, 149:11, 153:2, 163:22, 163:23, 164:21, 164:25, 165:1, 165:4, 165:5, 165:6, 165:10, 165:13, 166:8, 167:8, 167:8, 168:6, 172:25, 185:22, 186:15, 187:3, 192:18, 202:3, 202:7

208:11, 211:22, 212:7, 213:3, 213:11, 213:15, 213:19, 217:24, 218:17, 219:7, 220:9, 221:9, 223:12, 224:18, 224:20, 225:22, 226:23, 227:9, 229:3, 230:5

online [4] - 123:7, 148:4, 150:18

open [4] - 123:2, 170:5

37:11

ourselves [1] - 73:5

out-of-court [1] - 4:22

outlay [1] - 164:23

output [5] - 191:12, 191:16, 196:11, 196:13, 198:3, 204:12, 204:14

outside [4] - 4:9, 8:14, 18:4, 23:9, 98:13, 200:25, 222:20, 222:22, 228:14

outstanding [1] - 10:3

overall [1] - 183:3

overlap [2] - 44:16, 229:9

overstated [1] - 7:6

overturned [1] - 109:20

overview [4] - 50:9, 98:3, 174:19, 186:13

own [4] - 96:9, 221:11, 221:24, 224:9

owned [1] - 65:19

**P**

p.m [1] - 230:13

page [74] - 5:7, 5:8, 5:22, 6:21, 8:21, 8:24, 10:4, 13:1, 13:4, 30:14, 36:15, 35:20, 40:3, 40:8, 40:9, 40:18, 41:20, 42:21, 43:10, 43:18, 43:20, 44:12, 44:21, 44:25, 45:15, 45:24, 50:9, 52:15, 56:12, 60:16, 65:6, 66:11, 66:24, 67:2, 67:4, 80:19, 80:19, 88:18, 84:16, 92:14, 96:12, 139:13, 172:21, 173:2, 173:4, 185:13, 195:18, 197:24, 230:12, 230:14

129:17

**Panduit** [10] - 99:14, 99:23, 100:5, 101:20, 101:24, 103:2, 166:2, 166:4, 167:2

paper [41] - 34:7, 34:9, 34:12, 34:14, 34:16, 34:18, 42:1, 42:2, 42:3, 42:6, 42:8, 43:8, 46:11, 47:24, 49:16, 52:2, 52:5, 52:12, 52:16, 52:23, 55:6, 129:10, 129:15, 130:6, 130:19, 130:22, 130:23, 130:25, 151:21, 152:5, 153:6, 187:7, 214:4, 214:7, 230:6

participated [1] - 52:22

particular [10] - 10:18, 14:5, 16:12, 39:18, 44:20, 51:21, 61:2, 65:25, 66:3, 76:23, 183:6, 232:13

particularly [1] - 165:15

parties [1] - 7:24, 82:18, 66:1, 197:24, 224:20

particularly [4] - 175:6, 197:21, 198:23

partner [1] - 156:7

party [1] - 176:10

party's [1] - 97:21

pass [4] - 77:21, 109:1, 143:24, 168:23

past [4] - 55:12, 55:18, 100:11, 122:23, 127:21, 156:14

patent [103] - 9:14, 9:24, 33:19, 52:12, 53:18, 67:22, 67:23, 68:18, 68:21, 68:22, 69:2, 72:23, 75:19, 76:20, 76:4, 77:3, 77:4, 77:7, 77:9, 77:13, 78:4, 78:8, 78:11, 78:19, 79:10, 80:2, 80:5, 80:14, 90:8, 96:16, 96:21, 119:14, 120:14, 120:18, 127:18, 127:19, 130:7, 137:2, 137:20, 138:1, 141:4, 141:16, 141:20, 141:25, 143:2, 143:11, 143:12, 143:22, 143:23, 145:18, 145:21, 146:2, 152:2, 156:6, 159:11, 159:13, 159:17, 159:25, 162:7, 207:13, 222:14, 225:20, 226:9, 226:17, 226:21, 227:16, 227:18, 228:13, 229:10, 229:22, 229:25, 230:2

patentee [1] - 165:4

path [1] - 55:16, 191:25

patient [2] - 174:17, 177:1

patients [1] - 177:3

pay [4] - 100:21, 168:8, 168:10, 168:16

payment [1] - 82:10

**PC** [1] - 57:1

**PCs** [3] - 56:21, 56:25, 60:6

pd [1] - 176:8

pedals [2] - 83:11, 85:5

people [20] - 29:8, 29:10, 29:13, 33:20, 39:13, 51:14, 53:24, 53:25, 54:3, 55:22, 66:18, 66:20, 72:17, 105:22, 106:6, 150:20, 151:12, 164:24, 168:6, 188:16, 188:18, 189:22, 190:5, 195:18, 200:23, 209:2, 210:25, 213:20, 219:24, 220:25, 221:21, 223:25, 225:13, 226:13, 226:18, 227:1, 227:11, 227:22, 227:25, 228:10, 229:14

10:5, 10:20, 10:21, 11:20, 11:21, 11:24, 14:25, 16:1, 16:7, 17:17, 83:18, 228:22, 226:18, 227:1

**PLAINTIFF** [2] - 1:7, 2:3

plan [1] - 4:21, 57:8, 96:9, 174:20

plane [8] - 189:13, 191:16, 191:16, 193:8, 193:18, 193:19, 193:22, 194:6, 194:25, 195:16, 196:23, 197:21, 198:18, 198:19, 198:22, 199:10, 201:8, 203:5, 204:2, 207:6, 207:8, 207:10, 216:22

platform [1] - 178:23

play [8] - 162:1, 224:4, 24:15, 25:2, 85:16, 198:21, 178:24

played [2] - 24:6, 24:17

playing [4] - 4:25, 178:22, 178:25, 179:2

pleaded [1] - 77:2

plug [1] - 91:19, 91:23

plugged [1] - 199:20

plugs [1] - 199:17

point [4] - 13:25, 37:18, 56:15, 56:20, 56:17, 60:6, 213:22, 222:7

UNITED STATES DISTRICT COURT

255

184:15, 185:10, 185:16, 186:19, 198:21, 200:1, 201:5, 201:21, 202:12, 205:25, 206:7, 208:5, 208:11, 209:2, 209:3, 209:25, 213:9, 213:13, 213:17, 213:21, 213:25, 214:25, 215:5, 216:24, 217:4, 218:11, 218:15, 220:10, 221:15, 222:16, 224:24, 227:1, 227:3

patented [4] - 53:9, 79:21, 108:5, 108:8, 152:17, 222:6

patents [51] - 21:19, 53:20, 68:10, 68:14, 70:12, 72:17, 72:22, 73:23, 75:1, 75:6, 76:18, 77:6, 77:9, 79:24, 96:16, 96:24, 96:22, 96:25, 96:7, 97:16, 115:5, 115:8, 118:9, 129:6, 130:10, 130:13, 133:5, 133:8, 133:23, 139:20, 144:13, 144:16, 148:11, 148:14, 151:24, 157:1, 157:7, 157:17, 159:13, 163:25, 190:11, 190:12, 192:20, 192:24, 193:6, 195:17, 200:5, 206:16

**PAVEMETRICS** [1] - 1:8, 3:2

**Pavemetrics** [148] - 4:5, 4:14, 5:21, 6:23, 7:3, 7:8, 9:16, 15:11, 19:25, 21:16, 21:17, 24:4, 24:6, 24:18, 25:6, 26:25, 27:7, 27:20, 27:23, 27:25, 28:6, 28:14, 28:16, 29:16, 29:18, 29:20, 29:23, 32:3, 32:14, 33:9, 33:14, 34:19, 35:18, 36:13, 36:14, 36:18, 38:15, 39:3, 39:16,

39:24, 39:25, 42:19, 43:16, 46:8, 46:18, 47:18, 48:6, 51:22, 58:10, 69:9, 69:22, 69:16, 70:6, 70:8, 70:22, 71:18, 79:13, 81:2, 82:9, 82:25, 83:2, 83:6, 84:1, 84:4, 86:14, 87:4, 87:5, 87:18, 88:7, 88:16, 88:20, 88:25, 89:4, 89:7, 89:23, 90:4, 90:16, 94:15, 94:25, 95:11, 98:9, 98:9, 99:8, 100:13, 104:10, 104:15, 104:22, 104:25, 106:12, 110:15, 111:15, 111:24, 113:1, 113:14, 113:17, 118:21, 119:1, 119:19, 119:23, 120:20, 122:5, 122:20, 122:25, 126:17, 128:2, 128:4, 128:18, 129:6, 130:14, 133:1, 133:15, 135:5, 136:13, 136:23, 137:5, 139:1, 139:16, 141:24, 144:5, 144:12, 144:14, 145:24, 145:24, 147:1, 152:21, 152:24, 153:3, 153:6, 154:18, 154:20, 155:4, 158:21, 171:2, 171:4, 174:6, 220:16, 222:11, 222:16, 222:19, 223:14, 229:19

**Pavemetrics's** [4] - 39:5, 120:12, 125:8, 150:11

**PH** [1] - 1:24

payment [1] - 82:10

**PCs** [3] - 56:21, 56:25, 60:6

**PH** [1] - 1:24

**PhD** [4] - 110:19, 110:22, 110:23, 159:6, 160:25

people [20] - ...

