Christy G. Lea (SBN 212,060)
christy.lea@knobbe.com
Joseph R. Re (SBN 134,479)
joe.re@knobbe.com
Nicholas M. Zovko (SBN 238,248)
nicholas.zovko@knobbe.com
Alan G. Laquer (SBN 259,257)
alan.laquer@knobbe.com
Raymond Lu (SBN 340,873)
raymond.lu@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Phone: (949) 760-0404
Facsimile: (949) 760-9502

*Attorneys for Plaintiff/Counterclaim Defendant*
PAVEMETRICS SYSTEMS, INC.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| PAVEMETRICS SYSTEMS, INC., | Case No. 2:21-cv-1289-MCS-MMA |
| Plaintiff, | Honorable Mark C. Scarsi |
| v. | **PAVEMETRICS'S OPPOSITION TO TETRA TECH'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR NEW TRIAL** |
| TETRA TECH, INC., | |
| Defendant. | |
| AND RELATED COUNTERCLAIMS | |

# TABLE OF CONTENTS

**Page No.**

I. INTRODUCTION ...................................................................................1

II. THIS COURT SHOULD DENY JMOL ON INVALIDITY .........................1

    A.   Pavemetrics UML Sale & Support, Including Code, Is Prior Art ....................................................................................1

        1.   Jury Did Not Need to Rely Upon UML Sale & Support ...................................................................................1

        2.   Jury Found UML Sale & Support, Including Code, Is Prior Art .............................................................................1

        3.   UML Sale & Support Was a Public Use Because It Was Both Publicly Accessible and Commercially Exploited ..........................................................................2

        4.   TT Ignores the Law to Argue the Code Must Have Been Publicly Available to be Prior Art .............................4

        5.   TT Corroboration Arguments Are Legally & Factually Wrong .............................................................5

    B.   Substantial Evidence Supports the Obviousness Verdict ..............6

        1.   Claims 1 and 21 of the '293 Patent Are Invalid for Obviousness .........................................................................7

        2.   Claim 8 of the '557 Patent Is Invalid for Obviousness .......................................................................11

III. NO NEW TRIAL IS WARRANTED ......................................................13

    A.   Pavemetrics Presented Highly Relevant Evidence Regarding TT's Expert's Failure to Review the Accused Product ........................................................................................14

    B.   Pavemetrics Focused on the Facts, Not Discovery Disputes ......................................................................................16

    C.   Pavemetrics Presented Proper Evidence and Argument ..............19

    D.   Pavemetrics' Noninfringement Theories Were Legally Correct ......................................................................................21

        1.   Pavemetrics Correctly Argued that Its Sale of Unconnected Components Did Not Infringe System Claims ...................................................................................21

# TABLE OF CONTENTS
### (*cont'd*)

**Page No.**

2.    Pavemetrics Properly Argued the Artificial Intelligence Issue ................................................................24

IV. CONCLUSION ...............................................................25

# TABLE OF AUTHORITIES

**Page No(s).**

*Apple v. Samsung,*
  11-cv-01846, ECF 2947 (N.D. Cal. Feb 7, 2014) ........................................ 18

*BASF v. SNF Holding,*
  955 F.3d 958 (Fed. Cir. 2020) .......................................................................... 5

*Burdyn v. Old Forge Borough,*
  330 F.R.D. 399 (M.D. Pa. 2019) ..................................................................... 17

*CA, Inc. v. Simple.com,*
  780 F. Supp. 2d 196 (E.D. Cal. 2009) .............................................................. 5

*Caudle v. Bristow Optical,*
  224 F.3d 1014 (9th Cir. 2000) .................................................................. 18, 25

*Chrimar Sys. v. Alcatel-Lucent Enterp.,*
  2017 WL 568712 (E.D. Tex. Feb. 3, 2017) ..................................................... 21

*County of Maricopa v. Maberry,*
  555 F.2d 207 (9th Cir. 1997) .......................................................................... 16

*Cross Med. Prods. v. Medtronic Sofamor Danek,*
  424 F.3d 1293 (Fed. Cir. 2005) ...................................................................... 23

*Egbert v. Lippmann,*
  104 U.S. 333 (1881) ..................................................................................... 4, 5

*Finjan v. Blue Coat Sys.,*
  2016 WL 3880774 (N.D. Cal. July 18, 2016) ...................................... 7, 12, 17

*Finjan. v. Juniper Networks,*
  2019 WL 1116243 (N.D. Cal. Mar. 11, 2019) .......................................... 18, 20

*Fonar v. Johnson & Johnson,*
  821 F.2d 627 (Fed. Cir. 1987) ........................................................................ 13

*Hemmings v. Tidyman's,*
  285 F.3d 1174 (9th Cir. 2002) ........................................................................ 21

*Invitrogen v. Biocrest,*
  424 F.3d 1374 (Fed. Cir. 2005) ........................................................................ 4

*Juicy Whip v. Orange Bang,*
  292 F.3d 728 (Fed. Cir. 2002) .......................................................................... 5

# TABLE OF AUTHORITIES
## (*cont'd*)

**Page No(s).**

*Kinetic Concepts v. Blue Sky Med.*,
  554 F.3d 1010 (Fed. Cir. 2009) .................................................................. 18

*Kohler v. Inter-Tel Techs.*,
  244 F.3d 1167 (9th Cir. 2001) ............................................................. 7, 12

*KSR v. Teleflex*,
  550 U.S. 398 (2007) ................................................................................... 7

*Lazare Kaplan v. Photoscribe Techs.*,
  628 F.3d 1359 (Fed. Cir. 2010) .................................................................. 6

*Lockwood v. American Airlines*,
  107 F.3d 1565 (Fed. Cir. 1997) .................................................................. 4

*Mateyko v. Felix*,
  924 F.2d 824 (9th Cir. 1990) .................................................................... 18

*New Railhead v. Vermeer*,
  298 F.3d 1290 (Fed. Cir. 2002) .................................................................. 4

*Omega Patents v. CalAmp*,
  920 F.3d 1337 (Fed. Cir. 2019) ................................................................ 25

*Parker v. Randolph*,
  442 U.S. 62 (1979) ................................................................................... 18

*PharmaStem Therapeutics v. ViaCell*,
  491 F.3d 1342 (Fed. Cir. 2007) ................................................................ 14

*Phoenix Solutions v. West Interactive*,
  2010 WL 6032841 (C.D. Cal. 2010) .......................................................... 4

*Reeves v. Sanderson Plumbing Prods.*,
  530 U.S. 133 (2000) ................................................................................... 6

*Transocean Offshore Deepwater Drilling v. Maersk Contractors*,
  617 F.3d 1296 (Fed. Cir. 2010) ........................................................... 21, 23

*Transweb v. 3M Innovative Props.*,
  812 F.3d 1295 (Fed. Cir. 2016) .................................................................. 6

