# EXHIBIT E

| | |
|---|---|
| **From:** | Palace, Victor <Victor.Palace@finnegan.com> |
| **Sent:** | Friday, December 10, 2021 8:25 AM |
| **To:** | Nicholas.Zovko |
| **Cc:** | Cerulli, Nicholas; Parker, Aaron; Chung, Daniel; Melhado-Burke, Amanda; Ridge, Donald L.; Mathew, Jency; Ecklund, Steve; Horn, Kelly; Joe.Re; Christy.Lea; Alan.Laquer; Raymond.Lu; Lit PAVEL.001L |
| **Subject:** | RE: Pavemetrics Systems, Inc. v. Tetra Tech, Inc. - Case 2:21-cv-01289-MCS-MAA |

Counsel,

Please install TensorBoard on the Source Code Review computer.  The installer may be found here:

https://github.com/tensorflow/tensorboard

Regards,

**Victor Palace**
Associate
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
901 New York Avenue, NW, Washington, DC 20001-4413
(202) 408-4391 | cell: (303) 704-3814 | fax: (202) 408-4400 | victor.palace@finnegan.com |
www.finnegan.com

---

**From:** Nicholas.Zovko <Nicholas.Zovko@knobbe.com>
**Sent:** Thursday, December 9, 2021 5:12 PM
**To:** Cerulli, Nicholas <Nicholas.Cerulli@finnegan.com>
**Cc:** Parker, Aaron <Aaron.Parker@finnegan.com>; Chung, Daniel <Daniel.Chung@finnegan.com>; Melhado-Burke, Amanda <amelhadoburke@clarkhill.com>; Ridge, Donald L. <dridge@clarkhill.com>; Mathew, Jency <Jency.Mathew@finnegan.com>; Ecklund, Steve <steve.ecklund@finnegan.com>; Palace, Victor <Victor.Palace@finnegan.com>; Horn, Kelly <Kelly.Horn@finnegan.com>; EXT-joe.re@knobbe.com <joe.re@knobbe.com>; Christy.Lea <Christy.Lea@knobbe.com>; Alan.Laquer <Alan.Laquer@knobbe.com>; Raymond.Lu <Raymond.Lu@knobbe.com>; Lit PAVEL.001L <LitPAVEL.001L@knobbe.com>
**Subject:** RE: Pavemetrics Systems, Inc. v. Tetra Tech, Inc. - Case 2:21-cv-01289-MCS-MAA

*EXTERNAL* Email:

Nick,

Pavemetrics made versions 4.78.9.7, 4.78.9.5, and 4.78.6.0 available for inspection earlier today.

Best regards,

Nick

**Nicholas Zovko**
Partner
949-721-5295 **Direct**

# EXHIBIT F

| | |
|---|---|
| **From:** | Palace, Victor <Victor.Palace@finnegan.com> |
| **Sent:** | Wednesday, December 15, 2021 4:00 PM |
| **To:** | Joe.Re; Christy.Lea; Nicholas.Zovko; Raymond.Lu; Lit PAVEL.001L |
| **Cc:** | TT-PM-All-Team; Melhado-Burke, Amanda; Ridge, Donald L. |
| **Subject:** | Pavemetrics Systems, Inc. v. Tetra Tech, Inc. - Case 2:21-cv-01289-MCS-MAA |

Counsel,

We plan to inspect Pavemetrics' source code on December 20 and 21 during normal business hours (8:00 AM - 6:00 PM).  I will be in attendance.

As with the previous inspections, please have Visual Studio Code, Understand (SciTools), SmartGit, WinMerge, and TensorBoard installed on the Source Code Review computer.  Please also provide a breakout room reserved for the days of the inspection and the same computer arrangement (two computer screens, a mouse, and printer).

In addition, please confirm you will make available for inspection in a separate folder version "r10323" provided to CSX.

Also, please immediately provide tracking information for the source code pages requested on the last day of our previous inspection, Friday December 10, 2021.  Per paragraph 10.l. of the Protective Order, source code pages must be "provided … within three (3) business days" of the request, which is today Wednesday, December 15, 2021.

Best regards,
Victor

**Victor Palace**
Associate
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
901 New York Avenue, NW, Washington, DC 20001-4413
(202) 408-4391 | cell: (303) 704-3814 | fax: (202) 408-4400 | victor.palace@finnegan.com |
www.finnegan.com

This e-mail message is intended only for individual(s) to whom it is addressed and may contain information that is privileged, confidential, proprietary, or otherwise exempt from disclosure under applicable law. If you believe you have received this message in error, please advise the sender by return e-mail and delete it from your mailbox. Thank you.

Exhibit F
-9-

# EXHIBIT G

**CONTAINS EXCERPTS OF**

**RESTRICTED CONFIDENTIAL SOURCE CODE**

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| PAVEMETRICS SYSTEMS, INC., | Case No. 2:21-cv-1289-MCS-MMA |
|       Plaintiff, | |
|     v. | **CONTAINS EXCERPTS OF** |
| TETRA TECH, INC., | **RESTRICTED CONFIDENTIAL** |
|       Defendant. | **SOURCE CODE** |
| AND RELATED COUNTERCLAIMS | Honorable Mark C. Scarsi |
| | Honorable Maria A. Audero |

**REBUTTAL EXPERT REPORT ON NON-INFRINGEMENT OF**
**<u>DAVID FRAKES, PH.D.</u>**

149.   First, I disagree with Dr. Morellas' assertion that "a convolution operator is one type of gradient neighborhood that computes differential vertical measurements."[46]   Dr. Morellas correctly states that "a gradient operator is a weighted convolution operator using the neighboring pixels for the operation."[47] However, it does not follow that any weighted convolution operator using the neighboring pixels for the operation constitutes a "gradient operator," or a "gradient neighborhood."  As explained above, a gradient operator is a weighted operator which uses neighboring pixels in an image to calculate *gradient measurements*.  In his report, Dr. Morellas does not demonstrate, or even assert, that any convolution filter in LRAIL's neural network algorithms calculates a gradient measurement.

150. Second, Pavemetrics' neural network model defines a strid parameters of 2 on its input layers.  For example, as shown below, LRAIL's

---

[46] *Id.* at 179.

[47] *Id.*

neural network models have vertical and horizontal stride attributes of value 2 in its first input layer, a 2D depth-wise convolution layer.[48]



151.   The above stride values of 2 indicate that when sliding a convolution filter over the input image, the convolution layer will skip every other pixel in both the horizontal and vertical dimensions of the input image,[49] as shown below.[50]

/ / /

---

[48] Ex. L at 1 (LRAIL_FAS.pb, version 4.78.6.0) (as visualized in Netron).

[49] *See* Ex. G at 3; Initial Morellas Report, Ex. C at 30 ("stride is the distance between two consecutive positions of the kernel").

[50] Ex. K at 13.

194.   Thus, for the reasons stated above, LRAIL does not infringe claim 15 of the '293 patent.

### 5.   Claim 16

195.   Claim 16 recites: "The system of claim 15 wherein the step of comparing further comprises the step of applying a minimum correlation threshold so that a railway track bed feature will not be identified as a particular three dimensional feature from the feature library unless the minimum correlation threshold is met."

196.   First, as explained above, LRAIL does not infringe claim 15.  Thus, it similarly does not infringe claim 16, which depends from claim 15. Furthermore, as explained above, no LRAIL version was configured to run the "DetectFastener" function.

197.   As to the convolutional neural network algorithms, as explained above, LRAIL's convolutional neural network algorithms do not include any "three dimensional feature from [a] feature library" as described in claim 16. Furthermore, contrary to Dr. Morellas' assertions, LRAIL's convolutional neural network algorithms do not include a "minimum correlation threshold."  Finally, contrary to Dr. Morellas' assertions, LRAIL's convolutional neural network algorithms do not compare the result of a correlation to a threshold.  As shown in the figures below, LRAIL's convolutional neural network algorithms use two types of "activation functions": ReLu and Softmax.[65]

/ / /

---

[65] Ex. L at 2–3 (LRAIL_FAS.pb, version 4.78.6.0) (as visualized in Netron).

1
2
3
4
5
6
7
8
9
10
11
12
13



14      198.   To  the  extent  that  Dr.  Morellas  argues  that  a  neural  network
15   activation function is a "minimum correlation threshold," I disagree.  A person of
16   ordinary  skill  in  the  art  would  understand  the  term  "minimum  correlation
17   threshold," within the context of claim 14, to mean a single threshold value, such
18   that  correlation  scores  greater  than  the  threshold  value  represent  a  match.   In
19   contrast,  an  activation  function  is  a  method  that  is  far  more  complex  than
20   comparing a score to a single value.

21      199.   Furthermore, even if some types of activation functions could be said
22   to  represent  a  "minimum  correlation  threshold,"  in  my  opinion,  the  ReLu  and
23   Softmax  activation  functions  can  not  be  characterized  as  a  threshold.   The  ReLU
24   (Rectified Linear Units) activation function is a non-linear function that can be
25   defined  by  the  function  f(x) = max(x,0),  or  some  variant  thereof.   The  Softmax
26   activation function is similarly a non-linear function that calculates a probability
27   distribution, and can be defined by the function shown below:

28

376.   First, LRAIL's convolutional neural network algorithms never compute a "template matching score" because, as explained above, the neural network algorithms never perform a template matching operation.

377.   Second, LRAIL's convolutional neural network algorithms never use a "3D feature correlation threshold."  As explained above, the images input to LRAIL's neural networks are 2D RGB color images.  Thus, even if the convolutional neural network algorithms can be said to use a "feature correlation threshold," the threshold would be a 2D feature correlation threshold, rather than a 3D feature correlation threshold.

378.   Finally, contrary to Dr. Morellas' assertions, LRAIL's convolutional neural network algorithms do not compare the result of a correlation to a threshold.  As shown in the figures below, LRAIL's convolutional neural network algorithms use two types of "activation functions": ReLu and Softmax.[120]



---

[120] Ex. L at 2–3 (LRAIL_FAS.pb, version 4.78.6.0) (as visualized in Netron).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Executed on March 11, 2022 at Atlanta, Georgia.

By: _____

David Frakes, Ph.D.

Scanned with CamScanner

# EXHIBIT L







EXHIBIT H

RESTRICTED - CONFIDENTIAL SOURCE CODE

Morellas, Vassilios                                    March 23, 2022

1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

-----------------------------------x

PAVEMETRICS SYSTEMS, INC.,

          Plaintiff,          Civil Action No.

    v.                        2:21-cv-1289-MCS-MMA

TETRA TECH, INC.,

          Defendant.

-----------------------------------x

AND RELATED COUNTERCLAIMS

-----------------------------------x


** RESTRICTED - CONFIDENTIAL SOURCE CODE **


REMOTE VIDEOCONFERENCE

DEPOSITION OF VASSILIOS MORELLAS, Ph.D.

Wednesday, March 23, 2022

Plymouth, Minnesota


Reporter: Michael D. O'Connor, RMR, CRC, CRR

Job No. 51716

Exhibit H
-21-

RESTRICTED - CONFIDENTIAL SOURCE CODE

Morellas, Vassilios                                    March 23, 2022

95

1      Q.      And the number 16 represents the       12:23:12

2   number 16, correct?                               12:23:14

3      **A.      If they came from 10 and 6, yes.**       12:23:15

4      Q.      And the number 16 only represents      12:23:18

5   the number 16, correct?                           12:23:20

6      **A.      In that case, yes.**                     12:23:21

7      Q.      Do you know what the number of         12:23:27

8   pixels used by Fake3D is in terms of how many     12:23:41

9   data points are analyzed -- let me rephrase       12:23:44

10  that.                                             12:23:47

11          In your opinion, you've stated            12:23:51

12  that Fake3D has been used with a Pavemetrics       12:23:52

13  neural network, correct?                          12:23:56

14     **A.      Yes.**                                   12:23:57

15     Q.      And when the Pavemetrics neural        12:23:57

16  network is being applied to a particular image,   12:24:07

17  do you know what percentage of the pixels in      12:24:10

18  that image the neural network filters are         12:24:12

19  applied to?                                        12:24:14

20     **A.      It depends on how -- how you**           12:24:15

21  **configured your neural network.**                  12:24:29

22     Q.      Are you familiar with how             12:24:31

23  Pavemetrics has configured its neural network     12:24:34

24  that you've accused of infringement?              12:24:36

25     **A.      I know that there was some**            12:24:38

Henderson Legal Services, Inc.

