1              UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
2                  WESTERN DIVISION

3

4   PAVEMETRICS SYSTEMS, INC.,)
                      )
5                    )
          Plaintiff,  )
6                    )
         vs.        )   Case No.  2:21-CV-01289-MCS-MAA
7                    )
   TETRA TECH, INC.,     )   Los Angeles, CA
8                    )   October 24, 2022
         Defendant.  )
9   _____)

10

11

12

13                    HEARING

14      BEFORE THE HONORABLE MARC C. SCARSI
         UNITED STATES  DISTRICT JUDGE
15

16

17

18   APPEARANCES:            See Next Page

19   COURT REPORTER:      Recorded, Court Smart

20   COURTROOM DEPUTY:    Stephen Montes Kerr

21   TRANSCRIBER:          Dorothy Babykin
                     Courthouse Services
22                    1218 Valebrook Place
                    Glendora, California  91740
23                    (626) 963-0566

24

25   PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.
   TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

1    APPEARANCES:

2

3    FOR PLAINTIFF PAVEMETRICS SYSTEMS, INC.:

4

     KNOBBE MARTENS OLSON & BEAR LLP
5    BY:  CHRISTY I. LEA
           JOSEPH R. REA
6          ALAN G. LAQUER
           NICHOLAS M. ZOVKO
7          ATTORNEYS AT LAW
     2040 MAIN STREET
8    14TH FLOOR
     IRVINE, CALIFORNIA  92614
9

10   FOR DEFENDANT TETRA TECH, INC.:

11   FINNEGAN HENDERSON FARABOW GARRETT & DUNNER LLP
     BY:  JAMES R. BARNEY
12         NICHOLAS A. CERULLI
           ATTORNEYS AT LAW
13   901 NEW YORK AVENUE NW
     WASHINGTON, D.C.  20001
14
     CLARK HILL LLP
15   BY:  DONALD L. RIDGE
           ATTORNEY AT LAW
16   555 SOUTH FLOWER STREET
     24TH FLOOR
17   LOS ANGELES, CALIFORNIA  90017

18

19

20

21

22

23

24

25

1                              I N D E X

2     2:21-CV-01289-MCS-MAA                        OCTOBER 24, 2022

3     PROCEEDINGS:  MOTION FOR JUDGMENT AS A MATTER OF LAW ON THE
                    BASIS OF REGARDING INVALIDITY;
4                    MOTION FOR NEW TRIAL FILED BY DEFENDANT
                    AND COUNTERCLAIM PLAINTIFFS TETRA TECH TAS,
5                    INC. AND TETRA TECH, INC.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           LOS ANGELES, CALIFORNIA; OCTOBER 24, 2022

