Christy G. Lea (SBN 212,060)
christy.lea@knobbe.com
Joseph R. Re (SBN 134,479)
joe.re@knobbe.com
Nicholas M. Zovko (SBN 238,248)
nicholas.zovko@knobbe.com
Alan G. Laquer (SBN 259,257)
alan.laquer@knobbe.com
Raymond Lu (SBN 340,873)
raymond.lu@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Phone: (949) 760-0404
Facsimile: (949) 760-9502

*Attorneys for Plaintiff/Counterclaim Defendant*
PAVEMETRICS SYSTEMS, INC.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| PAVEMETRICS SYSTEMS, INC., | Case No. 2:21-cv-1289-MCS-MMA |
| Plaintiff, | Honorable Mark C. Scarsi |
| v. | **PAVEMETRICS' MEMORANDUM IN SUPPORT OF ITS MOTION FOR RECONSIDERATION OF ORDER GRANTING NEW TRIAL ON INFRINGEMENT OF '293 PATENT ONLY** |
| TETRA TECH, INC., | |
| Defendant. | |
| | Date:       March 6, 2023 |
| | Time:       9:00 a.m. |
| | Location:   Courtroom 7C |
| AND RELATED COUNTERCLAIMS | |

1

**TABLE OF CONTENTS**

2

**Page No.**

3

4   I.      INTRODUCTION .......................................................................................... 1

5   II.     PROCEDURAL HISTORY ......................................................................... 1

6           A.      The Trial and the Jury's Non-infringement Verdict on
                    the '293 Patent ................................................................................... 1

7

8                   1.      Tetra Tech Limited Its Infringement Claim to
                            Two Acts of Direct Infringement: Offering to
                            Sell and Selling ...................................................................... 1

9

10                  2.      Claim 1 of the '293 Patent Requires a Connected
                            System with Loaded Software with a Particular
                            Algorithm ................................................................................ 2

11

12                  3.      The Trial Evidence Showed Pavemetrics Offered
                            to Sell and Sold Unconnected Components with
                            Unloaded Software with Unspecified Algorithm

13                          Steps ........................................................................................ 3

14                  4.      The Trial Evidence Showed LRAIL's Alleged
                            "Gradient Neighborhood" Was Predefined on

15                          Non-LRAIL Hardware and Software in Canada .................. 6

16          B.      Tetra Tech's Motion for New Trial ................................................... 8

17          C.      The Court's Order Granting a New Trial........................................... 9

18   III.    LEGAL STANDARDS.............................................................................. 11

19   IV.     ARGUMENT ............................................................................................ 12

20          A.      The Court Failed to Consider the Futility of Tetra
                    Tech's Infringement Claim for the '293 Patent ............................. 12

21          B.      A New Trial Would Be Futile Because Tetra Tech

22                  Cannot Show Infringement of the '293 Patent ............................. 14

23                  1.      Pavemetrics Sold to CSX Unconnected
                            Components that Were Not "In Communication" ............. 16

24                  2.      The Sales to CSX Did Not Include a Processor

25                          "Configured to Run an Algorithm," Let Alone
                            the Claimed Algorithm Steps .............................................. 18

26                  3.      LRAIL Algorithms Never Included "Defining an

27                          Appropriate Gradient Neighborhood" ................................ 20

28

-i-

# TABLE OF CONTENTS
## (*cont'd*)

**Page No.**

    C.    No Alleged Misconduct by Counsel Could Have
Affected Outcome ........................................................................... 22

V.    CONCLUSION ...................................................................... 233

# TABLE OF AUTHORITIES

**Page No(s).**

*Acantha LLC v. DePuy Orthopaedics Inc.*,
    Case No. 15-C-1257, 2018 WL 1951228 (E.D. Wis. April 25,
    2018), *vacated on other grounds,* 2018 WL 2290715 ................................. 17

*Apple, Inc. v. Samsung Elecs. Co.*,
    2014 WL 549324 (N.D. Cal. 2014)................................................................. 12

*Cahill v. Edalat*,
    2021 WL 2850588 (9th Cir. 2021)................................................................. 12

*Centillion Data Sys., LLC v. Qwest Comm'ns Int'l, Inc.*,
    631 F.3d 1279 (Fed. Cir. 2011)..................................................................... 15

*Chalmers v. City of Los Angeles*,
    762 F.2d 753 (9th Cir. 1985).......................................................................... 11

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*,
    424 F.3d 1293 (Fed. Cir. 2005)............................................................... 15, 17

*Decca v. U.S.*,
    640 F.2d 1156 (Ct. Cl. 1980)......................................................................... 15

*Deepsouth Packing Co. v. Laitram Corp.*,
    406 U.S. 518 (1972) ....................................................................................... 15

*Franks Casing Crew & Rental Tools, Inc. v. Weatherford
Int'l, Inc.*,
    389 F.3d 1370 (Fed. Cir. 2004)..................................................................... 14

*Hemmings v. Tidyman's Inc.*,
    285 F.3d 1174 (9th Cir. 2002)................................................................. 10, 13

*Hendrix v. Novartis Pharm. Corp.*,
    2014 WL 4090840 (C.D. Cal. 2014).............................................................. 11

*Lutron Elecs. Co. v. Creston Elecs.*,
    970 F. Supp. 2d 1229 (D. Utah 2013) ........................................................... 18

*Mateyko v. Felix*,
    924 F.2d 824 (9th Cir. 1990)............................................................... 1, 11, 13

# TABLE OF AUTHORITIES
### (*cont'd*)

**Page No(s).**

*McDowell v. Calderon*,
   197 F.3d 1253 (9th Cir. 1999) ........................................................................ 11

*Nintendo of Am., Inc. v. Storman*,
   2021 WL 4772529 (C.D. Cal. 2021) .............................................................. 11

*Rotec Indus., Inc. v. Mitsubishi Corp.*,
   215 F.3d 1246 (Fed. Cir. 2000) ...................................................................... 15

