1

```
                    UNITED STATES OF AMERICA
 1                 UNITED STATES DISTRICT COURT
 2               CENTRAL DISTRICT OF CALIFORNIA
                        WESTERN DIVISION
 3                         - - -
 4              HONORABLE MARK C. SCARSI
             UNITED STATES DISTRICT JUDGE PRESIDING
 5                         - - -
 6
   PAVEMETRICS SYSTEMS, INC.,      )
 7                                 )
              PLAINTIFF,           )
 8                                 )
   VS.                             )  CASE NO.:
 9                                 )  CV 21-01289-MCS
   TETRA TECH, INC.,               )
10                                 )
              DEFENDANT.           )
11                                 )
12 _____)
13
14          REPORTER'S TRANSCRIPT OF PROCEEDINGS
15             THURSDAY, AUGUST 18, 2022
16               LOS ANGELES, CALIFORNIA
17
18
19
20
21
22
23          LAURA MILLER ELIAS, CSR 10019
            FEDERAL OFFICIAL COURT REPORTER
24          350 WEST 1ST STREET, ROOM 4455
            LOS ANGELES, CALIFORNIA 90012
25             PH:  (213)894-0374

              UNITED STATES DISTRICT COURT
```

2

```
 1  APPEARANCES OF COUNSEL:

 2

 3  ON BEHALF OF PLAINTIFF:
 4     KNOBBE, MARTENS, OLSON & BEAR, LLP
 5     BY: CHRISTY LEA, ESQ.
 6         JOSEPH RE, ESQ.
 7         NICHOLAS ZOVKO, ESQ.
 8         ALAN LAQUER, ESQ.
 9     2040 MAIN STREET
10     14TH FLOOR
11     IRVINE, CA 92614
12
13  ON BEHALF OF DEFENDANT:
14     FINNEGAN HENDERSON
15     BY: JAMES BARNEY, ESQ.
16         AARON PARKER, ESQ.
17         NICHOLAS CERULLI, ESQ.
18         JENCY MATHEW, ESQ.
19         DANIEL CHUNG, ESQ.
20     901 NEW YORK AVENUE NW
21     WASHINGTON, DC 20001
22
23
24
25          UNITED STATES DISTRICT COURT
```

3

```
                         INDEX
 1
 2  WITNESSES FOR
    TETRA TECH:
 3
              DIRECT   CROSS   REDIRECT  RECROSS
 4
    MESHER, DAREL
 5  BY: MR. CERULLI  15         79
    BY: MR. RE            33              82
 6
 7  LARSON, WILLIAM
    BY: MR. CHUNG   86       120
 8  BY: MR. ZOVKO        101             123
 9  FOX-IVEY, RICHARD
    (VIA VIDEO) 125
10
    TALBOT, MARIO
11  (VIA VIDEO) 126
12  NGUYEN, THANH
    (VIA VIDEO) 126
13
    HAFIZ, ALI
14  (VIA VIDEO) 126
15  MORELLAS, VASSILIOS
16  BY: MR. BARNEY   128
17
18
19
20
21
22
23
24
25          UNITED STATES DISTRICT COURT
```

4

```
 1  LOS ANGELES, CALIFORNIA; THURSDAY, AUG. 18, 2022; 8:39 A.M.
 2                       - - -
 3      THE CLERK:  Calling Case No. CV 21-1289.
 4  Pavemetrics Systems, Inc. versus Tetra Tech, Inc.
 5  Counsel, please state your appearances.
 6      MS. LEA:  Good morning, Your Honor.
 7  Christy Lea on behalf of Pavemetrics.
 8      With me is Joseph Re, Nick Zovko and our client,
 9  John Laurent.
10      THE COURT:  Good morning.
11      THE COURT REPORTER:  Counsel, you might want to
12  pull all the microphones forward now.  Thank you.
13      MR. BARNEY:  Good morning, Your Honor.
14  James Barney on behalf of Tetra Tech.  And with me
08:39AM 15  today, Nick Cerulli, Connor McGregor and Aaron Parker.
16      THE COURT:  Good morning.  Okay.  So I understand
17  that the parties have a couple issues.  Let me start with
18  Tetra Tech.
19      MR. BARNEY:  I believe it's only one issue now.  We
08:39AM 20  were able to resolve the second issue.
21      THE COURT:  Great.
22      MR. BARNEY:  During Pavemetrics' opening yesterday,
23  Ms. Lea invoked or referred back to the Judicial Center video
24  on the concept of the duty of candor.  This is something that
08:39AM 25  was discussed in that video.  And she said or alleged that
            UNITED STATES DISTRICT COURT
```

EXHIBIT 2
-3-

5

1  Dr. Mesher, the inventor, had this piece of information about
2  the LRAIL and didn't submit it to the Patent Office.  Even
3  though he had a duty to disclose it, he did not.
4          That's improper, Your Honor, because inequitable
08:40AM 5  conduct is not in this case.  They didn't plead it, they
6  jury's not gonna be instructed on it, and so all that was was
7  an attempt to malign Dr. Mesher and accuse him of violating
8  his duty of candor.
9          I was tempted to object during the opening, but I'm
08:40AM 10  always loathe to do so so I did not, but I would just like to
11  bring it to your attention just to make sure it doesn't
12  continue during this trial, especially during the questioning
13  of Dr. Mesher this morning.
14          THE COURT:  Okay.  And so the inequitable conduct's
08:40AM 15  not in the case.  Any other reason why that information would
16  be relevant?  And I'm not coming up with one, but let me hear
17  from --
18          MR. BARNEY:  Well, can I add one thing?  Of course
19  we don't mind.  It's perfectly fine if they want to point ou
08:40AM 20  that that particular reference is not listed on the face of
21  the patents.  That's fine.  And they can have their expert do
22  it.  They can even ask Dr. Mesher about that.  But the
23  implication that he knew about it and refused to -- or
24  somehow violated some duty by not disclosing it, that's what
08:40AM 25  we're objecting to cause that is irrelevant to any issue in

UNITED STATES DISTRICT COURT

6

1  this case and highly prejudice.
2          THE COURT:  Okay, thank you.
3  Counsel.
4          MR. RE:  Good morning, Your Honor.  Mr. Re for
08:41AM 5  Pavemetrics.  Mr. Barney's correct.  There's no allegation of
6  inequitable conduct.  However, it is relevant of course, of
7  course if the inventor had access to information that he
8  should have given to the Patent Office, and the Patent Office
9  didn't have it.  That is in the jury instruction, shows that
08:41AM 10  it is easier to overcome our burden of clear and convincing
11  evidence if, in fact, the inventor did not disclose
12  information he had.
13          And so as everything else going in this trial, let
14  us see what we can elicit on cross-examination.  And I think
08:41AM 15  you built up this inventor as somebody very well
16  knowledgeable about patents and 29 patents.  And let's see
17  what information he had before he filed his application and
18  see what the witness has to say about what he disclosed and
19  what he didn't disclose.
08:42AM 20          But you're right, I'm not sure it would invalidate
21  the patent for inequitable conduct, but we're trying to make
22  it easier for us to sustain our burden by clear and
23  convincing by invalidity.  And it's very important that the
24  jury know what the inventor had and what he did not disclose
08:42AM 25  to the Patent Office.

UNITED STATES DISTRICT COURT

7

1          THE COURT:  So let me ask you this.  I'm just
2  trying to parse through this.  So as I understand, Tetra
3  Tech's argument is that certainly it's relevant whether or
4  not the reference was before the examiner.  And, you know,
08:42AM 5  because from an invalidity standpoint, it makes sense for you
6  to argue that the examiner didn't consider this reference.
7  This is something that the jury's considering, and so it's
8  fair game.
9          But why is it relevant whether or not the inventor
08:42AM 10  gave the reference to the Patent Office if you're not arguing
11  inequitable conduct?
12          MR. RE:  Because one, I would like to know why, why
13  the inventor thinks it is not anticipatory prior art which,
14  of course, my expert needs to know before my expert can
08:43AM 15  testify on invalidity.  So, for example, let's pretend the
16  inventor explains to me oh, this isn't relevant, Mr. Re
17  because of X, Y and Z.  I would like to elicit that testimony
18  so that my expert understands exactly what the inventor
19  thinks about the irrelevance of earlier prior art.  I will
08:43AM 20  show him some prior art references.
21          THE COURT:  Okay.  Um, let me hear from Tetra Tech
22  now.  What about that point that the inventor -- the
23  inventor's view on why he didn't believe it was prior art is
24  kind of fair game for the invalidity question.
08:43AM 25          MR. BARNEY:  It's not fair game, Your Honor.  It's

UNITED STATES DISTRICT COURT

8

1  an end run.  I mean, it's clear what they're doing.  They
2  brought it up in opening.  They've mentioned the duty of
3  candor.  There is actually no mystery about what they're
4  doing.  They're trying to malign Dr. Mesher with this alleged
08:43AM 5  violation of duty of candor.  It's improper.  What Mr. Re
6  just did there is end run.
7          You got it exactly right.  The only relevant piece
8  of information for purposes of invalidity is whether or not
9  it was listed and considered by the examiner.  And that's
08:44AM 10  fair game, we completely agree.  They can ask Dr. Mesher if
11  he knew about it.  But the point of, uh, why didn't you
12  submit it or why didn't you think it was relevant is getting
13  into this issue of inequitable conduct.  It's not an issue in
14  this case.
08:44AM 15          The only question is is it --was it considered or
16  was it not considered, and that's a yes, no.  That's an easy
17  thing to do.  You look on the face of the patent.  Their
18  expert can do it.
19          THE COURT:  Yeah.  So what about that -- so if the
08:44AM 20  inventor knew about and thought it wasn't -- it wasn't, um,
21  relevant, isn't that information that's, you know, relevant
22  to the inquiry?
23          MR. BARNEY:  I don't believe so, Your Honor.  Our
24  expert didn't submit an expert in this case.  They have an
08:44AM 25  expert who's gonna talk about the reference and why they

UNITED STATES DISTRICT COURT

**EXHIBIT 2**
**-4-**

**9**

1  think it's relevant.  We have an expert who's gonna talk
2  about it and why he thinks it's relevant.  This inventor
3  didn't submit an expert report.  This inventor didn't go
4  through claim construction and so forth.
08:44AM 5  Um, if they had an inequitable conduct case to
6  make, then that might be a relevant inquiry, whether or not
7  he subjectively thought it was relevant and subjectively
8  decided not to submit it to the Patent Office.
9  But otherwise, this subjective belief of the
08:45AM 10  inventor as to whether something is relevant or not doesn't
11  seem to have any relevance to the issue of invalidity.  Their
12  case-in-chief is this reference or this combination of
13  references meets every limitation of the claim.  That's the
14  only relevant inquiry, not somebody's subjective intent back
08:45AM 15  at the time the reference was being considered by the
16  inventor.
17  MR. RE:  Your Honor, first of all, they contest
18  whether or not certain items of ours is even prior art to
19  begin with.  That's the first thing.  And we have a dispute
08:45AM 20  over the prior art instruction and what's prior art and
21  what's not, and we couldn't stipulate to that so we offered
22  to stipulate --
23  THE COURT:  Counsel.  Counsel.  Address all the
24  discussion to the bench, not to other counsel.
08:45AM 25  MR. RE:  We --

**10**

1  THE COURT:  If you want to talk with other counsel,
2  you can always, you know, take a break and go outside.
3  MR. RE:  Well, I would have appreciated that.  I
4  didn't know it was being raised until right now.  Okay?
08:46AM 5  That's the first thing.  I'd like to have all my materials in
6  front of me cause this is the first I've heard of it.
7  THE COURT:  Again, I'm not interested in your
8  fights with each other.
9  MR. RE:  Well, I --
08:46AM 10  THE COURT:  You can take that outside.  I don't
11  really care.  Um, but when you're talkin' to the Court, talk
12  to the Court, not to the --
13  MR. RE:  Yes.
14  THE COURT:  -- opposing counsel.  You -- you
08:46AM 15  understand that.
16  MR. RE:  I understand that.
17  THE COURT:  Okay.  Please.
18  MR. RE:  I was just simply making the point that --
19  THE COURT:  Again, do you understand what I'm
08:46AM 20  saying?
21  MR. RE:  Yes.
22  THE COURT:  Okay, let's move on.
23  MR. RE:  Okay.  I -- I have been trying patent
24  cases for a long time.  This is the most relevant piece of
08:46AM 25  information for the jury.  We could not agree on what was

**11**

1  prior art.  I think of course it's important that the jury
2  know that the inventor had in his possession prior art.  I
3  couldn't think of anything --
4  THE COURT:  Wait a minute.  Why if you're now
08:46AM 5  making an inequitable conduct case does it matter whether it
6  was in the inventor's possession?
7  MR. RE:  Because first of all, it shows the timing.
8  First of all, it shows the public availability.  This is
9  competing companies, and if they have in their possession
08:46AM 10  documents, it shows the public nature of the document which
11  is part of the inquiry into whether there's prior art.  Okay?
12  Secondly, if it's not disclosed, I think I'm
13  entitled to know the reasons why it wasn't disclosed.
14  And this inventor, Mr. Barney really built this up
08:47AM 15  inventor as somebody with 29 patents.  And we objected to
16  putting in the 29 patents, and you said no, no, it's fair
17  game.  And it was only two patents at issue with a single
18  specification.  And they built him up like he's, uh, Albert
19  Einstein.
08:47AM 20  So I think I'm entitled to show that this inventor,
21  first of all, doesn't deserve that kind of credit of 29
22  patents, and secondly, to show that this inventor did, in
23  fact, know what was prior art, and it was prior art, had it
24  in his possession and did not disclose.  How could that be
08:47AM 25  any more relevant to an invalidity challenge of the patent is

**12**

1  beyond me?
2  THE COURT:  It really sounds like you're making
3  inequitable conduct argument, though.  I mean, you just ended
4  that sentence with the inventor had it in his possession and
08:48AM 5  didn't disclose it.  That's sort of boiler plate inequitable
6  conduct.  So I'm trying to figure what the -- where the line
7  is here cause --
8  MR. RE:  I'm not alleging any deceptive intent.
9  See?  I didn't say that he was deceptive at all.  I'm just
08:48AM 10  showing his availability and his knowledge.  I did not
11  suggest in any way that he -- the patents should be
12  invalidated or that he committed inequitable conduct.
13  I just think it is relevant that the inventor had
14  in his possession before he wrote the application certain
08:48AM 15  information.  And that also is relevant, of course, to the
16  disclosure and what he knew already existed, and that goes
17  into how the patent application was written.
18  So I'm not gonna suggest that there was deceptive
19  intent.  I just want to know you had this, you had this, and
08:48AM 20  do you know if Patent Office had it.  That's it.
21  THE COURT:  So I think you can ask him whether or
22  not he was aware of the reference.  I think you can point out
23  the fact that the reference wasn't in the file wrapper,
24  wasn't disclosed to the Patent Office.  But as far as his
08:49AM 25  decision as to whether or not and why he didn't disclose it

**EXHIBIT 2**
**-5-**

13

1  to the Patent Office, I think we're getting inequitable
2  conduct issues.
3          MR. RE:  Fair enough.  I will not -- I will not ask
4  why he didn't disclose it.  Fair enough.
08:49AM 5        THE COURT:  Okay.  Anything else this morning?
6          MR. BARNEY:  No, Your Honor, thank you.
7          THE COURT:  Anything else from Pavemetrics?
8          MS. LEA:  No, Your Honor.
9          THE COURT:  Okay.  Uh, so we're gonna start at
08:49AM 10  9:00.  We have a witness ready to go?
11          MR. CERULLI:  Yes, Your Honor.
12          THE COURT:  Okay, great.  So, um, if the jury's all
13  here and ready, we'll start right up at 9.  But if you can be
14  ready at 9, I'd like to at least give the jury the impression
08:49AM 15  we're, you know, ready for them.  This way, if they're a
16  little bit later this morning, they might get the idea that
17  they've got to be on time tomorrow and Tuesday and so on.
18          Okay.  Thanks, everybody.
19          THE CLERK:  All rise.  This court's in recess.
08:49AM 20          (Recess taken.)
21          THE CLERK:  All rise.
22          (Jury present.)
23          THE CLERK:  Please be seated.
24          THE COURT:  Welcome back to the jurors.  I
09:09AM 25  appreciate you all being here on time.  We'll get started.

14

1  We finished with the witness yesterday afternoon, and we'll
2  have Tetra Tech call their next witness, please.
3          MR. CERULLI:  Good morning, Your Honor.  Before we
4  call our next witness, we'd just like to pre-admit some
5  exhibits to the documents.
6          THE COURT REPORTER:  I'm sorry, Counsel.  Could you
7  speak up a little or maybe raise the lectern?
8          MR. CERULLI:  Yeah, sure.
9          THE COURT REPORTER:  Appreciate it.
09:09AM 10          MR. CERULLI:  So those are Exhibits 12, 13, 712,
11  713, 816, 825, and 826.
12          THE COURT:  Any objection, Counsel?
13          MR. RE:  No objection, Your Honor.
14          THE COURT:  Okay.  Exhibits 12, 13, 712, 713, 816,
09:09AM 15  825 and 826 are in evidence.
16          (Exhibits 12, 13, 712, 713, 816, 825, 826 admitted.)
17          MR. CERULLI:  With that, Tetra Tech calls its next
18  witness, Dr. Mesher.
19          THE COURT:  Stand here for me, please.
09:10AM 20          Raise your right hand.
21          (Witness sworn.)
22          THE CLERK:  Please be seated.  I'm gonna bring you
23  a binder of exhibits in a second.  Will you state and spell
24  your full name for the record, please.
09:10AM 25          THE WITNESS:  Uh, Darel Edward Mesher, D-a-r-e-l

15

1  E-d-w-a-r-d, M-e-s-h-e-r.
2          THE CLERK:  Thank you.
3          THE COURT REPORTER:  You want to pull that
4  microphone right close to you.  Thank you very much.
09:10AM 5          THE COURT:  Okay.  Counsel, you may proceed.
6          DIRECT EXAMINATION
7  BY MR. CERULLI:
8  Q.  Please introduce yourself to the Judge and the jury.
9  A.  My name is Darel Mesher.
09:11AM 10  Q.  And Dr. Mesher, who do you currently work for?
11  A.  I work for Tetra Tech TAS, Inc. in Alberta, Canada.
12  Q.  And what is your title at Tetra Tech TAS?
13  A.  Chief Technical Officer.
14  Q.  And what are some of your job responsibilities as Chief
09:11AM 15  Technical Officers?
16  A.  I manage a group that develops technology for the rail
17  industry and, uh, I also provide technical guidance to other
18  groups within the company.
19  Q.  And can you please briefly describe your educational
09:11AM 20  background?
21  A.  I received Bachelor's of Computer Engineering in 1985, a
22  Masters of Electrical Engineering in 1987 and a PhD in
23  Electronic Engineering in 1992, all of those from McMaster
24  University in Southern Ontario.
09:11AM 25  Q.  And as part of you PhD, did you do a dissertation?

16

1  A.  Yes.  It was titled Artificial Intelligence Applied to
2  Bridge Deck Radar Interpretation.
3  Q.  Um, and can you explain to the jury what you mean by
4  artificial intelligence?
09:12AM 5  A.  The substance of that research was the development of
6  expert systems and neural networks to correctly and
7  accurately interpret nondestructive bridge deck radar data
8  that had been collected on bridge type structures.
9  Q.  And you mentioned neural networks.  What is that term?
09:12AM 10  A.  Generally, they are a software tool that's configurable
11  that is typically used for feature identification in data.
12  Q.  So after your PhD research, what was your first job?
13  A.  In 1992, I started work with EBA Engineering Consultants
14  Limited in Edmonton.
09:12AM 15  Q.  And how long did you work for EBA?
16  A.  In fact, I still work for EBA.  EBA was acquired in the
17  period 2010 through 2013 by Tetra Tech so I have been with
18  EBA slash Tetra Tech for my entire career.
19  Q.  And when you first started EBA, what were some of your
09:13AM 20  job responsibilities there?
21  A.  Uh, I was developing a fledgling group that was
22  developing technology specific to roadway assessments and
23  basically commercializing my PhD research.
24  Q.  So you've been working on -- in the public
09:13AM 25  transportation industry for about 30 years now?

**EXHIBIT 2**
**-6-**

17

1    A.   Uh, yes, for my entire career.

2    Q.   And what made you get into the public transportation

3    field?

4    A.   Uh, when I was a young person living in Montreal, my

09:13AM 5    parents were involved in a bad car accident on a bridge deck,

6    and my mother was in hospital for almost a year and wound up

7    being disabled from that.

8    Q.   And you had mentioned earlier that your subject of your

9    dissertation was bridge decks?

09:14AM 10   A.   Yes.

11   Q.   So you've been doing, um, you mentioned design work for

12   about 30 years in the public transportation field.  Do you

13   have any patents on your designs?

14   A.   Yes, the 28 patents in the rail technology space.

09:14AM 15   Q.   And two of your rail patents are at issue in this case?

16   A.   Yes.

17   Q.   If you could turn to your exhibit binder referred to

18   Exhibit 12.  If you could just pull that up on the screen?

19   You recognize this as one of your patents in this case?  It's

09:14AM 20   U.S. Patent 10,362,293?

21   A.   Yes.

22   Q.   And it's entitled 3D Track Assessment System and Method?

23   A.   Correct.

24   Q.   And you're listed as the sole inventor on that patent?

09:14AM 25   A.   That is correct.

UNITED STATES DISTRICT COURT

---

18

1    Q.   And if we can turn to Exhibit 13, do you recognize that

2    as the second patent in this case?  It's U.S. Patent

3    10,616,557?

4    A.   Yes.

09:15AM 5    Q.   And that is entitled 3D Track Assessment Method?

6    A.   Correct.

7    Q.   And, again, you're listed as the sole inventor on this

8    patent as well.

9    A.   Correct.

09:15AM 10   Q.   Um, can you tell us a little bit about what lead to the

11   development of these two patents?

12   A.   As we had talked about earlier, I had started my career

13   developing technologies for roadway assessment, and through

14   that, we created a unique technology that was, uh, radar used

09:15AM 15   to assess roads and bridges.

16        And Canadian National Railway in 2002 invited us to

17   apply that technology to the rail space to vehicles to assess

18   the substructure underneath the rails which we did.  And that

19   began a relationship with Canadian National Railways that

09:16AM 20   allowed us to continue to develop technologies.  And we added

21   to that high rail based system the ability to do 2D image

22   based track assessment.

23        And in 2013, we sought an industrial research

24   assistance program federal funding in Canada to develop 3D

09:16AM 25   triangulation sensor technology that would be suitable for

UNITED STATES DISTRICT COURT

---

19

1    the rail industry so that really began the developments in

2    the rail space.

3    Q.   And -- and you mentioned 3D.  Can you explain to the

4    jury a little bit what you mean by 3D?

09:16AM 5    A.   2D everyone's familiar with.  Your iPhone camera takes

6    2D pictures.  They are intensity or color based images.

7         The 3D technology and measurements we're talking

8    here generate a true rendition of the elevation profile of a

9    surface over which these measurements are made.  So the,

09:17AM 10   uh -- at the end of doing a data collection in the track

11   space, you'd wine up with a very accurate rendering of the

12   track surface.

13   Q.   Okay.  So the subject matter of these two patents is

14   railroad track inspection; correct?

09:17AM 15   A.   It is, yes.

16   Q.   Um, can you tell us why that's important?

17   A.   The rail industry assesses, maintains their track

18   infrastructure on an annual basis and tries to maintain it in

19   order to keep the traffic on the rails and not having

09:17AM 20   catastrophic failures, derailments.  So the safety aspect of

21   monitoring and assessing these track systems are very

22   important.

23   Q.   Before you started developing your -- what lead to the

24   development of these patents, were there other systems out

09:18AM 25   there, other railroad track inspection systems?

UNITED STATES DISTRICT COURT

---

20

1    A.   Yes, there were.

2    Q.   And so what made your track inspection systems any

3    different?

4    A.   The three dimensional technology that we're talking

09:18AM 5    about here, the hardware used to do the measurements, was a

6    mature science.  It had been used for decades.  The real

7    substance of the innovation was associated with doing

8    developments on the algorithms associated with doing the post

9    processing and analysis of that track bed.

09:18AM 10   Q.   And what made your algorithms different than the prior

11   systems?

12   A.   It was really the speed and accuracy that we were

13   motivated to improve.  The faster we can process data and the

14   more accurate it is, the better the interpretation and

09:18AM 15   results.

16   Q.   And what are some of the ways that your algorithm

17   improved speed and accuracy?

18   A.   Three of them are the use of an appropriate gradient

19   neighborhood as part of the algorithm.  The second would be

09:19AM 20   the combination of both elevation data and intensity data

21   when we're doing the analysis.  And the third one would be

22   the extraction of the railhead artifact in the three

23   dimensional elevation data which tends to overshadow the

24   subtle components we're most interested in assessing.

09:19AM 25   Q.   So walk through that a little bit.  You mentioned

UNITED STATES DISTRICT COURT

**EXHIBIT 2**

**-7-**

---

21

1    appropriate gradient neighborhood.  Can you tell us how that
2    improves either speed or accuracy?
3    A.    Yeah, the -- the use of an appropriate gradient
4    neighborhood allows us to tailor the, uh, detection -- the --
09:19AM 5    the algorithm for the detection of the feature, and it both
6    improves the accuracy in identifying the feature, but it also
7    improves the speed associated with doing the analysis of the
8    3D environment.  So it's one of those algorithms
9    that does both a speed improvement and an accuracy
09:20AM 10   improvement.
11   Q.    The second thing you mentioned was the combination,
12   using both elevation and intensity.  And can you tell us
13   about how that improves either speed or accuracy?
14   A.    The use of any additional attributes when we try to
09:20AM 15   characterize features that we're most interested in improves
16   the accuracy of the detection of those features.  So the
17   combination of elevation data as well as intensity data
18   allows us to improve the accuracy of actually finding the
19   feature that we're interested in assessing.
09:20AM 20   Q.    The third thing you mentioned was removing the railhead.
21   Can you tell us what that means?
22   A.    In rail elevation data, by far the largest feature that
23   we're profiling when we do our 3D elevation map is the
24   railhead.  It sits about eight inches above the rest of the
09:21AM 25   track surface.

UNITED STATES DISTRICT COURT

---

22

1               An analogy would be if I was above a forest and
2    trying to count or identify the boulders that are sitting on
3    the ground, if I can cut off the trees on the ground level,
4    it becomes a very easy process to be able to identify those.
09:21AM 5    In the same regard, if we can remove the railhead artifacts
6    and only leave the subtle components we're interested in
7    assessing, then we're in a situation where we can enhance the
8    accuracy of the detection and the classification.
9    Q.    Now, you don't actually remove the railhead on the rails
09:21AM 10   themselves; correct?
11   A.    No.  We identify where railheads are, and then we use
12   the -- an estimate from the rail base, the bottom of the rail
13   to replace the elevation data that would have been the
14   railhead.  So we basically lower the railhead down to the
09:21AM 15   rail base level.
16   Q.    And have your algorithms, you know, made it into any
17   commercial products?
18   A.    Uh, yes.  The development that was done in 2015 is the
19   result of a contract that was awarded to us circa
09:22AM 20   December 2014 allowed us to do this development of all of
21   these algorithms that then were embedded in a product that is
22   mounted on a test car that's in service even today.  So that
23   technology is still being used today.
24   Q.    Which product are you referring to?
09:22AM 25   A.    That 2015 development would have been referred to as 3D

UNITED STATES DISTRICT COURT

---

23

1    Track Assessment System.
2    Q.    And for us, it's the 3DTAS.
3    A.    3DTAS is the acronym, yes.
4    Q.    Um, and so -- um, so you said you made your first sale
09:22AM 5    of that in 2015.  Um, does Tetra Tech still sell its 3DTAS
6    today?
7    A.    Yes.  Uh, between the period 2015 and current day, we've
8    been doing continuous development on that technology.  So
9    yes, it's still being offered for sale today.
09:23AM 10   Q.    Um, and does Tetra Tech sell it individually or as part
11   of a larger offering?
12   A.    The technology as itself as it was in 2015 can be sold
13   individually as a component or as we do now.  Because getting
14   access to the railway track is -- can be an expensive
09:23AM 15   undertaking, clients' owners are interested in as much data
16   being collected when a single survey is being done.
17               So we offer it as a combined integrated system that
18   adds panoramic digital imagery, it adds LiDAR sensors.  It
19   adds a control environment that maintains power and climate
09:23AM 20   control requirements for the car that it's mounted in.
21               We have a high resolution 3D measurement system
22   that measures the side profiles of the rails.  You can
23   actually read the manufacturer's marks off the side of them
24   as well as other track features like joint bars that are a
09:24AM 25   part of the track structure.

UNITED STATES DISTRICT COURT

---

24

1               And then, of course, we have the 3DTAS system with
2    the profiling of the track surface underneath the railway
3    car.
4    Q.    So you mentioned quite a few rail inspection
09:24AM 5    technologies.  You know, how does 3DTAS compare to those
6    other technologies?
7    A.    All of the technologies provide useful and valuable
8    data, but the reality is from a track operator owner
9    standpoint, it is the condition of the track itself, the
09:24AM 10   infrastructure that's underneath the cars, that is the
11   biggest component in the safety and safe operation of those
12   cars.  It's what they maintain on an annual basis.
13               So the 3DTAS system is the technology that we
14   provide that does the inventory and assessment of that
09:24AM 15   infrastructure.  So the 3DTAS data by and far would be the
16   most valuable from a safe operation and maintenance
17   standpoint to an operator.
18   Q.    Um, so the algorithm that we've been talking about
19   today, um, does Tetra Tech still use those today?
09:25AM 20   A.    Yes.  As I said, we've done continuous development since
21   2015, but the source for the deployed software contains all
22   of the -- the algorithms that we've developed since 2015 and
23   beyond.
24   Q.    And what are some of the ways that you've continued to
09:25AM 25   develop or evolve?

UNITED STATES DISTRICT COURT

---

**EXHIBIT 2**
**-8-**

25

1    A.    Currently, we are looking for methods that improve the
2    speed and the accuracy of our measurements, and that includes
3    machine vision and machine learning technologies.
4    Q.    What do you mean by machine vision and machine learning?
09:25AM 5    A.    We have -- we use convolutional neural networks to train
6    to identify features to be able to then do the assessments on
7    them.
8    Q.    And you said the algorithms that we were talking about
9    earlier still are implemented today?
09:26AM 10   A.    They're still part of the source for the entire deployed
11   software.
12   Q.    And you had mentioned your 2015 sale.  Who was that to?
13   A.    That was to Canadian National Railway.
14   Q.    And Canadian National's a Class 1 railroad?
09:26AM 15   A.    It is, yes.
16   Q.    Uh, has Tetra Tech offered its 3DTAS to other Class 1
17   railroads?
18   A.    Yes.
19   Q.    And what are some of those?
09:26AM 20   A.    Uh, CSX, and we've had inquiries from most of the
21   Class 1s, interacted with most of the Class 1s.
22   Q.    Okay.  And about when did Tetra Tech offer its 3DTAS to
23   CSX?
24   A.    Uh, we began discussions with CSX in the Spring of 2019
09:26AM 25   and then continued dialogue and exchanging information with

26

1    KCS -- or sorry, CSX all the way through 2019 through 2020
2    and then provided them with a comprehensive proposal in the
3    Fall of 2020.
4    Q.    Can you turn to Exhibit 713?  Do you recognize
09:27AM 5    Exhibit 713?
6    A.    Yes.
7    Q.    And what is it?
8    A.    This is a source code -- extraction from our source code
9    repository that we maintain now.
09:27AM 10   Q.    And what was it dated?
11   A.    It's dated August 13th, 2021.
12   Q.    Okay.  So this is around the time you offered your 3DTAS
13   to CSX?
14   A.    Yes, a period after that.
09:28AM 15   Q.    And can you turn to Exhibit 825?
16   A.    Yes.
17   Q.    What is Exhibit 825?
18   A.    This is a manual for an off-the-shelf 3D elevation
19   sensor produced by SICK.  This particular version of it is
09:28AM 20   Ranger3.
21   Q.    And does Tetra Tech use the Ranger3 sensors in its
22   3DTAS?
23   A.    Yes.  These are the ones we're using.
24   Q.    Okay, thank you.  Can you move to Exhibit 712?  Do you
09:28AM 25   recognize Exhibit 712?

