1

```
                    UNITED STATES OF AMERICA
                   UNITED STATES DISTRICT COURT
                  CENTRAL DISTRICT OF CALIFORNIA
                         WESTERN DIVISION
                            - - -
                 HONORABLE MARK C. SCARSI
             UNITED STATES DISTRICT JUDGE PRESIDING
                            - - -

     PAVEMETRICS SYSTEMS, INC.,      )
                                     )
              PLAINTIFF,             )
                                     )
     VS.                             )   CASE NO.:
                                     )   CV 21-01289-MCS
     TETRA TECH, INC.,               )
                                     )
              DEFENDANT.             )
     _____)



                REPORTER'S TRANSCRIPT OF PROCEEDINGS

                   FRIDAY, AUGUST 19, 2022

                    LOS ANGELES, CALIFORNIA
```

```
                 LAURA MILLER ELIAS, CSR 10019
                FEDERAL OFFICIAL COURT REPORTER
                 350 WEST 1ST STREET, ROOM 4455
                  LOS ANGELES, CALIFORNIA 90012
                    PH:  (213)894-0374
```

UNITED STATES DISTRICT COURT

---

2

**APPEARANCES OF COUNSEL:**

ON BEHALF OF PLAINTIFF:

   KNOBBE, MARTENS, OLSON & BEAR, LLP
   BY: CHRISTY LEA, ESQ.
       JOSEPH RE, ESQ.
       NICHOLAS ZOVKO, ESQ.
       ALAN LAQUER, ESQ.
   2040 MAIN STREET
   14TH FLOOR
   IRVINE, CA 92614

ON BEHALF OF DEFENDANT:

   FINNEGAN HENDERSON
   BY: JAMES BARNEY, ESQ.
       AARON PARKER, ESQ.
       NICHOLAS CERULLI, ESQ.
       JENCY MATHEW, ESQ.
       DANIEL CHUNG, ESQ.
   901 NEW YORK AVENUE NW
   WASHINGTON, DC 20001

UNITED STATES DISTRICT COURT

---

3

```
                        INDEX
     WITNESSES FOR
     TETRA TECH:

                  DIRECT    CROSS    REDIRECT   RECROSS


     MORELLAS, VASSILIOS

     BY: MR. BARNEY   18         90
     BY: MR. LAQUER    39              99, 103, 106

     BY: THE COURT 102, 104


     SCHOETTELKOTTE,
     TODD

     BY: MS. MATHEW  108, 199     249
     BY: MR. ZOVKO    218


     WITNESSES FOR
     PAVEMETRICS:

     HABEL, RICHARD

     BY: MR. RE      137         197
     BY: MR. BARNEY  165
```

UNITED STATES DISTRICT COURT

---

4

```
    LOS ANGELES, CALIFORNIA; FRIDAY, AUG. 19, 2022; 8:34 A.M.

                            - - -

         THE CLERK:  Calling Item No. 1.

         Case No. CV 21-1289.

08:34AM  Pavemetrics Systems, Inc. versus Tetra Tech, Inc.

         Counsel, please state your appearances.

         (Appearances as heretofore noted.)

         THE COURT:  Good morning, everyone.

         So did we decide when we're gonna do the video

08:34AM  testimony?

         MR. RE:  Yes.  It appears that the most convenient

    would be doing it at 1:00 after the lunch hour.  That expect

    to be done by then.  And so 1 o'clock video.  We'll test it

    during the lunch hour.

08:34AM       THE COURT:  Great.

         MR. BARNEY:  That works for us.

         THE COURT:  So we gave you a set of the final jury

    instructions last night, and I'm not sure if you've had a

    chance to go through them or not, but are there questions?

08:35AM       I know I wanted to talk about the nonobviousness

    instruction.  What we were talking about earlier about the

    nonobviousness instruction was this issue of simultaneous

    invention.  And I struggled with it because it seems like

    what we're really looking at is obviousness and not

08:35AM  nonobviousness when we talk about simultaneous invention.
```

UNITED STATES DISTRICT COURT

EXHIBIT 3
-58-

5

1    And so I'm wondering what's the parties think about

2  that and why that's in the nonobviousness instruction.

3    MR. RE:  You are correct, Your Honor.  This is Mr.

4  Re for Pavemetrics.  You are correct.  Simultaneous

08:35AM 5  invention, if there are many people who simultaneously arrive

6  at the invention at around the same time that is an

7  indication of obviousness, not nonobviousness.

8    THE COURT:  Right.  And so does it belong in the

9  nonobviousness instruction?

08:36AM 10   MR. RE:  That would be where it'd be an appropriate

11  place to put it, in the nonobviousness.

12   THE COURT:  Okay.  And is there a model instruction

13  that includes the simultaneous invention language?

14   MS. LEA:  Yeah.  So it included in Federal Circuit

08:36AM 15  Bar.  They do it differently because they list the factors,

16  and they don't tell the jury which way the particular factors

17  go.  But, of course, if you're going to consider the factors

18  in favor of obviousness, you should consider the factor that

19  is in favor not being obvious.  This is definitely a case

08:36AM 20  where we have a development happening around the same time by

21  different parties.

22   THE COURT:  And so the case law that -- or the

23  legal rule you're trying to tease out is that if multiple

24  people are inventing it at the same time, it's obvious.

08:37AM 25   MS. LEA:  Yes.

6

1    THE COURT:  Does Tetra Tech agree with that basic

2  proposition of law?

3    MR. CHUNG:  Yes, Your Honor.  During our meet and

4  confers, we did agree to include that instruction from the

08:37AM 5  federal circuit bar model.  I guess it's an issue of how that

6  fits with the language of the rest of the fourth factor in

7  terms of, you know, do we say it's obviousness or

8  nonobviousness so I think it's more of a matter of probably

9  form over substance in terms of clarifying that particular

08:37AM 10  factor.

11   THE COURT:  Okay.  Let me pull it up again.  Would

12  that legal concept belong in the instruction on obviousness?

13  And I take it the federal circuit bar instruction had it in

14  nonobviousness; correct?

08:38AM 15   MR. CHUNG:  I believe the federal circuit bar

16  association model had it in obviousness, and it included all

17  of the factors.  So it was a longer instruction that was

18  comprehensive whereas the instructions we have now are

19  broken.

08:38AM 20   MS. LEA:  Yes, Your Honor.  So we had proposed the

21  federal circuit bar model which used the comprehensive

22  obviousness instruction, and Tetra Tech had proposed an AIPLA

23  instruction that broke them out.  We agreed to break them

24  out.  They agreed to include the simultaneous invention

08:39AM 25  instruction.

7

1    And if you look at Instruction No. 35 in your jury

2  instructions, you could see that No. 4 says additional

3  considerations, if any, that indicate that the invention was

4  obvious or not obvious.  So we want to make sure that in the

08:39AM 5  instruction on the additional considerations that we include

6  the factor that shows that the invention was obvious.  And

7  we'd like to be clear with the jury which way that factor

8  goes just like it's clear that the other factors might go the

9  other way.

08:39AM 10   THE COURT:  Okay.

11   And so let me pull up Instruction 35; right?

12   MS. LEA:  Yes, Your Honor.

13   THE COURT:  Let me make sure I've got the right

14  set.  Um, Instruction 35 is obviousness?  Generally?

08:39AM 15   MS. LEA:  Yes, Your Honor.

16   THE COURT:  Okay.

17   MS. LEA:  And there's Numbers 1, 2, 3 and 4 in that

18  instruction.

19   THE COURT:  And you would propose to include the

08:40AM 20  simultaneous invention language here?

21   MS. LEA:  No.  I'm fine with it in the factors or

22  the additional considerations instruction.  I'm just showing

23  you that here we're telling the jury they can consider

24  additional consideration, if any, that indicate that the

08:40AM 25  invention was obvious or not obvious.

8

1    THE COURT:  Gotcha.

2    MS. LEA:  And then we go to the additional

3  consideration instruction, No. 39.  We have the instruction.

4    Right.  And you list the factors, and you say

08:40AM 5  answering all or some of these questions yes may suggest the

6  claim was not obvious, and then we're not giving the factor

7  that suggests that the claim is obvious which is the

8  simultaneous invention.

9    THE COURT:  Right.  And that was the problem.

08:41AM 10  We've listed in these factors; right?  The instruction says

11  answering yes may suggest the claim is not obvious, and it

12  seems to be a contradiction.  If we put here simultaneous

13  invention, for example, is one of these factors, right, did

14  others simultaneously invent it?  Yes.  That means it's not

08:41AM 15  obvious.  That's not the point we're trying to get at; right?

16   MS. LEA:  And so we have to add two sentences about

17  the simultaneous invention factor, and then if you answer

18  that question yes, that may suggest that the claim was

19  obvious.  And if you want to do an independent separate

08:41AM 20  instruction, that's fine with me, with Pavemetrics.

21   THE COURT:  Okay.  Um, why don't -- uh, yeah.  And,

22  I mean, I get the -- I get the legal point.  I just -- just

23  don't want to confuse the jury unnecessarily.  So your

24  proposal before was it was in this instruction, but it wasn't

08:42AM 25  one of these factors.  It was listed separately; right?

**EXHIBIT 3**

**-59-**

9

1    MS. LEA:  Yes, Your Honor.

2    THE COURT:  Okay.  And Tetra Tech has as one of the

3  factors, and the problem with it being one of factors is it

4  was contradictory.  So what does Tetra Tech think about going

08:42AM 5  back to Pavemetrics' prior language where it was pulled out

6  separately?

7    MR. CHUNG:  Your Honor, we'll take the guidance of

8  the Court.  If Your Honor prefers it that it be a separate

9  stand alone factor, we are willing to take Your Honor's

08:42AM 10  guidance on that.  I will note, however, that the fed circuit

11  model does it include it within the enumerated factors, um,

12  and it does preface that by stating whether obvious or not

13  obvious.

14    THE COURT:  And what do you think about this

08:43AM 15  sentence?  After the factors answering all or some of these

16  questions yes may suggest that the claim is not obvious.

17  That seems to be contradictory, right, if one of the factors

18  is simultaneous invention?

19    MR. CHUNG:  Yes, I see that.

08:43AM 20    THE COURT:  How do we fix this sentence?

21    MR. CHUNG:  If we just delete that sentence and

22  these are just considerations that the jury takes, that may

23  resolve the internal tension.  Perhaps whether or not for

24  each of the factors.  Is it whether or not?  Is there

08:44AM 25  consideration that you take?

UNITED STATES DISTRICT COURT

---

10

1    THE COURT:  Okay.  So yeah, that might work.

2  What I'm gonna do is I'll leave the parties to

3  maybe meet and confer a little on Instruction 39 and figure

4  that out because I get that the parties agree that this legal

08:44AM 5  principal should be given to the jury, and I just want to

6  make sure we don't have the jurors kind of scratching their

7  heads on an instruction that's noncontradictory.  So let's

8  put a pin in 39 for now.

9  What other issues do the parties have in the final

08:44AM 10  set of instructions?

11    MR. CHUNG:  Tetra Tech has one note, Your Honor.

12    THE COURT:  Okay.

13    MR. CHUNG:  And that's for Instruction No. 21.

14    THE COURT:  Summary of contentions?

08:45AM 15    MR. CHUNG:  Yes, Your Honor.

16    THE COURT:  Okay.

17    MR. CHUNG:  Line 19 where it is discussing damages.

18  Right now, it appears to be limited to the '293 patent

19  whereas other instructions related to damages identifies both

08:45AM 20  patents.

21    THE COURT:  Okay.  I think that's something that we

22  should fix.  Thank you.  And let me hear from -- anything

23  else?

24    MR. CHUNG:  I think the other point is on line 14,

08:45AM 25  there's a in our view confusing identification of various

UNITED STATES DISTRICT COURT

---

11

1  versions of Pavemetrics' LRAIL system.  Our position has been

2  that the accused product is the LRAIL, and removing that that

3  various versions of Pavemetrics LRAIL system and just leaving

4  it at LRAIL systems would also be consistent with the rest of

08:45AM 5  the instructions.

6    THE COURT:  Products are alleged to infringe are

7  Pavemetrics' LRAIL systems?  Can we say systems?

8    MR. CHUNG:  Yes.

9    THE COURT:  Okay.  I think that works.

08:46AM 10    MR. CHUNG:  And that's all Tetra Tech has on the

11  instructions, Your Honor.

12    THE COURT:  Okay, let me hear from Pavemetrics now.

13  With Mr. Re, I thought it was particularly funny

14  yesterday when you said no one's every accused you of not

08:46AM 15  speaking up.  I thought that was pretty good.

16    MR. RE:  Well, I come from a very loud family.

17  Being one of twelve does that to you.  The youngest boy, too.

18  So I'm an East Coaster from New York like you so --

19    THE COURT:  Yeah.

08:46AM 20    MR. RE:  -- I appreciate all your comments about

21  the Orange men and the Buffalo Bills.  I'm a Giants' fan from

22  New York City.  And I heard somebody say Downstate, but

23  people from New York City never say Downstate.  Downstate

24  means like Rockland County, Westchester, something like that.

08:46AM 25  But no New Yorker from New York City would ever say

UNITED STATES DISTRICT COURT

---

12

1  Downstate, New York.

2    THE COURT:  I'm sure.

3    MR. RE:  One of the jurors said Downstate, New

4  York.  That told me he wasn't from the City.

08:47AM 5  But it's a pleasure to meet you.

6    THE COURT:  There's a lot of Giants' fans in

7  Syracuse as well.

8    MR. RE:  I love Syracuse.

9  With regard to the last issue on the versions, I

08:47AM 10  suggest the Court hold off on that until you at least see the

11  evidence with regard to this whole issue of the LRAIL and

12  versions.  And it's a complicated subject, and I -- I

13  recommend we just hold off on that until you at least see the

14  evidence before we have a final charge conference.

08:47AM 15    THE COURT:  Okay.  We can certainly table that

16  until the close of evidence.

17    MR. RE:  Okay.  Uh, my first comment would be with

18  regard to the damages that Mr. Chung mentioned, there is some

19  ambiguity throughout the instructions on the damages

08:47AM 20  issue.  I just need the clarity for the record.  Is it the

21  Court's ruling that Tetra Tech has a damages case for the

22  jury on the '557?

23    THE COURT:  Yes.

24    MR. RE:  Okay.  And is it the Court's ruling that

08:48AM 25  they have a damages case based on use which is the

UNITED STATES DISTRICT COURT

**EXHIBIT 3**

**-60-**

---

**13**

1  infringement of the '557?

2  THE COURT:  Uh, yes.  Yes, that's correct.

3  MR. RE:  Okay.  Thank you.  Uh, with that, I

4  preserve my record, and I won't go through the jury

08:48AM 5  instructions on that level of detail.

6  I next would like to raise Instruction No. 26.  And

7  this one, I think, is very important, and I think we might

8  have agreement, but I haven't had a chance to discuss it with

9  opposing counsel.

08:48AM 10  Instruction No. 26 talks about direct infringement

11  by literal infringement.  And then it continues to say there

12  are two types of direct infringement; literal infringement

13  and infringement under the Doctrine of Equivalence.

14  Uh, I suggest and propose and request that this

08:48AM 15  instruction be simplified because they are not -- the

16  plaintiff is not advancing a case under the Doctrine of

17  Equivalence.  It's never been at issue.  The concept of

18  literal verus doctrine is not gonna be presented to the jury,

19  and this should be simplified to just to refer to the

08:49AM 20  concepts of literal infringement only.

21  THE COURT:  That would be great if we could do

22  that.  Is that the case that there's no DOE here?

23  MR. CHUNG:  That's correct, Your Honor.

24  THE COURT:  Okay.  Then we'll do that.  We'll get

08:49AM 25  rid of Doctrine of Equivalence.

UNITED STATES DISTRICT COURT

---

**14**

1  MR. RE:  With that, I assume the Court has made a

2  final proposal on Instruction 51 with regard to the damages

3  date, and because the Court has ruled there is a damages case

4  on the '557, we understand that the Instruction 51 flows

08:50AM 5  directly from the Court's ruling that they can advance the

6  case for reasonable royalty on the '557 with regard to the

7  AID accused infringement.

8  THE COURT:  Correct.

9  MR. RE:  And I apologize that the appellate lawyer

08:50AM 10  in me is coming out.

11  THE COURT:  That's okay.

12  MR. RE:  With that, I have nothing further for this

13  portion of the charge conference.

14  THE COURT:  Okay.  Anything else we need to discuss

08:50AM 15  before the jury comes back?

16  MR. CHUNG:  Tetra Tech has three objections to

17  exhibits that we understand Pavemetrics will propose to

18  enter.  And Your Honor, those exhibits are 510, 565, and 566.

19  We are objecting to these exhibits as hearsay, but we are

08:51AM 20  willing to withdraw those objections to the extent that

21  Pavemetrics can lay proper foundation for a proper hearsay

22  exception.

23  THE COURT:  Okay.  Just generally, what are these

24  exhibits?

08:51AM 25  MR. CHUNG:  Uh, 510 purports to be a publication

UNITED STATES DISTRICT COURT

---

**15**

1  that Pavemetrics is relying on for their invalidity case.

2  THE COURT:  Okay.

3  MR. CHUNG:  565 appears to be a document of meeting

4  minutes.

08:51AM 5  THE COURT:  Okay.

6  MR. CHUNG:  And 566 on its face is a quarterly

7  report for a project titled An Automated System for Rail

8  Transit Infrastructure Inspection.

9  THE COURT:  Okay.  And when do you expect these to

08:52AM 10  come up?

11  MR. CHUNG:  Uh, we understand that they will come

12  up during the direct examination of Mr. Laurent.

13  THE COURT:  Okay.  Um, what's Pavemetrics' view on

14  whether or not we should deal with these issues now or wait

08:52AM 15  to see if an appropriate foundation's laid?

16  MS. LEA:  Your Honor, we -- we can wait or I can

17  explain it right now.

18  THE COURT:  Well, we have a few minutes.  Do you

19  want to explain?  And then we could decide whether we'll

08:52AM 20  address the issues now or wait till they come up.

21  MS. LEA:  So I'll start with the meeting minutes,

22  Exhibits 565 and 566, those are meeting minutes from the UML

23  Project which is a project of the U.S. Department of

24  Transportation which makes them official public records and

08:53AM 25  subject to a hearsay exception.

UNITED STATES DISTRICT COURT

---

**16**

1  Um, John Laurent was also involved in their

2  preparation and revision and received them, and so he'll be

3  able to testify to that as well.

4  THE COURT:  Okay.  So these are -- the hearsay

08:53AM 5  exception is government records?

6  MS. LEA:  Would be 8038, and we have the

7  foundational witness, too, who is involved in the preparation

8  and receipt.

9  THE COURT:  Okay.

08:53AM 10  Counsel, do you have a response to that?

11  MR. CHUNG:  With respect to these two exhibits,

12  Your Honor, to the extent that foundation can be laid, we

13  will withdraw that -- those objections.

14  THE COURT:  Okay.  Excuse me one second.  I'll be

08:54AM 15  right back.

16  We were going to address 510?

17  MS. LEA:  Yes, Your Honor.  510 is prior art

18  article by customers of Pavemetrics.  This is the Spanish

19  customers who bought three in 2010 and wrote an article about

08:55AM 20  their use of Pavemetrics' product and then published it in

21  conjunction with the Transportation Research Board of the

22  National Academies, a board that advises the President of the

23  United States and the Congress of the United States so it

24  would also be a public record.

08:55AM 25  In addition, Mr. Laurent was consulted on the draft

UNITED STATES DISTRICT COURT

---

**EXHIBIT 3**

**-61-**

17

1  and requested -- they asked his permission to include
2  Figure 2 in the draft which he gave.  He then attended a
3  presentation of the paper at the Transportation Research
4  Board conference, and eh received a copy of the final paper.
08:55AM 5            THE COURT:  Okay.
6            Counsel, that seem like an appropriate foundation
7  to get around the hearsay rule.
8            MR. CHUNG:  Withdraw the objection.
9            THE COURT:  Okay.  Well, that was straightforward.
08:56AM 10           Anything else before we get the jury?
11           MS. LEA:  Your Honor, would you prefer that I enter
12  the exhibits now or wait till after lunch?  He can go after
13  lunch, I believe.
14           THE COURT:  We can wait till after lunch.
08:56AM 15           MS. LEA:  Okay.
16           THE COURT:  Let's see if the jurors are ready.
17           THE CLERK:  All rise.
18                  (Jury present.)
19           THE COURT:  Okay.  Everyone, please have a seat.
08:59AM 20           Welcome back to the jurors.  Thanks everybody for
21  being on time today.  We'll get started right away.  We had
22  Dr. Morellas on the stand so we'll continue with his
23  testimony.
24           Okay.  Counsel, you can proceed.
09:00AM 25           MR. BARNEY:  Thank you, Your Honor.

UNITED STATES DISTRICT COURT

---

18

1            DIRECT EXAMINATION (RESUMED)
2  BY MR. BARNEY:
3  Q.   Good morning, Dr. Morellas.
4  A.   Good morning.
09:00AM 5  Q.   Welcome back?
6  A.   Thank you.
7  Q.   Yesterday we were talking about the LRAIL system quite a
8  bit.  That's the accused product in this case.  And now, I'll
9  like to switch gears and talk about the 3DTAS system.  That's
09:00AM 10  Tetra Tech product.  Okay?
11  A.   Okay.
12  Q.   Now, first of all, did you perform an analysis as to
13  whether Tetra Tech's 3DTAS system satisfies the limitations
14  of the asserted claims?
09:00AM 15  A.   Yes, I did.
16  Q.   And if you could just explain at a very high level to
17  the jury a little bit about the 3DTAS system.
18  A.   Of course.  I have included this slide here just to show
19  the -- Tetra Tech's 3DTAS system.  You can see two pictures
09:00AM 20  on the top.  The one on the right is an actual image that
21  comes from the right-hand side, uh, embedded on a actual train car.
22  On the left-hand side, on the top, you see a computer
23  graphics rendering of the system looking at the system from a
24  different angle.
09:01AM 25            The bottom left, you can see the results of

UNITED STATES DISTRICT COURT

---

19

1  processing the data that were collected by the system, and
2  you can see the identification of features along with some
3  physical measurements.  And on the bottom right, it's just a
4  quote assessing the tie condition's scoring based on industry
5  standard in specific surface distresses.
09:01AM 6  Q.   And does the Tetra Tech 3DTAS system include both
7  hardware and software?
8  A.   That is correct.
9            MR. BARNEY:  Let's have the next slide.
09:01AM 10  Q.   And Doctor, can you explain how you did your analysis as
11  to whether the 3DTAS system meets all the limitations of
12  Claim 1 of the '293 patent?
13  A.   Yes.  I followed the same process that we used for
14  examining the patents against LRAIL.  And now, in this case,
09:02AM 15  I placed the right column with the 3DTAS system, and I follow
16  the same process.  I consider each one of the limitations of
17  Claim 1 and see if they satisfy or embedded in the 3DTAS
18  system.
19            Now, I see a red box around two of the limitations,
09:02AM 20  Steps B and C of the algorithm.  Why you have put a red box
21  there?
22  A.   Uh, because they are the particular limitations that are
23  in dispute by Pavemetrics.
24  Q.   So it is your understanding that all of the limitations
09:02AM 25  that don't have that red box around them are not disputed?

UNITED STATES DISTRICT COURT

---

20

1  A.   That's correct.
2  Q.   Did you carefully analyze the 3DTAS system to see
3  whether those undisputed limitations are, indeed, satisfied?
4  A.   Yes.
09:03AM 5  Q.   Did you analyze the source code?
6  A.   Yes, I did.
7  Q.   And so just very quickly, is the 3DTAS system a system
8  for assessing a railway track bed?
9  A.   Yes, it is.
09:03AM 10  Q.   Does it include a power source?
11  A.   Yes.
12  Q.   Does it include a light emitting apparatus powered by
13  the power source for emitting light energy to toward a
14  railway track?
09:03AM 15  A.   Yes.
16  Q.   Does it include a data storage apparatus in
17  communication with at least one processor?
18  A.   Yes.
19  Q.   And does it, uh -- is it -- does it have at least one
09:03AM 20  sensor for sensing reflected light that was emitted from the
21  light emitting apparatus in acquiring three dimensional
22  surface elevation and intensity image data of --
23            THE COURT REPORTER:  I'm sorry, Counsel.
24            Maybe just a little slower, please.
25            Does it have at least --

UNITED STATES DISTRICT COURT

---

EXHIBIT 3
-62-

21

1    MR. BARNEY:  I thought I learned my lesson
2  yesterday with that.  Um, would you like me to start with the
3  whole limitation?
4    THE COURT REPORTER:  I have a reflected light from
5  light emitting. . .
6  BY MR. BARNEY:
7  **Q.**  Um, from a light emitting apparatus in acquiring three
8  dimensional surface elevations and intensity image data of
9  the railway track to be stored in the data storage apparatus
09:04AM 10  wherein the at least one sensor is in communication with the
11  at least one processor?
12  **A.  Yes.**
13  **Q.**  Okay.  And, again, are any of these hardware limitations
14  disputed in terms of whether the 3DTAS system meets them?
09:04AM 15  **A.  No.**
16  **Q.**  How about does the 3DTAS system include at least one
17  processor that is configured to run an algorithm for
18  processing three dimensional surface elevation and intensity
19  data gathered from the at least one sensor and saved in the
09:04AM 20  data storage apparatus?
21  **A.  Yes.**
22  **Q.**  And does the algorithm include the step of acquiring
23  three dimensional surface elevation and intensity data
24  representative of an area segment of railway track bed?
09:05AM 25  **A.  Yes.**

22

1  **Q.**  And going down to step b, does it include the step of
2  storing information corresponding to the identifying railway
3  track bed feature in the data storage apparatus?
4  **A.  Yes.**
09:05AM 5  **Q.**  And, again, are those three software limitations in
6  dispute?
7  **A.  Actually, two.**
8  **Q.**  Well, the -- three blue checkmarks are -- the three
9  checkmarks in the blue portion of your claim chart, are they
09:05AM 10  in dispute?
11  **A.  They are not.**
12  **Q.**  Okay.  So now let's take at the two that are in dispute.
13  **A.  Okay.**
14  **Q.**  What is your opinion, Doctor, as to whether the 3DTAS
09:05AM 15  system performs the limitation of step b which is generating
16  a track elevation map based on the acquired three dimensional
17  data?
18  **A.  Yeah.  You see a portion of the code that shows in the**
19  **enclosed boxes the intensity data and the elevation data that**
09:05AM 20  **are received by the sensors.  And at the bottom is 712 is an**
21  **image that shows the combination of intensity and elevation**
22  **data.**
23  **Q.**  Okay.  And, again, you're pointing to -- in the code,
24  you're referring to Exhibit 1713?
09:06AM 25  **A.  That is correct.**

23

1  **Q.**  Is that Tetra Tech source code?
2  **A.  It is.**
3  **Q.**  And did you find two variables in there that correspond
4  to intensity data and elevation data?
09:06AM 5  **A.  That is correct.**
6  **Q.**  And in the image below, what has been done with those
7  types of data, if anything?
8  **A.  Uh, the intensity image and the elevation image are**
9  **combined to create this particular final image that we see at**
09:06AM 10  **the bottom.**
11  **Q.**  Okay.  And in your opinion, does that satisfy the
12  requirement of generating a track elevation map based on the
13  acquired three dimensional data?
14  **A.  That is correct.**
09:06AM 15  **Q.**  Now, how do you respond to Dr. Frakes' opinion that the
16  3D images -- that the image that we're looking at there in
17  Exhibit 712 doesn't actually include intensity data, it's
18  only elevation data?
19  **A.  I disagree with him simply because the data coming from**
09:07AM 20  **those two different sources are combined in this image to**
21  **create a final image.**
22  **Q.**  Can you elaborate a little bit more as to what the
23  disagreement is between you and Dr. Frakes on that -- on that
24  issue?
09:07AM 25  **A.  Uh, I believe that he thinks that this image contains**

24

1  **only elevation data, but I disagree with him because this is**
2  **the image that shows a combination of both intensity and**
3  **elevation data.**
4  **Q.**  Is there anything associated with the values that are
09:07AM 5  associated with the each pixel where there's a disagreement
6  between you and Dr. Frakes?
7  **A.  Uh, yeah.  Again, he thinks that this is an elevation**
8  **image as opposed to my belief that this image contains both**
9  **because you use intensity and elevation in every pixel of the**
09:08AM 10  **image.**
11  **Q.**  And when you say use it in every pixel, how is that
12  done?
13  **A.  Uh, you are looking at the values of the intensity, and**
14  **if the intensity value is too low, that means that this is**
09:08AM 15  **not a good elevation or range data to process so this is a**
16  **way that this combination of those two data come into play in**
17  **this image.**
18  **Q.**  Okay.  Let me see if I can put it a different way.  The
19  image that we're seeing in Exhibit 712, if that image
09:08AM 20  actually were only elevation data and not a combination of
21  elevation and intensity, would it look the way that it looks?
22  **A.  No.**
23  **Q.**  What -- what -- what is it in that feature that leads to
24  believe that intensity data has been taken into consideration
25  in creating that map?

**EXHIBIT 3**
**-63-**

---

25

1   A.  Uh, the box that I have enclosed there that shows low
2   intensity areas would be different.
3   Q.  Thank you, Doctor.  And so in your opinion, does the
4   3DTAS system satisfy limitation step b of the algorithm?
09:09AM 5   A.  Yes.
6   Q.  Okay.  And let's turn now to step c.  Oh, excuse me.  I
7   forgot to ask you is there anything else you considered with
8   respect to that limitation B?
9   A.  Yeah.  You can see the next slide here that this is a
09:09AM 10  YOLO network that we heard yesterday, the You Only Look Once
11  combination of neural network that uses the elevation map
12  data.
13  Q.  And I think I was now getting into step c, and so let me
14  ask you about step c.  Step c, again, it requires identifying
09:09AM 15  a railway track bed feature from the track elevation map
16  further including the steps of defining an appropriate
17  gradient neighborhood representing a small 2D track section
18  over which differential vertical measurements are calculated
19  and moving the gradient neighborhood like a sliding window
09:10AM 20  over the 3D elevation data using the processor.  Did I read
21  that right?
22  A.  Yes.
23  Q.  And Doctor, what is your opinion as to whether Step 3 is
24  satisfied by the 3DTAS system?
09:10AM 25  A.  And as I said yesterday, the combination of neural

UNITED STATES DISTRICT COURT

---

26

1   networks, the idea that this is part of this Claim C.  So I
2   was able -- next slide, please.  As you can see, the neural
3   network is applied, and in this case, it is used to identify
4   the rails of the, uh -- this is the function of the CNN's
09:11AM 5   network that is used to identify the rails in the image.
6   Q.  A couple follow-up questions, Doctor.  You mentioned
7   convolutional neural network.  Is that what -- the YOLO
8   algorithm or system, is that what that is?
9   A.  That is correct.
09:11AM 10  Q.  And it's kind of a funny name.  Can you explain why they
11  call it a YOLO?
12  A.  Uh, this is a particular type of a convolutional neural
13  network that is able to identify multiple different objects
14  in the image without -- by assigning basically -- I wouldn't
09:11AM 15  want to get into the technicalities, but it is able to at the
16  same time detect different types of objects in the image.
17  Q.  And what is the input for the YOLO convolutional network
18  that occurs in step c?
19  A.  It is the track elevation map data.
09:12AM 20  Q.  The one you referred to earlier that has the combination
21  of elevation and intensity data?
22  A.  That is correct.
23  Q.  Now, is there a dispute between you and Dr. Frakes
24  regarding this limitation?
09:12AM 25  A.  Again, this is the same thing that we talked yesterday

UNITED STATES DISTRICT COURT

---

27

1   about the gradient neighborhood.
2   Q.  Okay.  And you and Dr. Frakes just have a disagreement
3   about whether the gradient neighborhood I think you said has
4   to have edge definition features or something of that sort?
09:12AM 5   A.  The gradient neighborhood, in my opinion, is that there
6   are ways that are not really defined and not fixed.  But he
7   has a very narrow view of these gradient operator.
8   Q.  And is that the same dispute that we already talked
9   about when we were the discussing the same limitation with
09:12AM 10  respect to the LRAIL system?
11  A.  That is correct.
12  Q.  So in summary, Doctor, if I could have the next slide,
13  what is your opinion as to whether Tetra Tech's 3DTAS system
14  satisfies all the claims of Claim 1 of the '207 patent?
09:13AM 15  A.  It does satisfy them.
16  Q.  I think I said 207.  I meant '293.
17  A.  Yes.
18  Q.  I know it didn't sound right.  Let's talk about Claim
19  21.  And, again, because Claim 21 depends from Claim 1, is
09:13AM 20  that why you put the checkmark in that first line?
21  A.  That is correct.
22  Q.  Okay.  How about the other limitation that has to do
23  with, you know, detecting the joint bar candidates and
24  comparing length and so forth?  In your opinion, is that
09:13AM 25  satisfied by the 3DTAS system?

UNITED STATES DISTRICT COURT

---

28

1   A.  Yes.
2   Q.  And as far as you know, is that disputed?
3   A.  I don't think so.
4   Q.  Okay.  So what is your opinion as to whether the 3DTAS
09:13AM 5   system meets all the elements of Claim 21?
6   A.  It does meet the claims of Claim 21.
7   Q.  Okay.  And now, let's turn to Claim 8 of the '557
8   patent.  And, again, I see you have the elements here of
9   Claim 8.  And why do you have the red box around one of them?
09:14AM 10  A.  This is one part of the limitation that is in dispute.
11  Q.  And did you carefully look at the 3DTAS system and
12  software to determine whether the undisputed limitations are,
13  in fact, satisfied?
14  A.  Yes.
09:14AM 15  Q.  And so what is your opinion as to whether the 3DTAS
16  system has software that detects railroad, tie, distress
17  using a system for assessing a railway track bed?
18  A.  It is.
19  Q.  And what is your opinion as to whether the 3DTAS system
09:14AM 20  has an algorithm that performs step b comparing ties in the
21  elevation data with tie surface plane model by calculating
22  the difference between tie surface elevation data and the tie
23  surface plan model using the processor?
24  A.  It does that, too.
09:15AM 25  Q.  Okay.  What is your opinion as to whether the 3DTAS

UNITED STATES DISTRICT COURT

---

**EXHIBIT 3**
**-64-**

29

1  system satisfies step c which requires identifying tie
2  surface regions with elevations less than a tie surface plane
3  minus a crack depth threshold as tie crack targets?
4  A.  Yes.
09:15AM  5  Q.  Using the processor.
6  A.  Yes, it does that, too.
7  Q.  Okay.  And what is your opinion as to whether the 3DTAS
8  system performs step b which is determining physical
9  parameters of crack targets using the processor?
09:15AM 10  A.  It does it.
11  Q.  So now let's take a look at the disputed limitation
12  which is step a.  And let's break it down like we did before.
13  Does the 3DTAS system input elevation data?
14  A.  Yes.  And it is part of the code in particularly the
09:15AM 15  variable that I have enclosed in the purple box is where the
16  elevation data come in.
17  Q.  Okay.  And that variable is iwd.Rng0?
18  A.  Correct.
19  Q.  And, again, range, is that a synonym of elevation?
09:16AM 20  A.  That is correct.
21  Q.  How about the next requirement?  Does the 3DTAS system
22  input longitudinal and transverse elevation map resolution
23  data?
24  A.  Yes.  We see these particular data where those two
09:16AM 25  variables are included.

UNITED STATES DISTRICT COURT

30

1  Q.  Okay.  And yesterday we talked about what transverse and
2  longitudinal mean.  Is that sort of like the X and Y axis on
3  the grid?
4  A.  That is correct.
09:16AM  5  Q.  And does that anything to do with names of the variables
6  that you circled?
7  A.  Uh, yes.  Those are the variable.
8  Q.  Okay.  So one of the variables is X mm, and the other
9  variable is Y mm.
09:16AM 10  A.  That's correct.
11  Q.  Now, Dr. Frakes have a disagreement with you about
12  particular part of step a?
13  A.  Yes.  And this is the same disagreement that we talked
14  about yesterday just because in the highlighted portion of
09:16AM 15  the limitation that I have with yellow includes the name
16  transfer elevation map resolution data, he thinks that this
17  should come out from a track elevation map, but this is not
18  the case here because, uh only input from elevation data is
19  required.
09:17AM 20  Q.  And let me make sure I understand.  As you understand
21  Dr. Frakes' opinion, he thinks that the longitudinal and
22  transverse elevation map resolution data must include both
23  elevation and intensity data.
24  A.  That is correct.
09:17AM 25  Q.  And, again, we saw something like that in Claim 1 of the

UNITED STATES DISTRICT COURT

31

1  '293 patent; right?
2  A.  Right.
3  Q.  But this is a different patent; right?
4  A.  This is different patent, yes.
09:17AM  5  Q.  And in your opinion, does -- the longitudinal and
6  transverse elevation map resolution data in this claim, does
7  it require both elevation and intensity data?
8  A.  No.
9  Q.  Is there any requirement in this claim for an input of
09:18AM 10  intensity data?
11  A.  No.
12  Q.  Is there anything in the claim in the Court's claim
13  construction of this claim that requires intensity data?
14  A.  No.
09:18AM 15  Q.  And so what's your opinion as to whether that particular
16  aspect of claim -- uh, the Limitation A is satisfied?
17  A.  It is satisfied.
18  Q.  How about does the next?  Does the 3DTAS system input
19  rail base feature coordinates?
09:18AM 20  A.  Yes.  And here you see another structure that we can see
21  the comment of line 10 that says this is a structure to store
22  properties for a rail base, and below you see the variables
23  that are associated with the rail base edge feature
24  coordinates.
09:18AM 25  Q.  And the coordinates you've identified are left edge raw,

UNITED STATES DISTRICT COURT

32

1  left edge --
2  A.  Right.
3  Q.  -- and right edge raw and right edge.
4  A.  Correct.
09:18AM  5  Q.  And the comments at the top of that is that this is a
6  structure to store properties for rail base?
7  A.  Correct.
8  Q.  How about the next requirement?  Does the 3DTAS system
9  detect tie bounding box data?
09:19AM 10  A.  Yes.  And this is another structure, data structure
11  that's actually named by the name this is enclosed in the
12  green box, bounding box, and I have highlighted with red
13  boxes the X and Y coordinates of the four vertices of the
14  rectangle box.
09:19AM 15  Q.  Okay.  How about the next limitation?  Does the 3DTAS
16  input system input approximate ties surface plane data?
17  A.  Yes.  And this is the actual relevant part of the code
18  does exactly that.
19  Q.  Okay.  And so we're showing portions of Exhibit 713, and
09:19AM 20  there's a comment at the top that says calculate estimated
21  elevation profile for tie based on elevation points and two
22  halves of tie center region?
23  A.  That is correct.
24  Q.  And then there's some, uh -- there's some variables, and
09:20AM 25  they have names such as left tie elevation, tie elevation,

UNITED STATES DISTRICT COURT

**EXHIBIT 3**
**-65-**

33

1  histogram Max, right tie elevation and tie elevation
2  histogram Max.  How does those relate to your opinion?
3  A.  Yes.  These are actually the functions the particular
4  procedure that is followed there by considering first, you
09:20AM 5  know, one half of the tie, the right half of the tie, and
6  then using those two data, you create the slope of the plane
7  that is fitting the data.
8  Q.  And about the last requirement?  Does the 3DTAS system
9  operate wherein significant elevations due to the railheads
09:20AM 10  for each rail have been removed from the elevation data?
11  A.  Yes.  As you see the comment on line 79 of the code, the
12  code reads get rid of rails, and the place that this is
13  happening at rows 82 and 88 where the pixel values associated
14  with the railings are set to zero.
09:21AM 15  Q.  Okay.  And so taking this all together, Doctor, what is
16  your opinion as to whether the 3DTAS system meets all the
17  limitations of Claim 8 of the '557 patent?
18  A.  It does meet all the limitations.
19  Q.  Okay, Doctor --
09:21AM 20      You can take that down.
21      Yesterday we talked about convolution networks.
22  And have you heard the term artificial intelligence?
23  A.  Yes.
24  Q.  And what is artificial intelligence?
09:21AM 25  A.  It's an umbrella term that contains all of these

34

1  techniques.
2  Q.  And sometimes abbreviate AI?
3  A.  Correct.
4  Q.  And so artificial intelligence would include a technique
09:22AM 5  such as a convolutional neural network?
6  A.  That is correct.
7  Q.  Okay.  And so when you're talking about AI such as a
8  convolutional neural network, does human a programmer have to
9  program the computer to do those things?
09:22AM 10  A.  That is correct.
11  Q.  Okay.  So, for instance, in the convolutional neural
12  network in the LRAIL system, was it programmed by a human
13  programmer?
14  A.  Yes.
09:22AM 15  Q.  And based on your review of the source code, does it
16  carry out the functions it was programmed to perform?
17  A.  Correct.
18  Q.  And if it wasn't programmed by a human being to perform
19  those functions, in your opinion based on your experience,
09:22AM 20  would it be able to somehow start up performing functions
21  that it wasn't programmed to do?
22  A.  No.
23  Q.  Okay.  And so artificial intelligence doesn't mean that
24  the computer is -- is literally thinking for itself.  Is that
09:22AM 25  true?

