**Page 1**

```
  1                    UNITED STATES OF AMERICA
                     UNITED STATES DISTRICT COURT
  2                 CENTRAL DISTRICT OF CALIFORNIA
                           WESTERN DIVISION
  3                          - - -
  4                  HONORABLE MARK C. SCARSI
               UNITED STATES DISTRICT JUDGE PRESIDING
  5                          - - -
  6    PAVEMETRICS SYSTEMS, INC.,        )
  7          PLAINTIFF,                   )
  8    VS.                               )   CASE NO.:
  9    TETRA TECH, INC.,                 )   CV 21-01289-MCS
 10          DEFENDANT.                   )
 11                                       )
 12    _____)
 13
 14           REPORTER'S TRANSCRIPT OF PROCEEDINGS
 15              TUESDAY, AUGUST 23, 2022
 16               LOS ANGELES, CALIFORNIA
 17
 18
 19
 20
 21
 22
 23        LAURA MILLER ELIAS, CSR 10019
           FEDERAL OFFICIAL COURT REPORTER
 24        350 WEST 1ST STREET, ROOM 4455
           LOS ANGELES, CALIFORNIA 90012
 25             PH:  (213) 894-0374


                 UNITED STATES DISTRICT COURT
```

**Page 2**

```
  1    APPEARANCES OF COUNSEL:

  2

  3    ON BEHALF OF PLAINTIFF:
  4        KNOBBE, MARTENS, OLSON & BEAR, LLP
  5        BY: CHRISTY LEA, ESQ.
  6            JOSEPH RE, ESQ.
  7            NICHOLAS ZOVKO, ESQ.
  8            ALAN LAQUER, ESQ.
  9        2040 MAIN STREET
 10        14TH FLOOR
 11        IRVINE, CA 92614
 12
 13    ON BEHALF OF DEFENDANT:
 14        FINNEGAN HENDERSON
 15        BY: JAMES BARNEY, ESQ.
 16            AARON PARKER, ESQ.
 17            NICHOLAS CERULLI, ESQ.
 18            JENCY MATHEW, ESQ.
 19            DANIEL CHUNG, ESQ.
 20        901 NEW YORK AVENUE NW
 21        WASHINGTON, DC 20001
 22
 23
 24
 25

                 UNITED STATES DISTRICT COURT
```

**Page 3**

```
  1                        INDEX
  2    WITNESSES FOR
       PAVEMETRICS:
  3
                  DIRECT   CROSS   REDIRECT   RECROSS
  4
  5    BRAD SPENCER
       (VIDEO 24)
  6
       BERNARD TEUFELE
  7    (VIDEO 24)
  8
       ROBERT OLENOSKI
  9    (VIDEO 24)
 10    LAURENT, JOHN
       BY: MS. LEA    26
 11    BY: MR. PARKER        78
 12    HEBERT, JEAN
       BY: MS. LEA    110        154
 13    BY: MR. CERULLI        144
 14    TREGELLIS, CHRISTIAN
       BY: MR. ZOVKO  156
 15
       FRAKES, DAVID
 16    BY: MR. LAQUER 169
 17    BY: THE COURT
       (192, 194)
 18
 19
 20
 21
 22
 23
 24
 25
```

```
                 UNITED STATES DISTRICT COURT
```

**Page 4**

```
  1    LOS ANGELES, CALIFORNIA; TUESDAY, AUG. 23, 2022; 8:36 A.M.
  2                          - - -
  3             THE CLERK:  Calling Item No. 1.
  4        Case No. C.V.  21-1289.
08:36AM  5        Pavemetrics Systems, Inc. versus Tetra Tech, Inc.
  6        Counsel, please state your appearances.
  7             (Appearance as heretofore noted.)
  8             THE COURT:  Good morning, everybody.  I understand
  9    there was quite a line outside so I applaud you all for being
08:36AM 10    able to get here on time.  What issues do we need to discuss
 11    before the jury comes in?
 12             MR. LU:  Good morning, Your Honor.
 13             THE COURT:  Good morning.
 14             MR. LU:  Pavemetrics objects to certain of Tetra
08:36AM 15    Tech's designations of the deposition transcript of Robert
 16    Olenoski.
 17             THE COURT:  Okay.  And these are -- this is a
 18    deposition that -- well, tell me a little bit about this
 19    deposition.
08:37AM 20             MR. LU:  This is a deposition of a Tetra Tech
 21    consultant who -- that we plan to play today for the jury,
 22    and we are objecting to lines regarding certain out-of-court
 23    statements b CSX regarding LRAIL's abilities to use railway
 24    geometry which is not something in this case.
08:37AM 25             THE COURT:  So you're playing this deposition today

                 UNITED STATES DISTRICT COURT
```

**EXHIBIT 4**
**-122-**

5

1  of Mr. Olenoski, and Tetra Tech has identified
2  counter-designations, and you're objecting to those?
3      MR. LU:  Correct, Your Honor.
4      THE COURT:  Okay.  Do you have a copy for me?
08:38AM 5  Can you identify for the designations that you're
6  objecting to?
7      MR. LU:  Yes, Your Honor.  The first one is page 71
8  line 24 to 72, line 4, and the second portion is page 89,
9  line 10 to 89, line 20.
08:38AM 10      THE COURT:  And those are the two?
11      MR. LU:  Yes, sir.  Or yes -- yes, Your Honor.
12      THE COURT:  Okay.  And your objection is hearsay
13  and relevance?
08:39AM 14      MR. LU:  Hearsay and relevance.  Yes, Your Honor.
08:39AM 15      THE COURT:  Okay.  Let me hear from Tetra Tech.
16  And let's start out with 71, line 24 to 72, line 4.
17      MR. PARKER:  Thank you, Your Honor.  We're not
18  offering those statements for the truth of the matter
19  asserted that CSX actually believed.  That is we believe that
08:39AM 20  the statements are relevant that directly respond to the
21  question above that Pavemetrics has designated into Tetra
22  Tech end buying in LRAIL.  On page 71, line 18, the question
23  asks, and did Tetra Tech end up buying in LRAIL.
24      So we believe that that response that we've
08:40AM 25  counter-designated, Your Honor, responds directly to that

6

1  question or is, you know, a follow-up on the answer to that
2  question.
3      THE COURT:  Mr. Olenoski works for -- he's the
4  Tetra Tech consultant?
08:40AM 5      MR. PARKER:  Yes, Your Honor.
6      THE COURT:  And so I guess you're offering this to
7  show Mr. Olenoski's understanding of a reason that Tetra Tech
8  ended up not buying an LRAIL system; is that right?
9      MR. PARKER:  Correct.
08:41AM 10      THE COURT:  And why is that relevant?
11      MR. PARKER:  Um, it's our view that it's relevant.
12  They marked the question, and did Tetra Tech end up buying in
13  LRAIL as relevant so to the extent that that question's
14  relevant, we believe that the answer is also relevant.
08:41AM 15      THE COURT:  So for completeness purposes.
16      MR. PARKER:  Yes, Your Honor.
17      THE COURT:  Okay.  Let's look at 89, line 10
18  through 89, line 20.
19      MR. PARKER:  And we have the exact same situation
08:41AM 20  where they have designated or testimony or testimony has been
21  designated lines 10 through 20 on page 89.  They're just a
22  continuation of Mr. Olenoski's answer to the above questions
23  that have not been objected to by Pavemetrics.  And for the
24  same reason, we're not offering the CSX statements for the
08:42AM 25  truth of the mattered asserted, just Mr. Olenoski's

7

1  impression.
2      THE COURT:  Okay.  Thanks.  Let me hear back from
3  counsel for Pavemetrics.  Why isn't this -- why shouldn't
4  this come in for completeness sake?  Because there does seem
08:42AM 5  to be a hook here, and did Tetra Tech end up buying LRAIL?
6      MR. LU:  Well, Your Honor, we're not objecting on
7  the grounds that it's not responsive to certain designations
8  by Pavemetrics, but I guess just because it's the next
9  question down doesn't make the testimony itself relevant.
08:42AM 10  Railway geometry is not at issue in this case, it hasn't been
11  discussed at all, the jury is not going to know what it
12  means, and we would object on those grounds.
13      THE COURT:  Okay.  I think it's fair game for
14  completeness sake so I'm gonna allow that testimony.
08:43AM 15      MR. LU:  Yes, Your Honor.
16      THE COURT:  Okay.  Anything else we need to
17  discuss?
18      MR. CERULLI:  Yes, Your Honor.  We had a few
19  objections to Dr. Frakes' demonstratives.  We'd like to
08:43AM 20  approach just to hand you some materials.
21      THE COURT:  Please.
22      MR. CHUNG:  May I approach, Your Honor?
23      THE COURT:  Yes.  Is it appropriate to have
24  witnesses here during this or what are the parties view on
08:44AM 25  that?

8

1      MR. CERULLI:  I think we're okay with it.
2      MS. LEA:  It's expert related.
3      MR. CERULLI:  Yes.
4      THE COURT:  Okay.  Okay.
08:44AM 5      MR. CERULLI:  So our first objection is slides 26
6  to 28, and we'll pull them up for you.  So Dr. Frakes never
7  opined on the infringement with respect to Claim 21.  He
8  provided no opinions in his expert report.  And so slides 26
9  to 28 provide for the first time opinions with respect to
08:44AM 10  features contained in Claim 21.  So this is clearly beyond
11  the scope of his expert report.
12      And now counsel yesterday told us that this was in
13  response to Dr. Morellas' opinions that he provided Thursday
14  and Friday, but they never objected as it being outside the
08:45AM 15  scope of his report.  So, you know, this is sort of an end
16  around way for them to add new opinions with respect to Claim
17  21 that were never provided previously.
18      THE COURT:  Okay.  And I've got his report in front
19  of me; right?
08:45AM 20      MR. CERULLI:  Yes.  It's the rebuttal report, and
21  it's page 66.  You'll see beyond the arguments with respect
22  to Claim 1, there was no additional arguments raised with
23  respect to Claim 21.
24      THE COURT:  And what I'm looking at page 66 is the
08:45AM 25  sum total of his opinions on Claim 21?

**EXHIBIT 4**
**-123-**

**9**

1  MR. CERULLI:  It is, Your Honor.

2  THE COURT:  Okay.  And is this the singular issue

3  or are there other issues with the slides?

4  MR. CERULLI:  We have other issues with the slides

08:46AM 5  as well.

6  THE COURT:  Okay.  So we'll deal with this one

7  first.  So it looks like in these slides, he's expressing an

8  opinion that the infringement proof put on by Tetra Tech is

9  inaccurate cause it relies on different software versions.

08:46AM 10  Were those -- that testimony on the different versions that

11  was put on, was that in your expert's report?

12  MR. CERULLI:  It was, Your Honor.  He only provided

13  excerpts of one version of code as representative of all the

14  other versions of code.  There was many versions, I believe,

08:46AM 15  five or so that were analyzed by Dr. Morellas.  And so for

16  brevity, he only included one versions of code in his

17  analysis.

18  THE COURT:  Okay.  Let me hear from Pavemetrics

19  then.

08:47AM 20  MR. LAQUER:  Good morning, Your Honor.  Alan

21  Laquer.

22  These demonstratives from Dr. Frakes do not address

23  the substance of the claim limitations of Claim 21.  They go

24  to respond to Dr. Morellas' opinion stated in his direct that

08:47AM 25  any of the versions of software he addressed are

**10**

1  representative of all other versions.

2  That opinion did not appear in Dr. Morellas'

3  report.  I did object when Dr. Morellas raised that.  That

4  was in Day 2 of the transcript beginning at page 156.  That

08:47AM 5  objection is still outstanding.

6  So Your Honor may, of course, sustain that

7  objection and strike Dr. Morellas' opinion with respect to

8  respectiveness.  However, if Dr. Morellas is permitted to

9  introduce new testimony regarding representativeness, then

08:47AM 10  Dr. Frakes should be permitted to respond and state the

11  software versions are not representative.

12  THE COURT:  Okay, so he's saying the versions are

13  different.

14  MR. LAQUER:  Yes.  And on pages 27 and 28, he

08:48AM 15  identifies specific lines of source code from the version

16  that Dr. Morellas relies upon showing substantive differences

17  from the very section that Dr. Morellas relies upon.

18  This is specific and particular to Claim 21 here

19  because Claim 21 depends on Claim 1.  For Claim 1,

08:48AM 20  Dr. Morellas relied upon one version of code.  For Claim 21,

21  he relies upon a different version of code.

22  So Dr. Morellas has failed to present a single

23  system that even in his opinion satisfies every limitation of

24  Claim 21.  This is what Dr. Frakes is explaining in these

08:48AM 25  demonstratives.

**11**

1  THE COURT:  And, I guess, why didn't Dr. Frakes

2  make these -- or describe these opinions in his report?

3  MR. LAQUER:  Well, simply because the opinion that

4  Dr. Morellas provided in his report was -- or that Dr.

08:49AM 5  Morellas presented in his testimony was not in his report.

6  Counsel for Tetra Tech said that Dr. Morellas identified

7  certain versions of code.  He didn't make a representation or

8  an opinion regarding representativeness.

9  During the meet and confer, I asked for counsel to

08:49AM 10  direct me to such an opinion in Dr. Morellas' report, and no

11  identification was given.  That's why I objected during

12  Dr. Morellas' testimony when he claimed for the first time

13  that these versions are representative of each other.

14  THE COURT:  And I guess my question is so

08:49AM 15  Dr. Morellas used -- just to make it simple, Dr. Morellas

16  used a version of software in his report to opine on his

17  infringement opinions with respect to Claim 21; correct?

18  MR. LAQUER:  For the added limitation of Claim 21,

19  he identified a version of a code, yes.

08:49AM 20  THE COURT:  Okay.  And, um, that was in his report?

21  MR. LAQUER:  Um, well, allow me to clarify.  He

22  included block citations for many of his citations to code so

23  he was not very specific on -- he would sometimes provide an

24  excerpt from one version, and then have a big string cite

08:50AM 25  which is a very different presentation than the way he

**12**

1  addressed the code in his direct testimony.

2  THE COURT:  Okay.  And -- but so why didn't

3  Dr. Frakes opine in his report that the version that

4  Dr. Morellas was referring to in his report was, um -- didn't

08:50AM 5  include the functionality he said?

6  MR. LAQUER:  Well, again, for this reason, that

7  Dr. Morellas used large block string cites that appeared to

8  rely upon several versions of code whereas now for the first

9  time in his direct, he relied upon a single version for

08:50AM 10  Claim 21.

11  THE COURT:  Okay.  So the crux of the issue you

12  have is that the specifics of what Dr. Morellas was relying

13  on were not apparent from the report?

14  MR. LAQUER:  Yes, Your Honor.

08:51AM 15  THE COURT:  But they became apparent in the

16  testimony.

17  MR. LAQUER:  Yes.  Not only did it become apparent,

18  but during the direct testimony, Dr. Morellas changed from

19  large block citations for different, um, limitations to a

08:51AM 20  wide range of versions to suddenly picking individual

21  versions per limitation or claim and adding a new concept of

22  representation which was not presented in his report.

23  THE COURT:  Okay.  Let me hear from Tetra Tech.

24  What say you about this?

08:51AM 25  MR. CERULLI:  Your Honor, the -- the same code is

**EXHIBIT 4**

**-124-**

**13**

1  fund in multiple versions of code, and the string sites that
2  the counsel referred to clearly were -- you know, again, we
3  cited one excerpt from one piece of code and then a string
4  site to refer to the other versions of code rather than, you
08:51AM  5  know, put in five different excerpts that all contain the
6  same code.  And so this --
7  And Dr. Morellas explains early in his report that
8  he is referring to an example of source code that, you know,
9  is representative of multiple versions of code.  So, again,
08:52AM 10  Dr. Frakes could have raised this issue in his rebuttal
11  report, but he did not.
12  THE COURT:  Is it clear -- so looking at this slide
13  we've got on the screen, the accused LRAIL version is not
14  representative, it says here, uh, Dr. Morellas relied on
08:52AM 15  r10323 for Claim 1, but on for 4.78.6.0 for Claim 21.  Um,
16  did Dr. Morellas identify his report that he relied on for
17  4.78.6.0 for Claim 21?
18  MR. CERULLI:  He did, Your Honor.  And I believe he
19  also included a citation to the r10323 version as well.  And
08:53AM 20  I don't believe there's any dispute that it's also contained
21  in the r10323 version.  Otherwise, you know, Dr. Frakes could
22  have pointed that out in his rebuttal report.
23  THE COURT:  Counsel indicates that this was unclear
24  from Dr. Morellas' report that this is what he was doing.
08:53AM 25  Can you point me to where Dr. Morellas identifies these

UNITED STATES DISTRICT COURT

**14**

1  versions in his report?
2  MR. CERULLI:  I don't have the -- Dr. Morellas's
3  report with me here.  I do believe he sets forth the -- to
4  make clear that it is -- you know, he's -- there's multiple
08:53AM  5  versions of code, and he is citing to excerpts of a
6  particular version.
7  And I believe what we have here is a situation
8  where he for Claim 1 had mapped to that r10323 version and
9  then also contained an excerpt from the Version 4.78 but also
08:54AM 10  made clear that through a string site that was it also
11  contained in the r10323 version.
12  THE COURT:  Okay.  What about counsel's argument
13  that Dr. Morellas was kind of vague in his report and got
14  specific -- more specific on the stand, and therefore --
08:54AM 15  therefore, it's sort of fair game to, um, have Dr. Frakes
16  take those specifications.
17  MR. CERULLI:  You know, I think they're focusing on
18  the word representative.  But again, the string cite to make
19  clear that it's -- the same code is contained in multiple
08:55AM 20  versions of code.  It is pretty clear.  And he was just
21  explaining for the jury sake that when we cite to -- you know
22  we're talking about multiple versions of code.  When we cite
23  to one version, it is simply exemplary.  And I believe
24  Dr. Morellas opines that he also reviewed multiple,
08:55AM 25  additional versions of code also confirmed that the code was

UNITED STATES DISTRICT COURT

**15**

1  found in those versions as well.
2  THE COURT:  These charts I'm looking at, this comes
3  from Dr. Morellas' direct; correct?
4  MR. CERULLI:  Yes.
08:55AM  5  THE COURT:  This sort of callouts of the code, were
6  these in his report?
7  MR. CERULLI:  They were, Your Honor.
8  THE COURT:  Including the version numbers?
9  MR. CERULLI:  Yes.
08:55AM 10  THE COURT:  Okay.  Let me ask counsel for
11  Pavemetrics, if these callouts were in his numbers including
12  these version numbers, and arguments weren't made in the
13  rebuttal that this was somehow the wrong code, why should we
14  allow Dr. Frakes do it now?
08:56AM 15  MR. LAQUER:  Because Dr. Morellas never presented
16  an opinion on representativeness.  We've -- I've asked where
17  in that report counsel believes it exists.  It does not.
18  Importantly, counsel's now relying on statements
19  multiple times that it's supposedly the same code across
08:56AM 20  these versions.  If you could look at Slide 28 which is the
21  code here, at least in that example we're identifying, it's
22  different code.  There's different code in the items that
23  counsel -- or that Dr. Morellas string cited in his report.
24  Here we can see R10323 doesn't even include the
08:56AM 25  Fake3D code that Dr. Morellas is opining forms the basis of

UNITED STATES DISTRICT COURT

**16**

1  his infringement opinion.  There are differences 4.8, 4.78
2  R10323, and Dr. Morellas' report having a large block of
3  string sites for each of these limitations is insufficient to
4  now claim their one version is representative of another,
08:57AM  5  particularly when you drill in after having seen when he
6  testified in court and see that the code is different.
7  THE COURT:  What's on the Slide 28?
8  Walk me through it.
9  MR. LAQUER:  Yes, Your Honor.  This is a part of
08:57AM 10  the LRAIL source code called LCMS Rail Analyzer.  This is
11  the.cpp file.  And we can see that there's a highlighting of
12  a particular function for joint bar detection which is a
13  limitation and a concept at issue in Claim 21.
14  So we can see in the 4.80 version, there is the
08:57AM 15  joint bar detection function.  We see that again in the 4.78
16  version.  We see the same file in the r10323 version at the
17  bottom right, that function is not present.
18  And so, again this, goes to an interplay between
19  Claim 1 and Claim 23 -- I'm sorry, Claim 21, I correct
08:58AM 20  myself.  In Claim 21, this joint bar concept is addressed but
21  the underlying Fake3D allegation is absent in r10323.  So to
22  rely on that version for Claim 21 is a fundamental
23  inconsistency within Dr. Morellas' opinion on Claim 21 first
24  laid bare in their testimony, Your Honor.
08:58AM 25  THE COURT:  Okay.  Let me ask Tetra Tech what is

UNITED STATES DISTRICT COURT

**EXHIBIT 4**

**-125-**

## 17

1  the harm with letting Dr. Frakes make these points?  Is there
2  anything -- I mean, can't you just clear up any issues on
3  your rebuttal case?
4  MR. CERULLI:  You know, Your Honor, I think that he
5  has not presented any opinions in his report on Claim 21, and
6  so again, this is kind of them trying to find very
7  inconsequential differences in order to make an argument with
8  respect to Claim 21 now, and we think that's inappropriate.
9  THE COURT:  Okay.  What other objections?  Is there
10  other topics of objections you have?
11  MR. CERULLI:  Yeah, we have two more, Your Honor.
12  THE COURT:  Okay.  Let's go through those.
13  MR. CERULLI:  Okay.  The second objection we have
14  is there are a range of slides that take two grounds from
15  Dr. Frakes' invalidity report and essentially merge them and
16  pick and choose from -- from two different grounds.
17  Now, in Dr. Frakes's rebuttal -- sorry, opening
18  report, if you just go to the Table of Contents, you will see
19  that there is one ground for the UML sale and support.
20  That's Roman Numeral VII A.  And then if you look at 8B, it
21  refers to this printed publication which is UML TRB 2014.
22  And these are two separate grounds for invalidity that
23  Dr. Frakes raises.
24  And in the slides, Dr. Frakes goes back and forth
25  between the UML article and the UML sale and support which

UNITED STATES DISTRICT COURT

## 18

1  really relies on a prior system and relies on the source
2  code.  And never in Dr. Frakes' report does he, you know talk
3  about combining these two references and those two grounds,
4  and, you know, so this is -- this is now new opinions outside
5  the scope of his report.
6  THE COURT:  Okay.  So looking at Roman VII, is he
7  making an anticipation argument on the UML sale and support?
8  MR. CERULLI:  Um, I believe it's -- you know, due
9  to narrowing the issues in this case.  I believe it's now on
10  obviousness ground.
11  THE COURT:  Obviousness ground?
12  MR. CERULLI:  Yeah.
13  THE COURT:  And with respect to the UML TRB 2014,
14  he's doing an obviousness analysis with respect to that
15  reference.
16  MR. CERULLI:  Correct.
17  THE COURT:  But he never does an obviousness
18  analysis by combining the references.
19  MR. CERULLI:  Correct.
20  THE COURT:  Okay.
21  So let me hear from counsel on that.
22  MR. LAQUER:  Your Honor, in the verdict form that
23  Tetra Tech proposed, they combined the URB sale and support
24  with the U, um -- I'm sorry, UML sale and support with the
25  URB-TRB2014.  It's not surprising these are the same system.

UNITED STATES DISTRICT COURT

## 19

1  This is a document talking about the system.  This is
2  document talking about a device.
3  And so the jury will be presented in Question 6
4  with the question as to whether or not the UML sale and
5  support and/or -- here we have it right here, and/or UML TRB
6  2014 render obvious Claim 8 of the '557 patent.
7  Rather than spend twice as much time going over the
8  same system twice, once based on the source code and once
9  based on a document describing that system, Dr. Frakes in his
10  direct is presenting the information in the same format as it
11  will be presented to the jury on the jury -- on the verdict
12  form.
13  THE COURT:  So he's not combining the references;
14  right?
15  MR. LAQUER:  Well, they're already distinct.  It's
16  the same system.  So it's really not a question of obvious to
17  combine when the things are describing the same thing.
18  Obviously, the expert report has unlimited pages and
19  unlimited time, and they're really not a constraint in terms
20  of efficiency, but for purposes of presenting the information
21  to the jury in a format that the jury is able to understand
22  and relate to the verdict form, it's already the same thing.
23  THE COURT:  Okay.  So he's not combining the
24  references.  He's just talking about them at the same time?
25  MR. LAQUER:  Well, it's -- it's Pavemetrics early

UNITED STATES DISTRICT COURT

## 20

1  work with UML.  So it's already the case that the UML TRB
2  document is informative as to the sale and support when you
3  have a document talking about the system.
4  THE COURT:  Okay.
5  Okay, let me hear the third issue.
6  MR. CERULLI:  Thank you, Your Honor.
7  The third issue is with respect to Slides 81 and
8  82, and this concerns the Marking Statute.  So the Marking
9  Statute requires that if you practice your invention, you
10  need to mark your product.
11  And earlier in this case, Your Honor found that
12  that two sales that were prior notice were excluded from this
13  case.  And so under the law of the case, Tetra Tech practices
14  its patent cause if Tetra Tech did not practice its patent,
15  then those two sales would still be at issue.
16  Now, Dr. Frakes is presenting an opinion that's
17  contrary to the law of the case which is that Tetra Tech does
18  not practice its invention.  And now, essentially, you know,
19  we have some tension here, and effectively, if Tetra Tech
20  does not practice its invention, then those two prior
21  prenotice sales would be back in the case.
22  Now, we don't suggest that those two sales come
23  back in now, but for Dr. Frakes to present opinions that the
24  3DTAS does not practice his invention would be contrary to
25  the law of the case.

UNITED STATES DISTRICT COURT

**EXHIBIT 4**
**-126-**

21

1   THE COURT:  And is that opinion in Dr. Frakes'
2   report?
3   MR. CERULLI:  Uh, it is, Your Honor.
4   THE COURT:  Okay.  And so the two systems that were
5   excluded were -- tell me a little bit more about that.
6   Refresh my memory on what we're talking about.
7   MR. CERULLI:  Yes.  So -- so Tetra Tech sent a
8   letter in January 2021.  And so there was a summary judgment
9   motion with respect to two sales that occurred in
10  October 2020.  And so Your Honor found that those -- you
11  know, the Marking Statute, there was a requirement.
12  There was no notice provided.  And the notice was first
13  provided in January 2021 so those prior notice sales were,
14  uh, excluded by Your Honor.
15  THE COURT:  Okay.
16  Let me hear from Pavemetrics on that.
17  MR. LAQUER:  Your Honor, Pavemetrics explained that
18  in view of Tetra Tech's contention that its products practice
19  its patents, the Marking Statute does apply based on its
20  view, based on its position, and, of course, that's an issue
21  for it to prove.
22  Dr. Morellas in his testimony opined that he
23  believes he had carried that burden.  Here and in his report,
24  Dr. Frakes is simply pointing out that Dr. Morellas failed to
25  carry his burden.  Dr. Frakes is not stating that 3DTAS does

UNITED STATES DISTRICT COURT

22

1   not practice the invention.  Instead because Dr. Morellas
2   failed to look at Tetra Tech's neural network files,
3   Dr. Frakes has explained that Dr. Morellas is unable to show
4   one way or the other whether it practices the '293 patent
5   because Dr. Morellas himself opines that the neural network
6   is responsible for performing the claim.
7   THE COURT:  Okay.  So this is -- these are the
8   rulings.
9   With respect to the first issue.  I don't think
10  Dr. Frakes has an opinion on Claim 21 in his report so I
11  don't think he's allowed to talk about that.  From the
12  report, it just seems like he's saying if Claim 1, um --
13  Claim 21 follows Claim 1.  So there's no infringement on
14  Claim 1, there's no infringement on Claim 21 so I don't think
15  he can opine specifically about the infringement issues with
16  respect to Claim 21.
17  With respect to the issue on the prior art, the UML
18  sales and UML TRB 2014, I think that -- as long as he's not
19  making an argument about combining those two references, I
20  think it's fair game for him to talk about them together.
21  And with respect to this last issue, I think he can
22  opine on Dr. Morellas' analysis with respect to 3DTAS and
23  whether it practices the patent.
24  MR. LAQUER:  Understood.
25  THE COURT:  Are we ready for the jury to come out?

UNITED STATES DISTRICT COURT

23

1   MS. LEA:  We just have issues on jury instructions
2   that could be saved for later or done now?
3   THE COURT:  Why don't we do that on a break and
4   have the jury come out.
5   THE CLERK:  All rise.
6   (Jury present.)
7   THE COURT:  Welcome back to the jurors.  Thanks for
8   getting here on time.  Sorry we kept you waiting a little
9   bit.  I understand there was long lines outside today so
10  thanks for all you do to get here and manage that.  We will
11  get started.  We had just finished up with an expert witness
12  when we completed things on Friday.
13  Where are we now?
14  MS. LEA:  Your Honor, Pavemetrics will call its
15  next witness.
16  THE COURT:  Okay.  Please do.
17  MS. LEA:  I will ask Mr. Lu to do so.
18  MR. LU:  We're going to start the day with three
19  witnesses by video deposition.  First Pavemetrics calls
20  Mr. Bradford Spencer on behalf of CSX Transportation by video
21  deposition taken on January 20th, 2022.  It'll be about 26
22  minutes long.  And at this time, Pavemetrics would move to
23  admit Exhibits 464 and 465.
24  THE COURT:  Okay.  Counsel, any objection to 464
25  and 465?

UNITED STATES DISTRICT COURT

24

1   MR. PARKER:  No, Your Honor.
2   THE COURT:  464 and 465 are in evidence.
3   (Exhibit 464 and 465 admitted.)
4   THE COURT:  And go ahead play the video deposition
5   of Mr. Bradford Spencer.
6   (Video deposition played.)
7   MR. LU:  Next Pavemetrics will call Bernard Teufele
8   by video deposition.  It will be about six minutes.  And I
9   would just like to move into evidence Exhibit 231.
10  THE COURT:  Okay.  Counsel, any objections to
11  Exhibit 231?
12  MR. PARKER:  No, Your Honor.
13  THE COURT:  Okay, Exhibit 231 is in evidence.
14  (Exhibit 231 admitted.)
15  THE COURT:  And you can go ahead and play the video
16  of Mr. Bernard Teufele.
17  (Video deposition played.)
18  MR. LU:  Next Pavemetrics calls Robert Olenoski by
19  video deposition.  This will be about 14 minutes, and we'd
20  like to admit Exhibits 189, 192, 193, and 194.
21  THE COURT:  Okay.  Counsel, any objection to the
22  exhibits?
23  MR. PARKER:  No, Your Honor.
24  THE COURT:  Okay.  Exhibits 189, 192, 193 and 194
25  are now in evidence.

UNITED STATES DISTRICT COURT

**EXHIBIT 4**
**-127-**

25

1          (Exhibits 189, 192, 193, 194 admitted.)

2          THE COURT:  And you can now go ahead and play the

3   video deposition of Mr. Robert Olenoski.

4          (Video deposition played.)

10:00AM 5   THE COURT:  Go ahead and call your next witness.

6          MS. LEA:  Pavemetrics calls John Laurent.

7          THE CLERK:  Please raise your right hand.

8          (Witness sworn.)

9          THE CLERK:  Please be seated.

10:01AM 10  MS. LEA:  It looks like Mr. Laurent has a book in

11  his hand.  We have an official witness book to provide him.

12  That might be a better idea?

13         THE COURT:  Okay.

14         MS. LEA:  Counsel for Tetra Tech has asked that

10:01AM 15  Dr. Hebert leave the room.

16         THE COURT:  Okay.

17         THE CLERK:  Will you please state and spell your

18  full name for the record?

19         THE WITNESS:  My name is John Laurent.  So it's

10:01AM 20  spelled J-o-h-n L-a-u-r-e-n-t.

21         THE CLERK:  Thank you.

22         MS. LEA:  And Your Honor, I have a few exhibits to

23  preadmit?

24         THE COURT:  Whenever you're ready.

10:02AM 25  MS. LEA:  Exhibit 26, Exhibit 86-1, 189, 193.

UNITED STATES DISTRICT COURT

26

1          THE CLERK:  Are they the same exhibits that were

2   used in Olenoski?

3          MS. LEA:  They might have been.

4          THE COURT:  Okay.  189 and 193 are already in

10:02AM 5   evidence.

6          MS. LEA:  452?  510, 526, 527, 555, 558, 565, 566,

7   572, 763, 811.  And I will have one that I'll admit during

8   the testimony, Your Honor.

9          THE COURT:  Okay.  Any objection to these exhibits,

10:03AM 10  Counsel?

11         MR. PARKER:  No objection, Your Honor.

12         THE COURT:  Okay.  So Exhibits 26, 86-1, 452, 510,

13  526, 527, 555, 558, 565, 566, 572, 763 and 811 are in

14  evidence.

10:03AM 15  You can proceed, Counsel.

16         MS. LEA:  All right.

17         DIRECT EXAMINATION

18  BY MR. LEA:

19  Q.  Good morning, Mr. Laurent.

10:03AM 20  A.  Good morning.

21  Q.  How long have you been in the transportation field?

22  A.  I would say my whole professional career.

23  Q.  And how old are you?

24  A.  I am 58.

10:04AM 25  Q.  As of when?

UNITED STATES DISTRICT COURT

27

1   A.  As of today.

2   Q.  Well, Happy Birthday.

3   A.  Thank you.

4   Q.  Great way to spend your birthday, I guess?

10:04AM 5   A.  Yeah, it must be fate.

6   Q.  Can you tell us your profession, please?

7   A.  So okay.  I am Vice-President and CTO, Vice-President

8   for Business Development and CTO at Pavemetrics.

9   Q.  And what is your educational background?

10:04AM 10  A.  So I started off by doing a Bachelor's degree in Physics

11  Engineering, and then I did a Master's in Electrical

12  Engineering.  The specialization was using neural networks

13  for imagining process at LaValle University.

14  Q.  And what did you do after you received your Master's in

10:05AM 15  electrical engineering?

16  A.  So when I finished my Masters, I went to work for the

17  National Optics Institute of Canada.  Their acronym is INO.

18  And I have a job as a researcher.  So I started off as a

19  researcher, and after a few years, they named me Head of the

10:05AM 20  Machine Division in 3D Sensors Group at INO.

21  Q.  And how long did you lead that group?

22  A.  I worked there for 18 years.

23  Q.  And what technology did your group develop?

24  A.  So we mainly developed 3D sensors and software for

10:05AM 25  applications mostly applied to the transportation industry.

UNITED STATES DISTRICT COURT

28

1          MS. LEA:  If we could please show slide one?

2   Q.  Can you explain what is shown on demonstrative slide

3   one?

4   A.  Yes.  So that was the main technology we were using.  We

10:06AM 5   were using for the laser triangulation.  So basically, what

6   you see here is a laser.  The laser is projecting a line onto

7   the surface.  That line is gonna contour the object.  So the

8   camera looks at the shape of the line, the laser line, to get

9   the contour of the object, and that gives you the shape of

10:06AM 10  the object.

11         And then the distance is calculated using

12  triangulations of basic high school geometry, you know, the

13  distance between the camera and the laser.  You calculate the

14  angle alpha, and then you use the inversus tan operation, and

10:06AM 15  you can get the distance from the laser to the surface.

16         THE COURT:  If you're going through technical

17  materials, Mr. Laurent, just go a bit slower and make sure

18  the court reporter hears.

19         THE WITNESS:  Sure thing.

10:07AM 20  BY MS. LEA:

21  Q.  Did you publish on your work at INO?

22  A.  Yes.  INO is a research center.  We did a lot of

23  publications so I have published in my career over 30

24  articles, and I've presented at least over a hundred times at

10:07AM 25  the different conferences around the world, mostly on the

UNITED STATES DISTRICT COURT

EXHIBIT 4

-128-

29

1   subject of using 3D technology and lasers for, uh -- for
2   measuring the condition of transportation infrastructures.
3   Q.   And I understand you've done around the world flights
4   multiple times to attend these conferences?
5   A.   Yes.  Been around for a while, almost a million miles.
6   Q.   And why do you have you published so extensively?
7   A.   Well, it's good for two things.  One, it shares with the
8   community so people -- you know, the people will be
9   interested in what we have to show them, and it's good for --
10  it's good for the people who have infrastructures because
11  they can see what we can do with our technologies so they're
12  more interested in purchasing our systems.  So the more
13  people know what we can do, the better it is for us.
14  Q.   And when did you found Pavemetrics?
15  A.   So Pavemetrics was founded in 2009, and that's when I
16  left INO to found Pavemetrics with my colleagues.  And you
17  got to remember, a research center is an R and D center.
18  It's not good for commercializing technology.  So we felt we
19  were ready to commercialize the technology that was developed
20  at INO so we started Pavemetrics.
21  Q.   And what was your first commercial product called when
22  you founded Pavemetrics?
23  A.   So when we started Pavemetrics, that was when we
24  announced the LCMS system.  That's an acronym that's for
25  Laser Crack Measurement System.