111:6, 111:11, 191:22, 191:16, 192:4, 193:14, 206:25, 210:6, 210:6, 213:9, 81:8

pennission [1] - 34:15

permitted [2] - 10:8, 10:10, 96:17

person [4] - 164:5, 164:15, 167:18, 174:4, 174:7

personal [4] - 57:2, 57:3, 180:12, 182:7

personality [1] - 111:21, 141:5, 141:7, 145:13

**PH** [1] - 1:24

phase [1] - 4:5

phone [2] - 110:19, 110:22

photo [4] - 66:25

phrase [4] - 189:24, 208:16, 209:21, 209:25, 226:6, 226:19

physically [1] - 219:11

physicians [1] - 171:12

**PI** [4] - 12:10, 129:12, 137:3

picked [3] - 14:21, 40:8, 40:11

picking [1] - 122:20

picks [3] - 70:19

picture [9] - 62:25, 64:9, 65:12, 66:25, 66:25, 69:15, 69:15, 69:18, 69:19, 69:18, 69:16, 66:12, 85:16

pie [1] - 141:6

piece [3] - 24:22, 42:4, 42:10

pieces [3] - 54:5, 56:5, 150:11

pixels [26] - 122:22, 124:9, 191:21, 191:22, 192:1, 192:6, 192:9, 192:15, 192:17, 192:22, 193:7, 193:20, 193:23, 194:10, 194:16, 194:22, 195:24, 196:24, 196:25, **PLACE** [4] - 231:14, 231:16

place [4] - 183:8, 201:1, 222:1

places [4] - 81:12, 178:2

**PLAINTIFF** [2] - ...

230:13

problem [1] - 106:7, 183:1, 218:12

problems [4] - 47:5, 219:14, 220:9

procedure [1] - 230:8

proceed [4] - 20:15, 43:7, 103:22, 106:21, 173:1, 186:14, 186:21, 183:14, 183:25, 229:10, 230:2

**PROCEEDINGS** [4] - 1:14, 231:5

process [17] - 27:13, 32:25, 56:6, 56:18, 56:20, 58:24, 59:10, 110:12, 121:10, 122:6, 125:14, 126:1, 160:20, 176:20, 183:19, 193:15, 205:1, 206:1

**production** [4] - 128:15, 126:20, 126:22, 136:23, 137:1, 230:2

**Professor** [31] - 113:18, 114:2, 114:9, 117:9, 119:24, 120:8, 120:13, 120:16, 122:10, 122:16, 124:16, 127:3, 133:14, 134:12, 174:1, 177:17, 177:20, 177:24, 179:4, 180:10, 182:11, 185:6, 202:14

**profiler** [4] - 33:10, 33:22, 33:24, 34:15, 34:16, 35:9, 35:24, 35:25, 36:4, 36:6, 54:9, 55:2, 60:20, 172:4

promote [1] - 33:1, 104:2

pronounce [1] - 114:7

pronounced [1] - 104:24

proof [4] - 9:8, 165:13

proper [1] - 8:5, 165:1

proposed [2] - 161:25, 167:20

**props** [1] - 37:5

property [4] - 126:23, 144:12, 150:4, 171:25, 171:19

proprietary [4] - 136:2, 137:17, 172:23, 173:10

proved [1] - 165:12

proven [1] - 165:13

provide [4] - 41:25, 94:1, 96:2, 165:7, 171:17

provided [3] - 66:8, 147:3, 150:23, 162:21, 190:13, 221:24

providing [1] - 89:7

public [1] - 39:7

UNITED STATES DISTRICT COURT

256

54:3

portion [4] - 5:8, 85:8, 100:13

portrait [1] - 172:6

position [4] - 21:20, 110:15, 115:1, 115:19, 187:18

position [10] - 21:20, 110:15, 115:1, 115:15, 157:18, 181:11, 212:6, 214:9, 214:17, 215:9, 216:1

positioning [1] - 37:21

positions [1] - 114:22

positive [1] - 42:1

possibilities [1] - 57:7, 171:11

possibility [1] - 220:17

possible [3] - 82:4, 64:11, 130:18, 162:13, 214:17

possibly [1] - 90:16

post [4] - 66:2, 66:11, 75:4, 89:7, 99:3

**PowerPoint** [4] - 4:23

practicable [1] - 174:17

practice [4] - 20:9, 20:14, 20:18, 20:20, 20:21, 20:25, 21:8, 128:12, 157:14, 171:18, 171:20

practiced [1] - 21:19

practices [4] - 20:13, 22:24, 22:25

pre [4] - 109:18, 137:13

**pre-2017** [1] - 137:13

pre-dated [2] - 109:18, 137:13

pre-defined [3] - 165:20, 192:25

pretty [4] - 14:20, 42:6, 54:21, 158:11, 182:18, 209:14, 213:21, 228:8

**pre-2017** [1] - ...

present [10] - 10:22, 16:17, 20:23, 23:6, 42:16, 43:1, 43:5, 69:25, 74:2, 74:7, 91:2, 98:10, 103:16, 122:8, 122:18, 122:22, 122:24, 123:9

present [4] - 91:21, 91:25, 187:24

present [4] - 122:8, 122:18, 122:22, 123:9

presentation [4] - 4:23, 23:13

presented [4] - 21:2, 21:5, 41:6, 87:2

presenting [1] - 11:6

preserve [1] - 95:5

President [4] - 27:7, 27:11

presidents [4] - 39:25

**PRESIDING** [1] - 1:4

**pretty** [4] - ...

pre-dated [1] - 14:2, 144:15, 168:11, 168:16, 180:10, 180:22, 183:1, 228:1

prevailing [1] - 102:1

prevent [1] - 110:20

previous [4] - 133:17, 216:23, 227:1, 227:24

previously [1] - 47:9, 47:25, 47:17, 111:15, 208:24, 215:8

price [4] - 85:4, 85:14, 85:23, 85:24, 85:25

primary [1] - 168:8, 191:18

principle [4] - 140:21, 141:6

print [4] - 17:20, 172:20, 173:14

printed [1] - 17:21

priority [1] - 136:2, 137:17

problem [1] - ...

106:7, 183:1, 218:12

profession [1] - 21:8

professional [2] - 20:22, 157:2

professor [1] - 171:5, 171:17, 171:12

program [4] - 34:18, 34:21, 34:24, 56:16, 56:17, 56:19, 58:19, 60:18, 60:19, 61:11, 63:11, 102:17, 102:18, 102:19, 102:23, 102:24, 103:1, 103:2, 103:7, 105:13, 160:7, 190:6, 190:7, 190:8, 191:13, 193:1, 193:3, 193:5, 197:1, 198:10

programs [1] - 63:13, 157:22

project [1] - 38:2, 91:20, 91:25, 91:5, 187:24

projecting [1] - 28:6

**Projects** [1] - 171:16, 172:4

**Profiler** [2] - 33:10, 41:21, 171:6

promote [1] - 171:4

pronounce [1] - 172:4

promote [1] - 185:13, 187:8

properly [1] - 135:16

properties [1] - 213:24

property [4] - 171:25, 171:19, 172:23, 173:10

proprietary [1] - ...

39:7

UNITED STATES DISTRICT COURT

**Exhibit 4**
235

50:18, 54:9, 73:22, 106:12, 108:23, 122:14, 148:6, 150:20, 151:1, 157:3, 158:3, 179:8
publically [1] - 33:1
publication [16] - 17:21, 107:1, 107:2, 108:11, 120:13, 172:22, 209:24, 216:11, 216:16, 216:21, 216:25, 217:3, 217:5
publications [2] - 28:23, 173:3
publicly [1] - 156:4
publish [4] - 28:21, 34:7, 39:8, 49:13, 61:4, 61:16, 107:6, 155:4
published [24] - 28:23, 29:6, 34:9, 34:20, 41:21, 46:11, 47:23, 48:3, 48:4, 49:14, 49:16, 55:21, 73:21, 88:2, 105:8, 107:13, 120:9, 120:10, 120:25, 123:11, 148:3, 150:17, 150:21, 155:22, 155:1
publishing [2] - 106:11, 108:22
put [1] - 204:1
puff [10] - 8:6, 43:9, 80:17, 81:10, 82:21, 83:14, 98:11, 149:8, 152:8, 173:11
pulled [1] - 84:18
pulling [1] - 150:20
purchase [13] - 35:14, 35:15, 35:20, 36:1, 59:2, 62:18, 163:13, 164:14, 165:24, 214:16, 214:24, 214:16, 214:14
purchased [7] - 38:19, 60:25, 62:17, 65:8, 66:21, 119:3, 129:15
purchaser [2] - 164:4, 164:7
purchases [1] - 164:18
purchasing [1] - 29:12
purple [1] - 205:1
purpose [2] - 46:23
purposes [4] - 6:15, 19:20, 35:12, 50:25, 160:11, 165:20

put [2] - 9:8, 9:11, 13:5, 30:15, 46:15, 55:6, 57:24, 58:2, 134:12, 136:9, 136:15, 157:20, 159:12, 163:18, 168:2, 172:7, 180:12, 194:4, 198:9, 208:24, 222:19, 222:24
putting [2] - 38:7, 177:25

Q
qualification [1] - 196:2
qualified [1] - 157:5
quality [1] - 53:6
quarterly [2] - 39:2, 39:11, 41:15, 41:17
Questions [1] - 92:17
questions [11] - 6:22, 70:4, 71:7, 71:21, 83:22, 109:3, 109:7, 154:6, 192:13, 202:2, 202:9
questions's [1] - 61:13
quick [1] - 172:16
quite [3] - 4:9, 139:21, 143:22
quotation [17] - 59:15, 59:23, 60:1, 60:3, 62:25, 64:16, 64:18, 70:4, 70:8, 80:23, 81:1, 81:11, 81:14, 82:16, 82:17, 82:19, 83:7
quote [2] - 60:6, 60:13, 64:21, 70:6, 70:22, 81:16

R
R10323 [2] - 15:24, 16:2
r10323 [10] - 13:5, 13:19, 13:21, 14:8, 14:11, 16:16, 16:21, 62:5, 62:8, 62:12, 131:14, 200:6
r5320 [5] - 114:5, 114:13, 114:17, 118:5, 119:17, 147:3, 214:16
rail [12] - 32:20, 32:22, 33:22, 34:1, 34:8, 34:11, 35:12, 38:21, 38:22, 38:24, 40:7, 40:11, 40:12, 40:24, 41:1, 41:5

42:4, 43:12, 44:16, 45:16, 45:22, 46:2, 46:8, 47:1, 48:10, 54:12, 57:11, 57:14, 57:15, 57:19, 57:20, 57:22, 58:2, 58:15, 58:23, 60:11, 65:1, 66:5, 66:12, 72:10, 73:19, 78:7, 78:13, 78:25, 79:5, 104:5, 112:16, 113:2, 114:22, 115:13, 115:17, 120:18, 131:9, 131:16, 131:17, 139:22, 139:24, 146:16, 183:15, 202:21, 204:21, 205:1, 205:2, 206:5, 206:20, 206:23, 206:24, 207:2, 222:11, 225:11, 227:8, 227:17
Rail [1] - 16:10, 34:25, 35:1, 42:11, 73:15, 73:25, 158:22
Railet [1] - 74:25, 73:3, 73:23, 158:20
railroad [23] - 33:24, 43:15, 44:13, 44:19, 52:22, 58:5, 116:7, 139:17, 134:25, 135:6, 139:3, 139:21, 139:23, 141:24, 141:9, 141:14, 141:15, 199:15, 201:10, 221:2, 221:4
Range [1] - 34:25
rare [4] - 164:6, 164:11, 164:13, 164:16, 164:18, 164:19, 173:11, 176:1, 178:14, 178:19, 178:22, 179:9, 218:1, 218:15, 220:11, 221:17, 221:19, 222:1
raw [1] - 69:8, 90:12
Re [1] - 77:11, 96:15, 97:1
RE [19] - 2:6, 91:19, 91:21, 91:25, 92:3, 92:16, 93:2, 93:11, 93:24, 94:1, 94:19, 95:3, 95:14, 95:24, 96:1, 96:18, 97:3, 97:6
reach [5] - 193:23
reach [5] - 12:13
reached [1] - 159:4
read [25] - 185:8, 188:23, 220:1, 221:1, 221:16, 221:20, 222:1, 222:6

reading [14] - 54:21, 149:6, 167:20, 185:5, 185:8, 191:12, reads [1] - 221:16
ready [18] - 22:25, 25:24, 29:19, 51:6, 64:12, 64:15, 87:1, 130:5, 130:8, 181:22
real [13] - 74:6, 121:5, 121:7, 121:9, 124:11, 133:22, 140:12, 141:11, 172:16, 173:1
Range [2] - 34:25
rare [1] - 69:5
re-ask [1] - 164:1, 164:1, 164:1
RE-EXAMINATION [1]
reaction [1] - 68:2, 88:6, 88:8, 88:14, 100:10, 100:13, 100:14, 108:22, 108:10, 108:12, 145:1, 152:2, 152:13, 152:20, 166:5, 178:8, 220:11, 222:11
read [1] - 89:6
reader [1] - 128:5
readily [3] - 96:2, 175:20, 197:6
readiness [1] - 55:4, 96:5
readily [1] - 150:1
readings [1] - 161:11
realize [1] - 216:21
realized [4] - 68:20, 133:21, 134:20, 219:17
really [33] - 18:1, 19:16, 19:19, 32:4, 54:2, 65:22, 67:9, 108:18, 108:22, 201:10, 221:2, 221:4
Range [1] - 34:25
reasonable [11] - 98:25, 103:5, 159:15, 160:3, 167:8, 167:18, 167:19, 168:11, 168:12, 168:13
reason [1] - 67, 6:24, 12:6, 139:23, 142:3, 142:20, 153:12, 186:18, 189:8, 189:23, 190:19, 201:4, 204:21, 227:8, 227:17