**TABLE OF EXHIBITS**

| Decl. Ex. Number | Trial Ex. Number | Description |
|---|---|---|
| colspan-header: **Declaration of Aaron Parker** | | |
| Ex. 1 | NA | Day 1 Trial Transcript<br>• Preliminary Jury Instructions<br>• Opening Statements<br>• Gary Keyes |
| Ex. 2 | NA | Day 2 Trial Transcript<br>• Darel Mesher<br>• William Larson<br>• Videos (Fox-Ivey, Talbot, Nguyen, Hafiz)<br>• Vassilios Morellas |
| Ex. 3 | NA | Day 3 Trial Transcript<br>• Vassilios Morellas<br>• Todd Schoettelkotte<br>• Richard Habel |
| Ex. 4 | NA | Day 4 Trial Transcript<br>• Videos (Spencer, Teufele, Olenoski)<br>• John Laurent<br>• Jean-Francois Hebert<br>• Christian Tregillis<br>• David Frakes |
| Ex. 5 | NA | Day 5 Trial Transcript<br>• David Frakes<br>• Vassilios Morellas<br>• Final Jury Instructions<br>• Closing Arguments |
| Ex. 6 | 26 | Automatic Track Inspection Using 3D Laser Profilers to Improve Rail Transit Asset Condition Assessment and State of Good Repair – A Preliminary Study ("UML-TRB2014") |
| Ex. 7 | 508 | UML Source Code |

| Ex. 8 | 565 | 2013-05-14 UML Research Group 3rd Quarterly Meeting Minutes |
|---|---|---|
| Ex. 9 | 566 | 2013-09-30 UML Research Group 5th Quarterly Report |
| Ex. 10 | 811 | Pavemetrics quotation for CSX dated 2/15/2021 |
| Ex. 11 | 844 | Goods Agreement with CSX dated 3/15/2021 |
| **Declaration of Nicholas Zovko** | | |
| Ex. A | | Excerpts of Deposition Transcript of Christian Tregillis |
| Ex. B | | 2022-07-08 E-mail from Cerulli to Counsel for Pavemetrics |
| Ex. C | | Excerpts of Tetra Tech's Initial Deposition Designations for the Deposition Transcript of Bradford Spencer |
| Ex. D | | Excerpts of Tetra Tech's Initial Deposition Designations for the Deposition Transcript of Ali Hafiz |
| **Declaration of Alan Laquer** | | |
| Ex. E | | 2021-12-10 E-mail from Palace to Counsel for Pavemetrics |
| Ex. F | | 2021-12-15 E-mail from Palace to Counsel for Pavemetrics |
| Ex. G | | Excerpts of the Rebuttal Expert Report on Non-Infringement of David Frakes, Ph.D., and Exhibit L thereto |
| Ex. H | | Excerpts of Deposition Transcript of Dr. Vassilios Morellas |

| Ex. I | | Transcript of the Federal Judicial Center video titled "The Patent Process: An Overview for Jurors" |
|---|---|---|
| Ex. J | | Excerpts of the Initial Expert Report on Invalidity of David Frakes, Ph.D. |
| Ex. K | | ECF 2947 in Apple, Inc. v. Samsung Elecs. Co., Case No. 11-CV-01846-LHK (N.D. Cal. Feb. 7, 2014) |
| Ex. 12 | 12 | Certified copy of US Patent No. 10,362,293 |
| Ex. 40 | 40 | 2020-04-07 Pavemetrics Sale A Quotation |
| Ex. 510 | 510 | Lorente et al., Detection of Range-Based Rail Gage and Missing Rail Fasteners, Transportation Research Record 2448, pp. 125-132 (2014) ("EC-TRB2014") |
| Ex. 526 | 526 | UML Purchase Order Dated 2012-09-17 |
| Ex. 527 | 527 | August 2012 LCMS Hardware and Software Installation Manual Rev 2.5 |
| Ex. 528 | 528 | September 2012 LCMSDataAcquisition Library: User Manual Rev. 2.0.2.0 |
| Ex. 555 | 555 | 2012-09-27 Pavemetrics Invoice No. 246 to UML |
| Ex. 572 | 572 | 2014  Pavemetrics LRAIL Data Sheet |
| Ex. 686 | 686 | 2014-10-22 E-mail from Robert Olenoski to Darel Mesher re New Rail Inspection Datasheet and attachment |

# I.  INTRODUCTION

Tetra Tech's ("TT") motion for judgment on invalidity lacks merit.  TT ignores much of the record, fails to follow the jury instructions, and misrepresents the law governing what is prior art.  Because abundant evidence supports the jury's invalidity verdicts, JMOL should be denied.

TT's motion for a new trial on infringement also lacks merit.  TT presents a laundry list of disconnected complaints, many of which are just not true, do not concern infringement, were never objected to, or were caused by TT.  Most importantly, TT never argues the noninfringement verdict is against the great weight of the evidence.  It also ignores that the jury is presumed to have followed the jury instructions.  And because the evidence and law overwhelmingly established no infringement, TT fails to show unfair prejudice that could have affected case outcome.  Accordingly, its motion for a new trial on infringement should also be denied.

## II.  THIS COURT SHOULD DENY JMOL ON INVALIDITY

### A.  Pavemetrics UML Sale & Support, Including Code, Is Prior Art

#### 1.  Jury Did Not Need to Rely Upon UML Sale & Support

TT ignores that the verdict asked whether the asserted claims would have been obvious in view of "Pavemetrics' UML Sale and Support **and/or** UML-TRB2014," either alone or in combination with other references.  ECF 309 at 6-7.  And this Court instructed the jury that the parties agree that UML-TRB2014 is prior art.  Ex. 5, 121:24-25.  Accordingly, the jury is presumed to have found invalidity based on **either** the UML Sale and Support, UML-TRB2014, or both, either alone or in combination with other references.  Thus, UML Sale and Support was not needed to show obviousness because UML-TRB2014 and other references could have independently supported the invalidity verdict.

#### 2.  Jury Found UML Sale & Support, Including Code, Is Prior Art

TT agrees that "the UML Sale and Support includes excerpts of source

code," but argues that Pavemetrics failed to establish that the code (which included source code and a Matlab script) is prior art.  Br. 3-9.  But TT's focus on the code in isolation is misplaced.

The Final Pretrial Conference Order defined the "UML Sale and Support" to include **both (1)** the 2012 sale of Pavemetrics' product with rail inspection capabilities and use of that device to inspect railway tracks (*i.e.*, UML Sale), **and (2)** technical support and development consulting in *2012-2014, including uses of code* tested as proof of concept (*i.e.*, **UML Support**).  ECF 285 at 8.  And this Court instructed the jury to determine whether "UML Sale and Support" is prior art, not individual code.  Ex. 5, 122:7-14.  And the verdict form reflects that description of the prior art.  ECF 309 at 6-7.

### 3. UML Sale & Support Was a Public Use Because It Was Both Publicly Accessible and Commercially Exploited

Substantial evidence supports the jury's finding that UML Sale and Support was a public use.  Pavemetrics sold the system and support services to UML as part of Pavemetrics commercially exploiting its product.  UML then publicly used that purchase in a manner accessible to the public.  That all occurred before February 2015.  Thus, UML Sale and Support is prior art.  Ex. 5, 122:12-14 ("An invention was publicly used when it was *either* accessible to the public *or* commercially exploited.").

Pavemetrics always acted publicly and commercially.  Pavemetrics was founded to commercialize INO's 3D laser technology.  Ex. 3, 140:13-141:11 (Habel); Ex. 4, 28:21-29:20 (Laurent).  In 2012, Pavemetrics sold its 3D laser rail inspection system to UML.  Ex. 4, 35:8-19 (Laurent); Exs. 526 (purchase order), 527 (installation manual), 555 (invoice).  In 2014, Pavemetrics distributed LRAIL flyers to promote the system and put them on its website.  Ex. 4, 46:8-17 (Laurent); Ex. 572; Ex. 2, 67-72 (Mesher); Ex. 686.

The U.S. Dept. of Transportation funded the UML project so it was

public.  Ex. 4, 39:3-8 (Laurent); Ex. 3, 162:15-163-15 (Habel).  Pavemetrics regularly met with public institutions and government agencies, including UML, the FRA, and NASA, to describe Pavemetrics' analysis of UML's rail data.  Ex. 4, 39:9:40:7 (Laurent); Tr. Exs. 565 (Parker 8), 566 (Parker 9).  Pavemetrics software programmers shared details at those meetings about Pavemetrics' algorithms and taught about its rail inspection software.  *See* Ex. 4, 113:1-16, 154:11-155:6 (Hebert: "we were explaining step-by-step what were the algorithms."); Tr. Exs. 565, 566 (minutes); Ex. 3, 162:15-163:15 (Habel).