202-220-4158                www.hendersonlegalservices.com

Exhibit H
-22-

RESTRICTED - CONFIDENTIAL SOURCE CODE

Morellas, Vassilios                                      March 23, 2022

171

| | | |
|---|---|---|
| 1 | Q. Yes. | 03:07:19 |
| 2 | **A. There are, yes, multiple feature** | 03:07:20 |
| 3 | **maps at the last layer.** | 03:07:23 |
| 4 | Q. How many? | 03:07:24 |
| 5 | **A. It depends on the particular** | 03:07:29 |
| 6 | **architecture that you're using, and this is the** | 03:07:32 |
| 7 | **decision of the user.** | 03:07:35 |
| 8 | Q. How many architectures of | 03:07:35 |
| 9 | Pavemetrics's LRAIL system have you reviewed in | 03:07:37 |
| 10 | this case? | 03:07:42 |
| 11 | **A. Like I said, I have not seen the** | 03:07:42 |
| 12 | **particular structures of the Pavemetrics's** | 03:07:45 |
| 13 | **neural networks, because there was not** | 03:07:51 |
| 14 | **information provided to me during the time of** | 03:07:53 |
| 15 | **the source code video.** | 03:07:55 |
| 16 | Q. The Pavemetrics's neural network | 03:07:58 |
| 17 | was included on the source code review | 03:08:02 |
| 18 | computer, correct? | 03:08:06 |
| 19 | **A. Not exactly. What was available** | 03:08:06 |
| 20 | **was the API.** | 03:08:08 |
| 21 | Q. The .PV files were also made | 03:08:15 |
| 22 | available and you reviewed those as part of | 03:08:17 |
| 23 | your source code review, correct? | 03:08:19 |
| 24 | **A. The .PV files are binary files** | 03:08:21 |
| 25 | **that you need to have particular software to** | 03:08:25 |

Exhibit H
-23-

RESTRICTED - CONFIDENTIAL SOURCE CODE

Morellas, Vassilios                                          March 23, 2022

172

| | | |
|---|---|---|
| 1 | actually translate them to the particular | 03:08:30 |
| 2 | information that you want to get out of the | 03:08:33 |
| 3 | neural network, and these were not available at | 03:08:35 |
| 4 | the time that we were there. | 03:08:37 |
| 5 | In fact, we asked you personally, | 03:08:39 |
| 6 | but you were not able to provide this for us. | 03:08:41 |
| 7 | Q.    You're talking about a particular | 03:08:43 |
| 8 | viewer, not the PV files, correct? | 03:08:45 |
| 9 | A.    A software that will allow us to | 03:08:48 |
| 10 | be able to view the PV files. | 03:08:50 |
| 11 | Q.    So the PV files were on the source | 03:08:56 |
| 12 | code review computer, correct? | 03:09:01 |
| 13 | A.    They were used for us to make any | 03:09:02 |
| 14 | -- to make any decision as to what they are. | 03:09:07 |
| 15 | There were files given to us, but were unable | 03:09:14 |
| 16 | to get any information out of it, because there | 03:09:16 |
| 17 | were binary files. | 03:09:20 |
| 18 | Q.    So you were unable to form an | 03:09:20 |
| 19 | opinion as to the contents of Pavemetrics's | 03:09:22 |
| 20 | convolutional neural network, because you could | 03:09:25 |
| 21 | not understand the .PV files? | 03:09:27 |
| 22 | MR. CERULLI:  Objection. | 03:09:30 |
| 23 | Mischaracterizes the testimony. | 03:09:30 |
| 24 | A.    Well, what I was able to see | 03:09:32 |
| 25 | during my code review was the fact there was | 03:09:38 |

Exhibit H
-24-

278

1                    C E R T I F I C A T E

2

3          I, Michael O'Connor, Registered

4    Merit Reporter/Certified Realtime Reporter,

5    do hereby certify:

6               That VASSILIOS MORELLAS, Ph.D., the

7    witness whose testimony is hereinbefore set

8    forth, was duly sworn by me and that such

9    testimony is a true and accurate record of

10   my stenotype notes taken in the foregoing

11   matter to the best of my knowledge, skill

12   and ability.

13              IN WITNESS WHEREOF, I have hereunto

14   set my hand and Notarial Seal this 23rd day

15   of March 2022.

16

17

18                       *Michael O'Connor*

19        _____

20        MICHAEL O'CONNOR, RMR, CRR, CRC

21                  Notary Public

22

23   My Commission expires:
     November 22, 2022
24

25

EXHIBIT I

## THE PATENT PROCESS: AN OVERVIEW FOR JURORS

Hello, I'm Jeremy Fogel.

I've been a United States district judge since 1998, and I am now the Director of the Federal Judicial Center. As you probably know by now, this is a patent case, so you may be wondering, how can I sit in judgment on a case like this, when I'm not entirely sure what a patent is? We hope to answer that concern with this brief video, which will give you some of the background needed to do your job.

This case will involve some special issues that the judge and lawyers will explain to you; but all patent cases involve some basics that you will learn about. This video will discuss what patents are, why we have them, how people get them, and why there are disputes that require us to call in a jury like you. We'll also show you what patents look like.

The United States Constitution gives Congress the power to pass laws relating to patents. Article I, section 8, clause 8 allows congress to "promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries." A patent, then, is an official grant by the united states government that gives its owner certain rights to an invention. Those include the right to stop others from making, using, selling, or offering for sale the invention that is claimed in the patent.

A patent lasts for a specific period of time, usually 20 years from the date that the application is filed by the inventor. But because it takes an average of 3 years for the patent and trademark office to act on the application, the effective life of the patent is closer to 17 years.

A patent represents a bargain made between the government and the inventor. In return for the right to prevent others from using the invention, the inventor must enhance the public knowledge, or what we sometimes call the state of the art, by adding something new and useful to it. A famous example is Thomas Edison's invention of the light bulb. Harnessing electrical power for illumination transformed society and led to many other important breakthroughs.

During the lifetime of the patent, its disclosure may inspire new inventions, and after it expires, the invention is free for anyone to use. It is this combination of something new and valuable to

Exhibit I
-26-

the public that justifies granting time-limited patent protection to the inventor. A patent is in many ways like a deed to a piece of property. It grants the owner the right to keep people off the property or to charge them a fee, like rent, for using it. And just as a deed indicates boundaries defining the landowner's property, a patent claim defines the patentee's domain.

The patent system works because the inventor is required to describe the invention in clear and specific terms, so that the public knows what the boundaries of the invention are. Once a patent is issued by the government, it becomes available for public inspection. In that way, anyone who learns of the patent can read it and understand exactly what the inventor invented and the limits of the patent set forth in the claims.

Now that we understand what a patent is, let's take a closer look at the term "invention." An invention is a new way of solving a problem or a useful new machine, manufacture, or composition of matter. The patent process begins in the mind of the inventor, and in particular when the invention is formulated in the mind of the inventor. Patent lawyers call this "conception." this is when the idea occurs to the inventor clearly enough that he or she can write it down and explain it to someone. To qualify for a patent, the invention needs to be new and useful. Also, it must not be obvious to one of ordinary skill in the field. If the inventor believes these requirements are met, he or she will prepare an application for filing with the patent and trademark office, whose headquarters are in Alexandria, Virginia, just outside of Washington, D.C. the Patent And Trademark Office--often called the "PTO"-- is the agency of the federal government whose job it is to examine patent applications to make sure they are in proper form and comply with the requirements of the law.

The inventor can prepare an application for filing with the PTO, but usually it is drafted by a patent attorney or a patent agent who specializes in what is called "prosecuting" patent applications; that is, the process by which they are evaluated. The attorney or agent works with the inventor to be sure the invention is described and claimed in a way that complies with the law and the regulations of the PTO. 98% of patent applications are made online using the PTO's electronic filing system, although a few paper applications are still made.

When the PTO receives the inventor's application, it is first checked to see if it is complete and complies with all the PTO's application requirements. It then assigns the submission to a patent

Exhibit I
-27-

examiner--a staff person with a background in the field or "art" the invention falls within--to evaluate the application and decide whether a patent can be granted.

You've been given a sample patent to refer to as you watch this video, so you already have a sense of what a patent looks like. But now, let's take a closer look at the 3 main parts of a patent.

To begin with, there is some basic identifying information on the first page. This material is highlighted in your handout. On the upper right side of the page is the number assigned to the patent by the PTO. And on the left side is a title that describes the invention, and the names of the inventors and sometimes the company to whom they have assigned the patent. Also on the left is the date when the patent application was filed, and back on the right, the date when the patent issued. There also is more detailed information on the first page, including a list of numbers following the caption "field of search." These numbers identify previously issued patents the examiner looked at or "searched" to make sure the applicant's claimed invention really is something new, not obvious, and thus patentable. Also listed on the first page are what we call "references"; that is, previous patents or articles that describe the technology or "prior art" known at the time the application was filed.

It may seem strange to you that we call this pre-existing technology "prior art," even though it has nothing to do with artists. We use the word "art" in its historical sense, to include inventions and other subject matter reasonably related to the claimed invention. We also refer to the latest technology as "state of the art," and we say of someone who can understand and apply the technology that he or she is "skilled in the art."

The second major part of the patent is what we call the "specification" or "written description." As is the case in your sample, it is usually the longest part of the patent. It includes an abstract, which is a brief summary of the invention; a background section that describes the nature of the problem the invention is supposed to solve; one or more drawings, called "figures," that illustrate various aspects of the application; and a detailed description of one or more "embodiments" of the invention. An embodiment is a specific device or method that uses the invention, such as a particular form of light bulb.

The third and most important part of the patent is the claims. These are the numbered paragraphs that appear at the end. The claims are what give the public notice of the boundaries of the

Exhibit I
-28-

invention. They are similar to the description of property you may have seen in a deed, referring to precise measurements taken on the ground. The judge will instruct you further on how any technical or ambiguous terms in the patent claims should be understood.

Now that we've discussed the main parts of a patent, let's look at how the PTO processes patent applications, what we referred to earlier as "prosecution" of the patent application. This process begins when the inventor's application arrives at the PTO. There, it receives a filing date. Under the America Invents Act of 2011, filing dates will determine who is awarded the patent if there are competing valid applications. In 2012, the PTO received nearly 600,000 patent applications and issued more than 270,000 patents.

After determining that the application is complete, the receiving branch also decides what field of technology an application relates to and assigns it to the appropriate examining group. In order to make that decision, the patent examiner usually looks at patents that have been issued previously, in the same or closely related fields of art. The examiner has computer databases that contain information used to accomplish this task.

Another part of the job is to decide if the inventor's description of the invention is complete and clear enough to meet the requirements for a patent, including the requirement that the description enables someone of ordinary skill in the field to actually make and use it. However, because the job of examining so many applications is challenging, the law requires the applicant to tell the examiner whatever he or she knows about the prior art that might be important to the examiner's decision on whether to allow the patent. We call this the applicant's duty of candor.

One way the applicant can satisfy this duty is by bringing pertinent prior art to the attention of the examiner, either in the original application or in other submissions called "Information Disclosure Statements." In this way, the decisions of the examiner are based on both the information provided by the applicant, and on the information the examiner finds during his or her prior art search.

Sometimes the examiner concludes that the application meets all the requirements we've discussed and allows the patent to issue at this first stage. But more frequently, the examiner will reject the application as deficient in some respect. This decision will be communicated by the examiner in what is called an "Office Action," which is a preliminary notice to the applicant of

Exhibit I
-29-

what the examiner finds insufficient or unpatentable. For example, the examiner may reject certain claims as being unpatentable because a journal article, written and published by another person prior to the effective filing date of the patent application, disclosed what the applicant was currently claiming. At that point, the applicant prepares a written response, either agreeing or disagreeing with the examiner. An applicant who agrees with the examiner can suggest amendments to the application designed to overcome the examiner's rejection.

Alternatively, an applicant who disagrees with the examiner's office action can explain the reasons for the disagreement. This exchange of Office Actions and responses goes on until the examiner issues a "Final Office Action," which may reject or allow some or all of the applicant's claims. The overall process is referred to as the "prosecution history" of the application. The written incoming and outgoing correspondence between the PTO examiner and the applicant is also called the "file wrapper." in the past, these file wrappers were all in paper form, as were the submitted applications. Now they are most often electronic and may occasionally be paper as well.