2           THE CLERK:  CV 21-01289, PAVEMETRICS SYSTEMS, INC. VERSUS

3    TETRA TECH, INC.

4           COUNSEL, STATE YOUR APPEARANCES, PLEASE.

5           MS. LEA:  GOOD MORNING.

6           THIS IS CHRISTY LEA FROM KNOBBE MARTENS ON BEHALF OF

7    PLAINTIFF PAVEMETRICS.

8           I HAVE WITH ME JOSEPH RE, ALAN LAQUER, AND NICK ZOVKO.

9           THE COURT:  GOOD MORNING.

10          MR. BARNEY:  JAMES BARNEY ON BEHALF OF TETRA TECH.

11          WITH ME IS NICK CERULLI AND DON RIDGE.

12          THE COURT:  GOOD MORNING.

13          GOOD MORNING.  I'VE GONE THROUGH THE PAPERS.  I THINK

14   I'VE GOT A GOOD SENSE OF THE ISSUES.

15          I -- JUST TO -- JUST TO PREVIEW WHERE THE COURT'S AT, I AM

16   STRUGGLING WITH FINDING ENOUGH EVIDENCE IN THE TRIAL TO JUSTIFY

17   THE INVALIDITY VERDICTS.

18          AND SO LET ME GIVE -- LET ME GIVE PAVEMETRICS AN

19   OPPORTUNITY TO -- TO THE EXTENT THERE'S -- THERE'S ANYTHING IN

20   ADDITION TO WHAT YOU FILED THAT YOU'D LIKE TO SAY ABOUT THE

21   INVALIDITY QUESTION.

22          MS. LEA:  GOOD MORNING, YOUR HONOR.

23          THE COURT:  GOOD MORNING.

24          MS. LEA:  SO, YOUR HONOR, WE DO BELIEVE THERE IS

25   SUFFICIENT EVIDENCE TO AFFIRM THE OBVIOUSNESS VERDICTS IN THIS

1    CASE WHEN YOU LOOK AT THE RECORD AS A WHOLE.

2           THIS TRIAL STARTED WITH THE INFRINGEMENT CASE FIRST.

3    TETRA TECH WENT FIRST.  WE HEARD ALL OF THE TESTIMONY ON THEIR

4    WITNESSES WHICH WOULD ALSO INCLUDE SOME OF THE PRIOR ART.

5           AND THEN WE HEARD THE TESTIMONY FROM PAVEMETRICS'

6    WITNESSES.

7           AND I THINK WHAT'S ALSO IMPORTANT TO RECOGNIZE WHO THE

8    POSITA IS.

9           AND THE OBVIOUSNESS CASE, AS YOU KNOW, IS VIEWED FROM

10   THE PERSON OF ORDINARY SKILL IN THE ART.

11          HERE THAT IS SOMEONE WITH AN ENGINEERING DEGREE AND

12   AT LEAST TWO YEARS' EXPERIENCE IN COMPUTER VISION INCLUDING AN

13   UNDERSTANDING OF ALGORITHMS USED FOR IMAGE PROCESSING WHO IS

14   AWARE OF ALL OF THE PRIOR ART.

15           AND IN THIS CASE THAT'S THE UML-TRB 2014 ARTICLE.  THAT

16   ARTICLE DISCLOSED IDENTIFYING FEATURES FROM A 3-D DEPTH MAP.  SO,

17   NOW I'M FOCUSED ON THE  '293 PATENT.

18          AND IDENTIFYING FEATURES FROM A TRACK ELEVATION MAP,

19   THE FIRST PART OF LIMITATION C.

20          SO, WE HAVE IDENTIFYING FEATURES FROM A 3-D DEPTH MAP

21   DISCLOSED RIGHT IN THE ARTICLE.

22          WE HAVE THREE DIFFERENT IMAGES DISCLOSED IN THE ARTICLE

23   -- A RANGE IMAGE, AN INTENSITY IMAGE, AND THE MERGED 3-D IMAGE

24   THAT THEY CONTEND IS A 3-D MAP.  AND THE JURY HEARD EVIDENCE WAS

25   A 3-D MAP.  AND WE HAD THAT THE ARTICLE DISCLOSED IDENTIFYING

1    FEATURES FROM A RANGE IMAGE.

2           THE JURY WAS -- WE DID ARGUE BEFORE THE JURY THAT IT

3    WOULD BE OBVIOUS TO TRY TO IDENTIFY FEATURES FROM ANY OF THOSE

4    THREE IMAGES.  DR. HEBERT TESTIFIED THAT THEY IDENTIFIED FEATURES

5    FROM BOTH IMAGES, RANGE AND INTENSITY.

6           AND, OF COURSE, IT WOULD BE OBVIOUS TO TRY ANY OF THEM.

7           WE ALSO HAVE THE UML SELL AND SUPPORT.  SO, THIS IS THE

8    PRIOR USE AND PRIOR SALE OF THE SYSTEM FOR RAIL TO UML AND THE

9    DEVELOPMENT OF ALGORITHMS OVER A TWO-YEAR PERIOD SUBJECT TO

10   THAT COMMERCIAL AGREEMENT BETWEEN THEM.

11          AND, AGAIN, WE HAVE THE SAME THREE IMAGES.  WE HAVE

12   ALGORITHMS CREATED TO IDENTIFY FEATURES FROM THE RANGE IMAGE.

13   AND, OF COURSE, IT WOULD HAVE BEEN OBVIOUS TO TRY THE OTHER

14   TWO IMAGES AS WELL.

15          NOW --

16          THE COURT:  LET ME  -- CAN WE GET A LITTLE BIT MORE

17   SPECIFIC.

18          LET'S LOOK AT A COUPLE OF THE STEPS -- THE IDENTIFYING

19   STEP AND THE STORING STEP.

20          IN THE BRIEFING THERE WAS A LOT OF DISCUSSION OVER

21   WHETHER OR NOT THERE WAS ANY EVIDENCE AT ALL THAT THOSE STEPS

22   WERE FOUND IN THE PRIOR ART.

23          AND EVEN DR. FRAKES TESTIFIED GENERALLY THAT HE

24   BELIEVED THE PATENTS WERE INVALID BASED UPON HIS ANALYSIS.

25          BUT WHAT WERE THE SPECIFICS ON THE IDENTIFYING STEP AND

1       THE STORING STEP?

2               MS. LEA:  OKAY.

3               SO, ON THE IDENTIFYING STEPS  -- SO IT'S IDENTIFYING A

4       FEATURE FROM A 3-D MAP USING A GRADIENT NEIGHBORHOOD.

5               THE COURT:  UH-HUH.

6               MS. LEA:  SO WE NEED TO FIND A GRADIENT NEIGHBORHOOD

7       AND WE NEED TO MOVE IT LIKE A SLIDING WINDOW.

8               AND, SO, WE HAVE DR. MESHER, THE INVENTOR, ADMITTING

9       THAT THAT ENTIRE GRADIENT NEIGHBORHOOD STEP IS A FAIRLY

10      STANDARD TECHNIQUE IN COMPUTER VISION.

11              WE HAVE DR. FRAKES TELLING  -- TESTIFYING THAT THAT

12      TECHNIQUE HAS BEEN USED IN COMPUTER VISION SINCE THE 1960S.