*San Diego Comic Convention v. Dan Farr Prods.*,
   2018 WL 4078588 (S.D. Cal. 2018) .............................................................. 12

*Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*,
   163 F. Supp. 2d 426 (D. Del. 2001), *aff'd in part, rev'd in part
   on other grounds*, 308 F.3d 1167 (Fed. Cir. 2002) ...................................... 14

## OTHER AUTHORITIES

35 U.S.C. §112 ................................................................................................ 3

Fed. R. Civ. P. 59 ........................................................................................... 11

Fed. R. Civ. P. 60 ........................................................................................... 11

Fed. R. Civ. P. 61 ........................................................................................... 12

Local Rule 7-18 ......................................................................................... 11, 14

# I.  **INTRODUCTION**

Pavemetrics moves for partial reconsideration of the Court's Order granting a new trial because it is based on a manifest error of law at least with respect to the infringement allegations on the '293 patent.  The Order focused exclusively on attorney conduct and failed to consider the futility of Tetra Tech's infringement claims in evaluating whether such conduct could have affected the verdict as required by binding Ninth Circuit precedent.  *See, e.g., Mateyko v. Felix*, 924 F.2d 824, 828 (9th Cir. 1990).  Because Tetra Tech has no evidence to support those infringement claims, any alleged misconduct of counsel at the trial could not have affected the jury verdict that Tetra Tech failed to prove infringement.  Under these circumstances, any new trial cannot possibly produce a different result.  Accordingly, Pavemetrics respectfully moves the Court to reconsider its order granting Tetra Tech's motion for a new trial on infringement of the '293 patent.

# II.  **PROCEDURAL HISTORY**

## A.    **The Trial and the Jury's Non-infringement Verdict on the '293 Patent**

### 1.    **Tetra Tech Limited Its Infringement Claim to Two Acts of Direct Infringement: Offering to Sell and Selling**

Tetra Tech accused Pavemetrics of directly infringing claim 1 and its dependent claim 21 of U.S. Patent No. 10,362,293 by offering to sell and selling three LRAIL systems to its customer, CSX Technologies.  ECF 318 at 16 (Final Pretrial Conf. Order); Ex. 5, Tr. 116:16-19 (Jury Instructions).  Tetra Tech did not accuse Pavemetrics of any other act of direct infringement.  It also did not assert that Pavemetrics indirectly infringed the '293 patent under 35 U.S.C. § 271(b) or (c).

Tetra Tech also accused Pavemetrics of indirectly infringing Claim 8 of U.S. Patent No. 10,616,557 by inducing its customer AID to infringe.  ECF 309

-1-

at 4 (Verdict Form Q.2).  Pavemetrics is **not** seeking reconsideration of the new trial order with respect to the '557 patent.

The jury found that Tetra Tech failed to prove that Pavemetrics directly infringed the '293 patent by "selling or offering to sell" to CSX the three LRAIL systems.  ECF 309 at 4 (Verdict Form Q.1).

### 2. <u>Claim 1 of the '293 Patent Requires a Connected System with Loaded Software with a Particular Algorithm</u>

Claim 1 of the '293 Patent recites:

A system for assessing a railway track bed, the system comprising:

a power source;

a light emitting apparatus powered by the power source for emitting light energy toward a railway track;

*a data storage apparatus in communication with at least one processor*;

at least one sensor . . . wherein the at least one *sensor is in communication with the at least one processor*; and

wherein the at least one *processor is configured to run an algorithm* . . . comprising the steps of:

a. acquiring three dimensional surface elevation *and* intensity data representative of an area segment of railway track bed;

b. generating a track elevation map based on the acquired three dimensional data;

c. identifying a railway track bed feature from the track elevation map further including the steps of:

i. *defining an appropriate gradient neighborhood* representing a small 2D track section

/ / /

-2-

over which differential vertical measurements are calculated and

ii. moving the gradient neighborhood like a sliding window over the 3D elevation data using the processor; and

d. storing information corresponding to the identified railway track bed feature in the data storage apparatus.

Ex. 12 (emphases added).  Asserted claim 21 depends from claim 1, and necessarily includes all the limitations of claim 1.  35 U.S.C. §112(d); Ex. 5, Tr. 116:22-117:2 (Jury Instructions).

As the emphasized language above shows, claim 1 requires that the data storage apparatus and the processor must each be "in communication with" the sensor.  It also requires that the processor must be "configured to run an algorithm," and that algorithm must perform certain steps, including "defining an appropriate gradient neighborhood."

### 3. The Trial Evidence Showed Pavemetrics Offered to Sell and Sold Unconnected Components with Unloaded Software with Unspecified Algorithm Steps

At trial, Tetra Tech called nine witnesses.  Only one witness testified with respect to infringement of the '293 patent, Tetra Tech's expert, Dr. Vassilios Morellas.  Pavemetrics called eight witnesses, three of whom testified on issues concerning direct infringement of the '293 patent: its two founders, John Laurent and Jean-Francois Hebert, and its expert, Dr. David Frakes.  The founders testified about the features of the accused LRAIL systems, and the expert testified that Pavemetrics did not directly infringe the '293 patent for multiple reasons.

/ / /

/ / /

-3-

With regard to the three sales to CSX, Mr. Laurent and Dr. Hebert testified to the following facts. Their testimony was unrebutted and unimpeached.