27

1    A.    Just a second.  Yes.
2    Q.    And what is Exhibit 712?
3    A.    Uh, these are two annotated data blocks produced by the
4    3DTAS system.
09:29AM 5    Q.    And how do you know that?
6    A.    I produced these images.
7    Q.    So we were talking a little bit about your first sale
8    in 2015, and you had mentioned you began development around
9    2013.  Can you tell us a little bit about that time frame
09:29AM 10   between when you began development and made your first sale
11   in 2015?
12   A.    Yes.  As I said, the focus of the research that was done
13   on -- in the -- in the with the IRA federally funded research
14   project was to develop a data collection system that could
09:29AM 15   produce elevation data, robust data collection environment
16   collected on tracks and that produced the -- with using
17   off-the-shelf technologies.
18           And then we started doing development after the
19   requirements for the delivery to the federal government as
09:30AM 20   the report was generated.  Then we did development
21   through 2013, end of 2013, 2014.  And then we're awarded the
22   contract in December of 2014 for the development for the
23   3DTAS system.  So there was continuous evolving development
24   done all the way through that period.
09:30AM 25   Q.    Can you tell us about how many hours you personally

28

1    invested in this development?
2    A.    I recognize when we started the research on the 3D
3    sensor technology that it was going to be a significant
4    improvement in the safety of track assessments, and because
09:30AM 5    of that, I was highly motivated.  I was vested in it.  So
6    beyond the 40 hours every week where I was doing programming,
7    I was also working nights and weekends to see if I could
8    advance this and experiment with the technology and continue
9    the development.
09:31AM 10   Q.    And this involved drafting source code?
11   A.    Yes, it did.  And probably thousands of hours of
12   developing source code.
13   Q.    Ballpark number, how many lines of code do you think you
14   developed?
09:31AM 15   A.    I don't know the exact number, but over that period of
16   time, we're talking about hundreds of thousands of lines of
17   code inside the development environment that I was working
18   which is a product from a company called Mathworks.  Math Lab
19   was the development environment.
09:31AM 20   Q.    And was there anyone who helped you develop these
21   algorithms?
22   A.    Uh, no, I was doing it.
23   Q.    And along the way, how did you keep track of your
24   progress?
09:31AM 25   A.    Uh, at the time and even today, all of the developments

**EXHIBIT 2**
**-9-**

---

29

1  that I do are done on a personal work station.  I do
2  development, and inside the development environment that I
3  work on, it just is a continually evolving development.  So I
4  start with an idea and then modify it, and it just continues
5  to morph and change through the history of it.
6  Q.   And at any point, did you ever share your source code
7  with anybody outside of Tetra Tech?
8  A.   No.  Tetra Tech takes IP very seriously and, uh, didn't
9  share it with anyone.
10  Q.   Were you aware of Pavemetrics prior to the filing of
11  this lawsuit?
12  A.   Yes.
13  Q.   And how -- how did you know Pavemetrics?
14  A.   Uh, at that time, prior to 2010, I was managing the data
15  collection group within the companies I had said earlier, and
16  as part of that, I would attend conferences and other places
17  where the roadway data collection, science and technology was
18  demonstrated.
19  Q.   Did you ever purchase any Pavemetrics' products?
20  A.   I was aware of the Pavemetrics' laser route measurement
21  system, and then they came out with the LCMS system.  And
22  through interactions with Pavemetrics and discussions at
23  conferences, when they approached our clients who were
24  Departments of Transportation and suggested that this was a
25  new objective measurement possibility for roadway data

UNITED STATES DISTRICT COURT

---

30

1  collection.
2          And because we were doing that data collection
3  service, and we had suggested to our clients that this would be
4  an important attribute that they could add to their data
5  collection, and when they were convinced that was the case,
6  they added it to the contracts, and as soon as it was part of
7  a requirement for delivery, Tetra Tech bought one.  So we
8  bought one in 2012.
9  Q.   And when you say bought one, which product are you
10  referring to?
11  A.   We bought an LCMS system in 2012.  We bought another one
12  in 2017.
13  Q.   Okay.  And what was your impression of the LCMS
14  products?
15  A.   Uh, all of the interaction that we had had with
16  Pavemetrics, as I said, demonstrations and looking at data,
17  and it was a -- a good product.
18  Q.   And did you, uh, use the hardware as part of your use of
19  the product?
20  A.   Uh, yes.  The system comes with hardware and software.
21  And as we said earlier, the triangulation technology that
22  we're talking about here if we're doing the 3D profiling,
23  it's off-the-shelf so it's common and has been used for
24  years.  Pavemetrics created one that was suitable for use in
25  roadway environments.

UNITED STATES DISTRICT COURT

---

31

1          And after we had bought it, we used their system
2  for a period of time and started to evaluate it.  And when we
3  went through did those evaluations, we found that some of the
4  post processing and reporting was lacking.  And at that time,
5  as was typical for any of the other technologies that we had
6  developed over the years, we approached Pavemetrics to find
7  out whether or not we could get access to the raw data so
8  that Tetra Tech would be able to develop our own post
9  processing and reporting capabilities.
10          And I was surprised to find at the time that that
11  library wasn't available.  We couldn't get access to the raw
12  data.  We continued to have discussions, and through those
13  discussions, Pavemetrics agreed that they would provide us
14  with a licensed copy of a library that would give us access
15  to the -- to the raw data.  And at that point, we started
16  doing the development of our own post processing and analysis
17  routine with the raw data from as I said the sensors that the
18  elevation data is pretty common.
19  Q.   And when you say post processing reporting, what are you
20  referring to?
21  A.   Uh, the ability to develop our own tools in order to
22  analyze the roadway data and provide reports to our clients.
23  Q.   And you mentioned raw data.  Can you explain what raw
24  data is?
25  A.   As you see in the -- in the, uh -- well, for these

UNITED STATES DISTRICT COURT

---

32

1  systems, we're talking about the elevation profile for the
2  roadway surface itself.  So basically, the three dimensional
3  measurements of the roadway system, that's what we were
4  seeking is to take that, and then we would start developing
5  our own ability to do the analysis.
6  Q.   And -- and what do you -- what do you do with the raw
7  data?
8  A.   Uh, we wind up post processing it and generating the
9  attributes that were entrusted in providing to our clients,
10  customizing the reports for our clients' needs.
11  Q.   Um, and you mentioned you were involved in both the
12  pavement inspection and railroad inspection fields.  Um, are
13  there any similarities between the two fields?
14  A.   As I said, the -- the technology for doing the
15  measurement is identical, the photo triangulation, the use of
16  draping a laser line across the surface.  And then using a 3D
17  sensor to measure the elevation, that's common.  The real
18  difference is in the algorithms.  The post processing and
19  analysis is very different between roadways and the rail
20  environment.
21  Q.   I mean, why are they different?
22  A.   Well, anybody that's driven a car understands that a
23  roadway is essentially a plane or surface.  And when we're
24  doing an analysis of a roadway, we're interested in very
25  subtle features, very small, subtle features for that roadway

UNITED STATES DISTRICT COURT

---

**EXHIBIT 2**
**-10-**

---

33

1 surface.

2        And in contrast, the rail environment as I said has

3 very large, physical 3D features, uh, very complicated

4 environment in order to identify all those features, those

09:37AM 5 very subtle features that we're interested in.  So the post

6 processing and analysis software, the algorithms are really

7 where the fundamental difference is.

8        MR. CERULLI:  Thank you.  No further questions.

9        THE COURT:  Thank you, Counsel.

09:38AM 10        Any cross-examination?

11        MR. RE:  Yes, Your Honor.

12        THE COURT:  You may proceed.

13        CROSS-EXAMINATION

14 BY MR. RE:

09:38AM 15 Q.  Good morning, Dr. Mesher.  We've never met.

16 A.  Good morning.

17 Q.  My name is Joseph Re, and I'll be asking you some

18 questions.

19 A.  Certainly.

09:38AM 20 Q.  You mentioned that some of the technology, the 3D

21 triangulation, the sensors, the hardware was old technology;

22 right?  You knew about that from others; right?

23 A.  That had been used for years in many different

24 industries, yes.

09:39AM 25 Q.  Yeah, and used by whom?  Pavemetrics; right?

---

34

1 A.  It was used in the lumber industry to profile wood.  It

2 was used in the tire industry to map tire treads.  It was

3 used in industry to analyze circuit boards.

4 Q.  How about roads?  Who was the leader in analyzing roads

09:39AM 5 with this technology?

6 A.  Uh, I don't know market share numbers if that's what

7 you're asking me, but the roadway use of 3D triangulation

8 predates the LCMS system.

9 Q.  Yes.  And LCMS is a road system; right?

09:39AM 10 A.  Yes.

11 Q.  And that predates your patent by many years, doesn't it?

12 A.  I don't know what the first offering date was of LCMS

13 so . . .

14 Q.  You used to go these conferences.  What are they called,

09:39AM 15 RPUG?

16 A.  Yes.

17 Q.  Yeah.  That's an acronym for Routed Profile User Group;

18 right?  What did I call it?  Oh, road.  Road Profiler User

19 Group.  Right?

09:40AM 20 A.  You're asking to confirm?  Yes, Road Profiler User

21 Group.

22 Q.  I'm gonna ask you questions that I would appreciate you

23 just try to confirm, and we can go quicker, okay?  And that

24 was later named the Pavement Evaluation Conference; correct?

09:40AM 25 A.  Yes.

---

35

1 Q.  And you used to go to those conferences virtually every

2 year; right?

3 A.  Yes.

4 Q.  And you've been going to those conferences since 1997;

09:40AM 5 right?

6 A.  I don't know what the exact date was that I started, but

7 it was circa that time.

8 Q.  Circa.  You mean about 1997; right?  That's what you

9 mean by circa?

09:40AM 10 A.  Yes.  I agree with you.

11 Q.  Okay.  And you used to go and keep a watchful eye on

12 Canadian technology in particular; right?

13 A.  No, I went to see all of the technology, interact with

14 potential clients, and I am a -- have an interest in Canadian

09:41AM 15 technology, yeah.

16 Q.  Yeah.  You're a stronger supporter of using Canadian

17 technology if it exists; right?

18 A.  Yes.

19 Q.  And at the 2002 conference, you attended lectures by

09:41AM 20 Mr. John Laurent, John Laurent of the National Optical

21 Institute at the RPUG conference; right?

22 A.  I -- I'm not sure of the 2002, but yes, I've seen John

23 Laurent present at RPUG.

24 Q.  And you know it's about 2002?  Would you agree?

09:41AM 25 A.  Sure.

---

36

1 Q.  Okay.  And, in fact, you testified about your visit at

2 that conference in another trial you attended in Canada;

3 right?

4 A.  Yes.

09:41AM 5 Q.  And you went to that conference in particular and

6 watched Mr. Laurent make a presentation of technology that

7 had been developed in Canada; right?

8 A.  Yes.

9 Q.  And you would take concise notes, concise notes when Mr.

09:42AM 10 Laurent would speak at that conference; right?

11 A.  I took concise notes of every presentation at that

12 conference because I made a presentation of the conference

13 when I got back.

14 Q.  And with regard to Mr. Laurent's notes, however, you

09:42AM 15 would repeat to your clients in seminars what you learned

16 from Mr. Laurent at that seminar; correct?

17 A.  Uh, I typically reported what technologies were

18 available.

19 Q.  And you'd report them to your clients based on the

09:42AM 20 concise notes you wrote from listening to Mr. Laurent; right?

21 A.  I reported all of the content of that conference, and

22 Mr. Laurent's presentation would be part of it, yes.

23 Q.  And you would report that to your clients; right?

24 A.  Yes.

09:42AM 25 Q.  Right.  And you thought at that time in 2002 that he

---

**EXHIBIT 2**
**-11-**

37

1   presented -- by the way, how long have you known Mr. Laurent?
2   A.   Since those early years at RPUG.
3   Q.   And you're both from Canada, I notice; right?
4   A.   Yes.
09:43AM 5   Q.   And how far back in those early years at RPUG do you
6   remember Mr. Laurent, my client?
7   A.   As I said, circa that reference to that meeting that we
8   had so when John first started making the presentations.
9   Q.   So circa 1997?
09:43AM 10   A.   I don't know if John would attend it in 1997.
11   Q.   But at least by 2002; right?
12   A.   Right.
13   Q.   And you concede, sir, that he presented on pioneering 3D
14   triangulation for roadways; right?
09:43AM 15   A.   Yes.
16   Q.   I assume you think pretty highly of Mr. Laurent and his
17   expertise; right?
18   A.   I do.
19   Q.   And you also think pretty highly of Richard Habel.  Do
09:44AM 20   you know Richard Habel.
21   A.   I never met Richard.  We talked on the phone.
22   Q.   But you highly recommended him to serve as an expert for
23   Tetra Tech in litigation Tetra Tech was in against a company
24   called G REX, didn't you?
09:44AM 25   A.   No.

UNITED STATES DISTRICT COURT

38

1   Q.   I'd like you to take a look at your binder, and maybe
2   this will refresh your recollection.  If you take a look at
3   binder you have that is the cross-examination binder?  If you
4   could go to the very last page on the binder, the very last
09:44AM 5   page.  I just want to see if this refreshes your
6   recollection.
7   THE COURT:  Okay.  Counsel, I don't think the
8   witness testified he didn't remember.  I thought he answered
9   no.
09:44AM 10   MR. RE:  That's correct.  And I'm gonna -- I'd like
11   to impeach, Your Honor.  But let's see if I can refresh his
12   recollection first.
13   Q.   Do you see the email on the last page?
14   A.   Uh, no, I don't.  No, I don't.
09:45AM 15   Q.   Do you have a cross-examination binder?  Let me see what
16   binders you have.
17   THE COURT:  Counsel, I'm looking at the
18   cross-examination binder.  The last page looks like a slide
19   from a presentation with a Bates stamp for Tetra Tech 135791.
09:45AM 20   Is that what you have?
21   THE WITNESS:  That's exactly what I have, yes.
22   MR. RE:  Okay.  Then my book is not up-to-date.
23   Q.   Let's go to the one that says Pavemetrics 0139266.  It
24   must the second to the last page.
09:45AM 25   A.   Second to last page in which section?

UNITED STATES DISTRICT COURT

39

1   Q.   Cross-examination binder.  Can I see what binder you're
2   looking at?  Does it say cross in the front?
3   A.   Yeah.
4   THE COURT:  It's the same binder I've got.
09:45AM 5   All right.  Were you directing him to the tab that
6   says Pavemetrics S0139266?
7   MR. RE:  Correct.
8   THE COURT:  Okay.  So that's the second from the
9   last tab.
09:46AM 10   THE WITNESS:  Okay.
11   THE COURT:  And it looks like it's an email dated
12   April 7th, 2017?  Do you have that?
13   THE WITNESS:  Okay.
14   MR. RE:  Correct.
09:46AM 15   THE WITNESS:  What am I looking at?  Please, what
16   am I looking at?
17   BY MR. RE:
18   Q.   Look at the email that's in your book.
19   A.   Yes.
20   Q.   It's one page.
21   A.   Yeah.
22   THE COURT:  Do you want him to read the email?
23   MR. RE:  No.
24   Just do you have it?
09:46AM 25   I just want to identify it first for the record

UNITED STATES DISTRICT COURT

40

1   before we publish, Your Honor?
2   Q.   Could you identify that document, please?
3   A.   It's a document between myself and our Canadian counsel.
4   MR. RE:  Okay.  Your Honor, I'd like to -- for the
09:46AM 5   record, I'd like to move this in evidence as Exhibit 688?
6   THE COURT:  Any objection, Counsel?
7   MR. CERULLI:  Can we go to side bar?
8   THE COURT:  Sure.
9   (The following proceeding occurred at side bar.)
09:47AM 10   THE COURT:  We're at side bar.  Just remind
11   everybody of the rules.  Please identify yourself and speak
12   into the microphone.
13   MR. CERULLI:  This appears to be statements from
14   Bob Seguriatas which is all hearsay.  The witness is Dr.
09:47AM 15   Darel Mesher who is cc'ed on an email.  I believe this was
16   brought up as impeachment.  I don't know what statement he's
17   impeaching of Dr. Mesher.
18   MR. RE:  I'll demonstrate that for you.  Didn't you
19   recommend Richard Habel as an expert.
09:48AM 20   MR. BARNEY:  You're trying to impeach with this
21   witness?
22   THE COURT:  Let me ask you this.  It does appear so
23   you're looking at this statement here.
24   MR. RE:  That's one of them, yes.
09:48AM 25   THE COURT:  This statement Dr. Mesher highly

UNITED STATES DISTRICT COURT

**EXHIBIT 2**
**-12-**

41

1    recommends a potential expert.

2            MR. RE:  His lawyer to Dr. Mesher and cc'ed to my

3    client.

4            THE COURT:  Explain to me how you get around the

09:48AM  5    hearsay rule?

6            MR. RE:  He can deny it.  He can deny it's

7    referring to him.  It's against his own interest.

8            THE COURT:  I'm sorry.  This is an out-of-court

9    statement made by Bob Seguriatas.  He's saying Mr. Mesher is

09:48AM  10    highly recommending.  You're putting it for the truth of the

11    matter asserted.  Why is it not hearsay?

12            MR. RE:  First of all, I was going to use this to

13    refresh recollection first so I wouldn't admit it if he

14    refreshed his recollection.

09:49AM  15            THE COURT:  You can't refresh recollection if the

16    witness hasn't testified he needs his recollection refreshed.

17            MR. RE:  I think I can still refresh when a witness

18    doesn't request it.

19            THE COURT:  There's no basis to refresh.

09:49AM  20            MR. RE:  I can use this to refresh his recollection

21    and he can concede the point.

22            THE COURT:  No.  I think you still have to get

23    around the hearsay exception.

24            MR. RE:  I'll have it admitted either way.  I'll

09:49AM  25    try to refresh recollection.  I won't admit it.

UNITED STATES DISTRICT COURT

42

1            THE COURT:  You might still have a hearsay problem,

2    but we'll see.

3            MR. CERULLI:  I was just going to add I don't

4    believe this has been identified as an exhibit.  You said you

09:50AM  5    were going to introduce it with Mr. Habel?

6            MR. RE:  I thought I could get it admitted here.

7            THE COURT:  We can deal with that later.

8            MR. RE:  I won't admit it.  Just use to refresh.

9            THE COURT:  I don't think you can use it to refresh

09:50AM  10    his recollection.

11            MR. RE:  I won't.  I'll ask him if that's correct

12    or not without reading.

13            THE COURT:  That's improper use of the document.

14            MR. RE:  Okay.  I won't push it.  Time is too

09:50AM  15    valuable.

16                (Side bar concluded.)

17            THE COURT:  And Counsel, you can proceed.

18            MR. RE:  Yes.  Thank you, Your Honor.

19        Q.   If I understood you correctly, is it your testimony that

09:50AM  20    you did not recommend Richard Habel to the Tetra Tech lawyers

21    to assist in Tetra Tech's litigation against G REX?

22        **A.   Uh, his name was brought forward in discussions with Bob**

23    **Seguriatas regarding people that I felt would have expertise**

24    **in this area.**

09:51AM  25        Q.   And wasn't Mr. Habel one of those people that you felt

UNITED STATES DISTRICT COURT

43

1    would have expertise in this area?

2        A.   Yes.

3        Q.   Okay.  And you participated and testified in that

4    litigation against G REX; right?

09:51AM  5        **A.   I did.**

6        Q.   Both in deposition and at the trial, right, in Canada?

7        A.   Yes.

8        Q.   And I believe you testified here today that the 3D

9    triangulation methods used to measure is off-the-shelf, old

09:52AM  10    technology; right?

11        **A.   It is, uh, mature technology, yes.**

12        Q.   And when you say mature, you mean well before your

13    patent; right?

14        A.   Yes.

09:52AM  15        Q.   And your patent was February of 2015; right?

16        A.   Yes.

17        Q.   So the word mature means prior to that time by some

18    degree; right?

19        A.   Yes.

09:52AM  20        Q.   And you recognize that 3D triangulation technology for

21    road surface is readily usable in rail surface assessment

22    applications; right?

23        **A.   Uh, could you repeat that, please?**

24        Q.   Do you recognize that the technology for road surface

09:52AM  25    assessment is readily usable in rail surface assessment

UNITED STATES DISTRICT COURT

44

1    applications?

2        **A.   What's the context for that, please?  The statement,**

3    **where did that come from?**

4        Q.   I'm just asking you a question.  Do you think that's

09:52AM  5    true or not?

6        **A.   Okay.  Please repeat it one more time?**

7        Q.   Do you, sir, recognize that the technology using 3D

8    triangulation to measure and make maps for road surface,

9    streets, roads, pavements is readily usable in rail surface

09:53AM  10    assessment applications?

11        A.   Yes.

12        Q.   Okay.  And the method for measuring 3D elevation maps is

13    the same whether it's measuring wood, ties or rail.

14        A.   Yes.

09:53AM  15        Q.   Right.  And the technologies are transferable between

16    road and rail; right?

17        **A.   The 3D triangulation elevation measurement technology**

18    **is, yes.**

19        Q.   Yes.  And that's the technology that you incorporated

09:53AM  20    into the 3DTAS that was available in 2002; right?

21        A.   Yes.

22        Q.   And so there's nothing about the implementation that you

23    did with the off-the-shelf triangulation technologies that

24    were already available in roadway introduced by people like

09:53AM  25    John Laurent; right?

UNITED STATES DISTRICT COURT

**EXHIBIT 2**

**-13-**

---

**45**

1  A.  You're referring to the 3D triangulation technology used
2  to do the measurements in the field?
3  Q.  Yes.  That all existed for roadway, and you used it for
4  rail; right?
09:54AM 5  A.  It existed for many industries, yes.
6  Q.  Including roads.
7  A.  Including roads.
8  Q.  And those products that you needed, those were
9  commercial products available for anyone to purchase; right?
09:54AM 10  A.  Yes.
11  Q.  And, for example, one of the products is this SICK
12  camera; right?
13  A.  Uh, yes.  As a 3D measurement sensor, yes.
14  Q.  How long has that SICK camera been around?
09:54AM 15  A.  Uh, there's been many iterations of it.  It would be --
16  I don't know the exact time that the first one was
17  introduced.
18  Q.  Right.  And your claim requires that you use at least
19  one sensor; right?
09:54AM 20  A.  Uh, yes.
21  Q.  Right.  And the claim also requires three dimensional
22  surface elevation and intensity data; right?
23  A.  Yes.
24  Q.  And back when you filed your patent, these SICK sensors
09:55AM 25  were available commercially; right?

UNITED STATES DISTRICT COURT

---

**46**

1  A.  Yes.
2  Q.  And those sensors that were available, they acquire both
3  elevation and intensity data; right?
4  A.  Yes.
09:55AM 5  Q.  Now, let's talk about this neighborhood, this 2D
6  gradient neighborhood.  Claim 1 of your patent also requires
7  defining an appropriate gradient neighborhood representing a
8  small 2D track section; right?  You understand that?
9  A.  Yes.
09:55AM 10  Q.  The claim also requires what you call a track elevation
11  map; right?
12  A.  Yes.
13  Q.  And you recognize, sir, don't you, that using a 2D
14  gradient methodology for moving around inside the elevation
09:55AM 15  map to measure height changes is a fairly standard technique;
16  right?
17  A.  The use of an appropriate gradient neighborhood is the
18  key aspect of that claim.
19  Q.  But I -- my question didn't have the word appropriate in
09:56AM 20  it.  I was just asking you if you recognize that using a 2D
21  gradient methodology for moving around inside your elevation
22  map in order to measure height changes is a fairly standard
23  technique.
24  A.  Yes.
09:56AM 25  Q.  And your claim also requires that the gradient

UNITED STATES DISTRICT COURT

---

**47**

1  neighborhood represent a small 2D track section; right?
2  A.  Yes.
3  Q.  And using a small neighborhood and moving it around is a
4  very common processing method; right?
09:56AM 5  A.  Yes.
6  Q.  I want to talk about some -- how you used 3DTAS.  Now,
7  your 3DTAS process requires -- it required featured libraries
8  that include 3D models of the features of interest to be
9  located in the 3D elevation map; right?
09:57AM 10  A.  Yes.
11  Q.  And you've updated those models, let's call them,
12  countless times for the 3DTAS; right?
13  A.  Uh, we add more features to those libraries as we
14  encounter them.
09:57AM 15  Q.  And you've done it countless times, though, I think you
16  said.  Countless; right?
17  A.  Many, yes.
18  Q.  Okay.  How many would you say?  50, 60 sound right?
19  A.  Uh, probably more than that.
09:57AM 20  Q.  And the software tool that you use is typically just a
21  mouse and a human being; right?
22  A.  Yes.
23  Q.  It's a hand process; right?
24  A.  It is.  Yeah, it was a hand process for the 2015
09:57AM 25  implementation of the 3DTAS system.

UNITED STATES DISTRICT COURT

---

**48**

1  Q.  And the number of models keeps growing because there are
2  different fastening systems for different railroads; right?
3  A.  Yes.  As we encounter new features, the new models are
4  created.
09:58AM 5  Q.  And the railroad industry is about 200 years old, at
6  least; right?
7  A.  Yes.
8  Q.  And that means there's a lot of models that need to
9  accumulate over time; right?
09:58AM 10  A.  Yes.
11  Q.  And there's many variants of the same thing.  That's why
12  there's so many; right?
13  A.  Uh, no.  Typically, it's one model for each feature.
14  The system has the ability to generalize so it's not a
09:58AM 15  requirement to have exact iterations of different similar
16  models.
17  Q.  But there are many variants of the same thing that
18  you're trying to model?
19  A.  Uh, gross variations on features?  Yes.
09:58AM 20  Q.  Okay.  And then you moved on.  You said this 3DTAS was
21  under continuous development; right?
22  A.  Yes.
23  Q.  And the development started '13, '14, 2014, 2014, and it
24  continues to this day; right?
09:59AM 25  A.  Yes.

UNITED STATES DISTRICT COURT

---

**EXHIBIT 2**

**-14-**

---

49

1   Q.   So it's been evolving and changing over time; right?

2   A.   **Yes.**

3   Q.   And I think you referred to in your deposition modern

4   times versus other times.  Do you remember that?  In your

09:59AM 5   deposition, you talk about modern times?

6   A.   **I don't recall that.**

7   Q.   So in what we call modern times, today, Tetra Tech no

8   longer uses this manual process with the mouse we just

9   discussed; right?

09:59AM 10  A.   **Uh, the -- the identification of features for machine**

11  **learning applications requires the same manual process for**

12  **going through and identifying features so it is the same.**

13  Q.   So you still do it by hand is what you're saying?

14  A.   **As features are added, yes.  To train convolutional**

09:59AM 15  **neural networks, it's the same process, yes.**

16  Q.   Convolutional neural networks.  When did you start using

17  convolution neural networks?

18  A.   **Uh, that would have been probably two years ago.**

19  Q.   Two years ago.

10:00AM 20  A.   **We started investigating them, yes.**

21  Q.   Started investigating them two years ago.

22  A.   **Right.**

23  Q.   So isn't it simple to say that convolution neural

24  networks is not in your 2015 patent?

10:00AM 25  A.   **Yes.  That's true.**

---

50

1   Q.   In fact, your patent doesn't say anything -- doesn't

2   anywhere say the words artificial intelligence, does it.

3   A.   **That's true.**

4   Q.   Doesn't say machine learning, does it.

10:00AM 5   A.   **No.**

6   Q.   Doesn't say neural networks, does it.

7   A.   **No.**

8   Q.   Doesn't say convolutional neural networks, does it.

9   A.   **No.**

10:00AM 10  Q.   Doesn't say deep neural networks, does it.

11  A.   **No.**

12  Q.   Because all of that, all of that I just mentioned you

13  didn't begin investigating until about two years ago; right?

14  A.   **Correct.**

10:00AM 15  Q.   So it obviously, obviously can't be in the two patents

16  in this case; right?

17  A.   **No.**

18  Q.   Can you show me anywhere in your patent where it

19  mentions any of these types of artificial intelligence

10:01AM 20  techniques?

21  A.   **Uh, it doesn't exist in the patents.**

22  Q.   Thank you.  But you were very familiar with AI before

23  you filed for your patent; right?

24  A.   **Yes.**

25  Q.   In fact, and I think you've talked about, it was in your

---

51

1   doctoral dissertation in 1992; right?

2   A.   **Right.**

3   Q.   But you chose not to include anything about AI in your

4   2015 patent; right?

10:01AM 5   A.   **That's true.**

6   Q.   And you're the sole inventor; right?

7   A.   **I am.**

8   Q.   And so you obviously read the patent before you filed

9   it; right?

10:01AM 10  A.   **Yes.**

11  Q.   Today unlike the 3DTAS -- the patent is on 3DTAS of

12  2015; right?

13  A.   **Yes.**

14  Q.   Right.  But today you use artificial intelligence, a

10:01AM 15  model that we call YOLO; right?

16  A.   **Yes.**

17  Q.   Tell the ladies and gentlemen of the jury what YOLO

18  stands for.

19  A.   **You Only Look Once.  It's an acronym.  So we take an**

10:01AM 20  **entire scene and recognize features in it.**

21  Q.   Right.  And -- and counsel showed you Exhibit 715.  Do

22  you remember that?

23  A.   **Uh, yes.**

24  Q.   713.  Right?

10:02AM 25  A.   **Yes.**

---

52

1   Q.   And 713 is source code that was dated August 2021;

2   right?

3   A.   **Yes.**

4   Q.   And that source code discusses and uses the YOLO; right?

10:02AM 5   A.   **Uh, yes.**

6   Q.   And YOLO or You Only Look Once is a convolutional

7   network for artificial intelligence, isn't it?

8   A.   **It's an algorithm that sits on top of a framework**

9   **typically that is a convolutional neural network, yes.**

10:02AM 10  Q.   Do you associate that with artificial intelligence?

11  A.   **Yes.**

12  Q.   Yes.  And there's libraries that are available to

13  provide that functionality; right?

14  A.   **Yes.**

10:02AM 15  Q.   And these are open, public -- open source, public

16  software libraries; correct?

17  A.   **Correct.**

18  Q.   And you use one of those public libraries, don't you.

19  A.   **Yes.**

10:03AM 20  Q.   And public library.  What's the name of the public

21  library that you use?

22  A.   **One of the ones that we've incorporated is Darknet.**

23  Q.   Darknet.  Is that with a capital N?  You don't know?

24  A.   **I'm not sure.**

10:03AM 25  Q.   Cause you didn't select using Darknet, did you.

---

**EXHIBIT 2**

**-15-**

### 53

1  A.  Uh, no, I did not.
2  Q.  Seth Phillips did; right?
3  A.  Seth Phillips is the one that evaluated it, yes.
4  Q.  And there was another group that was working on this
5  type of technology, and you gave them general direction;
6  right?
7  A.  Uh, I -- yes, I provided the directions for the software
8  development for this.
9  Q.  And so you learned about Darknet library from other
10  people at Tetra Tech who were doing machine learning
11  implementations; right?
12  A.  Yes.
13  Q.  And one of the people was Seth Phillips; right?
14  A.  No.  Seth is part of our group.
15  Q.  He's the one that decided to use YOLO; right?
16  A.  He's the one that evaluated it and found it has
17  sufficient performance and accuracy to include it, yes.
18  Q.  So it helps with accuracy to have YOLO; right?
19  A.  Yes.
20  Q.  Helps with speed, too; right?
21  A.  Yes.
22  Q.  And when did YOLO become available?
23  A.  I have no idea when it was first available.
24  Q.  Well after your patent, though; right?
25  A.  Yes.

UNITED STATES DISTRICT COURT

### 54

1  Q.  In fact, the University of Washington is responsible for
2  YOLO; right?
3  A.  I have no factual information on that.
4  Q.  You don't know whether University of Washington
5  published the YOLO technique?
6  A.  Uh, no.
7  Q.  But you suspect it'd be well after your patent; right?
8  A.  Um, yes.
9  Q.  So your patent doesn't really address artificial
10  intelligence, but rather your patent, the '293, specifically
11  requires the use of an application specific windowed
12  gradient; right?
13  A.  Uh, it uses an appropriate gradient neighborhood
14  approach, yes.
15  Q.  It required that; right?
16  A.  It's part of the claim, yes.
17  Q.  And if it's in the claim, then it's required; right?
18  A.  Yes.
19  Q.  We talked about this ATAC yesterday, I think.  Mr. Keyes
20  talked about ATAC.  You remember that?
21  A.  I wasn't in the courtroom.
22  Q.  Oh.  When did you stop processing data with 3DTAS?  Do
23  you remember?  There was a period you stopped processing.
24  A.  You'll have to provide some context, please.
25  Q.  Does it sound correct that you stopped processing data

UNITED STATES DISTRICT COURT

### 55

1  with 3DTAS in January of 2018 because of a court order?
2  A.  I don't recall that.
3  Q.  And you don't recall resuming with new methods in
4  December of 2018?
5  A.  Uh, now I recall what it is you're referring to.  Yes,
6  there was a change in an algorithm.
7  Q.  Yes.  And that change in algorithm occurred after
8  December 2018; right?
9  A.  I'm not sure of the time line dates, but that period is
10  about correct.
11  Q.  And 2018 is after 2015; right?
12  A.  Yes.
13  Q.  And in 2019, you were invited by Canadian National to
14  bid.  You remember that?
15  A.  Uh, yes.
16  Q.  And you offered to them your latest sensor and AI
17  technology in the Summer of 2019.  Does that sound right?
18  A.  Yes.
19  Q.  And that's four years after you filed your patent;
20  right?
21  A.  Correct.
22  Q.  Now, before you filed for your patent, you were well
23  aware of LCMS; right?
24  A.  Yes.
25  Q.  And you were -- as a matter of fact, you said you bought

UNITED STATES DISTRICT COURT

### 56

1  one in 2012, and you bought another one in 2017; right?
2  A.  Yes.
3  Q.  And even though you bought one in '12 and one in '17,
4  you were a continuous customer of my client, Pavemetrics;
5  right?
6  A.  Yes.
7  Q.  And what kind of services did you get over the years
8  between 2012 and 2021?  What kind of services?  Why were you
9  a continuous customer even though you bought only two items?
10  Two LCMSs.
11  A.  Because we acquired one of their units, and we
12  interacted with Pavemetrics in order to help them -- to
13  assist them in improving their product by giving them
14  feedback.  And as I said, we -- after we got their system,
15  evaluated it, we sought access to the library to provide us
16  access to the raw data so we could develop our own post
17  processing and reporting algorithms.
18  Q.  And did you know before you filed your patent that
19  Pavemetrics marketed the LCMS for use in many applications?
20  A.  Uh, I was familiar with the LCMS for roadway
21  applications, yes.
22  Q.  And when did you first learn that Pavemetrics was
23  marketing LCMS for use with rail inspection?
24  A.  Uh, sometime after 2015.
25  Q.  I'd like you to go into your notebook and now look at

UNITED STATES DISTRICT COURT

**EXHIBIT 2**
**-16-**

57

1 that last document.