35

1  A.  That is true.
2  Q.  Somebody has to program it to do it; right?
3  A.  Right.
4  Q.  All right, Doctor, in a moment, I'm gonna ask you to
09:22AM 5  summarize your opinions that you've expressed over the past
6  few hours, but before I do that, I'd like to ask you to assume for
7  the sake of your opinions that the only activities that we're
8  looking at in this case are those that occurred after
09:23AM 9  January 5th, 2021.  This is the date that Tetra Tech sent a
10  letter to Pavemetrics putting them on notice of infringement.
11  Okay?  Do you understand my assumption?
12  A.  Can you repeat?
13  Q.  Yeah.  I want you to assume that the only activities
14  that are relevant here are the activities that occurred after
09:23AM 15  January 5, 2021.  Okay?
16  A.  Okay.
17      MR. BARNEY:  So if I could have the next slide,
18  please.
19  Q.  With that assumption in mind, can you please summarize
09:23AM 20  your opinions?
21  A.  Okay.  The first thing is that the LRAIL systems sold
22  with software that included Fake3D with DCNN or the later
23  mixed image with DCNN infringes Claims 1 and 21 of the '293
24  patent.
09:24AM 25  Q.  Okay.  And with my assumption in mind about the date,

36

1  what are the sales of the LRAIL system that fall into that
2  first opinion of yours?
3  A.  Uh, these are the three sales that were made to CSX.
4  Q.  Okay.  And do you recall when those were made?
09:24AM 5  A.  Uh, March, uh, 2021?
6  Q.  Okay.  Now, when we were going through your analysis of
7  these two claims of the '293 patent, you also included the
8  LRAIL system that was delivered to AID.  Do you recall that?
9  A.  Yes.
09:24AM 10  Q.  Now, with the assumption that I've asked you to assume
11  that only things after January 5th, 2021 are relevant, why
12  doesn't that LRAIL systems fit into your first opinion?
13  A.  Because this was done prior to that date.
14  Q.  When you say done, do you mean sold?
09:24AM 15  A.  Yes.
16  Q.  Okay.  So the LRAIL that was delivered to AID --
17      MR. LAQUER:  Objection.  Leading and beyond the
18  scope of the identified expertise, Your Honor.
19      THE COURT:  Let me have the question again?
09:25AM 20      MR. BARNEY:  I was going to ask him if the sale --
21  excuse me.  He said the activity was before, and I'm asking
22  him to clarify whether the sale of the system to AID preceded
23  January 5th, 2021.
24      THE COURT:  Okay.
09:25AM 25      MR. LAQUER:  Counsel for Tetra Tech has

EXHIBIT 3

-66-

---

37

1 specifically represented Dr. Morellas is not an expert in
2 sales or financial transactions.
3 THE COURT: Yeah. I mean, this seems like a fact
4 issue, right, and it doesn't seem appropriate for the expert.
09:25AM 5 Explain to me why. . .
6 MR. BARNEY: Your Honor, he simply -- he did review
7 interrogatories and so forth. That information actually is
8 part of what he reviewed. So I was simply asking him to
9 explain why that one particular LRAIL is not contained in his
09:25AM 10 direct infringement opinion. And I don't intend to dwell on
11 it. I just wanted to ask him that question.
12 THE COURT: Okay. You can ask the question and
13 then move on, Counsel.
14 MR. BARNEY: Okay.
09:26AM 15 Q. So -- so Doctor, why isn't that one LRAIL system that
16 was delivered to AID not included in your direct infringement
17 summary given my assumption that I asked you to assume?
18 **A. Because this sale -- the sale happened before that date.**
19 Q. So what is your second summary opinion, Doctor?
09:26AM 20 **A. That using the LRAIL as instructed by Pavemetrics, AID**
21 **directly infringed Claim 8 of the '557 patent.**
22 Q. All right. And so the LRAIL that was provided to AID I
23 believe you testified earlier -- what was the date of that?
24 Do you recall?
09:26AM 25 A. Uh, February 2021.

UNITED STATES DISTRICT COURT

---

38

1 Q. I'm sorry?
2 A. February 2021.
3 Q. So that was after January 5th, 2021?
4 A. Right.
09:26AM 5 Q. And on that second opinion, if I were to ask you to
6 assume that the knowledge prong of induced infringement is
7 satisfied, if I ask you to assume that, what is your opinion
8 as to whether, uh, uh, Pavemetrics induced infringement by
9 providing that LRAIL to AID in February of 2021 with
09:27AM 10 instructions for use?
11 **A. It did infringe.**
12 Q. Okay. And then what is your third opinion, Doctor?
13 **A. Yeah. The last one is that following the code, I**
14 **realize I prove that Tetra Tech's 3DTAS system practices the**
09:27AM 15 **Claims 1 and 21 of the '293 patent and Claim 8 of the '557**
16 **patent.**
17 Q. And Doctor, as part of your investigation, do you feel
18 you had all of the information you needed to draw these
19 conclusions to a reasonable degree of scientific certainty?
09:27AM 20 A. Yes, I did.
21 Q. Did you apply the same type of scientific and
22 engineering rigor that you would for any other endeavor that
23 you would undertake in your academic and professional career?
24 A. Yes, I did.
09:27AM 25 MR. BARNEY: Thank you, Doctor.

UNITED STATES DISTRICT COURT

---

39

1 I pass the witness.
2 THE COURT: Okay. Cross-examination?
3 MR. LAQUER: Yes, Your Honor.
4 May I proceed, Your Honor?
09:28AM 5 THE COURT: Please.
6 CROSS-EXAMINATION
7 BY MR. LAQUER:
8 Q. Good morning, Dr. Morellas.
9 A. Good morning.
09:28AM 10 Q. Tetra's lawyers hired you to prepare your infringement
11 opinions against Pavemetrics; correct?
12 A. Correct.
13 Q. And so Tetra Tech is relying on you in support of their
14 attempt to shut Pavemetrics down from selling LRAIL; correct?
09:29AM 15 A. Correct.
16 Q. And you don't know about -- or you did not know about
17 automated railway track detection before you began working on
18 this case; correct?
19 A. Yes.
09:29AM 20 Q. And as of your deposition in March, you never bothered
21 speaking with Dr. Mesher, the named inventor; correct?
22 **A. I spoke with him when I was about to be interviewed by**
23 **Finnegan, and this is the first time that I talked to him**
24 **briefly about what the system does.**
09:29AM 25 Q. Let's look at the transcript from your deposition. It's

UNITED STATES DISTRICT COURT

---

40

1 in the cross binder that I've handed to it. It should be the
2 first tab there. I'd like you to look at page 54 beginning
3 at line 3.
4 A. Yes.
09:29AM 5 MR. LAQUER: Your Honor, may I publish this?
6 THE COURT: You want to read 54, lines 3 through 5?
7 Is that the idea?
8 MR. LAQUER: Yes, Your Honor.
9 THE COURT: You can go ahead and do that.
09:30AM 10 MR. LAQUER:
11 "Q. Have you ever spoken with Darel Mesher?
12 "A. No, I have not."
13 Q. Was that your sworn testimony when I took your
14 deposition?
09:30AM 15 A. Yes.
16 THE COURT: And Counsel, the date of this was
17 March 23rd, 2022?
18 MR. LAQUER: Yes, Your Honor.
19 Q. You know that Dr. Mesher did not invent automated
09:30AM 20 railway and track assessment; correct?
21 A. Correct.
22 Q. And the patents admit that Georgetown Rails Aurora 3D
23 Surface Profile system was available before Tetra Tech filed
24 for the patents in 2015; correct?
09:30AM 25 A. Correct.

UNITED STATES DISTRICT COURT

---

**EXHIBIT 3**
**-67-**

**41**

1    Q.   And Georgetown Rails is known in this industry as GRX; 2 correct?
3    **A.   Correct.**
4    Q.   And GRX is one just example of earlier automated
09:30AM 5 three-way 3D track assessment technology; correct?
6    **A.   Yes.**
7    Q.   And you testified yesterday about what you thought was 8 the new aspect of these asserted claims; correct?
9    **A.   Correct.**
09:31AM 10    Q.   And in forming your opinion about what is new or is not 11 new in these claims, did you consider the older GRX patents 12 that Pavemetrics helps Tetra Tech invalidate as being 13 obvious?
14    **A.   I did not look thoroughly in the patents so I'm not** 15 **quite sure the exact way they do things.**
16    Q.   Okay. Let's look at slide 96 of your demonstratives. 17 This is one we're just looking at here. So this is your 18 summary of opinions; correct?
19    **A.   Yes.**
09:31AM 20    Q.   And you mentioned that this is based for the '293 patent 21 on three LRAIL sales; correct?
22    **A.   That is correct.**
23    Q.   Okay. And those -- rather Claim 1 of the '293 24 patent and Claim 21 are system claims; correct?
09:31AM 25    **A.   Yes.**

UNITED STATES DISTRICT COURT

**42**

1    Q.   And Claim 21 depends on Claim 1; correct?
2    **A.   Correct.**
3    Q.   So that means that Claim 21 contains every single 4 requirement of Claim 1; correct?
09:31AM 5    **A.   Correct.**
6    Q.   And then Claim 21 adds some additional requirements; 7 correct?
8    **A.   Yes.**
9    Q.   So if any sale of LRAIL did not infringe Claim 1 of the
09:32AM 10 '293 patent, then it's impossible for it to have infringed 11 Claim 21; correct?
12    **A.   Can you slow down a little bit so I can. . .**
13    Q.   Of course. If any LRAIL sale did not infringe Claim 1 14 of the '293 patent, then it's impossible for that sale to
09:32AM 15 have infringed Claim 21; correct?
16    **A.   Yes. For that particular claim.**
17    Q.   Okay. And you were asked some questions where you were 18 asked to assume knowledge requirement. Do you recall that?
19    **A.   Yes.**
09:32AM 20    Q.   What is your understanding of what that assumption is?
21    **A.   Uh, can -- can you give me a little more information** 22 **about that?**
23    Q.   Well, you were asked to assume the knowledge requirement 24 was satisfied. What was your understanding of what you were
09:32AM 25 assuming?

UNITED STATES DISTRICT COURT

**43**

1    **A.   I was assuming that, uh, Pavemetrics knew about the** 2 **particular patent.**
3    Q.   Well, you understand that in order to indirectly 4 infringe a patent, the accused party must know about the
09:33AM 5 patent and believe that their acts are causing infringement?
6    **A.   Uh, the way I understand it is that if the party knew** 7 **about the existence of the patent and still chose to sell the** 8 **product.**
9    Q.   Okay. And so if your understanding of the law is
09:33AM 10 incorrect, and the party actually needed to know about the 11 patent and believe that they were causing infringement, then 12 the opinion you provided does not apply; is that correct?
13    **A.   If they. . . I'm not an expert in that particular part** 14 **of the law, but it might be the case, might not be the case.**
09:33AM 15 **I'm not sure.**
16    Q.   Okay. So let's assume that that is the law, and that in 17 order to infringe indirectly, Pavemetrics would have needed 18 to know about the patent and to believe that it was causing 19 AID to infringe the patent. Do you understand that?
09:34AM 20    **A.   Yes.**
21    Q.   Okay. And you understand that Tetra Tech bears the 22 burden of proving every element of infringement; correct?
23    **A.   That is correct.**
24    Q.   So you understand that if that is the law, then it is
09:34AM 25 Tetra Tech's burden to show not only did Pavemetrics

UNITED STATES DISTRICT COURT

**44**

1 supposedly have an infringing LRAIL system that infringed 2 Claim 8, and not only did they know about the '557 at the 3 time of the accused act, but also that they actually believed 4 they were causing infringement. Do you understand that?
09:34AM 5    **A.   Yes.**
6    Q.   Okay. And you were asked a question just earlier this 7 morning about a January 5th date. Do you recall that? Or 8 January 5th of 2021.
9    **A.   Yes.**
09:34AM 10    Q.   Okay. And that's with respect to, um -- well, I'll 11 rephrase that. Tetra Tech's lawyer, Mr. Aaron Parker, sent 12 Pavemetrics an accusation letter on January 5th of 2021; 13 correct?
14    **A.   Yes.**
09:35AM 15    Q.   That's what started this dispute; correct?
16    **A.   Yes.**
17    Q.   And so it's your understanding that that's why you were 18 asked about January 5th of 2021; correct?
19    **A.   That is correct.**
09:35AM 20    Q.   But the January 5th letter never mentioned the '557 21 patent; correct?
22    **A.   Uh, I'm not sure.**
23    Q.   Okay. So you don't know when Tetra Tech even first 24 bothered telling Pavemetrics about the '557 patent?
09:35AM 25    **A.   I'm not sure I was asked. I just provide my technical**

UNITED STATES DISTRICT COURT

**EXHIBIT 3**
**-68-**

45

1    expertise to -- by looking at the source code, reviewing the
2    patent claims and come up with, uh, my positions about it.
3    Q.   Okay.  And if the January 5, 2021 letter did not mention
4    the '557 patent, then your opinion based on an assumption of
09:36AM 5    Pavemetrics knowledge for that date doesn't apply; correct?
6    A.   I'm not sure about that.
7    Q.   Okay.  And you understand that Pavemetrics filed this
8    lawsuit in response to receiving the threat letter from Tetra
9    Tech; correct?
09:36AM 10   A.   Correct.
11   Q.   You haven't shown any evidence that Pavemetrics actually
12   believed that it was infringing the '557 patent; correct?
13   A.   I don't know about that.
14   Q.   Can you tell me any evidence you've pointed to that
09:36AM 15   suggests Pavemetrics actually had that belief?
16   A.   Uh, I'm not sure.  I don't know.
17   Q.   Okay.  It doesn't make sense for a company to start a
18   patent lawsuit asking for an explanation of whether or not it
19   infringes if it actually thinks it infringes; isn't that
09:36AM 20   right?
21   A.   I'm not sure about that either.
22   Q.   Okay.  You understand that Claim 8 of the '557 patent is
23   a method claim; correct?
24   A.   Yes.
09:37AM 25   Q.   And so you understand that a method claim can only be

UNITED STATES DISTRICT COURT

46

1    infringed by actually performing the method; correct?
2    A.   Correct.
3    Q.   Okay.  You understand that merely selling a product
4    that's capable of infringing a method claim does not infringe
09:37AM 5    that method claim; correct?
6    A.   I'm not sure of that either.
7    Q.   Let's look at your slide number 19.  Now, you understand
8    that Tetra Tech is accusing Pavemetrics of infringing under
9    what is called literal infringement; correct?
09:37AM 10   A.   Can you repeat?  Can you be more specific?
11   Q.   Are you familiar with the term literal infringement?
12   A.   Not quite.
13   Q.   Okay.  This is your first time as an expert witness;
14   correct?
09:37AM 15   A.   That is correct.
16   Q.   All right.  So I'll provide a little bit of explanation.
17   Literal infringement means that every single word in the
18   patent claim must be met exactly by the accused product with
19   no room for deviation whatsoever.  Do you understand that,
09:38AM 20   Dr. Morellas?
21   A.   Yes.
22   Q.   Okay.  And so you can see here there's several words in
23   this claim of the '293 patent Claim 1; correct?
24   A.   Yes.
09:38AM 25   Q.   And to prove that an LRAIL sale has infringed Claim

UNITED STATES DISTRICT COURT

47

1    1, Tetra Tech bears the burden of proving that for every
2    single one word in that claim, the specific LRAIL sale that's
3    accused exactly meets that, word for word; correct?
4    A.   Correct.
09:38AM 5    Q.   And you've provided some check boxes on the right here
6    where you've gone through and checked off, but -- but really
7    because every word is a requirement, there's a lot more boxes
8    so let's take a look at what the requirement really is for
9    every single claim.
09:38AM 10           If we can pull that up?
11           This is a better representation of what Tetra Tech
12   bears the burden of proving; correct?
13   A.   I'm not sure I understand this.
14   Q.   Every word is a requirement that must be met literally;
09:39AM 15   correct?
16           MR. BARNEY:  Your Honor, I'd like to lodge an
17   objection.  I believe this is a mischaracterization of the
18   law.  Your Honor, gave us leeway, but I didn't think he was
19   gonna dwell on it.  I don't think he's stating the law
09:39AM 20   correctly.  I'm objecting to what he's doing.
21           THE COURT:  Yeah, I will sustain the objection.  I
22   think it's a characterization of the law.  Certainly it's an
23   argument.  But we'll instruct the jury on what the law of
24   infringement is.  So I'd ask you to just stick to the
09:39AM 25   witness's opinions that he's expressed on cross-examination

UNITED STATES DISTRICT COURT

48

1    so I think that -- yeah, without instructing the witness on
2    the specific area of law.
3           MR. LAQUER:  Understood, Your Honor.
4    Q.   Let's look at slide 49 of yours.  Now, during your
09:39AM 5    presentation, you identified different versions of source
6    code for some of the claim limitations than for others;
7    correct?
8    A.   Correct.
9    Q.   And on slide 49, we see some discussion of Claim 21;
09:40AM 10   correct?
11   A.   Uh, yes.
12   Q.   And you're relying on Version 4.78 of the source code;
13   correct?
14   A.   Correct.
09:40AM 15   Q.   Let's look at slide number 39.  Now, this is another
16   requirement of Claim 21.  This is identifying a railway track
17   bed feature; correct?
18   A.   Correct.
19   Q.   But here you're relying on a different version of source
09:40AM 20   code, Version 4.73; correct?
21   A.   Correct.
22   Q.   So you haven't identified any evidence supporting your
23   statement that a specific version of LRAIL performed all of
24   the required claim limitations; correct?
09:40AM 25   A.   Uh, I do not agree with that simply because, um, first

UNITED STATES DISTRICT COURT

EXHIBIT 3
-69-

---

**49**

1  of all, um, during my stay at Knobbe Martens offices, we had
2  limitations as to the number of pages that, uh, should be
3  printed, and there were -- we were looking at, uh, hundreds
4  of thousands, if not millions of code lines so we had to make
09:41AM  5  some. . .
6  Q.  Doctor, I'm just asking you to identify whether --
7       MR. BARNEY:  Objection, Your Honor.
8       THE COURT:  Yeah.  I think we should let him
9  complete his answer.
09:41AM 10       MR. LAQUER:  Understood.
11       THE WITNESS:  Yes.  So we have to make some choices
12  as to what portions of the code should be printed out to make
13  the case.  And there are no substantial difference between
14  different versions of the code.  Okay.  And this part of the
09:41AM 15  code is the one that shows that, uh, intensity and, uh,
16  elevation has been used in this particular structure along
17  with the network, and that makes the point here in this
18  light.
19  BY MR. LAQUER:
09:42AM 20  Q.  You believe that one version of Pavemetrics' LRAIL code
21  works the same way as later versions of Pavemetrics' LRAIL
22  code for the purpose of what's being discussed in these
23  asserted claims; correct?
24  A.  What I'm saying is that, uh -- that apart from being
09:42AM 25  different versions, there may be some differences, but from

UNITED STATES DISTRICT COURT

---

**50**

1  my experience when reviewing the code, I realize that there
2  are no substantial difference, and there are difference only
3  in specific parts of the code.
4  Q.  Okay.
09:42AM  5  A.  So I try to focus on those differences.
6  Q.  Okay.  There's not substantial differences between the
7  earlier LRAIL code and the later LRAIL code; right?
8  A.  That's what I believe.  I mean, I am not a hundred
9  percent sure because there are like I said millions of lines
09:42AM 10  of code so I cannot give you a hundred percent answer.
11  Q.  Okay.  We can move on.  And so it's pretty well
12  established by now that the '293 and the '557 patents don't
13  mention artificial intelligence; correct?
14  A.  Yes.
09:43AM 15  Q.  And you heard Dr. Mesher testify yesterday that
16  artificial intelligence doesn't exist in the patents;
17  correct?
18  A.  That is correct.
19  Q.  Now, there have been some slides shown with the cover of
09:43AM 20  the patents; correct?
21  A.  The what?
22  Q.  Some slides have been shown in this case showing the
23  front page of the patents; correct?
24  A.  Yes.
09:43AM 25  Q.  And Tetra Tech's lawyers have shown some asserted claim

UNITED STATES DISTRICT COURT

---

**51**

1  language from the patents as well; correct?
2  A.  Yes.
3  Q.  Have you read the full patents asserted here?
4  A.  Yes, I did.
09:43AM  5  Q.  Okay.  So you understand that the '293 patent is over
6  70 pages long; correct?
7  A.  Yes.
8  Q.  So when we're discussing that artificial intelligence is
9  not mentioned anywhere in this patent, this is not a
09:43AM 10  questions of whether AI is mentioned in a small document;
11  right?
12  A.  It's not there.
13  Q.  Right.  It's not anywhere one any one of these pages;
14  correct, Dr. Mesher -- or Dr. Morellas?
09:43AM 15  A.  Correct.
16  Q.  Okay.  The patent's over 19,000 words long; correct?
17  Well, you might not have counted, but I'll represent to you
18  that I use a word count so --
19  A.  I'll take your word for it.
09:44AM 20  Q.  All right.  So over 19,000 words long, and none of those
21  words are artificial intelligence; right?
22  A.  That is right.
23  Q.  Over 19,000 words, and none of the words here are
24  convolutional neural network; correct?
09:44AM 25  A.  Correct.

UNITED STATES DISTRICT COURT

---

**52**

1  Q.  And Tetra Tech changed from using traditional computer
2  vision recognition systems to a neural network system a few
3  years ago; correct?
4  A.  That's what I heard yesterday, yeah.
09:44AM  5  Q.  Well, you already knew that even before yesterday;
6  correct?
7  A.  Yes.
8  Q.  You knew when you prepared your infringement opinion
9  earlier in this case that Tetra Tech only moved from computer
09:44AM 10  vision traditional systems to new neural network systems a
11  few years after it filed these patent applications; correct?
12  A.  That is correct, but the R and D activities that might
13  have been happening there could have started prior to that
14  date.
09:45AM 15  Q.  That sounds like a lot of speculation; isn't that
16  correct, Doctor?
17  A.  Yeah.  I mean, usually because I have worked in an R and
18  D environment, before a product is introduced, that is, uh,
19  prior activities as far as they schedule the particular
09:45AM 20  procedures that eventually is gonna be out in the product.
21  Q.  But we didn't hear Dr. Mesher provide any testimony
22  about that, did we, Dr. Morellas.
23  A.  No, we did not.
24  Q.  Okay.  And so when Tetra Tech filed for the asserted
09:45AM 25  patents in 2015, Tetra Tech used traditional computer vision

UNITED STATES DISTRICT COURT

---

**EXHIBIT 3**
**-70-**

53

1  recognition technology; correct?

2  **A.   Probably.**

3  **Q.**   And you're accusing Pavemetrics of now infringing based

4  on using a different technology, convolutional neural

09:45AM 5  networks; correct?

6  **A.   Yeah, the particular -- excuse me.  The particular parts**

7  **that are put in the claim are practiced by the neural**

8  **network.**

9  **Q.**   And Tetra Tech also uses a neural network which it

09:46AM 10  recently moved to you testified; correct?

11  **A.   Yes.**

12  **Q.**   But Pavemetrics uses a different convolutional neural

13  network than Tetra Tech does; correct?

14  **A.   That is correct.**

09:46AM 15  **Q.**   They're built on different engines; correct?

16  **A.   There is a different type of neural network.**

17  **Q.**   Okay.  And you spoke with Tetra Tech's damages expert,

18  Mr. Schoettelkotte; correct?

19  **A.   Uh, just once briefly.**

09:46AM 20  **Q.**   Okay.  And you told him that the main novelty of the

21  asserted patents is the ability to use the combination of

22  surface elevation data with intensity data; correct?

23  **A.   That is one of the innovations, yes.**

24  **Q.**   You told him that is the main innovation; correct?

09:46AM 25  **A.   I may have used that, uh, word, but this is not the only**

54

1  innovation.

2  **Q.**   Let's look at your deposition on page 16 beginning at

3  line 22 continuing to 23.

4  **A.   Page 16, which lines?**

09:47AM 5  **Q.**   Page 16, lines 12 through 23.

6  **A.   Okay.**

7       THE COURT:  Hold on one second.  And Counsel,

8  you're wanting to read this in for impeachment?

9       MR. LAQUER:  Yes, Your Honor.

09:47AM 10       THE COURT:  Um, do you have an objection?

11       MR. BARNEY:  I believe it's improper impeachment.

12       I don't see anything inconsistent in what he said.

13       THE COURT:  Yeah.  I -- I agree with counsel.

14  Especially if you consider lines 12 through 23, I think it's

09:47AM 15  consistent with what he testified to.

16  BY MR. LAQUER:

17  **Q.**   Dr. Morellas, you didn't say anything to Mr.

18  Schoettelkotte about the main innovation in these patents

19  supposedly being a sliding window, did you?

09:47AM 20  **A.   No.**

21  **Q.**   And you didn't tell him that the main innovation here

22  was a gradient neighborhood; correct?

23  **A.   Like I said, it was a very brief call.**

24  **Q.**   Okay.

09:48AM 25  **A.   So I didn't mention any of those details.**

55

1  **Q.**   You didn't say anything to him about the importance that

2  the gradient neighborhood is an appropriate gradient

3  neighborhood; correct?

4  **A.   Uh, I don't think he was the appropriate person to have**

5  **this kind of discussion.**

09:48AM 6  **Q.**   Claim 1 of the '293 patent requires an appropriate

7  gradient neighborhood; correct?

8  **A.   Correct.**

9  **Q.**   And an appropriate gradient neighborhood is one that is

09:48AM 10  flexible to encompass different sizes; correct?

11  **A.   Uh, yes, different -- yeah.**

12  **Q.**   So Claim 1 requires defining an appropriate gradient

13  neighborhood; correct?

14  **A.   Yes.**

09:48AM 15  **Q.**   But you can't answer what in the '293 patents

16  specification enables one of ordinary skill in the art to

17  understand that the patent teaches the use of a flexible size

18  gradient neighborhood; correct?

19  **A.   It doesn't teach, yes.**

09:49AM 20  **Q.**   Let's look at your slide number 32.  So here you've

21  identified some LRAIL source code that you believe meets the

22  claims algorithm step a; correct?

23  **A.   Yes.**

24  **Q.**   Let's look at 37.  Here you've identified software

09:49AM 25  source code that you believe meets the claims algorithm step

56

1  b; correct?

2  **A.   Correct.**

3  **Q.**   Let's look at slide 39.  This is for the first part of

4  step c before you get to the little roman numeral i; correct?

09:49AM 5  **A.   Yes.**

6  **Q.**   And here you've identified some source code that you

7  believe meets that first part of step c; correct?

8  **A.   Yes.**

9  **Q.**   Let's go on to slide 41.  This is for the next part of

09:49AM 10  the algorithm step c after the little roman numeral one;

11  correct?

12  **A.   Yes.**

13  **Q.**   This is the part for defining an appropriate gradient

14  neighborhood; correct?

09:50AM 15  **A.   Correct.**

16  **Q.**   You have not identified any source code from anything in

17  LRAIL for this claim limitation; correct?

18  **A.   This is the part of the code that does that.**

19  **Q.**   On the right side?  This is the part of the code?

09:50AM 20  **A.   This is a technique that has been used to amend this**

21  **particular part of the limitation.**

22  **Q.**   And you're referring to Exhibit 117; correct?

23  **A.   Yes.**

24  **Q.**   This is a paper that was presented at a conference in

09:50AM 25  Tokyo; correct?

**EXHIBIT 3**
**-71-**

---

57

1  A.  Correct.

2  Q.  And this paper describes the Deep CNet Neural Network;

3  correct?

4  A.  Yes.

09:50AM 5  Q.  Have you present -- you have not presented any evidence

6  that LRAIL uses the Deep CNet Neural Network for any accused

7  LRAIL sale; correct?

8  A.  Correct.  But, uh, as I -- as I see the information from

9  different presentations including papers, I believe that this

09:51AM 10  is the, uh, convolutional neural network that they use.

11  Q.  You spent 80 hours reviewing the LRAIL inspection

12  computer you testified; correct?

13  A.  Correct.

14  Q.  And in those 80 hours, you could not identify anything

09:51AM 15  supporting the defining an appropriate gradient neighborhood

16  claim language of Claim 1 of the '293 patent; correct?

17  A.  Uh, no, that is not correct.  In fact, we asked for the

18  neural network code, but it was not given to us.

19  Q.  The neural network files were present on the inspection

09:51AM 20  computer; correct?

21  A.  No.  They were binary files that you are not able to

22  look at them.

23  Q.  Pavemetrics did provide its neural network information

24  for you to review, but you chose not to review it during

09:51AM 25  the -- or to attend that visit; correct?

UNITED STATES DISTRICT COURT

---

58

1  A.  That is not correct.

2  Q.  I'd like to have you look at your deposition, page 95

3  beginning at line 22.

4  A.  Page 95, what line?

09:52AM 5  Q.  Line 22 through page 96, line 11.  And I'm asking you

6  whether the neural network information was provided for you

7  to review.

8  A.  Yes.

9  Q.  Do you agree that Pavemetrics provided that information?

09:52AM 10  A.  Like I said, uh, what was available, uh, was the results

11  of a cross compiling neural network.  Let me just tell the

12  jury how this works.  Uh, the development of neural networks

13  are performed in a different platform, software platforms --

14  MR. LAQUER:  Your Honor, this is nonresponsive.  I

09:53AM 15  would ask that the witness be instructed to answer the

16  question.  Of course, if counsel is looking on redirect for

17  the witness to provide some, um, longer speech, that would be

18  their --

19  THE COURT:  And you're asking the question.

09:53AM 20  Why don't you -- why don't you ask the question

21  again.

22  MR. LAQUER:  Yes, Your Honor.

23  Q.  Dr. Morellas, Pavemetrics did provide this neural

24  network information for you to review, but you chose not to

09:53AM 25  join for those visits; correct?

UNITED STATES DISTRICT COURT

---

59

1  A.  Which line are you reading on?

2  Q.  I'm --

3  THE COURT:  Well, let's put the deposition away for

4  now.

09:53AM 5  THE WITNESS:  Okay.

6  THE COURT:  And just see, you know, if you can

7  answer the question.

8  BY MR. LAQUER:

9  Q.  Pavemetrics did provide that neural network information,

09:53AM 10  but you did not come to those visits to look at it; correct?

11  A.  I don't understand.  During my visits, my last visit to

12  Knobbe Marten, the neural network code was asked to be

13  delivered, but it was not available.  I see that there were

14  files associated with the running of the neural network, but

09:54AM 15  I was not actually in a position to look at what kind of a

16  neural network was, uh, employed.

17  MR. LAQUER:  Your Honor, I would like to publish

18  the deposition beginning at page 95, line 22 regarding the

19  fact that the information was available, but the witness did

09:54AM 20  not attend that --

21  THE COURT:  Well, I think -- I think I don't want

22  you to characterize it, um. . .

23  MR. BARNEY:  Your Honor, may we approach?

24  THE COURT:  Yes.  Because I know this is an issue

09:54AM 25  we talked about earlier so. . .

UNITED STATES DISTRICT COURT

---

60

1  (The following discussion occurred at side bar.)

2  THE COURT:  Is the issue whether or not it was

3  available?

4  MR. LAQUER:  Your ruling on denying Pavemetrics'

09:55AM 5  Motion in Liminae No. 2, Your Honor held that -- let me get

6  the exact wording.

7  THE COURT:  And I'm just wondering whether this is,

8  I mean this answer seems to be consistent with what he's

9  saying.

09:55AM 10  MR. LAQUER:  No, Your Honor.  In the answer --

11  THE COURT:  He says I know some information was

12  provided lately.  Didn't have the time to review that, but

13  during my visits, the data of source code for this

14  information was not available.

09:55AM 15  MR. LAQUER:  He is a key witness and I would like

16  the witness to acknowledge the information was available, but

17  he did not come to review it.  He in his previous answer

18  sought an adverse implication that Pavemetrics did not make

19  it available.  It's important for the jury to know

09:56AM 20  Pavemetrics made it available.

21  THE COURT:  So the objection is?

22  MR. BARNEY:  He opened the door to the subject of

23  their MIL and having him trying to explain the circumstances

24  has put the witness in an unfair position because this

09:56AM 25  witness doesn't know the back and forth of what happened.

UNITED STATES DISTRICT COURT

---

**EXHIBIT 3**

**-72-**

61

1   The attorneys are trying to pin on Dr. Morellas essentially a
2   perimeter of willful blindness, that he put his head in the
3   sand.  He spent eight days looking at code and they were
4   supposed to provided it.
09:56AM 5        It wasn't that he didn't want to review it.  He had
6   other jobs.  That's when it was supposed to be brought and it
7   wasn't.  This is a discovery dispute between the parties and
8   they should not pin it on Dr. Morellas the he did something
9   wrong.  They've opened the door and I'm not exactly sure how
09:56AM 10  to cure the character assassination.
11       MR. LAQUER:  We provided what Dr. Morellas
12  requested and I'd be happy to present those email and
13  personally confirm him being present.  We provided the exact
14  tool and he confirmed in his deposition we made it available
09:57AM 15  after he attended.  His last visit was on December 10th.
16  Counsel for Tetra Tech returned on additional days and
17  confirmed by email the requested tool was available and
18  Dr. Morellas just never showed up.
19       THE COURT:  So I'm trying to think the best way to
09:57AM 20  resolve this.  The argument you're trying to make is had he
21  come back after his visits, he could have reviewed --
22       MR. LAQUER:  Yes, Your Honor.  This goes to their
23  burden and rather than carry the burden, they're trying to
24  cure it by pointing to a paper.
09:57AM 25       THE COURT:  Why isn't that relevant?

62

1        MR. BARNEY:  Your Honor, I didn't object to them
2   asking did you review the neural network.  This opens the
3   door as to why and he's already explained why.  It wasn't
4   available during his visit.  That's it.  The squabbling is
09:58AM 5   between the attorneys.  The expert had nothing to do with it.
6        THE COURT:  I think that's right.  It's in the
7   record now it wasn't available when he was there.
8        MS. LEA:  That is not true.  What he is saying not
9   true.
09:58AM 10       THE COURT:  That's the discovery dispute.  The
11  expert is under the impression it was not available when he
12  was there.
13       MS. LEA:  That's not true.  And what's relevant is
14  he did not review it and not whether we provided it to him or
09:58AM 15  not.  These attorneys could have shown up with him.
16       THE COURT:  I think the expert testified it wasn't
17  available during his visits.  That's at least the expert's
18  understanding.  I think anything else is a discovery dispute
19  or dispute between the parties as to those facts, but I don't
09:59AM 20  want any of the lawyers testifying.  So do you have somebody
21  on your witness list that will testify the expert is wrong?
22       MR. LAQUER:  I have documents that are emails from
23  Tetra Tech's counsel.
24       THE COURT:  Again, I don't want counsel to testify.
09:59AM 25  I don't want -- what I'm saying is the expert is saying he

63

1   did not believe it was there when he was reviewing the source
2   code during that period of time.  And you're saying that the
3   expert's wrong, but I don't know whether that seems more like
4   discovery dispute than a matter for this dispute.
10:00AM 5        MR. LAQUER:  Your Honor, we're seeking an adverse
6   inference because during opening statements Tetra Tech
7   presented an argument that Pavemetrics has hidden the
8   infringement in the neural networks and now the witness
9   claimed that we hid that by not providing the tool to him.
10:00AM 10  He's chosen to link an issue directly to the merits to this
11  discovery issue.
12       THE COURT:  I got that.  The expert testified in
13  his deposition during my visits the data of source code this
14  information was not available.  Now, who's gonna saying the
10:00AM 15  expert was wrong there?  Which witness can say it was
16  available?
17       MR. LAQUER:  The only people who were involved is
18  myself, the expert, an attorney from Tetra Tech who sent
19  emails between counsel which should be admissible as a party
10:01AM 20  proponent.  We supplied them with a protective order so we
21  can present the evidence.
22        I don't seek to admit those emails.  We worked
23  closely with the attorneys.  Look at those emails we have in
24  the binder which may refresh his recollection that the
10:01AM 25  information was available.