10:07AM (line 5)
10:08AM (line 10)
10:08AM (line 15)
10:08AM (line 20)
10:08AM (line 25)

UNITED STATES DISTRICT COURT

30

1   Q.   And what did it do?
2   A.   Oh, it -- it was applied to measuring roads.  So
3   basically, you could travel at 60 miles per hour and use
4   these sensors to measure cracks and to measure ruts and to
5   measure all kinds of features with a road surface.  The
6   cracks you can detect at six miles per hour were about a 16th
7   an of inch.
8   Q.   And this was in 2009?
9   A.   This was in 2009, yeah.
10  Q.   And what exactly is the LCMS system?
11  A.   Well, it's basically two 3D laser profilers that explain
12  the principle.  And they're placed about six feet over the
13  road surface or whatever surface you want to scan.  And using
14  those sensors, you can see a full 12-meter width profile.  So
15  it sees a very wide profile because we can put them very
16  high.  If you have to keep the sensor low, then you can't see
17  very wide.
18  Q.   And what did the sensors measure?
19  A.   So the sensors measure two kinds of data.  The first
20  data is elevation data so it's the distance between the
21  sensor and the object that's elevation or we also call it
22  range data.  And there's the intensity data.  The intensity
23  is basically the amount of light that's reflected back to the
24  sensor so it's like taking an image with an ordinary camera.
25  Q.   And sometimes in this case, we hear the intensity called

10:09AM (line 5)
10:09AM (line 10)
10:09AM (line 15)
10:10AM (line 20)
10:10AM (line 25)

UNITED STATES DISTRICT COURT

31

1   2D data; is that right?
2   A.   That's correct, that's 2D data.
3   Q.   And sometimes the elevation range is called 3D data?
4   A.   3D data, that's correct.
5   Q.   And why is it important to measure both 2D intensity and
6   3D elevation or range data?
7   A.   Well, you use them to detect different things.  For
8   example, the 3D data, we definitely use that to detect the
9   cracks because the cracks are gonna be deeper than the
10  surface of the pavement so by measuring the depth of the
11  crack, we know that it's below the surface pavement, and it's
12  a crack.
13        But there are things like lane markings.  Lane
14  markings are just paint on the asphalt surface so, you know,
15  there's no elevation difference between a lane marking and a
16  pavement surface.  So you see the lane marking's white.
17  That's in the intensity image.  And the asphalt will be
18  black.  So wherever you see a white stripe, you have your
19  lane marking.
20  Q.   What did the inspection processing software do in 2009?
21  A.   Well, we, uh -- we were using traditional machine image
22  processing algorithms to detect cracks.  We were using it to
23  detect rutting, to detect texture of the road, all kinds of
24  things.
25  Q.   And -- and did it do that from both range and intensity

10:10AM (line 5)
10:11AM (line 10)
10:11AM (line 15)
10:11AM (line 20)
10:11AM (line 25)

UNITED STATES DISTRICT COURT

32

1   images?
2   A.   Yeah, we would process both those kinds of data.
3   Q.   And how many LCMS systems has Pavemetrics sold?
4   A.   So we're really the world leader in this field.  We have
5   sold over 400 systems in about 45 different countries.  This
6   technology in the USA has been used in virtually every state
7   to measure the roads.  CalTrans in California uses our
8   technology to measure the condition of your roads.
9         And we would say on a typical year, last year, we
10  probably scanned about five million miles of roads.  So no
11  one could ever dream of that, but if you want a picture,
12  five million miles is 200 times around the circumference of
13  the world.
14  Q.   And what surfaces did Pavemetrics market the LCMS system
15  as inspecting?
16  A.   So we did our marketing based on all kinds of
17  transportation infrastructures.  So we tell our customers we
18  can use these sensors because we did use them for different
19  applications.  We were marketing them for roads, for
20  airports, airport runways.  We were using it for rail.  And
21  we were also using it to scan tunnel linings, you know,
22  inside a lot of rail tunnels.
23  Q.   You can use the same sensors for inspecting roads and
24  railroads?
25  A.   Correct.

10:10AM (line 5)
10:11AM (line 10)
10:11AM (line 15)
10:11AM (line 20)
10:13AM (line 25)

UNITED STATES DISTRICT COURT

**EXHIBIT 4**
**-129-**

33

1   Q.  Did you ever publically promote the use of LCMS for

2  inspecting rails?

3   A.  Oh, yeah, we did a lot of that.  We started -- in 2012,

4  we started doing some demonstrations with the technology with

10:13AM  5  railways, and we started presenting information on our system

6  at conferences.

7   Q.  And was one of those conferences the RPUG conference?

8   A.  Yes, that's one of the first conferences.

9   Q.  And what does Rpug stand for?

10:13AM  10   A.  RPUG is an acronym for Road Profiler User Group.

11   Q.  If we can turn to Exhibit 558?  And what is Exhibit 558?

12   A.  So that's one the presentations that I did.  This one is

13  the presentation I did at RPUG 2012.

14   Q.  If we could go to page 3?  What is shown on page 3 of

10:14AM  15  your RPUG 2012 presentation?

16   A.  Well, there's two other products there.  Those are

17  legacy products that we had, LRMS and LRIS.  One was just for

18  running, the other one was just for imagining, but what we

19  were really talking about in this presentation is the LCMS.

10:14AM  20  And I explained to the people there that those sensors could

21  be used, of course, for road inspection but also for

22  airports, tunnels, rail inspection.

23   Q.  And did Pavemetrics ever sell an LCMS system for

24  inspecting railroad?

10:14AM  25   A.  Uh, well, yeah, we sold several.  The first, you know,

UNITED STATES DISTRICT COURT

34

1  couple of LCMS systems we sold that were used for rail

2  inspection was in 2010.  We sold three systems to a company

3  called EuroConsult in Spain.

4   Q.  And what does EuroConsult use the system for?

10:15AM  5   A.  Well, they use them for both tunnel -- scan tunnels

6  lines and for rail inspection.

7   Q.  And did EuroConsult publish a paper describing their use

8  of the LCMS system for railways?

9   A.  Yeah, that is correct.  They published a paper at a

10:15AM  10  conference called TRB in 2014 that described the use of the

11  LCMS sensors for rail inspections.

12   Q.  And is that a paper that you are familiar with and have

13  seen?

14   A.  Yeah.  They sent me the paper so I could review it, and

10:15AM  15  they asked my permission to use some of the illustrations

16  that was in the paper.

17   Q.  If we could show Exhibit 510, please?  Is Exhibit 510

18  the EuroConsult paper?

19   A.  It is.

10:16AM  20   Q.  And when, and where was this published?

21   A.  TRB 2014, January 2014.  And TRB is in Washington D.C.

22  It's the Transportation Research Board meeting.  That's a

23  group that's part of the National Academy of Sciences and

24  Engineering and Medicine in the U.S.

10:16AM  25   Q.  And the title is Detection of Range Based Rail Gauge

UNITED STATES DISTRICT COURT

35

1  Missing Rail Fasteners.  And was that detection done with

2  your device?

3   A.  Uh, correct, we were using our LCMS sensors.

4   Q.  And it says use of high resolution two and three

10:16AM  5  dimensional images.  And those were collected with your

6  device?

7   A.  Again, yes.

8   Q.  Okay.  Now, did Pavemetrics ever sell an LCMS system for

9  inspecting railroads in the United States?

10:17AM  10   A.  Uh, we did.  In 2012, we sold the sytem to the

11  University Massachusetts Lowell, an LCMS system, that was

12  used for rail inspection purposes.

13   Q.  If we could show Exhibit 526?  So what is Exhibit 526?

14   A.  Uh, I believe that's the purchase order.  So it's a

10:17AM  15  purchase order from UML.  And as you can see the description,

16  it says two 3D laser profiling sensors so those are the LCMS

17  3D sensors with the lasers and cameras.  And it's got all the

18  cables and -- and the, uh, software and the frame grabbers

19  and controllers.

10:17AM  20   Q.  And if we could just scroll back up, the purchase order

21  is dated September 17th, 2012?

22   A.  That's correct.

23   Q.  Now, if we could turn to Exhibit 555?  What is

24  Exhibit 555?

10:18AM  25   A.  So that would be the invoice we sent UML for the

UNITED STATES DISTRICT COURT

36

1  purchase of their system.

2   Q.  And what is it dated?

3   A.  It's dated the 27th of September, 2012.

4   Q.  Again, European dating there?

10:18AM  5   A.  Yeah, it's our French background.

6   Q.  Thank you.  Okay.  And let's see.  So it shows the LCMS

7  system was listed there as being invoiced?

8   A.  Yeah.

9   Q.  Okay.  If we could go to Exhibit 527?  What is

10:18AM  10  Exhibit 527?

11   A.  So that's a copy -- whoops.  Okay.  That's a copy of the

12  LCMS Hardware and Software Installation Manual dated

13  August 2012 that was sent to UML with the sensors.

14   Q.  If we could go to page 28?  Do see Figure 9 at the top

10:19AM  15  of the page that shows a left image and a right image?

16   A.  Yes.

17   Q.  And what is Figure 9 showing?

18   A.  So basically, those two images are -- are the images

19  coming from each of the sensors.  So the left image is the

10:19AM  20  data from the left sensor and the right from the right

21  sensor.

22   Q.  And they give four options for displaying the data.  It

23  says intensity, range, rectified range and 3D.  Do you see

24  that?

10:19AM  25   A.  Yes.

UNITED STATES DISTRICT COURT

**EXHIBIT 4**

**-130-**

37

1   Q.   Okay.  And I think we've covered this, but briefly, what
2   is the intensity image?
3   A.   So the intensity is the 2D information reflected in use
4   of pavement in this case.
5   Q.   And the range image?
6   A.   The range is the distance between the vertical elevation
7   data so the distance between the sensor and the surface.
8   Q.   And the rectified range?
9   A.   So the rectified range is just like a zoom in on a part
10  of the range.  So it allows you to see better the details,
11  for example, to see the cracks.  Otherwise, if you're too far
12  away, then you can't see the cracks.
13  Q.   And what is the 3D image?
14  A.   Um, the 3D image is the same as the intensity image
15  except we -- we added shadows to the intensity image so that
16  there's contrast like to see the cracks.  You can see those
17  cracks better in the intensity images.
18  Q.   As we go down to the fourth bullet point on that same
19  page, it describes the 3D image, and it says the 3D image is
20  resulting from the merging of the both the intensity and
21  range images.  The 3D effect is created by positioning two
22  artificial lighting sources over the image.  The result is
23  similar to the 3D images that's created the LCMS data viewer
24  3D software.  Can you explain what is meant by a merging of
25  both the intensity and range images?

UNITED STATES DISTRICT COURT

38

1   A.   Um, well, yeah, I can explain.  It's basically saying
2   that, um, we project a light on the -- well, we use the 3D to
3   calculate the angles of the images to see how the light would
4   reflect off the surface.  So depending on where the surface
5   points to, the shape and where the actual light source is,
6   then you're gonna get more or less light coming back to you.
7   So it's the way that we calculate where we should be putting
8   the shadows in the images.
9   Q.   And do you understand that -- first, let me ask you,
10  what does Pavemetrics call this image and its source code?
11  A.   So this is the image that we call Fake3D.
12  Q.   And so -- and you understand in this case, Tetra Tech is
13  accusing Pavemetrics current -- is currently accusing
14  Pavemetrics of infringing by using Fake3D; correct?
15  A.   That's correct.
16  Q.   And Pavemetrics had the Fake3D image in 2012; correct?
17  A.   Yeah, even in 2010.
18  Q.   All right.  And what did UML do with the LCMS that it
19  purchased?
20  A.   So, um, UML was interested in demonstrating how this
21  technology can be used to inspect rail.  So we -- we used the
22  sensors to collect data on rail, and that way we could
23  demonstrate that we were capable of detecting the features on
24  the rail.
25  Q.   And what did Pavemetrics do with the results from the

UNITED STATES DISTRICT COURT

39

1   UML project?
2   A.   So the results were presented at quarterly meetings.
3   Q.   And did Pavemetrics require UML to sign any type of
4   confidentiality agreement to maintain the secrecy of
5   Pavemetrics's technology or algorithm?
6   A.   No.  This was a project funded by the Department of
7   Transportation so all the information was public, and we
8   intended to publish papers on it.
9   Q.   If you can turn to Exhibit 565?  Do you recognize
10  Exhibit 565?
11  A.   Those are the third quarterly meeting minutes from the
12  UML project.
13  Q.   And what are they dated?
14  A.   Um, yeah.  May 14th, 2013.
15  Q.   And what was your role on the UML research project?
16  A.   Oh.  I was Project Leader for Pavemetrics.
17  Q.   And in general, who were the attendees at this
18  particular meeting?
19  A.   So we see there are several people from the FRA, and
20  that's the Federal Railroad Administration.  We even have
21  Mr. Nelson from NASA and several different university
22  professors from different universities and some graduate
23  students.  And we have -- we have two developers from
24  Pavemetrics so Mr. Metari and Talbot.
25  Q.   And were they vice-presidents of Pavemetrics?

UNITED STATES DISTRICT COURT

40

1   A.   Yeah, I think they got a promotion for this meeting.
2   No, they -- they were developers.
3   Q.   And by developers, you mean software programmers?
4   A.   Yes.
5   Q.   And what did the meeting minutes relate to?
6   A.   So they would describe the work we did analyzing the
7   rail data for UML.
8   Q.   If we could go to page 8, please, of Exhibit 565?  And
9   what is shown on page 8 of Exhibit 565?
10  A.   So it describes the algorithm that we used to detect the
11  rail edges.
12  Q.   Now, Step 4 says applied the Canny method for rail edge
13  detection.  What is the Canny method?
14  A.   So it's a very old, traditional method for computer
15  vision.  It basically calculates vertical gradients over an
16  entire image using a sliding window.
17  Q.   If we could go to slide 13?  What's shown on slide 13?
18  A.   So those are the 3D data, the images of 3D data.
19  Q.   Is it the Fake3D image?
20  A.   That's correct, it's the Fake3D.
21  Q.   If we could go to slide 14?  And what is shown in slide
22  14?
23  A.   So that's the Fake3D that's been merged together, right
24  and left side, and you see the results of the edge rail
25  detection on -- on that image.

UNITED STATES DISTRICT COURT

**EXHIBIT 4**
**-131-**

---

41

1    Q.  If we could go to slide 15?  What's being discussed on

2    slide 15?

3    A.  Well, it basically describes the next steps, next thing

4    that we're gonna be working on for the UML project.  So we

5    were gonna continue -- we had already detected the rails.

6    Now we're gonna continue for detecting fasteners, missing

7    fasteners, and detecting the cross ties.

8    Q.  And did you develop algorithms to detect those features?

9    A.  Yes, we did.

10    Q.  If we could go to Exhibit 565?  What is Exhibit 565?

11    So that's. . .

12    Q.  566, I'm sorry.

13    A.  Yeah, that's what I was wondering.

14    Q.  My fault.  What is 566?

15    A.  So that's the fifth quarterly report.  We're nearing the

16    end of the project here.

17    Q.  The fifth quarterly report for the UML project?

18    A.  Yes, that's correct.

19    Q.  And if we could go to page 17?  Sorry.  Let's go to

20    page 19.  At the top of page 19, it refers to Task 20,

21    published papers and make presentations.  What's being

22    discussed in this paragraph?

23    A.  So what's being discussed here is we had prepared a

24    presentation for the 2014 TRB annual meeting, and you have to

25    send those papers in advance, and we had received very

(10:26AM lines 5, 10; 10:27AM lines 15, 20, 25)

UNITED STATES DISTRICT COURT

---

42

1    positive comments on that paper.

2    Q.  It calls it a laser paper?

3    A.  Yeah, it's a laser paper.  That's the use of the LCMS

4    sensors for the rail inspection application.

5    Q.  And if se could go to Exhibit 26?  What is Exhibit 26?

6    A.  So that is the paper that was presented at the TRB 2014

7    conference.

8    Q.  And you are an author on this paper; correct?

9    A.  I am.

10    Q.  See that there.  And the title is Automatic Track

11    Inspection Using 3D Laser Profilers to Improve Rail Transit,

12    Asset Condition Assessment and State of Good Repair, a

13    preliminary study.  Why was it called a preliminary study?

14    A.  Well, it was the first time we presented anything on

15    this topic so we knew there was gonna be a lot more work to

16    do a lot more things to present going forward.

17    Q.  And what are the 3D laser profilers discussed in this

18    article?

19    A.  Again, they are the LCMS sensors that Pavemetrics

20    provides.

21    Q.  If we go to the abstract on page 2?

22    THE COURT:  Counsel, before we get into that, why

23    don't we take our morning break.  So we'll take ten minutes

24    and come back at 10:40.

25    THE CLERK:  All rise.

(10:27AM lines 5; 10:28AM lines 10, 15; 10:29AM lines 20)

UNITED STATES DISTRICT COURT

---

43

1    (Jury not present.)

2    THE COURT:  Okay.  We'll resume at 10:40.

3    (Recess taken.)

4    THE CLERK:  All rise.

5    (Jury present.)

6    THE CLERK:  This court's again in session.

7    THE COURT:  Okay.  Counsel, you may proceed.

8    MS. LEA:  We were on Exhibit 26, the UML-TRB paper.

9    If we can pull that back up, please?  And we are in the

10    abstract on page 2, and I'd like to read line 60.

11    "Based on the 3D depth map generated by the LCMS,

12    new methods have been developed for measuring rail gauge,

13    detecting missing or broken fastener and identifying cracks

14    in concrete ties."

15    Q.  Now, were all of those features of a railroad identified

16    by the Pavemetrics LCMS from the 3D depth map?

17    A.  Uh, yes, that is correct.

18    Q.  Okay.  If we can look at page 3, page 3, line 118, it

19    says the LCMS sensor has been used around the world for high

20    speed highway inspection, and then it says the LCMS is

21    capable of collecting extremely precise and detailed data at

22    speeds of up to 100 kilometers per hour.  How many miles per

23    hour is that?

24    A.  Uh, that's 60 miles per hour.

25    Q.  And if we could go to page 4, there's a section 2,

(10:46AM lines 10, 15; 10:47AM lines 20, 25)

UNITED STATES DISTRICT COURT

---

44

1    hardware configuration.  What hardware is described here?

2    A.  So you see there the 3D laser profilers that were used.

3    You can see we have the high power lasers and the cameras

4    that in the sensors.  And there's a controller.

5    Q.  And when you refer to 3D laser profilers, is that

6    another name for sensors?

7    A.  Profilers, sensors, yes.

8    Q.  And let's see.  If we can look at lines 140 through 141

9    just a little in this section.  And I believe -- does this

10    also refer to processing by a high performance computer?

11    A.  That's correct.

12    Q.  And if we turn to page 5 of Exhibit 26, Section 3,

13    automatic inspection of railroad, what is shown in Figure 3?

14    A.  So that figure is representing the fact that we have the

15    two sensors and each of the two sensors seeing half of the

16    rail.  There's an overlap sensor area in the center, and that

17    allows us to stitch everything together into one profile.

18    Q.  So you have a complete view of the entire cross section

19    of the railroad track?

20    A.  Yes, uh, up to 12 feet wide.

21    Q.  If we could go to page 6, Figure 4?  What is the image

22    in Figure 4 showing?

23    A.  So that would be a 3D map acquired by the LCMS so it's a

24    combination of 2D and 3D data together.

25    Q.  And on page -- if we could go to page 6, please?  I'm

(10:47AM lines 5; 10:48AM lines 10, 15, 20; 10:49AM lines 25)

UNITED STATES DISTRICT COURT

---

**EXHIBIT 4**

**-132-**

45

1  sorry, let's stay right there and look at that highlighted
2  section. It states LCMS sensors simultaneously acquire both
3  range and intensity images of the scanned surfaces by merging
4  the range and intensity data. 3D profiles of the scanned
5  surfaces can be obtained. Is this also referring to the  10:49AM
6  Fake3D image?
7  A.  **Uh, yes, the last one. The last part, yes.**
8  Q.  And if we could turn to Figure 5 in Exhibit 26? Can you
9  explain to the jury what is shown in Figure 5?
10  A.  **So Figure 5, again, is a picture of you have on the left**  10:50AM
11  **side the just standard intensity image. Then in the middle,**
12  **it's range or elevation data. And on the right, you have the**
13  **merged Fake3D images where the shadows have been added to the**
14  **intensity image.**
15  Q.  And if we could look at page 7? I believe we're on  10:50AM
16  Section 3.1, rail gauge estimation. At around line 188, it
17  refers to this algorithm utilizes the 3D range data from the
18  LCMS sensor as follows. And then what are these steps that
19  are laid out in general?
20  A.  **This is basically an algorithm to detect the edges of**  10:50AM
21  **the rails. So it'll detect the edge of the left and right**
22  **rail, and the gauge is basically the distance between the two**
23  **rails.**
24  Q.  And I believe the algorithm goes over to the next page.
25  And there's Step 4 that refers to a Sobel kernel being  10:51AM

46

1  applied for edge detection and Step 5, the Canny method, is
2  applied in order to extract the rail head contour. What
3  is -- the Sobel kernel and the Canny method, what are they
4  doing?
5  A.  **Again, those are very traditional machine vision**  10:51AM
6  **techniques. They calculate vertical gradient over the entire**
7  **image and use a sliding window.**
8  Q.  Now, we've been talking about LCMS for rail in 2014.
9  When did Pavemetrics change the name to LRAIL?
10  A.  **In 2014.**  10:51AM
11  Q.  Was that shortly after this -- this paper published?
12  A.  **Yeah. It was after the TRB conference, yes.**
13  Q.  If we could see Exhibit 572? What is Exhibit 572?
14  A.  **So that would be the first LRAIL flyer that we**
15  **distributed commercially and put on our website.**  10:52AM
16  Q.  And when was that?
17  A.  **I believe it was around October, November 2014.**
18  Q.  And I'd like to change topics. When did Pavemetrics get
19  its first project directly from the FRA that's funded by the
20  FRA?  10:52AM
21  A.  **So we submitted a project proposal in 2016, I believe,**
22  **and we were awarded a project in 2017.**
23  Q.  Okay. And what was the purpose of that project?
24  A.  **Oh. It was for a change detection. So change detection**
25  **is basically you look at changes over time. So you'll scan**  10:52AM

47

1  the rail once, and then you go back six months later, and you
2  scan it again, and then you try to detect what changed over
3  time.
4  So remember Brad Spencer, he was saying if there's
5  flooding, you could have problems. So if there's flooding,  10:53AM
6  you could have ballast levels that fall, and that would
7  indicate that, you know, that would be a problem with your
8  structure. So basically, that's what we were doing.
9  Q.  So previously, you had been identifying features, and
10  this is the next step in detecting changes over time in  10:53AM
11  features.
12  A.  **Yeah. So it's more difficult cause you have to both**
13  **identify features and then compare them over different times.**
14  Q.  Okay. And I believe you told us that you submitted a
15  proposal in March 2017?  10:53AM
16  A.  **We submitted in '16. We were awarded the project in**
17  **2017.**
18  Q.  Thank you. And how did Pavemetrics detect the changes?
19  A.  **Uh, well, we -- we started off with the traditional**
20  **machine vision algorithms, and eventually, we used AI for --**  10:53AM
21  **for that task.**
22  Q.  So you started with the traditional computer vision
23  techniques that you had previously published on in your TRB
24  2014 paper?
25  A.  **Yeah, those were the same type of algorithm for sure.**  10:54AM

48

1  Q.  Okay. And did you complete the contract with the FRA?
2  A.  **Yes, we did. Uh, we completed the contract, and I**
3  **believe it was published in 2020.**
4  Q.  And what was published in 2020?
5  A.  **Oh, the -- the final report.**  10:54AM
6  Q.  Now, let's talk about when Pavemetrics started
7  transitioning to artificial intelligence and deep neural
8  networks. When was that?
9  A.  **In 2018, we started -- we started experimenting with**
10  **neural networks for rail applications.**  10:54AM
11  Q.  And what are some of the advantages of using a neural
12  network?
13  A.  **Well, in 2018, it was the time where they become very**
14  **popular. We could see people using those things for facial**
15  **recognition, for self-driving cars and even detecting cancer**  10:54AM
16  **cells so we figured we could train a neural network to detect**
17  **features in the railway. And the way -- the way it's done is**
18  **instead of having to program complex algorithms, you just**
19  **show an image of what you want the computer to learn, and it**
20  **can tell what it is. So much easier to**  10:55AM
21  **train a neural network than to program a computer on a step**
22  **by step algorithm.**
23  Q.  Okay. And in general, what was the experiment that you
24  did?
25  A.  **So for -- so what we were experimenting with in 2018 and**  10:55AM

**EXHIBIT 4**
**-133-**

49

1    2019 is simply training the neural network by showing them

2    images of -- of different components.  So we showed images of

3    ties, and we showed images of ballast.  We'd show images of

4    actually wooden ties and concrete ties and images of the

5    fasteners.  And then we would tell the neural network what

6    they were, and we would train them on the training set, and

7    then we would test them on another set called a testing set,

8    and that would tell us how well the neural network was

9    recognizing these features.

10   Q.   And how well did it work?

11   A.   Oh, it was working really good.  We were very close to

12   even 100 percent recognition on the testing set.

13   Q.   And did you publish on your neural network experiment?

14   A.   Oh, yeah.  We published at papers on our experiments in

15   2018 and at in 2019 at Arema again.  And we also

16   published a paper at WCRR in Japan in 2019.

17   Q.   And what does WCRR stand for?  World Congress on Railway

18   Research?

19   A.   Yeah.

20   Q.   So many acronyms.  If we could go to Exhibit 117,

21   please?  Do you recognize Exhibit 117?

22   A.   Yeah, that's the paper we presented at WCRR.

23   Q.   And you are author of --

24   A.   Yeah, I -- I'm one of the authors, yeah.

25   Q.   And this was presented in Tokyo in 2019?

UNITED STATES DISTRICT COURT

50

1    A.   Yes, it was.

2    Q.   Now, the title says Development of an Artificial

3    Intelligence, a Deep Neural Network for the Automation of

4    Railway Maintenance and Safety Inspections.  Why was it

5    titled development?

6    A.   Well, it was a summary of the experiments that we were

7    doing with the neural networks during the last two years in

8    2018 and '19.

9    Q.   If we could go to page 4, Section 3.3, overview of track

10   inspection DNN, and DNN stands for Deep Neural Network;

11   correct?

12   A.   That's correct.

13   Q.   Okay.  It says the image classification algorithm

14   developed in prior work is a seven layer supervised machine

15   learning algorithm based on deep CNET.  What is deep CNET?

16   A.   Deep CNET is -- it's a type of neural network.  It's one

17   of the models that are available, uh -- that are available in

18   the public domain.

19   Q.   And did you use deep CNET in your experimentation in

20   2018 and 2019?

21   A.   Uh, yes, we did.

22   Q.   And was the deep CNET neural network added to

23   Pavemetrics' LRAIL software?

24   A.   No, it wasn't.  It was just used for experimental

25   purposes.

UNITED STATES DISTRICT COURT

51

1    Q.   And so did you ever implement it into your source code

2    library or any software for a customer?

3    A.   No.  Uh, we never implemented this into the LRAIL

4    software.

5    Q.   And why not?

6    A.   Well, when we were ready to use AI in our LRAIL, we had

7    better neural networks available to us so we used different

8    ones.

9    Q.   And what neural network did you use in the software with

10   customers?

11   A.   So it was a neural network based on the tensor flow.

12   Q.   And it was not the deep CNET described in Exhibit 117?

13   A.   No, it wasn't.

14   Q.   Now, were you in the courtroom when Dr. Morellas

15   testified?

16   A.   Yes, I was.

17   Q.   And he's the technical expert for Tetra Tech?

18   A.   That's correct.

19   Q.   Did you hear him testify that he based his infringement

20   analysis on the deep CNET in Exhibit 117?

21   A.   Yes, I saw that.

22   Q.   And -- but Pavemetrics never used deep CNET with a

23   customer; correct?

24   A.   No, we didn't.

25   Q.   You just used it for experimenting for the results in

UNITED STATES DISTRICT COURT

52

1    this paper; correct?

2    A.   Yes, this paper and the other two papers we presented.

3    Q.   Okay.  So -- so does Exhibit 117 describe the neural

4    network used with the four sales at issue in this case?

5    A.   No, it does not.

6    Q.   And what neural network was used with the four sales at

7    issue in this case?

8    A.   Another network, another neural network based on the

9    tensor flow engine.

10   Q.   And does Pavemetrics' neural network model with tensor

11   flow operate differently than the deep CNET neural network

12   described in Exhibit 117?

13   A.   Yes, it does.  All the different neural networks have

14   different structures and operate differently.

15   Q.   If we could go to page 8 of Exhibit 117, your Tokyo 2019

16   paper and highlight the last paragraph.  I'll read the first

17   sentence.  It says one interesting observation from the

18   researchers is that much like every human brain, each neural

19   network is unique due to its specific combinations of nodes,

20   layers and connections as well as the constant evolution of

21   those same factors.  Did you write those words in 2019?

22   A.   Well, I participated.  I was one of the authors in the

23   paper.  I don't know wrote if I wrote those exact words

24   myself, but I certainly believe that those words are true.  I

25   believe that every neural network is different.  They

UNITED STATES DISTRICT COURT

**EXHIBIT 4**

**-134-**

53

1   different structures, different number of neurons.  The
2   interconnections are different.  And even they change over
3   time because we continue training these over time with new
4   fasteners and -- and new things, new images all the time so,
5   you know, they're in constant evolution.
6   Q.   And then the next sentence says this quality makes it
7   impossible to define the exact methodology of any given and
8   has the interesting implication of preventing a neural
9   network from being patented as well as preventing a neural
10   network from infringing upon an existing patent.  Was that
11   your belief about neural networks in 2018?
12   A.   Yes, it was.  When you look at patent claims, they
13   usually describe the very precise algorithms where you have
14   to do step a, b, c, d, e, f, but that's not how a neural
15   network works.  Everything's happening in parallel, and we
16   don't know exactly how they're configured because the neural
17   network configures itself.  So if you can't describe what
18   exactly it's doing even, you can't patent it or say it's
19   infringing.
20   Q.   Okay.  I'd like to shift gears now and talk about
21   something else.  So after presenting on using a neural
22   network to inspect railroad in 2018 and 2019, what happened
23   with respect to your LRAIL business?
24   A.   Oh.  So people loved the AI stuff.  I would have dozens
25   of people come to see me after my presentation and say he,

UNITED STATES DISTRICT COURT

54

1   this is great.  This is really interesting.  You know, we
2   would love to see, hear more about it, and it was a really
3   popular subject back then.  And also, people were talking
4   about all the work we were doing with FRA and Amtrak.  So
5   yeah, we were getting a lot of interest from this work.
6   Q.   Okay.  So let's look at Exhibit 907 since you just
7   mentioned your FRA work.  What is Exhibit 907?
8   A.   So this is a news report that -- I guess that announces
9   the -- you know, when the report was made public by the FRA
10   for the results of our studies so the FRA report that
11   confirms how, you know, AI based algorithms can be used for
12   rail inspection.
13   Q.   And it's talking about your AI based algorithms and
14   LRAILs; correct?
15   A.   Yeah, that's correct.  That's the result of several
16   years of studies we did with the FRA.
17   Q.   Okay.  And the paragraph being shown right now says
18   LRAIL change measurements were determined to be highly
19   repeatable.  Is that your understanding?
20   A.   Yes.  They are very repeatable in 99 percent so
21   that's -- that's a pretty good score.
22   Q.   And -- and let's make sure we have the date.  What was
23   the date on this news release?
24   A.   The date is May 1st, 2020.
25   Q.   And it's talking about your FRA report dated what?

UNITED STATES DISTRICT COURT

55

1   A.   It would be around that same time, I guess.
2   Q.   Your April 2020 FRA report?
3   A.   Probably.  Uh, I don't see the date on this.
4   Q.   Okay.  Let's see, I know it's in there.  Let's go with
5   it was around this time.  And let's talk about your LRAIL
6   sales in 2020 and 2021.  If we could put up the demonstrative
7   slide 2?  How many sales in the United States did you have
8   for LRAIL in 2020 and 2021?
9   A.   Well, 2020, 2021, we see here there's six, uh, six
10   sales.
11   Q.   And why did you have more sales in 2020 and 2021 than
12   you had had in the past for LRAIL?
13   A.   Um, well, there are several reasons.  First of all, we
14   had switched to AI, and customers were very interested in
15   those kinds of features.
16        And basically, the AI algorithms worked better.
17   They were more accurate and were faster than what we were
18   using in the past.
19        And there's another thing.  We heard a lot about
20   the GREX patents, and they were invalidated in 2020.  And FRA
21   paper was published also we saw in April, May 2020.  So all
22   those things really gave us -- gave the people a lot of
23   interest in our products, and that's why -- and that's one of
24   the major reasons CSX bought our products.
25        And another thing that's happened is the computing

UNITED STATES DISTRICT COURT

56

1   power was there.  And for neural networks, we could use the
2   GPUs from graphic cards that would increase the speed of our
3   calculations as well.  You know, all those factors.
4   Q.   What's a GPU?
5   A.   A Graphical Processor Unit.
6   Q.   And does that give you the ability to process faster?
7   A.   Uh, yeah, because neural networks are parallel type
8   operations, and GPUs do the same kind of operations in their
9   own networks.  They do calculations in parallel.
10   Q.   Now, last week, Tetra Tech's counsel showed a 2016 LRAIL
11   market review that suggested in the prior art, the older
12   LRAIL was slow.  If we could see Exhibit 46 at page 5?  Do
13   you recognize this -- this presentation?
14   A.   Yeah, I -- I did.  I saw that.
15   Q.   And now, the third bullet point that they highlighted
16   says we haven't done realtime processing yet.  What is
17   realtime processing?
18   A.   So realtime processing would mean that you can process
19   the data as fast as you collect it.
20   Q.   And then it says you need to process at 60 miles per
21   hour, but currently only 7.2 kilometers so six PCs needed.
22   What's that referring to?
23   A.   Well, we were capable of acquiring the data at 60 miles
24   per hour, but in order to process the data at 60 miles per
25   hour, we needed to use six PCs.

UNITED STATES DISTRICT COURT

**EXHIBIT 4**
**-135-**

57

1   Q.   What's a PC?

2   A.   Uh, well, personal computers.

3   Q.   You needed more computers.

4   A.   Yeah, that's correct.  That's what we use actually for
11:09AM  5   CSX.  We have about six PCs with the graphic cards in them.

6   Q.   Not different algorithms; correct?

7   A.   No.  We didn't need to change algorithms for that, no.

8   Q.   Okay.  So what was your market plan for LRAIL?

9   A.   Oh, okay.  So initially, we never -- we never really
11:09AM  10   looked at the boxcar applications.  We had developed our

11   LRAIL system to go on hi-rail vehicles.  So the thing is

12   there's a few boxcars I think 50 was the number that we were

13   using, but hi-rails for inspections, there's hundreds and

14   hundreds of them.  There's 600 short line rail in the U.S.
11:10AM  15   And all the inspectors have to drive -- use hi-rail vehicles

16   to drive, and they have to drive the tracks on a weekly

17   basis.  So we saw that as a huge market potential, much

18   bigger market for us than the boxcars.