17:3, 17:17
receive [6] - 88:12, 117:12, 136:7
received [14] - 27:14, 85:8, 172:22, 203:9, 74:14, 74:17, 79:16, 80:11, 88:8, 141:2, 141:13, 141:15, 151:4, 172:21
receives [1] - 129:25
receiving [3] - 68:16, 74:23, 141:6
recess [4] - 43:3, 91:15, 91:16, 169:3
recognition [1] - 48:15, 49:12
recognize [16] - 39:9, 49:21, 56:13, 60:2, 70:15, 76:14, 106:17, 106:21, 112:25, 122:20, 136:18, 138:11, 152:11, 160:14, 173:11, 225:6
recognized [1] - 229:7
recognizes [1] - 157:14
recognizing [1] - 49:9
recompile [1] - 135:1
record [15] - 23:18, 95:19, 97:7, 100:11, 102:4, 107:10, 110:7, 118:25, 155:23, 168:2, 200:2, 207:10
recorded [6] - 17:6, 17:17, 19:19, 78:1, 207:10
records [14] - 113:17, 148:15, 148:13, 148:14, 148:20, 148:20, 162:21, 142:3, 142:20, 188:23, 187:2, 187:6, 187:14, 187:16
recover [1] - 19:10
recross [1] - 155:13
RECROSS [1] - 3:3
rectangle [1] - 140:20
rectangular [1] - 140:9
rectified [4] - 36:23, 37:8, 37:9, 119:10
red [3] - 91:21, 91:23, 96:5
redacted [3] - 97:7, 97:9, 97:10
redefine [1] - 129:6
REDIRECT [3] - 3:3, 154:9
REDUCED [1] - 231:12
redirect [1] - 150:4

89:23, 89:24, 94:10, 209:23, 209:24, 212:3, 218:5, 219:23, 221:16, 223:24, 224:25, 225:4, 225:24, 226:25, 229:4
referenced [4] - 207:20, 214:21, 120:22, 218:22
references [7] - 18:3, 18:18, 19:13, 19:24, 22:19, 108:3, 108:9, 188:7
recognition [1] - 132:1, 63:25, 97:9, 131:16, 143:15, 160:6, 164:4
referring [10] - 12:4, 13:8, 45:5, 56:22, 101:16, 104:25, 105:12, 159:21, 173:19
refers [1] - 17:7, 41:20, 45:17, 45:25, 102:1
reflect [2] - 38:4, 62:20, 65:10
reflected [1] - 30:23
reflects [2] - 37:3, 98:1, 115:3
refresh [1] - 21:5
refreshing [1] - 42:2
refuse [1] - 167:4
refusing [1] - 167:7
regard [1] - 215:11
regarding [3] - 4:22, 4:23, 10:9, 11:8, 80:12, 80:15, 107:16, 107:24, 140:6, 189:1, 192:9, 197:5, 198:1, 225:18, 226:12, 227:21
regimen [1] - 132:10
region [1] - 137:21
regular [1] - 147:1, 147:8
regularly [1] - 147:14, 223:2
regulation [1] - 225:17
regulations [1] - 65:9
relate [2] - 19:22, 40:5, 91:7, 104:5, 159:5, 159:25, 216:22, 221:7
related [3] - 8:2, 94:13, 110:12, 139:22, 220:7

relating [4] - 78:25, 85:20, 98:6, 159:6, 173:8, 216:21, 218:5, 219:23, 223:24, 224:25, 225:4
relation [1] - 128:9
relations [1] - 136:14
relative [8] - 178:24, 179:1, 179:2
releases [1] - 173:5
relevance [1] - 5:13, 5:14, 177:4
relevant [9] - 5:20, 6:10, 6:11, 6:13, 6:14, 7:9, 80:18, 136:25, 160:14, 197:10, 197:25, 204:24, 221:7
relied [1] - 41:20, 45:17, 45:25, 102:1
rely [1] - 12:6, 18:2, 181:19
relying [2] - 12:12, 15:18, 216:9
remaining [1] - 230:5
remember [1] - 29:17, 47:3, 48:1, 81:25, 93:4, 94:5, 172:4
remind [1] - 116:13, 140:15
reminder [1] - 183:20, 200:6
remove [1] - 133:22, 133:23, 134:5, 137:14, 137:18, 137:19
removed [5] - 136:5, 137:3, 153:6, 153:10, 153:25, 153:20, 153:21, 154:4, 163:5
removing [1] - 133:24
represent [1] - 151:18, 192:21, 221:10
representation [1] - 11:7, 12:22, 224:24
representations [1] - 112:14
repair [1] - 42:12
report [6] - 8:8, 8:11, 8:15, 8:16, 8:20, 9:11, 10:3, 11:2, 11:4, 11:5, 11:10, 11:16, 11:20, 12:3, 12:4, 12:13, 12:22, 13:24, 14:1, 13:4, 14:3, 15:17, 15:19, 15:22, 13:24, 14:1, 14:3, 14:13, 14:15, 15:6, 15:17, 15:23, 16:2, 17:5, 17:18, 18:2, 18:5, 19:18, 21:2, 21:23, 22:10, 22:12, 41:15, 41:17, 48:5, 54:8, 54:9, 141:5, 201:16, 202:2

representing [1] - 44:14
represents [1] - 225:21
request [7] - 70:3, 70:9, 86:3, 86:17, 86:24, 104:16, 186:14, 186:22
requested [1] - 215:20
requirement [1] - 21:11, 187:9, 187:19, 189:5, 192:16, 200:20, 202:2, 202:7, 201:2, 201:4, 203:24, 204:16, 205:8, 205:22
requirements [1] - 199:21, 201:6, 205:22, 215:22, 217:22
requires [1] - 20:9
requiring [1] - 189:20
research [16] - 28:22, 29:17, 29:18, 30:15, 146:6, 148:22, 149:2, 149:4, 158:8, 158:12, 171:9, 171:15, 171:24, 172:5
REPORTED [1] - 231:1
REPORTER [1] - 1:14, 231:12, 231:23
REPORTER'S [1] - 1:14
reports [2] - 106:18, 173:4, 175:19
repository [1] - 113:19, 113:23, 113:23, 128:9, 126:10, 128:11, 173:18, 181:18, 181:24, 201:25, 207:22, 221:12, 224:22, 222:13, 223:24, 223:25, 224:21, 224:23, 231:2

30:21, 30:24, 30:20, 36:21, 37:7, 43:19, 44:16, 45:18, 75:17, 182:19, 182:21, 198:19, 199:24, 205:9, 205:19, 220:12, 229:16
seeking [1] - 94:12, 94:15, 94:18, 94:20, 227:24
seem [2] - 7:4, 101:13
seemed [1] - 30:15
seems [1] - 31:10, 181:9, 186:15, 188:5, 199:16, 216:9, 216:21, 217:8
segmentation [1] - 172:5, 226:10, 172:8, 226:22, 228:21
select [1] - 108:6
sell [2] - 48:8, 48:15
self-driving [2]
sell [1] - 105:8
send [1] - 41:20, 70:6, 78:18, 127:15, 140:21, 127:4, 211:4, 156:13, 157:20, 130:16, 211:12, 211:16, 217:7
shared [1] - 45:9
shared [1] - 45:9
sharing [1] - 156:13
shelves [1] - 161:1
shift [1] - 9:11
shifts [1] - 120:21
shifting [1] - 141:1
shortcut [1] - 97:15
shortly [1] - 191:1
short-term [1] - 65:4
shown [1] - 39:21

responsible [1] - 22:6
responsive [1] - 7:7
rest [3] - 94:22, 179:3
restate [1] - 218:23
result [5] - 37:22, 54:15, 64:21, 128:3, 142:16, 142:18
resulted [1] - 60:13
resulting [1] - 37:20
results [11] - 128:9, 39:2, 40:4, 51:25, 54:10, 58:8, 72:20, 120:2, 128:10, 128:18, 148:14, 148:17, 149:4, 150:21, 155:2
review [16] - 34:14, 56:11, 159:3, 164:15, 176:17, 179:22, 180:10, 181:22, 182:10, 182:16, 183:20, 200:10, 214:13
reviewing [1] - 107:21, 145:14
reviewed [2] - 14:24, 141:15, 144:11, 144:14, 144:15, 179:21, 176:5, 175:23, 175:15, 179:6, 214:19, 215:1
reviewer [1] - 183:8
reviewing [1] - 107:23, 55:14, 214:20
revise [1] - 82:10
revoke [1] - 82:10
rewrite [1] - 93:14
rich [1] - 135:1
Richard [4] - 68:19, 70:18, 147:15, 147:16, 145:16
rid [1] - 94:5
right-hand [2] - 82:8, 114:16, 114:17
rise [2] - 23:5, 42:25, 43:4, 91:1, 103:15
Road [1] - 33:10
road [10] - 30:5, 30:13, 31:23, 33:21, 57:21, 66:5, 66:12, 69:15, 110:25, 111:19, 111:23