Those meetings addressed the UML project, including algorithms for detecting rail edges (Tr. Ex. 565 at 8; Ex. 4, 40:8-16 (Laurent)), the Canny method for calculating vertical gradients (*id.*), creating Fake3D images (Tr. Ex. 565 at 13, 14; Ex. 4, 40:17-25 (Laurent)), and detecting missing fasteners (Tr. Ex. 566 at 13-15).  The minutes also explained that Pavemetrics submitted a paper to the Transportation Research Board (TRB) to be published at its annual meeting in 2014.  Tr. Ex. 566 at 19; Ex. 4,  41:15-42:4 (Laurent).

That publication, called UML-TRB2014, also described algorithms used in UML Sale and Support, including algorithms for detecting edges of rails.  Tr. Ex. 26 (Parker 6) at 7; Ex. 4, 45:15-23 (Laurent).  It described algorithms using Sobel kernels and the Canny method to calculate vertical gradients over the entire image using a sliding window.  Tr. Ex. 26 at 7-8; Ex. 4 (Laurent), 45:24-46:7; *see also* Ex. 3, 150:1-4 (Habel).  It also described the results of algorithms Pavemetrics developed for detecting cracks on railroad ties.  Tr. Ex. 26 at 11-12; Ex. 4, 119:23-120:10 (Hebert).  UML-TRB2014 also showed Fake3d images.  Tr. Ex. 26 at 6-7, Figs. 4-5; Ex. 4, 44:21-45:14 (Laurent).

TT argues "the 2012 sale did not include processing software" and Pavemetrics received "no money or other compensation" for the code.  Br. 6.  But the 2012 sale did include processing software.  Ex. 526 (purchase order includes "software library"); Ex. 555 (invoice includes "software upgrades");

Ex. 527 and Ex. 4, 35:9-13 (Pavemetrics sent software installation manual to UML with sale).  TT relies on Hebert's testimony that Pavemetrics "didn't **deliver** the processing software" to UML in 2012.  Br. 6 (citing Ex. 4, 146:18-20).  But that Pavemetrics later **delivered** the processing software to UML does not mean that Pavemetrics **sold** a system without processing software.  Moreover, the UML Sale and Support included ongoing support of the 2012 sale, which, as explained above, included software and algorithms to detect railway features.  Ex. 555.

TT also argues that the UML algorithms were "still under development and not ready for commercialization."  Br. 8-9.  TT confuses the instruction for public use with the instruction for sale or offer for sale.  *See* Ex. 5, 122:12-21.  Regardless, the evidence shows that the system worked for rail inspection, was sold to UML, and an algorithm for identifying features was already developed.  *E.g.*, Ex. 4, 120:11-121:6 (Hebert).  Thus, the jury could have found that UML Sale and Support was both a public use and an on-sale bar.

### 4. <u>TT Ignores the Law to Argue the Code Must Have Been Publicly Available to be Prior Art</u>

TT argues that "the source code was kept confidential and only in Pavemetrics' possession."  Br. 4-5.  But public use can occur even if people cannot observe the inner workings of the invention.  *Egbert v. Lippmann*, 104 U.S. 333, 336 (1881) (woman's corset not visible to the public when worn).  When something is used as part of a commercial activity, such as the UML Sale and Support, the public does **not** need access to the underlying code.[1]

---

[1] *See Invitrogen v. Biocrest*, 424 F.3d 1374, 1380 (Fed. Cir. 2005) ("Commercial exploitation is a clear indication of public use."); *New Railhead v. Vermeer*, 298 F.3d 1290, 1297 (Fed. Cir. 2002) (Public use "does not necessarily mean open and visible in the ordinary sense."); *Phoenix Solutions v. West Interactive*, 2010 WL 6032841, at *7 (C.D. Cal. 2010) ("The operational novelty of the invention does not have to be exposed to the public in order for the invention itself to be in public use.").

1    In *Lockwood v. American Airlines*, the Federal Circuit rejected the exact

2    argument TT makes here.   107 F.3d 1565, 1570 (Fed. Cir. 1997).   Patentee

3    Lockwood argued that "critical aspects" of AA's reservation system were

4    unavailable to the public because the airline kept the software algorithms

5    confidential.  *Id.*  The Federal Circuit rejected that argument: "the public need

6    not have access to the inner workings of a device for it to be considered in

7    public use or used by others within the meaning of the statute."  *Id.*  Applying

8    *Lockwood*, a district court similarly held: "[I]t is irrelevant that certain aspects

9    of [the] software package may have been inaccessible to the public . . . ."  *CA,*

10   *Inc. v. Simple.com*, 780 F. Supp. 2d 196, 304 (E.D. Cal. 2009).

11   TT relies primarily on *BASF* to argue that the code must have been

12   publicly accessible.  Br. 6.  In *BASF*, the court vacated summary judgment and

13   remanded for trial because the district court incorrectly held that confidentiality

14   agreements were legally irrelevant.  *BASF v. SNF Holding*, 955 F.3d 958, 965-

15   68 (Fed. Cir. 2020).  But that greatly differs from the facts here, where a trial

16   was conducted.  TT's patents claim systems for inspecting rails and methods of

17   using those systems.  Pavemetrics openly discussed its rail inspection system to

18   promote LRAIL without ever imposing confidentiality restrictions on anyone.

19   Moreover, with regard to the code, *BASF* makes clear that each aspect of the

20   claimed invention need not be public.  *Id.* at 966-67.

21   ### 5.   TT Corroboration Arguments Are Legally & Factually Wrong

22   TT argues extensively that Pavemetrics relied on uncorroborated

23   evidence, citing *Juicy Whip* and *Finnigan*.  Br. 7-8.  But those cases are

24   inapplicable because they involved oral testimony ***alone***.  Here, Pavemetrics

25   presented many contemporaneous documents establishing that the UML Sale

26   and Support is prior art, which *Juicy Whip* explains is sufficient.  *See supra*

27   Section II.A.3; *Juicy Whip v. Orange Bang*, 292 F.3d 728, 743 (Fed. Cir. 2002)

28   ("Reliable evidence of corroboration preferably comes in the form of physical

records that were made contemporaneous with the alleged invention."). TT's arguments about "cross-corroboration" and its reliance on *Lacks* and *Woodland* are inapplicable for the same reason. Br. 7-8.

Moreover, courts apply a "rule of reason" standard to determine the sufficiency of corroboration, "under which all pertinent evidence is examined in order to determine whether the inventor's story is credible." *Transweb v. 3M Innovative Props.*, 812 F.3d 1295, 1301-02 (Fed. Cir. 2016). "Importantly, this analysis does not require that every detail of the testimony be independently and conclusively supported by the corroborating evidence." *Id.* Pavemetrics presented abundant evidence corroborating that the UML Sale and Support is prior art, which is more than enough under the rule of reason. *See supra* Section II.A.3; *Lazare Kaplan v. Photoscribe Techs.*, 628 F.3d 1359, 1373-75 (Fed. Cir. 2010). TT's attempt to cherry-pick and focus on the code is "the antithesis of the rule of reason." *Transweb*, 812 F.3d at 1302.

**B.**    **Substantial Evidence Supports the Obviousness Verdict**

For each claim limitation that TT contends lacks substantial evidence, TT bears the burden of proving that none of the relevant record, taken as a whole, supports the obviousness verdict. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000). But TT ignores most of the relevant evidence, including Pavemetrics' fact-witness testimony, exhibits, and admissions by TT's witnesses. TT wrongly restricts its JMOL argument to Pavemetrics' "case in chief," particularly to Pavemetrics' expert testimony. But the Court correctly instructed the jury to consider all of the evidence. Ex. 1, 15:1-18:7. Moreover, the parties stipulated that their respective cases were not limited to only witnesses they called. ECF 285 at 47.