Most patent applications filed on or after November 29, 2000 are published by the PTO 18 months after the inventor has filed his or her application, so that the public may inspect it. Once a final PTO Office Action has occurred, and one or more claims have been allowed, the applicant is required to pay an issuance fee, and the patent is printed. Then, on the date shown on the upper right-hand corner of the first page of the patent, it is "issued" by the PTO, and the inventor receives all the rights of a patent. That date is highlighted on your sample.

Once a patent has issued, the inventor, or the person or company the inventor has assigned a patent to, can enforce the patent against anyone who uses the invention without permission. We call such unlawful use "infringement." but the PTO and its examiners have no jurisdiction over questions relating to infringement of patents. If there is a dispute about infringement, it is brought to the court to decide.

Sometimes in a court case, you are also asked to decide about "validity." that is whether the patent should have been allowed at all by the PTO. A party accused of infringement is entitled to challenge whether the asserted patent claims are sufficiently new or non-obvious in light of the prior art, or whether other requirements of patentability have been met. In other words, a defense to an infringement lawsuit is that the patent in question is invalid.

Exhibit I
-30-

You may wonder why it is that you would be asked to consider such things when the patent has already been reviewed by a government examiner. There are several reasons for this. First, there may be facts or arguments that the examiner did not consider, such as prior art that was not located by the PTO or provided by the applicant. In addition, there is, of course, the possibility that mistakes were made or important information overlooked. Examiners have a lot of work to do, and no process is perfect. Also, unlike a court proceeding, prosecution of a patent application takes place without input from people who might later be accused of infringement, so it is important that we provide a chance for someone who is accused of infringement to challenge the patent in court.

In deciding issues of infringement and validity, it is your job to decide the facts of the case. The judge will instruct you about the law, which may include the meaning of certain words or phrases contained in the patent. So it is your primary duty as jurors to resolve any factual disputes and--in some cases, such as infringement and validity--to apply the law to those facts.

To prove infringement, the patent holder must persuade you, by what is called "a preponderance of the evidence" relating to the facts of the case, that the patent has been infringed. To prove invalidity, the alleged infringer must persuade you by what is called "clear and convincing evidence" that the patent is invalid.

The judge in your case will explain these and other terms and provide additional specific instructions at the appropriate time.

Good luck with your task, and thank you for your service.

Exhibit I
-31-

EXHIBIT J

**CONTAINS EXCERPTS OF**

**RESTRICTED CONFIDENTIAL SOURCE CODE**

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| PAVEMETRICS SYSTEMS, INC., | ) Case No. 2:21-cv-1289-MCS-MMA |
| Plaintiff, | ) |
| | ) |
| v. | ) **CONTAINS EXCERPTS OF** |
| TETRA TECH, INC., | ) **RESTRICTED CONFIDENTIAL** |
| Defendant. | ) **SOURCE CODE** |
| | ) |
| AND RELATED COUNTERCLAIMS | ) Honorable Mark C. Scarsi |
| | ) Honorable Maria A. Audero |

**INITIAL EXPERT REPORT ON PATENT INVALIDITY OF**
**DAVID FRAKES, PH.D.**

d. calculating and storing physical parameters for a plurality of feature targets using the processor.

7.     I am informed that Tetra Tech asserts claims 8–10 and 14 of the '557 patent.

## VIII.   THE '293 PATENT IS INVALID

**A.     The UML Sale and Support Anticipates or Renders the Claims Obvious**

8.     Below, I explain how the UML Sale and Support, anticipates or, alone or in combination with other prior art references, renders the asserted claims of the '293 patent obvious.

9.     The sale of Pavemetrics' LCMS system to UML and the use of that system ("UML Sale") and subsequent support and consulting for UML on USDOT Contract No. RITARS-12-H-UML ("UML Support"), alone or in combination with other prior art references, render claims 1, 2, 4, 15, 16, 19–23, 25, 36, 37, and 40–43 of the '293 patent obvious.

10.     By September 2012, Pavemetrics offered to sell, and sold, to the University of Massachusetts-Lowell ("UML") a Laser Crack Measurement System ("LCMS") with software assessing a railway track bed.[1]  Pavemetrics updated that system to UML through providing technical support and development consulting for UML[2] on USDOT Contract No. RITARS-12-H-UML[3], including updated software versions and use of the software script "matlab_cracks.m" crack detection algorithm.

11.     The source code described below is from LCMS software version r8320.  I understand that this version was used in connection with the UML Sale and Support.  I also understand that this version of the source code was made

---

[1] ECF No. 33, at ¶ 17; ECF No. 33-1.

[2] ECF No. 33, at ¶ 17; ECF No. 33-2.

[3] ECF No. 33-3.

-24-

available for Tetra Tech to inspect and was specifically marked as used in connection with the UML Sale and Support.

12.     I understand that several of Pavemetrics' witnesses, including John Laurent, Jean-Francois Hebert, and Mario Talbot, were involved in the sale and use of the UML system.  As such, I also intend to rely upon their testimony as to the capabilities of the system.  I also intend to rely on publications, presentations made about the system, including UML-TRB2014, quarterly reports, invoices, and other records. I have attached as Exhibit V many of these documents.  I have attached hereto as Appendix I a claim chart citing to many of these documents.  I have attached hereto as Appendix II a claim chart comparing UML-TRB2014 to the asserted claims.

13.     In this section, I also cite to Alejandro García Lorente et al., *Detection of Range-Based Rail Gage and Missing Rail Fasteners: Use of High-Resolution Two- and Three-Dimensional Images*, 2448 TRANSP. RSCH. REC.: J. TRANSP. RSCH. BD._ 125 (2014) ("EC-TRB2014"), as an additional prior art reference that in combination with UML Sale and Support renders the asserted claims obvious.  I have attached hereto as Appendix III a claim chart comparing EC-TRB2014 to the asserted claims.

    **1.**    <u>**Independent Claim 1**</u>

        **a.**    <u>**Preamble**</u>

14.     The preamble of claim 1 recites "a system for assessing a railway track bed."  The UML Sale and Support discloses such a system.

15.     For example, the First Quarterly Report of Cooperative Agreement No. RITAS-12-H-UML, dated September 30, 2012, states that "the team will start developing algorithms based on the tools developed by Pavemetrics Systems Inc.

/ / /

-25-

1    Executed on February 18, 2022 at Atlanta, Georgia.

2

3                         By:   _____

                                      David Frakes, Ph.D.

4

5

6   55128373

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-184-

Scanned with CamScanner

Exhibit J
-35-

# EXHIBIT K

1

2

3

4

5

6

7

8      UNITED STATES DISTRICT COURT

9      NORTHERN DISTRICT OF CALIFORNIA

10      SAN JOSE DIVISION

11  APPLE, INC., a California corporation,        )      Case No.: 11-CV-01846-LHK
                                                  )
12                      Plaintiff,                )
                                                  )
          v.                                      )      ORDER DENYING SAMSUNG'S
13                                                )      MOTION FOR JUDGMENT AS A
                                                  )      MATTER OF LAW, REMITTUR, OR A
14  SAMSUNG ELECTRONICS CO., LTD., A             )      NEW TRIAL; DENYING APPLE'S
    Korean corporation; SAMSUNG                   )      MOTION FOR JUDGMENT AS A
15  ELECTRONICS AMERICA, INC., a New York )      MATTER OF LAW AND OTHER POST-
    corporation; SAMSUNG                          )      TRIAL RELIEF
16  TELECOMMUNICATIONS AMERICA, LLC, )
    a Delaware limited liability company,        )
17                                                )
                        Defendants.               )
18  ─────────────────────────────────────────────)

19         On November 21, 2013, after six days of trial and two days of deliberation, a jury awarded

20  Apple roughly $290 million in damages for Samsung's infringement of three U.S. utility patents

21  and two U.S. design patents. *See* Dkt. 2822 ("November 2013 Jury Verdict"). That verdict was not

22  the first damages verdict in this case. Fifteen months earlier, a different jury had sided with Apple

23  and awarded roughly $1.049 billion on its infringement and trade dress claims against Samsung.

24  *See* Dkt. 1931 ("August 2012 Amended Jury Verdict"). Samsung successfully moved for judgment

25  as a matter of law as to that first award, based on a theory that Apple's damages numbers relied on

26  improper notice dates. *See* 35 U.S.C. § 287(a) (predicating infringement damages in certain

27  circumstances on proof that "the infringer was notified of the infringement and continued to

28  infringe thereafter"). Because Apple had not presented sufficient evidence to recalculate the

1

United States District Court
For the Northern District of California

1    appropriate damages award for some of the infringing sales at issue in light of the proper notice

2    dates, the Court struck approximately $410 million from the first award and ordered a limited new

3    trial on damages relating only to those sales. *See* Dkt. 2271 at 26 ("Retrial Order"); 2316 at 2 (Case

4    Management Order reinstating portion of original jury award). The November 2013 verdict is the

5    result of that retrial.

6           The parties have now filed post-trial motions addressing the jury's latest verdict.

7    Specifically, Apple seeks additur, supplemental damages, and prejudgment interest, *see* Apple's

8    Motion for Judgment as a Matter of Law ("Apple JMOL"), Dkt. 2876, and Samsung has moved for

9    judgment as a matter of law, remittitur, and a new trial, *see* Samsung's Motion for Judgment as a

10   Matter of Law ("Samsung JMOL"), Dkt. 2877.[1] The Court held a hearing on the post-trial motions

11   on January 30, 2014. For the following reasons, the Court DENIES each of the parties' requests.

12   **I.      LEGAL STANDARD**

13          Rule 50 permits a district court to grant judgment as a matter of law "when the evidence

14   permits only one reasonable conclusion and the conclusion is contrary to that reached by the jury."

15   *Ostad v. Oregon Health Sciences Univ.*, 327 F.3d 876, 881 (9th Cir. 2003). A party seeking

16   judgment as a matter of law after a jury verdict must show that the verdict is not supported by

17   "substantial evidence," meaning "relevant evidence that a reasonable mind would accept as

18   adequate to support a conclusion." *Callicrate v. Wadsworth Mfg.*, 427 F.3d 1361, 1366 (Fed. Cir.

19   2005) (citing *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992)).

20          A new trial is appropriate under Rule 59 "only if the jury verdict is contrary to the clear

21   weight of the evidence." *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218 (9th Cir. 2010). A court

22   should grant a new trial where necessary "to prevent a miscarriage of justice." *Molski v. M.J.

23   Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007).

24

25

26

27   ───────────────
     [1] Apple has also renewed its request for a permanent injunction. *See* Dkt. 2897. The Court will
     address that renewed request in a separate order.

28

Case No.: 11-CV-01846-LHK
ORDER DENYING POST-TRIAL MOTIONS                                                    Exhibit K
                                                                                       -37-

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.    APPLE'S REQUEST FOR SUPPLEMENTAL DAMAGES AND PREJUDGMENT INTEREST

Apple renews its request for the Court to award supplemental damages for infringing products sold after August 25, 2012, and for prejudgment interest based on the two verdicts and supplemental damages. Apple JMOL at 6-8. The Court previously decided to wait until the appeals of this case are resolved to begin the process of calculating supplemental damages and prejudgment interest. *See* Retrial Order at 6, 8 (citing *Intron, Inc. v. Benghiat*, 2003 WL 22037710, at *16 (D. Minn. 2003); *Eolas Techs., Inc. v. Microsoft Corp.*, 2004 WL 170334 at *8 (N.D. Ill. 2004), *vacated in part on other grounds*, 399 F.3d 1325 (Fed. Cir. 2005)). Apple asks the Court to reconsider this decision because Samsung is no longer selling any of the infringing products "and the Court can now readily compute a final total." Apple JMOL at 6.

The Court declines Apple's invitation to revisit its decision. Even Apple acknowledges that proceeding with an accounting now will require additional discovery. *See id.* at 7-8. The Court maintains its conclusion that obtaining the Federal Circuit's guidance, both as to the merits as well as to how to calculate supplemental damages, before proceeding with an accounting is the most efficient and acceptable way to proceed. *See* Retrial Order at 3-6. Accordingly, Apple's request to proceed with discovery and an accounting of supplemental damages and prejudgment interest is DENIED.