13              WE HAVE DR. HEBERT TESTIFYING THAT THAT TECHNIQUE WAS

14      THE FIRST THING HE LEARNED IN COMPUTER VISION.

15              SO, IT IS AN OLD TECHNIQUE.  C IS AN OLD TECHNIQUE.

16              AND THEN WE HAVE THE ACTUALLY DISCLOSED IN THE PAPER.

17      THE UML-TRB2014 ARTICLE DISCLOSES THE SOBEL FILTER AND THE

18      CANNY METHOD.

19              WE HAVE DR. HEBERT AND DR. AND MR. LAURENT TESTIFYING

20      THAT BOTH OF THOSE FILTERS ARE GRADIENT NEIGHBORHOODS THAT

21      CALCULATE DIFFERENTIAL VERTICAL MEASUREMENTS.

22              SO, WE HAVE MULTIPLE WITNESSES' TESTIMONY AND WE HAVE

23      THE ARTICLE.  WE HAVE MEETING MINUTES LAYING OUT THE ALGORITHM

24      WITH THE SOBEL AND THE CANNY AND APPLYING THAT TO THE -- TO AN

25      IMAGE TO IDENTIFY FEATURES.  AND WE HAVE ALL THREE IMAGES

1    INCLUDING THE MERGED 3D IMAGE IN THOSE PAPERS.

2              THAT IS A ROCK SOLID OBVIOUSNESS CASE.

3              THE COURT:  AND THE STORING LIMITATION AS WELL?

4              MS. LEA:  YES.

5              SO, ON THE STORING LIMITATION, FIRST OF ALL, WE HAVE

6    DR. MORELLAS, THEIR EXPERT, ADMITTING THAT ALL OF THE HARDWARE

7    IS IN THE PRIOR ART.  AND THAT INCLUDES THE DATA STORAGE

8    APPARATUS.  NOTHING NEW ABOUT STORING.

9              THEN WE HAVE THE UML SALE AND SUPPORT.  AND WITH THAT

10   SALE WE PROVIDED A MANUAL THAT DESCRIBED SAVING THE DETECTED

11   RESULTS AS ANY COMMON SENSE WOULD TELL YOU WOULD HAPPEN.

12   AND THAT IS IN EXHIBIT 527, PAGES 31 AND 33.  WE CITED THAT IN OUR --

13   IN OUR BRIEF.

14             I DO WANT TO MENTION THERE IS A TYPO ON OUR BRIEF WITH

15   RESPECT TO THAT MANUAL.  IT WAS IN TESTIMONY ON PAGE 36. THIS

16   WOULD BE MR. LAURENT, LINES 9 TO 24.  AND THAT IS WHERE HE DID

17   DESCRIBE PROVIDING THE 2012 MANUAL TO UML.  AND HE REFERRED TO

18   PAGE 28 WHERE IT SHOWS THOSE SAVED IMAGES.

19             AND THEN IF YOU  --

20             THE COURT:  CAN YOU  -- CAN YOU – I'M SORRY.  CAN YOU POINT

21   ME SPECIFICALLY TO WHERE THE TYPO IS.  I JUST WANT TO MAKE A

22   CORRECTION ON MY COPY.

23             MS. LEA:  YES. THE TYPO IS ON PAGE 4 OF OUR OPPOSITION AT

24   THE VERY FIRST LINE.  IT SHOULD BE EXHIBIT 4, 36.

25             THE COURT:  EXHIBIT 4, 36?

1          MS. LEA:  YES.  IT SAYS 35.

2          THE COURT:  GOTCHA.  OKAY.  THANK YOU.

3          MS. LEA:  OKAY.

4          SO, WE PROVIDED A 2012 MANUAL THAT'S TITLED "ACQUISITION

5    AND SOFTWARE MANUAL."  AND ON PAGE 28 IT SHOWS THE SAVED

6    IMAGES.  AND A FEW PAGES LATER IT TALKS ABOUT SAVING THE

7    DETECTED RESULTS.  AS ONE OF ORDINARY SKILL WOULD USE COMMON

8    SENSE AND KNOW THAT, OF COURSE, YOU'RE SAVING THE RESULTS.

9          THEY NEVER ARGUED THAT THIS WASN'T THERE.  BECAUSE, OF

10   COURSE, IT IS THERE.

11         THEIR OWN EXPERT SAID – EXPLAIN THAT ANY SYSTEM

12   IDENTIFYING FEATURES AND HAVING RESULTING IMAGES FROM THAT

13   IDENTIFICATION MUST HAVE STORED THEM.

14         SO, THE JURY HEARD THAT TESTIMONY.  AND THEN THEY SEE

15   THAT WE HAVE THE SAME EXACT XNL FILES THAT HE TALKED ABOUT MUST

16   HAVE BEEN STORED.  THOSE XNL FILES EXISTED IN THE PRIOR ART.

17   THEY'RE IN THE MANUAL.  THEY'RE IN THE PAPER.  THEY'RE IN THE

18   MEETING MINUTES.   AND WE HAD TESTIMONY ON THOSE X AMOUNT

19   OUTPUT FILES.  AND THEN OF COURSE WE HAD THE MANUAL ITSELF

20   WHICH SAYS THEY WERE SAVED.

21         THE COURT:  OKAY.  THANK YOU.

22         LET ME GET A RESPONSE FROM TETRA TECH ON JUST THESE

23   TWO LIMITATIONS, THE IDENTIFYING AND STORING LIMITATION.

24         MR. CERULLI:  THANK YOU, YOUR HONOR.

25         NICK CERULLI ON BEHALF OF TETRA TECH.

1          SO, THERE'S NO DISPUTE THAT THEIR EXPERT FAILED TO

2     PROVIDE AN ANALYSIS FOR THESE LIMITATIONS.

3          AND, SO, WHAT WE'RE LEFT WITH IS THE RECORD.

4          AND I'LL JUST RESPOND TO WHAT MS. LEA HAD ADDRESSED.

5          WITH RESPECT TO THE IDENTIFYING LIMITATION, IT REQUIRES

6     IDENTIFYING FROM AN ELEVATION MAP, WHICH YOUR HONOR CONSTRUED

7     TO BE ESSENTIALLY A COMBINATION OF BOTH INTENSITY AND ELEVATION.

8          NOW, THE REFERENCES THEMSELVES, THE UML-TRB ARTICLE

9     REFERRED TO IDENTIFYING FROM AN ELEVATION-ONLY IMAGE.  IT HAS NO

10    DISCLOSURE OF A COMBINED ELEVATION AND INTENSITY MAP BEING

11    USED AS THE -- FOR THE IDENTIFYING STEP.

12         NOW, THEY'VE ARGUED IN THEIR BRIEFING THAT IT WOULD HAVE

13    BEEN OBVIOUS TO TRY.  BUT THAT WAS NEVER PRESENTED TO THE JURY.

14    THE JURY  -- THERE WAS NO EXPERT EXPLAINING THAT, YOU KNOW, IT

15    WOULD HAVE BEEN OBVIOUS TO TRY TO APPLY THIS IDENTIFICATION

16    ALGORITHM TO A COMBINED ELEVATION INTENSITY MAP.  THAT'S WHERE

17    YOU NEED EXPERT TESTIMONY.  AND THEY FAILED TO PROVIDE ANY.