In February 2021, Pavemetrics quoted three sensor kits and LRAIL software to CSX, which the witnesses referred to at trial as Sales 2-4. Ex. 4, Tr. 62:22-25, 64:16-23 (Laurent); Ex. 811. CSX agreed to buy the three sensor kits. The Quotation identified the hardware included in the sensor kits: two sensors, a controller with power supply, frame grabber boards, and all necessary cables. Ex. 811. It did ***not*** include a processor. *Id.* The Quotation also included LRAIL software, but did not describe particular software algorithm steps or promise to use particular algorithm steps. *Id.* It specified that the "LRAIL software license is valid only for the pair of sensors with which it was purchased, is non-transferable and cannot be used with any other sensors." *Id.*

In March 2021, Pavemetrics and CSX entered into a "Goods Agreement," which would govern the sale of three LRAIL Inspection Systems, including the previously quoted sensor kits and LRAIL software. Ex. 4, Tr. 63:1-2 (Laurent); Ex. 844 (Goods Agreement, which incorporated the Quotation by reference). The Goods Agreement identified the three sensor kits and LRAIL software as "Standard LRAIL Hardware and Software." Ex. 844 at 17 (Annex 1 to Appendix). It did not describe particular software algorithm steps or promise to provide any particular software algorithm steps. It also included a separate line item for "special hardware" that included processing hardware and data storage hardware. *Id.*

In April 2021, Pavemetrics sent CSX an invoice for the three "Standard LRAIL Hardware and Software" sales. Ex. 4, Tr. 63:7-10 (Laurent); Ex. 849. Pavemetrics separately invoiced CSX for the special hardware. Ex. 850. Payment for each invoice was due within 60 days of receipt. Ex. 844 at 15 (Appendix ¶2).

-4-

In August 2021, Pavemetrics shipped to CSX the Standard LRAIL Hardware (i.e., the three sensor kits), which include two sensors (also called "laser profilers"), a controller, a power supply, frame grabber boards, and all necessary cables.  Ex. 4, Tr. 67:1-13 (Laurent).  The sensor kits were in a carrying case and were not connected to anything, as shown in the photo below from Pavemetrics' installation manual:



Ex. 28; Ex. 4, Tr. 66:24-67:13 (Laurent).  Pavemetrics separately shipped to CSX the processing computers for Sales 2-4.  Ex. 4, Tr. 63:11-12 (Laurent), 130:18-20 (Hebert).  Those computers did ***not*** have any software when shipped.  Ex. 4, Tr. 63:13-15, 67:18-20 (Laurent), 130:21-23 (Hebert).

Dr. Hebert testified that it can take several months after a sale before the sensors, processors, and other hardware have been assembled and mounted on a vehicle.  Ex. 4, Tr. 130:2-11.  To ensure the customer uses the latest version of software, Pavemetrics typically waits to send the software until the LRAIL hardware has been assembled and mounted and is ready for use.  *Id.*  The

LRAIL hardware for Sales 2 and 3 was installed in a boxcar and assembled in September 2021.  Ex. 4, Tr. 64:3-12 (Laurent).

In December 2021, Pavemetrics provided and licensed the processing software (Version 4.80.2) for Sales 2 and 3.  Ex. 4, Tr. 63:16-22, 64:13-15, 65:6-18 (Laurent), 130:24-131:2, 131:18-24 (Hebert).  No evidence suggests that Pavemetrics ever provided or licensed any processing software for Sale 4. Ex. 4, Tr. 63:23-24, 65:19-20 (Laurent), 135:25-136:2 (Hebert).

Even though Sales 2-4 were sold as unconnected components in multiple boxes and Sale 4 was never assembled, Dr. Morellas analyzed infringement as if the LRAIL hardware and software had been connected, loaded, and assembled for use.  Ex. 2, Tr. 158:5-163:13, 168:9-19.  But Dr. Morellas admitted that the three sales to CSX occurred back in March 2021.  Ex. 2, Tr. 154:23-25.  When pressed, Dr. Morellas admitted he did not know whether LRAIL was sold with the sensors connected or disconnected from the processor.  Ex. 3, Tr. 75:20-76:17.

4.  **The Trial Evidence Showed LRAIL's Alleged "Gradient Neighborhood" Was Predefined on Non-LRAIL Hardware and Software in Canada**

Claim 1 of the '293 Patent requires at least one processor configured to run an algorithm comprising the step of "defining an appropriate gradient neighborhood."  Ex. 12.  Dr. Morellas testified that the filters in LRAIL's neural network are the "appropriate gradient neighborhood."  Ex. 2, Tr. 180:20-182:11. Dr. Frakes confirmed that LRAIL's neural network contains those filters.  Ex. 4, Tr. 175:21-176:16.  But *all* witnesses agreed that Pavemetrics defines the filters on non-LRAIL hardware and software *in Canada*.  Ex. 4, Tr. 128:1-15, 129:2-11 (Hebert), 176:9-180:17, 182:2-11 (Frakes); Ex. 5, Tr. 108:7-18 (Morellas).

Dr. Hebert testified that:

- Pavemetrics defined LRAIL's filters by training LRAIL's neural network.

Ex. 4, Tr. 128:1-5.

- Pavemetrics trained LRAIL's neural network using its office processing computers in Canada, which are different than the processing hardware sold with an LRAIL system. *Id.* at 128:6-9; 129:2-5.

- Pavemetrics trained LRAIL's neural network using different software than the LRAIL software. *Id.* at 128:10-15.

- Pavemetrics does not send the software that trains the neural network to customers. *Id.* at 129:2-5.

- After Pavemetrics predefined the LRAIL filters during that training in Canada, the filters are fixed and never change. *Id.* at 129:6-11.

Tetra Tech never challenged any of those facts in cross-examination or through its own experts' testimony. Rather, Dr. Morellas, admitted that Pavemetrics predefined the filters before selling LRAIL:

> Q:    So then those filter values, what you call the gradient neighborhood, are predefined by the time the LRAIL is sold; correct?
>
> A. Yes, but the --

Ex. 5, Tr. 108:7-10. Tetra Tech declined the Court's invitation to ask additional questions. *Id.* at 11-18.