2 A. Yes.

3 Q. Could you take a look in your cross book at the last

4 document in your book? It says Tetra Tech 0135776. Do you

10:09AM 5 see that?

6 A. Yes.

7 Q. And do you see this is a string of emails on which you

8 are copied?

9 A. Yes.

10:09AM 10 Q. And there's no doubt that you would have received it if

11 it was sent to you?

12 A. It's certainly came to my email box, and I've responded

13 to this email from Richard Fox-Ivey.

14 MR. RE: Your Honor, can I move for the admission

10:09AM 15 of Exhibit 688?

16 THE COURT: I'm sorry. Are you referring to this

17 document in this tab as 688?

18 MR. RE: Yes. 688 would be our next exhibit

19 number, and I'd like to move for the admission Tetra Tech

10:09AM 20 0135776.

21 THE COURT: Okay. A couple of things. One, the

22 whole document or just the page you referenced?

23 MR. RE: Oh, the whole document.

24 THE COURT: Okay. So you have to give me the whole

10:09AM 25 base number range to identify the exhibit.

UNITED STATES DISTRICT COURT

58

1 MR. RE: Thank you, Your Honor.

2 THE COURT: Let me ask is there an objection?

3 MR. CERULLI: We do object. This wasn't identified

4 on the exhibit list.

10:10AM 5 THE COURT: Okay. It wasn't identified on the

6 exhibit list, Counsel. What's your basis for bringing it in

7 now?

8 MR. RE: Because the witness has just said to my

9 surprise that he was not aware of any marketing by my client

10:10AM 10 to use LCMS in rail.

11 THE COURT: Okay. Again, let me explain something

12 to you.

13 (The following proceedings occurred at side bar.)

14 THE COURT: I just want a little bit more order

10:10AM 15 putting in exhibits. If they're not pre-admitted, if you

16 want to use an exhibit to impeach, then you can use an

17 exhibit to impeach if it's impeaching.

18 If you want to use an exhibit to refresh a

19 witness's recollection, you first need to establish that they

10:10AM 20 don't remember, and then you have to establish that looking

21 at a document might help them remember, then you can use the

22 document. I'm not sure what you're doing here.

23 MR. RE: First of all this was identified. It's

24 not a question of having to be for impeachment. I regret it

10:11AM 25 wasn't on the list last night. It's an email to and from the

UNITED STATES DISTRICT COURT

59

1 witness. I can't introduce it?

2 THE COURT: You want to introduce an exhibit into

3 evidence?

4 MR. RE: Yes.

10:11AM 5 THE COURT: Is there an objection? I thought the

6 objection is it wasn't on list.

7 MR. CERULLI: It's not on the list and it's not

8 being used for impeachment.

9 MR. RE: It's definitely being used for

10:11AM 10 impeachment. There's several documents showing he does know

11 my client was marketing LCMS for rail.

12 THE COURT: You want to use this as impeaching his

13 statement?

14 MR. RE: Well, I'd like to have it admitted as

10:12AM 15 well.

16 THE COURT: If you're using it for impeachment,

17 then it comes into evidence.

18 MR. RE: Yes.

19 THE COURT: So what's your objection to that?

10:12AM 20 MR. CERULLI: I'm not clear what impeachment

21 standard --

22 MR. RE: The impeachment is your client said he

23 didn't know my client marketed LCMS for rail before filing

24 his patent. That's all.

10:12AM 25 MR. BARNEY: You might be right. Can you point in

UNITED STATES DISTRICT COURT

60

1 the document where the impeachment is?

2 THE COURT: Go back out there, ask the question

3 again, and then you can attempt to use this document for

4 impeachment.

10:13AM 5 MR. RE: I'll call it 688.

6 THE COURT: Okay.

7 (Side bar concluded.)

8 THE COURT: Counsel, can you just repeat your last

9 question?

10:13AM 10 BY MR. RE:

11 Q. My question was when do you believe that you first

12 learned that my client was marketing LCMS for use in possible

13 rail inspections?

14 A. Uh, I don't recall it being prior to the -- the patent

10:13AM 15 date.

16 MR. RE: Okay. I'd like to move for the admission

17 of Exhibit 688?

18 THE COURT: Okay. 688 can be admitted.

19 (Exhibit 688 admitted.)

10:13AM 20 MR. RE: 688 for the record bears the Bates number

21 of Tetra Tech 0135776 through Tetra Tech 0135791.

22 THE WITNESS: And this is the email from Richard

23 Fox-Ivey to myself on, whatever this date is, February 14th,

24 2013. That's the email we're talking about?

10:14AM 25 BY MR. RE:

UNITED STATES DISTRICT COURT

**EXHIBIT 2**

**-17-**

61

1   Q.   Yes.
2   A.   **Which was sent regarding the airport conference which**
3   **Richard had applied, added some zip file to it which in here**
4   **I said that I am not -- don't attend these conferences and to**
10:14AM 5   **forward them to our person that does attend the call for**
6   **these conferences which was Richard Kohler.  I don't recall**
7   **ever looking at this or opening it.  I just suggested to**
8   **Richard that he forward it to the right person.**
9   Q.   Okay.  Is it your testimony that you don't recall this
10:14AM 10   email or any of the attachments?
11   A.   **I don't recall the -- opening these attachments, and to**
12   **be honest with you, I don't recall this email either.**
13   Q.   But you have no doubt that you received it on or about
14   February 14th, Valentine's Day, 2013; right?
10:14AM 15   A.   **I responded to it and said that he should get in touch**
16   **with Richard Kohler.**
17   Q.   But he also wrote to you if I'm reading this
18   correctly -- if you see the top of it, it says Hi Darel.
19   Now, who's Richard Fox-Ivey?
10:15AM 20   A.   **He works for Pavemetrics.**
21   Q.   And he writes Hi Darel.  Check out the attached zipped
22   slides.
23   A.   **Right.**
24   Q.   Happy to have Richard use any of them as he sees fit.
10:15AM 25   A.   **Right.**

UNITED STATES DISTRICT COURT

62

1   Q.   Okay.  Did you ever open up any of the attached zip
2   slides?
3   A.   **I don't recall doing it.  But my comment later in this**
4   **email chain is you should forward them to Richard.  He's the**
10:15AM 5   **one that's attending the conference.**
6   Q.   Can you just answer my question?  And can you go --
7   A.   **I don't recall opening any -- I don't recall opening the**
8   **zip files that were attached to this.**
9   Q.   Okay.  Can you go to the next page and see if that helps
10:16AM 10   you in any way?  Where it says technology overview, do you
11   see that?
12   A.   **Yes.**
13   Q.   And who is showing a technology overview?  Can you tell?
14   THE COURT:  Well, let's stick with whether the
10:16AM 15   witness has any recollection of this document cause if not,
16   questions about it aren't appropriate.  Do you recall ever
17   looking at this presentation?
18   THE WITNESS:  I don't recall ever opening this zip
19   file to get access to the slides.
10:16AM 20   THE COURT:  Okay.  Please move on, Counsel.
21   BY MR. RE:
22   Q.   Okay.  Let's try -- if you could open up to your book,
23   Exhibit 185?  Cross-examination book?
24   A.   **Yes.**
25   Q.   Could you identify for the record Exhibit 185?  It's an

UNITED STATES DISTRICT COURT

63

1   email to you; right?
2   A.   **Yes, an email to me from Rob Olenoski.**
3   Q.   Who's Rob Olenoski?
4   A.   **At that time, he was the President of International**
10:17AM 5   **Cybernetics.**
6   Q.   And this is dated October 7th, 2014; right?
7   A.   **Yes.**
8   Q.   And that's before your patents; right?
9   A.   **Yes.**
10:18AM 10   Q.   And if we go down to one email down, if we can show --
11   MR. RE:  Oh, Your Honor, I'd like to move in
12   Exhibit 185?
13   THE COURT:  Any objection, Counsel?
14   MR. CERULLI:  No objection.
10:18AM 15   THE COURT:  Exhibit 185 is in evidence.
16   (Exhibit 185 admitted.)
17   BY MR. RE:
18   Q.   And so the top of it -- let's show the top just so the
19   jury can see this is the email that we were just discussing.
10:18AM 20   The top email; right?
21   A.   **Yes.**
22   Q.   You have no doubt that you would have received it on or
23   about 10:33 p.m. on October 7th of 2014; right?
24   A.   **Yes, I -- I responded to it.**
25   Q.   And then if we can go down to the next part of the

UNITED STATES DISTRICT COURT

64

1   email, it's the same day, where it says Darel, the same day,
2   Mr. Olenoski says Darel, thought you should see this and find
3   out if you're going to the show.  I left you several messages
4   to call me.  It's not like you to not return calls.  Are you
10:19AM 5   okay?  I have a few items to go over with you.  Do you see
6   that?
7   A.   **Yes.**
8   Q.   Do you believe you received that email as well?
9   A.   **Yes.**
10:19AM 10   Q.   Okay.  Let's go down to the email right below it.  And
11   here's one, Richard Fox-Ivey writing to Robert Olenoski.  Do
12   you see that?
13   A.   **Yes.**
14   Q.   And this would have been attached to the email below,
10:19AM 15   the email you received; right?
16   A.   **Correct.**
17   Q.   And in this one, Richard Fox-Ivey, the Pavemetrics
18   consultant, is writing to Mr. Olenoski; right?
19   A.   **Yes.**
10:19AM 20   Q.   And it says Hi Rob.  Curious to know if you are still
21   doing something with Tetra Tech in the rail business these
22   days.  Pavemetrics is pushing forward with adapting the LCMS
23   to the rail industry calling it LRAIL.  Attached are a few
24   slides showing some current images as well as some of the new
10:19AM 25   algorithms.  Do you have any doubt you received this email in

UNITED STATES DISTRICT COURT

**EXHIBIT 2**
**-18-**

65

1   2014 as indicated?

2   **A.   No, it was part of this email chain so I would have**
3   **received it if Rob would have sent it.**

4   Q.   You would of received it; right?

10:20AM 5   **A.   Right.**

6   Q.   And you see there are slides referencing the LRAIL;
7   right?

8   **A.   There are attachments to it, yes.**

9   Q.   And this you had in your possession before filing your
10:20AM 10   patent; right?

11   **A.   I would have received this email, yes.**

12   Q.   I'd like you to take a look at another exhibit in your
13   book.

14          THE COURT:  I think Counsel, before we turn to the
10:20AM 15   next exhibit, we're gonna take our morning break.  So we will
16   come back at 10:35.

17          THE CLERK:  All rise.

18              (Jury not present.)

19          THE COURT:  Please have a seat.  So we'll stand
10:21AM 20   adjourned until 10:35.  Anything we need to talk about before
21   we break or are we good?

22          MR. RE:  Nothing here.

23          THE COURT:  Just let the witness know that you
24   can't really talk to the lawyers for Tetra Tech on this break
10:21AM 25   cause you're on cross-examination at this time.  So you're

UNITED STATES DISTRICT COURT

66

1   free to take a walk or stretch your legs, but just don't talk
2   about your testimony.  Thank you very much.  Okay.  We'll see
3   everybody in 15 minutes.

4              (Recess taken.)

10:40AM 5              (Jury present.)

6          THE COURT:  Mr. Re, you can proceed with
7   cross-examination.

8          MR. RE:  Thank you, Your Honor.

9   Q.   You understand there's two patents asserted in this
10:41AM 10   case?

11   **A.   Yes.**

12   Q.   But you also understand those patents have identical
13   specifications; right?

14   **A.   Yes.**

10:41AM 15   Q.   And you understand they both rely on the same filing
16   date; right?

17   **A.   I'm not certain.  I would have to look at the patents.**

18   Q.   That sounds right.  They both have the February 2015
19   filing date?

10:41AM 20   **A.   Uh, I can't verify that.  I don't know that factually.**
21   **I'd have to look at them.**

22   Q.   Okay.  If you wanted to, they're in your book.  It's
23   Exhibits 12 and 13 if you want to look at 'em.  I'll
24   represent to you, if you are willing, that both of 'em come
10:41AM 25   from the same specification and have the same filing date for

UNITED STATES DISTRICT COURT

67

1   priority purposes.  You understand that?

2   **A.   I'll take you at your word, yes.**

3   Q.   Okay.  So if something is not in one patent, it's also
4   not in the other patent with regard to the specifications,
10:41AM 5   right, because the specifications are identical; right?

6   **A.   Yes.**

7   Q.   And so when you count how many patents you have, you
8   count each issued patent even though they come from the
9   identical specification; right?

10:42AM 10   **A.   Yes, they are issued patents.**

11   Q.   Right.  And so when you said you had 29 patents, you
12   counted the two patents in this case as two; right?

13   **A.   Yes.**

14   Q.   Okay.  Even though they have identical specifications;
10:42AM 15   right?

16   **A.   Yes.**

17   Q.   Okay.  And we were discussing about LCMS for rail, do
18   you remember, before the break?

19   **A.   Yes.**

10:42AM 20   Q.   And I'd like you to identify for the record Trial
21   Exhibit 686 in your cross-examination book.  It's an email to
22   you.

23   **A.   Yes.**

24   Q.   And do you believe you received this email on or about
10:42AM 25   October 22, 2014?

UNITED STATES DISTRICT COURT

68

1   **A.   Yes.**

2          MR. RE:  Your Honor, I'd like to move for the
3   admission of Exhibit 686.

4          THE COURT:  Any objection?

10:43AM 5          MR. CERULLI:  No objection.

6          THE COURT:  Okay.  686 is in evidence.

7              (Exhibit 686 admitted.)

8   BY MR. RE:

9   Q.   And Mr. Olenoski is writing to you cc Ewing Kung.  Do
10:43AM 10   you see that?

11   **A.   Yes.**

12   Q.   Who is Ewing Kung?

13   **A.   A person in our group, the TAS group, Tetra Tech TAS.**

14   Q.   And what kind of person is he?  What kind of group?
10:43AM 15   What is he doing in the group?

16   **A.   He's an electrical engineer that works with us.**

17   Q.   And below it, do you see where Richard Fox-Ivey is
18   writing Olenoski who wrote to you?

19   **A.   Yes.**

10:43AM 20   Q.   Do you see that part dated October 22?

21   **A.   Rob forwarded it.**

22   Q.   And do you see how Richard Fox-Ivey from Pavemetrics is
23   writing to Rob, and he wrote Hi Rob.  We just released this.
24   Not sure if I sent it to you the other day or not.  Do you
10:44AM 25   see that?

UNITED STATES DISTRICT COURT

**EXHIBIT 2**
**-19-**

## 69

1    A.    Yes.

2    Q.    And then it says also FYI, we're gonna be at a

3    conference in Seattle next week in case you're sending Eric

4    or someone else.  Do you see that?

10:44AM 5    A.    Yes.

6    Q.    And if we go up the email, there's a PDF attachment.  Do

7    you know what a PDF attachment is?

8    A.    Yes.

9    Q.    Is there any doubt in your mind that the PDF attachment

10:44AM 10   was attached as indicated by attachments on your email?

11   **A.    I assume that it is as it's shown, and it was attached.**

12   Q.    Now, let's take a look at the attachment.

13         MR. CERULLI:  Objection, Your Honor.  Foundation.

14         THE COURT:  Um, well, let me see what the question

10:44AM 15   is gonna be here.  What's your question gonna be, Counsel?

16         MR. RE:  Well, I already laid the foundation.

17   Q.    My question is do you believe that there was attachment,

18   a PDF attachment indicated by the word attachments on the top

19   of Exhibit 686 in the first email?

10:45AM 20   A.    Uh, yes.

21   Q.    Okay.

22         THE COURT:  Well, I mean, what I was asking about

23   is your next question because he believes there was an

24   attachment, but if you're gonna ask him about the document, I

10:45AM 25   think you need to lay foundation that he's got familiarity.

UNITED STATES DISTRICT COURT

## 70

1          MR. RE:  Okay.

2    Q.    Do you have any familiarity with the attachment?

3    **A.    Uh, I don't remember it, but I recognize the LCMS system**

4    **mounted on a hi-rail that's collecting data on the rail.**

10:45AM 5    Q.    Yes.  And this is the brochure picture that Mr. Barney

6    used in his opening slides.  There was a picture of the auto

7    rail brochure; isn't that right?

8    **A.    I am not sure what the source of the image was that was**

9    **used in the opening slides.**

10:45AM 10   Q.    Okay.  But you've seen this brochure many times; right?

11   **A.    I don't know that I've seen it many times.  This is a**

12   **brochure that is demonstrating the use of the off-the-shelf**

13   **photo triangulation method for rail.  There's no description**

14   **in here of algorithms or anything.  It's showing some 3D**

10:46AM 15   **data.**

16         MR. RE:  Your Honor, if I could just publish the

17   attachment?

18         THE COURT:  Yes, go ahead.

19   BY MR. RE:

10:46AM 20   Q.    Let's take a look at this.  Now, is there any doubt in

21   your mind this comes from Pavemetrics?

22   **A.    No.**

23   Q.    Any document in your doubt that Pavemetrics did, in

24   fact, laser rail inspection system in 2014?

10:46AM 25   **A.    Uh, no, no question.**

UNITED STATES DISTRICT COURT

## 71

1    Q.    No question, okay.  And one of the key features of laser

2    rail inspection system is that it inspects at speeds up to

3    100 kilometers per hour.  Do you see that?

4    A.    Uh, yes.

10:46AM 5    Q.    And in your view, is 100 kilometers per hour considered

6    fast or not?

7    A.    Uh, yes.

8    Q.    That's fast; right?

9    A.    It's -- yes.

10:46AM 10   Q.    Okay.  And is there any doubt in the photograph --

11   there's some photographs if we can take a look at those.  Is

12   there any doubt in your mind that those are pictures of

13   railroad tracks?

14   **A.    Pictures of railroad tracks.  Are you talking about the**

10:47AM 15   **three circular images at the bottom?**

16   Q.    Well, actually the one on the right, there is a truck

17   with sensors laser beaming on the rail.

18   **A.    Yes.  That is a hi-rail with the LCMS system mounted on**

19   **it.**

10:47AM 20   Q.    Okay.  And then there's another page talking more about

21   the components and the capabilities; right?

22   A.    Yes.

23   Q.    Okay.  And you have no doubt that this was sent to you

24   in and in your possession by October 22, 2014; right?

10:47AM 25   **A.    Uh, yes.  That lists capabilities that aren't possible**

UNITED STATES DISTRICT COURT

## 72

1    **with these systems.**

2    Q.    Sir, I'm just asking if you had it in your possession.

3    A.    Yes.

4    Q.    Okay.  And you are familiar with patent litigation.

10:47AM 5    You've been involved in some patent litigation; right?

6    A.    Yes.

7    Q.    And, in fact, you participated in the G REX litigation;

8    right?

9    A.    Yes.

10:48AM 10   Q.    And, in fact, your company, Tetra Tech, succeeded in the

11   G REX litigation; right?

12   A.    Yes.

13   Q.    And your company ended up proving five G REX patents

14   were invalid for obviousness; right?

10:48AM 15   A.    Yes.

16   Q.    And you assisted to get that result; right?

17   A.    Yes, I was -- yes.

18   Q.    And when you were testifying in Canada, you were

19   testifying for the purpose of explaining to the court the

10:48AM 20   state of the art that preexisted in the G REX patents; right?

21   A.    Yes.

22   Q.    And the G REX patents precede your patents; right?

23   A.    Yes.

24   Q.    Now, I'm gonna change subjects a little bit.  From a

10:48AM 25   technical standpoint, you believe from a technical standpoint

UNITED STATES DISTRICT COURT

**EXHIBIT 2**
**-20-**

73

1 that the Georgetown Aurora System is the closest technical
2 competitor to Tetra Tech; right?
3 A.   When was that statement made?
4 Q.   How about at your deposition in this case?
5 A.   Okay.  Georgetown rail system provides the same
6 measurement and reporting capabilities that I am aware of.
7 Q.   Yes.  And so you -- at the time of your deposition in
8 2020, January of this year, you believed the Georgetown
9 Aurora System is the closest technical competitor; right?
10 A.   Yes.
11 Q.   To you, to Tetra Tech; right?
12 A.   To our 3DTAS system, yes.
13 Q.   And you also believe that LRAIL is not a competitor in
14 the space of 3DTAS' realtime autonomous collection of
15 reporting; right?
16 A.   Uh, yes.
17 Q.   And the products are very dissimilar; right?
18 A.   They are -- pardon?
19 Q.   Dissimilar.
20 A.   That's not the closest competitor that we have.
21 Q.   No.  In fact, you compare -- like comparing apples to
22 oranges.  Very different; right?
23 A.   The LCMS system for the LRAIL system you're referring
24 to?
25 Q.   Yeah.

UNITED STATES DISTRICT COURT

74

1 A.   Yeah.  It was post process, yes.
2 Q.   So it's like apples and oranges to try to compare and
3 LCMS and LRAIL with Tetra Tech's?
4 A.   Yes.
5 Q.   Okay.  I must have misspoken.  The deposition that
6 you -- you were deposed this year.  I thought I said like
7 2022 was your deposition; right?  Not 2020.
8 A.   Yes.
9 Q.   There was no litigation between the parties in 2020;
10 right?
11 A.   Between the parties being Pavemetrics and Tetra Tech.
12 Q.   Yes.  We're the parties, yes.
13 A.   Correct.
14 Q.   This suit didn't start until February of 2021; right?
15 A.   Yes.
16 Q.   And so your deposition was after that; right?
17 A.   Yes.
18 Q.   Okay.  Um, this brochure in Exhibit 686, do you recall
19 ever giving that to anybody?
20 A.   I don't recall doing that --
21      THE COURT REPORTER:  I'm sorry, I couldn't hear
22 you, Counsel.
23 BY MR. RE:
24 Q.   Now, did you give it to anybody?
25      THE COURT:  And you had an objection, Counsel?

UNITED STATES DISTRICT COURT

75

1      MR. CERULLI:  Yeah.  I think we're getting very
2 close to what we discussed this morning.
3      THE COURT:  Okay.  And so your objection would be
4 relevance?
5      MR. CERULLI:  Yes.
6      THE COURT:  Objection sustained.  Move on.
7 BY MR. RE:
8 Q.   Do you know if the Patent Office had the brochure that
9 was attached to Exhibit 686?
10 A.   I am not sure if they had it or not.
11 Q.   I'll represent to you that the Patent Office had no
12 information on LRAIL.  Does that sound correct to you?
13 A.   Uh, again, I -- I -- it's not part of the documents that
14 were referenced in the patent.  They did not have it.
15 Q.   So you've been a patentee many times so you understand
16 that the Patent Office did not have any information about
17 LRAIL when examining your two patents; correct?
18 A.   Yes.
19 Q.   Now, this was -- it was not your decision for Tetra Tech
20 to assert your patents against Pavemetrics, was it.
21 A.   No.
22 Q.   That decision was made by the head office, wasn't it?
23 A.   That's correct.
24 Q.   And you have no knowledge how the head office decided to
25 assert these patents against my client; right?

UNITED STATES DISTRICT COURT

76

1 A.   I have no direct knowledge.
2 Q.   But you do know that Gary Keyes was probably the person
3 with the most input along with your corporate lawyer, Preston
4 Hobbs III?
5 A.   Hobson III.
6 Q.   Hobson?
7 A.   Yeah.
8 Q.   So it was their decision whether to assert the patents
9 against my client?
10 A.   Uh, I think my comment was that those -- Gary Keyes and
11 Preston Hobson III were part of the decision making group.
12 Q.   And it wasn't you; right?
13 A.   Uh, I was asked for input, but it wasn't my decision.
14 Q.   And it wasn't your decision, but you gave input; right?
15 A.   Yes.
16 Q.   And, in fact, you don't even know if Pavemetrics or
17 LRAIL system uses the method of Claim 8t of the '557 patent;
18 right?
19 A.   Uh, the analysis was done by our legal team, and it was
20 identified through that analysis and with my input,
21 obviously, because I was looking at it.
22 Q.   But when you testified, you said, and you know this is
23 true, right, that you don't even know if any system by
24 Pavemetrics uses the method of Claim 8 of the '557 patent;
25 correct?

UNITED STATES DISTRICT COURT

**EXHIBIT 2**
**-21-**

77

1   A.   **What is the reference from that?  Where is that in**
2   **context, please?**
3   Q.  Do you understand?
4   A.   **Where is that from?**
10:53AM 5   Q.  Isn't it -- isn't it true that you don't even know if
6   Pavemetrics or its LRAIL system uses the method of Claim 8 of
7   the '557 patent; right?
8   A.   **Can you provide the context for that?**
9   Q.  No, I need to know if that's true or not.
10:54AM 10  A.   **Uh, at this point in time, with all of the analysis that**
11  **was done prior to this litigation, it had been demonstrated**
12  **that there was, uh, reasonable cause that they infringe.**
13  Q.  No.  My question is at the time you were deposed in
14  January of this year, did you even know when the case was
10:54AM 15  going on when the '557 was asserted in this case -- it was
16  added to this case during the litigation.  You know that;
17  right?
18  A.   **Mm-hmm.**
19  Q.  And at that time, it was added to the case in 2021.
10:54AM 20  Right?  And then you were deposed in 2022; right?
21  A.   **Yes.**
22  Q.  At the time you were deposed in 2022, did you know --
23  you did not know, in fact, that Pavemetrics or its LRAIL
24  system uses the method of Claim 8t of the '557; correct?
10:54AM 25  A.   **I would have to see the dates on when discussions had**

UNITED STATES DISTRICT COURT

78

1   happened with our legal team and when that was -- that
2  statement was made.
3  Q.  Let's go to your deposition at page 271 in your binder.
4  And if we can --
10:55AM 5  A.   What is, uh, the deposition number?
6  Q.  Look at page 271 of your binder.  It would be the
7  deposition in the front.
8        THE COURT:  It's the first tab of the binder.  And
9  you're referring him to page 271; is that correct?
10:55AM 10       MR. RE:  271, lines 4 through 9.
11       THE WITNESS:  I'm sorry, I don't know what
12  section I'm -- oh, this, got it.  So where are we?  Which
13  page, please?
14       MR. RE:  271.
10:55AM 15       THE WITNESS:  Okay.
16       MR. RE:  I want to ask you were you asked these
17  questions, and did you give those answers?
18       Okay.  Let's -- so you're not aware of any
19  Pavemetrics system that uses the approach of Claim 8 in Tetra
10:56AM 20  Tech's '557 patent; correct?  And you said I'm not aware of a
21  system that uses that approach.
22       Were you asked this question by Mr. Laquer, and did you
23  give that answer?
24  A.   Uh, yes, I did.
10:56AM 25       MR. RE:  I have no further questions, Your Honor.

UNITED STATES DISTRICT COURT

79

1       THE COURT:  Thank you, Counsel.
2       Any redirect?
3       MR. CERULLI:  Yes.
4       THE COURT:  Please proceed.
10:56AM 5       REDIRECT EXAMINATION
6  BY MR. CERULLI:
7  Q.  Dr. Mesher, we were just talking about Claim 8 in the
8  '557 patent, and you said you weren't aware of any system
9  that practiced that claim.  Did you ever review Pavemetrics'
10:56AM 10  source code?
11  A.   No, I did not.
12  Q.  Are you aware of how their algorithms work with inside
13  that source code?
14  A.   No, there's no published information or information I
10:57AM 15  have access to that would disclose any of their algorithms.
16  Q.  Okay.  And would you need to have that awareness and be
17  aware of how the source code works --
18  A.   Yes.
19  Q.  -- in order to know?
10:57AM 20  A.   Yes, I would need that information in order to be able
21  to answer that question correctly.
22  Q.  And we talked a lot about off-the-shelf hardware, the
23  LCMS sensors, the LRAIL sensors, uh, the SICK sensors.  Did
24  you invent the hardware -- are you claiming to invent any
10:57AM 25  of that hardware?

UNITED STATES DISTRICT COURT

80

1   A.   No.  As I had said before, it's a mature science.  Photo
2  triangulation to get PDL elevation measurements has been used
3  for decades and decades for many different industries.  I
4  mean, we didn't invent that.
10:57AM 5  Q.  And when we're talking about hardware, we're talking
6  about the cameras, the lasers.  All of these have been done
7  for years.
8  A.   Yes, the lasers and measurement technology in order to
9  produce an elevation map is a mature known science.
10:58AM 10  Q.  Okay.  And so in the context of '293 and '557 patents,
11  what did you invent?
12  A.   The algorithms associated with the post processing in
13  order to increase both the speed and the accuracy of
14  measurement.  That was really a unique aspect.
10:58AM 15  Q.  And you were also asked about neural networks, and I
16  believe you referred to them earlier as software tools.  Can
17  you carry out your algorithms that you invented using neural
18  networks?
19  A.   You could structure the neural networks to be able to
10:58AM 20  do -- to emulate that algorithm, yes.
21  Q.  And is that, in fact, the way you do that today?
22  A.   Uh, that is one of the approaches that we use today
23  cause we have several at our disposal.
24  Q.  And if we could pull up Exhibit 686?
10:59AM 25  A.   In which binder?

UNITED STATES DISTRICT COURT

**EXHIBIT 2**
**-22-**

81

```
 1   Q.   It should be the cross binder.
 2   A.   Oh, okay.  Somebody's gonna put it on the screen for me.
 3   Thank you.
 4   Q.   And I believe you said you didn't recall, you know,
 5   reviewing the attachment, um, but, uh, you -- you believe you
 6   received the email.
 7   A.   Uh, yes.
 8   Q.   And, um, do you receive a lot of emails?
 9   A.   Uh, yes.  And when I see something like this, I'm trying
10   to look for a response back to somebody that indicates that I
11   actually opened them and looked at whatever the attachments
12   are.  I spend a great deal of my time out of the office so
13   what I've got on me at the time is a phone so opening up
14   something like this on a phone may or may not happen.  And as
15   you said, I get many, many emails in a day.
16   Q.   Well, assuming that you did receive the attachment if we
17   can review it.  Maybe we can -- so this is clearly a
18   brochure, and I believe it's two pages.  It's a two-page
19   brochure.  And in your practice, typically, do flyers and
20   brochures explain all the details of how your algorithms
21   work?
22   A.   Uh, no, and this is clearly a marketing brochure.  There
23   are claimed measurements that are made here that cannot made
24   with these systems, at least not to the accuracy that a rail
25   client would find acceptable so it's -- this is obviously a
```

UNITED STATES DISTRICT COURT

82

```
 1   disclosure of using the LCMS system on track with the stated
 2   claims measurement parameters that practically, with my
 3   experience, I recognize you can't make these.
 4   Q.   And you had mentioned earlier that you're not familiar
 5   with Pavemetrics' source code or how its algorithms work.
 6   Correct?
 7   A.   Correct, and there is no information on here whatsoever
 8   about any algorithms.  This is literally a marketing
 9   brochure.
10      MR. RE:  Your Honor, --
11      MR. CERULLI:  No further questions.
12      MR. RE:  -- I object.  Your Honor, I object.  I
13   move to strike to the extent he's giving opinion testimony on
14   the document he told me he doesn't even remember receiving.
15   Therefore, it's opinion testimony with no foundation.
16      THE COURT:  Objection's overruled.
17      The answer can stand.
18      MR. CERULLI:  No further questions, Your Honor.
19      THE COURT:  Any recross, Counsel?
20      MR. RE:  Yes.
21              RECROSS-EXAMINATION
22   BY MR. RE:
23   Q.   I understood from your redirect that you need to see the
24   source code to determine if there's infringement; right?
25   A.   If you were trying to determine that another system
```

UNITED STATES DISTRICT COURT

83

```
 1   performed calculations the same way that we do, you would
 2   need more information, detailed descriptions of the
 3   algorithm.
 4   Q.   That's not quite what I said.  You need to see source
 5   code to determine if somebody is infringing your patents;
 6   right?
 7   A.   You need detailed information on the algorithms that are
 8   being used.
 9   Q.   And couldn't make that determination based upon public
10   information; right?
11   A.   Uh, you could.  If you had full disclosure in the public
12   regarding detailed algorithm information, you would be able
13   to.
14   Q.   But when did you first have that kind of information?
15   A.   Which information?
16   Q.   The information you just referred to that the public
17   could have.
18   A.   Uh, I didn't.  I had said in my -- my deposition that I
19   was unable to say whether or not they infringed or not.  I
20   didn't have access to it.  It was restricted.
21   Q.   Right.  So take a look at Exhibit 235 in your book.
22   A.   Yes.
23   Q.   And that is a declaration that you wrote; isn't that
24   correct?
25   A.   Yes.  This is a document prepared with our legal counsel
```

UNITED STATES DISTRICT COURT

84

```
 1   and -- yes.
 2   Q.   And it was submitted to this Court; right?
 3   A.   Yes.
 4   Q.   And it was submitted to this Court to explain your
 5   opinion of infringement; right?
 6   A.   Correct.
 7   Q.   And did you have any source code in order to make this
 8   declaration to this Court?
 9   A.   No.
10   Q.   And, in fact, you explicitly say in your declaration
11   that this is all based on publically available documents;
12   right?
13   A.   Yes.
14   Q.   And apparently, when you filed this with the Court on
15   March 3rd, 2021, you had no trouble opining on infringement
16   despite seeing no source code; right?
17   A.   Uh, that's correct.
18      MR. RE:  No further questions Your Honor.
19      THE COURT:  Let me just ask real quick, um, does
20   this declaration, Doctor, refer to the '293 patent or is it
21   the '557 patent?  Or both.
22      THE WITNESS:  Uh, the reference in here that I see
23   are '293 and, uh. . . I'm just looking to see.  '293 patent.
24      THE COURT:  Okay, thank you.
25      MR. RE:  If I may, Your Honor?  In light of your
```

UNITED STATES DISTRICT COURT

**EXHIBIT 2**
-23-

---

85

1  question, I could ask another.