64

1        May I seek to refresh?
2        MR. BARNEY:  Your Honor, so I can be heard?
3        THE COURT:  I'm sorry?
4        MR. BARNEY:  I disagree with the assertion we did
10:01AM 5   anything of the sort in the opening.  In the opening we
6   explained we had a theory and had the time line to explain
7   when that particular theory was presented and we said
8   Pavemetrics' AI in general can't infringe a patent.  Nothing
9   to do with discovery.  There's evidence to support what I
10:02AM 10  said in opening.  I did not accuse them of hiding the code.
11  What they asserted now is a theory at the company that they
12  used AI so they couldn't be accused of infringement.
13       THE COURT:  What about so if we look at the
14  deposition page 95 line 22 through 96 line 11.
10:03AM 15       MR. BARNEY:  He said the information was provided
16  lately and he wasn't able to review while he was there.  The
17  problem from his perspective, I get what they're saying.
18  They think he's wrong about that, but from his perspective,
19  he did not think it was available for his scheduled visit for
10:03AM 20  eight days when he was there.
21       THE COURT:  I think this issue is really what the
22  expert's understanding was.  I think the expert expressed
23  his understanding at his deposition from page 95 line 22
24  through 96 line 11.  So far his testimony has been consistent
10:03AM 25  with that.  I don't think there's grounds for impeachment

**EXHIBIT 3**

**-73-**

65

1 here. Obviously, if you want to try to put on another
2 witness to make a different case, but I don't want to get
3 this expert involved in communication between the parties.
4 Do you have any reason to believe the expert
10:04AM 5 doesn't believe what he said in his deposition?
6 MR. LAQUER: So I know that counsel returned and
7 inspected and confirmed the requested information was
8 available as with the previous inspections. So it was
9 available on December 10th when he was there and he never
10:04AM 10 returned to the subsequent visits which counsel alone says I
11 will be in attendance and that was sent. . .
12 THE COURT: I think we should move on. I think the
13 witness testified consistent with his deposition. Everything
14 else is a discovery issue between the parties.
10:04AM 15 MR. RE: I request that we have a curative
16 instruction. I do not want our firm to be blamed for their
17 failure of proof on infringement. I think we need to work
18 together and have a curative instruction before the final
19 instructions.
10:05AM 20 THE COURT: I'll let the parties meet and confer on
21 that.
22 (Side bar concluded.)
23 THE COURT: Counsel, please proceed.
24 BY MR. LAQUER:
10:05AM 25 Q.  Dr. Morellas, you wanted to look at Pavemetrics'

UNITED STATES DISTRICT COURT

66

1 convolutional neural network files; correct?
2 A.  Yes.
3 Q.  But you did not; correct?
4 A.  **I did not because the, uh -- the tools were not**
10:05AM 5 **available to me.**
6 Q.  You've also presented an opinion that Tetra Tech's
7 system utilizes Claim 1 of the '293 patent; correct?
8 A.  Uh, yes.
9 Q.  Let's look in your slides on page 93. This is source
10:05AM 10 code that you're identifying you believe satisfies the
11 approximate tie surface plane requirement for Tetra Tech's
12 system for Claim 1 of the '293 patent; correct?
13 A.  **Correct.**
14 Q.  Let's look at the next page, page 94. You've identified
10:06AM 15 some --
16 Slide 94? Thank you.
17 So this is source code from Tetra Tech that you
18 believe performs steps of Claim 1 of the '293 patent;
19 correct?
10:06AM 20 A.  Yes.
21 Q.  And you testified that Tetra Tech satisfies the. . .
22 Let's go to Slide 85.
23 Here you've pointed to some source code that
24 follows the Tetra Tech YOLO convolutional neural network;
10:06AM 25 correct?

UNITED STATES DISTRICT COURT

67

1 A.  **Correct.**
2 Q.  And you believe that somewhere inside of the YOLO
3 network is something that performs steps required by Claim 1
4 of the '293 patent; correct?
10:07AM 5 A.  **Yes.**
6 Q.  Did you look at the Tetra Tech convolutional neural
7 network?
8 A.  **No.**
9 Q.  So you wanted to look at the Pavemetrics convolutional
10:07AM 10 neural network to see whether it performs the patent;
11 correct?
12 A.  **No. I just wanted to see the specifics of how the**
13 **network is, um, implemented.**
14 Q.  I see. So you didn't look at either the Tetra Tech
10:07AM 15 neural network or the Pavemetrics neural network; correct?
16 A.  **Correct.**
17 Q.  And you believe that those neural networks are required
18 parts of infringing Claim 1 of the '293 patent; correct?
19 A.  **What I'm saying is that, uh, the convolutional neural**
10:07AM 20 **network's practice, this particular part of the claim.**
21 Q.  You don't have any idea how many filters are in
22 Pavemetrics' convolution neural network; correct?
23 A.  **Correct.**
24 Q.  You haven't even seen any of the structures in
10:07AM 25 Pavemetrics' neural network; correct?

UNITED STATES DISTRICT COURT

68

1 A.  **Correct.**
2 Q.  You haven't reviewed a single architecture of
3 Pavemetrics' neural network; correct?
4 A.  **Correct.**
10:08AM 5 Q.  You don't have any idea about the structure of the
6 Pavemetrics' LRAIL neural network; correct?
7 A.  **Correct.**
8 Q.  But to know whether something is an appropriate gradient
9 neighborhood, you have to interact with that data; correct?
10:08AM 10 A.  **What I'm saying is that just the principles that the**
11 **convolution neural network applies is consistent with the**
12 **claim, uh, limitation.**
13 MR. LAQUER: Your Honor, I would like, uh, the
14 witness to review deposition, slide -- or sorry, deposition,
10:08AM 15 page 106 beginning at line 23 so that I may impeach.
16 THE COURT: Let me look at it first. Uh, page 106,
17 line 23?
18 MR. LAQUER: Yes, Your Honor, through page 107,
19 line 13.
10:09AM 20 THE WITNESS: Which lines?
21 THE COURT: Well, hang on. Let me -- let me look
22 at it first, uh, Dr. Morellas.
23 THE WITNESS: Yes.
24 THE COURT: I'm sorry, what was the line?
10:09AM 25 MR. LAQUER: 13, Your Honor. And I was asking

UNITED STATES DISTRICT COURT

**EXHIBIT 3**
**-74-**

69

1  whether something that is an appropriate gradient
2  neighborhood has to interact with that data.
3          THE COURT:  Okay.
4          Counsel, do you have an objection?
10:09AM 5          MR. BARNEY:  I -- I don't have an objection.
6          THE COURT:  Okay.  You can go ahead and read.
7          MR. LAQUER:  Your Honor, I'd like to publish by
8  video clip.  Would you please play Video Clip 106.
9  BY MR. LAQUER:
10:11AM 10  Q.  Was that your sworn testimony, Dr. Morellas?
11  A.  Yes.
12  Q.  You have not seen the methodologies in the LRAIL neural
13  network files; correct?
14  A.  Uh, I have not seen them, but I assume since the
10:11AM 15  convolutional neural networks are used, I know quite a lot of
16  information about that.
17  Q.  You understand that Tetra Tech is trying to shut down
18  Pavemetrics from selling LRAIL based on your assumptions;
19  correct?
10:11AM 20  A.  I'm not sure what their plans.  I'm just here to give
21  you my opinion.
22  Q.  And you were about to say what you assume, and you
23  stopped yourself; correct?
24  A.  Yeah, that's what I said.
10:11AM 25  Q.  Okay.  So your opinions are based on assumptions rather

UNITED STATES DISTRICT COURT

70

1  than evidence; correct?
2  A.  No.  That is not correct.
3  Q.  Isn't it serious enough to get the right evidence and
4  form the right opinions that you should have requested more
10:11AM 5  time or more access if you believed you didn't have enough to
6  form your opinion, Dr. Morellas?
7  A.  Uh, as I said, I have all the information that I needed.
8  I didn't have the specifics of the neural network structure,
9  but this didn't prevent me from reaching the conclusions that
10:12AM 10  I did.
11  Q.  Now, you heard video deposition testimony yesterday;
12  correct?
13  A.  Which -- which video?
14  Q.  Well, there was a video where Tetra Tech's attorneys
10:12AM 15  questioned Mr. Nguyen and Mr. Hafiz from AID about LRAIL
16  configuration files; correct?
17  A.  I was at Mr. Hafiz' video, but I'm not sure I was -- I
18  don't remember the other video.
19  Q.  Okay.  But you're familiar with what configuration files
10:12AM 20  are; correct, Dr. Morellas?
21  A.  Uh, yes.
22  Q.  Okay.  And LRAILs' configuration files determine what
23  software functions run when LRAIL is used; correct?
24  A.  I suppose.
10:12AM 25  Q.  Okay.  But you've also never seen an LRAIL configuration

UNITED STATES DISTRICT COURT

71

1  file; correct?
2  A.  Uh, yes.
3  Q.  Yes, you have or yes, you have not.
4  A.  I, I have not, but what I -- I was applying the judge's
10:13AM 5  claim construction that it says that in order to run an
6  algorithm, uh, you don't have to rewrite, recompile or
7  rebuild or redesign software.
8  Q.  So you believe you don't have to look at LRAIL
9  configuration files to determine how LRAIL is configured; is
10:13AM 10  that correct?
11  A.  No.  What I'm saying is that the code that is delivered
12  by Pavemetrics to its customers, it contains all different
13  functionalities which are selected by selecting the
14  parameters, and this is what we refer to as configuration
10:13AM 15  file.
16  Q.  Right.  And so, for example, the Fake3D that you've
17  accused of infringing the patent claims might never be used
18  depending on the configuration file; correct?
19  A.  It doesn't matter because the functionality is there in
10:14AM 20  there code to be used by the user.
21  Q.  Software has a lot functionality that can be there but
22  never used; correct, Dr. Morellas?
23  A.  It depends.
24  Q.  But that -- that happens; correct?
10:14AM 25  A.  It depends on the needs of the user.

UNITED STATES DISTRICT COURT

72

1  Q.  Okay.  The mixed image functionality that you've accused
2  of infringement is also not enabled by default; correct,
3  Dr. Morellas?
4  A.  By default?  I don't know.  Uh, I do not know about
10:14AM 5  that, but there's a choice for the user to use it.
6  Q.  You don't know whether any of the LRAIL sales that
7  you're accusing of infringement have ever used what you're
8  saying performs the patent claims; correct?
9  A.  Again, what I'm saying is that the functionality is
10:14AM 10  there for the user.  And as I showed in one of the slides,
11  the combination of intensity and elevation data significantly
12  improves the DCNN data that goes into the network.
13  Q.  But you aren't even sure if an LRAIL configuration file
14  exists; right?
10:15AM 15  A.  Uh, gee, the configuration from what I understand by
16  reading the manuals comes from the graphical user interface
17  that is part of the computer.
18          MR. LAQUER:  Your Honor, I would like to publish
19  deposition beginning at page 145, line 5 through line 14.
10:16AM 20          THE COURT:  So the question was, um, you aren't
21  even sure LRAIL configuration files exist; right?
22          MR. LAQUER:  Correct, Your Honor.
23          THE COURT:  Okay.  Does counsel have an objection?
24          MR. BARNEY:  Uh, I just don't see the, uh,
10:16AM 25  inconsistency so I would say it's improper impeachment.

UNITED STATES DISTRICT COURT

**EXHIBIT 3**
**-75-**

73

1        THE COURT:  Yeah, I agree.  I don't think this is
2    um, close enough.
3        MR. LAQUER:  Okay.
4    Q.   Mr. -- Dr. Morellas, you admit that you don't know
10:16AM 5    whether an LRAIL configuration file exists; correct?
6    A.   Uh, I have not seen any configuration file, but by
7    reading the manuals and listening to one of the videos
8    yesterday when by selecting particular boxes in the graphical
9    user interface, this is what it generates, the configuration
10:16AM 10    file, but I have not seen one myself.
11    Q.   And because you haven't seen any LRAIL configuration
12    file, you can't answer whether the LRAIL configuration file
13    affects whether LRAIL is configured to run mixed image;
14    correct?
10:17AM 15    A.   Uh, I don't agree with you.  As I said earlier, the
16    functionality is there for the user to use.
17        MR. LAQUER:  Your Honor, may I impeach with
18    page 146 beginning at line 13 through page 147, line 3?
19        THE COURT:  Any objection?
10:17AM 20        MR. BARNEY:  Again, Your Honor, I hate to be a
21    broken record.  I just don't see the inconsistency.
22        THE COURT:  I thought you were going to -- you were
23    gonna ask about 145, line 5 through 145, line 14.  I think
24    you could play that, but, again, I don't think -- the one you
10:18AM 25    moved to I don't think is direct enough to the questions he's

UNITED STATES DISTRICT COURT

74

1    answering.
2        MR. LAQUER:  Understood, Your Honor.
3    May I publish 145, line 5 through 14?
4        THE COURT:  Yes.
10:18AM 5        (Deposition Video Clip 145 played.)
6    BY MR. LAQUER:
7    Q.   That was in March when I took your deposition; correct,
8    Dr. Morellas?
9    A.   That is correct.
10:19AM 10    Q.   Since March, have you asked to see a configuration file?
11    A.   No.
12    Q.   And since March, have you asked to see any neural
13    network file?
14    A.   No.
10:19AM 15    Q.   Let's look at Claim 1 of the '293 patent.  And we'll
16    look at your slide number 19.  Claim 1 requires that the
17    sensor is in communication with the power source.  And we can
18    see that if we look at the last red line; correct,
19    Dr. Morellas?
10:19AM 20    A.   Are you talking about the last portion of the hardware
21    limitations?
22    Q.   Yes.  That's correct, Dr. Morellas.  The last section
23    that's read there, we see wherein the at least one sensor is
24    in communication with the at least one processor.  Do you see
10:20AM 25    that?

UNITED STATES DISTRICT COURT

75

1    A.   Yes.
2    Q.   You understand that to literally infringe Claim 1, a
3    system must have its sensor in communication with the
4    processor at the time of the supposed infringement; correct?
10:20AM 5    A.   Correct.
6    Q.   You haven't presented evidence that any accused LRAIL
7    sale had its sensor in communication with the processor at
8    the time of the supposed infringement; correct?
9    A.   No.  I have shown that the sensor is in communication
10:20AM 10    with the processor that runs the acquisition computer, and
11    there is a network that connects also to the acquisition
12    computer with the processing computer so this is one computer
13    system that is interfaced with the sensor.
14    Q.   But if the evidence shows that the sensor and the
10:21AM 15    processor are sold in a disconnected state, then your opinion
16    does not apply; correct, Dr. Morellas?
17    A.   Well, no components can work in isolation so they have
18    to be present in order to take advantage of the functionality
19    of a system.
10:21AM 20    Q.   Right.  So they couldn't be infringing when sold.  It
21    would have to be that they infringed later if they were
22    actually used in an infringing way within the appropriate
23    jurisdiction; correct?
24    A.   No, I do not agree with you simply because the sales
10:21AM 25    were turnkey sales that includes both hardware and software.

UNITED STATES DISTRICT COURT

76

1    Q.   Right.  But you know that the hardware was disconnected;
2    correct, Dr. Morellas?
3    A.   I'm not sure about that.
4    Q.   Let's look in your report that's in your binder, and
10:21AM 5    let's look at page 35 there.  It's in your binder.  Looking
6    at page 35 of your report, the photograph there, does that
7    refresh your recollection?
8    A.   Yes.
9    Q.   So having your recollection refreshed --
10:22AM 10        MR. LAQUER:  Your Honor, may I publish page 35 from
11    the report?
12        THE COURT:  Why don't you just ask him a question.
13        MR. LAQUER:  Yes.
14    Q.   Dr. Morellas, these LRAIL sales are sold in a manner
10:22AM 15    where the sensors are disconnected from the processor;
16    correct?
17    A.   I do not know.
18    Q.   Okay.  But you know that it's Tetra Tech's burden to
19    prove infringement; correct?
10:22AM 20    A.   Yes.
21    Q.   Claim 8 of the '557 patent requires inputting rail base
22    edge feature coordinates; correct?
23    A.   Correct.
24    Q.   But you can't provide an example of how rail base edge
10:22AM 25    feature coordinates can be input as part of the '557 patent;

UNITED STATES DISTRICT COURT

EXHIBIT 3
-76-

---

### 77

1 correct?

2 **A.   Excuse me, are you talking about the, uh, LRAIL system?**

3 **Q.**   I'm asking whether or not you can provide an example of

4 how rail based edge feature coordinates can be input as part

5 of the '577 patent?

6 **A.   Yes, I think I showed that in my slide.**

7 MR. LAQUER:  Your Honor, I'd like to publish

8 deposition, page 22 beginning at line 2.

9 THE WITNESS:  Which page?

10 THE COURT:  Hang on.  Let me look at it first.

11 THE WITNESS:  Oh.

12 THE COURT:  Line 2 through what?

13 MR. LAQUER:  16, Your Honor.

14 THE COURT:  Any objection, Counsel?

15 MR. BARNEY:  Uh, yes, Your Honor.  It's not clear

16 from the context of what -- what happened in the deposition

17 if they're talking about the same, um, thing.  Uh, I -- I see

18 a question about hypothetical examples versus what they're

19 talking about here which is the actual LRAIL system.

20 MR. LAQUER:  Your Honor, my question was directly

21 from the deposition.

22 THE COURT:  Okay.  Yeah, I'll let you go ahead and

23 publish this.  And then Counsel, if you want to go into it on

24 redirect, you can.

25 MR. LAQUER:  Would you play Video Clip 22, please?

---

### 78

1

2 BY MR. LAQUER:

3 **Q.**   Was that your sworn testimony, Dr. Morellas?

4 **A.   Yes.**

5 **Q.**   And you admitted that in the deposition I took on -- of

6 you on March 23rd of 2022; correct?

7 And that was after you had reviewed Pavemetrics

8 source code; correct?

9 **A.   Yes.**

10 **Q.**   And that after you had reviewed Tetra Tech source code;

11 correct?

12 **A.   Yes.**

13 THE COURT:  Okay, Counsel, we'll take our morning

14 break now.  We'll come back in 15 minutes.

15 THE CLERK:  All rise.

16 (Jury not present.)

17 THE COURT:  We'll stand in recess until 20 of.

18 And I'll just remind Dr. Morellas, no conversations

19 about your testimony with Tetra Tech counsel during the

20 break.

21 THE WITNESS:  Okay, sure.

22 (Recess taken.)

23 THE CLERK:  All rise.

24 (Jury present.)

25 THE COURT:  Please be seated.  Counsel, you can

---

### 79

1 continue with your cross-examination.

2 BY MR. LAQUER:

3 **Q.**   Dr. Morellas, let's look at slide 67 of yours.  So the

4 bottom right where you've got a red box around what says

5 position, and it says tie bounding box data, do you see that?

6 **A.   Yes.**

7 **Q.**   So there are four points that are identified, and

8 there's an X value and a Y value for each of the four points;

9 correct?

10 **A.   Yes.**

11 **Q.**   This is tie bounding box data that is output by the

12 LRAIL system, you believe; correct?

13 **A.   Yes.**

14 **Q.**   And you agree that in the context of the '557 patent, a

15 circle is not a box; correct?

16 **A.   No.**

17 **Q.**   In the context of the '557 patent, neither a circle nor

18 an oval are boxes; correct?

19 **A.   It doesn't fit that.**

20 MR. LAQUER:  Your Honor, I would like to publish

21 deposition beginning at page 28, line 10.

22 THE COURT:  Okay.  Go ahead.

23 MR. LAQUER:  If we could play Video Clip 28,

24 please?

25 BY MR. LAQUER:

---

### 80

1 **Q.**   All right, let's go back to your Slide No. 67.  So at

2 the bottom, that is box the output; correct?

3 **A.   Correct.**

4 **Q.**   And what you've put a red box around at the top is the

5 input; correct?

6 **A.   Yes.**

7 **Q.**   And the input is what's called a mask; correct?

8 **A.   Correct.**

9 **Q.**   And a mask is a blob like shape.  Could be anything;

10 correct?

11 **A.   Could be anything.**

12 **Q.**   Yeah, like a circle; right?

13 **A.   No.**

14 **Q.**   So a mask can't be a circle.

15 **A.   No.  In image processing, when we talk about masks, we**

16 **mean rectangular boxes.**

17 **Q.**   But a mask can be anything; correct?

18 **A.   Could be.**

19 **Q.**   This shows the Court's claim construction for the term

20 moving the gradient neighborhood like a sliding window over

21 the 3D elevation data.  You see that, Dr. Morellas?

22 **A.   Yes.**

23 **Q.**   And the construction is sequentially and completely

24 applying the gradient neighborhood to the 3D elevation data.

25 Do you see that, also?

---

**EXHIBIT 3**

**-77-**

---

81

1  A.  Yes.

2  Q.  And you understand that in patent speak, construction is

3  another way of saying definition; right?

4  A.  Yes.

10:46AM 5  Q.  So that means that that phrase, moving the gradient

6  neighborhood like a sliding window over the 3D elevation

7  data, is defined for us in this case as meaning sequentially

8  and completely applying the gradient neighborhood to the 3D

9  elevation data; correct?

10:46AM 10  A.  Correct.

11  Q.  So in order for any sale of LRAIL sale to infringe Claim

12  1, that LRAIL sale must literally satisfy the claim term as

13  construed by the Court; correct?

14  A.  Correct.

10:46AM 15  Q.  And you mentioned yesterday that one of the things that

16  you and Dr. Frakes who's Pavemetrics technical expert

17  disagree about is the word completely here; right?

18  A.  Uh, yeah.  I mean, it's not -- not exactly that, uh,

19  that he said that, uh, not all the pixels are calculated.

10:47AM 20  Q.  Right.  And that's because he has explained that LRAIL's

21  neural network uses what's called a stride value of two;

22  correct?

23  A.  That's, uh -- that's what was in his rebuttal report,

24  the last, uh, report that he submitted.

10:47AM 25  Q.  Right, because he looked at the LRAIL neural network

---

82

1  files; right?

2  A.  I -- I believe so.

3  Q.  All right.  And just to be clear, you did not; correct?

4  A.  I'm sorry?

10:47AM 5  Q.  You did not look at the LRAIL neural network files;

6  correct?

7  A.  Correct.

8  Q.  You have no reason to doubt him when he explains that

9  the LRAIL neural network uses a stride value of two; correct?

10:47AM 10  A.  I do not have any reason.

11  Q.  Okay.  And with a stride value of one, a filter will

12  move one pixel at a time; correct?

13  A.  Correct.

14  Q.  With a stride value of two, it skips every other pixel;

10:48AM 15  right?

16  A.  Correct.

17  Q.  And Dr. Frakes has explained that in his view, having a

18  stride value of two means that what you've called the

19  gradient neighborhood is not being applied completely;

10:48AM 20  correct?

21  A.  No, I don't agree with that.

22  Q.  I understand that you don't agree.  I just to make sure

23  that we're on the same page with what you believe he

24  understands or his opinion versus your opinion.  He thinks

10:48AM 25  that stride value of two is not complete because it's

---

83

1  skipping every other pixel.  You think that it's still

2  complete when it's skipping every other pixel.  Right?

3  A.  That is correct.

4  Q.  Okay.  And the pixels are the elements of the data that

10:48AM 5  you believe the gradient neighborhood slides are applied

6  over; correct?

7  A.  Correct.

8  Q.  And you testified that even with LRAIL's stride value of

9  two, there is no pixel that gets skipped; right?

10:49AM 10  A.  Every pixel is contributing to the, uh, calculations.

11  Q.  Is any pixel skipped when LRAIL -- because LRAIL has a

12  stride value of two?

13  A.  What I'm saying is that every pixel is contributing to

14  the calculations, in fact, more than once.

10:49AM 15  Q.  But are pixels skipped?  Yes or no.

16  A.  If you use a stride -- a stride of two, you move the

17  window two pixels at a time.

18  Q.  So pixels are getting skipped; correct?

19  A.  It depends how you define the skipping process --

10:49AM 20  Q.  Well --

21  A.  -- uh, word.

22  Q.  I wrote down yesterday one of your answers, and that was

23  that there is no pixel that gets skipped.  Do you believe

24  that's correct, that no pixel gets skipped or do you think

10:50AM 25  pixels are skipped with a stride value?

---

84

1  A.  No, what I'm say was -- what I said yesterday is that

2  even with a stride of two, all pixels are contributing to

3  the, uh, calculation of the gradient.

4  Q.  Okay.  But pixels are skipped; correct?

10:50AM 5  A.  If you want to -- if skipping means in the sense that we

6  have a stride of two, if that's what you mean, yes.  But in

7  my opinion, the way I understand this is that every pixel is

8  contributing to the gradient operations, in fact, more than

9  once.  That's what I mean.

10:50AM 10  Q.  But if the stride was one, there would be twice as much

11  work getting done because more pixels -- there would be more

12  pixel analysis; correct?

13  A.  Apparently, yes.

14  Q.  Okay.  And let's go to your slide 44; correct?

10:50AM 15  A.  Yes.

16  Q.  So this is where you've shown your belief about a stride

17  value of two and your opinion of pixels being skipped or not;

18  correct?

19  A.  That's correct.

10:51AM 20  Q.  And so the pixel that is under analysis for the

21  convolution is the one that's at the center of the green, um,

22  square of nine pixels total; correct?

23  A.  Actually, the -- the gradient in this particular case

24  where the weights are different, uh, it -- it shows

10:51AM 25  information coming from all the pixels.

---

**EXHIBIT 3**

**-78-**

---

**85**

1    Q.   Right. But the pixel that is being skipped over is the

2   center of the green square where in the left most, that's the

3   pixel that's on the second column and then in the middle, it

4   is the one two, three four. . . all right.

10:51AM 5       All right. So this is Step 1; correct?

6   **A.   Yes.**

7    Q.   And this is Step 2; correct?

8   **A.   Yes.**

9    Q.   And the pixel that got skipped between Steps 1 and 2 is

10:52AM 10   that pixel right there; correct?

11   **A.   All the pixels are, uh -- are skipped by two.**

12   **A.   All right.**

13   **A.   All these pixels in this, uh, green box.**

14    Q.   Okay. And because the stride value is two, pixels are

10:52AM 15   being skipped; correct?

16   **A.   No. I disagree with you. As I explained to you, even**

17   **with a stride of two, all pixels are contributing to the**

18   **calculations of the gradient operator.**

19    Q.   So you believe that even with a stride of two, the

10:52AM 20   filter does not skip any pixels; correct?

21   **A.   Yes.**

22    Q.   Okay. Um, you found this picture in, um, what's listed

23   here as Exhibit 709, the Karami book; correct?

24   **A.   Yes.**

10:52AM 25    Q.   Uh, did you know about the Karami book before you

UNITED STATES DISTRICT COURT

---

**86**

1   started working on this case?

2   **A.   No.**

3    Q.   Okay. Uh, did you read the Karami book?

4   **A.   Yes, I did. It's one of the books.**

10:53AM 5    Q.   Okay. And so you read the page of the Karami book where

6   you took this picture from that you show on slide 44;

7   correct?

8   **A.   Yes.**

9    Q.   Okay. And you believe that the Karami book supports

10:53AM 10   your view that even with stride value of two, the filter does

11   not skip any element; correct?

12   **A.   In the sense that I described to you, yes.**

13       MR. LAQUER: Your Honor, I would like to introduce

14   the next exhibit. That Exhibit is Exhibit 689. It is just a

10:53AM 15   subset of Exhibit 709, and I don't think we would need to

16   introduce the entire book that, uh, Dr. Morellas has

17   identified and relied on, but I'd like to just introduce the

18   particular page that he's relied on along with the cover and

19   copy right page.

10:53AM 20       THE COURT: Any objections, Counsel?

21       MR. BARNEY: No objection, Your Honor.

22       THE COURT: Okay. It, um -- the exhibit -- and

23   this is Trial Exhibit 709?

24       MR. LAQUER: Um, well, I'm --

10:53AM 25       THE COURT: Or, I'm sorry, you're making a new

UNITED STATES DISTRICT COURT

---

**87**

1   exhibit.

2       MR. LAQUER: I was making a new because --

3       THE COURT: Yeah.

4       MR. LAQUER: -- it's just --

10:53AM 5       THE COURT: Okay.

6       MR. LAQUER: -- gonna be that page so --

7       THE COURT: And -- and so this will be exhibit

8   number again?

9       MR. LAQUER: 689, Your Honor.

10:54AM 10       THE COURT: Six eight nine.

11       Okay, six eight nine is in evidence.

12       (Exhibit 689 admitted.)

13   BY MR. LAQUER:

14    Q.   Let's see where in the Karami book you got that picture

10:54AM 15   from. Could you, uh, show us that?

16       This is the page from the Karami book where you

17   took the picture from; correct?

18   **A.   That is correct.**

19    Q.   And so this is Exhibit 689; right?

10:54AM 20   **A.   Uh --**

21    Q.   Well, uh, I'll just tell you --

22   **A.   Yeah.**

23    Q.   -- that's what we just moved --

24   **A.   Okay.**

10:54AM 25    Q.   -- into evidence, all right?

UNITED STATES DISTRICT COURT

---

**88**

1   **A.   Yeah.**

2    Q.   Let's look at the text that shows up right above the

3   picture that you used in this line. That reads if the

4   convolution stride is equal to two, this means that the

10:54AM 5   filters -- the filter slides through 2 consecutive elements

6   of the input layer. The filter slides through the input data

7   by moving two elements per step, i.e., skipping one element.

8   Do you see that, Dr. Morellas?

9   **A.   Yes.**

10:55AM 10    Q.   So Karami confirms that with a stride value of two, the

11   filter does skip every other element; correct?

12   **A.   It's -- that's his interpretation.**

13    Q.   Right. But that's the book that you used to support

14   your opinion that Pavemetrics supposedly infringes this

10:55AM 15   patent claim; correct?

16   **A.   Correct.**

17    Q.   Right. And so it doesn't actually support your

18   conclusion, does it, Dr. Morellas.

19   **A.   I disagree with you simply because, uh, he tries to**

10:55AM 20   **interpret the fact that when you, uh, slide the neighborhood**

21   **by two pixels, one pixel in the -- in the middle is skipped**

22   **all along.**

23    Q.   Right. But --

24   **A.   All the time.**

10:55AM 25    Q.   -- that's the book you chose to put in your slides to

UNITED STATES DISTRICT COURT

---

**EXHIBIT 3**

**-79-**

89

1  present in this case; correct?
2  A.   Correct.
3  Q.   All right.  And you believe that Tetra Tech should be
4  able to shut down Pavemetrics' sales of LRAIL based on your
10:55AM 5  use of the Karami book that contradicts your opinion?
6  A.   I'm not in a position to do that.
7  Q.   But that's what you're sitting here --
8  A.   The Court --
9  Q.   -- attempting to do.
10:56AM 10  A.   The Court will decide about it.
11  Q.   All right.  And your opinion is based on your
12  assumptions of how LRAIL's neural network works when you
13  haven't seen the neural network files; correct?
14  A.   These are not assumptions.  There is facts about the --
10:56AM 15  how the neural networks are being used in this case.
16  Q.   Right.  And some individuals including Pavemetrics' fact
17  witnesses and its expert witness have looked at those files;
18  correct?
19  A.   Can you repeat the question, please?
10:56AM 20  Q.   I said some individuals, particularly Pavemetrics' fact
21  witnesses and its expert witness, have actually looked at the
22  evidence of Pavemetrics' neural network; correct?
23  A.   I suppose.
24  Q.   And you didn't even look at Tetra Tech's neural network
10:56AM 25  files; right?

UNITED STATES DISTRICT COURT

90

1  A.   I looked at some but not specifically, uh, the network
2  files.
3  Q.   Okay.  You spoke with Tetra Tech's damages expert;
4  correct?
10:56AM 5  A.   Yes.
6  Q.   And you understand that damages can only occur if there
7  has been infringement of a valid patent claim; correct?
8  A.   I'm not sure of that.
9  Q.   Okay.  Is it your understanding that if the jury were to
10:57AM 10  disagree with you about infringements on the asserted claims,
11  then the opinion of Tetra Tech's damages expert would be
12  irrelevant?
13          MR. BARNEY:  Objection, Your Honor.
14          THE COURT:  Yeah, I think this is outside the scope
10:57AM 15  of what this witness is here to testify to.
16          MR. LAQUER:  I have no further questions at this
17  time.
18          THE COURT:  Thank you.  Any redirect, Counsel?
19          MR. BARNEY:  Yes, Your Honor.
10:57AM 20              REDIRECT EXAMINATION
21  BY MR. BARNEY:
22  Q.   Hello again, Dr. Morellas.
23  A.   Hi.
24  Q.   Just a few follow-up points.  Counsel asked you, um --
10:57AM 25  or he -- he -- he made the point that there's no mention of

UNITED STATES DISTRICT COURT

91

1  artificial intelligence or convolutional neural networks in
2  the patents.  Do you recall that?
3  A.   Yes.
4  Q.   Now, do the patents disclose the algorithms that are set
10:58AM 5  forth in the claims?
6  A.   Like we saw in the particular, uh, limitations that we
7  examined, their particular parts, particularly step c claims
8  those.
9  Q.   If I could have, uh, slide 11 from your
10:58AM 10  demonstratives -- excuse me, slide 10 from your
11  demonstratives, please?  Dr. Morellas, we spoke about this
12  yesterday, but does the patent disclose the algorithm that's
13  claimed in the '293 patent?
14  A.   Yes.
10:58AM 15  Q.   And can that algorithm be performed without a neural
16  network?
17  A.   Possibly.
18  Q.   Can it be performed with a neural network?
19  A.   Yes.
10:58AM 20  Q.   For purposes of infringement, does it matter one way or
21  the other whether it's performed with or without a neural
22  network?
23  A.   I don't think so.
24  Q.   It it's performed without a neural network, and it
10:59AM 25  accomplishes every limitation of the claim, would that be

UNITED STATES DISTRICT COURT

92

1  infringement?
2  A.   I suppose.
3  Q.   If it's performed with a neural network and accomplishes
4  every limitation of the claim, would that also be
10:59AM 5  infringement?
6  A.   Yes.
7  Q.   Does it make any difference whatsoever to your
8  infringement opinion whether the patent talks about neural
9  networks?
10:59AM 10  A.   No.  Because we -- as we said, we tried to, uh, apply
11  Court's construction by following the particular steps a, b,
12  c and d so this is -- comes as a whole, uh, package.
13  Q.   Now, counsel also, uh, questioned you quite a bit on
14  whether or not you looked at the neural network code when you
10:59AM 15  did your source code review.
16  A.   Right.
17  Q.   And -- and as far as you're aware, was it available when
18  you were reviewing your source code?
19  A.   It was not available for me to see the particular
11:00AM 20  architecture or the specifics of the neural network.
21  Q.   Now, is it necessary -- first of all, how -- how many
22  years of experience do you have with neural networks?
23  A.   Quite a -- uh, like I said yesterday, I started in 1991,
24  but the particular, um, uh, neural networks, um, they came
11:00AM 25  to, uh -- to be very popular in the last -- in the last, uh,

UNITED STATES DISTRICT COURT

EXHIBIT 3
-80-

93

1   seven, eight years, nine years.

2   Q.   Would you say you were very familiar with the

3   convolutional neural networks?

4   A.   Yes.  Actually, the, uh -- uh, the first version of, uh,

11:00AM 5   convolutional neural networks started in, uh, 1996, I

6   believe.

7        MR. BARNEY:  Let's have slide 41.  Slide 41.

8   Q.   And, uh, Dr. Morellas, um, based on your understanding

9   of how neural -- convolutional neural networks work, is it

11:01AM 10   your -- what is your opinion as to whether it necessarily is

11   going to perform the steps that are set forth in step c?

12   A.   Yes, that's -- we showed that yesterday by showing the

13   particular animation that, uh, I tried basically to simplify

14   in a way that, uh, uh, all the appropriate gradient

11:01AM 15   neighbor -- uh, neighborhood is moved around the, uh -- the

16   image.

17   Q.   Have you ever seen a convolution neural network that

18   doesn't define an appropriate gradient neighborhood and slide

19   it across the data set forth in Limitation C?

11:02AM 20   A.   No.

21   Q.   Okay.  And how does -- Pavemetrics when they present

22   their technology to the industry in papers such as the one

23   that you show in Exhibit 117, how do they explain how their

24   neural network works?

11:02AM 25   A.   I guess they don't need to explain much except if they

UNITED STATES DISTRICT COURT

94

1   call the name convolution neural network, I'm sure everybody

2   that the audience understands what is happening there.  They

3   may describe the particular ways that they train the network,

4   but the main body of information comes from the fact that

11:02AM 5   convolution neural networks are being used.

6   Q.   Okay.  Well, for instance, in Exhibit 117 that you have

7   on the slide, are they explaining the use of a gradient

8   network in exactly the same way that you just testified?

9   A.   Yes, because they talk about the convolutional layers

11:02AM 10   where different filters are applied.

11        MR. BARNEY:  Slide 29, please?

12   Q.   Now, counsel also asked you some questions about

13   configuration files.  Do you remember that?

14   A.   Yes.

11:03AM 15   Q.   And he asked you whether you had reviewed configuration

16   files and so forth.  Do you recall that?

17   A.   Yes.

18        MR. BARNEY:  Now, I wanna look at the court's claim

19   construction on the screen of the term is configured to run

11:03AM 20   an algorithm.  And the court construed that to mean is

21   programmed to run an algorithm without the need to rebuild,

22   rewrite or recompile the code for or resign any of that

23   hardware or software.

24   Q.   Did I read that correctly?

11:03AM 25   A.   Yes.

UNITED STATES DISTRICT COURT

95

1   Q.   And did you apply that construction?

2   A.   Yes, I did.

3   Q.   In the LRAIL source code that you reviewed, is it

4   programmed to run the algorithms steps a through d?

11:04AM 5   A.   Yes.

6   Q.   Is it programmed to run that algorithm without the need

7   to rebuild the algorithm?

8   A.   Yes.

9   Q.   Is it -- do you have to rewrite the code to run that

11:04AM 10   algorithm?

11   A.   No.

12   Q.   Did you have to recompile the code to run that

13   algorithm?

14   A.   I don't believe so.

11:04AM 15   Q.   Okay.  And do you have to redesign any of the hardware

16   or software to run that algorithm?

17   A.   No.

18   Q.   So in the LRAIL system that they sold to CSX in that

19   turnkey sale that source code that you reviewed, was it

11:04AM 20   configured to perform steps a through d in accordance with

21   the court's construction?

22   A.   Yes.

23   Q.   Did you need to look at configuration files to know

24   that?

11:04AM 25   A.   No.

UNITED STATES DISTRICT COURT

96

1        MR. BARNEY:  Slide 67, please.

2   Q.   I believe there was a question about circles and ovals

3   and rectangles.  Do you remember that?

4   A.   Yes.

11:05AM 5   Q.   Okay.  And what is the shape of a railroad -- this Claim

6   8, that's about detecting railroad tie distress.

7   A.   Yes.

8   Q.   And what's the shape of a railroad tie?

9   A.   Rectangular.

11:05AM 10   Q.   Okay.  And so what would you expect the tie bounding --

11   the tie bounding box data to be?

12   A.   A rectangle.

13   Q.   And what is shown in the output of Exhibit 27 that

14   you've shown?

11:05AM 15   A.   The coordinates of the four vertices of the rectangle.

16   Q.   And the portion of the input that you pointed to is a

17   mask.  Am I correct?

18   A.   Yes.

19   Q.   And what is the shape of a mask as used in image

11:05AM 20   processing?

21   A.   Rectangular.

22   Q.   Okay.  Is that all consistent with your opinion that you

23   expressed earlier?

24   A.   Yes.

11:05AM 25        MR. BARNEY:  And let's go to slide 38, please.

UNITED STATES DISTRICT COURT

**EXHIBIT 3**
**-81-**

---

**97**

1  Q.  Then there was some questions about this limitation of
2  moving the gradient neighborhood like a sliding window over
3  the 3D elevation data.  Do you remember that?
4  A.  Yes.
5  Q.  And counsel in particular was pointing you to the
6  court's construction that says sequentially and completely
7  applying the gradient neighborhood to the 3D elevation data.
8  Did I read that correctly?
9  A.  Yes.
10  Q.  And did you apply that construction in your analysis?
11  A.  Yes, I did.
12  Q.  Dr. Morellas, does that construction say anything about
13  skipping pixels?
14  A.  No.
15  Q.  Does it say that you can't skip a pixel in that
16  construction?
17  A.  No.
18  Q.  Does it -- what does it say?
19  A.  **Just sliding the window sequentially and completely.**
20  Q.  Okay.  Now, let's take a look at your illustration on
21  page 44.  Okay.  Now in this illustration, the gradient
22  neighborhood is the green neighborhood; right?
23  A.  **Right.**
24  Q.  And is it being slid 2 by 2, in other words, with a
25  stride of two across that data?