19   Q.   And a hi-rail vehicle, that's a truck?
11:10AM  20   A.   Yeah.  It's a truck that can go on the rail and on the

21   road so they use 'em a lot for maintenance.

22   Q.   And who do you typically sell hi-rail trucks to?

23   A.   Okay.  So our business model is to sell the integrators.

24   So we sell the sensors, they put 'em on the trucks, and they
11:10AM  25   go to inspect the roads.  And we were wanting to do the same

UNITED STATES DISTRICT COURT

58

1   thing.  Say okay, we would sell an LRAIL system to

2   integrators.  They would put 'em on hi-rail vehicles and go

3   inspect the rails.  So that was our business model.

4   Q.   And so how did it come to be that you're -- you're
11:11AM  5   suddenly submitting a proposal to a major railroad like CSX

6   in early 2020?

7   A.   Well, they contacted us.  They had heard about the

8   results we had from the FRA so Brad Spencer contacted us, and

9   he wanted to know more about the LRAIL.
11:11AM  10   Q.   And did Pavemetrics submit a proposal to CSX?

11   A.   Yes, we did.  We submitted a proposal to CSX for -- so

12   they could acquire some LRAIL systems.

13   Q.   And was the proposal successful?

14   A.   Um, yes.  They, uh, acquired a first LRAIL in 2020, and
11:11AM  15   it was to be installed on one of their hi-rail vehicles so

16   they could do testing with it.

17   Q.   And so how many -- how many total sales to CSX have you

18   made -- or had you made in 2020 and 2021?

19   A.   Okay.  That's five to CSX, yeah.
11:11AM  20   Q.   And if we could show slide 2 again?  Okay.  What is Sale

21   A on slide 2?

22   A.   So Sale A is that first sale that was installed on the

23   hi-rail.

24   Q.   And that one was sold in October 2020?
11:12AM  25   A.   Well, yeah.  It was delivered before that because

UNITED STATES DISTRICT COURT

59

1   they first -- at first, they leased it, and then later they

2   decided to -- to purchase it.

3   Q.   And then what is Sale B on this chart?

4   A.   It's the second system that we sold to CSX.  That one
11:12AM  5   was to be installed on a boxcar.

6   Q.   And that was sold in October 2020?

7   A.   Yeah, same date.

8   Q.   And you understand that Sales A and B are not at issue

9   in this case because they were sold before January 5th, 2020;
11:12AM  10   correct?

11   A.   Yes, that's correct.

12   Q.   Okay.  If we could go to slide three, please?  I would

13   like to focus on Sale A for a few minutes.  Can you please

14   walk us through Sale A?  And we have the slide to help you.
11:13AM  15   A.   Okay.  So the dates are there.  The quotation we sent to

16   CSX was April 7th, 2020.  And then we actually shipped the

17   hardware to them in June 2020.  We invoiced them on

18   October 23, 2020.  And we sent them the license for the

19   software October 30th, 2020.  Then we had to sign a goods
11:13AM  20   agreement with them, and that was signed on November 5th,

21   2020.

22   Q.   I would like to look at a few of these documents.  For

23   the first one, the quotation, I think this is an old version

24   of the slides, we're gonna use Exhibit 40.  It's the same as
11:13AM  25   Exhibit 162.  They're both in evidence.  But let's turn to

UNITED STATES DISTRICT COURT

60

1   the April 2020 quotation to CSX for Sale A.  We have here

2   Exhibit 40.  Do you recognize Exhibit 40?

3   A.   Yes, that's the quotation we sent to CSX.

4   Q.   And what is the date?
11:14AM  5   A.   April 7th, 2020.

6   Q.   Okay.  And I notice the quote is for a turnkey LRAIL

7   inspection system.  What does that mean?

8   A.   So the turnkey LRAIL would be the LCMS sensors, the

9   LRAIL software and basically all the components you
11:14AM  10   need.  So there would be the acquisition computer and the GPS

11   system and everything you need to operate on a hi-rail

12   vehicle.

13   Q.   And this quote ultimately resulted in a sale to CSX;

14   correct?
11:14AM  15   A.   That's correct.

16   Q.   Okay.  And if we could go to page 2, and we're gonna

17   blow up the third bullet point, please.  It says note that

18   the included data processing software is nontransferable, and

19   its use is limited to processing data from the included
11:15AM  20   sensors.  It cannot be used to process data from other

21   sensors.  Does that accurately reflect how Pavemetrics'

22   software license works?

23   A.   Yeah.  All our software licenses are the same.  When you

24   buy software, it only works with the sensors of the hardware
11:15AM  25   that you purchased.  So we checked the serial numbers of the

UNITED STATES DISTRICT COURT

**EXHIBIT 4**
**-136-**

61

1 hardware, and you can only operate the software with those
2 particular units.
3 Q. Let's turn in your book to Exhibit 658. We won't
4 publish it just yet until we lay a foundation. Do you have
11:16AM 5 Exhibit 658?
6 A. I do.
7 Q. And what is Exhibit 658?
8 A. So Exhibit 658 is the software is the keys, license keys
9 that we would have sent to CSX so they could use the
11:16AM 10 processing software with their sensors.
11 Q. Okay. And what sensors is the key in Exhibit 658 for?
12 A. They're for sensors F 625 and F 626.
13 Q. And those are the sensors in Sale A; correct?
14 A. That's correct.
11:16AM 15 MS. LEA: Okay. Your Honor, I would like to
16 publish and admit 658?
17 THE COURT: Any objection?
18 MR. PARKER: No, Your Honor.
19 THE COURT: 658 is in evidence.
11:17AM 20 (Exhibit 658 admitted.)
21 MS. LEA: I'm going to show it to the jury.
22 Q. And can you please again explain what 658 is?
23 A. So that's the software key. It's an enclosed -- an
24 encrypted key bunch of a set of numbers. And you can see SNF
11:17AM 25 625 and SNF 626. Those are serial numbers of the sensors.

62

1 So basically, you need those keys to operate the processing
2 software.
3 Q. Okay. If we can go back to slide three, what software
4 version was licensed for Sensors F 625 and F 626?
11:17AM 5 A. So the software version was r10323.
6 Q. And what was the term of that license?
7 A. So that license would have expired one year later.
8 Q. And so we have r10323 was licensed for those sensors.
9 And those sensors are on one unit; right? Two sensors on one
11:18AM 10 unit?
11 A. Yeah. For Sale A, yeah, two sensors.
12 Q. And so could version r10323 be used with Pavemetrics'
13 other sensors sold to CSX in Sales 2, 3 or 4?
14 A. No.
11:18AM 15 Q. Why not?
16 A. Well, because they wouldn't have the license key.
17 Q. Now, after CSX purchased Sales A and B in 2020, did they
18 purchase any more LRAIL systems?
19 A. Yes, they did.
11:18AM 20 Q. And how many?
21 A. Uh, three more.
22 Q. Okay. Let's look at those sales. If we could go to
23 slide five? Can you walk us through the sale of Sales 2, 3
24 and 4 here?
11:19AM 25 A. So February 15th, we sent the quotation for all three.

63

1 March 15th, we got the goods agreement, the contract signed
2 with CSX.
3 Q. Let me ask you, the goods agreement, is that a
4 Pavemetrics' document?
11:19AM 5 A. No, that's a CSX document. It was all the terms and
6 conditions they want us to comply with.
7 Q. Okay. And then what happened?
8 A. Um, well we actually, uh -- they -- well, we invoiced
9 the -- they wanted to buy the system with the goods agreement
11:19AM 10 so then they invoiced the sale on April 21st.
11 Q. And when was the hardware shipped for those three sales?
12 A. So the hardware was shipped in August 2021.
13 Q. And did the hardware include software when it was
14 shipped?
11:19AM 15 A. No, it didn't. Not in August, no.
16 Q. And when was the software delivered to CSX?
17 A. So the software was delivered December 9, 2021.
18 Q. And what version of software was it?
19 A. So 480.20-C4E9AA15F.
11:20AM 20 Q. And what units was -- was that software licensed for?
21 A. So it was licensed for only for Sale 2 and 3, F705,
22 F706, F707, and F708.
23 Q. And so was it licensed for Sale 4?
24 A. No, it wasn't.
11:20AM 25 Q. And sometimes in this case, have we referred to that

64

1 software version as 480 for short?
2 A. Yes.
3 Q. Now, let's go to slide six. And using this timeline,
4 can you explain why you did not provide a license to software
11:21AM 5 version 480 for Sale 4?
6 A. Okay. Well, let's start with the invoice on April. So
7 the invoice was for all three systems; Sales 1, 2 and 3.
8 Then we ship the hardware for all three systems, Sales 2, 3
9 and 4 in August. And then in September, the hardware was
11:21AM 10 installed but only for Sales 2 and 3. We could not -- we
11 could not do anything with Sale 4 because the boxcar wasn't
12 ready.
13 Q. Okay. And then in December 2021, what happened?
14 A. In December 2021, the software was installed for 2 and 3
11:21AM 15 but not on 4 because the boxcar wasn't ready.
16 Q. Now, let's look at the quotation for completeness. If
17 we can go to Exhibit 811, what is Exhibit 811?
18 A. That's the quotation to CSX in February 2021.
19 Q. And it was for what?
11:22AM 20 A. It was for three LRAIL systems.
21 Q. And did this quote result in the sale of Sales 2, 3 and
22 4 to CSX?
23 A. Yes, it did.
24 Q. Now, I notice it doesn't say turnkey. Why is that?
11:22AM 25 A. Well, the turnkey -- turnkey applies to when we install

**EXHIBIT 4**
**-137-**

65

1  systems on hi-rail vehicles.  So this was a boxcar.  We don't
2  provide all the components needed to run a system on a boxcar
3  so it can't be a turnkey system.
4  Q.   By the way, what was the price on these LRAILs?
5  A.   $350,000 each.
6  Q.   And towards the bottom of the page, there's a note.  It
7  says note, LRAIL software license is valid only for the pair
8  of sensors with which it was purchased.  Is non-transferable
9  and cannot be used with any other sensors.  Does that
10  accurately reflect how Pavemetrics' software license worked
11  for Sales 2 and 3 and 4?
12  A.   Um, yes.  All our -- our systems are sold that way.
13  Q.   All right.  We'll go back to slide five.  I think we
14  beat this to death, but what version was licensed for Sales 2
15  and 3?
16  A.   So -- the software version?
17  Q.   Yeah.
18  A.   480.
19  Q.   And was 480 licensed for Sale 4?
20  A.   No, it wasn't.
21  Q.   And has the license to version 480 for Sales 2 and 3
22  expired?
23  A.   Yes.  Uh, it expired after three months.
24  Q.   Okay.  And why was it such a short-term license?
25  A.   Oh, because we were continually up -- updating this

UNITED STATES DISTRICT COURT

66

1  software.
2  Q.   Okay.  Let's go to Exhibit 28.  What is Exhibit 28?
3  A.   So that's the LCMS.  Those are the sensors we used, uh,
4  LCMS two hardware software installation manual.
5  Q.   Okay.  And for road and rail applications dated
6  March 2021?
7  A.   That is correct.
8  Q.   And is the manual you provided to CSX with Sales 2, 3
9  and 4?
10  A.   Yes, that would be the case.
11  Q.   Let's go to page 30, please?  And in Section 4.3.1, it
12  says LCMS road inspect.  Does this section imply a rail
13  inspection, too?
14  A.   Yes, but our processing software works the same way.
15  Q.   Now, if we look at the last sentence of that section, it
16  says a valid license file is required to activate the
17  different processing modules.  What does that mean?
18  A.   Well, that means depending on the customer, some people
19  will have access to algorithms, for example, to detect cracks
20  in roads, and some people, it will be to detect ties and
21  rails.  So depending on what the client purchased or needed,
22  we would activate certain processing modules, and others
23  would be deactivated.
24  Q.   And if we can go to page 14 of the same manual, what is
25  the photo shown on page 14?

UNITED STATES DISTRICT COURT

67

1  A.   So that's the shipping case, the carrying case that we
2  provide the customers when we ship the sensors to them.
3  Q.   And so when it says laser profilers two, is that the
4  sensors?
5  A.   Yeah, those are the sensors on the right and left sides.
6  Q.   And nothing's connected in this box; correct?
7  A.   Nothing is connected, no.
8  Q.   And where is the processing computer?
9  A.   So if we were to provide a processing computer, it would
10  have been shipped in a different box.
11  Q.   So when you ship Sales 2, 3 and 4 to CSX, were the
12  sensors connected to a processing computer?
13  A.   No, they were not.
14  Q.   And was it possible for the sensors shipped to CSX to
15  communicate with the processing computer when they are not
16  connected?
17  A.   No, it's not possible.
18  Q.   And did the processing computer shipped to CSX for Sales
19  2, 3 and 4 have software on it?
20  A.   No, they did not.
21  Q.   Okay.  Let's switch gears again.  When did you first
22  learn about the '293 patent at issue in this case?
23  A.   The '293 patent?  We heard about it when we received the
24  notice of infringement letter on January 9th, 2021.
25  Q.   Okay.  Was that January 5th, 2021?

UNITED STATES DISTRICT COURT

68

1  A.   Yeah, right, on January 5th.
2  Q.   And what was your reaction?
3  A.   Well, it came as a bit of a shock, especially coming
4  from Tetra Tech.  We had a long-term relationship with them.
5  We -- we provided them with sensors and equipment and
6  software over, I think, like a ten-year period of time.  And
7  I was used to communicating with Darel Mesher about certain
8  things.
9       We would call each other.  I would call him.  I
10  remember calling him when they invalidated the GREX patents.
11  I congratulated them cause it was good work.  So I was
12  surprised to get a letter like that from a lawyer with no
13  head's up.
14  Q.   And Dr. Mesher had never raised any patents with you?
15  A.   No, nothing Tetra Tech owned.
16  Q.   And what did you do after receiving the letter about the
17  '293?
18  A.   So we started analyzing the patent, the '293 patent, my
19  colleagues and Jeff and Richard and others.  And as we
20  started analyzing, we realized well, we could not be
21  infringing on that patent.  I mean, most of what was
22  disclosed in the patent, everything that was there, we
23  figured we thought we were doing the same thing.  And we had
24  disclosed that in our 2014 TRB paper; right?
25       And also we were using neural networks now, and you

UNITED STATES DISTRICT COURT

EXHIBIT 4
-138-

69

1    know, neural networks were not described anywhere in that
2    patent so we didn't see how that could, you know, affect us.
3    And when we started looking at the details of the claim
4    construction, the way they constructed their 3D map with the
11:29AM 5    need to have both elevation and intensity data at each point,
6    we weren't doing that either.
7    Q.   Now, we've heard about Tetra Tech buying LCMS systems
8    and software and raw data from Pavemetrics.  When did they
9    start doing that?
11:29AM 10   A.   Excuse me.  Can you repeat that question?
11   Q.   We've heard about Tetra Tech buying LCMS systems from
12   Pavemetrics and software and raw data.  When did Tetra Tech
13   start doing that?
14   A.   So the first system we sold to Tetra Tech was in 2012
11:29AM 15   for road inspection.
16   Q.   And did Pavemetrics ever tell Tetra Tech about LRAIL?
17   A.   Oh, yes.  We communicated multiple times with Darel to
18   tell him about our progress and what we were doing with the
19   LRAIL.  The last time we did that was in May, I believe, May
11:30AM 20   or June 2020.  We had a discussion about it again.
21   Q.   Okay.  And did you give any type of technical
22   presentation to Tetra Tech about LRAIL in 2020?
23   A.   Yes.  We gave a complete presentation of everything we
24   could do with the system at that time.
11:30AM 25   Q.   And who did you present to at Tetra Tech?

70

1    A.   It was Darel Mesher, and it was Robert Olenoski.
2    Q.   And what happened after the presentation?
3    A.   The day after, I received a request from Robert Olenoski
4    to -- well, he had a few questions, and he wanted a quotation
11:30AM 5    for the system.
6    Q.   And did Pavemetrics send an LRAIL quote to Rob Olenoski
7    and Darel Mesher at Tetra Tech?
8    A.   Yes, we -- we sent them a quotation because we didn't
9    think at that time they were a competitor.
11:31AM 10   Q.   And during the presentation or after the technical
11   presentation or immediately after, did Mr. Olenoski or
12   Dr. Mesher ever mention that Tetra Tech had patents that
13   might cover LRAIL?
14   A.   No, they didn't.
11:31AM 15   Q.   Let's look at Exhibit 189, please.  Do you recognize
16   Exhibit 189?
17   A.   Yes.  That's the email from Robert Olenoski.  It's an
18   email exchange with Robert Olenoski, uh, Richard Fox-Ivey,
19   Darel Mesher.
11:31AM 20   Q.   Let's look at the first email at the bottom of the
21   chain, the earliest email, and this one's dated June 9th,
22   2020.  Is -- is that the date that Pavemetrics sent a quote
23   for LRAIL to Tetra Tech?
24   A.   That's correct.
11:31AM 25   Q.   Okay.  And that's shown in this email; correct?

71

1    A.   Yes.
2    Q.   And if we can go to the next email, see what happened
3    next.  Did Mr. Olenoski write back the next day?
4    A.   Yes.  That's the email where he's writing back to us.
11:32AM 5    Q.   On June 10th, 2020?
6    A.   Yes.
7    Q.   Okay.  And he has questions; correct?
8    A.   That's correct.
9    Q.   And Number one says I see the software will only work
11:32AM 10   with the sensors that come with the unit.  Was he right about
11   that?
12   A.   That's correct.
13   Q.   And so Tetra Tech knew before this lawsuit that LRAIL
14   software will only work with the sensors that come with the
11:32AM 15   unit; correct?
16   A.   Correct.
17   Q.   Then he says in number two, if Tetra Tech needed
18   multiple systems, would Pavemetrics do anything for a
19   discount?  What did you think about that question?
11:33AM 20   A.   That's my favorite client catch question.  So I love --
21   I love those kinds of questions.
22   Q.   You were excited that Tetra Tech was considering buying
23   multiple systems?
24   A.   Yeah, we were -- we were very happy.
11:33AM 25   Q.   Number three, John, is that you?

72

1    A.   That's me, yes.
2    Q.   John had mentioned that we could possibly see the CSX
3    system in action and possibly be at the track when the
4    system is delivered in Gainesville, Florida.  Did you -- did you
11:33AM 5    mention that?
6    A.   Yeah, I -- I did.  Since they were interested in the
7    system, and I knew we were -- they were -- I think Robert
8    lives very close to that, and he's in Tampa Bay, I think, so
9    I mentioned he could go over and look at the system so he
11:33AM 10   could see how -- how it looked like installed on hi-rail.
11   Q.   And that's your LRAIL system.
12   A.   Yes, it's ours.  Yes.
13   Q.   And then further down in the email, he says it is great
14   to see the progress you have made, and we are interested in
11:34AM 15   seeing how the system can perform.  How did that make you
16   feel?
17   A.   Well, um, it's always nice to get praise from people in
18   the industry.  I agree with him.  With the AI algorithms that
19   we were using, we were -- we were really -- really having
11:34AM 20   great results.
21   Q.   Now, did Mr. Olenoski say anything about patents in his
22   email?
23   A.   I don't see the word patent anywhere in that email.
24   Q.   And did Mr. Olenoski go see the -- the CSX LRAIL system?
11:34AM 25   A.   Oh, yeah, he went.  He went to see it, yes.

**EXHIBIT 4**
**-139-**

73

1   Q.   When?

2   A.   Uh, he went on the day of commissioning of the system to

3   CSX.

4   Q.   Is that the day it was delivered?

11:34AM  5   A.   Yes.

6   Q.   And did Mr. Olenoski or anyone at Tetra Tech ever say

7   anything about Tetra Tech's patents to you after seeing LRAIL

8   in July 2020?

9   A.   Nobody did, no.

11:35AM  10   Q.   And when did you first hear of 3DTAS?

11   A.   So as you saw in -- in the pictures this morning, Brad

12   Spencer was at the commissioning of the LRAIL in Florida, and

13   so he met Robert Olenoski there.  And a couple weeks later, I

14   think we were discussing, and he wanted to know what our

11:35AM  15   relationship was with Tetra Tech because he said they're

16   bidding on this project, too.

17          So at that point, we knew that something wasn't

18   right.  So we started looking at the Internet for what kind

19   of information we could find on the 3DTAS system and hi-rail

11:36AM  20   AI stuff, and we couldn't find anything, anything at all.

21   There was nothing published.  So we asked Brad if he had any

22   marketing material that would be public that he could share

23   with us, and he shared just the one brochure on the RailAI

24   system.

11:36AM  25   Q.   On RailAI.

74

1   A.   Yeah.

2   Q.   Now, had you ever seen Tetra Tech present at any

3   conferences on 3DTAS?

4   A.   No.  Um, I go to dozens and dozens of these conferences.

11:36AM  5   I have never seen anything presented concerning the Tetra

6   Tech system at any real conference.  I've never seen them

7   have a commercial booth and present marketing material at any

8   conferences during all this time.  And basically, I couldn't

9   learn anything on their system.

11:36AM  10   Q.   And so you never sat in a presentation of Dr. Mesher's

11   and took notes and then took them back and presented to your

12   customers on his presentation?

13   A.   I didn't even know if they were commercializing the

14   system at that point until Brad told me that he had received

11:37AM  15   a bid from them.

16   Q.   And did you ever search for 3DTAS again?

17   A.   Yeah, we did.  When we received the letter, notice of

18   infringement, in January 5th of 2021, we went back on the

19   Internet to try to find out more information about it, and,

11:37AM  20   again, we found nothing.  Nothing was on the Internet

21   concerning that product.

22   Q.   Did your view of no infringement ever change since

23   receiving the January 5th, 2021 letter?

24   A.   No, it didn't.  And it won't.

11:37AM  25   Q.   And before the January letter from the Tetra Tech

75

1   lawyers, you were not aware of the patents; correct?

2   A.   That's correct.

3   Q.   Now, who did you consider to be competitors of

4   Pavemetrics' LRAIL?

11:38AM  5   A.   So the competitors that we were auctioning, GREX.  GREX

6   had a similar system to us with two 3D laser profilers.  And

7   they were actually already doing a tie evaluation for CSX so

8   they were definitely a competitor.

9          Then there's a bunch of other companies.  Several

11:38AM  10   of them were -- have 3D systems as well.  So there's Rail

11   Vision.  In the UK there's BEDSIS.  There's Sherman.  There's

12   Mermec that's Italian, but they do have offices in the U.S.

13   And there's Ensco.  And we heard of Balford Beatty also has

14   systems.

11:38AM  15   Q.   And which of the companies sell systems with 3D sensors

16   and cameras?

17   A.   Well, most of 'em have at least some kind of 3D sensor

18   and have imaging systems as well.

19   Q.   And when did you first learn of the '557 patent, the

11:39AM  20   other patent at issue in this case?

21   A.   Oh.  So that's when the Tetra Tech lawyers brought it up

22   again.  I think it was in July 2021.

23   Q.   And that's the first time Tetra Tech brought it up;

24   correct?

11:39AM  25   A.   I believe so, yes.

76

1   Q.   It was not in that January 5th, 2021 letter.

2   A.   That wasn't.

3   Q.   Now, did you ever believe that you infringed the '557

4   patent?

11:39AM  5   A.   Um, no, I didn't.  That's the one, I think, with the

6   cracks on the ties.  So we had been doing crack detection for

7   almost 20 years already so those are things that we had been

8   doing for a long, long period of time.  And when we looked at

9   the description of the algorithm, we could see things that we

11:39AM  10   were doing that was different.

11   Q.   And did CSX ever inquire about this lawsuit?

12   A.   Oh, CSX?  Yeah.  At some point, they had heard about the

13   lawsuit so they asked us about it.

14   Q.   And if we could go to Exhibit 86-1?  Do you recognize

11:40AM  15   Exhibit 86-1?

16   A.   I do.  It's an email I sent to Colin Connor which is the

17   in-house attorney for CSX.

18   Q.   Okay.  So sometimes large corporations have attorneys

19   that are employees of the company; correct?

11:40AM  20   A.   Yes, that's the case.

21   Q.   And so you wrote to Mr. Connor, an attorney at CSX.  And

22   why did you do that?

23   A.   Well, we wanted to reassure him that we were taking this

24   litigation seriously, and that we had filed what we call a

11:40AM  25   declaratory judgment action.  So yeah, that was this case

**EXHIBIT 4**
**-140-**

77

1 here.

2 Q.   And it says I am pleased to update you concerning our

3 patent case with Tetra Tech.  We filed that suit in Los

4 Angeles to show Tetra Tech's patent infringement threats

5 were without merit.  Is that right?

6 A.   That's correct.

7 Q.   And then in the next paragraph, you said if you would

8 like exact details concerning the case, please feel free to

9 speak directly with our patent litigation team at Knobbe

11:41AM 10 Martens in Irvine, California.  And then you mention Joseph

11 Re who's here today; correct?

12 A.   Yeah, that bald guy over there.

13 Q.   Yes.  And you mentioned my name, Christy Lea; correct?

14 A.   Yeah.

15 Q.   And then you gave out our direct dial phone numbers?

16 A.   Yes, I did.

17 Q.   And why did you do that?

18 A.   Well, I wanted them to know that we have -- we have

19 hired very competent attorneys, and that we were going to

11:41AM 20 solve -- solve this case in court if we needed to.

21        MS. LEA:  Thank you very much.  Pass the witness.

22        THE COURT:  Cross-examination, Counsel?

23        MR. PARKER:  Yes, Your Honor.

24

11:42AM 25

UNITED STATES DISTRICT COURT

78

1                      CROSS-EXAMINATION

2 BY MR. PARKER:

3 Q.   Good almost afternoon, Mr. Laurent, and Happy Birthday.

4 A.   Thank you.

11:42AM 5 Q.   I'm Aaron Parker with Tetra Tech.  So I wanted to go

6 back to testimony you just gave about your knowledge of Tetra

7 Tech's rail inspection systems.  I think you testified that

8 you didn't learn about their systems until midway

9 through 2021 after those conversations with -- or your

11:43AM 10 meetings with Mr. Olenoski; is that correct?

11 A.   Um, are you sure about your dates?

12 Q.   When were you -- when did you first learn about Tetra

13 Tech's rail inspection systems?

14 A.   So the only information -- well, I think you're asking

11:43AM 15 about 2020, not 2021.  Could that be the case?

16 Q.   Uh, yeah, you're correct.

17 A.   All right.  So yes.

18 Q.   So mid-2020?

19 A.   Yes.

11:43AM 20 Q.   But you mentioned you were aware of the GREX litigation

21 in which GREX filed a patent infringement suit against Tetra

22 Tech; is that right?

23 A.   Yes.

24 Q.   And you understand that was for a patent infringement

11:44AM 25 relating to a rail inspection system, inf fact, the 3DTAS

UNITED STATES DISTRICT COURT

79

1 system; correct?

2 A.   Yes, it was for -- there was litigation, but I'm not

3 sure I knew for exactly the name of the system or that, no.

4 Q.   But as of 2017, 2018, you obviously knew that Tetra Tech

11:44AM 5 had rail inspection systems that GREX believed were

6 infringing their patents, and you were well aware of the GREX

7 patent?  That's true, isn't it?

8 A.   I'm sorry, that question goes way too fast for me to

9 process it.

11:44AM 10 Q.   That's fine.  You were well aware of the GREX patent.

11 That's correct?

12 A.   Yes, we were.

13 Q.   And you'd been tracking -- Pavemetrics had been tracking

14 the GREX patents and had had concerns about those patents and

11:44AM 15 potential infringement?

16 A.   A lot of legal terms in there, but we had received

17 letter of notice from GREX.  So a letter of notice is where

18 they send you a letter, and they mention hey, we have this,

19 this, this and this and that patent so kind of, you know, to

11:45AM 20 warn you, to warn you that if you do, uh, if you -- you know,

21 so that you know what they have patented so you cannot

22 infringe on it.  They even ask us if we infringe.  And we

23 looked at it, and we figured we were not infringing on these

24 patents.

11:45AM 25 Q.   Using legal terms I'm throwing out here, but you

UNITED STATES DISTRICT COURT

80

1 testified earlier that DNN can't be infringing.  You're not a

2 patent attorney; right?

3 A.   Gosh, no.

4 Q.   Yeah.  And you have not had any training in evaluating

11:45AM 5 patent claims to determine infringement?

6 A.   Well, aside from the last year, no.

7 Q.   You have not submitted an expert report in this case

8 about whether DNN can infringe.  That's correct?

9 A.   I'm not the one that's doing the expertise.  That's

11:46AM 10 Dr. Frakes.

11 Q.   You also testified that after you received the letter in

12 2021 regarding infringement of the '293 patent that you

13 didn't think you infringed, but you just admitted you're not

14 a patent attorney.  You don't have any formal training

11:46AM 15 regarding evaluating patents.

16 A.   Well, you got me there, yeah.

17 Q.   I'd like to pull up your timeline, slide six.  Thank

18 you.  You're missing some dates, relevant dates from this

19 timeline.  Am I correct?

11:46AM 20 A.   Perhaps you could tell me which ones?

21 Q.   Okay.  So those two dates prior to your April 2021

22 invoice dates.  And, in fact, you actually talked about

23 quotation from February 15th of 2021.  You talked about that;

24 correct?

11:46AM 25 A.   Could you repeat that question, sorry?

UNITED STATES DISTRICT COURT

**EXHIBIT 4**

**-141-**

81

1    Q.  Yeah.  You -- you -- we saw the quotation from
2  February 15, 2021 in which Pavemetrics offered to sell CSX
3  three LRAIL systems.  Do you recall that?
4    **A.**  **I'm trying to figure out the timeline.  So that would be**
11:47AM    **before. . .**
6    Q.  It's the dot on the left all the way over there,
7  February 15th offer for sale?
8    **A.**  **Okay.  I don't remember these documents, but perhaps you**
9  **can show them to me, I guess.**
11:47AM 10    Q.  Can you pull up Exhibit 811, please?  This is the
11  quotation that your counsel brought on the screen and
12  highlighted in a few places where --
13    **A.**  **Oh, okay.  Okay, yes.**
14    Q.  And just to run through it, this was a quotation --
11:47AM 15    **A.**  **I thought it was an invoice.  Okay, sorry.**
16    Q.  Yeah.  So this is the quote.  The offer for sale of
17  three LRAIL systems; is that correct?
18    **A.**  **Yes, it is.**
19    Q.  And those LRAIL systems included LRAIL sensors?
11:48AM 20    **A.**  **Yes.**
21    Q.  Acquisition software?
22    **A.**  **Yes.**
23    Q.  And processing software; correct?
24    **A.**  **Yes.**
11:48AM 25    Q.  There's also a line further down that says one year of

UNITED STATES DISTRICT COURT

82

1  software updates and technical support.  It's down toward the
2  bottom, and it's highlighted.  Do you see that?
3    **A.**  **Well, yes, that's standard as well.**
4    Q.  Yeah.  And then below, I think your counsel pointed out
11:48AM  5  the note, LRAIL software license is valid.  Can you read
6  that?  Am I correct?
7    **A.**  **Yes, that's correct.**
8    Q.  Okay.  And then if you go up to the upper right-hand
9  corner above the gray line, it says Pavemetrics reserves the
11:48AM 10  right to revoke the license in case of payment default?
11    **A.**  **Yeah, that's correct.**
12    Q.  You were offering to sell CSX an LRAIL that came with
13  software and the license that came with hardware and that
14  came with LRAIL sensors; is that correct?
11:48AM 15    **A.**  **That's correct.**
16    Q.  So after you sent that quotation, you testified that
17  that quotation was tied to a goods agreement, is that
18  correct, in which the parties agreed to that sale, to that
19  quotation or offer for sale?
11:49AM 20    **A.**  **Yeah.  It's the terms and conditions, yeah.**
21    Q.  And that's a goods agreement.  Can you pull up
22  Exhibit 844, please?  Does this look familiar?
23    **A.**  **Uh, it looks familiar, yes.**
24    Q.  Okay.  And that's the goods agreement between CSX and
11:49AM 25  Pavemetrics dated March 15th, 2021?

UNITED STATES DISTRICT COURT

83

1    **A.**  **Yeah, that's correct.**
2    Q.  So Pavemetrics did sell three LRAIL systems to CSX at
3  that time on that date; correct?
4    **A.**  **How did you finish your question?  I'm sorry.**
11:49AM  5    Q.  I'm sorry.  That date reflects the sale of three LRAIL
6  systems from Pavemetrics to CSX, that ones we discussed in
7  the quotation?
8    **A.**  **Well, it reflects the date that we signed the agreement,**
9  **I guess?**
11:49AM 10    Q.  Okay.  Well, in this case, you submitted several
11  declarations, do you recall doing that, under penalty of
12  perjury?
13    **A.**  **Sure.**
14    Q.  Can you pull up Exhibit 995, please?
11:50AM 15    MR. PARKER:  Your Honor, we'd like to enter into
16  evidence his declaration, Exhibit 995?
17    THE COURT:  What part of the declaration?
18    MR. PARKER:  Paragraph 6.
19    Any objections, Counsel?
11:50AM 20    MS. LEA:  Yes, Your Honor.  Improper impeachment.
21    MR. PARKER:  Your Honor, I can walk -- I can walk
22  through some questions.
23    THE COURT:  The closer you can get to the actual
24  language, the better.
11:51AM 25    MR. PARKER:  Sure.  Appreciate it.

UNITED STATES DISTRICT COURT

84

1    Q.  So isn't it true that Pavemetrics sold three LRAIL
2  systems to CSX in 2021?
3    **A.**  **Yes.**
4    Q.  And isn't it true that CSX and Pavemetrics entered into
11:51AM  5  a goods agreement on March 15th, 2021 for the sale of three
6  LRAIL systems?
7    **A.**  **Yes.**
8    Q.  And isn't true that Annex 1 which is a March 15th, 2021
9  Goods Agreement shows that three units consisting of LRAIL
11:51AM 10  sensors, acquisition software and processing software were
11  sold?
12    **A.**  **I would agree with that, yes.**
13    Q.  Now, you were here for your counsel's opening argument.
14  It's been a while, but that was last Wednesday, I believe; is
11:51AM 15  that correct?
16    **A.**  **That was the day, yeah.**
17    Q.  And we've actually been through it today, but Ms. Lea
18  pulled up an image, Figure 5, from page 7 of Trial
19  Exhibit 26.  This is the image, we'll get there, um, that
11:52AM 20  has -- on the right, the image has -- is that intensity, and
21  intensity, and the range was in the center, and then you have
22  3D merged on the right.  Do you recall this image?
23    **A.**  **I do.**
24    Q.  Now, the 3D merged image on the right in Figure 5,
11:52AM 25  that's just intensity; right?

UNITED STATES DISTRICT COURT

**EXHIBIT 4**

**-142-**

85

1    A.   It's the intensity image that has been enhanced with

2    the -- with the shadows, yeah.

3    Q.   And you gave a deposition in this case; correct?

4    A.   I did.

5    Q.   That was also under the penalty of perjury?

6    A.   I swear -- I swore that at my deposition as well, yeah.

7         MR. PARKER:   Your Honor, I'd like to direct him to

8    a portion of his deposition transcript that relates to the

9    answers to the last question.

10        THE COURT:   Okay.  Can you point me to his

11   deposition transcript?

12        MR. PARKER:   Yeah.  It's page 95, lines. . .

13        THE COURT:   19 through 21?

14        MR. PARKER:   Yes.  Yes, Your Honor.

15        THE COURT:   And is this the same image shown at the

16   deposition?

17        MR. PARKER:   Yes, Your Honor.

18        THE COURT:   You can play it.

19   BY MR. PARKER:

20   Q.   At your deposition, you testified relating to

21   Figure 5 -- okay, so the scanned image in Figure 5, that's

22   just -- the 3D scanned image in Figure 5, that's just

23   intensity, and you answered yes.

24   A.   Well, Figure 5 has a -- has just the intensity image in

25   it so. . . oh, and it has both.  It has the Fake3D, it has

UNITED STATES DISTRICT COURT

---

86

1    intensity, and it has a range.  It has all three.

2    Q.   So the 3D merged on the right so that's just intensity.

3    That's what you testified to in your deposition.

4    A.   It's a 2D image.  It's a 2D image.  A Fake3D is a 2D

5    image with shadows.