112:2, 119:1, 141:10, 183:15
roads [3] - 30:2, 32:7, 32:8, 33:1, 32:19, 32:23, 57:24, 60:1
Rob [1] - 70:6
Robert [4] - 4:15, 24:18, 25:3, 70:1, 70:3, 70:17, 70:18, 72:7, 73:13
ROBERT [2] - 3:8
robustly [1] - 227:17
Rock [1] - 156:22
rocks [1] - 140:16
role [1] - 58:6, 113:9, 111:10, 113:22, 113:23, 90:7, 92:9, 99:1, 130:3, 130:13, 131:17, 146:4, 146:8, 146:11, 146:14, 159:1, 159:3, 193:9, 218:6
Roman [1] - 17:22
room [10] - 92:5, 162:9
ROOM [1] - 1:23
royalty [1] - 96:25, 103:5, 159:15, 160:3, 167:18, 167:19
ROUGH [1] - 231:7
RPUG [1] - 33:7, 33:10, 33:13, 33:15, 57:21
Rpug [1] - 33:9
rules [2] - 172:1, 199:3, 219:11, 219:16, 219:18, 223:7
RULES [1] - 231:7
rulings [1] - 65:2, 61:16, 66:18, 100:18
running [3] - 93:18, 126:5, 129:6, 187:6

58:22, 59:3, 59:13, 59:14, 60:1, 61:13, 62:11, 63:21, 63:23, 64:5, 64:11, 65:16, 131:12, 131:16, 132:1, 132:10, 136:2, 138:3, 143:13, 143:15, 159:16
sale [15] - 17:9, 17:25, 18:7, 18:23, 18:24, 19:4, 20:2, 20:4, 58:22, 60:12, 62:23, 63:10, 64:21, 81:7, 81:19, 82:19, 83:6, 83:7, 134:4, 134:6, 135:11, 135:23
sales [40] - 20:12, 20:15, 20:19, 20:22, 20:24, 21:2, 21:3, 21:5, 22:11, 35:9, 52:4, 52:6, 55:6, 57:1, 58:17, 62:1, 63:11, 67:18, 130:16, 130:21, 132:25, 133:17, 143:11, 143:12, 143:18, 143:20, 143:23, 144:17, 144:19, 144:20, 145:1, 145:20, 145:21, 145:24, 146:1, 167:10, 167:16, 171:8, 171:18, 173:15, 204:16
same [6] - 4:10, 12:20, 131:12, 136:24, 165:10, 165:16
San [1] - 17:2, 19:18
San [1] - 1:16
satisfied [2] - 202:11, 207:14, 212:21
satisfies [1] - 10:23
satisfying [12] - 215:21
satisfy [5] - 197:15, 197:3, 200:3, 201:2, 206:2, 202:6
save [1] - 208:15
saved [5] - 23:2, 112:14, 112:16, 114:8, 148:16, 149:5
saw [10] - 51:21, 55:21, 56:14, 57:17, 71:17, 79:9, 81:18, 81:21, 88:7, 146:24
scanned [1] - 32:10
scanning [1] - 162:12
SCARS [1] - 1:4
scenario [1] - 194:25
scheduled [1] - 163:25
Schottelkotte [6] - 99:13, 101:16, 103:2, 159:6, 16:6, 16:11, 16:14, 16:15, 17:18, 26:6, 31:10, 34:3, 34:6, 34:9, 34:13, 35:18, 36:6, 36:14, 36:23, 37:10, 37:11, 41:16, 41:23, 141:2, 144:5, 161:3, 164:24, 168:9
Schottelkotte's [3]
school [1] - 157:18, 157:21, 163:10, 163:13
scope [1] - 193:9, 194:2

score [1] - 54:21
screen [1] - 13:13, 81:11, 86:12, 88:5
script [1] - 149:19, 150:12, 150:15, 159:13, 183:23, 183:3, 183:14, 188:8, 188:9, 188:16, 189:16, 189:18, 194:7
search [1] - 74:16
seat [1] - 103:18
seated [1] - 23:9, 110:5, 150:21, 169:9
second [1] - 17:14, 17:18, 17:20, 18:2, 50:8, 96:15, 105:19, 180:11, 180:12, 180:19, 180:20, 181:3, 181:19, 181:23, 181:24, 198:5
secondly [1] - 198:5
seconds [1] - 97:4
secrecy [1] - 39:4
secure [1] - 40:3, 44:6, 44:16, 45:2, 46:12, 66:15, 99:15, 103:1
security [1] - 58:8
segment [2] - 142:1, 144:23, 146:11, 159:3, 162:9, 162:19, 162:21, 164:13, 165:9, 172:5
segments [1] - 159:3, 205:20, 228:8
select [1] - 66:2
select [3] - 198:6, 56:17
self [1] - 68:15, 131:20
selected [1] - 228:21
self-driving [2] - 57:22, 57:23, 57:24, 58:1, 58:8, 131:15, 131:16, 139:9, 183:6, 183:7, 183:14, 188:3
semiconductor [1] - 189:2
send [1] - 41:20, 70:6, 78:18, 127:15, 140:21, 227:11, 211:4, 227:5, 227:8, 227:17

63:11, 63:12, 63:14, 67:10, 67:14, 67:18, 67:20, 67:4, 67:5, 194:16, 130:22, 186:25
sequence [1] - 121:25
sequentially [1] - 116:7, 124:14
serial [2] - 60:25, 61:25
series [1] - 123:22
serious [1] - 76:24
serve [1] - 217:16
serves [1] - 108:1, 108:1
served [1] - 45:8, 228:1, 228:6, 228:22, 229:9, 229:14, 229:21, 229:24, 200:19
session [1] - 43:8
session [1] - 43:8
set [15] - 49:6, 167:25, 72:15, 73:7, 180:5, 127:24, 131:14, 147:15, 152:3, 156:13, 186:25, 186:25, 217:11, 217:21, 218:1
setting [1] - 189:1
seven [1] - 50:14
several [1] - 72:19
several [17] - 12:6, 55:25, 186:14, 204:25, 186:19, 187:21, 187:25, 188:22, 193:12, 193:21, 193:25, 193:14
shown [1] - 39:21

Exhibit 4
236

**skipped** [5] - 98:2, 192:7, 193:15, 193:16, 198:11
**skipping** [11] - 124:9, 191:1, 191:15, 191:19, 191:21, 191:22, 191:25, 192:8, 195:14, 196:14, 198:12
**skips** [1] - 124:5
**slash** [2] - 132:22
**Slide** [62] - 15:20, 16:7, 102:7, 160:16, 160:17, 161:19, 161:20, 162:4, 162:5, 162:23, 165:7, 170:6, 174:9, 177:13, 178:6, 181:3, 183:19, 185:21, 187:7, 188:1, 188:21, 189:3, 189:4, 189:15, 191:6, 194:1, 196:15, 196:25, 197:1, 197:14, 197:25, 198:15, 199:7, 199:8, 199:23, 201:3, 201:24, 203:1, 203:21, 203:22, 204:10, 204:18, 204:19, 205:7, 205:8, 205:23, 206:18, 207:10, 214:12, 215:6, 215:12, 215:18, 215:19, 216:3, 217:12, 220:18, 223:21, 224:16, 228:25, 229:15
**slide** [49] - 13:12, 28:1, 28:2, 40:17, 40:21, 41:1, 41:2, 55:7, 58:20, 58:21, 59:12, 59:14, 62:3, 62:23, 64:3, 65:13, 80:17, 98:11, 98:12, 101:11, 102:7, 102:17, 157:21, 159:12, 165:14, 165:15, 167:17, 170:13, 172:20, 180:9, 182:19, 183:17, 189:15, 189:16, 190:23, 198:2, 198:8, 198:14, 201:16, 202:16, 204:20, 206:10, 207:16, 216:16, 217:11, 229:1
**slides** [18] - 8:5, 8:8, 9:3, 9:4, 9:7, 17:14, 17:24, 59:24, 97:16, 98:10, 156:20, 170:3, 191:13, 191:14, 199:15, 206:17, 212:12, 220:18
**Slides** [1] - 20:7
**sliding** [8] - 40:16, 46:7, 186:21, 189:19, 189:22, 190:21, 196:17, 201:14
**slight** [1] - 95:4
**slow** [4] - 56:12, 133:21, 153:14, 178:3
**slower** [1] - 28:17
**slowly** [1] - 113:25
**small** [3] - 111:17, 170:21, 171:2
**smart** [1] - 180:19
**SNF** [2] - 61:24, 61:25
**snippet** [1] - 204:3
**Sobel** [5] - 45:25, 46:3, 223:4, 223:5, 223:20
**Software** [3] - 36:12, 172:3, 172:19
**software** [152] - 9:9, 9:25, 10:11, 11:16, 27:24, 31:20, 35:18, 37:24, 40:3, 50:23, 51:2, 51:4, 51:9, 59:19, 60:9, 60:18, 60:22, 60:23, 60:24, 61:1, 61:8, 61:10, 61:23, 62:2, 62:3, 62:5, 63:13, 63:16, 63:17, 63:18, 63:20, 64:1, 64:4, 64:14, 65:7, 65:10, 65:16, 66:1, 66:4, 66:14, 67:19, 68:6, 69:8, 69:12, 71:9, 71:14, 81:21, 81:23, 82:1, 82:5, 82:13, 84:10, 111:10, 111:24, 112:2, 112:3, 112:7, 112:9, 112:12, 112:15, 112:17, 112:25, 113:1, 113:11, 114:3, 114:5, 114:6, 114:7, 114:12, 114:24, 115:3, 117:20, 119:6, 119:7, 119:11, 119:23, 120:12, 120:14, 120:16, 120:19, 122:7, 125:13, 125:14, 125:16, 126:4, 126:13, 126:22, 127:1, 127:11, 127:16, 128:10, 128:12, 128:13, 128:14, 128:21, 128:24, 129:3, 129:4, 129:12, 129:14, 129:16, 129:24, 130:2, 130:10, 130:13, 130:22, 130:24, 131:1, 131:8, 131:10, 131:11, 131:14, 131:18, 131:21, 133:8, 134:18, 134:19, 135:25, 136:2, 136:11, 136:12, 138:3, 138:5, 140:22, 143:22, 146:14, 146:15, 146:19, 154:15, 168:19, 170:23, 176:15, 178:17, 188:2, 188:3, 189:8, 189:9, 189:10, 206:22, 210:19, 214:18, 215:1, 215:8, 218:9, 219:12, 220:10, 226:21, 227:4, 228:3
**sold** [28] - 32:3, 32:5, 33:25, 34:1, 34:2, 35:10, 58:24, 59:4, 59:6, 59:9, 62:13, 65:12, 69:14, 84:1, 84:11, 90:2, 113:3, 119:2, 141:22, 142:11, 143:13, 146:5, 186:25, 198:17, 199:5, 199:21, 206:21, 223:22
**solution** [1] - 229:13
**solutions** [2] - 170:23, 178:17
**solve** [4] - 77:20, 226:4, 229:12
**solves** [1] - 205:18
**someone** [1] - 208:24
**sometimes** [9] - 11:23, 30:25, 31:3, 63:25, 76:18, 140:17, 156:11, 156:12, 208:21
**somewhat** [1] - 222:3
**somewhere** [2] - 92:7, 112:18
**soon** [2] - 88:14, 134:20
**sorry** [26] - 16:19, 17:17, 18:24, 23:8, 41:12, 41:19, 45:1, 79:8, 80:25, 81:15, 83:4, 83:5, 87:11, 89:1, 90:3, 97:14, 136:14, 148:19, 154:1, 190:2, 197:14, 215:19, 218:20, 222:13, 228:13
**sort** [7] - 8:15, 14:15, 15:5, 113:20, 149:17, 163:21, 212:20
**sounds** [3] - 153:15, 158:12, 203:10
**source** [86] - 10:15, 13:8, 16:10, 18:1, 19:8, 38:5, 38:10, 51:1, 113:19, 114:2, 115:22, 116:20, 116:24, 117:8, 117:9, 118:18, 118:22, 119:11, 123:2, 126:1, 126:2, 126:7, 126:8, 126:9, 126:17, 126:18, 126:21, 126:22, 126:23, 126:24, 126:25, 127:1, 127:9, 127:14, 127:15, 131:20, 131:21, 132:17, 132:20, 133:23, 134:3, 134:5, 134:11, 134:19, 135:1, 136:4, 136:6, 137:3, 137:18, 138:12, 141:1, 141:17, 146:25, 147:10, 147:14, 147:23, 148:3, 148:9, 149:1, 149:9, 149:11, 149:24, 150:2, 153:7, 153:17, 153:18, 153:19, 175:12, 175:14, 176:18, 176:20, 176:21, 176:24, 177:2, 187:22, 188:6, 204:6, 209:17, 209:18, 210:3, 210:11, 214:16, 214:21, 216:4, 216:15, 224:4
**sources** [1] - 37:22
**Spain** [1] - 34:3
**speaking** [2] - 104:2, 104:10
**special** [1] - 181:16
**specialization** [2] - 27:12, 110:21
**specialized** [1] - 127:19
**specialty** [1] - 152:5
**specific** [24] - 10:15, 10:18, 11:23, 14:14, 52:19, 102:15, 102:25, 108:5, 114:7, 114:21, 125:5, 125:18, 129:15, 148:17, 165:6, 176:13, 181:2, 185:25, 194:14, 203:16, 207:17, 209:16
**specifically** [4] - 22:15, 100:4, 139:13, 228:18
**specificities** [1] - 14:16
**specificity** [1] - 191:24
**specifics** [1] - 12:12
**speed** [3] - 43:20, 56:2, 121:4
**speeds** [1] - 43:22
**spell** [4] - 25:17, 110:6, 155:22, 169:11
**spelled** [1] - 25:20
**SPENCER** [1] - 3:5
**Spencer** [8] - 23:20, 24:5, 47:4, 58:8, 73:12, 161:17, 163:24, 164:16
**spend** [3] - 19:7, 27:4, 186:9
**spent** [3] - 176:19, 177:1, 177:25
**spike** [1] - 188:12
**spy** [4] - 104:15, 105:25, 106:4, 106:6
**spying** [1] - 106:10
**SS** [1] - 231:5
**staff** [1] - 168:21
**Stage** [1] - 180:14
**stage** [11] - 179:14, 179:15, 180:4, 180:15, 180:17, 180:22, 180:23, 181:23, 182:3, 182:10, 182:17
**stages** [2] - 179:9,