TT relies on *Fresenius*, but that case had "no testimony" where "any witness" discussed a claim limitation. TT also relies on *Koito*, but the defendant there "did not even mention the . . . reference after introducing it into evidence."

TT also relies on *Proveris* and *Centricut*, but in each the non-moving party failed to offer any expert testimony.  Here, Frakes reviewed the prior art and confirmed that it invalidates the claims.  Ex. 4, 206:11-208:10, 213:3-18.

The obviousness analysis is conducted from the perspective of a POSITA, whom TT admitted would have a very high level of skill.  Ex. 5, 123:4-18; Ex. 2, 136:16-137:8.  Yet, in seeking JMOL against the jury's obviousness verdict, TT never discusses a POSITA.  The evidence, including TT's admissions, confirm that limitations TT now disputes were widely known to a POSITA before the filing date.  *KSR v. Teleflex*, 550 U.S. 398, 420-21 (2007).

### 1.   Claims 1 and 21 of the '293 Patent Are Invalid for Obviousness

The jury found that Claims 1 and 21 would have been obviousness in view of Pavemetrics' "UML Sale and Support ***and/or*** UML-TRB2014 ***either*** alone ***or*** in combination with EC-TRB2014.  ECF 309 at 6.

Laurent testified that the UML-TRB2014 publication (Tr. Ex. 26) describes the Pavemetrics prior-art system used in the UML Sale and Support.  Ex. 4, 41:19–42:9.  He also testified that EC-TRB2014 is a 2014 publication describing algorithms used with Pavemetrics' hardware for rail inspection.  *Id*. 33:23–34:24.  Both publications describe using Pavemetrics' LCMS to collect and analyze railroad data. *Id*. 34:7–35:7, 42:10–20; Ex. 4, 217:24-218:7.  Later in 2014, Pavemetrics renamed that railroad use of LCMS to "LRAIL," which TT accused of infringement.  Ex. 4, 40:8-17.  Both publications describe hardware for collecting and storing elevation and intensity data of a railway track bed and computer vision algorithms for processing that data.  Tr. Ex. 26 (Parker 6) at 4–13; Ex. 510 at 3–9; Ex. 4, 215:19-216:2.

TT identifies only two limitations, (c) and (d), from Claim 1 that it contends lack substantial evidence for obviousness.  Br. 10-11.  Thus, TT has waived any arguments with respect to other limitations.  *Kohler v. Inter-Tel Techs*., 244 F.3d 1167, 1182 (9th Cir. 2001) ("Issues raised in a brief which are

1   not supported by argument are deemed abandoned."); *Finjan v. Blue Coat Sys.*,

2   2016 WL 3880774, *4 (N.D. Cal. July 18, 2016) (denying JMOL where some

3   issues raised only in short conclusory statements).

4               **a.      Prior art disclosed identifying features from a 3D map**

5        TT argues that limitation (c) warrants JMOL.  Br. 10.  That limitation

6   recites "identifying a railway track bed feature from the track elevation map…"

7   But UML-TRB2014 discloses that: "[b]ased on the 3D depth map generated by

8   the LCMS, new methods have been developed for measuring rail gauge,

9   detecting missing or broken fasteners, and identifying cracks in concrete ties."

10  Tr. Ex. 26 (Parker 6) at 2:60-62; *see* Ex. 4, 43:8-17.

11       UML-TRB2014 also disclosed generating three types of images:

12  intensity, range, and 3D merged.  Tr. Ex. 26 at Fig. 5; *see id.* at 6:168-169, 6–7,

13  Fig. 4; Ex. 4, 45:8-14 (Laurent).  UML-TRB2014 further disclosed an

14  "algorithm" that "utilizes the 3D range data from the LCMS sensors."  Tr. Ex.

15  26 at 7:188-8:213.  It taught that the result "is that the edges of the rail in a

16  given image are detected and highlighted."  *Id.* at 8; Ex. 4, 45:15-23 (Laurent).

17  Pavemetrics argued that "when there's only three choices… it can be obvious to

18  try them all and see which one works best."  Ex. 5, 215:9-13.  The jury was

19  instructed to consider whether it would have been obvious to try the

20  combination when there are a finite number of identified, predictable solutions.

21  *Id.* 126:9-13.  The jury could have concluded that identifying a rail-edge from a

22  range image renders obvious identifying a railway feature from a 3D map.

23       The UML Sale and Support also disclosed identifying railway features

24  from 3D data.  For example, the meeting minutes explained under the heading

25  "Task 11 – Develop algorithms and software tools to interpret the 3D laser data"

26  that "the Pavemetrics group has developed a new algorithm for the detection

27  and recognition of missing fasteners."  Tr. Ex. 566 (Parker 9) at 13.  The LCMS

28  Manual, part of UML Sale and Support, also confirms that the system generated

intensity, range, and 3D images.  Ex. 527 at 28; Ex. 4, 36:9-13.  Laurent also explained that it generated those image types.  Ex. 4, 36:11-38:8.  He explained that it created a "Fake3D image" based on the collected intensity and range data.  *Id.* 38:9-24.  Morellas testified that Fake3D is a track elevation map because it is a combination of intensity and elevation data.  Ex. 2, 179:20-180:2; Ex. 4, 118:11-14 (Hebert).  Frakes testified that accused Fake3D was also present in UML Sale and Support.  Ex. 4, 221:3-222:6.  The jury could have concluded that Fake3D was an elevation map and that it would have been obvious to apply UML Sale and Support's feature identification algorithm to its Fake3D.

EC-TRB2014 also disclosed identifying features from a 3D map.  It describes a rail inspection system that uses laser and scan-line cameras to collect elevation and intensity data.  Ex. 510 at 3–4, Figs. 1 & 2.  The system generates "a 3-D cloud of points" from that data.  *See id.*; Fig 3.  EC-TRB2014 discloses algorithms for identifying features, such as the track gage, from the 3D data.  *Id.* at 3–5, Figs. 4–7.  The jury could have concluded that it would have been obvious to combine EC-TRB2014's feature identification from a 3D map with UML Sale and Support and/or UMLTRB2014.  Ex. 4, 223:21-224:9.

TT alleges in a four-word parenthetical that there was no motivation to combine the references.  Br. 11.  But the record provides substantial evidence of that motivation.  The UML Sale and Support and UML-TRB2014 all described the same Pavemetrics UML system.  Ex. 4, 41:19-42:7 (Laurent).  Frakes opined that a POSITA would have been motivated to combine all of the references, including EC-TRB2014 with the UML references.  Ex. 4, 223:21-224:15.  He explained "these are things in the same field.  They're very related in terms of content."  *Id.*  He further testified that, "this prior art is very clustered in this application space of inspecting rail and road.  So combining features from it is not at all a big leap from someone of ordinary skill in the art."  Ex. 5, 26:11-27:3.

**b.**   **Prior art also disclosed a gradient neighborhood which calculates differential vertical measurements**

UML-TRB2014 also discloses the remainder of limitation (c). Specifically, it discloses applying Sobel kernels and the Canny method to elevation data to identify features, such as the rail head.  Tr. Ex. 26 at 7–8. Laurent explained that Sobel and Canny were well-known computer vision methods that define a gradient neighborhood representing a small section of an image over which differential measurements are calculated and move the gradient neighborhood like a sliding window over the image data.  Ex. 4, 40:8-16, 45:24-46:7, 115:19-116:25, 223:1-13; Tr. Ex. 26 at 8; Tr. Ex. 565 (Parker 8) at 8.  As Morellas testified, moving a gradient neighborhood across an image that includes elevation data necessarily calculates vertical gradient measurements as recited in step (c).  Ex. 5, 52:2-20.

Moreover, Mesher admitted "that using a 2D gradient methodology for moving around inside [his] elevation map in order to measure height changes is a fairly standard technique" and that "using a small neighborhood and moving it around is a very common processing method."  Ex. 2, 46:19–47:5.  Frakes also testified that gradient windows and neighborhoods "are concepts that have been around for a long time" and have been used in traditional imaging processing and computer vision since the 1960s.  Ex. 4, 184:20-185:4.