## III.    THE PARTIES' MOTIONS FOR JUDGMENT AS A MATTER OF LAW

The jury's November 2013 verdict awarded a lump sum to Apple in the amount of $290,456,793, broken down only by product.[2] Before evaluating the propriety of this award, the

---

[2] The jury awarded the following damages amounts for each infringing product:

| Samsung Product | Jury Award |
|---|---|
| Captivate | $21,121,812 |
| Continuum | $6,478,873 |
| Droid Charge | $60,706,020 |
| Epic 4G | $37,928,694 |
| Exhibit 4G | $2,044,683 |
| Galaxy Prevail | $22,143,335 |
| Galaxy Tab | $9,544,026 |
| Gem | $4,831,453 |
| Indulge | $9,917,840 |

(footnote cont'd)

Case No.: 11-CV-01846-LHK
ORDER DENYING POST-TRIAL MOTIONS

Exhibit K
-38-

1    Court must determine whether it may deconstruct the overall award into the three categories of

2    damages that Apple sought at trial: (A) Apple's lost profits for certain of Samsung's sales that

3    infringed Apple's U.S. Utility Patent No. 7,844,915 (the "'915 Patent"); (B) a reasonable royalty

4    for Samsung's remaining sales that infringed the '915 Patent and sales that infringed one or both of

5    Apple's U.S. Utility Patent Nos. 7,864,163 (the "'163 Patent") and 7,469,381 (the "'381 Patent");

6    and (C) Samsung's profits for Samsung's sales that infringed two Apple design patents (U.S.

7    Design Patent Nos. D604,305 (the "D'305 Patent") and D618,677 (the "D'677 Patent")).

8         Samsung contends that the jury awarded all the lost profits and reasonable royalties Apple

9    requested and the average of the infringer's profits the parties requested. Samsung JMOL at 3-4.

10   Although Apple argues that Samsung improperly "deconstruct[s] the verdict," it does not seriously

11   contend that the jury awarded anything less than the full amount Apple requested in lost profits and

12   reasonable royalties. *See* Apple Opp. at 2-4 (contesting "Samsung's proffered deconstruction" of

13   the jury verdict only as to the award of Samsung's profits). Indeed, in its own motion for judgment

14   as a matter of law, Apple acknowledges that "the jury awarded Apple all its requested lost profits

15   and reasonable royalty damages." Apple JMOL at 2; *see* Dkt. 2885-1 at 2 n.2 (Apple's notice of

16   errata to its motion acknowledging that "[t]he damages awarded for the six products for which

17   Apple sought only Apple's lost profits and a reasonable royalty were identical to the damages

18   calculated by [Apple's damages expert].").  In light of these concessions by Apple, the Court

19   assumes the jury adopted Apple's proposed lost profits and reasonable royalty calculations. The

20   Court will separately address the award of Samsung's profits below.

21

22

23
_____

24   (footnote cont'd from previous page)

| Samsung Product | Jury Award |
|---|---|
| Infuse 4G | $99,943,987 |
| Nexus S 4G | $10,559,907 |
| Replenish | $3,046,062 |
| Transform | $2,190,099 |

Dkt. 2822 at 1-2.

Case No.: 11-CV-01846-LHK
ORDER DENYING POST-TRIAL MOTIONS

### A.    The Jury's Award of Lost Profits Damages

The jury awarded $113,777,344 in lost profits to Apple for Samsung's infringement of the '915 Patent.[3] At trial, Apple based its entitlement to lost profits on the four factors enumerated in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978): (1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) capacity to exploit the demand, and (4) the amount of profit Apple would have made but for Samsung's infringement. Samsung challenges the bulk of Apple's lost profits award for failure to establish factors two and four. *See* Samsung JMOL at 6-22. Samsung also challenges the award of lost profits as to the Galaxy Tab based on Apple's alleged lack of capacity to make additional tablet sales (*Panduit* factor 3). *See id.* at 23-24. The Court has little trouble concluding that Apple presented sufficient evidence to support the jury's lost profits award.

The Court already rejected Samsung's sufficiency arguments as to Apple's lost profits theory after the first trial, concluding that Apple's evidence "constitute[d] exactly the type of economic evidence of causation that the Federal Circuit requires in sustaining an award of lost profits." Retrial Order at 14 (citing *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1353 (Fed. Cir. 2001)). For the retrial, the Court restricted Apple's damages expert to the same lost profits theory. *See* Dkt. 2316 at 3.[4] Apple complied with that restriction, presenting the same evidence of entitlement to lost profits through its retrial damages expert, Julie Davis, as it did through its first damages expert, Terry Musika. *Compare* 2013 Tr. 665:14-671:22; PX 25F.8 (Davis expert testimony and exhibits relating to the market share of various smartphone manufacturers, based on data collected and analyzed by independent research firm IDC) *with* 2012 Tr. 2084:23-2085:9; PX 25A1.8 (same from Musika); *compare* 2013 Tr. 671:24-676:17; PX25F.14-15 (Davis testimony and exhibits relating to Apple's capacity to manufacture additional phones and tablets) *with* 2012 Tr. 2085:13-2086:3; PX25A1.14-15 (same from Musika); *compare*

[3] Roughly speaking, the '915 patent covers touch-to-scroll and pinch-to-zoom technology. *See Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1358 (Fed. Cir. 2013).
[4] Because Apple's damages expert from the first trial passed away in December 2012, the Court permitted Apple to substitute a new damages expert, but prohibited her from relying on "(1) new sales data . . . ; (2) new products; and (3) new methodologies or theories." Dkt. 2316 at 3.

United States District Court
For the Northern District of California

1    2013 Tr. 650:5-660:12 (Davis testimony about survey and other evidence indicating demand) *with*

2    2012 Tr. 2076:3-2083:3 (same from Musika).

3            What is more, in pre-trial motions for the damages retrial, Samsung successfully restricted

4    Apple's lost profits case in the retrial to damages on the '915 Patent alone—even though Apple

5    obtained a verdict of lost profits damages as to all three utility patents in the first trial. *See* Dkt.

6    2719 (Nov. 12, 2013 Order granting Samsung's emergency motion to exclude).[5] If anything, Apple

7    spent more time eliciting testimony during the retrial in support of its identical lost profits theory,

8    bolstering its arguments to the jury for lost profits damages under the '915 patent alone. *See* 2013

9    Tr. 688:23-690:16 (Davis relying on Apple's profits and loss statements in PX181); *id.* 508-509

10   (Apple's vice president of procurement testifying about Apple's iPad capacity and PX182).

11   Samsung fails to explain how Apple's previously adjudged "adequate" evidence has become

12   insufficient to support Apple's trimmed lost profits claim in this trial.

13           Samsung did not introduce any additional evidence at the retrial that required the jury to

14   now reject Apple's request for lost profits damages. Samsung presented largely the same types of

15   evidence in the retrial that it elicited in the first trial. *Compare* Samsung JMOL at 6-12, 18-22

16   (compiling cross-examination evidence of Davis and Hauser regarding alleged failure to focus on

17   demand for the patented features) *with* 2012 Trial Tr. 2124:19-2135:22 (cross examination of

18   Musika regarding alleged lack of demand for the patented features); *id.* 2142:20-2143:24 (same);

19   *id.* 2151:4-2159:24 (same); *id.* 1923:5-1945:14 (cross examination of Hauser as to whether his

20   surveys accurately reflect market demand for the patented features); *compare* Samsung JMOL at

21   23-24 (compiling evidence of Apple's alleged lack of capacity for the iPad 2) *with* 2012 Trial Tr.

22   3046:25-3047:8 (Samsung's damages expert testifying as to alleged lack of capacity for the iPad

23   2).

---

[5] In a ruling prior to the damages retrial, the Court held that, for purposes of claiming lost profits on a particular patent, potential design arounds for that patent must be considered as of the date of first infringement rather than the date the defendant received notice of the infringement. *See* Dkt. 2660. Because Davis conceded that shifting the design around dates for the '381 and '163 Patents meant that Samsung would have designed around those two patents by the date Samsung received notice of them, Apple was unable to claim lost profits for those patents and was forced to rely solely on a claim for reasonable royalties. *See* Dkt. 2719.

6

Case No.: 11-CV-01846-LHK
ORDER DENYING POST-TRIAL MOTIONS

Exhibit K
-41-

United States District Court
For the Northern District of California

During the damages retrial, Samsung presented two proposed noninfringing alternatives that Samsung was unable to present at the first trial. In particular, the first jury found that Samsung's Galaxy Ace and Intercept smartphones did not infringe the '915 Patent. *See* August 2012 Amended Jury Verdict at 3. During the retrial, Samsung relied on the first jury's noninfringement finding as to those two phones to argue to the retrial jury that Apple failed to show the absence of acceptable noninfringing alternatives. *See, e.g.*, 2013 Trial Tr. 468:23-470:11; PDX 29.21-.22. The retrial jury, however, reasonably rejected Samsung's noninfringing alternatives defense.

As to the Galaxy Ace, Apple told the jury that the first jury found that this phone infringed Apple's '163 and '381 Patents. *See* 2013 Trial Tr. 1188:4-5. For that reason, the jury could have concluded that the Galaxy Ace was not an available noninfringing alternative. *See Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1548 (Fed. Cir. 1995) (en banc) (affirming factual lost profits finding where "the only substitute for the patented device was . . . another of the patentee's devices" and therefore "*being patented by [the patentee]*, it was not available to customers except from [the patentee]") (emphasis added).[6] Samsung highlights Davis's concessions that design arounds for the '381 and '163 patents would have been complete before the Galaxy Ace came on the market, *see* 2013 Trial Tr. 1200:23-1201:7, 1201:9-17, and contends that those concessions preclude Apple from arguing that the '381 and '163 Patents rendered the Galaxy Ace unavailable. Although compelling, the jury was not required to credit that design around argument in light of the fact that Samsung had not in fact developed a version of the Galaxy Ace that did not infringe the '381 and '163 Patents.

As to the Intercept, the evidence showed that that phone was a 10-month-old device at the time of the lost profits period with a small, low-resolution screen and a slide-out physical

---

[6] In a pre-trial ruling, the Court held, over Apple's objection, that the Federal Circuit's decision in *Rite-Hite* did not prevent, as a matter of law, Samsung from arguing at trial that the Galaxy Ace was an available noninfringing alternative even though it infringed other Apple patents. *See* Dkt. 2657 at 8-13. Nonetheless, Rite-Hite makes clear that, as a "question of proof," 56 F.3d at 1548, the jury could permissibly conclude that the Galaxy Ace was not in fact available because it infringed other patents.

Case No.: 11-CV-01846-LHK
ORDER DENYING POST-TRIAL MOTIONS

Exhibit K
-42-

United States District Court
For the Northern District of California

1    keyboard. *See* DX952.014; JX1009; 2013 Trial Tr. 1186:19-21. Moreover, the phone ranked below

2    the industry average—and well below the iPhone 4 and iPhone 3GS—in a 2011 J.D. Power

3    customer satisfaction survey that included Samsung customers. *See* PX69.84-.85. From this

4    evidence, the jury could have concluded that the Intercept was not an acceptable alternative.

5         Finally, Samsung argues that it could have easily and quickly implemented the

6    noninfringing touch-to-scroll, pinch-to-zoom technology imbedded in the Intercept and Galaxy

7    Ace in another phone. *See* Samsung JMOL at 16-17. However, Samsung presented no evidence to

8    that effect. The jury permissibly disagreed with Samsung's attorney argument. Samsung's request

9    for judgment as a matter of law as to the jury's lost profits award is therefore DENIED.

10        **B.    The Jury's Award of Reasonable Royalty Damages**

11        The jury awarded Apple the $34,625,194 in reasonable royalty damages that it requested.

12   The Court holds that substantial evidence supports this award. Through Davis, Apple provided

13   expert testimony as to a reasonable royalty rate on which the parties would have agreed in a

14   hypothetical negotiation based on an evaluation of a number of factors. In particular, Davis

15   testified that she evaluated "the cost[s] to Samsung of being out [of] the market long enough to

16   design around the patents in this case," 2013 Trial Tr. 705:19-21 ("Cost Approach"), the "profits

17   . . . attributable to [Samsung's] use of [the] technology[,]" *id.* 705:23-24 ("Income Approach"), the

18   demand for the patented features, *see id.* 649:25-650:4, 650:20-660:10, and the "relationship

19   between the parties," *id.* 706:23-707:6.