18         NOW, WITH RESPECT TO THE STORING LIMITATION, THEY

19    MENTION THIS MANUAL THAT TALKED ABOUT SAVING DETECTION

20    RESULTS.

21         WELL, THE CLAIM REQUIRES STORING IN A DATABASE.  THEY

22    DIDN'T MENTION WHERE THE DATABASE IS.  YOU KNOW, AND, AGAIN, I GO

23    BACK TO THE FRESNIUS AND KOITO CASES -- THE FEDERAL CIRCUIT

24    CASES THAT REQUIRE YOU TO CLEARLY EXPLAIN AND IDENTIFY FOR THE

25    JURY WHERE IT IS IN THE REFERENCE.

1          NOW, I THINK IT'S THE <u>KOITO</u> CASE IN PARTICULAR WHERE THE

2     COURT FOUND THE LIMITATION MAY BE FOUND IN THE DOCUMENT ITSELF.

3     BUT THAT ARGUMENT WAS NEVER MADE.  AND IT WAS NEVER POINTED

4     OUT TO THE JURY.

5          AND, SO, THEIR POST-HOC ANALYSIS THAT IS NOT IN FRONT OF

6     THE JURY IS NOT ENOUGH TO OVERCOME THAT.  THEY  -- THEY NEEDED

7     TO POINT OUT TO THE JURY WHERE IT WAS.

8          AND TO THE EXTENT THEY'RE MAKING, YOU KNOW, ARGUMENTS

9     THAT IT WOULD HAVE BEEN INHERENT OR OBVIOUS JUST BECAUSE

10    THEY'RE SAVING RESULTS, AGAIN, THAT'S  -- THAT'S EXPERT TESTIMONY.

11         AND IT WOULD HAVE BEEN ONE THING IF DR. FRAKES HAD

12    TESTIFIED TO THAT, BUT HE DID NOT.  AND FOR THOSE REASONS THEY –

13    THEY FAILED TO MAKE A SHOWING FOR THOSE TWO STEPS.

14         THE COURT:  OKAY.  THANK YOU, COUNSEL.

15         SO, I WANT TO MOVE ON TO THE NEW TRIAL MOTION.

16         AND LET ME START WITH TETRA TECH.  I'VE GOT A QUESTION

17    FOR COUNSEL.

18         SO, THE COURT DEALT WITH OBJECTIONS THAT TETRA TECH

19    MADE AND WITH OBJECTIONS THE COURT HAD TO SOME OF THE

20    ARGUMENTS THAT WERE MADE BY PAVEMETRICS.

21         AND I TRIED TO GIVE SOME CURATIVE -- CURATIVE

22    INSTRUCTIONS.

23         LET ME JUST ASK COUNSEL FIRST.  WHY WEREN'T THE

24    CURATIVE INSTRUCTIONS ENOUGH?

25         MR. BARNEY:  YOUR HONOR, AS THE NINTH CIRCUIT HAS

1    RECOGNIZED, FOR INSTANCE, IN THE ANHEUSER-BUSCH CASE,

2    SOMETIMES THE MISCONDUCT IS SO PERVASIVE THROUGHOUT THE

3    ENTIRE TRIALTHAT EVEN CURATIVE INSTRUCTIONS ARE NOT ENOUGH TO

4    ESSENTIALLY CURE THE MISCONDUCT.

5         AND I THINK THAT'S THE SITUATION WE HAVE HERE.

6         AS PART OF THE TOTALITY OF THE CIRCUMSTANCES TEST THAT

7    YOUR HONOR MUST APPLY TO DETERMINE WHETHER A NEW TRIAL IS

8    JUSTIFIED, ONE OF THE THINGS TO LOOK AT IS THE NATURE OF THE

9    COMMENTS, THE FREQUENCY OF THE COMMENTS.

10        AND HERE PART OF THE PROBLEM IS AS WE EXPLAINED IN OUR

11   BRIEFING, IT'S NOT JUST ONE PARTICULAR COMMENT THAT WAS SO

12   EGREGIOUS A NEW TRIAL WAS NECESSARY, IT WAS THE REPEATED

13   ATTEMPT BY PAVEMETRICS' COUNSEL TO BRING IN IRRELEVANT AND

14   INFLAMMATORY ISSUES THAT HAD ABSOLUTELY NO RELEVANCE TO THIS

15   CASE AND HAD NO PURPOSE OTHER THAN TO APPEAL TO THE JURY'S

16   PREJUDICES AND PASSIONS.

17        AND YOU'RE CORRECT, YOUR HONOR, THAT YOUR HONOR DID

18   INTERVENE ON A NUMBER OF OCCASIONS.  WE OBJECTED ON A NUMBER

19   OF OCCASIONS.  AND YOU PROVIDED CURATIVE INSTRUCTIONS.

20        BUT AT SOME POINT IT'S DIFFICULT AND ALMOST IMPOSSIBLE TO

21   UNRING A BELL.

22        AND, SO, AS AN EXAMPLE, DURING CLOSING ARGUMENT WHEN

23   THE JURY HEARD THIS VERY IMPASSIONED ARGUMENT FROM

24   PAVEMETRICS' COUNSEL THAT THE REASON THAT TETRA TECH IS HERE

25   WAS TO BE ABLE TO SUBPOENA PAVEMETRICS' CUSTOMERS IN ORDER TO

1    ESSENTIALLY GATHER OR SPY ON PAVEMETRICS' TECHNOLOGY.

2           YOUR HONOR INTERVENED.  THERE WAS A CURATIVE

3    INSTRUCTION.  BUT ONCE THE JURY HEARD THAT, I DON'T KNOW WHAT --

4    WHAT CURATIVE INSTRUCTION COULD ESSENTIALLY GET THAT THOUGHT

5    OUT OF THE JURY'S MIND.

6           THE COURT:  AND LET ME ASK YOU THIS.  AND I KNOW THIS

7    WASN'T ARGUED IN THE BRIEFING.  AND SO  -- BUT I'VE BEEN  -- BUT I'VE

8    BEEN KIND OF WONDERING ABOUT THIS.  AND I WONDER WHETHER YOU

9    HAVE  -- WHETHER YOU HAVE A THOUGHT ON IT.  AND I'LL ASK COUNSEL

10    FOR PAVEMETRICS THE SAME THING.

11           SO, I  -- I INTERJECTED MYSELF IN THE TRIAL SEVERAL TIMES TO

12    GIVE CURATIVE INSTRUCTIONS TO THE JURY.  AND I WONDER IN A TRIAL IF

13    -- IF A JUDGE IS -- I MEAN, I REALLY SHOULD BE, YOU KNOW, PRETTY QUIET

14    UP HERE, RIGHT  -- JUST LETTING YOU ALL GO  -- GO BACK AND FORTH

15    AND REALLY KIND OF FADE INTO THE BACKGROUND SO THE JURY CAN

16    ABSORB EVERYTHING FROM COUNSEL.

17           BUT IF A JUDGE IN A TRIAL, YOU KNOW, GIVES TOO MANY

18    CURATIVE INSTRUCTIONS OR – OR IS SEEN AS SORT OF PREVENTING THE

19    PARTIES FROM DOING SOMETHING, TAKES A MORE ACTIVE ROLE, DOES

20    THAT HAVE THE POTENTIAL NECESSARILY OR DOES THAT HAVE THE

21    POTENTIAL IN A TRIAL FOR  -- FOR THAT EVEN TO BE A BASIS FOR A NEW

22    TRIAL?

23           IN OTHER WORDS, LET'S SAY THERE WERE JURORS THAT, YOU