Pavemetrics' founders testified that LRAIL's neural network is based on the TensorFlow engine. Ex. 4, Tr. 51:9-11 (Laurent), 122:25-123:8 (Hebert). Dr. Frakes explained that neural networks based on TensorFlow use two high-level stages: the training stage and the inference stage. Ex. 4, Tr. 176:9-15. He explained that in the training stage the convolutional neural network determines what its filter values should be. *Id.* at 179:16-180:14. He further explained that in the subsequent inference stage "that model has pre-defined filters that it already figured out in the training stage. And we can now take it and send it out to be a product and to go do something in the world." *Id.* at 180:15-17, 182:2-8.

Dr. Frakes explained that the filter's definition does not change because "[a]fter training, the filters are – are locked in." *Id.* at 182:9-11.

**B.    Tetra Tech's Motion for New Trial**

After the jury verdict, Tetra Tech moved for a new trial on infringement solely based on trial conduct of Pavemetrics' counsel. ECF 323.   Although Tetra Tech moved for JMOL on the jury's verdict of invalidity, it did not move for JMOL on the verdict of noninfringement.   Thus, it never challenged the sufficiency of the evidence supporting the jury's noninfringement verdict.   With regard to its motion for a new trial on infringement, Tetra Tech never explained how any presentation of the evidence could have resulted in a finding of infringement.   It never complained or even suggested that it was precluded from presenting any evidence that could help it prove infringement.   Rather, Tetra Tech repeatedly stated, in conclusory fashion, that Pavemetrics' attorney conduct had "severely prejudiced Tetra Tech and affected the jury's verdict." ECF 323 at 21; *see also id.* at 19, 22.

In its motion, Tetra Tech also accused Pavemetrics of presenting non-infringement theories that were contrary to law.   *Id.* at 24-30.   It argued that Pavemetrics' noninfringement argument based on unconnected components was legally incorrect.   *Id.*   According to Tetra Tech, the February 2021 Quotation alone was sufficient to find an infringing offer to sell.   *Id.* at 24-25 (citing *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296 (Fed. Cir. 2010)).   Tetra Tech also argued that the March 2021 Goods Agreement alone was sufficient to find an infringing sale.   ECF 323-1 at 25.   But neither the Quotation nor the Goods Agreement included any components "in communication" or any specific algorithm. Ex. 811; Ex. 844.

In its opposition, Pavemetrics explained that "the evidence and law overwhelmingly established no infringement" and thus Tetra Tech "fail[ed] to show unfair prejudice that could have affected case outcome."   ECF 328 at 9,

21-22. Pavemetrics explained, like it explains below, that its Quotation and Goods Agreement with CSX were insufficient to show infringement as a matter of law. *Id.* at 30 ("TT could not have shown infringement based on either document as a matter of law."). Pavemetrics also explained that "TT failed to show infringement for many reasons," including because "the feature in Pavemetrics' neural network that TT alleges satisfies the gradient neighborhood limitation is performed only in Canada during training of the neural network." *Id.* at 21. Thus, Pavemetrics argued, Tetra Tech "cannot show any miscarriage of justice to warrant a new trial." *Id* at 22.

In reply, Tetra Tech did not respond to these arguments, except to call them "pure speculation." ECF 331 at 9.

At the new-trial hearing, Pavemetrics explained that no evidence could have supported a finding of infringement, and thus Tetra Tech cannot show a miscarriage of justice. ECF 336, Tr. 16:17-21 ("none of the things they are pointing to affected the outcome"), 24:13-17. The Court did not ask either party a single question about the merits of Tetra Tech's infringement case. The Court merely commented that it understood Pavemetrics' noninfringement arguments and that "they're good noninfringement arguments." *Id.*, Tr. 17:24-25.

## C. **The Court's Order Granting a New Trial**

In its Order granting a new trial, the Court acknowledged Pavemetrics' argument that the evidence could not support an infringement finding. ECF 335 at 4. In particular, the Court acknowledged Pavemetrics' argument that Tetra Tech's infringement analysis missed five claim limitations, including limitations requiring components in communication with each other. *Id.* It also acknowledged that Pavemetrics argued that its "neural network feature does not infringe the gradient neighborhood limitation because the feature was only performed in Canada." *Id.* However, the Court never addressed the merits of any of Pavemetrics' noninfringement arguments.

Instead, the Court adopted Tetra Tech's argument that "the aggregate effect of the many improper statements warrants a new trial because the statements left the impression that Tetra Tech acted improperly and that its witnesses were hiding information." *Id.* But the Court never explained how any such impression could bear on the undisputed characteristics of the three accused LRAIL offers for sale and sales as reflected in the Quotation and the Goods Agreement. Nor did the Court address how Tetra Tech could ever succeed in attempting to show infringement when undisputed facts prove that Pavemetrics sold unconnected components and defined the alleged "gradient neighborhood" on other hardware and software in Canada. The Court never addressed Pavemetrics' arguments that it would be entitled to JMOL of non-infringement, regardless of any impression the jury may have had about Tetra Tech's witnesses.

Rather than address the merits of Pavemetrics' noninfringement arguments, the Court decided that Pavemetrics' new trial argument relied upon an incorrect legal standard. *Id.* at 4 n.2. In a footnote, the Court correctly observed that "[u]nder Rule 59, a new trial may also be granted to prevent a miscarriage of justice, among other reasons." *Id.* (citing *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007); *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990)). But the Court did not address the standard governing a "miscarriage of justice."

The Ninth Circuit has held that, in analyzing whether there has been a miscarriage of justice, a court must evaluate the alleged prejudiced based on the totality of the circumstances, which includes the strength of the case. *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174 (9th Cir. 2002). But rather than consider the merits as part of that totality of the circumstances, the Court criticized Pavemetrics for arguing based on those merits. ECF 335 at 4 n.2.

/ / /

-10-

The Court applied the wrong standard by overlooking that a "miscarriage of justice" ***cannot*** occur when the jury reached the only verdict supported by the evidence—regardless of any alleged attorney misconduct. The law simply does not authorize a new trial when a new trial could not result in a different outcome.