2  THE COURT:  No.

3  Counsel, do have any redirect based on that cross?

4  MR. CERULLI:  Um, no redirect, thank you.

5  THE COURT:  Okay, witness is excused.  Thank you.

6  Counsel, call your next witness.

7  MR. CHUNG:  Tetra Tech calls Mr. William Larson.

8  May I approach, Your Honor?

9  And, Your Honor, if I may, may I take care about

10  one housekeeping matter --

11  THE COURT:  Yes.

12  MR. CHUNG:  -- about the pre-admitted exhibits?

13  THE CLERK:  Wait.  Can I -- I have to take those

14  down.  Can I swear him in first?

15  THE COURT:  Yes.

16  THE CLERK:  Will you raise your right hand?

17  (Witness sworn.)

18  THE CLERK:  Please be seated.

19  Will you please state and spell your full name for

20  the record.

21  THE WITNESS:  William Frederick Larson,

22  W-i-l-l-i-a-m  F-r-e-d-e-r-i-c-k  L-a-r-s-o-n.

23  THE CLERK:  Thank you.

24  MR. CHUNG:  Your Honor, may I admit into the record

25  a couple of exhibits that are not objected to?  They are

UNITED STATES DISTRICT COURT

---

86

1  Exhibits 162, 831 and 841.

2  THE COURT:  Yes.

3  THE COURT:  Any objection, Counsel?

4  MR. ZOVKO:  No objection, Your Honor.

5  THE COURT:  Okay.  Exhibits 162, 831 and 841 are in

6  evidence.

7  (Exhibits 162, 831, 841 admitted.)

8  DIRECT EXAMINATION

9  BY MR. CHUNG:

10  Q.  Good morning, Mr. Larson.  Could you please tell the

11  Judge and jury your full name?

12  A.  Yes, William Larson.

13  Q.  And are you currently employed, sir?

14  A.  Yes, I am.

15  Q.  And who is your employer?

16  A.  Tetra Tech.

17  Q.  And how long have you worked for Tetra Tech?

18  A.  About two years.

19  Q.  And what did you do for work before joining Tetra Tech?

20  A.  I worked for CSX Transportation.

21  Q.  And how long did you work with CSX?

22  A.  About 13 years.

23  Q.  And what were the approximate dates that you worked for

24  CSX?

25  A.  Uh, July of 2007 until June of 2020.

26  Q.  And what did you do for work before joining, uh, CSX?

UNITED STATES DISTRICT COURT

---

87

1  A.  I was in the Navy.

2  Q.  And, uh, how long were you in the Navy for?

3  A.  27 years.

4  Q.  Could you briefly describe your professional experience

5  in the Navy?

6  A.  Uh, yes.  I was a Surface Warfare Officer.  Uh, retired

7  as a Navy Captain.  Uh, was a commanding officer of two Navy

8  warships and a Major Training Command ashore.

9  Q.  And what did you do for work, if anything, before

10  joining the Navy?

11  A.  I went into the Navy right out of college.  I was ROTC.

12  Q.  Could you please briefly describe your educational

13  background?

14  A.  Yes.  I have a Bachelor of Science, a Mechanical

15  Engineering degree from Duke University and a Master of Arts

16  from the U.S. Naval War College.

17  Q.  And how did your 27 years of experience in the Navy

18  translate to your work in the rail industry and CSX?

19  A.  Uh, in the Navy, when I wasn't out on ships on shore

20  duty, the two main things that I was working on were computer

21  systems and combat direction systems, uh, so technology.  And

22  then also did two tours in ship repair which was with

23  contract requirements for the Federal Acquisition Regulation

24  or FAR, uh, and so I was working with suppliers and

25  contracts.

UNITED STATES DISTRICT COURT

---

88

1  Q.  And could you please briefly describe the positions you

2  held at CSX during your 13 years there?

3  A.  Yes.  I, uh, started in Purchasing.  I was a Director of

4  Mechanical Purchasing.  That's cars and locomotives.  So I

5  worked with suppliers to contract for the purchase of cars

6  and locomotives and all the repair parts of those.

7  I moved into the Material Management.  So all of

8  those parts that I had been purchasing, I worked on supplying

9  all of the storerooms out for the locomotive service centers

10  and car shops on the entire CSX system.

11  I was, uh, promoted into Process Improvement where

12  I did SICK signal work, mostly for the Engineering and

13  Facilities groups, and then was moved into and got a job in

14  the Engineering Department where I ended up as the Director

15  of Engineering Technology Implementation.

16  Q.  And could you describe the responsibilities of the

17  Engineering Department at CSX?

18  A.  Yes.  The Engineering Department's responsible for all

19  of the track infrastructure so all the rail ties, all of the

20  fasteners and the ballast which is the rocks under the --

21  under the tracks.  Also, all of the structures so the

22  bridges, the tunnels, all of the -- all of the infrastructure

23  that the train runs on.  And they would plan 'em, build 'em,

24  uh, inspect them and maintain all of those assets.

25  Q.  And as the Director of Engineering Technology

UNITED STATES DISTRICT COURT

**EXHIBIT 2**
**-24-**

89

1 Implementation, could you briefly describe what your
2 responsibilities were?
3 A.   Yes.  My overall responsibility was to work with our
4 Technology Group and work to accelerate bringing the
11:10AM 5 technology into engineering to improve both the operations,
6 uh, and primarily to reduce costs and improve safety.
7 Q.   And what was your involvement with track inspection as
8 the Director of Engineering Technology Implementation?
9 A.   One of the big functions was to look at all of the
11:11AM 10 inspection, not just track inspection.  So in almost every
11 area for engineers, signal and the track, there are
12 requirements from the FRA, the Federal Railroad
13 Administration, and those would be inspections that a man
14 would have to go and do.
11:11AM 15        So there was a long list of what a man who is
16 either driving over the tracks or was walking the tracks
17 would have to visually look for.  And so what we were doing
18 is looking for technology that would hit as many of those
19 specific items that a man had to do and see where technology
11:11AM 20 could do that same function.
21 Q.   And what were you looking for in autonomous track
22 inspection technology at CSX?
23 A.   Well, so the man was out there and was looking.  If the
24 man's looking the wrong way, he's missing things.  And if two
11:11AM 25 people went out and walked, you get two different inspection

90

1 reports very often.  They find different things wrong with
2 the same track.
3        So we were looking for reliable, repeatable and
4 accurate results.  So by reliable, I mean every time it goes
11:12AM 5 and finds the same thing.  Similarly, repeatable, either
6 direction, day, night, doesn't matter the environmental
7 conditions, it would find it.
8        And the accuracy of the human eye versus the
9 ability of the sensors that are available now with the
11:12AM 10 technology that's available would allow better accuracy.  And
11 one of the problems that we had was with false alerts so
12 false reports.  So if it was reported as bad, it might be
13 bad, it might not.  Somebody would have to go back out and
14 look so we were trying to make that accuracy.
11:12AM 15 Q.   And initially, which companies were you considering for
16 an autonomous track inspection system at TAS?
17 A.   There were quite a few.  The main ones were ENSCO,
18 Balfour Beatty, Placer, Tetra Tech and Pavemetrics.
19 Q.   And around what time were you considering these
11:13AM 20 companies?
21 A.   This was in the winter, spring of 2019, 2020.
22 Q.   And what was your role in evaluating these companies?
23 A.   I was member of a team.  There were several directors at
24 my level in the engineering department.  We had a procurement
11:13AM 25 manager from purchasing in the group, and our direct boss of

91

1 those directors was -- our AVP was in the group as the
2 primary review of the systems.
3 Q.   And what's an AVP?
4 A.   Assistant Vice-President.
11:13AM 5 Q.   And did any companies not make the initial cut at CSX?
6 A.   Yes.  The first three I mentioned, ENSCO, Balfour Beatty
7 and Placer, those all were using a visual system kind of like
8 high speed using the phone -- your camera from your phone so
9 they would look at pictures and pixels and determine from
11:14AM 10 those using algorithms, but there was an issue.  And they had
11 a tendency to have a high false alarm rate, false results
12 that I mentioned.
13        So usually, they would have to have a person in the
14 loop.  So that person -- once the result was that it was an
11:14AM 15 issue, a person would look at it and make the call if it was
16 true or not which would put the subjective person back in the
17 loop and increase the time required to get that, uh, result.
18 Q.   And so which companies were left for consideration?
19 A.   Tetra Tech and Pavemetrics.
11:14AM 20 Q.   And what were the products from these two companies that
21 CSX was considering purchasing?
22 A.   The Tetra Tech RailAI system and the Pavemetrics' LRAIL
23 system.
24 Q.   And what was your impression of technical capabilities
11:14AM 25 of Tetra Tech's RailAI system?

92

1 A.   The RailAI system is a group of many sensors so it was
2 the closest to being able to hit that full FRA list of what a
3 man has to do look for.  So the closest of anything that we
4 saw, you have an Automated Inspection System.
11:15AM 5 Q.   And what was your impression of the technical
6 capabilities of Pavemetrics' LRAIL at the time?
7        THE COURT REPORTER:  I'm sorry, Counsel.
8        Can you just say that a little bit slower?
9        MR. CHUNG:  Yeah, yeah.
11:15AM 10        THE COURT REPORTER:  Thank you.
11        THE COURT:  You probably need to slow down a little
12 bit, especially with technical terms.  And if there's an
13 answer that requires that you give a name of something, and
14 it's not common, maybe you can spell it for the court
11:15AM 15 reporter.
16        THE WITNESS:  Thank you.
17        MR. CHUNG:  Thank you.
18 Q.   What was your impression of the technical capabilities
19 of Pavemetrics LRAIL at the time?
11:15AM 20 A.   The Pavemetrics LRAIL system used two 3D cameras looking
21 down so similar data to what Tetra Tech was looking in the
22 similar system 3DTAS, um, getting the same data.  And it had
23 a capability of looking at grading ties and inventory, the
24 track structure, et cetera, down there very similar.
11:15AM 25 Q.   I'd like to show you Exhibit 162 on the screen which is

**EXHIBIT 2**
**-25-**

93

1   admitted in evidence.  Do you see Exhibit 162, Mr. Larson?
2   A.   Yes, I do.
3   Q.   What is Exhibit 162?
4   A.   This is a quotation from Pavemetrics to me at -- well, I
11:16AM 5   worked at CSX for a turnkey LRAIL inspection system.
6   Q.   And what were you expecting that Pavemetrics would
7   deliver to CSX under this quotation?
8   A.   Uh, well, exactly what it says there.  It's the
9   hardware, software and the ability upon receipt to, uh,
11:16AM 10   conduct track inspection, on insulation to conduct track
11   inspection.
12   Q.   Okay.  Going back to the full Tetra Tech RailAI system,
13   were there any stand alone components that you were
14   considering at the time?
11:16AM 15   A.   Yes.  In the first proposal from Tetra Tech, it was for
16   the full RailAI system, but we -- we at CSX went back to
17   Tetra Tech and asked them to break apart all the systems to
18   allow us to look at pricing for the various components.  So
19   Tetra Tech did do that.  And we're looking at all the various
11:17AM 20   components and discussing them with the 3DTAS being the most
21   likely one that we were looking at.
22   Q.   And why were you looking at the 3DTAS?
23   A.   Um, those down looking systems had the ability to grade
24   ties, and the biggest cost offset was the grading of ties
11:17AM 25   which CSX was paying annually a company called G REX with

UNITED STATES DISTRICT COURT

94

1   their Aurora row system a little over $2 million.
2   Q.   And so for the -- I'm gonna go back to the full RailAI
3   system.  What was your impression of the price for Tetra
4   Tech's RailAI system at the time?
11:17AM 5   A.   Well, the RailAI system was -- was generally higher in
6   price, but again, it had multiple sensors and multiple
7   capabilities so it was the much more capable system.  And
8   given all that it could look at in inspection, there were --
9   there were cost offsets to be able to make a case affording
11:18AM 10   cost benefits.
11   Q.   And could you briefly describe those cost offsets?
12   A.   Yes.  The biggest one would be the grading of ties.  I
13   mentioned the Aurora row sytem from Georgetown Rail.  CSX was
14   spending over $2 million a year just to look at 6000 miles of
11:18AM 15   ties.
16       Uh, there were other offsets as well because when
17   you're looking at an automated, autonomous car which could
18   replace a man car and other systems, and that would allow you
19   to replace the crew for the man car, that required a separate
11:18AM 20   locomotive and crew to run which was expensive.
21       It also took track time.  So while it was there,
22   you couldn't run trains.  The new cars that we were looking
23   at for Tetra Tech and Pavemetrics would be in Consis so you
24   would save money from the operations of being able to run
11:19AM 25   more trains, and it would provide more safety by doing more

UNITED STATES DISTRICT COURT

95

1   track miles inspection.
2   Q.   And how did the price of Tetra Tech's RailAI compare to
3   the Aurora service of CSX's model?
4   A.   The RailAI installed in the CSX car was about
11:19AM 5   4-and-a-half million dollars so about twice what CSX was
6   paying so it would pay for itself in about two years just on
7   the tie inspection alone.  There were the others I was
8   talking about.
9   Q.   I'd like to show you Exhibit 831 which is in evidence.
11:19AM 10       Can we pull it up on the screen, please.
11       Mr. Larson, what is Exhibit 831?
12   A.   This is a series of emails between myself and Brad
13   Spencer.  We were both at CSX.  Brad was the Director of
14   Track Testing, one of the people on the team looking at this.
11:19AM 15   Q.   And I want to direct your attention to the bottom email.
16   A.   Yes.
17   Q.   And what is stated in this part of the email chain?
18   A.   Uh, it talks about my -- um, telling Brad that I'm
19   looking at cost offsets.  We're paying north over
11:20AM 20   $2 million a year for 6000 miles of tie grading with the G
21   REX system.  And I say all of a sudden, Tetra Tech at
22   4-and-a-half million dollars isn't sounding so expensive
23   because it would mean it had to have a two-year pay back just
24   based on tie grading.
11:20AM 25   Q.   And this -- this email was sent while you were at CSX;

UNITED STATES DISTRICT COURT

96

1   correct?
2   A.   That's correct.
3   Q.   I want to talk now about the 3DTAS, the stand alone
4   component.  How did the price of Tetra Tech's 3DTAS compare
11:20AM 5   to the Aurora service that CSX was using at the time?
6   A.   The price of the 3DTAS system was a little bit less than
7   the full RailAI system so it was less than one year for the
8   Aurora system.  The payback was less than a year.
9   Q.   And do you recall how many miles the Aurora system was
11:21AM 10   inspecting per year?
11   A.   Yeah.  From that email, it was 6000 miles is what CSX
12   was paying, just over $2 million worth.
13   Q.   So how did the 6000 miles that the Aurora system was
14   inspecting compare to Tetra Tech's RailAI and 3DTAS?
11:21AM 15   A.   Yeah.  The intention was to put either the Tetra Tech
16   RailAI system or Pavemetrics system, either one, on the one
17   CSX existing autonomous track assessment cars, ATAC cars,
18   which had just geometry at that point.  And those cars were
19   running between 60 and 100,000 miles a year so about ten
11:21AM 20   times the mileage that they were getting from Georgetown.
21   Q.   And what was your recommendation to CSX senior
22   leadership after evaluating proposals from Tetra Tech and
23   Pavemetrics?
24   A.   Right.  Well, my charge was to automate inspection.  The
11:21AM 25   RailAI system is the one that automated track inspection to

UNITED STATES DISTRICT COURT

**EXHIBIT 2**
**-26-**

97

1    the greatest amount.  It was -- you know, offset cost in
2    about two years.  So my recommendation was to go with the
3    Tetra Tech RailAI system.
4    Q.    And what was the team's recommendation to CSX leadership
11:22AM 5    after evaluating proposals from Tetra Tech and Pavemetrics?
6    A.    Right.  The team's recommendation based on the budget
7    realities, and this is in the pandemic so, you know, Spring
8    of 2020, was that that amount of money would not be
9    available, and the budget was less than that, um, something
11:22AM 10   under 2 million.  I don't remember the exact amount.  So the
11   team recommended to go with Pavemetrics as it was able to
12   achieve the biggest cost offset which is that $2 million
13   Georgetown Aurora system for a much less price.
14   Q.    And what is your impression of how the evaluation
11:22AM 15   process would have shook out had Pavemetrics not offered the
16   LRAIL?
17              MR. ZOVKO:  Objection.
18              Calls for opinion testimony, Your Honor.
19              THE COURT:  Sustained.
11:22AM 20   BY MR. CHUNG:
21   Q.    Were you involved in CSX's decision to select
22   Pavemetrics LRAIL?
23   A.    I was not.
24   Q.    And why was that?
11:23AM 25   A.    CSX was doing an reorganization and downsizing, and I

98

1    was -- I got a phone call stating my job had been eliminated.
2    And I was given the offer of taking a lesser job or retiring
3    with a severance package, and I elected to retire.
4    Q.    And what did you do after retiring from CSX?
11:23AM 5    A.    I wasn't ready to retire retire.  I wanted to go find
6    something that was interesting to do.  Um, so I had a lot of
7    contacts, especially from my time in the rail industry in
8    purchasing, the CEOs and, you know, high level rail people,
9    and so I made phone calls, emails.  Also went and had my Navy
11:23AM 10   contacts so I was talking to people in the Defense industry.
11   And I was out looking for a job, but, again, I had a
12   severance package so I wasn't in a hurry.
13   Q.    And how did you end up joining Tetra Tech?
14   A.    Uh, I think about two weeks after I left CSX, I got a
11:23AM 15   call from Tetra Tech, Gary Keyes, and he was asking me, you
16   know, what had happened, what was going on with CSX and the
17   company.  And we talked for a little while.  And I guess
18   about a week later, a little less, he called back and asked
19   me if I'd be interested in working for Tetra Tech and help
11:24AM 20   them to continue to develop the RailAI system as a rail
21   subject matter expert.
22   Q.    And why did you decide to join Tetra Tech?
23   A.    The Tetra Tech system like I said was the most complete,
24   automated inspection system out there on the market.  I found
11:24AM 25   it -- think it has the ability to really transform the

99

1    industry.  It's -- you know, it's an exciting proposition,
2    and I was, you know, really -- uh, really wanted to go be
3    part of that.
4    Q.    And what's your job title now at -- at Tetra Tech?
11:24AM 5    A.    Senior Advisor Asset Management.
6    Q.    And what are your responsibilities briefly in that role?
7    A.    Uh, I primarily to work as a rail subject matter expert
8    assist them in continuing to develop the RailAI and other
9    rail based systems.  Uh, and also work in marketing of that
11:24AM 10   system.
11   Q.    And are there any other industries in which you work?
12   A.    Yes.  Uh, I live in Jacksonville, Florida.  Uh, so
13   there's a Tetra Tech office in that area just southeast out
14   of Jacksonville, uh, so I work with them on business
11:25AM 15   development.  They primarily conduct environmental and civil
16   engineering work, a lot of which is with the Navy and which I
17   have many good contacts.  So I work with them in developing
18   business, uh, in those areas.
19   Q.    And what is your relationship with CSX been like since
11:25AM 20   you retired?
21   A.    It's good.  I still have occasional contact with people
22   who worked for me and I worked with, and professionally, I'm
23   still working to CSX and trying to make sure they understand
24   the value of RailAI.
11:25AM 25   Q.    And I'd like to show you Exhibit 841 which is in

100

1    evidence, and we'll put it on the screen.  Are you familiar
2    with 841?
3    A.    Yes.
4    Q.    And what is Exhibit 841?
11:25AM 5    A.    It is a savings and benefit to CSX for the proposal we
6    made on a lease of the Tetra Tech RailAI system.
7    Q.    And were these savings and benefits, analyses delivered
8    to CSX during your time at Tetra Tech?
9    A.    Yes.  There were several, uh, versions of these to CSX
11:26AM 10   and other railroads.
11   Q.    And in your role at Tetra Tech, are your business
12   development efforts for the rail industry directed only at
13   CSX?
14   A.    No.  No.  I'm working with all -- pretty much all the
11:26AM 15   North American Class 1 railroads and also with some of the
16   smaller railroad and quite a bit with some international
17   customers and also the Metro, the larger Metro systems and
18   other transits.
19   Q.    And has your impression of the RailAI and 3DTAS changed
11:26AM 20   at all since joining Tetra Tech?
21   A.    Well, now I have, you know, complete visibility into the
22   capabilities of the system so I'm only more impressed with
23   the system, and, you know, I think it really does have the
24   ability going forward to change the industry.
11:27AM 25              MR. CHUNG:  Pass the witness, Your Honor?

**EXHIBIT 2**
**-27-**

101

1  THE COURT:  Cross-examination, Counsel?

2  MR. ZOVKO:  Yes, Your Honor.

3  THE COURT:  Please proceed.

4  CROSS-EXAMINATION

5  BY MR. ZOVKO:

6  Q.  Good morning, Mr. Larson.

7  A.  **Good morning.  So in June 2020 after working at CSX for**

8  **13 --**

9  THE COURT REPORTER:  I'm sorry, Counsel.  You're

10  gonna need to speak up a little bit.  You might want to raise

11  the lectern.

12  MR. ZOVKO:  There we go.

13  THE COURT REPORTER:  Thank you very much.

14  MR. ZOVKO:  All right.

15  THE COURT REPORTER:  Thank you.

16  BY MR. ZOVKO:

17  Q.  So Mr. Larson, in June of 2020 after working at CSX for

18  13 years, you were let go as part of a large round of job

19  cuts at CSX; right?

20  A.  **That's correct.**

21  Q.  And at that time, CSX let an individual named Lloyd Pile

22  go as well; right?

23  A.  **Yes.**

24  Q.  And Mr. Pile was an assistant VP, Vice-President, at

25  CSX; right?

UNITED STATES DISTRICT COURT

102

1  A.  **He was my direct supervisor, yes.**

2  Q.  So you directly reported to Mr. Pile; correct?

3  A.  **That's correct.**

4  Q.  CSX also let an individual named Ed Tubbs go at the same

5  time; is that right?

6  A.  **Yes, among several other people there in the department.**

7  Q.  And Mr. Tubbs was a director at CSX; right?

8  A.  **Yes.**

9  Q.  He worked at the same level as you at CSX; correct?

10  A.  **Yes.**

11  Q.  But CSX did not let Brad Spencer go at that time;

12  correct?

13  A.  **That's correct.**

14  Q.  In fact, Brad Spencer still works at CSX today; right?

15  A.  **Yes, he does.**

16  Q.  Mr. Larson, you have a binder with cross exhibits.  Can

17  you please turn to Exhibit 166?

18  THE COURT:  Counsel, do I have that?

19  THE WITNESS:  I don't see it.

20  I just go from 162 to 178.

21  THE COURT:  It looks like it's coming.

22  THE WITNESS:  Number again, please?

23  BY MR. ZOVKO:

24  Q.  166.  Do you have that in your binder there?

25  A.  **I have the tab, yes.**

UNITED STATES DISTRICT COURT

103

1  Q.  Okay.

2  A.  **Yes, I Do.**

3  Q.  Okay.  You wrote this document; correct?

4  A.  **Yes.  This is a document I did, I think, every two**

5  **weeks.  This is summary for the team, but not a personal**

6  **opinion.**

7  Q.  And you wrote this document while you worked at CSX;

8  right?

9  A.  **Yes, April 14th of 2020.**

10  MR. ZOVKO:  Your Honor, I move to admit Exhibit

11  166?

12  THE COURT:  Any objection?

13  MR. CHUNG:  No objection, Your Honor.

14  THE COURT:  Okay.  Exhibit 166 is in evidence.

15  (Exhibit 166 admitted.)

16  BY MR. ZOVKO:

17  Q.  Mr. Larson, on page 2 in the fifth paragraph, you wrote

18  Pavemetrics was recently brought to our attention.  It looks

19  to be a good fit for capability and budget; right?

20  A.  **Yes.**

21  Q.  You also wrote their system is relatively simple, robust

22  and received high marks from the FRA and Amtrak; right?

23  A.  **Yes.**

24  Q.  By their system, you meant Pavemetrics LRAIL system;

25  right?

UNITED STATES DISTRICT COURT

104

1  A.  **Yes.**

2  Q.  Near the bottom of the page, you wrote a recommendation

3  of what CSX should do at the time; right?

4  A.  **Yes, again from the group, not a personal**

5  **recommendation.**

6  Q.  Right.  And so this was a CSX recommendation as of

7  April 14, 2020; right?

8  A.  **Uh, yes, based on budget realities.**

9  Q.  And you wrote to your colleagues that Pavemetrics

10  appears to be our best option; right?

11  A.  **Yes.**

12  Q.  At the time, the price of the Tetra Tech system being

13  offered to CSX was $4.5 million; right?

14  A.  **Uh, that was for the system -- the full system of RailAI**

15  **which would be mounted on a CSX boxcar, uh, as opposed to**

16  **just the 3DTAS which wold more compare with the LRAIL system**

17  **that was also under consideration.**

18  Q.  Okay.  Well, in this email, in the second paragraph, you

19  wrote that the price of Tetra Tech's system is $4.5 million;

20  correct?

21  A.  **Uh, yes.**

22  Q.  And you wrote that Tetra Tech system is outside fiscal

23  reality; right?

24  A.  **Yes, I did.**

25  Q.  And that just means Tetra Tech system was too expensive;

UNITED STATES DISTRICT COURT

**EXHIBIT 2**

**-28-**

105

```
 1   right?
 2   A.  Yeah.  Well, like I said, it was -- during the pandemic,
 3   there wasn't the ability to go after more money so it was --
 4   the full RailAI system was outside budget capabilities, yes.
 5   Q.  And at that time during the beginning of a pandemic, CSX
 6   was under budget constraints; right?
 7   A.  Yes.
 8   Q.  CSX at the time also evaluated a system as you explained
 9   on direct, a system from a company called Balfour Beatty;
10   right?
11   A.  Yes.
12   Q.  And at this time, the Balfour Beatty system was offered
13   to CSX for $1.5 million; right?
14   A.  Uh, yes.
15   Q.  And that $1.5 million system from this third competitor,
16   Balfour Beatty, was also too expensive for CSX; right?
17   A.  Uh, yes, plus its capabilities remember I said had too
18   many false alarms.
19   Q.  Okay, thank you.  Answer the question, and then your
20   counsel will have a chance to answer and ask any additional
21   questions.  Ultimately, you wrote that CSX should lease
22   Pavemetrics LRAIL system; right?
23   A.  Yes.
24   Q.  You also wrote that CSX should negotiate with
25   Pavemetrics to purchase an LRAIL system; right?
```
(timestamps: 11:32AM lines 5, 10; 11:32AM line 15; 11:33AM lines 20, 25)

UNITED STATES DISTRICT COURT

106

```
 1   A.  Yes.
 2   Q.  Mr. Larson, the price of Pavemetrics LRAIL system is
 3   about average; right?
 4   A.  Um, yes.  It was average for the single systems that we
 5   were looking at, yes.
 6   Q.  Not too high; correct?
 7   A.  No.
 8   Q.  Not too low; correct?
 9   A.  No.
10   Q.  Mr. Larson, please turn to Exhibit 161 in that binder,
11   please.
12   A.  I have it.
13   Q.  The third email down is from you; correct?
14   A.  Um. . .
15   Q.  April 7, 2020, 8:09 a.m.  Do you see that?
16   A.  Uh, I see 12-07.  It's very small type.  Sorry.
17   Q.  From William Larson sent to Lloyd Pile, Brad Spencer.
18   Do you see that?
19   A.  Yes.  Got it, mm-hmm.
20   Q.  And you wrote that email; correct?
21   A.  Uh, yes.
22   Q.  And you're copied on all the other emails in this chain;
23   correct?
24   A.  Yes.
25        MR. ZOVKO:  Your Honor, I move to admit Exhibit 161
```
(timestamps: 11:33AM lines 5, 10; 11:34AM lines 15, 20, 25)

UNITED STATES DISTRICT COURT

107

```
 1   into evidence.
 2        THE COURT:  Any objection, Counsel?
 3        MR. CHUNG:  Appears to be hearsay.
 4        No objection, Your Honor.  I retract that.
 5        THE COURT:  Exhibit 161 is in evidence.
 6            (Exhibit 161 admitted.)
 7   BY MR. ZOVKO:
 8   Q.  And to clarify, Mr. Larson, you wrote these emails and
 9   received these emails while you were working at CSX, not
10   Tetra Tech; right?
11   A.  Yes.
12   Q.  And you wrote -- your email, the third one down that we
13   initially talked about on April 7, 2020, you wrote it after
14   Tetra Tech provided a proposal to CSX; right?
15   A.  That's correct.
16   Q.  And you stated the price for a RailAI system like we
17   talked about would be about $4.5 million; correct?
18   A.  That is correct, yes.
19   Q.  And you also stated that taking out certain components
20   of the RailAI such as the RailWEB and the LiDAR system would
21   then reduce the RailAI price to about $2.4 million; correct?
22   A.  Yes, I did.
23   Q.  And so at this time, Tetra Tech's --
24   A.  Excuse me.  It's 2.4 million less than the 4.5 million,
25   not 2.4 million.  Sorry.
```
(timestamps: 11:34AM lines 5, 10; 11:35AM lines 15, 20, 25)

UNITED STATES DISTRICT COURT

108

```
 1   Q.  Thank you.  Thank you.  So 2.4 million less.  So that
 2   system with certain parts removed from the RailAI would have
 3   been $2.1 million at this time; correct?
 4   A.  Uh, yes.  I'm not understanding exactly all the systems
 5   that could be removed for the installation, but that's --
 6   that's what we were looking at the time early in the process.
 7   Q.  Right.  So that's referring to a, I think, price of the
 8   system potentially at 2.1 million; correct?
 9   A.  Yes.
10   Q.  And you state in this email here that this particular
11   system that would be 2.1 million is still pricey; correct?
12   A.  Yes.
13   Q.  Please turn to Exhibit 165, Mr. Larson.  Mr. Larson, you
14   wrote this email, Exhibit 165; correct?
15   A.  Yes, I did.
16   Q.  And you wrote it while you worked at CSX; correct?
17   A.  Yes, I did.
18        MR. ZOVKO:  Your Honor, I move to admit Exhibit 165
19   into evidence.
20        THE COURT:  Any objection, Counsel?
21        MR. CHUNG:  No objection, Your Honor.
22        THE COURT:  Okay.  165 is in evidence.
23            (Exhibit 165 admitted.)
24   BY MR. ZOVKO:
25   Q.  And in this email, Mr. Larson, you told Mr. Pile, your
```
(timestamps: 11:35AM line 5; 11:36AM lines 10, 15; 11:37AM lines 20, 25)

UNITED STATES DISTRICT COURT

**EXHIBIT 2**

**-29-**

109

1   direct supervisor, and Brad Spencer who still works at CSX
2   that Pavemetrics was the standout for price; right?
3   **A.   Yes.**
4   Q.   What you meant is CSX's budget at the time did not allow
11:37AM 5   Tetra Tech to seriously consider the RailAI; right?
6   **A.   You mean CSX consider the RailAI.   If -- yes, that is**
7   **true.   They would not be able to consider the full RailAI,**
8   **but they could consider components.**
9   Q.   Thank you.   I'll just reask the question so it'll be
11:37AM 10   clear for the record.   What you meant is CSX's budget did not
11   allow CSX to seriously consider Tetra Tech's RailAI at the
12   time; right?
13   **A.   That's correct, the full RailAI system.**
14   Q.   Mr. Larson, when you were at CSX, Tetra Tech never
11:38AM 15   provided to CSX any data to show or prove how the RailAI
16   worked; correct?
17   **A.   Very limited data, that's correct.**
18   Q.   Very limited or no data?
19   **A.   I think there was some data provided, but they could not**
11:38AM 20   **provide a large amount of data, not what Pavemetrics could**
21   **provide.**
22   Q.   Mr. Larson, why don't you turn to your deposition
23   transcript.   And you were deposed earlier in this lawsuit;
24   right?
11:38AM 25   **A.   Yes.**

110

1   Q.   Earlier this year; right?
2   **A.   Yes.**
3   Q.   Turn to your deposition transcript at page 65, please.
4   And so you see on page 65, please read lines 12 through 14,
11:39AM 5   please.
6   THE COURT:   Before you do that -- okay.   Any
7   objection, Counsel?
8   MR. CHUNG:   Your Honor, I think that's improper
9   impeachment.   He asked about the CN data.
11:39AM 10   THE WITNESS:   I'm not seeing where you're talking
11   here.
12   THE COURT:   So, I'm sorry, what was the question
13   that you asked him, Counsel?
14   BY MR. ZOVKO:
11:39AM 15   Q.   When you were at CSX, Tetra Tech never provided any data
16   to prove that RailAI worked; right?
17   THE COURT:   And Counsel, your objection is that
18   this is not referring to CSX.
19   MR. CHUNG:   May we approach, Your Honor?
11:40AM 20   THE COURT:   Sure.
21   (The following proceedings occurred at side bar.)
22   MR. CHUNG:   Your Honor, it's improper impeachment.
23   It's data for RailAI.   It's not -- it's just talking about
24   any actual data at the time and it's improper impeachment.
11:40AM 25   THE COURT:   So how does it impeach what he said?