UNITED STATES DISTRICT COURT

---

**98**

1  A.  Yes.
2  Q.  And I just want to -- just so we can all focus on that
3  red box, I'm gonna just give it a name.  I'm gonna call it
4  Pixie the Pixel.  Okay?
5  A.  Yeah.
6  Q.  You with me?
7  A.  Yes.
8  Q.  Pixie the Pixel.  In the first step of one, does Pixie
9  the Pixel contribute to the, uh -- to the, uh, gradient
10  neighborhood?
11  A.  Yes.
12  Q.  In Step 2 where that gradient neighborhood has moved
13  over by a stride of two, is Pixie the Pixel still
14  contributing to that gradient neighborhood?
15  A.  Yes.
16  Q.  And is it also true that on the next -- if there were a
17  Step 4, wouldn't we see the green box two pixels down on the
18  left-hand side from where it is now?
19  A.  Yes.
20  Q.  And in that situation, would Pixie the Pixel still be
21  contributing to that gradient neighborhood?
22  A.  That is correct.
23  Q.  So is every pixel in this example with a stride of two
24  contributing to the gradient neighborhood?
25  A.  Yes.

UNITED STATES DISTRICT COURT

---

**99**

1  Q.  And does that meet the court's construction of
2  sequentially and completely applying the gradient
3  neighborhood to the 3D elevation data?
4  A.  Yes.
5  MR. BARNEY:  Thank you.
6  I have no further questions.
7  THE COURT:  Okay.  Any recross?
8  MR. LAQUER:  Yes, Your Honor.
9  RECROSS-EXAMINATION
10  BY MR. LAQUER:
11  Q.  Let's look at your slide 41.  You just testified about
12  whether it's necessary to look inside of this deep neural
13  network in order to determine whether it performs step c;
14  correct?
15  A.  Yes.
16  Q.  And the deep neural network that you were referring to
17  is the Deep CNet Network; correct?
18  A.  **That's correct.**
19  Q.  You were not referring to the LRAIL network; correct?
20  A.  **This is a publication from Pavemetrics data that shows**
21  **about the Deep CNet that was used.**
22  Q.  Does a white paper presented at a conference in Tokyo
23  infringe a United States patent?
24  A.  **I cannot answer this question.**
25  Q.  You know that the claims of that patent are on systems,

UNITED STATES DISTRICT COURT

---

**100**

1  not on documents that say things.  Right; Dr. Morellas?
2  A.  **This is part of a particular limitation that is part of**
3  **the claim so this is a particular procedure that is**
4  **inconsistent with one of the sub-limitations.**
5  Q.  So if I write a document about a spaceship, am I
6  infringing a Space X patent?  You actually have to make a
7  product or sell a product or do something other than just
8  write a paper to infringe; right, Dr. Morellas?
9  MR. BARNEY:  Objection, Your Honor.  I think is all
10  calling for legal conclusions.
11  THE COURT:  Yeah, I think that's right.  I think
12  let's stick to technical opinions.
13  BY MR. LAQUER:
14  Q.  Let's look at Slide 29.  This is the construction of
15  configured to run an algorithm.  Just to be clear, it's your
16  opinion that you don't need to look at LRAIL's configuration
17  file to determine how LRAIL is configured; is that correct?
18  A.  **When the software is shipped, there are certain**
19  **parameters that are set that would allow the system to run.**
20  **However, you can change the functionality by putting the**
21  **parameters that apparently reconfigure the system to do**
22  **something different.**
23  Q.  Right.  And you didn't look to see how the configuration
24  file reconfigured those parameters to cause LRAIL to do
25  something different; correct?

UNITED STATES DISTRICT COURT

**EXHIBIT 3**
**-82-**

101

1    A.   Uh, what I looked was the manual that shows the graphic

2    values that interface that can change some of the parameters.

3    Q.   Would you please answer my question with a yes or a no,

4    Dr. Morellas?  I asked whether or not you looked at the

11:11AM 5    configuration files to determine whether they change how the

6    LRAIL parameters are configured.

7    A.   They were no configuration files available to me.

8    Q.   Do you know LRAIL's default values are in terms of using

9    range only images rather than Fake3D images?

11:11AM 10   A.   I'm not sure of that.

11   Q.   Do you know what LRAIL's default values are for whether

12   or not it uses mixed images?

13   A.   No, I do not know those.

14   Q.   Only review half of the evidence in this case, then you

11:12AM 15   haven't reviewed the evidence completely, have you.

16   A.   What do you mean by half the evidence?

17            THE COURT:  Counsel, I think that's argumentative.

18            Let's stick to his technical opinions.

19            MR. LAQUER:  All right.

11:12AM 20   Q.   Dr. Morellas, Tetra Tech did not invent neural networks;

21   correct?

22   A.   Yes.

23   Q.   Yes, they invented it?  Or it's correct they did not

24   invent neural networks.

11:12AM 25   A.   They did not invent neural networks.

UNITED STATES DISTRICT COURT

102

1    Q.   Right.  That's not their invention; correct?

2    A.   That is correct.

3    Q.   That's not what they have rights from the '293 and the

4    '557 patent on; correct?

11:12AM 5    A.   Correct.

6            MR. LAQUER:  No further questions.

7            THE COURT:  Anything else, Counsel?

8            MR. BARNEY:  Nothing further, Your Honor.

9            THE COURT:  And I apologize, I'm just gonna ask a

11:12AM 10   few questions.  Can you pull up that new Exhibit 689?  The

11   second page of it, can somebody put it on the screen?  It's

12   the book.

13            EXAMINATION

14   BY THE COURT:

11:13AM 15   Q.   Okay.  So in just looking at these diagrams, the green

16   section, is that -- is that kind of like the filter?

17   A.   Yes.

18   Q.   And so that green section in Step 1, it's looking at

19   those nine pixels?

11:13AM 20   A.   Correct.

21   Q.   Making some mathematical computation on that?

22   A.   Correct.

23   Q.   And then in Step 2, it slides over and looks at those

24   nine pixels in the middle.

11:13AM 25   A.   Correct.

UNITED STATES DISTRICT COURT

103

1    Q.   Makes a computation of that.  In 3, it focuses on those

2    nine pixels and makes a computation.

3    A.   That is correct.

4    Q.   So when we're talking about sliding here, it's -- I

11:13AM 5    guess if we only slid once, we would do more computations?

6    A.   Correct.

7    Q.   If we slide by two, we're doing less computations?

8    A.   Yes.

9    Q.   If we could slide by three, we're doing even less

11:14AM 10   computations.

11   A.   Correct.

12   Q.   But all of the pixels are being used in computing the

13   result.

14   A.   Yes.

11:14AM 15   Q.   Is that the gist of it?

16   A.   Yes.

17            THE COURT:  Okay, thank you.

18            I just wanted to make sure.  Thank you.

19            MR. LAQUER:  May I ask one question to follow up?

11:14AM 20            THE COURT:  Sure.

21            FURTHER RECROSS-EXAMINATION

22   BY MR. LAQUER:

23   Q.   Dr. Morellas, you have no evidence as to whether or not

24   Tetra Tech's neural network has a stride value of four or

11:14AM 25   greater?

UNITED STATES DISTRICT COURT

104

1    A.   I do not know about the specifics of the neural network.

2    Q.   And if it has a stride of four or greater, even under

3    your view of the sliding window, it would not practice the

4    patent; correct?

11:14AM 5    A.   No, I disagree because the windows light sequentially

6    and completely throughout the whole image.

7    Q.   But if it had a stride of four, then there would be

8    pixels that would never be green in this illustration;

9    correct?

11:15AM 10   A.   Yes, but this is not consistent with the court's

11   construction claim that says if you move the window

12   sequentially and completely throughout the image.

13   Q.   Do you believe the stride value of 100 would satisfy the

14   court's construction?

11:15AM 15   A.   Yeah.  If there are high resolution images, but this is

16   probably not appropriate.  It won't make any sense in that

17   case.

18            MR. LAQUER:  I have no further questions.

19            THE COURT:  So let me jump in again.

11:15AM 20            FURTHER EXAMINATION

21   BY THE COURT:

22   Q.   Because really it depends on the inside of the filter;

23   right?

24   A.   Yes.

11:15AM 25   Q.   So if our filter was 100 by 100 --

UNITED STATES DISTRICT COURT

105

1   A.  Yes.

2   Q.  -- and we had a stride of 90, we would get all the

3 pixels.

4   A.  Uh, yes.

11:15AM 5   Q.  Right?  Because the filter's big enough to make sure you

6 get all the pixels.

7   A.  Yeah.

8   Q.  So it really is a function of the filter size and the

9 stride.  If those are appropriate, then you'll get all the --

11:15AM 10 all the pixels.

11   **A.  Right, and you will not -- and essentially, when you do**

12 **that, you will not get information.  More information is**

13 **better so they can use it.**

14   Q.  Sure, sure.  But it would depend on computing power and

11:16AM 15 those things.

16   A.  Yeah.

17   Q.  You would make that tradeoff of how big of a stride

18 depending on your filter.

19   A.  Correct.

11:16AM 20   Q.  So, for example, in this example here, our filter's 3 by

21 3.

22   A.  Yes.

23   Q.  Um, if our filter was 2 by 2, and we have a stride of

24 three, we would miss pixels.

11:16AM 25   A.  Yes.

UNITED STATES DISTRICT COURT

---

106

1   Q.  But if our filter was, um, 2 by 2, and we have a stride

2 of two, we'd actually still get all the pixels.

3   A.  Yes.

4   Q.  But it wouldn't -- it wouldn't have as much data.

11:16AM 5   A.  Yes.

6       THE COURT:  Thank you.

7       MR. LAQUER:  Your Honor?

8       THE COURT:  Okay.

9       MR. LAQUER:  I have follow-up that I think would be

11:16AM 10 really relevant directly --

11       THE COURT:  Okay, okay.

12       FURTHER RECROSS-EXAMINATION

13 BY MR. LAQUER:

14   Q.  Dr. Morellas, do you have any evidence what the size of

11:16AM 15 the filter is in Tetra Tech's neural network?

16   A.  Uh, again, like I said, I have not seen the code.

17       MR. LAQUER:  Thank you.  No further questions.

18       THE COURT:  Mr. Barney, sorry, anything further?

19       MR. BARNEY:  Uh, no, Your Honor.

11:17AM 20       THE COURT:  Okay.  Witness is excused?

21       MR. BARNEY:  Yes.

22       THE COURT:  Okay.  Thank you very much.

23 Thanks for indulging me, Dr. Morellas.

24       THE WITNESS:  Yes, Your Honor.

11:17AM 25       THE COURT:  Mr. Barney, can you call your next

UNITED STATES DISTRICT COURT

---

107

1 witness?

2       MR. BARNEY:  May we have a moment?

3       THE COURT:  Sure.  Okay, Counsel, you can proceed.

4       MS. MATHEW:  Your Honor, at the time, Tetra Tech

11:18AM 5 calls William Todd Schoettelkotte.

6       THE COURT:  Okay.

7       THE CLERK:  Raise your right hand.

8       (Witness sworn.)

9       THE CLERK:  Please be seated.

11:19AM 10       MS. MATHEW:  Your Honor, at this time, we have a

11 list --

12       THE COURT REPORTER:  Wait.

13       THE CLERK:  Will you please state and spell your

14 full name for the record.

15       THE WITNESS:  Certainly.  William Todd

16 Schoettelkotte, W-i-l-l-i-a-m, Todd, T-o-d-d, Schoettelkotte,

17 S-c-h-o-e-t-t-e-l-k-o-t-t-e.

18       THE COURT:  Counsel?

19       MS. MATHEW:  Your Honor, at this time, we have a

11:19AM 20 list of exhibits that the parties have met and conferred

21 about to which there are no objections.  At this time, I'd

22 like to move them into evidence.

23       THE COURT:  Please list them for me.

24       MS. MATHEW:  Exhibits 40, 41, 44, 835, 843, 844,

11:19AM 25 845, 848, 849, 850, 851, 852, 853, 902, 904, 905, 906, 907,

UNITED STATES DISTRICT COURT

---

108

1 908 and 916.

2       THE COURT:  Okay.  Counsel, any objections?

3       MR. ZOVKO:  No objections, Your Honor.

4       THE COURT:  Okay.  Exhibits 40, 41, 44, 835, 843,

11:20AM 5 844, 845, 848, 849, 850, 851, 852, 853, 902, 904, 905, 906,

6 907, 908 and 916 are in evidence.

7 Please proceed.

8       DIRECT EXAMINATION

9 BY MS. MATHEW:

11:20AM 10   Q.  And sir, could you introduce yourself again for the

11 record?

12   **A.  Sure.  My name is William Todd Schoettelkotte.  I go by**

13 **Todd.**

14   Q.  And where do you work?

11:20AM 15   **A.  I work at a firm called J.S. Held.**

16   Q.  And what is J.S. Held?

17   **A.  J.S. Held is a multidisciplinary consulting firm.  It**

18 **does a variety of financial-transactional-type work as well**

19 **as research, investigatory work, action -- accident, excuse**

11:21AM 20 **me, reconstruction.  I focus on intellectual property at the**

21 **firm.**

22   Q.  And in that, what do you do, Mr. Schoettelkotte?

23   **A.  So as part of my role, I value intellectual property for**

24 **a variety of reasons.  It could be commercial sale, a**

11:21AM 25 **transaction.  I'm also involved in assisting clients to**

UNITED STATES DISTRICT COURT

**EXHIBIT 3**

**-84-**

---

109

1  monetize intellectual properties in other ways.  For example,
2  perhaps they're looking to sell a portfolio of patents or
3  trying what patents in their portfolio might be of value.
4            In addition I'm also involved in disputes such as
11:21AM 5  this one here where there's an alleged patent infringement.
6  Q.   What were you asked to do in this case?
7  A.   In this case I was asked to review the evidence, um,
8  that was provided to me and assess what the measure and
9  amount of damage would be, um, for the infringement of the
11:22AM 10  '293 and '557 patents by Pavemetrics in this case.
11  Q.   And have you completed your damages analysis?
12  A.   I have, yes.  That's correct.
13  Q.   Did you reach a conclusion as to the appropriate measure
14  and amount of damages in this case?
11:22AM 15  A.   Yes.
16  Q.   Mr.  Schoettelkotte, are you offering any opinions in
17  this case regarding infringement or validity as it relates to
18  the patents?
19  A.   No, I'm not.  My role is not one of the technical
11:22AM 20  expert.  I'm focusing on the economic harm in this case.
21  Dr. Morellas who was here just a moment ago, he would be a
22  technical expert.  That's not, again, my role here.
23  Q.   Thank you.  Before we get into the details, can you tell
24  us little bit about how long you have been working on
11:23AM 25  valuation of intellectual property and analyzing damages in

UNITED STATES DISTRICT COURT

---

110

1  business disputes?
2  A.   Sure.  It's been, um, at this point, maybe 25 years.
3  Um, it's funny, I measure myself a lot by my children.  My
4  kids are now graduating from school.  So I started before
11:23AM 5  they were born and now they're out of the house, and I'm an
6  empty nester and so we're still going.  So that's about where
7  we are at.
8  Q.   Can you tell us about your educational background that
9  enables you to do that type of work?
11:23AM 10  A.   Sure.  So I graduated with a degree in Business
11  Management from Rice University.  It's a school in Houston,
12  Texas.  I stayed there and got my Master's of Accounting.  My
13  education was pretty formally related to, um, finance,
14  accounting, economics, statistics, things of that nature and
11:23AM 15  the other required curriculum as well.
16  Q.   Do you have any professional certifications or
17  memberships related to your work?
18  A.   I do.  I'm a Certified Public Account.  I'm licensed in
19  the State of Texas.  I'm a Certified Valuation Analyst with
11:24AM 20  an organization called the NACVA.  It's essentially an
21  accreditation for people who have a, um, kind of a career
22  focused on valuing various things.  My focus would be
23  intellectual property.
24  Q.   And have you testified at trial before on matters
11:24AM 25  relating to damages for intellectual property and business

UNITED STATES DISTRICT COURT

---

111

1  disputes?
2  A.   I have in U.S. District Courts like this one here as
3  well as state courts.
4            MS. MATHEW:  Your Honor, at this time we'd proffer
11:24AM 5  Mr. Schoettelkotte as an expert in damages evaluation
6  relating to patents.
7            THE COURT:  Any objection, Counsel?
8            MR. ZOVKO:  No objection, Your Honor.
9            THE COURT:  So Mr. Schoettelkotte is so designated.
11:24AM 10  He may provide expert testimony on damages in intellectual
11  property matters.
12            MS. MATHEW:  Thank you.
13  Q.   Can you explain what sort of information you used to
14  conduct your analysis?
11:24AM 15  A.   Sure.  So when I get involved in a case like this,
16  there's a variety of information that comes through a process
17  called discovery.  So counsel on both sides look to discover
18  various pieces of information from the opposing party, and I
19  get to look at that information.  Again, it's what drives and
11:25AM 20  really what allows me to come to the conclusions that I do.
21            It includes things like the patents at issue here,
22  it includes various documents from the parties such as Tetra
23  Tech and Pavemetrics that would things like financial
24  information, profit and loss statements, invoices.  It would
11:25AM 25  also include things like email transmissions, documents,

UNITED STATES DISTRICT COURT

---

112

1  marketing information.  Just things that would be help to
2  value something.  Those are the types of things I would be
3  focused on.
4            We've heard references to deposition testimony.
11:25AM 5  I've certainly reviewed deposition testimony of the witnesses
6  in this case.  The ones that, um, may be we've heard from at
7  this point would be Mr. Larson so I had an opportunity to
8  review his deposition as well as Mr. Keyes.
9            Um, publicly available information, available to
11:25AM 10  all of us, that I sometimes look at that information.  Might
11  be information from the SEC on financial filings.  And then
12  finally, I like to have discussions various witnesses in the
13  case.  In this case I had discussions with Dr. Morellas as
14  well as Mr. Larson and Mr. Keyes.
11:26AM 15  Q.   And have you been present in this courtroom during this
16  trial to hear the testimony of the various witnesses and
17  experts who have testified?
18  A.   I have.  I arrived in, um, in Los Angeles on Monday.
19  Trial started on Tuesday, and I have been here for the large
11:26AM 20  majority.  I had to step out a few times for other
21  obligations I had, but in large part, I've been here hearing
22  the testimony come in.
23  Q.   Thank you.
24            Now, sir, how many Pavemetrics' sales are accused
11:26AM 25  of infringement in this case?

UNITED STATES DISTRICT COURT

---

**EXHIBIT 3**

**-85-**

113

1    A.   I understand that there are four Pavemetrics' sales that
2    are accused.
3    Q.   And could you tell us a little bit more about those
4    four?
5    A.   Sure.  You'll see that I've prepared a slide here and at
6    the top it says CSX.  So there were three sales that were
7    made to CSX by Pavemetrics.  And those sales occurred on
8    March 15, 2021.  I reviewed a Goods Agreement as part of my
9    review of that material.  And then in addition to that, um,
10   there was an additional sale to a company called AID or
11   Advanced Infrastructure Design.
12           There was one sale to AID, um, and there's really
13   two parts to this.  I understand that there was a sale that
14   was made in December 23rd, 2020, but the particular item was
15   delivered, the accused product, was delivered in
16   February 2021 so those are the dates.
17           The importance of those dates is for CSX, I
18   understand that that's an assessment of something called
19   direct infringement which is why I'm looking at the date of
20   the sale.  And I understand for AID, it's a situation where
21   it's an indirect infringement.  And under that indirect
22   infringement, I understand that the infringement occurs upon
23   delivery which is why I'm looking at the February 2021 date.
24           MR. ZOVKO:  Objection, Your Honor.  Move to strike.
25   The witness's answer is beyond the scope of his expert

114

1    report.  He did not address delivery in his expert report.
2            THE COURT:  I think, correct me if I'm wrong, the
3    witness is providing the reason why he looked at certain
4    things not testifying as to those specific facts; correct?
5            THE WITNESS:  Yes, that's correct.  I think these
6    are legal issues.  I'm simply using the facts that I have.
7            THE COURT:  So the answer could stand.
8            Please proceed.
9            MS. MATHEW:  Can we pull up Exhibit 844?  It's been
10   admitted already.
11   Q.   Mr. Schoettelkotte, is this the Goods Agreement you
12   referred to earlier?
13   A.   I did.  If we could just focus maybe on the top
14   paragraph.  You'll see it says the goods agreement is made as
15   of the 15th day of March 2021.  That is the date I showed in
16   slide.  And then you'll note there's CSX Transportation and
17   then Pavemetrics.  So these are the types of documents I
18   talked about earlier that I reviewed and this is that
19   agreement.
20           If we go down to the next paragraph just very
21   briefly.  It says whereas purchaser wishes to purchase three
22   LRAIL inspection systems and additional support from seller.
23   That's how I identified the three sales that were at issue.
24   I also had the opportunity to look at invoices as well.
25   Q.   Thank you.

115

1            Mr. Schoettelkotte, why did you include a
2    pre-notice sale in your analysis of the accused sales?
3    A.   Well, I understand that there's a legal argument in the
4    case which suggests that for this particular sale to AID, it
5    is an indirect infringement based on something called
6    inducement and that inducement occurs upon delivery of that
7    unit to AID.
8    Q.   For those sales how have you determined to be the
9    correct measure and amount of damages in this case?
10   A.   I really did it in two ways.  There's an analysis and we
11   might go to my next slide.  So in essence what I've done is
12   so I've focused on it in two ways, lost profit and reasonable
13   royalty.  For lost profits which is the first element of
14   damages that I'm looking at, I'm factoring in something
15   called the two player market test as well as the Panduit
16   Four-Factor Test.
17   Q.   And let's start with your lost profits opinion.
18           Is there a framework you use to calculate damages
19   in a case like this?
20   A.   I do.  So there's really two.  One of them is called as
21   I mentioned earlier, two player market test.  And essentially
22   what we're doing is we're evaluating the market and we're
23   determining how many players have this specific technology in
24   the market and they're providing those services to the
25   market.  And those services are of the same product and

116

1    they're providing them to the same customer.
2            And the question we ask ourselves, and this is
3    maybe one of the more important questions we deal with, we're
4    asked to recreate the market by removing the infringer out of
5    the market, in this case Pavemetrics.  We've removed
6    Pavemetrics from the market because you can't legally
7    infringe.  And then you ask yourself the question if
8    Pavemetrics is out of the market, who would make the sale?
9            And here we have Tetra Tech offering its 2D, 3D
10   technology and Pavemetrics was out of the market, one player
11   would be left and that would be Tetra Tech.  That's called
12   the two player market test.  Again, as I mentioned earlier
13   and I think we'll talk about it, there's another test called
14   the Four-Factor Panduit Test.
15   Q.   Did you find that there was a two player market in this
16   case?
17   A.   I did.  As I mentioned a moment ago, what I was
18   evaluating was are both Pavemetrics and Tetra Tech selling
19   into the same market, the railroad market?  Yes, they are.
20           Are they both selling a similar product with
21   similar features?  Yes, they are.  This is the 2D, 3D
22   technology that evaluates railroad tracks.
23           And lastly, were they both bidding on the work for
24   CSX?  The answer to that is yes as well.  So if you remove
25   Pavemetrics, then the player that would be left is Tetra Tech

**EXHIBIT 3**
**-86-**

117

1    and that's why the two player market test for lost profits is

2    met.

3    Q.    So based on your finding that there was a two player

4    market, what did you concluded?

5    A.    I concluded that when we look at damages in this case

6    for CSX, there would be total damages for the CSX sales made

7    by Pavemetrics, Tetra Tech would be entitled to its lost

8    profits of 3,357,000.

9         And for the additional sale that was made to

10   Advanced Infrastructure Design, I determined that there would

11   be something called a reasonable royalty.  So I haven't

12   calculated lost profits, but rather a reasonable royalty,

13   we'll talk about what that is later, for total past damages

14   of 3,607,000.  Again, three lost profit units for CSX.  One

15   reasonable royalty unit for AID or Advanced Infrastructure

16   Design.

17   Q.    So for lost profits you determined that a two player

18   market applied.

19        Now, let's talk about the Panduit Four-Factor Test.

20   Can you explain what that is?

21   A.    Sure.  So there's a case, it's a 1978 case.  It was out

22   of the 6th Circuit Court of Appeals.  It was a judge called

23   Judge Markey.  I know this because the Panduit Test is

24   something that is somewhat preeminent in my field.  Most

25   damages experts will look at it to see if lost profits are

UNITED STATES DISTRICT COURT

118

1    appropriate.  This four-factor test includes these four

2    factors on the screen.

3    Q.    And let's talk about the first factor for a moment.  How

4    did you address that factor in your analysis?

5    A.    So demand for the patented product is simply that.  It's

6    asking the question is the marketplace interested in the

7    product.  Is there demand for it?  And one of the ways to

8    test that is to assess whether there has been sales in the

9    marketplace.  If there has been sales, well, sales equal

10   demand.  There was demand.

11        And here what I'm showing is that Tetra Tech has

12   sold five of its 3DTAS systems from August 25, 2015 to the

13   present and Pavemetrics has sold six of its LRAIL systems

14   from October 23rd, 2020 to October 21, 2021.

15        One of the things I thought was interesting about

16   this is that you can see by the dates, Tetra Tech entered the

17   market before Pavemetrics did so they created the market.

18   They set the market, they set the price.  And the follower in

19   the market was Pavemetrics coming in with their LRAIL

20   product.

21        And that's another situational distinction I think

22   for determining whether lost profits would be appropriate

23   because, again, if removed Pavemetrics from the market, that

24   would leave Tetra Tech as the only player offering this

25   technology.

UNITED STATES DISTRICT COURT

119

1    Q.    Did you look at anything else to determine whether there

2    was demand for this patented technology?

3    A.    I did.  So I said earlier that one of the main things

4    you look at is whether there had been sales and that

5    generally it's accepted that if there are sales, then there

6    is demand.  But I also like to understand is there a focus on

7    do people really clamor for that technology.

8         If we go to the next slide, this is actually an

9    email that I read.  We've heard about a gentleman named

10   Mr. Fox-Ivey.  You'll see up at the top right he is with

11   Pavemetrics.  And Mr. Fox-Ivey sent an email to Mr. Matthew

12   and he was asking Mr. Matthew can you tell me something about

13   the LRAIL technology.  What do you think about it?  What have

14   you seen?  And Mr. Matthew says, of unique value is the

15   ability to analyze both images and 3D scans from the same

16   section of rail in order to reduce false negatives and

17   positives and thus improve detection accuracy.

18        So this an example of demand in the marketplace not

19   only for the patented feature, but for the patented

20   technology.  And it's very consistent with what we heard

21   Mr. Larson say yesterday during his testimony.  I think he

22   talked about false negatives, false positives and the

23   importance of eliminating those.

24   Q.    That's a reference to Trial Exhibit 835.

25        And so what did you conclude about the first

UNITED STATES DISTRICT COURT

120

1    Panduit factor?

2    A.    I concluded that the first Panduit factor is met.

3    Q.    And you said the second Panduit factor was the absence

4    of acceptable non-infringing alternatives; correct?

5    A.    That's right.

6    Q.    What is this factor asking?

7    A.    It's asking if you were to take Pavemetrics out of the

8    market is there someone else offering 2D, 3D technology in a

9    fashion that number one, would be acceptable to the market,

10   but importantly would not infringe.  So it's referred to as

11   an acceptable non-infringing substitute.  If you remove

12   Pavemetrics, can someone else come and make Pavemetrics'

13   sales or would it be left to Tetra Tech to make those sales?

14        And what I've determined based on my discussions

15   with Mr. Larson and Dr. Morellas is that there are no

16   non-infringing alternatives available on the marketplace.

17   You may recall Mr. Larson speaking to us yesterday and he

18   mentioned that during his time at CSX, he was evaluating

19   Pavemetrics, Tetra Tech and a company called Balfour Beatty.

20        And ultimately they concluded that Balfour Beatty

21   did not have the technology necessary to meet their needs so

22   they set that company aside.  And it came down to Tetra Tech

23   and Pavemetrics.  And so again if you remove Pavemetrics,

24   would there be an alternative that can come in?  I understand

25   there wouldn't because no one else was offering 2D, 3D

UNITED STATES DISTRICT COURT

EXHIBIT 3

-87-

---

121

1    capabilities like those two companies were.

2    Q.    So what was your conclusion with respect to the second

3    Panduit Factor?

4    A.    It's met.  There are no non-infringing acceptable e

5    alternatives in the market.

6    Q.    Let's move to Factor No. 3 now.  What does this factor

7    relate to?

8    A.    It relates to capacity.

9         So after we determined that there is demand,

10   there's no alternatives, we have to ask ourselves could Tetra

11   Tech have made the sales that Pavemetrics made from a

12   manufacturing capacity and marketing capacity.  And this

13   factor was met as well.  I have a slide on this.

14        You may recall that Mr. Keyes in his testimony

15   yesterday, and there's a bit here, but if I just point you to

16   the highlighted sections.  He was talking about how many

17   units they could made and he said in this first highlighted

18   section, we also looked into how many 3DTAS systems we could

19   build.

20        And he goes on to say because again CSX originally

21   asked for adding their systems adding their components on to

22   their ATAC cars and what that meant they were gonna take a

23   3DTAS and put it on of the one rail cars.  He continues down

24   below, he says we thought probably do about ten or so of the

25   3DTAS systems.

UNITED STATES DISTRICT COURT

---

122

1         So what that tells us is that they certainly had

2    the ability to make the three units of sales that were made

3    to CSX if they could in fact do ten units during that same

4    time frame.  So that shows us the manufacturing capacity is

5    there.

6         From a marketing capacity, well, we already know

7    that Tetra Tech was at the table negotiating with CSX.  So

8    they clearly knew about it, they were negotiating for it so

9    they clearly had the marketing capacity.  So I determined the

10   capacity factor is also met.

11   Q.    And the final Panduit Factor, Factor No. 4, that's

12   really the amount of profit; correct?

13   A.    It is, and this is where we get into some of the

14   financial information and I won't belabor it too much, but

15   I'd to show you a slide if I may.

16        So what I've shown here is on the left-hand are the

17   products, 3DTAS and an affiliated product called a control

18   system.  They work together to provide the 2D, 3D technology,

19   but also be able to help control the system, kind of monitor

20   the information that's being there, and they can set certain

21   parameters to determine, you know, asking questions how many

22   rail ties might be -- are there a problem with in a set of 14

23   or 15, things of that nature.

24        What I've shown here across the top are the revenue

25   costs and incremental profit per unit.  The first thing I

UNITED STATES DISTRICT COURT

---

123

1    would say is I had an opportunity, as I said earlier, to

2    review the financial information of Tetra Tech.  And in doing

3    so what I was looking to understand is if they were gonna

4    make the sales that Pavemetrics made, how much profit would

5    they generate when they made those sales.

6         So the first thing I did was identify what revenue

7    was associated with the 3DTAS and it was $993,000.  And what

8    were the costs associated to bring that to market?  And those

9    total costs were $231,000 for an incremental profit of

10   762,000.  Now, an incremental profit is really a profit where

11   you're only taking into account variable costs.  You're not

12   looking at the fixed costs because with a company like Tetra

13   Tech, it wouldn't really be an impactful event if they made

14   just a few more units like three or four.  So the fixed costs

15   wouldn't really change, but the incremental would because you

16   have material and direct labor and direct overhead and things

17   of that nature.  So for the 3DTAS, it would be $762,000 in

18   incremental profit and then for the control systems similarly

19   looking at Tetra Tech's financial information, I identified

20   474,000 in revenue, $117,000 in cost, and $357,000 in

21   incremental profits.  When I add the two incremental profit

22   numbers up that number is $1,119,000 per unit in incremental

23   profit.  That means every time Pavemetrics made a sale to CSX

24   that's the amount that Tetra Tech would stand to lose because

25   of the infringing sale made by Pavemetrics.  Meaning Tetra

UNITED STATES DISTRICT COURT

---

124

1    Tech couldn't make the sale because Pavemetrics came in at

2    lower price.

3    Q.    Does that complete your analysis for the Panduit

4    Factors?

5    A.    It does.

6         So essentially what I'm showing on this slide very

7    quickly is that all four factors have been met.  So now I've

8    shown there's two ways that lost profits have been shown, the

9    two player market test and the Four-Factor Panduit Test.

10   Q.    So Mr. Schoettelkotte, what are the lost profits in this

11   case?

12   A.    If we can go to the next slide?

13        We said just a moment ago the incremental profit

14   per unit sold was $1,119,000 per unit multiplied by three

15   CSX units would show past lost profits of $3,357,000.  I say

16   past because to the extent that Pavemetrics continues selling

17   into the future, it's likely additional lost sales would be

18   found.

19   Q.    Mr. Schoettelkotte, we've heard during this trial that

20   Tetra Tech's 3DTAS system is priced higher than Pavemetrics

21   LRAIL system.  Is that something you considered as part of

22   your lost profits analysis?

23   A.    I did.  So one of the things we oftentimes look at is

24   the standpoint of accounting and finance and economics is

25   really trying to understand the nature of the market and what

UNITED STATES DISTRICT COURT

---

**EXHIBIT 3**

**-88-**

125

1  companies consider including return on investment and all
2  factors like that and I had the opportunity to do that in
3  this case.
4  Q.  Can you pull up Trial Exhibit 841 at this time?
11:44AM  5        Is this one of the documents that you reviewed and
6  considered, Mr. Schoettelkotte?
7  A.  It is.  This was a document Mr. Larson talked about
8  yesterday.  It was towards the end of his testimony and what
9  he was describing about it was one of the things that he
11:45AM 10  thought would be important was to try and share what the cost
11  benefit analysis would be to CSX.  Essentially to say if you
12  were to lease these 3DTAS or RailAI units, the benefit you
13  would get in cost savings would out strip the cost of the
14  unit.
11:45AM 15        And Mr. Larson talked about a number of things, but
16  we'll focus just on this page if we may.  And if we just take
17  a look at the first or excuse me, yeah, the first paragraph
18  and I'm going to point to just the first three lines.  It
19  says the lease of Tetra Tech's RailAI track assessment boxcar
11:46AM 20  offers CSX immediate and quantifiable cost savings.  And
21  that's a really important consideration in this field because
22  there is so much track to evaluate.
23        Regardless of whether CSX exercises its option to
24  purchase the RailAI boxcar, the 1.2 million lease amount for
11:46AM 25  40,000 miles over 100 days provides CSX with approximately

126

1  $3 million in benefits.  So when he was talking about just
2  the RailAI, he was pointing out to CSX if you buy this, it
3  will pay for itself within a year.
4        If you go to the next section called Tie Inspection
11:46AM  5  Savings, when we're looking at the 3DTAS and the controller
6  which is providing the 2D, 3D feature set that's in the LRAIL
7  system, what we see here is that the boxcar in this lease
8  example would collect 40,000 miles over the 100-day period of
9  the lease and it would provide a very significant volume of
11:47AM 10  savings.
11        And he goes on to say, um, that over a period of a
12  year, he says which will replace the need for a large tie
13  inspection program with CSX's current supplier of
14  approximately $2 million per year for future miles of tie
11:47AM 15  inspection.  The current supplier was a company called
16  Georgetown.  They offered something called the Aurora system.
17  The Aurora system evaluated rail ties, but it could only do
18  6,000 miles a year.
19        And so what they found is that using 3DTAS, they
11:47AM 20  could do 60,000 to 90,000 miles a year.  So significantly
21  more mileage, but you will recall back, the price of the
22  3DTAS with the controller was $1.4 million.  But they're
23  saying here that they would have a 2.3 -- 2 to $2.3 million
24  cost savings.  So in the first year, it would pay for itself
11:48AM 25  and there would be a profit associated with it.  And every

127

1  year thereafter, you would get that cost savings, but you
2  would own the product.
3        So this was a very important document to me when we
4  assess whether the pricing of Tetra Tech's 3DTAS and
11:48AM  5  controller, how that compared to other pricing in the market.
6  Because when you compare it to what the return on investment
7  would be, as a financial person, I find that very important
8  and here the return on investment would positive first year
9  and additional profits going forward every year after that.
11:48AM 10  Q.  What about CSX?  Did you do any analysis of its
11  financial performance in forming your opinion?
12  A.  I did.  Now, CSX didn't produce any financial
13  information in this case because they're not part of this
14  case, but they're a public company.  And as a financial
11:48AM 15  person, I know that if I go to the SEC website, I can find
16  their financial performance.  And in 2019 and 2020, CSX had
17  over $10 billion in revenue and net profit, the bottom line,
18  net profit was between 2 and $3 billion per year.
19        And so what I determined is that number one, they
11:49AM 20  had the financial wherewithal to make an investment, but a
21  company that is that successful would recognize the return on
22  investment that Tetra Tech was offering them paying
23  $1.4 million for a system, but generating almost
24  $2.25 million in cost savings that initial year.  Paying
11:49AM 25  for itself and increasing the bottom line profit going

128

1  forward.
2  Q.  Thank you.
3        Now, let's turn to your reasonable royalty opinion.
4  Can you explain what is a reasonable royalty?
11:49AM  5  A.  Sure.  So one of the things that, um, that I want to
6  share with you is let's assume for a minute that you're in a
7  case and you're dealing with patent damages and you find that
8  lost profits might not be appropriate for a particular sale,
9  we're then guided by some language that says damages would be
11:50AM 10  no less than a reasonable royalty for the use made of the
11  infringement.
12        So adequate to compensate that's the lost profits
13  we just calculated, but no less than a reasonable royalty.
14  So it was my opinion that the sale to AID and the delivery to
11:50AM 15  AID did not necessarily, um, suggest a lost profits measure
16  of damage, but then I'm guided to calculate a reasonable
17  royalty because that's what the statute guides me to do.  No
18  less than a reasonable royalty.
19        And there is a case, it's called the Georgia
11:50AM 20  Pacific case similar to the Panduit case, was a 1970 case out
21  of New York, and what the court said in that case was I'm
22  going to set forth 15 factors that individuals should
23  consider when determining what a licensing rate should be.
24        And so I've done this slide because I wanted to
11:51AM 25  share with you what a licensing agreement is and many of

**EXHIBIT 3**
**-89-**

129

1  might know this, but if you don't, this might be helpful.  I

2  compare it or I analogize it to a real property example.  If

3  you've ever had an apartment or you've rented a home, you say

4  well, I have a house and I'm gonna make an agreement with the

11:51AM 5  landlord.

6         And that agreement is I'm gonna sign a lease and

7  that lease is going to allow me to use the home.  And in

8  return I'm gonna pay a monthly rent, and likely most of us

9  have done that so we understand the concept.

11:51AM 10        With intellectual property it's very similar.  Here

11  you're talking about a patent.  And you've got a licensor

12  who's the patent owner and a licensee who wants to license

13  that patent.  Instead of a lease agreement, they sign a

14  license agreement.  And the same rules apply in that you are

11:51AM 15  essentially saying I want to use your patent, but you're

16  gonna pay a royalty for the right to use that.

17        So just like we pay a monthly rent, here we're

18  gonna pay a per unit license fee in order to use that

19  technology.  So that's what we're talking about.

11:52AM 20  Q.  Thank you.  Did you consider all 15 Georgia Pacific

21  factors in forming your opinions?

22  A.  I did, um, but we're not gonna have to go through all of

23  them because some of them didn't apply.

24  Q.  And what do you mean by they didn't apply?

11:52AM 25  A.  They were, after I reviewed them, they were neutral in

130

1  nature meaning they didn't push the royalty rate up or down.

2  They more, as I assessed them, I said well, the royalty rate

3  really wouldn't be impacted by that factor so I'm going to

4  leave that one out.

11:52AM 5  Q.  Earlier you mentioned a hypothetical negotiation.  Can

6  you explain what that is?