6    Q.   But --

7    A.   There's no elevation data in a Fake3D image if that's

8    your question.

9    Q.   Thank you.  So Mr. Laurent, would you turn to

10   Exhibit 416 in your binder, please.

11   A.   In my binder?

12   Q.   Yeah.  Are you there?  It's also on the screen.  This is

13   an email chain with the subject line, LRAIL shipping, and

14   it's between Pavemetrics and its client, AID.  Is that

15   correct?

16   A.   Yeah, it looks to be an email chain.

17   Q.   And in the bottom email, it's dated February 12th of

18   2021.

19   A.   That's what's written.

20        THE COURT:   Counsel, I just want to confirm.

21        This is in evidence?

22        MR. PARKER:   Yes, Your Honor.

23        THE COURT:   Thank you.

24   BY MR. PARKER:

25   Q.   And it says I just want to let you know that everything

UNITED STATES DISTRICT COURT

---

87

1    is ready for your new equipment shipping planned for next

2    Monday; right?  Did I read that correctly?

3    A.   Yes.

4    Q.   So isn't it right that Pavemetrics shipped the LRAIL to

5    AID on February 15th, 2021 which is the Monday following that

6    project February 12th?

7    A.   Yeah.  In three different boxes, yes.

8    Q.   And that's just days after Pavemetrics filed the lawsuit

9    against Tetra Tech in this case which was filed on

10   February 11th?

11   A.   Oh, sorry.  Okay.  Um, yeah.  Sorry.  The AID sale, we

12   shipped the sensors, all the sensors.  And you know what you

13   saw in the box, the picture you saw in the box with the

14   sensors and controllers and all that, that was shipped on

15   January 4th, 2021.  And what was shipped on February 12th,

16   that was like the structures, the mechanical structures and a

17   few other components.  So that's what he's talking about.

18   Q.   Could you turn to Exhibit 985 in your binder, please?

19   This is another email string between Pavemetrics and AID.  I

20   believe you were copied on these emails.

21        MR. PARKER:   Your Honor, I'd like to move

22   Exhibit 985 into evidence?

23        THE COURT:   Any objection, Counsel?

24        MS. LEA:   No objection, Your Honor.

25        THE COURT:   Okay.  985 can come into evidence.

UNITED STATES DISTRICT COURT

---

88

1              (Exhibit 985 admitted.)

2        THE COURT:   And it can be published.

3    BY MR. PARKER:

4    Q.   Did you see the email at the bottom of the first page?

5    It's on the screen.

6    A.   Yes.  Oh, yes I see it, but I'm trying to read it.

7    Q.   That email from Pavemetrics to AID says I just saw that

8    you received the LRAIL crates yesterday.  Did I read that

9    correctly?

10   A.   Yes.

11   Q.   But the response from Mr. Hakis at AID on February 23,

12   2021 at the top of the page says we did receive the LRAIL

13   yesterday, and everything looks good.  We will start

14   assembling the LRAIL soon.  Did I read that correctly?

15   A.   That's correct.

16   Q.   So Mr. Laurent, you understand that Pavemetrics filed

17   this lawsuit against Tetra Tech; right?

18   A.   Absolutely.

19   Q.   And you also understand that despite Pavemetrics being

20   the one to initiate this lawsuit, it was Pavemetrics that was

21   trying to hide this lawsuit from its own customers.

22   A.   No, I wouldn't say that.

23   Q.   If you could look at Exhibit 48 in your binder, please?

24   This is an email that you sent on March 26, 2021 to

25   Mr. Fox-Ivey and Mr. Hebert of Pavemetrics.

UNITED STATES DISTRICT COURT

---

EXHIBIT 4

-143-

## 89

1    **A. Which one, sorry?**

2    **Q.** Exhibit 48.

3    **A. Okay.**

4    **Q.** And this is internal Pavemetrics email; correct?

11:58AM 5    **A. That's correct.**

6    **Q.** And it's kept in the ordinary course of business at

7    Pavemetrics, and it bears a Pavemetrics' Bates number at the

8    bottom; is that correct?

9    **A. Yes, it is.**

11:58AM 10    MR. PARKER:  Your Honor, I'd like to move

11    Exhibit 48 into evidence, please?

12    THE COURT:  Any objection, Counsel?

13    MS. LEA:  No objection, Your Honor.

14    THE COURT:  Okay.  Exhibit 48 is in evidence.

11:58AM 15    (Exhibit 48 admitted.)

16    BY MR. PARKER:

17    **Q.** So Mr. Laurent, in your words at the email at the top

18    says I think we should avoid giving visibility to AID with

19    the TT stuff going on.  Does it say that?

11:59AM 20    **A. That's what it says.**

21    **Q.** An AID is a customer of Pavemetrics; right?

22    **A. Yes, they are.**

23    **Q.** And the reference to TT stuff going on, that's a

24    reference to Tetra Tech and this lawsuit; isn't that right?

11:59AM 25    **A. That's correct.**

UNITED STATES DISTRICT COURT

## 90

1    **Q.** So you wanted to keep Tetra Tech from finding out that

2    you had sold an LRAIL to AID; isn't that correct?

3    **A. Can you repeat the question, sorry?**

4    **Q.** You -- you, Pavemetrics --

11:59AM 5    **A. Yes.**

6    **Q.** -- wanted to keep Tetra Tech from learning about your

7    sale to AID on March 26, 2021?

8    **A. I would say that's a fair assessment.**

9    **Q.** And you were in the courtroom last week when Mr. Hafiz

11:59AM 10    testified by video; is that correct?

11    **A. Yes I was.**

12    **Q.** And you heard Mr. Hafiz say that the first time he heard

13    of Tetra Tech was when he was subpoenaed in this case in

14    November 2021; is that right?

11:59AM 15    **A. Yes.**

16    **Q.** But Pavemetrics never told AID about this lawsuit, did

17    they.

18    **A. No, we figured, uh, we weren't infringing so there's**

19    **need to do that.**

12:00PM 20    **Q.** So you want to keep them in the dark.

21    **A. We -- we basically wanted to keep them out of this**

22    **lawsuit.**

23    THE COURT:  Counsel, this is a good time to break

24    for lunch now.  So we'll go ahead and break for lunch, and

12:00PM 25    we'll ask the jurors to come back at 1 o'clock.  Thank you.

UNITED STATES DISTRICT COURT

## 91

1    THE CLERK:  All rise.

2    (Jury not present.)

3    THE COURT:  So we'll come back here at 12:45, and

4    it'll give us some time to talk about jury instructions so

12:00PM 5    I'll ask you to come back at 12:45 for discussion.

6    You're in the middle of cross so please don't have

7    any conversations with your counsel that in any way relate to

8    your testimony.

9    Anything else we need to do before we break for

12:01PM 10    lunch?

11    MS. LEA:  No, Your Honor.

12    MR. BARNEY:  No, Your Honor.

13    THE COURT:  Thank you.

14    We'll see you at 12:45.  Thank you.

12:01PM 15    THE CLERK:  This court's in recess.

16    (Lunch recess.)

17    THE COURT:  Okay.

18    Where are we on jury instructions?

19    MR. RE:  Making great progress, Your Honor.

12:48PM 20    THE COURT:  Great.

21    MR. RE:  I have a red line copy that I sent to

22    counsel yesterday, copies of both the verdict form and the

23    proposed jury instructions with some red lines.

24    THE COURT:  Great.

12:49PM 25    MR. RE:  We might want to start with the verdict

UNITED STATES DISTRICT COURT

## 92

1    form only because it's much simpler.

2    THE COURT:  Okay.

3    MR. RE:  The first suggestion and proposal is in

4    Question No. 1.  And obviously, Your Honor, I'm not repeating

12:49PM 5    anything where the Court has already made rulings.  I'm

6    trying to seek improvement only.  We propose that the

7    preposition to CSX be included somewhere in Question 1 to

8    contrast it with Question 2 which is AID.  This way, it's

9    very, very clear that CSX is the only alleged sale to be part

12:49PM 10    of the direct infringement question.

11    THE COURT:  Okay.  And is there an objection to

12    that?

13    MR. CHUNG:  Uh, no objection, Your Honor.

14    THE COURT:  Okay.  So we can go ahead and add that,

12:50PM 15    that's fine.

16    MR. RE:  You'll be very pleased to hear that we

17    agreed to eliminate Questions 7 and 8.

18    THE COURT:  Great.  No objection to that?

19    MR. CHUNG:  No objection, Your Honor.

12:50PM 20    THE COURT:  Okay.  And I see in the new Question 7

21    to CSX, any objection to that?

22    MR. CHUNG:  No objection, Your Honor.

23    THE COURT:  Okay.  The verdict form's done; then;

24    right?

12:50PM 25    MR. CHUNG:  That's it.

UNITED STATES DISTRICT COURT

**EXHIBIT 4**
**-144-**

93

1    THE COURT: Okay, jury instructions.

2    MR. RE: Well, in view of the verdict form getting

3  trimmed down, it helps on the jury instructions. Jury

4  Instruction No. 26, you might remember we had a discussion

12:50PM 5  that we would propose a revision? And so revised in lines 3

6  and 4 of the redline.

7    THE COURT: Okay. Any objection to the revision in

8  lines 3 and 4?

9    MR. CHUNG: No objection, Your Honor.

12:51PM 10    THE COURT: Okay.

11    MR. RE: The next thing we propose is this

12  discussion about dependent and independent claims could be

13  greatly simplified given the fact that we have only one

14  dependent claim in the case, and I have rewritten it so that

12:51PM 15  it makes it clear that Claim 21 is the dependent claim. And

16  it takes out a lot of the confusion when there's such a

17  simple number of claims at issue.

18    THE COURT: Okay. Any objection to that?

19    MR. CHUNG: No objection, Your Honor.

12:51PM 20    THE COURT: So Instruction 26 as amended looks

21  good.

22    MR. RE: This my favorite one. Eliminate jury

23  Instruction No. 32 in its entirety.

24    THE COURT: Okay. Any objection with that?

12:51PM 25    MR. CHUNG: No objection, Your Honor.

UNITED STATES DISTRICT COURT

94

1    THE COURT: And 33 as well?

2    MR. CHUNG: No objection there, Your Honor.

3    THE COURT: Okay. So 32 and 33 are gone.

4    Let's look at 34.

12:52PM 5    MR. RE: 34 you will remember came up in our

6  discussion that now, there is no longer a challenge that UML

7  TRB 2014 is prior art. This has been rewritten to make that

8  clear that it's not disputed. Also, since we eliminated the

9  arguments related to Tetra Tech's 3D tie assessment, we've

12:52PM 10  eliminated any reference to that piece of alleged prior art.

11    And I believe that is the reasons for all the

12  changes in Instruction No. 34.

13    THE COURT: And any objection to those changes?

14    MR. CHUNG: No objection, Your Honor.

12:52PM 15    THE COURT: Okay, 34 looks good. 35 looks good

16  cause we're getting rid of anticipation?

17    MR. RE: Correct.

18    THE COURT: Okay.

19    MR. RE: Boy, we're making progress. 39. As your

12:52PM 20  discussion last week with Ms. Lea over the simultaneous and

21  independently created the same invention claimed in the

22  patents is now placed separate and apart from the rest of the

23  list, and I believe that takes care of any ambiguity.

24    THE COURT: It does take care of ambiguity.

12:53PM 25    Any objection to Instruction 39?

UNITED STATES DISTRICT COURT

95

1    MR. CHUNG: No objection, Your Honor.

2    THE COURT: Okay, 39 is done. Is that it?

3    MR. RE: There is one more, Instruction No. 51.

4    This one is just a -- two slight little changes to

12:53PM 5  fix any defect in 51. Obviously, we preserve all prior

6  arguments, but I mean, given the Court's rulings, the

7  ambiguity was the lack of a proper basis to lines 6 and 7 to

8  make it clear that Tetra Tech gave notice on January 5th, not

9  that we agree that what the infringement began.

12:54PM 10    THE COURT: Yeah, that looks good to me.

11    Any objection to that, Counsel?

12    MR. CHUNG: No objection, Your Honor.

13    THE COURT: So 51 is done.

14    MR. RE: And one more word, the word whichever is

12:54PM 15  first should be whichever is later on line 12.

16    THE COURT: Yes, that seems correct.

17    Any objection?

18    MR. CHUNG: Uh, no objection, Your Honor, but I

19  will note for the record that I think for the Fed Circuit

12:54PM 20  Model instructions, it does say whichever is first, but I

21  think Mr. Re is right that it should be later.

22    THE COURT: Okay. We'll make it later.

23    Okay. Anything else?

24    MR. RE: That's it, Your Honor, thank you.

12:54PM 25    THE COURT: Okay, thank you.

UNITED STATES DISTRICT COURT

96

1    And thank you to the parties for working on that.

2    MR. CHUNG: And Your Honor, we do have one minor

3  correction to the jury instructions as well.

4    THE COURT: Okay.

12:55PM 5    MR. CHUNG: It was, Your Honor, to Instruction No.

6  21? If you may recall, on line 22 relating to damages of the

7  asserted patents, we proposed inserting any claim of the '293

8  patent or '557 patent has not been infringed and not invalid.

9  And then I do believe that Mr. Re may have asked that the

12:55PM 10  various versions of the product in lines 15 through 18 would

11  be shelved for later. I don't know if that is something we

12  want to resolve today or if you want to meet and confer on

13  that and have a finalized Instruction No. 21 for tomorrow.

14    THE COURT: If you could meet and confer on that,

12:55PM 15  that would make sense. And then Mr. Re, adding the '557

16  patent, that would be consistent with the Court's ruling;

17  correct?

18    MR. RE: Yes. That is our objection, Your Honor.

19    THE COURT: Okay. So subject to the objections of

12:56PM 20  Pavemetrics, we'll include that, if you decide that any claim

21  of the '293 or '557 patent have been infringed. Okay.

22    MS. MATHEW: Your Honor? There's also an issue

23  with their damages demonstrative, and we understand that

24  witness will be presented. If we have a few minute, we'd

12:56PM 25  like to address that now if you're okay.

UNITED STATES DISTRICT COURT

**EXHIBIT 4**
**-145-**

97

1    THE COURT: Okay. Let me just ask Mr. Re, anything
2    else in the jury instructions?
3    MR. RE: No. I have just one little housekeeping
4    issue that will take me 15 seconds?
12:56PM 5    THE COURT: Okay.
6    MR. RE: Per the instructions of Mr. Kerr, I want
7    to make it clear on the record there are two redacted
8    exhibits that have been entered. I have copies in the
9    redacted form. They are now being referred to as
12:56PM 10   Exhibits 85-1 and 86-1. These are the two redacted emails
11   concerning the preliminary injunction, and I have copies for
12   the book and the Court.
13   THE COURT: Thank you. Thank you very much. Okay.
14   So we have a damages instruction -- I'm sorry, a damages
12:57PM 15   witness coming up, and you've got some objections to their
16   slides.
17   MS. MATHEW: Yes, Your Honor.
18   THE COURT: And just let me ask because we didn't
19   cover this, in Instruction 22, there was some text taken out
12:57PM 20   and some simplification made. Is that objected to by either
21   party? Instruction 22? I think it would simply it to take
22   out anticipation. Is that okay with everyone?
23   MR. CHUNG: No objection from Tetra Tech, Your
24   Honor.
12:58PM 25   THE COURT: Okay.

UNITED STATES DISTRICT COURT

98

1    MR. RE: Well, what's reflected in red line, I
2    guess I must have skipped it. The two sided document? Yes,
3    we have that deleted as shown on page 25, overview of
4    applicable law Instruction No. 22.
12:58PM 5    THE COURT: Okay, great. I just want to make sure
6    we're all in agreement. Great. Thank you.
7    Okay. Counsel?
8    MS. MATHEW: Yes, Your Honor. Yesterday
12:58PM 9    Pavemetrics exchanged their demonstratives that they plan to
10   present their damages expert. In it includes two slides, no
11   lost profits, and if you could pull slide number four. Tetra
12   Tech objects to this slide to the extent that it's raising a
13   new theory of outside the scope of his report.
14   Nowhere in Mr. Tregellis' report does he opine that
12:59PM 15   Tetra Tech is not entitled to lost profits nor does he offer
16   any opinion as to what the amount should be, and so we
17   believe that he should not be permitted to testify about
18   this.
19   In addition, when we asked Mr. Tregellis during his
12:59PM 20   deposition about whether he was opining whether Tetra Tech's
21   entitled to lost profits or whether the amount is zero, he
22   denied it multiple times, and so this is a new theory that
23   should be kept out.
24   THE COURT: So you're arguing in damages for lost
12:59PM 25   profits on the sales to CSX and reasonable royalty on the

UNITED STATES DISTRICT COURT

99

1    other sale; correct?
2    MS. MATHEW: Correct, Your Honor.
3    THE COURT: And the Pavemetrics' damages expert has
4    not opined on the appropriate measure of lost profits for
12:59PM 5    sales to CSX.
6    MS. MATHEW: He has not, Your Honor.
7    THE COURT: Okay.
8    Let me hear from counsel for Pavemetrics.
9    MR. ZOVKO: Your Honor, Nick Zovko for Pavemetrics.
01:00PM 10   That's incorrect. Pavemetrics' damages expert
11   addressed lost profits, paragraphs 102 to 118 of his expert
12   report. He explained that Tetra Tech is only entitled to
13   lost profits if Mr. Schoettelkotte and Tetra Tech can
14   establish the four Panduit factors are met.
01:00PM 15   In his report, he has an entire section on why
16   there are no in his opinion there are no acceptable
17   noninfringing alternatives shown by Tetra Tech, and
18   therefore, lost profits have not been shown by Tetra Tech,
19   and Tetra Tech's not entitled to lost profits. So that's the
01:00PM 20   fundamental part of his report.
21   THE COURT: So he goes through the factors then?
22   MR. ZOVKO: He discusses the factors and focuses on
23   Panduit Factor 2 and concludes that it has not been
24   established.
01:01PM 25   THE COURT: Okay. Counsel in light of that, what's

UNITED STATES DISTRICT COURT

100

1    the issue?
2    MS. MATHEW: Your Honor, we're not saying that
3    Mr. Tregellis cannot opine about lost profits, just
4    specifically that Tetra Tech is not entitled to lost profits.
01:01PM 5    He walks through Panduit factors, but for the Panduit factors
6    on an infringement alternative, he doesn't offer an opinion
7    that there is a non-infringing alternative that would be
8    acceptable here.
9    And I have a copy of the transcript that I think
01:01PM 10   that would help elucidate this so I could read it into the
11   record?
12   THE COURT: Well, yeah. It's just is it short?
13   MS. MATHEW: I could read a portion of it that
14   would be short.
01:01PM 15   THE COURT: Okay.
16   MS. MATHEW: So the question that we asked is in
17   your opinion, there should be zero lost profits or it should
18   be limited by a certain amount based on availability of
19   acceptable noninfringing alternatives? And in response, he
01:02PM 20   responded no, I think you misunderstand my opinion. It is
21   above my pay grade to call balls and strikes and make
22   decisions about whether there should be award of lost
23   profits. I'm not offering legal opinion, and ultimately, I
24   think that that is a legal opinion about whether there should
01:02PM 25   an award of lost profits.

UNITED STATES DISTRICT COURT

**EXHIBIT 4**
**-146-**

101

1  THE COURT: Okay. And so he's saying that the idea
2  about whether there's going to be an award of lost profits or
3  not is a legal issue, and he's just testifying about damage
4  information; is that correct?
01:03PM 5  MS. MATHEW: Correct, Your Honor. But he also goes
6  on to say ultimately, I'm not saying that lost profits should
7  be zero, so he also doesn't offer any opinions about the
8  amount that that should be.
9  THE COURT: Okay. So if he's saying he's not
01:03PM 10  indicating that lost profits should be zero, your objection
11  to the slide is the slide says lost profits should be zero.
12  MS. MATHEW: Correct, Your Honor.
13  THE COURT: Yeah. Well, that does seem
14  inconsistent, Counsel. Do you have a response?
01:03PM 15  MR. ZOVKO: Yes, Your Honor. I believe
16  Mr. Schoettelkotte is referring to he has to rely on this
17  technical expert here, Dr. Frakes, for the existence of
18  noninfringing alternatives, and he goes through the analysis
19  in his report. And he just concluded in it that Tetra Tech
01:03PM 20  has not established Panduit Factor 2 so the logical
21  assumption is lost profits don't apply.
22  THE COURT: Yeah. I don't think, though -- in
23  light of his deposition testimony, I think he can say he
24  didn't think they established Panduit Factor No. 2. But I
01:04PM 25  don't think he can make that legal jump. You can make that

UNITED STATES DISTRICT COURT

102

1  legal jump in closing, but I don't think he can make it in
2  his testimony in light of his deposition.
3  MR. ZOVKO: Thank you.
4  THE COURT: Okay.
01:04PM 5  Do we have the jurors back from lunch?
6  MS. MATHEW: Just one more thing, Your Honor. The
7  following slide, Slide 5 has a heading that also says no lost
8  profits, and so we just ask that they -- one suggestion would
9  be to eliminate no, just lost profits.
01:04PM 10  THE COURT: Yeah, and I think in light of his
11  deposition testimony, I agree with you, and obviously, these
12  are legal arguments that counsel can make.
13  MR. ZOVKO: May I be heard, Your Honor?
14  THE COURT: Um, sure. Did you have something that
01:04PM 15  addresses the specific conflict that seems to be here. I
16  mean, if he says he's not testifying that there should be no
17  lost profits in his deposition, how can he now on his slide
18  say there's no lost profits?
19  MR. ZOVKO: Yeah. I'm not sure the context of that
01:05PM 20  deposition testimony, and we don't have the whole transcript
21  but --
22  THE COURT: Well, you have the transcript; right?
23  I mean, you've -- you've looked at it; right.
24  MR. ZOVKO: I -- I have looked at it. I wasn't
01:05PM 25  aware that this was the specific objection that was gonna be

UNITED STATES DISTRICT COURT

103

1  raised today. He has an entire section in his report that
2  Mr. Schoettelkotte has not established Panduit Factor 2, and
3  therefore, lost profits has not been established. Half of
4  his report is on no lost profits. The other half is
01:05PM 5  assessing the reasonable royalty.
6  THE COURT: Do you have a copy of his report you
7  can point me to?
8  MR. ZOVKO: Yes, Your Honor.
9  THE CLERK: Your Honor, may I bring 'em in?
01:05PM 10  THE COURT: Yes.
11  Okay. We can pick this up at our next break, but
12  for now, the Court's rulings stands the way it is. I don't
13  think he should say no lost profits in light of that
14  deposition testimony. Thank you.
01:05PM 15  THE CLERK: All rise.
16  (Jury present.)
17  THE COURT: Okay. Welcome back from lunch to the
18  jurors. Please have a seat, and we'll get started. We had a
19  witness on the stand. He's coming back, and we'll pick up
01:06PM 20  right where we left off.
21  I believe we're on cross-examination, Counsel, so
22  please proceed.
23  CROSS-EXAMINATION (CONTINUED)
24  BY MR. PARKER:
01:06PM 25  Q.  Welcome back, Mr. Laurent. So earlier you testified

UNITED STATES DISTRICT COURT

104

1  that you travel around the world attending conferences and
2  speaking at conferences; is that right?
3  A.  That's part of my job, yes.
4  Q.  And attending trade shows as well; right? Many of those
01:07PM 5  trade shows and conferences relate to the rail inspection
6  industry; is that correct?
7  A.  Yes.
8  Q.  And Pavemetrics authorizes and finances those trips?
9  A.  I would say I do that.
01:07PM 10  Q.  And many of those trips are for speaking opportunities?
11  A.  Yes.
12  Q.  And also opportunities for Pavemetrics to promote and
13  market their products; is that right?
14  A.  That's why we do that at the same time, yeah.
01:07PM 15  Q.  It also provides an opportunity for Pavemetrics to spy
16  on their competitors; is that right?
17  A.  I wouldn't say that, no.
18  Q.  Would you please take a look at Exhibit 49 in your
19  binder, please? You have it?
01:07PM 20  A.  Yeah, I do.
21  Q.  That's an email exchange between you and Mr. Fox-Ivey at
22  Pavemetrics; is that correct?
23  A.  Yes, it is.
24  Q.  And it's a corporate record that's been produced by
01:08PM 25  Pavemetrics in this case; is that correct?

UNITED STATES DISTRICT COURT

**EXHIBIT 4**
**-147-**

105

1    A.   Yes, that's the case.

2         MS. MATHEW:   Your Honor, we'd like to move Exhibit

3    49 into evidence?

4         THE COURT:   Any objection?

01:08PM 5    MS. LEA:   No objection, Your Honor.

6         THE COURT:   Exhibit 49 is in evidence.

7              (Exhibit 49 admitted.)

8         THE COURT:   It can be published.

9    BY MR. PARKER:

01:08PM 10   Q.   So this is an email exchange we've established between

11   you and Mr. Fox-Ivey, and it relates to companies who meet at

12   AREMA.

13   A.   Yes, that's right.

14   Q.   And AREMA is a railroad conference?

01:08PM 15   A.   Yes, the biggest one in the U.S.  It's scheduled for

16   this weekend, actually.

17   Q.   Okay.  But the bottom of the email, Mr. Fox-Ivey is

18   identifying a list of competitors; right?  And he calls them

19   a hit list?

01:08PM 20   A.   Um, they're not all competitors, but you see the FRA

21   there, they're definitely not a competitor.  Frugo is one of

22   our clients.  And a lot of these other people we're talking

23   with have interest, actually, in integrating our technology.

24   Q.   So can you move up to the top email, please?  In that

01:09PM 25   email, Mr. Fox-Ivey suggests we need to spy on them; is that

UNITED STATES DISTRICT COURT

106

1    correct?

2    A.   Well, just below that, you see GREX where I mention

3    GREX.

4    Q.   So it's okay to spy on GREX?

01:09PM 5    A.   No, that was a joke, you know, that's a joke.  We don't

6    spy on people at conferences.  We go and meet people.  We

7    learn about their products.  Even with competitors, we go and

8    talk to them and ask 'em how they're doin', I mean, and how

9    their sales are going and so on.  I don't think that's

01:09PM 10   spying.

11   Q.   You testified that publishing papers is important;

12   right?  Important to let the public know what Pavemetrics is

13   doing; is that right?

14   A.   Yeah.  I think that's one of our main marketing

01:09PM 15   opportunities.

16   Q.   Please turn to Exhibit 20 in your binder.  If you need

17   to look through it, you can take a second.  Do you recognize

18   this document?

19   A.   Give me a second.

01:10PM 20        MR. PARKER:   It's already in evidence, Your Honor.

21        THE WITNESS:   Well, yeah, I think I recognize the

22   subject matter at least.

23   BY MR. PARKER:

24   Q.   Okay.  This is an email exchange between you and

01:10PM 25   Mr. Fox-Ivey on that first page; correct?  And it relates to

UNITED STATES DISTRICT COURT

107

1    a publication that refers to LRAIL algorithms; is that right?

2    A.   So it wasn't a publication yet.  That -- I think that's

3    the third report that was in '21.  Yeah.  So that's the

4    report we were preparing for the next phase of the FRA work

01:11PM 5    we were doing.  So it would be the report that was -- would

6    be the report that we were gonna publish, the one after

7    March 2020.  So it would have been on the work that we'd done

8    since then.

9    Q.   But the date is March 2021; is that correct?  You said

01:11PM 10   2020.  It just wanted to make sure the record --

11   A.   Okay.  What I was saying, the report before that was

12   March 2020.  So this is a report that actually I'm not even

13   sure it's been published yet.

14   Q.   You see down at the bottom, the third email on the

01:11PM 15   pages, it says regarding mention of LRAIL to algorithms.  Do

16   you see that?

17   A.   Yeah.

18   Q.   And then bottom line, Mr. Fox-Ivey sent this email to

19   you, and he says there are 15 uses of the word algorithm.

01:11PM 20   Let me know if any of these need to be edited.  Did I read

21   that correctly?

22   A.   Um, yes.

23   Q.   So he was reviewing this draft for, you know, the

24   discussion of algorithms regarding -- within the LRAIL

01:12PM 25   system; is that correct?

UNITED STATES DISTRICT COURT

108

1    A.   Yeah, that's the case.

2    Q.   In the email above that, you also looked at this draft,

3    is that correct, and you stated these references look all too

4    vague, that it would be hard for anyone to point to a

01:12PM 5    specific point and claim it infringes on a specific patented

6    algorithm so I think we are okay here.  Did I read that

7    correctly?

8    A.   That's the way, yeah, it's written.

9    Q.   So you wanted to keep the references about the LRAIL

01:12PM 10   algorithm vague so the patentholders couldn't read this

11   report, this publication and accuse you of infringement; is

12   that correct?

13   A.   Okay.  So that's a long sentence.  So what is here is we

14   were in the middle of a lawsuit, right, that we're now in?

01:12PM 15   And yeah, you have to be careful.  We learned that in these

16   reports, and we learned that unfortunately, scientific papers

17   can be taken out of context, and then they can be used

18   against you to bring on a lawsuit.

19   Q.   So you wanted to hide from Tetra Tech and your other

01:13PM 20   competitors what the algorithms in the LRAIL were actually

21   doing.

22   A.   Well, at least we were publishing.  This is -- this is

23   an FRA paper, right, so it's a public document.  And, uh, I

24   haven't seen anything from Tetra Tech.  Were you guys hiding

01:13PM 25   from GREX?

UNITED STATES DISTRICT COURT

**EXHIBIT 4**

**-148-**

109

1   MR. PARKER:  I'll pass the witness, Your Honor.

2   THE COURT:  Okay.  And let me just tell him this.

3   You're here to answer questions.

4   THE WITNESS:  Excuse me?

01:13PM 5   THE COURT:  I'm trying to get your attention.

6   THE WITNESS:  Oh.

7   THE COURT:  You're here to answer questions, not

8   ask them so please refrain from that.

9   Any redirect, Counsel?

01:13PM 10   MS. LEA:  No, Your Honor.

11   Have a happy birthday, Mr. Laurent.

12   THE COURT:  Okay.  The witness is excused.

13   Please call your next witness.

14   MS. LEA:  Our witness is being brought back in the

01:14PM 15   courtroom.  While waiting would you like for me to pre-admit

16   exhibits?

17   THE COURT:  We can do it now.

18   MS. LEA:  Okay.  I'd like to pre-admit Exhibits 31,

19   508, 517, 528, 553, 618, 619, 657, 674, 676 and 678.

01:14PM 20   THE COURT:  Any objections, Counsel?

21   MR. CERULLI:  No objection, Your Honor.

22   THE COURT:  Okay.  Exhibits 31, 508, 517, 528, 553,

23   618, 619, 657, 674, 676 and 678 are now in evidence.

24   And you can go ahead and call your next witness

01:15PM 25   then.

UNITED STATES DISTRICT COURT

110

1   MS. LEA:  Yes.  I would like to call

2   Dr. Jean-Francois Hebert.

3   THE CLERK:  Please raise your right hand.

4   (Witness sworn.)

01:15PM 5   THE CLERK:  Please be seated.

6   Will you please state and spell your full name for

7   the record?

8   THE WITNESS:  Jean-Francois Hebert, J-e-a-n

9   F-r-a-n-c-o-i-s H-e-b-e-r-t.

01:16PM 10   THE CLERK:  Thank you.

11   DIRECT EXAMINATION

12   BY MS. LEA:

13   Q.  Good afternoon, Mr. Hebert.

14   A.  Good afternoon.

01:16PM 15   Q.  What is your position at Pavemetrics?

16   A.  I am Vice President of Research and Development.

17   Q.  What is your educational background?

18   A.  I have a degree in Actuarial Science.  I have a Master's

19   Degree in Statistics and I also have a PhD degree in

01:16PM 20   Electrical Engineering and Computer Engineering with a

21   specialization in neural networks.

22   Q.  And what did you do after obtaining your PhD?

23   A.  So a few months before I got my PhD, I started working

24   with INO which is National Optical Institute in Canada.

01:17PM 25   Q.  And is INO the same organization that John Laurent

UNITED STATES DISTRICT COURT

111

1   previously worked at?

2   A.  Yes, and this is where I met John Laurent.

3   Q.  And did you work with Mr. Laurent at INO?

4   A.  Yes, we were working together.  We were developing 3D

01:17PM 5   sensors for road inspection.  So that would mean collecting

6   data from the road, and then performing the detection of

7   different defects on the road like cracks and potholes and

8   other defects.

9   Q.  And what was your role in the LCMS project?

01:17PM 10   A.  At that time I was a software developer and my role was

11   to develop the algorithms for performing the detection of

12   distress in the images.

13   Q.  And when did you leave INO?

14   A.  I left INO in 2009 when John Laurent and Richard Habel

01:17PM 15   and I started Pavemetrics Systems.

16   Q.  And at that time what was your role at Pavemetrics?

17   A.  Well, in the very beginning, we were a very small team.

18   In fact, it was the only three of us.  So my role was to

19   continue the development of the algorithms for our road

01:18PM 20   inspections systems.

21   Q.  Did you personally draft the code for Pavemetrics' LCMS?

22   A.  Well, yes.  In fact I wrote most of the algorithms that

23   were used for our road inspection system.

24   Q.  And what are the software components for the LCMS

01:18PM 25   sensors?

UNITED STATES DISTRICT COURT

112

1   A.  So there are two main components.  First, you have the

2   acquisition software that will collect the data on the road

3   and then there is the processing software that will read the

4   data and will perform the analysis for detection of the

01:18PM 5   different defects.

6   Q.  And does Pavemetrics have different types of processing

7   software depending on the application?

8   A.  Yes.  We have a single processing library, but the

9   processing library can be interfaced with different software

01:18PM 10   depending on the application.  So if the application is for

11   an LRAIL system, for example, it will be a stand alone

12   software that can used at the office for processing the data,

13   but if the sensors are to be mounted on a boxcar, then there

14   will be multiple computers and it will be a different

01:19PM 15   software interface with our library.

16   Q.  Okay.  So the hi-rail truck the data that is collected,

17   and then the processing software is on a computer at an

18   office somewhere not in the truck.

19   A.  Exactly.

01:19PM 20   Q.  And that's different with a boxcar?

21   A.  Yes.  For the boxcar the processing computers are

22   mounted within the boxcar as well as the acquisition

23   computer.  And there are multiple computers so the interface

24   between our library is different.  So it's exactly the same

01:19PM 25   algorithms, but with different software interface.

UNITED STATES DISTRICT COURT

**EXHIBIT 4**
**-149-**

113

1 Q.  And when did Pavemetrics begin developing software for
2 rail inspections?
3 A.  That was in 2012.  At that time we sold the LCMS system
4 to University Massachusetts Lowell, UML.  They were involved
01:20PM 5 in a research project for automated railroad inspection.  So
6 as part of the contract that we signed with UML, we were
7 developing the algorithms for identify different railway
8 track bed features from the images.
9 Q.  And what was your role in the UML Project?
01:20PM 10 A.  Well, at that time our team was getting a little bit
11 bigger.  We had hired a few more software developers.  So my
12 role was to supervise, uh, the development of the algorithms
13 by the developers associated with this project.
14 Q.  Who were the two Pavemetrics developers on the UML
01:20PM 15 Project?
16 A.  So that was Samy Metari and Mario Talbot.
17 Q.  And does Pavemetrics have any records of the development
18 that Mr. Talbot and Mr. Metari did for the UML Project?
19 A.  Yes.  All our source code is saved in a repository.  So
01:20PM 20 a repository is sort of a database that can keep track of the
21 changes over time.  So from the repository, we can go back in
22 time and retrieve the older versions that were used at the
23 time for the UML Project.
24 Q.  Okay.  Let's look at Exhibit 508 and we'll take this
01:21PM 25 slowly.  Do you recognize Exhibit 508?