179:12
**stand** [6] - 14:14, 33:9, 49:17, 103:19, 112:11, 131:10
**standard** [4] - 45:11, 82:3, 196:23, 218:2
**stands** [4] - 50:10, 103:12, 152:15, 152:20
**stark** [1] - 185:4
**start** [13] - 5:16, 23:18, 64:6, 69:9, 69:13, 88:13, 91:25, 116:2, 119:6, 120:24, 174:21, 190:23, 215:17
**started** [29] - 23:11, 27:10, 27:18, 29:20, 29:23, 33:3, 33:4, 33:5, 47:19, 47:22, 48:6, 48:9, 68:18, 68:20, 69:3, 73:18, 103:18, 110:23, 111:15, 120:22, 157:20, 158:21, 167:20, 170:20, 176:1, 178:9, 178:14, 178:20
**starts** [2] - 152:14, 227:12
**startup** [1] - 170:21
**startups** [1] - 170:24
**State** [2] - 42:12, 171:4
**STATE** [1] - 231:6
**state** [9] - 4:6, 10:10, 25:17, 32:6, 110:6, 155:22, 169:11, 199:4, 199:21
**statements** [6] - 4:23, 5:18, 5:20, 6:24, 15:18, 158:4
**states** [2] - 45:2, 171:14
**States** [2] - 35:9, 55:7
**STATES** [4] - 1:1, 1:1, 1:4, 231:9
**stating** [1] - 21:25
**Statistics** [1] - 110:19
**Statute** [4] - 20:8, 20:9, 21:11, 21:19
**stay** [1] - 45:1
**STENOGRAPHIC** [1] - 231:15
**STENOGRAPHICALLY** [1] - 231:10
**step** [12] - 47:10, 48:21, 48:22, 53:14, 154:21, 182:15, 191:15, 213:25, 218:8, 219:13, 219:21
**Step** [7] - 40:12, 45:25, 46:1, 192:5, 194:13, 219:21
**step-by-step** [1] - 154:21
**steps** [5] - 41:3, 45:18, 122:7, 178:3, 227:2
**Steps** [1] - 187:12
**still** [11] - 10:5, 20:15, 115:16, 140:21, 161:6, 166:19, 170:25, 171:11, 200:7, 202:15, 206:3
**stitch** [1] - 44:17
**stone** [2] - 190:12, 201:16
**stopped** [1] - 133:20
**stopping** [1] - 229:17
**store** [1] - 147:17
**stored** [1] - 147:23
**stores** [1] - 147:14
**straight** [1] - 192:8
**straightforward** [1] - 212:21
**strange** [3] - 163:18, 163:20, 180:10
**STREET** [2] - 1:23, 2:9
**stride** [17] - 190:25, 191:4, 191:12, 191:18, 192:3, 194:19, 194:21, 195:18, 195:20, 195:22, 196:20, 196:23, 197:17, 197:22, 198:9, 198:14
**Stride** [3] - 194:24, 194:25
**strike** [1] - 10:7
**strikes** [1] - 100:21
**string** [9] - 11:24, 12:7, 13:1, 13:3, 14:10, 14:18, 15:23, 16:3, 87:19
**stripe** [1] - 31:18
**strong** [2] - 186:5, 186:11
**strongly** [1] - 151:19
**structure** [2] - 47:8, 125:2
**structures** [4] - 52:14, 53:1, 87:16
**student** [1] - 134:15
**students** [1] - 39:23
**studies** [2] - 54:10, 54:16
**study** [2] - 42:13
**stuff** [6] - 53:24, 73:20, 89:19, 89:23, 203:14, 230:8
**subject** [7] - 29:1, 54:3, 86:13, 96:19, 106:22, 157:15, 173:4
**subjective** [2] - 202:3, 202:10
**subjectively** [1] - 206:2
**submit** [1] - 58:10
**submitted** [6] - 46:21, 47:14, 47:16, 58:11, 80:7, 83:10
**submitting** [1] - 58:5
**subpoenaed** [1] - 90:13
**substance** [1] - 9:23
**substantial** [1] - 166:20
**substantive** [1] - 10:16
**substitutes** [2] - 166:5, 166:7
**succeeded** [3] - 134:21, 135:8, 137:13
**successful** [2] - 58:13, 170:24
**suddenly** [2] - 12:20, 58:5
**sufficient** [1] - 212:2
**suggest** [1] - 20:22
**suggested** [1] - 56:11
**suggestion** [2] - 92:3, 102:8
**suggests** [1] - 105:25
**suit** [8] - 77:3, 78:21, 143:4, 143:5, 153:5, 160:6, 183:24
**sum** [1] - 8:25
**summarize** [6] - 170:6, 172:21, 175:8, 177:13, 200:12, 201:4
**summarized** [2] - 159:6, 160:20
**summary** [3] - 21:8, 50:6, 157:21
**summer** [4] - 133:20, 134:15, 143:1, 143:9
**supervise** [1] - 113:12
**supervised** [1] - 50:14
**supervising** [1] - 154:15
**supplier** [4] - 160:23, 161:10, 166:3
**supply** [1] - 165:1
**support** [31] - 17:19, 17:25, 18:7, 18:23, 18:24, 19:5, 20:2, 82:1, 130:1, 141:9, 148:11, 148:25, 150:9, 182:1, 207:14, 208:3, 208:8, 208:12, 208:16, 209:5, 211:1, 213:3, 213:11, 213:19, 217:15, 217:25, 218:11, 219:3, 219:11, 219:17, 224:2
**supported** [1] - 223:22
**supports** [1] - 161:8
**suppose** [1] - 222:14
**supposed** [1] - 201:25
**supposedly** [6] - 15:19, 184:5, 184:9, 185:23, 203:23, 218:11
**surface** [21] - 28:7, 28:15, 30:5, 30:13, 31:10, 31:11, 31:14, 31:16, 37:7, 38:4, 118:17, 202:25, 205:11, 205:15, 205:20, 205:21, 206:7, 219:21
**surfaces** [3] - 32:14, 45:3, 45:5
**surprise** [2] - 141:11, 172:13
**surprised** [1] - 68:12
**surprising** [1] - 18:25
**surrounds** [1] - 227:12
**sustain** [3] - 10:6, 222:24, 228:20
**swear** [1] - 85:6
**switch** [2] - 67:21, 209:17
**switched** [1] - 55:14
**swore** [1] - 85:6
**sworn** [4] - 25:8, 110:4, 155:20, 169:9
**symmetry** [2] - 227:18, 227:23
**System** [3] - 29:25, 183:25, 225:9
**system** [107] - 6:8, 10:23, 18:1, 18:25, 19:1, 19:8, 19:9, 19:16, 20:3, 29:24, 30:10, 32:14, 33:5, 33:23, 34:4, 34:8, 35:8, 35:11, 36:1, 36:7, 57:11, 58:1, 59:4, 60:7, 60:11, 63:9, 65:2, 65:3, 69:14, 69:24, 70:5, 72:3, 72:7, 72:9, 72:11, 72:15, 72:24, 73:2, 73:19, 73:24, 74:6, 74:9, 74:14, 75:6, 78:25, 79:1, 79:3, 107:25, 111:23, 112:11, 113:3, 119:3, 120:18, 121:16, 125:15, 129:24, 141:22, 142:11, 158:17, 158:18, 158:19, 161:15, 168:9, 183:3, 186:25, 202:24, 206:24, 207:3, 209:10, 209:23, 210:3, 215:23, 216:10, 216:12, 216:13, 216:14, 216:20, 216:22, 216:25, 217:6, 217:15, 217:18, 217:25, 218:11, 219:3, 219:12, 219:17, 220:2, 220:3, 220:12, 220:14, 221:8, 222:8, 222:11, 223:22, 223:24, 224:3, 224:8, 224:19, 224:20, 226:14, 226:20, 228:24, 229:5
**Systems** [2] - 4:5, 111:15
**SYSTEMS** [1] - 1:6
**systems** [44] - 21:4, 29:12, 32:3, 32:5, 34:1, 34:2, 58:12, 62:18, 64:7, 64:8, 64:20, 65:1, 65:12, 69:7, 69:11, 71:18, 71:23, 75:10, 75:14, 75:15, 75:18, 78:7, 78:8, 78:13, 79:5, 81:3, 81:17, 81:19, 83:2, 83:6, 84:2, 84:6, 111:20, 141:10, 175:5, 177:14, 178:8, 199:4, 206:20, 210:4, 214:3, 215:21, 223:16
**sytem** [1] - 35:10