The UML Sale and Support also used the gradient neighborhood recited in limitation (c).  For example, the meeting minutes explained that the system's laser algorithm can "extract a new range image based on the detected point; apply a remapping process on the new range image; apply Canny method for rail edge detection…"  Tr. Ex. 565 at 3; Ex. 4, 40:8-25.  As discussed above, the Canny method defines and applies a gradient neighborhood.  Laurent confirmed that the UML system's Canny method "calculates vertical gradients over an entire image using a sliding window."  *Id.* 40:12-16.

TT attempted to distinguish the UML prior art from Claims 1 and 21 by arguing that the claims required an "appropriate" gradient neighborhood. Ex. 5, 69:5-70:14.  TT argued that an "appropriate" gradient neighborhood must be flexible, rather than fixed.  *Id.*  But Frakes testified that it would have been obvious to modify the Canny and Sobel prior art methods to make them flexible. Ex. 5, 21:17-22:11, 24:10-22, 25:5-16.

### c.    Prior art also disclosed storing the identified information

TT also argues for JMOL based on step (d), which recites merely storing the identified information.  TT never disputed at trial that the prior art discloses storing the information.   The jury could have correctly concluded that an algorithm that identifies information using a processor must have stored that information when identifying the feature.   Moreover, the record contains numerous images of identified railway track bed feature information from the prior art. *E.g.*, Tr. Ex. 26 (Parker 6) at 8–12 (showing images of identified rails, fasteners, and cracks); Ex. 510 at 4–7; Tr. Ex. 565 at 9–14.  The jury could have correctly concluded that such images must have been stored to be printed.  The jury also saw XML output files stored as a result of the data processing.  Ex. 528 at 6, Figure 1.  UML Sale and Support's Manual describes saving the detected results.  Ex. 527 at 31.  Morellas explained that a system identifying features must store them.  Ex. 2, 169:2-19, 188:9-189:2.

### 2.    Claim 8 of the '557 Patent Is Invalid for Obviousness

The jury found that Claim 8 would have been obvious in view of UML Sale and Support and/or UML-TRB2014.  ECF 309 at 7.  UML Sale and Support included software that detected cracks in roads based on 3D laser triangulation and elevation data.  *E.g.*, Ex. 1, 40; Ex. 4, 29–31.  Laurent explained that, like the method described in claim 8, LCMS software detected cracks by comparing elevation values with a surface.  Ex. 4, 31:5–12.  Mesher admitted that "the technology using 3D triangulation to measure and make maps

-11-

1  for road surface . . . is readily usable in rail surface assessment applications."
2  Ex. 2, 44:7–11.    Accordingly, the prior art was used for rail inspection,
3  including crack detection in UML Sale and Support. Ex. 4, 33–36, 119:23–
4  120:10 (Hebert); Tr. Ex. 26 (Parker 6) at 11–12; ECF 327-1, 35:4–8.   The
5  meeting minutes confirm that Pavemetrics "showed the team screen shots of 3D
6  data that detects the cracks in wooden ties."  Tr. Ex. 565 (Parker 8) at 3.

7       TT identifies only one limitation from Claim 8 that it contends lacks
8  substantial evidence for obviousness: "significant elevations due to the rail
9  heads for each rail have been removed from the elevation data."  Br. 13.  Thus,
10  TT has waived any arguments with respect to other limitations.  *Kohler*, 244
11  F.3d at 1182; *Finjan*, 2016 WL 3880774 at *4.

12       But TT is incorrect.  UML-TRB2014 discloses that "[t]he Canny method
13  is applied in order to ***extract the rail head*** contour."  Tr. Ex. 26 at 8:204; Ex. 4,
14  45:24-46:7.   UML Sale and Support also disclosed extracting rail heads.   For
15  example, a plain-English comment embedded within UML Sale and Support's
16  RailDetector.cpp code file explains that UML Sale and Support will "Apply a
17  double threshold operator to the range image m_pfImagesZ in order to ***extract***
18  ***the rail head***."   Tr. Ex. 508 (Parker 7) at 97:418.   UML Sale and Support
19  minutes also confirmed that the system detected rail heads.  Tr. Ex 565 at 8.

20       TT argues that "because that evidence primarily consists of source code,
21  which the average juror cannot understand, a reasonable jury could not possibly
22  have reached these conclusions on their own."  Br. 14.  But that UML Sale and
23  Support code page includes ***more*** than source code.   It also includes the
24  comment explaining the source code in clear, plain English.  Moreover, UML-
25  TRB2014 includes the same disclosure.  Neither *Proveris* nor *Centricut,* relied
26  upon by TT includes such descriptions in plain English.   The jury could have
27  found that extracting (*i.e.* removing) a rail head renders obvious removing a rail
28  head as recited by Claim 8.

-12-

Morellas testified that Frakes "points to something" in the software that he is "relying on for his UML Service and Support prior art" and that is "called extract the railhead."   Ex. 5, 79:10-15.   Morellas attempted to differentiate extracting a railhead from removing a railhead.  *Id.* 79:16-80:2.  The jury could have disagreed with him and concluded that UML Sale and Support rendered obvious the limitation reciting removing rail heads.  Indeed, Mesher used the terms removal and extraction interchangeably when he characterized this claim limitation as "the extraction of the railhead artifact in the three dimensional elevation data." Ex. 2, 20:21–23.  Furthermore, Morellas testified that there was a motivation to remove railheads.  *Id.* 149:1-12.

Thus, the record contained substantial evidence to support the jury's finding that claim 8 of the '557 patent is invalid for obviousness.

### III.  <u>NO NEW TRIAL IS WARRANTED</u>

TT seeks a new trial on infringement and damages only.  Br. 1, 25.  After hearing seventeen witnesses testify about 130 exhibits, the jury found that TT did not prove Pavemetrics infringed.   TT ignores the weakness of its infringement case.  TT never suggests that verdict is against the great weight of the evidence.  Indeed, it could not.  TT has shown nothing that rendered the trial unfair or could have reasonably affected the non-infringement verdict.  It is "entitled to a fair, not a perfect trial." *Fonar v. Johnson & Johnson*, 821 F.2d 627, 633 (Fed. Cir. 1987).

The evidence overwhelmingly showed that Pavemetrics did not offer for sale or sell an infringing device.  For example, Pavemetrics never offered for sale or sold a fully connected system.  Even if it had, its system was missing at least *five* claim limitations.  Ex. 4, 185:21–186:11 (Frakes).  Moreover, the feature in Pavemetrics' neural network that TT alleges satisfies the gradient neighborhood limitation is performed only in Canada during training of the neural network.  *Id.*, 128:6-22.  Finally, abundant evidence supports the jury's

-13-

implied finding that Pavemetrics had no intent to induce any infringement. *E.g.,* Ex. 3, 157:5-11 (Habel); Ex. 4, 75:19-76:10 (Laurent), 143:9-23 (Hebert). Thus, TT failed to show infringement for many reasons, and thus cannot show any miscarriage of justice to warrant a new trial.

A.   **Pavemetrics Presented Highly Relevant Evidence Regarding TT's Expert's Failure to Review the Accused Product**

TT distorts the trial record to argue that Pavemetrics used an irrelevant "discovery dispute" about TT's expert's failure to review Pavemetrics' accused neural network. Br. 14-15. But that failure is highly relevant. The Court agreed with Pavemetrics that ***why*** Morellas did not review the neural network is of "little relevance." ECF 287 at 5. TT distorts that holding to argue that ***whether*** Morellas reviewed the neural network is irrelevant. Br. 14-15.