20        Using her Cost Approach, Davis calculated Samsung's expected costs of not obtaining a

21   license for each patent (i.e., its costs of being off the market for a period of time and its costs of

22   designing around each of the patented features). For the '381 Patent (which covers bounce-back

23   technology), Davis calculated Samsung's estimated costs at $0.85 for smartphones and $0.98 for

24   tablets. For the '915 Patent, Davis calculated Samsung's estimated costs at $1.30 for smartphones

25   and $1.50 for tablets. For the '163 Patent (which covers tap-to-zoom, tap-to-center technology),

26   Davis calculated Samsung's estimated costs at $0.85 for smartphones and $0.98 for tablets. *See*

27   PX25F.16.

28

Case No.: 11-CV-01846-LHK
ORDER DENYING POST-TRIAL MOTIONS

Exhibit K
-43-

United States District Court
For the Northern District of California

1      Using her Income Approach, Davis evaluated Samsung's estimated profits from obtaining a

2   license to the technology at $0.52 to $4.03 for the '381 Patent, $0.80 to $6.20 for the '915 Patent,

3   and $0.52 to $4.03 for the '163 Patent. *Id.* After considering the fifteen *Georgia-Pacific* factors and

4   their relative weight, Davis settled on a reasonable royalty rate for each patent that fell a little

5   below halfway between her estimated profit ranges. *See id.* (listing Davis's proposed final per unit

6   royalty rate at $2.02 for the '381 patent, $3.10 for the '915 Patent, and $2.02 for the '163 Patent).

7   The jury reasonably relied on Davis's calculations in setting its reasonable royalty award.

8      Other evidence supported the jury's adoption of Apple's reasonable royalty number.

9   Apple's technical experts established evidence of demand for the patented features by testifying

10  that Samsung's own documents indicated that Samsung had studied and decided to adopt the

11  features of the utility patents-in-suit based on their embodiment in Apple's products. *See* 2013

12  Trial Tr. 422:9-19, 450:6-11 (describing PX57 at 73 and PX38 at 24). Moreover, numerous

13  witnesses and documents supported Apple's claim that the parties' relationship was (and is) highly

14  competitive. *See id.* 848:10-849:16 (testimony from Apple's senior vice president of worldwide

15  marketing), *id.* 1106:11-1110:16 (Samsung's damages expert acknowledging competition), PX62

16  (Samsung document entitled "iPhone 5 Counter Strategy") (capitalization removed).

17     Samsung challenges the evidence presented at the retrial on two grounds. As set forth

18  below, although the Court finds Samsung's challenges warrant careful evaluation in light of a

19  number of recent Federal Circuit opinions closely scrutinizing the propriety of large reasonable

20  royalty awards, the Court ultimately concludes that neither challenge warrants upsetting this jury's

21  damages award.

22              **1.     Davis's *Georgia-Pacific* Analysis**

23     Samsung first contends that the *Georgia-Pacific* analysis Davis used in reaching her

24  proposed reasonable royalty rate was insufficient under *Whitserve, LLC v. Computer Packages,*

25  *Inc.*, 694 F.3d 10 (Fed. Cir. 2012). In *Whitserve*, the Federal Circuit held that a defendant's motion

26  for judgment as a matter of law against a reasonable royalty award should have been granted, in

27  part because the patentee's expert proffered only a "superficial recitation of the *Georgia-Pacific*

28  factors." *Id.* at 31; *see id.* ("[R]eciting each factor and making a conclusory remark about its impact

9

United States District Court
For the Northern District of California

1   on the damages calculation before moving on does no more than tell the jury what factors a

2   damages analysis could take into consideration.").

3        Taken as a whole, Davis's reasonable royalty opinion overcomes the concerns raised in

4   *Whitserve*. In her testimony related to a reasonable royalty, Davis emphasized factor 5 (the

5   competitive relationship between the parties). *See* 2013 Trial Tr. 706:21-707:6 (Davis confirming

6   that this factor is "particularly relevant"). She also relied on the demand for the patented features,

7   *see id.* 650:20-659:17; *id.* 649:25-650:4 (testifying that demand is "relevant to the determination of

8   the amount of reasonable royalties")—which is relevant to at least factor 8 (commercial success of

9   the product made under the patent), factor 9 (utility and advantages of the patented technology),

10  and factor 11 (infringer's use of the invention and the value of that use). Although Davis might

11  have spent more time testifying about the quantifiable impact of the *Georgia-Pacific* factors on her

12  final royalty rate, even *Whitserve* acknowledges that, when conducting such an analysis,

13  "mathematical precision is not required." 694 F.3d at 31.

14       Although not itself admitted into evidence, Davis's expert report further supports the jury's

15  award here. *See Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1264 (Fed. Cir. 2013)

16  (holding that questions challenging an expert's damages model "should be resolved under the

17  framework of the Federal Rules of Evidence and through a challenge under *Daubert*" and not

18  "[u]nder the guise of sufficiency of the evidence."). In her expert report, Davis supported the

19  reasonable royalty opinion she ultimately gave to the jury by describing and adopting Musika's full

20  analysis of the *Georgia-Pacific* factors, including those factors that Davis and Musika found to be

21  "neutral," as well as the factors Davis emphasized at trial. *See* Dkt. 2517-4 ("Davis Rep.") ¶¶ 198-

22  251, Exhibits 42, 43, 46-S, 47-S. Indeed, Samsung never challenged the admissibility of Apple's

23  experts' reasonable royalty opinions prior to trial on the basis that they failed to analyze the

24  *Georgia-Pacific* factors sufficiently. *See* Dkt. 927-1 at 4-7 (Samsung *Daubert* motion); 1157 at 11-

25  13 (*Daubert* Order). In light of Davis's trial testimony and the support in her expert report, the

26  Court concludes that Davis's reasonable royalty opinion satisfies the *Whitserve* requirement that

27

28

United States District Court
For the Northern District of California

1    experts using the *Georgia-Pacific* factors "should concentrate on *fully* analyzing the *applicable*

2    factors" rather than "cursorily reciting all fifteen." 694 F.3d at 31 (emphases in original).[7]

3            **2.      Apportionment Between Patented and Unpatented Features**

4            The second ground on which Samsung challenges the reasonable royalty award is Apple's

5    alleged failure to "'give evidence tending to separate or apportion the defendants' profits and the

6    patentee's damages between the patented feature and the unpatented features.'" Samsung JMOL at

7    26 (quoting *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011)). The

8    Court, however, agrees with Apple that Davis sufficiently accounted for the patented and

9    unpatented features in proposing a royalty rate to the jury. In particular, in selecting a rate from the

10   range of possible rates derived from her Income Approach, Davis explicitly stated in her expert

11   report that she adopted Musika's "apportioning [of] [Samsung's] profit for an allowed return on

12   existing tangible and intangible assets consistent with a desired return by investors in the industry,

13   a return for all other intellectual property licensed in, and a return for all other companywide based

14   intellectual property." Davis Rep. Exhibits 46-S, 47-S. As this Court similarly stated in response to

15   Samsung's *Daubert* challenge prior to the first trial, "while Samsung may disagree with [Ms.

16   Davis's] apportionment . . ., [her] basic income approach methodology is sound and is not subject

17   to exclusion under FRE 702 and *Daubert*." *Daubert* Order at 12; *see Versata*, 717 F.3d at 1264.

18   Moreover, Davis's testimony that she used as a check on her proposed royalty rate "the costs to

19   Samsung of being out [of] the market long enough to design around *the patents in this case*," 2013

20   Trial Tr. 705:19-20 (emphasis added), provided yet another indication that she adequately

21   measured the value of the patented features, rather than the unpatented features, in calculating a

22   reasonable royalty.

---

[7] *Whitserve* is distinguishable for yet another reason. The expert in *Whitserve* calculated a reasonable royalty rate by starting from a "now discarded rule of thumb that assumes the patentee would get about 25% of the infringer's expected profit" and relying on the *Georgia-Pacific* factors to increase that rate to one that appeared to be up to 86.75% of the infringer's profit. *Id.* at 31-33. In other words, the expert in *Whitserve* used a "bare-bones *Georgia-Pacific* analysis" to approximately triple his starting royalty rate. *Id.* at 33. Davis did not similarly inflate her starting rate using the *Georgia-Pacific* factors. Instead, the record makes clear that Davis picked a rate below the midpoint of the estimated profitability ranges of the relevant products in light of the design-around costs to Samsung and the *Georgia-Pacific* factors. *See* PX25F.16.

11

Case No.: 11-CV-01846-LHK
ORDER DENYING POST-TRIAL MOTIONS

United States District Court
For the Northern District of California

1    This is not a case like *Uniloc*, where the patentee relied on the entire market value rule (i.e.,

2    assessing damages based on a percentage of the entire market value of the accused product)

3    without a showing that "'the entire value of the whole machine, as a marketable article, is properly

4    and legally attributable to the patented feature.'" 632 F.3d at 1318 (quoting *Garreston v. Clark*,

5    111 U.S. 120, 121 (1884)). Here, Davis did not purport to rely on the entire market value rule, nor

6    has Samsung accused her of doing so. Davis's determination of a royalty rate based on an

7    apportionment of the results of her Income Approach as well as the cost to Samsung of proceeding

8    without a license to the patented technology (as opposed to a royalty rate that equals a percentage

9    of Samsung's overall revenue for sales of the infringing product) gave the jury sufficient evidence

10   to account for the unpatented features of the infringing phones.

11   For the foregoing reasons, Samsung's request for judgment as a matter of law as to the

12   jury's reasonable royalty award is DENIED.

13                   **C.      The Jury's Award of Infringer's Profits**

14   The remainder of the jury award ($142,054,256)—the portion not attributable to lost profits

15   or reasonable royalties—is based on Samsung's profits for its infringement of the D'305 and D'677

16   Patents. Section 289 of Title 35 authorizes damages for design patent infringement of the amount

17   of the infringer's "total profit" for each infringing sale. At trial, the parties agreed on Samsung's

18   gross revenues from infringing sales ($854 million) and essentially agreed on the deductible costs

19   of goods related to those sales ($623 million). *See* 2013 Trial Tr. 692:1-11; 692:25-693:8; 1014:21-

20   1015:4; PDX100.17. The parties centrally disputed the amount of operating expenses to be

21   deducted from Samsung's gross revenues. Davis testified that none of Samsung's claimed

22   operating expenses was directly attributable to the infringing products and therefore Apple's

23   infringer's profits award should be Samsung's gross revenues less its costs of goods, or

24   approximately $231 million. *See* 2013 Trial Tr. 702:24-703:3. Samsung's damages expert, Michael

25   Wagner, testified that all Samsung's operating expenses—including Samsung's overall logistical,

26   advertising, temporary staffing, insurance, depreciation, travel, research and development, and

27   general and administrative expenses, *see* 2013 Trial Tr. 961:4-964:10; SDX3960.002,

28   SDX7001.005—should be allocated to each infringing phone and also deducted from Samsung's

1    gross revenues, *see id.* 1015:5-16; DX676. After deducting operating expenses, Mr. Wagner

2    proposed a total infringer's profits award of approximately $53 million. *See* DX781.002.

3           The jury's award of infringer's profits falls exactly halfway between each side's proposed

4    award. Samsung notes that this award of infringer's profits can also be viewed as 61.3960645% of

5    Davis's proposed infringer's profits award. Samsung JMOL at 3.

6                   **1.      Samsung's Motion for Judgment as a Matter of Law**

7           Samsung's motion for judgment as a matter of law as to the jury's infringer's profits award

8    is based on two distinct challenges: (a) the jury entered an improper compromise verdict, and

9    (b) the jury improperly double counted infringing sales by awarding two types of damages for

10   certain infringing sales. The Court addresses both challenges in turn.

11                          **a.      Compromise Verdict**

12          Samsung first contends that the jury's infringer's profit award is an improper compromise

13   verdict. *See* Samsung JMOL at 28-29. This challenge is easily dismissed. A compromise verdict

14   "'is one reached when the jury, *unable to agree on liability*, compromises that disagreement and

15   enters a low award of damages.'" *Romberg v. Nichols*, 970 F.2d 512, 521 (9th Cir. 1992) (quoting

16   *Nat'l R.R. Passenger Corp. v. Koch Indus.*, 701 F.2d 108, 110 (10th Cir. 1983)) (emphasis added),

17   *vacated on other grounds*, *Nichols v. Romberg*, 506 U.S. 1075 (1993). Here, liability was not at

18   issue because the first jury had already found that Samsung infringed Apple's valid patents. "Proof

19   of damages is governed by a less strict standard than proof of liability." *Landes Const. Co., Inc. v.

20   Royal Bank of Canada*, 833 F.2d 1365, 1373 (9th Cir. 1987). The Court agrees with Apple that the

21   jury in the damages retrial "was entitled to choose a damages award within the amounts advocated

22   by the opposing parties." *Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1347 (Fed. Cir. 2011).