24    KNOW, THOUGHT, YOU KNOW, BOY, I JUST DON'T LIKE THIS JUDGE, AND

25    THEY SEE THE JUDGE AS ADMONISHING ONE SIDE, WOULD THAT HAVE

1    THE POTENTIAL TO MAYBE -- TO MAYBE INFLUENCE THE JURY IN AN

2    IMPROPER WAY?

3           MR. BARNEY: YOUR HONOR, I WILL FALL BACK ON THE AGE-OLD

4    ANSWER OF ANYTHING IS POSSIBLE.

5           I'M NOT AWARE OF ANY CASE LAW THAT SPECIFICALLY GETS TO

6    THAT POINT.  BUT I THINK THERE'S A VERY CLOSELY RELATED POINT THAT

7    YOUR HONOR'S QUESTION IS -- DOES GET TO.  AND THAT IS THE NEED --

8           SO, YOUR HONOR DID INTERVENE ON A NUMBER OF OCCASIONS.

9    BUT THAT'S ANALOGOUS TO ACTIVITIES OR MISCONDUCT BY ONE PARTY

10   THAT REQUIRES THE COUNTER PARTY TO CONSTANTLY OBJECT.

11          AND AS THE COURTS HAVE RECOGNIZED, THE VERY NEED TO

12   CONSTANTLY OBJECT IS ITSELF PREJUDICIAL BECAUSE THE JURY WILL

13   PERCEIVE THAT AS WHAT THE OBJECTING PARTY BEING ESSENTIALLY

14   AFRAID OF THE EVIDENCE OR HAVING SOMETHING TO HIDE -- WHICH WAS

15   VERY MUCH THE THEME OF THEIR CASE -- THAT WE HAD SOMETHING TO

16   HIDE, THAT DR. MORELLAS, YOU KNOW, DIDN'T -- DIDN'T REVIEW THE

17   CODE, MEANING HE HAS SOMETHING TO HIDE.

18          AND, SO, I THINK YOUR HONOR'S QUESTION IS A GOOD ONE.  I

19   THINK IT KIND OF GETS TO THAT POINT -- WHICH IS THE NEED TO

20   INTERVENE, THE NEED TO OBJECT DRIVEN BY IMPROPER CONDUCT IS

21   ITSELF PREJUDICIAL.

22          THE COURT:  OKAY.  LET ME ASK YOU THIS.

23          IF THE COURT WERE INCLINED TO, YOU KNOW, GRANT A NEW

24   TRIAL, WOULDN'T IT BE FAIR TO GRANT A NEW TRIAL ON ALL ISSUES?

25          IN OTHER WORDS, WHY -- WHY WOULD IT BE FAIR FOR THE

1      COURT TO GIVE A DIRECTED VERDICT ON THE INVALIDITY ISSUE BUT

2      REQUIRE A RETRIAL FOR EVERYTHING ELSE?

3              MR. BARNEY: YOUR HONOR, WE THINK THE INVALIDITY -- MOST

4      OF THE CONDUCT THAT WE ARE POINTING TO HAD TO DO WITH  -- I

5      WOULDN'T SAY MOST OF IT -- A LOT OF IT HAD TO DO WITH THE

6      INFRINGEMENT ISSUE.

7              WE THINK THAT THEY HAD AN OPPORTUNITY TO PRESENT THEIR

8      CASE ON INVALIDITY AND SIMPLY DIDN'T MAKE OUT A CASE OF INVALIDITY

9      THAT THE JURY COULD  -- COULD  -- COULD FIND AMOUNTS TO CLEAR AND

10     CONVINCING EVIDENCE.

11             IF YOUR HONOR IS INCLINED TO GRANT A NEW TRIAL AND FEELS

12     THAT IT'S NECESSARY TO -- YOU KNOW, TO HAVE A NEW TRIAL ON BOTH

13     ISSUES, WE WOULD  -- WE WOULD NOT BE OPPOSED TO THAT.  BUT WE

14     THINK FOR THE REASONS THAT WE'VE EXPLAINED IN OUR BRIEF, THEY DID

15     HAVE THEIR OPPORTUNITY TO PROVE INVALIDITY AND SIMPLY FAILED TO

16     CARRY THAT BURDEN.

17             THE COURT:  THANK YOU, COUNSEL.

18             LET ME GET A RESPONSE FROM PAVEMETRICS ON THESE  -- ON

19     THESE TWO  -- TWO ISSUES.

20             THE FIRST ISSUE BEING, YOU KNOW, IS THE  -- IS THE

21     FREQUENCY OF THE OBJECTIONS, IS THAT  -- WAS THAT PREJUDICIAL TO

22     TETRA TECH?

23             WAS THE COURT'S ADMONITIONS TO COUNSEL FOR

24     PAVEMETRICS, WAS THAT PREJUDICIAL -- COULD – COULD THAT

25     POTENTIALLY BE PREJUDICIAL TO TETRA TECH BECAUSE IT SHOWS -- IT

1   MAY SHOW THE COURT FOCUSING ON ONE – ONE PARTY AND NOT THE

2   OTHER.

3         AND FINALLY THIS POINT ABOUT IF THERE WAS A NEW TRIAL

4   SHOULD IT BE ON ALL ISSUES.

5         MS. LEA:  OKAY, YOUR HONOR.  SO, I WILL ADDRESS BOTH

6   THOSE FIRST ONES TOGETHER.

7         IT WAS  -- IT WAS PREJUDICIAL AGAINST MY CLIENT

8   PAVEMETRICS.  THIS COURT GAVE TETRA TECH EVERY OPPORTUNITY IN

9   THIS TRIAL.  YOU SUSTAINED ALL OF THEIR OBJECTIONS.  YOU GAVE THEM

10  ANY CURATIVE INSTRUCTION THAT THEY ASKED FOR.  MANY TIMES THEY

11  DID NOT ASK FOR A CURATIVE INSTRUCTION.  AND YOU OFFERED A

12  CURATIVE INSTRUCTION.

13        WE DID NOT REPEAT ANY -- ANY STATEMENTS THAT HE'S

14  ALLEGING.  HE'S POINTING TO VERY ISOLATED DIFFERENT STATEMENTS

15  AND CALLING IT REPETITIVE.  THEY WERE NEVER REPEATING ANY ISSUE

16  OVER AND OVER AGAIN THAT YOUR HONOR HAD ORDERED US NOT TO.

17        BUT, YOU KNOW, YOUR HONOR, NONE OF THAT MATTERS HERE

18  BECAUSE THEY CANNOT SHOW A MISCARRIAGE OF JUSTICE HERE.  NONE

19  OF THE THINGS THEY ARE POINTING TO AFFECTED THE OUTCOME HERE.

20  AND THE REASON IS BECAUSE IF THE VERDICT HAD GONE IN THEIR

21  FAVOR, WE WOULD BE ENTITLED TO JML OF NO INFRINGEMENT.

22        IT DOES MATTER THAT THEIR EXPERT NEVER LOOKED AT OUR

23  NEURAL NETWORK.  THEIR EXPERT NEVER LOOKED AT THE ACCUSED

24  PRODUCT.  HE NEVER LOOKED AT OUR NEURAL NETWORK.  HE CANNOT

25  SHOW INFRINGEMENT BASED UPON IT.  AND ONE OF THOSE REASONS IS

1    BECAUSE THE PORTION OF THE NEURAL NETWORK THAT HE ACCUSES OF

2    DEFINING A GRADIENT NEIGHBORHOOD IN STEP C IS THE TRAINING OF

3    THE NEURAL NETWORK THAT OCCURS ON AN ENTIRELY DIFFERENT