### III. <u>LEGAL STANDARDS</u>

Motions for reconsideration are governed by Federal Rules of Civil Procedure 59(e) and 60(b). *See* Fed. R. Civ. P. 59(e), 60(b). In this District, motions for reconsideration are further governed by Local Rule 7-18. That Local Rule permits such motions when the movant can show a "failure to consider material facts presented to the Court before such decision." L.R. 7–18.

Courts in this District have interpreted Local Rule 7-18 to be coextensive with Rules 59(e) and 60(b). *See, e.g., Hendrix v. Novartis Pharm. Corp.*, 2014 WL 4090840, at *2 (C.D. Cal. 2014)*; see also McDowell v. Calderon,* 197 F.3d 1253, 1255 n.1 (9th Cir. 1999) (summarizing four permissible grounds for Rule 59(e) motions, including to correct manifest errors of law or fact and to prevent manifest injustice); *Nintendo of Am., Inc. v. Storman*, 2021 WL 4772529, at *1 (C.D. Cal. 2021) (motion for reconsideration may be granted to correct clear error or prevent manifest injustice).

When reviewing new trial motions alleging attorney misconduct, the Ninth Circuit, has held that "[a] new trial is warranted ***only*** if counsel's misconduct ***affected the verdict***." *Mateyko v. Felix*, 924 F.2d 824, 828 (9th Cir. 1990) (emphasis added) (affirming denial of new trial motion despite improper attacks on the verdict loser's credibility and mischaracterizing expert testimony); *Chalmers v. City of Los Angeles*, 762 F.2d 753, 761 (9th Cir. 1985) (affirming denial of new trial motion where there has been no showing that personal attacks on the verdict loser's attorneys "affected the outcome of the case"); *Cahill v. Edalat*, 2021 WL 2850588, at *4-5 (9th Cir. 2021) (affirming

denial of motion for new trial where losing party at trial "has failed to show that the evidence would have affected the verdict"). This rule is reflected in Rule 61 of the Federal Rules of Civil Procedure, which provides that "[a]t every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." Fed. R. Civ. P. 61.

Following that Ninth Circuit precedent, district courts have denied motions for new trial when no evidence shows that the alleged misconduct affected the outcome. *San Diego Comic Convention v. Dan Farr Prods.*, 2018 WL 4078588, at *13-14 (S.D. Cal. 2018) (denying motion for new trial and explaining that "the only question is whether these purportedly prejudicial statements affected the outcome of the case"); *Apple, Inc. v. Samsung Elecs. Co.*, 2014 WL 549324, at *13-16 (N.D. Cal. 2014) (denying motion for new trial where "there is no evidence that the jury was influenced by Apple's problematic comments during closing argument").

In its Motion for New Trial, Tetra Tech did not adhere to these legal standards and thus could not have sustained its burden to show that the alleged misconduct led to an improper verdict. Similarly, the Court failed to apply these legal standards and to determine how any alleged misconduct could have affected the verdict in view of the undisputed evidence showing no infringement as a matter of law.

## IV. <u>ARGUMENT</u>

### A. <u>The Court Failed to Consider the Futility of Tetra Tech's Infringement Claim for the '293 Patent</u>

In granting a new trial, this Court failed to consider that Tetra Tech did not prove infringement of the '293 patent and cannot prove infringement as a matter of law. Tetra Tech's inability to prove infringement was a critical, material fact to its motion because, as explained, a new trial cannot be granted where the attorney conduct did not affect the outcome of the trial. *Mateyko*, 924

1  F.2d at 828 ("A new trial is warranted only if counsel's misconduct affected the
2  verdict.").

3      As explained above, Pavemetrics raised Tetra Tech's inability to prove
4  infringement in both its opposition brief and at the hearing.  Yet, Tetra Tech
5  made no argument and submitted no evidence to show that substantial evidence
6  could possibly support an infringement verdict.  Nor did this Court address this
7  material fact in its new-trial Order.

8      The Court dismissed Pavemetrics' argument that the verdict was not
9  against the great weight of the evidence in a footnote, holding that this was "not
10 the correct standard," because a new trial may also be granted to "prevent a
11 miscarriage of justice."  ECF 335 at 4, n.2.  But Pavemetrics explained that
12 Tetra Tech "cannot show a miscarriage of justice," because Tetra Tech failed to
13 show infringement as a matter of law and, thus, "none of the things they are
14 pointing to affected the outcome here."  ECF 336, Hearing Tr. 16:17-21.

15     The Court overlooked that an important factor to determine whether a
16 miscarriage of justice occurred is "the strength of the [verdict winner's] case."
17 *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1195 (9th Cir. 2002) (affirming
18 denial of new trial despite improper comments in the verdict winner's closing
19 argument because "[i]n the absence of counsel's improper statements, we cannot
20 say that we think a different verdict was likely").  The Court made this error,
21 despite acknowledging that the "strength of the case" is a relevant consideration.
22 ECF 335 at 3.  The Court also failed to analyze the merits of Tetra Tech's
23 infringement case, despite having acknowledged at the hearing that
24 Pavemetrics' arguments are "good noninfringement arguments."  ECF 336,
25 Hearing Tr. 17:24-25.

26     Here, that factor shows there can be no miscarriage of justice because, as
27 explained in detail below, Tetra Tech's infringement case was insufficient as a
28 matter of law.  Where a verdict winner would be entitled to summary judgment

-13-

of no infringement before a new trial, because the patentee can offer no evidence to show the accused product contains every claim limitation, then no conduct could have affected the outcome of the trial. *Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*, 163 F. Supp. 2d 426, 454-55 (D. Del. 2001) (denying new trial where "[s]uch an exercise would be futile"), *aff'd in part, rev'd in part on other grounds*, 308 F.3d 1167, 1184 (Fed. Cir. 2002) (affirming denial of new trial despite improper comments where infringement "was not a close question").