111

1   MR. ZOVKO:   He said a limited amount of data was
2   provided.   In the deposition I asked a few lines down was any
3   data brought later.   He answered I do not remember them
4   providing us with any data.
11:40AM 5   THE COURT:   You can read 65, 12 through 65, 22.
6   MR. ZOVKO:   12 through 14, and this one right here
7   20 through 24 on 65.
8   THE COURT:   I'll let you read the whole thing.   I
9   think the middle one provides context so read 12 through 24.
11:41AM 10   Just read it into the record.
11   MR. BARNEY:   Can we ask for an additional portion
12   under the Rule of Completeness?   He explains he provided a
13   little bit of data and later on he elaborated.   I'm referring
14   to page 66 at line 8.
11:41AM 15   MR. ZOVKO:   He knows that now working at Tetra
16   Tech.   He doesn't remember at CSX sharing any data.
17   MR. BARNEY:   The Rule of Completeness would allow
18   both of those statements in and the jury can draw its own
19   conclusion on impeachment.
11:42AM 20   MS. LEA:   Your Honor, they have redirect.
21   THE COURT:   I'll let you follow up on redirect.
22   (Side bar concluded.)
23   THE COURT:   Okay, Counsel, you may proceed with
24   reading some of the deposition testimony.
11:42AM 25   So most of these witnesses have been deposed

112

1   before, and so when counsel feels like the answer is
2   inconsistent with something they said in the deposition, they
3   can do what's called impeachment by putting the prior
4   testimony in the record.   And actually, counsel's gonna read
11:42AM 5   from the deposition transcript.   And the reason why we sort
6   of talked about it beforehand is that you're not allowed to
7   put in prior testimony unless it meets some rules, and we
8   were just verifying that.
9   So please go ahead, Counsel.
11:42AM 10   MR. ZOVKO:   And Mr. Larson, this is from your
11   deposition in the case on January 13th, 2022.   Page 65, lines
12   12 through 14.
13   "Q.  So Tetra Tech didn't provide you with any
14   actual data at that time; correct?
11:43AM 15   "A.  It did not.
16   "Q.  Do you know why?
17   "A.  Well, no.   At that time, it was just a -- the
18   initial was just a sales presentation so we wouldn't expect
19   them to provide any data.
11:43AM 20   "Q.  Did they later provide you with any data?
21   They meaning Tetra Tech and you meaning CSX?
22   "A.  I do not remember them providing us with any
23   data."
24   THE COURT:   Counsel, you can proceed.
11:43AM 25   BY MR. ZOVKO:

**EXHIBIT 2**
**-30-**

113

```
 1    Q.   And, in fact, Mr. Larson, Tetra Tech could not provide
 2    any such data to CSX; correct?
 3    A.   That is correct.  Well, they -- no.  They had a limited
 4    amount of data they could have provided, and -- but they
 5    could not provide the majority of it from Canadian National.
 6    Q.   And Tetra Tech couldn't provide most of its data because
 7    Tetra Tech had a contract with another railroad company
 8    called CN that prevented Tetra Tech from sharing any data on
 9    the 3DTAS and RailAI with CSX or others; right?
10    A.   That's correct.
11    Q.   Mr. Larson, please turn to Exhibit 160.
12    A.   Okay.
13    Q.   While you were at CSX, you received this email from your
14    co-worker, Ed Tubbs; correct?
15    A.   Yes.
16         MR. ZOVKO:  Your Honor, I move to admit Exhibit 160
17    into evidence.
18         THE COURT:  Any objection, Counsel?
19         MR. CHUNG:  Yes, Your Honor, this hearsay.
20         THE COURT:  What's the exception to the hearsay
21    rule, Counsel?
22         MR. ZOVKO:  State of mind, Your Honor.
23         THE COURT:  State of mind.  Um, I'm not sure.
24    Who's state of mind and what for?
25         MR. ZOVKO:  Mr. Tubbs' state of mind after a
```

UNITED STATES DISTRICT COURT

114

```
 1    presentation with Tetra Tech, not for the truth of the matter
 2    asserted.  And present tense impression as well.  It was done
 3    immediately after this presentation.  And I will note
 4    additionally, Tetra Tech has two -- this email in its
 5    pre-admitted exhibits for this witness.
 6         THE COURT:  Counsel, is it already in evidence?
 7         MR. ZOVKO:  Yes.  The content of this email is in
 8    evidence in Exhibits 463 and 462.  This is the first email in
 9    the chain.  What they have admitted is that email plus
10    additional emails.
11         THE COURT:  So it's already in evidence.
12         MR. CHUNG:  Those two exhibits are not in evidence.
13         THE COURT:  Okay, let me clarify.  So the exhibits
14    are not in evidence.  I mean, we can have a quick side bar,
15    but you might want to try to keep these to a minimum.
16         MR. ZOVKO:  Tetra Tech told us they were gonna
17    intend to show Mr. Larson those two exhibits.
18         THE COURT:  But they did not.
19         MR. ZOVKO:  Correct.
20         THE COURT:  Okay.  Are you calling Mr. Tubbs?
21         MR. ZOVKO:  No, Your Honor.
22         THE COURT:  Okay, yeah.  So I don't think you have
23    basis to get this into evidence with respect to the hearsay
24    rule so I think you have to move on.
25    BY MR. ZOVKO:
```

UNITED STATES DISTRICT COURT

115

```
 1    Q.   Mr. Larson, Mr. Ed Tubbs was the Director of Capital
 2    Planning at CSX; right?
 3    A.   Yes.
 4    Q.   And that means Mr. Tubbs was involved with budgeting;
 5    right?
 6    A.   No, Mr. Tubbs was involved with planning the ties and
 7    rail and where they go.  He had no control over that budget.
 8    That was managed by the chief engineers who were outside and
 9    worked for the vice-president of engineering.
10    Q.   Okay, thanks for that clarification.  And Mr. Tubbs'
11    opinions were important to CSX; right?
12    A.   Yes.
13    Q.   Mr. Larson, please turn to Exhibit 831, this will be in
14    the direct binder.  Your counsel asked you about it.
15    A.   Okay, I have it.
16    Q.   And near the top of the email is an email from Brad
17    Spencer to you; right?
18    A.   Yes.
19    Q.   An email you received at your time at CSX; right?
20    A.   Uh, yes.
21    Q.   And Mr. Spencer wrote to you we are not sure if Tetra
22    Tech is good either; right?
23    A.   Yes.
24    Q.   And this was in early April 2020; right?
25    A.   That's correct.
```

UNITED STATES DISTRICT COURT

116

```
 1    Q.   Mr. Larson, please turn to Exhibit 178 in your cross
 2    binder.
 3    A.   All right.  I have it.
 4    Q.   You wrote this email after you joined Tetra Tech;
 5    correct?
 6    A.   Uh, yes.
 7    Q.   And you wrote the email to Gary Keyes; right?
 8    A.   Yes.
 9    Q.   And Mr. Keyes is your supervisor at Tetra Tech; correct?
10    A.   That's correct.
11    Q.   And you wrote some of your thoughts about a discussion
12    with Mr. Spencer at CSX; right?
13    A.   Yes.
14    Q.   Near the top of the page, you wrote CSX can't justify
15    the cost of Tetra Tech's RailAI system; right?
16    A.   Yes, of the RailAI system.
17    Q.   And at the time in October 2020, you thought CSX would
18    trial one of the Placer or the Balfour Beatty systems, but
19    CSX ended up trying Pavemetrics LRAIL; right?
20    A.   Uh, just a second.  I don't see that.
21    Q.   So that's on page 2 under the heading The Way Ahead.
22    A.   Uh, yes.
23    Q.   You wrote that; right?
24    A.   Yes.
25    Q.   You also state -- if we go back to page 1 near the
```

UNITED STATES DISTRICT COURT

**EXHIBIT 2**
**-31-**

## 117

1 bottom, you also talk about Ricky Johnson at CSX.
2 A. Yes.
3 Q. And who is Ricky Johnson?
4 A. Ricky Johnson at that time was the Vice-President of
5 engineering.
6 Q. And so Mr. Johnson was the head of the engineering
7 department at CSX?
8 A. Correct. My supervisor, Lloyd Pile, reported to
9 Ricky Johnson.
10 Q. And you state in this email that Tetra Tech's RailAI
11 would be a large capital expense that Mr. Johnson at CSX
12 would need to champion to the CSX board in order to win CSX
13 as a client; right?
14 A. Yes.
15 Q. And the email also states you believe Mr. Johnson was up
16 for a promotion; right?
17 A. That's true.
18 Q. And if we go back to page 2, just above the heading The
19 Way Ahead, you state in this email to Mr. Keyes that Tetra
20 Tech's agreement with CN not to release data was preventing
21 you from showing any concrete system advantages of the
22 RailAI; right?
23 A. Yes.
24 Q. And the RailAI included the 3DTAS system; right?
25 A. Right, it was the full systems of systems, the expensive

## 118

1 option.
2 Q. And CN is Canadian National that we've talked about.
3 A. Yes, that's correct.
4 Q. And in your email on the first page -- oh, I'm sorry,
5 the second page. Let's stay with the second page near the
6 top, third bullet. In your email, you state Pavemetrics is a
7 problem; right?
8 A. Yes.
9 Q. And in this email in October 2020 to Mr. Keyes, you
10 never mentioned Tetra Tech's -- any of Tetra Tech's patents;
11 right?
12 A. I did not.
13 Q. You did not mention Tetra Tech's '923(sic)patent; right?
14 A. I did not.
15 Q. And you did mention the '557 patent right?
16 A. I did not.
17 Q. So Mr. Larson, CSX let you go before CSX decided to
18 purchase Pavemetrics LRAIL system; right?
19 A. Yes.
20 Q. So you weren't at CSX when CSX decided to purchase the
21 LRAIL system; right?
22 A. I was not.
23 Q. So you don't actually personally know why CSX chose
24 LRAIL; correct?
25 A. Uh, only what I had in conversations with Brad Spencer

## 119

1 subsequent to them, uh, which you can see by these emails.
2 Q. No direct personal knowledge, right, because you were
3 working at Tetra Tech at the time; right?
4 A. That's correct.
5 Q. And after you joined Tetra Tech, your primary contact at
6 CSX was Brad Spencer; right?
7 A. Uh, yeah, Brad Spencer and Lee Moss were the two main
8 ones, but normally, Brad is.
9 Q. And Brad Spencer has been your friend for a long time;
10 right?
11 A. Yes.
12 Q. So Brad Spencer would know why CSX ultimately decided to
13 select the LRAIL; correct?
14 A. Yes.
15 Q. Mr. Larson, Brad Spencer testified at a deposition in
16 this lawsuit earlier this year; right?
17 A. I understand he did, yes.
18 Q. Did you read any of Mr. Spencer's deposition testimony?
19 A. I did not.
20 Q. Did you watch -- there's a video of Mr. Spencer's
21 deposition. Did you watch Mr. Spencer's deposition at all?
22 A. No. I had no idea I was even allowed to.
23 Q. So never read or watched any of Mr. Spencer's deposition
24 testimony; right?
25 A. No, I don't believe so.

## 120

1 Q. That's what I thought.
2 No further questions, Your Honor.
3 THE COURT: Thank you.
4 Any redirect, Counsel?
5 MR. CHUNG: Yes, Your Honor.
6 THE COURT: And how much do you think you're gonna
7 have?
8 MR. CHUNG: I'll finish before the hour is up.
9 THE COURT: Great. Perfect.
10 REDIRECT EXAMINATION
11 BY MR. CHUNG:
12 Q. Mr. Larson, counsel for Pavemetrics discussed with you
13 Exhibit 166? Could we put that up, please?
14 A. Yes.
15 Q. And you stated that you wrote this particular document?
16 A. Yes.
17 Q. Uh, was that your recommendation or was that the team's
18 recommendation?
19 A. As I told him, this is an update that was bi-weekly so I
20 wrote this for the team.
21 MR. CHUNG: And can we go to Exhibit 161, please?
22 Q. And Mr. Larson, you recall discussing with counsel
23 Exhibit 161. And I want to direct your attention to
24 without the rail web and LiDAR statement.
25 A. Yes, uh-huh.

UNITED STATES DISTRICT COURT

**EXHIBIT 2**
**-32-**

121

1   Q.   Are RailWEB and LiDAR needed to conduct tie inspection?

2   A.   **No, they're not.**

3   Q.   I want to talk to you about the data for RailAI.  And

4   what I want to do is I want to read in the rest of your

11:55AM 5   deposition testimony if you could follow with me.  It's on

6   page 66 for completeness.  It's gonna be page 66, lines 8 to

7   23?

8        MR. ZOVKO:  Objection, Your Honor.  Hearsay.

9        THE COURT:  Yeah.  I mean, do you want to ask him a

11:56AM 10  question about it before you bring that in?  It's not -- why

11  don't you ask him to see if you can get the information

12  you're looking for.

13  BY MR. CHUNG:

14  Q.   Uh, do you recall whether or not, uh, Tetra Tech

11:56AM 15  provided any data concerning its RailAI system?

16  A.   **In -- reading through the deposition, I said that no,**

17  **it did not, and I followed on by saying that Tetra Tech did**

18  **have data which I was made aware of after I worked for Tetra**

19  **Tech.  So I did not remember Tetra Tech providing CSX any**

11:56AM 20  **data, but there was a limited amount of data that did not**

21  **belong to CN that they could have shown and may have after I**

22  **left, I don't know.**

23  Q.   And was CN using the Aurora system?

24  A.   **No.  That was one of the things that CN was very tight**

11:57AM 25  **lipped about their system, but we were impressed by the fact**

UNITED STATES DISTRICT COURT

122

1   **that CN was the only North American Class 1 railroad that was**

2   **not using that Aurora system.**

3   Q.   And what would that tell you compared to that data?

4   A.   **The team at CSX assumed that that meant that the RailAI**

11:57AM 5   **system, the 3DTAS was performing the tie grading and was**

6   **effective so they had used Aurora, and they had done away**

7   **with it.**

8   Q.   Could we turn to Exhibit 178, please?

9   A.   **Yes.**

11:57AM 10  Q.   And second page?  And we've seen this a lot, and this is

11  your email, and I want to highlight Pavemetrics is a problem?

12  A.   **Yes.**

13  Q.   Mr. Larson, what did you mean by that statement?

14  A.   **Uh, yes.  Pavemetrics had a system that would do tie**

11:57AM 15  **grading which was the main cost offset of the purchase of the**

16  **system.  It didn't have a lot of the other capabilities.  But**

17  **one of the problem in the railroad in their purchasing was**

18  **that once you get into a railroad, moving that person out,**

19  **you have it installed, it'd be very much less likely that**

11:58AM 20  **Tetra Tech would be able to get into CSX once Pavemetrics had**

21  **a contract and some units there.**

22       MR. CHUNG:  No further questions, Your Honor.

23       THE COURT:  Okay.  Counsel, do you have any

24  recross?

11:58AM 25       MR. ZOVKO:  Yes, Your Honor.  Briefly.

UNITED STATES DISTRICT COURT

123

1        THE COURT:  Briefly?

2             RECROSS-EXAMINATION

3   BY MR. ZOVKO:

4   Q.   Mr. Larson, stay on Exhibit 178, please, and turn to the

11:58AM 5   second page just after where you stated Pavemetrics was a

6   problem.  You go on to say they provide a low cost solution;

7   right?

8   A.   **Yes, they were cheaper.**

9   Q.   They were cheaper.  You're referring to Pavemetrics was

11:58AM 10  cheaper; right?

11  A.   **Yes.**

12  Q.   And you also say in the next sentence additionally, they

13  have conducted a successful trial with the FRA; right?

14  A.   **Yes.**

11:59AM 15  Q.   And the FRA is the Federal Railroad Administration;

16  right?

17  A.   **Yes.**

18  Q.   In the next paragraph in this email you wrote to

19  Mr. Keyes, you also wrote our concern over perception of how

11:59AM 20  CN will prevent us -- or perceive us shopping a system

21  developed from our own work with them is further preventing

22  marketing the system effectively.  Right?

23  A.   **Uh, I don't see that.  Where is that line?**

24  Q.   It's the next bullet.

11:59AM 25  A.   **Oh, I'm sorry.  Yes?**

UNITED STATES DISTRICT COURT

124

1   Q.   And actually, I'll just start with the first sentence in

2   that bullet.  You wrote our agreement with CN to not release

3   data is preventing us from showing any concrete system

4   advantages; right?

11:59AM 5   A.   **Yes.**

6   Q.   And then you go on to state our concern over perception

7   of how CN will perceive us shopping a system developed from

8   our work with them is further preventing marketing the system

9   effectively; right?

12:00PM 10  A.   **Yes.**

11       MR. ZOVKO:  No further questions, Your Honor.

12       THE COURT:  Okay.  Anything else, Counsel?

13       MR. CHUNG:  No, Your Honor.

14       THE COURT:  The witness is excuse.  We'll take our

12:00PM 15  break for lunch and come back at 1:00.  Thank you very much.

16       THE CLERK:  All rise.

17            (Jury not present.)

18       THE COURT:  Okay.  We'll come back at ten minutes

19  to 1 in case we have anything to talk about before the next

12:00PM 20  witness.  We'll stand adjourned until 12:50.  Thank you.

21            (Lunch recess.)

22       THE CLERK:  All rise.

23            (Jury present.)

24       THE COURT:  Counsel, call your next witness.

01:05PM 25       MR. BARNEY:  Your Honor, Tetra Tech calls as its

UNITED STATES DISTRICT COURT

**EXHIBIT 2**

**-33-**

125

1  next witness Richard Fox-Ivey by pre-recorded video
2  deposition.
3      THE COURT:  Okay.
4      MR. BARNEY:  And before we start, Your Honor, we
01:05PM 5  have some pre-agreed upon exhibits for this witness.
6      THE COURT:  Okay.
7      MR. BARNEY:  Exhibits 3, 4, 14, 15, 18 and 20.
8      THE COURT:  Any objections?
9      MR. LU:  No objections, Your Honor.
01:05PM 10     THE COURT:  Okay, Exhibits 3, 4, 14, 15, 18 and 20
11  are now in evidence.
12         (Exhibits 3, 4, 14, 15, 18, 20 admitted.)
13     (Video deposition of Richard Fox-Ivey played.)
14     MR. BARNEY:  Our next witness, we'd like to play
01:19PM 15  the video deposition of Mario Talbot.
16     THE COURT:  Okay.
17     MR. BARNEY:  And the exhibits for this witness are
18  Exhibits 776 and 778.
19     THE COURT:  Okay.  Counsel, is there any objections
01:19PM 20  to these coming in?
21     MR. LU:  No, Your Honor.
22     THE COURT:  Okay.  Then Exhibits 776 and 778 are
23  now in evidence.
24         (Exhibits 776, 778 admitted.)
01:20PM 25     THE COURT:  You may go ahead and play the
UNITED STATES DISTRICT COURT

126

1  deposition.
2      (Video deposition of Mario Talbot played.)
3      MR. BARNEY:  Thank you, Your Honor.  We have two
4  more of these.  So our next witness we'd like to call is
01:31PM 5  Thanh, T-h-a-n-h, Nguyen, N-g-u-y-e-n, a video deposition.
6      THE COURT:  Any exhibits with this one?
7      MR. BARNEY:  Yes, Your Honor.  Exhibits 98 and 101.
8      THE COURT:  Any objection to those being admitted?
9      MR. LU:  None, Your Honor.
01:31PM 10     THE COURT:  Okay.  98 and 101 are in evidence.
11         (Exhibits 98 and 101 admitted.)
12     THE COURT:  And you may play the deposition.
13     (Video deposition of Thanh Nguyen played.)
14     MR. BARNEY:  We have one more video deposition,
01:46PM 15  Your Honor.  We'd like to call Mr. Ali, A-l-i, Hafiz,
16  H-a-f-i-z, by video deposition.
17     THE COURT:  Okay.
18     MR. BARNEY:  And we have Exhibits 439, 440, 442,
19  and 729.
01:46PM 20     THE COURT:  Any objection to those exhibits coming
21  in?
22     MR. LU:  No, Your Honor.
23     THE COURT:  Okay.  Exhibits 439, 440, 442 and 729
24  are in evidence.
01:46PM 25     (Exhibits 439, 440, 442, 729 admitted.)
UNITED STATES DISTRICT COURT

127

1      (Video deposition of Ali Hafiz played.)
2      MR. LU:  Your Honor, Pavemetrics would move to
3  admit Exhibit 416 that was discussed during the deposition of
4  Ali Hafiz.
02:00PM 5     THE COURT:  Any objection?
6      MR. BARNEY:  No objection, Your Honor.
7      THE COURT:  Okay.  Exhibit 416 is admitted.
8      MR. BARNEY:  Counsel, could you please tell us what
9  was the nature of the exhibit?  I can't remember.
02:00PM 10     MR. LU:  It was an email Bates number 00000147
11  through 148.
12     MR. BARNEY:  No objection, Your Honor.
13     THE COURT:  Okay.  Exhibit 416 is in.
14         (Exhibit 416 admitted.)
02:01PM 15     THE COURT:  Okay.
16     Counsel, please call your next witness.
17     MR. BARNEY:  Your Honor, at this time, Tetra Tech
18  calls Dr. Vassilios Morellas.
19     THE CLERK:  Please raise your right hand.
02:02PM 20         (Witness sworn.)
21     THE CLERK:  Please be seated.
22     Will you please state and spell your full name for
23  the record.
24     THE WITNESS:  Vassilios Morellas.  It is
02:02PM 25  V-a-s-s-i-l-i-o-s  M-o-r-e-l-l-a-s.
UNITED STATES DISTRICT COURT

128

1      THE CLERK:  Thank you.
2      MR. BARNEY:  Your Honor, I have a list of exhibits
3  that the parties have met and conferred about that I'd like
4  to move into evidence.
02:02PM 5     THE COURT:  Okay.
6      MR. BARNEY:  They are Exhibits 24, 25, 27, 28, 30,
7  98, 439, 723, 117, 728, 734, 740, 741 and 990.
8      THE COURT:  Okay.  Does counsel have any objections
9  to those?
02:03PM 10     MR. LU:  No objection.
11     THE COURT:  Okay.  Exhibits 24, 25, 27, 28, 30, 98,
12  439, 723, 117, 728, 734, 740, 741 and 990 are now in
13  evidence.
14     (Exhibits 24, 25, 27, 28, 30, 98, 439, 723, 117, 728, 734,
02:03PM 15         740, 741, 990 admitted.)
16     MR. BARNEY:  Thank you, Your Honor.
17     DIRECT EXAMINATION
18  BY MR. BARNEY:
19  Q.  Good morning, Dr. Morellas.  I'm sorry, good afternoon,
02:04PM 20  Dr. Morellas.
21  A.  **Good afternoon.**
22  Q.  Been a long day.  Could you please introduce yourself to
23  the jury?
24  A.  **My name is Vassilios Morellas.**
02:04PM 25  Q.  And where do you work, Dr. Morellas?
UNITED STATES DISTRICT COURT

**EXHIBIT 2**
**-34-**

129

1  A.  I am Research Professor if Electrical Engineering at
2  University of Minnesota.
3  Q.  Do you hold any other positions other than your
4  professorship?
02:04PM 5  A.  Yes.  I am a Scholar at the Center to Transportation
6  Studies.  And also, I am the Director of the National Science
7  Foundation on Robotics and Sensor Technologies that improve
8  human well-being.
9  Q.  Dr. Morellas, did you prepare some power point slides to
02:04PM 10  help assist with your testimony today?
11  A.  Yes.
12  Q.  If you need the slides to advance at anytime, please let
13  us know, and we'll do that for you.
14  A.  I'll do that.
02:04PM 15  Q.  And if you can turn in your binder and find Exhibit 708,
16  please?
17  A.  Yes.
18  Q.  Do you recognize that?
19  A.  Yes, this is my CV.
02:05PM 20  Q.  Does it appear to be accurate?
21  A.  Yes.
22         MR. BARNEY:  Your Honor, we move for the admission
23  of Exhibit 708.
24         THE COURT:  Any objection, Counsel?
02:05PM 25         MR. LAQUER:  No objections.

UNITED STATES DISTRICT COURT

130

1         THE COURT:  Okay.  708's in evidence.
2              (Exhibit 708 admitted.)
3  BY MR. BARNEY:
4  Q.  And Dr. Morellas, could you please briefly explain to
02:05PM 5  the jury your educational background starting with your
6  undergraduate studies?
7  A.  Yes.  I did my undergraduate degree in Mechanical
8  Engineering from the National Trinidad University of Athens
9  in Greece.  And after two years serving the Greek Air Force,
02:05PM 10  I moved to the U.S., and I obtained my Master's degree from
11  Columbia University and my PhD from the University of
12  Minnesota.
13  Q.  Now, did your Master's degree at Columbia have any
14  particular focus?
02:06PM 15  A.  Yeah.  It focused on control theory as it is used for
16  controlling electrical mechanical systems.
17  Q.  And how about your PhD that you completed at the
18  University of Minnesota?  Does that have a particular focus
19  or thesis?
02:06PM 20  A.  Yes.  I used neural networks for developing a mobile
21  robot architecture for navigation.
22  Q.  Now, I believe you mentioned that you're a Scholar in
23  the University of Minnesota Center for Transportation
24  Studies.  Could you please tell the jury a little more about
02:06PM 25  that?

UNITED STATES DISTRICT COURT

131

1  A.  Uh, yes.  This center is part of the university, and its
2  role is to bring funding from outside agencies like
3  Department of Transportation or federal agencies like the
4  Federal Highway Administration so that the facility of the
02:07PM 5  University of Minnesota can work on these projects.
6  Q.  I'll actually ask you to please slow down.  I know the
7  court reporter is really struggling.
8  A.  Okay.
9  Q.  Thank you.  And you also mentioned that you are the
02:07PM 10  Director of the National Science Foundation Center on Robots
11  and Sensors.  Could you please explain -- well, first of all,
12  what is the National Science Foundation?
13  A.  The National Science Foundation is a federal agency that
14  sponsors researched to academic institutions.  And in this
02:07PM 15  particular center that I am director of, it is called -- it
16  goes under the name IUCS.  That stands for Inner City
17  University Cooperative Research Centers.  And this is a
18  consortium of four universities including the University of
19  Minnesota, the University of Pennsylvania, Clemson University
02:08PM 20  and WUPI.
21  Q.  And what is the role or the goal of the NSF Center on
22  Robots and Sensors?
23  A.  The idea is to attract industrial businesses and have
24  the university researchers to work on the projects that are
02:08PM 25  brought up by the industries so that they have more modern

UNITED STATES DISTRICT COURT

132

1  solutions.
2  Q.  And as the director of this center on robots and
3  sensors, can you give us some examples of some of the
4  projects that you oversee?
02:08PM 5  A.  Um, sure.  One comes from a medical domain so we use
6  advanced AI machine learning techniques to detect an MRI
7  images, cancers from kidney, in kidney.  And another example
8  is from a transportation domain where we use a network of
9  cameras to assist truck parking and the liability at areas
02:09PM 10  around the country.
11  Q.  Did you work anywhere else before you became a professor
12  at the University of Minnesota?
13  A.  Yes.  I work for Honeywell for about a little more than
14  eight years.
02:09PM 15  Q.  Is that Honeywell International?
16  A.  That is correct.
17  Q.  What kind of company is that?
18  A.  Back then was company that was developing security
19  systems.
02:09PM 20  Q.  What did you do when you were working at Honeywell?
21  A.  I was a principal research scientist.  I was in charge
22  of managing a small number of engineers, writing proposals to
23  bring money, research money into the company.
24  Q.  So Doctor, looking at your whole academic and
02:10PM 25  professional career, what would you say has been your primary

UNITED STATES DISTRICT COURT

EXHIBIT 2
-35-

---

133

1    area of focus?
2    A.   My primary area was using sensors and most of the times,
3    uh, imaging sensors, cameras that is, uh, to come up with
4    some automated systems.
02:10PM 5    Q.   Have you heard of a term called computer vision?
6    A.   Of course I have.
7    Q.   What is computer vision?
8    A.   Computer vision means the use of cameras or video
9    cameras, and we use these day in order to be able to
02:10PM 10    interpret the activities that happens in the video.
11    Q.   How many years of experience would you say you have
12    working with computer vision sensors?
13    A.   All my career, more than 30 years.
14    Q.   Do you consider yourself an expert in the field of
02:11PM 15    computer vision systems?
16    A.   Yes, I do.
17    Q.   Now, earlier when I asked you about your PhD work, you
18    mentioned something called neural networks. What is a neural
19    network?
02:11PM 20    A.   A neural network is a computer program, uh, that is
21    inspired by processes that happen in our brains.
22    Q.   Okay. And do you have experience with neural networks?
23    A.   Yes.
24    Q.   How many years of experience do you have with neural
02:11PM 25    networks?

UNITED STATES DISTRICT COURT

---

134

1    A.   I have started working with neural networks when I was a
2    student, a graduate student, and I had a -- the first
3    publication was in 1991. And then as I said, my PhD thesis
4    was focused in the area of using neural network for
02:12PM 5    autonomous control of robots.
6    Q.   Do you consider yourself an expert in the field of
7    neural networks?
8    A.   Yes. I do.
9    Q.   Have you heard of a convolutional neural network?
02:12PM 10    A.   Of course I have.
11    Q.   What is that?
12    A.   Uh, a convolutional neural network is a type of neural
13    network that uses a particular operation that is called
14    convolution.
02:12PM 15    Q.   Okay. Can you explain to perhaps somebody who doesn't
16    know what convolution is like what is convolution?
17    A.   A convolution is you start with a few numbers, if you
18    will, that are arranged in a rectangular grid, and you're
19    trying to use this structure as a way to compare it with any
02:12PM 20    numbers that we have to process.
21    Q.   And how many years of experience would you say you have
22    with convolutional neural networks?
23    A.   Uh, the convolutional neural networks, there was a big
24    wave of advancements in the last seven years or so.
02:13PM 25    Q.   Now, have you heard the term of the source code?

UNITED STATES DISTRICT COURT

---

135

1    A.   Of course.
2    Q.   What is source code?
3    A.   Of course. Source code is the totality of computer
4    programs that are worked together to accomplish a task.
02:13PM 5    Q.   And do you have experience with working with source
6    code?
7    A.   Yes.
8    Q.   Are you able to review source code and understand what
9    it means?
02:13PM 10    A.   Yes.
11    Q.   How many years have you been working with source code?
12    A.   My whole career.
13    Q.   Over 30 years?
14    A.   Over 30 years.
02:13PM 15    MR. BARNEY:   If I could have slide four, please.
16    Q.   Your CV which we marked and admitted as Exhibit 708, it
17    contains a number of publications that you're author or
18    co-author on; is that correct?
19    A.   That is correct.
02:13PM 20    Q.   Do any of these publications relate to computer vision
21    technology?
22    A.   Actually, the majority of them relate to computer
23    vision.
24    Q.   How about neural networks? Do any of them relate to
02:14PM 25    neural networks?