7  A.  These are the factors we're going to cover and so I

8  won't go through them right now.  I'm just going to say for

9  ease of discussion, I separated them into licensing, business

11:52AM 10  and technical factors.  The licensing factors are there

11  any licenses that either party has entered into that would

12  give us some kind of an understanding of what the parties

13  might have agreed to.

14        Again, if we go back to the purchase of a house,

11:53AM 15  your realtor might say hey, look, I know you want to a

16  purchase house that's a three bedroom home.  Well, there's

17  other three bedroom homes around your block that have sold

18  for this amount.  And so when they tell you that, you kind of

19  get a feeling for oh, I know about what I'll pay.

11:53AM 20        It can be similar in an intellectual property case.

21  If there's a patent, you find a similar patent and you say

22  well, what does somebody else license that similar patent

23  for.  You can take that and say well, that provides us some

24  understanding of what you might pay in this situation.

11:53AM 25        Then there are business factors and those relate to

131

1  things such as whether the parties are competitors and

2  financial data.  This particular set of factors was very

3  important to my analysis.  And then there's the technical

4  factors and things that I learned from Dr. Morellas and

5  Mr. Larson.  And then finally, there's something called a

6  hypothetical negotiation which is what Ms. Mathew referenced

7  just a moment ago.

8  Q.  Thank you.

9         Now, before we discuss the factors in more detail,

11:54AM 10  can you provide us information about what royalty amount you

11  calculated Pavemetrics would have been willing to pay Tetra

12  Tech, um, for use of its technology in this hypothetical

13  negotiation?

14  A.  I'd be happy to do that.  I think I have one more slide

11:54AM 15  I wanted to touch on if we can go to the next slide.  That

16  15th factor is something called a hypothetical negotiation.

17  And so that hypothetical negotiation obviously didn't happen

18  because if the parties had come to an agreement, we wouldn't

19  be here right now.

11:54AM 20        So what I'm asked to do as a financial person is to

21  assess let's look at all the facts in the case and let's

22  understand what the parties would have agreed to if they had

23  gotten together and negotiated an agreement at the time of

24  first infringement.

11:54AM 25        And you'll see below the handshake it says no later

132

1  than November 2020 that's when the first -- that's at or

2  around the time when the first sale was made by Pavemetrics.

3  And so I've used that as the time when I believe the parties

4  would have gotten together and negotiated a license

11:55AM 5  agreement.

6  Q.  So what royalty amount did you ultimately determine

7  would be appropriate here?

8  A.  In my opinion an appropriate and reasonable royalty

9  would be $250,000 per unit.

11:55AM 10  Q.  Now, let's turn to the factors, the Georgia Pacific

11  factors.  You mentioned earlier that you grouped them into

12  three categories.  And so first, let's address the technical

13  factors you considered.  What did you consider under these

14  factors?

11:55AM 15  A.  So in this particular set of factors, I'm looking at the

16  importance of the technology, the features, the attributes.

17  What is the marketplace clamoring for?  What are the

18  companies marketing?  And then secondarily, I'm asking are

19  there acceptable noninfringing alternatives?  And I'm also

11:55AM 20  talking about what I learned from other experts in the case.

21  Q.  Did you see any Pavemetrics documents that talked about

22  the benefits associated with the LRAIL product?

23  A.  I did.  So here we're talking again about what are the

24  features and attributes that the market is talking about.

25  This is actually a presentation that Pavemetrics, um, was

**EXHIBIT 3**

**-90-**

133

1    part of providing at a seminar.  And what I noticed about
2    this is on the page over to the left, they identified
3    objectives:  Improve railway network safety through improved
4    reliability and robustness of track inspections.  So they're
11:56AM 5    looking how do we come up with a solution to make what's
6    currently in the market better.
7            And if we go to the other document I had on the
8    slide.  So they say in the title they refer to it as LRAIL
9    Technology and they say two types of scans combine for
11:56AM 10   analysis.  They say that it's unique to Railmetrics which is,
11   um, kind of tag line for Pavemetrics so they're one in the
12   same as I understand it.  And so then they say there's the 2D
13   intensity scan which measures the intensity of the laser
14   light reflected by surface similar to a line scan.
11:57AM 15      I'm not a technical expert, but as a layman, I
16   understand that to be when they're taking almost very close,
17   well-lit, laser-like pictures of what the track surface looks
18   like, but then they're now going to combine it with the 3D
19   range scan which provides the elevation and depth
11:57AM 20   measurement.
21           Now, my understanding is that these types of photos
22   using 2D 3D allows someone to look at the rail, it allows
23   someone to look at the ties, the tie plates, as well as for
24   lack of a better word, the nails that are used to nail in the
11:57AM 25   tie plates so it gives you that perspective.  And I

UNITED STATES DISTRICT COURT

134

1    understand that it does it more quickly, does it more
2    objectively, it's not a subjective and it also does it more
3    accurately.  So that was one of the documents that I looked
4    at.
11:58AM 5    Q.  Were there other documents that set forth the benefits
6    of the patented technology?
7    A.  There was, yes.  So these are some comments that were
8    made throughout the marketplace because I'm always looking to
9    understand what are other people saying not just the parties
11:58AM 10   involved.
11           Tetra Tech said, "3DTAS is a fully integrated and
12   turnkey track assessment system that collects full-width,
13   high-resolution, 3D track surface profile data at track
14   speed."
11:58AM 15      The Federal Railroad Administration said,
16   "combination of high-resolution imaging and 3D scanning is
17   designed to deliver greater return on investment."
18           "3-dimensional laser inspection systems that
19   combine high-speed laser triangulation sensors and artifical
11:58AM 20   intelligence to automatically inspect the condition of, and
21   detect safety-related changes in, railway infrastructure."
22           Pavemetrics went on to say, this is the top right,
23   "can easily replace multiple legacy measurement systems.
24   Saving you cost, weight and power."  This was very similar to
11:59AM 25   the discussion we had about the Aurora system earlier from

UNITED STATES DISTRICT COURT

135

1    Georgetown and the analysis that Mr. Larson did saying it
2    would replace Georgetown.
3            "Capturing both 2D images and 3D profiles all in
4    the same pass."
11:59AM 5    And then finally, combining those images, "2D
6    imaging and 3D scanning with artificial intelligence for
7    automatic processing."
8            And then a company called ENSCO which I believe is
9    focusing just on the rails on the track said, "to reduce
11:59AM 10   false negatives and positives and thus improve detection
11   accuracy."
12           I learned from Mr. Larson that false negatives and
13   positives in the rail industry are very costly because you
14   have to send people out to the rail and you pay those
11:59AM 15   salaries for them to go out there and find it.  But if it's a
16   false positive or a false negative that can be cumbersome,
17   costly because you're shutting down rail, you're shutting
18   down the railway and you're having to pay people.
19           So all of these are the types of things that
12:00PM 20   suggested to me that there were benefits under this Factor 9
21   and 10 which is really looking to the benefits of the
22   technology over old modes.
23   THE COURT:  Counsel, I think it's time for us to
24   break for lunch.  We can break for lunch now and come back at
12:00PM 25   1 o'clock.

UNITED STATES DISTRICT COURT

136

1            Just to alert the jury, we have a witness
2    testifying by video.  We may do that at 1:00 and take a break
3    here and then come back to Mr. Schoettelkotte after that
4    witness or we may continue with Mr. Schoettelkotte.  I'll
12:00PM 5    leave that to the parties.  Just to give you a little bit of
6    warning things might be different when you get back.  Thanks.
7    THE CLERK:  All rise.
8            (Jury not present.)
9    THE COURT:  Okay.  We'll stand adjourned.  Try to
12:01PM 10   get back here about five minutes to 1:00 just so we all know
11   what we're doing.  Thanks.
12   MR. RE:  We'll play it at 1:00.  That's the goal.
13   THE COURT:  Okay, great.  Thank you.
14           (Lunch recess taken.)
01:01PM 15   THE COURT:  Okay.  Are we all set?
16   MR. RE:  Yes, if you find the audio acceptable.
17   We've done the best we can, and I think the witness is just
18   gonna have to really speak up and speak slowly.
19   Okay, Richard?
01:01PM 20   THE WITNESS:  No problem.
21   THE COURT:  We'll get the jury in here and we'll
22   start.
23           (Jury present.)
24   THE COURT:  Welcome back to the jurors.
01:04PM 25   We're taking a break in the witness you were

UNITED STATES DISTRICT COURT

EXHIBIT 3
-91-

137

1  listening to earlier.  We have a witness by video and we're
2  gonna do that now and go back to the other witness later.
3          So I'll ask counsel for Pavemetrics, this is a
4  witness Pavemetrics is introducing.
01:04PM 5      MR. RE:  Thank you, Your Honor.
6          Pavemetrics calls at its first witness Richard
7  Habel.
8          THE CLERK:  Good afternoon.
9          Will you please raise your right hand?
01:04PM 10          (Witness sworn.)
11          THE CLERK:  Will you please state and spell your
12  name for the record?
13          THE WITNESS:  My first name is Richard and my last
14  name is Habel.  It's spelled H-a-b-e-l.  Richard Habel.
01:05PM 15      THE CLERK:  Thank you.
16          MR. RE:  And in order to facilitate things,
17  Your Honor, the parties stipulated to the following exhibits
18  to be admitted prior to the questioning of Mr. Habel.
19          THE COURT:  Okay.  Can you please identify them for
01:05PM 20  me?
21          MR. RE:  Yes.  Exhibits 77, 85, 576, 578, 595, 660,
22  661 and 875.
23          THE COURT:  Any objections, Counsel?
24          MR. BARNEY:  No objection, Your Honor.
01:05PM 25      THE COURT:  Okay.  Exhibits 77, 85, 576, 578, 595,

UNITED STATES DISTRICT COURT

138

1  660, 661 and 875 are now in evidence.
2          You can proceed, Counsel.
3                  DIRECT EXAMINATION
4  BY MR. RE:
01:05PM 5  Q.  Good afternoon, Mr. Habel.
6          I understand you are unable to travel because of a
7  medical condition; is that correct?
8  A.  That's true.
9  Q.  And who is with you in the room where you are?
01:06PM 10  A.  Uh, there is Ms. Nicole Nazareth from DLA Piper, there
11  is our corporate lawyer and there is IT support.
12  Q.  And the lawyer, Ms. Nazareth I think you said, is she
13  the lawyer for Tetra Tech?
14  A.  That's correct.
01:06PM 15  Q.  And do you have any materials before you, Mr. Habel?
16  A.  Yes, I have my trial documents.
17  Q.  And do those contain the exhibits that I just read into
18  the record?
19  A.  Yes.
01:06PM 20  Q.  Do you have any other notes or any other pieces of paper
21  before you?
22  A.  There is my deposition that is in the binder.  Nothing
23  else.
24  Q.  Mr. Habel, what is your occupation?
01:07PM 25  A.  I'm president of Pavemetrics Systems.

UNITED STATES DISTRICT COURT

139

1  Q.  And how long have you been the president of Pavemetrics
2  System?
3  A.  Since 2009 when I co-founded the company with my
4  colleagues Jean-Francois Hebert and John Laurent.
01:07PM 5  Q.  Can you briefly give us an overview of your educational
6  background?
7  A.  I have a college degree in Pure Sciences.  I have a
8  Bachelor's degree and a Master's degree in Electrical
9  Engineering.  My Master's specialty was Telecommunication.
01:07PM 10  Q.  And what do you do as the president of Pavemetrics
11  Systems?
12  A.  Well, since the beginning, I organize the company.  I
13  overview various activities like sales and marketing,
14  research and development, production, administration,
01:08PM 15  finance.  I make sure that all of our activities are properly
16  funded.
17  Q.  And in the entire company, how many people including
18  yourself work for Pavemetrics System?
19  A.  About 23.
01:08PM 20  Q.  And how long have you known Mr. John Laurent?
21  A.  Since the late '80s when we were doing research.  He
22  was, uh, researching in the field of computer vision and I
23  was in telecom.
24  Q.  And how did it come about that the two of you got
01:08PM 25  together to start Pavemetrics?

UNITED STATES DISTRICT COURT

140

1  A.  Well, as I said, we met during our master's degree and
2  we quickly became friends.  We traveled together in 1989 to
3  Central America.  We went to South Africa in 1990 so we both
4  had a passion for traveling.  In 1991 I moved to Ottawa, but
01:09PM 5  John and I always stayed in close contact.  I was present at
6  his wedding and I had the chance to see his two children
7  grow.
8          In 2004 my dad was in Quebec City and he had a
9  heart attack.  Unfortunately, he died 2007.  During the
01:09PM 10  difficult period of my life, I traveled a lot to Quebec City
11  and I often met John.  This is when we started working on a
12  business plan and a finance plan for Pavemetrics.
13          In 2008, I started negotiating a license with the
14  National Optical Institute for their 3D laser technology.
01:10PM 15  That's the technology John Laurent and Jean-Francois Hebert
16  had been working on for about 10 years together.  So I met
17  Jean-Francois for the first time in August 2009 when John
18  introduced him to me and we got along together very quickly.
19  Couple of months later, the three of us co-founded
01:10PM 20  Pavemetrics Systems.
21  Q.  What is your relationship with the National Optical
22  Institute that you mentioned?
23  A.  Uh, we're a licensee so we acquired a perpetual
24  worldwide exclusive license on their 3D laser technologies in
01:11PM 25  2009.

UNITED STATES DISTRICT COURT

EXHIBIT 3
-92-

141

1    Q.   And what did you pay for that perpetual worldwide

2    exclusive license?

3    A.   **$350,000 in three payments.**

4    Q.   And what was that a license on?

01:11PM 5    A.   **Uh, it did cover three product lines, the NRIS, NRS and**

6    **the LCMS which is the 3D laser technology.**

7    Q.   And you knew John throughout the period, Mr. Laurent

8    throughout the period that he was working at INO?

9    A.   **Yes, that's correct.**

01:12PM 10    Q.   And is that license with INO still in effect?

11    A.   **Yes.**

12    Q.   I want to change subjects.  When did you first encounter

13    Tetra Tech or its predecessor subsidiary EBA?

14    A.   **Back in 2012 when they became an indirect customer.**

01:12PM 15    Q.   What do you mean they became an indirect customer?

16    A.   **Well, an indirect customer is a hand user.  Our direct**

17    **customers are integrators.  So we sell our system to**

18    **integrators, our direct customer.  They integrate it on video**

19    **and they resell to an end user like EBA, Tetra Tech.**

01:12PM 20    Q.   And for how long has EBA and Tetra Tech been your

21    customer?

22    A.   **2012.**

23    Q.   Just for the record, could you identify Exhibit 576?

24    A.   **Yes.  This is a June 2012 invoice for the rental of an**

01:13PM 25    **LCMS sytem to ICC International Cybermetrics Corporation on**

142

1    **behalf of EBA and Tetra Tech.  You can see on the invoice the**

2    **primary contact at Pavemetrics System.  And that the system**

3    **was shipped to Darel Mesher Chief Technology Officer of EBA**

4    **Engineering Consultants in Edmonton, Alberta.  So the invoice**

01:13PM 5    **shows that we rented sensors, acquisition software and data**

6    **processing software for road surface defects.**

7    Q.   And I notice the date says 12/06/2012.  Just for

8    clarifying the record, could you explain the date and the way

9    it is presented on this page?

01:14PM 10    A.   **Yeah, I always trying to get it fixed, but with our**

11    **software, it's not really easy.  So this is the French way of**

12    **writing the date.  You start with the date, the month, and**

13    **then the year.  So it's June 12, 2012.**

14    Q.   If we can just show a picture of the top of Exhibit 576

01:15PM 15    so we know exactly what the witness was referring to.

16    In the upper left, uh, it appears in Quebec you

17    put -- you use more of a European style of dating.  Is that

18    what you meant?

19    A.   **Yes, that's the French way of writing the date.**

01:15PM 20    Q.   So it's day, month, and then year; correct?

21    A.   **That's correct.**

22    Q.   And if we can go to the bottom half and see what's being

23    purchased and rented.

24    A.   **Yeah, it's an LCMS system composed of the sensors and**

01:15PM 25    **its controller and acquisition software and also data**

143

1    **processing software for road surface defects.**

2    Q.   And it says $30,000.  I think it's safe to say this is

3    not a purchase, but a rental agreement?

4    A.   **Yes, that's correct.**

01:16PM 5    Q.   And what happened next in your relationship with

6    Tetra Tech?

7    A.   **Well, we worked closely with their integrator and**

8    **Tetra Tech.  And a couple of months later, they decided to**

9    **purchase the system.**

01:16PM 10    Q.   And if you could identify Exhibit 578 for the record,

11    please.

12    A.   **578 you said?**

13    Q.   We have it on the screen if that helps.

14    A.   **No, I have it in the binder.  I think it's easier.**

01:17PM 15    **Okay.  This is a chain of email that lead to the**

16    **purchase of the system by ICC on behalf of EBA Tetra Tech.**

17    **If you go to the bottom of that email chain.**

18    Q.   To the invoice?

19    A.   **Page 3, page 3.  You can see that Darel Mesher the CEO**

01:17PM 20    **of EBA sent an email to its integrator Rob Olenoski.  In this**

21    **email Darel made it clear that he wanted to be able to**

22    **extract the complete raw elevation data from our system.**

23    **So when I saw that, I proposed to make it**

24    **available.  You just go to page 2.  So I offered ICC for or**

01:18PM 25    **EBA to come into a yearly technical support and we will**

144

1    **include the access to the data.**

2    Q.   Okay.  Let me ask you some questions.  Why did you offer

3    to EBA Tetra Tech your raw data?

4    A.   **Well, because they were a customer, they requested it,**

01:18PM 5    **and I thought if you wanted to build some features that were**

6    **not necessarily available in our software.**

7    Q.   And did Tetra Tech and ICC buy any more units from you

8    over the years?

9    A.   **Yes.  In 2017 they acquired another system.**

01:19PM 10    Q.   And throughout this period, did they continue to be your

11    customer?

12    A.   **Yes, yes.**

13    Q.   And what kind of services was Tetra Tech purchasing from

14    you from 2012 for the next ten years or so?

01:19PM 15    A.   **Uh, essentially software support plan including the raw**

16    **data access.**

17    Q.   And did Tetra Tech always pay for continual services

18    from you?

19    A.   **Yes, yes.  They were a good customer.**

01:19PM 20    Q.   And when's the last time you remember Tetra Tech paying

21    you for your services?

22    A.   **Um, it was towards the end of 2020, although they also**

23    **had an equipment failure in 2021 that we fixed.**

24    Q.   This equipment failure did that occur before or after

01:20PM 25    the litigation?

**EXHIBIT 3**

**-93-**

145

1  A.  Uh, after the litigation.

2  Q.  And so you kept dealing with Tetra Tech even after the

3  suit was filed; is that correct?

4  A.  That's correct.

01:20PM 5  Q.  And why did you continue to service, provide services to

6  Tetra Tech even though the litigation had commenced?

7  A.  Well, they were a good customer and I was convinced that

8  this case would be resolved quickly.

9  Q.  And what other interactions have you had with the

01:20PM 10  company Tetra Tech other than what we've discussed?

11  A.  In 2016, 2017, Robic, a law firm representing when they

12  were fighting a patent infringement case with GREX contacted

13  me and I provided prior art and evidence about the use of 3D

14  laser system for the inspection of railways.

01:21PM 15  Q.  And what is your understanding of how you got involved

16  in Tetra Tech's patent litigation against GREX?

17  A.  Robic's lawyer got my name from Darel Mesher who

18  recommended me as a potential witness.

19  Q.  And Robic is R-o-b-i-c?  It's the name of a law firm in

01:22PM 20  Canada?

21  A.  That's correct.

22  Q.  And they were the lawyers for Tetra Tech?

23  A.  Yes.

24  Q.  And did you cooperate and provide information and deal

01:22PM 25  with Tetra Tech's lawyer in the 2017 time frame?

146

1  A.  Yes, I did.

2  Q.  And was there anybody at Pavemetrics who would have

3  preferred that you not participate in helping Tetra Tech?

4  A.  My colleague John Laurent preferred that I didn't

01:22PM 5  participate.

6  Q.  Why did Mr. Laurent object to you serving as an expert

7  and helping Tetra Tech win their case against GREX?

8  A.  He didn't want to attract the attention of GREX on to

9  Pavemetrics.

01:23PM 10  Q.  Why?  What's your understanding why?

11  A.  Um, you know, we didn't want to be involved in a

12  lawsuit.  We wanted to avoid any kind of dispute and we

13  thought if -- if the attention -- GREX had sued many other

14  companies before and we just didn't want to be involved in

01:23PM 15  any lawsuit.

16  Q.  But you, if I understand the facts, you still helped

17  Tetra Tech even though your partner Mr. Laurent would have

18  preferred you did not; is that correct?

19  A.  That's correct, but not as an expert witness.  I helped

01:23PM 20  them.  I provided evidence and prior art only.

21  Q.  So you didn't then accept serving as an expert witness;

22  is that correct?

23  A.  Yes, that's correct.

24  Q.  Instead you just provided information and prior art to

01:24PM 25  help Tetra Tech; is that correct?

147

1  A.  That's correct.

2  Q.  When did you first learn about either of the two patents

3  that are at issue in this trial?

4  A.  On January 5, 2021, I received a letter from Aaron

01:24PM 5  Parker, uh, partner at Finnegan who wrote to me on behalf of

6  Tetra Tech.  By the way that letter only mentioned the '293

7  patent.

8  Q.  Okay.  If we can just call that up.  Can you see on the

9  screen when we put up a document?

01:24PM 10  A.  Yeah.

11  Q.  Exhibit 51.  It's previously admitted the other day.

12  A.  It's not on the screen right now.  Okay.  I see it.

13  Q.  Is this the January 5, 2021 letter you just referred to?

14  A.  Yes, it is.

01:25PM 15  Q.  And what did this letter demand that you do if you

16  remember?

17  A.  Their letter requested that we stop making and selling

18  LRAIL and it gave us 14 days to respond.

19  Q.  And what was your initial reaction upon receiving

01:25PM 20  Exhibit 51?

21  A.  Well, I was shocked.  Tetra Tech had been a good

22  customer for ten years.  I helped them when they fought

23  patent litigation case with GREX.  And now they were asking

24  that we stop making and selling the LRAIL.  Didn't make too

01:26PM 25  much sense to me.

148

1  Q.  Why didn't it make much sense to you?

2  A.  Well, after all this dealing with Tetra Tech, um, didn't

3  expect it from a customer.

4  Q.  And did you ever ignore this letter?

01:26PM 5  A.  No, not at all.  I responded within the date Mr. Parker

6  gave me.

7  Q.  If you could identify for the record Exhibit 661.

8  A.  Yes.  This is a chain of email that shows my

9  correspondence with Mr. Parker from Finnegan, Tetra Tech's

01:27PM 10  lawyer.  So the first email at the bottom essentially shows

11  that on January 5th, yeah, on January 5th, Mr. Parker just

12  sent me the letter that you just showed me.

13  Q.  Okay.  This is the cover email for Exhibit 51?

14  A.  Yes, that's correct.

01:27PM 15  Q.  Okay.  And it's from Aaron Parker to you dated

16  January 5th at 4:57 p.m.  Do you see that?

17  A.  Yes.

18  Q.  And I notice there's some cc's, Nicholas Cerulli, Aaron

19  Parker, Wanda Whittington.  And the subject is cease and

01:28PM 20  desist letter patent infringement.  Do you see that?

21  A.  Yes.

22  Q.  And do you recall receiving this cover email at the same

23  time that you received the attachment to the email which is

24  Exhibit 51?

01:28PM 25  A.  Yes.

**EXHIBIT 3**

**-94-**

149

1   Q.  And just looking at this email chain, how many back and

2 forth emails did you have with Mr. Aaron Parker?

3   A.  Mr. Parker sent me three emails and I responded.  I

4 always responded within the days he gave me.

01:28PM 5   Q.  And what did you do after receiving the email and the

6 letter of Exhibit 51?

7   A.  I read the patent.  I paid special attention to the

8 claims and I was convinced that we didn't infringe the

9 patent.

01:29PM 10   Q.  And why did you know to spend special attention to the

11 claims?

12   A.  Sir, can you please repeat the question?

13   Q.  Yes.  How did you know to spend special attention on the

14 claims?

01:29PM 15   A.  Well, this is what counts; right?  Like that's what the

16 patent claims.  That's the invention.  So I wanted to know

17 what was claimed, what invention was claimed.  So I read, uh,

18 started with the independent claims and I saw that the patent

19 required analyzing a 3D map and that 3D map was constructed

01:30PM 20 using an image involving intensity and elevation data

21 together.

22          And I knew that our traditional algorithm didn't

23 analyze and create an image combining intensity and elevation

24 data.  Was only about elevation data, our algorithm only

01:30PM 25 about elevation data.

150

1          And furthermore, in 2014 we published, well, in

2 collaboration with the University of Massachusetts,

3 Pavemetrics published a paper in a 2014 conference where we

4 disclosed the algorithm that we were using for our LRAIL.

01:31PM 5 That was well before the '293 patent was filed so I was

6 confident we didn't infringe.

7   Q.  So it sounds like you know something about reading a

8 patent because you referred to an independent claim.  How did

9 you know about things like independent claims and reading

01:31PM 10 claims and understanding the patent like you did?

11   A.  In 2014 I worked closely with a law firm and my

12 expertise was in the telecom sector at the time.  And I

13 teaching lawyers how telecom systems worked and that's when

14 they taught me about independent and dependent claims.

01:32PM 15   Q.  And did you write a letter back to Mr. Parker?

16   A.  Of course I did.

17   Q.  I'd like to have you identify for the record Trial

18 Exhibit 660 if we can call that up.

19   A.  Yes.  This is the letter I wrote to Mr. Parker on

01:32PM 20 January 19th within the 14 days he gave me.  And if you look

21 at my letter, it says that we will have a U.S. patent

22 attorney study the patent '293 of which we were unaware.

23   Q.  So did you write this letter before retaining counsel in

24 this case?

01:32PM 25   A.  Yes.

151

1   Q.  And was it true when you wrote this letter on

2 January 19th that you, your company, anyone you know was

3 unaware of the '293 patent before January 5th?

4   A.  I was unaware of the '293 patent before receiving the

01:33PM 5 letter from Mr. Parker and my colleagues John Laurent and

6 Jean-Francois Hebert were not aware of that patent.

7   Q.  After you sent your January 19th response, did you hear

8 from Mr. Parker again?

9   A.  Yes.  He sent me an email.

01:33PM 10   Q.  And if we can go back to Exhibit 661 to look at

11 Mr. Parker's email of Monday, January 25, 2021.

12   A.  Yes, this is the email that I received from Mr. Parker.

13 He is requesting that we provide a detailed analysis of

14 Claim 1 of the '293 patent by February 12, 2021.  Otherwise,

01:34PM 15 he will file a complaint against Pavemetrics.  So --

16   Q.  And -- I didn't mean to cut you off.

17   A.  I was saying essentially, uh, he was threatening us to

18 go to court.

19   Q.  And did you ever receive from Tetra Tech or its lawyers

01:34PM 20 any detailed analysis why you infringed Claim 1 at any time?

21   A.  No.

22   Q.  But it appears they expected you to tell them why

23 Pavemetrics did not infringe; is that correct?

24   A.  That's correct.

01:35PM 25   Q.  And after Mr. Parker sent and you received his

152

1 January 25th email, what did you do next?

2   A.  I wrote back.  Sorry, sorry.  After that letter, what I

3 did, okay, we hired you, Mr. Re and Knobbe Marten law firm.

4 We learned that we didn't have to sit around when Tetra Tech

01:35PM 5 kept sending us letters like that and we decided to file a

6 suit for declaration that Pavemetrics doesn't infringe the

7 '293 patent.

8   Q.  Okay.  Before we get to the filing of the suit, there's

9 a few more pieces of correspondence I want to get through.

01:36PM 10 Could you identify Trial Exhibit 77 for the record, please?

11   A.  77.  Oh, yeah, you're right.  I'm forgetting about this

12 letter.  Yes, this is a letter I wrote to Mr. Parker on

13 February 1st.  And what it says is that we have conducted a

14 preliminary internal analysis on this '293 patent and that we

01:36PM 15 have reached preliminary conclusions that the LRAIL does not

16 infringe the claims of the '293 patent.  I also said that we

17 were in the process of choosing a U.S. patent attorney and

18 that he will respond directly to him in due course.

19   Q.  And this was written prior to hiring me and my law firm;

01:37PM 20 is that correct?

21   A.  Yes, that's correct.

22   Q.  And after you wrote Exhibit 77, what happened next in

23 your correspondence with Mr. Parker?  Do you remember?

24   A.  I think there might have been another email that we

01:38PM 25 received and that email kind of said that if we didn't stop

**EXHIBIT 3**

**-95-**

153

1  making the LRAIL and offering it for sale, uh, that they were
2  threatening us of going to court.
3  Q.  Let's take a look at Exhibit 661, the top portion.
4  A.  Yes.  Yeah, that's the email where Aaron Parker says
01:38PM 5  that if by February 12th, Pavemetrics doesn't provide a
6  detailed claims analysis, I will have no choice then filing a
7  complaint against Pavemetrics.
8  Q.  In fact he says if by February 12, 2021, Pavemetrics
9  does not provide a detailed analysis on an element-by-element
01:39PM 10  basis explaining why Pavemetrics LRAIL does not infringe
11  Claim 1 of the '293 patent, Tetra Tech will have no choice
12  but to proceed with filing the complaint against Pavemetrics
13  in the U.S. District Court for patent infringement of the
14  '293.
15          I want to ask you again did Tetra Tech ever provide
01:39PM 16  to you a detailed analysis on an element-by-element basis why
17  they believed you infringed?
18  A.  No, not at that time.
19  Q.  And this February 5th email was in response to your
01:40PM 20  January 25th email letter of Exhibit 77; correct?
21  A.  That's correct.  I responded by the deadline that they
22  had given me.
23  Q.  And so now what happened after February 5th when you
24  received Mr. Parker's final email?
01:40PM 25  A.  Well, I also met with my colleague John and

UNITED STATES DISTRICT COURT

154

1  Jean-Francois and they revealed other reasons why he believed
2  that we didn't infringe Claim 1 of the '293 patent.  And so
3  collectively we were all confident that we didn't infringe
4  the patent.  That's also when we hired you and Knobbe Marten.
01:41PM 5  Q.  And when did you first think that your AI networks were
6  even at issue in this case?
7  A.  Oh, wow.  Okay.  The patent is 70 pages long.  I read
8  it.  Nowhere in the patent it mentions artifical
9  intelligence.  Nowhere in the patent it mentions neural
01:41PM 10  network.  I was convinced that this was all about
11  conventional algorithms.  Furthermore, our artificial
12  intelligence engine uses publicly available neural networks
13  so I couldn't see it.
14  Q.  Could you repeat the statement about using a publicly
01:41PM 15  available neural network?
16  A.  Yes.  We use public libraries.  You know, there are lots
17  of them public neural networks available from Facebook,
18  Google.  All these companies they make neural networks
19  available in the public domain.
01:42PM 20  Q.  So if I understand you, you didn't think your neural
21  network was at issue because you used publicly available
22  tools and software.
23  A.  That's correct.  And the patent didn't mention
24  artificial intelligence nor neural networks.
01:42PM 25  Q.  And have you ever written to people outside of

UNITED STATES DISTRICT COURT

155

1  Pavemetrics expressing your confidence in this litigation?
2  A.  Yes.  It came up when a patent -- sorry.  It came up
3  when a company showed a desire to acquire Pavemetrics.
4  Q.  And if you could identify for the record the redacted
01:43PM 5  Trial Exhibit 85?
6  A.  Yes, I have it in front of me.
7  Q.  What is that?
8  A.  Do you want to put it on the screen?
9  Q.  Yes.
01:43PM 10  A.  Okay.
11  Q.  Go slowly, Richard.  It's very difficult to hear you.
12          Is this email from you?
13  A.  Yes.
14  Q.  And to whom are you writing?
01:43PM 15  A.  I am writing to Martin Theriault who is the president of
16  Eddyfi NDT.
17  Q.  And why were you writing to Eddyfi NDT?
18  A.  Eddyfi NDT showed an interest in acquiring Pavemetrics
19  and they asked me about this lawsuit.  So if you read the
01:44PM 20  email, you will see that I am very confident that this
21  lawsuit was just about intimidation from Tetra Tech.
22  Q.  Let's go through it slowly.
23  A.  Okay.
24  Q.  You are explaining some facts about the dispute between
01:44PM 25  Pavemetrics and Tetra Tech.  Do you see that?

UNITED STATES DISTRICT COURT

156

1  A.  Yeah.
2  Q.  And if we can highlight that above the redaction and
3  I'll read it to the record says, "following a few letters of
4  intimidation from Tetra Tech's lawyers such as the one
01:45PM 5  attached to this email."  Let's stop there.
6          What did you attach to this email?
7  A.  It was one of the email that Mr. Parker sent me.
8  Q.  And isn't it true it was Exhibit 51 which is dated
9  January 5th and it's referred to in the attachment section
01:45PM 10  above.  If we can scroll up, you see where it says
11  attachments?
12  A.  Yeah, the cease and desist letter.
13  Q.  Does that refresh your recollection that it was
14  Exhibit 51 that you were showing to your potential acquirer;
01:45PM 15  correct?
16  A.  Yes, that's true.
17  Q.  Let's continue where I was reading.  Let's finish the
18  highlighting.  It then says, Pavemetrics brought an action to
19  obtain a declaratory judgment that it does not infringe Tetra
01:46PM 20  Tech's patent 10,362,293.  Do you see that?
21  A.  Yes.
22  Q.  And what was your intention in bringing this declaratory
23  judgment action before this jury?
24  A.  Well, it was to show that we were very confident in our
01:46PM 25  position, we were very confident we didn't infringe Tetra

UNITED STATES DISTRICT COURT

EXHIBIT 3
-96-

157

1   Tech's intellectual property.
2   Q.   Are you aware one of the issues being presented in this
3   trial is an allegation that you infringed willfully?
4   A.   Yes.
01:46PM 5   Q.   Did you at any time ever believe Pavemetrics was
6   infringing either the '293 or the '557 patents?
7   A.   I was always confident that we didn't infringe those two
8   patents.
9   Q.   Did you ever, ever believe that any customer of yours
01:47PM 10   was directly infringing by using your LRAIL system?
11   A.   Definitely not.
12   Q.   Let's continue going down this email.
13         The next paragraph, let's highlight it.  It's one I
14   want to show my mother.  Our lawyer is Joseph Re partner at
01:47PM 15   Knobbe Martens.  Joe's also President of the American
16   Intellectual Property Law Association.  As this dispute is a
17   significant investment for Pavemetrics, you will find that we
18   have hired the best lawyer to represent us.
19         Why were you conveying that to your potential
01:47PM 20   acquirer?
21   A.   I wanted to give them confidence that we didn't infringe
22   and if they wanted to learn more, they could contact you
23   directly.  I was also trying to show them that we take IP
24   very seriously.
01:48PM 25   Q.   Let's continue as we go further down this email.  You

UNITED STATES DISTRICT COURT

158

1   then say you'd like to reiterate the following regarding
2   intellectual property litigation and you then discuss two
3   lines down CSX.  Do you see that?
4   A.   Yes.
01:48PM 5   Q.   And you said CSX chose the Pavemetrics LRAIL because it
6   is superior to all other railroad inspection systems.  This
7   will likely have a driving affect with other U.S. railways.
8         What were you conveying to your acquirer with that
9   statement?
01:48PM 10   A.   Well, CSX was the first Tier 1 customer that acquired
11   our LRAIL system and I was hoping that many more U.S. railway
12   would do the same.
13   Q.   The next statement says Tetra Tech, a company with a
14   market capitalization of $6.5 billion also coveted CSX's
01:49PM 15   business.  What were you conveying with that statement?
16   A.   Well, I thought at this point the fight was David and
17   Goliath.  Pavemetrics is a tiny company.  We have managed to
18   sell our products to CSX and that was all about intimidation
19   from that large company.
01:49PM 20   Q.   The next statement says in the face of the loss of this
21   opportunity, Tetra Tech chose bullying.
22         What did you mean by bullying?
23   A.   Intimidation.  It wanted us to go away.
24   Q.   And then a couple lines down, you invite further
01:50PM 25   discussion.  Why would you invite further discussion about

UNITED STATES DISTRICT COURT

159

1   the details of the litigation?
2   A.   I wanted to show that we were confident that Pavemetrics
3   didn't infringe Tetra Tech's intellectual property.
4   Q.   And what ultimately happened, the culmination of this
01:50PM 5   discussion with Eddyfi?
6   A.   I'm sorry.  Could you please repeat your question?
7   Q.   What you said, if you're too worried about the dispute
8   going forward, then I understand and we can stop the
9   discussions.  Do you see that?
01:50PM 10   A.   Yes, that's correct.  You know, sometimes companies want
11   to acquire another one, it can be afraid of an ongoing
12   litigation.  So I told them if after seeing this lawsuit, if
13   they wanted to walk away, I was okay with that.
14   Q.   And what happened?  Did they walk away or did a purchase
01:51PM 15   occur?
16   A.   Yes, a purchase occurred.
17   Q.   And so now Pavemetrics was recently purchased by what's
18   the name of the company they've been bought by?
19   A.   Uh, Gradient.  Eddyfi he change its name.  It's a
01:51PM 20   holding company and Pavemetrics is now a subsidiary of
21   Gradient.
22   Q.   Okay.  I want to change subjects on you and I want to,
23   uh, do you understand that one of the LRAIL sales alleged to
24   be a patent infringement is your sale to the engineering firm
01:52PM 25   Advance Infrastructure Design known as AID?