UNITED STATES DISTRICT COURT

114

1 A.  Yes.  This is a compilation of some excerpts from our
2 earlier source code that was used for the UML Project.
3 Q.  And what software version excerpt is shown on pages 2
4 through 85?
01:21PM 5 A.  So the software version in case is r8320.
6 Q.  And when was the software version created?
7 A.  So this specific software version was saved in the
8 repository in May 2014.
9 Q.  And was it done for the UML Project?
01:21PM 10 A.  Yes, exactly.
11 Q.  And we're gonna go to page 90 of this exhibit.  And
12 again, what software version is shown on pages 90 to 119?
13 A.  Uh, r8320.
14 Q.  The same one.
01:22PM 15 A.  The same one.  Again, from 2014 in May.
16 Q.  In the upper right-hand corner, there's some typed
17 language.  What does it say in the upper right-hand corner?
18 A.  Well, there you can find the name of the creator of the
19 file.  What that means it was Samy Metari.  It also says that
01:22PM 20 the file was created September 2012.  And the name of the
21 file is Rail Detector meaning that this specific file would
22 perform the detection of the positions of the rail in the
23 images.
24 Q.  Now, does this version of the software identify features
01:22PM 25 of a railroad?

UNITED STATES DISTRICT COURT

115

1 A.  Yes, exactly.  For instance, it detect the position of
2 the rails from LCMS images.
3 Q.  How does this version of the software identify features?
4 A.  Using both the intensity and range images that are saved
01:23PM 5 by our sensors.
6 Q.  Now, let's go to page 93, same exhibit.  And near the
7 bottom of that page of code, we'll look at line 222.  What
8 does this line of code mean?
9 A.  Well, this line of code is the beginning of a function.
01:23PM 10 In that case the name of the function is process so that
11 means that the following lines will actually do the detection
12 of the defects in the images.  In this case, uh, because the
13 name of the class is rail detector, this is actually the
14 first function that will perform the detection of the
01:23PM 15 position of the rails in the image.
16 Q.  Let's go to page 98.  And on page 98, are we still in
17 the same rail detector function?
18 A.  Yes.
19 Q.  And on, let's see, line 455, there's a comment.  That's
01:24PM 20 a comment; right?
21 A.  Yeah, it's a comment.  It says that we will apply the
22 Canny method.  That means after that comment, the source code
23 will perform the Canny method for detecting the position of
24 the rails in the images.
01:24PM 25 Q.  And what is the Canny method?

UNITED STATES DISTRICT COURT

116

1 A.  It's a very traditional method that is used in Computer
2 Vision.  In fact, it's probably the first thing you start
3 learning when you take courses in Computer Vision algorithm.
4 It will detect the edges in the images.
01:24PM 5 Q.  And how does the Canny method work?
6 A.  So it uses filters that is pre-defined and filter will
7 be moved completely and sequentially over the image for
8 measuring gradient measurements.
9 Q.  And are those vertical gradient measurements?
01:25PM 10 A.  Yes.
11 Q.  And is that an algorithm?
12 A.  Yes, it's an algorithm.
13 Q.  And remind me, again, the date of this?
14 A.  That was May 2014.
01:25PM 15 Q.  Now, were you in the courtroom -- do you understand that
16 Tetra Tech is pointing to the Fake3D images as being an
17 infringing image in this case?
18 A.  Yes, I do.
19 Q.  Now, did LRAIL generate Fake3D images in the UML 2015
01:25PM 20 source code?
21 A.  Yes.
22 Q.  I said 2015.  I meant 2014.  Let me do that again.
23     Does LRAIL generate Fake3D images in the UML 2014
24 source code?
01:26PM 25 A.  Yes.

UNITED STATES DISTRICT COURT

**EXHIBIT 4**
**-150-**

117

1    Q.   And in general how is the Fake3D image generated?

2    A.   Well, the Fake3D image, it's an intensity image over

3    which we will add shadows to make it appear like it is a

4    3D image.  It uses the elevation data for determining where

01:26PM 5    to add the shadows in the intensity image.

6    Q.   Okay.  And if we can go to Exhibit 517.

7         What is the Exhibit 517?

8    A.   This is an excerpt of the source code from 2014 that was

9    used for the UML Project.  And this is the source code that

01:26PM 10   will actually compute the Fake3D image.  If you look at

11   line 18 for instance, you can see that the LCMS Fake3d

12   function will receive different input and two of those input

13   are the range data PrangeZ and also the intensity data that

14   will be Pintensity.

01:27PM 15   Q.   And this Exhibit 517 is an excerpt from r8320, the same

16   version of code we just looked at; right?

17   A.   Yes, from 2014.

18   Q.   And do you understand that Tetra Tech's expert contends

19   that your 2014 Fake3D image is different than the Fake3D

01:27PM 20   image in your later versions of software.

21   A.   Yes, I understand.

22   Q.   Is that correct?

23   A.   No, that's not correct.

24   Q.   Now, do you understand Dr. Morellas points to the

01:27PM 25   GetPosition function?

118

1    A.   Yes.

2    Q.   And he says that shows Fake3d does not use any range

3    data.

4    A.   Yes, but he's wrong.  If you look at the definition of

01:28PM 5    the GetPosition function.

6    Q.   If we can go to page 2 line 66.

7    A.   Yes.  You can see that the GetPosition function actually

8    returns at 3D points and the third coordinate of the point is

9    the range data.  So that means that the Fake3D function from

01:28PM 10   2014 was also using the range elevation data.

11   Q.   And what does that show in basic English?

12   A.   Well, it shows that Fake3D from 2014 is the same

13   algorithm that we use now today.  It uses both intensity and

14   range.

01:28PM 15   Q.   But how does it use the range?

16   A.   It uses the range to determine the orientation of the

17   surface and the orientation of the surface is compared to the

18   orientation of an artificial lighting source.  So this is how

19   we use the range data in the Fake3D version of 2014.

01:29PM 20   Q.   Now, you just mentioned that something about using

21   Fake3D today.  Does Pavemetrics use Fake3D today in its

22   source code?

23   A.   No, not any more.

24   Q.   We'll talk about that in a moment, but I wanted to

01:29PM 25   clarify that for the record.

119

1         What about the LCMS for road inspection that you

2    sold to Tetra Tech?  Did it generate Fake3D images also?

3    A.   Uh, yes.  In 2012 for the system that they purchased

4    from us, it has the Fake3D function.

01:29PM 5    Q.   And how would Tetra Tech have known that?

6    A.   Well, when they start the software, the main processing

7    software, the user has different options to display a

8    different image type and Fake3D is one of these image type.

9    Q.   Those are the four image types:  Intensity, range,

01:30PM 10   rectified range, 3D?

11   A.   Yes.  The software says 3D, but in the source code it's

12   related to Fake3D.

13   Q.   Okay.  We need to shift a little bit and talk about the

14   '557 patent.  That's a different algorithm; right?

01:30PM 15   A.   Yes.

16   Q.   Okay.  Let's look at Trial Exhibit 508.  This is the

17   exhibit we looked at earlier; right on r8320?

18   A.   Yes.

19   Q.   And you understand that Tetra Tech accuses Pavemetrics

01:30PM 20   of inducing AID to infringe Claim 8 of the '557 patent that

21   talked about a method for detecting cracks on ties.

22   A.   Yes, that's correct.

23   Q.   Now, did Pavemetrics develop software that detected

24   cracks on ties for the UML Project?

01:31PM 25   A.   Yes.  In 2013 we wrote the paper that was presented at

120

1    TRB in 2014.  TRB is Transportation Research Board.  And in

2    that paper we were presenting the results of an algorithm

3    that we had developed for detecting cracks on wooden ties.

4    Q.   Go to page 86 of Exhibit 508.  And what's shown on

01:31PM 5    pages 86 to 89 of Exhibit 508?

6    A.   Well, this is the algorithm that was developed for

7    detecting cracks on wooden ties.

8    Q.   And now were the results of the UML Project ever

9    published?

01:31PM 10   A.   Yes, they were published at TRB in 2014.

11   Q.   Now, I'd like to shift gears and talk about

12   Pavemetrics's development of the software after the UML

13   Project so after the publication of the UML TRB 2014 paper.

14        Did you continue developing your software after

01:32PM 15   that project?

16   A.   Yes.  In 2015 we hired a new software developer that was

17   Mr. Nguyen and his job was to develop the algorithms for the

18   rail inspection system.

19   Q.   And how has the LRAIL software changed since the 2014

01:32PM 20   paper?

21   A.   Uh, it changes a lot.  The biggest change, uh, after

22   2014 is that we started using AI technique, uh, using neural

23   networks for detecting, uh, the railway track bed features.

24   Q.   And why did Pavemetrics start using AI instead of the

01:32PM 25   traditional image processing techniques that it published in

**EXHIBIT 4**

**-151-**

---

121

1    the TRB 2014 paper?

2    A.   Well, the AI algorithms were much more faster than the

3    traditional algorithm that we were using before, and the new

4    speed that we were getting was allowing us to use, uh, to

01:33PM 5    develop new application, for instance, for near real time

6    application.

7    Q.   And what is near real time application or near real time

8    processing?

9    A.   Near real time processing means that we collect the data

01:33PM 10   at the same time as we process the data.  So the acquisition

11   computer and the processing computers are both in the same

12   vehicle.  This is an application that we will use typically

13   for a boxcar.

14   Q.   And how fast can it move?

01:33PM 15   A.   60 miles per hour.

16   Q.   And what allows the LRAIL system on a boxcar to go so

17   fast?

18   A.   Well, one of the advantage with the neural network is

19   that it can perform a huge amount of computation in parallel

01:33PM 20   meaning at the same time and so that makes them very fast for

21   processing the data.  And another factor that makes them very

22   fast is that they can also skip pixels in the image so they

23   don't need to analyze the complete image.

24   Q.   Okay.  So neural network performs calculations in

01:34PM 25   parallel not in sequence.  Did I understand that?

---

122

1    A.   That's correct.

2    Q.   And that's different than the traditional techniques?

3    A.   Yes.

4    Q.   Okay.  And how -- are there other ways that the neural

01:34PM 5    network differs from the traditional processing techniques?

6    A.   Well, they are also much easier to do with the tradition

7    technique, the software developer has to write all the steps

8    of the algorithm one after the other.  With neural network

9    you don't need to do this.  Just present an image to the

01:34PM 10   neural network and it will detect automatically the features

11   of interest.

12   Q.   Now, did Pavemetrics develop its own neural network?

13   A.   No, we use neural networks that are available in the

14   public domain.

01:34PM 15   Q.   And can you tell us in general how the neural network

16   works and how it's trained?

17   A.   So the first thing you need to do if you want to use a

18   neural network is that you need to train it.  So you will

19   present to the neural network thousands of different images

01:35PM 20   for the object of interest.  Eventually, the neural network

21   will converge, it will be trained.  And when the neural

22   network is trained, you can present to the neural network a

23   new image that it has never seen in the past and it will be

24   able to detect the features.

01:35PM 25   Q.   And what tools does Pavemetrics use for implementing its

---

123

1    neural network into LRAIL?

2    A.   So we use the Tensor Flow library.  It's an open source

3    library that is available on the Internet for free.  It was

4    created by Google in 2015.

01:35PM 5    Q.   Okay.  So you use Google's Tensor Flow library.

6    A.   That is correct.

7    Q.   And that's available online.

8    A.   Yes.

9    Q.   You didn't invent that.

01:36PM 10   A.   No.

11   Q.   And Google published it in 2015?

12   A.   Well, the library was compiled in 2015 approximately,

13   yes.

14   Q.   Now, what type of neural network does LRAIL use?

01:36PM 15   A.   The type of neural network that we use are convolution

16   neural networks.  So a convolution neural network has several

17   layers.  We also call them Deep Neural Network.  The first

18   layers of the neural network will perform a convolution on

19   the image and the last layers will do the detection of the

01:36PM 20   features.

21   Q.   Okay.  And what is a convolution?

22   A.   A convolution is a series of calculations that are

23   applied to an image for modifying the image.

24   Q.   And how are the convolutional filters applied over the

01:36PM 25   image?

---

124

1    A.   Well, a good thing with the neural network is that it

2    can do a lot of computation in parallel so. . .

3    Q.   This is in the parallel thing again; right?

4    A.   Right.

01:37PM 5    Q.   And I believe you also mentioned that it skips every

6    other pixel?

7    A.   That is correct.

8    Q.   And why does it do that?

9    A.   Because in skipping pixels, you can get the results

01:37PM 10   faster so this is why we can use the neural networks for our

11   near real time application because they are very fast due to

12   their implementation.

13   Q.   So the convolutional filters are not applied to the

14   image sequentially or completely.

01:37PM 15   A.   No.

16   Q.   Why not?

17          MR. PARKER:  Objection, Your Honor.  Calls for

18   expert testimony.

19          THE COURT:  I think he can answer to his

01:37PM 20   understanding of the code.  You can ask him that.

21   BY MS. LEA:

22   Q.   Okay.  So based upon your understanding of the way your

23   neural network works, um, are the filters applied

24   sequentially or completely to the image?

01:37PM 25   A.   No, they are not.

---

**EXHIBIT 4**

**-152-**

125

1    Q.   Why not?

2    A.   Because the neural network is a big structure.  The

3    computation can be done in parallel.  First instance, the

4    firstly type of neural network that we use are depth wise

01:38PM 5    convolution neural network.  So for that specific type of

6    convolution neural network, the filters are applied in

7    parallel to the three channel of the input image.

8    Q.   Okay.  So are the filters in Pavemetrics's neural

9    network flexible in size?

01:38PM 10   A.   No.  Their size is fixed.

11   Q.   Fixed.  Doesn't change?

12   A.   Doesn't change.

13   Q.   Okay.  All right.  Let's talk about LRAIL software.

14   What software is needed to process data collected by the

01:38PM 15   LRAIL system?

16   A.   There are different pieces of software that are needed.

17   Uh, we need a configuration file.  We need the object code.

18   We need neural networks that are trained on specific image

19   type and we also need a license file.

01:38PM 20   Q.   Okay.  What is a configuration file?

21   A.   A configuration file is a text file that a user can use

22   to rewrite some processing parameters in the object code

23   while the object code is executed in memory.

24   Q.   Okay.  And what's the object code?

01:39PM 25   A.   So the object code is what you get when you compile the

UNITED STATES DISTRICT COURT

126

1    source code.  So the programmer will write all the lines in

2    the source code, you will then use a compiler, and the

3    results of the compilation will be the object code.

4    Q.   Okay.  Is that like what we think of as software?

01:39PM 5    A.   The object code is actually the program that is running

6    on the computer.

7    Q.   And how does Pavemetrics organize its source code?

8    A.   So as I said earlier, our source code is saved in a

9    repository.  We have more than one million lines of source

01:39PM 10   code and the repository allows us to keep track of the

11   changes over time.

12   Q.   And is Pavemetrics continuing to develop new code?

13   A.   Yes, every day.  We now add a team of 10 to 15 software

14   developers and their job is to develop new code.  This is

01:40PM 15   what they do all day.  They will improve the existing

16   features of our library, but they will also test new ideas

17   using what we call R and D source code.

18   Q.   How does Pavemetrics handle R and D source code?

19   A.   There are different ways to do this, but if you want to

01:40PM 20   test something that is very easy to implement, we will

21   typically implement the R and D source code directly into our

22   main source code, but the software developer will protect the

23   R and D source code with confidential parameters such that

24   anyone else than him can use the R and D source code.

01:40PM 25   Q.   And why do you write the R and D source code into the

UNITED STATES DISTRICT COURT

127

1    same repository as your source code that you compile software

2    from?

3    A.   Because this is the easiest way to do if you want to do

4    a very simple test.

01:41PM 5    Q.   And is it easy to protect access to that R and D code?

6    A.   Yes, using, uh, the configuration file that we talked

7    earlier, uh, the programmer can define confidential

8    parameters.  So in that way that means that the users cannot

9    activate the R and D source code because they are not aware

01:41PM 10   of the confidential parameter.  Confidential parameter is not

11   documented in our software manual.

12   Q.   So how does Pavemetrics' programmers access the R and D

13   features in the code?

14   A.   Well, we are the only one to have access to the source

01:41PM 15   code.  We don't send the source code to the customers.

16   Q.   Now, you had said that the third software needed is a

17   neural network trained on an input image.  Why do you a

18   neural network trained on the input image type?

19   A.   Well, because the neural network are specialized to

01:41PM 20   recognize objects only for the image type that they have seen

21   in the past.  So if you train a neural network to detect

22   objects on intensity image, for instance, and then you

23   present to the neural network the range image, you will not

24   be able to detect any features because it has never seen that

01:42PM 25   type of image in the past.

UNITED STATES DISTRICT COURT

128

1    Q.   And does Pavemetrics train the LRAIL neural network?

2    A.   Yes.

3    Q.   And what is the result of training LRAIL's neural

4    network?

01:42PM 5    A.   The -- the learning defines the neural network's filter.

6    Q.   And was LRAIL's neural network trained using LRAIL

7    hardware or different hardware?

8    A.   It's a different hardware.  The LRAIL, uh, neural

9    network are trained in Canada on our processing computers.

01:42PM 10   Q.   And was LRAIL's neural network trained using software

11   that is included on LRAIL going to customers or on using

12   different software?

13   A.   It's a different software that we have at the office.

14   We do not send the software that trains the neural network to

01:43PM 15   customer.

16   Q.   Okay.  So where does Pavemetrics train its neural

17   network?

18   A.   At our office in Canada.

19   Q.   Okay.  So if I follow this, first, Pavemetrics trains

01:43PM 20   the neural network in Canada on different hardware and

21   different software; is that right?

22   A.   Yes.

23   Q.   And then LRAIL is sent to a customer that runs the

24   software that's different and on different hardware; is that

01:43PM 25   right?

UNITED STATES DISTRICT COURT

**EXHIBIT 4**
**-153-**

129

1    A.   That's correct.

2    Q.   So training is different than using.

3    A.   Yes.  The training software is not part of the LRAIL

4    software.  It's a software that is running on our computer in

5    Canada.

01:43PM 6    Q.   All right.  Does LRAIL redefine its filters after they

7    were pre-defined during training in Canada?

8    A.   No.  Once the neural networks are trained, the filters

9    are fixed and they never change.

01:44PM 10   Q.   And that happens before you ship the unit; right?

11   A.   Right.

12   Q.   And the fourth software piece is the license file.

13        What is that?

14   A.   So, uh, the software is licensed to be used only on a

01:44PM 15   specific pair of sensors that were purchased by the customer.

16   So the license file allows us to block the software to be

17   used on other pair of sensors.

18   Q.   Do you understand that Tetra Tech has accused four of

19   Pavemetrics sales as infringing?

01:44PM 20   A.   Yes.

21   Q.   And what is your role in LRAIL sales?

22   A.   I'm not involved in that business development on the

23   sales side.  So my role is to make sure that if a customer

24   buys a system from us, he will get the good software with a

01:44PM 25   valid license file and that he also receives all the

UNITED STATES DISTRICT COURT

130

1    technical support that he needs.

2    Q.   And in general what software version is included with

3    each sale?

4    A.   So it can take several months before the customer is

01:45PM 5    actually ready to use the sensors because they need to be

6    mounted on a vehicle.  This is not something that can be done

7    only in a few week.  So usually we will send them the latest

8    version that is available when they are ready to actually use

9    the equipment.

01:45PM 10   Q.   So it's common to send the hardware before software.

11   A.   It happens all the time.

12   Q.   And do you know, do you have personal knowledge of which

13   software versions were provided and licensed for each sale?

14   A.   Yes.

01:45PM 15   Q.   And do you understand that Tetra Tech claims that

16   Pavemetrics' sales to CSX infringed the '293 patent?

17   A.   Yes.

18   Q.   And when was the processing computer for Sales 2, 3 and

19   4 shipped to CSX?

01:46PM 20   A.   That was in August 2021.

21   Q.   And did the processing computer for Sales 2, 3 and 4

22   have software on it when it was shipped to CSX?

23   A.   No.

24   Q.   And was software provided to and licensed to CSX as part

01:46PM 25   of Sales 2 and 3?

UNITED STATES DISTRICT COURT

131

1    A.   Yes, we provided them with a software version 4.80 in

2    December 2021.

3    Q.   And do you understand that Tetra Tech contends that

4    Version 10323 delivered to CSX back in October 2020 was

01:46PM 5    available for CSX to use with Sales 2, 3 and 4?

6    A.   Yes, I understand.

7    Q.   Is that accurate?

8    A.   That is not possible.  Uh, first of all, the software

9    that sent to CSX was licensed only for their hi-rail vehicle

01:46PM 10   and also the software that was sent at that time was a stand

11   alone software that can be used on a desktop or a lap top in

12   their office.  The boxcar for Sale 2 and 3 and 4, the sensors

13   are mounted in a boxcar with multiple computers for it's a

14   different software interface.  Version r10323 wouldn't be

01:47PM 15   compatible with the boxcars.

16   Q.   And you referred to a hi-rail truck.  Is that Sale A?

17   A.   Sale B was a hi-rail truck.

18   Q.   Okay.  Let's look at software.  Let's turn to

19   Exhibit 619.  What is Exhibit 619?

01:47PM 20   A.   So this is an excerpt from our source code

21   Version 4.80.2.  This is the source code, the software that

22   was delivered to CSX in December 2021.

23   Q.   For Sales 2 and 3; right?

24   A.   For Sale 2 and 3, yeah.

01:48PM 25   Q.   Let's look at lines 65 to 68 on the top of the second

UNITED STATES DISTRICT COURT

132

1    page.  There we go.  Okay.  What did these lines mean?

2    A.   So these are the, uh, the parameters that will define

3    what image type will be used by the neural network for the

4    detection of different railway features.  In that case there

01:48PM 5    are four neural networks.  One is for the detection of the

6    fastener, uh, the tie plate, the sides and the joint bars.

7    Q.   And what image type will the neural network use for each

8    of these, um, in each of these cases?

9    A.   So by default the neural network use a range image.

01:48PM 10   Q.   Okay.  And a range image is an elevation image?

11   A.   That's correct.

12   Q.   And how do you know that the neural network will use a

13   range image?

14   A.   If you look at line 65, for instance, there's a comment.

01:49PM 15   It says 0: Range so that the means that the value zero is

16   assigned to the range image.  And before that comment, you

17   can see that the source code is actually using the value

18   zero.

19   Q.   So the first zero in the box that's the one that's

01:49PM 20   actually telling the source code what to image use?

21   A.   That's correct.

22   Q.   And everything after semicolon slash slash, those are

23   comments so that your programmers know what's happening?

24   A.   Exactly.

01:49PM 25   Q.   Okay.  And so it defines zero to be range; is that

UNITED STATES DISTRICT COURT

**EXHIBIT 4**

**-154-**

133

1  right?

2  A.  That's correct.

3  Q.  And then after some other definitions, there's a comment

4  the default is using normalized range image as the input for

01:49PM  5  neural network.  And NN is neural network; right?

6  A.  That's correct.

7  Q.  And why is this comment here?

8  A.  It indicates to the software developer that the default

9  value for the input of the neural network is the range image.

01:50PM  10  Q.  And why does Pavemetrics use a range image rather than

11  intensity image or an image that combines range and intensity

12  in the neural network here?

13  A.  So we try different image type and the range image is

14  what works the best for our application.

01:50PM  15  Q.  Now, I notice in the comment it says 1: not yet

16  assigned.  What does that mean?

17  A.  So for versions previous to this one, uh, we tried -- we

18  were using the Fake3D image as an input for the neural

19  network.  This is something that we tested in 2020 and 2021,

01:50PM  20  but during summer 2021, we stopped using the Fake3D image as

21  an input because we realized that it was too slow for our

22  near real time application so we just decided to remove it

23  from the source code.

24  Q.  And did removing it have anything to do with this

01:51PM  25  litigation?

134

1  A.  Well, we also knew that Tetra Tech was saying that the

2  Fake3d was a 3D elevation map.  So in order to avoid any

3  dispute, we just decided to remove it from the source code.

4  Q.  So did any of the CSX Sales 2 or 3 or 4 include Fake3d

01:51PM  5  in the source code for identifying features?

6  A.  No.

7  Q.  Now, Dr. Morellas testified that Fake3D image is used as

8  an input in Sales 2, 3 and 4; is that correct?

9  A.  No.

01:51PM  10  Q.  Okay.  And -- and you know that because?

11  A.  Because it's not available any more in the source code.

12  Q.  And if we can put the exhibit back up and let's talk

13  about the comment also has 2: mix image as the input for NN

14  neural network.  What is that comment referring to?

01:52PM  15  A.  So in summer 2021, we had a student intern that was

16  working with us and he had the idea to try combining

17  different type of sensors together intensity, range, edge and

18  different sensors.  One our software developer integrate some

19  R and D source code in the main software such as we can test

01:52PM  20  the R and D mixed image.  And we realized very soon that in

21  fact it was not working.  We near succeeded to train a neural

22  network using a mixed image.

23  Q.  And what would need to be done to enable the neural

24  network to analyzed a mixed image instead of the default

01:52PM  25  range image?

135

1  A.  So you could rewrite the source code and recompile the

2  object code or you could use a configuration file that would

3  rewrite the default value in the object code.

4  Q.  And would anything else need to be done to enable the

01:53PM  5  neural network to analyze a mixed image instead of the

6  default range image?

7  A.  Yes.  You would also have to actually have a neural

8  network that trained on mixed image and we never succeeded

9  to train such a network.

01:53PM  10  Q.  And did Pavemetrics ever send CSX a configuration file

11  for Sales 2, 3 and 4?

12  A.  Oh, yes.

13  Q.  And did that configuration file in any way have anything

14  to do with mixed image?

01:53PM  15  A.  No.

16  Q.  Okay.  And did Pavemetrics every send CSX a neural

17  network trained on mixed images?

18  A.  No.  Such a neural network doesn't exist.

19  Q.  And with CSX have even known about the R and D mixed

01:54PM  20  image?

21  A.  No.

22  Q.  And, um, did -- was the R and D mixed image available to

23  CSX for Sales 2, 3 or 4?

24  A.  No.

01:54PM  25  Q.  In December 2021 what software version was provided for

136

1  Sale 4 to CSX?

2  A.  We didn't provide any software version for Sale 4.

3  Q.  And did Pavemetrics make any further other changes to

4  its source code in December 2021?

01:54PM  5  A.  Yes.  In December 2021, we removed the mixed image from

6  the source code.

7  Q.  So it's not even in there any more as a test image.

8  A.  No.

9  Q.  Now, if you could turn in your binder, we won't put it

01:54PM  10  up just yet, Exhibit 552-1.  What is Exhibit 552-1?

11  A.  Well, it's a piece of software from December 2021.  It's

12  a piece of software, uh, and it shows on page 2 that the only

13  input --

14  THE COURT:  Sorry.  Before you testify about what

01:55PM  15  it is or what it shows, you might want to put this in

16  evidence.

17  BY MS. LEA:

18  Q.  Okay.  So you do recognize the document?

19  A.  Yes.

01:55PM  20  MS. LEA:  I would like to move it into evidence.

21  THE COURT:  Any objection, Counsel?

22  MR. PARKER:  No objection.

23  THE COURT:  552-1 is in evidence and certainly the

24  witness can describe it.

01:55PM  25  (Exhibit 552-1 admitted.)

**EXHIBIT 4**

**-155-**

---

137

MS. LEA:  Okay.

Q.  So you were telling us that 552-1 is a version of your source code from December 2021 after mixed image was removed; correct?

01:56PM A.  That is correct.

Q.  Okay.  And let's just look where can we go to see the --

A.  That would be on page 2, yes, line 65.  You can see now that, for instance, for the faster neural network, the only image type that can be input is the range data.  It's the same thing for the other neural networks.

Q.  And why did Pavemetrics remove the mixed image from the code?

A.  It was never used.  Uh, we never succeeded to train a neural network on mix image so we just decided to remove it from the code.

Q.  Okay.  And how long did it take Pavemetrics to remove the R and D mix image from the code?

A.  It was only a few lines of source code to delete so it took less than half a day.

01:56PM Q.  And who deleted it?

A.  Mr. Nguyen.

Q.  And what is Mr. Nguyen's salary for half a day?

A.  $200.

Q.  Now, let's talk about the '557 patent.  Do you understand that Tetra Tech contends that AID has used LRAIL

---

138

Sale 1 to infringe the method Claim 8 in the '557 patent?

A.  Yes.

Q.  Okay.  And which software versions were provided to AID as part of Sale 1?

01:57PM A.  Well, for Sale 1 at first we provided them with software version 4.75 and that version was later updated to 4.78.

Q.  And why did AID receive two versions?

A.  Well, they found a big in 4.75 so we fixed the bug and we sent a new version and that was 4.78.

01:57PM Q.  And if we could turn to the Exhibit 618.

Do you recognize Exhibit 618?

A.  Yes, this is an excerpt from our source code for Version 4.78.

Q.  And 4.78 we're using that as short form for Version 4.78.6.0; right?

A.  That is correct.

Q.  Did 4.78 have the ability to detect cracks in wooden ties?

A.  Yes.

01:58PM Q.  Go to page 18, please.  And do you see Line 38621?

A.  Yes.

Q.  And what is on that line?

A.  So this is the beginning of the function detect wooden tie cracks which will actually detect the cracks on the wooden ties.

---

139

Q.  And did you hear Dr. Morellas testify that your detect wooden tie crack function inputs rail base coordinates to detect cracks?

A.  Yes.

01:58PM Q.  Is that correct?

A.  No, that's not correct.

Q.  And how do you know that?

A.  Well, if you look --

MR. PARKER:  Objection.

01:59PM Your Honor, can we have a brief side bar?

THE COURT:  What's the objection you're making?

MR. PARKER:  Again, calls for expert testimony.  We're talking specifically about claim language inherent to the accused code.

01:59PM MS. LEA:  He's testifying about his code.

THE COURT:  Can you ask the question again, Counsel?

BY MS. LEA:

Q.  Does your code input rail base coordinates into the detect wooden tie crack function?

A.  No.  If you look at the list of inputs, there are quite a lot of inputs, but none of them is related to a rail base edge.  And the reason why that we actually don't need the position of the rail base edge when we want to detect cracks on wooden ties.  It's not relevant to that function so we are

---

140

not using it in that function.

Q.  And did you hear Dr. Morellas testify that your detect tie crack function inputs a tie bounding box to detect cracks?

02:00PM A.  Yes.

Q.  Is that correct?

A.  No, that is not correct.  The input that we use regarding the detect ties is the contour of the tie.  So even though the ties are typically rectangular when they are brand new, uh, they get broken over time so some pieces of the ties will be missing and there can also be ballast on the ties.  So our function will input the real contour of the tie that is detected and this is why we use a mask and not a bounding box.

02:00PM Q.  Okay.  Can you remind the jury what ballast is?

A.  The ballast is the big rocks that are under the ties.  Sometimes they move and they can get over the ties.  So in that case the algorithm that will detect the tie will not get the full contour of the tie because it will not be visible from our images so we do not detect a perfect rectangle.

Q.  And is the detect wooden tie crack function still in the LRAIL software today?

A.  No, it has been replaced with AI-based algorithm.  So we have neural network now that can detect cracks on wooden ties.

---

**EXHIBIT 4**
**-156-**

141

1    Q.   Okay.  Shifting gears away from source code, were you
2    aware that Pavemetrics received a letter on January 5, 2021
3    from Tetra Tech's lawyers accusing Pavemetrics of infringing
4    the '293 patent?
02:01PM  5    A.   Yes, I was aware.
6    Q.   And what was your reaction to receiving that letter from
7    their lawyers?
8    A.   I was very shocked.  Uh, Tetra Tech was a good customer
9    for us.  I was personally giving them technical support on
02:02PM 10   their two road inspection systems.  I was the main contact
11   with their technical team so it was a real surprise for us.
12   Q.   And did you form any -- what did you do after you
13   received the letter?
14   A.   So I was on vacation at that time.  Uh, a few days after
02:02PM 15   we received the letter, my colleagues called me.  Uh, they
16   sent me by email a copy of the patent.  I reviewed the
17   patent.  I was very well aware of how our source code is
18   working and we were confident that we were not infringing the
19   '293 patent.
02:02PM 20        And one reason is that we do not combine the
21   intensity and the range data to form a 3D elevation map that
22   was one reason.  We also knew that we had sold a system to
23   UML in 2012 which was three years before the patent was filed
24   and all our algorithms were now using convolution neural
02:03PM 25   network or neural networks and there's no mention of any AI

UNITED STATES DISTRICT COURT

142

1    or neural networks in the patent.
2    Q.   Okay.  So just gave me three reasons.  So the first
3    reason you said that LRAIL does not combine intensity and
4    elevation data to form a 3D elevation map.  I'm a little
02:03PM  5    confused.  So how -- how is that different than Fake3D?
6    A.   Well, for me a 3D elevation map would be something that
7    you could look in a 3D viewer.  The Fake3D image in my
8    opinion, it's an intensity image that you add shadows.
9    Q.   Does it have any elevation data in it?
02:03PM 10   A.   No.
11   Q.   And you also mentioned that you sold your system back in
12   2012; is that right?
13   A.   Right.
14   Q.   And that would be prior art to these patents?
02:03PM 15   A.   Yes, that's my understanding.
16   Q.   And as a result, what did that make you believe about
17   these patents?
18   A.   Well, as a result we thought that these patents were
19   invalid.
02:04PM 20   Q.   And I believe your third reason was the patent mentions
21   nothing about neural networks or AI; is that right?
22   A.   That's correct.
23   Q.   And have you maintained these beliefs to this day?
24   A.   Yes.
02:04PM 25   Q.   And when did you learn about the '557 patent?

UNITED STATES DISTRICT COURT

143

1    A.   Uh, in summer 2021.
2    Q.   Okay.  And how did you learn about that patent?
3    A.   Uh, we got a letter from Finnegan.
4    Q.   Okay.  So after the suit, after you filed the suit, you
02:04PM  5    filed the suit?
6    A.   Right.
7    Q.   And then -- that was back in February 2021?
8    A.   That is correct.
9    Q.   Then in summer of 2021 they sent another?
02:04PM 10   A.   That's correct.
11   Q.   Identifying the '557 patent.
12   A.   Yes.
13   Q.   And was that before or after you sold Sale 1 to AID?
14   A.   That was after.
02:04PM 15   Q.   It was before or after you delivered Sale 1 to AID?
16   A.   It was after.
17   Q.   Okay.  Did you ever believe that you infringed the '557
18   patent?
19   A.   No.
02:05PM 20   Q.   And why not?
21   A.   Because I'm well aware of how the crack detection
22   algorithms work in our software and it's quite different to
23   what is described in the patent.
24        MS. LEA:  Thank you.  I will pass the witness.
02:05PM 25        THE COURT:  Okay.  Any cross-examination, Counsel?

UNITED STATES DISTRICT COURT

144

1         MR. CERULLI:  Yes, thank you, Your Honor.
2             CROSS-EXAMINATION
3    BY MR. CERULLI:
4    Q.   Good afternoon, Dr. Hebert.
02:05PM  5    A.   Good afternoon.
6    Q.   Dr. Hebert, you're not a lawyer; correct?
7    A.   Correct.
8    Q.   And you're not trained in reading patents; is that
9    right?
02:06PM 10   A.   That's right.
11   Q.   Um, and you reviewed the two patents at issue in this
12   case; is that right?
13   A.   That's right.
14   Q.   Um, and after you reviewed these patents, you didn't
02:06PM 15   have any conclusions; correct?
16   A.   After I reviewed these patents, I was convinced that we
17   were not infringing these two patents.
18        MR. CERULLI:  Your Honor, I would like to read in,
19   it's part of the depo transcript, it's page 25 line 23.
02:06PM 20        THE COURT:  Page 25.
21        MR. CERULLI:  Line 23 to page 26 line 4.
22        THE COURT:  Okay.  You can read that.
23   BY MR. CERULLI:
24   Q.   So Dr. Hebert, you were deposed in January of 2022?
02:07PM 25   A.   That's correct.

UNITED STATES DISTRICT COURT

**EXHIBIT 4**
**-157-**

---

**145**

1    Q.   And I'm gonna read lines from your testimony here.

2         "Q.   Did you analyze the patents prior to retaining

3    counsel?

4         "A.   We looked at different claims, yes.

02:07PM 5      "Q.   And what was your conclusion when you looked

6    at the patents before retaining counsel?

7         "A.   My conclusion personally?

8         "Q.   Yes.

9         "A.   I'm not, I'm not trained in reading patents.