**T**

**T-r-e-g-e-l-l-i-s** [1] -

156:1
**table** [1] - 187:14
**Table** [3] - 17:18, 210:9, 211:11
**Talbot** [4] - 39:24, 113:16, 113:18, 152:12
**talks** [1] - 225:1
**Tampa** [1] - 72:8
**tan** [1] - 28:14
**task** [1] - 47:21
**Task** [1] - 41:20
**teaches** [2] - 227:21, 227:23
**Team** [1] - 171:19
**team** [10] - 77:9, 111:17, 113:10, 126:13, 141:11, 156:10, 170:17, 171:24, 172:7, 174:6
**teams** [1] - 171:25
**Tech** [110] - 4:5, 4:20, 5:1, 5:15, 5:22, 5:23, 6:4, 6:7, 6:12, 7:5, 9:8, 11:6, 12:23, 16:25, 18:23, 20:13, 20:14, 20:17, 20:19, 21:7, 25:14, 38:12, 51:17, 68:4, 68:15, 69:7, 69:11, 69:12, 69:14, 69:16, 69:22, 69:25, 70:7, 70:12, 70:23, 71:13, 71:17, 71:22, 73:6, 73:15, 74:2, 74:6, 74:25, 75:21, 75:23, 77:3, 78:5, 78:22, 79:4, 87:9, 88:17, 89:24, 90:1, 90:6, 90:13, 95:8, 97:23, 98:12, 98:15, 99:12, 99:13, 99:17, 99:18, 100:4, 101:19, 108:19, 108:24, 116:16, 119:2, 119:5, 119:19, 129:18, 130:15, 131:3, 134:1, 137:25, 141:8, 151:5, 153:11, 154:1, 157:25, 158:20, 158:23, 159:9, 159:17, 160:1, 160:10, 161:2, 161:5, 161:24, 164:2, 164:14, 164:22, 165:19, 166:10, 170:9, 170:12, 172:9, 183:16, 198:22, 199:5, 201:25, 206:13, 207:4, 217:13, 217:21, 218:9, 218:14, 221:11, 221:14
**TECH** [1] - 1:9
**Tech's** [25] - 4:15, 21:18, 22:2, 56:10, 73:7, 77:4, 78:7, 78:13, 94:9, 98:20, 99:19, 117:18, 141:3, 146:25, 157:19, 158:4, 161:16, 166:13, 166:15, 173:21, 175:2, 175:13, 176:23, 176:25, 202:1
**technical** [15] - 28:16, 51:17, 69:21, 70:10, 82:1, 101:17, 130:1, 141:9, 141:11, 158:5, 161:12, 171:16, 175:18, 182:22, 210:3
**technique** [3] - 120:22, 122:7, 221:23
**techniques** [9] - 46:6, 47:23, 120:25, 122:2, 122:5, 185:15, 185:17, 223:6, 226:24
**technologies** [1] - 29:11
**Technologies** [1] - 171:16
**technology** [16] - 27:23, 28:4, 29:1, 29:18, 29:19, 32:6, 32:8, 33:4, 38:21, 39:5, 105:23, 161:5, 161:23, 162:7, 171:13, 226:4
**Technology** [1] - 170:12
**tedious** [1] - 178:3
**telecommunication** [1] - 152:3
**ten** [4] - 42:23, 68:6, 169:2, 173:8
**Ten** [1] - 173:7
**ten-year** [1] - 68:6
**tended** [1] - 156:16
**tense** [1] - 179:2
**tension** [1] - 20:19
**Tensor** [2] - 123:2, 123:5
**tensor** [3] - 51:11, 52:9, 52:10
**TensorFlow** [14] - 176:4, 176:8, 178:20, 178:23, 178:24, 178:25, 179:6, 179:9, 182:2, 182:9, 190:10, 190:24, 197:12, 198:10
**tenured** [1] - 171:4
**term** [7] - 62:6, 65:24, 68:4, 182:12, 196:7, 196:16, 196:19
**terms** [7] - 19:19, 63:5, 79:16, 79:25, 82:20, 224:7, 229:7
**test** [6] - 49:7, 126:16, 126:20, 127:4, 134:19, 136:7
**tested** [1] - 133:19
**testified** [23] - 16:6, 51:15, 78:7, 80:1, 80:11, 82:16, 85:20, 86:3, 90:10, 103:25, 106:11, 134:7, 151:10, 151:23, 152:5, 153:10, 157:7, 158:7, 159:22, 162:7, 162:10, 162:11, 164:16
**testify** [10] - 51:19, 98:17, 136:14, 139:1, 140:2, 157:5, 163:2, 167:1, 174:17, 174:20
**testifying** [6] - 101:3, 102:16, 139:15, 162:20, 164:10, 192:14
**testimony** [45] - 6:20, 7:9, 7:14, 9:10, 10:9, 11:5, 11:12, 12:1, 12:16, 12:18, 16:24, 21:22, 26:8, 78:6, 91:8, 101:23, 102:2, 102:11, 102:20, 103:14, 124:18, 139:12, 145:1, 145:12, 145:23, 151:18, 153:6, 157:15, 157:24, 158:10, 158:16, 161:18, 163:24, 164:12, 165:16, 167:21, 170:3, 175:18, 177:3, 203:3, 210:15, 211:20, 212:16, 229:22
**testing** [3] - 49:7, 49:12, 58:16
**Tetra** [132] - 4:5, 4:14, 4:20, 5:1, 5:15, 5:21, 5:23, 6:4, 6:7, 6:12, 7:5, 9:8, 11:6, 12:23, 16:25, 18:23, 20:13, 20:14, 20:17, 20:19, 21:7, 21:18, 22:2, 25:14, 38:12, 51:17, 56:10, 68:4, 68:15, 69:7, 69:11, 69:12, 69:14, 69:16, 69:22, 69:25, 70:7, 70:12, 70:23, 71:13, 71:17, 71:22, 73:6, 73:7, 73:15, 74:2, 74:5, 74:25, 75:21, 75:23, 77:3, 77:4, 78:5, 78:6, 78:12, 78:21, 79:4, 87:9, 88:17, 89:24, 90:1, 90:6, 90:13, 94:9, 95:8, 97:23, 98:11, 98:15, 98:20, 99:12, 99:13, 99:17, 99:18, 99:19, 100:4, 101:19, 108:19, 108:24, 116:16, 117:18, 119:2, 119:5, 119:19, 129:18, 130:15, 131:3, 134:1, 137:25, 141:3, 141:8, 146:25, 151:5, 153:11, 154:1, 157:19, 157:25, 158:4, 158:20, 158:23, 159:8, 159:17, 160:1, 160:10, 161:2, 161:5, 161:16, 161:24, 164:2, 164:14, 164:22, 165:19, 166:10, 166:13, 166:15, 173:21, 175:2, 175:13, 176:23, 176:25, 183:16, 198:22, 199:5, 201:25, 202:1, 206:13, 207:4, 217:13, 217:21, 218:9, 218:14, 221:11, 221:14
**TETRA** [1] - 1:9
**Teufel** [1] - 165:15
**Teufele** [2] - 24:7, 24:16
**TEUFELE** [1] - 3:6
**text** [5] - 97:19, 125:21, 220:18, 220:19, 227:12
**texture** [1] - 31:23
**THAT** [3] - 231:10, 231:12, 231:14
**THE** [260] - 3:17, 4:3, 4:8, 4:13, 4:17, 4:25, 5:4, 5:10, 5:12, 5:15, 6:3, 6:6, 6:10, 6:15, 6:17, 7:2, 7:13, 7:16, 7:21, 7:23, 8:4, 8:18, 8:24, 9:2, 9:6, 9:18, 10:12, 11:1, 11:14, 11:20, 12:2, 12:11, 12:15, 12:23, 13:12, 13:23, 14:12, 15:2, 15:5, 15:8, 15:10, 16:7, 16:25, 17:9, 17:12, 18:6, 18:11, 18:13, 18:17, 18:20, 19:13, 19:23, 20:4, 21:1, 21:4, 21:15, 22:7, 22:25, 23:3, 23:5, 23:7, 23:16, 23:24, 24:2, 24:4, 24:10, 24:13, 24:15, 24:21, 24:24, 25:2, 25:5, 25:7, 25:9, 25:13, 25:16, 25:17, 25:19, 25:21, 25:24, 26:1, 26:4, 26:9, 26:12, 28:16, 28:19, 42:22, 42:25, 43:2, 43:4, 43:6, 43:7, 61:17, 61:19, 77:22, 83:17, 83:23, 85:10, 85:13, 85:15, 85:18, 86:20, 86:23, 87:23, 87:25, 88:2, 89:12, 89:14, 90:23, 91:1, 91:3, 91:13, 91:15, 91:17, 91:20, 91:24, 92:2, 92:11, 92:14, 92:18, 92:20, 92:23, 93:1, 93:7, 93:10, 93:18, 93:20, 93:24, 94:1, 94:3, 94:13, 94:15, 94:18, 94:24, 95:2, 95:10, 95:13, 95:16, 95:22, 95:25, 96:4, 96:14, 96:19, 97:1, 97:5, 97:13, 97:18, 97:25, 98:5, 98:24, 99:3, 99:7, 99:21, 99:25, 100:12, 100:15, 101:1, 101:9, 101:13, 101:22, 102:4, 102:10, 102:14, 102:22, 103:6, 103:9,