Morellas' failure to review Pavemetrics' neural network was highly relevant because he opined that it met the gradient neighborhood claim limitations. Ex. 3, 53:3-8. Not having reviewed Pavemetrics' neural network, Morellas could not possibly compare it to the claims. *See PharmaStem Therapeutics v. ViaCell*, 491 F.3d 1342, 1350-54 (Fed. Cir. 2007) (affirming JMOL of no infringement where expert failed to review data from the accused product, instead relying on marketing materials and publications).

Morellas blamed Pavemetrics for his failure to review the neural network. Morellas testified he relied solely on a paper from a Tokyo conference to show that LRAIL's neural network satisfied the "appropriate gradient neighborhood" claim limitation. Ex. 2, 181:10-184:25 (testifying about Tr. Ex. 117). But that Tokyo paper did not describe the accused neural network. Ex. 4, 49:13-50:25. Pavemetrics confronted Morellas with his failure to present any evidence how the LRAIL neural network satisfied the claim language. Ex. 3, 56:9-57:20. Morellas responded by blaming Pavemetrics, falsely testifying that "In fact, we asked for the neural network code, but it was not given to us." *Id.*, 57:17-18.

-14-

Morellas was wrong.  Pavemetrics first made its neural network available for inspection in May 2021.  Laquer ¶8.  TT waited until December 10, 2021 to request a neural network viewer, which Pavemetrics provided that same day, well before the January 20, 2022 fact discovery cut-off date.  *Id.* ¶¶15-16.  Following installation of the viewer, TT continued to inspect files on the laptop, and it never filed any discovery motions related to inspection.[2]  *Id.*  Thus, TT should never have promoted and defended Morellas' false "understanding" of the inspection facts.

Morellas' false excuse addressed the irrelevant issue of **why** he failed to review the neural network.  As Pavemetrics' argued in Motion in Limine No. 2, Morellas should not have been permitted to offer that irrelevant, distracting, and false testimony.  ECF 228.  Any reason for his failure to review the neural network was irrelevant because it could not tend to prove infringement.  Nor could it relieve TT of its burden to prove infringement.

TT misrepresents Frakes' testimony trying to justify Morellas' failure.  TT argues that Frakes "only sought to review the files **after** the close of fact and expert discovery."  Br. 16.  TT relies on Frakes' testimony that "the **majority** of my review was after my deposition."  Ex. 5, 28:20-24.  But Frakes also reviewed portions of Pavemetrics' neural network before serving his expert report.  For example, in his non-infringement rebuttal report, Frakes analyzed those portions.  Ex. G at 61-62.  Even Morellas admitted in his deposition that Frakes addressed Pavemetrics' neural network in his report.  Ex. H at 96:12-21.  Thus, Frakes reviewed Pavemetrics' neural network, but Morellas reviewed none of it.  The jury could have found Frakes more credible than Morellas on whether the neural network satisfied certain claim limitations.

---

[2] On Dec. 20, 2021, TT **first** alleged an infringement theory concerning Pavemetrics' neural network. Laquer ¶¶4-6 (Second Supp. Inf. Contentions).

TT also exaggerates Pavemetrics' closing.  Pavemetrics' primary point was that Morellas based his infringement analysis on the Tokyo paper rather than on Pavemetrics' neural network.  Ex. 5, 228:11-24.  In this context, TT cannot claim any harm from the single statement that Morellas could have looked at the code.  Moreover, the Court instructed the jury that "Arguments and statements by lawyers are not evidence."  Ex. 1, 16:18-22.  It also gave a curative instruction.  Ex. 5, 242:5-20.  The true harm to TT came from its expert's failure to review the accused neural network and testifying that **all** convolution neural networks **necessarily** perform the claim limitations.

TT argues that this case is comparable to a case where the Ninth Circuit affirmed a new trial.  Br. 16 (quoting *County of Maricopa v. Maberry*, 555 F.2d 207, 219 (9th Cir. 1997)).  But that case involved prejudicial questions to an expert witness and incorrect jury instructions, something TT does not argue here.  *Maricopa*, 555 F.2d at 224.  The question in *Maricopa* concerned an expert's off-the-record admission on the ultimate issue in that case, unlike here, where Morellas' reasons for not reviewing the neural network were irrelevant.

**B.    Pavemetrics Focused on the Facts, Not Discovery Disputes**

TT argues that Pavemetrics "deliberately disregard[ed] the Court's instruction to present this case on the facts and not to reference discovery squabbles."  Br. 16 (citing Ex 2, 10:7-22).[3]  TT cites a few seconds from Pavemetrics' one-hour closing argument to argue Pavemetrics' "**focused on** discovery disputes" during closing argument.  Br. 17 (citing Ex. 5, 238:1-239:14, 242:5-20).  A review of Pavemetrics' entire closing argument shows that it focused on the merits of the case, not on discovery disputes.  Ex. 5, 204:16-242:2.  Moreover, TT cannot point to the customer subpoenas when *it*

---

[3] The "Court's instruction" TT cites was not about "discovery squabbles." Rather, the Court was explaining that it did not "really care" if the parties met and conferred before raising evidentiary disputes.  *See* Ex. 2, 10:7-11.

repeatedly raised those same subpoenas. It made no objection to playing deposition testimony of Pavemetrics' customer, Ali Hafiz, who testified that he had been subpoenaed to testify. ECF 327-1 at 20 (Tr. 216:22-25). When cross-examining Laurent (Pavemetrics' VP), TT again raised that Hafiz was subpoenaed. Ex. 4, 90:12-15. TT again raised that customer subpoena in its own closing, arguing that "Hafiz was surprised to get a subpoena." Ex. 5, 199:21-200:3.

Only afterward did Pavemetrics briefly reference the subpoena in its closing. The jury could have found that, by taking the extreme step to enforce subpoenas on Pavemetrics' customers, TT had an improper motive and was not merely "defending [its] property rights" as it argued. Ex. 5, 165:8-19. The same is true for the brief reference to a motion and TT's real reason for bringing suit. Pursuing suit for a non-merits-based reason calls into question the credibility of TT's witnesses. *See Burdyn v. Old Forge Borough*, 330 F.R.D. 399, 410 (M.D. Pa. 2019) ("[A]ttempting to convince the jury that the plaintiff has ulterior motives for bringing the lawsuit such as financial gain" is "an often-used impeachment tactic in civil trials."). "Moreover, the purpose of closing argument is . . . to explain why one side's evidence should be believed over the other." *Finjan*, 2016 WL 3880774 at *13 (denying new trial motion based on statements made in closing). Indeed, TT itself acknowledged that whether it is "a good corporate citizen" is relevant to "general credibility and character" of its witnesses. Ex. 1, 8:18-23, 30:20-21:1. And this Court instructed the jury that "[i]n considering the testimony of any witness, you may take into account . . . any other factors that bear on believability." Ex. 1, 19:2-15.

TT also initially designated additional deposition testimony regarding customer subpoenas to play at trial. Zovko ¶¶13-19, Ex. B; Ex. C, Spencer 10:3-8 ("you're here testifying on behalf of CSX . . . pursuant to a subpoena served by Tetra Tech"); Ex. D, Hafiz 18:23-19:1, 195:6-12, 197:18-20. Thus,

TT cannot show that mentioning customer subpoenas was unfair, prejudicial, or amounted to a miscarriage of justice.