23                          **b.      Double Counting**

24          Samsung's second challenge warrants a more extensive analysis. Samsung attacks the

25   jury's infringer's profits award on the ground that the verdict is the result of improper double

26   counting. More specifically, Samsung contends that the jury improperly awarded both lost profits

27   and infringer's profits for the same infringing sales. The jury was instructed that it could not award

28   lost profits or reasonable royalties on any sales for which it also awarded infringer's profits. *See*

13

1   Dkt. 2784 at 42 (Final Jury Instruction No. 34). Samsung contends that the jury disobeyed this

2   instruction by averaging the parties' overall proposed infringer's profits awards even though Davis

3   and Wagner disagreed as to the number of infringing sales to be used to calculate the infringer's

4   profit award. Samsung JMOL at 30. Because Wagner's infringer's profits calculation captured

5   some phones that Davis included in her lost profits calculation, Samsung contends the jury's

6   averaging of the two proposals impermissibly awarded two forms of damages for the same

7   infringing sale.

8       An example will help clarify the purported problem. The controversy here stems from the

9   jury's damages award for the Infuse 4G ($99,943,987), which infringes both the '915 Patent and

10  the D'677 Patent. Davis used a two-step process to calculate damages for the Infuse 4G. First,

11  Davis opined, and the jury indisputably accepted, that Apple was entitled to $43,968,916 in lost

12  profits for Infuse 4G sales that would have gone to Apple but for the infringement. *See* PX25G1.2.

13  Second, with respect to all other sales of the Infuse 4G—i.e., sales that Samsung would have kept

14  (for example because of a customer's loyalty to Samsung), sales that would have gone to a third-

15  party, or sales that occurred after the design-around period—Davis opined that Apple was entitled

16  to $91,165,035 in infringer's profits. *See* PX25G1.4. In contrast, Wagner did not believe Apple was

17  entitled to any lost profits, and therefore he attributed *all* the Infuse 4G sales to his proposed

18  infringer's profits award of $42,942,776. *See, e.g.*, 2013 Trial Tr. 994:20-995:1; DX781.002.

19  Samsung contends that the jury necessarily and improperly awarded Apple lost profits and

20  infringer's profits damages on some of the same Infuse 4G sales by adopting Davis's lost profits

21  number, which captures some of the infringing Infuse 4G sales, and by also relying on Wagner's

22  infringer's profits award, which captures all the infringing Infuse 4G sales including those that

23  were part of Davis's lost profits calculation.

24      The Court finds that if Samsung is correct that the jury averaged both sides' proposed

25  infringer's profits award, then Samsung is also correct that the jury improperly double counted. For

26  the following reasons, however, Samsung's attempt to deconstruct the jury's infringer's profits

27  award goes too far.

28

Case No.: 11-CV-01846-LHK
ORDER DENYING POST-TRIAL MOTIONS

United States District Court
For the Northern District of California

14

United States District Court
For the Northern District of California

1        As an initial matter, the standard for evaluating a jury's damages verdict is generally

2    lenient. The Court "must uphold the jury's finding of the amount of damages unless the amount is

3    grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation

4    or guesswork." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001).

5    It will be a "rare case in which it is sufficiently certain that the jury['s damages] award was not

6    based on proper consideration of the evidence" and therefore cannot stand. *In re First Alliance*

7    *Mortg. Co.*, 471 F.3d 977, 1001 (9th Cir. 2006).

8        The proceedings here do not suggest that this is such a case. In the two cases on which

9    Samsung relies to contend that the Court should reverse engineer the jury's infringer's profits

10   award, the Court of Appeals was concerned with whether the jury had relied on an *expert's*

11   "incorrect damages calculation." *Id.* at 1002; *see Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d

12   1301, 1338 (Fed. Cir. 2009) ("What *Lucent's licensing expert proposed* here does not comport with

13   the purpose of damages law or the entire market value rule.") (Emphasis added). Similarly, when

14   this Court closely examined the jury verdict from the first trial, the Court did so out of concern that

15   "the jury's awards for patent infringement . . . [were] based on *Mr. Musika's numbers*," which used

16   "[erroneous] early notice dates." Retrial Order at 18 (emphasis added). Here, in contrast, Samsung

17   maintains that its expert's damages analysis was proper, but that the jury nonetheless acted

18   improperly because it relied on only part of his conclusions. In other words, Samsung asks the

19   Court to conclude that the jury ignored the Court's instructions and reached an improper damages

20   verdict all on its own, even though the Court has no reason to believe the jury was led even

21   partially astray by improper expert testimony. In these circumstances, precedent does not require

22   the Court to deconstruct the jury's award in search of error.

23       In any event, the Court does not agree with Samsung that the jury's error here is a

24   "mathematical certainty." Samsung Reply at 2 n.1. Unlike the breakdown of the overall award

25   between lost profits, reasonable royalties, and infringer's profit, Samsung fails to justify its

26   contention that the jury *must have* settled on an infringer's profits amount by averaging the two

27   experts' overall infringer's profits proposals. Even Wagner's declaration in support of Samsung's

28   motion for judgment as a matter of law does not say the jury necessarily reached its conclusion in

15

1    the way Samsung suggests; instead, Wagner merely concludes that "[t]he percentage applied by the

2    jury [to each product that infringed a design patent], 61.3980645%, *can be calculated* by averaging

3    the Samsung profits numbers presented by Ms. Davis . . . and myself." Dkt. 2979 ¶ 14 (emphasis

4    added).

5           Just as likely, the jury could have halved the overall operating expenses deducted by

6    Wagner ($178,638,595) and deducted that halved amount ($89,319,298) from Davis's proposed

7    infringer's profit award ($231,373,554). Following that logic, the jury would have arrived at the

8    same number for an overall infringer's profits award ($142,054,256) and the same percentage

9    reduction of Davis's proposed infringer's profit award (61.3980645%). Under this scenario,

10   however, the jury would have relied solely on Davis's proposed infringer's profit award as a

11   starting point—which indisputably did not include the lost profits units—and used only Wagner's

12   overall operating expenses figure to reduce that amount. Thus, the jury would not have used

13   Wagner's ultimate infringer's profit figure. In this way, the jury's award could still be a

14   permissible choice "within the amounts advocated by the opposing parties," *Spectralytics*, 649 F.3d

15   at 1347, without double counting any lost profits sales. Samsung does not explore, much less rebut,

16   this or any other possible explanation for the jury's award. Because "juries are presumed to follow

17   their instructions," *Richardson v. Marsh*, 481 U.S. 200, 211 (1987), and because the Court is able

18   to construe the evidence here in a way that is consistent with the jury's verdict, *see Air-Sea

19   Forwarders, Inc. v. Air Asia Co., Ltd.*, 880 F.2d 176, 189 (9th Cir. 1989), the Court concludes the

20   jury reached its verdict without double counting.

21          Accordingly, Samsung's motion for judgment as a matter of law as to the jury's infringer's

22   profits award is therefore DENIED.[8]

23

24   _____

     [8] Samsung also challenges the jury's infringer's profits award on the ground that Samsung's profit
25   was not attributable to its infringement of Apple's design patents. Samsung JMOL at 30. Samsung
     acknowledges, however, that the Court has already rejected this argument as "clearly foreclosed by
26   Federal Circuit precedent." Retrial Order at 12 (citing *Nike Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d
     1437, 1442-43 (Fed. Cir. 1998)); *see Nike Inc.*, 138 F.3d at 1441 ("'It is expedient that the
27   infringer's entire profit on the article should be recoverable,' for 'it is not apportionable' . . . .")
     (quoting H.R. Rep. No. 1966 at 1 (1886), *reprinted in* 18 Cong. Rec. 834 (1887)). Samsung
28   provides no basis for the Court to reconsider that conclusion now, and the Court declines to do so.

Case No.: 11-CV-01846-LHK
ORDER DENYING POST-TRIAL MOTIONS

## 2.    Apple's Motion for Judgment as a Matter of Law

Apple also moves for judgment as a matter of law on the award of infringer's profits, contending that "[t]he only reasonable conclusion that the jury could have reached . . . was that Apple is entitled to the full amount of Samsung's profits." Apple JMOL at 2. Apple made a similar request for additur after the first trial. The Court rejects Apple's request now just as it did then. *See* Retrial Order at 2. The Seventh Amendment prohibits a judicial increase in a damages award made by a jury. *See Dimick v. Schiedt*, 293 U.S. 474, 486-87 (1935). The jury heard the parties' competing evidence and argument as to how much of Samsung's operating expenses the jury should deduct from Samsung's infringement revenues. The reasonableness of Samsung's proffered overhead allocation formula—based on a three-step methodology that Samsung Telecommunications America's Vice-President of Finance and Operations testified the company used in the ordinary course of business, *see* 2013 Trial Tr. 964:18-965:22, 967:14-17—was a dispute for the jury to resolve. *See Sunbeam Prods., Inc. v. Wing Shing Prods. (BVI) Ltd.*, 311 B.R. 378, 401 (S.D.N.Y. 2004), *aff'd*, 153 F. App'x 703 (Fed. Cir. 2005) ("'The reasonableness of the proffered overhead allocation formula is a question of fact in all cases.'") (quoting *Hamil Am., Inc. v. GFI, Inc.*, 193 F.3d 92, 105 (2d Cir. 1999)). The jury partially credited both sides' positions and reached a reasonable decision. The Court will not disturb the verdict. Apple's request for judgment as a matter of law is therefore DENIED.

## IV.    SAMSUNG'S NEW TRIAL MOTIONS

Samsung alleges two bases on which the Court should grant it a new trial. Both bases allege that Apple made improper and prejudicial arguments at trial. The Court is not convinced by either.

### A.    Apple's References to Samsung's Revenues From Infringing Sales

First, Samsung argues that Apple improperly referenced Samsung's total infringing revenues 15 times during trial. *See* Samsung Reply at 21. Samsung, however, made no contemporaneous objection to any of these references. At no time during trial did Samsung raise with the Court the concern it raises now: that Apple was improperly presenting an irrelevant revenue number in order to make Apple's requested damages seem relatively insignificant. *See Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1193 (9th Cir. 2002) ("[A]llowing a party to wait to

17

United States District Court
For the Northern District of California

1    raise the error until after the negative verdict encourages that party to sit silent in the face of

2    claimed error.").

3          Although Samsung successfully raised a pre-trial objection to certain slides that Apple

4    planned to use during Davis's infringer's profits testimony, Samsung's two-and-a-half line pre-trial

5    objection was sustained and was limited to those particular slides. *See* Dkt. 2700 at 2 (objecting to

6    PDX100.7, PDX100.30, PDX100.31, and PDX100.34); *see also* Dkt. 2721 (sustaining objections).

7    Pointing to the Court's pre-trial ruling sustaining that objection and citing Fed. R. Evid. 103(b),

8    Samsung contends that it did not need to renew its objection during trial. Samsung Reply at 23; *see*

9    Fed. R. Evid. 103(b) ("Once the court rules definitively on the record — either before or at trial —

10   a party need not renew an objection or offer of proof to preserve a claim of error for appeal."). But

11   Rule 103(b) applies to preserving claims of error as to an adverse ruling, not claims of error that

12   relate to a ruling in a party's favor. *See* Fed. R. Evid. 103(a) (setting out rules for preserving a

13   "claim [of] error *in a ruling* to admit or exclude evidence") (emphasis added). Samsung never

14   alerted the Court to concerns that Apple's use of Samsung's total revenue number at different

15   stages "deliberately ignored the Court's instruction" regarding Davis's infringer's profits

16   testimony; improperly "belittled the calculations of Samsung's damages expert;" or "flaunted

17   Samsung's total revenues in order to mislead the jury into thinking that its [overall] damages

18   calculations were somehow 'conservative.'" Samsung JMOL at 36-37. Indeed, even after Apple's

19   case in chief, Samsung argued merely that it was entitled to judgment as a matter of law that Apple

20   presented no evidence to support an award of damages greater than $379 million, 2013 Trial Tr. at

21   923:17-21, not that Apple's references to Samsung's revenues were unfairly prejudicial, should

22   have been excluded, or warranted a curative instruction.[9]

23          Without having alerted the Court to Apple's alleged misconduct during trial, Samsung

24   cannot now establish that it is entitled to a new trial absent a showing of "plain or fundamental

25

26   _____
     [9] Apple also used Samsung's revenue during the first trial, without objection from Samsung. *See*
27   2012 Trial Tr. at 4123:6-10 (Apple's counsel during closing argument: "Samsung's infringing sales
     have generated $8.160 billion in revenue for Samsung. The damages in this case should be large
28   because the infringement has been massive.").