4    SYSTEM, DIFFERENT HARDWARE, DIFFERENT SOFTWARE IN CANADA.  AND

5    THAT IS TESTIMONY FROM DR. HEBERT AND CONFIRMED BY THEIR OWN

6    EXPERT DR. MORELLAS ON REDIRECT.  SO, THAT VERDICT WOULD HAVE

7    COME BACK.  THERE'S NO REASON TO SEND IT BACK TO A NEW TRIAL

8    WHEN THEY CANNOT SUSTAIN THEIR VERDICT ON THE EVIDENCE.

9          THE SECOND REASON IS BECAUSE THEIR ONLY ACTS OF

10   INFRINGEMENT WERE OFFER TO SELL AND SELL.  AND THESE CLAIMS

11   REQUIRE A CONNECTED SYSTEM.  THEY REQUIRE A SENSOR AND

12   COMMUNICATION WITH THE PROCESSOR THAT WAS NEVER OFFERED FOR

13   SALE.  THAT WAS NEVER SOLD.

14         PAVEMETRICS SELLS UNCONNECTED COMPONENTS IN

15   MULTIPLE BOXES.  THE CSX SALE THAT DIDN'T EVEN HAVE A PROCESSOR

16   WITH SOFTWARE ON IT.  THESE CLAIMS REQUIRE A PROCESSOR

17   CONFIGURED TO RUN AN ALGORITHM WITH SPECIFIC STEPS.

18         NONE OF THOSE STEPS ARE MENTIONED IN THAT QUOTE --

19   WHAT THEY CALL AN OFFER.  NONE OF THEM ARE MENTIONED IN THE

20   CONTRACT WHICH THEY CALL A SALE.

21         SO --

22         THE COURT:  SO, LET ME JUST MOVE YOU FORWARD A LITTLE

23   BIT ON THAT.

24         SO, I GET THE ARGUMENTS YOU'RE MAKING AND THEY'RE GOOD

25   NONINFRINGEMENT ARGUMENTS.

1    AND I'M WONDERING WHY IN CLOSING THERE WAS A

2    DISCUSSION OF SUBPOENAS TO PAVEMETRICS' CUSTOMERS.  IT SEEMED

3    LIKE, ONE, IT WAS NOT EVIDENCE IN THE RECORD AT ALL.  BECAUSE IT

4    WASN'T ANYTHING THAT WAS ADMITTED DURING THE TRIAL.  TWO, IT

5    SEEMED TO MOVE AWAY FROM THE INFRINGEMENT ISSUE.

6    I MEAN, AS YOU ALL THOUGHT, I'VE GOT SOME FAMILIARITY WITH

7    PATENT CASES.  YOU KNOW, BEEN INVOLVED IN LOTS OF THEM.  TRIED

8    LOTS OF THEM.

9    YOU KNOW, THE ISSUE IS TYPICALLY IS THERE INFRINGEMENT.

10   IS THERE NOT INFRINGEMENT.  IS THERE  -- YOU KNOW, HAS SOMEBODY

11   PROVEN OBVIOUSNESS.  HAVE THEY NOT  -- HAVE THEY NOT PROVEN

12   OBVIOUSNESS.

13   YOU KNOW, DAMAGES.  YOU KNOW, WE LOOK AT COMPARABLE

14   LICENSES AND THOSE THINGS.  BUT THEY'RE FAIRLY  -- THEY'RE FAIRLY

15   DIRECTED TO THE ISSUES AT HAND.

16   AND I DON'T  -- FOR THE LIFE OF ME I'VE BEEN TRYING  -- I'VE

17   BEEN LOOKING AT THIS  -- TRYING TO FIGURE OUT WHAT POSSIBLY THE

18   ISSUE OF SUBPOENAS TO PAVEMETRICS CUSTOMERS COULD HAVE BEEN

19   RELEVANT TO AND WHY IT WAS DISCUSSED IN CLOSING ARGUMENT

20   WHEN, ONE, IT DOESN'T SEEM TO BE RELEVANT TO ANY ISSUES; TWO,

21   THERE WAS NO EVIDENCE IN THE TRIAL.  AND, SO, IT WAS TAKING THINGS,

22   YOU KNOW, TELLING THE JURY ABOUT THINGS THAT THEY WEREN'T

23   AWARE OF.  AND, THREE, IT'S DISPARAGING, RIGHT.  IF IT'S IMPROPER,

24   THAT'S SOMETHING TO DEAL WITH DURING THE PRETRIAL PHASE.

25   SO, GIVE ME  -- GIVE ME SOME  -- GIVE ME SOMETHING TO GRAB

1    ON TO HERE.

2          MS. LEA:  OKAY.

3          SO, WELL FIRST OF ALL, THE SUBPOENA WAS IN EVIDENCE,

4    RIGHT.  SO. DR. – MR. HAFIZ TESTIFIED THAT HE WAS SUBPOENAED.  THEY

5    BROUGHT UP THE SUBPOENAS WITH TWO DIFFERENT WITNESSES ON

6    CROSS-EXAMINATION.  AND THEY ALSO BROUGHT UP THE SUBPOENA IN

7    THEIR OWN CLOSING ARGUMENT.

8          SO, I SIMPLY RESPONDED TO IT.  OKAY.  AND I MENTIONED THAT,

9    YES, THEY DID SUBPOENA OUR CUSTOMERS.  THE JURY ALWAYS WANTS

10   TO KNOW WHY ARE WE HERE.  WHY ARE WE HERE.  WHY ARE THEY SUING

11   US ON -- WHY ARE THEY LOOKING FOR A VERDICT HERE ON THESE TEST

12   IMAGES.  YOU KNOW, WHY ARE WE HERE OVER SUCH A SMALL AMOUNT

13   OF MONEY.

14         AND, OF COURSE, THE FACT THAT THEY'RE SEEKING THIS

15   INFORMATION ALWAYS POTENTIALLY RELEVANT TO A DAMAGES ANALYSIS

16   AND JUST RELEVANT TO WHY ARE WE HERE.

17         THE COURT:  THANK YOU.

18         AND, THEN, JUST  -- IF YOU CAN ANSWER MY LAST QUESTION

19   EARLIER.

20         WOULD IT BE FUNDAMENTALLY UNFAIR TO PAVEMETRICS TO -- IF

21   THE COURT WAS INCLINED TO ISSUE A DIRECTED VERDICT ON THE

22   INVALIDITY ISSUE BUT REQUIRE A NEW TRIAL ON EVERYTHING ELSE.  OR

23   SHOULD THE COURT TRY EVERYTHING.

24         MS. LEA:  IF THERE WERE GOING TO BE A NEW TRIAL THERE

25   CERTAINLY SHOULD BE A NEW TRIAL ON EVERYTHING.

1    NOW, IF THE DIRECTED VERDICT IS DENIED, THERE SHOULD NOT

2    BE A NEW TRIAL ON INVALIDITY.  THAT VERDICT SHOULD STAND.

3    AND I DIDN'T GET TO RESPOND TO HIM ON THE INVALIDITY JML.

4    AND I WOULD LIKE TO DO SO, YOUR HONOR.

5    THE COURT:  I THINK I'VE GOT ENOUGH ON THAT.  WE'VE

6    ACTUALLY  -- WE'VE BEEN THROUGH THAT.  SO, THANK YOU FOR THAT.

7    LET ME JUST ASK COUNSEL FOR TETRA TECH TO RESPOND TO

8    THIS POINT.

9    AND I'M  -- I'M SORRY.  I APOLOGIZE TO COUNSEL FOR

10    PAVEMETRICS IF I  -- I DIDN'T RECALL TESTIMONY ABOUT THE SUBPOENAS

11    THAT WERE DISCUSSED IN CLOSING DURING THE TRIAL.  AND, SO, I COULD

12    -- I COULD BE WRONG ON THAT.