This Court acknowledged that Pavemetrics' noninfringement arguments are "good noninfringement arguments." ECF 336, Hearing Tr. 17:24-25. But it overlooked that those noninfringement arguments show Tetra Tech cannot meet its burden to show infringement as a matter of law. Because Tetra Tech cannot meet its burden, no conduct could have affected the outcome of the trial.

Accordingly, this Court should vacate its new-trial Order with respect to a new trial on the '293 patent. *See* L.R. 7-18 (reconsideration is warranted upon "a manifest showing of a failure to consider material facts presented to the Court before such decision").

**B.** **A New Trial Would Be Futile Because Tetra Tech Cannot Show Infringement of the '293 Patent**

To prove infringement, Tetra Tech must show that Pavemetrics offered to sell or sold a system meeting "each and every limitation" of claim 1 of the '293 patent. *Franks Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*, 389 F.3d 1370, 1378 (Fed. Cir. 2004). Indeed, the Court correctly instructed the jury to compare the product offered for sale or sold "with each and every one of the requirements of a claim to determine whether all of the requirements of that claim are met." Ex. 5, Tr. 116:14-19; *see also id.* 111:4-8 (similar instruction).

"To infringe an apparatus claim, the device must meet all of the structural limitations." *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424

F.3d 1293, 1311-12 (Fed. Cir. 2005).  In *Cross Medical*, the Federal Circuit rejected a patentee's argument that, to show infringement, the accused direct infringer need only make (or sell) devices that are ***capable of being converted*** into infringing devices.  *Id.*; *Centillion Data Sys., LLC v. Qwest Comm'ns Int'l, Inc.*, 631 F.3d 1279, 1284, 1288 (Fed. Cir. 2011) (direct infringement by "use" and "making" a patented system requires using and combining all the claim elements).

This basic rule existed prior to the Federal Circuit in binding precedent. *Decca v. U.S.*, 640 F.2d 1156, 1168 (Ct. Cl. 1980) ("Direct infringement does not occur until a system, comprised of [the claimed components] has been constructed and is available for use."); *see also Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 528 (1972) (a "combination patent protects only against the operable assembly of the whole and not the manufacture of its parts"); *Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1252 (Fed. Cir. 2000) (applying the same "operable assembly" requirement to an "offer to sell" components accused of infringing a combination patent).

Tetra Tech has not and cannot present substantial evidence that Pavemetrics offered to sell or sold an LRAIL system satisfying all of the limitations of claim 1 of the '293 patent.  In particular, it has not and cannot show that the three offers and sales included:

- the "in communication" limitations in claim 1, namely "a data storage apparatus in communication with at least one processor" and "at least one sensor is in communication with at least one processor."
- the "processor configured to run" limitation of claim 1, namely "wherein at least one processor is configured to run an algorithm . . ." or
- the "defining a gradient neighborhood" limitation of claim 1.

/ / /

-15-

**1.     Pavemetrics Sold to CSX Unconnected Components that Were Not "In Communication"**

Tetra Tech did not and cannot present any evidence that, as offered, sold, and delivered with unconnected components in boxes, Sales 2-4 to CSX met the "in communication" limitations of Claim 1 of the '293 patent.[1]

Pavemetrics presented undisputed and irrefutable evidence that it offered and sold unassembled kits to Pavemetrics' customer, CSX. Specifically, the sold hardware was shipped in multiple boxes containing *unconnected* components. Ex. 4, Tr. 67:11-13, 62:22-67:20, 63:11-12 (Laurent), 130:18-20 (Hebert). Pavemetrics also presented undisputed and irrefutable evidence that the unconnected components did not communicate. Ex. 4, Tr. 67:14-17 (Laurent), 186:23-187:1, 198:14-199:22 (Frakes). Tetra Tech has not and cannot present any evidence to the contrary.

Tetra Tech's technical expert, Dr. Morellas, *merely assumed* that the LRAIL system was assembled, and that the processor and the data storage apparatus and sensor components of the system were connected. Ex. 2, Tr. 158:5-163:13. When challenged with the irrefutable evidence showing the LRAIL components were shipped unconnected in boxes, Dr. Morellas professed not to know whether they were sold connected. Ex. 3, Tr. 75:20-76:17. But even the installation and hardware manual that Dr. Morellas relied upon for his infringement opinions showed the boxed sensor kit with unconnected components. Ex. 28 at 14.

Under Dr. Morellas' theory, these unconnected components required at least subsequent assembly even to have the potential to meet the "in communication" limitation in claim 1. But Tetra Tech has not accused Pavemetrics of *making*, contributing to the making, or inducing anyone to

---

[1] Tetra Tech did not accuse Sale 1 to AID of infringing the '293 patent.

make, an infringing device.  *See* ECF 318 at 16 (Final Pretrial Conf. Order); Ex. 5, Tr. 116:16-19 (Jury Instructions); ECF 309 at 4 (Verdict Form Q.1). Therefore, any subsequent assembly of LRAIL Sales 2-3 cannot be relied upon by Tetra Tech to show infringement.

Because Sales 2-4 are missing at least the "in communication" limitations, these sales could not have directly infringed claim 1 of the '293 patent or its dependent claim 21.  *See Cross Med.*, 424 F.3d at 1310-12 (Fed. Cir. 2005) (no direct infringement by a medical device manufacturer because asserted claim required the device to be in contact with bone, and no contact occurred until surgeons used the device); *Acantha LLC v. DePuy Orthopaedics Inc.*, Case No. 15-C-1257, 2018 WL 1951228, *4 (E.D. Wis. April 25, 2018) (a manufacturer of an orthopedic implant sold as a kit of components for assembly by the physician does not directly infringe an "assembly" claim by selling components capable of being assembled).[2]  For a jury to have a legal basis for a finding of direct infringement of claim 1, Tetra Tech must present substantial evidence that ***each limitation*** in claim 1 was present in Sales 2-4.  As the Federal Circuit found in *Cross Medical*, if even ***one*** limitation of a claim is missing from Sales 2-4, a jury cannot legally find Pavemetrics to have directly infringed the '293 patent.  424 F.3d at 1311-12.