UNITED STATES DISTRICT COURT

---

136

1    A.   Some of them, they do.
2    Q.   And do you have any patents in the field of image
3    processing or computer vision?
4    A.   I have a little bit more than 20 patents.
02:14PM 5    Q.   In that field?
6    A.   In that field, yeah.
7    Q.   Doctor, are you familiar with the concept of a person of
8    ordinary skill in the art which we sometimes abbreviate as
9    POSA as it applies in patent cases?
02:14PM 10    A.   Yes.
11    Q.   And just generally, what is your understanding of what a
12    POSA is in a patent case?
13    A.   A POSA person is a person that has enough training and
14    experience to offer an objective opinion about a particular
02:14PM 15    problem.
16    Q.   And in this case, did you submit your proposed
17    definition or your understanding of what you think a person
18    of ordinary skill in the art is in this particular case?
19    A.   Yes.
02:15PM 20    Q.   And I'm just gonna read this, and then I have some
21    questions about it.
22    A.   Yes.
23    Q.   If I understand, your definition is that a person of
24    ordinary skill in the art would have a Bachelor's degree
02:15PM 25    Electrical Engineering, Computer Engineering, Mechanical

UNITED STATES DISTRICT COURT

**EXHIBIT 2**

**-36-**

137

1 Engineering, Computer Science, Physics or a related field and
2 at least four years of experience or the academic equivalent
3 in the field or Computer or Machine vision.  Did I read that
4 correctly?
02:15PM 5 **A.  Yes.**
6 Q.  And Doctor, do you believe that you meet that
7 qualification of a person of ordinary skill in the art?
8 **A.  Yes, I do.**
9 Q.  Now, your colleague, Dr. Frakes, who was the expert on
02:15PM 10 behalf of Pavemetrics, did he also a proposed definition?
11 **A.  He did.**
12 Q.  And I'm gonna read this and again have a question for
13 you.  Dr. Frakes' definition was a person of ordinary skill
14 in the art would have a Bachelor's degree in Electrical
02:15PM 15 Engineering, Computer Engineering, Mechanical Engineering,
16 Computer Science, Physics or a related field and at least two
17 years experience or the academic equivalent in the field of
18 Computer or Machine Vision including an understanding of
19 algorithms used to process data or image processing.  Did I
02:16PM 20 read that correctly?
21 **A.  Yes, you did.**
22 Q.  And Dr. Morellas, do you believe you meet that
23 definition as well?
24 **A.  I believe I do.**
02:16PM 25 Q.  And if I understand from -- from your degree of

138

1 education and experience, would you say you actually have
2 more experience than what these minimal definitions require?
3 **A.  That is correct.**
4 Q.  Are you able in this case to testify as to what a person
02:16PM 5 of ordinary skill in the art would have thought and perceived
6 at the time of the invention?
7 **A.  Yes.**
8 **MR. BARNEY:  Your Honor, at this time, we offer**
9 **Dr. Morellas as an expert in computer engineering, neural**
02:16PM 10 **networks and computer vision systems.**
11 THE COURT:  Okay.  Any objection to the tender of
12 this witness as an expert in those fields?
13 MR. LAQUER:  No objections, Your Honor.
14 THE COURT:  The witness is so designated as an
02:17PM 15 expert in that area.
16 When we have an expert just for the jury, we lay a
17 foundation that the witness has expertise.  There's an offer
18 to put them as an expert.  The other side gets to object.
19 Once that's established now this expert is an expert witness,
02:17PM 20 then they can give opinion testimony.  So they can testify
21 beyond what they've seen or heard or did.  They can give
22 opinions as to things based on their expertise.  And they'll
23 be one for the other side as well.
24 Go ahead, Counsel.
02:17PM 25 MR. BARNEY:  Thank you, Your Honor.

139

1 Q.  So Dr. Morellas, in this case, did you submit two expert
2 reports in this case?
3 **A.  Yes.**
4 Q.  So you submitted an opening report that you provided
02:17PM 5 some opinions, and then Dr. Frakes had an opportunity to
6 respond to that, and he also had some opinions, and then you
7 submitted a second report; is that correct?
8 **A.  That is correct.**
9 Q.  I want to focus on your first report here today, okay,
02:17PM 10 Doctor?
11 **A.  Yes.**
12 Q.  And with respect to the opinions that you're gonna be
13 giving today here in court, what were you asked to
14 investigate in that first report?
02:18PM 15 **A.  I was asked to investigate whether Pavemetrics LRAIL**
16 **system infringes the asserted claims of the patents '293 and**
17 **'557.  And I was also asked to investigate whether Tetra**
18 **Tech's 3DTAS systems practices the asserted claims of the**
19 **'293 and '557 patent.**
02:18PM 20 Q.  Now, Doc, did you -- did you approach those questions
21 with an open mind?
22 **A.  Yes, I did.**
23 Q.  Did you apply the same engineering and analytical rigor
24 that you do in your other tasks that you perform in your
02:18PM 25 professional career?

140

1 **A.  I did.**
2 Q.  And at the end of your investigation, were you able to
3 form an opinion about these two questions?
4 **A.  Yes, I was able to do that.**
02:18PM 5 Q.  And are you prepared to explain those opinions to the
6 jury today?
7 **A.  Yes.**
8 Q.  Did you review any materials in this part of your
9 investigation?
02:18PM 10 **A.  Uh, yes.  And besides the actually the documents for the**
11 **patents themselves, I took into account the claim**
12 **construction order.  I reviewed a lot of technical materials**
13 **including source code, technical publications, presentations,**
14 **uh, books and articles.  And then I also took into account**
02:19PM 15 **various court documents that were produced through the**
16 **process like testimonies and declarations.**
17 Q.  Now, one of the things you mentioned was source code.
18 Did you review the source code for the accused LRAIL
19 products?
02:19PM 20 **A.  Yes, I did.**
21 Q.  And where did you actually review that source code?
22 **A.  At Knobbe Martens' offices in California.**
23 Q.  So the Pavemetrics law firm's office in California?
24 **A.  That is correct.**
02:19PM 25 Q.  And how many hours or days did you spend reviewing that

**EXHIBIT 2**
**-37-**

---

141

1    source code?

2    A.   I spend, uh, eight days for about ten hours a day.

3    Q.   A total of about 80 hours reviewing source code?

4    A.   That is correct.

02:20PM 5         MR. BARNEY:  Now, uh, the next slide, please?

6    Q.   Um, I think we've seen these patents enough in the last

7    day or so.  Um, are these the two patents that you, uh,

8    analyzed in this case?

9    A.   Yes.

02:20PM 10   Q.   And this is the '293 and '557 patent?

11   A.   That is correct.

12   Q.   And you reviewed the specification and the drawings?

13   A.   Yes.

14   Q.   As well as the claims?

02:20PM 15   A.   Yes.

16        Okay.  We've heard about these patents already so I'm

17   gonna ask you to be very brief, but can you just briefly

18   explain your understanding of what these patents are about?

19   A.   Yes.  Uh, they need to the inspect railroad tracks.  And

02:20PM 20   they have two choices.  The first one will to do it following

21   a manual process which is very tedious and usually, it

22   doesn't -- it's not always accurate.

23        Or you can have an automated system that does that

24   for them.  An automated system is more reliable, is faster.

02:21PM 25   We can do that many times without a lot of effort and

UNITED STATES DISTRICT COURT

---

142

1    increase safety in the -- in the rail networks.  And in

2    addition to that, it prevents accidents like maybe you have

3    catastrophic for the environment.  So the choice is obvious.

4    Have an automated system.

02:21PM 5    Q.   Now, in the system that's disclosed in the patents, does

6    it have both hardware and software components to it?

7    A.   Yes.

8    Q.   And can you explain to the jury what the hardware

9    components of the system are?

02:21PM 10   A.   This is just an illustration that shows how the

11   different components come together.  There's a power source

12   that powers all of the electronics.  There are light

13   protectors and sensors that receive the light that is bounced

14   off of the object.  A processor that receives, processes the

02:22PM 15   data.  And a data storage apparatus that stores the results

16   of these processing.

17   Q.   Now, Doctor, these hardware components, the sensors, the

18   power source, the data storage, were these new at the time of

19   the invention?

02:22PM 20   A.   Uh, no.

21   Q.   Um, what was new in the invention?

22   A.   Uh, the new part was how long this -- what kind of

23   processing do you perform received data.

24   Q.   So you mentioned that there was also a software

02:22PM 25   component to the invention.  Can you explain what the

UNITED STATES DISTRICT COURT

---

143

1    software portion of what's claimed in the '293 patent is?

2    And actually, before you answer that, do you have the word

3    algorithm on this slide?

4    A.   No.

02:22PM 5    Q.   What's an algorithm?

6    A.   An algorithm is -- it's like a recipe or a plan for the

7    computer to follow in order to achieve the final result.

8    Q.   Is it something that's typically carried out in

9    software?

02:23PM 10   A.   That is correct.

11   Q.   So if I just use the word software, will that be

12   sufficient for you to understand what I'm saying?

13   A.   Yes.

14   Q.   Okay.  Can you please explain the software or algorithm

02:23PM 15   steps that are claimed in the '293 patent?

16   A.   Of course.  I use four steps as it was described by the

17   Court.  So in the first step, the system of wires 3D track

18   elevation and intensity data.  In Step B, there is a

19   generation of track elevation map based on the acquired

02:23PM 20   elevation and intensity data.  In Step 3, they receive the

21   data by being processed by a computer to identify track

22   defects.  And the last Step D, the results of the processing

23   are stored.

24   Q.   Okay.  Now, just to elaborate a bit more on step C, in

02:24PM 25   your slide, you -- you mentioned something called a gradient

UNITED STATES DISTRICT COURT

---

144

1    neighborhood and a sliding window technique.  Are those parts

2    of the process in Step C that are -- that are used to analyze

3    the data?

4    A.   That is correct.

02:24PM 5    Q.   And I have a couple follow-up questions.  Um, what is

6    the difference between elevation and intensity data?

7    A.   Yeah.  I'll use this illustration so I can convey the

8    idea.  Processor contains two parts.  The first part, shed

9    laser light into the scene as you can see the pink sort of

02:24PM 10   cone there.  Then the light that is reflected off the object

11   is received like a camera.

12        And then there are two different types of

13   information that are generated.  The one on the left shows a

14   profile of the section that is cut by the laser beam.  And in

02:25PM 15   the right part, you see the distribution of the energy of the

16   light that is produced by the camera.  And as you can see,

17   there are different sections because as the cars in this case

18   moves through the scene, different profiles are generated.

19   Q.   So if you collect all these different profiles as the

02:25PM 20   truck or the object moves through the beam, does that create

21   a three dimensional representation of the object?

22   A.   Yes, it does.

23   Q.   Okay.  And in your slide, you've got an elevation and

24   then in parentheses range.  Why do you use two different

02:25PM 25   words there?

UNITED STATES DISTRICT COURT

---

**EXHIBIT 2**
**-38-**

145

1    A.   Those are the same thing.

2    Q.   Elevation data is the same thing as range data?

3    A.   That is correct.

4    Q.   Two different words for the same type of data?

02:26PM 5    A.   That is correct.

6    Q.   And my other follow-up question is you in Step, B you

7    mentioned that there's an elevation map that is generated

8    based on this acquired elevation and intensity data.  And my

9    question is why does the patent teach to do that?  Is there

02:26PM 10   some advantage to using both of these types of data?

11   A.   Uh, yes.  I mean, sensors are not always accurate.  And

12   in this case, since we have two different types of

13   information, we would like to combine them so they can

14   complement each other's deficiencies.  So by combining them,

02:26PM 15   we have a presentation that is more accurate than using the

16   data we started with.

17   Q.   And one more question in -- or follow-up question, I

18   should say.  Can you explain a little bit more about how that

19   sliding gradient neighborhood works, the one that was in Step

02:27PM 20   C?

21   A.   Yeah.  In order for make this more simple for the people

22   to understand, I use this example that we see on the left

23   side of the image that all of us are familiar with when we're

24   taking pictures with our cameras.  You may have noticed that

02:27PM 25   there are these boxes around our faces.

UNITED STATES DISTRICT COURT

146

1            And one way to think about is that the camera or

2    the phone has model of the phase, and this model moves left

3    to right, top to bottom, and when there is enough correlation

4    between the actual image and the model of the face, then the,

02:27PM 5    uh, computer understands that this is the place where there

6    is -- we found the face.

7            And the same idea is applied in the case where now

8    we don't have an image, but we have a track elevation

9    mapping.

02:28PM 10   Q.   Just to make sure I understand, in your example on the

11   left with the picture of the father and son, there's a

12   definition -- there's a window that's defined, and the

13   computer kind of knows what a face is supposed to look like.

14   Is that right?

02:28PM 15   A.   That is right.

16   Q.   It's got some preconceived notion that it's gotta have

17   some eyes and a nose and some other features.

18   A.   That is correct.

19   Q.   And then the window is sliding across that image data

02:28PM 20   back and forth and up and down, and at each moment, it's

21   asking itself is what's inside this box a face or not?

22   A.   That is correct.

23   Q.   And when it gets to the point where enough -- enough,

24   uh -- there's enough that makes it look like a face, that it

02:28PM 25   matches what it understands a face to be, it draws a box

UNITED STATES DISTRICT COURT

147

1    around it.

2    A.   That's correct.

3    Q.   And is that the same type of technique that's being used

4    in Step C in this patent?

02:28PM 5    A.   That's correct.

6    Q.   And do you have experience with this type of technique?

7    A.   Yes.

8    Q.   Now, can -- this technique that you've described, can it

9    be carried out by a neural network?

02:29PM 10   A.   Yes.

11   Q.   Does it have to be carried out by a neural network?

12   A.   Not necessarily.

13   Q.   So it's something that can be done either without a

14   neural network or with a neural network.

02:29PM 15   A.   That is correct.

16   Q.   And can it be done with a convolutional neural network?

17   A.   Yes.

18   Q.   Does it have to be done with a convolutional neural

19   network?

02:29PM 20   A.   Not necessarily.

21   Q.   Now, if I tell you, Doctor, I'm running a convolutional

22   neural network, does that tell you anything in terms of

23   whether this particular type of technique is being employed?

24   A.   Yes.

02:29PM 25   Q.   Why do you say that?

UNITED STATES DISTRICT COURT

148

1    A.   Because that's how the convolutional neural networks

2    work.

3    Q.   How do you know that?

4    A.   Because I have worked with them.

02:29PM 5    Q.   Okay, all right.  That makes sense.  Can I have the next

6    slide, please?

7            Now, so far we've talked about the '293 algorithm.

8    Can you please explain to the jury what is the algorithm that

9    is claimed in the '557 patent?

02:29PM 10   A.   Sure.  This is a different algorithm.  And again, as I

11   did with the previous algorithm, I outlined this with four

12   steps.  In the first step, we start from the point where we

13   have collected the elevation data, and we remove the

14   railheads.  In Step B, we create an approximate model of the

02:30PM 15   surface of the tie.  In Step 3, we identify a crack.  And in

16   Step D, we calculate some parameters of the crack.

17   Q.   Okay.  Now, first of all, this algorithm that's being

18   claimed in the '557 patent, is it the same as the algorithm

19   that we just went through in the '293 patent?

02:30PM 20   A.   No, they are different.

21   Q.   Different algorithms.

22   A.   Different algorithms.

23   Q.   Different patents, different claims, different

24   algorithms.

02:30PM 25   A.   That is correct.

UNITED STATES DISTRICT COURT

**EXHIBIT 2**
**-39-**

---

**149**

1 Q. Okay. Uh, and in this Step A, you mentioned something
2 about removing the railhead from the elevation data, and I
3 was wondering if you could explain a little bit more about
4 that.
02:31PM 5 A. Uh, yes. Since in this particular claim, they are
6 interested in -- in finding features associated with the tie
7 which is the lowest and the shortest in dimensions, uh, the
8 railhead being the highest and the closest part in the field
9 of view creates many problems because it's the most dominant
02:31PM 10 feature. So eventually, we would like to remove that so that
11 it can make the processing in making decision about tie much
12 easier to the computer.
13 Q. And does the patent explain how to remove the railhead
14 data from the elevation data?
02:31PM 15 A. Yes. It has a very thorough explanation of how to do
16 that.
17 Q. Now, I'd like to change gears a little bit and talk
18 about the LRAIL product which is the accused product in this
19 case. And before I do that, I know you mentioned you
02:32PM 20 reviewed a bunch of materials, and I want to just maybe take
21 a quick peek at some of the materials that you reviewed just
22 so we know what they look like.
23 A. Sure.
24      MR. BARNEY: Could I please have Exhibit 27?
02:32PM 25 Q. Doctor, what is Exhibit 27?

**150**

1 A. It's a user manual for the LRAIL system.
2 Q. Okay. That's something you reviewed as part of your
3 investigation?
4 A. Yes.
02:32PM 5      MR. BARNEY: If I could have Exhibit 28, please?
6      Just put it on the screen.
7 Q. Okay. And Doctor, what is Exhibit 28?
8 A. This is another manual referring to hardware and
9 software installation.
02:32PM 10 Q. And this one of the things that you reviewed as part of
11 your investigation?
12 A. Yes.
13      MR. BARNEY: Then if I could have Exhibit 30,
14 please?
02:33PM 15 Q. What's Exhibit 30, Doctor?
16 A. It is another manual of the LRAIL that does acquisition
17 and processing software.
18 Q. And this is something that you also reviewed?
19 A. Yes.
02:33PM 20 Q. Did you review a lot of other stuff as well in addition
21 to these three?
22 A. Yes.
23      MR. BARNEY: Now if I could have slide 16, please?
24 Q. So, again, briefly, uh, keeping in mind the time, and
02:33PM 25 it's after lunch and so forth, can you please briefly explain

**151**

1 what the LRAIL system is?
2 A. Yes. And I have included this Exhibit 734 which is a
3 brochure that shows, uh, the two laser profilers that are
4 mounted on a platform above the pickup truck. And they are
02:33PM 5 able to collect data, the brochure says at speeds up to 180
6 kilometers per hour, and they analyze the data to produce
7 some results next to the different features.
8 Q. Okay. And does the LRAIL system include both hardware
9 and software?
02:34PM 10 A. Yes, it does.
11 Q. Now, in the documents you reviewed, did you gain an
12 understanding of how the LRAIL is sold to customers?
13 A. Yes. Can I have the next slide, please? Yes. I looked
14 at the declaration of Dr. Hebert, and I saw that they are
02:34PM 15 sold as turnkey sales.
16 Q. All right, let me take step back. Um, who is
17 Dr. Hebert?
18 A. He is the Vice-President of R & D Operations at
19 Pavemetrics.
02:34PM 20 Q. Okay. And what is a declaration? What's your
21 understanding of what a declaration is?
22 A. Uh, a declaration is a sworn statement that is submitted
23 to the court under oath.
24 Q. I'm gonna read some information here, and then I'm gonna
02:35PM 25 have some questions for you. Okay?

**152**

1 A. Yes.
2      MR. BARNEY: So in this declaration of
3 Jean-Francois Hebert, in paragraph 4, he states aside from
4 testing the LRAIL with the United States government,
02:35PM 5 Pavemetrics has sold six LRAIL systems in the United States.
6 Those sales were turnkey sales that basically LRAIL hardware,
7 LRAIL acquisition software and LRAIL processing software.
8      In paragraph 8, he states the complete LRAIL
9 package includes two 3D laser triangulation sensors that can
02:35PM 10 be mounted on a train car or hi-rail vehicle to capture high
11 resolution stands on a railway.
12      It also includes executable copies of acquisition
13 software compiled from LRAIL software source code? The
14 sensors send signals to the computer system running the
02:35PM 15 acquisition software. The acquisition software then produces
16 output files in the FIS format which is a file format
17 designed specifically by Pavemetrics.
18      At the end, it states I declare under penalty of
19 perjury that the following is true and correct. Executed
02:36PM 20 January 9th, 2022 in Quebec City, Canada signed by
21 Dr. Hebert.
22 Q. Did I read that correctly?
23 A. Yes.
24 Q. And did you consider this information in coming up with
02:36PM 25 your conclusions?

**EXHIBIT 2**
**-40-**

153

1    A.   Yes, I did.
2    Q.   And what does this declaration tell you about how the
3    LRAIL is sold to customers?
4    A.   Uh, it is sold like he said turnkey systems that include
02:36PM 5    hardware and acquisitional software and processing software.
6    Q.   Okay.  And in Dr. Hebert's declaration, did he say
7    anything about the software like the versions of code that
8    are -- that were provided?
9    A.   Yes.  Can I have the next slide, please?
02:36PM 10   Q.   It may be easiest if I read this, and then I'm gonna
11   have some questions.
12   A.   Okay.
13              MR. BARNEY:  So in Paragraph 23 in the declaration
14   of Dr. Hebert, it states Pavemetrics has sent the following
02:36PM 15   LRAIL software versions to its U.S. customers excluding the
16   U.S. government.  In October 2020, Pavemetrics delivered to
17   CSX LRAIL Software Version R 10205 with an executable file to
18   override R 10205 with Version R 10323 (2020-10-26).
19              In February 2021, Pavemetrics delivered to Advance
02:37PM 20   Infrastructure Design (AID) LRAIL Software Version R 10494
21   (2021-01-19).
22              In December 2021, Pavemetrics delivered to CSX
23   LRAIL Software Version 4.80.2.0-C4E9AA15F (2021-12-09).
24              Again, signed at the bottom I declare under the
02:38PM 25   penalty of perjury that the following -- excuse me, that the

154

1    foregoing is true and correct.  Executed January 9th, 2022 at
2    Quebec City, Canada.
3    Q.   Did you consider this information in your opinions,
4    Doctor?
02:38PM 5    A.   Yes, I did.
6    Q.   So how many versions of software did Mr. -- or did Dr.
7    Hebert describe here?
8    A.   Uh, there are three versions.  The one appearing under
9    paragraph A which was the R 10323.  Uh, in paragraph B, it's
02:38PM 10   the Version R 10494.  And the one appearing in paragraph C,
11   and that one, I'll repeat the same, is 4.80 and .2.0 --
12   Q.   Okay.  Did you review each of those three versions of
13   software in your investigation?
14   A.   Yes I did.
02:39PM 15   Q.   Now, on the previous page, and I think it was
16   paragraph 4 of Dr. Hebert's declaration, he stated he made
17   six sales, U.S. sales of the LRAIL system.  Of those six, how
18   many are you going to be testifying about here today?
19   A.   About four sales.
02:39PM 20   Q.   Okay.  And which are those?
21   A.   Uh, three sales that were made to CSX and one sale that
22   was made to AID.
23   Q.   And do you know when the three sales to CSX occurred?
24   A.   Yes, in March 2021.
02:39PM 25   Q.   And do you know when the delivery of the AID system was

155

1    made to AID?
2    A.   In February 2021.
3    Q.   So those are the four LRAIL systems that you're going to
4    be testifying about today; is that correct?
02:40PM 5    A.   That is correct.
6    Q.   And do you know at the time of the sale of the LRAIL
7    system to CSX in March of 2021 which version of the LRAIL
8    software according to Dr. Hebert's declaration was available
9    to CSX at that time?
02:40PM 10   A.   It's Version R 10323.
11   Q.   And t the time of the delivery of the LRAIL system to
12   AID in February of 2021, which version of the LRAIL software
13   was available to AID at that time?
14   A.   Is the Version R 10494.
02:40PM 15   Q.   Okay.  Now, having reviewed both of those versions, are
16   there any meaningful differences between those two versions
17   with respect to your opinions here today?
18   A.   No.
19   Q.   Okay.  And was there a particular algorithm that you
02:40PM 20   focused on or that probably is the central part of your focus
21   uh, in those, uh, software versions?
22   A.   Yeah.  The, uh, deep convolutional neural networks.
23   Q.   And what is the main --
24              MR. LAQUER:  Objection, Your Honor regarding the
02:41PM 25   scope of the report.

156

1              THE COURT:  I'm sorry, was the objection to this
2    last question?
3              MR. LAQUER:  Uh, yes.
4              THE COURT:  What's the objection?
02:41PM 5              MR. LAQUER:  It's beyond the scope of the report
6    with respect to the representative aspect.
7              THE COURT:  Okay.  Um, he can go ahead and answer
8    the question.
9              Counsel, just so you know, when is a good stopping
02:41PM 10   point?  And we'll take our afternoon break.
11              MR. BARNEY:  Yes, Your Honor.
12   Q.   Um is there -- uh, you mentioned deep convolutional
13   neural network.  In the two versions of the software that
14   were provided to CSX and to AID that you just mentioned, what
02:41PM 15   was the input in terms of the data into that deep
16   convolutional neural network?
17   A.   Yeah.  The data were recorded under the name Fake3D.
18   Q.   So those two versions of the software had what's called
19   Fake3D that was inputted into a convolutional neural network.
02:42PM 20   Am I correct?
21   A.   That is correct.
22   Q.   Now, the additional third software version, how did that
23   come about?
24   A.   Uh, the other version had a different, uh -- they
02:42PM 25   replaced the Fake3D input by another one that was called

EXHIBIT 2
-41-

157

1       Mixed Image.
2       Q.   Other than the replacement of Fake3D with Mixed Image
3    data, was there any other significant changes?
4       A.   No.
02:42PM 5       Q.   And, again, you reviewed that Mixed Image code?
6       A.   Yes, I did.
7       Q.   Um, and -- and how was it provided?  In other words, I
8    see that was provided in December of 2021.  So that was after
9    the sale in March of 2021?
02:42PM 10       A.   Yes.
11       Q.   Okay.  Was that an update?
12       A.   I believe so.
13            MR. BARNEY:  I think this is an appropriate time,
14    Your Honor.
02:42PM 15            THE COURT:  Okay.  We'll take an afternoon break,
16    and we'll get back here a little bit before 3 o'clock.
17            Thank you.
18            THE CLERK:  All rise.
19            (Jury present.)
02:43PM 20            THE COURT:  On the technical terms, just go a
21    little slower, especially when you string two or three terms
22    together, convolutional, neural network, you know, those
23    things.  So just be a little bit slower.  It'll be easier for
24    everybody.  So we'll reconvene about 3 o'clock.
02:43PM 25            THE CLERK:  All rise.  This court's in recess.

UNITED STATES DISTRICT COURT

158

1                    (Recess taken.)
2            THE COURT:  Welcome back, Dr. Morellas.
3            Counsel, please go ahead.
4    BY MR. BARNEY:
03:03PM 5       Q.   So Dr. Morellas, just before we broke, I was about to
6    move to a different topic.  And I think at this point, we're
7    ready to begin discussing your infringement analysis.
8            So if I could Slide 19 on the screen please.
9            So Doctor, can you explain what we're looking at
03:03PM 10    here?
11       A.   Yes.  You see on the left-hand side of the slide that I
12    had grouped the limitations that are in the Claim 1 of the
13    '293 patent into two categories.  Those related to hardware
14    and those related to software.  And on the right-hand side,
03:04PM 15    you see those boxes?  What I was trying to do is to see if
16    each one of those limitations were embodied in the LRAIL that
17    I viewed.
18       Q.   Just so I'm clear, what's represented in this chart is
19    the entirety of Claim 1 of the '293 patent; is that correct?
03:04PM 20       A.   That is correct.
21       Q.   You've split them into individual limitations or
22    elements?
23       A.   That's right.
24       Q.   And then you've divided those into hardware and software
03:04PM 25    elements?

UNITED STATES DISTRICT COURT

159

1       A.   Correct.
2       Q.   And what happens if you end up with a checkmark in each
3    of these boxes?  What does that mean?
4       A.   If in the end you check all the boxes, that means the
03:04PM 5    LRAIL system infringes Claim 1 of the '293 patent.
6       Q.   And you did this analysis for the LRAIL system, the
7    three LRAIL systems that were sold to CSX in March of 2021
8    and the LRAIL system that was delivered to AID in February of
9    '21; is that correct?
03:05PM 10       A.   Yes.
11       Q.   So let's start with the hardware limitations and let's
12    start with that first limitation.  Is the LRAIL system, and
13    again, I'm referring to those four LRAIL systems that we just
14    mentioned, is the LRAIL system for assessing a railway track
03:05PM 15    bed?
16       A.   Yes, because as it was advertised in the brochure, this
17    is what the LRAIL system does.  It's a railway inspection
18    system.
19       Q.   And when you say the brochure, you're referring to
03:05PM 20    Exhibit 734?
21       A.   That's correct.
22       Q.   And that's one of the materials you reviewed?
23       A.   Yes.
24       Q.   So in your opinion is this first limitation satisfied?
03:05PM 25       A.   It is satisfied.

UNITED STATES DISTRICT COURT

160

1       Q.   Second limitation says a power source.
2            In your opinion does the LRAIL system have a power
3    source?
4       A.   That is correct.  That is Exhibit 30 from the software
03:05PM 5    manual that shows that there is a power supply.
6       Q.   So in your opinion is this limitation satisfied?
7       A.   Yes.
8       Q.   The next limitation requires a light emitting apparatus
9    powered by the power source for emitting light energy toward
03:06PM 10    a railway track.
11            In your opinion does the LRAIL system satisfy that
12    limitation?
13       A.   Yes, because as you can see, I have two sources of
14    information here about that.  One coming from a Pavemetrics
03:06PM 15    presentation, Exhibit 728 and another one, Exhibit 734 from
16    the LRAIL brochure that shows the two laser profilers.
17       Q.   And what is a laser profiler?
18       A.   It's a -- it's the sensor that we have been talking
19    about.  The one that has a meter that, uh, sheds light, laser
03:06PM 20    light and a receiver that receives that information and gives
21    us the elevation and the intensity data.
22       Q.   And is that laser profiler powered by the power source
23    in the LRAIL product?
24       A.   Of course.
03:07PM 25       Q.   Okay.  And so in your opinion is this limitation

UNITED STATES DISTRICT COURT

**EXHIBIT 2**
**-42-**

161

1    satisfied?

2    A.   Yes.

3    Q.   The next limitation requires a data storage apparatus in

4    communication with at least one processor.

03:07PM 5          In your opinion is this limitation satisfied by the

6    LRAIL system?

7    A.   Yes.  Again, I included some pictures from, um, the

8    software manual and I have highlighted in the red box that

9    the computer includes processors and data storage.

03:07PM 10   Q.   And how do you know that the data storage is in

11   communication with the processor?

12   A.   Uh, because there is the data position computer that

13   connects to the sensors through a controller, the LCMS-2

14   controller.

03:07PM 15   Q.   And so in your opinion is this limitation satisfied?

16   A.   Yes.

17   Q.   And so for the next limitation, I think we should break

18   this down into smaller chunks.  This is kind of a long

19   limitation.  Let's begin with the first chunk which is at

03:08PM 20   least one sensor for sensing reflected light that was emitted

21   from the light emitting apparatus.

22          In your opinion, does the LRAIL system satisfy that

23   limitation?

24   A.   Yes.  As I included in this Exhibit 30, information

03:08PM 25   coming from the software manual that talks about the

UNITED STATES DISTRICT COURT

162

1    high-power laser line projections.  And you can see in the

2    picture next to that something that we saw in the previous

3    slide about the two sensors.

4    Q.   So you're referring to the Figure 2 there that's labeled

03:08PM 5    LCMS-2 sensors?

6    A.   Correct.

7    Q.   And can you just explain again to make sure that I

8    understand the pieces of equipment that are pictured there,

9    the LCMS-2 sensors, do they include both the laser profiler

03:08PM 10   and the sensor in the same piece of equipment?

11   A.   I believe so, yes.

12   Q.   The next limitation, part of this limitation requires

13   acquiring three-dimensional surface elevation and intensity

14   image data of the railway track to be stored in the data

03:09PM 15   storage apparatus.

16          In your opinion does the LRAIL system satisfy that

17   limitation?

18   A.   Yes.  Again, I have provided some information from

19   Pavemetrics presentation, Exhibit 741.  And as you can see,

03:09PM 20   the title of the slide, uh, the system is able to do we have

21   intensity and range image data collection.  And I have also

22   highlighted in the red box, the sensor controller and data

23   storage PC that stores that information.

24   Q.   So just so I'm clear, Exhibit 741 is a Pavemetrics

03:09PM 25   presentation?

UNITED STATES DISTRICT COURT

163

1    A.   That is correct.

2    Q.   And it's about the LRAIL system?

3    A.   Yes.

4    Q.   And the particular slide of that presentation that

03:10PM 5    you're showing, what is the title of it?

6    A.   Intensity and Range Image Data Collection.

7    Q.   And what does range data mean?

8    A.   It's the elevation data that we saw earlier and it gives

9    you the profile of the object that the laser light hits.

03:10PM 10   Q.   And so how does this presentation relate or conform with

11   your -- or affirm your opinion regarding this particular

12   limitation?

13   A.   The limitation is satisfied.

14   Q.   And did you take a look at the Pavemetrics LRAIL source

03:10PM 15   code to see whether that limitation shows up in the source

16   code?

17   A.   Yes, I did.  And you can see the version on the bottom,

18   these are two pieces of the software coming from the

19   particular version, the Version r10323.

03:10PM 20          And for those of you that have not seen computer

21   code before, it's each of those lines is a statement for the

22   computer to interpret and usually the name of the variables

23   that we assign, uh, describes something about the information

24   that they carry.

03:11PM 25          And we can see, uh, the different types of

UNITED STATES DISTRICT COURT

164

1    information that are being used in these snippets of

2    software.  And it's RangeZ as you see in the purple boxes and

3    Intensity as you can see in the blue boxes.

4    Q.   And Doctor, I see, um, that there are what look like

03:11PM 5    comments.  So for instance on the upper box, there's a

6    //range data from left and right camera and on the bottom

7    box, it says //intensity data from left and right camera.

8          What are those lines, what are they?

9    A.   These are comment lines and these are not read by the

03:11PM 10   computer.  This is just information for the people that will

11   look at the software to know what type of information is

12   stored on those variables.

13   Q.   And who put those comments in the code?

14   A.   Uh, the software programmer that worked on it.

03:12PM 15   Q.   So the person at Pavemetrics who programmed this

16   software, put those comments in the code.  Is that your

17   understanding?

18   A.   Yes.

19   Q.   And do those comments relate in any way to your opinion

03:12PM 20   as to whether the system acquires three-dimensional surface

21   elevation and intensity data of the railway to be stored in

22   the data storage apparatus?