UNITED STATES DISTRICT COURT

160

1         Do you know that?
2   A.   Yes.
3   Q.   And you know in this case, we've been calling that Sale
4   No. 1; right?
01:52PM 5   A.   Yes.
6   Q.   And when did you make the Sale No. 1 to AID?
7   A.   December 2020.
8   Q.   And how do you know the exact date of the sale?
9   A.   I would need to see the invoice and any payment
01:52PM 10   identification.
11   Q.   Okay.  I'd like to identify what's been marked as
12   Trial Exhibit 595.  Could you identify that?
13   A.   Yeah, I have it in front of me.
14   Q.   What's that?
01:52PM 15   A.   This is an invoice to AID on December 23rd, 2020, and
16   the invoice states the payment terms says payable upon
17   receipt.
18   Q.   What does payable upon receipt mean?
19   A.   It means that the amount is owed when they receive the
01:53PM 20   invoice.
21   Q.   And did they pay upon receiving the invoice?
22   A.   Yes, they did.
23   Q.   And if we could look at Exhibit 875, particularly the
24   second page of this email string to AID.  I'm looking at
01:53PM 25   page 2 of the eight-page Exhibit 875.  There's an email by

UNITED STATES DISTRICT COURT

**EXHIBIT 3**
**-97-**

161

1    you dated Thursday, December 24th, 10:14 a.m.
2         Do you see that?
3    A.   Yes.
4    Q.   So you were working on Christmas Eve it looks like.
01:54PM 5    A.   Yeah, I never stop.
6    Q.   Okay.  And does this email confirm in your mind that
7    payment was made in full by AID on December 24, 2020?
8    A.   Yes, the money was in our bank account when I check on
9    December 24th.
01:54PM 10   Q.   And when did you recognize the sale to AID on your
11   books?
12   A.   December 2020.
13   Q.   And why did you recognize this sale and receive payment
14   so quickly from AID?
01:54PM 15   A.   Well, the final invoice had been sent, payment was
16   received, and the customer wanted the expense in his
17   financial year 2020.
18   Q.   Okay.  I'd like to change subjects now.  One issue that
19   comes up occasionally is your pricing of your LRAIL system.
01:55PM 20        How does or how did Pavemetrics determine the price
21   you would charge for LRAIL?
22   A.   Well, we had been making the LCMS for road inspection
23   for multiple years and we just used the same pricing
24   structure as for the road inspection project.  So
01:55PM 25   essentially, the two projects had the same value to the

UNITED STATES DISTRICT COURT

162

1    customer.  Furthermore, it used the same sensor, the same
2    hardware, the same acquisition software.  The only difference
3    is in the processing software where the algorithms are
4    different.
01:55PM 5    Q.   But the difference in the algorithms in the software
6    between the LCMS and the LRAIL causes no change in price; is
7    that correct?
8    A.   That's correct.  The same price structure.
9    Q.   I want to change subjects again on you, and I really
01:56PM 10   thank you for being able to do this.  I recognize it was a
11   bit of an imposition, but I'll be brief.
12        I see Pavemetrics does a lot of publishing.  Do you
13   know notice that?
14   A.   Yes.
01:56PM 15   Q.   Why does Pavemetrics do so much publishing of their
16   research and development?
17   A.   My colleague John Laurent is from NOI, the National
18   Optical Institute, and it's a research center so John had
19   been publishing his work for almost 10 years.  Pavemetrics
01:56PM 20   just continued doing the same.
21   Q.   And what are some of the other reasons you publish your
22   research for all to see?
23   A.   Uh, we did a lot of work for U.S. -- I don't mean
24   U.S. -- for government agency like the Federal Road
25   Administration of the Department of Transportation of the

UNITED STATES DISTRICT COURT

163

1    U.S. government, the Federal Railway Administration, the FRA
2    for short.  So the FRA is a good customer and since they're
3    our customer, our bids and material are in the public domain.
4    Q.   What do you mean by public domain?
01:57PM 5    A.   Uh, I think they would be published all the bids that we
6    receive.
7    Q.   And I notice you don't file lots of patents.
8    A.   Oh, may I go back to the previous questions?  There are
9    another reasons whey we publish a lot.  It kind of shows that
01:58PM 10   we have developed our product and it shows when we've
11   developed it.  The conference paper I mentioned earlier in
12   2014 is a good example of it.  So it shows that we developed
13   our system.  It shows when we developed it, but we always
14   believed we were ahead of everybody in our research and
01:58PM 15   development activities.
16   Q.   I just want to clarify something.  Slow down for a
17   second.  One word you were you saying I had a little trouble
18   understanding.  Were you saying the word develop
19   d-e-v-e-l-o-p?
01:58PM 20   A.   Yeah.
21   Q.   So by publishing it shows when or by when Pavemetrics
22   developed what's in the publication.  Is that what you meant?
23   A.   Yes.
24   Q.   And what's the benefit of having a fixed date in a
01:59PM 25   publication showing the world what you have developed?

UNITED STATES DISTRICT COURT

164

1    A.   Oh, you see this is a good questions.  You know, if you
2    look at the date our paper was published with the University
3    of Massachusetts, it's well before the '293 patent with a
4    time stamp on it.
01:59PM 5    Q.   And did that paper give you confidence that you could
6    continue to sell LRAIL despite the intimidation and bullying
7    from Tetra Tech?
8    A.   Yes.
9         MR. RE:  I have no further questions, Your Honor.
02:00PM 10        THE COURT:  Cross-examination?
11        MR. BARNEY:  Yes, Your Honor.
12        And may I ask your policy on the sequestering of
13   witnesses, fact witnesses, during cross-examination?
14        THE COURT:  Yes, they should be sequestered.
02:00PM 15        MR. RE:  No, Your Honor, it's too late.  That
16   practice of Rule 615 sequestration has to be invoked prior to
17   the first witness.
18        THE COURT:  I'm not sure what's in our standing
19   orders, but fact witnesses shouldn't be listening to other
02:00PM 20   witnesses.
21        MR. RE:  That is not correct, Your Honor.  That --
22        THE COURT:  That's my policy.  I don't want fact
23   witnesses listening to other fact witnesses.
24        MR. RE:  Your Honor, I feel that we were prejudiced
02:00PM 25   because if we weren't following Rule 615 of the Federal

UNITED STATES DISTRICT COURT

**EXHIBIT 3**

**-98-**

165

1 Rules, I would have requested sequestration of their fact
2 witnesses and I didn't get to do that.  In fact their
3 witnesses --
4    THE COURT:  Wait one second.  Counsel, were your
02:00PM 5 fact witnesses --
6    MR. BARNEY:  Yes, they were sequestered,
7 Your Honor.
8    THE COURT:  That's what I had suspected.  It's a
9 pretty standard practice.  I'm surprised it didn't come up
02:00PM 10 earlier, but yes, fact witnesses should not be watching other
11 fact witnesses testify.
12    MR. RE:  Okay.  Just -- no, he's the corporate
13 representative.  The corporate representative gets to stay.
14 There's only one fact witness.
15    MR. BARNEY:  May I proceed, Your Honor?
02:01PM 16    THE COURT:  Please.
17    CROSS-EXAMINATION
18 BY MR. BARNEY:
19 Q.   Good afternoon, Mr. Habel.
02:01PM 20 A.   Good afternoon, sir.
21 Q.   I apologize we can't meet face-to-face so you'll just
22 have to take my word for it that I'm better looking than
23 Mr. Re.
24    MR. RE:  So stipulated.
02:01PM 25 BY MR. BARNEY:

UNITED STATES DISTRICT COURT

166

1 Q.   I want to pick up where Mr. Re left off regarding your
2 receipt of the notice of infringement on January 5, 2021.
3 Okay?
4 A.   Yes.
02:02PM 5 Q.   Now, your testimony was that you received that letter
6 and you did your own analysis of the patent and you felt
7 based on that analysis, that you did not infringe it; is that
8 correct?
9 A.   Yes.
02:02PM 10 Q.   Now, it's true that you don't have a law degree; right?
11 A.   This is true.
12 Q.   And you don't have formal training in patent law;
13 correct?
14 A.   That's correct.
02:02PM 15 Q.   And you have no formal training in interpreting patents;
16 correct?
17 A.   That's correct.
18 Q.   You do, however, have some experience in searching for
19 patents.  I believe you testified about that with Mr. Re; is
02:02PM 20 that correct?
21 A.   Correct.
22 Q.   So one of the things you did when you were a consultant
23 in the intellectual property field for two to three years,
24 you searched for patents and prior art; correct?
02:02PM 25 A.   That's not exact.  My primary function was to look at

UNITED STATES DISTRICT COURT

167

1 patents and explain how telecommunication systems were
2 working.
3 Q.   But you did search for patents as a consultant in the
4 intellectual property field; correct?
02:03PM 5 A.   That was not my mandate.  My mandate was to explain how
6 telecom system were working to lawyers.
7 Q.   Not my question.  I did not ask you about your mandate.
8 Like to remind you that you already testified about this in
9 your deposition.  And I believe you testified that while you
02:03PM 10 were an intellectual property consultant, you searched for
11 patents; isn't that correct?
12    MR. RE:  Your Honor, it's improper impeachment
13 without access to page and line number if he's gonna use the
14 deposition in a peremptory way that like.
02:03PM 15    THE COURT:  No, it's okay.  He's asking him a
16 question if that's what he testified.  He can say yes or no
17 or I don't know.
18    THE WITNESS:  I did search for patents on the US
19 PTO website.
02:04PM 20 BY MR. BARNEY:
21 Q.   You know how to search for patents on the US PTO
22 website; correct?
23 A.   Yeah, you enter some key words.
24 Q.   Sure.  And in fact you also know how to search for
02:04PM 25 trademarks because I believe you searched for trademarks on

UNITED STATES DISTRICT COURT

168

1 the US PTO website; correct?
2 A.   I did that once, yes.
3 Q.   Okay.  So I know you've testified about what you did,
4 what you did after you received Mr. Parker's letter, but I
02:04PM 5 would like to ask you what you did not do.  Okay.
6 A.   Okay.
7 Q.   You did not take the 10 or 15 minutes that it would have
8 taken for you to go to the PTO website to search for what
9 other patents were in the family of the '293 patent that was
02:04PM 10 identified in that letter, did you?
11 A.   That's correct.
12 Q.   And I believe when you were asked about that at your
13 deposition, your answer was that's because Mr. Parker's
14 letter only identified the '293 patent.  Is that fair?
02:05PM 15 A.   That's true.
16 Q.   Now, the fact of the matter is Tetra Tech and its
17 attorneys at that time did not have access to Pavemetrics
18 confidential source code; correct?
19 A.   Yes.
02:05PM 20 Q.   But you did; right?
21 A.   Yes.
22 Q.   So the only person in the world really who could tell
23 whether there might be infringement of another patent in the
24 family at that point was you or your colleagues who had
02:05PM 25 access to your confidential source code.

UNITED STATES DISTRICT COURT

**EXHIBIT 3**
**-99-**

169

1  Do you understand that?

2  A.  First of all, I'm not a patent attorney.  Okay?  I

3  cannot reach that conclusion on myself.  And Mr. Parker

4  seemed to know our products well and he just raised the '293

02:06PM 5  patent and he focused on Claim 1.

6  Q.  So let me ask you a different question.  If I understand

7  the time line correctly, you sent -- why don't we have

8  Exhibit 77 on the screen.  This is the email you responded

9  back to Mr. Parker dated February 1st.

02:06PM 10  In the email you indicated towards the bottom that

11  you are in the process of choosing a U.S. patent attorney who

12  will independently assess your allegations of infringement.

13  Did I read that correctly?

14  A.  Yes, that's correct.

02:06PM 15  Q.  So that way February 1st and I will represent to you

16  that you filed this lawsuit against my client on

17  February 11th.  Will you accept my representation?  Does that

18  sound correct to you?

19  A.  Yes.

02:07PM 20  Q.  So I'm assuming that you hired the Knobbe Martens law

21  firm some time between February 1st and February 11th.  Does

22  that sound reasonable?

23  A.  That's correct.  I think we hired them on February 11th.

24  Q.  Now, Mr. Re was asking you about that AID sale you made.

02:07PM 25  I'd like to show you a different exhibit.  I don't believe

UNITED STATES DISTRICT COURT

---

170

1  it's in your binder.  In your binder can you please turn to

2  985.

3  A.  Yes, I have it.

4  Q.  And let's get that on the screen.  Do you recognize

02:08PM 5  that, sir?

6  A.  Yes.

7  Q.  And what is it?

8  A.  It's the invoice I sent to AID on December 23rd, 2020.

9  MR. BARNEY:  So I do have a document.  It arose

02:08PM 10  during Mr. Re's direct examination.  It was not in the

11  binder.  So at this time, I'd like to show Mr. Re.

12  THE COURT:  In evidence.

13  MR. BARNEY:  It's not in evidence yet.  I'd like to

14  move it in.  It's not in Mr. Habel's binder.

02:09PM 15  Q.  Mr. Habel, you mentioned you sold a system to AID, an

16  LRAIL system.  Do you recall that?

17  A.  Yes.

18  Q.  And do you recall you delivered that LRAIL system to AID

19  on February 23rd, 2021?  Does that sound correct?

02:09PM 20  A.  Some bits and pieces were delivered in February.

21  Q.  And does February '21 sound about right?

22  A.  Well, the last bits and pieces, yes, but the sensors

23  were delivered earlier.

24  Q.  Understood.  But if I were to represent to you that

02:10PM 25  Mr. Hafiz who testified earlier in this trial confirmed

UNITED STATES DISTRICT COURT

---

171

1  receipt of the LRAIL system on February 23rd, 2021, would

2  that about right to you?

3  A.  No, because what we called the system is the sensors and

4  the sensors were picked up on January 4th because their

02:10PM 5  carrier had some delays.

6  Q.  So the additional pieces that were necessary to operate

7  the LRAIL system were shipped in February.  Is that what

8  you're saying?

9  A.  Yes, it was metal works and computers.

02:10PM 10  Q.  Now, at any time after you hired the Knobbe Marten law

11  firm and you already had high-power legal counsel, president

12  of the American Intellectual Property Law Association and so

13  forth, did you look into the PTO website and spend ten

14  minutes to make sure that system that you were in the process

02:11PM 15  of delivering to AID did not infringe any other patents?

16  A.  No.

17  Q.  Why not?

18  A.  We figured that the lawyers of the Tetra Tech knew about

19  their IP portfolio and if there was something I needed to

02:11PM 20  see, they would have raised it to my attention.

21  Q.  Mr. Habel, if it only took ten minutes to check the PTO

22  website for the additional patents in the patent family, why

23  not just spend that ten minutes?

24  A.  It doesn't take just ten minutes to analyze the patent

02:11PM 25  portfolio and you know it.  Took me a while just to analyze

UNITED STATES DISTRICT COURT

---

172

1  the '293 patent so I had my hands full.

2  Q.  Okay, Mr. Habel.  Let's change topics.  Do you know a

3  person by the name of Mr. Fox-Ivey?

4  A.  Yes, Richard Fox-Ivey, he's a consultant working with

02:12PM 5  us.

6  Q.  Thank you.  He's a principal consultant for Pavemetrics?

7  A.  Correct.

8  Q.  And one of the things he does is he does marketing

9  reports for Pavemetrics; correct?

02:12PM 10  A.  He did some marketing reports, that's correct.

11  Q.  And you trust the work that Mr. Fox-Ivey does for

12  Pavemetrics; correct?

13  A.  Yes, but I don't check all of his work.

14  Q.  And Mr. Fox-Ivey has a Pavemetrics email address; isn't

02:12PM 15  right?

16  A.  That's correct.  It makes it easier when he interacts

17  with customers.

18  Q.  And that's my point.  So when he interacts with your

19  customers and potential customers he holds himself out as

02:12PM 20  being a representative of Pavemetrics; correct?

21  A.  He holds himself as being a principal consultant for

22  Pavemetrics.

23  Q.  Right.  With a Pavemetrics email address and doesn't he

24  also list the corporate Pavemetrics mailing address under his

02:13PM 25  tag line in his correspondence?

UNITED STATES DISTRICT COURT

**EXHIBIT 3**
**-100-**

173

1      A.   That's true.

2      Q.   Likewise, when Pavemetrics gives presentation to the

3 industry, it identifies Mr. Fox-Ivey as being associated with

4 Pavemetrics; correct?

02:13PM 5      A.   **It identifies him as being a principal consultant for**

6 **Pavemetrics.**

7      Q.   So changing gears again, I'd like you to look in your

8 binder and find Exhibit 53.

9      A.   **There is no Exhibit 53 in my binder.**

02:13PM 10      Q.   Please ask Ms. Nazareth to give you the cross binder. I

11 apologize, Mr. Habel. I should have made that clear to you.

12          THE COURT:  Can I ask counsel is there a set of

13 binders for me somewhere?

14          MR. BARNEY:  I believe they're on the credenza,

02:14PM 15 Your Honor.

16          THE WITNESS:  Look at the indexing of this binder,

17 it's got numbers going from 1 to 28. What number is it?

18          MR. BARNEY:  I'm looking for Exhibit 53. Perhaps

19 Ms. Nazareth can help you.

02:15PM 20          THE WITNESS:  It goes from 49 to 57 so it's not

21 there.

22          MR. BARNEY:  I apologize for that. That's part of

23 the problem doing zoom examinations.

24          Your Honor, I'm hoping this could solve the

02:15PM 25 problem. Your Honor, Mr. Re has given me a thumb's up to put

UNITED STATES DISTRICT COURT

---

174

1 this on the screen. May I do so, Your Honor?

2          THE COURT:  Sure.

3          MR. BARNEY:  I apologize again, Mr. Habel. I don't

4 know why it didn't get sent to you. I'm going to put it on

02:16PM 5 the screen and I would like you to take a look at it.

6      Q.   And tell me whether this is the summary of sales

7 information that you prepared in response to Tetra Tech's

8 Interrogatory No. 2?

9      A.   That's correct.

02:16PM 10      **What is the date on it because there were a few**

11 **versions?**

12      Q.   This one I believe is the latest version, the last one

13 you did.

14      A.   Okay.

02:16PM 15      Q.   And really I just want to confirm a couple things so we

16 don't need to dwell on this document. Can you confirm for

17 fiscal year 2102, you sold one set of LRAIL hardware to the

18 University of Massachusetts for the purpose of conducting

19 research for use on a railway system?

02:17PM 20      A.   That's correct.

21      Q.   And then after that one sale, Tetra Tech did not make

22 another U.S. sale of an LRAIL system until 2020; is that

23 correct?

24      A.   Tetra Tech?

02:17PM 25      Q.   Oh, I'm sorry. Pavemetrics did not make another sale of

UNITED STATES DISTRICT COURT

---

175

1 the LRAIL system until 2020; is that correct in the

2 United States?

3      A.   **That's correct. There were consulting fees, but no**

4 **system sale.**

02:17PM 5      Q.   And what I'd like to do now for the rest of my

6 questioning of you, Mr. Habel, I'd like to go back in time

7 and take you back to the year 2014.

8      Hopefully, you have Exhibit 73 in your binder.

9      A.   Yes.

02:18PM 10      Q.   I'm thankful. Is this a document titled "Rail and

11 Tunnel Inspection Market Overview and Strategy"?

12      A.   Yes.

13      Q.   And do you recognize this as a report that was created

14 by Mr. Fox-Ivey?

02:18PM 15      A.   That's what it says at the top.

16          MR. RE:  I object until he lays a proper

17 foundation.

18 BY MR. BARNEY:

02:18PM 19      Q.   Was this document produced by Pavemetrics in this case?

20 It's got a Pavemetrics production number?

21      A.   **Is the question for me?**

22      Q.   Mr. Habel, do you recognize this document?

23      A.   **It's a document that Richard Fox-Ivey prepared for John**

24 **in November 2014.**

02:19PM 25      Q.   And that's John Laurent?

UNITED STATES DISTRICT COURT

---

176

1      A.   That's correct.

2      Q.   And this document was produced to us from your corporate

3 files; correct?

4      A.   Yes.

02:19PM 5          MR. BARNEY:  Your Honor, I move the admission of

6 Exhibit 73.

7          MR. RE:  No objection.

8          THE COURT:  Exhibit 73 is in evidence.

9          (Exhibit 73 admitted.)

02:19PM 10 BY MR. BARNEY:

11      Q.   If I could go to page 3 of this market overview and

12 strategy document. Mr. Habel, this document says that the

13 document broadly outlines what we know about the global rail

14 and tunnel inspection markets as well as provides a suggested

02:20PM 15 plan of attack. Do you see that?

16      A.   Yeah.

17      Q.   And what I want to do is go to page 18 where that plan

18 of attack is laid out. Let's just begin under the words our

19 offer. Let know when you're ready.

02:20PM 20      A.   Yeah, I have page 18 in front of me.

21      Q.   The document states that our easiest way in is likely to

22 be an inspection company (based in Canada or the U.S.) that

23 is already working with the Tier 1 railroads, but has

24 antiquated technology we can replace.

02:20PM 25      Do you see that?

UNITED STATES DISTRICT COURT

**EXHIBIT 3**

**-101-**

177

1   A.   Yes.

2   Q.   And you understand what is meant by Tier 1 railroads;

3   right?

4   A.   Yes.

02:21PM 5   Q.   Those are the big, big railroad companies; right?

6   A.   Correct.

7   Q.   And in the second paragraph or the second one down

8   underneath that it says, "Our immediate value-add to them

9   will be superior imaging technology since we don't yet have

02:21PM 10   all the algorithms for automated distress analysis.  As we

11   develop and prove our algorithms, we will have a stronger

12   selling proposition."  Did I read correctly?

13   A.   That's correct.

14   Q.   Okay.  And the third paragraph says, "The other

02:21PM 15   advantage that we can bring to the market is a

16   multifunctional system that is priced well below the higher

17   accuracy competition (as per feedback John Laurent obtained

18   from MTM Geismar.  Did I read that correctly?

19   A.   Yes.

02:22PM 20   Q.   Now, Mr. Habel like you to turn in your binder and find

21   Exhibit 46, please.

22   A.   Yes, I have it.

23   Q.   And do you recognize it?

24   A.   Boy, it looks like a Power Point with our logo on the

02:22PM 25   front page.

UNITED STATES DISTRICT COURT

178

1   Q.   And is it titled 2016 LRAIL Market Review and 2017 Plan?

2   A.   Yes.

3   Q.   And, again, it was produced to Tetra Tech in this case

4   from Pavemetrics' business files?

02:23PM 5   A.   I suspect so.

6        MR. BARNEY:  Your Honor, we move the admission of

7   Exhibit 46 into evidence.

8        THE COURT:  Any objection?

9        MR. RE:  No objection, Your Honor.

02:23PM 10        THE COURT:  46 is in evidence.

11        (Exhibit 46 admitted.)

12   BY MR. BARNEY:

13   Q.   Mr. Habel, can you please turn to page 2 of Exhibit 46.

14   And just to look at the agenda of this Power Point, it

02:23PM 15   includes Market Overview, 2016 Marketing Efforts Review,

16   2017 Marketing Approach, Technology Development Required and

17   Questions for Serge.  Do you see that?

18   A.   Yes.

19   Q.   And does that indicate to you that this presentation was

02:23PM 20   given at the end of 2016 or the very beginning of 2017?

21   A.   I suspect from the title from the front page.

22   Q.   It was in that time frame; correct?

23   A.   Yeah.

24   Q.   And if you could turn to page 3, please.

02:24PM 25   A.   I have it.  Okay.

UNITED STATES DISTRICT COURT

179

1   Q.   So I want to read these bullet points and then I have

2   some questions.  So the first bullet point says -- actually,

3   the third bullet point says, "Market has interest, but we

4   don't yet have a killer app.  One thing that we do which no

02:24PM 5   one else can nor do we have a proven system."

6        Did I read that correctly?

7   A.   Yes.

8   Q.   And then the next bullet says, "Part of the problem in

9   finding a killer app is working around legal issues.  Other

02:24PM 10   part is it takes time and integrator feedback to develop and

11   validate.  Market is also undecided."

12        Did I read that correctly?

13   A.   Yes.

14   Q.   If you could go to page 5, please.  You see this is a

02:25PM 15   slide titled "State of Technology".  Do you see that?

16   A.   Yeah.

17   Q.   And the first bullet point says, "We have done

18   eight-plus demos.  Still haven't hit any out of the park."

19        Did I read that correctly?

02:25PM 20   A.   Yes.

21   Q.   And the next bullet point says, "We haven't processed

22   more than a few hundred miles in total so we still have

23   plenty to learn."  Did I read that correctly?

24   A.   Yes.

02:25PM 25   Q.   The next bullet point says, "We haven't done real time

UNITED STATES DISTRICT COURT

180

1   processing yet (need to create templates on the fly, need to

2   process at 60 miles per hour but currently only 7.2

3   kilometers per hour) so six PCs needed?"

4        Did I read that correctly?

02:25PM 5   A.   Yes.

6   Q.   Now, for those of us in the U.S. who may not be familiar

7   with kilometers per hour, am I correct that 7.2 kilometers

8   per hour is about five miles an hour?

9   A.   Yes.

02:26PM 10   Q.   And that's a lot slower than 60 miles per hour; correct?

11   A.   Correct.

12   Q.   And the next bullet point says, "Technology isn't ready

13   for production use yet."  Did I read that correctly?

14   A.   Yes.

02:26PM 15   Q.   Now, let's go to page 9, please.  And page 9 is titled

16   "2017 Market Focus Continued".  Do you see that?

17   A.   Yes.

18   Q.   And there's a section that talks about a company called

19   Zetica, do you see that?

02:26PM 20   A.   Yeah.

21   Q.   Zetica was a potential client at that time, a potential

22   customer?

23   A.   Yes.

24   Q.   And it says regarding Zetica, they see the potential,

02:26PM 25   but they also see there is still work to do.  They want real

UNITED STATES DISTRICT COURT

**EXHIBIT 3**
**-102-**

---

181

1  time at speed results.  Do you see that?
2  A.  Yeah.
3  Q.  And real time at speed results means they want results
4  faster than five miles per hour; correct?
02:27PM 5  A.  I think it's what is meant.
6  Q.  They want results that come out at the speed that the
7  trains are actually traveling; correct?
8  A.  That's correct.
9  Q.  And let's go to page 10, please.  And at the top of
02:27PM 10  page 10 this is under the topic Required Tech Development,
11  the first bullet point is "basically we have a bunch of proof
12  of concept algorithms."  Do you see that?
13  A.  Yeah.
14  Q.  And then it says, "Now we need to make production ready
02:27PM 15  tools out of them.  Process miles, fix problems, publish new
16  versions; is that right?
17  A.  Yeah, that's correct.
18  Q.  You could put that aside.  I'm now going to move to the
19  year 2017, Mr. Habel.  I'd like to show you and you can just
02:28PM 20  look on the screen or turn to Exhibit 14 in your binder.
21  It's already in evidence so if we could please have it on the
22  screen.  And just to blow up maybe the first part of it.
23  A.  14 you said?
24  Q.  Yeah.
02:28PM 25  A.  Okay.  I have it.

UNITED STATES DISTRICT COURT

---

182

1  Q.  And can you confirm that this is an email exchange?
2  It's a chain of emails between you and Mr. Fox-Ivey and it
3  copies a couple other people.  Do you see that?
4  A.  Yes.
02:28PM 5  Q.  And the title of it is Tetra Tech court case.
6     Do you see that?
7  A.  Yes.
8  Q.  If you can go down further in the chain from where we
9  are now just to see the original question.  Can you confirm
02:28PM 10  that what was being conveyed in this email was some
11  information about the Tetra Tech court case, and in this
12  chain of emails, you had a question about who Rail Radar was?
13     Do you see that?
14  A.  That's correct.
02:29PM 15  Q.  At the very top of this email chain, Mr. Fox-Ivey
16  responds on October 16, 2017 copying Mr. Laurent and
17  Mr. Hebert.  And his response is, he answers your question, I
18  think Tetra Tech owns Rail Radar, but then he adds you might
19  also be interested to see Darel's list of patents.
02:29PM 20     Do you see that?
21  A.  Yes.
22  Q.  And he provided a Google link that listed patents that
23  named as the inventor Darel Mesher?
24  A.  Yes.  I didn't click on that link.
02:29PM 25  Q.  And you understand that to be Dr. Darel Mesher, the

UNITED STATES DISTRICT COURT

---

183

1  Chief Technology Officer of Tetra Tech TAS?
2  A.  Yes, and I didn't click on the link.
3  Q.  So by the date of this email, Pavemetrics knew
4  Dr. Mesher had patents; correct?
02:30PM 5  A.  I knew it before.  I didn't --
6  Q.  And you reviewed some of -- I'm sorry.
7     MR. RE:  Objection.  I'd like the witness to
8  finish.  Just go a little slower.  I went slower --
9     THE COURT:  Counsel, counsel, sit down.  I told you
02:30PM 10  before address yourself to the Court.  If you guys want to
11  talk, you can ask for a break and go outside.  I'm not gonna
12  tell you again.  Sit down.
13     Please proceed, Counsel.
14  BY MR. BARNEY:
02:30PM 15  Q.  Mr. Habel, I apologize for cutting you off.  It's an
16  artifact of the zoom call that we're on.  Can you please
17  continue your answer?
18  A.  I said I didn't click on that link, but I knew Darel
19  Mesher had patents because when I met with Robic, their
02:30PM 20  lawyer told me Darel Mesher, but he didn't mention at that
21  time Darel Mesher had patents on work that he had done
22  previously well before their LRAIL system, well before the
23  '293 patent.
24  Q.  Okay.  If you could turn in your binder, uh, since
02:31PM 25  you've mentioned the GREX case, please turn in your binder to

UNITED STATES DISTRICT COURT

---

184

1  Exhibit 67.
2  A.  Yeah.
3  Q.  And do you recognize this?
4  A.  Yes.  I'd like to see it on the screen just to make
02:31PM 5  sure.
6  Q.  I'll do that, but I have to move it into evidence first.
7     Do you recognize it as an email chain between you
8  and other people at Pavemetrics in April of 2017?
9  A.  Yes, 18 of April 2017.
02:31PM 10     MR. BARNEY:  Your Honor, we move for the admission
11  of Exhibit 67.
12     THE COURT:  Any objection?
13     MR. RE:  No objection.
14     THE COURT:  Exhibit 67 is in evidence.
02:32PM 15     (Exhibit 67 admitted.)
16  BY MR. BARNEY:
17  Q.  Okay.  And just to set the table here, we already know a
18  Canadian law firm called Robic had contacted you to
19  potentially be an expert witness in a litigation between
02:32PM 20  Georgetown Rail called GREX and Tetra Tech; is that correct?
21  A.  Yes.
22  Q.  And the lawsuit was about Tetra Tech's 3DTAS system;
23  right?
24  A.  I didn't know the name of the system at the time.
02:32PM 25  Q.  Fair enough.  And you were unsure how to respond to that

UNITED STATES DISTRICT COURT

---

**EXHIBIT 3**
**-103-**

185

1   law firm's request; is that fair?

2   A.   Yes.

3   Q.   And so you sent an email out to your team and you wanted

4   their input, you wanted their advice or recommendations as to

02:32PM 5   what you should do; is that correct?

6   A.   I suspect I did.  I know that I seek advices from my

7   colleagues.

8   Q.   Mr. Laurent, if you go down towards the bottom of the

9   email and work our way back up, Mr. Laurent responded to your

02:33PM 10  inquiry and his response was, "I am not sure how our

11  testimony can help them if they don't use our stuff."

12      Do you see that?

13  A.   Yes.

14  Q.   And it is true, is it not, that Tetra Tech in its 3DTAS

02:33PM 15  system that was at issue in that case did not use

16  Pavemetrics' stuff; right?

17      MR. RE:   Lacks foundation.  Mischaracterizes

18  testimony.

19      THE COURT:   He can answer the question if he can.

02:33PM 20     THE WITNESS:   At that time we just didn't know what

21  Tetra Tech were doing.  We were just guessing.  You'll

22  remember earlier that I said that they asked for raw data

23  access?  So we didn't know what they were doing, what

24  processes were that they might be using our LCMS and that

02:34PM 25  they build software using these profiles.

186

1   BY MR. BARNEY:

2   Q.   Okay.

3   A.   The 3D raw data.  So this is why John said that no, we

4   don't if they are using our stuff or not.  If they don't use

02:34PM 5   it, it might be useless.

6   Q.   Thank you.

7       The next thing he said, however, is also, your C.V.

8   is not 3D vision, it's telecom, and they would probably

9   discredit you on that in court.  Do you recall that?

02:34PM 10  A.   Yes.

11  Q.   Okay.  So let's move up the email chain and Mr. Fox-Ivey

12  weighed in at some point.  And Mr. Fox-Ivey indicated, um,

13  sort of in that first bullet point, they already have their

14  own rail inspection system in play.  If they win the case,

02:35PM 15  why would they switch to ours?  Do you see that?

16  A.   Yes.

17  Q.   So you knew at the time Tetra Tech had a rail inspection

18  system on the market; correct?

19  A.   Okay.  That's what's written there, but it was pure

02:35PM 20  speculation.

21  Q.   You weren't aware that they were competing for rail

22  inspection business, uh, for instance with the Rail Canada?

23  A.   You know they could have just used our system for it.  A

24  year earlier Rob Olenoski, their integrator, had told me that

02:35PM 25  if it hadn't been of the GREX lawsuit, we would have been

187

1   selling many LRAIL to its customer so. . .

2   Q.   I just want you to listen to my question.  I'm afraid

3   we're two ships passing in the night.

4       Did you know in April of 2017 that Tetra Tech had a

02:36PM 5   rail inspection system on the market called 3DTAS?

6   A.   No.

7   Q.   Okay.  That's fair enough.

8   A.   I never heard of the name 3DTAS or if I saw it, I didn't

9   memorize it the 3DTAS.  The first time I Googled it is when

02:36PM 10  we received the '293 patent and the only thing on Google on

11  the 3DTAS was that patent.

12  Q.   Now, at the top of your email, you announce your

13  decision on whether or not you're going to participate in

14  this lawsuit.  Excuse me.  As an expert as requested by the

02:36PM 15  Robic law firm.

16      If I could just blow up that very top email from

17  you to your team, you say in the third paragraph, it's not

18  clear that we would sell more LCMS LRAILs to Tetra Tech.  You

19  mention the fact that they're paying money for the access to

02:37PM 20  the raw data.  You mention that they might also be working on

21  rail applications using our sensors.  Do you see that?

22  A.   Yes.

23  Q.   And then you say working with Robic on this case would

24  be a good opportunity to know exactly what Tetra Tech is

02:37PM 25  doing for rail inspection.  Did I read that correctly?

188

1   A.   Yes.  And can I comment on that?

2   Q.   Well, let me ask you a question and I'm sure your

3   response will include your comment.  Was that an opportunity

4   for you to gather information about a potentially competitive

02:37PM 5   product?

6   A.   No.  We had -- we had been in the dark for a while and I

7   wanted to know if they were going to use our LCMS LRAIL

8   system.

9   Q.   And to be fair, what you said in your email at the time

02:38PM 10  is you wanted to know exactly what Tetra Tech is doing for

11  rail inspection.  Weren't those your words?

12  A.   That's right.  I wanted to know what type of features

13  they had built on our sensors.

14  Q.   And then what you concluded therefore is I will offer to

02:38PM 15  work anonymously.  That's what you decided to do; right?

16  A.   That's right because my colleague John didn't want GREX

17  to pay attention to us.

18  Q.   Okay.  Mr. Habel, we're going to now move forward one

19  more year to 2018.  Did there come a time in 2018 or perhaps

02:38PM 20  early 2019 when Pavemetrics decided to transition the LRAIL

21  software to deep neural networks?

22  A.   That's correct.

23  Q.   And Pavemetrics prepared presentations and papers on the

24  use of deep neural networks; correct?

02:39PM 25  A.   Yes, we did some presentations on DNN.

EXHIBIT 3
-104-

189

| | |
|---|---|
| 1 | Q. If you could turn in your binder to Exhibit 88, please. |
| 2 | A. Yes. |
| 3 | Q. Do you recognize this? |
| 4 | A. It's an email from me to Richard Fox-Ivey. |
| 02:39PM 5 | MR. BARNEY: Your Honor, I'd move for the admission |
| 6 | of Exhibit 88. |
| 7 | THE COURT: Exhibit 88 any objection? |
| 8 | MR. RE: No objection. |
| 9 | THE COURT: Exhibit 88 can come into evidence. |
| 02:39PM 10 | (Exhibit 88 admitted.) |
| 11 | BY MR. BARNEY: |
| 12 | Q. If you could look at the bottom of page 2 of this email |
| 13 | because you have to build these emails up from the bottom. |
| 14 | In this email chain, Mr. Fox-Ivey is providing you guys a |
| 02:39PM 15 | draft presentation regarding deep learning; right? |
| 16 | A. That's correct. |
| 17 | Q. And he asked for your comments; right? |
| 18 | A. Yes. |
| 19 | Q. And if you can go all the way up to the bottom of |
| 02:40PM 20 | page 1, your comment back to Mr. Fox-Ivey was good job. That |
| 21 | will make our competitor reluctant to start, initiate any IP |
| 22 | litigation and will reinsure our potential customers. |
| 23 | Did you read that correctly? |
| 24 | A. That's right. Everybody was afraid of GREX in the |
| 02:40PM 25 | industry. |

UNITED STATES DISTRICT COURT

190

| | |
|---|---|
| 1 | Q. And then in your next paragraph you say is I |
| 2 | particularly like the conclusion on the last slide, DNNs, and |
| 3 | that stands for deep neural networks; right? |
| 4 | A. That's correct. |
| 02:40PM 5 | Q. DNNs like our brain do not follow a well-understood |
| 6 | algorithm so it is not possible to patent a particular DNN |
| 7 | nor is it possible to infringe upon existing patents with a |
| 8 | DNN. Isn't that what you wrote? |
| 9 | A. Exactly. |
| 02:41PM 10 | Q. Now, who told you that? Who told you that that was a |
| 11 | fact? |
| 12 | A. My colleague John Laurent has a Master's degree in |
| 13 | Artificial Intelligence and he knew deep neural network very |
| 14 | well. |
| 02:41PM 15 | Q. Does Mr. Laurent have a degree in law? |
| 16 | A. No, he has a degree in electrical engineering and a |
| 17 | Master's degree in Electrical Engineering and he has been |
| 18 | using deep neural networks for 30 years. |
| 19 | Q. I'm not doubting his credentials, sir, but I'm asking |
| 02:41PM 20 | does he have any credentials that you know of that would |
| 21 | allow him to offer this opinion that it's not possible to |
| 22 | infringe a patent with a deep neural network? |
| 23 | A. He's not a lawyer. You're right. |
| 24 | Q. And then finally you say, um, if you go down to the |
| 02:42PM 25 | third paragraph, you offer some -- some rephrasing and the |

UNITED STATES DISTRICT COURT

191

| | |
|---|---|
| 1 | reason is it suggests that our existing algorithms are not |
| 2 | using DNNs and we want to maintain some ambiguity in order to |
| 3 | achieve our objectives. Do you see that? |
| 4 | A. Yes. |
| 02:42PM 5 | Q. And how did maintaining ambiguity regarding your -- the |
| 6 | use of DNNs help you achieve your objectives? |
| 7 | A. Well, we were at the place where we're transitioning our |
| 8 | traditional algorithms to artificial intelligence. I don't |
| 9 | know why I wrote that. Why did I want to maintain some |
| 02:42PM 10 | ambiguity. It was probably about the time when we would |
| 11 | shift from conventional to neural network. You know it's |
| 12 | really fast when you use DNN so it's not like conventional |
| 13 | algorithm. It goes much faster and at the time, I didn't |
| 14 | know how fast it would go. I don't know. That's only |
| 02:43PM 15 | context I can put around it. |
| 16 | Q. Okay. So let's move to a different exhibit. I'd like |
| 17 | you to look in your binder and find Exhibit 89. |
| 18 | A. Yeah. |
| 19 | Q. And do you recognize that exhibit? |
| 02:43PM 20 | A. Yeah, it's an email from Richard Fox-Ivey to John and |
| 21 | Jean-Francois and Mario Talbot and myself are cc'ed. |
| 22 | MR. BARNEY: Your Honor, at this time we move for |
| 23 | the admission of Exhibit 89. |
| 24 | THE COURT: Any objection? |
| 02:43PM 25 | MR. RE: No objection. |

UNITED STATES DISTRICT COURT

192

| | |
|---|---|
| 1 | THE COURT: Exhibit 89 is in evidence. |
| 2 | (Exhibit 89 admitted.) |
| 3 | BY MR. BARNEY: |
| 4 | Q. Again, this is another one of these big email chains |
| 02:44PM 5 | with several different people involved. Is that fair? |
| 6 | A. Yes. |
| 7 | Q. And I'd like to go down to page 3 in the last big |
| 8 | paragraph on page 3. And just for orientation, this is from |
| 9 | Mr. Fox-Ivey. Do you see that? |
| 02:44PM 10 | A. Yes. |
| 11 | Q. He's thanking you and Mr. Laurent for your feedback; |
| 12 | right? |
| 13 | A. Yes. |
| 14 | Q. And down in that last paragraph, uh, he's got an |
| 02:44PM 15 | explanation and let me just read it, and then I have a |
| 16 | question. |
| 17 | It says, "John, will this be a true statement? I |
| 18 | think the key premise in our argument is that DNNs are |
| 19 | constantly changing at the hidden level so there isn't any |
| 02:45PM 20 | one specific methodology that you can point to as being "our |
| 21 | method". Thus we can't patent the whole of the DNN nor can |
| 22 | the whole of the DNN infringe on an existing patent. |
| 23 | "At best you could patent one specific DNN |
| 24 | configuration that was true at one specific moment in time. |
| 02:45PM 25 | By the same token, you could argue at one specific time the |

UNITED STATES DISTRICT COURT

**EXHIBIT 3**

**-105-**

193

1  DNN configuration did infringe on someone's IP, but that
2  moment would be fleeting as the DNN configuration would
3  subsequently change as the DNN "learns".
4      Do you recall reading that analysis from
02:45PM 5  Mr. Fox-Ivey?
6  **A.  Mr. Fox-Ivey has a degree in philosophy so when he**
7  **writes technical information and legal stuff, you should take**
8  **it with a grain of salt.**
9  Q.  And so you agree with me he's not a lawyer and you don't
02:45PM 10  know where he got this theory that somehow a deep neural
11  network just can't infringe.
12  **A.  I'm sure he probably got it from the Internet.  And the**
13  **deep neural networks they configure themselves so it's**
14  **understanding is that the neural network will configure**
02:46PM 15  **itself to achieve what it was trained to do.  So the**
16  **configuration of the DNN might be patented, but when he train**
17  **it on or -- I don't have a degree in computer vision either.**
18  Q.  Okay.  Let's go to the next page and let's see your
19  comments.  Blow up the email from you back to Mr. Fox-Ivey.
02:47PM 20      And your statement is "that although we should make
21  sure that the technical content is correct, our main
22  objectives are discourage our competitors to initiate IP
23  litigation against us and reassure our potential customers
24  about the IP situation of the LRAIL."
02:47PM 25      Did I read that correctly?