02:07PM 10   I could just have opinions.  I didn't have any conclusion

11   myself."

12        Was that your testimony on January 2022?

13   A.   Yes.

14   Q.   So after reviewing the patents, you didn't have any

02:07PM 15   conclusions yourself.

16   A.   Myself, no.  I meant my colleagues John and Richard and

17   we discussed together.  And so we were convinced all together

18   we were not infringing the patent.

19   Q.   So they had opinions, but you didn't have any conclusion

02:08PM 20   yourself.

21   A.   My opinion was that we were not infringing the patent.

22   This was my opinion.

23   Q.   That's inconsistent with your testimony from January?

24        MS. LEA:  Objection, Your Honor.

02:08PM 25        THE COURT:  You can answer.

UNITED STATES DISTRICT COURT

---

**146**

1         THE WITNESS:  My opinion was that we were not

2    infringing the patent.

3    BY MR. CERULLI:

4    Q.   Now, I'd like to talk little bit about the 2012 sale to

02:08PM 5    UML.  So Pavemetrics sold its LCMS to University of

6    Massachusetts Lowell in 2012; is that right?

7    A.   Right.

8    Q.   And this sale was part of a research project with the

9    University of Massachusetts?

02:08PM 10   A.   That is correct.

11   Q.   And the sale included the LCMS sensors; is that right?

12   A.   Right.

13   Q.   And at that time Pavemetrics didn't deliver a processing

14   software as part of that sale; is that right?

02:09PM 15   A.   At that time we didn't deliver the processing software.

16   We had a contract with UML for delivering algorithms for rail

17   inspection.

18   Q.   Right.  So in 2012, again, you did not deliver a

19   processing software; correct?

02:09PM 20   A.   That we correct.

21   Q.   Okay.  And so you began developing algorithms as part of

22   this research project; is that right?

23   A.   That's right.

24   Q.   And as we saw earlier, um, Pavemetrics is pointing to a

02:09PM 25   2014 version of source code as prior art to Tetra Tech's

UNITED STATES DISTRICT COURT

---

**147**

1    patents; is that right?

2    A.   That's right.

3    Q.   Um, and this is referred to as Version r8320; is that

4    right?

02:09PM 5    A.   Right.

6    Q.   And that's dated May 2014; correct?

7    A.   That's correct.

8    Q.   So 2014 is two years after 2012; correct?

9    A.   That's correct.

02:10PM 10   Q.   So that 2014 source code couldn't possibly be part of

11   that sale that occurred in 2012?

12   A.   That's correct.

13   Q.   Now, Pavemetrics, you had mentioned that Pavemetrics

14   stores its source code in a repository; correct?

02:10PM 15   A.   Correct.

16   Q.   And just for clarification to the jury, a repository is

17   a database where you store different versions of code; is

18   that fair?

19   A.   Yes.

02:10PM 20   Q.   And you keep track of changes over the years; is that

21   right?

22   A.   That's right.

23   Q.   Now, this 2014 source code was stored in Pavemetrics'

24   repository; correct?

02:10PM 25   A.   Correct.

UNITED STATES DISTRICT COURT

---

**148**

1    Q.   And only Pavemetrics had access to the repository?

2    A.   Correct.

3    Q.   And Pavemetrics never published the 2014 source code

4    online; correct?

02:11PM 5    A.   That's correct.

6    Q.   And never disseminated it to the public?

7    A.   That's correct.

8    Q.   So only Pavemetrics and Pavemetrics alone had access to

9    that 2014 source code.

02:11PM 10   A.   That's correct.

11   Q.   Now, um, Pavemetrics doesn't have any records to support

12   that this 2014 version was actually used; correct?

13   A.   Yes, we have some records that it was actually used.

14   Q.   Okay.  And what are those records?

02:11PM 15   A.   Uh, just before that version was saved in the

16   repository, we sent an email with some results to UML and the

17   results were produced using that specific version.

18   Q.   And have we seen this email today?

19   A.   Sorry?

02:11PM 20   Q.   Have we seen this email today?

21   A.   Uh, no.

22   Q.   So it's not in evidence.

23   A.   It's not in evidence.

24   Q.   So other than this email that's not in evidence, you --

02:12PM 25   there's no other records to support that you used this 2014

UNITED STATES DISTRICT COURT

---

**EXHIBIT 4**

**-158-**

---

149

1  source code?

2  A.  So the UML Project was a research project with UML. So

3  there a lot of emails exchanged with UML and we were sending

4  them some results on our research and our progress.

02:12PM 5  Q.  But, again, we haven't seen any of these emails today;

6  correct?

7  A.  That's correct.

8  Q.  Now, I'd like to pull up Exhibit 508.  And this is the

9  2014 source code we were discussing?

02:12PM 10  A.  Yes.

11  Q.  And the majority of this file includes a source coding

12  format known as C++; correct?

13  A.  That's correct.

14  Q.  Zoom in on the top line .cp at the kind of first line

02:13PM 15  there, that tells you it's C++ code; correct?

16  A.  Yes.

17  Q.  Now, if we skip to page 86, sort of buried within the

18  C++ code, we have and counsel showed this, it's a mat lab

19  script; correct?

02:13PM 20  A.  That is correct.

21  Q.  And again zoom in on the top line it ends in .m and that

22  tells you it's mat lab; correct?

23  A.  That's correct.

24  Q.  And mat lab's a different source code format than C++;

02:13PM 25  correct?

---

150

1  A.  Correct.

2  Q.  And you notice there is no date on source code file;

3  correct?

4  A.  That's correct.

02:13PM 5  Q.  And you personally don't know the exact date of this mat

6  lab file?

7  A.  I know that this mat lab was created in 2013, but I

8  don't know the exact date.

9  Q.  But you don't have any records to support that.

02:13PM 10  A.  No.

11  Q.  And nothing in Pavemetrics's repository would tell you

12  the date of this mat lab script.

13  A.  No.

14  Q.  And that's because Pavemetrics doesn't even keep this

02:14PM 15  mat lab script in its repository?

16  A.  That's correct.

17  Q.  And, again, Pavemetrics never published this mat lab

18  script online; correct?

19  A.  Correct.

02:14PM 20  Q.  It never distributed it to the public?

21  A.  Oh, we published the results from that mat lab, that's

22  correct.

23  Q.  But the mat lab script itself was never published

24  online.

02:14PM 25  A.  No.

---

151

1  Q.  It was never published to, uh, the public.

2  A.  No.

3  Q.  Now, I'd like to fast forward to 2021.  Um, we were

4  talking earlier about the letter that Pavemetrics received

02:14PM 5  from Tetra Tech; correct, accusing them of infringement?

6  A.  Correct.

7  Q.  And we heard from Mr. Habel on Friday that Pavemetrics

8  conducted an analysis; correct?

9  A.  That's correct.

02:15PM 10  Q.  Mr. Habel testified that he was very confident that

11  Pavemetrics did not infringe; correct?

12  A.  Correct.

13  Q.  And Mr. Habel also mentioned that Pavemetrics was so

14  confident it didn't infringe that it brought lawsuit; is that

02:15PM 15  right?

16  A.  Correct.

17  Q.  I don't believe you were here for Mr. Laurent's

18  testimony, but I can represent to you he also believes

19  strongly you did not infringe.

02:15PM 20       As we discussed earlier, you also reviewed the

21  patents; correct?

22  A.  Correct.

23  Q.  And as you testified in January 2022, you did reach any

24  conclusions?

02:15PM 25  A.  I have opinions at that time.

---

152

1  Q.  Okay.  But you're not trained in patents?

2  A.  I can read a patent, but I'm not trained in patent law.

3  Q.  Mr. Habel has a telecommunication background; correct?

4  A.  Correct.

02:16PM 5  Q.  And you had testified earlier that you have a specialty

6  in neural networks; correct?

7  A.  In Computer Vision.

8  Q.  And if we could just pull up Exhibit 89.  So Exhibit 809

9  already in evidence is a series of emails.  And if we could

02:16PM 10  scroll down to the bottom, so these are emails between --

11  you're copied on these emails and you recognize Mr. Laurent,

12  Mr. Fox-Ivey, Mr. Talbot, yourself and Mr. Habel?

13  A.  Yes.

14  Q.  If you go to the line May 9, 2018 email and it starts

02:17PM 15  with BTW which stands for by the way, and I'm just gonna read

16  this, "by the way you might get arguments that DNNs can't be

17  patented in theory -- can be patented in theory."

18       Did I read that correctly?

19  A.  Yes.

02:17PM 20  Q.  And DNN stands for neural networks; correct?

21  A.  Deep neural networks.

22  Q.  Thank you.  If we can just zoom out, so nowhere if we

23  scrolled through the email, nowhere do you respond to

24  Mr. Laurent's comment.

02:17PM 25  A.  I think that this email was about a paper they wrote at

---

**EXHIBIT 4**
**-159-**

153

1   A.   a conference.  I don't think I was an author on that paper.

2   Q.   Fair to say you didn't chime in on this particular back

3   and forth?

4   A.   That's correct.

02:18PM 5   Q.   Now, several months after Pavemetrics brought suit, as

6   you discussed in your direct testimony, Pavemetrics removed

7   several of the accused functions from its source code; is

8   that right?

9   A.   That's right.

02:18PM 10   Q.   You testified yourself that Pavemetrics removed the code

11   because Tetra Tech was pointing to these features.

12   A.   It was one of the reasons.  The other reason is that the

13   code they were pointing to was not useful for our

14   application.  It was either too slow or it was not working.

02:18PM 15   Q.   So Doctor, it sounds like you yourself weren't very

16   confident that Pavemetrics was infringing.

17   A.   That is wrong.  As I said, the source code was not

18   working for us.  It took less than a day to remove the source

19   code so it was very easy to just remove the source code.

02:19PM 20   Q.   But you removed the code, didn't you, Doctor?

21   A.   We removed because we were not using.  There was no way

22   that we would need this code in the future.

23   Q.   And Pavemetrics was pointing to this as accused

24   functionalities; correct?

02:19PM 25   A.   Pavemetrics?

UNITED STATES DISTRICT COURT

154

1   Q.   Sorry.  Tetra Tech was pointing to this as accused

2   functionalities; correct?

3   A.   That's correct.

4   Q.   And you removed that code?

02:19PM 5   A.   That's correct.

6        MR. CERULLI:  No further questions.

7        THE COURT:  Any redirect, Counsel?

8        MS. LEA:  Yes.

9            REDIRECT EXAMINATION

02:19PM 10   BY MS. LEA:

11   Q.   Throughout the UML -- well, let me just ask you how long

12   did the UML Project last, what years?

13   A.   It was 2012, '13 and '14.

14   Q.   And you were developing algorithms during that project?

02:19PM 15   A.   I was supervising the software developers who were

16   writing the algorithm.

17   Q.   And is it your understanding that Pavemetrics shared

18   those algorithms with people at UML?

19   A.   We were discussing the content of these algorithms with

02:20PM 20   the people at UML.  There were several meetings and we were

21   explaining step-by-step what were the algorithms.

22   Q.   And did you send your programmers to those meetings?

23   A.   Yes.

24   Q.   And did they share details of the algorithms at those

02:20PM 25   meetings?

UNITED STATES DISTRICT COURT

155

1   A.   Yes, they present -- they did present and they were

2   sharing the different results of the algorithms that were

3   available when these meetings occurred.

4   Q.   And did people at Pavemetrics publish an article that

02:20PM 5   details the algorithm?

6   A.   Yes, we published a paper in 2014 at TRB conference.

7   Q.   And Dr. Hebert, is it your practice to chime in on

8   emails?

9   A.   No.

02:20PM 10   Q.   No?  Too busy writing code?

11   A.   Exactly.

12        MS. LEA:  Thank you.

13        THE COURT:  Any recross?

14        MR. CERULLI:  No, Your Honor.

02:20PM 15        THE COURT:  The witness is excused.

16        Please call your next.

17        MR. ZOVKO:  Your Honor, as its next witness

18   Pavemetrics calls Christian Tregellis.

19        THE CLERK:  Raise your right hand.

02:21PM 20            (Witness sworn.)

21        THE CLERK:  Please be seated.

22        Will you please state and spell your full name for

23   the record?

24        THE WITNESS:  Christian Dale Tregellis.

02:21PM 25   C-h-r-i-s-t-i-a-n middle name D-a-l-e last name

UNITED STATES DISTRICT COURT

156

1   T-r-e-g-e-l-l-i-s.

2        THE CLERK:  Thank you.

3            DIRECT EXAMINATION

4   BY MR. ZOVKO:

02:22PM 5   Q.   Good afternoon, Mr. Tregellis.

6        Where are you currently employed?

7   A.   I work for Hemming Morse.  I'm a partner at Hemming

8   Morse in our Los Angeles office.

9   Q.   What is your role at Hemming Morse?

02:22PM 10   A.   Uh, I lead a team and I perform financial accounting and

11   economic investigations sometimes in the contexts of legal

12   disputes, sometimes in other contexts.

13   Q.   What were you asked to do in this case?

14   A.   To do that kind of analysis.  To analyze financial

02:22PM 15   accounting and economic issues.  In the course of my career,

16   I tended to focus on damages and particularly intellectual

17   property damages and that's the work I did in this case.

18   Q.   Let's discuss your background.  Would you briefly

19   explain your education and employment relative this case?

02:22PM 20   A.   Sure.  I prepared some slides and thank you for pulling

21   up this one.  As I wrote here, I got an undergraduate degree

22   in Economics from Occidental College over in Eagle Rock.  And

23   then after working for what used to called First Interstate

24   Bank which is now part of Wells Fargo, I then went back to

02:23PM 25   graduate school and got an MBA in finance and accounting and

UNITED STATES DISTRICT COURT

EXHIBIT 4
-160-

157

1   graduated in March of 1993 so 29-and-a-half years ago or so.
2   Uh, and then I also have some professional credentials. I'm
3   a certified public accountant licensed in California and then
4   I have some credentials I listed there as well.
02:23PM 5   Q.   Have you been qualified to testify as an expert before
6   concerning financial matters?
7   A.   I have. I've testified in a little over 50 trials and
8   arbitrations.
9        MR. ZOVKO:  Your Honor, at this time Pavemetrics
02:23PM 10   offers Mr. Tregellis as an expert in intellectual property
11   damages.
12        THE COURT:  Any objection, Counsel?
13        MS. MATHEW:  No objections, Your Honor.
14        THE COURT:  The Court so recognizes the witness as
02:23PM 15   an expert and he can provide opinion testimony in the subject
16   areas.
17   BY MR. ZOVKO:
18   Q.   What did you do analyze to Mr. Schoettelkotte's opinions
19   who was Tetra Tech's expert witness on financial matters?
02:24PM 20   A.   I started by looking at his analysis and I put the
21   summary slide here on this page. I also wanted to look at
22   backup information so I looked at the documents, uh, that I
23   had, uh, several documents that had been produced by the
24   parties in this case. I read deposition testimony from
02:24PM 25   representatives of Pavemetrics, Tetra Tech, CSX, AID, um, an

158

1   independent contractor as well. So I looked at a lot of that
2   information.
3        I also did some research in the public domain. I
4   looked at Tetra Tech's financial statements as a publicly
02:24PM 5   traded company. I also spoke with Dr. Frakes, the technical
6   expert similar to Dr. Morellas. I spoke with the three
7   individuals from Pavemetrics who testified in the last day or
8   so, uh, and I think on Friday of last week. I attended the
9   trial today and last Friday. And I think I read the
02:25PM 10   testimony of Dr. Mesher from the first day. I think that
11   pretty much covers it.
12   Q.   Sounds like a lot of research. When doing your research
13   for this case, did you find any information on LRAIL and
14   3DTAS?
02:25PM 15   A.   I did. I looked up information about the history of
16   those. I found consistent with I think what the testimony
17   was today the LRAIL system had not -- really was an
18   adaptation of the LCMS system and then was originally
19   identified in late 2014 as the LRAIL system. And then I
02:25PM 20   think I saw also RailAI at a website on the Tetra Tech
21   website that showed up in 2021 and 3DTAS also started in
22   2021. I've seen mention of it going back to 2019, RailAI,
23   but like I said, I think the cite came up on the Tetra Tech
24   website in 2021.
02:26PM 25   Q.   So you didn't see anything about 3DTAS before 2021; is

159

1   that fair?
2   A.   I think that's right.
3   Q.   Based on your review of that information as a whole,
4   have you reached any opinions in this matter?
02:26PM 5   A.   I have and they relate to the damages analysis of
6   Mr. Schoettelkotte which I've summarized relating to lost
7   profits where he's identified for the three sales to CSX that
8   he believed that those would have become profits to Tetra
9   Tech in what we damages experts call the but for world. A
02:26PM 10   world in which Pavemetrics had not infringed any patents and
11   in this case for the CSX damages, that is the '293 patent.
12        So if you could advance the slide. I put on two
13   additions there. The '293 patent is what I understand from
14   Dr. Morellas is associated with the lost profits units to
02:27PM 15   CSX, and then you have the reasonable royalty of $250,000 for
16   the one unit sale to AID which was Sale No. 1 and that's
17   covered by the '557 patent I understand from Tetra Tech.
18   Q.   I think you may have said Dr. Morellas. You may have
19   meant Mr. Schoettelkotte. Do you have any disagreement with
02:27PM 20   Mr. Schoettelkotte's analysis and opinions?
21   A.   I did, although it wasn't a mistake. I was referring to
22   Dr. Morellas who had testified about where, uh, which patents
23   aligned with which sales as I understood. But yes, I do have
24   some areas of disagreement and they relate to the lost
02:27PM 25   profits analysis based on the idea that in the but for world,

160

1   those sales to CSX would have gone to Tetra Tech which is
2   something that I think the witnesses today have talked about,
3   and then I also have opinions about the reasonable royalty as
4   well.
02:27PM 5   Q.   Do you have an opinion on whether Pavemetrics has
6   infringed either of the patents in this suit?
7   A.   No, that's not my role. That's really their role. They
8   can consider all that information and the arguments by both
9   sides. I don't have an opinion on that. I've assumed
02:28PM 10   liability. I've assumed that Tetra Tech prevails for
11   purposes of my analysis on that question.
12   Q.   So if the jury were to find that Pavemetrics doesn't
13   infringe and/or the patents are invalid are your opinions
14   relevant at all?
02:28PM 15   A.   No.
16   Q.   Let's turn to Slide 3. What are you trying to explain
17   on Slide 3?
18   A.   I think the key issue I have with Mr. Schoettelkotte's
19   analysis is I think he ignored key evidence much of which
02:28PM 20   we've heard summarized today. And he in his lost profit
21   analysis and that's really what we're talking about here is
22   the lost profit piece first. He assume there is a two
23   supplier market and it really becomes a one supplier market
24   because according to Mr. Schoettelkotte, Pavemetrics would
02:29PM 25   not have been able to make any sale to CSX.

**EXHIBIT 4**

**-161-**

161

1    As he said, if you take Pavemetrics out of the
2    market, all of the sales would go to Tetra Tech, but I don't
3    think that's the right way of looking at it.  I think the
4    evidence indicates that if Pavemetrics were to not be able to
02:29PM 5   use the technology that Tetra Tech alleges is covered,
6    Fake3D, mix images, in that case Pavemetrics would have still
7    made those sales.  I think there's a great deal of evidence
8    that supports that idea and that's not something that
9    Mr. Schoettelkotte considered as possible.
02:29PM 10   So his two supplier theory I think ignores market
11   information and realities by assuming Fake3D and mix image
12   were useable and used.  I think while I'm not a technical
13   expert, I think that other evidence has come in showing they
14   were not usable and they were not used.  He assumes CSX must
02:30PM 15   buy a new system he being Mr. Schoettelkotte.  And finally I
16   think he ignored all of Tetra Tech's disadvantages compared
17   to LRAIL which I think Mr. Spencer talked about in the
18   testimony we heard this morning.
19   Q.   Let's move to Slide 4.  What question are you posing on
02:30PM 20   Slide 4?
21   A.   It's the one that frames the question of lost profits.
22   In the but for world, what would have happened if we had seen
23   a world in which Pavemetrics was not to use the technology
24   that Tetra Tech claimed is covered by their patents and in
02:30PM 25   particular for like I said the '293 patent for lost profits

162

1    question, what would have happened?  Where would those sales
2    have gone?  That's the right analysis and I think there's
3    information like I said that relates to that.
4    Q.   Turn to Slide 5.  What are you trying to explain on your
02:30PM 5   Slide 5?
6    A.   I think Mr. Schoettelkotte has inflated the patent
7    technology.  When he testified on Friday, he talked about how
8    there was value in using 2D and 3D images.  Well, I
9    understand that the '293 patent doesn't cover artificial
02:31PM 10   intelligence.  Dr. Morellas testified to that.  Dr. Mesher
11   testified to that.  Mr. Schoettelkotte even agreed to that.
12   And similarly the use of 2D and 3D scanning had
13   predated the '293 patent.  Those three individuals also
14   agreed with that.  So it's not as if the '293 patent says you
02:31PM 15   can't use 2D and 3D images which is exactly the evidence that
16   Mr. Schoettelkotte said demonstrated the key and important
17   value of the patent, but that's not what I understand to be
18   covered by the patent.
19   Now, scientific experts and others are going to be
02:31PM 20   really testifying more to that, but based on my understanding
21   of the evidence, my understanding is that Mr. Schoettelkotte
22   overstated what the patents cover.
23   Q.   The next bullet on Slide 5, you refer to Dr. Morellas.
24   What are you trying to explain there?
02:32PM 25   A.   Well, as I wrote there, Dr. Morellas accused LRAIL based

163

1    on Fake3D and mixed images despite the fact that those images
2    were never used, and I think we just heard Dr. Hebert testify
3    about that.  When I say never used, actually used by CSX in a
4    unit delivered to CSX.  And so the Fake3D, I think Dr. Hebert
02:32PM 5   just talked about that, it was removed in the versions that
6    were sent to CSX.
7    These particular units that we're talking about,
8    the two, three, four units, the mixed image was not
9    configured Dr. Hebert talked about that.  And Fake3D and
02:32PM 10   mixed images don't have value to CSX which has never used
11   them and in fact they perform worse than what is currently
12   used which is as I understand it range images using AI.
13   Q.   Did you consider why CSX actually chose to purchase
14   Pavemetrics LRAIL?
02:33PM 15   A.   I did, and I think that's very important information.
16   Q.   Why do you think it's important?
17   A.   Well, because as a damages expert, I have to, like I
18   said, put myself into this strange but for world.  It's a
19   counter-factual world.  What would have happened if the
02:33PM 20   accused infringer hadn't infringed.  Here I have a strange
21   sort of information available to tell me what would have
22   happened because we can see what actually did happen.
23   And what we can see actually happened is that
24   according to Mr. Spencer whose testimony we heard this
02:33PM 25   morning, the primary issue that he talked about that I heard

164

1    at least was that 3DTAS was too expensive.  It's expensive
2    and he was turned down and that Tetra Tech wasn't flexible on
3    lowering their price.
4    So here we have information from the purchaser at
02:34PM 5   CSX, the person making the decision to tell us what's driving
6    the decision.  That's very rare in my damages universe to be
7    able to have that kind of information from a purchaser to
8    tell us what was important to them as I tried to figure what
9    would have happened in this but for world.
02:34PM 10   Q.   Now, in your experience testifying dozens of patent
11   infringement disputes, did you say that it's rare to get
12   direct testimony from a customer; is that correct?
13   A.   I did.  It's very rare.
14   Q.   What was the cost to CSX of a Tetra Tech purchase based
02:34PM 15   on your review of the evidence?
16   A.   Well, I think Mr. Spencer had testified to this today.
17   He was saying that by the time you considered all of the
18   purchases and things that were required, it was something in
19   the neighborhood of $2.4 million and that times five units is
02:34PM 20   a significant amount of money, $12 million.
21   And if you consider what I think he said about five
22   times the cost to go with Tetra Tech compared to Pavemetrics
23   that's a significant cash outlay and a big difference to buy
24   the five units that were being contemplated by CSX.
02:35PM 25   Especially in the context of 2020 with COVID and

**EXHIBIT 4**
**-162-**

---

165

1  supply chain problems and the railroads were not having good

2  financial performance at that time, layoffs including

3  Mr. Larson, uh, that's a situation in which I think it's --

4  it's important information that I think Mr. Schoettelkotte

02:35PM 5  should have looked at and I don't think he really did.

6  Q.   Is there anything else specific you wanted to convey on

7  Slide 6?

8  A.   Well, I think there was also a document, uh, I think

9  it's been referred to as Exhibit 178.  It's an email from

02:35PM 10 Mr. Larson to Mr. Keyes talking about the challenges of

11 trying to sell to CSX.  In there, again, we see the same

12 issues, too expensive.  I think there was one other issue as

13 well which is the importance of a proof of concept.

14     I have another slide on that.  I think if you

02:35PM 15 advance one more slide.  Mr. Teufel, I think that's the right

16 way he pronounced it, we heard in his testimony this morning,

17 that he had said there were constraints created by CN

18 Canadian National limitations and Canadian National saying

19 that Tetra Tech couldn't use their information to try to make

02:36PM 20 sales or for other purposes with other railroads so that's

21 also an issue that created limitations.

22     Again, I didn't see any evidence that

23 Mr. Schoettelkotte considered that, but it looks like that

24 was important in affecting the purchase decision by the folks

02:36PM 25 at CSX.

UNITED STATES DISTRICT COURT

---

166

1  Q.   Before we finish we lost profits, just briefly, very

2  briefly, what is Panduit Factor 2?

3  A.   Well, I talked earlier about this two supplier market

4  and Mr. Schoettelkotte referred to this Panduit Factor 2, the

02:37PM 5  one about noninfringing substitutes.  And it really deals

6  with the same issues, the same concepts.  So in the but for

7  world are there substitutes that CSX could have gone to get

8  the advantages CSX wanted?

9      And Mr. Schoettelkotte said we've removed

02:37PM 10 Pavemetrics, then the only thing that's left is Tetra Tech.

11 I don't think it's proper to remove Pavemetrics.  The

12 question is if Pavemetrics had not infringed according to

13 Tetra Tech's definition of what infringement is which I

14 recognize the jury may or may not agree with that, but I have

02:37PM 15 to take Tetra Tech's interpretation.  I have to assume Fake3D

16 infringes or mixed images are infringing.

17     If I take their assumption, what would have

18 happened?  And so here I think the evidence shows that those

19 sales still would have gone to Pavemetrics.

02:37PM 20 Q.   And so in this case have you seen substantial evidence

21 indicating that there should not be an award of lost profits?

22 A.   As I understand it, that's a legal question and it's

23 really a question for the jury, but I've seen significant

24 problems.

02:38PM 25     THE COURT:  Let me jump in.  I think you can

UNITED STATES DISTRICT COURT

---

167

1  testify to what was in your report, that you disagreed with

2  the Panduit factor, but as far as whether or not there is or

3  isn't lost profits, that's not something you covered in your

4  report.

02:38PM 5      THE WITNESS:  Exactly.  That's what I was trying to

6  avoid.

7      MR. ZOVKO:  Your Honor, can I simply reframe that

8  question?

9      THE COURT:  No.  And counsel, we talked about it.

02:38PM 10 Move on to the next question.  I don't want to hear any more

11 about lost profits about this witness especially after what we

12 talked about.  I don't think you addressed the Court's

13 concern in that question at all.

14     MR. ZOVKO:  May I have a brief side bar?

02:38PM 15     THE COURT:  No.  Move on.

16 BY MR. ZOVKO:

17 Q.   Let's move on to the next slide.  This addresses

18 reasonable royalty.  What did you do to evaluate

19 Mr. Schoettelkotte's opinions on reasonable royalty?

02:38PM 20 A.   Well, I started by reading his report and listening to

21 his testimony the other day and I also evaluated what the

22 factors were that he said were driving his conclusion about

23 that reasonable royalty on the sale to AID.  So there I saw a

24 lot of the same issues that I just talked about, about the

02:39PM 25 availability of an alternative, of an alternative that would

UNITED STATES DISTRICT COURT

---

168

1  be noninfringing.  If you can get something else for cheaper,

2  that could put a limitation on the value.

3      And I felt as though here, Mr. Schoettelkotte's

4  failure to consider the noninfringing alternative was an

02:39PM 5  important failure in his whole premise and the way he looked

6  at the value, here it's of the '557 patent for AID, but I

7  think that is an important failure and it's one that caused

8  him to conclude that Pavemetrics would be willing to pay all

9  of their profits on the system making $250,000 of profits and

02:39PM 10 pay them all as a royalty.  I think that's a faulty analysis

11 and it's not reasonable.

12 Q.   So what is your ultimate opinion on a reasonable royalty

13 in this case?

14 A.   Well, like I said here, why would pay for unused and

02:40PM 15 easily removed features and the unaccused alternatives offer

16 better results.  So I think that those indicate that a

17 $250,000 reasonable royalty is based on an improper

18 foundation and analysis.  I think it would be limited to the

19 cost of eliminating as Pavemetrics did the accused software

02:40PM 20 which I think Dr. Hebert said took about half a day with some

21 of the people who were on Pavemetrics' staff.

22     MR. ZOVKO:  Thank you, sir.

23     I pass the witness.

24     THE COURT:  Any cross-examination, Counsel?

02:40PM 25     MS. MATHEW:  No cross.

UNITED STATES DISTRICT COURT

---

**EXHIBIT 4**

**-163-**

169

1   THE COURT:  Okay.  Why don't we take our afternoon
2   break and come back at ten minutes to 3:00.
3   (Recess taken.)
02:56PM 4   THE COURT:  Counsel, go ahead and call your next
5   witness.
6   MR. LAQUER:  Your Honor, Pavemetrics calls as its
7   next witness Dr. David Frakes.
8   THE CLERK:  Please raise your right hand.
9   (Witness sworn.)
02:56PM 10   THE CLERK:  Please be seated.
11   Please state and spell your full name for the
12   record.
13   THE WITNESS:  Sure.  My full name is David Harold
02:57PM 14   Frakes.  D-a-v-i-d  H-a-r-o-l-d  F-r-a-k-e-s.
02:57PM 15   MR. LAQUER:  And Your Honor, I have a few exhibits
16   I would like to move into evidence.  The parties have met and
17   conferred on them.  Exhibits 507, 511 and 544.
18   THE COURT:  Any objections to 507, 511 and 544?
19   MR. CHUNG:  No objection, Your Honor.
02:57PM 20   THE COURT:  507, 511 and 544 are in evidence.
21   You can proceed, Counsel.
22   DIRECT EXAMINATION
23   BY MR. LAQUER:
24   Q.  Good afternoon, Dr. Frakes.
02:57PM 25   A.  Good afternoon.

UNITED STATES DISTRICT COURT

170

1   Q.  Could you please introduce yourself to the jury?
2   A.  Yes, of course.  Hi, I'm David.  Nice to meet y'all.
3   Q.  And have you prepared slides for your testimony?
4   A.  I have.
02:57PM 5   Q.  All right.  Let's open those up, please and let's turn
6   to Slide No. 2.  Dr. Frakes, can you briefly summarize your
7   education?
8   A.  I got my B.S. in Electrical Engineering in 1998 from
9   Georgia Tech.  I went on the get an M.S. in Mechanical
02:57PM 10   Engineering and Electrical Engineering, and finally, my PhD
11   is in Bioengineering, um, all from the Georgia Institute of
12   Technology or Georgia Tech.
13   Q.  Let's go on to your next slide.  Could you briefly
14   describe your career history?
02:58PM 15   A.  Okay, yes, my career.  Well, so believe it or not, my
16   first job out of college was actually playing football in the
17   NFL for the team that's now the Washington Commanders, but I
18   didn't last very long.  I didn't make it through preseason so
19   it was back to grad school for me.
02:58PM 20   After I finished my PhD, I, uh, first started my
21   first small business, my first startup, 4D Imaging and it was
22   a tiny company that used Computer Vision and machine learning
23   to provide software solutions to the biomedical and military
24   sectors.  Um, it's not the most successful of the startups
02:58PM 25   that I've founded, but 20 years later, it still exists and

UNITED STATES DISTRICT COURT

171

1   people have worked their whole careers there so I'm really
2   proud of that small business.
3   I went on from there to be a faculty member at
4   Arizona State University where I became a tenured associate
02:59PM 5   professor and holder of an endowed chair on the Fulton School
6   of Engineering Entrepreneurship Endowed Chair.  I was
7   professor their in electrical engineering and biomedical
8   engineering.  And again we did research mostly in Computer
9   Vision and artificial intelligence.
02:59PM 10   At the same time I also acquired an adjunct
11   appointment at Mayo Clinic.  I still have that appointment.
12   I work there with physicians to create new artificial
13   intelligence technology that's pointed toward detecting
14   disease states and images.
02:59PM 15   When I moved on from ASU, I went to Google and I
16   became a technical lead in Advanced Technologies and Projects
17   Group.  I worked on a lot of different projects there.  All
18   of them practically involving Computer Vision and machine
19   learning.  I collaborated with the Way Mo Team on
03:00PM 20   self-driving cars and the last project I last lead there was
21   something called Lens Labs.
22   If you've heard of Google Lens Project, it's their
23   visual search engine that let's you search what you see.  I
24   ran a team there that drove the research behind that product.
03:00PM 25   All in all, I lead teams of over a hundred engineers there

UNITED STATES DISTRICT COURT

172

1   over a number of years.
2   From Google I went on to Apple where I was Lead of
3   Camera Software for this first three camera iPhone that you
4   may remember.  And there we worked on a lot of projects using
03:00PM 5   machine learning for face detection, segmentation, all the
6   different modes you may enjoy on your iPhone like portrait
7   mode and panorama, those are the things that my team put
8   together.
9   I left Apple to go back to Georgia Tech because I
03:01PM 10   got an opportunity to go back to alma mater and be a
11   professor there and that was always kind of a dream of mine.
12   But shortly after getting to Atlanta, my wife and I got a big
13   surprise because we already had a young boy, and then we had
14   a twin boy and girl very shortly after.
03:01PM 15   So having three kids under three made things
16   complicated real quick and we decided we wanted to be back
17   out here with family.  So a couple months ago, I moved back
18   to Apple and I am leading the Camera Algorithms Group out of
19   San Diego where I'm once again Lead of Camera Software.
03:01PM 20   Q.  Let's turn on to next slide.  Could you briefly
21   summarize whether you've received any research grants,
22   publication and awards?
23   A.  Yeah, um, you know, being an academic a big part of is
24   acquiring grant funding.  I've had over 50 grant awards.  I
03:02PM 25   just got one a couple weeks ago for using artificial

UNITED STATES DISTRICT COURT

**EXHIBIT 4**
**-164-**

173

1   intelligence to learn about the real neural network, the
2   connection to the brain so that's exciting.
3        I have over 75 journal publications, 170 conference
4   proceedings.  I've been the subject of over 25 news reports
03:02PM  5   and media releases.  I've won a number of awards including
6   one I'm particularly proud of at Apple where I had one of the
7   Top Ten Projects for our Week of Code competition.  And
8   lastly, I have over ten patents relating to Computer Vision
9   and artificial intelligence.
03:02PM 10   Q.   Now, if you can just briefly look at Exhibit 544.  I
11   think we can pull it up here.  Do you recognize this?
12   A.   Yes.  It looks like a fairly up-to-date version of my
13   C.V.
14   Q.   All right.  We can take that down.  How does your
03:02PM 15   experience compare to the parties proposed definitions of a
16   person of ordinary skill in art?
17   A.   I feel like in both cases, I have considerably more
18   experience than the definition.
19   Q.   And when you say in both cases, are you referring to
03:03PM 20   both Pavemetrics' proposal for the definition of a person of
21   ordinary skill in the art as well as Tetra Tech's proposal
22   for that definition?
23   A.   That's correct.
24   Q.   And have you applied that definition in your work in
03:03PM 25   this case?  Let me rephrase.