103:10, 103:15, 103:17, 105:4, 105:6, 105:8, 106:21, 109:2, 109:4, 109:5, 109:6, 109:7, 109:12, 109:17, 109:20, 109:22, 110:3, 110:5, 110:8, 110:10, 124:19, 136:14, 136:21, 136:23, 139:11, 139:16, 143:25, 144:20, 144:22, 145:25, 146:1, 154:7, 155:13, 155:15, 155:19, 155:21, 155:24, 156:2, 157:12, 157:14, 166:25, 167:5, 167:9, 167:15, 168:24, 169:1, 169:4, 169:8, 169:10, 169:13, 169:18, 169:20, 174:14, 174:16, 192:12, 193:11, 194:3, 195:5, 195:20, 195:22, 195:25, 196:1, 196:2, 196:5, 208:20, 209:9, 209:12, 209:22, 210:5, 210:20, 211:2, 211:5, 211:15, 211:21, 212:3, 212:9, 212:19, 213:1, 216:9, 216:17, 217:3, 220:6, 222:22, 222:24, 228:15, 228:19, 229:16, 230:4, 230:12, 231:8, 231:9, 231:10, 231:11, 231:12
**the.cpp** [1] - 16:11
**themselves** [1] - 209:5
**theory** [6] - 98:13, 98:22, 152:17, 161:10, 210:18
**THEREAFTER** [1] - 231:12
**therefore** [4] - 14:14, 14:15, 99:18, 103:3
**they've** [1] - 181:20
**thinking** [1] - 224:23
**third** [14] - 20:5, 20:7, 39:11, 56:15, 60:17, 107:3, 107:14, 118:8, 127:16, 142:20, 181:19, 186:23, 202:23, 219:24
**THIS** [1] - 231:14
**thoughts** [1] - 195:9
**thousands** [2] - 122:19, 179:24
**threats** [1] - 77:4
**three** [39] - 23:18, 34:2, 35:4, 59:12, 62:3, 62:21, 62:25, 63:11, 64:7, 64:8, 64:20, 65:23, 71:25, 81:3, 81:17, 83:2, 83:5, 84:1, 84:5, 84:9, 86:1, 87:7, 111:18, 125:7, 141:23, 142:2, 158:6, 159:7, 162:13, 163:8, 172:3, 172:15, 201:6, 202:16, 211:1, 218:22, 218:25, 219:21
**three-dimensional** [3] - 218:22, 218:25, 219:21
**thresholds** [2] - 225:2, 228:1
**throughout** [3] - 154:11, 178:22, 219:5
**throwing** [1] - 79:25
**Thursday** [1] - 8:13
**tie** [33] - 75:7, 94:9, 132:6, 138:24, 139:2, 139:20, 140:3, 140:8, 140:12, 140:18, 140:19, 140:21, 188:11, 202:19, 202:25, 203:6, 203:23, 204:1, 204:2, 204:4, 204:11, 204:13, 204:16, 205:11, 205:15, 205:19, 205:20, 205:21, 205:22, 206:4, 206:7
**tied** [1] - 82:17
**ties** [24] - 41:7, 43:14, 49:3, 49:4, 66:20, 76:6, 119:21, 119:24, 120:3, 120:7, 138:18, 138:25, 139:25, 140:8, 140:9, 140:10, 140:11, 140:16, 140:17, 140:25, 202:24, 205:10, 206:6
**TIME** [1] - 231:11
**timeline** [4] - 64:3, 80:17, 80:19, 81:4
**tiny** [1] - 170:22
**title** [4] - 34:25, 42:10, 50:2, 225:8
**titled** [3] - 50:5, 183:25, 184:2
**titles** [1] - 183:21
**TO** [1] - 231:12
**today** [25] - 4:21, 4:25, 23:9, 27:1, 77:11, 84:17, 96:12, 103:1, 118:13, 118:21, 140:22, 148:18, 148:20, 149:5, 158:9, 158:17, 160:2, 160:20, 164:16, 174:20, 175:17, 178:21, 208:19, 219:2
**together** [20] - 22:20, 40:23, 44:17, 44:24, 111:4, 134:17, 145:17, 172:8, 193:21, 194:15, 194:22, 197:21, 208:22, 208:24, 209:1, 222:1, 227:5, 230:9
**Tokyo** [3] - 49:25, 52:15, 197:6
**tomorrow** [3] - 96:13, 230:4, 230:6
**took** [5] - 74:11, 137:19, 153:18, 168:20
**tool** [3] - 179:7, 197:19, 198:4
**tools** [1] - 122:25
**Top** [1] - 173:7
**top** [15] - 36:14, 41:20, 88:12, 89:17, 105:24, 131:11, 131:25, 149:14, 149:21, 194:8, 198:5, 220:24, 226:5, 227:7, 228:6
**topic** [1] - 42:15
**topics** [5] - 17:10, 46:18, 174:17, 174:19, 183:18
**total** [2] - 8:25, 58:17
**toward** [3] - 82:1, 171:13, 205:1
**towards** [3] - 65:6, 228:6, 229:20
**Track** [3] - 42:10, 183:25, 184:2
**track** [23] - 44:19, 50:9, 72:3, 113:8, 113:20, 120:23, 126:10, 147:20, 187:4, 199:24, 200:8, 201:21, 215:24, 218:21, 218:25, 220:4, 221:10, 221:12, 221:15, 221:21, 221:22, 224:5, 224:8
**tracking** [2] - 79:13
**tracks** [1] - 57:16
**trade** [2] - 104:4, 104:5
**traded** [1] - 158:5
**tradition** [2] - 122:6, 174:23
**traditional** [19] - 31:21, 40:14, 46:5, 47:19, 47:22, 116:1, 120:25, 121:3, 122:2, 122:5, 177:14, 177:19, 177:20, 183:8, 184:23, 185:1, 185:4, 185:20, 214:7
**train** [10] - 48:16, 48:21, 49:6, 122:18, 127:21, 128:1, 128:16, 134:21, 135:9, 137:13
**trained** [19] - 122:16, 122:21, 122:22, 125:18, 127:17, 127:18, 128:6, 128:9, 128:10, 129:8, 135:8, 135:17, 144:8, 145:9, 152:1, 152:2, 180:21, 181:19, 182:1
**training** [19] - 49:1, 49:6, 53:3, 80:4, 80:14, 128:3, 129:2, 129:3, 129:7, 179:14, 179:16, 180:4, 180:5, 180:14, 180:17, 181:12, 181:18, 181:21, 182:11
**trains** [2] - 128:14, 128:19
**TRANSCRIPT** [1] - 1:14
**transcript** [8] - 4:15, 10:4, 85:8, 85:11, 100:9, 102:20, 102:22, 144:19
**TRANSCRIPTION** [2] - 231:13, 231:14
**transferable** [1] - 65:8
**Transit** [1] - 42:11
**transitioning** [1] - 48:7
**transportation** [5] - 26:21, 27:25, 29:2, 32:17, 178:12
**Transportation** [4] - 23:20, 34:22, 39:7, 120:1
**travel** [2] - 30:3, 104:1
**TRB** [24] - 17:21, 18:13, 19:5, 20:1, 22:18, 34:10, 34:21, 41:24, 42:6, 43:8, 46:12, 47:23, 68:24, 94:7, 120:1, 120:10, 120:13, 121:1, 155:6, 207:3, 211:13, 219:23
**TRB2014** [28] - 18:25, 207:14, 207:19, 207:22, 208:3, 208:4, 208:8, 208:12, 208:17, 209:5, 213:4, 213:7, 213:8, 213:12, 213:15, 213:16, 213:22, 215:20, 217:2, 217:3, 217:21, 218:15, 219:8, 220:3, 223:25, 224:5
**TREGELLIS** [1] - 3:14
**Tregellis** [6] - 98:19, 100:3, 155:18, 155:24, 156:5, 157:10
**Tregellis'** [1] - 98:14
**trial** [3] - 158:9, 178:22, 198:24
**Trial** [2] - 84:18, 119:16
**trials** [1] - 157:7
**triangulation** [1] - 28:5
**triangulations** [1] - 28:12
**tried** [3] - 133:17, 164:8, 209:20
**trigger** [1] - 227:18
**trimmed** [1] - 93:3
**trips** [2] - 104:8, 104:10
**truck** [6] - 57:19, 57:20, 112:16, 112:18, 131:16, 131:17

265

trucks [2] - 57:22, 57:24
TRUE [1] - 231:14
true [8] - 52:24, 79:7, 84:1, 84:4, 84:8, 206:9
truth [2] - 5:18, 6:25
try [7] - 47:2, 74:19, 133:13, 134:16, 165:19, 177:17, 217:7
trying [14] - 17:6, 81:4, 88:6, 88:21, 92:6, 109:5, 160:16, 162:4, 162:24, 165:11, 167:5, 193:18, 216:23, 229:12
TT [3] - 89:19, 89:23
TUESDAY [2] - 1:15, 4:1
tunnel [2] - 32:21, 34:5
tunnels [3] - 32:22, 33:22, 34:5
turn [20] - 33:11, 39:9, 44:12, 45:8, 59:25, 61:3, 86:9, 87:18, 106:16, 131:18, 136:9, 138:10, 160:16, 162:4, 170:5, 172:20, 181:3, 195:6, 196:15, 206:11
turned [1] - 164:2
turnkey [4] - 60:6, 60:8, 64:24, 64:25, 65:3
twice [2] - 19:7, 19:8
twin [1] - 172:14
two [26] - 19:12, 51:17, 17:14, 17:16, 17:22, 18:3, 20:12, 20:15, 20:20, 20:22, 21:4, 21:9, 22:19, 29:7, 30:11, 30:19, 33:18, 35:4, 35:16, 36:18, 37:21, 39:23, 44:15, 45:22, 50:7, 52:2, 62:9, 62:11, 66:4, 67:3, 71:17, 75:6, 80:21, 95:4, 97:7, 97:10, 98:2, 98:10, 112:1, 113:14, 117:12, 138:7, 141:10, 144:11, 144:17, 147:8, 159:12, 160:22, 161:10, 163:8, 166:3, 174:2, 177:8, 178:21, 179:12, 183:23, 184:5, 184:13, 191:12, 191:13, 191:15, 191:19, 192:4, 192:5, 193:20, 195:18, 196:20, 197:24, 198:10, 198:11, 198:15, 199:17, 208:21, 208:22, 210:12, 210:16, 210:22, 210:24, 211:1, 211:14, 211:16, 212:4, 212:8, 212:15, 216:19, 216:20, 229:22
two-and-a-half [1] - 229:22
type [39] - 39:3, 47:25, 90:16, 56:7, 69:21, 119:8, 123:14, 123:15, 125:4, 125:5, 125:19, 127:18, 127:20, 127:25, 132:3, 132:7, 133:13, 134:17, 137:9, 181:16, 188:11, 188:12, 188:22, 189:1, 214:5, 225:4
typed [1] - 114:16
types [1] - 112:6
typewritten [1] - 231:12
typical [2] - 32:9
typically [4] - 57:22, 121:12, 126:21, 140:9