Moreover, TT never objected to any statements Pavemetrics made in closing.  Only after the Court ordered a sidebar did TT raise any concern.  Even then, it did not move for mistrial, but accepted the Court's offer to give a curative instruction.  That curative instruction was extremely favorable to TT, again showing the jury was not influenced by the issues TT now complains.  Ex. 5, 242:13-16.  TT ignores that "the law presumes that jurors carefully follow the instructions given to them." *Caudle v. Bristow Optical*, 224 F.3d 1014, 1023 (9th Cir. 2000). This is a "crucial assumption underlying [the jury] system." *Parker v. Randolph*, 442 U.S. 62, 88 (1979).  "In cases in which parties have moved for new trials because of attorney misconduct, courts have routinely held that a curative instruction is a factor weighing strongly against granting a new trial."  Ex. K, *Apple v. Samsung*, 11-cv-01846, ECF 2947 at 27 (N.D. Cal. Feb 7, 2014) (citing *Kinetic Concepts v. Blue Sky Med.*, 554 F.3d 1010, 1025 (Fed. Cir. 2009); *Mateyko v. Felix*, 924 F.2d 824, 828 (9th Cir. 1990)).

TT also claims that Pavemetrics misrepresented "discovery issues" during witness examination.  Br. 17.  But it cites only Pavemetrics' cross-examination of TT's damages expert, Schoettelkotte.  An issue related to damages cannot serve as grounds for a new trial on infringement.  *See Finjan. v. Juniper Networks*, 2019 WL 1116243, *2 (N.D. Cal. Mar. 11, 2019) ("Finjan fails to show how an issue related to damages could serve as grounds for a new trial based on a verdict finding noninfringement.  The issue of damages is therefore moot.").  Regardless, Pavemetrics ***never*** misrepresented a discovery issue when cross-examining Schoettelkotte.  Zovko ¶¶3-8.

Citing Pavemetrics' closing argument, TT accuses Pavemetrics of "attempting to insinuate that TT was hiding something or was somehow being dishonorable."  Br. 17 (citing Ex. 5, 206:21-208:1, 212:11-15, 230:24-231:4).

But **TT** first raised the issue of honor, arguing that honor concerns "general credibility and character" of its client and corporate witnesses.  Ex. 1, 8:18-23.  Indeed, TT emphasized the point in its closing, noting that "TT is a well-respected and **honorable** company based right here in Los Angeles."  Ex. 5, 166:20-25; *see also* Ex. 1, 68:20-69:19 (boasting about helping disadvantaged, women-owned, and veteran-owned small businesses).  Thus, it was TT, not Pavemetrics, who attempted "to stoke bias and prejudice the jury," including through local, American, and minority references.  Pavemetrics merely responded to TT's reliance on its own honor and did so on the merits.  Ex. 5, 206:11-13.  There was no impropriety or unfair prejudice to TT, and certainly no miscarriage of justice.

## C.    <u>Pavemetrics Presented Proper Evidence and Argument</u>

TT argues that Pavemetrics suggested in opening that Mesher "committed inequitable conduct" by failing to submit LRAIL prior art to the PTO.  Br. 17-18.  But Pavemetrics **never** mentioned "inequitable conduct" to the jury.  *See* Ex. 1, 56:25-57:6.  Moreover, TT never objected to anything said in opening, but strategically waited until **after** opening to raise the issue.  *See* Ex. 2, 4:22-5:13.  Pavemetrics explained the relevance of the issue, and the Court resolved it by instructing Pavemetrics what questions it could and could not ask Mesher.  Ex. 2, 7:12-13:4.  TT never requested a curative instruction, and Pavemetrics never raised the duty of candor again.

Moreover, the parties jointly requested that the Court play the Federal Judicial Center's video, which mentioned a patent applicant's duty of candor.[4]  Ex. 1, 26:1-11.  The video explained that "the law requires the applicant to tell the examiner whatever he or she knows about the prior art that might be

---

[4] TT referred to the video numerous times in its opening and closing.  Ex. 1, 33:8-25, 34:15-35:1, 37:11-14, 43:7-15; Ex. 5, 165:13-18, 243:8-12.

important to the examiner's decision on whether to allow the patent." Laquer ¶25, Ex. I (video transcript). The video said nothing about inequitable conduct.

TT is incorrect to argue Mesher's failure to disclose was "unsupported by the facts." Br. 17. Mesher admitted he had LRAIL prior art well before he filed his patent application, and the PTO had no information about LRAIL. Ex. 2, 69:16-70:7, 70:20-25, 71:23-25, 75:11-14. The jury could have considered Mesher's failure to disclose the LRAIL brochure to the PTO in judging his credibility. *See* Ex. 1, 19:2-15 (instructing jury that it may consider "any other factors that bear on believability" of a witness). Moreover, because Mesher's email was dated before February 2015, it confirmed the LRAIL brochure was prior art. Ex. 686. And because the PTO never had any information about any LRAIL prior art, that made Pavemetrics' burden to prove obviousness easier to overcome. Ex. 5, 124:24-125:6.

TT next complains that Pavemetrics "repeatedly and willfully scoffed at this Court's authority and violated its rulings." Br. 18. It gives two examples. First, it pretends Pavemetrics' damages expert opined "that the lost profits should be $0." *Id*. But no such opinion was given at trial. Rather, the expert testified exactly as he did at his deposition. Zovko ¶¶9-12, Ex. A. Regardless, because the jury found no liability, mooted issues on damages cannot warrant a new trial. *See Finjan*, 2019 WL 1116243 at *2.

Second, TT complains that Frakes tried to testify about the UML sale and publication prior art together "beyond his report and deposition." Br. 18. Before Frakes took the stand, and not before the jury, this Court ruled for Pavemetrics—allowing Frakes "to talk about [the references] together." Ex. 4, 22:17-20. But TT objected again during Frakes' testimony, and this time, the Court ordered Pavemetrics to "[d]eal with separate items of prior art with the expert." Ex. 4, 212:21-24. Thus, Pavemetrics disregarded no ruling requiring

1    TT to object before the jury.[5]

2    **D.      Pavemetrics' Noninfringement Theories Were Legally Correct**

3           TT does not dispute that substantial evidence supports the

4    noninfringement verdict.  Nor does it argue that the verdict is contrary to the

5    clear weight of the evidence.  Rather, it accuses Pavemetrics of contradicting the

6    law in its noninfringement presentation.  Br. 19.  But Pavemetrics never

7    contradicted the controlling jury instructions or any other law.  Rather, it argued

8    that, as a factual matter, the products it offered for sale and sold do not infringe.

9           Moreover, TT admits Pavemetrics presented its noninfringement theories

10   in its opening, when examining witness, and in its closing.  Br. 21-23.  But TT

11   never objected to any aspect of Pavemetrics' noninfringement defense.  And it

12   was TT's "responsibility to raise issues they believe warrant gatekeeping in a

13   timely manner at an appropriate stage in the case."  *Chrimar Sys. v. Alcatel-*

14   *Lucent Enterp.*, 2017 WL 568712, at *6 (E.D. Tex. Feb. 3, 2017); *Hemmings v.*

15   *Tidyman's*, 285 F.3d 1174, 1193 (9th Cir. 2002) ("[A]llowing a party to wait to

16   raise the error until after the negative verdict encourages that party to sit silent

17   in the face of claimed error.").

18          **1.      Pavemetrics Correctly Argued that Its Sale of Unconnected**

19                  **Components Did Not Infringe System Claims**

20          The Court instructed the jury to compare the product offered for sale or

21   sold "with each and every one of the requirements of a claim to determine

22   whether all of the requirements of that claim are met."  Ex. 5, 116:14-19; *see*

23   *also id.* 111:4-8.  TT never requested a jury instruction based on *Transocean*

24   *Offshore Deepwater Drilling v. Maersk Contractors*, 617 F.3d 1296, 1311 (Fed.

25

26          [5] Also, TT cannot show harm, because the references described the same
27   UML system.  Ex. 4, 18:22-20:4; Tr. Ex. 566 (minutes referring to publication).
     Moreover, Frakes did disclose in his report that he intended to rely on the UML-
28   TRB2014 publication as evidence of the UML system.  Ex. J (Frakes ¶12).