Case No.: 11-CV-01846-LHK
ORDER DENYING POST-TRIAL MOTIONS

Exhibit K
-53-

1  error." *Settlegoode v. Portland Pub. Schs.*, 371 F.3d 503, 517 (9th Cir. 2004); *see Hemmings*, 285

2  F.3d at 1193 ("Plain error is a rare species in civil litigation, encompassing only those errors that

3  reach the pinnacle of fault . . . .") (internal quotation marks and citation omitted). Samsung has not

4  made this showing. As Samsung implicitly acknowledges, a portion of Samsung's revenue number

5  was relevant for calculating the award of Samsung's profits. *See* Samsung Reply at 21-22 (noting

6  that only half of the sales that were the subject of the damages retrial were ineligible for infringer's

7  profits) (emphasis added). The Court instructed the jury to determine Samsung's profit "by

8  deducting certain expenses from gross revenue," defined as "all of the infringer's receipts from the

9  sale of articles using any design found infringed." Dkt. 2784 at 39 (Final Jury Instruction No. 31).

10  The jury is presumed to have followed this instruction. *See Richardson*, 481 U.S. at 211.

11       Moreover, the jury's infringer's profits award—which was in between the two parties'

12  proposals—indicates that the jury followed the Court's instruction on gross revenues. During the

13  damages retrial, both parties' experts agreed on the proper measure of gross revenues in proposing

14  their damages totals. *See*, *e.g.*, 2013 Trial Tr. at 692 (Davis testimony that she and Wagner agreed

15  on infringer's profits revenues); 1034:5-8 (Wagner testifying that the total revenues number was

16  not "a relevant calculation" and that "[w]e should begin focusing on that smaller number of these

17  phones that are sold that are infringing only the design patent"). Moreover, as discussed above, the

18  jury rendered a verdict supported by substantial evidence. In such a situation, a finding of plain

19  error is inappropriate. *See Settlegoode*, 371 F.3d at 520 (holding that a district court abused its

20  discretion by finding plain error in part because "there was more than sufficient evidence for the

21  jury to find in [plaintiff's] favor"); *Hemmings*, 285 F.3d at 1195 (finding no plain error where "[i]n

22  the absence of counsel's improper statements, we cannot say that we think a different verdict was

23  likely"). Samsung has not explained why a different result is warranted here. Indeed, Samsung has

24  not addressed the plain error standard at all.

25       For the foregoing reasons, on this record, Samsung cannot establish that allowing the jury

26  to hear Apple's references to Samsung's revenues on all infringing sales amounted to plain error.

27

28

Case No.: 11-CV-01846-LHK
ORDER DENYING POST-TRIAL MOTIONS

Exhibit K
-54-

**United States District Court**
For the Northern District of California

**B.      Apple's Appeal to Prejudice**

Last, Samsung contends that a new trial is warranted under Rule 59 on the basis that Apple appealed to racial, ethnic, and national origin prejudice throughout its case. Samsung relies primarily on Apple counsel's closing argument, which Samsung contends was an inappropriate, prejudicial appeal. For the reasons stated below, the Court finds that while the comments were troubling, a new trial is not warranted under the applicable standard.

Samsung principally relies on the following portion of Apple's closing argument:

> We are extremely fortunate to live in what I'll call the Greater Bay Area. Not only is it beautiful, but we live in the center of one of the most vibrant economies in the world. Intel, Yahoo, Oracle, Facebook, eBay, and hundreds and hundreds of other companies, including Google, and including Apple, and these companies attract talented employees at every level. Even, we heard, Samsung has opened a research center here so that they can take advantage of the talent in this area.
>
> The companies provide jobs. They create technology that improves the way people work. And the company -- and this economy supports an education system that is second to none in the world, Berkeley, Stanford, San Jose State, U.S. [sic] Santa Cruz, even Santa Clara where I went to school.
>
> These educational institutions interact with this economy, interact with these companies and create a place that the whole world knows as Silicon Valley.
>
> But let's be equally clear about one thing. Our vibrant economy absolutely depends on fair competition. It depends on a patent system that encourages inventors to invent, it encourages investors to invest, and it encourages employers to hire.
>
> If we allow that system of law to decay, investors will not invest, people will not take risks, and our economy will disappear.
>
> When I was young, I used to watch television on televisions that were manufactured in the United States. Magnavox, Motorola, RCA. These were real companies. They were well known and they were famous. They were creators. They were inventors. They were like the Apple and Google today.
>
> But they didn't protect their intellectual property. They couldn't protect their ideas. And you all know the result. There are no American television manufacturers today.

2013 Trial Tr. at 1396:14-1397:20. Samsung's counsel immediately objected, stating "[t]his is improper argument, outside the scope, and limited elements that one should not appeal to in a court of law." *Id.* at 1397:21-23. Apple's counsel stated that "I don't think that's right, your honor. This

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    is an argument about the policy of these laws." *Id.* at 1397:24-25. The Court asked Apple's counsel

2    if he could move on, to which Apple's counsel indicated, "I can," *id.* at 1398:1-2, and did so.

3             After the jury left the courtroom and entered the deliberation room for deliberations,

4    Samsung's counsel moved for a mistrial. The Court denied the motion without prejudice to renewal

5    in the instant post-trial motions. *Id.* at 1407:8-11. Further, the Court offered Samsung various

6    potential remedies. The Court asked Samsung's counsel if he would like a rebuttal to the arguments

7    in Apple's closing that Samsung's counsel found problematic. *Id.* at 1408:11-13. The Court also

8    offered to bring the jury back into the courtroom to hear the Court's reiteration of the Court's

9    earlier instruction that jurors should not be motivated by sympathies or prejudice. *Id.* at 1414:4-10.

10   Samsung's counsel stated that while he did not believe that this would cure the problem, it would

11   be appropriate. *Id.* at 1414:15-16.

12             At this point, the Court, over Apple's contention that any curative instruction was

13   unnecessary, brought the jury back to the courtroom. Only twenty-three minutes had elapsed since

14   the jury entered the deliberation room, and the jury gave the Court a note as it reentered the

15   courtroom. *Id.* at 1415:16-18. The note informed the Court that the jury had selected a foreperson

16   and that the jurors needed certain office supplies for their deliberations, including paper,

17   highlighters, and tape. *Id.* at 1415:25-1416:3. After handling the jury note for office supplies, the

18   Court instructed the jurors as follows:

19             Now, as I said when I read you final jury instruction number 1, you must
20             follow all of my instructions and not single out some and ignore others.
             They're all important.  I do want to just remind you of jury instruction number
21             1, which does state that you must not be influenced by any personal likes or
             dislikes, opinions, prejudices, or sympathy, and any appeal by any of the
22             parties to any prejudice or sympathy is not proper. So with that instruction,
             I'm going to excuse you back to the jury room to begin deliberations.

23   *Id.* at 1416:10-19. As the Court's admonishment suggests, this was not the first time the Court had

24   instructed the jury regarding setting aside prejudices. The Court's very first preliminary jury

25   instruction, distributed and read to jurors before opening statements, stated that "you must not be

26   influenced by any personal likes or dislikes, opinions, prejudices, or sympathy." *Id.* at 321:10-11.

27   Moreover, the Court provided a similar instruction as the first instruction of the final jury

28   instructions, which were distributed and read to jurors prior to closing arguments: "You must not

                                          21

United States District Court
For the Northern District of California

1    be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means you

2    must decide the case solely on the evidence before you. You will recall that you took an oath to do

3    so." *Id.* at 1236:25-1237:4. Importantly, each juror had a printed copy of the preliminary jury

4    instructions throughout the entire trial and deliberations and a printed copy of the final jury

5    instructions during closing arguments and deliberations.

6           The Court begins its analysis by noting that while attorneys have an obligation to serve as

7    fierce advocates for their clients, this obligation must be tempered by attorneys' obligation to

8    ensure that the judicial system is fundamentally fair. Fairness of our system requires that all parties,

9    regardless of race, ethnicity, or national origin, not only receive a trial free from prejudice, but also

10   perceive that they will receive such a trial. This fairness is undermined when counsel either

11   explicitly or implicitly invokes the prejudice of jurors rather than relying on the applicable law and

12   the proven facts. *See LeBlanc v. Am. Honda Motor Co., Inc.*, 688 A.2d 556, 560 (N.H. 1997)

13   ("This sort of argument, which may be indirect or implied, as well as direct or express, is

14   nonetheless an affront to the court.") (internal quotation marks and citation omitted).

15          Here, the Court finds the implications of Apple counsel's statements in closing argument

16   troubling. The transcript does not capture the full context of counsel's closing argument. *See*

17   *Commil USA, LLC v. Cisco Sys., Inc.*, 720 F.3d 1361, 1371 (Fed. Cir. 2013) (noting that a district

18   court's "on-the-scene assessment of the prejudicial effect, if any, carries considerable weight")

19   (internal quotation marks omitted). Counsel's argument clearly suggested an us-versus-them,

20   American-versus-non-American theme to the jury, which could have evoked national origin

21   prejudice. This effect is minimized by the cold transcript, which elides counsel's strategic and

22   effective pauses, timed in a way that created silence for listeners to connect the dots and make

23   troubling inferences. The transcript further does not capture the broader context of the courtroom

24   and the trial, during which the immediate rows behind the attorneys were filled with client

25   representatives with obvious differences in terms of racial and ethnic backgrounds. Therefore, an

26   American-versus-non-American theme, which might not be troubling in every case given

27   Americans and non-Americans are of diverse backgrounds, in the context of this trial also could

28   have been perceived as invoking racial or ethnic prejudice.

22

**United States District Court**
For the Northern District of California

1    Moreover, the impact of statements that call into question the actual and perceived fairness

2    of our judicial system to all parties must be considered in the broader context regarding whether all

3    juries in the United States can fairly adjudicate patent disputes between American companies and

4    foreign companies. Judge Moore's empirical work before joining the U.S. Court of Appeals for the

5    Federal Circuit cites statistical support for a perception of potential jury bias. *See* Kimberly A.

6    Moore, *Xenophobia in American Courts*, 97 Nw. L. Rev. 1497 (2003). Judge Moore's study found

7    that "foreign patent holder win rates in jury trials against domestic infringers (38%) are

8    significantly lower than domestic patent holder win rates against foreign infringers (82%). In

9    contrast, in cases decided by judges, the patentee win rate is almost identical, with domestic

10   patentees winning 35% of the time against foreign infringers, and foreign patentees winning 31%

11   of the time against domestic infringers." *Id.* at 1509-10. Moreover, Judge Moore found that while

12   foreign inventors acquire 45% of patent rights annually, they seek to enforce their patent rights in

13   only 13% of litigated cases, notwithstanding the fact that litigated foreign patents are, according to

14   Judge Moore, likely to be stronger than their domestic counterparts. *Id.* at 1504-05, 1535-36. As

15   Judge Moore states, "[t]he disparity is important in part because it may reflect foreigners' cynicism

16   about their prospects of enforcing patents in U.S. courts." *Id.* at 1504. Judge Moore concluded that

17   "[t]he perceptions, and verifiable accuracy of the perceptions, of xenophobic bias in the U.S. patent

18   litigation process likely have substantial impact on international trade and foreign relations and

19   undermine confidence in the U.S. legal process for foreign and domestic parties alike." *Id.* at 1550.

20   Particularly in light of this empirical context and the high-profile nature of this litigation,

21   the Court expresses its disapproval and disappointment in the comments that led to the instant

22   motion. Counsel in this case have been exceptionally well prepared, and the Court has no doubt

23   that counsel carefully chose each theme before presenting it to the jury in closing arguments. As

24   the Court expressed after counsel's statement, the Court is particularly troubled by the clear

25   implication of the closing argument that Samsung's foreignness was at issue in this case. 2013

26   Trial Tr. at 1414:5-6 ("To say American versus non-American company clearly implies foreign.").

27   Nonetheless, despite the troubling nature of counsel's closing argument, the Court notes

28   that the level of misconduct here does not warrant a mistrial under the Ninth Circuit's standard. *See*

United States District Court
For the Northern District of California

1    *Kehr v. Smith Barney, Harris Upham & Co., Inc.*, 736 F.2d 1283, 1286 (9th Cir. 1984) (noting that

2    the Ninth Circuit has "no trouble concluding that [counsel's] remarks were improper" though the

3    comments do not warrant a mistrial). Under Ninth Circuit case law, granting a motion for new trial

4    on the grounds of attorney misconduct is only appropriate where the "flavor of misconduct . . .