13    BUT IS THERE  -- MR. BARNEY, CAN YOU JUST RESPOND TO

14    THOSE POINTS.

15    MR. BARNEY:  I DON'T RECALL ANYTHING ABOUT THE SUBPOENA

16    EITHER.  I MEAN, I'LL GO BACK AND DO A WORD SEARCH, AND MAYBE THE

17    WORD  "SUBPOENA" IS IN THERE.  I'M NOT QUESTIONING THAT IT'S IN

18    THERE.

19    BUT THE WORD "SUBPOENA" CAME UP MERELY TANGENTIALLY,

20    YOU KNOW, IN A VIDEO CLIP WITH A GUY SAYING I RESPONDED TO A

21    SUBPOENA.

22    THE WAY THAT WAS USED IN HER CLOSING WAS COMPLETELY

23    DIFFERENT AND COMPLETELY INAPPROPRIATE.  SHE WASN'T SAYING, OH,

24    THERE WAS THESE SUBPOENAS.  SHE WAS SAYING WHY ARE WE HERE.

25    WE'RE HERE BECAUSE THEY WANTED TO GET INFORMATION

1    ABOUT OUR COMPANY.  AND THEY DID SO BY SUBPOENAING OUR

2    CUSTOMERS.  AND THEY SAID THAT WAS DISHONORABLE.

3             AND, SO, THE IMPRESSION THAT SHE WAS TRYING TO LEAVE

4    WITH THE JURY REALLY GOES BEYOND -- WAY BEYOND THE PALE.

5    BECAUSE NOT ONLY ARE THEY SAYING THAT THE MERE ACT OF ISSUING

6    SUBPOENAS IS SOMEHOW IMPROPER  -- WHICH WE ALL KNOW IN THIS

7    COURTROOM IS NOT.  THAT'S HOW YOU GATHER EVIDENCE ESPECIALLY

8    WHEN THERE'S AN ACCUSATION OF INDIRECT INFRINGEMENT, HOW ELSE

9    ARE YOU GOING TO GET THE INFORMATION.

10            SO, WE KNOW THAT THAT IS FAR AFIELD OF WHAT  -- OF WHAT

11   THE LAW IS.

12            BUT MOREOVER, THE IMPLICATION GOES EVEN DEEPER THAN

13   THAT.  BECAUSE IF YOU READ THE FULL  -- THE FULL SORT OF

14   TRANSCRIPT OF WHAT SHE WAS GETTING AT THERE WAS THAT WE WERE

15   USING THESE SUBPOENAS AND WE WERE GATHERING INFORMATION

16   ABOUT PAVEMETRICS THROUGH THE SUBPOENA PROCESS.  THE

17   IMPLICATION BEING THAT THERE WAS A VIOLATION OF THE PROTECTIVE

18   ORDER AND THAT COUNSEL WAS SOMEHOW FEEDING PAVEMETRICS

19   CONFIDENTIAL INFORMATION TO TETRA TECH.

20            SO, IT WAS EVEN MORE SINISTER THAN JUST THE FACT THAT

21   SHE MENTIONED THE SUBPOENAS WAY BEYOND ANYTHING THAT GOT

22   MENTIONED IN THE TRIAL.  THERE WAS NO SORT OF EVIDENCE OF THAT.

23   AND WE JUST THINK IT WAS BEYOND THE PALE.

24            THE COURT:  OKAY.

25            I'M GOING TO ASK -- WELL, LET ME ASK PAVEMETRICS FIRST.

1

2                 ONE OF THE OTHER POINTS THAT YOU MADE IN CLOSING WAS

3       THAT THE ASSERTION OF THE PATENT RIGHTS HERE WOULD LEAD TO AN

4       INCREASE IN INFLATION BECAUSE IT MAKES EVERYTHING MORE

5       EXPENSIVE.

6                 AND I'M WONDERING WHETHER THAT ARGUMENT IS A PROPER

7       THING FOR THE JURY TO CONSIDER WHETHER THEY SHOULD FIND

8       INFRINGEMENT OR NONINFRINGEMENT BASED ON THE -- THE POTENTIAL

9       FOR INCREASED INFLATION.

10                I THINK YOU SAID EVERYTHING FROM, YOU KNOW, YOUR

11      AMAZON PURCHASES NEVER BECAUSE OF THE  -- BECAUSE OF THE

12      INCREASE IN RAIL COSTS.

13                WHY IS THAT PROPER TO A DETERMINATION OF INFRINGEMENT?

14                MS. LEA:  AGAIN, I THINK IT GOES TO THE GENERAL MAKE-UP OF

15      THE CASE.  AND THEY PUT THEIR GOOD CORPORATE CITIZENRY SHIP AT

16      ISSUE IN THIS CASE.  IT'S JUST ABOUT HOW THEY SAY THAT, YOU KNOW  --

17                THE COURT:  NO, NO.  I MEAN, I UNDERSTAND THAT.  BUT WHAT

18      I'M SAYING IS LIKE YOU  -- THE ARGUMENT YOU MADE TO THE JURY IS

19      THAT INFRINGEMENT -- OR AN INFRINGEMENT FINDING HERE WOULD

20      INCREASE THE COST OF THEIR AMAZON PACKAGES.

21                AND I'M WONDERING ABOUT WHETHER THAT'S AN IMPROPER

22      THING FOR THE JURY TO CONSIDER IN DETERMINING INFRINGEMENT.

23      BECAUSE, I MEAN ESSENTIALLY YOU'RE APPEALING TO THEIR

24      SELF-INTEREST, RIGHT.  YOU KNOW, IF YOU -- IF YOU  -- IF YOU FIND FOR

25      TETRA TECH EVERYTHING IS JUST GOING TO GET MORE EXPENSIVE

1    INCLUDING YOUR AMAZON PACKAGES.  AND A JUROR MIGHT BE THINKING,

2    GEEZ, YOU KNOW, THIS IS HITTING MY OWN POCKETBOOK.

3          I'M JUST WONDERING.  THAT WOULD SEEM TO BE IMPROPER TO

4    ME, BUT I'M WONDERING IF YOU'VE GOT A WAY THAT IT BECOMES

5    RELEVANT.

6          MS. LEA:  I THINK IT'S NO DIFFERENT THAN THEM SAYING, YOU

7    KNOW, THIS IS ABOUT SAFETY, RIGHT.  WE NEED TO KEEP THE TRACK

8    SAFE.  AND THAT'S WHAT OUR PATENTS DO IS THEY KEEP THE TRACK

9    SAFE.

10         SO, TO ME IT'S THE EXACT SAME THING ABOUT, LOOK, YOU

11    KNOW, THEY'RE HERE  -- IT WAS EMPHASIZING THE DAMAGES POINT,

12    RIGHT.  SO, THEY'RE HERE ON A 5-MILLION-DOLLAR SYSTEM.  AND WE

13    HAVE A 350-THOUSAND-DOLLAR SYSTEM.  AND THEY'RE TRYING TO

14    COMPARE THESE APPLES AND ORANGES.  SO, IT WAS JUST MORE

15    FLAVORING ON THE SAME THING.  IT WAS A SIMPLE STATEMENT, ONE

16    STATEMENT IN A LARGE HOUR-LONG CLOSING --

17         THE COURT:  YEAH.  I DON'T  --