At most, Tetra Tech may have shown that Sales 2-4 included a sensor and a processor as unconnected components in boxes that Pavemetrics may have intended to be assembled.  But any such intent is not enough.  "[I]ntent is an element of indirect infringement, not direct infringement." *Lutron Elecs. Co. v. Creston Elecs.*, 970 F. Supp. 2d 1229, 1233-1236 (D. Utah 2013).  In *Lutron*, the claim required "a control device coupled to the electrical device by a wire

---

[2] On reconsideration, the district court vacated its summary judgment, because it reconstrued the claim to no longer require "assembly." *Acantha LLC v. DePuy Orthopaedics Inc.*, Case No. 15-C-1257, 2018 WL 2290715, *1-2 (E.D. Wis. May 19, 2018).

connection." *Id.* at 1233.   The court held that a manufacturer who sells its control devices to distributors with intent that they connect it to an electrical device cannot be liable for direct infringement.   *Id.* at 1236.   The court allowed the trial to proceed only on devices the defendant itself had installed using a wire connection.   *Id.*   Similarly here, to prove direct infringement, Tetra Tech had to present substantial evidence that Pavemetrics offered to sell or sold components already "in communication."   Because Tetra Tech did not present such evidence, the jury correctly reached a verdict of no infringement.   And because no such evidence exists, any new trial would be futile.

2.      **The Sales to CSX Did Not Include a Processor "Configured to Run an Algorithm," Let Alone the Claimed Algorithm Steps**

Tetra Tech did not and cannot show that Pavemetrics offered to sell or sold a system meeting the limitation of claim 1 of the '293 patent "wherein at least one processor is configured to run an algorithm . . ." having certain steps. The accused sales to CSX (Sales 2-4) were sold with a processer that was delivered ***without*** any software installed. Ex. 4, Tr. 67:18-20 (Laurent), 130:18-23 (Hebert).   This Court construed "is configured to run an algorithm" to mean "is programmed to run an algorithm without the need to rebuild, rewrite, or recompile the code for, or redesign any of that hardware or software."   ECF 103 at 23-26.   That is, any processors that Pavemetrics sold to CSX with Sales 2-4 were not pre-loaded with or "programmed to run" any software or algorithm.

Tetra Tech has not and cannot present any evidence that Sales 2-4 without any pre-loaded software can meet the limitation of claim 1 of the '293 patent requiring that a processor be "programmed to run an algorithm."   As with the "in communication" limitations of claim 1, Tetra Tech's technical expert Dr. Morellas assumed that the software was already installed on the processor for his opinion on infringement.   But it is undisputed that Pavemetrics provided the software for Sales 2 and 3 to CSX well after Sales 2 and 3 were sold and the

1    processors delivered.  Ex. 4, Tr. 63:16-22, 64:13-15, 65:6-18 (Laurent), 130:24-
2    131:2, 131:18-24 (Hebert).  The record is devoid of any evidence that software
3    was ever provided for Sale 4, let alone loaded onto a processor for Sale 4.  *See*
4    Ex. 4, Tr. 64:3-64:15, 65:19-20 (Laurent), 135:25-136:2 (Hebert).

5            In addition, Pavemetrics presented evidence that Sales 2-4 could not have
6    used any software until granted individual and unique software licenses by
7    Pavemetrics. Ex. 4, Tr. 60:16-62:16, 63:16-24 (Laurent); Ex. 811; Ex. 28 at 35-
8    36.  That is, each software license given to CSX by Pavemetrics corresponded
9    to **specific** LRAIL sensors associated with each sale.  This means that CSX
10   could **not** have used with Sales 2-4 any prior license or software that CSX may
11   have previously received for an unaccused LRAIL system.

12           In its new trial motion, Tetra Tech argued that Pavemetrics' Quotation
13   was an infringing offer to sell.  ECF 323-1 at 25 (citing *Transocean Offshore*
14   *Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1311
15   (Fed. Cir. 2019)).  But Tetra Tech ignores that it must show the Quotation
16   included every claim limitation.  In *Transocean*, the Federal Circuit remanded
17   for a determination as to "whether the subject of the offer to sell was of a
18   'patented invention.'"  617 F.3d at 1310, n.4.  Here, there can be no dispute that
19   the Quotation did not include **any** processor or the claimed algorithm steps.  Ex.
20   811.  Thus, the offer to sell reflected in the Quotation is missing multiple claim
21   limitations and cannot infringe.

22           Tetra Tech also argued that Pavemetrics' Goods Agreement was an
23   infringing sale because it included LRAIL hardware and software.  ECF 323-1
24   at 25 (citing *Transocean*, 617 F.3d at 1311).  But the Goods Agreement merely
25   included LRAIL software without specifying any particular algorithm steps.
26   Ex. 844 at 17 (Annex 1 to Appendix).  Again, Tetra Tech overlooks that the
27   contract in *Transocean* was accompanied by schematics that "could support a
28   finding that the sale was of an infringing article under § 271(a)."  617 F.3d at

1311.  Here, there were no such accompanying schematics or specification of any particular algorithm steps.

At trial, Tetra Tech had argued that the r10323 software CSX previously purchased in 2020 was "available" for CSX to use with the 2021 sales (Sales 2-4).  Ex. 2, Tr. 155:6-10 (Morellas), 169:22-170:1, 170:17-22 (Closing).  But Tetra Tech offered ***no evidence*** to support its "availability" theory.  Rather, Mr. Laurent testified that Pavemetrics previously sold and licensed the r10323 software only for use with a non-accused sale, and it could not be used with any other sales.  Ex. 4, Tr. 58:20-62:16 (Laurent), 131:3-15 (Hebert); Ex. 40 at 2 (2020 Quotation); Ex. 843 (2020 Goods Agreement); Ex. 658 (license key for no-accused Sale A sensors).  Even if CSX could have used the software it purchased in 2020 with the systems it purchased in 2021, the 2020 software was not part of the 2021 sales.  Tetra Tech has not presented and cannot present any evidence to show that the r10323 software was included in the sale of the 2021 systems.