23   A.   Yes.

24   Q.   How so?

03:12PM 25   A.   Because this is just the -- a proof of that.  They

UNITED STATES DISTRICT COURT

**EXHIBIT 2**

**-43-**

165

1    collect the range data, the intensity data are collected and
2    are stored in the data storage apparatus.
3       Q.   And did you review the report that Dr. Frakes provided
4    in response to your report?
03:12PM 5   A.   Uh. . . yes.
6       Q.   Rebuttal report?
7       A.   Yeah.
8       Q.   And how do you respond to his assertion that acquiring a
9    laser line is not the same thing as acquiring
03:13PM 10   three-dimensional surface elevation data?
11      A.   Yeah.  As we saw earlier, uh, as the rail track moves
12   along with the sensors, it sweeps the different parts of the
13   railway so it collects all of these laser lines and it
14   creates a surface elevation.
03:13PM 15   Q.   Can we go to Slide 12, please?
16            So are you referring to that upper picture on the
17   left-hand side?
18      A.   That is correct.
19      Q.   So each one of those is acquiring data from a laser
03:13PM 20   line, but if you move that laser line across the object, what
21   do you get?
22      A.   You get the surface elevation.
23      Q.   And that's three dimensional?
24      A.   That's three dimensional, yeah.
03:13PM 25   Q.   All right, Doctor.  Now, let's look at the last portion

166

1    of this limitation which requires wherein at least one sensor
2    is communication with the at least one processor.
3             What is your opinion as to whether the LRAIL system
4    satisfies that limitation?
03:14PM 5   A.   Uh, it does satisfy that.  And as you can see in
6    Exhibit 28 that comes from installation manual, there is the
7    controller that interfaces data and control signals between
8    the host computer and the laser profilers.
9       Q.   And is there anything else you looked at that confirms
03:14PM 10   your opinion that this portion of the limitation is met?
11      A.   Next slide, please.
12            Yes, you can see, again, some part from the
13   declaration of Dr. Hebert that talks about this.  And he
14   highlighted the portion that relates to this particular
03:14PM 15   portion of the claim that the sensors sends signals to the
16   computer system running the acquisition software.
17      Q.   And what does that tell you that the sensor sends
18   signals to the computer system running the acquisition
19   software?  What does that tell you, if anything, about
03:14PM 20   whether the sensor is in communication with the processor?
21      A.   Uh, yeah, it is in communication with the processor and
22   we saw previously the controller that does that.
23      Q.   And so putting all of this together, what is your
24   opinion as to whether that last hardware limitation is
03:15PM 25   satisfied by the LRAIL system?

167

1       A.   It is satisfied.
2       Q.   So let's now turn to the software limitations.
3             And Doctor, in this first software limitation,
4    you've highlighted two of the terms in blue.  Can you explain
03:15PM 5   why you've done that?
6       A.   Yeah, these are some terms that were construed by the
7    Court to have a certain meaning so that we can interpret it
8    in the proper way.
9       Q.   And did you apply those meanings that the Judge handed
03:15PM 10   down in your opinion?
11      A.   Yes.
12      Q.   So let's take a look at the first one.  The Judge
13   construed is configured to run an algorithm to mean "is
14   programmed to run an algorithm without the need to rebuild,
03:16PM 15   rewrite or recompile the code for, or redesign any of that
16   hardware or software."
17            Did I read that correctly?
18      A.   Yes.
19      Q.   And did you apply that construction in your analysis?
03:16PM 20   A.   Yes, I did.
21      Q.   And then the Judge construed comprising the steps of a,
22   b, c and d to mean "the algorithm must be configured to run
23   the steps in the recited order" and "the method steps must be
24   performed in the recited order."
03:16PM 25            Did I read that correctly?

168

1       A.   Yes.
2       Q.   Did you apply that construction in your analysis?
3       A.   Yes, and as you saw previously about those slides that
4    describe the algorithm, I followed those steps a, b, b and d.
03:16PM 5   Q.   So let's break this limitation down into smaller chunks
6    again.  We have the next slide.  What is your opinion as to
7    whether the LRAIL system has at least one processor -- excuse
8    me.  Let me restart that.
9             What is your opinion as to whether the LRAIL system
03:16PM 10   satisfies the requirement that the at least one processor is
11   configured to run an algorithm for processing
12   three-dimensional surface elevation and intensity data
13   gathered from the at least one sensor?
14      A.   Yes.  Again, this is information coming from the
03:17PM 15   software manual, Exhibit 30.  I have enclosed the computer in
16   the red box and also, I highlighted the portion of the text
17   that the data processing computer is responsible for
18   processing the 3D files (FIS format) stored on the data
19   acquisition computer.
03:17PM 20   Q.   And in the last limitation we looked at, we looked at
21   some code in the software code that talked about intensity
22   and range data.  Do you recall that?
23      A.   Yes.
24      Q.   And is that the data that's being run on an algorithm
03:17PM 25   for processing that data?

**EXHIBIT 2**
**-44-**

169

1   A.  Yes.

2   Q.  And then the next portion of this limitation requires

3  that data is saved and saved in the data storage apparatus.

4       What's your opinion as to whether the LRAIL system

03:18PM  5  saves that data in a storage apparatus?

6   A.  Yes, it does.  And again, this is the computer system

7  that uses the data processing computer and the data

8  acquisition computer and the 3D data stored on the

9  acquisition computer.

03:18PM 10   Q.  So you're referring to Exhibit 30, the LRAIL software

11  manual again?

12   A.  Right.

13   Q.  And are you referring to the part that says the

14  processing computer accesses raw 3D data stored on the

03:18PM 15  acquisition computer?

16   A.  That is correct.

17   Q.  So that tells you that data was stored or saved in the

18  data storage apparatus?

19   A.  Yes.

03:18PM 20   Q.  So putting all that together, what is your opinion as to

21  whether this limitation is satisfied by the LRAIL system?

22   A.  It is satisfied.

23   Q.  Let's go now to the next limitation which is actually

24  step a of the algorithm.  So you see it says the algorithm

03:19PM 25  comprising the steps of and then it has steps a, b, c, d?

170

1   A.  Yes.

2   Q.  What is your opinion as to whether the LRAIL system

3  acquires three-dimensional surface elevation and intensity

4  data representative of area segment of railway track bed?

03:19PM 5   A.  Uh, yes, it does that and we showed this particular

6  picture earlier where I explained that the range data and

7  intensity data are being collected by the system.

8   Q.  So when it says acquiring three-dimensional surface

9  elevation and intensity data, does that mean collecting that

03:19PM 10  data from the railroad track?

11   A.  That is correct.

12   Q.  And so the code, the portions of the code that we looked

13  at earlier is that telling you anything as to whether that

14  data is being collected?

03:19PM 15   A.  Yeah, it is collected and, yeah.

16   Q.  And again those comments that were put in there by the

17  Pavemetrics programmer that say range data from left and

18  right camera and intensity data from left and right camera is

19  that consistent with your opinion that this limitation is

03:20PM 20  satisfied?

21   A.  Yes.

22   Q.  Is there anything else that conforms or relates to your

23  opinion that this limitation is satisfied?

24   A.  Yes.  Next slide, please.  So here is some portions of

03:20PM 25  the Pavemetrics presentation that shows two images.  The top

171

1  one is intensity image and the bottom one is the range data

2  3D which is the elevation.

3   Q.  And, again, Exhibit 741 is that what you're referring

4  to?

03:20PM 5   A.  Yes.

6   Q.  And that was a Pavemetrics presentation?

7   A.  Yes.

8   Q.  And is this consistent with the portions of the code,

9  the software that we just looked at that talked about range

03:20PM 10  and intensity data?

11   A.  Yes.

12   Q.  And so what is your opinion, Doctor as to whether step a

13  of this claim is satisfied?

14   A.  It is satisfied.

03:20PM 15   Q.  Step b requires, first of all, I see you've highlighted

16  something in blue.  Can you please explain why you did that?

17   A.  Yes, again, this is a term that the Court, uh, construed

18  to mean -- have a specific meaning.

19   Q.  Okay.  So I'll just read this and I'll have some

03:21PM 20  questions.  The Court construed track elevation map to mean

21  representation of both the height (elevation) and intensity

22  of reflected laser light (intensity) at each data point

23  within an area across the entire width of the railroad track

24  bed.  Did I read that correctly?

03:21PM 25   A.  Yes.

172

1   Q.  Did you apply that construction when you were doing your

2  analysis?

3   A.  Yes, I did.

4   Q.  Now, what is your opinion as to whether the LRAIL system

03:21PM 5  generates a track elevation map based on the acquired

6  three-dimensional data?

7   A.  Okay.  To reach my conclusion about this, I have looked

8  at a particular presentation of Pavemetrics at the AREMA

9  Conference in 2021.  This is Exhibit 24.  And you can see I

03:22PM 10  have zoomed in to the red box that talks about two types of

11  scans combined for analysis unique to Railmetrics.

12       And the two types of scans are the 2D intensity

13  scan which we see a picture of next to that and also the 3D

14  range scan where we also see another picture of that.

03:22PM 15   Q.  Okay.  So Exhibit 24 is a Pavemetrics presentation?

16   A.  Yes, it is.

17   Q.  And did the authors of this presentation include

18  Pavemetrics' personnel?

19   A.  Yes.

03:22PM 20   Q.  And on the particular slide that you're showing of that

21  presentation, what is the title of that particular slide?

22   A.  Elevated Technology.

23   Q.  And it's saying that there are two types of scans

24  combined for analysis.  What are the two types of scans that

03:23PM 25  are combined for analysis in the LRAIL system?

**EXHIBIT 2**

**-45-**

173

1    A.    The 2D intensity scan and the 3D range scan.

2    Q.    And that's what that slide says?

3    A.    Yes.

4    Q.    And is that consistent with your opinion as to how the

03:23PM 5    LRAIL system works based on everything else you have

6    reviewed?

7    A.    Yes.

8    Q.    Now, earlier you referred to another presentation, um, I

9    believe it was Exhibit 741.  And I was wondering if I could

03:23PM 10   just get that called up to the screen.

11          Is this another presentation that you considered in

12   your analysis?

13   A.    Yes.

14   Q.    And the title of it is Use of Deep Neural Networks For

03:23PM 15   Railroad Inspection?

16   A.    Yes.

17   Q.    And was it presented by, uh, I know it says Railmetrics.

18   Do you understand Railmetrics to be just another name for

19   Pavemetrics that they used occasionally?

03:23PM 20   A.    Yeah, another brand name, yes.

21   Q.    So this was a Pavemetrics presentation?  Is that your

22   understanding?

23   A.    Yes.

24   Q.    And if you can go to page 2, who were the researchers

03:24PM 25   for this particular presentation?

UNITED STATES DISTRICT COURT

---

174

1    A.    John Laurent and Mario Talbot.

2    Q.    And do you recognize those as being Pavemetrics'

3    employees?

4    A.    Yes.

03:24PM 5    Q.    And if we could go to page 12, please.  We've seen this

6    slide before.  It was on one of your earlier slides.  And can

7    you remind us what this slide says about the type of data

8    that is collected in the LRAIL system?

9    A.    Two types of data intensity and range data.

03:24PM 10   Q.    And if we can go to page 13 of this presentation, the

11   next page, which type is that?

12   A.    This is the intensity image.

13   Q.    And that's the label that Pavemetrics put on it?

14   A.    That's correct.

03:24PM 15   Q.    If we can go to the next page, what type of data are we

16   seeing there?

17   A.    These are the range data.

18   Q.    And that's the label that Pavemetrics put on it?

19   A.    That's correct.

03:25PM 20   Q.    And did they call it 3D?

21   A.    Yes.

22   Q.    And then page 15, what are we seeing on page 15?

23   A.    This is another image that combines those two types of

24   data.

03:25PM 25   Q.    And Pavemetrics put the label Combined Result on this

UNITED STATES DISTRICT COURT

---

175

1    picture?

2    A.    That is correct.

3    Q.    And does this relate in any way to your opinion about

4    whether the LRAIL system creates an elevation map based on

03:25PM 5    the acquired three-dimensional data?

6    A.    Yes.

7    Q.    And what is your opinion?

8    A.    That it does satisfy that.

9    Q.    Now, is there any other information that you looked at

03:25PM 10   that relates to your opinion that this limitation b is

11   satisfied?

12   A.    Yes, there are two more pieces of information that

13   confirm that.  One comes from the installation manual which

14   is the Exhibit 28, and I have highlighted the portion

03:26PM 15   pertaining to this particular part of the claim.  "The 3D

16   image is resulting from the merging of both the intensity and

17   range images."  This is one of them.

18          And another one that is also important is the one

19   that comes from a Federal Railroad Administration report,

03:26PM 20   Exhibit 98.  And I highlighted the portion of that, again,

21   that reads, "The addition of matching 3D scans for each 2D

22   image significantly improves the DCNN dataset leading to more

23   robust and reliable detection results."

24   Q.    You mentioned FRA.  What is that?

03:26PM 25   A.    It's the Federal Railroad Administration.

UNITED STATES DISTRICT COURT

---

176

1    Q.    That's a government agency in the United States?

2    A.    That is correct.

3    Q.    Who created this report that we see in Exhibit 98?

4    A.    Pavemetrics.

03:27PM 5    Q.    And so when the comment there that the addition of

6    matching 3D scans for each 2D image significantly improves

7    the deep convolutional neural network dataset leading to more

8    robust and reliable detection results, your understanding

9    that statement is coming from Pavemetrics; is that correct?

03:27PM 10   A.    That is correct.

11   Q.    Now, did you look to the source code to see whether this

12   limitation in step b is satisfied?

13   A.    Uh, yes.

14   Q.    And what did you find?

03:27PM 15   A.    That it is satisfied and I will explain, uh, as simple

16   as I can this particular portion of the software.  You see

17   the first red box that is called LCMS Fake3D and this is

18   what's called a class.  And one of the functions of the class

19   uses what I have highlighted with purple boxes are data that

03:28PM 20   are associated with range information.  And you can see the

21   top purple box that contains the name RngFilt, this is range

22   information that comes in to process it.

23          And then next slide, please.  And what I have

24   highlighted with blue boxes is quantities that are associated

03:28PM 25   with intensity information.

UNITED STATES DISTRICT COURT

---

**EXHIBIT 2**

**-46-**

177

1    Next slide, please.  And what comes out is the
2  p3DInt variable that is in the green box which is, uh,
3  combines those two types of data into one, thus creating a 3D
4  elevation and intensity image.
03:29PM 5    Q.    And in your opinion is that an elevation map based on
6  the acquired three-dimensional data?
7    A.    Yes.
8    Q.    So based on everything you've seen and everything you've
9  talked about, what's your opinion as to whether limitation b
03:29PM 10 is satisfied?
11   A.    It is satisfied.
12   Q.    Let's go to the next limitation.  And, again, I see that
13 you've highlighted two things in blue which I understand from
14 your methodology means that the Court has construed it; is
03:29PM 15 that right?
16   A.    That is right.
17   Q.    And so the Court construed the term neighborhood to mean
18 zone of a limited area.  Did you apply that construction in
19 your analysis?
03:29PM 20   A.    Yes, I did.
21   Q.    And then the Court construed "moving the gradient
22 neighborhood like a sliding window over the 3D elevation
23 data" to mean "sequentially and completely applying the
24 gradient neighborhood to the 3D elevation data."
03:30PM 25   Did you apply that construction to your analysis?

UNITED STATES DISTRICT COURT

178

1    A.    Yes, I did.
2    Q.    So let's take a look at this claim limitation c and
3  break it into smaller pieces.
4    Doctor, what is your opinion as to whether the
03:30PM 5  LRAIL system identifies a railway track bed feature from the
6  track elevation map?
7    A.    Uh, it does.  And again I have included some portions of
8  the code.  The first important information is the Fake3D
9  Image is being used as an input.  Uh, and you can see the
03:30PM 10 bottom three portions of the code where this particular data
11 structure, the Fake3D Image is input to different running fastener for the
12 that are associated with the network running fastener for the
13 first one, spike for the second and tie clip for the third.
14   Q.    And just so I understand, the three features that you've
03:31PM 15 identified, uh, I think you said. . . I've just lost my place
16 here.  What were the three features again, I'm sorry?
17   A.    Fastener which is the second box, the second yellow box.
18 You can see the second starts with m_oFastenerNetwork.
19   Do you see that?
03:31PM 20   Q.    So you're talking about on the left-hand side not the
21 part you've highlighted in red, but you can tell what it is
22 from the very left-hand side of that box where it says
23 m_oFastenerNetwork.  You understand that to be a fastener
24 feature.
03:32PM 25   A.    That's correct.

UNITED STATES DISTRICT COURT

179

1    Q.    And then underneath it for the same reason you
2  understand that to be a spike feature; is that correct?
3    A.    That's right.
4    Q.    And then last one is a tie plate feature.  Did I get
03:32PM 5  that right, Doctor?
6    A.    Yes.
7    Q.    And then how do you know --
8    THE COURT:  Counsel, just so you know, you can draw
9  on these if you want as well just using your finger.
03:32PM 10 BY MR. BARNEY:
11   Q.    Can you circle -- those are the variables you were
12 pointing to when you were pointing out the features?
13   A.    Spike and tie plate here.
14   Q.    Thank you.
03:32PM 15   And how do you know, Dr. Morellas that the step of
16 identifying these features is that it's identifying it from
17 the track elevation map?  How do you know that?
18   A.    Because the particular data structure that was an input
19 to this network is the Fake3D structure that we saw earlier.
03:32PM 20   Q.    Just so I'm clear, the Fake3D structure that we saw
21 earlier which was the combination of the intensity and the
22 elevation data that's the input that's being used to identify
23 these features?
24   A.    That is correct.
03:33PM 25   Q.    And is that the elevation map, the Fake3D is that the

UNITED STATES DISTRICT COURT

180

1  elevation map?  Is that right?
2    A.    That is right.
3    Q.    And did you consider any other information in forming
4  your opinion?
03:33PM 5    A.    Yes.  Next slide, please.
6    Q.    So we saw the testimony of Mr. Nguyen earlier today.
7    Did you take his testimony into consideration in
8  forming your opinions?
9    A.    Yes, I did.
03:34PM 10   Q.    What does Mr. Nguyen have to say about this, uh, whether
11 the track elevation map is being used to identify these
12 features?
13   A.    He said that there is a particular variable that is the
14 portion of the name is UseFake3DImForNN.  And when this
03:34PM 15 particular variable set to particular number, then the
16 functionality of using the Fake3D with a neural network is
17 enabled.
18   Q.    And is that consistent with what you saw in the code?
19   A.    Yes.
03:34PM 20   Q.    Let's go to Slide 41, please.  Let's take a look at the
21 next portion of this limitation.  This limitation c actually
22 has two sub-steps, Roman numeral I and Roman numeral II.  So
23 let's take a look at Roman numeral I.
24   What is your opinion as to whether the LRAIL
03:35PM 25 systems defines an appropriate gradient neighborhood

UNITED STATES DISTRICT COURT

EXHIBIT 2
-47-

181

1  representing a small 2D track section over which differential

2  vertical measurements are calculated?

3  **A.   Yes, the very fact that the system, the LRAIL system**

4  **uses a convolutional neural network that means that it**

03:35PM 5  **defines an appropriate neighborhood that is called**

6  **convolution here.**

7  Q.   And does anything else support your opinion?

8  **A.   Uh, yeah, there is the paper basically in which this,**

9  **uh, this information comes from.**

03:35PM 10  Q.   And what is that paper?

11  **A.   It's a paper that was presented at the WCRR Conference**

12  **in Tokyo in 2019.**

13  Q.   How does it relate to your opinion?

14  **A.   I think this is satisfied.**

03:35PM 15  Q.   In this presentation in Section 3.3 where it says

16  overview of Track Inspection Deep Neural Network, what are

17  they describing?  What are they saying in this presentation?

18  **A.   They describe basically at a high level the steps that**

19  **are taken by using the convolutional neural network, the deep**

03:36PM 20  **convolutional network.**

21  Q.   And I see you've highlighted something there.  Does that

22  relate to this idea of defining appropriate gradient

23  neighborhood?

24  **A.   Yes.**

03:36PM 25  Q.   And how so?

182

1  **A.   Uh, because, uh, the appropriate means that, um, the**

2  **ways that goes into the convolution are defined based on the**

3  **particular feature that you are detecting.**

4  Q.   And so is the 5x5 convolutional layer an example of an

03:36PM 5  appropriate gradient neighborhood in this instance?

6  **A.   Yes.**

7  Q.   Now, is there a dispute between you and Dr. Frakes

8  Pavemetrics expert about this particular limitation?

9  **A.   Yeah, there is a dispute.  Dr. Frakes he doesn't**

03:37PM 10  **disagree with me about the gradient operator of using a**

11  **convolution filter in that case, but he has, uh, he takes a**

12  **narrow view as far as what numbers goes into the ways of the**

13  **filter, however this is not required by the deep**

14  **convolutional networks.**

03:37PM 15  Q.   Okay.  Let me take a step back there.  Does the

16  disagreement between you and Dr. Frakes have to do with how

17  you're defining or understanding what a gradient neighborhood

18  is?

19  **A.   Yes.**

03:37PM 20  Q.   And in your opinion is Dr. Frakes' understanding or

21  definition of that term consistent with how you believe it's

22  used in the field of neural networks?

23  **A.   Uh, yes.  I mean, he's constrained.  There's not a**

24  **requirement for the deep convolution neural network to**

03:38PM 25  **operate.**

183

1  Q.   Your answer was a little unclear to me.

2     Is his understanding of what a gradient network is

3  is it consistent with how you think that term is actually

4  used in normal use in the field of convolutional networks?

03:38PM 5  **A.   His point of view is not.**

6  Q.   And now, can you please explain why?  And try to put it

7  in terms I might understand.

8  **A.   His, uh, opinion comes from the most -- more traditional**

9  **parts of computer -- of image processing where you use those**

03:38PM 10  **operators to find, uh, edge, small edges, like we call them**

11  **edge pixels in the image that you are processing, but this is**

12  **an old technology that has been replaced by the modern**

13  **techniques we are using in convolutional neural network.**

14  Q.   So in the convolutional neural network if you use the

03:39PM 15  term neural network as you understand it, does the system in

16  the LRAIL system define an appropriate gradient neighborhood?

17  **A.   Yes.**

18  Q.   Now, does the claim require the type of gradient

19  neighborhood that of Dr. Frakes is using in his opinion?

03:39PM 20  **A.   No.**

21  Q.   Does the Court's construction require the type of

22  gradient neighbor that Dr. Frakes is using?

23  **A.   No.**

24  Q.   Now, based on your experience with convolutional neural

03:39PM 25  networks, are you confident that the LRAIL system defines an

184

1  appropriate gradient neighborhood as required by this claim

2  limitation?

3  **A.   Yes.**

4  Q.   Okay.  Let's move to the next portion.  So Roman numeral

03:40PM 5  II requires moving the gradient neighborhood like a sliding

6  window over the 3D elevation data using the processor.

7     What's your opinion as to whether the LRAIL system

8  satisfies that limitation?

9  **A.   Yeah, I'm gonna explain that so that I can prove my**

03:40PM 10  **point here.  This is a part of the Pavemetrics paper as part**

11  **of Exhibit 117, uh, and as you can see, they process images**

12  **and they use deep neural network to identify fasteners in the**

13  **railway track.**

14     **Um, so I wanted to break it down to you so I can**

03:40PM 15  **explain this sliding idea.  So you have the gradient**

16  **neighborhood that slides along the image from left to right,**

17  **top to bottom and that's where the measurements were made.**

18  **And this is basically the slide idea that is part of the, um,**

19  **this portion of the limitation.**

03:41PM 20  Q.   And, again, knowing that this is a convolutional neural

21  network, does that tell you anything about whether there's

22  going to be this sliding technique applied?

23  **A.   Yes, absolutely.**

24  Q.   And how do you know that?

03:41PM 25  **A.   Because I have worked and I know about the theory.**

**EXHIBIT 2**
**-48-**

185

1   Q.   Now, does Dr. Frakes disagree with you that there is a
2 window that slides across the image in the LRAIL system?
3   A.   **Yes, there is a disagreement.**
4   Q.   Let me break the disagreement down.
03:41PM 5   A.   **Okay.**
6   Q.   Two parts.  Does he disagree with you that there's a
7 window that slides across the image?
8   A.   **No, there's no disagreement on that.**
9   Q.   What is the disagreement?
03:41PM 10   A.   **So as you can see in this slide, the gradient**
11 **neighborhood is highlighted with green.  Okay?**
12          **And Dr. Frakes thinks that if we have a stride of**
13 **two which means from step to step going from one to two, the**
14 **use of particular gradient neighborhood has to move if there**
03:42PM 15 **is a stride of 2 by two pixels.  So this is the disagreement.**
16   Q.   Let me take a step back.  Make sure we all understand.
17   A.   **Yes.**
18   Q.   Now, this illustration you've shown here, this is just
19 an illustration from a book; right?
03:42PM 20   A.   **That is correct, yes.**
21   Q.   And so the size of the appropriate gradient neighborhood
22 in the LRAIL system, it doesn't necessarily have to be a 3x3;
23 right?
24   A.   **No.**
03:42PM 25   Q.   Does it depend on which feature you're looking for?

UNITED STATES DISTRICT COURT

186

1   A.   **Yes.  Eventually, yes.**
2   Q.   So depending on whether you're looking for a weld or
3 connector or something that might change what the appropriate
4 gradient neighborhood is?
03:42PM 5   A.   **Yes.**
6   Q.   But whatever size it is is it your understanding of
7 Dr. Frakes' opinion that he believes there's a stride of 2.
8   A.   **Yes, he raises that point.**
9   Q.   And can you explain one more what does stride mean?
03:43PM 10 Does that mean you're moving at two pixels each time you move
11 the window?
12   A.   **That is correct.**
13   Q.   And why does he think that somehow means it doesn't
14 satisfy the claim?
03:43PM 15   A.   **He says it doesn't do that for all the pixels in the**
16 **image; however, as you can see, the pixels that are enclosed**
17 **by the red box contribute to the two steps I and II to the**
18 **development of applying the gradient operator.**
19   Q.   So the example you're showing on Slide 44 with a 3x3
03:43PM 20 window, as that slides across the image even if it's doing it
21 with stride of 2, does every single pixel contribute to
22 that window?
23   A.   **Actually, it contributes more than once.**
24   Q.   There's no pixel that gets skipped even though you're
03:43PM 25 using a stride of 2.

UNITED STATES DISTRICT COURT

187

1   A.   **No.**
2   Q.   And is that what you're illustrating here in this
3 illustration?
4   A.   **That's what I'm trying to do, yeah.**
03:44PM 5   Q.   Even though the green neighborhood moves over with a
6 stride of 2, that red box is still within that neighborhood;
7 right?
8   A.   **That is correct.**
9   Q.   And then as it gets to the end and then drops down by
03:44PM 10 two pixels to begin its next row is it gonna pick up that
11 same red box again?
12   A.   **Yes.**
13   Q.   And so in this example, even though you're using a
14 stride of 2, are there any pixels that get left out?
03:44PM 15   A.   **No.**
16   Q.   Every pixel gets to participate.
17   A.   **Yes.**
18   Q.   And the Court's construction just to review requires
19 sequentially -- this is the Court's construction of moving
03:44PM 20 the gradient neighborhood like a sliding window over the 3D
21 elevation data.
22          The Court's construction requires sequentially and
23 completely applying the gradient neighborhood to the 3D
24 elevation data.  Doctor, in your opinion even with a stride
03:44PM 25 of 2, does the gradient neighborhood in the LRAIL system

UNITED STATES DISTRICT COURT

188

1 sequentially and completely apply the gradient neighborhood
2 to the 3D elevation data?
3   A.   **Yes, it does.**
4   Q.   So do you disagree with Dr. Frakes on that?
03:45PM 5   A.   **I do.**
6   Q.   Overall, what is your opinion as to whether step c of
7 Claim 1 is satisfied?
8   A.   **It is satisfied.**
9   Q.   And let's go to the last limitation.  Last limitation is
03:45PM 10 step d.  It requires storing information corresponding to the
11 identified railway track bed feature in the data storage
12 apparatus.
13          What's your opinion as to whether the LRAIL systems
14 satisfies that limitation?
03:45PM 15   A.   **Having included two pieces of information again, one as**
16 **Exhibit 30 coming from the software manual that says that the**
17 **data processing computer is responsible for processing the 3D**
18 **files stored on the data acquisition computer and for**
19 **outputting and saving the files, XML files and JPEG images.**
03:46PM 20          **And the bottom part of the slide is taken from a**
21 **Pavemetrics presentation is an illustration of images that**
22 **are being stored in their system.**
23   Q.   So is my understanding correct that in the Pavemetrics
24 systems those little thumbnails that we're looking at, those
03:46PM 25 are railway track bed features and they've been stored in the

UNITED STATES DISTRICT COURT

**EXHIBIT 2**

**-49-**

189

1  data storage apparatus?
2  **A.   Yes.**
3  **Q.**   And so Doctor, what's your opinion as to whether step D
4  is satisfied?
03:46PM 5  **A.   It is satisfied.**
6  **Q.**   So I think now we've gone through everything.  So can we
7  take a step back and look at all of the limitations again.
8       Doctor, what is your opinion as to whether the
9  LRAIL system that was sold -- the LRAIL systems that were
03:46PM 10  sold to CSX in March of 2021 and delivered to AID in February
11  of 2021 satisfy each and every limitation of Claim 1 of the
12  '293 patent?
13  **A.   Yeah, all the limitations are met.**
14  **Q.**   And what is your opinion therefore as to whether those
03:47PM 15  LRAIL systems infringe Claim 1 of the '293 patent?
16  **A.   It infringes Claim 1 of the '293 patent.**
17  **Q.**   And in reaching that conclusion, did you have everything
18  you feel you needed to review that reach that conclusion with
19  a reasonable degree of confidence?
03:47PM 20  **A.   Yes.**
21  **Q.**   So let's move now to Claim 21.  First of all, this is a
22  dependent claim; right?
23  **A.   That is correct.**
24  **Q.**   Can you explain to the jury your understanding of what a
03:47PM 25  dependent claim is?

190

1  **A.**   Uh, it's a continuation -- no.  Basically, it imports
2  **all the claims and defines a new claim and new ideas on that.**
3  **Q.**   Let me see if I can try and you tell me whether my
4  understanding is correct.  Am I correct that a dependent
03:48PM 5  claim incorporates all the limitations of the previous claim
6  and then it adds a new limitation?
7  **A.   That is correct, yes.**
8  **Q.**   And in this case the first requirement of Claim 21 is
9  you have to have the system of Claim 1.  Is that your
03:48PM 10  understanding?
11  **A.   Yes, that's correct.**
12  **Q.**   And since we've already gone through Claim 1, what is
13  your understanding as to whether that limitation is
14  satisfied?
03:48PM 15  **A.   It is satisfied.**
16  **Q.**   This next limitation requires, "wherein the algorithm
17  step of identifying a railway track bed feature further
18  comprises the step of measuring the length of a joint bar
19  candidate, determining whether the length of the joint bar
03:48PM 20  candidate falls between a minimum joint bar length threshold
21  and a maximum joint bar length threshold, and identifying the
22  joint bar candidate as a joint bar if the length measurement
23  of the joint bar candidate falls between a minimum joint bar
24  length and a maximum joint bar threshold."
03:49PM 25       Did I read that correctly?

191

1  **A.   Yes.**
2  **Q.**   First of all, does Pavemetrics dispute that that
3  limitation is satisfied by the LRAIL system?
4  **A.   No.**
03:49PM 5  **Q.**   Can you just -- that's a lot of words and a lot of
6  joints.  Can you just explain to the jury your understanding
7  of what this limitation requires?
8  **A.   This limitation requires that there have been some areas**
9  **detected as possible candidates of containing joints.**
03:49PM 10  **Basically, what it says is for every one of those candidates,**
11  **we make a measurement of its length and if its length falls**
12  **between it's bigger than the minimum and it's smaller than**
13  **the maximum, then we'll accept it as a joint, a joint bar;**
14  **however, if it does not fit this check, then it is rejected**
03:50PM 15  **by the system.**
16  **Q.**   So now, let's just take a look at the claim and the
17  limitation again and break it into smaller chunks.
18       The system requires, uh, this additional step
19  further comprising the steps of measuring the length of the
03:50PM 20  joint bar candidate.  Does the LRAIL system measure the
21  length of the joint bar candidate?
22  **A.   Yes, and I have highlighted in that box the particular**
23  **comment from the software that does that.**
24  **Q.**   And that's the box that says -- that has the comment
03:50PM 25  length of joint bar.