UNITED STATES DISTRICT COURT

194

1  **A.  Yes, that's correct.  At that time we were afraid of**
2  **GREX.  GREX was suing everybody.  It prevented us from**
3  **selling many LRAIL.  It was all about GREX.**
4  Q.  Well, you say it was all about GREX, but you say your
02:47PM 5  main objectives were to discourage our competitors plural.
6  So who else other than GREX were you trying to discourage
7  from initiating IP litigation against you?
8  **A.  Well, there are many, many other rail inspection**
9  **equipment suppliers and service providers so we were afraid**
02:48PM 10  **of another GREX.**
11  Q.  And Tetra Tech was also one of your competitors at that
12  time, wasn't it?
13  **A.  No, they were our customer.  And I helped them in 2017**
14  **in their legal confrontation with GREX.  They were a**
02:48PM 15  **customer.  A customer that requested my help, help that I**
16  **provided.**
17  Q.  So let's go up and see what Mr. Laurent had to say about
18  the situation.  Same email chain.  Mr. Laurent responded to
19  Mr. Fox-Ivey copying you and Mr. Hebert and Mr. Talbot.  And
02:49PM 20  his comment was if we get sued, it's your fault.
21      Did I read that correctly?
22  **A.  Yes, it looks like sarcasm to me.**
23  Q.  By the way where is Mr. Fox-Ivey?  I mean, do you know
24  where he is physically?
02:49PM 25  **A.  He's on vacation this week.**

UNITED STATES DISTRICT COURT

195

1  Q.  Did you ask him --
2  **A.  I don't know where physically he is, but I think he's on**
3  **vacation.**
4  Q.  Did you ask him in your role as president and CEO of the
02:49PM 5  company to come and testify in this trial?
6  **A.  No.**
7  Q.  Okay.  Moving forward to 2019.  And I would like you to
8  turn in your binder to Exhibit 3.  It's already in evidence
9  and so we're gonna put it on the screen.
02:50PM 10  **A.  Yes.**
11  Q.  This is an email, again, from the ever popular
12  Mr. Fox-Ivey and he is responding to a call that I believe
13  you issued for a brain-storming session concerning LRAIL; is
14  that correct?
02:50PM 15  **A.  Yes.**
16  Q.  And the date of this is September 4th, 2019 which I
17  believe was the day the meeting was scheduled to occur;
18  correct?
19  **A.  Yes.**
02:51PM 20  Q.  And what Mr. Fox-Ivey is adding is some bullet points in
21  advance of the meeting.  And his first bullet point in
22  September of 2019 was LRAIL is not selling.  We want to find
23  a way to make money from it.
24      Did I read that correctly?
02:51PM 25  **A.  Yes.**

UNITED STATES DISTRICT COURT

196

1  Q.  He then says, and by the way, these are all bold type in
2  the original email.  We need to discuss why it is not
3  selling.  What do we think we know?  Do we know enough?
4      Do you see that?
02:51PM 5  **A.  Yeah.**
6  Q.  And about four bullet points later, four bullet points
7  down, one of his question was will having DNN flip the
8  switch?  Do you see that?
9  **A.  Yeah.**
02:51PM 10  Q.  So he's wondering if using this deep neural network is
11  going to flip the switch and make it sell; right?
12  **A.  Yeah.**
13  Q.  And if you continue down that page, he lists several
14  LRAIL disadvantages.  Uh, the first one he lists is that it's
02:52PM 15  not proven in the industry, but we are doing the three FRA
16  projects that is exactly for this purpose.  You see that?
17  **A.  Yeah, that's correct.**
18  Q.  And then his next one was not as hi-speed as pure as 2D
19  system would be.  You see that?
02:52PM 20  **A.  Yeah.**
21  Q.  And then his last bolded bullet point again was
22  emphasizing we need to develop some potential ways to
23  increase sales that fit with why it's not selling.
24      Did I read that correctly?
02:52PM 25  **A.  Yeah.**

UNITED STATES DISTRICT COURT

**EXHIBIT 3**
**-106-**

197

1   Q.  Oh, and the one right above that under disadvantages is
2   that it's not as hi-resolution and accuracy as some dedicated
3   solutions for geometry rail head ware; correct?
4   A.  Yes, and the technology he's referring here it's some
02:53PM 5   kind of technology where you walk on the railway and it's
6   very precise.
7         MR. BARNEY:  No further questions.
8         Thank you for your time.  I do apologize for the
9   glitchiness.
02:53PM 10        THE WITNESS:  You're welcome.
11        THE COURT:  Counsel, how long do you think your
12  redirect will take?
13        MR. RE:  Three minutes.
14              REDIRECT EXAMINATION
02:53PM 15  BY MR. RE:
16  Q.  Mr. Habel, can you hear me?
17  A.  Yes.
18  Q.  When did you first believe the DNN or CNN or any neural
19  networks of LRAIL was even at issue in this case?
02:53PM 20  A.  Oh, it came really late in the case.
21  Q.  Well after the case was filed in 2021.
22  A.  That's correct.
23  Q.  In all the correspondence that Mr. Barney showed you, in
24  any of it did you ever suspect that Tetra Tech could be a
02:54PM 25  possible plaintiff asserting a patent against you?

UNITED STATES DISTRICT COURT

198

1   A.  I'm sorry.  Please repeat the question.
2   Q.  Throughout the years 2016, 2017, 2018, 2019, even 2020,
3   did you ever suspect that Tetra Tech would assert patents to
4   prohibit the sale of LRAIL?
02:54PM 5   A.  Never, never.  I was really shocked when I received the
6   letter from Mr. Parker.
7   Q.  And when Mr. Laurent was making the joke about it's your
8   fault if we get sued, who was at issue in the preceding email
9   that created the joke by Mr. Laurent?
02:55PM 10  A.  I think it was Richard Fox-Ivey or myself.
11  Q.  No, but who was the company, who was the company at
12  issue attending the conference in the front row?
13  A.  Okay, I'm sorry.  Can you point me to the exhibit?  I
14  apologize.
02:55PM 15  Q.  It's Exhibit 89.  Remember when Mr. Laurent made the
16  joke or made the statement if we get sued, it's your fault.
17        Do you see that?
18  A.  Yeah.
19  Q.  And he's writing to Richard Fox-Ivey.  Do you see that?
02:55PM 20  A.  Yeah, was expecting GREX to be in the front row.
21  Q.  Exactly.  Is this about Tetra Tech at all?
22  A.  Never.
23  Q.  And Tetra Tech received and requested quotes from you to
24  buy an LRAIL from you in 2020; isn't that correct?
02:56PM 25  A.  Yes.

UNITED STATES DISTRICT COURT

199

1   Q.  So when was the first time you ever suspected that Tetra
2   Tech had a patent that could in any way relate to LRAIL?
3   A.  I never thought that the patents related to rail
4   inspection and I couldn't see why I received a letter from
5   Mr. Parker that they could have thought our LRAIL infringed
02:56PM 6   on their intellectual property.  I never thought it.
7   Q.  And when did you first even think that Tetra Tech was in
8   fact a competitor of yours?
9   A.  When I received that letter.
02:57PM 10        MR. RE:  I have no further questions, Your Honor.
11        THE COURT:  Okay.  Counsel, anything else?
12        MR. BARNEY:  Nothing, Your Honor.
13        THE COURT:  The witness is excused.
14        We'll take our afternoon break.  We'll come back
02:57PM 15  here at ten minutes after 3:00.  Thank you.
16              (Jury not present.)
17        THE COURT:  Be back at ten minutes after 3:00.
18              (Recess taken.)
19        THE COURT:  Okay.  Please have a seat.
03:12PM 20        When we broke for lunch, we had a witness on the
21  stand who is now back on the stand.
22        Counsel, you can proceed with your direct
23  examination.
24              DIRECT EXAMINATION (CONTINUED)
03:12PM 25  BY MS. MATHEW:

UNITED STATES DISTRICT COURT

200

1   Q.  Mr. Schoettelkotte, welcome back.
2   A.  Thank you.
3   Q.  Before we broke for lunch, you were talking about the
4   Georgia Pacific factors specifically the benefits of the
03:12PM 5   patent technology; correct?
6   A.  That's correct.
7   Q.  And we were viewing the other documents that set forth
8   the benefits associated with that patent technology?
9   A.  That's correct.
03:12PM 10  Q.  Can we put up Slide 19?
11        And could you just remind us what you were saying
12  about this slide and what the benefits were?
13  A.  Sure.  So we were talking about the Georgia Pacific
14  factors, specifically, Factors 8 and 9 as well as 14.  And
03:13PM 15  these were some documents that I had identified in the
16  marketplace from Tetra Tech, the Federal Railroad
17  Administration, Pavemetrics and ENSCO which are highlighting
18  the 2D and 3D scanning capabilities and importance of those
19  for railroad industry for a number of reasons.
03:13PM 20        Largely, cost savings, return on investment,
21  accuracy, getting humans off of the tracks to prevent
22  injuries, things of that nature.  Those were all things we
23  heard Mr. Larson talk about yesterday as part of his
24  testimony.
03:13PM 25  Q.  Do the technical factors also consider the availability

UNITED STATES DISTRICT COURT

EXHIBIT 3
-107-

201

1   of whether a noninfringing alternative is available?

2   A.   They do because not only is it important to assess the

3   benefits of the technology in terms of what they provide from

4   an economic standpoint, we also want to know whether there

03:14PM 5   are alternatives that are available.

6        You can imagine when you have something that's

7   rare, you say to yourself well, if it's rare, it would be

8   more valuable because there are not alternatives for it.  If

9   you can do something, you know, many different ways perhaps,

03:14PM 10   maybe something has less value.

11        Here you'll recall earlier when we talked about the

12   second Panduit Factor which was whether acceptable and

13   available alternatives exists, I had told you that that

14   factor had been met meaning no alternatives were available

03:14PM 15   for the patents at issue in this case.

16        Well, I also take that into account here because if

17   it is rare, it's rare and you can't recreate the benefits of

18   this technology without infringing, well, that would mean

19   that the patents are more valuable so it would add upward

03:15PM 20   pressure on the royalty rate.  Rare -- rare things require a

21   premium.

22   Q.   And so can you summarize the overall impact that the

23   technical Georgia Pacific factors have on your analysis of

24   the reasonable royalty in this matter?

03:15PM 25   A.   Sure.  So the technical factors that would be Factors 8

202

1   and, um, excuse me, 9 and 10 rather would have an upward

2   impact on the royalty.  Those are the first two, the first

3   two data points are benefits and the last one is lack of a

4   noninfringing alternative.  There would be significant upward

03:15PM 5   impact for these factors based upon the manner of the

6   benefits and that there are no alternatives that would be

7   available for the patents at issue.

8   Q.   Now, let's turn to the business financial factors.

9   Which factors are included here?

03:15PM 10   A.   Factor 5, Factor 6, 8 and 11 and 13.

11   Q.   Beginning with Factor 5 commercial relationship between

12   the parties, can you please explain that and how that would

13   affect the hypothetical negotiation?

14   A.   So I view these factors as being, um, some of the more

03:16PM 15   important.  I mean they're all important, but some of the

16   more important factors in this case.  You know, when I'm

17   evaluating factors in cases, I look at, you know, certain of

18   the factors in some cases that are more important or less

19   important.  These factors are extremely important here and

03:16PM 20   largely because we've seen that Tetra Tech and Pavemetrics

21   are direct, head-to-head competitors.  We saw that with their

22   efforts to both make sales to CSX.  So if they're the only

23   two players in the market and they're direct, head-to-head

24   competitors, then it gets into a situation where if you are

03:16PM 25   the one losing the sale, immediately you begin to think about

203

1   well, what does that mean to my margins?  What type of sales

2   and profits do I lose when my direct, head-to-head competitor

3   makes the sale and I don't?  And those are the types of

4   things that from an economics standpoint really kind of come

03:17PM 5   to bear when you think about the competitive relationship

6   between parties.  So this particular factor would have an

7   upward impact.

8        There's also, and I'm going to take Factors 6, 8

9   and 11 together.  6, 8 and 11 focus on two things really, the

03:17PM 10   profitability of products that are being sold.  One of the

11   things we want to look at is well, are the products

12   successful?  Are they selling in the market and do they drive

13   significant profit premiums?  And if they do, well, then that

14   would put upward pressure on the royalty, but it would also

03:17PM 15   serve as a data point for consideration as to what someone

16   would be willing to pay in order to access that technology.

17   So if you have technology and you can charge a premium price

18   and generate premium profits, well that would stand to

19   suggest you'd be willing to pay a relatively meaningful

03:18PM 20   royalty in order to access that technology and so that's

21   really what Factors 6 and 8 and 11 suggest.

22        Factor 6 is just slightly different, though, in

23   that talks about someone called conveyed sales.  The phrase

24   actually came from when you think about trucks going down the

03:18PM 25   road and you got a bunch of trucks following each other,

204

1   people called a convoy.

2        Well, from an economic standpoint, if one product

3   is sold and you have other products that follow along, those

4   are called convoyed sales that go with that product.  And in

03:18PM 5   the Georgia Pacific factors it identifies hey, if you have

6   convoyed sales that are sold with the patented product, that

7   can also have an upward impact on the royalty.  And we see

8   that in this case and we'll talk a little bit about it.

9        Finally, Factor 13 is also very important.  It

03:18PM 10   touches on something that's extremely meaningful.  It's

11   called apportionment.  Essentially, what we're trying to do

12   is we're trying to take into account all the contributions

13   that licensee in this case the defendant Pavemetrics brings

14   to the table.  Cause, you know, they run a business and they

03:19PM 15   have employees and they have software and they have marketing

16   professionals and engineers.

17        They certainly are bringing technology to market

18   and so we have to take that into consideration as we're

19   determining what the royalty rate would be.  It's called

03:19PM 20   apportionment and we do that in a number of ways.  Also, a

21   very important factor.

22   Q.   Thank you.  Let's start with Factors 8 and 11.  Can you

23   explain specifically how these factors relate to your

24   analysis?

03:19PM 25   A.   Sure.  If we go to the next slide, I think we can make

**EXHIBIT 3**
**-108-**

205

1    it fairly brief.  So I said a moment ago, we look at
2    profitability as a data point.  So here what we see is this
3    is Tetra Tech.  We know that they sold five 3DTAS systems and
4    the revenue that they generated was just over $7 million.
03:20PM  5    And their revenue per system was $1,407,453 and they
6    generated a gross profit on those revenues of $735,057 and
7    they generated an operating profit of $422,823.
8         And the reason that's meaningful, I said earlier
9    that we not only want to take into account that if you drive
03:20PM 10    premium pricing as well as premium profits for your
11    technology, they're not only data points you would consider
12    if you were going to grant a license to someone cause it
13    factors into what do you stand to lose if I license.
14         Well, in Tetra Tech's case, they stand to lose
03:20PM 15    revenue of $1.4 million and gross profit of $735,000 and
16    more.  So the question is what would they be willing to
17    license given those premium prices and profit.  So that's
18    Tetra Tech.
19         If you go to the next slide, I performed a similar
03:21PM 20    analysis for Pavemetrics with their LRAIL system.  They sold
21    six LRAILs and generated $2,951,861.  The revenue per system
22    was $491,977.  I also calculated their gross and operating
23    profit.  Their gross profit was about 80 some percent so
24    relatively healthy.  So they generated some premium profits
03:21PM 25    there.

206

1         And their operating profits per systems, I looked
2    at two years.  I looked at their last two years and it ranged
3    anywhere from an operating profit of 70 percent to 75 percent
4    so also premium profits.  This is the type of thing you would
03:21PM  5    at to look at to say well, Pavemetrics is also generating
6    premium profits of 70 and 75 percent from this technology.
7         So we start to look at not only does it have an
8    upward impact on the royalty, but those are also data points
9    that we would like at.  I have a similar slide for
03:21PM 10    Pavemetrics as well if you would like to talk about that.
11    Q.   Um, yes, let's turn to Pavemetrics.  What amount of
12    profit does it generate on LRAIL as a stand alone without the
13    software?
14    A.   So here I'm looking at it without what I'll call
03:22PM 15    ancillary or convoyed sales.  So without those ancillary or
16    convoyed sales, LRAIL generates $2,095,000.  Revenue per
17    system is 349,167, gross profit per system is 293,300 and the
18    operating profit per system is 240,925 to 261,875.  And those
19    profit margins are similarly healthy net margins 70 to 75
03:22PM 20    percent in those years.
21    Q.   And looking at these figures, what is significance of
22    the profitability as it relates to the George Pacific
23    factors?
24    A.   Again, these serve two roles.  They serve as data
03:22PM 25    points.  If you were negotiating a royalty, you would take

207

1    these into account, these data points into account in
2    determining what you would be willing to license the
3    technology for not only as a licensee, but a licensor.
4         Someone's generally generating premium profits, you
03:23PM  5    look at that and you say well, you have to take that into
6    account in terms of assessing what the royalty rate would be
7    because the products have been commercially successful.
8    Q.   Let's move to the sixth factor.  In addition to sales
9    and profits Pavemetrics makes on the LRAIL, does it also
03:23PM 10    generate sales and profits from products sold along with the
11    LRAIL?
12    A.   It does.  We called these convoyed sales a few moments
13    ago.  The additional revenue here you'll see is $142,810.
14    The additional gross profit $119,961 and the additional
03:23PM 15    operation profit 98,539 to 107,108.  And this is also on a
16    per unit basis.  So they make the sales of their products and
17    they also have convoyed sales that they sell.  So, again, it
18    goes to showing they're commercially successful with the
19    product and driving premium sales and premium profits.
03:24PM 20    Q.   And what is the impact on the royalty rate in this case?
21    A.   Mostly it's data points.  Again, these are data points
22    that I think the parties would consider.  From an economic
23    standpoint, they're identifying two things.  They're
24    identifying, uh, the performance of the products, but also
03:24PM 25    because they're commercially successful, that puts upward

208

1    pressure on the royalty.
2    Q.   And finally we have Factor 13.  Can you explain the
3    importance of this factor?
4    A.   So we talked about this a few minutes ago.  Factor 13 is
03:24PM  5    where the apportionment discussion takes place.  And we have
6    to take into account well, what types of things does
7    Pavemetrics bring to the table.  What I'm showing here is
8    something that relates to the patented technology.
9         We know the patented technology is a significant
03:24PM 10    aspect of the accused products.  We've seen that in the
11    documents.  2D, 3D, the ability to read ties, to save money
12    as it relates to, um, reading the ties for purposes of
13    servicing CSX.  We know it was going to replacing the Aurora
14    system that was being offered for Georgetown that about
03:25PM 15    $2,250,000 savings alone just on replacing that system.  So
16    we know this feature is very important.
17         So Factor 13 says well, look at the patented
18    features, but we also need to take into account what
19    Pavemetrics brings to the table.
03:25PM 20    Q.   Did you consider any other documents as you were
21    considering this?
22    A.   I did.  This is an LRAIL flyer that was put out by
23    Pavemetrics, and I thought this was an interesting document
24    because it highlights LRAIL AI-Enhanced Railway Inspection
03:25PM 25    System.

**EXHIBIT 3**
**-109-**

209

1    And what it says on the second page, you don't see
2  it here, but what it says on the second page is that the
3  LRAIL combines 2D imaging, 3D scanning, image processing and
4  artificial intelligence to automatically scan and inspect the
03:26PM 5  entire track area including ballast which is the rocks that
6  are underneath the ties, the ties, the sleepers, the
7  railheads and the fasteners and it talks about some key
8  features.
9    And one of those key features is combined
03:26PM 10 high-resolution 2D imaging and 3D laser profiling.  And so
11 what these documents tell me as we talked about today in
12 other forms is that the technology's extremely important.  As
13 I spoke with Dr. Morellas, he identified it to me as being
14 core and fundamental to these products.
03:27PM 15    From what we understand it's important, but we also
16 want to take into account other things that Pavemetrics
17 brings to the table and those are the things that I mentioned
18 earlier such as their people, their resources, their
19 financial capabilities, the Pavemetrics name, growing the
03:27PM 20 company, all of the types of resources that they bring to
21 bear should also be considered.
22    And so that would be a downward pressure on the
23 royalty rate because we want to give them, Pavemetrics credit
24 for everything that they bring to bear in the negotiation.
03:27PM 25 Q.   Now, let's move to the final group of Georgia Pacific

210

1  factors which would be the licensing factors.  What factors
2  would you like to discuss here?
3  A.   Um, just Factor 4.  The other factors I reviewed them,
4  but they were much less relevant to this particular
03:27PM 5  hypothetical negotiation, um, and so Factor 4 is the one I'd
6  like to talk about.
7  Q.   Okay.  Let's talk about Factor 4 then.  And what does
8  this factor relate to?
9  A.   So, again, this is in the licensing factors and what it
03:28PM 10 really says is what is the willingness, what's the
11 willingness of Tetra Tech, the patent owner, to license their
12 technology.  Some licensors or some owners of patents rather,
13 they want to keep their technology to themselves.  They want
14 to commercialize it themselves.  Right?  They invented it.
03:28PM 15 They want to commercialize it.  They want to generate profits
16 and they want to have that as a way to compete.  So some will
17 say they don't want to license.
18    Now, here because we're looking at a hypothetical
19 negotiation under Georgia Pacific, we get to take into
03:28PM 20 account the fact that Tetra Tech does not want to license and
21 that has upward pressure on the royalty.  Cause they would
22 say no, we don't want to license.  We would prefer not to.
23 We want to commercialize it ourselves, but Georgia Pacific
24 requires that we come to an agreement.  It requires that we
03:29PM 25 come to an agreement so this factor would have an upward

211

1  influence because of their desire not to license.
2  Q.   And there's one last factor, Factor 15 as well; correct?
3  A.   That's correct.
4  Q.   And the last factor, Factor 15 is the hypothetical
03:29PM 5  negotiation.
6  A.   That's correct.
7  Q.   Can you summarize your opinions as to the appropriate
8  royalty rate in this case?
9  A.   Sure.  So I mentioned a few minutes ago that I thought
03:29PM 10 the data points would be very meaningful to a hypothetical
11 negotiation.  And if we show that slide again?
12    If you look over to the far right-hand side, you'll
13 remember the 1.1 million.  This was the incremental profit
14 that we talked about under lost profits.  As I mentioned,
03:29PM 15 this is a number that Tetra Tech would consider because they
16 would say if we give a license to Pavemetrics, we stand to
17 lose $1.1 million for every sale that they make.
18    So take, for example, CSX.  Both parties are
19 competing there.  Tetra Tech wants to win that sale.
03:30PM 20 Pavemetrics takes it with the infringing technology and Tetra
21 Tech is harmed by the fact that they can't make that sale.
22 So they would have that number in their mind.
23    They would also have their gross profit in mind;
24 right?  They would want to consider well, if we're
03:30PM 25 apportioning away and we understand that there might be other

212

1  costs in addition to the incremental profit, this 735,057 for
2  the 3DTAS gross profit would be another number we would look
3  at.  Importantly, they would recognize that Tetra Tech and
4  Pavemetrics pricing there's a significant disparity.
03:30PM 5    Pavemetrics price for the 3DTAS is approximately --
6  excuse me, for their LRAIL is approximately $600,000 less in
7  price than the 3DTAS.  So there would be a significant focus
8  on that because of that head-to-head competitive
9  relationship.
03:31PM 10    We'd also look at the operating profit of the
11 3DTAS.  And so on the far right-hand side, we're looking at
12 the profits of Tetra Tech and on the left-hand side, you'll
13 see LRAIL gross profit of 413,000.  You'll see LRAIL profit
14 at 368, and then there's an additional operating profit.
03:31PM 15 You'll remember that I said they provided two operating
16 profits, one at 70 percent and one at 75.  So that range was
17 339 to 368.
18    And then I also looked at their system only LRAIL
19 profit which is the far left-hand side and that ranges from
03:31PM 20 240,000 to 293,000.  I believe, again, these would be data
21 points that the parties would consider in terms of what would
22 be a reasonable royalty to account for those Factor 8,
23 Factor 11 and 6 data points that we talked about.
24 Q.   So what's the next step of your analysis?
03:32PM 25 A.   We need to apply the other Georgia Pacific factors to

EXHIBIT 3
-110-

213

1  make sure we understand where within the range we would fall.
2  I have two slides I'd like to walk through very quickly, if I
3  may.
4          And so we talked about Factor 4 just a moment ago.
03:32PM 5  That's on top.  There's a preference not to license and
6  instead to commercialize.  That's Tetra Tech's preference.
7  Upward pressure on the royalty.
8          Factor 5 we talked about the intense competition
9  and there's really two issues here.  One is it's a
03:32PM 10  head-to-head two player market and so that brings into
11  account Pavemetrics makes the sale.  Tetra Tech does not.
12          The other element here and we heard Mr. Keyes talk
13  about this yesterday and that's second line item on five,
14  Tetra Tech stands to lose sales and profit by licensing in a
03:32PM 15  limited market.  There's only seven major railroads in this
16  market.  And so once they buy one or two or three of these
17  products, the market starts to fade in terms of how many
18  units can be sold.
19          I think Mr. Keyes said they estimated there was no
03:33PM 20  more than 500-unit sales of these types of products in the
21  market.  Because it's a smaller market that would be
22  something the parties would take into account.  It's a
23  scarcity so that would put upward pressure on the royalty.
24          Finally, Factor 6, we talked about this.  It's
03:33PM 25  convoyed sales.  There's additional sales and profit that's

214

1  generated.
2          Let's go to the next slide.  So we talked a lot
3  about the lack of a noninfringing alternative.  Um, we
4  understand that there's no noninfringing alternatives.
03:33PM 5  Again, as I said, I talked to Dr. Morellas, I talked to
6  Mr. Larson.  We heard about how CSX whittled down who they
7  were looking at.  They said Balfour Beatty they weren't going
8  to be -- they didn't have the technology in order to do what
9  needed to be done so it came down to Tetra Tech and
03:34PM 10  Pavemetrics.  That would come into play, no alternatives.
11  The patents at issue here.  We've talked
12  about that as well.  And that's not only the core and
13  fundamental nature of what I talked about with Dr. Morellas,
14  but it's also the fact that this overcame limitations that,
03:34PM 15  uh, otherwise, uh, this overcame limitations that otherwise
16  other products in the market struggled with.  The one talked
17  we talked about most recently is the Aurora system which
18  could only do 6,000 miles a year versus 60,000 to 90,000 by
19  the RailAI system.
03:34PM 20  And then finally Factor 13, we talked about that as
21  being we need to make sure we apportion down to give credit
22  where credit is due to Pavemetrics.
23  Q.  Mr. Schoettelkotte, earlier you talked about how many
24  units, potential units were there.  Could you clarify the
03:34PM 25  number that you had mentioned?

215

1  A.  For lost profits or royalty?
2  Q.  Royalty.
3  A.  For royalty it's one unit and it's a sale that includes
4  sale and delivery of a product to AID.
03:35PM 5  Q.  I'm sorry.  I meant to clarify.  Potential units in
6  terms of testimony you had heard earlier today from
7  Mr. Keyes?
8  A.  Oh, I'm sorry.  That was 500.  500 units in the market
9  across seven railways so it would be a limited market.
03:35PM 10  Q.  Turning back to the factors, what is the impact of these
11  factors?
12  A.  If we go to the next slide, please.  So what I've
13  determined is that Tetra Tech would obviously want to focus
14  on the far right-hand side of this chart in terms of what
03:35PM 15  they would be losing.  And they would not take into
16  account their incremental profit, their gross profit, they
17  would take into account the significant price difference and
18  their operating profit, but they would also have to
19  understand the profits that Pavemetrics is generating.
03:36PM 20  And in order to apportion, in order to apportion,
21  I've given Pavemetrics the benefit of all of their costs not
22  only to get to a gross profit, but also to get to an
23  operating profit.  So I'm giving them costs in terms of
24  apportionment of not only things like costs of goods sold and
03:36PM 25  labor, but also administrative costs and other things which

216

1  would get to these LRAIL system only operating profits.
2          Given the impact of the Georgia Pacific factors
3  including apportionment, I determined that a reasonable
4  royalty here would be no less than, no less than $250,000 per
03:37PM 5  unit.
6  Q.  Mr. Schoettelkotte, did you perform an analysis to
7  determine the reasonableness of the royalty rate?
8  A.  I did, yes.  This is just a quick summary of my opinion.
9  Remember there was one sale and then delivery of a
03:37PM 10  Pavemetrics LRAIL to AID.  This is the one unit that would be
11  at issue $250,000 times that one unit is obviously
12  $250,000 and that would be the royalty.
13          Then I performed an analysis to show the
14  reasonableness of this royalty in the concluding section of
03:37PM 15  my presentation.
16  Q.  What impact does this royalty rate have on price
17  difference?
18  A.  So what we see here is this is the price of the 3DTAS
19  and a controller which I understand would perform the
03:38PM 20  functions that the LRAIL system provides.  So keep in mind
21  that Tetra Tech would want to sell the RailAI and all the
22  functionality that the LRAIL system provides and that they
23  believe that the RailAI system comes with a very significant
24  amount of additional technology which allows railroads to be
03:38PM 25  to more effective and more efficient.

**EXHIBIT 3**
**-111-**

217

1     If I'm looking on just a component-by-component
2  level, what would be shown here is a 3DTAS and controller
3  which would be used with one of these ATAC cars in order to
4  perform a 2D 3D assessment of the ties.  The price of that
5  would be $1,407,453.  The comparable price of the LRAIL
6  system is $491,977.  So the price difference is rather
7  significant.
8     If we go to the next slide, if we were to add the
9  reasonable royalty that I've calculated, that would if
10  Pavemetrics decided they would increase their price by just
11  the royalty itself, their price would increase to $714,977
12  which would still be significantly less than Tetra Tech's
13  price at $1,407,453.
14     So I performed that analysis to determine you've
15  got Tetra Tech who develops this market and is first to the
16  market, is the patent owner, sets the price.  They have a
17  competitor who comes into the market at a lower price.  If
18  they were to charge a royalty of $250,000, Pavemetrics could
19  still compete in the market, I mean, it would still be a
20  lower price than Tetra Tech from a competitive standpoint.
21     And from my standpoint, from an economics
22  standpoint, that seems to be a reasonable royalty rate.
23  Q.   Does that complete your analysis of damages in this
24  case?
25  A.   It does, yes.

03:39PM (lines 5, 10, 15)
03:40PM (lines 20, 25)

UNITED STATES DISTRICT COURT

218

1  Q.   Total past damages?
2  A.   Sure.  So we talked about lost profits to CSX and
3  3,357,000.  We talked about the reasonable royalty of 250,000
4  for the one unit that went to AID.  So the total past damages
5  for all four units would be $3,607,000.
6  Q.   And this is for past damages; correct?
7  A.   That's correct.  To the extent that Pavemetrics was to
8  sell additional units, my understanding is that they would
9  either be subject to potential lost profits or a royalty
10  depending on what the Court were to determine.
11     MS. MATHEW:  Thank you, Mr. Schoettelkotte.
12     I will pass the witness.
13     THE COURT:  Cross-examination.
14     MR. ZOVKO:  Yes, Your Honor.
15     CROSS-EXAMINATION
16  BY MR. ZOVKO:
17  Q.   Good afternoon, Mr. Schoettelkotte.
18  A.   Good afternoon.
19  Q.   You're not here to tell the jury whether or not
20  Pavemetrics infringes; correct?
21  A.   No, I'm not.
22  Q.   And you're not here to tell the jury whether or not the
23  patents are valid; correct?
24  A.   That's correct, I'm not.
25  Q.   And if the jury finds in fact that Pavemetrics does not

03:40PM (line 5)
03:41PM (lines 10, 15)
03:42PM (lines 20, 25)

UNITED STATES DISTRICT COURT

219

1  infringe, then damages are zero; correct?
2  A.   That is correct.  There would be no reason for my
3  testimony or Mr. Tregellis.
4  Q.   Likewise, if the jury finds that the patents are
5  invalid, then damages are zero; correct?
6  A.   That is correct.
7  Q.   And if I understood you in your calculations, uh, with
8  respect to damages, you assumed that there was both
9  infringement and the patents are valid; correct?
10  A.   That's correct.
11  Q.   And you understand the reason I'm up here asking you any
12  questions about damages, even though Pavemetrics strongly
13  believes it doesn't owe Tetra Tech anything, is that we have
14  an obligation to provide the jury with evidence relating to
15  damages.  You understand that; correct?
16  A.   Well, I don't want to suggest to know why you're
17  standing where you are.  Um, I assume you're doing your job
18  for your client, but I don't know why you're standing there
19  other than to speak with me today.  I just don't know.
20  Q.   Let's pull up Slide 23, please of Mr. Schoettelkotte's
21  demonstratives.  Sorry.  24.  Thank you.
22     Mr. Schoettelkotte, in this slide you created, it
23  refers to the middle, there's a box and it says six LRAIL
24  systems sold; correct?
25  A.   That's correct.

03:42PM (lines 5)
03:43PM (lines 10, 15, 20)
03:44PM (line 25)

UNITED STATES DISTRICT COURT

220

1  Q.   And it states revenue about 2.9 million for those six
2  LRAIL sales; correct?
3  A.   That's correct.
4  Q.   But there's only four LRAIL sales at issue in this
5  trial; correct?
6  A.   That is correct as well.
7  Q.   Three sales to CSX; right?
8  A.   Yes.
9  Q.   And just one sale to AID; right?
10  A.   I would be happy to explain if you'd like me to.
11  Q.   Just answer my questions.
12  A.   Yes, you are correct.  I would be happy to explain if
13  you would like me to.
14  Q.   Understood.  If I want an explanation, I'll ask for it.
15  Thank you.
16  A.   Yes, sir.
17  Q.   So you understand there can be no damages on
18  Pavemetrics' first two sales to CSX; right?
19  A.   Yes, that's correct.  I understand that is a legal
20  issue.
21  Q.   But in this slide for the jury, you did not provide the
22  total revenue for Pavemetrics' four LRAIL sales at issue
23  actually in this trial; right?
24  A.   Well, that would be improper.
25  Q.   Yes or no.

03:44PM (lines 5, 10, 15)
03:45PM (lines 20, 25)

UNITED STATES DISTRICT COURT

EXHIBIT 3
-112-

221

1  A.  I didn't because that would be improper.

2  Q.  Why would it be improper?

3  A.  Because what I'm showing here is I'm showing the

4  profitability associated with the sales that were made by

03:45PM 5  Pavemetrics.  There's four units at issue and those four

6  units at issue are based upon I understand to be a legal

7  issue.  This is an analysis of the financial performance of

8  Pavemetrics.  It has nothing to do with the royalty base.  It

9  has everything to do with the significant financial

03:46PM 10  performance of Pavemetrics with the sales of their products.

11  Q.  And nothing in the slides you just went through would

12  show the jury what Pavemetrics' total revenue is for the four

13  sales at issue in this trial; right?

14  A.  Well, again, it wouldn't, but that would be improper.

03:46PM 15  Q.  Yes or no.

16  A.  No, cause it would be improper.

17  Q.  So the total revenue for the four LRAIL systems at issue

18  in this trial would be less than 2.9 million; correct?

19  A.  Yes.

03:46PM 20  Q.  And what is the total revenue for the four LRAIL sales

21  at issue in this trial?

22  A.  I haven't committed that to memory.  It's not of any

23  significance to my analysis for the reason that I mentioned.

24  Q.  Well, if we -- you're a financial expert now in this

03:47PM 25  case; right?

222

1  A.  I am.  That's correct.

2  Q.  So you can do the math and roughly estimate what the

3  total revenue of the four LRAIL systems at issue in this

4  trial would be?

03:47PM 5  A.  Sure.  If I estimated 491,000 and I rounded up to

6  500,000 and I multiplied times four, it would be roughly

7  2 million.

8  Q.  Roughly, 2 million.  But your opinion is that

9  Pavemetrics should pay Tetra Tech over $3.6 million as a

03:47PM 10  result of this lawsuit; correct?

11  A.  That's correct.

12  Q.  And so your opinion is Pavemetrics should pay Tetra Tech

13  nearly twice the total amount of money that Pavemetrics has

14  received for the four products at issue in this case; right?

03:47PM 15  A.  In lost profits and reasonable royalty, that's correct.

16  Q.  Go to the next slide, please.  So now we're on the slide

17  I think you explained relates to just the LRAIL unit itself

18  and not what you call convoyed sales; correct?

19  A.  That's correct.

03:48PM 20  Q.  So if we focus on just the LRAIL units at issue in this

21  case accused of infringement, six of them including the two

22  not accused of infringement, the total revenue is about

23  2 million; right?

24  A.  Can you repeat that?  I'm sorry.

03:48PM 25  Q.  The six LRAIL systems that Pavemetrics has sold, two not

223

1  at issue in this case, the total revenue you state here is

2  about $2 million; correct?

3  A.  Yes, 2,095,000, that's correct.

4  Q.  And what would the total revenue of the four LRAIL

03:48PM 5  systems at issue in the trial be not including convoyed

6  sales?

7  A.  I will take a similar approach as I did last time.  I

8  will round the 349,000 up to 350,000.  I'll multiply that by

9  four and that would be 1.5 million.

03:49PM 10  Q.  1.4 million; correct?

11  A.  I beg your pardon.  You're correct.

12  Q.  I'm not a financial expert, but I do know basic

13  arithmetic.  1.4 million compared to, again, 3.6 million you

14  believe Pavemetrics should pay Tetra Tech; right?

03:49PM 15  A.  Yes.  Based upon lost profits and a reasonable royalty,

16  that's right.

17  Q.  So, again, looking at the LRAIL units alone accused of

18  infringement in the case, you believe Tetra Tech should get

19  over twice the total amount of money Pavemetrics has received

03:49PM 20  at all for those four accused units; correct?