UNITED STATES DISTRICT COURT

174

1        Have you -- do you believe that any differences
2   between those two definitions has any of consequence to your
3   analysis in this case?
4   A.   No, I don't.  And I also feel like for the person of
03:03PM  5   ordinary skill in the art in 2015, that's actually when I was
6   growing my team at Google so I was hiring people like crazy
7   and many of them were that person of ordinary skill in the
8   art so I feel very informed to apply that.
9   Q.   Let's go on to your next Slide No. 5.
03:03PM 10        You know what first, Your Honor, Pavemetrics offers
11   Dr. Frakes as an expert in artificial intelligence, neural
12   networks, Computer Vision, computer engineering and
13   electrical engineering.
14        THE COURT:  Any objection, Counsel?
03:04PM 15        MR. CHUNG:  No objection, Your Honor.
16        THE COURT:  The witness is so designated.  He can
17   testify and give his opinions on those topics.
18   BY MR. LAQUER:
19   Q.   Could give us a very brief overview of what topics you
03:04PM 20   plan to testify about here today?
21   A.   Absolutely.  So I'm gonna start off and talk a little
22   bit about the differences between AI, neural networks and
23   tradition Computer Vision.  I'm gonna cover Pavemetrics early
24   work.  Both patents, the '293 and the '557.
03:04PM 25        I'm gonna tell you why it is my opinion LRAIL does

UNITED STATES DISTRICT COURT

175

1   not infringe.  I'm also gonna tell you why it is my opinion
2   Pavemetrics early work invalidates Tetra Tech's claim.  I'm
3   gonna cover secondary considerations that confirm those
4   claims are obvious.  And then I'm going to talk about
03:04PM  5   nonaccused alternative systems and finally, I'll discuss how
6   Dr. Morellas did not show whether 3DTAS uses the asserted
7   claims.
8   Q.   Can you briefly summarize the materials that you
9   considered in forming your opinions here?
03:05PM 10   A.   Sure.  So first and foremost, I considered the LRAIL
11   neural network files which I looked at myself.  I looked at
12   the LRAIL source code for current and early versions.  I
13   looked at additional prior art.  I looked at Tetra Tech's
14   3DTAS source code.  I looked at patents, their file histories
03:05PM 15   and the Court's claim construction.
16        I had discussions John Laurent and Dr. Hebert who
17   we heard from earlier today.  I also looked at additional
18   technical documents, deposition testimony, discovery, expert
19   reports and other materials including those reviewed by
03:05PM 20   Dr. Morellas.
21   Q.   Dr. Frakes, is it possible to look inside a neural
22   network?
23   A.   Yes, it certainly is.
24   Q.   Can you explain?
03:06PM 25   A.   Well, in looking at the LRAIL neural network files, I

UNITED STATES DISTRICT COURT

176

1   really started by doing what anyone would do using a computer
2   which is opening a folder and figuring out where they are
3   because they live on a computer just like any other files
4   that you might be used to.  So I went into the TensorFlow
03:06PM  5   folder where those files live and I look at what files were
6   present there.
7        I also used a network visualizer that allows you to
8   take a .pd file from TensorFlow that describes the graph of the
9   actual neural network and it shows it to you in a way where
03:06PM 10   you can see how the parts are connected and which numbers are
11   used where.  And so I used that program to actually examine
12   Pavemetrics' neural network to see exactly how it worked.
13        And beyond that, I also probed specific values in
14   these filters that we keep talking about.  There are numbers
03:06PM 15   in there and you can use software to see what numbers are in
16   there.  I did that.
17   Q.   Can you describe your review of Pavemetrics' LRAIL
18   source code?
19   A.   Uh, yes.  So I spent several days at the Pavemetrics
03:07PM 20   counsel's office in California going over the source code and
21   looking at all the files from configuration files to source
22   files in multiple languages, et cetera.
23   Q.   And could you describe your review of Tetra Tech's 3DTAS
24   source code?
03:07PM 25   A.   Very similar.  I went to Tetra Tech's counsel's office

UNITED STATES DISTRICT COURT

**EXHIBIT 4**
**-165-**

177

1      in Washington, D.C., and again I spent several days reviewing
2      the source code that was made available to me there.
3      Q.    Based on hearing Dr. Morellas' testimony, how would you
4      describe the relevance of the materials that you have
5      considered in forming your opinions as compared to what he
6      has considered in forming his?
7      A.    Right.  Well, as you all know, Dr. Morellas is
8      contending that LRAIL infringes because it uses these two
9      types of images and because of what it does inside of a
10     neural network, but he never looked inside the neural
11     network.  I did that.  So I feel like I'm in a much better
12     position to provide an opinion about infringement.
13     Q.    Let's go on to Slide No. 7.  Can you summarize what the
14     differences are between traditional computer vision systems
15     and artificial intelligence neural networks?
16     A.    Yeah, sure.  You all have heard a lot about this
17     already.  I'm gonna try to keep it high level and provide
18     some useful examples.  When I think about the contrast
19     between traditional computer vision and now AI, um, with
20     traditional computer vision, the human being in the loop had
21     to do a lot of the work.  We had to write down all the rules.
22     We had to tell the computer exactly what to do.
23           Now, with AI it's very different because the
24     computer figures out a lot of it for itself.  So, you know, I
25     spent a lot of time in my previous work putting boxes around

178

1      things and cutting little images out to see if I could match
2      them in other places.  Now, artificial intelligence
3      eliminates those tedious and slow steps and it even figures
4      out things that, you know, we couldn't even come up with
5      ourselves.
6      Q.    Let's go on to Slide No. 8.  Dr. Frakes, can you
7      describe your personal experience working with artificial
8      intelligence and neural network systems?
9      A.    Yeah, sure.  So, um, gosh, I first started working with
10     AI when I was in grad school so this is back in the '90s, and
11     we were working on building human operator models for
12     transportation conductors and construction operators so that
13     was very early days.
14           I really started first using computer vision in the
15     context of AI in my late grad school research and then at
16     that company I mentioned 4D imaging where we were providing
17     military and biomedical software solutions for those sectors.
18           At ASU I continued using AI in almost every part of
19     my research, but it was really when I got to Google that I
20     started doing the most with AI.  You see this TensorFlow logo
21     up here.  I know you've heard those two words a lot today and
22     throughout the trial.  As Dr. Hebert explained earlier,
23     TensorFlow is the AI platform that Pavemetrics uses.
24           And TensorFlow was released by Google in 2015.  I
25     was very fortunate to be working there when TensorFlow was

179

1      released.  But even better, I was fortunate to be at Google
2      before tense was released because I got to work with it
3      before the rest of the world even knew it existed and that
4      was very cool.
5            So working, you know, to the degree that I have
6      with TensorFlow has really shaped a lot of my career.  And I
7      think it's wonderful that Google built a tool like this and
8      made it available to the public domain for everyone to use.
9      Q.    Can you describe what the stages are of a TensorFlow
10     neural network engine?
11     A.    Sure.  Yeah, I mean, again, keeping it high level,
12     there's really the two stages that we've kind of heard about
13     already, but I'll do my best to explain them again to you
14     briefly.  There's the training stage upfront, and then
15     there's the inference stage after that.
16           So in training, you're basically taking this model
17     and you're giving it a whole lot of information so that it
18     can figure out to do something useful.  I really like to use
19     face detection as the example because a lot of people like
20     that on your phone, you know, where you can find all the
21     pictures of our friends and that happens through face
22     detection.  That's something I worked on at Apple.
23           So we would take a whole bunch of images, hundreds
24     of thousands of images that are annotated so that means they
25     have boxes drawn around the things we care about in this case

180

1      faces.  You feed those into a neural network and it figures
2      out how to find faces.  It's that simple or that complicated
3      depending on how you look at it, but that's what the network
4      does for you.  That's the training stage.
5            While you're training that network and it's seeing
6      all these different faces, it's figuring out what values
7      should be in the filters in the network.  You keep hearing
8      about the filters, too.  It's figuring out what should those
9      values be.  You see an example on the slide of these, you
10     know, kind of strange looking filters over here on the right.
11           Those are example of filters from a neural network.
12     So it's the kind of features that the network learns to put
13     in these filters do its job.  In this case finding faces.  So
14     that's Stage 1, the training.
15           Now, in the second stage, we get to inference.
16     Now, that model has pre-defined filters that its already
17     figured out in the training stage.  And we can now take it
18     and send it out to be a product and to go do something in the
19     world.  So the model's gotten smart, it's learned something
20     and now we can use it the real world to accomplish whatever
21     objective it is that we trained it to do.  And that's the
22     inference stage.
23           Now, the really cool part about the inference stage
24     is that you don't have to show it things its seen before.  I
25     just knows generally now what a face looks like so it can see

EXHIBIT 4
-166-

181

1    any face and it's gonna find it even though it's never seen
2    that specific face before.
3    Q.    And just turn over to Slide No. 9 here.  And could you
4    just briefly identify where the concepts you were talking
5    about are shown in the illustration we see here?
03:13PM 6    A.    Sure.  Yeah, I really like this graphic.  It does a good
7    job of breaking it down.  That untrained model is over there
8    on the left.  So it's just kind of that skeleton where we've
9    got some nodes and some connections, but it hasn't learned
03:14PM 10   anything yet so it's really just an architecture.  Doesn't
11   have any intelligence yet if you will.
12          Then we go through that training process which is
13   the second column.  That's where we feed in all those images.
14   Now, this example is using cats instead of faces, but the
03:14PM 15   process is very much the same.  And this, by the way, is a
16   special type of learning called deep learning that we're
17   talking about here.
18          So after that training operation, that's where we
19   get that trained model there in the third column so it now
03:14PM 20   knows something.  Its filters have been pre-defined.  They've
21   been established through training and now they're set and
22   ready to go out into the world.
23          And then that last stage inference that's where we
24   show the network new data it's never seen before, but it
03:14PM 25   helps us identify, again, in this case a cat or a face

182

1    depending on the application we've trained it to support.
2    Q.    And how are the pre-defined TensorFlow filters used in
3    the inference stage?
4    A.    Well, they live in convolution neural networks and so
03:15PM 5    they're used in convolutions and basically, those fixed
6    numbers that live in these filters of fixed size and shape
7    are used to process the images that come in and tell us if
8    there is something interesting in the image.
9    Q.    So in the TensorFlow neural network, does the definition
03:15PM 10   of the filter change in the inference stage?
11   A.    No.  After training, the filters are -- are locked in.
12   Q.    And is the term applying a convolution neural network or
13   a filter a concept that you are' familiar with?
14   A.    Yes, I think so.
03:15PM 15   Q.    Can you explain where in the step we see here a filter
16   gets applied?
17   A.    Well, the filter would be applied in the inference stage
18   when it processes the data that come in.
19   Q.    All right.  Let's go on to the next slide.  Before we
03:16PM 20   get into a lot of details later in your discussion of
21   invalidity regarding Pavemetrics early work, could you
22   provide some high-level technical description what you
23   addressed and prepared an opinion on regarding Pavemetrics
24   early work?
03:16PM 25   A.    Yes.  So I reviewed Pavemetrics early work, of course,

183

1    including a lot of the work products you see here over on the
2    right.  Instruction manuals, the code that shows how it
3    works, images showing the overall system architecture and
4    even meeting minutes and other documents from that early era,
5    that 2012 to 2014 era before the patents in question were
03:16PM 6    filed.
7          One of the things that I noticed was that the
8    algorithms in place then very much said traditional computer
9    vision based feature detection and also this Fake3D image
03:16PM 10   method which you keep hearing about.  Both of those things
11   were present in that early work.
12   Q.    And did you reach any conclusions based on your review
13   of Pavemetrics early work?
14   A.    I did.  I confirmed that Pavemetrics early automated
03:17PM 15   rail and road inspection activity and the associated
16   documents do invalidate the claims of the Tetra Tech patents.
17   Q.    Well, let's go on to the next slide and we'll address a
18   few other topics before we go into detail on the invalidity
19   issue.  Looking at Slide 11, could you just provide a
03:17PM 20   reminder of some high-level facts around the asserted patents
21   here, the '293 and '557 regarding their dates, titles and
22   claims?
23   A.    Absolutely.  So as I'm sure you'll recall, the two
24   patents in suit here are the '293 and '557.  The '293 patent
03:17PM 25   which is titled 3D Track Assessment System and Method was

184

1    filed in 2015 and the '557 patent which is a continuation of
2    the '293 patent is titled 3D Track Assessment Method.  The
3    '293 patent has 43 claims.  The '557 patent has 16 claims.
4    Q.    Now, you heard Dr. Morellas present his belief that
03:18PM 5    Pavemetrics supposedly infringes just two of the claims of
6    '293 patent, Claims 1 and 21; correct?
7    A.    I did hear that.
8    Q.    And you also then heard his explanation as to why he
9    believes Pavemetrics supposedly infringes Claim 8 of the '557
03:18PM 10   patent; correct?
11   A.    I heard that also.
12   Q.    And based on that, what have you focused your analysis
13   on regarding the claims in these two patents?
14   A.    Those same claims.  Claim 1 and 21 of the '293 patent
03:18PM 15   and Claim 8 of the '557 patent.
16   Q.    So you're not presenting any opinion as to whether or
17   not the other claims of these patents are invalid; is that
18   correct?
19   A.    I am not.
03:18PM 20   Q.    What was your impression when you first read the
21   asserted patents?
22   A.    Well, I think the thing that jumped out at me most was
23   that they clearly describe very traditional computer vision
24   methods.  Um, the content talking about the gradient windows
03:19PM 25   and neighborhoods, these are concepts that have been around

**EXHIBIT 4**
**-167-**

185

1   for a long time and that we've been using in traditional

2   image processing and computer vision for ages, you know,

3   really since the field was born in the '60s. It felt very

4   traditional and conventional to me. I think that's in stark

03:19PM  5   contrast to reading about things that are focused on

6   artificial intelligence.

7      Q.   And how do you believe one of ordinary skill in the art

8   would react in reading the asserted patents here?

9      A.   Clearly, the same way. I mean when we look at the

03:19PM 10   patent in the context of artificial intelligence, we heard

11   Dr. Mesher say they don't list artificial intelligence

12   anywhere and they don't list machine learning anywhere or

13   convolution neural networks or deep learning.

14           And so none of those words that we used to

03:20PM 15   described these techniques are present anywhere in the

16   patent. But even beyond the vocabulary, the fundamental

17   techniques that underlie artificial intelligence, just the

18   convolutional operator itself, you know, these things are

19   missing from the patents and it's pretty clear evidence that

03:20PM 20   they are discussing traditional computer vision.

21      Q.   Let's go on to your next Slide No. 12. How many issues

22   would you like to discuss about Dr. Morellas' opinion that

23   LRAIL sales to CSX supposedly infringe Claims 1 and 21 of the

24   '293?

03:20PM 25      A.   There are four specific issues that I'm going to

UNITED STATES DISTRICT COURT

186

1   discuss.

2      Q.   And what's your impression based on knowing that there

3   are four different issues you've identified about that?

4      A.   Well, four is a big number. I mean, when there are four

03:21PM  5   strong reasons like this for noninfringement, um, it sends me

6   a very clear signal that it's really not even close here.

7   Any one of these alone would prove noninfringement.

8           So the fact that there are four and even more

9   honestly, but we only have so much time to spend with each

03:21PM 10   other, it gives me a very good indication that there is

11   strong evidence for noninfringement here.

12      Q.   Before we go into detail on these four, could you

13   provide just a high-level overview of what these four

14   noninfringement issues address?

03:21PM 15      A.   Yes, I can. First, I'm gonna point out that LRAIL sales

16   to CSX were configured for range only not Fake3D or mixed

17   image.

18      Q.   And what is the second reason that LRAIL sales don't

19   infringe the asserted claims of the '293 patent?

03:21PM 20      A.   No LRAIL algorithm for defining an appropriate gradient

21   neighborhood and moving it like a sliding window has ever

22   existed.

23      Q.   And what is the third reason that the accused LRAIL

24   sales do not infringe the asserted claims?

03:22PM 25      A.   Well, as shipped the system is sold without sensors in

UNITED STATES DISTRICT COURT

187

1   communication with a processor.

2      Q.   And could let us know what the fourth reason is?

3      A.   Sure. Even if Fake3D had been enabled which it was not,

4   LRAIL would not generate a track elevation map and calculate

03:22PM  5   differential vertical measurements.

6      Q.   We're running a little ahead of time so no reason to

7   rush. All right. We can go to Slide 13. And this addresses

8   the first noninfringement reason you identified. Now, can

9   you explain what claim requirement this relates to?

03:22PM 10      A.   Yes. So this relates to Claim 1 which requires the

11   processor is configured to run an algorithm comprising the

12   Steps of A through D.

13      Q.   Over the right side, there are claim constructions

14   provided in a table. Do you see that there?

03:23PM 15      A.   I do.

16      Q.   Did you apply the Court's claim constructions to all of

17   your analysis in this case?

18      A.   Absolutely.

19      Q.   Does LRAIL satisfy the configure to run requirement of

03:23PM 20   Claim 1?

21      A.   No, it does not.

22      Q.   And based on your review of LRAIL source code, were the

23   accused sales configured to run either Fake3D or mixed image?

24      A.   No, they were not configured to run either one of those

03:23PM 25   image types in any case.

UNITED STATES DISTRICT COURT

188

1      Q.   Let's go on to Slide No. 14. For the versions of

2   software that had some Fake3D or mixed image software

3   present, did you assess whether the software configured LRAIL

4   to run those particular functions?

03:24PM  5      A.   I did.

6      Q.   And can you explain what we see on the source code here?

7   This is from Exhibit 619 and also references 618 and 552-1.

8      A.   Sure. So I think Dr. Hebert did a good job explaining

9   some similar examples earlier. What we see here that's

03:24PM 10   highlighted are these four different variable types: Image

11   type of fastener NN or neural network, image type for tie

12   plate NN, image type for spike NN, and image type for joint

13   bar NN.

14           And in every case, you see immediately after those

03:24PM 15   variable names, the assignment is zero. What does that mean?

16   It means that the neural network is going to run a range

17   image and a range image only.

18      Q.   And a range image is not accused of infringement in this

19   case; is that correct?

03:24PM 20      A.   It is not.

21      Q.   Let's go on to the next Slide No. 15. This has an

22   excerpt from Exhibit 616. Does this identify the same type

23   of information?

24      A.   It does. And this is just another good example of that

03:25PM 25   variable being set to zero in every case. And when that is

UNITED STATES DISTRICT COURT

**EXHIBIT 4**
**-168-**

189

1    the setting, the type of image that runs is a range image.
2    No Fake3D, no mixed image.
3    Q.   Let's go on to Slide 16.  This includes Dr. Morellas'
4    Slide 30 embedded within it.  How did Dr. Morellas address
03:25PM 5    the configure to run requirement of Claim 1?
6    A.   Right.  So Dr. Morellas in his analysis, um, he showed
7    this -- this picture of a product manual rather than LRAIL
8    software code and that was confusing to me because if you
9    want to look at how software is configured to run, you need
03:25PM 10   to look at the software.  The numbers that are assigned to
11   the variables in LRAIL dictate how it works.  It's that's
12   configuration that matters when it comes to how it runs so a
13   manual just isn't going to give you that level of
14   information.
03:26PM 15   Q.   Let's look at your next slide, Slide No. 17.  Could you
16   let us know what claim limitation this slide addresses?
17   A.   Yes.  So this addresses Claim 1 defining an appropriate
18   gradient neighborhood and moving the gradient neighborhood
19   like a sliding window over the 3D elevation data.
03:26PM 20   Q.   Does the accused LRAIL perform the limitation requiring
21   defining an appropriate gradient neighborhood and moving the
22   gradient neighborhood like a sliding window over the 3D
23   elevation data?
24   A.   It's a long phrase, but no, it does not.
03:26PM 25   Q.   Did you hear Dr. Morellas provide his opinion that in

UNITED STATES DISTRICT COURT

190

1    the context of these patents, an appropriate gradient
2    neighborhood is one that must be fixed in size -- sorry --
3    must be flexible in size?
4    A.   I did hear that.
03:27PM 5    Q.   Do you agree?
6    A.   I do.
7    Q.   Does that affect your opinion regarding infringement by
8    LRAIL?
9    A.   Well, absolutely because as I mentioned before, in the
03:27PM 10   context of the TensorFlow, that's where Dr. Morellas accusing
11   these filters of being is inside the neural network.  Those
12   filters aren't flexible.  They are set in stone.  They are
13   one size and they never change.  One size, one shape, every
14   day of the week, every week of the month, every month of the
03:27PM 15   year.
16   Q.   And do you see the constructions on the right for moving
17   the gradient neighborhood and as well as neighborhood itself?
18   A.   I do.
19   Q.   And have you provided any analysis regarding the
03:27PM 20   construction of moving the gradient neighborhood like a
21   sliding window over the 3D elevation data?
22   A.   Yes, I have.  I think we talk about it on the next
23   slide, but I'll start getting into that.  What determines the
24   movement of that gradient neighborhood in TensorFlow is that
03:28PM 25   stride variable.  So when that stride variable is set to some

UNITED STATES DISTRICT COURT

191

1    number greater than one, it is skipping data and I think
2    we're gonna talk about.
3    Q.   Skip ahead and go to 19.  Let's go to 21.  All right.
4    This has some more discussion of stride value; is that right?
03:28PM 5    A.   It is.
6    Q.   So looking at Slide 21, we see Slide 44 on the left from
7    Dr. Morellas' presentation and then we also see the Karami
8    book Exhibit 689 in the center which Dr. Morellas provided as
9    the basis of his presentation on the left.
03:28PM 10         On the right side, we see the chapter from the
11   Karami book Chapter 5 that appeared immediately above that
12   figure reading but if the convolution stride is equal to two,
13   this means the filter slides through two consecutive elements
14   of the input layer.  The filter slides through the input data
03:29PM 15   by moving two elements per step i.e. skipping one element.
16         Dr. Frakes, what is your opinion of that
17   description by the Karami book?
18   A.   I think it's exactly right.  When using a stride value
19   of two, you are skipping one element.  And what that means
03:29PM 20   for Window operations like convolutions is that you're
21   actually skipping a whole group of pixels.  So, of course,
22   when you're skipping groups of pixels, you're not performing
23   the operation completely.
24   Q.   Can you give us a little bit more specificity on what
03:29PM 25   you mean when you say a Window element and skipping a group

UNITED STATES DISTRICT COURT

192

1    of pixels?
2    A.   Sure.  So if you look at the areas in green that are in
3    those figures, right, we see them moving here with a stride
4    value of two.  So that when the green window moves from
03:30PM 5    Step 1 to Step 2, it leaves two white columns behind it.  So
6    it didn't process the group of pixels that included the
7    Columns 2, 3 and 4.  It skipped that group and it went
8    straight on to 3, 4 and 5.  So, again, when skipping groups
9    of pixels that include, the operation is just not being
03:30PM 10   performed completely.
11              EXAMINATION
12   BY THE COURT:
13   Q.   All right.  Let me jump in because I had some questions
14   when the other expert was testifying.  If we're
03:30PM 15   looking at this diagram, right, you see the green area in
16   Box 1?
17   A.   I do.
18   Q.   And so those nine boxes in that green area are those
19   pixels?
03:30PM 20   A.   Yes.
21   Q.   They're meant to represent pixels.
22   A.   They are.
23   Q.   So in the first, I guess, iteration of this filter, it's
24   considering the first nine pixels in the upper left-hand
03:30PM 25   corner; correct?

UNITED STATES DISTRICT COURT

**EXHIBIT 4**
**-169-**

193

1   A.  I agree with that.

2   Q.  Then the filter moves on and now it's considering

3   another set of nine pixels; correct?

4   A.  That's also correct.

03:31PM  5   Q.  And each time the filter moves, it's considering the

6   number of pixels that's, I guess, consistent with the size of

7   the filter; right?

8   A.  Nine pixels each time, yes.

9   Q.  Because it's a nine pixel filter.

03:31PM  10   A.  Correct.

11         THE COURT:  Thank you.  I just wanted to make sure

12   I understood it.

13   By MR. LAQUER:

14   Q.  And Dr. Frakes, is there a difference between whether or

03:31PM  15   not a pixel is skipped and whether or not a group of pixels

16   are skipped?

17   A.  Yes, absolutely.  You can articulate it either way

18   really in trying to describe what's happening, but the end

19   effect is that group of pixels, um, that's in Columns 2, 3

03:31PM  20   and 4, when you skip from blue dot one to blue dot two here,

21   that group is never processed together.  You jump right over

22   and go to a new group.  So that group of pixels is simply not

23   processed here even if some of its members may be involved in

24   other math at some point in time.

03:32PM  25   Q.  And let's go back to the construction that was on

UNITED STATES DISTRICT COURT

---

194

1   Slide 17.

2             EXAMINATION

3   BY THE COURT:

4   Q.  Actually, can you go back for a second?  Can you put

03:32PM  5   that picture back up?

6         So you find it significant that, for example,

7   pixels, if we give these pixels numbers and letters with A

8   through A, B, C, D on the top and 1, 2, 3, 4 on the side, so

9   in the first iteration, we've got pixel A-1 is in the green

03:32PM  10   area; right?

11   A.  Correct.

12   Q.  As is B-1, C-1 and so on.  You find it significant that

13   when we move to Step 2, we're considering a group of nine

14   pixels and the specific group of pixels of, I guess,

03:32PM  15   Column 2, Column 3 and Column 4 is never considered together.

16   A.  That's correct because --

17   Q.  So that's the distinction you're making; right?

18   A.  It is because --

19   Q.  So even if we had a stride of one, then that wouldn't

03:33PM  20   happen; correct?

21   A.  No.  If we have a stride of one, then Columns 2, 3 and 4

22   get processed together.

23   Q.  Right, exactly.  That would be the difference between a

24   Stride 1 and a Stride 2.  But you'll agree with me if you had

03:33PM  25   a Stride 1 in the same scenario, you'd never consider the

UNITED STATES DISTRICT COURT

---

195

1   upper left most pixel with the bottom right most pixel;

2   right?

3   A.  Oh, of course not, but if I can provide just a little

4   more clarity.

03:33PM  5         THE COURT:  I just want you to answer the question.

6   I'll turn it back to counsel.  I don't want to take up too

7   much time.

8   BY MR. LAQUER:

9   Q.  Dr. Frakes, could you explain your thoughts on this

03:33PM  10   discussion of groups of pixels?

11   A.  Yes.  Every unique combination of nine pixels will give

12   a different output for the filter.  So if you're not

13   considering all of the combinations with the filter, then

14   you're skipping a unique value that's going to be in the

03:34PM  15   output.  That's the point.  That the window of operation has

16   to address each group not just use some members and some math

17   operations to create output.  Each group has to be considered

18   for it to be complete.  When you use a stride value of two

19   that's not happening.

03:34PM  20         THE COURT:  But if you use a stride value of one,

21   that wouldn't happen either; right?

22         THE WITNESS:  Yes, it would.  With a stride value

23   of one, you would consider each adjacent group of nine

24   pixels.

03:34PM  25         THE COURT:  Each adjacent group of nine pixels.

UNITED STATES DISTRICT COURT

---

196

1         THE WITNESS:  That's right.

2         THE COURT:  That's the qualification.  So you think

3   it's important to consider each adjacent group of nine

4   pixels.

03:34PM  5         THE WITNESS:  I do.

6   BY MR. LAQUER:

7   Q.  Dr. Frakes, does the fact we're addressing the term as

8   to whether the particular locations being addressed should be

9   adjacent or not?

03:34PM  10   A.  Absolutely.  Because it's the window that defines the

11   area that creates unique output.  If you skip to nonadjacent

12   windows, you're leaving an area behind that would have

13   contributed unique output to the mathematical operation.

14   You're just skipping right over it.

03:35PM  15   Q.  Let's turn back to Slide 17 whereas the construction is

16   provided for this claim term moving the gradient neighborhood

17   like a sliding window over the 3D elevation data.

18         And could you describe how one of ordinary skill in

19   the art would understand the term completely in that

03:35PM  20   definition to affect whether a stride value of two is a

21   complete or incomplete application?

22   A.  They would understand it to be carried out like a

23   standard convolution which uses a stride value of one.  It's

24   that simple.

03:35PM  25   Q.  Let's go on to next, Slide 18.  This has Dr. Morellas'

UNITED STATES DISTRICT COURT

**EXHIBIT 4**

**-170--**

197

1  Slide 41 embedded within it.  Can you identify what
2  Dr. Morellas relied upon for his opinion that the LRAIL
3  accused product satisfy this claim limitation?
4  A.   Yeah.  So for his analysis of defining an appropriate
03:36PM 5  gradient neighborhood, Dr. Morellas used this paper from the
6  Tokyo conference that I think we've seen a couple times now.
7  What's interesting about the paper, among other things, is
8  that it focuses on using deep CNET as the neural network
9  model that is used in the paper.
03:36PM 10        And as we learned earlier from Dr. Hebert, LRAIL
11  never used deep CNET.  It's completely different model.
12  LRAIL uses TensorFlow and that is not a deep CNET
13  implementation so it's really not relevant to the analysis.
14  Q.   Let's go on to the next Slide No. 18.  I'm sorry.
03:36PM 15  No. 19.  How did you assess whether LRAIL's neural network
16  applies its filter completely or incompletely regarding
17  stride value?
18  A.   So, again, I looked in the neural network and by doing
19  that, I used that visualization tool that I mentioned before.
03:37PM 20  It called out all the connections, the layers, shows how they
21  comes together.  It also lists out the parameters so one of
22  those parameters is the stride value and that value is listed
23  explicitly right there in the network.  It's very clear and
24  that's how I knew the value was two.
03:37PM 25  Q.   Let's look at Slide No. 20 in case that's relevant to

198

1  this discussion.  It has some excerpts from Exhibit 507.  Can
2  you tell us what we're looking at on this slide?
3  A.   The graphic there on the left that's the output of this
4  visualization tool that I mentioned.  If you focus in on this
03:38PM 5  top left layer here, depth wise, Conv2D native, it tells you
6  what the filter size is there in that box.  And if you select
7  that, then you get to see the dialogue that's over on the
8  right side of the slide.
9        There I've put a box around the stride values 1, 2,
03:38PM 10  2 and 1.  And in the context of TensorFlow, those two values
11  of two, those are the skipped values for going across and
12  going down.  So that's how you know that window is skipping
13  things in both directions.
14  Q.   All right.  We already looked at the next slide stride
03:38PM 15  value of two and go to Slide 22.  Can you let us know what
16  limitation of Claim 1 this addresses?
17  A.   Yes.  This addresses the limitation of being sold
18  without sensors in communication or that rather at least one
19  sensor be in communication with at least one processor.
03:39PM 20  Q.   And what is your understanding of how this claim
21  limitation is affected by the requirements for literal patent
22  infringement as Tetra Tech is alleging here?
23  A.   All right.  Well, as I understand literal infringement
24  and as it was explained to us earlier in the trial, that
03:39PM 25  means that every word has to be accounted for.  So even if

199

1  it's a minor implication maybe in the larger context of the
2  product, every word must be accounted for it to literally
3  infringe.  Those are the rules so that's how I understand it.
4  Q.   Did you analyze the state of the accused LRAIL systems
03:39PM 5  at the time they are sold as accused by Tetra Tech?
6  A.   I did.
7  Q.   Let's go on and look at your next Slide No. 23.  This
8  shows Dr. Morellas' Slide 27 embedded within it.  Dr. Frakes,
9  can you tell us what did Dr. Morellas analyze for the claim
03:40PM 10  requirement sensors in communication with at the least one
11  processor?
12  A.   I believe this is another case where a manual was
13  consulted.
14  Q.   And could you let us know what you can see from the page
03:40PM 15  of the manual that Dr. Morellas included in his slides?
16  A.   Yes.  From this manual image that Dr. Morellas provided,
17  you can see these two blue plugs here which are highlighted
18  in yellow.  You may not be able to see the labels behind
19  those, but they say left sensor and right sensor.  As you can
03:40PM 20  tell, there's nothing plugged in there.  So it's very clear
21  in this state as sold, there is no sensor communicating with
22  the processor.
23  Q.   Now, let's go on to your next Slide No. 24.  This
24  addresses the track elevation map and calculating
03:40PM 25  differential vertical measurement requirement from Claim 1 of

200

1  the '293 patent.
2        Dr. Frakes, what is your impression as to whether
3  or not the accused LRAIL sales satisfy these claim
4  requirements?
03:41PM 5  A.   Well, I don't feel that they do.  Because even if, for
6  example, our r10323 had applied Sales 2 through 4 and even if
7  Fake3D had been enabled, LRAIL still would not generate a
8  track elevation map.
9  Q.   And we've heard some discussion of Fake3D.  Did you
03:41PM 10  review the Fake3D code in order to assess how Fake3D works?
11  A.   I did.
12  Q.   Could you just briefly summarize what you observed?
13  A.   Yeah, I think the clearest way to explain it is that the
14  Fake3D image is essentially just a flat 2D image that has
03:41PM 15  fake shadows on it.  So it doesn't really include any
16  elevation data in the image itself.  For example, you can't
17  tell what the elevation is at any point in that image.  It's
18  a just flat image with fake shadows and I know I'm repeating
19  myself now, but that's easiest way to explain it.
03:42PM 20  Q.   And what is your understanding of what the requirement
21  for calculate differential vertical measurements addresses?
22  A.   Well, I mean, that requirement makes it pretty explicit
23  that you have to measure some height difference; right?  A
24  differential vertical measurement.  There has to be some
03:42PM 25  height difference.  And if there's no height in the image in

**EXHIBIT 4**
**-171-**

---

**201**

1 the first place, you can't measure a difference. I don't see
2 how the image could satisfy that requirement.
3 Q.   Looking at your next Slide No. 25, can you briefly
4 summarize your opinion regarding whether the LRAIL's accused
03:42PM 5 sales infringe the asserted claims of the '293 patent?
6 A.   Sure. Well, the accused LRAIL sales, the three to CSX,
7 do not infringe Claim 1 and thus dependent Claim 21 because
8 that depends on one of the '293 for at least these four
9 reasons we just talked about.
03:43PM 10        First, LRAIL was configured for range only. It's
11 not mixed image or Fake3D and this is in all cases.
12        Second, LRAIL algorithm doesn't do defining an
13 appropriate gradient neighborhood and moving it like a
14 sliding window. We talked about appropriateness and how that
03:43PM 15 means flexible and variable. The filters in the neural
16 network are fixed. They're set in stone. They don't slide
17 completely any way. They skip data.
18        Next, sales were of disconnected components. We
19 just saw that clear example where the sensor ports were not
03:43PM 20 connected to anything at sale.
21        And lastly, Fake3D is not a track elevation map so
22 LRAIL doesn't calculate differential vertical measurements in
23 my opinion.
24 Q.   Let's go on to Slide No. 29. This addresses the
03:44PM 25 allegation by Tetra Tech as to supposed induced infringement.

UNITED STATES DISTRICT COURT

---

**202**

1        Dr. Frakes, did you hear Tetra Tech's counsel ask
2 Dr. Morellas questions about induced infringement and
3 subjective belief about infringement?
4 A.   I did.
03:44PM 5 Q.   And do you understand that those types of phrases get
6 added to questions about induced infringement because induced
7 infringement has an extra requirement beyond direct
8 infringement. Is that your understanding?
9 A.   Yes, it is.
03:44PM 10 Q.   And so setting aside whether the subjective belief
11 requirement is satisfied for the '557 patent Claim 8, have
12 you looked at the claim language of the '557 patent Claim 8
13 to assess whether the operation of LRAIL itself would satisfy
14 that claim?
03:44PM 15 A.   Yes, I have and there's still no induced infringement
16 for these three reasons that I've said on the slide.
17 Q.   Can you identify what the first reason is?
18 A.   Yes. So first of all, there's no inputting of detected
19 tie bounding box data.
03:45PM 20 Q.   And the second reason?
21 A.   There's also no inputting of rail base edge feature
22 coordinates.
23 Q.   And the third?
24 A.   The system does not compare ties and elevation data with
03:45PM 25 a tie surface plane model.