**U**

U.S [6] - 34:24, 57:14, 75:12, 105:15, 225:16
UK [1] - 75:11
ULB [1] - 217:6
ultimate [2] - 168:12, 206:12
ultimately [6] - 60:13, 100:23, 101:6
UML [mis] - 17:19, 17:21, 17:25, 18:7, 18:13, 18:24, 19:4, 19:5, 20:1, 22:17, 22:18, 35:15, 35:25, 36:13, 38:18, 38:20, 39:1, 39:3, 39:12, 39:15, 40:7, 41:4, 41:17, 43:8, 94:6, 113:4, 113:6, 113:9, 113:14, 113:18, 113:23, 114:2, 114:9, 114:19, 116:19, 116:23, 117:9, 119:24, 120:8, 120:12, 120:13, 141:23, 146:5, 146:16, 148:16, 149:2, 149:3, 154:11, 154:12, 154:18, 154:20, 207:13, 207:14, 207:19, 208:2, 208:3, 208:7, 208:8, 208:11, 208:12, 208:16, 208:17, 208:18, 209:4, 209:5, 210:25, 211:13, 213:3, 213:17, 213:19, 213:21, 213:22, 214:19, 214:24, 215:20, 217:2, 217:3, 217:21, 218:15, 219:8, 220:3
unable [1] - 22:3
unaccused [1] - 168:15
unclear [1] - 13:23
uncommon [1] - 210:3
under [6] - 20:13, 21:11, 83:11, 85:5, 140:16, 172:15, 227:14
undergraduate [1] - 156:21
underlie [1] - 185:17
underlying [1] - 16:21
underscores [1] - 225:10
understood [5] - 22:23, 199:23, 193:12, 211:16
unfair [1] - 212:23
unfortunately [1] - 108:16
unique [5] - 52:19, 195:11, 195:14, 196:13, 196:13
unit [8] - 62:9, 62:10, 71:10, 71:15, 129:10, 159:16, 163:4
Unit [1] - 56:5
United [2] - 35:9, 55:7
UNITED [4] - 1:1, 1:1, 1:4, 231:8
units [10] - 61:2, 63:18, 63:20, 84:9, 159:14, 163:7, 163:8, 164:19, 164:24
universe [1] - 164:6
universities [1] - 39:22
University [7] - 27:13, 35:11, 113:4, 146:5, 146:9, 171:4, 206:24
university [1] - 39:21
unlimited [2] - 19:18, 19:19
untrained [1] - 181:7
unused [1] - 168:14
up [98] - 5:23, 6:1, 6:8, 6:12, 7:5, 8:6, 17:2, 23:11, 35:20, 43:9, 43:22, 44:20, 55:6, 60:17, 65:25, 68:13, 75:21, 75:23, 80:17, 81:10, 82:8, 82:21, 83:14, 84:18, 94:5, 97:15, 103:11, 103:19, 105:24, 134:12, 136:10, 149:8, 152:8, 156:21, 158:13, 158:21, 158:23, 170:5, 173:11, 178:4, 178:21, 194:5, 195:6, 206:17, 217:4, 219:8, 220:3
up-to-date [1] - 173:12
update [1] - 77:2
updated [1] - 138:6
updates [1] - 82:1
updating [1] - 65:25
upfront [1] - 179:14
upper [5] - 82:8, 114:16, 114:17, 192:24, 195:1
URB [2] - 18:23, 18:25
URB-TRB2014 [1] - 18:25
USA [1] - 32:6
usable [1] - 161:14
useable [1] - 161:12
useful [4] - 153:13, 177:18, 179:18, 227:24
User [1] - 33:10
user [3] - 119:7, 125:21
users [1] - 127:8
uses [12] - 32:7, 107:19, 116:6, 117:4, 118:13, 118:16, 175:6, 177:8, 178:23, 196:23, 197:12, 223:12
utilizes [1] - 45:17

**V**

vacation [1] - 141:14
vague [4] - 14:13, 63:4, 58:10
valid [5] - 65:7, 66:16, 82:5, 129:25, 206:13
validation [1] - 227:18
validating [1] - 227:22
validity [1] - 218:15
value [20] - 132:15, 132:17, 133:9, 135:3, 162:8, 162:17, 163:10, 167:18, 168:6, 191:4, 195:14, 195:18, 195:20, 195:22, 196:20, 197:13, 197:19, 197:24, 198:15
values [15] - 176:13, 180:6, 180:9, 198:9, 198:11, 190:25, 201:15, 203:25, 204:25, 205:3, 205:14
variables [4] - 189:11,

266

220:22, 220:24, 201:22
various [1] - 96:10
Vehicle [1] - 225:10
vehicle [5] - 57:19, 60:12, 121:12, 134:13, 135:1
vehicles [6] - 57:11, 57:15, 58:2, 58:15, 59:25, 65:1
verdict [8] - 18:22, 19:11, 19:22, 91:22, 91:25, 92:23, 93:2, 93:4
Version [8] - 14:9, 131:4, 131:14, 131:21, 138:13, 138:15, 138:17, 147:3, 214:16
version [37] - 9:13, 10:15, 10:20, 10:21, 11:16, 11:19, 11:24, 12:3, 12:9, 13:13, 13:19, 13:21, 14:6, 14:8, 14:11, 14:23, 15:8, 15:12, 16:4, 16:14, 16:16, 16:22, 59:23, 62:4, 62:5, 62:12, 63:18, 64:1, 64:5, 65:14, 65:16, 65:21, 114:3, 114:5, 114:6, 114:7, 114:12, 114:24, 115:7, 116:9, 118:19, 130:3, 130:8, 130:13, 131:1, 135:25, 136:2, 137:2, 138:6, 139:8, 146:25, 148:12, 148:15, 148:17, 173:12, 226:20
versions [31] - 9:9, 9:10, 9:14, 9:16, 9:25, 10:1, 10:11, 10:12, 11:7, 11:13, 12:8, 12:20, 12:21, 13:1, 13:4, 13:9, 14:1, 14:5, 14:20, 14:22, 14:25, 15:1, 15:20, 96:10, 113:22, 130:17, 130:24, 131:13, 138:3, 138:7, 147:17, 163:5, 175:12, 175:16, 189:6, 214:16, 226:9
200:21, 200:24, 201:22
Vice [5] - 27:7, 110:16, 39:25
vice [1] - 39:25
Vice-President [2] - 27:7
vice-presidents [1] - 39:25
video [10] - 23:9, 23:20, 24:4, 24:8, 24:15, 24:19, 25:3, 90:10
VIDEO [3] - 3:5, 3:7, 90:10
Video [3] - 24:6, 24:12, 24:18
view [7] - 6:11, 7:24, 21:18, 21:20, 44:18, 74:22, 93:2
viewer [2] - 37:23, 142:7
Vil [2] - 17:20, 18:6
virtually [1] - 32:6
visibility [1] - 89:18
visible [1] - 140:19
Vision [1] - 75:11
Vision [11] - 116:2, 116:3, 152:7, 170:22, 171:9, 171:18, 173:8, 174:3, 174:13, 174:23, 228:5
vision [22] - 40:15, 46:5, 47:20, 47:22, 116:7, 171:9, 171:19, 177:20, 178:14, 183:9, 184:23, 185:20, 214:6, 223:7, 223:13
visualization [2] - 197:19, 198:4
visualize [1] - 197:16
visualized [1] - 220:4
visualizer [1] - 176:7
visually [1] - 211:19
vocabulary [1] - 18:16
VS [1] - 1:8

**W**

waiting [2] - 23:8, 109:15
walk [5] - 16:8, 59:14, 62:23, 83:21
walking [1] - 217:7
walks [1] - 100:5
warn [1] - 79:20
WAS [1] - 231:12
Washington [2] - 34:21, 170:17, 177:1
WASHINGTON [1] - 2:21
ways [3] - 122:4, 126:19
WCRR [4] - 49:16, 49:17, 49:22
web [1] - 227:5
website [4] - 46:15, 158:20, 158:21, 158:24
Wednesday [1] - 84:14
week [7] - 56:10, 90:9, 94:20, 130:7, 158:8, 190:14
Week [1] - 173:7
weekend [1] - 105:16
weekly [1] - 57:16
weeks [2] - 73:13, 172:25
Welcome [1] - 103:25
welcome [2] - 23:7, 103:17
well-known [1] - 218:2
Wells [1] - 150:4
WEST [1] - 1:23
WESTERN [1] - 1:2
whereas [2] - 12:8, 196:15
wherein [2] - 218:19, 219:13
white [6] - 31:16, 31:18, 192:5, 203:14, 204:7
whole [10] - 26:22, 132:2, 138:8, 138:9, 168:5, 171:1, 179:17, 179:23, 199:21
wide [7] - 12:20, 30:15, 30:17, 44:20, 192:13, 192:14, 196:8
widely [1] - 223:9
width [1] - 30:14
wife [1] - 172:12
willing [1] - 168:8
win [2] - 191:20, 191:25
window [15] - 40:16, 46:7, 186:21, 189:19, 189:22, 190:21, 192:4, 190:15, 196:10, 196:11, 196:17, 196:12, 201:14
windows [2] - 184:24, 196:12
wise [2] - 125:4, 198:5

Witness [1] - 25:8
witness [17] - 23:11, 23:15, 25:5, 25:11, 77:21, 96:24, 97:15, 189:3, 189:9, 190:14, 108:8
WITNESS [11] - 25:19, 28:19, 100:21, 109:4, 109:6, 110:8, 146:1, 155:24, 167:5, 169:13, 195:22, 196:1, 196:5
WITNESSES [1] - 3:2
witnesses [2] - 7:24, 23:19, 160:2
won [1] - 173:5
wonderful [1] - 179:7
wondering [1] - 41:13
wooden [1] - 49:4
word [5] - 14:18, 72:23, 95:14, 107:19, 198:25, 199:2
words [7] - 52:21, 52:23, 52:24, 89:17, 178:21, 185:14, 208:15
works [1] - 6:3
world [18] - 28:25, 29:3, 32:4, 32:13, 43:19, 104:1, 159:10, 159:25, 161:22, 161:23, 163:18, 163:19, 164:3, 166:7, 170:3, 180:19, 181:22
Worry [1] - 49:17
wrote [2] - 163:11
worse [1] - 163:11
write [6] - 52:22, 127:3, 127:7, 126:1,
wrote [4] - 52:23, 76:21, 111:22, 119:25, 152:25, 156:21, 156:25

**Y**

y'all [1] - 170:2
year [5] - 32:9, 62:7, 68:6, 80:6, 81:25, 190:15
years [14] - 27:19, 27:22, 50:7, 54:16, 76:7, 141:23, 147:8, 147:20, 154:12, 171:22, 172:11, 172:22, 215:13, 220:18
yellow [2] - 199:18, 204:2
yesterday [6] - 8:12, 88:8, 88:13, 91:22, 94:8, 94:11
YORK [1] - 2:20
young [1] - 172:13
yourself [5] - 145:15, 145:20, 152:12, 153:10, 153:15, 170:1

**Z**

zero [11] - 98:21, 100:17, 101:7, 101:10, 101:11, 132:15, 132:18, 132:19, 132:23, 188:15, 188:25
zoom [4] - 37:9, 149:14, 149:21, 222:12, 223:13, 220:18
zooming [1] - 220:19
ZOVKO [2] - 2:7, 49:17
Zovko [1] - 99:9

UNITED STATES DISTRICT COURT

**Exhibit 4**
**238**