-21-

Cir. 2010). If it had, that instruction would have explained that any offer for sale or sale by contract must contain sufficient detail to "support a finding that the sale [or offer] was of an infringing article." *Id*. Thus, unsurprisingly, TT never objected to Pavemetrics' unconnected-components argument, even though Pavemetrics raised that argument throughout trial. Br. 21.

TT points to the quotation and the Goods Agreement, but each contain insufficient details to show that the three systems (Sales 2-4) infringe Claims 1 and 21 of the '293 patent. *See* Tr. Ex. 811 (Parker 10). Both documents describe a list of unconnected components, including three LCMS-2 sensors. *See id.*; Tr. Ex. 844 (Parker 11). Contrary to TT's view, neither are for a "Turnkey System" (though such phrase would not support TT's infringement theory). *See* Tr. Ex. 844 at 17 ("This is just the LRAIL sensor heads and standard acquisition and processing software."); Ex. 4, 64:16-65:3.

Neither document describes a system having a sensor "in communication with" a processor that is "configured to run" the claimed algorithm. *See* Ex. 12 ('293 Claim 1). The quotation does not discuss software details such as identifying a feature from a 3D map or doing so by defining and moving a gradient neighborhood. Thus, the quoted system does not include "each and every one of the requirements" of Claim 1. The same is true for the Goods Agreement, which contains even less detail about the software algorithms. *See* Tr. Ex. 844. Thus, TT could not have shown infringement based on either document as a matter of law.

Indeed, TT recognized that it needed additional evidence to try to show a sale of a product satisfying the claims. Ex. 2, 83:4-8 (Mesher: To determine infringement, "[y]ou need detailed information on the algorithms that are being used."); Ex. 2, 159:6-189:16 (Morellas cited nine exhibits in an attempt to show infringement, including Exs. 24, 28, 30, 98, 117, 728, 734, 740, 741). Instead of looking at the actual products sold, *i.e.*, what was shipped in response to the

sale, TT wrongly encouraged the jury to look at software previously licensed to CSX for use with a system sold in 2020 ("the Sale A software").  Ex. 5, 169:22-170:1, 155:6-10 (Morellas citing Ex. 740).   The record is devoid of any evidence that the Sale A software was sold with or licensed for Sales 2-4.  To the contrary, the record shows that the Sale A software was licensed for Sale A only and could ***not*** be used with other systems, such as Sales 2-4.  Ex. 4, 59:22-61:2 (Hebert); Ex. 40 (Sale A Quotation: "the included data processing software is nontransferable, and its use is limited to processing data from the included sensors. It cannot be used to process data from other sensors.").

Moreover, TT's argument that '[i]t is undisputed that the prevailing commercially available software in February-March 2021 contained the accused Fake3D functionalities" is completely wrong and without evidentiary or legal support.  Br. 20.  Pavemetrics disputed TT's "available software" argument throughout the trial.  Ex. 5, 17:19-19:2, 145:7-15; 236:15-24.  TT cites no jury instruction or caselaw to support its "prevailing commercially available" theory.  *Transocean* does not support such a theory.  Rather, in *Transocean*, the Federal Circuit vacated summary judgment of no infringement after holding that "the schematics that accompanied that contract could support a finding that the sale was of an infringing article."   617 F.3d at 1311.   TT presented no such schematic or other details showing any communication between components or any processor configured to run any algorithm.

Pavemetrics never misrepresented the law.  It is well settled that "[t]o infringe an apparatus claim, the device must meet all of the structural limitations."  *Cross Med. Prods. v. Medtronic Sofamor Danek*, 424 F.3d 1293, 1311-12 (Fed. Cir. 2005) (vacating summary judgment of infringement where patent claim required connection and the device was made and sold in an unconnected state).  The determination of infringement is a question of fact.  *Id.* at 1302.  Here, Pavemetrics made a factual argument, supported by the

1   evidence, that the system offered for sale and sold consisted of unconnected
2   components.  It was certainly reasonable for Pavemetrics to argue that what it
3   intended to, and ultimately did ship and deliver to customers, is evidence of
4   what was offered for sale and sold.

5       **2.    Pavemetrics Properly Argued the Artificial Intelligence Issue**

6       TT also wrongly accuses Pavemetrics of misrepresenting the law by
7   arguing that it does not infringe because it uses artificial intelligence.  Br. 21.
8   Again, TT acknowledges that Pavemetrics made this argument throughout the
9   trial, including in its opening statement.  Br. 22.  Again, TT never once objected
10  or requested a jury instruction on this issue.

11      TT argues that the patents do not describe "a specific embodiment using
12  artificial intelligence has no legal consequence."  Br. 21-22.  But Pavemetrics
13  made a factual argument that it uses artificial intelligence. Pavemetrics
14  explained that TT cannot show that Pavemetrics' neural network practices the
15  claimed invention for several reasons, including because it does not use a
16  gradient neighborhood and it does not completely slide a filter over any
17  neighborhood.  Ex. 4, 190:16-192:10.

18      And that the patents never refer to any type of artificial intelligence calls
19  into question the credibility of TT's expert who testified that *all* convolutional
20  neural networks (CNNs) perform the claimed algorithm.  Ex. 1, 25:5-10 (jury
21  instruction on judging opinion testimony).  Mesher admitted that his patents do
22  not refer to CNNs even though he was very familiar with artificial intelligence
23  decades before he filed his patent application.  Ex. 2, 50:1-51:10.  He also
24  admitted that he did not start using CNNs for inspecting rails until two years ago
25  in 2020.  *Id.* 49:16-25.  A reasonable jury could infer from this evidence that
26  Morellas was not credible when he testified that *all* CNNs perform the claimed
27  algorithm.  *See*, *e.g.*, Ex. 2, 147:21-148:2.  They could also infer that Morellas
28  was not credible when he testified that "the very fact that the system, the LRAIL

-24-

system uses a [CNN] that means that it defines an appropriate neighborhood." Ex. 2, 180:24-181:6, 183:24-184:3 (Morellas admitted that his infringement analysis is based on his **general** experience with CNNs). The jury was free to find Morellas not credible, particularly given his admission that he never looked at Pavemetrics' neural network. Ex. 3, 65:25-66:5.

TT alleges that Pavemetrics "repeatedly examined witnesses about claim scope" and the AI issue. Br. 22-23. But Pavemetrics' corporate witnesses' thoughts and beliefs about its AI networks were probative of their **good faith belief** that Pavemetrics did not infringe the asserted patents, which was relevant to both inducement and willfulness. *Omega Patents v. CalAmp*, 920 F.3d 1337, 1353 (Fed. Cir. 2019) (reversing infringement because excluded subjective belief testimony). Pavemetrics never showed an "indifference to correct law on infringement during cross-examination of TT's witnesses," as TT alleges. Br. 23. Pavemetrics was free to impeach both Morellas and Mesher with the fact that the patents never mention AI. Moreover, TT waived any objection to any questions about AI by not objecting.

Lastly, Pavemetrics' technical expert did not testify about a "word-for-word" infringement test. Rather, he explained merely his correct understanding of the test for literal infringement, i.e., that every word or limitation must be accounted for. Ex. 4, 198:20-199:3. Regardless, during TT's cross-examination, this Court instructed the jury "to ignore all the advice from the lawyers and the witnesses with respect to . . . what the legal test is for infringement." Ex. 5, 22:14-23:2. It also instructed the jury at the beginning of the trial that it "must follow the law as I give it to you." Ex. 1, 15:1-6. And the jury is presumed to have followed the law as given by this Court. *See Caudle*, 224 F.3d at 1023.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny TT's motions.

Respectfully Submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  October 3, 2022         By:   /s/ Christy G. Lea
                                      Christy G. Lea
                                      Joseph R. Re
                                      Nicholas M. Zovko
                                      Alan G. Laquer
                                      Raymond S. Lu

*Attorneys for Plaintiff/Counterclaim Defendant*,
PAVEMETRICS SYSTEMS, INC.

56341762

-26-