5    sufficiently permeate an entire proceeding to provide conviction that the jury was influenced by

6    passion and prejudice in reaching its verdict." *Id.* (internal quotation marks omitted). The Court

7    must consider whether any allegedly offending remarks were isolated or persistent, whether

8    opposing counsel timely objected or moved for a mistrial, and whether the jury's award was

9    excessive. *Id.* As part of this inquiry, the Court must consider when the potentially problematic

10   comments occurred and what proportion of the trial was infected by such comments. *United States

11   v. Rhodes*, 713 F.2d 463, 469 (9th Cir. 1983). The Federal Circuit has suggested that courts should

12   also consider whether counsel persists in making problematic statements even after being

13   admonished by the court to refrain from so doing. *Commil*, 720 F.3d at 1370. Ultimately, "[a] new

14   trial is warranted only if counsel's misconduct affected the verdict." *Mateyko v. Felix*, 924 F.2d

15   824, 828 (9th Cir. 1990).

16        In this case, the Court finds that Apple counsel's statements at closing argument, while

17   potentially evoking prejudice, do not meet the standard for two reasons. First, misconduct did not

18   permeate the proceedings. Rather, the problematic comments were confined to a few seconds of the

19   closing argument, which quickly came to an end upon Samsung's objection and this Court's

20   admonishment to Apple's counsel to move on. *Settlegoode*, 371 F.3d at 518 ("[W]here offending

21   remarks occurred principally during opening statement and closing argument, rather than

22   throughout the course of the trial, we are less inclined to find the statements pervaded the trial and

23   thus prejudiced the jury.") (internal quotation marks omitted); *Cooper v. Firestone Tire & Rubber

24   Co.*, 945 F.2d 1103, 1107 (9th Cir. 1991) (holding isolated comments in closing argument is

25   insufficient to warrant mistrial).

26        Samsung contends that at other parts of the trial, Apple evoked racial or national origin

27   prejudice (1) by using the phrase "Samsung Korea" and asking questions regarding whether certain

28   actions were undertaken by Samsung's Korean executives, and (2) by pointing to the fact that

24

United States District Court
For the Northern District of California

1    certain Samsung engineers did not speak English. Samsung JMOL at 38-39. The Court disagrees.

2    As a threshold matter, Samsung did not contemporaneously object to any of the references about

3    which it now complains, and Samsung's counsel conceded at the hearing on the instant motion that

4    these questions and comments were not problematic at the time they were asked or made.

5    Transcript of January 30, 2014 Hearing, Dkt. 2945, at 86:15-87:17.

6          With respect to the first set of questions and comments to which Samsung points, the Court

7    finds that these references were made to explain Samsung's corporate structure and the interplay

8    between various executives. For example, Samsung now contends that the following comment in

9    opening statement by Apple counsel was troublesome:

10          You will have Plaintiff's Exhibit 60 to look at. This is a document, the title of it is
       "STA Competitive Situation Paradigm Shift." I can't translate all of that for you
11          because I don't know what all of it means, but the STA is Samsung
       Telecommunications of America. It's one of the American subsidiaries of the
12          Korean Samsung Communications Company.

13    2013 Trial Tr. 348:13-18. The Court finds that these questions and comments did not evoke racial

14    or national origin prejudice. Instead, they aided the jury in understanding the relationship between

15    the various Samsung entities who were Defendants in the litigation and to explain various

16    documents. *See also id.* at 1166:17-1167:4 (asking questions regarding corporate structure to

17    explain the relationships between various Samsung executives discussed in an email exhibit).

18    Importantly, Samsung itself recognized the importance of its corporate structure. On direct, Tim

19    Sheppard, a Samsung executive, testified as follows:

20          Q. Where is STA [Samsung Telecommunications America] located?
       A. Its headquarters is in Dallas. It's in Dallas
21          Q. And where is the rest of Samsung located?
       A. Samsung is a multinational company. There's operations in many countries, but the
22          headquarters is in Korea.

23    *Id.* at 953:24-954:3. Samsung strains credulity when it claims that these factual questions and

24    comments about Samsung's corporate structure evoke racial or national origin prejudice.

25          With respect to the second set of questions and comments to which Samsung points, the

26    Court notes that the line of questioning was directed toward impeaching Samsung's damages

27    expert. Samsung extensively relied on Wagner's conversations with Samsung engineers to contend

28    that Samsung could design around the patents in suit. Accordingly, Apple challenged the reliability

25

Case No.: 11-CV-01846-LHK
ORDER DENYING POST-TRIAL MOTIONS

1   of the information that Wagner received from the engineers by noting the various challenges in the

2   communications between the engineers and Wagner:

> Q. But the design around periods were not something you came up with on
> yourself, by yourself; correct?
> A. No, I did not.
> Q. So let's make sure that the jury understands how you came up with them. The
> design around periods were provided to you in telephone calls with Korean
> engineers of Samsung; correct?
> A. That is correct.
> Q. You don't speak Korean; correct?
> A. I don't.
> Q. They don't speak English; correct?
> A. I think some of them had halting English, but there was a person there from
> Samsung who translated for them.
> Q. Right. And the person doing the translation was a lawyer who was a Samsung
> employee who was sitting with the Samsung employee in Korea doing the
> translation; correct?
> A. That's accurate.
> Q. And you got your design around periods from the translation done by the
> Samsung lawyers; correct?
> A. Yes.
> Q. And it's true, is it not, that you did nothing on your own to verify whether
> those design around times were accurate or not?
> A. That's correct. I wouldn't have any experience if I tried to do it to give any
> value in this courtroom.
> Q. Right. So if there is -- do you know -- do you know whether any of those
> Samsung engineers are going to testify here and tell the jury what the basis is of
> those design around periods?
> A. I don't believe so.

17   *Id.* at 1090:15-1091:18. Here too, Samsung overreaches by claiming that these questions evince or

18   evoke racial or national origin prejudice. Apple's references to Korea and translation were

19   designed to show the following multiple bases for the unreliability of Wagner's testimony on a

20   critical point: (1) Wagner's conversations with Samsung engineers were by international telephone

21   calls and not face-to-face; (2) Wagner could not directly communicate with Samsung engineers and

22   thus could not directly evaluate the Samsung engineers' statements; and (3) most importantly, that

23   the use of an interested party, a Samsung lawyer, as the translator between Wagner and the

24   Samsung engineer rendered Wagner's testimony regarding the design arounds potentially

25   unreliable. Prejudice was not the basis for or effect of this line of questioning. *See also id.* at

26   1322:19-22 ("Now, Mr. Wagner admitted that his entire theory was dependent upon telephone

27   conversations with Samsung folks in Korea. They didn't speak English, he didn't speak Korean.

28   *There were Samsung lawyers sitting next to them translating.*") (emphasis added). Accordingly, the

26

United States District Court
For the Northern District of California

1    Court finds that the comments to which Samsung points are not rooted in prejudice, and that

2    therefore, attorney misconduct did not "permeate" the proceedings.

3         Second, there is no evidence that the jury was influenced by Apple's problematic comments

4    during closing argument. To the contrary, here the Court instructed the jury not to be influenced by

5    any prejudices or sympathies multiple times, including once shortly after the problematic

6    statements. "[T]he law presumes that jurors carefully follow the instructions given to them."

7    *Caudle v. Bristow Optical Co., Inc.*, 224 F.3d 1014, 1023 (9th Cir. 2000). This is a "crucial

8    assumption underlying [the] system." *Parker v. Randolph*, 442 U.S. 62, 73 (1979). In cases in

9    which parties have moved for new trials on the basis of attorney misconduct, courts have routinely

10   held that a curative instruction is a factor weighing strongly against granting a new trial. *See*

11   *Kinetic Concepts, Inc. v. Blue Sky Med. Grp., Inc.*, 554 F.3d 1010, 1025 (Fed. Cir. 2009); *Mateyko*,

12   924 F.2d at 828. Moreover, here the presumption that the jury was not animated by prejudice is

13   particularly strong in light of the fact that the jury came back twenty-three minutes after the start of

14   deliberations with a note asking for office supplies to aid their deliberations. This suggests that the

15   jury was focused on the task at hand—calculating damages—and was not fixated on any

16   potentially improper argument made by counsel in closing. The jury's verdict further shows that

17   the jury was appropriately focused on the evidence and the relevant law. As discussed above, the

18   jury verdict was not excessive. This is probative evidence that the jury was not unduly affected by

19   prejudicial comments. *See Kehr*, 736 F.2d at 1286 (holding the fact that "the jury's award of

20   damages in this case was not excessive" cut against awarding a new trial on the basis of attorney

21   misconduct).

22        The authority Samsung cites in support of a new trial is distinguishable. For example,

23   unlike *Commil USA*, 720 F.3d at 1370-71, where the Federal Circuit affirmed a grant of a mistrial

24   when counsel invoked religious prejudice in closing argument and on cross-examination, including

25   after the district court had given a curative instruction, here, counsel's problematic statements were

26   much more confined and did not occur after the Court's curative instruction. Moreover, the holding

27   in *Commil USA* stemmed from deference to the district court's findings. *Id.* at 1370, 1375

28   (O'Malley, J. concurring in part and dissenting in part) ("I agree with the majority that it is

27

United States District Court
For the Northern District of California

1    appropriate to defer to the trial court's first-hand assessment of whether counsel's conduct was

2    sufficiently improper as to call into question the integrity of the jury's verdict.").

3           *Caudle v. Dist. of Columbia,* 707 F.3d 354 (D.C. Cir. 2013), is also distinguishable, because

4    in that case, where the D.C. Circuit reversed a denial of a mistrial, counsel made four improper

5    arguments, including making an impermissible "argument after the district court had sustained

6    *three* objections." *Id.* at 361 (emphasis in original). Unlike *Caudle*, in the instant case, after the

7    Court asked Apple's counsel to move on from the troubling line of argument, counsel did so, and

8    did not thereafter make any problematic comments.

9           Moreover, unlike *Bird v. Glacier Elec. Coop., Inc.*, 255 F.3d 1136, 1151 (9th Cir. 2001)

10   (emphasis added), where the Ninth Circuit refused to recognize a tribal court judgment because

11   "closing argument [in the tribal court case] was *replete* with appeals to bias," the problematic

12   statement in the instant case was isolated, not pervasive. *See also City of Cleveland v. Peter Kiewit*

13   *Sons' Co.*, 624 F.3d 749, 755 (6th Cir. 1980) (reversing for a new trial where counsel "almost

14   continuously sought to plant the seed in the minds of the jurors that [the defendant] was a very

15   large corporation with international operations," including in opening statement, examination of

16   multiple witnesses, and closing argument).

17          Finally, *LeBlanc*, 688 A.2d at 560, in which the New Hampshire Supreme Court, applying

18   New Hampshire law, reversed a denial of a mistrial, is also distinguishable. In *LeBlanc*, counsel

19   asked troubling questions during examination of witnesses regarding Honda's status as a Japanese

20   company and followed up with a closing argument that evoked Pearl Harbor and inspired

21   xenophobia. *Id.* at 581-82. Despite the fact that counsel objected to both the questioning and the

22   closing argument, the trial "court did not strike the remarks or issue a curative instruction to the

23   jury." *Id.* at 582. Unlike *LeBlanc*, here, the only objection was to closing argument and a prompt

24   curative instruction was given to the jury.

25          In sum, the Court finds that Apple counsel's comments do not warrant a mistrial.

26   Nonetheless, the Court finds this situation troubling. Next month, these parties and these counsel

27   are set to go to trial for a third time. Counsel are encouraged to be mindful of the important role

28

Case No.: 11-CV-01846-LHK
ORDER DENYING POST-TRIAL MOTIONS

Exhibit K
-63-

1    that lawyers play in the actual and perceived fairness of our legal system as they prepare for and

2    litigate the next round of this patent dispute.

3    **V.     CONCLUSION**

4           For the foregoing reasons, the Court DENIES the parties' post-trial motions.

5

6    **IT IS SO ORDERED.**

7    Dated: February 7, 2014

8                                                                    LUCY H. KOH
                                                                    United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No.: 11-CV-01846-LHK
ORDER DENYING POST-TRIAL MOTIONS

Exhibit K
-64-