18         MR. LEA:  -- ABOUT THE MERITS.

19         THE COURT:  YEAH, I THINK THAT  -- I DON'T  -- JUST SO YOU

20    KNOW.  THEIR ARGUMENT ABOUT IT WAS JUST, YOU KNOW, TWO SECONDS

21    OR A SIMPLE STATEMENT.  I DON'T THINK THAT CARRIES MUCH WATER

22    BECAUSE, YOU KNOW, IF YOU'RE ARGUING TO THE JURY – YOU KNOW, IF

23    YOU HAVE AN HOUR-LONG CLOSING AND YOU SAY, BUT, YOU KNOW, THE

24    DEFENDANT, YOU KNOW, CHEATS ON HIS TAXES.  I MEAN, THAT LITTLE

25    TINY BIT COULD REALLY INFLUENCE A JURY.

1    SO, I DON'T KNOW THAT THAT ARGUMENT HAS MUCH WATER,

2  BUT --

3    MS. LEA:  WELL, I THINK IT DEPENDS ON WHAT THE STATEMENT

4  IS ABOUT.

5    THE COURT:  RIGHT.

6    MS. LEA:  I MEAN, THIS WAS ACTUALLY ABOUT THE CASE AND

7  THE DIFFERENCE IN THE DAMAGES NUMBER --

8    THE COURT:  OKAY.

9    MS. LEA:  I MEAN, IF YOU'RE COMPARING IT TO THE

10  ANHEUSER-BUSCH CASE, THAT CASE IS ABOUT RACE AND BIGOTRY AND

11  REALLY INFLAMMATORY STATEMENTS AND A WHOLE LOT OF THEM.  OKAY.

12  THAT IS NOT THIS CASE.

13    AND THEY ALSO DIDN'T HAVE THE ISSUE WHERE WE ARE

14  ENTITLED TO JUDGMENT ON THE INFRINGEMENT ISSUES FOR AT LEAST

15  TWO DIFFERENT REASONS.  SO, THERE CAN BE NO MISCARRIAGE OF

16  JUSTICE.  THE JURY COULD NOT HAVE FOUND INFRINGEMENT IN THIS

17  CASE AND IT HAD THAT VERDICT UPHELD.

18    YOUR HONOR GAVE CURATIVE INSTRUCTIONS.  THE JURY IS

19  DEEMED TO HAVE FOLLOWED THOSE.  THERE WAS NO -- THERE'S NO

20  BASIS TO OVERTURN THIS INFRINGEMENT VERDICT.

21    THE COURT:  THANK YOU.

22    THIS IS GOING TO BE THE LAST QUESTION FOR TETRA TECH.

23    JUST ON THIS ISSUE OF THE INFLATION ISSUE, I WAS CURIOUS

24  AS TO WHETHER IT COULD POSSIBLY HAVE BEEN RELEVANT OR ANYTHING

25  AND WHETHER IT WAS APPEALING TO THE JURORS' SELF-INTEREST IN AN

1   IMPROPER WAY.

2         BUT COUNSEL POINTS OUT THAT, YOU KNOW, INDICATING THAT

3   YOUR CLIENT IS HELPING THE SAFETY OF THE RAILWAYS COULD BE

4   APPEALING TO THE JURY'S' SELF-INTEREST AS WELL.

5         ARE THOSE -- ARE THOSE KIND OF TWO OF THE SAME SORT OF

6   THINGS?

7         MR. BARNEY:  THEY'RE DIFFERENT, YOUR HONOR.  THE

8   TECHNOLOGY AT ISSUE HERE DOES DEAL WITH SAFETY.  THAT'S JUST A

9   FACT, AN UNDISPUTED FACT.

10         AND WE NEVER SUGGESTED THAT IF YOU RULE AGAINST US

11   YOUR TRACKS ARE GOING TO BE UNSAFE.  WE NEVER MADE THAT

12   ARGUMENT, THAT IF YOU DON'T ALLOW  -- IF YOU DON'T GIVE US NO – A

13   VERDICT OF INFRINGEMENT AND AWARD DAMAGES, NOW YOUR TRACKS

14   ARE GOING TO BE UNSAFE.  WE NEVER MADE THAT ARGUMENT.

15         SO, THAT'S  -- THAT'S APPLES AND ORANGES.

16         NOW, THE ARGUMENT THAT SHE MADE WAS IN FACT IMPROPER.

17   IT WAS MORE THAN JUST A FEW SECONDS AS A MATTER OF FACT.  AND IT

18   WASN'T JUST INFLATION.  THERE WAS AN ALLEGATION THAT WE WANTED

19   TO CONTROL THE MARKET, THAT WE WERE GOING  -- WE'RE GOING TO

20   SET THE TONE FOR THE MARKET, BY GOLLY, AND WE'RE GOING TO DO IT

21   ANY WAY WE CAN.  THAT THEY WANT INFLATION.  AND THAT -- THEN THEY

22   WENT ON TO SAY THAT'S NOT WHAT THE PATENT SYSTEM IS MEANT TO BE

23   AND SO FORTH.

24         SO, IT WAS REALLY A BROAD SIDE ATTACK ESSENTIALLY

25   CASTING ASPERSIONS ON THE COMPANY ITSELF IN TERMS OF TRYING TO

1    BE A MONOPOLIST AND SO FORTH.  AND THERE WAS NO EVIDENCE OF

2    THAT AT TRIAL.  IT WOULD BE ONE THING IF THEY HAD ADDUCED

3    EVIDENCE AND THEN THEY TRIED TO SUM IT UP AT CLOSING.  BUT THIS

4    WAS JUST A STRAIGHT-UP AD HOMINEM ATTACK ON THE COMPANY.

5           ONE QUICK NOTE ABOUT THE ANHEUSER-BUSCH CASE.  THAT

6    WAS NOT A CASE THAT HAD TO DO WITH RACIAL ASSERTIONS.  THAT WAS

7    REALLY ABOUT EVIDENCE THAT HAD BEEN PRECLUDED IN LIMINE FROM

8    COMING INTO THE CASE.  AND THE PLAINTIFF IN THAT CASE REPEATEDLY

9    TRIED TO BRING IT IN THROUGH THE BACK DOOR.

10          THE COURT:  OKAY.  THANK YOU, COUNSEL.

11          I APPRECIATE IT.  THANK YOU FOR THE BRIEFING.

12          AND WE WILL GET BACK TO WORK ON THIS AND GET OUT AN

13   ORDER SOON.

14          MR. BARNEY:  THANK YOU, YOUR HONOR.

15          (PROCEEDINGS CONCLUDED.)

16

17

18

19

20

21

22

23

24

25

1        TRANSCRIBER'S CERTIFICATE

2

3          DISCLAIMER

4   THE INTEGRITY OF THIS TRANSCRIPT MAY BE ADVERSELY AFFECTED

5     DUE TO MUFFLED AND UNCLEAR AUDIO TRANSMISSION.

6     I, Dorothy Babykin, attest that the foregoing proceedings provided to me

7 electronically were transcribed by me to the best of my ability.

8

9          _/s/_  _Dorothy Babykin_

10

11         Dorothy Babykin

12

13 Date:   11/5/2022

14

15

16

17

18

19

20

21

22

23

24

25

Dorothy Babykin Courthouse Services
1218 Valebrook Place   •   Glendora, CA 91740   •   626.963.0566   •   dotnisbet@aol.com