Tetra Tech has failed to present any evidence that sales of processors with no software or uninstalled software meets the "programmed to run an algorithm" limitation of claim 1.  Thus, no reasonable jury could ever find that Sales 2-4, as ***sold*** or ***offered to sell*** by Pavemetrics were "configured to run an algorithm" of any kind, let alone one meeting the specific limitations in claim 1 of the '293 patent.  Therefore, Pavemetrics cannot infringe claims 1 and 21 of the '293 patent as a matter of law and a new trial on that issue could never change the outcome.

### 3.      LRAIL Algorithms Never Included "Defining an Appropriate Gradient Neighborhood"

Claim 1 requires at least one processor configured to run an algorithm comprising the step of defining an appropriate gradient neighborhood.  Ex. 12.  Tetra Tech alleged that LRAIL's convolutional neural network filters were the

claimed "appropriate gradient neighborhood." Ex. 5, Tr. 108:7-10.  Even under Tetra Tech's allegations, there can be no infringement unless the accused LRAIL systems contained a processor configured to run an algorithm that defines LRAIL's convolutional neural network filters.  But no LRAIL in the United States has ever included such an algorithm.

Dr. Hebert testified that Pavemetrics defined the neural network filters in Canada, using different hardware and software than the LRAIL system sold to customers.  Ex. 4, Tr. 128:1-5.  He also testified that Pavemetrics never sent any customer the software that Pavemetrics used to define its neural network filters. *Id.* at 129:2-5.  Tetra Tech submitted no evidence disputing that LRAIL's neural network filters are defined only in Canada.

Dr. Hebert also testified that once predefined in Canada, LRAIL's neural network filters are fixed and never change after Pavemetrics provides an LRAIL to a customer.  *Id.* at 129:6-11.  Thus, the accused LRAILs never included an algorithm to define an appropriate gradient neighborhood.

Dr. Morellas admitted that the predefined LRAIL filters, which he calls the gradient neighborhood, were trained using different hardware than the LRAIL hardware, and different software than the LRAIL software.  *Id.* at 107:15-108:6.  And in the final question of trial, Dr. Morellas admitted:

> Q. So then those filter values, what you call the gradient neighborhood, are ***predefined*** by the time the LRAIL is sold; correct?
>
> A. Yes

*Id.* at 108:7-10 (emphasis added).  Tetra Tech did not attempt redirect.  *Id.* at 108:11-14.  Trial testimony ended with that fatal and uncurable admission by Dr. Morellas.  *Id.* at 17-20.  Accordingly, Tetra Tech cannot show that the three LRAILs sold to CSX infringe either claim 1, or its dependent claim 21, as a matter of law.

## C.   No Alleged Misconduct by Counsel Could Have Affected Outcome

Because Tetra Tech cannot show infringement as a matter of law, no conduct of counsel could have affected the jury verdict.  Even if the alleged misconduct caused the jury to disbelieve Tetra Tech's only witness regarding infringement—Dr. Morellas—the outcome would not have been different if they had instead believed him.

The Court found that "the jury was left with the prejudicial impression that the expert had the opportunity to review the source code but chose not to do so." ECF 335 at 5.[3]  Apparently, the Court believes that knowing Dr. Morellas "had the opportunity to review the source code but chose not to do so" caused the jury to discredit his testimony.  But never does the Court explain what testimony of Dr. Morellas would have proved infringement if the jury had believed him.  Even if the jury had credited all of Dr. Morellas' testimony, there would still be no infringement.  Indeed, Dr. Morellas admitted that the neural network filters are predefined in Canada.  Ex. 5, Tr. 107:15-108:10.  And he also admitted that he did not know whether LRAIL was sold with the processor and data storage apparatus in communication with the sensor.  *Id*. at 92:10-17.

This Court gave Tetra Tech every opportunity to present its infringement case.  Despite this, Tetra Tech failed to make out a prima facie case of infringement.  Thus, it cannot show that any conduct by Pavemetrics could have affected the outcome of the jury verdict.  This Court failed to consider that a new trial would be futile.  Accordingly, this Court erred by granting a new trial and should reconsider its Order.

---

[3] The Court ignored the unrebutted declaration of Alan Laquer showing that, in fact, Dr. Morellas had the opportunity to review the neural network but did not do so.  ECF 330 at 5-7.  Thus, Tetra Tech could not have been prejudiced by any jury belief that "the expert had the opportunity to review the source code but chose not to do so." ECF 335 at 5.  The prejudiced party was Pavemetrics whom the Court precluded from impeaching Dr. Morellas' incorrect testimony.  Ex. 3, Tr. 64:21-65:14.

# V. **CONCLUSION**

For the foregoing reasons, Pavemetrics respectfully requests that the Court grant its motion for reconsideration and deny Tetra Tech's motion for a new trial on infringement of the '293 patent.

Respectfully Submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  February 6, 2023          By:  /s/ *Christy G. Lea*
                                      Christy G. Lea
                                      Joseph R. Re
                                      Nicholas M. Zovko
                                      Alan G. Laquer
                                      Raymond S. Lu

                                      *Attorneys for Plaintiff/Counterclaim Defendant,*
                                      PAVEMETRICS SYSTEMS, INC.

### <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Pavemetrics Systems, Inc., certifies that this brief contains 6,441 words, which [choose one]:

 X  complies with the word limit of L.R. 11-6.1.

__ complies with the word limit set by court order dated [date].

Dated:  February 6, 2023        By:  <u>/s/ *Christy G. Lea*</u>
                                      Christy G. Lea

                                     *Attorneys for Plaintiff/Counterclaim Defendant*,
                                     PAVEMETRICS SYSTEMS, INC.