192

1  **A.   That is correct.**
2  **Q.**   Okay.  Next requirement is that the system or the
3  algorithm determine whether the length of the joint bar
4  candidate falls between a maximum joint bar length threshold
03:50PM 5  and a maximum -- I'm sorry.  I read that incorrectly.  Falls
6  between a minimum joint bar length threshold and a maximum
7  joint bar length threshold.
8       Does the LRAIL system perform that step?
9  **A.   Yes.  And as you can see, there are the two places that**
03:51PM 10  **are highlighted by their boxes that do this checking of the**
11  **minimum and maximum length.**
12       THE COURT:  Let me just ask.  I'm sorry.  Is the
13  minimum length is 0.9 and the maximum length the 1.1?
14       THE WITNESS:  Yeah, the minimum length is the 90
03:51PM 15  percent of the BF joint body length.
16       THE COURT:  I gotcha.  And the maximum is 110
17  percent.  Thank you.
18  BY MR. BARNEY:
19  **Q.**   So does that mean, Doctor that the system kinda has an
03:51PM 20  idea of what a typical joint bar should be in terms of
21  length?
22  **A.   That is correct.**
23  **Q.**   Then it's if I find something and I think it might be a
24  joint bar, I check to see whether it's within 90 percent of
03:51PM 25  that length and 110 percent of that length and if it is, it's

**EXHIBIT 2**
**-50-**

193

1 a joint bar?
2 **A. That's correct.**
3 MR. LAQUER:  Objection, leading.
4 MR. BARNEY:  Sorry, Your Honor.
03:51PM 5 THE COURT:  I would sustain the objection, but I
6 started it so go ahead.
7 BY MR. BARNEY:
8 Q. And the next requirement is identifying the joint bar
9 candidate as a joint bar if the length measurement of the
03:52PM 10 joint bar candidate falls between a minimum joint bar
11 threshold and a maximum joint bar length threshold.
12 Is that satisfied by the LRAIL system?
13 **A. Yeah, because this is the output of the -- of this**
14 **previous checking and, uh, this is where the joint bar is**
03:52PM 15 **recorded.**
16 Q. And so putting that all together, what is your opinion
17 as to whether this additional step of Claim 21 is satisfied?
18 **A. It is satisfied.**
19 Q. And what is your opinion all together as to whether
03:52PM 20 Claim 21 is satisfied?
21 **A. It is satisfied.**
22 Q. And therefore what is your opinion as to whether
23 Claim 21 -- well, first of all, does Pavemetrics disagree on
24 this additional limitation about identifying the joint bar
03:53PM 25 length and so forth?

194

1 **A. No.**
2 Q. I know they disagree about Claim 1, but in terms of
3 Claim 21 that additional limitation, there's no dispute;
4 right?
03:53PM 5 **A. No dispute.**
6 Q. So what's your opinion as to whether the LRAIL systems,
7 the four LRAIL systems that we've been referring to infringe
8 Claim 21 of the '293 patent?
9 **A. They do infringe Claim 21.**
03:53PM 10 Q. Now, I'm calling back the declaration of Dr. Hebert and
11 you recall we talked about these three different software
12 versions?
13 **A. Yes.**
14 Q. And so far am I correct that we've talked about the
03:53PM 15 first two?
16 **A. Correct.**
17 Q. Because those first two were the ones that were provided
18 to CSX and AID?
19 MR. LAQUER:  Objection, leading.
03:53PM 20 BY MR. BARNEY:
21 Q. Have we talked about the first two?
22 **A. Yes.**
23 Q. We have not yet talked about the third version; right?
24 **A. Correct.**
03:53PM 25 Q. And when was the third version provided to CSX according

195

1 to Dr. Hebert?
2 **A. On December 2021.**
3 Q. And, again, you reviewed that version?
4 **A. Yes.**
03:54PM 5 Q. Is that the one that you said has something to do with
6 mixed image?
7 **A. Yes.**
8 Q. Did you perform an infringement analysis like we did for
9 the other versions of the source code to determine whether
03:54PM 10 the mixed image version of the source code still infringes
11 the claim?
12 **A. I did.**
13 Q. Let's take a look at that.  Can you explain what you
14 did?
03:54PM 15 **A. Yes.  So I followed the same process that we followed**
16 **for the, uh, case of Fake3D.  And so we're gonna take every**
17 **one of those limitations against the mixed image version of**
18 **the software.  And if this new version embodies those**
19 **limitations, we're gonna check the boxes again.**
03:55PM 20 Q. Now, as you understand how this software update was
21 accomplished, did it change any of the hardware on the
22 system?
23 **A. No.**
24 Q. So what is your opinion of whether the hardware
03:55PM 25 limitations are still satisfied by the LRAIL system with the

196

1 updated mixed image software?
2 **A. They are satisfied.**
3 Q. They didn't change when the software was updated; is
4 that right?
03:55PM 5 **A. No, that is right.**
6 Q. So let's take a look at the software limitations.
7 In your opinion, Doctor does the mixed image
8 version of the LRAIL system still satisfy the requirement at
9 least one processor is configured to run an algorithm for
03:55PM 10 processing three-dimensional surface elevation and intensity
11 data gathered from the at least one sensor and saved in the
12 data storage apparatus?
13 **A. Yes, and the same reasons I was showing the previous**
14 **version of the Fake3D.  So that it is data processing**
03:55PM 15 **computer that is responsible for processing the 3D files**
16 **stored on the data acquisition computer.**
17 Q. You didn't see anything in the updated software version
18 that changed your opinion on this limitation.
19 **A. No.**
03:56PM 20 Q. So in your opinion is it satisfied?
21 **A. Yes.**
22 Q. How about step a acquiring three-dimensional elevation
23 and intensity data representative of an area segment of
24 railway track bed?  What is your opinion as to whether that
03:56PM 25 is still satisfied by the updated mixed image software?

**EXHIBIT 2**
**-51-**

### 197

1  A.   It is satisfied because the same uses of code appear in
2  this particular version.
3  Q.   And just so I understand, the software code that you've
4  got on Slide 56, what version did that come from?  What
03:56PM 5  version of code are we looking at there?
6  A.   This is stating as you can see at the bottom, Version
7  4.80.2.0-c4e9aa15f.
8  Q.   So that's the updated software that was provided in
9  December of 2021?
03:57PM 10  A.   That is correct.
11  Q.   And does it still have all of that same information we
12  looked at before including the comments from the programmer
13  indicating its collecting range data from the left and right
14  camera and intensity data from the left and right camera?
03:57PM 15  A.   Yeah, they're included.
16  Q.   And so what is your opinion about whether step b is
17  still satisfied by the updated software?
18  A.   It is satisfied.
19  Q.   Okay.  And I'm sorry, I said step b.  I meant step a.
03:57PM 20       What is your opinion as to whether the mixed image
21  software still satisfies step a of Claim 1?
22  A.   Yes, it does satisfy it because we show the data both
23  the elevation and intensity.
24  Q.   Now, we're looking at step b.  What is your opinion
03:58PM 25  about whether the updated mixed image software still

UNITED STATES DISTRICT COURT

### 198

1  satisfies step B of Claim 1?
2  A.   Yeah, so the Fake3D data structure was replaced and this
3  new type of is a three channel type of --
4       THE COURT:  I'm sorry.  You said what type?
03:58PM 5       THE WITNESS:  Three channels.  So in the first
6  channel, you see the purple box that includes elevation or
7  range data and the name of the variable confirmed that.  The
8  third channel which is a blue box, it's associated with
9  intensity information and the middle one, Channel 2, they do
03:58PM 10  some information about the edges.
11  BY MR. BARNEY:
12  Q.   So they've added some information about the edges in the
13  intensity, uh, I'm sorry, in the mixed image version, but
14  does it still include elevation data and intensity data in
03:59PM 15  the elevation map?
16  A.   Yes.
17  Q.   And so what' your opinion about whether the mixed image
18  update still satisfies step b?
19  A.   Yes, it is satisfied.
03:59PM 20  Q.   Okay.  Let's go to step c.  Is the mixed image software
21  in your opinion still configured to perform step c of
22  Claim 1?
23  A.   Yes.
24  Q.   And how do you know that?
03:59PM 25  A.   Because seeing it from this Pavemetrics presentation

UNITED STATES DISTRICT COURT

### 199

1  that the neural network is used for processing this data.
2  Q.   So Doctor, in terms of how the data is processed, how
3  that elevation map is processed, does anything change between
4  the Fake3D version of the code and the mixed image version of
04:00PM 5  the code in terms of how the data is processed?
6  A.   No.
7  Q.   It's still inputted into a convolutional neural network?
8  A.   Yes.
9  Q.   Is it still, uh, does it still define an appropriate
04:00PM 10  gradient neighborhood representing a small 2D track --
11       THE COURT REPORTER:  I'm sorry.
12  BY MR. BARNEY:
13  Q.   Does it still define an appropriate gradient
14  neighborhood representing a small 2D track section over which
04:00PM 15  differential vertical measurements are calculated?
16  A.   Yes.
17  Q.   And does it still move the gradient neighborhood like a
18  sliding window over the 3D elevation data using the
19  processor?
04:00PM 20  A.   Yes.
21  Q.   And you confirmed that by looking at the mixed image
22  source code?
23  A.   Yes.
24  Q.   And so in your opinion is step C still satisfied by the
04:00PM 25  mixed image update?

UNITED STATES DISTRICT COURT

### 200

1  A.   Yes, it is satisfied.
2  Q.   And then how about limitation D storing information
3  corresponding to the identified railway track bed feature in
4  the data source apparatus?  Is that still satisfied by the
04:01PM 5  mixed image update?
6  A.   Yes, it is because this step is the same as the Fake3D
7  version.
8  Q.   And so in your opinion does the -- so in your opinion is
9  step D satisfied by the mixed image version of the code?
04:01PM 10  A.   It is satisfied.
11  Q.   And that didn't change from the change in the code from
12  3D to -- from Fake3D to mixed image?
13  A.   It did not change.
14  Q.   All right.  Doctor, so putting all that together then,
04:01PM 15  what is your opinion as to whether the mixed image version of
16  the updated software still meets all the claim limitations of
17  Claim 1?
18  A.   As you see all the boxes are checked so this means that
19  the mixed image version of the software still infringes
04:02PM 20  Claim 1.
21  Q.   And if we take a look at Claim 21.  Did any of the
22  changes that were made in the mixed image update change your
23  opinion as to whether Claim 21 is satisfied?
24  A.   No, it would not.
04:02PM 25  Q.   And, again, is Pavemetrics disputing that additional

UNITED STATES DISTRICT COURT

**EXHIBIT 2**
**-52-**

---

201

1  step in Claim 21 is satisfied by the mixed image version by

2  the code?

3  **A.  No, they don't dispute that.**

4  Q.  I'd like to change gears and talk about the '557 patent.

04:02PM 5  **A.  Yes.**

6  Q.  And so we've been talking quite a bit about the '293.

7  I'd like to now talk about the other patent.

8  **A.  Yes.**

9  Q.  And what do we have here, Doctor?  What are you showing

04:02PM 10  us on Slide 62?

11  **A.  Again, we're gonna check each one of the limitations of**

12  **Claim 8 of the '557 patent with the LRAIL software and try to**

13  **find out where these particular limitations are embodied in**

14  **the software.**

04:03PM 15  Q.  And just so we're all clear, is Claim 8 -- it has an

16  algorithm; right?

17  **A.  Yes.**

18  Q.  And it's what we call a method step?

19  **A.  Yes.**

04:03PM 20  Q.  So in order to perform the claim, you have to perform

21  the method.  Is that your understanding?

22  **A.  That is correct.**

23  Q.  Is this algorithm different than the algorithm that was

24  set forth in Claim 1 of the '293 patent?

04:03PM 25  **A.  Yes, it is different.**

UNITED STATES DISTRICT COURT

---

202

1  Q.  It has different steps?

2  **A.  Different steps.**

3  Q.  Different limitations?

4  **A.  Yes.**

04:03PM 5  Q.  It has different claim constructions.

6  **A.  Correct.**

7  Q.  So let's start with the first limitation.  And I'm

8  specifically talking now about the LRAIL system that was

9  provided to AID.  Okay?

04:03PM 10  **A.  Yes.**

11  Q.  In February of 2021.  So when I say LRAIL, that's the

12  one I'm talking about for Claim 8.

13       Does that LRAIL system perform a method for

14  detecting railroad tie distress?

04:03PM 15  **A.  Yes.**

16  Q.  And how do you know that?

17  **A.  Because there are two parts of a software code that show**

18  **that.  One is top blue box that is the comment that mentions**

19  **that this function detects the cracks on the surface of**

04:04PM 20  **wooden tie.  Uh, and the second piece of information coming**

21  **from the function that is surrounded by the red box that its**

22  **name is detect wooden tie crack.**

23  Q.  So in your opinion is this limitation satisfied?

24  **A.  Yes.**

25  Q.  The next limitation I think we're gonna look at and

UNITED STATES DISTRICT COURT

---

203

1  break it into smaller chunks.  Does the LRAIL system that was

2  provided to AID input elevation data?

3  **A.  Yes.  And as we can show as part of the variables that**

4  **have been included in the function, the wooden ties crack**

04:04PM 5  **detect function, uh, this information is in the box.**

6  Q.  Okay.  Does the LRAIL system that was provided to AID

7  input longitudinal and transverse elevation map resolution

8  data?

9  **A.  Yes.  And as we can see, those particular variables are**

04:05PM 10  **defined in the function.**

11  Q.  What does transverse and longitudinal mean?

12  **A.  Uh, transverse is the direction along the wooden ties**

13  **and longitudinal is along the rails.**

14  Q.  And does that relate in any way to the names of the

04:05PM 15  variables that have X and Y in them?

16  **A.  Yes.**

17  Q.  How so?

18  **A.  X is along the wooden tie and Y is along the rail.**

19  Q.  Now, is there a dispute between you and Dr. Frakes on

04:05PM 20  this particular limitation?

21  **A.  Yes, there is a dispute about the meaning of that and**

22  **because there is the portion of the highlighted text that**

23  **includes the elevation map, those two words, he thinks that**

24  **we need to have present intensity.  However, as you can see,**

04:06PM 25  **this claim requires only elevation data and not intensity and**

UNITED STATES DISTRICT COURT

---

204

1  elevation.

2  Q.  Just so I'm clear, when we were looking at the algorithm

3  in Claim 1 of the '293 patent, did that claim specifically

4  say that you had to have both intensity and elevation data in

04:06PM 5  the elevation map?

6  **A.  That is correct.**

7  Q.  Does Claim 8 of the '557 patent say that?

8  **A.  No.**

9  Q.  Is there any claim construction for that term in Claim 8

04:06PM 10  of the '557 patent that requires that?

11  **A.  No.**

12  Q.  So do you agree with Dr. Frakes that is required in this

13  claim?

14  **A.  No, I do not agree.**

04:07PM 15  Q.  And in your opinion is that highlighted section of the

16  claim satisfied?

17  **A.  Yes, it is satisfied.**

18  Q.  How about the next input?  Does the LRAIL system that

19  was provided to AID, does it input rail base edge feature

04:07PM 20  coordinates?

21  **A.  Yes.  And in order to find something about the cracks on**

22  **the tie, we have to be able to detect ties.  And as you can**

23  **see, the function in the blue box is the function that**

24  **detects the ties in the range image.  Uh, and that's part of**

04:07PM 25  **this particular function, I have highlighted the variable**

UNITED STATES DISTRICT COURT

---

**EXHIBIT 2**

**-53-**

205

1    with the purple box at the bottom that is a presentation of
2    rail base edge feature coordinates.
3    Q.   Okay.  At the bottom are you talking about in purple?
4    A.   Yes.
04:08PM 5    Q.   And first all taking a step back, what is the rail base?
6    Just in the real world, what's the rail base?
7    A.   It's the bottom part of the railhead as it goes down,
8    this is the rail base where basically it meets.
9    Q.   Top of the rail earlier we called that railhead.
04:08PM 10   A.   The railhead and the bottom part is the base.
11   Q.   And what you've highlighted there in purple, does the
12   variable indicate that that is rail base edge feature
13   coordinates?
14   A.   Yes.
04:08PM 15   Q.   And what is the name?
16   A.   It's m_pucRailMaskWFootDS.
17   Q.   How about the next limitation, does the -- or is it
18   actually part of it?  Does the LRAIL system that was provided
19   to AID input detected tie bounding box data?
04:09PM 20   A.   Yes, and I have included two box here.  The top part is
21   a variable that is associated with the tie bounding box.  As
22   you can see on the red box, it's _pucOneTieMask.  And the
23   bottom part comes from a Pavemetrics manual that shows how
24   the tie bounding box is represented.  Essentially, it is
04:09PM 25   represented by the four corners of a rectangle.

UNITED STATES DISTRICT COURT

206

1    Q.   So let's just take a step back.  What is a tie bounding
2    box?
3    A.   Uh, it is basically an orthogonal area.
4         THE COURT:  And what does orthogonal mean?
04:09PM 5         THE WITNESS:  It means, uh, we know about square;
6    right?  So an orthogonal is a square that doesn't necessarily
7    have all the slides equal.  So a box basically is an area, in
8    this case a rectangular area that shows where the tie is
9    located on the image.
04:10PM 10   BY MR. BARNEY:
11   Q.   Okay.  Again, I'm just, I apologize if I'm
12   oversimplifying it, just tell me.  Are the railroad ties
13   rectangular in shape?
14   A.   Yes.
04:10PM 15   Q.   Does the tie bounding box bound or identify the location
16   of the railroad tie?
17   A.   Yes.
18   Q.   So we would expect the tie bounding box to have a
19   rectangular shape?
04:10PM 20   A.   That is correct.
21   Q.   And how many corners do you need to identify to define a
22   rectangle?
23   A.   Four corners.
24   Q.   Four.  Okay.  And so when you looked at the code, what
04:10PM 25   did it tell you about whether it is inputting data referring

UNITED STATES DISTRICT COURT

207

1    to the tie bounding box?
2    A.   That's what it says there, yeah.
3    Q.   And so the data that you provided from Exhibit 27, I
4    think you called that out put file, out put data?
04:11PM 5    A.   So this is from Pavemetrics manual.  It's just a
6    description of how ties are detected.
7    Q.   And does that portion of the manual indicate that four
8    points that would indicate a tie bounding box?
9    A.   Yes.  As you can see in the red box that I have included
04:11PM 10   there, we have four numbers.  And, for example, the Point1X
11   and the Point1Y are the coordinates of the, one of references
12   of the rectangle.  And then we have there's a total of four
13   of those numbers that define the coordinates of each of the
14   corners of the rectangle.
04:11PM 15   Q.   Okay.  Let's move to the next requirement.  Does the
16   LRAIL system that was provided to AID input a approximate tie
17   surface plane data to a processor?
18   A.   Yes, and I have identified this portion of the code that
19   starts with the identification of the tie and then it goes
04:12PM 20   and visits all the points in the mask that represents the tie
21   and collects all the range information and then it fits a
22   plane on those points.
23        And as an output, the function that I have included
24   in green, the FitPlaneOnPtList is a function that calculates
04:12PM 25   the entire surface plane, approximate tie surface plane and

UNITED STATES DISTRICT COURT

208

1    the output is the approximate tie surface plane parameters
2    that are enclosed in the red box.
3    Q.   And so what you've boxed in red is the approximate tie
4    surface plane; is that correct?
04:12PM 5    A.   These are the parameters that make this presentation.
6    Q.   And that is gonna be used in a subsequent step.  Am I
7    correct about that?
8    A.   Yes.
9    Q.   Let's go to the rest of this limitation a wherein
04:13PM 10   significant elevations due to the railheads for each rail
11   have been removed from the elevation data.
12        What's your opinion as to whether the LRAIL system
13   that was provided to AID performs that function?
14   A.   Yes, and this is the most complex part of my
04:13PM 15   presentation because there are a number of steps that we need
16   to follow to show how I reach that conclusion.
17        So we'll start with the function that detects the
18   cracks.  And this function assumes that ties have been
19   detected and let's look at the function that detects the
04:13PM 20   ties.  This function called another function within it that
21   is called DetectNoBallastSection that I enclosed in the
22   purple box.
23        Now, let's look at the function
24   DetectNoBallastSection.  It uses two variables there that I
04:14PM 25   have included in the blue boxes.  The variable is the

UNITED STATES DISTRICT COURT

EXHIBIT 2
-54-

209

1   m_pucAllObjectMask where those, the value of this variable

2   becomes zero and then next slide, please.  And this mask at

3   the bottom of the green box says exactly that this is the

4   mask containing all objects with rails removed.  So this is

04:14PM 5   the explanation how they remove the railheads.

6   Q.   And, again, the comment at the bottom, this is the mask

7   containing all objects with rails removed, who put that

8   comment into the code?

9   A.   The software programmer.

04:15PM 10   Q.   Pavemetrics programmer put that comment in the code?

11   A.   Yes.

12   Q.   And having reviewed all this code, how long do you

13   estimate that you spent reviewing this code?

14   A.   Like I said, eight days for about ten hours a day.

04:15PM 15   Q.   And so after reviewing that, did you come to a

16   conclusion as to whether this limitation a is satisfied by

17   the LRAIL system provided to AID?

18   A.   Yes.

19   Q.   What's your conclusion?

04:15PM 20   A.   It is satisfied.

21   Q.   Let's now go to step b of the Claim 8 algorithm.  Does

22   the LRAIL software that was provided to AID identify --

23   compare ties in the elevation data with a tie surface plane

24   model by calculating the difference between the tie surface

04:16PM 25   elevation data and the tie surface plane model using the

UNITED STATES DISTRICT COURT

210

1   processor?

2   A.   Yes.  I'm showing in this part of the slide a portion of

3   the program that takes into account the presentation of the

4   model of the surface plane which is an approximation, and

04:16PM 5   then each one of those points that happen to be in this plane

6   are compared with the actual range measurements and they find

7   those differences.  And the differences are containing the

8   variable D which is in the green box, dRngDiff.  So these are

9   all the different points along the tie.

04:16PM 10   Q.   And, again, I'm going to make a stab at this.  If I get

11   it wrong, let me know.  Comparing requires comparing two

12   things to find the differences. Is that fair?

13   A.   Fair, yeah.

14   Q.   So here you're comparing the actual elevation data of

04:17PM 15   some particular feature with the plane -- the tie surface

16   plane model that you created in step a.  Is that fair?

17   A.   That's fair.

18   Q.   And the purpose for doing that is what?

19   A.   The purpose of doing that is because if in your range

04:17PM 20   data there are cracks, okay, when you create an approximate

21   plane, you don't want to -- these are considered some kind of

22   outliers.  You want to get voting from the majority of pixels

23   do not -- are not part of the crack to create a fair

24   approximation of where this plane supposed to be.

04:17PM 25       And then you use this hypothetical presentation of

UNITED STATES DISTRICT COURT

211

1   the plane to the actual data so they can see the differences

2   and these are the places where actually cracks would be

3   located.

4   Q.   So in this comparison step if it turns out that your

04:18PM 5   actual data is way lower than your hypothetical plane that

6   you calculated in step a, that means you probably have a

7   crack.

8   A.   That is correct.

9   Q.   So here in the code we see difference dRngDiff so that

04:18PM 10   indicates a comparison step?

11   A.   Yes.

12   Q.   And then it's comparing the adPlaneParams, is that the

13   approximate tie surface plane model that we saw earlier in

14   step a?

04:18PM 15   A.   Yes.

16   Q.   To the actual tie surface elevation to figure out

17   whether there's a crack.  Is that fair?

18   A.   That's fair.

19   Q.   Okay.  And in your opinion is this limitation satisfied?

04:18PM 20   A.   Yes.

21   Q.   Let's go to step c.  Step c requires identifying tie

22   surface regions with elevations less than a tie surface plane

23   minus a crack depth threshold as the crack targets using the

24   processor.  In your opinion does the LRAIL system that was

04:19PM 25   provided to AID satisfy that limitation?

UNITED STATES DISTRICT COURT

212

1   A.   Yes, because those particular numbers that we computed

2   earlier with dRngDiff are compared with the threshold that is

3   enclosed in the purple box and this is basically the process.

4   Q.   And what was detected in this code is called the

04:19PM 5   cfDetectWoodenTieCrack_CrackDepth; is that right?

6   A.   That is right.

7   Q.   And so in your opinion is this limitation satisfied?

8   A.   It is satisfied.

9   Q.   And let's go to the last limitation d determining

04:19PM 10   physical parameters of crack targets use the processor.

11       In your opinion is that limitation satisfied by the

12   LRAIL system provided to AID?

13   A.   Yes, and this Exhibit 740 shows the results of this

14   calculation including the crack's height, length, depth and

04:20PM 15   angle.

16   Q.   Okay.  And what's your opinion as to whether step d is

17   satisfied?

18   A.   It is satisfied.

19   Q.   I should have followed up.  Are crack height, crack

04:20PM 20   length, crack depth and crack angle are those parameters of

21   the crack?

22   A.   Yes.

23   Q.   Okay.  So is limitation d satisfied in your opinion?

24   A.   Yes.

04:20PM 25   Q.   And is there anything that sort of informs your opinion

UNITED STATES DISTRICT COURT

**EXHIBIT 2**
**-55-**

213

1   about that?

2   A.   Yeah, that is also some information coming from

3   Pavemetrics presentation where they categorize the difference

4   types of cracks into very severe, severe, moderate, light,

04:20PM 5   very light or unmarked.  And they do that by considering the

6   depth, the width and the length of the cracks.

7   Q.   So taking all of this, uh, taking a step back here and

8   looking at the whole claim, what is your opinion, Doctor as

9   to whether the LRAIL system that was provided to AID performs

04:21PM 10  all of the steps of Claim 8?

11  A.   It does perform all the steps.

12  Q.   Now, as part of your analysis, were you able to

13  determine if AID actually used the LRAIL system that it

14  purchased from Pavemetrics in the United States?

04:21PM 15  A.   Yes, I did some investigation.  I looked up the

16  testimony of Mr. Ali Hafiz where he said that they use the

17  LRAIL system to collect data.

18  Q.   Okay.  And we actually saw that deposition testimony

19  earlier today from Mr. Hafiz.  And so how does that relate to

04:21PM 20  your opinion that AID actually used that system in the

21  United States?

22  A.   Yes, his testimony confirms that.

23  Q.   How about your -- how do you know that AID actually

24  performed the method of Step 8 in the United States?  So far

04:22PM 25  you've said they used the system in the United States.  How

UNITED STATES DISTRICT COURT

214

1   do you know they performed the actual steps of Claim 8?

2   A.   Yeah, I looked at the number AID output files and you

3   can see an example of that an AID output file that shows.

4   Other thing in this slide, software version, the red box.

04:22PM 5   Also, the date and time this particular software was running

6   and some parameters like the blue parameters called tie crack

7   parameters.

8        Some global parameters that are used for making

9   inferences as far as different calculations.  And in the

04:23PM 10  green box where it says the tie rating variable set to one

11  which means that this particular functionality of tie crack

12  detection was enabled.

13  Q.   Let me ask a few follow-up questions.  What is an output

14  file?

04:23PM 15  A.   An output file is a file in the computer that shows the

16  result of something being run in the computer.

17  Q.   And so when you run the system, when you run the LRAIL

18  system and it collects data, at some point you can produce an

19  output file?

04:23PM 20  A.   That is correct.

21  Q.   And is this an example of one of the output files that

22  was produced by AID in this case?

23  A.   That is correct.

24  Q.   And what can you tell from this output file?  For

04:24PM 25  instance can you tell which software version was running?

UNITED STATES DISTRICT COURT

215

1   A.   Yes, the software version was the number that we saw in

2   the red box 4.75.6.4.

3   Q.   And is that the version of the software that was

4   provided to the AID with the LRAIL system that was delivered

04:24PM 5   in February of 2021?

6   A.   Yes.

7   Q.   And can you tell the date when the actual data was

8   collected?

9   A.   Yes, it was 28th of June of 2021.

04:24PM 10  Q.   And then you mentioned that you could tell that there

11  was a particular function that enabled.  Tie crack detect

12  function; is that right?

13  A.   Yes.

14  Q.   And what does that tell you, if anything, about whether

04:24PM 15  Claim 8, the algorithm of Claim 8 is now being implemented?

16  A.   Yes, it was being implemented and being performed.

17  Q.   And is that because that particular function's high

18  rating is the same function that we just went through for the

19  last 20 minutes and showed how each step is satisfied?

04:24PM 20  A.   Yeah, actually tie rating is a parameter that tells the

21  computer to include this functionality of detecting the tie

22  cracks.

23  Q.   And if I could have the next slide, please.  Is this

24  another portion of that output file?

04:25PM 25  A.   Yes.  This portion of the output file shows the results

UNITED STATES DISTRICT COURT

216

1   of the processing.  And in this case there were four ties

2   that were detected and the number of cracks that the system

3   detected.  And at the bottom in the blue box, uh, they showed

4   the crack parameters like area, width, depth, length and

04:25PM 5   angle.

6   Q.   And are these the indicators that tell you whether or

7   not Claim 8 was actually practiced by the AID usage?

8   A.   Yes.

9   Q.   And if we can go to Slide 79, did you review other

04:26PM 10  output files other than that example you just showed?

11  A.   Yes, I combined some other AID output files and I

12  created this table.  On the top row you see the execution

13  date so I recorded the times that the software was executed.

14  And there is particular row that talks -- that is named tie

04:26PM 15  rating.  We saw that variable in the previous slide that it

16  has the value one and that means that the particular

17  functionality of detecting ties and tie cracks was enabled.

18  Q.   Have the next slide, please.  Doctor, having reviewed

19  all of that -- oh, I'm sorry.  One more question.  Did you

04:26PM 20  take a look at the manuals and the instructions that were

21  provided to AID?

22  A.   Yes.

23  Q.   And in your opinion do they provide instructions on how

24  to operate the LRAIL system in a manner that practices

04:27PM 25  Claim 8 of the '557 patent?

UNITED STATES DISTRICT COURT

**EXHIBIT 2**
**-56–**

217

1   A.   Yes.

2   Q.   So putting this all together, Doctor what is your

3   opinion as to whether AID, the customer who receives that

4   LRAIL unit, whether AID directly infringed Claim 8 of the

04:27PM 5   '557 patent?

6   A.   It did infringe the Claim 8.

7   Q.   Now, in this case are you familiar with a concept called

8   induced infringement?

9   A.   Yes.

04:27PM 10   Q.   That's been explained to you?

11   A.   Yes.

12   Q.   And are you aware that the concept of induced

13   infringement requires direct infringement by the downstream

14   user, but it also has a knowledge prong?

04:27PM 15   A.   That is correct.

16   Q.   Now, if I ask you to assume that the knowledge prong is

17   going to be shown through other evidence in the case, what

18   would your opinion be as to whether there has been induced

19   infringement because of the activities of AID?

04:28PM 20   A.   There was induced infringement.

21         MR. BARNEY:  Your Honor, I have a time question?

22         THE COURT:  You're asking me if this is a good time

23   to break for the day?

24         MR. BARNEY:  Well, maybe.  Uh, I think I have 10 or

04:28PM 25   15 minutes, and so it's really just one of those judgement

UNITED STATES DISTRICT COURT

218

1   calls.  Uh, I don't know how tired people are, and I don't

2   know Your Honor's preferences.

3         THE COURT:  I'm hearing from the jury that they

4   think we should break for today and pick up tomorrow morning

04:28PM 5   at 9:00.  So we'll go ahead and do that.

6         MR. BARNEY:  Thank you, Your Honor.

7         THE CLERK:  All rise.

8         (Jury not present.)

9         THE COURT:  So we'll pick with this witness

04:28PM 10   tomorrow morning at 9:00.  You finish your direct.

11   Obviously, we'll do cross and redirect.  We have the video

12   witness tomorrow; right?

13         MS. RE:  Yes, Your Honor.

14         THE COURT:  And we're doing that at 9:00; is that

04:29PM 15   correct?

16         MR. RE:  Well, we don't need to.  We're a little

17   behind where we thought we'd be.  And so we can -- it's

18   really your pleasure.  It's whether you want it to be exactly

19   at 9:00.  I mean, obviously, that's good for the witness, but

04:29PM 20   he can wait.  He is on the east coast so we didn't want it to

21   go too late.

22         THE COURT:  Well, it's up -- I guess I'll leave it

23   to you to decide how you want to do that.

24         MR. BARNEY:  I actually have no objection to

04:29PM 25   however they want to do it.  Um, if they want to do it first

UNITED STATES DISTRICT COURT

219

1   thing in the morning and then resume with Dr. Morellas after

2   that, that's fine, but we're also fine if they want to wait

3   till afternoon.

04:29PM 4         THE COURT:  Okay.  So I'll leave it to you all to

04:29PM 5   decide that.

6         We've got new versions of the jury instruction and

7   verdict form.  I guess we can get copies to the parties.  If

8   you want to stick around, we can get you copies this

9   afternoon.  You can look 'em over tonight, and we can talk

04:29PM 10   about any issues you've got tomorrow morning at 8:30.  And

11   then we can also decide what we're gonna start out with at

12   9:00.  Okay?

13         Anything else?

14         MR. BARNEY:  Nothing further, Your Honor.

04:30PM 15         THE COURT:  Okay.  Thank you, everybody.

16         THE CLERK:  All rise.  We are adjourned.

17         (Proceedings were concluded at 4:30 p.m.)

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

220

1

2              CERTIFICATE OF REPORTER

3

4   COUNTY OF LOS ANGELES    )

5               ) SS.

6   STATE OF CALIFORNIA    )

7

8   I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED

9   STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,

10   DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE

11   FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET

12   FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN

13   FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO

14   FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION

15   OF MY STENOGRAPHIC NOTES.

16

17

18   DATE:  AUGUST 19, 2022

19

20     /s/  LAURA MILLER ELIAS

21   LAURA MILLER ELIAS, CSR 10019

22   FEDERAL OFFICIAL COURT REPORTER

23

24

25

UNITED STATES DISTRICT COURT

EXHIBIT 2
-57-