21  A.  In lost profits and reasonable royalty, that is correct.

22  Q.  You talked about Pavemetrics' pricing of its LRAIL a

23  little bit; is that right?

24  A.  That's correct.

03:50PM 25  Q.  Did you listen to Mr. Habel's testimony earlier today?

224

1  A.  Portions of it, not all of it.

2  Q.  Were you there when Mr. Habel explained that the pricing

3  of Pavemetrics' LRAIL is based on its historical pricing of

4  its LCMS system which it sold for many years.  Did you hear

03:50PM 5  that?

6  A.  I did.

7  Q.  Let's go to Slide 29, I believe it is.

8      The slides changed because last night they sent us

9  a version.  We had a new version today.  So if there's a

03:51PM 10  discrepancy in slides, that's why.  I'll do my best to keep

11  it going.  It's the slide with the bar graph.  32 of the

12  version that was sent by Mr. Schoettelkotte's representatives

13  last night.

14      And in red you talked about the theoretical

03:51PM 15  possibility or the price difference between Tetra Tech's

16  3DTAS and Pavemetrics' LRAIL; right?

17  A.  That's correct.

18  Q.  And I believe you suggested that Pavemetrics could

19  increase its price to make up for the idea of having to pay a

03:51PM 20  royalty to Tetra Tech; is that right?

21  A.  Um, that wasn't quite what my testimony was.  I'd be

22  happy to repeat it if you'd like.

23  Q.  Sure.

24  A.  So the testimony that I provided was Pavemetrics came

03:51PM 25  into the market at a lower price than Tetra Tech.  Tetra

**EXHIBIT 3**
**-113-**

225

1  Tech's price was higher. They came into the market in 2015.
2  Pavemetrics came into the market to my knowledge in 2018.
3  Ultimately, if Pavemetrics were to pay a royalty consistent
4  with the reasonable royalty that I've determined of $250,000,
03:52PM 5  it would still be, and they chose to pass that along to a
6  customer, their price would still be well below Tetra Tech's
7  pricing.
8  Q.  Are you aware of any instance where Pavemetrics has
9  raised the price of its LRAIL?
03:52PM 10  A.  Um, well, I'm not, but, no, no.  Not in the record, no.
11  Q.  And you reviewed thousands of Pavemetrics' documents in
12  this case; right?
13  A.  I think that's correct, yes.
14  Q.  And you reviewed all the testimony from many Pavemetrics
03:52PM 15  witnesses; right?
16  A.  I did, yes.
17  Q.  And you heard Mr. Habel as we established earlier
18  testify today pricing was based on the legacy LCMS system;
19  right?
03:52PM 20  A.  I'm not sure I'm aware whether that system is accused or
21  not.  So they came into the market with a different system.
22  That system is now called LRAIL.  I understand it is accused
23  of infringing.  In order to use the technology, they would
24  have to pay a reasonable royalty.  So perhaps they weren't
03:53PM 25  paying a reasonable royalty on their LCMS system, but here

UNITED STATES DISTRICT COURT

226

1  what I've been asked to do is assess what a reasonable
2  royalty is.
3  Q.  And in fact based on the facts of this case, Pavemetrics
4  actually gave CSX a discount because CSX bought five units, a
03:53PM 5  volume discount; right?
6  A.  Can you repeat that?  Your words got mixed up a little
7  bit.  I wanted to hear it one more time, please.
8  Q.  Let's focus on the facts of this case.  In this case
9  Pavemetrics in fact provided CSX with a volume discount in
03:53PM 10  that they gave CSX a lower price because CSX was buying five
11  units as opposed to just a single unit; correct?
12  A.  I think they did, yes.  And I believe those were the
13  accused units.
14  Q.  And you're not aware of any testimony from CSX that CSX
03:54PM 15  would have paid more than it did for an LRAIL; correct?
16  A.  No, I'm not aware of that.  I know that they wanted the
17  best system out there.  They wanted the system that would be
18  the best.  Again, I'm operating in a but for world where
19  they're trying to make a decision to get the best technology
03:54PM 20  out there and what that impact would be, but I haven't seen
21  any testimony that's related to what you've said.
22  Q.  Right.  They went with the best so they picked the
23  LRAIL.  And you're not aware of Mr. Hafiz of AID testifying
24  that AID would have purchased LRAIL if it was priced at a
03:54PM 25  higher price; correct?

UNITED STATES DISTRICT COURT

227

1  A.  I didn't understand the first part of your question.
2  That was inconsistent with what I said.  I never suggested
3  that so if we start that question over.  You mentioned
4  something about they went with LRAIL because they were the
03:55PM 5  best.  LRAIL was infringing so it's an infringing accused
6  product, but I never said they were the best.  I said CSX was
7  looking for the best product.
8  Q.  And CSX purchased the LRAIL; correct?
9  A.  They did, but that's the accused product.
03:55PM 10  Q.  If there's more explanation needed, I'm sure your
11  counsel will do it.  I'm trying to move things along for the
12  jury.
13  A.  Understood.  I just wanted to make sure the record is
14  clear.
03:55PM 15  Q.  And you're not aware, so I'll go back to my question,
16  you're not aware of Mr. Hafiz at AID or anyone else from AID
17  testifying that AID would have purchased LRAIL at a price
18  higher than it in fact did; correct?
19  A.  I haven't seen testimony of that sort.
03:55PM 20  Q.  Certainly not $600,000 more; correct?
21  A.  Well, again, you need to look at the economics before
22  you make that judgment.
23  Q.  So this slide identifies the accused LRAIL systems;
24  correct?
03:56PM 25  A.  It does, yes.

UNITED STATES DISTRICT COURT

228

1  Q.  And according to you, Pavemetrics sold three LRAIL
2  systems to CSX on March 15, 2021; correct?
3  A.  Um, I just want to make sure we're being clear.  That
4  was in the Goods Agreement we looked at.  So when you say
03:56PM 5  according to me, I showed the jury a Goods Agreement which
6  identified that specific date.  So according to the Goods
7  Agreement, that's when that date occurred.  It's not
8  according to me, it's the Goods Agreement.
9  Q.  Okay.  But for the purpose of analysis, you had
03:56PM 10  determined whether there were sales of accused units;
11  correct?
12  A.  That's correct.  That's why I looked at the Goods
13  Agreement.
14  Q.  And you assigned dates to those sales; correct?
03:56PM 15  A.  Absolutely I did, yes.
16  Q.  And for the three CSX units, you assigned March 15, 2021
17  as the date; correct?
18  A.  That's correct as well.
19  Q.  For the AID unit, you assigned December 23rd, 2020, as
03:56PM 20  the date of sale; correct?
21  A.  Well, I don't know that -- there's a legal issue here
22  that I want to make sure that I'm clear on.  I understand
23  that this unit there's an argument for something called
24  indirect infringement.  It's a legal argument.  It's beyond
03:57PM 25  my purview, but I am aware that the argument is it was sold

UNITED STATES DISTRICT COURT

EXHIBIT 3
-114-

229

1  on December 23rd, but the indirect infringement through
2  something called inducement --
3  MR. ZOVKO: Well, Your Honor, this is well beyond
4  the scope of his expert report.
03:57PM 5  THE COURT: I'll let him finish his answer.
6  Go ahead.
7  THE WITNESS: Thank you, sir.
8  The indirect infringement was based upon inducement
9  and inducement occurred when the product was delivered. So
03:57PM 10  the slide I showed the ladies and gentlemen in the courtroom
11  was not this slide. It had two dates on it and the second
12  date was the delivery date. And so that was my
13  understanding, again, a legal issue, but I wanted to make
14  sure the record was clear this wasn't the slide we talked
03:58PM 15  about during my presentation.
16  MR. ZOVKO: Right.
17  Q.  This was a slide your counsel sent us last night;
18  correct? That we did not object to; right?
19  A.  You're asking me questions that I don't --
03:58PM 20  THE COURT: And again, let me stop you for a
21  second. There's some discussions earlier when the witness
22  first got on the stand about slides you got last night. None
23  of that's appropriate when we have the jury here. Ask him
24  questions about opinions in his report, and then you guys can
03:58PM 25  squabble all night outside the courtroom about stuff you want

UNITED STATES DISTRICT COURT

230

1  to complain about.
2  MR. ZOVKO: Understood, Your Honor.
3  Q.  You understand at the end of this trial, the jury will
4  be instructed on the date that damages can begin in this
03:58PM 5  case; right?
6  A.  Again, that's a legal issue and I will leave that to the
7  trier of fact. I don't want to speak for the trier of fact
8  so I don't know if I can give you that answer. I understand
9  what's being alleged and that's what I provided, but I can't
03:59PM 10  tell you how the trier of fact will direct the jury. Sorry.
11  Q.  So you don't know whether -- do you know whether or not
12  the parties have agreed that that date for the '293 patent is
13  January 5, 2021?
14  A.  I don't have an awareness of that. My understanding
03:59PM 15  is -- I've provided my understanding of the allegation and
16  I've calculated damages in that form, but those are legal
17  issues that you're asking me about and I'm working as an
18  economic expert based upon those ground rules.
19  Q.  So we established earlier that according to your
03:59PM 20  analysis, Pavemetrics sold one LRAIL unit to AID. Can I ask
21  you few quick questions about that? Is that all right?
22  A.  Sure, absolutely.
23  Q.  So if after receiving this LRAIL from Pavemetrics, AID
24  used that LRAIL every single day for a year, would that
04:00PM 25  change your opinions at all?

UNITED STATES DISTRICT COURT

231

1  A.  Well, again, this is getting into what I would call a
2  liability issue. My understanding is, and again, you've
3  asked me and I'll do the best I can. This is a legal issue
4  and the legal issue is based upon something called indirect
5  infringement. And I understand as a layman that that
6  indirect infringement can be triggered when there's an
7  induced infringement. And that the induced infringement can
8  be a situation where the selling party teaches the customer
9  how to do the infringement --
04:00PM 10  MR. ZOVKO: Your Honor, this is not in his report.
11  THE COURT: I know, but you can go ahead and finish
12  your answer.
13  THE WITNESS: Thank you, sir.
14  MR. ZOVKO: I'm asking him --
04:00PM 15  THE COURT: Hang on.
16  THE WITNESS: So ultimately my understanding as a
17  layman is that that inducement takes place when the seller of
18  the product teaches the purchaser of the product how to
19  perform the invention. And I understand in this case this is
04:01PM 20  what's been alleged. I have no opinion on this that when the
21  product was sold and delivered to AID, at the point in time
22  it was delivered, there would be an inducement and that
23  inducement would trigger the infringement.
24  THE COURT: I think we can avoid going off in these
04:01PM 25  areas if you ask him questions about some of his opinions

UNITED STATES DISTRICT COURT

232

1  that he expressed with respect to, I don't know, reasonable
2  royalties or, um, lost profits or those things that are sort
3  of the nuts and bolts of a damages expert report.
4  MR. ZOVKO: And there are some fundamental issues.
04:01PM 5  I'll try couple a more questions.
6  THE COURT: Well, okay. I mean the legal questions
7  that underlie the questions you're asking are gonna be
8  decided and instructed to the jury or the jury's gonna make
9  determinations as to whether a sale counts as an infringement
04:02PM 10  or not. Um, I think this witness is kind of assuming, he's
11  assuming that these count as infringing sales and he's
12  extrapolating damages based on that; is that correct?
13  THE WITNESS: Yes, sir. That is absolutely
14  correct.
04:02PM 15  THE COURT: So attacking his assumption, then
16  obviously if he's wrong about these be infringing sales, then
17  they won't be damages. But if he's right, he's got this
18  analysis based on that. So I'd wish you start there. You're
19  perfectly able to do whatever you want to do, but that's why
04:02PM 20  we're getting into these areas.
21  MR. ZOVKO: Can I try one more question?
22  THE COURT: Sure, of course.
23  BY MR. ZOVKO:
24  Q.  AID's uses are not relevant to your damages
04:02PM 25  calculations; is that fair?

UNITED STATES DISTRICT COURT

EXHIBIT 3
-115-

233

1　A.　Um, my damages calculation is because there's an
2　infringement.  If there's no infringement, then my damages
3　calculation wouldn't be necessary for the jury.  I understand
4　that, again, there's an argument over indirect infringement
04:03PM 5　and those issues are legal issues.  If the trier of fact
6　determines that there is no infringement, at that point in
7　time there would be no damages.  And if there is
8　infringement, well, then my reasonable royalty for AID in my
9　opinion would be $250,000 per unit.
04:03PM 10　Q.　All right.  I want to bring up something you mentioned
11　on direct.  You talked about 500 units; is that right?
12　A.　That's correct.
13　Q.　And what was that?  Can you clarify that again?
14　A.　Sure.  So during Mr. Keyes testimony, I believe his name
04:03PM 15　is Gary Keyes.  He's an employee of Tetra Tech.  He's in the
16　courtroom for his testimony yesterday.  And I believe his
17　testimony was that there are in their estimation, Tetra Tech,
18　500 units of these type of products would be the market for
19　the rail system.  And a limited market, a limited market
04:04PM 20　would be a consideration in terms of the royalty in this case
21　because the smaller the market, the more competitive the
22　market gets.
23　Q.　Mr. Keyes, do you have a book up there, a cross binder?
24　A.　I do.
04:04PM 25　Q.　I'm sorry, Mr. Schoettkotte.  Could you please turn to

UNITED STATES DISTRICT COURT

234

1　the transcripts from this trial in there.  Do you see a tab
2　with that?
3　A.　I do, yes.
4　Q.　And from Wednesday, August 17th, page 77.  Let me know
04:05PM 5　when you get there.
6　　THE COURT:  Counsel, what are you trying to do with
7　the trial transcript?
8　　MR. ZOVKO:  Well, Mr. Schoettkotte incorrectly
9　stated Mr. Keyes' testimony so I'm trying to clarify the
04:05PM 10　record.
11　　THE COURT:  Okay.  I mean, I don't think it's
12　appropriate to cross-examine him with a transcript from the
13　trial about what somebody else said.  You can certainly have
14　him assume what somebody testified to and move on.  And,
04:05PM 15　again, can I have counsel come up to side bar?
16　　(Following proceedings held at side bar:)
17　　THE COURT:  I've told the jury they're not going to
18　have transcripts available to them certainly so I really
19　don't want to be throwing transcripts around.
04:06PM 20　　What are you trying to do?
21　　MR. ZOVKO:  He said there are 500 units out there
22　and the testimony was maybe 50 units.
23　　THE COURT:  So you can ask him if he's wrong about
24　that, but, again, the transcript doesn't come into evidence
04:06PM 25　so there's no real way to use it to verify what somebody said

UNITED STATES DISTRICT COURT

235

1　or didn't say.  It's up to the jury to determine what a
2　person said or didn't say.  So you can certainly ask him if
3　this person said 15 not 500 and how would that change his
4　analysis without using the transcript.
04:06PM 5　　MR. ZOVKO:  Understood, Your Honor.  Thank you.
6　　(Side bar concluded.)
7　　THE COURT:  You can proceed, Counsel.
8　BY MR. ZOVKO:
9　Q.　Mr. Schoettkotte, our understanding of Mr. Keyes'
04:07PM 10　testimony is he said there's maybe quote, unquote "maybe" 50
11　of these types of units.  Does that change your opinion or
12　analysis with respect to this issue?
13　A.　Um, yeah, I would actually say that if I, first of all,
14　if I misheard him, then I would apologize to the ladies and
04:07PM 15　gentlemen in the courtroom.  But I would say if he said
16　there's maybe 50, that would suggest that the market is
17　actually more competitive than what I thought I heard.  So 50
18　would mean that you have two players competing for a smaller
19　market which would make it actually more competitive.  My
04:07PM 20　apologies for mishearing him, but it would actually make it
21　more competitive if he said 50.
22　Q.　Let's turn to your lost profits consideration analysis
23　at this time.  You're asserting lost profits for only three
24　sales to CSX only; correct?
04:08PM 25　A.　That's correct, yes.

UNITED STATES DISTRICT COURT

236

1　Q.　And so the customer relevant to the lost profits
2　analysis who would have purchased a Tetra Tech unit in this
3　but for world you've constructed is CSX; right?
4　A.　That's right.
04:08PM 5　Q.　And I believe you testified you didn't have access to
6　information from CSX because CSX is not a party to this
7　lawsuit; right?
8　A.　Well, I didn't have access to their financial
9　information, but I was able to find it through the SEC.  So
04:08PM 10　when I say that they didn't produce information, they didn't
11　produce.  They didn't produce information such as the type of
12　information I got from Tetra Tech and Pavemetrics.
13　Q.　Right.  So the fact that CSX wasn't a party to this
14　lawsuit doesn't mean that CSX didn't provide information in
04:09PM 15　this lawsuit; right?
16　A.　Oh, I would agree with that.
17　Q.　In fact CSX provided information in response to requests
18　from Tetra Tech's lawyers; correct?
19　A.　I believe that's accurate, yes.
04:09PM 20　Q.　CSX produced thousands of pages of documents; right?
21　A.　Yes.  Again, I was referring to their financial
22　performance.
23　Q.　And a CSX employee, Brad Spencer testified on behalf of
24　the corporation CSX; right?
04:09PM 25　A.　Yes, I recall that.

UNITED STATES DISTRICT COURT

**EXHIBIT 3**
**-116-**

237

1   Q.   Now, focusing on Brad Spencer of CSX, you didn't speak
2   with Brad Spencer before you formed your opinions in this
3   lawsuit; correct?
4   A.   That's correct.
04:10PM 5   Q.   But you did review Mr. Spencer's deposition; right?
6   A.   Yes, I did.
7   Q.   You reviewed the entire deposition Mr. Spencer gave?
8   A.   Yeah, you asked me that at my deposition and I agreed
9   with you.  I did, yes.
04:10PM 10   Q.   And so you understand that Mr. Spencer testified that
11   both RailAI and 3DTAS was too expensive for CSX; right?
12   A.   I would say that they strongly considered both of them,
13   but they had a cheaper product with Pavemetrics.
14   Q.   And you understand then Mr. Spencer testified that Tetra
04:10PM 15   Tech was not flexible in lowering its price; right?
16   A.   Yes, but I believe he also testified that Tetra Tech had
17   come back with numerous proposals to make its arrangements
18   with CSX more economically reasonable for the purposes of
19   their analysis.
04:11PM 20   Q.   Thank you for that, but to keep this moving, just answer
21   my question and I'm sure your lawyers will ask you those
22   types of questions.  And we'll keep it going for the jury.
23   A.   Okay.  Thank you.
24   Q.   Mr. Spencer also testified you understand the primary
04:11PM 25   reason CSX chose to purchase LRAIL was the cost of the LRAIL;

238

1   right?
2   A.   I believe that was one of the reasons, yes.
3   Q.   And Mr. Spencer testified that even after CSX purchased
4   the first two LRAILs from Pavemetrics, Tetra Tech was still
04:11PM 5   pitching or attempting to sell the RailAI and 3DTAS system to
6   CSX; right?
7   A.   That's my understanding, yes.
8   Q.   And Mr. Spencer testified at that time his supervisors
9   immediately turned down any proposals from Tetra Tech because
04:11PM 10   it just too much, CSX didn't have the budget; right?
11   A.   I think there's something like that.  I know you are
12   trying to summarize his testimony and I'm not suggesting
13   you're wrong in those exact words, but I know there was
14   discussion of that, but I don't know if that was exactly the
04:12PM 15   way he said it.
16   Q.   Mr. Schoettelkotte, were you here yesterday when I asked
17   Mr. Larson of Tetra Tech questions?
18   A.   Yes, I was.
19   Q.   Okay.  So you heard testimony from Mr. Larson that he
04:12PM 20   was let go by CSX in June of 2020; right?
21   A.   That's correct, yes.
22   Q.   And you heard that Mr. Larson was part of a large round
23   of job cuts at CSX at that time; right?
24   A.   I did, yes, I heard that.
04:12PM 25   Q.   Again, that was at the beginning of pandemic; right?

239

1   A.   That's my understanding.
2   Q.   And you heard Mr. Larson testify that CSX had budget
3   constraints at the time, beginning of pandemic; right?
4   A.   I understand that was part of the discussion.
04:12PM 5   Q.   And you heard Mr. Larson testify and we went through
6   emails that established that Mr. Larson had wrote at the time
7   that Tetra Tech's price was too expensive for CSX; right?
8   A.   Um, I don't know if he exactly said that.  There were
9   some emails I went through on pricing and I understand
04:13PM 10   pricing was a concern, but I'm not aware what you just set
11   forth is what I recall the email saying exactly.  So I'll
12   have to take your word for it, but I don't recall that
13   specifically.
14   Q.   And do you recall that even after Mr. Larson joined
04:13PM 15   Tetra Tech, Mr. Larson had an understanding that Tetra Tech's
16   product was too expensive for CSX based on discussions he had
17   with Mr. Spencer; right?
18   A.   Well, I understand that they're still continuing to try
19   to sell to them and I know that they're still communicating.
04:13PM 20   I believe they think fondly of one another.
21   Q.   Okay.  Can you answer my question, please?
22   A.   I think I did.  I believe they're still negotiating, but
23   in terms of what you stated, I can't tell you that's exactly
24   what Mr. Larson's testimony was.  I know they still haven't
04:14PM 25   purchased and price is a concern.

240

1   Q.   You don't recall Mr. Larson's testimony?
2   A.   No, I do recall.  I don't know if what you're suggesting
3   is exactly what Mr. Larson testified to.  You're summarizing
4   it.  It don't have it in front of me.
04:14PM 5   Q.   You concluded that or you talked about in your
6   presentation that this is a two player market; is that right?
7   A.   For this technology, that's correct.
8   Q.   And you testified that you believe there's a two
9   supplier market and there are no other suppliers besides
04:14PM 10   Pavemetrics and Tetra Tech, and all sales in this but for
11   world would have gone to Tetra Tech; is that correct?
12   A.   I want to be careful there.  When you say all sales,
13   we're suggesting the three sales to CSX because we've talked
14   about the same market, the same product and the same
04:15PM 15   customer.
16   Q.   So limiting to the three sales to CSX, what I stated
17   previously that's a fair characterization?
18   A.   That's what my analysis is focused on.  That's what I
19   was asked to review is the relationship between those
04:15PM 20   parties.  That's what we've been looking at so I would say
21   that's generally correct.
22   Q.   And let's take a side tour on the sale that's not part
23   of your lost profits analysis.  That's the AID sale; correct?
24   A.   That's correct.
04:15PM 25   Q.   And you talked about Pavemetrics and Tetra Tech being

**EXHIBIT 3**
**-117-**

241

1    head-to-head competitors; right?

2    A.   That's correct.

3    Q.   And but for the AID sale, Tetra Tech and Pavemetrics are

4    not head-to-head competitors; right?

04:15PM 5    A.   Well, I understand that Tetra Tech didn't compete for

6    that sale.  So in a conservative fashion, I have not

7    incorporated that sale into my analysis because I know that

8    they weren't competing for that sale.

9    Q.   And you understand AID is not a Class 1 railroad; right?

04:16PM 10   A.   That's correct.

11   Q.   And Tetra Tech promotes its products.  One of its target

12   markets is Class 1 railroads; right?

13   A.   I understand that they're thought of very highly by

14   Class 1 and they're successful there.

04:16PM 15   Q.   AID is an integrator.  They don't buy rail cars;

16   correct?

17   A.   I think that's fair.  That's why I assessed that sale as

18   a reasonable royalty and not a lost sale.

19   Q.   So let's go back to the but for world we talked about.

04:16PM 20   CSX had other options, though, if Pavemetrics wasn't around;

21   correct?

22   A.   Um, Tetra Tech for 2D, 3D surfaces.

23   Q.   Right.  But there's other options for CSX; right?  They

24   don't have to purchase from Tetra Tech; correct?

04:17PM 25   A.   Nothing that would have been acceptable.

242

1    Q.   Well, what about CSX could have just not purchased one

2    at all; right?

3    A.   I'm not aware that that would be an acceptable

4    noninfringing alternative for what we're doing.  That would

04:17PM 5    put CSX in a position where they're not getting the economic

6    benefits of the transaction that occurred here.

7    Q.   And CSX, another option for CSX would be to stick with

8    the Georgetown Rail Services that it's been using for a

9    while; correct?

04:17PM 10   A.   Certainly, they could have done that, but they found

11   that to be not acceptable which is why they were looking for

12   other options.

13   Q.   You've seen no documents from CSX or testimony from

14   current CSX employees saying that that would not have been

04:17PM 15   acceptable to stay with GREX; right?

16   A.   Um, I haven't seen anything specifically about GREX.  I

17   have read the testimony of Mr. Spencer.  I'd be happy to tell

18   you what he said.

19   Q.   And so if something's too expensive and there's a budget

04:18PM 20   constraint and there's no other options, you don't have to

21   buy that; right?

22   A.   Again, maybe you don't have to buy it, but that's why we

23   talked about those economic considerations that I raised

24   earlier and the return on investment.  So maybe you don't

04:18PM 25   have to buy it, but that's not the reliable result in a but

243

1    for world calculation.

2    Q.   Please pull up Slide 12.  So staying with lost profits,

3    element two here is or requirement two here is absence of

4    acceptable noninfringing substitutes; right?

04:19PM 5    A.   Yes.

6    Q.   And so Tetra Tech must prove to a reasonable certainty

7    that there are no acceptable noninfringing substitutes to

8    have a chance to be entitled for lost profits; is that right?

9    A.   That's right.  It's more likely than not.

04:19PM 10   Q.   And did you -- were you here for Dr. Morellas's

11   testimony?

12   A.   I was, yes.

13   Q.   And do you recall Dr. Morellas talking about two accused

14   functionalities?

04:19PM 15   A.   I seem to recall that, yes.

16   Q.   And one of those is Fake3D; right?

17   A.   I believe that's correct.

18   Q.   And the second is mixed image; right?

19   A.   I believe that's accurate as well.

04:19PM 20   Q.   So if the LRAIL did not have those two accused

21   functionalities, Fake3D and mixed image that would be a

22   nonaccused LRAIL system for the purposes of this lawsuit;

23   correct?

24   A.   Um, well, you're asking me if they removed the

04:20PM 25   technology at issue and you asked me whether it would be

244

1    noninfringing, but there's a bigger question.  This factor is

2    acceptable noninfringing alternatives.

3        When you say would it be noninfringing, I would say

4    it might be.  It sounds like you're designing something out.

04:20PM 5    But if you were to remove what Dr. Morellas says is the

6    patented technology, it loses its acceptability so it would

7    not be something that I would consider reasonable.

8    Q.   Sir, I didn't ask about acceptability in that question.

9    I just asked if it was noninfringing for the purposes of this

04:20PM 10   element.  We can address acceptability as well.  I understand

11   there's a --

12   A.   We're talking about Factor 2 and you've highlighted it

13   on my slide which is why I'm addressing it so my apologies,

14   but I'm, again, just trying to help.  Yes, I understood this

04:21PM 15   is a factor and there's two important elements of this

16   factor.  You're correct if you remove those, if you designed

17   those out, it would be noninfringing, but it wouldn't have

18   the patented technology so it wouldn't be acceptable.

19   Q.   When you say remove those, you're referring to removing

04:21PM 20   Fake3D and mixed image; correct?

21   A.   Yes, it's a technical issue which Dr. Morellas is much

22   more qualified than me to talk about, but if you're

23   suggesting that to not infringe you would do those things, I

24   can't speak to that.  But I would say if that was

04:21PM 25   Dr. Morellas' opinion, I would be on board with whatever he

**EXHIBIT 3**
**-118-**

245

1 said from an infringement stand point.

2 Q.   Are you aware of any customers relating to this lawsuit

3 that have requested algorithms requiring a Fake3D

4 functionality?

04:22PM 5 A.   I haven't seen anything like that, no.

6 Q.   Are you aware of any customers in this lawsuit wanting

7 algorithms having a mixed image functionality?

8 A.   Again, you're talking about some specific technology.  I

9 think they want the benefits of those things.  I can't speak

04:22PM 10 whether they are looking for those specific technologies.  I

11 think they want the benefits of what the accused technology

12 provides.

13 Q.   Can you please answer my question?

14 A.   I am certainly trying, sir.

04:22PM 15 Q.   I'll ask it again.  Are you aware of any customers in

16 this lawsuit requesting algorithms from Pavemetrics with

17 mixed image functionality?

18 A.   No, not in those words.

19 Q.   Go to Slide 19, please.  Sorry.  The slides got switched

04:23PM 20 between the two versions.  My apologies.

21       Mr. Schoettelkotte, while we're pulling that up,

22 you understand Darel Mesher is the named inventor on the

23 asserted patents; right?

24 A.   I do.

04:24PM 25 Q.   But you didn't speak with Dr. Mesher at all before you

UNITED STATES DISTRICT COURT

246

1 formed your opinions in this case; right?

2 A.   No, I didn't believe it was necessary.

3 Q.   Did you watch Dr. Mesher's testimony yesterday?

4 A.   I did, yes.

04:24PM 5 Q.   You did speak with Gary Keyes; right?

6 A.   I did, yes.

7 Q.   And you saw his testimony that he has no technical

8 understanding of the asserted patents; right?

9 A.   Yes, but -- yes.

04:24PM 10 Q.   And you spoke with Bill Larson; right?

11 A.   I did.

12 Q.   And he's on the sales side at Tetra Tech as well?

13 A.   That's correct.

14 Q.   On the technical side, it sounds like you spoke with

04:24PM 15 Dr. Morellas before forming your opinions; right?

16 A.   I did.

17 Q.   And earlier this morning, Dr. Morellas explained clearly

18 that you had one brief call with him; correct?

19 A.   I did have a call with Dr. Morellas.

04:25PM 20 Q.   And he characterized it as a very brief call in fact;

21 right?

22 A.   I heard that, yes.

23 Q.   So your understanding of the patented features for the

24 purpose of your damages analysis is based on a very brief

04:25PM 25 call with Tetra Tech's technical expert Dr. Morellas; is that

UNITED STATES DISTRICT COURT

247

1 right?

2 A.   Well, that's one of the elements, yes.

3 Q.   And not on discussions with Dr. Mesher; right?

4 A.   That's correct.

04:25PM 5 Q.   So this was Slide 6 on this version.  This was a slide

6 you went through in the demonstratives.  And you highlighted

7 features that you believe are important in demonstrating what

8 you were talking about is the patented features and how that

9 plays into the damages analysis; is that right?

04:25PM 10 A.   Yes.

11 Q.   And you talked about LRAIL combines 2D imaging, 3D

12 scanning, image processing; right?

13 A.   That's correct.

14 Q.   And artificial intelligence to do certain things like

04:26PM 15 automatically scan and inspect tracks; right?

16 A.   That's correct.

17 Q.   Artificial intelligence, you heard Dr. Morellas make

18 very clear this morning that that's not part of the asserted

19 patents; right?

04:26PM 20 A.   Of course, yes.

21 Q.   And 2D imaging and 3D scanning, you heard the other day

22 that Dr. Mesher talked about that as being old technology;

23 right?

24 A.   That's correct.

04:26PM 25 Q.   So in the underlying portion here, this is talking about

UNITED STATES DISTRICT COURT

248

1 either old technology or aspects that are not in the asserted

2 patents; correct?

3 A.   Yes.  I'd be happy to explain.

4 Q.   You talked about -- let me just ask you how much -- what

04:27PM 5 profit would Pavemetrics make on normal products that are not

6 what you talked about earlier premium products of LRAIL?

7 A.   I'm not sure I can answer that question.  I don't know

8 what you're referring to.

9 Q.   You talked about premium -- premium versions of LRAIL

04:27PM 10 or --

11 A.   No, I didn't.  No, I didn't.  What I talked about was --

12 I may have misunderstood.  I'll move on.

13 A.   You should.

14 Q.   Thank you for clarifying.

04:27PM 15       Mr. Schoettelkotte, do you understand that

16 Pavemetrics also has a damages expert in this case; right?

17 A.   I do, yes.

18 Q.   And his name is Christian Tregellis; right?

19 A.   Yes.

04:28PM 20 Q.   Mr. Tregellis has reviewed your opinions and offered

21 opinions himself and has some disagreements with your

22 opinions; right?

23 A.   Yes.

24 Q.   You understand that Mr. Tregellis will testify next

04:28PM 25 week; right?

UNITED STATES DISTRICT COURT

EXHIBIT 3
-119-

249

1   A.   Yes.

2        MR. ZOVKO:  No further questions.

3        THE COURT:  Counsel, how much redirect do you have,

4   if any?

04:28PM 5        MS. MATHEW:  Just one question, Your Honor.

6        THE COURT:  Okay.  Go ahead.

7        MS. MATHEW:  Let's pull up Slide 24.

8            REDIRECT EXAMINATION

9   BY MS. MATHEW:

04:28PM 10   Q.   Mr. Schoettelkotte, earlier you were asked about your

11   inclusion of six LRAIL units in your analysis of Pavemetrics

12   profitability?

13   A.   Yes.

14   Q.   Could you explain why you included the six LRAIL units

04:29PM 15   as opposed to the four units that are at issue in this case?

16   A.   Yes.  So I mentioned earlier, there's a hypothetical

17   negotiation that occurs as part of the Georgia Pacific

18   factors, that's Factor 15.

19        And there's six units because the hypothetical

04:29PM 20   negotiation occurs at the time of first infringement and that

21   was in November 2020 and from November 2020 to today, there

22   have been six units sold.  I wanted to show the jury what the

23   profitability on those six units were because that would be a

24   full and complete analysis.

04:29PM 25        Now, I do understand that two of those units are

UNITED STATES DISTRICT COURT

250

1   not at issue in the case for a legal issue which I won't get

2   into because it's not my purview, but it has nothing to do

3   with the financial or economic performance of the

4   profitability related to infringing units which is why I used

04:30PM 5   all six units.

6        If you were to remove two as counsel suggested, it

7   would be incomplete and it would be wrong.  And I didn't want

8   to mix up the record by taking that position.

9        MS. MATHEW:  Thank you, Your Honor.

04:30PM 10        No further questions and thank you,

11   Mr. Schoettelkotte.

12        THE COURT:  Counsel?

13        MR. ZOVKO:  No further questions, Your Honor.

14        THE COURT:  The witness is excused.

04:30PM 15        So to the jurors, we'll break and we will come back

16   on Tuesday because the court's dark on Monday.  So I'll ask

17   you to make sure you're here on time on Tuesday.  We're gonna

18   have a long day.  We're gonna try to make sure we can wrap

19   things up.  Hopefully on Wednesday, you can be starting your

04:30PM 20   deliberations.  So I'll ask you to try to get here on time on

21   Tuesday.

22        Remember, it's a long weekend so I know you're

23   gonna be tempted to talk to all your friends about this

24   case, don't do it.  Hold out.  You can do it.  In all

04:31PM 25   seriousness, it's just important not to get other people's

UNITED STATES DISTRICT COURT

251

1   opinions.  You know, there could be lots of things that could

2   come up where somebody might mention something and you go oh,

3   that reminds me I'm trying to figure out what convolution

4   neural networks do.  Don't do any of that.

04:31PM 5        Try to make sure you limit all of your

6   conversations to steer clear of the case.  Don't do any

7   research either.  Those of you that like to go online, like

8   to look things up, don't do that either.  If you don't

9   understand something, it's the -- it's -- well, the lawyers

04:31PM 10   are giving you everything that they're gonna give you.  If

11   you don't understand it, you don't understand it.  You're not

12   allowed to do any outside research on it.

13        So hopefully you'll enjoy your weekend and won't be

14   thinking about this case, but if you do, don't talk about it.

04:32PM 15   Thank you very much.  Thanks for being such a good jury.

16        THE CLERK:  All rise.

17            (Jury not present.)

18        THE COURT:  So we are dark on Monday because I've

19   got criminal things.  We could, um, obviously we're gonna be

04:32PM 20   here on Monday if there's issues that we need to discuss or

21   resolve, we could potentially meet on Monday or we could just

22   wait until Tuesday morning at 8:30 if there's anything that

23   comes up.  You probably all have a lot of work to do any way.

24        Anybody have anything we need to discuss now?

04:32PM 25        MR. RE:  I do, Your Honor.  Maybe we're talking

UNITED STATES DISTRICT COURT

252

1   about the same thing.  Your Honor, based upon the changes in

2   the slides and the presentation that I just saw, I would like

3   just a kind request, if we could just know the damages claim

4   that is being made with respect to each patent.

04:33PM 5        I do not know and I think you might feel the same

6   way if they are seeking a reasonable royalty for AID on the

7   '293.  And that is leading to a lot of confusion and we've

8   wasted a lot of time if that claim is no longer being made.

9   I think you may have dropped it.  I don't know if you meant

04:33PM 10   that.  I don't know if a claim is being made for infringement

11   of the '293 for damages for the sale for AID.  I don't know

12   is that what you were gonna raise?

13        MS. LEA:  That was one of the issues I was going to

14   raise.  It sounded like counsel dropped that today during

04:33PM 15   Dr. Morellas' testimony.  We had not heard that before and we

16   want to confirm it.

17        THE COURT:  As I understand it, there's lost

18   profits on three sales under the '293 patent and there's a

19   reasonable royalty sought for one sale under the '557; is

04:34PM 20   that correct?

21        MR. BARNEY:  That's our case, Your Honor.

22        THE COURT:  Okay.

23        MR. RE:  That was not their case until today.

24        MR. BARNEY:  Incorrect, Your Honor.  We --

04:34PM 25        THE COURT:  Again --

UNITED STATES DISTRICT COURT

EXHIBIT 3
-120-

253

1   MR. RE:  Okay.  So I just want the record to be
2   clear, there is no reasonable royalty being sought for the
3   AID sale on the '293 and it is simply based on a sale or an
4   induced infringement AID on the '557 only.
04:34PM 5   THE COURT:  From the damages standpoint, yes.
6   Okay, Counsel.
7   MS. LEA:  Just one other small issue, Your Honor,
8   on the jury instructions.  This is on the prior art
9   Instruction No. 34.  I understand from Tetra Tech that
04:34PM 10   they're no longer disputing that UML TRV 2014 is prior art so
11   it should come out of the disputed instruction.
12   And I just wanted to put that on the record.  I can
13   work with their counsel to suggest an additional instruction
14   that is prior art and that's stipulated.
04:35PM 15   THE COURT:  Great.
16   MR. CHUNG:  That's correct, Your Honor.  We'll work
17   together.
18   THE COURT:  Thank you.
19   So unless we hear from the parties, we'll meet at
04:35PM 20   8:30 Tuesday morning to see if there's any further issues,
21   and we'll go forward there.
22   You might want to check in.  We can give you the
23   time we have.  You probably have your own count on time, but
24   if you want to get our clock, we can provide it to you after
04:35PM 25   we close out today.  Thank you.

UNITED STATES DISTRICT COURT

254

1   THE CLERK:  All rise.
2   This court is adjourned.
3   (Proceedings were concluded at 4:35 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT

255

1
2   CERTIFICATE OF REPORTER
3
4   COUNTY OF LOS ANGELES    )
5                            ) SS.
6   STATE OF CALIFORNIA      )
7
8   I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED
9   STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,
10   DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE
11   FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET
12   FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN
13   FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO
14   FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION
15   OF MY STENOGRAPHIC NOTES.
16
17
18   DATE:  AUGUST 21, 2022
19
20    /s/  LAURA MILLER ELIAS
21   LAURA MILLER ELIAS, CSR 10019
22   FEDERAL OFFICIAL COURT REPORTER
23
24
25

UNITED STATES DISTRICT COURT

**EXHIBIT 3**
**-121-**