UNITED STATES DISTRICT COURT

---

**203**

1 Q.   Let's go on to Slide 30. Can you tell us what this
2 claim, well, I'll skip it ahead. I'll note that you've
3 included some testimony from Dr. Morellas here.
4        Can you explain why?
03:45PM 5 A.   I just wanted to highlight this in the context of not
6 inputting tie bounding box data.
7 Q.   And so Dr. Morellas has identified his opinion that the
8 bounding box must be orthogonal. Do you agree that a
9 bounding box must be orthogonal?
03:46PM 10 A.   I do, and it's very much like the name sounds. It's a
11 box like any other you would imagine.
12 Q.   And do you agree or disagree that a mask can be
13 anything?
14 A.   Yeah, a mask is usually just a white blob of stuff on a
03:46PM 15 black background in image processing. It could be one thing,
16 it could be multiple things. It doesn't have any specific
17 shape, you know, associated with it.
18 Q.   And so is it your understanding that a mask can be
19 anything meaning any shape?
03:46PM 20 A.   Yes.
21 Q.   Okay. Let's look at Slide 31 which has Dr. Morellas'
22 Slide 67 embedded in it. How did Dr. Morellas attempt to
23 show that LRAIL supposedly meets the inputting detected tie
24 bounding box claim requirement?
03:46PM 25 A.   Yeah, so here he focused on this variable that we see

UNITED STATES DISTRICT COURT

---

**204**

1 there. It's puc1 tie mask I believe is what it says. It's
2 the one labeled detected tie bounding box data in the yellow
3 snippet.
4 Q.   And do you believe that this is detected tie bounding
03:47PM 5 box data?
6 A.   No. I've looked at the source code. Again, this is a
7 mask and it's a binary image that has white values and black
8 values and just some shape in it to indicate the presence of
9 some feature of interest.
03:47PM 10 Q.   What did Dr. Morellas show at the bottom of Slide 67?
11 A.   So those are tie bounding box data in the bottom there
12 on the right. That's the output of the process. The claim
13 requires the tie bounding box data are input. This is not
14 input. This is output. So that's what we would look for on
03:47PM 15 the input to see if there's infringement. It's not there.
16 If a mask is going in, the tie bounding box data are going
17 out.
18 Q.   Let's look at the at your next Slide 32. This has
19 Dr. Morellas' Slide 66 embedded in it. Can you tell us what
03:48PM 20 requirement from Claim 8 this slide addresses?
21 A.   It addresses inputting rail base edge feature
22 coordinates.
23 Q.   And how did Dr. Morellas attempt to show whether LRAIL
24 satisfies this limitation?
03:48PM 25 A.   Again, he's identified another mask variable. This one

UNITED STATES DISTRICT COURT

---

EXHIBIT 4
-172-

205

1   mpuc rail mask foot DS which is labeled in purple toward the

2   bottle as rail base edge feature key coordinates.

3   Q.   Do you believe that variable satisfies the claim

4   requirement?

03:48PM 5   A.   No, for the same reason we just discussed, that's a

6   mask. It's not coordinates.

7   Q.   Let's go on to Slide 33.  This has Dr. Morellas'

8   Slide 71 embedded in it.  Can you tell us what claim

9   requirement this addresses?

03:48PM 10   A.   So this addresses comparing ties in the elevation data

11   with a tie surface plane model.

12   Q.   And what does Dr. Morellas address for that claim

13   requirement?

14   A.   Here he's looking at this variable add plane params and

03:49PM 15   contending that this identifies an approximate tie surface

16   plane.

17   Q.   Do you agree or disagree with his conclusion?

18   A.   I disagree because the way that Pavemetrics solves this

19   problem, they look at only half of a tie at a time.  They do

03:49PM 20   it in segments.  So this is not a tie surface plane model.

21   It's only half of the tie surface plane and half the tie is

22   not a tie so I don't see fulfilling the requirement.

23   Q.   Let's look at Slide 34.  Could you briefly let us know

24   your conclusion regarding whether Pavemetrics accused acts

03:49PM 25   have induced any infringement of the '557 patent?

UNITED STATES DISTRICT COURT

206

1   A.   So even if Pavemetrics had known of the '557 patent and

2   even if Pavemetrics had subjectively believed that LRAIL

3   infringed, there's still no induced infringement in my

4   opinion because LRAIL does not do inputting the detected tie

03:50PM 5   bounding box data, it does not do inputting the rail base

6   edge feature coordinates, and it does not compare ties in the

7   elevation data with the tie surface plane model.

8        And just as a reminder, any one of these means no

9   infringement, but they're all true.

03:50PM 10   Q.   We can go ahead and take the slide down and just briefly

11   like to turn to your invalidity analysis.  Dr. Frakes, what

12   is your ultimate conclusion regarding whether or not the

13   asserted claims here by Tetra Tech are valid or invalid?

14   A.   Based on everything I that reviewed, I feel they are

03:50PM 15   invalid.

16   Q.   And can you explain why?

17   A.   Sure.  Can we bring the slides up?

18   Q.   We can go on to Slide 35.

19   A.   So there's a lot of background that's relevant here.

03:50PM 20   First off Pavemetrics rail inspection systems were earlier

21   than the patents.  In 2010 Pavemetrics sold its sensors to

22   EuroConsult as we heard about earlier who developed software

23   for rail inspection.  Then in 2012 Pavemetrics made that

24   first sale of rail inspection system to the University of

03:51PM 25   Massachusetts at Lowell.

UNITED STATES DISTRICT COURT

207

1        Again, in 2014 both Pavemetrics and EuroConsult

2   published and presented papers on rail inspection using

3   Pavemetrics LCMS system at that TRB board meeting we've heard

4   about a couple times.  It was only in 2015 that Tetra Tech

03:51PM 5   filed for its patents.

6   Q.   So based on Pavemetrics early work, do you believe that

7   the asserted claims would have been obvious to one of the

8   ordinary skill in the art at the time of filing?

9   A.   I do.

03:51PM 10   Q.   Look at Slide 36, here.  When discussing Pavemetrics

11   early work for your invalidity analysis, can you let us know

12   what items you focused on?

13   A.   Yes.  So in looking at invalidity, I focused on the UML

14   sale and support.  This paper UML-TRB2014.  The EC-TRB2014

03:52PM 15   paper which was the second one we talked about being

16   published in the previous slide.  And also one other paper by

17   Gibet-Serra that adds a specific piece of functionality that

18   we'll discussion.

19   Q.   And for the record, the UML-TRB2014 document that you

03:52PM 20   referenced is Exhibit 26; is that correct?

21   A.   That's correct.

22   Q.   The EC-TRB2014 is Exhibit 510; is that correct?

23   A.   That's also correct.

24   Q.   And the Gibet-Serra document that you used for the

03:52PM 25   dependent Claim 21 is Exhibit 511; is that correct?

UNITED STATES DISTRICT COURT

208

1   A.   That's correct.

2   Q.   And what is your opinion as to whether the UML sale and

3   support and/or UML-TRB2014 either alone or in combination

4   with EC-TRB2014 invalidates Claims 1 and 21 of the '293

03:53PM 5   patent as obvious?

6   A.   I believe that they do.

7   Q.   And what is your opinion as whether the UML sale and

8   support and/or UML-TRB2014 in combination with EC-TRB2014 and

9   Gibert-Serra invalidate Claim 21 of the '293 as obvious?

03:53PM 10   A.   I believe they do invalidate Claim 21.

11   Q.   And what is your opinion as to whether the UML sale and

12   support and/or UML-TRB2014 invalidate Claim 8 of the '557

13   patent as obvious?

14   A.   I believe they also invalidate Claim 8 as obvious.

03:53PM 15   Q.   So to save some words going forward, can we use the

16   phrase Pavemetrics' early work to mean UML sale and support

17   and/or UML-TRB2014?

18        MR. CHUNG:   Objection, Your Honor.  This goes to

19   what we discussed earlier today.

03:54PM 20        THE COURT:   When we talk about any invalidity with

21   obviousness, sometimes people will combine two things

22   together and say in light of these two things together, this

23   invention is obvious, and that's okay if there was a

24   motivation for someone to put them together.

03:54PM 25        Here as I understand the argument, Pavemetrics is

UNITED STATES DISTRICT COURT

**EXHIBIT 4**

**-173-**

## 209

1  not arguing that these things together cause the patent to be
2  obvious, but each one separately so one or the other would
3  cause the patent to be obvious.  In talking about the early
4  work, what counsel should have said that the UML sale and
03:54PM 5  support or the UML-TRB2014, either of those by themselves,
6  one or the other, would cause the patent to be obvious;
7  right?
8      MR. LAQUER:  Not exactly.
9      THE COURT:  Are you combining them?
03:55PM 10     MR. LAQUER:  Well, they are the same system,
11  Your Honor and that is why it's described as and/or.
12     THE COURT:  Exactly what we talked about earlier.
13  Let's have a side bar conference to discuss this.
14     (The following proceedings were held at side bar:)
03:55PM 15     MR. CHUNG:  This is what we were worried about and
16  discussed this morning.  We're talking about specific
17  elements of the claim and we'll switch from article to source
18  code, back to article, back to source code, and it will
19  become confusing to the jury to figure out what grounds are
03:55PM 20  actually being tried.  And it's also outside the scope of
21  what was actually provided by that phrase.
22     THE COURT:  As I understand what counsel is saying,
23  this is one reference; right?  The prior system is one
24  reference in the publication that really describes it; is
03:56PM 25  that right?

UNITED STATES DISTRICT COURT

## 210

1      MR. LAQUER:  Yes, Your Honor.  We have significant
2  foundation laid by Dr. Laurent, Dr. Hebert's documents of the
3  system.  It's not uncommon to use source code and technical
4  manuals.  It's all describing systems.
03:56PM 5      THE COURT:  Was this point made clear in the expert
6  report?
7      MR. LAQUER:  I believe so.
8      MS. LEA:  As well as contentions.
9      MR. CHUNG:  If you go to the Table of Contents,
03:56PM 10  they are separate grounds, Your Honor.  They're called out
11  separately and without a combination between the source code
12  and article so there isn't any motivation to combine the two.
13  Also, they're different dates.  So to the extent they say the
14  same thing, I think that is no longer the case given
03:57PM 15  Dr. Hebert's testimony.  We're left with the combination of
16  two different dated pieces of prior art by itself does
17  not invalidate a combination of prior art by obviousness.
18     MR. LAQUER:  The interior infringement theory looks
19  to some describe at hardware as well as software.
03:57PM 20     THE COURT:  I don't want to talk about this issue.
21  So the contention, tell me about the contentions.  Do they
22  describe this as one piece of prior art or as two pieces of
23  prior art?
24     MS. LEA:  Two pieces of prior art that can be
03:57PM 25  combined.  The UML paper is evidence that the entire UML sale

UNITED STATES DISTRICT COURT

## 211

1  and support expands two to three years.
2      THE COURT:  So are they combined in the contentions
3  as a combination?
4      MS. LEA:  They are.
03:57PM 5      THE COURT:  So if they're combined in the
6  contentions, your issue really is just an expert report
7  issue?
8      MR. CHUNG:  That's correct, Your Honor.
9  What's in the contentions, in the contentions is
03:58PM 10  the expert bringing in what's contained within the expert
11  report and deposition.  And here as provided by the Table of
12  Contents, these pieces of prior art that's a separate ground
13  and UML-TRB is a separate ground.  There's no combination of
14  the two.
03:58PM 15     THE COURT:  Yeah, that's what I thought we
16  understood this morning.  No combination of the two.  Deal
17  with them separately.  Deal with them as separate pieces of
18  prior art.
19     MS. LEA:  But in the case we can argue the
03:58PM 20  combination based upon the other factual testimony?
21     THE COURT:  You can argue the combination just
22  won't have an expert opinion on the combination.
23  Does that make sense?
24     MS. LEA:  Is this enough?  I just want to be
03:58PM 25  careful because some of the representations about the damages

UNITED STATES DISTRICT COURT

## 212

1  report were not correct.  I want to make sure we have
2  sufficient time to respond to this.
3      THE COURT:  I'm not sure what that means.  The
4  expert can't combine them.  These two combined make it
03:59PM 5  obvious wasn't in the report.  You can make argument.
6      MR. LAQUER:  At least present them, though, making
7  clear not argument or opinion being provided by the expert
8  that these two just should be combined.
9      THE COURT:  That's what I thought we said this
03:59PM 10  morning.
11     MR. CHUNG:  I guess the concern we have is that the
12  slides jump from presentation to article to the code and back
13  to the presentation and back to the code.  And I don't know
14  if that's going to be too confusing to the jury appearing to
03:59PM 15  be a combination of the two.
16     MS. LEA:  The testimony is it's the same project.
17     MR. LAQUER:  The presentation is designed based on
18  the verdict form.
19     THE COURT:  We talked about that this morning.
04:00PM 20  You're sort of working around the issue.  I need the parties
21  to kind of be straightforward with the Court.  Deal with
22  separate items of prior art with the expert because I think
23  it is unfair to have the expert to be combining if he didn't
24  do it in his report.  Thank you.
04:00PM 25     (Side bar concluded.)

UNITED STATES DISTRICT COURT

**EXHIBIT 4**
**-174-**

213

1    THE COURT: Please proceed, Counsel.

2    BY MR. LAQUER:

3    Q.   Dr. Frakes, is it your opinion that UML sale and support

4    on its own, alone or in combination with EC-TRB2014

04:01PM 5    invalidates Claim 1 and 21 of the '293 patent as obvious?

6    A.   Yes.

7    Q.   And is it your opinion that UML-TRB2014 either alone or

8    in combination with EC-TRB2014 invalidates Claim 1 and 21 of

9    the '293 patent as obvious?

04:01PM 10    A.   Yes.

11    Q.   Is it your opinion that UML sale and support in

12    combination with EC-TRB2014 and Gibert-Serra reference

13    invalidate Claim 21 of the '293 patent as obvious?

14    A.   Yes, it is.

04:01PM 15    Q.   And is it your opinion that UML-TRB2014 in combination

16    with EC-TRB2014 and Gibert-Serra invalidate Claim 21 of the

17    '293 patent as obvious?

18    A.   Yes, it is.

19    Q.   Is it your opinion that UML sale and support invalidates

04:01PM 20    Claim 8 of the '557 patent as obvious?

21    A.   Yes, it is.

22    Q.   Do you believe UML-TRB2014 invalidates Claim 8 of the

23    '557 patent as obvious?

24    A.   Yes, I do.

04:02PM 25    Q.   All right.  Taking a little bit of a step back, could

UNITED STATES DISTRICT COURT

214

1    you describe at a higher picture what your impression is of

2    the Pavemetrics activities described by Dr. Hebert and by

3    Mr. Laurent as compared to the LRAIL accused systems that you

4    analyzed for noninfringement in particular with respect to

04:02PM 5    differences of processing image type?

6    A.   Yes.  Well, I looked at a number of the earlier versions

7    of Pavemetrics code and, you know, they use traditional

8    computer vision processing algorithms.  The Fake3D image that

9    we've talked about a number of times is present in that code

04:02PM 10    and has been since the earliest versions that I've looked at

11    so that should provide some context.

12    Q.   Let's look at Slide 37.  Can you identify examples of

13    documents you've reviewed in forming your opinions as to

14    invalidity?

04:03PM 15    A.   Of course.  Some of the exhibits I've reviewed include

16    source code like Version r8320, um, I've purchase orders

17    including Exhibit 526, I've looked at the hardware and

18    software installation manuals and also the data acquisition

19    manual.  I've also reviewed UML Project meeting minutes,

04:03PM 20    invoices and additional UML documents.

21    Q.   And for the record is the source code you referenced

22    Exhibit 508?

23    A.   It is.

24    Q.   And is the purchase order Exhibit 526?

04:03PM 25    A.   That's correct.

UNITED STATES DISTRICT COURT

215

1    Q.   And manual is exhibit, the hardware and software manual

2    Exhibit 527?

3    A.   Correct.

4    Q.   And the data acquisition manual is Exhibit 528?

04:04PM 5    A.   Also correct.

6    Q.   So let's go to Slide 38.  Here we see the limitations of

7    Claim 1 of the '293 patent and identification of hardware and

8    software.  Do you see that?

9    A.   I do.

04:04PM 10    Q.   I think we'll skip over an extremely longer process with

11    regard to going on these visually, but let's look at

12    Slide 39.  Can you let us know what additional documents

13    you -- can you describe just at a high level, we could zoom

14    in on the left side, this is the purchase order that we saw

04:04PM 15    addressed by Mr. Hebert; correct -- or Mr. Laurent; correct?

16    A.   Correct.

17    Q.   Let's just start discussing the claim limitations.

18    Let's go back to Slide 38.  Let's look at Slide 26.  Okay.

19    Sorry.  Slide 42.  And here we see a figure from Exhibit 26,

04:05PM 20    the UML-TRB2014.  Dr. Frakes, can you describe whether the

21    systems from Pavemetrics' early work are systems satisfying

22    the claim requirements shown here?

23    A.   Yes.  The image clearly shows a system for assessing a

24    railway track bed.

04:05PM 25    Q.   And so do you believe that this was available and

UNITED STATES DISTRICT COURT

216

1    obvious to one of ordinary skill in the art as of the filing?

2    A.   I do.

3    Q.   Look at Slide 43.  Is there any dispute to your

4    knowledge whether there was a power source included in the

04:06PM 5    prior art Pavemetrics' work?

6    A.   No, there is not.

7    MR. CHUNG:  Objection, Your Honor.  This going back

8    to what we discussed earlier.

9    THE COURT:  Hang on one second.

04:06PM 10    So we're looking at an invoice from the system as

11    opposed to a publication.  Are we on publication or on the

12    system now?

13    MR. LAQUER:  We are discussing the system and the

14    purchase order describing the attributes of the system as

04:06PM 15    having a power source.

16    MR. CHUNG:  The previous slide was the publication.

17    THE COURT:  That's what I thought.

18    This is getting confusing and I apologize.

19    Essentially, what counsel is relying on are two

04:07PM 20    pieces of -- two items of prior art.  One is an actual patent

21    and one is a publication relating to -- which may or may not

22    relate to that system.  As I understand it, they might have

23    different dates and things.  It's trying to keep in your mind

24    that when we're looking at whether the patent was obvious or

04:07PM 25    something, we're looking at the publication about the system

UNITED STATES DISTRICT COURT

**EXHIBIT 4**
**-175-**

217

1 and that's the thing that's called, what's the number?

2     MR. LAQUER: UML-TRB2014.

3     THE COURT: UML-TRB2014 that's a publication. So

4 you'll be asked to determine whether the patent is obvious

04:07PM 5 because of that publication. We're also looking at an actual

6 system and that system is just called the ULB system and

7 that's separate. Try to do a better job when you're walking

8 through this, make it clear to the jury which one of those

9 we're talking about.

04:08PM 10     MR. LAQUER: All right.

11 Q. Let's look slide providing the hardware limitation offer

12 review. We can back up to Slide 38. Dr. Frakes, is it your

13 understanding that Tetra Tech has not raised any dispute that

14 all of the hardware limitations were satisfied by the UML

04:08PM 15 sale and support prior art system itself?

16 A. That is my understanding.

17 Q. So there's not even a dispute about the hardware based

18 on Pavemetrics prior system; correct?

19 A. No.

04:08PM 20 Q. Is it your understanding there's also not a dispute

21 raised by Tetra Tech that the UML-TRB2014 document satisfied

22 all of the hardware limitation requirements?

23 A. That is my understanding.

24 Q. And so to be clear is it your opinion that the UML sale

04:08PM 25 and support system made known to one of ordinary skill in the

UNITED STATES DISTRICT COURT

218

1 art at the time of the filing of the patent applications that

2 all of these standard hardware, well-known hardware items

3 were already within that person's knowledge?

4 A. That's correct.

04:09PM 5 Q. Does that also apply to the document prior art reference

6 Exhibit 26?

7 A. It does.

8 Q. Now, going on to the algorithm, the first step in the

9 software, is it your understanding that Tetra Tech has argued

04:09PM 10 as to whether or not the Fake3D algorithm in the UML sale and

11 support system was supposedly different than the Fake3D

12 algorithm in the accused products?

13 A. I believe I've heard that.

14 Q. Is it your understanding that Tetra Tech has the same

04:09PM 15 argument against validity for UML-TRB2014 document?

16 A. Yes.

17 Q. Do you agree or disagree with Dr. Morellas' opinion that

18 there was somehow a difference with regard to Fake3D as it

19 relates to the following claim limitation: Wherein at least

04:10PM 20 one processor is configured to run -- I'm sorry. That would

21 be generating track a elevation map based on the acquired

22 three-dimensional data.

23 A. Can we restate that question?

24 Q. Absolutely. Looking at the claim limitation generating

04:10PM 25 a track elevation map based on the acquired three-dimensional

UNITED STATES DISTRICT COURT

219

1 data, do you agree or disagree with Dr. Morellas that there

2 is a difference in Fake3D today as compared to at the time

3 of -- rather in the UML sale and support system?

4 A. I disagree with Dr. Morellas on that point. I've looked

04:10PM 5 at code throughout the history of Pavemetrics from before and

6 after the patent. Fake3D has not changed.

7 Q. And is your opinion on that issue the same for the

8 UML-TRB2014 document?

9 A. It is.

04:11PM 10 Q. And do you believe that the sensors described in the UML

11 sale and support document and were physically present in the

12 system satisfy the first limitation of the software

13 limitations that wherein step?

14 A. I do.

04:11PM 15 Q. And so do you believe that one of ordinary skill in the

16 art at the time of the invention knowing of the UML sale and

17 support system would have realized such sensors could be

18 used?

19 A. I agree with that.

04:11PM 20 Q. And do you agree that the sensors would perform the

21 acquiring three-dimensional surface step, Step A shown here?

22 A. Yes, we see that in all of the material.

23 Q. Let's look at Exhibit 26, the UML-TRB reference, the

24 second page and the third page and let's go on to the fourth.

04:12PM 25 Do you see the sensors shown here on page 4 of Exhibit 26?

UNITED STATES DISTRICT COURT

220

1 A. Yes, I do. I see the sensors there. Do you see the

2 Q. Let's go on to page 5 of this system. Do you see the

3 document Exhibit 26 prior art UML-TRB2014 showing a system

4 for assessing railway track beds as visualized here?

04:12PM 5     MR. CHUNG: Objection, Your Honor, leading.

6     THE COURT: Why don't you rephrase it, please.

7     MR. LAQUER: Sure. Let me grab a binder.

8 Q. Dr. Frakes, looking at Exhibit 26, does this inform your

9 opinion as to whether the UML prior art document discloses

04:13PM 10 the invention claimed in Claim 1 of the '293 patent software

11 limitation or rather hardware for acquisition?

12 A. Yes, I see the system that's referenced in that claim.

13 Q. Let's look at Exhibit 528. Do you see this description

14 in the data acquisition manual of the prior art system

04:13PM 15 showing the sensors also present there?

16 A. Yes, I see the sensors.

17 Q. And looking at Exhibit 508, you know, let's go to

18 Slide 48 and zoom in on your slides on the text on the right.

19 Zooming in on the text on the right, is it your understanding

04:14PM 20 that the code shown here from Exhibit 508 is relevant for

21 acquisition?

22 A. Yes, it is. In particular I see variables that

23 reference both intensity and elevation data. So the

24 variables up top for C1 is M_pucIntdata that represents

04:14PM 25 intensity data and below where we see multiple variables

UNITED STATES DISTRICT COURT

**EXHIBIT 4**
**-176-**

221

1 highlighted, one, for example is m_PfRangeC data that
2 indicates range or elevation data.
3 Q.   Let's look at Exhibit 26 at page 7.  This shows an image
4 that we've seen before labeled with intensity left, range
04:15PM 5 center and 3D merged right.  Do you see that, Dr. Frakes?
6 A.   I do.
7 Q.   Does this relate to your opinions of the Fake3D
8 algorithm provided in the system prior art claim?
9 A.   Right.  Well, you know, it's my opinion that the Fake3D
04:15PM 10 doesn't represent a track elevation map, but I can see how
11 reasonable minds can differ on that point.  And if Tetra Tech is
12 correct that Fake3D is in fact a track elevation map, well,
13 we're seeing it here in this early work.
14 Q.   Now, if Tetra Tech is incorrect and Fake3D is not a
04:15PM 15 track elevation map, is it possible to invalidate a patent
16 claim as obvious even with a prior art reference that does
17 not exactly match that?
18 A.   It is.
19 Q.   And do you believe that if the finder of fact were to
04:16PM 20 agree with your opinion about Fake3D not actually being a
21 track elevation map, would it have been obvious for one of
22 ordinary skill in the art to create a track elevation map
23 knowing the Fake3D technique?
24 A.   I believe so because we're looking here at an image
04:16PM 25 where intensity and elevation data are being combined

UNITED STATES DISTRICT COURT

222

1 together.  Now, I described Fake3D before as a flat image
2 with fake shadows put on it, but we could think of doing the
3 process somewhat in the opposite way.  Keeping the elevation
4 data and allowing intensity values to affect those.  And of
04:16PM 5 those elevation data are present in the image, well, it's
6 something that could be used to perform the patented claims.
7 Q.   There was discussion of mat lab in respect to the
8 earlier Pavemetrics system.  Do you recall that, Dr. Frakes?
9 A.   Yes, I do.  It's one of my favorite languages.
04:17PM 10 Q.   And would it have been obvious to one of ordinary skill
11 in art to implement a system that runs on rail rather than
12 ina mat lab computer?
13 A.   I'm sorry.  I'm not sure I understand the question.
14 Q.   Suppose you had an algorithm implemented in mat lab.  Do
04:17PM 15 you believe that in the context of Claim 1 of the '293
16 patent, it would have been obvious to one of ordinary skill
17 in the art to implement in a different programming language
18 what had previously been implemented in mat lab?
19 A.   Oh, of course.
04:17PM 20 MR. CHUNG:  Outside the scope of this expert's
21 report and deposition.
22 THE COURT:  Is it outside the scope of the report?
23 MR. LAQUER:  I would need to double-check closely.
24 THE COURT:  Well, then I'll sustain the objection.
04:18PM 25 BY MR. LAQUER:

UNITED STATES DISTRICT COURT

223

1 Q.   Let's look at page 58 of your presentation.  Let's look
2 over on the right side.  This is the presentation from the
3 UML document Exhibit 26 and we've highlighted here discussion
4 of Sobel kernels and edge detection.  Can you let us know
04:18PM 5 what are Sobel kernels?
6 A.   So these are techniques widely used in image processing
7 and computer vision for calculating gradients in images.
8 They can be several different sizes, but essentially they're
9 used in convolutional operations to find edges and again,
04:18PM 10 gradients in images.
11 Q.   And what is the Canny method?
12 A.   It's another method that uses filters like these for
13 edge detection and computer vision and image processing.
14 Q.   So how does your analysis of Pavemetrics' early
04:18PM 15 implementation of LRAIL compare to your analysis of the
16 accused artificial intelligence LRAIL systems?
17 A.   Oh, well, they're very different.  Obviously, when it
18 comes to the artificial intelligence product, it's doing
19 something, you know, very different than what we would
04:19PM 20 consider happening with Sobel kernels and Canny methods.
21 Q.   Let's look at your Slide No. 62.  With respect to the
22 UML system that Pavemetrics sold and supported, do you
23 believe that one of ordinary skill in the art would have a
24 motivation to combine that system with the other reference
04:19PM 25 including ECB-TRB2014 as you noted?

UNITED STATES DISTRICT COURT

224

1 A.   Yeah, I do because when we look at what was present with
2 the UML sale and support, we have all of these components
3 already present.  The system is there, the sensors are there,
4 there is a power source, acquiring 2D and 3D data.  Then when
04:20PM 5 look at ECB-TRB2014 paper, it shows these track elevation
6 maps.  So these are things in the same field.  They're very
7 related in terms of content.  And so to me to use one of
8 those track elevation maps with a system like that provided
9 in the UML sale seems obvious.
04:20PM 10 Q.   And do you have the same opinion or a different opinion
11 with regard to the UML documentation and whether one of
12 ordinary skill in the art would have combined what was
13 disclosed in the UML document with then the, um, the other
14 prior art combinations?
04:20PM 15 A.   I have the same opinions.
16 Q.   Let's look at claim or your Slide 63.  This addresses
17 the dependent claim of the '293 patent, Claim 21.
18 Based on opinion of the dependent Claim 1 with
19 respect individually to the UML system and also the UML
04:21PM 20 document, what is your opinion as to whether the UML system
21 in combination with Gilbert-Serra would render obvious
22 Claim 21?
23 A.   Right.  So in thinking about Claim 21, it is a dependent
24 claim.  So we already talked about Claim 1 and how I feel
04:21PM 25 that is invalid.  When you add the reference by Gibert-Serra,

UNITED STATES DISTRICT COURT

EXHIBIT 4
-177-

225

1   it talks very clearly about doing this process measuring
2   joint bar length and comparing it to different thresholds.
3   So when I see that reference, again, in the same field about
4   the same type of content and I consider that with the other
04:21PM 5   material, to me that becomes obvious.
6   Q.   Look at Exhibit 511 page 3.  Do you recognize this as
7   the Gibert-Serra prior art document?
8   A.   That's right.  As we see by the title A Machine Vision
9   System For Automated Joint Bar Inspection From a Moving Rail
04:22PM 10   Vehicle, so this underscores what I had brought up before.
11   This is even in the rail field and it's talking about looking
12   at joint bar lengths and making decisions accordingly so in
13   combination, I see the material as obvious.
14   Q.   And the abstract of Gibert-Serra begins broken joint
04:22PM 15   bars have been identified as one of the major causes of main
16   line derailments in the U.S.  On October 2006, the U.S.
17   Federal Railroad Administration issued a federal regulation
18   that mandates periodic inspections to detect cracks and other
19   indications of potential failures in CWR joints.
04:23PM 20        Do you see that, Dr. Frakes?
21   A.   I do.
22   Q.   And does this inform your opinion as to one of ordinary
23   skill in the art and whether they would have a motivation to
24   combine this reference when considering the joint bar
04:23PM 25   dependent Claim 21?

UNITED STATES DISTRICT COURT

226

1   A.   Absolutely.  Even the first sentence identifying broken
2   joint bars as one of the major causes of main line
3   derailments, clearly there is motivation to combine that with
4   other technology to solve the problem.
04:23PM 5   Q.   Could we look at the top of this prior art Gibert-Serra
6   document and just check the date.  You see March 13th
7   through 16 of 2007?
8   A.   That's right 2007.
9   Q.   Now, let's look at page 5 of Gibert-Serra.  Was your
04:23PM 10   consideration of the sensor hardware disclosed here in
11   Gibert-Serra also relevant to your analysis of obviousness of
12   the Claim 21 of the '293 patent?
13   A.   Yes.  Because, again, here's it's showing hardware that
14   performs similarly to, you know, a laser-based system for
04:24PM 15   measuring features on a railroad.  Highly relatable to the
16   other content that we would combine to show obviousness.
17   Q.   Let's look at the bottom right of this page where
18   there's a section Joint Bar Detection.  Can you read the
19   first sentence after joint bar detection?
04:24PM 20   A.   The latest version of the system does not use lasers but
21   relies on the software approach to detect the presence of
22   joint bars.
23   Q.   And what is your opinion as to whether one of ordinary
24   skill in the art would combine sensor techniques from one
04:24PM 25   reference with respect to another in the Gibert-Serra

UNITED STATES DISTRICT COURT

227

1   disclosure?
2   A.   Well, I think it pretty much lays out the steps here to
3   do exactly that.  Even if lasers are not used, it indicates
4   that software can be used to detect the presence of joint
04:25PM 5   bars so it weaves it all together very nicely.
6   Q.   Let's look over at the next page, page 6.  Can you
7   describe what is shown here at the top of page 6?
8   A.   Yes, so this is a picture of the rail head.  There are
9   other features indicated in the picture including a gap as
04:25PM 10   well as detected cracks and the center region is highlighted
11   for context.
12   Q.   And there's some text actually surrounds, starts a
13   little bit before this page at the bottom of the previous and
14   continues on under this figure that I'd like you to focus in
04:25PM 15   on.  If you could go back to page 5 of Gibert-Serra.
16        This reads a combination of both types of features
17   on joint bars of the same rail is used to robustly detect
18   them.  Each trigger is validated by checking the symmetry and
19   the length of the bar to remove false detections.
04:26PM 20        Dr. Frakes, can you explain what Gibert-Serra
21   teaches of one of ordinary skill in the art regarding
22   validating?
23   A.   Well, it teaches that both symmetry and length matter.
24   They're useful in identifying joint bars appropriately.  So
04:26PM 25   using, for example, minimum and maximum joint bar length

UNITED STATES DISTRICT COURT

228

1   thresholds to identify a joint bar candidate as being a joint
2   bar makes a lot of sense when you read this.
3   Q.   And would that be performed in software?
4   A.   It would.
04:26PM 5   Q.   Let's look at page 7 of Exhibit 511, the second
6   paragraph over on the left side towards the top.  That begins
7   once the joint bar is detected and segmented, a match filter
8   is applied within different segments to get a map of
9   locations where there are likely cracks.
04:27PM 10        Dr. Frakes, what is segmentation?
11   A.   Segmentation applies loosely to isolating something
12   within an image and identifying where its boundaries are.
13        MR. CHUNG:  Sorry for the belated objection, but
14   this is outside the scope of his expert report.
04:27PM 15        THE COURT:  Is this in his expert report?
16        MR. LAQUER:  I believe there is discussion of this
17   paragraph, but I would need to double-check that
18   specifically.
19        THE COURT:  If you can't point it to me, then I'll
04:27PM 20   sustain the objection.
21   BY MR. LAQUER:
22   Q.   Dr. Frakes, do you believe that one of ordinary skill in
23   the art would have motivation to combine Gibert-Serra with
24   the UML system you previously discussed?  Let's look at
04:28PM 25   Slide 65.

UNITED STATES DISTRICT COURT

EXHIBIT 4
-178-

229

1   A.   Okay.  Now that we have the slide, can you ask the

2   question again, please?

3   Q.   What motivation would one of ordinary skill in the art

4   have to combine the Gibert-Serra reference with the UML

04:28PM 5   system disclosure?

6   A.   Well, we saw that there is a motivation to combine in

7   terms of the problem being very recognized in the field and

8   important.  We also see from the Gibert-Serra paper and

9   Pavemetrics' early work that there's a great deal of overlap

04:28PM 10   between both the hardware and the methods being used.

11        So this is something that people do in the field

12   when they're trying to solve a new problem.  They see what

13   else is going on and when they see a new solution out there,

14   they combine and it's obvious.

04:28PM 15   Q.   Look at Slide 66.

16        THE COURT:  I will note it's 4:30.  Since we're at

17   a good stopping point, we'll break here for the night and

18   come back at 9:00.  The parties I've been keeping them on

19   like a clock so they only have so much time to put on their

04:29PM 20   case which is why they may be going faster as we gets towards

21   the end.

22        They only have two-and-a-half hours of testimony

23   left so we'll have that in the morning.  Then we'll do the

24   closing instructions.  We'll have lunch and then we'll have

04:29PM 25   closing arguments after that and then you can deliberate

UNITED STATES DISTRICT COURT

230

1   after that.  That's what the day looks like.

2        Okay.  Thank you.

3        (Jury not present.)

4        THE COURT:  So we will pick up tomorrow at 8:30.

04:30PM 5   We can handle the one remaining issue with jury instructions.

6        Anything else we need to talk about tomorrow, but I

7   would like to get the jury instructions read before lunch so

8   you have the lunch break to kind of get your closing stuff

9   together.

04:30PM 10        Does that schedule work for everybody?

11        MR. BARNEY:  Yes, Your Honor.

12        THE COURT:  Thank you.  Have a good night.

13        (Proceedings were concluded at 4:30 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

231

1

2              CERTIFICATE OF REPORTER

3

4   COUNTY OF LOS ANGELES   )

5                 ) SS.

6   STATE OF CALIFORNIA   )

7

8   I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED

9   STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,

10   DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE

11   FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET

12   FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN

13   FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO

14   FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION

15   OF MY STENOGRAPHIC NOTES.

16

17

18   DATE:  AUGUST 24, 2022

19

20     /s/  LAURA MILLER ELIAS

21   LAURA MILLER ELIAS, CSR 10019

22   FEDERAL OFFICIAL COURT REPORTER

23

24

25

UNITED STATES DISTRICT COURT

**EXHIBIT 4**
**-179-**