**Page 1**

```
                    UNITED STATES OF AMERICA
                   UNITED STATES DISTRICT COURT
                  CENTRAL DISTRICT OF CALIFORNIA
                        WESTERN DIVISION

                           - - -
                  HONORABLE MARK C. SCARSI
             UNITED STATES DISTRICT JUDGE PRESIDING
                           - - -

PAVEMETRICS SYSTEMS, INC.,        )
                                  )
          PLAINTIFF,              )
                                  )
VS.                               )   CASE NO.:
                                  )   CV 21-01289-MCS
TETRA TECH, INC.,                 )
                                  )
          DEFENDANT.             )
_____)


              REPORTER'S TRANSCRIPT OF PROCEEDINGS

                 WEDNESDAY, AUGUST 24, 2022

                   LOS ANGELES, CALIFORNIA




              LAURA MILLER ELIAS, CSR 10019
            FEDERAL OFFICIAL COURT REPORTER
            350 WEST 1ST STREET, ROOM 4455
              LOS ANGELES, CALIFORNIA 90012
                  PH:  (213)894-0374


                 UNITED STATES DISTRICT COURT
```

**Page 2**

```
1   APPEARANCES OF COUNSEL:

2

3   ON BEHALF OF PLAINTIFF:
4       KNOBBE, MARTENS, OLSON & BEAR, LLP
5       BY: CHRISTY LEA, ESQ.
6           JOSEPH RE, ESQ.
7           NICHOLAS ZOVKO, ESQ.
8           ALAN LAQUER, ESQ.
9       2040 MAIN STREET
10      14TH FLOOR
11      IRVINE, CA 92614
12
13  ON BEHALF OF DEFENDANT:
14      FINNEGAN HENDERSON
15      BY: JAMES BARNEY, ESQ.
16          AARON PARKER, ESQ.
17          NICHOLAS CERULLI, ESQ.
18          JENCY MATHEW, ESQ.
19          DANIEL CHUNG, ESQ.
20      901 NEW YORK AVENUE NW
21      WASHINGTON, DC 20001
22
23
24
25
                 UNITED STATES DISTRICT COURT
```

**Page 3**

```
                        INDEX
WITNESSES FOR
PAVEMETRICS:

            DIRECT    CROSS    REDIRECT    RECROSS

FRAKES, DAVID
BY: MR. LAQUER  8              28
BY: MR. CHUNG          9

REBUTTAL CASE

WITNESS
FOR TETRA TECH:

MORELLAS,
VASSILIOS

BY: MR. BARNEY  33            101
BY: MR. LAQUER         84             107



JURY INSTRUCTIONS.................. 108

RULE 50 MOTION.................... 144

CLOSING ARGUMENT

BY: MR. BARNEY................... 164, 242

BY: MS. LEA...................... 204


VERDICT.......................... 252
```

```
                 UNITED STATES DISTRICT COURT
```

**Page 4**

```
         LOS ANGELES, CALIFORNIA; WEDNESDAY, AUG. 24, 2022; 8:42 A.M.

                              - - -

          THE CLERK:  Calling Case No. CV 21-1289.

          Pavemetrics systems versus Tetra Tech, TAS.

08:42AM   Counsel, state your appearances, please.

          (Appearances as heretofore noted.)

          THE COURT:  Good morning.  So we've got one more

jury instruction issue; right?  Who is ready to address that?

          MR. CHUNG:  Yes, Your Honor.  The parties have

08:43AM  reached an agreement on Instruction No. 21.  We have red line

copies for you.  If I may approach?

          THE COURT:  Please, thank you.  Okay.  This looks

fine to me.  Is this agreed to by the parties?

          MR. RE:  Subject to your rulings, yes, Your Honor.

08:44AM   THE COURT:  Thank you.  Yeah.  And I will note for

the record that there are objections outstanding to the

Court's ruling which impact this instruction, and the parties

have revised it in line with the Court's rulings

notwithstanding their objection.

08:44AM   Thank you.  Okay, we'll make this change.

          We're all set on jury instruction and verdict form.

          What else do we need to discuss before the jury

comes in?

          MR. RE:  Your Rule 50 A practice, Your Honor, I'm

08:44AM  not familiar with how you like it done.  Is there anything
```

```
                 UNITED STATES DISTRICT COURT
```

**EXHIBIT 5**
**-180-**

5

1   that needs to be in writing, and by when?

2       THE COURT:  I think we can -- I mean, typically, I

3   handle with oral motions, but it might make sense if the

4   parties feel like they would like to brief it, then I'm fine

08:44AM 5   with that as well.

6       MR. RE:  And when would you like a Rule 50 A motion

7   by?

8       THE COURT:  Um, let me see.  Why don't we do this.

9   Why don't we -- I guess we could deal with them -- if the

08:45AM 10   jury is gonna be going out this afternoon, they'll likely

11   come back some time tomorrow.  Maybe we could deal with it --

12   maybe we could deal with it in the morning while the jury's

13   out?

14       MR. RE:  Well, I do have -- I suggest we have a few

08:45AM 15   minutes of oral presentation before the jury deliberates just

16   in case there's something that may be possibly removed from

17   the verdict form.

18       THE COURT:  Okay.

19       MR. RE:  Then all issues will be preserved subject

08:46AM 20   to a writing subsequently to the schedule you set.

21       THE COURT:  Okay.  So why don't we do this.  Why

22   don't we talk about it once we do the -- we'll do the jury

23   instructions hopefully before lunch, and then we can do

24   Rule 50 A motions over lunch.

08:46AM 25       MR. RE:  Thank you.

UNITED STATES DISTRICT COURT

6

1       THE COURT:  Okay.  So does that work for Tetra

2   Tech?

3       MR. BARNEY:  Yes, Your Honor, that's fine.

4       MR. RE:  I did receive instructions that we will be

08:46AM 5   filing, the video transcripts, and make them part of the

6   record although they obviously don't go to the jury, but they

7   will be made part of the record today.

8       THE COURT:  Okay.

9       MR. CHUNG:  No objection.

08:46AM 10       THE COURT:  Okay, anything else?

11       MS. LEA:  Well, I just will mention that we intend

12   to lodge the slides that we used with John Laurent to make

13   them part of the record.

14       THE COURT:  Is there gonna be an objection to that?

08:46AM 15       MR. CHUNG:  If they're gonna be lodged in the

16   record for the jury, I think we would object to that.

17       MS. LEA:  So I meant for the appellate court

18   record, not for going back to the jury.

19       THE COURT:  Okay.  What does Tetra Tech think about

08:47AM 20   that?

21       MR. CHUNG:  That's fine.  We have no objection to

22   that, Your Honor.

23       THE COURT:  Okay, great.  Okay, anything else?

24       MR. LAQUER:  Your Honor, the parties have agreed to

08:47AM 25   submit the file history of the patents.

UNITED STATES DISTRICT COURT

7

1       THE COURT:  And what are the exhibit numbers for

2   the file history?

3       MR. LAQUER:  Exhibit No. 611 is the file history of

4   the '557 patent.

08:47AM 5       THE COURT:  Okay.

6       MR. LAQUER:  Exhibit No. 612 is the file history of

7   the '293 patent.

8       THE COURT:  Okay.

9       MR. LAQUER:  And Exhibit No. 613 is the file

08:47AM 10   history of the provisional patent application.

11       THE COURT:  Okay.  I'll wait until the jury comes

12   and put those into the record just so they're aware that

13   they're going to be in evidence.

14       MR. LAQUER:  Understood.  And I belive there's

08:48AM 15   already a printed set.  These are several thousand pages long

16   so we would just request if we could take the existing

17   printed set and make those available in the event that the

18   jury does wish to refer to the file histories.

19       THE COURT:  Okay.  And the printed set is 611, 612

08:48AM 20   and 613?

21       MR. LAQUER:  Yes, Your Honor.

22       THE COURT:  Okay.  Anything else?

23       MR. BARNEY:  Nothing, Your Honor.

24       THE COURT:  They'll come in as soon as the jury is

08:48AM 25   back.  Thank you.

UNITED STATES DISTRICT COURT

8

1       THE CLERK:  All rise.

2       (Jury present.)

3       THE COURT:  Welcome back to the jurors.  Thanks for

4   all your hard work and paying so careful attention.  We'll

09:08AM 5   pick up where we left off.  We had a witness on the stand

6   being presented by Pavemetrics.

7       You can proceed, Counsel.

8       DIRECT EXAMINATION (RESUMED)

9   BY MR. LAQUER:

09:08AM 10   Q.  Welcome back, Dr. Frakes.

11   **A.  Thank you.**

12   Q.  Have you reviewed the MATLAB cracks files?

13   **A.  I have.**

14   Q.  And what is your opinion regarding invalidity of Claim 8

09:08AM 15   of the '557 based on the UML system using that file?

16   **A.  Um, my opinion is that a person of ordinary skill in the**

17   **art would find that claim obvious based on the UML sale.**

18   Q.  Is there any nexus between what Dr. Morellas alleges to

19   be the patented feature and any secondary considerations of

09:09AM 20   nonobviousness?

21   **A.  I don't see a nexus there because the features that**

22   **Dr. Morellas claims infringe are actually unused and**

23   **experimental features.**

24   Q.  Has Dr. Morellas shown whether Tetra Tech's 3DTAS system

09:09AM 25   utilizes Claims 1 and 21 of the '293 patent?

UNITED STATES DISTRICT COURT

**EXHIBIT 5**

**-181-**

9

1    A.  No, he has not.

2    Q.  Why not?

3    A.  Uh, well, because he claims that it's the Tetra Tech

4    neural network that, uh, practices those claims, and he's

09:09AM  5    never looked at the neural network.

6         MR. LAQUER:  I pass the witness.

7         THE COURT:  Okay.  Thank you, Counsel.

8         Cross-examination?

9         MR. CHUNG:  Yes, Your Honor.

09:09AM  10         THE COURT:  Oh, I'm sorry, yes.  And before I

11   forget, the parties have agreed to move in some exhibits that

12   are the file histories of the patents.  And these are the

13   back and forth between the patentee and the Patent Office,

14   and they're kind of big documents, but they go through how

09:09AM  15   what was originally filed, how it was modified, those things.

16         There are three of them.  Exhibit 611 is the file

17   history for the '557 patent.  Exhibit 612 is the file history

18   for the '293.  And Exhibit 613 is a file history for the

19   provisional.  This was the first filing that lead to the

09:10AM  20   patents.  And so 611, 612 and 613 are now in evidence.

21         (Exhibits 611, 612, 613 admitted.)

22         THE COURT:  You can proceed, Counsel.

23         CROSS-EXAMINATION

24   BY MR. CHUNG:

09:10AM  25   Q.  Good morning, Dr. Frakes.

10

1    A.  Good morning.

2    Q.  And it's nice to meet you.  My name's Daniel Chung.  And

3    I heard that you tried out for the, I guess, now Washington

4    Commanders football team, but didn't make the team; right?

09:10AM  5    As a long time D.C. sports fan and a D.C. native, I just want

6    to note for the record that I think if you tried out for this

7    year, you may have a chance.  So think about that.

8         Let's just jump right into your opinions that you

9    just gave, and I want to start with infringement if we.  Can

09:10AM  10   you can turn to slide 22 of your demonstratives?  Dr. Frakes,

11   on top of the slide, it states noninfringement, sold without

12   sensors in communication.  Did I read that correctly?

13   A.  Yes, you did.

14   Q.  And Doctor, you agree that the accused LRAIL systems

09:11AM  15   include sensors and at least one processor such as an

16   acquisition computer?

17   A.  They do include those parts.

18   Q.  And Doctor, you agree that in order for the accused

19   LRAIL systems to operate, to collect and process data, the

09:11AM  20   sensors are going to be in communication with at least that

21   acquisition computer.

22   A.  After the sale, correct.

23   Q.  And why don't we turn to slide 23 of your

24   demonstratives.  And if we can please zoom in on the

09:11AM  25   highlighted part of where it says controller, cables,

11

1    installation.  And I just want to highlight a part that I

2    think you missed during your direct examination, and it

3    states the controller interfaces data and control signals

4    between the host computer and the laser profilers.  Did I

09:12AM  5    read that correctly, Dr. Frakes?

6    A.  You did.

7    Q.  And I'm just trying to get a sense of what your position

8    is here so I'm gonna -- I'm gonna try to explain it.  Is what

9    you're saying is that anybody abroad including in Canada can

09:12AM  10   sell as many infringing systems to U.S. customers to their

11   heart's content and then escape liability for patent

12   infringement by simply delivering the system in separate

13   boxes?  Is that the understanding of the law that you applied

14   in your analysis?

09:12AM  15         MR. LAQUER:  Objection.

16         Calls for a legal conclusion.

17         THE COURT:  Uh, he can go ahead and answer it with

18   respect to your analysis of your opinion of infringement.

19         THE WITNESS:  Uh, no, I certainly didn't make any

09:12AM  20   claim that broad.  I think what I said was that the system

21   isn't plugged in when it's sold.

22   BY MR. CHUNG:

23   Q.  Okay.  Well, Doctor, I believe the jury instructions

24   will clarify all this.  Let's go to slide 18 of your

09:13AM  25   demonstratives, and I wanna talk about the neural network.

12

1    And Doctor, yesterday you told the jury that you looked into

2    the LRAIL TensorFlow folder.  Do you remember that?

3    A.  I do.

4    Q.  Doctor, you, in fact, did not review the LRAIL

09:13AM  5    TensorFlow code.

6    A.  Yes, I did.

7    Q.  I'd like you to turn to your deposition testimony,

8    page 137, line 21 to page 138 to line 1.

9         THE COURT:  Okay, let me look at that first,

09:13AM  10   Counsel.

11         THE WITNESS:  Sorry, can you restate where I can

12   find that?

13         THE COURT:  Hang on one second.  Let me look at it

14   first.  137, line 21 to 138, line 1; is that right?

09:14AM  15         MR. CHUNG:  Yes, Your Honor.

16         THE COURT:  And you wanna read that into the

17   record?

18         MR. CHUNG:  Yes, Your Honor.

19         THE COURT:  Okay.  Any objection, Counsel?

09:14AM  20         MR. LAQUER:  Improper impeachment, Your Honor.

21         THE COURT:  I think you can read it.  Go ahead.

22         MR. CHUNG:

23         "Q.  Okay.  And you said you didn't review the

24   TensorFlow code; correct?

09:14AM  25         "A.  Correct."

**EXHIBIT 5**
**-182-**

---

**13**

1    Q.   Dr. Frakes, did I read that correctly?

2        MR. LAQUER: I'm going to object that that was not

3 the full area that was identified. There were higher line

4 numbers beginning at line 16, I believe, counselor said that

09:14AM 5 he was seeking to read in?

6        THE COURT: I think we're okay. Go ahead.

7 BY MR. CHUNG:

8    Q.   Dr. Frakes, did I read that correctly?

9    **A.   You did read that correctly.**

09:14AM 10   Q.   And Doctor, yesterday you testified to the jury that you

11 looked inside the LRAIL neural network. Do you remember

12 that?

13    **A.   I do.**

14    Q.   Doctor, it is true that you have not directly reviewed

09:15AM 15 the LRAIL neural network algorithms?

16    **A.   That is not true.**

17    Q.   I'd like to direct your attention to page 126, line 21

18 to page 127, line 7 of your deposition transcript.

19        THE COURT: Okay. Any objection to 126, line 21

09:15AM 20 through 127, line 7? Is that correct?

21        MR. LAQUER: Yes, Your Honor, improper impeachment.

22        THE COURT: Was that the correct site?

23        MR. CHUNG: That was the correct site, Your Honor.

24        THE COURT: And you think it's improper?

09:16AM 25    Um. . . I think you can read it. Go ahead.

UNITED STATES DISTRICT COURT

---

**14**

1        MR. CHUNG:

2        "Q. Have you reviewed the LRAIL neural network

3 algorithms?

4        "A. I've seen code that calls them, and I'm

09:16AM 5 familiar with graphics that Pavemetrics has provided that

6 demonstrate the architecture. I have not reviewed their

7 TensorFlow code directly, but I'm familiar with surrounding

8 code, and I'm familiar with TensorFlow at a very basic level,

9 of course, from my previous work.

09:16AM 10   Q.   Dr. Frakes, did I read that correctly?

11    **A.   You did read that correctly.**

12    Q.   Doctor, you do not dispute that the LRAIL uses a

13 convolutional neural network with a convolution filter.

14    **A.   Uh, I do not dispute that.**

09:17AM 15   Q.   You do not dispute that the LRAIL convolution filter is

16 a zone of limited area.

17    **A.   Yes, it is a zone of limited area.**

18    Q.   And aside from your position on the stride parameter of

19 two, you do not dispute the LRAIL convolution filter

09:17AM 20 slides across an input image.

21    **A.   With a slide -- with a stride value of two skipping**

22 **every other element, yes, it does slide across the -- the**

23 **image at the top input layer.**

24    Q.   And it is true, Doctor, that you cannot say with

09:17AM 25 certainty whether or not the LRAIL convolution filter is a

UNITED STATES DISTRICT COURT

---

**15**

1    gradient operator.

2    **A.   I can't say that it is. That's for certain.**

3    Q.   And you cannot say that it is not.

4    **A.   Well, the filters that I looked at in the neural network**

5 **were not gradient filters, and I did look.**

09:17AM 6       **MR. CHUNG: I'd like to direct you and the Court's**

7 **attention page 123, lines 4 through 17 of your deposition**

8 **transcript.**

9        THE COURT: Any objections?

09:18AM 10       MR. LAQUER: Again, this does not appear to be

11 proper attempted impeachment, Your Honor.

12        THE COURT: And the question was you could not say

13 that they -- well, can I hear the question again? Can -- can

14 you restate the question?

09:18AM 15       MR. CHUNG: You cannot say with certainty whether

16 or not the LRAIL convolution filter is a gradient operator.

17        THE COURT: Okay. You can go ahead and read it.

18        MR. CHUNG:

19        Q. Do convolutional neural networks ever calculate

09:19AM 20 gradient measurements?

21        "A. Do they ever calculate gradient measurements?

22 Well, you would have to know what a filter is inside of the

23 network, and they are learned. You know, they are not

24 specified so filters within the networks, they become what

09:19AM 25 they become. And so if you wanted to see if filters were

UNITED STATES DISTRICT COURT

---

**16**

1    doing gradient measurements, you would actually have to, you

2 know, look in and pull a filter out and say okay, well, this

3 particular filter here does that, and that's not something I

4 have done so I can say that they do -- they do gradient

09:19AM 5 operations, you know, with certainty."

6    Q.   Doctor, did I read that correctly?

7    **A.   You did. And I -- I think the issue we're running**

8 **over and over here again is -- is timing. Um, there are**

9 **multiple --**

09:20AM 10       THE COURT: He just asked you whether you read it

11 correctly. On redirect, you can explain that.

12        THE WITNESS: Yes, Your Honor.

13 BY MR. CHUNG:

14    Q.   Let's turn to slide 24 of your demonstratives. Doctor,

09:20AM 15 throughout this trial, we've been talking about Fake3D and

16 mixed images. Right?

17    **A.   Correct.**

18    Q.   And Doctor, you agree that the Mixed Image in the

19 accused LRAIL software meets the court's definition of track

09:20AM 20 elevation map.

21    **A.   Yes, although it was never configured to run.**

22    Q.   Doctor, you agree that the Mixed Image in the accused

23 LRAIL software meets the court's definition of track

24 elevation map?

09:20AM 25    **A.   I do.**

UNITED STATES DISTRICT COURT

---

**EXHIBIT 5**

**-183-**

17

1    Q.    Let's turn to slide 15 of your demonstratives.  And I
2    just want to highlight the source code are and the version
3    number.  Doctor, for the r10323 version of source code, it is
4    enabled to identify features from Fake3D by a configuration
09:21AM 5    file; correct?
6    A.    It can be.
7    Q.    Let me try that again.  For the r10232 version of source
8    code, it is enabled to identify features from Fake3D by
9    configuration file; correct?
09:21AM 10   A.    Partially correct.
11          MR. CHUNG:  May I direct your attention and the
12   Court's attention to page 79, line 15 to line 22 of your
13   deposition transcript.
14          THE COURT:  Counsel, on line 19 of page 79, there's
09:22AM 15   something that says "it" says.  What is "it" there?
16          MR. CHUNG:  I believe it's referring to Dr. Frakes'
17   rebuttal report.
18          THE COURT:  Okay.  Is that correct?
19          MR. LAQUER:  Your Honor, we have an objection based
09:22AM 20   on a prior ruling from Your Honor that I believe may need to
21   be addressed --
22          THE COURT:  At side bar?
23          MR. LAQUER:  Yes.
24          (The following proceedings were held at side bar.)
09:23AM 25          THE COURT:  Okay.  Just reminding everybody of the

UNITED STATES DISTRICT COURT

18

1    rules.  Please identify yourselves so court reporter can take
2    it down.
3          MR. LAQUER:  We object.  This is violating the
4    Court's summary judgment order.
09:23AM 5          MS. LEA:  So this is actually combining that
6    software version r10323 with the system that was sold in
7    Sale A.  He's talking about a configuration.  Obviously, it
8    wasn't configured with Sales 2 and 3 and 4.  It was never
9    even put on with them.  This is different than their
09:23AM 10   availability theory.  It's configured with the system.  We
11   won summary judgment on that system as it was sold
12   pre-notice.  They're trying to claw back, Your Honor.
13          THE COURT:  So this is referring to the first
14   system and not the others.  Is that the argument?
09:24AM 15          MS. LEA:  Referring to the 2020 system that we won
16   summary judgment on talking about how it's configured on the
17   actual system not how it's available for Sales 2, 3 and 4.
18          THE COURT:  Counsel.
19          MR. CHUNG:  I was just referring specifically to
09:24AM 20   the r10323 version.  I can ask the question again if you
21   don't want me to mention the other versions of the code or I
22   can just skip over the other references to these versions.
23          Are you talking about the 10205?
24          MS. LEA:  10232 and how it's configured and used on
09:24AM 25   a particular system.  We won summary judgment on that.  Your

UNITED STATES DISTRICT COURT

19

1    theory in opening is availability.  It's available to be used
2    with Sales 2, 3 and 4.
3          MR. CHUNG:  I think that's the entire point of this
4    trial is that it's a disputed fact whether or not -- which
09:25AM 5    version of code and what's available.
6          THE COURT:  I think that's correct.  I think you
7    can go ahead and read it.
8          MR. CHUNG:  Thank you.
9          (Side bar concluded.)
09:25AM 10          THE COURT:  Counsel, please proceed.
11          MR. CHUNG:  Thank you, Your Honor.  I'd like to
12   publish to the jury lines 15 through 22 of page 79 of
13   Dr. Frakes' deposition transcript.
14          "Q.  So in the second -- I'm sorry, third column,
09:25AM 15   it says Fake3D neural networks for the first three versions
16   of code which are the r10205 version, r10323 version and
17   r10494 version.  For all three of these versions, it says
18   enabled to identify features from Fake3D by a configuration
19   file.  Is that right?
09:26AM 20          "A.  That's correct.
21    Q.    Dr. Frakes, did I read that correctly?
22    A.    You did.
23    Q.    Thank you.  Now, let's talk about your opinions on
24   validity.  Please turn to slide 37 of your demonstratives.
09:26AM 25   Dr. Frakes, for your UML sale and support analysis, you rely

UNITED STATES DISTRICT COURT

20

1    on a sale of an LCMS system to UMS Lowell in 2012; is that
2    right?
3    A.    In part.
4    Q.    And you rely on source code version r8320 that was
09:26AM 5    created May 2014; is that right?
6    A.    Yes.
7    Q.    And you rely only on Pavemetrics, the accused infringer,
8    for your assumption that the r8320 source code version was
9    used in connection with a UML sale; isn't that right?
09:27AM 10   A.    Uh, the fact witnesses, yes, both John and Jeff.
11    Q.    And Doctor, you were here yesterday when Dr. Hebert of
12   Pavemetrics testified that the r8320 version of source code
13   cannot possibly be part of that 2012 UML sale.  You were here
14   for that?
09:27AM 15   A.    I was.
16    Q.    And Doctor, you were here yesterday when Dr. Hebert
17   testified that Pavemetrics did not even deliver processing
18   software to UMS Lowell as part of the 2012 UML sale.  You
19   were here for that as well?
09:27AM 20   A.    Yes, not until later did they deliver it.
21    Q.    And Doctor, you were here yesterday when Dr. Hebert
22   testified that the r8320 version of source code was never
23   disseminated to the public.  You were here for that, too?
24   A.    Yes, although its products were.
09:27AM 25   Q.    And Doctor, do you agree that your opinions are only as

UNITED STATES DISTRICT COURT

**EXHIBIT 5**
**-184-**

21

1  good as their underlying facts and assumptions?
2  **A.   I do agree with that.**
3  **Q.**   I'd like to move next to the UML-TRB article.  Let's
4  turn to slide 40 of your demonstratives.  And Doctor, you
09:28AM 5  were also here yesterday for Mr. Laurent's testimony?
6  **A.   Yes, I was.**
7  **Q.**   And you understand that Mr. Laurent is a co-author of
8  UML-TRB article?
9  **A.   I do.**
09:28AM 10  **Q.**   And doctor, you were here yesterday for Mr. Laurent's
11  testimony about the 3D merged image being just intensity?
12  **A.   You may have to refresh my memory on that.**
13  **Q.**   How -- how about this?  An image that is just intensity
14  does not meet the track elevation map element of Claim 1 of
09:28AM 15  the '293 patent; is -- is that correct?
16  **A.   I agree with that.**
17  **Q.**   Thank you.  Let's turn to slide 58 of your
18  demonstratives.  So Doctor, I understand your opinion to be
19  that Claim 1 of the '293 patent would have been obvious in
09:29AM 20  view of well-known methods like the Sobel and Canny
21  techniques.  Is -- is that fair?
22  **A.   Yes, it is.**
23  **Q.**   So I'm actually a little confused by that opinion,
24  Doctor.  Isn't it true that you submitted a sworn declaration
09:29AM 25  to this court opining that Claim 1 cannot cover the use of

22

1  known operators such as the Sobel filter?
2  **A.   Well, as you know, um, direct infringement and**
3  **obviousness have very different, um, types of requirements.**
4  **Uh, we're not talking about a word-for-word requirement for**
09:29AM 5  **obviousness.  Rather the point is that it would be obvious to**
6  **someone of ordinary skill in the art to predict the invention**
7  **based on the prior art.**
8  **Now, Canny and Sobel kernels being in the prior art**
9  **for someone to change them and make them flexible in size and**
09:30AM 10  **shape but as we heard from Dr. Mesher and from Dr. Morellas**
11  **is not a big leap.  So to see, that speaks to obviousness.**
12  **Q.**   Doctor, I'd like to direct your attention to Exhibit 512
13  in your binder?
14        THE COURT:  I just wanted to jump in real quick,
09:30AM 15  sorry.  I just wanted to clear up something.  There's been
16  some discussion about a word-for-word test for infringement,
17  and there was just some testimony that the test for
18  obviousness and infringement might be different.
19        I want you to ignore all the advice from the
09:30AM 20  lawyers and the witnesses with respect to what the standards
21  are, what the legal test is for infringement, this word for
22  word stuff or a different test.  We'll give you jury
23  instructions at the end of the case so we'll give you the
24  appropriate test to use.  So don't -- don't pay too much when
09:30AM 25  witnesses or the lawyers talk about a particular test,

23

1  especially if it's not the same as what the jury instructions
2  are.
3        I'm sorry.  Go ahead, Counsel.
4  BY MR. CHUNG:
09:30AM 5  **Q.**   I'd like to direct your attention, Dr. Frakes, to
6  Exhibit 512 in your binder.
7  **A.   Okay, I'm there.**
8  **Q.**   And this is a declaration that you submitted to this
9  court; correct?
09:31AM 10  **A.   Yes, it is.**
11  **Q.**   On the last page of this declaration, you submitted this
12  declaration under penalty of perjury; is that correct?
13  **A.   Actually, it looks like the last page is my CV.**
14        THE COURT:  Page 43, the last page of the
09:31AM 15  declaration.
16        THE WITNESS:  Yes, that's correct.
17  BY MR. CHUNG:
18  **Q.**   I'd like to direct your attention to paragraph 83 of
19  that declaration.  Do you see that?
09:32AM 20  **A.   Paragraph 83?**
21  **Q.**   Yes, Doctor.
22  **A.   Yes.**
23        THE COURT:  Do you want to publish that as
24  impeachment, Counsel?
09:32AM 25        MR. CHUNG:  Yes, Your Honor.

24

1        THE COURT:  You can go ahead and do that.
2        MR. CHUNG:  In my opinion, the prosecution history
3  confirms that the claim requires a very specific algorithm
4  for identifying the features of the rail track bed and cannot
09:32AM 5  cover use of known operators for calculating differential
6  vertical measurements such as Sobel filters or other known
7  differential operators.
8  **Q.**   Dr. Frakes, did I read that correctly?
9  **A.   Yes, you did.**
09:32AM 10  **Q.**   And in fairness, Doctor, a couple weeks later, you
11  submitted another sworn declaration to this court to clarify
12  that you actually do not believe that Claim 1 excludes well
13  known operators just as the Sobel filter.  Do you recall
14  that?
09:33AM 15  **A.   Not specifically, but if you care to refresh my memory,**
16  **I'd be glad to look at the article.**
17  **Q.**   Let's turn to the last tab in your binder.  It's the
18  supplemental declaration there.  And it's paragraph 5.  Do
19  you see paragraph 5?
09:33AM 20  **A.   Yes, I do.**
21  **Q.**   Does that refresh your recollection?
22  **A.   It does, thank you.**
23  **Q.**   And -- and the reason why I'm a little bit confused here
24  is because a couple months later, in your deposition, you
09:33AM 25  testified under oath that you were not aware of anything

**EXHIBIT 5**
**-185-**

25

1  incorrect in your original declaration, the one in which you
2  opine that Claim 1 cannot cover the use of known operators
3  such as the Sobel filter; is that right?
4  A.  Yes, that's right.
09:34AM 5  Q.  And today just -- just to confirm, you're now saying
6  that Claim 1 can cover well known operators such as the Sobel
7  filter and the Canny method; is that right?
8  **A.  Well, I've presented various opinions on -- on those**
9  **operators.  And when it comes to Claim 1, what I have said is**
09:34AM 10 **that clearly, the gradient neighborhood must be something**
11 **that is flexible and that is adaptive based on testimonies**
12 **we've heard from Dr. Mesher and Dr. Morellas.  I've further**
13 **gone on to say that in light of Sobel and Canny in prior art,**
14 **it would be obvious to someone of ordinary skill in the art**
09:34AM 15 **that this claim is invalid.  Those are the opinions I've set**
16 **forth.**
17 Q.  Is that now your fifth opinion on the Sobel and Canny
18 filters?
19 A.  I haven't been counting.
09:34AM 20 Q.  Let's move on.  Let's talk about Claim 21 of the '293
21 patent.  Let's look at Exhibit 4 of your demonstratives.  And
22 I'm gonna read slowly for the court reporter here.  Claim 21
23 requires determining whether the length of the joint bar
24 candidate falls between a minimum joint bar length threshold
09:35AM 25 and a maximum joint bar length threshold.  Did I read that

UNITED STATES DISTRICT COURT

26

1  correctly?
2  A.  I believe so.
3  Q.  Doctor, you would agree that the length of a joint bar
4  could be measured without applying a minimum length
09:35AM 5  threshold.
6  A.  Yes, that's possible.
7  Q.  And you would also agree that the length of a joint bar
8  could be measured without applying a maximum length
9  threshold.
09:35AM 10 A.  I'd also agree with that.
11 Q.  Okay.  I'm gonna try to distill down your obviousness
12 position, Doctor.  It appears that in your view, the claimed
13 inventions of the '293 and '557 patents would have been
14 obvious because a person of ordinary skill in the art would
09:36AM 15 have taken all of the information at his or her disposal and
16 modified Pavemetrics' prior system.
17 Is that a fair characterization of your opinion?
18 **A.  Yeah, I think that's a fair.  The prior art that's**
19 **referenced is interesting in this case because it's actually**
09:36AM 20 **so focused in the area of application.**
21 **You know, I've been asked to look at a lot of prior**
22 **art before, and sometimes things come, you know, from far**
23 **afield.  They wouldn't make sense to take technology from a**
24 **spaceship and put it into a medical device.  But that's not**
09:36AM 25 **the case here.  All this prior art is very clustered in this**

UNITED STATES DISTRICT COURT

27

1  **application space of inspecting rail and road.  So combining**
2  **features from it is not at all a big leap from someone of**
3  **ordinary skill in the art.**
4  Q.  Okay.  Doctor, you were here for the testimony of
5  Mr. Habel, President and CEO of Pavemetrics?
6  A.  I was.
7  Q.  And you're here when Mr. Habel testified about a 2014
8  Pavemetrics' market report in which they expressed that
9  quote, "we don't yet have all the algorithms for automated
09:37AM 10 distress analysis."  You were here for that?
11 **A.  I don't remember those exact words, but I'll take your**
12 **word for it.**
13 Q.  And you were here when Mr. Habel testified about a 2016
14 Pavemetrics' marker report in which they expressed that we
09:37AM 15 don't yet have a killer app.  You were here for that?
16 A.  I was.
17 Q.  And you were when Mr. Habel testified about that same
18 2016 March report, Pavemetrics expressed that we still have
19 plenty to learn?
09:37AM 20 **A.  I don't recall that exactly, but, again, I'll take your**
21 **word for it.**
22 Q.  And you were here when Mr. Habel testified about an
23 email he sent in 2017 saying that he wanted to know exactly
24 what Tetra Tech is doing for rail inspection.
09:37AM 25 You were here for that?

UNITED STATES DISTRICT COURT

28

1  A.  I believe I was.
2  Q.  Okay.  And you were here when Mr. Habel testified that
3  it was not until 2018, early 2019 when Pavemetrics decided to
4  transition the LRAIL software to deep neural networks.
09:38AM 5  You were here for that?
6  **A.  I think we can safely assume I was here for all of**
7  **Mr. Habel's testimony.**
8  Q.  Well, Doctor, it appeared that the claimed inventions at
9  the time did not seem so obvious to Pavemetrics, did it.
09:38AM 10 **A.  Well, you are referencing Mr. Habel's testimony, and I**
11 **believe he's a telecommunication's expert, so again, based**
12 **on my knowledge of a person of ordinary skill in the art, it**
13 **would have been obvious.**
14 MR. CHUNG:  Pass the witness, Your Honor.
09:38AM 15 THE COURT:  Thank you, Counsel.
16 Any redirect?
17 MR. LAQUER:  Yes, Your Honor.
18 REDIRECT EXAMINATION
19 BY MR. LAQUER:
09:38AM 20 Q.  Dr. Frakes, can you explain how and when you reviewed
21 LRAIL's neural network files throughout the course of this
22 case?
23 **A.  Yes.  I believe, uh, that the majority of my review was**
24 **after my deposition that was being referenced by counsel.**
09:38AM 25 Q.  You were asked about LRAIL software r10323.  Do you

UNITED STATES DISTRICT COURT

EXHIBIT 5
-186-

29

1  recall whether that version was ever used with any accused
2  LRAIL or a unit too early to be at issue here?
3  MR. CHUNG: Objection.
4  THE WITNESS: I think it was not --
09:39AM 5  MR. CHUNG: Can we have a side bar?
6  THE COURT: Um, sure.
7  (The following proceedings were held at side bar.)
8  THE COURT: Counsel, you have an objection?
9  MR. CHUNG: I do. From what we just heard,
09:39AM 10  Dr. Frakes is saying that he reviewed all this new stuff
11  after his deposition, after the close of expert discovery,
12  after the close of fact discovery which is clearly
13  improper. It goes to the same issues we've been dealing with
14  and I want to put that on the record.
09:39AM 15  THE COURT: I think it is improper if he reviewed
16  something after his expert report, after his deposition. I
17  don't see how he can testify to it because he can't have
18  opinions about -- these would seem to be new opinions.
19  MR. LAQUER: Your Honor, he did review it earlier.
09:40AM 20  Both sides' experts throughout the course of discovery were
21  reviewing things. It's not different than the expert
22  reviewing a patent in preparation of testifying later after
23  the deposition.
24  THE COURT: Are you saying he reviewed it before,
09:40AM 25  and then reviewed it again?

UNITED STATES DISTRICT COURT

30

1  MR. LAQUER: This has been available to both sides'
2  experts.
3  THE COURT: I thought he said on the stand he did
4  review it after the deposition.
09:40AM 5  MR. LAQUER: The question on the stand was
6  regarding the TensorFlow code.
7  THE COURT: I think it's improper for him to give
8  an opinion on things reviewed after the deposition. It's
9  different than the patent. If he reviewed the patent before
09:40AM 10  the deposition and then looked at it again, that's fine. If
11  it's something he didn't look at prior to his deposition,
12  it's improper for him to testify about opinions based on
13  that.
14  Where do we stand with respect to this particular
09:41AM 15  question?
16  Remind me the particular question was the r10323
17  unit at issue responsive to a question that came up for
18  cross-examination which imply accused versions infringed
19  based on functionality of a software version?
09:41AM 20  MR. CHUNG: The problem with the question is after
21  that he reviewed TensorFlow after the deposition. During
22  cross-examination, he said he did not review it.
23  THE COURT: I'm gonna strike it from the record and
24  we'll go on with this question.
09:42AM 25  MR. CHUNG: Understood, Your Honor.

UNITED STATES DISTRICT COURT

31

1  (Side bar concluded.)
2  THE COURT: Okay. We had an objection to, um, a
3  question that was asked of the witness, um, Dr. Frakes, how
4  and when you examined the LRAIL neural network, and the
09:42AM 5  answer was after my deposition being referenced by counsel.
6  So the way this works with experts is they prepare
7  a report, um, giving their opinions, and then the other side
8  can take their depositions and ask them questions about it.
9  So it's improper for a witness to talk about opinions or
09:42AM 10  review -- opinions based on review they did after their
11  deposition.
12  So I'm gonna strike that question and answer, and
13  we'll -- we'll move on. So the -- the question about
14  reviewing code after the deposition, that's stricken from --
09:43AM 15  from the record.
16  Counsel, please proceed.
17  BY MR. LAQUER:
18  Q. Dr. Frakes, you were asked about LRAIL software r10323.
19  Do you recall whether that version was ever used with any
09:43AM 20  accused LRAIL or a unit too early to be at issue here?
21  **A. It was never used with a case version.**
22  Q. Did you learn anything new in any of Tetra Tech
23  questions to you?
24  **A. I did not.**
09:43AM 25  Q. Did any of Tetra Tech's questions change any of your

UNITED STATES DISTRICT COURT

32

1  opinions in any way?
2  **A. No way whatsoever.**
3  MR. LAQUER: No further questions.
4  THE COURT: Thank you, Counsel.
09:43AM 5  Does Pavemetrics have a next witness to call?
6  MS. LEA: No, Your Honor.
7  THE COURT: Okay. I understand that at the close
8  of these cases, there will be some motions. We'll defer that
9  as we talked about earlier to the lunch break so we don't
09:43AM 10  take the jury's time.
11  Does Tetra Tech have any rebuttal witnesses at this
12  time?
13  MR. BARNEY: We do, Your Honor.
14  May I call my next witness?
09:44AM 15  THE COURT: Please.
16  MR. LAQUER: Your Honor? I was gonna ask if our
17  witness could leave the stand?
18  THE COURT: Oh, yeah. Yes.
19  MR. BARNEY: May I proceed, Your Honor.
09:44AM 20  THE COURT: Yes.
21  MR. BARNEY: Your Honor, Tetra Tech calls as its
22  next witness, rebuttal witness Dr. Morellas.
23  THE CLERK: Raise your right hand.
24  (Witness sworn.)
09:45AM 25  THE CLERK: Please be seated.

UNITED STATES DISTRICT COURT

EXHIBIT 5
-187-

---

33

1  Will you please state your name for the record
2  again.
3  THE WITNESS:  Vassilios Morellas, and that's
4  V-a-s-s-i-l-i-o-s M-o-r-e-l-l-a-s.
09:45AM  5  THE CLERK:  Thank you.
6  DIRECT EXAMINATION
7  BY MR. BARNEY:
8  Q.  Good morning, Dr. Morellas.
9  A.  Good morning.
09:45AM 10  Q.  Were you here yesterday and this morning for Dr. Frakes'
11  testimony regarding his opinions on infringement and
12  validity?
13  A.  Yes, I was.
14  Q.  Do you have any disagreements with those opinions
09:45AM 15  expressed by Dr. Frakes?
16  A.  Yes, I do.
17  Q.  And have you prepared any slides today to help
18  illustrate your testimony?
19  A.  I have.
09:46AM 20  Q.  So let's begin with Dr. Frakes' opinions on
21  infringement.  If we could go to next slide, please.  What
22  limitations -- as you understood his testimony, which
23  limitations in Claim 1 of the '293 patent is Dr. Frakes
24  contending are not satisfied by the LRAIL system?
09:46AM 25  A.  Yes.  I have highlighted those with the yellow marker,

UNITED STATES DISTRICT COURT

---

34

1  and these are the four places where there is a dispute.
2  Q.  And what I'd like to do, Doctor, is just go through each
3  one of these and see if you have any opinions that you would
4  like to express in response to Dr. Frakes' opinion.  Is that
09:46AM  5  okay?
6  A.  That is okay.
7  Q.  So let's go to the first one.  Were you here when
8  Dr. Frakes opined that the LRAIL system does not meet the
9  requirement in Claim 1, that the sensor is in communication
09:46AM 10  with the at least one processor?
11  A.  Yes, I was.
12  Q.  And do you agree with that opinion?
13  A.  Uh, no, I do not agree.  As we heard from Dr. Hebert,
14  the sale is a turnkey system that includes hardware, software
09:47AM 15  for both acquisition and processing, and in the end, if I am
16  a railway owner, and I see this brochure, and I decide to
17  purchase the system, I expect at the end of the day that the
18  system would be able to identify all features and all of
19  these functions that appear to be in the brochure.
09:47AM 20  Q.  Okay.  And do you understand the accused acts of
21  infringement with respect to '293 includes the sale of the
22  system?
23  A.  Yes.
24  Q.  Okay.  And you mentioned something earlier about a
09:47AM 25  turnkey sale.  What's your understanding of a turnkey sale?

UNITED STATES DISTRICT COURT

---

35

1  A.  A turnkey sale is a system that by the flip of a button
2  would be able to install the software and does all the --
3  whatever it -- it would be able to use it right away.
4  Q.  And if Pavemetrics made a turnkey sale of the LRAIL
09:48AM  5  system to CSX, would that -- and if that system met all the
6  claim limitations, would that be an infringement of the
7  claim?
8  A.  Yes, it would be.
9  Q.  And does it matter how they actually package it up and
09:48AM 10  ship it into the United States?
11  MR. LAQUER:  Objection, calls for a legal
12  conclusion.
13  THE COURT:  Yeah, I think it does.
14  Maybe move on to his opinions.
15  MR. BARNEY:  Thank you, Your Honor.
16  Q.  Uh, you mentioned the materials you reviewed from
17  Dr. Hebert?
18  A.  Yes.
19  Q.  And how does -- Dr. Hebert's opinion, what did he have
09:48AM 20  to say about whether when the system is operating, the
21  computer is in communication with the sensor?
22  A.  Well, I disagree with him because if I am buying the
23  sensor, uh, sensor by themselves or do anything.  I have
24  to have a computer to be able to interface with the sensor
09:49AM 25  and get the data from the environment.

UNITED STATES DISTRICT COURT

---

36

1  Q.  Let's move on to the next limitation.  Were you here
2  when Dr. Frakes opined that he does not believe that the
3  limitation configure to run an algorithm is satisfied because
4  the LRAIL system is configured with a default that does
09:49AM  5  not -- does not -- does not call up the Fake3D or the Mixed
6  Image algorithm?  Were you here for that?
7  A.  Yes, I was.
8  Q.  And do you agree with him that that means the limitation
9  is not satisfied?
09:49AM 10  A.  I disagree.  And actually, I look at the court's claim
11  construction for the term is configured to run the algorithm,
12  and this means that it's programmed to run the algorithm
13  without the need to rebuild, rewrite or recompile the code.
14  And I use this more times it was an example.
09:50AM 15  So, for example, we buy Microsoft software, okay,
16  and when we buy it, it comes with three preconfigured
17  features, but through the different menus, we can check the
18  boxes there that reconfigure in the system.  For example, in
19  this case, we check the spelling as we type.  There a number
09:50AM 20  of other options that we have.  So you can consider this
21  clicking of the boxes as a zero or one function.  You disable
22  it or you're enabling it.
23  Q.  And let me just ask a few follow-up questions to make
24  sure I understand just using your example of the spell check
09:50AM 25  feature on Microsoft Word which most people are familiar

UNITED STATES DISTRICT COURT

---

**EXHIBIT 5**
**-188-**

37

1  with.

2  A.  Okay.

3  Q.  Um, and so when you first open up Word after you

4  purchased it, if the configuration is the way we see it, does

09:50AM 5  that mean that the spell checker has been disabled by

6  default?

7  A.  Correct.

8  Q.  Okay.  And if you want to enable the spell checker, what

9  do you have to do?

09:51AM 10  A.  Just check the box.

11  Q.  And when you check that box, does that rewrite the

12  software code?

13  A.  No.

14  Q.  Does it rebuild the software?

09:51AM 15  A.  No.

16  Q.  Does it recompile the code?

17  A.  No.

18  Q.  Is it a redesign of the hardware or software?

19  A.  No.

09:51AM 20      MR. BARNEY:  Now, turning to the LRAIL system, and

21  we can go to Exhibit 28, please?

22      And this is in evidence, Your Honor.  Page 13?  And

23  if I could blow up just the introduction paragraph.  And the

24  second paragraph down, if we can highlight that?

09:51AM 25  Q.  Dr. Morellas, what does the LRAIL software and hardware

38

1  manual say about this configurability of the system?

2  A.  It says the LCMS system is delivered with libraries

3  either for Windows 7 or Windows 8, and the only thing that

4  the user has to do is easily configure and operate the

09:52AM 5  system.

6  Q.  Okay.  And does it say it allows the user to easily

7  configure and operate the system?

8  A.  Yes.

9  Q.  Okay.  And so if a user wants to operate LRAIL using

09:52AM 10  Fake3D or Mixed Image, how difficult is that for the user to

11  do?

12  A.  It's very easy.

13  Q.  Okay.  And is that basically the same thing as we saw

14  with Microsoft Word, just essentially clicking a button to

09:52AM 15  call up that -- that feature?

16  A.  Correct.

17  Q.  In doing so, does that rewrite the code?

18  A.  No.

19  Q.  Does that reconfigure the code?

09:52AM 20  A.  No.

21  Q.  And does it require a redesign of the system?

22  A.  No.

23  Q.  All right.  So if we could go back to your presentation,

24  please?  And so Doctor, what is your opinion as to whether --

09:52AM 25  do you agree with Dr. Frakes that this configured to run an

39

1  algorithm limitation is not satisfied?

2  A.  I do not agree with him.

3  Q.  So in your opinion, is this limitation satisfied by the

4  LRAIL system?

09:53AM 5  A.  It is satisfied.

6  Q.  Let's go to the next issue.  Do you -- were you here

7  when Dr. Frakes was explaining that because -- in his opinion

8  because the neighborhood, the window, that's used to slide

9  over the data in the LRAIL system has a stride of two that it

09:53AM 10  doesn't satisfy the, um -- that limitation as construed by

11  the court?

12  A.  Yes, I have.

13  Q.  Okay.  And just so -- we've seen this a bunch of times.

14  I'm gonna try not to belabor this, but let me just make sure

09:53AM 15  we've all got the right limitation and construction in mind.

16  So the limitation at issue here is moving the gradient

17  neighborhood like a sliding window over the 3D elevation data

18  using the processor.  Am I right about that?

19  A.  You're right.

09:53AM 20  Q.  And the court has construed that?

21  A.  Yes.

22  Q.  And I'm gonna read the construction, and I'll ask you

23  some questions.  So the Court's construction was

24  sequentially and completely applying the gradient

09:53AM 25  neighborhood to the 3D elevation data; is that correct?

40

1  A.  That is correct.

2  Q.  Now, Doctor, do you agree with Dr. Frakes that because

3  there's a stride of two that that means that the limitation's

4  not met under that construction?

09:54AM 5  A.  I do not agree with him.

6  Q.  Can you explain why, please?

7  A.  Yes.  I have prepared a little animation here.  You can

8  see the yellow neighborhood which is the, uh -- that is

9  moving throughout the image.  And as it moves, you see the

09:54AM 10  six boxes and the 6 pixels that it left behind.  These are

11  pixels that have already been contributed to the operation.

12  So every time that the yellow box covers part of the image,

13  there is some computations that are happening.  Okay?

14      Next?  You see the new six boxes appear in the

09:54AM 15  image.  And then the neighborhood moves, next, yeah, down two

16  pixels.  One more please.  And you can see how by moving --

17  by sliding the window throughout the image, all the pixels in

18  the image get to be contributing to the operation.

19  Q.  Okay, Doctor, I just have a few follow-up questions.

09:55AM 20  The yellow window that we saw moving across the data, um, is

21  that the gradient window?

22  A.  Correct.

23  Q.  And does it have some numbers in it and some weights?

24  A.  Yes.

09:55AM 25  Q.  And as it moves across the data which is now colored

EXHIBIT 5
-189-

41

1  green, what is it doing with respect to the data that's down
2  in the pixel level?
3  **A.   Uh, that is a combination.  There are some applications**
4  **that happen between the weight of the filter and the values**
09:55AM 5  **of the pixels.**
6  Q.   Okay.  So it's running calculations.  It's taking its
7  weighting values, and it's performing calculations based on
8  the values down at the pixel levels.
9  **A.   Yes.  It's weighting all the values of the pixels by the**
09:56AM 10  **weight of the filter.**
11  Q.   Okay.  And as it moves along that we just saw in your
12  animation, um, each time it moves by, u, two, it then steps
13  and performs calculations on the nine pixels beneath it.
14  **A.   Correct.**
09:56AM 15  Q.   And then it moves over two more and performs
16  calculations on the nine pixels beneath it.
17  **A.   Correct.**
18  Q.   Is there -- is there any pixel, Doctor, in the image
19  that gets entirely left out of that process?
09:56AM 20  **A.   Uh, no pixel's left behind.**
21  Q.   Is there any pixel in the image that doesn't get to
22  contribute to the calculation to the -- of the gradient?
23  **A.   No.**
24  Q.   And so in your opinion, just from what we've seen, even
09:56AM 25  with a stride of two, does this gradient neighborhood

UNITED STATES DISTRICT COURT

42

1  operation satisfy the court's construction?
2  **A.   It does satisfy the court's construction.**
3  Q.   Is it being applied sequentially?
4  **A.   Yes.**
09:56AM 5  Q.   Is it being applied completely?
6  **A.   Yes.**
7  Q.   Okay.  Now, how do you respond to the assertion that
8  because the Karami book that you relied on calls this 2by2
9  movement skipping one element that somehow means that
09:57AM 10  the claim limitation can't be met?  How do you respond to
11  that?
12  **A.   Although I agree with the text in the book, again, my**
13  **opinion is that the neighborhood is sliding throughout the**
14  **image sequentially and completely.**
09:57AM 15  Q.   Okay.  Does the court's claim construction say anything
16  about whether it has to be a stride of 1 or a stride of 2?
17  **A.   No, there is nothing.**
18  Q.   So in your opinion, is this limitation satisfied --
19  **A.   Correct, it --**
09:57AM 20  Q.   -- by the LRAIL?  I'm sorry, I -- probably -- I messed
21  up my question.  Is this limitation satisfied by the LRAIL
22  system in your opinion?
23  **A.   Yes.**
24  Q.   Let's go on to the next limitation.  Actually, before we
09:57AM 25  do that, did you -- were you here when Dr. Frakes was talking

UNITED STATES DISTRICT COURT

43

1  about, um, the TensorFlow, uh, software versus some other
2  type of deep neural network?
3  **A.   Yes.**
4  Q.   Okay.  Um, and just so we're all on the same page, is
09:58AM 5  there any dispute in this case that the LRAIL system, the
6  accused LRAIL system uses a deep convolutional neural
7  network?
8  **A.   Uh, I don't think there is any dispute on that.**
9  Q.   Okay.  And I think we also heard Dr. Frakes also agree
09:58AM 10  with that same point.
11  **A.   Correct.**
12  Q.   So there is something we agree on in this case; right?
13  **A.   Yes.**
14  Q.   Okay.  Could have the next slide, please?  So Doctor, in
09:58AM 15  this illustration that you've provided down, down along the
16  bottom, we've got these different names; TensorFlow, PyTorch,
17  theano and deep CNET.  What are those?
18  **A.   Yeah.  Uh, these are basically neural network libraries.**
19  **As we heard, TensorFlow comes from Google, PyTorch comes from**
09:58AM 20  **Facebook, theano is from the University of Montreal, and we**
21  **heard also about the deep CNET that was used in one of the**
22  **papers.  So basically, these are tools that a user can use to**
23  **develop, to design his or her own neural network.  In other**
24  **words, I can -- I can design the same architecture by using**
09:59AM 25  **either TensorFlow or PyTorch or other design libraries.  It's**

UNITED STATES DISTRICT COURT

44

1  **what is called an application programming interface.**
2  Q.   Okay.  Are these also sometimes called developer tools?
3  **A.   That's correct, yes.**
4  Q.   So whether you're using TensorFlow or you're using
09:59AM 5  PyTorch or you're using deep CNET, are you essentially
6  building the same deep neural network?
7  MR. LAQUER:  Objection, leading.
8  THE COURT:  You can answer.
9  THE WITNESS:  Yes.  Like I said, you can design the
09:59AM 10  same network by using different tools.
11  BY MR. BARNEY:
12  Q.   Okay.  And have you actually used some of these
13  different tools to create deep neural networks?
14  **A.   Yes.  I have used TensorFlow and PyTorch.**
09:59AM 15  Q.   Okay.  And between TensorFlow and PyTorch, did it matter
16  which one you use in terms of the end product that you
17  created in terms of a deep neural network?
18  **A.   No, there's no difference.**
19  Q.   Okay.  And once that deep neural network is created
10:00AM 20  using either TensorFlow or PyTorch or something else, do -- d
21  all deep neural networks operate by the same principles?
22  **A.   Yes.**
23  Q.   And can you, uh, explain to the jury what those
24  principles are?
10:00AM 25  **A.   Yeah.  The principle that is of course in variant is the**

UNITED STATES DISTRICT COURT

**EXHIBIT 5**
**-190-**

45

1 fact that there is always a gradient neighborhood that is
2 sliding throughout the image.
3 Q. Okay. And can you just break that down a little bit
4 more? We've got a picture of a woman, and there's some parts
10:00AM 5 of her face that have been sort of identified. Can you
6 provide a little more detail about what's happening there?
7 A. Yeah. As we see there, and as Dr. Frakes explained
8 yesterday, there are different layers of convolution. We
9 call them convolutional layers. And in each layer, there are
10:00AM 10 the filters that, uh, basically sweep the image making all
11 these, uh, calculations.
12     And at the end of the day, if we are interested in
13 the face, we would be able to find presentations of the face
14 in the, uh -- in the last layer of the convolutional, uh,
10:01AM 15 layer.
16 Q. And did you apply this understanding of how deep neural
17 networks operate to your analysis in this case?
18 A. Yes, I did.
19 Q. And in your opinion, does it change your opinion at all
10:01AM 20 to know that the deep neural network was created with
21 TensorFlow versus something else?
22 A. No, it does not.
23 Q. Okay. Let's go to the next dispute. Were you here when
24 Dr. Frakes opined that the LRAIL system in his opinion does
10:01AM 25 not satisfy the requirement of defining an appropriate

46

1 gradient neighborhood?
2 A. Yeah, I was.
3 Q. Okay. And with respect to the phrase -- the word
4 appropriate, were you here when Dr. Frakes opined that
10:01AM 5 because in his opinion, the neighborhood that's created
6 during a training of the neural network is fixed at the end
7 of that process that that means it can't be an appropriate
8 gradient neighborhood when used in the LRAIL system? Did you
9 hear that?
10:02AM 10 A. Yes, I heard that.
11 Q. What's your response to that?
12 A. Uh, I don't agree with this, uh, because as I include in
13 here, there are three different, uh, parts of the code, one
14 for fastener and one for spike and one for tie. So as we
10:02AM 15 saw, there are -- there are different features in the, uh,
16 railway product. You have different dimensions and different
17 looks.
18     So we have to have different, uh, appropriate
19 gradient neighborhoods to be able to -- to -- to tell the
10:02AM 20 fact they are different on the spike or the tie. We have are
21 different dimensions, different, uh, characteristics.
22     MR. LAQUER: I'm gonna object as beyond the scope
23 of the report, Your Honor.
24     THE COURT: Is this discussion in his report?
10:02AM 25     MR. BARNEY: I believe he does discuss this,

47

1 Your Honor, and it's directly responsive to what Dr. Frakes
2 opined on.
3     MR. LAQUER: I'd like to see where they believe in
4 the report there's an argument or an opinion that the
10:03AM 5 appropriateness is based on a particular feature.
6     MR. BARNEY: Your Honor, he actually opined about
7 this in his opening testimony. So actually the codes you're
8 looking at here, this actually comes from what he's already
9 testified about in this case, and there was no objection when
10:03AM 10 he testified about it.
11     THE COURT: Okay. You can proceed then.
12 BY MR. BARNEY:
13 Q. Doctor, I don't know whether you were done with your --
14 your testimony, but let me see if I can just back this out
10:03AM 15 and to make sure I understand. Throughout this case, both
16 sides have used this example of the iPhone, and, you know,
17 and you look at a picture, and you get a box around a face
18 that's on the iPhone. You're familiar with that?
19 A. Yes.
10:03AM 20 Q. And is that an example of -- of what a neural network
21 can do?
22 A. Exactly.
23 Q. Okay. And so it's sliding a window, and it has some
24 information that it's looking for, and when it -- because
10:03AM 25 it's been trained, and when it gets to a spot where it looks

48

1 like what it's looking for, it circles or boxes it.
2 A. That is correct.
3 Q. Now -- and you personally programmed, uh, visual, um,
4 computer vision programs like that?
10:04AM 5 A. Yes. Many times.
6 Q. In fact, I think you testified you did some of that
7 stuff at Honeywell?
8 A. Correct.
9 Q. So Doctor, if you're programming a neural network, and
10:04AM 10 you're training a neural network, and you want it to
11 recognize faces, um, I'm assuming that's gonna be one type of
12 gradient window with a particular size and weight.
13 A. Yes.
14 Q. But what if I ask you to program the network to only
10:04AM 15 look for eyeballs, not the entire face, but I wanna actually
16 pull out just the people's eyeballs. You with me so far?
17 A. Yes.
18 Q. Is that going to be a different type of gradient network
19 with different weightings and different size?
10:04AM 20 A. Yes.
21 Q. Okay. Is that -- and why is that?
22 A. Because this is a different, uh, feature than the face.
23 A. The eye is different than the entire face.
24 A. Of course.
10:04AM 25 Q. Okay. So coming back to the LRAIL system, is the LRAIL

**EXHIBIT 5**
**-191-**

49

1   system designed to search for different types of features?

2   A.   Yes.

3   Q.   Okay.  And so you mentioned fasteners, spikes and ties.

4   What is a tie?

10:05AM 5   A.   Uh, a tie is, uh, the wooden block that, uh, uh,

6   supports basically the rails.

7   Q.   Okay.  It's the ones that go horizontally, uh --

8   A.   Yeah.

9   Q.   What is a spike?

10:05AM 10   A.   A spike, uh, is something that is like a metal nail that

11   helps the fastener to clamp down the rail.

12   Q.   Okay.  And what is a fastener?

13   A.   The fastener is the part that keeps the, uh, rail down

14   on the, uh, tie.

10:05AM 15   Q.   Okay.  Do ties and spikes and fasteners have -- are they

16   different sizes from each other?

17   A.   Yes.

18   Q.   Am I -- am I correct that a tie is much bigger than a

19   spike?

10:05AM 20   A.   Yes.

21   Q.   Okay.  Do they have different shapes?

22   A.   Yes.

23   Q.   Okay.  So in the LRAIL system that you reviewed, um,

24   when the system is searching for a fastener, is it going to

10:05AM 25   use the same gradient neighborhood that it uses when it's

UNITED STATES DISTRICT COURT

50

1   searching for a spike?

2   A.   No.

3   Q.   When it's searching for a spike, is it gonna use the

4   same gradient neighborhood that it uses for searching for a

10:06AM 5   tie?

6   A.   No.

7   Q.   Okay.  So in your opinion, what does that mean in terms

8   of this requirement of the algorithm defining an appropriate

9   gradient neighborhood?

10:06AM 10   A.   Like I said, in order to detect different types of

11   features in the railway track, you need to have to have

12   different neighborhoods.

13   Q.   And in your opinion, is this limitation satisfied by the

14   LRAIL system?

10:06AM 15   A.   It is.

16   Q.   Let's go to the next point, please.  When were you here

17   when Dr. Frakes was talking, uh, about the -- whether or not

18   Fake3D includes elevation data?

19   A.   Yes, I was.

10:06AM 20   Q.   Okay.  And did you hear when he said that reasonable

21   people might disagree about whether it includes elevation

22   data?

23   A.   Yes.

24   Q.   Okay.  You're a reasonable person; right?

10:06AM 25   A.   Excuse me.  I hope I am.

UNITED STATES DISTRICT COURT

51

1   Q.   Okay.  Do you have any doubt in your mind whatsoever

2   that in the -- in the, uh, LRAIL code, the Fake3D, uh, image

3   includes elevation data?

4   A.   I don't have any doubt.

10:07AM 5   Q.   Any doubt whatsoever?

6   A.   No doubt.

7   Q.   And how can you be so sure, Doctor?

8   A.   Because I -- I explained last week, and I have put this

9   slide here as well, uh, this part of the code where you see

10:07AM 10   that the, um, uh, purple boxes that contain variables that

11   are associated with the range data, and the blue boxes that

12   contain the intensity information come together to create

13   the, uh -- the variable that is surrounded by uh, the green

14   box.

10:07AM 15   Q.   And so the portions of the code in both Fake3D and Mixed

16   Image -- is that your opinion in Mixed Image as well?

17   A.   Yes.

18   Q.   And so both in Fake3D and Mixed Image, is it your

19   opinion that the image data includes both elevation and

10:07AM 20   intensity data?

21   A.   Yes.  In fact, the -- in the Mixed Image like the

22   channels -- the, uh, color channels there that come together

23   to create the color perception that we perceive, the same way

24   it comes in this particular structure with channel one being

10:08AM 25   the range, uh, channel three being, uh, the intensity and

UNITED STATES DISTRICT COURT

52

1   channel two be, uh, the intensity and its, uh, uh, image.

2   Q.   Now, Doctor, with respect to the requirement in the

3   claim that the appropriate gradient neighborhood representing

4   a small 2D track section over which differential vertical

10:08AM 5   measurements are calculated, do you see that portion of the

6   claim?

7   A.   Yes.

8   Q.   Now, if the image data that's being inputted into the

9   neural network includes elevation data as I believe you just

10:08AM 10   testified in the LRAIL system, what's your opinion as to

11   whether differential vertical measurements are calculated?

12   A.   Differential vertical measurements would be calculated.

13   Q.   And why is that?

14   A.   Next slide, please?  So imagine that we have a gradient

10:09AM 15   neighborhood that is shown in the left with a 3 by 3 window,

16   uh, and as we do the gradient operations again by sliding

17   this neighborhood throughout the image, every time that, uh,

18   the gradient neighborhood covers part of the image, there are

19   calculations, gradient operations that are happening, and the

10:09AM 20   output is a differential, uh, vertical measurement.

21   Q.   So Doctor, we've gone through, I believe, all the

22   limitations that Dr. Frakes identified as being in dispute in

23   Claim 1.  And now that we've gone through all of them, has

24   anything changed your opinion, uh, that you expressed last

10:09AM 25   week that Claim 1 is infringed by the LRAIL system?

UNITED STATES DISTRICT COURT

**EXHIBIT 5**

**-192-**

53

1　A.　I have not changed my opinion.

2　Q.　Uh, let's, uh, now look at a different, uh, claim, and

3　that's Claim 8 of the '557 patent.  Which limitations of

4　Claim 8 did Dr. Frakes say that he disputed?

10:10AM 5　A.　Again, I have highlighted the portions in dispute here.

6　Q.　Okay.  And I'd like to just briefly talk about each one

7　of these again?

8　A.　Sure.

9　Q.　Uh, let's go to the first one.  So were you here when

10:10AM 10　Dr. Frakes opined that he does not believe that what you've

11　identified in your opinion, um, actually satisfies the

12　requirement of inputting rail based edge feature coordinates?

13　A.　I heard that.

14　Q.　And do you agree with him?

10:10AM 15　A.　I do not.

16　Q.　What -- what is the basis for disagreeing with you?

17　A.　The basis for disagreement with me is the definition of

18　the mask.  Okay?  And a mask in the case of the, uh, rails is

19　these rectangular boxes, uh, the red boxes that you see on

10:10AM 20　the right-hand side of the, uh -- of the, uh, slide.

21　However, the mask itself is defined by the coordinates of the

22　four vertices of the rectangle.

23　Q.　I wanna just take a step back and make sure we're all on

24　the same page.

10:11AM 25　A.　Yeah.

UNITED STATES DISTRICT COURT

54

1　Q.　Generally speaking, forget about LRAIL, forget about

2　anything else, generally speaking, can a mask take any shape?

3　A.　It could in some occasions depending on the application,

4　yeah.

10:11AM 5　Q.　But now, in this particular code, in this LRAIL code, in

6　this particular mask that you've identified, is it being

7　applied to a particular shape?

8　A.　Yes.

9　Q.　And what shape is that?  What is it that it's being

10:11AM 10　applied to?

11　A.　It's on the rails which is rectangular in this case.

12　Q.　The rail base.  Is it being applied to the rail base?

13　A.　The rail base, yes.

14　Q.　So when that mask which in general could take any shape

10:11AM 15　is applied to the rail base, what shape does it take?

16　A.　Rectangular.

17　Q.　Okay.  And so what is your opinion as to whether that

18　mask applied in that rail base as you've identified in the

19　code, uh, contains edge feature coordinates?

10:11AM 20　A.　It does contain.  As I -- as I explained again, the four

21　corners are the, uh, rail base, uh, feature, um, coordinates.

22　Q.　Okay.  I think we heard the description that Mr. -- or

23　Dr. Frakes used, and he said a mask is a blob.  You remember

24　that?

10:12AM 25　A.　Yes.

UNITED STATES DISTRICT COURT

55

1　Q.　Okay.  But when it's applied to a rail base, is it a

2　blob?

3　A.　Um, well, in -- in a sense yes, because, uh, uh, we are

4　interested in the particular, uh, pixels that are inside

10:12AM 5　that, uh -- that mask.

6　Q.　Okay.  But is it a blob with a particular shape?

7　A.　Yes.

8　Q.　And what is that shape?

9　A.　Uh, rectangular.

10:12AM 10　Q.　Thank you.  If I could have the next limitation, please.

11　Now, uh, did -- were you here when Dr. Frakes, uh, opined

12　that -- or disagreed with you, I should say, that the -- the

13　mask that you've identified, pucOneTieMask, is not an input

14　of, uh, tie bounding box data.  Were you here for that?

10:12AM 15　A.　Yes, I was.

16　Q.　And do you agree with his opinion?

17　A.　No, I don't.

18　Q.　Okay.  And is this basically relating to the exact same

19　issue we just discussed?

10:12AM 20　A.　Exactly.

21　Q.　Okay.  And so, uh, you agree that it's a mask; right?

22　A.　Yes.

23　Q.　But is it just a mask or is it a mask being applied to

24　something?

10:13AM 25　A.　A mask being applied to the tie.

UNITED STATES DISTRICT COURT

56

1　Q.　Okay.  And what shape are the ties?

2　A.　It's rectangular again.

3　Q.　And so Doctor, what is your opinion as to whether the

4　mask that you've identified when it's applied to a

10:13AM 5　rectangular railroad tie is an input of tie bounding box

6　data?

7　A.　I agree with that.  These are tie bounding box data.

8　Q.　And you've actually looked at the output-- the example

9　of output data from this particular, um, function; correct?

10:13AM 10　A.　Correct, and I showed them last week in my slides.

11　Q.　And what was the shape of that output?

12　A.　Uh, rectangular.

13　Q.　Did it include data about the vertices of the rectangle?

14　A.　Correct.  It was, yeah, the corners of the difference of

10:14AM 15　the four vertices were there.

16　Q.　And how does that relate, if at all, to your opinion

17　that the input that was provided by this particular mask is

18　the input of tie bounding box data?

19　A.　We're all in agreement about that.

10:14AM 20　Q.　Uh, and finally, let's go the next limitation.  Uh, were

21　you here when Dr. Frakes opined that he did not believe, uh,

22　you had proven that the, uh -- that there was a tie surface

23　plane model because in the LRAIL, um, the analysis only uses

24　half of a tie?

10:14AM 25　A.　I was here, yeah.

UNITED STATES DISTRICT COURT

**EXHIBIT 5**
**-193-**

---

57

1  Q.   Okay.  And what's your -- what's your, uh, opinion as to

2  whether that's correct?

3  A.   Uh --

4  Q.   Whether his opinion is correct.

10:14AM  5  A.   Uh, I don't agree with him simply because as you can

6  see, a portion or a half tie, uh, appears to be in the same

7  surface of a whole tie, okay, and the presentation -- well,

8  even for the presentation of the half tie, it would be the

9  same as the presentation of a whole tie.

10:14AM 10       But, again, in the code, you see that the

11  adPlaneParams coordinates that are highlighted by the red box

12  is the, uh, approximate, uh, tie surface plane that is being

13  used in the code.

14  Q.   And you mentioned the word approximate, and I want to go

10:15AM 15  back up.  Now, Dr. Frakes was focusing on this portion of

16  step b, but actually, the tie surface plane model comes into

17  play in the previous step; isn't that right?

18  A.   Yes.

19  Q.   So let's take a look at --

10:15AM 20       Go back to slide 12, please.

21       And if you look up in step a, when that tie surface

22  plane data first comes into the system, how is it described

23  in the claim?

24  A.   Um, as an approximate tie surface plane.

10:15AM 25  Q.   Approximate.

---

58

1  A.   Yes.

2  Q.   Okay.  So does the claim require the tie surface plane

3  data to be exact?

4  A.   No.

10:15AM  5  Q.   Is there anything in the claim that you've read that

6  requires it to be the entire -- to extend across the entire

7  tie?

8  A.   No.

9  Q.   Is there anything -- is there any claim construction

10:15AM 10  you're aware of that requires it to extend across the entire

11  tie?

12  A.   No.

13  Q.   Okay.  Now, let's go back to slide 15, please.

14       Now, Doctor, if you want to identify an approximate

10:16AM 15  plane of something that's flat, do you need to analyze the

16  entire flat surface?

17  A.   No.

18  Q.   Why is that?

19  A.   Uh, because first of all, the plane is infinite,

10:16AM 20  theoretically, and I don't need to get all the points to be

21  able to identify the -- to come up a with a representation of

22  the whole plane.

23  Q.   And so, Doctor, in your opinion, is this limitation

24  satisfied by the LRAIL system?

10:16AM 25  A.   It is.

---

59

1  Q.   Okay.  And, again, in summary, now that we've gone

2  through the three disputes that Dr. Frakes had on Claim 8,

3  does that change your opinion at all that you expressed last

4  week that Claim 8 is infringed by the LRAIL software?

10:16AM  5  A.   No, I don't change my opinion at all.

6  Q.   Let's change gears and talk about invalidity.

7       And let's start, uh, with the first ground and the

8  first argument that we heard Dr. Frakes express.  And that

9  was an obviousness argument; right?

10:17AM 10  A.   Right.

11  Q.   Can you explain your understanding, um, that you used

12  when you did your obviousness analysis?

13  A.   Yes.  My understanding is that a patent claim is obvious

14  if -- if it would have been obvious for a person of ordinary

10:17AM 15  person skill in the art at the time that the invention was

16  made.

17  Q.   Okay.  Are there any particular factors that must be

18  considered?

19  A.   Yes.  There are four different factors; the prior art,

10:17AM 20  the difference between the prior art and the claimed

21  invention, the level of ordinary skill in the art and some

22  additional considerations.

23       In addition, uh, a person of ordinary skill in the

24  art -- in the art we have a particular motivation, uh, to be

10:17AM 25  able to combine different documents in order to come up with,

---

60

1  uh, the invention.  In other words, uh, I don't rely on

2  hindsight.

3  Q.   Okay.  And I want to make sure I understand -- or I want

4  to see what your understanding of hindsight is, and I'm gonna

10:18AM  5  give you a hypothetical.

6  A.   Sure.

7  Q.   The hypothetical is that I've just invented a

8  combination microwave/frying pan.  It's a frying pan that's

9  got microwave technology in it, and you can just put it on

10:18AM 10  you countertop and fry's eggs on it without using a stove.

11  Are you with me so far?

12  A.   Sure.

13  Q.   Now, if that's my invention --

14  A.   Okay.

10:18AM 15  Q.   -- and you look back at the prior art before my

16  invention, and you find references to frying pans, and you

17  find references to microwaves, does that mean my invention is

18  obvious?

19  A.   No.

10:18AM 20  Q.   Why?

21  A.   Uh, because if it was obvious, somebody would have gone

22  back and, uh -- and done it before you.

23  Q.   Does -- the fact that references exist in the prior art

24  that teach all the elements collectively, does that

10:18AM 25  necessarily mean the patent is obvious?

---

**EXHIBIT 5**

**-194-**

61

1  A.  No.

2  Q.  Okay.  What do you have to have?  I mean, is there some

3  special thing you have to have to be able to combine these

4  things?

5  A.  Yeah, you have to have a reason.  Uh, you have to be

6  triggered by something to be able to go and pick those

7  different pieces and put them together as a -- as a new

8  invention.

9  Q.  So let's take a look -- well, first of all, you mention

10  in Step 1 that you're supposed to consider the scope and

11  content of the prior art.

12  A.  Yes.

13  Q.  Um, can you -- do you have an understanding of prior art

14  is just generally speaking?

15  A.  Yes.  Next slide please?  Prior art is any of these

16  elements, five elements; other patents, publications, uh, if

17  the, uh -- the system was public use or on sale or any other

18  information that is publically available about the, uh -- the

19  system.

20  Q.  Okay.  Now, Dr. Frakes mentioned some publication, a

21  2014 publication, for instance, or a Lorente publication.  Do

22  you have any dispute that those are prior art?

23  A.  No, I do not have any dispute on that.

24  Q.  Uh, but some of the stuff he talked about, I believe was

25  more in the nature of a public use.  Is that your

UNITED STATES DISTRICT COURT

62

1  understanding?

2  A.  Yes.

3  Q.  Okay.  And do you have an understanding of what it

4  takes, what are the requirements for something to qualify as

5  a public use or an on sale prior art?

6  A.  Sure.  Next slide, please?  Yeah.  I wanna draw your

7  attention to those highlighted areas.  The yellow part is

8  above the publically known.

9      MR. LAQUER:  Objection, Your Honor.

10      The jury will be instructed later.

11      THE COURT:  Yeah.  I think, again, when we're

12  testifying about the law, that's something you're going to

13  get.  You can ask him what he based his opinions on, but as

14  far as having him opine on the law, that's improper.

15      MR. BARNEY:  Understood, Your Honor.

16      I can move on.

17      THE COURT:  Thank you.

18  BY MR. BARNEY:

19  Q.  Let's turn to Dr. Frakes' first, um, first ground.

20  A.  Okay.

21  Q.  And, uh, what was his first -- what is his first

22  argument or first ground?

23  A.  Uh, it's the UML sale and support.

24  Q.  Okay.  And I want to take a look at what that actually

25  is.  What references does Dr. Frakes use to create what he

UNITED STATES DISTRICT COURT

63

1  calls the UML sale and support?

2  A.  Yeah.  He combines four references.  Top left is the

3  purchase order to UML.  Top right is the laser crack

4  measurement system.  And at the bottom are two software

5  codes.  The left one is software version r8323, and the right

6  is an undated, uh, part of code.  Uh, it's a MATLAB code.

7  Q.  And Dr. Frakes, again, do you have any dispute that the

8  2012 manual is a public -- a printed publication or a prior

9  art?

10  A.  I do not have any dispute.

11  Q.  And do you have any dispute that the Pavemetrics'

12  invoice that's on the upper left-hand side is prior art?

13  A.  I don't have any dispute.

14  Q.  What about the two software, uh, snippets?

15  A.  Uh, these are not prior art for me.

16  Q.  And why do you -- why do you say that?

17  A.  Uh, because as you can see, the date, uh, of the

18  software code r8320 is 2014, uh, and the sale was done, uh,

19  two years before that in 2012.  And as far as the mat lab,

20  uh, code, there is no date on it.

21  Q.  Uh, were you here for the testimony of Dr. Hebert?

22  A.  Yes.

23  Q.  Okay.  And were you here for the testimony of the other

24  Pavemetrics' fact witnesses?

25  A.  Yes.

UNITED STATES DISTRICT COURT

64

1  Q.  And, of course, you were here for the testimony of

2  Dr. Frakes.

3  A.  Yes.

4  Q.  Okay.  In any of that testimony, did you hear any

5  evidence to your knowledge that these two portions of code

6  were made publically available?

7  A.  No.

8  Q.  Did you hear any testimony or evidence that they were

9  actually provided to --

10      MR. LAQUER:  Objection.  Legal conclusion,

11  Your Honor.  Software doesn't need to be publically

12  available.  The question is whether the product --

13      THE COURT:  Sorry, hang on one second.

14      I think he can answer.

15  BY MR. BARNEY:

16  Q.  Doctor, I'll just repeat my question.  Did you see any

17  testimony or evidence that lead you to conclude or believe

18  that these portions of software code were actually delivered

19  to the University of Massachusetts Lowell?

20  A.  I did not see any evidence.

21  Q.  Okay.  Did you see any evidence or hear any testimony

22  that lead you to conclude that these specific portions of

23  code were actually used by the University of Massachusetts in

24  an actual, operational, um, rail inspection, um, system?

25  A.  No, I have not.

UNITED STATES DISTRICT COURT

EXHIBIT 5
-195-

65

1  Q.   Did you see any evidence or hear any testimony that
2  these specific snippets of code or these -- these code
3  modules were actually commercially exploited by the
4  University of Massachusetts?
10:24AM 5  A.   No, I have not.
6  Q.   So what's your conclusion -- or do you have an
7  understanding or conclusion as to whether these particular
8  portions of code that there's any evidence to show that they
9  actually were publically used?
10:24AM 10  A.   No, I do not have any evidence of that.
11  Q.   Now, let's just assume for the sake of argument that
12  they are prior art, okay, for the rest of my questioning?
13  A.   Okay.
14  Q.   Okay.  And let's go to the next slide, please.  What,
10:24AM 15  uh -- let me have the next slide after that.  Um, assuming
16  that they are prior art, and that all four of these things
17  can be combine -- combined together in the way that
18  Dr. Frakes has done, um, in your opinion, would that -- even
19  with that combination of four references, would that actually
10:24AM 20  disclose the elements of Claim 1?
21  A.   No, they wouldn't be able to disclose steps b and c
22  because there was no track elevation map, no appropriate
23  gradient neighborhood or identify a railway track bed feature
24  from the track elevation map.
10:25AM 25  Q.   Okay.  So let's take those one at a time if I could have

UNITED STATES DISTRICT COURT

66

1  the next slide.  Um, what is your opinion as to whether those
2  four references which Dr. Frakes calls the UML sales support
3  disclose or teach a track elevation map?
4  A.   No.  Um, the UML sale and support does not generate a
10:25AM 5  track elevation map.
6  Q.   Okay.  And -- and what, uh -- what is the basis for
7  that?  The next slide, please?  Can you explain why you
8  concluded that?
9  A.   Yes.  Um, I have put side by side two, uh, pieces of
10:25AM 10  code, one coming from the software version 8320 and the other
11  one from the LRAIL system.  Uh, and I have, uh, actually
12  looked at the code associated with a particular function to
13  get 3D intensity from the LCMS Fake3D, uh, structure.
14       And as you can see on the left code, there is no
10:26AM 15  mentioning of any, uh, range data that's coming to the final
16  variable, the PadInt.  However, we show extensively, last
17  week, there is evidence coming in purple boxes of range
18  information and the intensity information coming from the
19  blue boxes that comes together to create a 3D structure and
10:26AM 20  the variable.
21  Q.   And just to make sure I understand your testimony, on
22  the right-hand side of your demonstrative, that's the, uh,
23  accused LRAIL system, uh, that's at issue in this case; is
24  that correct?
10:26AM 25  A.   That's correct.

UNITED STATES DISTRICT COURT

67

1  Q.   And you testified last week that you went through that
2  code, and you were able to find exactly where there's
3  intensity data and elevation data combined into a 3D image
4  for purposes of the neural network analysis.
10:27AM 5  A.   Correct.
6       MR. LAQUER:  Objection, leading.
7       MR. BARNEY:  I could rephrase, Your Honor.
8       THE COURT:  Thank you.
9  BY MR. BARNEY:
10:27AM 10  Q.   Doctor, I just want to clarify that on the right, that's
11  the accused system.
12  A.   That's correct.
13  Q.   Did you find anything like that in the system on the
14  left which is the prior art system that Dr. Frakes is
10:27AM 15  referring to?
16  A.   No, I have not found anything like that.
17  Q.   Did you find any of the information like you see in the
18  purple boxes that show that elevation data is provided into
19  the, um -- is provided into the, uh -- the image that's being
10:27AM 20  analyzed?
21  A.   No, I have not seen it.
22  Q.   And so what does that lead you to believe in terms of
23  whether or not the prior art discloses an elevation map as
24  the court has construed it?
10:27AM 25  A.   It does not disclose an elevation map.

UNITED STATES DISTRICT COURT

68

1  Q.   And is there anything that supports your opinion --
2  beyond just looking at the code that you've just testified
3  about, is there anything else that you considered that
4  relates to your opinion?
10:27AM 5  A.   Yes.  Next slide, please.  We heard yesterday from, uh,
6  Mr. Laurent that, um, the 3D merge is just intensity and does
7  not include range data.
8  Q.   Okay.  And so you agree with him that the prior art
9  code, um, the 3D merged, uh, portion of that, is not
10:28AM 10  including intensity data?
11  A.   It does not include, uh, range data.
12  Q.   I'm sorry, does not include range data?
13  A.   Range data.  It does not.
14  Q.   And just to remind us, is range data the same thing as
10:28AM 15  elevation data?
16  A.   Correct.  Yes.
17  Q.   All right.  So Doctor, so what's your opinion as to
18  whether the prior art, uh, Mr. Frakes went through, uh,
19  satisfies Limitation B?
10:28AM 20  A.   It does not satisfy it.
21  Q.   Did you, did you look at the next Limitation C?
22  A.   Yes.
23  Q.   And what is your opinion as to whether the prior art,
24  the UML system, satisfies the first portion of Limitation C?
10:28AM 25  A.   Uh, it does not because, again, uh, C requires that the

UNITED STATES DISTRICT COURT

EXHIBIT 5
-196-

69

1   identification of, uh, railway track bed features from the
2   track elevation map, and as we can see in this part of the
3   code, um, that has the, uh, rail edges, uh, no Fake3D is used
4   to detect those.
5   Q.   All right.  And how about -- if I could have the next
6   slide.  How about the requirement of defining an appropriate
7   gradient neighborhood representing a small 2D track, uh,
8   section over which differential vertical measurements are
9   calculated?
10        Do you have an opinion as to whether the UML
11  system, the prior art system that Dr. Frakes referred to,
12  satisfies that limitation?
13  A.   It does not because as we heard yesterday, uh, from, uh
14  Dr. Hebert, they are using Sobel filters, and Sobel filters
15  are pretty fine.
16  Q.   Well, wait a second, Doctor.  I thought you said that
17  having a, uh -- a fixed filter is okay as long as you're
18  choosing different sized fixed filters searching for
19  different images?
20  A.   Well, in this particular, uh, case, the filter has fixed
21  weights in them.  The weight does not change.  And
22  traditionally, it's a 3by3, um, filter.
23  Q.   Okay.  I want to make sure I understand this.  Sobel
24  filter, how old is that technology?
25  A.   Uh, I would say probably 40 years old technology.

UNITED STATES DISTRICT COURT

70

1   Q.   Does a Sobel filter always have a predesigned -- a
2   predefined size and weight?
3   A.   Yes.
4   Q.   Does it have the same predefined size and weight
5   regardless of what image or feature you're searching for?
6   A.   Correct.
7   Q.   And so is it flexible in the sense that you can change
8   the size and weight depending on what type of feature you're
9   looking for?
10  A.   No.
11  Q.   Okay.  So in your opinion, does -- the use of a Sobel
12  filter in the prior art UML system, does that satisfy this
13  requirement of step c?
14  A.   No, it does not satisfy it.
15  Q.   Okay.  If I could have the next slide, please?
16        Now, I want to talk about the second argument that
17  Dr. Frakes went through.
18        THE COURT:  Counsel, let me stop you, and we'll
19  just take our morning break now for 10 minutes, and we'll
20  pick up then.  Thank you.
21        THE CLERK:  All rise.
22        (Jury not present.)
23        THE COURT:  Okay, we'll reconvene at 10:40.
24        (Recess taken.)
25        THE CLERK:  All rise.

UNITED STATES DISTRICT COURT

71

1        (Jury present.)
2        THE COURT:  Okay.  Counsel, you can proceed.
3        MR. BARNEY:  Thank you, Your Honor.
4   Q.   Doctor, before the break, we were just beginning your
5   commentary on Dr. Frakes' second invalidity argument.  And if
6   I could have the next slide?
7        What do you understand Dr. Frakes' second
8   invalidity argument to be?
9   A.   Uh, it's a combination of the UML sale and support and
10  the Lorente paper.
11  Q.   Okay.  And just for the record, you're talking about
12  EC-TRB2014, and you're gonna refer to that as the Lorente
13  paper?
14  A.   Correct.
15  Q.   And Doctor, how many total references are in this
16  combination that Dr. Frakes is asserting renders our claims
17  obvious?
18  A.   It's about five references.
19  Q.   Okay.  Again, assuming the two, uh, snippets of
20  source code actually are prior art, is it your opinion -- or
21  what is your opinion as to whether the combination of all
22  five of these references would render the claims of our
23  patents invalid?
24  A.   Again, uh, I don't agree with that.
25  Q.   And let's see the next slide, please.  And in

UNITED STATES DISTRICT COURT

72

1   particular, uh, what do you think is missing, if anything,
2   from the combination of these five references?
3   A.   I think the combination does not disclose steps b and c.
4   Q.   Okay.  And let's take those one at a time.  What is your
5   opinion or why do you feel that, um -- the combination of
6   the, um, UML system prior art and the Lorente paper, why do
7   believe that even combining those together, it still doesn't
8   disclose a track elevation map?
9   A.   Uh, we saw earlier that the UML sale and support does
10  not, uh, define a track elevation map.  Now, with the
11  inclusion of the Lorente paper, in the Lorente paper, they
12  study a range base -- a rail track inspection system, and as
13  the report says, they do not using -- uh, they use only range
14  data.
15  Q.   Okay.  I'm gonna take a step back and make sure I
16  understand what you're saying.  The way the court has
17  construed a track elevation map, am I correct that it has to
18  include both intensity and elevation data?
19  A.   Correct.
20  Q.   And as you were testifying before, you don't believe the
21  UML system, the four references that Dr. Frakes is using,
22  actually discloses the use of elevation data in an elevation
23  map.
24  A.   Correct.
25  Q.   Okay.  And so in order for this Lorente paper to what we

UNITED STATES DISTRICT COURT

**EXHIBIT 5**
**-197-**

73

1  say cure that defect, to fill that gap that's missing, what
2  would Lorente have to disclose?
3  **A.   He'd have to disclose that that includes both range and**
4  **intensity.**
10:46AM 5  Q.   Okay.  And what -- what does, in fact, Lorente disclose?
6  Does he disclose both the use of range and intensity?
7  **A.   No.  In fact, actually, I have underlined, uh, some text**
8  **there that says the data does not suffer from illumination**
9  **changes, and usually a problem with the illumination changes**
10:47AM 10 **come from the, uh, use of intensity ranges.**
11 Q.   And so when -- when, uh, Lorente was describing the
12 system of their patent, they called it a range based track
13 elevation system.  And what does that mean to you?
14 **A.   It uses only range, uh, or elevation data.**
10:47AM 15 Q.   Okay.  So your understanding is that because they called
16 it a range based inspection system, does that imply that it's
17 not using intensity in the calculation?
18 **A.   Correct.**
19 Q.   And how does -- that second sentence that you just
10:47AM 20 mentioned, does that relate or confirm your opinion in any
21 way?
22 **A.   It confirms my opinion because they exclusively say that**
23 **their data which in this case is range data does not suffer**
24 **from illumination changes.**
10:47AM 25 Q.   And if they were using intensity data, then they

74

1  wouldn't be able to say that?
2  **A.   Correct.**
3  Q.   Okay.  Um, and so what's your opinion as to whether the
4  combination of all five of these references discloses an
10:47AM 5  elevation map?
6  **A.   No, they do not.**
7  Q.   And how about the next limitation?  You mention
8  Limitation C.  What is it in Limitation C that you believe,
9  uh, is not, uh, disclosed or taught by the combination of the
10:48AM 10 UML system with Lorente?
11 **A.   As a part of Claim C, um, there is under numeral I, the**
12 **definition of an appropriate gradient neighborhood**
13 **representing a small 2D track section.  However, in the**
14 **Lorente paper, the processing happens in just, uh, one**
10:48AM 15 **dimensional line, and that's because they get sections of the**
16 **3D elevation.  So all they are processing is done on 1D.**
17 **       And in particular, they use a methodology that's**
18 **called derivative of Gaussian or DoG.  Um, and, again,**
19 **because they are in 1D scanned line, they do not define, uh,**
10:48AM 20 **a 2D, uh, track section.**
21 Q.   So 1D means one dimensional.
22 **A.   Correct.**
23 Q.   The claim requires two dimensional.
24 **A.   Correct.**
10:49AM 25 Q.   Do you see any teaching in Lorente that is teaching a

75

1  two dimensional gradient neighborhood?
2  **A.   No, there is mention of that.**
3  Q.   And so what's your opinion as to whether even if you
4  were to combine the UML system prior art and Lorente that
10:49AM 5  Limitation C would be satisfied?
6  **A.   It is not satisfied.**
7  Q.   Okay.  Now, Doctor, if there's two limitations that
8  aren't satisfied under the combination, what does that mean
9  in terms of whether that combination renders the claim
10:49AM 10 obvious?
11 **A.   It's not obvious.**
12 Q.   Let's go to the next one, please.  What is the third
13 ground that Dr. Frakes asserted in terms of invalidity?  And
14 this was for Claim 21, I believe?
10:49AM 15 **A.   Yes.**
16 Q.   Okay.  And let's just go, and you can describe what it
17 is in the slide.
18 **A.   Mm-hmm.**
19 Q.   So what is he doing in this third ground?
10:49AM 20 **A.   He brings in another document, another publication from**
21 **Gibert-Serra.**
22 Q.   Okay.  So now we're looking at Claim 21 which is a
23 dependent claim; right?
24 **A.   Correct.**
10:50AM 25 Q.   And how many total references is Dr. Frakes now using in

76

1  this combination to try to invalidate Claim 21?
2  **A.   Including the two codes, uh, six.**
3  Q.   Okay.  And, again, assuming for the sake of argument
4  that those two software snippets on the left-hand side
10:50AM 5  actually are prior art, assuming that's true.
6  **A.   Yeah.**
7  Q.   Um, do you have an opinion as to whether even if
8  somebody were to combine all six of these references into
9  one, would that still teach the limitation of Claim 21?
10:50AM 10 **A.   No, it would not.**
11 Q.   Okay.  Now, as reminder, can you please explain to the
12 jury again, briefly, of course, what Claim 21 is talking
13 about?
14 **A.   Yeah.  Next slide, please?  Yeah.  Again, we're talking**
10:50AM 15 **about the identification of joint bar, uh, uh, candidates.**
16 **So we start from the point where we have find some, uh, areas**
17 **in the image that are potential include -- potentially**
18 **include joint bars.**
19 **       And the claim says that we are checking the length**
10:51AM 20 **of these, uh, areas to be between the minimum and maximum**
21 **threshold, and if this condition is satisfied, then we're**
22 **accepting as this being a joint bar.  Otherwise, we reject**
23 **it.**
24 Q.   Okay.  So let's -- let's take a look at what the
10:51AM 25 teaching of this sixth reference is.  Next slide, please?

**EXHIBIT 5**
**-198-**

77

1      So when you take a look at that sixth reference
2  that he's bringing into his combination, the Gibert-Serra
3  reference, does it provide a teaching of the Claim 21 method?
4  A.  No.
10:51AM 5  Q.  Well, wait a second, Doctor.  What about the part that
6  Dr. Frakes pointed to where it says in the Gibert-Serra that
7  a combination of both types of features on both joint bars at
8  the same rail is used to robustly detect them?
9      Each trigger is validating by checking the symmetry
10:52AM 10  and the length of the bar to remove false detections?  Isn't
11  that a teaching of Claim 21?
12  A.  Uh, no.
13  Q.  Why not?
14  A.  What the paper says basically is that, uh, they look
10:52AM 15  at -- they look at the gap that exists between the rails as
16  they come together, and the joint bar tries to connect them
17  and views this point as the point of symmetry so they look at
18  one of the two parts that are separated by the point of
19  symmetry, and they try to see if they match.
10:52AM 20  Q.  Okay.  Is there anything in Gibert-Serra that talks
21  about using minimum and maximum length thresholds for this
22  analysis?
23  A.  No.  There's mention of, uh, threshold.
24  Q.  And it necessary to use minimum and maximum thresholds
10:52AM 25  to form this type of symmetry analysis that Gibert-Serra is

78

1  talking about?
2  A.  No.
3  Q.  And so what's your opinion, Doctor, as to whether --
4  even if you were to combine all six of the references that
10:52AM 5  Dr. Frakes says that a person of ordinary skill in the art
6  would have brought together, what's your opinion as to
7  whether it would have satisfied the second limitation of
8  Claim 21?
9  A.  It would not.
10:53AM 10  Q.  Let's move on, Doctor.  We didn't hear much from
11  Dr. Frakes on Claim 8 of the '557 patent.  Do you agree with
12  that?
13  A.  Yes.
14  Q.  Okay.  Now, I think he said maybe just one sentence
10:53AM 15  about it.
16  A.  Correct.
17  Q.  Okay.  Nevertheless, do you have an opinion -- well,
18  let's have the next slide.
19      Do you have an opinion -- as to whether his
10:53AM 20  proposed combination which is the four parts of the UML sale
21  and support, even if you were to put all those together, and
22  even if you were to assume that the software snippets are
23  prior art, do you have an opinion as if those would render
24  Claim 8 obvious?
10:53AM 25  A.  Yes.  There's no disclosure of the claims in that

79

1  patent.
2  Q.  Okay.  And is that -- which limitations do you think are
3  missing, uh, if any, from that combination?
4  A.  There's no disclosure of inputting and comparing and
10:54AM 5  identifying steps that are part of Claim 8.
6  Q.  Okay.  And can you -- just to keep this brief, can you
7  just give one example of what you feel is missing?  And if I
8  can have the next slide?
9  A.  Yes.
10:54AM 10  Q.  Does the software that Dr. Frakes is relying on for his
11  UML service and support prior art, does it disclose anywhere,
12  anywhere whatsoever the removal of railheads?
13  A.  No.  Actually, uh, he points to something that is the
14  called extract the railhead which is the complete opposite
10:54AM 15  from removing the railhead.
16  Q.  What do you do when you extract the railhead?
17  A.  You create an image.
18  Q.  Of the railhead?
19  A.  Yeah.
10:54AM 20  Q.  Okay.  And what did you do when you remove the railhead?
21  A.  Uh, you just remove it completely so there's no image of
22  that.
23  Q.  So extracting is you're actually focusing on the
24  railhead by creating an image of it; is that correct?
10:55AM 25  A.  Correct.

80

1  Q.  Whereas in our claim, you're removing it which is -- you
2  say is the opposite of that?
3  A.  The complete opposite, yes.
4      MR. LAQUER:  Objection, leading.
10:55AM 5      THE COURT:  You know, I think it is getting a lit
6  bit leading so maybe you can ask him more open ended
7  questions.  I know you're trying to go fast but --
8      MR. BARNEY:  I am, and I apologize to the Court and
9  to the jury for that.
10:55AM 10  Q.  So let me retry.  Doctor, did you see anywhere in the
11  references that Dr. Frakes provided of any mention or
12  teaching of removing the railheads?
13  A.  No.
14  Q.  And did you see, uh -- and by the way, do you know if
10:55AM 15  Dr. Frakes agrees with you that extracting railheads is the
16  opposite of removing railheads?
17  A.  Yeah.  He agrees with me, yes.
18  Q.  And did he propose any other reference and any other
19  combination reference that he's gonna bring in to actually
10:55AM 20  keep that missing limitation?
21  A.  No, he just said that it was obvious.
22  Q.  Okay.  Based on his say-so, you mean?
23  A.  Yes.
24  Q.  And so what is your opinion, Doctor, as to whether his
10:55AM 25  proposed combination would render Claim 8 of the '557 patent

**EXHIBIT 5**
**-199-**

81

1 obvious?

2 **A.   It's not obvious.**

3 Q.   Okay.  And just a few more questions, Doctor, and then

4 I'll let you go.  If I could have slide 47, please?  Now,

10:56AM 5 Doctor, so far, all of the combinations we've talked about

6 have used that UML sale and support as the base reference.

7 Is -- is that fair?

8 **A.   That's fair.**

9 Q.   Um, do you -- were you in the court when Dr. Frakes also

10:56AM 10 testified about this other publication, the UML-TRB2014?

11 **A.   Yes, I was.**

12 Q.   If we were to substitute that paper which is the paper

13 about the UML system --

14 **A.   Yes.**

10:56AM 15 Q.   -- for the UML system prior art, just substitute 'em and

16 run through the same analysis again that we just did, would

17 that change your opinion as to whether the claims were

18 obvious?

19 **A.   It would not change my opinion.**

10:56AM 20 Q.   Is there anything in this UML-TRB2014 paper that is an

21 improvement over the system prior art that Mr. Frakes ran

22 through?

23 **A.   No.**

24 Q.   Let's go to slide 49, please.  Doctor, you mentioned in

10:57AM 25 the beginning of your testimony that you -- you can consider

UNITED STATES DISTRICT COURT

82

1 called secondary factors or secondary considerations.

2 **A.   That's correct.**

3 Q.   And which, if any, of those did you consider in your

4 obviousness analysis?

10:57AM 5 **A.   I considered all of them, the things that are listed on**

6 **the slide.  That is commercial success, the long felt but**

7 **unresolved needs, the industry recognition and praise by**

8 **others and nexus to the claims.**

9 Q.   And with respect to commercial success, um, were you in

10:57AM 10 the courtroom when Mr. Schoettelkotte was -- was explaining,

11 uh, his theories on damages?

12 **A.   Yes.**

13 Q.   What's your understanding of how many sales of the -- of

14 Tetra Tech's 3DTAS there have been?

10:57AM 15 **A.   I believe it was five?**

16 Q.   Okay.  How many sales of the infringing LRAIL system

17 have there been?

18 **A.   Uh, four.**

19 Q.   So considering both the infringing LRAIL systems and the

10:58AM 20 Tetra Tech 3DTAS system, how many total sales have there been

21 of the patented system?

22 **A.   Uh, uh, nine.**

23 Q.   And did you hear him testify about what he considers the

24 size of the market?

10:58AM 25 **A.   Yes, I heard him.**

UNITED STATES DISTRICT COURT

83

1 Q.   And what is it?

2 **A.   Uh, I believe he was saying something like 50?**

3 Q.   Okay.  And, if, uh -- if the size of the market is 50,

4 what percentage of the market has now been represented by the

10:58AM 5 patented invention?

6 **A.   Approximately 20 percent.**

7 Q.   What does that tell you, if anything, about whether the

8 patented technology has been successful?

9 **A.   It's been successful.**

10:58AM 10 Q.   What, if anything, does that tell you about whether the

11 claims were actually obvious at the time of the invention?

12 **A.   No, it was not obvious.**

13 Q.   Okay.  And did you also consider long felt and

14 unresolved needs and industry recognition and praise?

10:58AM 15 **A.   Yes.**

16 Q.   Okay.  And can we just look at one example of slide 52?

17 What are we seeing in slide 52?

18 **A.   Yeah.  We saw the email from Brad Spencer from, uh, CSX**

19 **talking about the system, and, uh, he specifically said that,**

10:59AM 20 **uh, they probably have the most technologically advanced**

21 **track inspection system, and we are -- we are probably behind**

22 **them.**

23 Q.   What, if anything, does that, um, uh -- taking that

24 information into consideration, what, if anything, does that

10:59AM 25 lead you to conclude in terms of whether the patent was

UNITED STATES DISTRICT COURT

84

1 obvious or not obvious at the time of the invention?

2 **A.   Patent was not obvious.**

3 Q.   And finally, Doctor, if we go to slide 53, did you

4 consider whether the secondary factors that you testified

10:59AM 5 about have what's called a nexus to the claimed invention?

6 **A.   Yeah.  As you can see, I have highlighted the, uh, uh,**

7 **particular awards that, uh, uh, go back to the, uh, claims of**

8 **the patents; the rail joints, the tie, the crack, the**

9 **fastener, the spike, joint bars and so on.**

11:00AM 10 MR. BARNEY:  Thank you very much for your time

11 Doctor.  I pass the witness.

12 THE COURT:  Okay.  Any cross-examination?

13 MR. LAQUER:  Yes, Your Honor.

14 CROSS-EXAMINATION

11:00AM 15 BY MR. LAQUER:

16 Q.   Let's pull up 517.  Dr. Morellas, you've opined that you

17 believe the Fake3D software used with the UMASS sale did not

18 include any range information; is that correct?

19 **A.   Correct.**

11:00AM 20 Q.   And you've based that on the r8320 version of software;

21 correct?

22 **A.   That is correct.**

23 Q.   And so in Exhibit 517, we can see that the UMASS sale is

24 identified for r8320 here; correct?

11:00AM 25 **A.   Correct.**

UNITED STATES DISTRICT COURT

**EXHIBIT 5
-200-**

85

1   Q.   Now, you disagree with Dr. Frakes' opinion that this
2   invalidates because of this supposed difference you've
3   identified about Fake3D; correct?
4   A.   That is correct.
11:00AM 5   Q.   You believe that the claims are valid because the UML
6   Fake3D here did not use range information; correct?
7   A.   Yes.
8   Q.   But the Fake3D code in r8320 did use range information
9   as part of its Fake3D calculation; correct?
11:01AM 10   A.   Yeah.  There is range information appearing, but, uh, in
11   the part of the code that I showed you where the final value
12   was computed, there is no mention of the range information.
13   Q.   Right.  It's used in another part of the code, but it's
14   still used for Fake3D; correct?
11:01AM 15   A.   That is used in other parts of the code, yes.
16   Q.   For Fake3D; correct?
17   A.   Yes.
18   Q.   So the UML prior art system used Fake3D with range
19   information; correct?
11:01AM 20   A.   Yes.  Range information appears to be there.
21   Q.   Let's look at your slide 11.  This is a representation
22   of a convolutional neural network filter; correct?
23   A.   It's just a schematic.
24   Q.   It's a representation of a convolutional neural network
11:02AM 25   filter; correct?

UNITED STATES DISTRICT COURT

86

1   A.   Correct.
2   Q.   The yellow box in the center is the filter; correct?
3   A.   Correct.
4   Q.   The pink box on the right is the convolved feature;
11:02AM 5   correct?
6   A.   Correct.
7   Q.   You describe that as the output of the convolution;
8   correct?
9   A.   Correct.
11:02AM 10   Q.   And a convolution is a group operator; correct?
11   A.   Yes.
12   Q.   And you disagreed with the Karami book about whether a
13   stride value of two skips things or not; correct?
14   A.   Again, I gave my, uh, explanation of that.
11:02AM 15   Q.   Okay.  So if the stride value is one, then the filter
16   and the convolved feature both move over one to the right;
17   correct?
18   A.   Correct.
19   Q.   And we can see that shown here; correct?
11:02AM 20   A.   Yes.
21   Q.   But the results of the neural networks convolution is
22   different if the stride is two; correct?
23   A.   That is correct.
24   Q.   Let's take a look what happens to the output of the
11:02AM 25   convolutional filter with a stride of two.  Do you see that,

UNITED STATES DISTRICT COURT

87

1   Dr. Morellas?
2   A.   Yes.
3   Q.   So the output is only providing one out of these three
4   outputs on the top row; correct?
11:03AM 5   A.   Correct.
6   Q.   So it's skipping involution outputs; correct?
7   A.   No.  I don't agree with that.
8   Q.   It's not having the red -- the pink box in the top
9   center output location of the convolution; correct,
11:03AM 10   Dr. Morellas?
11   A.   No, let me -- let me --
12   Q.   No.  Your counsel can do that on redirect if they
13   choose.  Let's look at your Slide No. 8.
14   A.   Okay.
11:03AM 15   Q.   The picture at the top is of a woman's face; correct?
16   A.   Uh, yes.
17   Q.   And this is showing layers in a convolutional neural
18   network in your opinion; correct?
19   A.   Yes.
11:03AM 20   Q.   The picture at the top is from another book, the
21   Synjosky (phonetic) book; correct?
22   A.   Yes.
23   Q.   You included this picture in your report; correct?
24   A.   Correct.
11:03AM 25   Q.   But the book didn't list anything about TensorFlow or

UNITED STATES DISTRICT COURT

88

1   PyTorch or other neural networks; correct?
2   A.   Yes.
3   Q.   You just added that in this slide here; correct?
4   A.   I did, yes.
11:03AM 5   Q.   Yeah.  And Google created the TensorFlow and put that in
6   the public domain for free use; correct?
7   A.   Yes.
8   Q.   Do you believe that you or Dr. Frakes knows more about
9   TensorFlow?
11:04AM 10   A.   I don't want to make any comparison.
11   Q.   Do you have any idea?
12   A.   I have no idea.
13   Q.   Okay.  You can take that now.  With regard to Claim 8 of
14   the '557 patent, you just opined that -- that extracting
11:04AM 15   something is very different from removing it; is that
16   correct?
17   A.   Correct.
18   Q.   You understand that the test for obviousness is not
19   whether things are identical but whether one of ordinary
11:04AM 20   skill in the art would realize that the claim's identity is
21   obvious in view of the prior art; correct?
22   A.   Yes, but I don't see any particular motivation for
23   someone to do this.
24   Q.   Okay.  And so you don't believe that somebody with the
11:04AM 25   degrees and experience of a person of ordinary skill in the

UNITED STATES DISTRICT COURT

**EXHIBIT 5**
**-201-**

## 89

1 art would think that they could replace removing something
2 with extracting it?
3 A. What I'm saying is that there should be a motivation for
4 doing that.
11:04AM 5 Q. I'd like a yes or no answer, please. Do you believe
6 that somebody with the experience of one of ordinary skill in
7 the art in this case would not realize that extracting could
8 be replaced with removing?
9 A. No, I don't agree with you.
11:05AM 10 Q. Okay. Let's look at your Slide No. 50 here. So you've
11 shown the RailAI system on the left?
12 A. Yes.
13 Q. Do you know how many RailAI systems have been sold?
14 A. I don't know about that. I heard that the 3DTAS have
11:05AM 15 been, uh, five sales?
16 Q. Would it surprise you that there have been zero RailAI
17 systems sold by Tetra Tech?
18 A. It might be the case.
19 Q. Yeah, it is the case. We can take this slide down.
11:05AM 20 Now, you've accused the, um, feature, the sales here, of
21 being attributable to commercial success for secondary
22 considerations; correct?
23 A. Correct.
24 Q. So you believe that because the LRAIL units have been
11:05AM 25 sold, that shows that there is some sort of a demand for the

## 90

1 accused feature; correct?
2 A. Correct.
3 Q. And you believe that the accused feature is Fake3D and
4 Mixed Image used in the, uh, LRAIL systems; correct?
11:05AM 5 A. There is a bunch of, uh, features that are part of their
6 claim.
7 Q. Yes. But you believe that Fake3D or Mixed Image is
8 required; correct?
9 A. This -- this -- yeah, this is, uh, included there. Yes.
11:06AM 10 Q. Yes or no answers. All right? So you've also
11 acknowledged that Fake3D and Mixed Image have been disabled
12 for each one of the versions sold; correct?
13 A. I offered my opinion about that earlier.
14 Q. Right. And that opinion is that you think that maybe if
11:06AM 15 someone changed something in some file, it could be used, but
16 you have no evidence that ever happened; correct?
17 A. What I'm saying is that the user can select what kind of
18 configuration, uh, it will acquire.
19 Q. You've never shown a user doing that ever for any of
11:06AM 20 these sales; correct?
21 A. There is no, uh -- again, this is part of the
22 configuration. The user can choose any of those
23 functionalities.
24 Q. Okay. You agree that a feature that has not been used
11:06AM 25 and cannot be used by the user does not contribute to the

## 91

1 sales of the product; correct?
2 A. Again, you know, if you -- if the user is able to choose
3 certain parameters to enable certain functionalities, then he
4 can do that.
11:07AM 5 Q. Has any LRAIL customer ever enabled Fake3D?
6 A. I have no idea about that.
7 Q. Has any LRAIL customer ever enabled Mixed Image?
8 A. I do not know. I cannot answer these questions.
9 Q. So you agree there's no nexus then between what you've
11:07AM 10 accused of infringement and what you believe the scope of the
11 patent claims are; correct?
12 A. What I'm saying is that the nexus of the patent appears
13 in the product of, uh, Tetra Tech.
14 Q. You agree that no one has ever used that; correct,
11:07AM 15 Dr. Morellas?
16 A. I do not know that. I cannot answer that question.
17 Q. And you don't know whether they've tried to?
18 A. I do not know, but I --
19 Q. You have no idea what the consumer demand is.
11:07AM 20 A. I know I heard about what is the consumer demand, but I
21 do not know how they -- they use the different
22 functionalities.
23 Q. Okay. Let's look at your Slide No. 4. You've
24 underlined the phrase turnkey sales here; correct?
11:08AM 25 A. Yes.

## 92

1 Q. And you believe that turnkey shows that the sensors are
2 in communication?
3 A. I believe so.
4 Q. So you're arguing against the fact witnesses who have
11:08AM 5 actual, firsthand experience with these devices; is that
6 correct?
7 A. No. What I'm saying is that each one of those
8 components cannot operate in isolation. You have to have the
9 sensors and the software to be able to operate the system.
11:08AM 10 Q. You've never seen an LRAIL system in person, have you?
11 A. No, I have not.
12 Q. You've never seen one as it's shipped; correct?
13 A. I have not seen any.
14 Q. You haven't presented any evidence about whether an
11:08AM 15 LRAIL sensor was actually in communication with the processor
16 at the time of sale; correct?
17 A. I have not seen any system.
18 Q. Okay. Let's go ahead and look at Slide No. 9. Here you
19 rely on LRAIL Software Version r10323; correct?
11:09AM 20 A. Yes.
21 Q. And you've heard Dr. Hebert and Mr. Laurent explain this
22 can't be used with accused LRAIL sales; correct?
23 A. It cannot?
24 Q. Right. So this is irrelevant; correct?
11:09AM 25 A. Uh, why is it irrelevant?

**EXHIBIT 5**
**-202-**

93

1    Q.  Let's go on to slide 21.  You just opined that these are
2  four different references when they're all documents
3  describing the UML sale; correct?
4    A.  Uh, not necessarily.
11:09AM 5    Q.  You used an analogy provided by Tetra Tech's counsel
6  that it's not appropriate to combine different prior art
7  references; correct?
8    A.  Yes, what I -- what I said it that, uh --
9    Q.  I'd like to stay brisk here.  That analogy relied on a
11:09AM 10  frying pan and a microwave; correct?
11    A.  That example.
12    Q.  Yes, that example.  And so here we're looking at sensors
13  described in a manual for the UML system; correct?
14    A.  Uh, yes.
11:10AM 15    Q.  That's from the INO document; correct?
16    A.  Yes.
17    Q.  And we're looking at source code for the UML system;
18  correct?
19    A.  At the bottom, yes.
11:10AM 20    Q.  And we're looking at a sales order for the UML system;
21  correct?
22    A.  Yes.
23    Q.  Which one of these is the frying pan, and which one is
24  the microwave?
11:10AM 25    A.  Again, you know, what I'm saying is that those documents

UNITED STATES DISTRICT COURT

94

1  cannot be prior art.
2    Q.  These documents describe the same system.  Your analogy
3  was completely flawed; correct?
4    MR. BARNEY:  Objection, Your Honor, argumentative.
11:10AM 5    THE COURT:  Yeah.  Objection sustained.
6  BY MR. LAQUER:
7    Q.  So can you identify any differences in the systems here?
8    A.  Again, I explained that the r8320 is not prior art
9  because it was not part of the sale getting, uh, a date two
11:10AM 10  years after the -- the sale.
11    Q.  Let's go to Slide No. 19.  Here you were trying to
12  explain public use and public sale as it relates to prior
13  art; correct?
14    A.  Yes.
11:11AM 15    Q.  You understand that selling a system qualifies as prior
16  art even if the system source code remains confidential;
17  correct?
18    A.  Uh, maybe.
19    Q.  Well, so, for example, the iPhone could be prior art to
11:11AM 20  later devices; correct?
21    A.  Yes.
22    Q.  Even though Apple keeps the iPhone source code secret;
23  correct?
24    MR. BARNEY:  Your Honor, I -- I was giving a little
11:11AM 25  leeway cause I delved into this a little bit as well, but I

UNITED STATES DISTRICT COURT

95

1  think according to your order, there's --
2    THE COURT:  Yeah.  I think these are legal
3  arguments you can all make in closing.
4  BY MR. LAQUER:
11:11AM 5    Q.  Let's look at slide five.  The picture on the right with
6  the check boxes is from Microsoft Word; correct?
7    A.  Yes.
8    Q.  So you're using a Microsoft Word picture to argue that
9  LRAIL can be configured to use Fake3D; correct?
11:12AM 10    A.  This is just an example so --
11    Q.  So that's a yes?
12    A.  Yes.
13    Q.  Thank you.  You haven't shown any check box for Fake3D
14  in any LRAIL system; correct?
11:12AM 15    A.  This is part of it that is used.
16    Q.  Have you shown anything here showing that Fake3D can be
17  the input into the neural network of the LRAIL system?
18    A.  I have not shown it.
19    Q.  Right, you have not shown anything for LRAIL; correct?
11:12AM 20    A.  Yes.
21    Q.  You've only shown something for Microsoft Word; correct?
22    A.  Yes, but, uh, because the system is shipped as DLL
23  libraries, you don't have to recompile --
24    Q.  I asked yes or no questions.  Your counsel can ask to
11:12AM 25  follow up on redirect if they choose.

UNITED STATES DISTRICT COURT

96

1    THE WITNESS:  Okay.
2    THE COURT:  Well, let him finish his answer,
3  though.  I mean, you can always move to strike it.
4    Try to answer -- try to answer the question
11:12AM 5  directly.
6    THE WITNESS:  Yes, because the system is, uh,
7  shipped as DLL libraries, the user doesn't have to recompile
8  the code or rewrite the code if he uses the code with some
9  configuration parameters.
11:13AM 10  BY MR. LAQUER:
11    Q.  You heard Dr. Laurent and Mr. Hebert testify
12  yesterday -- I'm sorry, Mr. Hebert and Mr. Laurent testify
13  yesterday about the actual source code of LRAIL showing where
14  the configuration values are in the source code; correct?
11:13AM 15    A.  I'm not sure of that.
16    Q.  Okay.  You don't remember seeing the zeros in the source
17  code that make LRAIL use range only for its input?
18    A.  Yeah.  I've seen those, yeah.
19    Q.  Okay.  And so that's not a buoy box; correct?
11:13AM 20    A.  No.
21    Q.  That's actual source code; correct?
22    A.  Yes.
23    Q.  Somebody would have to go in and change those files in
24  order to make the zeros turn into ones; correct?
11:13AM 25    A.  No.

UNITED STATES DISTRICT COURT

**EXHIBIT 5**
**-203-**

97

1    Q.   You don't have to change a source code file in order to
2    change its value.
3    A.   You do not have to change the code.
4    Q.   Okay.  You've never shown any instance of Fake3D ever
5    being used by any customer; correct?
6    A.   Correct.
7    Q.   You admit that range only images being put into the
8    neural network does not infringe; correct?
9    A.   What I'm saying is that the capability is there.
10   Q.   You have never -- you admit that inputting range only
11   images into the neural network does not infringe; correct?
12   A.   If you put only range information, no.  But as --
13   Q.   And that -- I'm sorry, go ahead.
14   A.   But, uh, as I showed you in the -- in my presentation,
15   there are the uses of Fake3D in running the neural network.
16   Q.   Just to be clear, using range only images in LRAIL does
17   not infringe; correct?
18   A.   Yes.
19   Q.   And that is the value that is set in LRAIL's source code
20   by those zeros that we looked at; correct?
21   A.   Uh, like I said, we are going back to the same argument.
22   Q.   Right.  And here you're using a Microsoft Windows --
23   Microsoft Word image in order to try to show that LRAIL
24   infringes; correct?
25   A.   Yes.  What I'm trying to say is that you do not -- if

UNITED STATES DISTRICT COURT

98

1    you're gonna change the functionality or the configuration of
2    the Microsoft Word, you do not send the software back to
3    Microsoft to get a new version that will include this
4    functionality.
5    Q.   Does Microsoft Word infringe Claim 1 of the '293 patent?
6    A.   Claim 1 of the '9 -- '293 patent?
7    Q.   Correct.
8    A.   No.
9    Q.   No.  So your picture here is irrelevant; correct?
10   A.   It's just an example.
11   Q.   Have you looked at the source code of Microsoft Word?
12   A.   No.
13   Q.   Have you prepared anything about Microsoft Word source
14   code to any LRAIL source code?
15   A.   No.
16   Q.   No.
17   A.   There was no need.
18   Q.   There's no need because you just looked at a spell check
19   window in Microsoft Word and claim that that proves
20   infringement by LRAIL; correct?
21   A.   No.  What I wanted to say is to make the point that, uh,
22   for reconfiguring a system, you don't get to necessarily
23   rewrite or recompile the code.
24   Q.   And you believe because of the way Microsoft Word
25   operates, Pavemetrics should be shut down from continuing to

UNITED STATES DISTRICT COURT

99

1    sell LRAIL; correct?
2    A.   That's not my decision.
3    Q.   Have you ever looked at a configuration file?
4    A.   Uh, can you be more specific?
5    Q.   Have you ever looked at an LRAIL configuration file?
6    A.   No, I have not.
7    Q.   And you've never seen any example of any user ever using
8    the features you claim infringe; correct?
9    A.   I have not seen any configuration file.
10   Q.   You have no idea if any of this has ever been utilized.
11   Correct?
12   A.   I do not have information about that.
13   Q.   Did you ask?
14   A.   Uh, the -- the only, uh, time that I heard about the
15   configuration files is, uh, when I was giving my testimony to
16   you.
17   Q.   When you were looking in the source code, you saw that
18   the source code controlled the configuration; correct?
19   A.   Uh, no, I didn't see that.
20   Q.   What do you think controlled the configuration?
21   A.   The configuration is how you, uh -- how you compile your
22   program.  For example, you can run, uh, an object, uh, code
23   with different, uh, uh, parameters.  For example, if I -- if
24   I create a program, and I want to have the output going into
25   the screen versus the file, there is a way of configuring the

UNITED STATES DISTRICT COURT

100

1    execution of that program.
2    Q.   And you'd have to recompile the code in order to change
3    the result.
4    A.   No.  You did not.
5    Q.   You've never shown any use of any LRAIL that's accused
6    of using Fake3D or Mixed Image with those features; correct?
7    A.   No.  I just told you, uh, how the -- when you get the
8    code, that -- that's how you change the configuration.  You
9    don't have to recompile or rewrite the program.
10   Q.   To change what the result of a .cpp source code file is?
11   Is that your testimony?
12   A.   What I'm saying is that you do not have to rewrite the
13   code or recompile it, you know, in order to have different,
14   uh, outcomes from your software whether saving the data into
15   the screen or saving the data into a file.
16   Q.   Dr. Morellas, going back to the example of prior art, do
17   you believe that the UML version was capable of having
18   configurations changed?
19   A.   I have not seen such a thing.
20   Q.   Okay.  So you think that it could be possible to change
21   the accused versions of LRAIL any way you suppose, but you
22   don't know to what extent the prior art UML system could be
23   adapted.
24   A.   The UML reveals a prior, uh, version, but it didn't
25   have, uh, I didn't know anything about configuration files,

UNITED STATES DISTRICT COURT

EXHIBIT 5
-204-

---

101

1    no buoys, nothing.

2    Q.   Yes.  You have no idea how that prior UML version could

3    have been configured in order to render obvious all of the

4    asserted claims in Tetra Tech in this case; correct?

5    **A.   I didn't find anything in that code about that.**

6    Q.   You did not look.  Correct?

7    **A.   I did look.**

8    Q.   And you don't know how it can be configured; correct?

9    **A.   No.  There is no such a thing that you're talking about**

10   **right now.**

11   Q.   Have you ever seen any configuration of any UML with

12   options to change values?

13   **A.   No, I have not seen any.**

14              MR. LAQUER:  No further questions.

15              THE COURT:  Okay.  Any redirect, Counsel?

16              MR. BARNEY:  Just a short one, Your Honor.

17                    REDIRECT EXAMINATION

18   BY MR. BARNEY:

19   Q.   Can I have slide 11, please?  Dr. Morellas, my colleague

20   on the other side here was asking you about your

21   demonstrative on slide 11?  I believe he cut you off while

22   you were trying to explain something.  Could you please

23   continue your explanation?

24   **A.   Yeah.  Uh, for this particular case, I had the gradient**

25   **neighborhood sliding just one pixel to the right at a time.**

UNITED STATES DISTRICT COURT

---

102

1    **Okay?  And the point that I was trying to make is how the**

2    **differential vertical measurements were created.**

3         **So by sliding the gradient window of the particular**

4    **portions of the image, you get one differential vertical**

5    **measurement.  When you move the gradient neighborhood just**

6    **one pixel to the right, you're gonna have, uh, another one.**

7    **And finally, if we cover the whole, uh, first row, you'll**

8    **have the third pixel.**

9         **However, if I were to use a stride of two, instead**

10   **of having a 3 by 3 differential vertical measurements, I**

11   **would have a 2 by 2 differential vertical measurement.**

12   **That's the only point I wanted to make.**

13   Q.   Okay.  And in terms of the claim requirements, does the

14   LRAIL system calculate vertical measurements?

15   **A.   Yes.**

16   Q.   And in different a limitation that requires that the

17   gradient neighborhood, uh, move across the, uh, data like a

18   sliding window, and you saw the court's claim construction --

19   **A.   Yes.**

20   Q.   -- does it satisfy that construction?

21   **A.   It does, yes.**

22   Q.   Does it slide across the data sequentially?

23   **A.   Yes.**

24   Q.   Does it apply, um, the calculations, uh, completely?

25   **A.   Yes, it does.**

UNITED STATES DISTRICT COURT

---

103

1    Q.   Does it leave any pixel behind?

2    **A.   No.**

3    Q.   All right.  If I could have slide five, please.  There

4    was quite a bit of animated questioning about this idea of

5    Microsoft Word.  And Doctor, uh, why, again, were you using

6    this example of Microsoft Word?  What were you trying to, um,

7    explain to the jury?

8    **A.   Yes.  What I was trying to explain is that, uh, you**

9    **don't have to, uh, have a different, uh, uh, compiled version**

10   **of the code to enable certain functionalities.  By just**

11   **clicking those, uh, uh, buttons, you can enable or disable**

12   **according to your, uh, needs.**

13   Q.   Now, based on your 30 years of experience with software

14   code and -- and, uh, computer engineering, when you click a

15   button like on Microsoft Word to enable a feature, is there

16   some one or zero that's being changed somewhere, uh, to -- to

17   reflect that, uh -- that request?

18   **A.   That is correct.**

19   Q.   Does that mean you're rewriting the code?

20   **A.   No.**

21   Q.   Are you recompiling the code?

22   **A.   No.**

23   Q.   Are you rebuilding the code?

24   **A.   No.**

25   Q.   Okay.  Now, my colleague, uh, on the other side

UNITED STATES DISTRICT COURT

---

104

1    suggested that this is the only information you considered

2    and the only thing you presented to the jury, but do you

3    recall that we looked at Exhibit 28, uh, which was the LRAIL

4    Software and Maintenance Manual?

5    **A.   Yes.**

6    Q.   Okay.  Could I have that back on the screen, and go to

7    page 13, again?

8         Okay.  And did you also consider all of the

9    documentation that, uh, Pavemetrics provides to its customers

10   on how to operate this system?

11   **A.   Yes, I did.**

12              MR. BARNEY:  If we could blow up the very top

13   again, please.

14   Q.   And in terms of how many Pavemetrics tells its

15   customers, um, in terms of how difficult it is to actually,

16   uh -- to, uh -- uh, to adjust these configurations, do they

17   say that you have to rewrite the code to get a, uh -- for

18   instance, a 3D, um, uh, Fake -- uh, Fake3D module to be

19   enabled?

20   **A.   No.  In fact, uh, uh -- so you can see that the manual**

21   **says that the user can, uh, configure the system easily and**

22   **operate the system.**

23   Q.   Okay.  If the user can do it easily, what does that tell

24   you as to whether configuring the system requires rewriting

25   the software code?

UNITED STATES DISTRICT COURT

---

EXHIBIT 5
-205-

105

1   A.  No, it does not require it.
2   Q.  What does it tell you as to whether you have to
3   recompile the software code?
4   A.  No.
11:23AM 5   Q.  And what does it tell as to whether you have to redesign
6   the system, the hardware and software, in order to enable
7   Fake3D or Mixed Image?
8   A.  No.
9   Q.  Okay.  And are you, uh -- do you stand by your analogy
11:23AM 10  that this no different, uh, than clicking, uh, the -- the
11  button on the Microsoft spell check to enable that?
12  A.  Yes.  I stand by the -- my analogy.
13  Q.  Now, you got a lot of animated questions about whether
14  you know if anybody's ever used the, uh -- the Fake3D or
11:24AM 15  Mixed Image.  Do you recall that?
16  A.  Yes.
17  Q.  And I wanna be real clear here, Doctor.  Were -- were
18  you asked to go out and -- and ask, uh, Pavemetrics'
19  customers how they're using it?
11:24AM 20  A.  No, I was not.
21  Q.  Was that part of what you were asked to do?
22  A.  No.
23  Q.  Um, what do you understand -- just as a background, do
24  you understand that patent infringement can come in the form
11:24AM 25  of --

UNITED STATES DISTRICT COURT

106

1       MR. LAQUER:  Objection.
2       MR. BARNEY:  Well --
3       MR. LAQUER:  This is beyond the scope, Your Honor.
4   And this is going also to an issue the parties have addressed
11:24AM 5   in sidebars and through motion practice.
6       THE COURT:  Okay.  Let me -- let me just here the
7   question.
8       MR. BARNEY:  Well, I was gonna ask to set the
9   table.  They've asked many, many, many questions about use,
11:24AM 10  and I just want to make sure we can clarify whether he was
11  actually asked to analyze anything about use as opposed to
12  sale.
13      THE COURT:  You can him ask that.
14  BY MR. BARNEY:
11:24AM 15  Q.  Doctor, do you understand that there's different types
16  of acts that can be an infringement?
17  A.  Yes.
18  Q.  Do you understand that one of those acts can be use?
19  A.  Yes.
11:24AM 20  Q.  Do you understand that another one of those acts can be
21  a sale?
22  A.  Yes.
23  Q.  Between use and sale, which one were you asked to
24  analyze?
11:25AM 25  A.  Uh, the use.

UNITED STATES DISTRICT COURT

107

1   Q.  No.  Doctor, between use and sale, were you asked to
2   analyze whether the LRAIL system that was sold infringes or
3   whether it was infringing when it was used?
4   A.  Oh.  I -- yeah, I looked at the software so I suppose
5   that it was sold.
6   Q.  Okay.  Were you asked to analyze anything about the use
7   of the system by Pavemetrics' customers?
8   A.  No, I didn't.  No.
9       MR. BARNEY:  I have no further questions, Your
11:25AM 10  Honor.
11      THE COURT:  All right.  Uh, Counsel, you have about
12  30 seconds to ask a question.
13      RECROSS-EXAMINATION
14  BY MR. LAQUER:
11:25AM 15  Q.  Dr. Morellas, you mentioned the filter values in the
16  neural network that make up the colored boxes; correct?
17  A.  Yes.
18  Q.  Those are defined during the training stage of the
19  neural network; correct?
11:25AM 20  A.  Yes.
21  Q.  And you've heard that Pavemetrics performs that training
22  stage in Canada; correct?
23  A.  I heard that, yes.
24  Q.  Outside of the United States; correct?
11:25AM 25  A.  Yes.

UNITED STATES DISTRICT COURT

108

1   Q.  They're using different hardware that the LRAIL
2   hardware; correct?
3   A.  Yes.
4   Q.  Using different software than the LRAIL software;
11:25AM 5   correct?
6   A.  Uh, maybe, yes.
7   Q.  So then those filter values, what you call the gradient
8   neighborhood, are predefined by the time the LRAIL is sold;
9   correct?
11:26AM 10  A.  Yes, but the --
11      MR. LAQUER:  No further questions.
12      THE COURT:  Okay.  You're out of time anyway.
13  Counsel, any redirect?
14  MR. BARNEY:  No, Your Honor.
11:26AM 15      THE COURT:  Okay.  Witness is excused.  Thank you
16  very much.
17      Counsel, any more witnesses?
18  MR. BARNEY:  No, Your Honor.  We rest our case.
19      THE COURT:  Okay.  So we're done with the
11:26AM 20  testimony.
21      So now I'm gonna read you the jury instructions.
22  And, again, you'll have these instructions with you in the
23  jury room to -- if you want to consult with them.  So I
24  apologize in advance for kind of a long recitation of law,
11:26AM 25  but you'll have with you.  Um, I'll read them to you now.

UNITED STATES DISTRICT COURT

**EXHIBIT 5**
**-206-**

109

1    When I'm done, we'll break for lunch, and then we'll come
2    back and have closing arguments.  And, again, I'm reading
3    these to you just because the parties have sort -- we've made
4    sure that everybody agrees on the wording.
11:26AM 5    Okay.  As I did at the start of the case, I'll
6    first give you a summary of each side's contentions of the
7    case.  I'll then provide you with detailed instructions on
8    what each side must prove to win each of the contentions.
9    As I previously told you, Pavemetrics seeks a
11:27AM 10   declaratory judgment that it does not infringe Claims 1 and
11   21 of the '293 patent and Claim 8 of the '557 patent.  It
12   also seeks a declaratory judgement that those claims are
13   invalid.
14   Tetra Tech seeks money damages from Pavemetrics for
11:27AM 15   allegedly infringing the '293 patent by selling products that
16   Tetra Tech argues are covered by Claims 1 and 21 of the '293
17   patent.
18   Tetra Tech also argues that Pavemetrics caused its
19   customer, AID, to use those products to perform the method
11:27AM 20   covered by Claim 8 of the '557 patent.
21   Claims 1 and 21 of the '293 patent and Claim 8 of
22   the '557 patent are the asserted claims.  The products that
23   are alleged to infringe are Pavemetrics' LRAIL systems.  The
24   methods that are use to infringe are any use of the LRAIL
11:28AM 25   system by Pavemetrics' customer, AID, in United States.

UNITED STATES DISTRICT COURT

110

1    Your job is to decide whether the asserted claims
2    of the '293 and '557 patents are invalid and whether
3    Pavemetrics has infringed any of the asserted claims of the
4    '293 and '557 patents.
11:28AM 5    If you decide that any claim of the '293 patent or
6    the '557 patent has been infringed and is not invalid, you
7    will then need to decide any money damages to be awarded to
8    Tetra Tech to compensate it for infringement.
9    You will also need to make a finding as to whether
11:28AM 10   the infringement was willful.  If you decide that any
11   infringement has been willful, um, that decision should not
12   affect any damage award you make.  I will take willfulness
13   into account later.
14   OVERVIEW OF APPLICABLE LAW
11:28AM 15   In deciding the issues I just discussed, you will
16   be asked to consider specific legal standards.  I'll give you
17   an overview of those standards now and will review them in
18   more detail before the case is submitted to you for your
19   verdict.
11:29AM 20   The first issue you will be asked to decide is
21   whether Pavemetrics has infringed the claims of the '293 and
22   '557 patent.  Infringement asserted on a claim by claim
23   basis.  Therefore, there may be infringement as to one claim
24   but not infringement as to another claim.
11:29AM 25   There are a few different ways that a patent may be

UNITED STATES DISTRICT COURT

111

1    infringed.  I will explain the requirements for each of these
2    types of infringement to you in detail at the conclusion of
3    the case right now.
4    In general, however, to perform infringement, Tetra
11:29AM 5    Tech must prove by a preponderance of the evidence that
6    Pavemetrics sold or offered for sale in the United States a
7    product meeting all the requirements of a claim of the '293
8    patent.  Pavemetrics may also indirectly infringe the '557
9    patent by inducing its customer, AID, to infringe.  I will
11:29AM 10   provide you with more detailed instructions on the
11   requirements for each of these types of infringement in
12   subsequent instructions.  Another issue you will be asked to
13   decide is whether the '293 and '557 patents are invalid.  A
14   patent may be invalid for a number of reasons including
11:30AM 15   because it claims subject matter that would have been
16   obvious.
17   Even though every element of a claim is not shown
18   or sufficiently described in a single piece of prior art, the
19   claim may still be invalid if it would have been obvious to a
11:30AM 20   person in ordinary skill in the field of technology of the
21   patent at the relevant time.  You will need to consider a
22   number of questions in deciding whether the inventions
23   claimed in the '293 and '557 patents are obvious.  I'll
24   provide you detailed instructions on these questions at the
11:30AM 25   conclusion -- later on in these instructions.

UNITED STATES DISTRICT COURT

112

1    If you decide that any claim of the '293 or '557
2    patent has been infringed and is not invalid, you will then
3    need to decide any money damages to be awarded to Tetra Tech
4    to compensate for infringement.  A damage award should put
11:30AM 5    Tetra Tech in approximately the same financial position that
6    it would have been in had the infringement not occurred, but
7    in no event may the damages be less than what Tetra Tech
8    would have received had it been paid a reasonable royalty.  I
9    will instruct you on the meaning of reasonable royalty as
11:31AM 10   well.
11   The damages you will award are mean to compensate
12   Tetra Tech and not to punish Pavemetrics.  You may not
13   include in your award any additional amount as a fine or
14   penalty in order to punish Pavemetrics.  I'll give you more
11:31AM 15   detailed instructions on damages in a bit.
16   Now, Instruction 23 is patent claims.
17   Before you can decide many of the issues in this
18   case, you will need to understand the role of patent claims.
19   The patent claims are the numbered sentences at the end of
11:31AM 20   each patent.  The claims are important because it is the
21   words of the claim that define what a patent covers.
22   The figures and texts in the rest of the patent
23   provide a description and/or examples of the invention and
24   provide a context for the claims, but it is the claims that
11:31AM 25   define the breadth of the patent's coverage.  Therefore, what

UNITED STATES DISTRICT COURT

**EXHIBIT 5**
**-207-**

113

1 a patent covers depends in turn on what each of its claims
2 covers.
3 　　　　To know what a claim covers, a claims sets forth in
4 wards a set of requirements.  Each claim sets forth its
11:32AM 5 requirements in a single sentence.  The requirements of a
6 claim are often referred to as claim elements or claim
7 limitations.  The coverage of a patent is assessed on a claim
8 by claim basis.
9 　　　　When a thing such as a product or process meets all
11:32AM 10 the requirements of a claim, the claim is said to cover that
11 thing, and that thing is said to fall within the scope of the
12 claim.  In other words, a claim covers a product or process
13 where each of the claim elements or limitations is present is
14 that product or process.
11:32AM 15 　　　　You will first need to understand what each claim
16 covers in order to decide whether or not there is
17 infringement of the claim and to decide whether or not the
18 claim is invalid.
19 　　　　The first step is to understand the meaning of the
11:32AM 20 words used in the patent claim.  The law says that it is my
21 role to define the terms of the claims, and it your role to
22 apply my definition of the terms I have construed to the
23 issues that you are asked to decide in this case.
24 　　　　Therefore, as I explained to you at the start of
11:33AM 25 the case, I have determined the meaning of certain claim

UNITED STATES DISTRICT COURT

114

1 terms, and I will provide you my definition on certain claim
2 terms.  You must accept my definition of these words in the
3 claims as being correct.  It is your job to take these
4 definitions and apply them to the issues you are deciding
11:33AM 5 including the issue of infringement and invalidity.
6 　　　　For any words in the claims for which I have not
7 provided you with a definition, you should apply the ordinary
8 meaning of those terms in the field of the patent.  You
9 should not take my definition of the language of the claim as
11:33AM 10 an indication that I have a view regarding how you should
11 decide the issues that you are being asked to decide such as
12 infringement and invalidity.  These issues are yours to
13 decide.
14 　　　　Now, as I just mentioned, I've already determined
11:33AM 15 the meaning some terms in the claims in the '293 and '557
16 patents.  A chart reflected those meanings appears on the
17 page following this instruction.  For a claim term for which
18 I have not provided you with a definition, you should apply
19 the ordinary meaning of the term in the field of the patent.
11:34AM 20 　　　　You are to apply my definitions of the terms I have
21 construed throughout the case.  However, my interpretation of
22 the language of the claims should not be taken as an
23 indication that I have a view regarding issues such as
24 infringement and invalidity.  Those issues are yours to
11:34AM 25 decide.

UNITED STATES DISTRICT COURT

115

1 　　　　I'll provide you with more detailed instructions on
2 the meaning of the claim terms in this chart, and you've have
3 this chart here in your jury instructions.  I'm just gonna
4 read it to you.  These are the terms that the Court's already
11:34AM 5 defined.
6 　　　　Court's defined the term neighborhood in Claim 1 of
7 the '293 patent as zone of limited area.
8 　　　　The Court has defined moving the gradient
9 neighborhood like a sliding window over the 3D elevation.
11:34AM 10 That's in Claim 1 of the '293 patent.  I define that as
11 sequentially and completely applying the gradient
12 neighborhood to the 3D elevation data.
13 　　　　The Court's is configured to run an algorithm as is
14 programed to run an algorithm without the need to rebuild,
11:35AM 15 rewrite or recompile the code for or redesign any of the
16 hardware or software.
17 　　　　The Court has construed comprising the steps of a,
18 b, d, d as the algorithm must be configured to run the steps
19 in the recited order.
11:35AM 20 　　　　And the Court's construed the term track elevation
21 map to be the representation of both the height, elevation
22 and intensity of reflected laser light (intensity)at each
23 data point within an area across the entire width of the
24 railway track bed.
11:35AM 25 　　　　A track elevation map is not required to encode

UNITED STATES DISTRICT COURT

116

1 elevation and intensity data separately at each point but may
2 encode the elevation of intensity data by blending or merging
3 the values with mathematical formulas.
4 　　　　Now, the next instruction is on direct infringement
11:35AM 5 by literal infringement.
6 　　　　In order to prove direct infringement by literal
7 infringement, the patent holder must prove by a preponderance
8 of the evidence, i.e., that it is more like than not that the
9 alleged infringer made, used, sold or offered for sale within
11:36AM 10 or imported into the United States a product that meets all
11 of the requirements of the claim and did so without the
12 permission of the patent holder during the time the asserted
13 patent was in force.
14 　　　　You must compare the product with each and every
11:36AM 15 one of the requirements of a claim to determine whether all
16 of the requirements of that claim are met.  In this case,
17 Tetra Tech contends that Pavemetrics sold or offered for sale
18 in the United States the LRAIL that meets all of the
19 requirements of Claims 1 and 21 of the '293 patent.
11:36AM 20 　　　　You must determine separately for each asserted
21 claim on whether or not there is infringement.
22 　　　　For Dependent Claim 21, if you find that Claim 1
23 from which it depends is not infringed, there cannot be
24 infringement of that dependent claim.  A dependent claim
11:36AM 25 includes all of the elements of the independent claim plus it

UNITED STATES DISTRICT COURT

EXHIBIT 5
-208-

117

1 adds things.  So if Claim 1 is not infringed, Claim 21 can't
2 be infringed.
3          On the other hand, if you find that Independent
4 Claim 1 has been infringed, you must still decide separately
11:37AM 5 whether the product meets the additional elements of Claim 21
6 to determine if Claim 21 has been infringed.
7          Dependent Claim 21 includes all the requirements of
8 Claim 1 plus additional requirements of its own.
9          I will instruct now instruct you how to decide
11:37AM 10 whether or not Tetra Tech has proven that Pavemetrics has
11 infringed the '293 and '557 patents.  Infringement is
12 assessed on a claim by claim basis.  Therefore, there may be
13 infringement as to one claim but no infringement as to
14 another.
11:37AM 15          In this case, there are two possible ways a claim
16 may be infringed.  The two types of infringement are called
17 direct infringement and active inducement.  Active inducement
18 is referred to as indirect infringement.  There cannot be
19 indirect infringement without someone else engaging in direct
11:37AM 20 infringement.
21          In this case, Tetra Tech has alleged that
22 Pavemetrics directly infringed the system claims of the '293
23 patent.  In addition, Tetra Tech has alleged that AID
24 directly infringed the '557 patent, and Pavemetrics is liable
11:38AM 25 to actively inducing that direct infringement by AID.

UNITED STATES DISTRICT COURT

118

1          In order to prove infringement, Tetra Tech must
2 prove that the requirements of one or more these types of
3 infringements are met by a preponderance of the evidence,
4 that is, that it is more likely than not that all of the
11:38AM 5 requirements of one or more of these types of infringement
6 have been proven.
7          I'll now explain each of these types of
8 infringement in more detail.
9          Instruction No. 28 is indirect infringement/active
11:38AM 10 inducement.  Tetra Tech alleges that Pavemetrics is liable
11 for infringing by actively inducing another company to
12 directly infringe the '557 patent.  As with direct
13 infringement, you must determine whether there has been
14 active inducement on a claim by claim basis.
11:38AM 15          Pavemetrics is liable for active inducement of a
16 claim only if Tetra Tech proves by a preponderance of the
17 evidence:
18          (1) that AID's use of LRAIL directly infringes the
19 claim;
11:39AM 20          (2) that Pavemetrics took action during the time
21 the '557 patent was in force and was intended to cause and
22 led to AID's infringing use; and
23          (3) that Pavemetrics was aware of the '557 patent
24 and knew that AID's use if taken would constitute
11:39AM 25 infringement of that patent or that Pavemetrics believed

UNITED STATES DISTRICT COURT

119

1 there was a high probability that AID's use would infringe
2 the '557 patent, Pavemetrics took deliberate steps to avoid
3 learning of that infringement.
4          If you find that Pavemetrics was aware of the
11:39AM 5 patent but believed that the uses it encouraged did not
6 infringe the patent, Pavemetrics cannot be liable for
7 inducement.
8          In order to establish active inducement of
9 infringement, it is not sufficient that AID itself directly
11:39AM 10 infringes the claim nor is it sufficient that Pavemetrics was
11 aware of the use by AID that alleddgedly constitutes the
12 direct infringement.
13          Rather in order to find active inducement of
14 infringement, you must find either that Pavemetrics
11:40AM 15 specifically intended AID to infringe the '557 patent or that
16 Pavemetrics believed there was a high probability that AID
17 would infringe the '557 patent but deliberately avoided
18 learning the infringing nature of AID's use.
19          The mere fact, if true, that Pavemetrics knew or
11:40AM 20 should have known that there was a substantial risk that
21 AID's use would infringe the '557 patent would not be
22 sufficient to support a finding of active inducement of
23 infringement.
24          Willful Infringement
11:40AM 25          Now, willful infringement.  In this case, Tetra

UNITED STATES DISTRICT COURT

120

1 Tech argues that Pavemetrics willfully infringed the asserted
2 patents.
3          To prove willful infringement, Tetra Tech must
4 persuade you that Pavemetrics infringed a claim of the
11:40AM 5 asserted patents.  The requirements of proving such
6 infringement were discussed in prior instruction.
7          In addition, to prove willful infringement of a
8 claim, Tetra Tech must persuade you that it is more likely
9 true than not that Pavemetrics intentionally ignored or
11:41AM 10 recklessly disregarded that claim.  You must base your
11 decision on Pavemetrics's knowledge and action at the time of
12 infringement.
13          Evidence of Pavemetrics had knowledge of the patent
14 at the time of infringement by itself is not sufficient to
11:41AM 15 show willfulness.  Rather to show willfulness, you must find
16 that Pavemetrics engaged in additional conduct evidencing
17 deliberate or reckless disregard of Tetra Tech's patent
18 rights.
19          In deciding whether Pavemetrics willfully
11:41AM 20 infringed, you should consider all the facts surrounding the
21 infringement including whether Pavemetrics intentionally
22 copied Tetra Tech's patented technology in developing the
23 accused product or method, whether Pavemetrics knew or should
24 have known that its conduct involved an unreasonable risk of
11:41AM 25 infringement and whether Pavemetrics had a reasonable belief

UNITED STATES DISTRICT COURT

EXHIBIT 5
-209-

121

1  at the time of the infringement that its products did not
2  infringe the asserted patents or that the asserted patents
3  were invalid.
4      Instruction 30 is on invalidity.  I'll now instruct
5  you on the rules you must follow in deciding whether or not
6  Pavemetrics has proven that the asserted claim of the
7  asserted patents are invalid.  To prove that any claim of a
8  patent is invalid, Pavemetrics must persuade you by clear and
9  convincing evidence, that is, you must be left with a clear
10 conviction that the claim is invalid.
11     And as we said before, clear and convincing
12 evidence is a higher burden than preponderance of the
13 evidence.
14          PRESUMPTION OF VALIDITY
15     A party accused of infringing a patent may deny
16 infringement or prove that the asserted claims of the patent
17 are invalid.  A patent is assumed to be valid.  In other
18 words, it is presumed to have been properly granted by the
19 Patent and Trademark Office.  But for that presumption of
20 validity can be overcome if clear and convincing evidence
21 presented in court that proves the patent is invalid.
22     Now, in order for someone to be entitled to a
23 patent, the invention must actually be not obvious over what
24 came before which is referred to as the prior art.  The
25 parties agree that UML-TRB2015 is prior art.  You must

UNITED STATES DISTRICT COURT

122

1  determine whether Pavemetrics' UML Sale and Support,
2  EC-TRB2014 and Gibert-Serra are prior art that can be
3  considered in determining whether claims of the asserted
4  patents would have been obvious.
5      There are different types of prior art, and I will
6  instruct you on the relevant types that you need to consider.
7      Pavemetrics contends that Pavemetrics' UML Sale and
8  Support is prior art because it was publicly known or was
9  used on sale or otherwise made available to the public before
10 the filing date of the asserted patents.  An invention is
11 known when the information about it was reasonably accessible
12 to the public on that date.  An invention was publicly
13 when it was either accessible to the public or commercially
14 exploited.
15     An invention was sold or offered for sale when it
16 was offered commercially, and what was offered was ready to
17 be patented, i.e., it was reduced to practice or it was
18 described such that a person having ordinary skill in the
19 field of the technology could have made and used the claimed
20 invention even if it was not yet reduced to practice or
21 publicly disclosed.
22     Pavemetrics also contends that EC-TRB2014 and
23 Gibert-Serra are prior art because they were published or
24 otherwise made available to the public before the filing date
25 of the asserted patents.  Must prove by clear examine

UNITED STATES DISTRICT COURT

123

1  convincing evidence Pavemetrics must prove by clear and
2  convincing evidence that Pavemetrics' UML Sale and Support,
3  EC-TRB2014 and Gibert-Serra are prior art.
4      Now, this instruction is on obviousness generally.
5  Pavemetrics contends that the asserted claims of the asserted
6  patents are invalid because the claimed inventions are
7  obvious.  A claimed invention is invalid as obvious if it
8  would have been obvious to a person of ordinary skill in the
9  art of the claimed invention as of the filing date of the
10 asserted patents.  Obviousness may be shown by considering
11 one or more than one item of prior art.
12     In deciding obviousness, using avoid using
13 hindsight, that is, you should not consider what is known
14 today or what was learned from the teachings of the asserted
15 patents.  You should not use the asserted patents as a road
16 map for selecting and combining items of prior art.  You must
17 put yourself in the place of a person of ordinary skill in
18 the art as of the filing date of the asserted patents.
19     The following factors must be evaluated to
20 determine whether Pavemetrics has established that the
21 claimed invention is obvious:
22     (1)  the scope and content of the prior art relied
23 upon by Pavemetrics;
24     (2)  the differences, if any, between each claimed
25 invention of the asserted patents that Pavemetrics contends

UNITED STATES DISTRICT COURT

124

1  is obvious in the prior art;
2      (3)  the level of ordinary skill in the art as of
3  filing date of the asserted patents; and
4      (4)  additional considerations, if any, that
5  indicate that the invention was obvious or not obvious.
6      Each of these factors must be evaluated although
7  they be analyzed in any order, you must perform a separate
8  analysis for each claim.
9      Pavemetrics must prove by clear and convincing
10 evidence the invention would have been obvious.  Again, you
11 must undertake this analysis separately for each claim that
12 Pavemetrics contends is obvious.
13     I will now explain each of the four factors in more
14 detail.
15     THE FIRST FACTOR:  SCOPE AND CONTENT OF PRIOR ART
16     In deciding obviousness, the prior art reference
17 may be considered if it discloses information designed to
18 solve any problem or need addressed by the patent.  A prior
19 art reference may also be considered if it discloses
20 information that has obvious uses behind its main purpose and
21 if a person of ordinary skill in the art would reasonably
22 examine that reference when trying to solve any problem or
23 need addressed by the patent.
24     Where Pavemetrics is relying on prior art that was
25 not considered by the Patent and Trademark Office during

UNITED STATES DISTRICT COURT

**EXHIBIT 5**
**-210-**

125

1    examination, you may consider whether that prior art is
2    significantly different and more relevant that the prior art
3    Patent and Trademark office did consider.  If you decide it
4    is different and more relevant, you may weigh that prior art
5    more heavily when considering whether Pavemetrics has carried
6    its clear and convincing burden of proving invalidity.
7           Now, the second factor is differences between the
8    claimed invention and the prior art.
9           You should analyze whether there are relevant
10   differences between the prior art and the claimed from the
11   view of an person of ordinary skill in the art as of the date
12   of the asserted patents.  Your analysis must determined the
13   impact, if any, of such differences on the obviousness or
14   nonobviousness of the claimed invention as a whole and not
15   merely some portion of it.
16          In analyzing the relevances of the difference
17   between the claimed invention and the prior art, you may not
18   look for precise teaching in the prior art -- I'm sorry, you
19   do not need to look for precise teaching in the prior art
20   directed to the subject matter of the claimed invention.  You
21   may consider the inferences and creative steps that a person
22   or ordinary skill in the art would have employed in reviewing
23   the prior at the time of the intention.
24          For example, if the claim invention combined
25   elements known in the prior art, and the combination yielded

UNITED STATES DISTRICT COURT

126

1    results that were predictable to a person of ordinary skill
2    in the art at the time of invention, then this evidence would
3    make it more likely that the claim was obvious.  On the other
4    hand, if the combination of known elements yielded unexpected
5    or unpredictable results or if the prior art teaches away
6    from combining the known elements, then this evidence would
7    make it more likely that the claim that successfully combined
8    was not obvious.
9           Another factor is whether it would have been
10   obvious to try the combination of elements such as when there
11   is a design incentive or market pressure to solve a problem,
12   and there are a finite number of identified, predictable
13   solutions.
14          Importantly, a claim is not proven obvious merely
15   by demonstrating that the elements -- that the elements were
16   independently known in the prior art.  Most, if not all,
17   inventions rely on building blocks long-known, and claimed
18   discoveries almost of necessity will likely be combinations
19   of what was already known.  Therefore, you should consider
20   whether a reason existed at the time of the invention that
21   would have prompted a person of ordinary skill in the art in
22   the relevant filed to combine the teachings in the way the
23   claimed invention does.
24          The reason could come from the prior art, the
25   background knowledge of one of ordinary skill in the art, the

UNITED STATES DISTRICT COURT

127

1    nature of any problem or a need to be addressed, market
2    demand or common sense.  If you find that a reason existed at
3    the time of the invention to combine the elements of the
4    prior art to arrive at the claimed invention, and there would
5    have been a reasonable expectation of success for doing so,
6    this evidence would make it more likely that the claimed
7    invention was obvious.
8           Similarly, you may consider the possibility that a
9    reference teaches away from the claimed invention.  A
10   reference teaches away from the claimed invention when it
11   would have -- when it would have discouraged a person of
12   ordinary skill in the art as of the filing date of the
13   asserted patents from practicing the claimed invention or
14   when such a person would be lead in a different direction
15   than practicing the claimed invention.
16          You must undertake this analysis separately for
17   each claim that Pavemetrics contends is obvious.
18          The third factor is level of ordinary skill.
19          To determine the obviousness of the invention, you
20   must determine the level of ordinary skill in the field of
21   the invention at the time of the filing date of the asserted
22   patents.  Regardless of whether you are asked to articulate
23   in your verdict what you believe was the ordinary level of
24   skill in the field of the invention, you must consider and
25   assess this factor before reaching your conclusions in the

UNITED STATES DISTRICT COURT

128

1    case.
2           A person of ordinary skill is presumed to know all
3    prior art that you have determined to be reasonably relevant.
4    A person of ordinary skill is also a person ordinary
5    creativity that can use common sense to solve problems.
6           When determining the level of ordinary skill in the
7    art, you should consider all of the evidence submitted by the
8    parties including evidence of:
9           (1) the level of education and experience of
10   persons actively working in the field as of the filing date
11   of the asserted patents including the inventor;
12          (2) the types of problems encountered in the art as
13   of the filing date of the asserted patents; and
14          (3) the sophistication of the technology in the art
15   as of the filing date of the asserted patents including the
16   rapidity with which innovations were made in the art as of
17   the filing date of the asserted patents.
18          Now, the fourth factor in obviousness is other
19   considerations.
20          Before deciding the issue of obviousness for each
21   of the claimed inventions, you must also consider certain
22   factors which may help you determine whether or not an
23   invention would have been obvious.  No factor alone is
24   dispositive, and you must consider the obviousness or
25   nonobviousness of the invention as a whole.

UNITED STATES DISTRICT COURT

**EXHIBIT 5**
**-211-**

---

129

1  Certain of these factors include:

2  1. Were products covered by the claim commercially

3  successful due to the merits of the claimed invention rather

4  than due to promotion, salesmanship or features

11:51AM 5  of the product other than those found in the claim?

6  2. Was there a long-felt need for a solution to

7  the problem facing the inventor which was satisfied by the

8  claimed invention?

9  3. Did others try but fail to solve the problem

11:52AM 10  solved by the claimed invention?

11  4. Did others copy the invention?

12  5. Did the claimed invention achieve unexpectedly

13  superior results over the closest prior art?

14  6. Did others in the field or Pavemetrics praise

11:52AM 15  the claimed invention or express surprise at the making of

16  the claimed invention?

17  7. Did others accept licenses under the asserted

18  patents because of the merits of the claimed invention?

19  Answering all or some of these questions yes may

11:52AM 20  suggest that the claim was not obvious.

21  A factor that may suggest obviousness includes

22  whether another person simultaneously and independently

23  created the same invention claimed in the patents.

24  These factors are relevant only if there is a

11:52AM 25  connection or nexus between the factor and the invention

UNITED STATES DISTRICT COURT

---

130

1  covered by the patent claim.

2  Even if you conclude that some of the above factors

3  have been established, those factors should be considered

4  along with all the other evidence in the case in determining

11:52AM 5  whether Pavemetrics has proven that the claimed invention

6  would have been obvious.

7  Now, this instruction on damages.

8  If you find that Pavemetrics infringed any valid

9  claim of the asserted patents, you must then consider what

11:53AM 10  amount of damages to award to Tetra Tech. I will now

11  instruct you about the measure of damages. By instructing

12  you on damages, I am not suggesting which party should win

13  this case on any issue. If you find that Pavemetrics has not

14  infringed any valid claim of the patent, then Tetra Tech is

11:53AM 15  not entitled to any damages.

16  The damages you award must be adequate to

17  compensate Tetra Tech for infringement. They are not meant

18  to punish an infringer. The damages award if you reach this

19  issue should put Tetra Tech in approximately the same

11:53AM 20  financial position that it would have been in had

21  infringement not occurred.

22  Tetra Tech has the burden to establish the amount

23  of its damages by a preponderance of the evidence. In other

24  words, you should award only those damages that Tetra Tech

11:53AM 25  establishes it more likely than not suffered. While Tetra

UNITED STATES DISTRICT COURT

---

131

1  Tech is not required to prove the amount of damages with

2  mathematical precision, they must prove them with reasonable

3  certainty. You may not award damages that are speculative

4  damages that are only possible or damages that are based on

11:54AM 5  guesswork.

6  There are different type of damages that Tetra Tech

7  may be entitled to recover. In this case, Tetra Tech seeks

8  lost profits and/or a reasonable royalty. Lost profits

9  consist of any actual reduction in business profit Tetra Tech

11:54AM 10  suffered as a result of Pavemetrics' infringement.

11  A reasonable royalty is defined as the money amount

12  Tetra Tech and Pavemetrics would have agreed upon as a fee

13  for use of the invention at the time prior to when the

14  infringement began. But regardless of the types of damages

11:54AM 15  you may choose to award, you must be careful to ensure that

16  that award is no more or no less than the value of the

17  patented invention.

18  I will give you more detailed instructions

19  regarding damages subsequently. Note, however, that Tetra

11:54AM 20  Tech is entitled to receive no less than a reasonable royalty

21  for each infringing sale offered for sale and use.

22  Now, this instruction is on lost profits, the but

23  for test.

24  To recover lost profits as opposed to reasonable

11:54AM 25  royalty, Tetra Tech's must show a causal relationship between

UNITED STATES DISTRICT COURT

---

132

1  the infringement and Tetra Tech's loss of profit. In other

2  words, Tetra Tech must show that but for the infringement,

3  there's a reasonable probability that Tetra Tech would have

4  earned higher profits. To show this, Tetra Tech must prove

11:55AM 5  that if there had been no infringement, it would have made

6  some portion of the sales that Pavemetrics made on the

7  infringing product.

8  Tetra Tech is entitled to lost profits if it

9  establishes each of the following:

11:55AM 10  (1) that there was a demand for the patented

11  product;

12  (2) that there were no available, acceptable,

13  noninfringing substitute products;

14  (3) that Tetra Tech had the manufacturing and

11:55AM 15  marketing capability to make any infringing sales actually

16  made by Pavemetrics and for which Tetra Tech seeks an award

17  of lost profits, in other words, that Tetra Tech was capable

18  of satisfying the demand; and

19  (4) the amount of profit that Tetra Tech would have

11:55AM 20  made if Pavemetrics had not infringed.

21  Now, lost profits, this is on demand. Demand for

22  the patented product can be proven by significant sales of a

23  patent holder's patented product or significant sales of an

24  infringing product containing the patented features.

11:56AM 25  This is on lost profits, noninfringing substitute,

UNITED STATES DISTRICT COURT

---

**EXHIBIT 5**
**-212-**

133

1    availability.

2         An alternative product may be considered available

3    as a potential substitute if the product was not actually on

4    sale during the infringement period.  Factors suggesting the

11:56AM 5    alternative was available include whether the material,

6    experience and know-how to make or use the alleged substitute

7    was readily available at the time of infringement.

8         Factors suggesting the alternate was not available

9    include whether the material was of such high cost as to

11:56AM 10   render the alternative unavailable and whether an alleged

11   infringer would have had to design or invent around the

12   patented technology to develop an alleged substitute.

13        To be an acceptable, noninfringing substitute, a

14   product must have the advantages of the patented invention

11:56AM 15   that were important to people who purchased Pavemetrics'

16   product.

17        If purchasers of Pavemetrics' product were

18   motivated to buy that product because of features available

19   only from that product and Tetra Tech's patented product,

11:57AM 20   then some other alternative product is not an acceptable

21   substitute even if it otherwise competed with Tetra Tech's

22   and Pavemetrics' products.

23        On the other hand, if the realities of the

24   marketplace are that competitors other than the patentee

11:57AM 25   would likely have captured the sales made by the infringer

UNITED STATES DISTRICT COURT

134

1    despite a difference in the products, then the patentee is

2    not entitled to lost profits on those sales.

3         A patent holder is only entitled to lost profits

4    for sales it could have actually made.  In other words, Tetra

11:57AM 5    Tech must show that it had the manufacturing and marketing

6    capability to make the sales it said it lost.  This means

7    Tetra Tech must prove that it is more probable than not that

8    it could have made and sold or could have had someone else

9    make or sell for it the additional products it says it could

11:58AM 10   have sold but for the infringement.

11        A patent holder may calculate its lost profits on

12   lost sales by computing the lost revenue for sales it claims

13   it would have made but for the infringement and subtracting

14   from that figure the amount of additional costs or expenses

11:58AM 15   it would have incurred in making those lost sales such as

16   cost of goods, sales costs, packaging costs and shipping

17   costs.  Certain fixed costs do not vary with increases in

18   production or scale such as taxes, insurance, rent and

19   administrative overhead and should not be subtracted from a

11:58AM 20   patent holder's lost revenue.

21        If you find that a patent claim is infringed and

22   not invalid, Tetra Tech is entitled to at least a reasonable

23   royalty to compensate it for that infringement.

24        If you find that Tetra Tech has not proved its

11:58AM 25   claim for lost profits or has proved its claim for lost

UNITED STATES DISTRICT COURT

135

1    profit only for a portion of the infringing sales, then you

2    must award Tetra Tech a reasonable royalty for all infringing

3    sales for which it has not been awarded lost profits or

4    damages.

11:59AM 5         A royalty is a payment made to a patent holder in

6    exchange for the right to make, use or sell the claimed

7    invention.  A reasonable royalty is the amount of royalty

8    payment that a patent holder and the alleged infringer would

9    have agreed to in a hypothetical negotiation taking place at

11:59AM 10   a time prior to when the infringement first began.

11        In considering this hypothetical negotiation, you

12   should focus on what the expectations of the patent holder

13   and alleged infringer would have been had they entered into

14   an agreement at that time and had they acted reasonably in

11:59AM 15   their negotiations.  In determining this, you must assume

16   that both parties were believed the patent was valid and

17   infringed, and that both parties were willing to enter into

18   an agreement.

19        The reasonable royalty you determine must be a

12:00PM 20   royalty that would have resulted from the hypothetical

21   negotiation and not simply a royalty that either party would

22   have preferred.  Evidence of things that happened after the

23   infringement first began can be considered in evaluating the

24   reasonable royalty only to the extent that the evidence aids

12:00PM 25   in assessing what royalty would have resulted from a

UNITED STATES DISTRICT COURT

136

1    hypothetical negotiation just prior to the first

2    infringement.

3         In determining the amount of reasonable royalty,

4    you may consider evidence of any of the following factors in

12:00PM 5    addition to any other evidence presented by the parties on

6    the economic value of the patent.

7         (1) any royalty received by the licensor of the

8    patent-in-suit proving or tending to prove an established

9    royalty;

12:00PM 10        (2) the rates paid by Pavemetrics to license other

11   patents comparable to the asserted patents;

12        (3) the nature and scope of the license as

13   exclusive or non-exclusive or as restricted or non-restricted

14   in terms of its territory or with respect to whom the

12:01PM 15   manufactured product may be sold;

16        (4) the licensor's established policy and marketing

17   program to maintain its right to exclude others from using

18   the patented invention by not licensing others to use the

19   invention or by granting licenses under special conditions

12:01PM 20   designed to preserve that exclusivity;

21        (5) the commercial relationship between the

22   licensor and the licensee such as whether or not they are

23   competitors in the same territory in the same line of

24   business;

12:01PM 25        (6) the effect of selling the patented product in

UNITED STATES DISTRICT COURT

EXHIBIT 5
-213-

137

1  promoting other sales of licensee, the existing value of the
2  invention to the licensor as a generator of sales of its
3  non-patented items and the extent of such collateral sales;
4  (7) the duration of the asserted patents and the
12:01PM  5  term of the license;
6  (8) the established profitability of the product
7  made under the asserted patents, its commercial success and
8  its popularity;
9  (9) the utility and advantages of the patented
12:01PM  10  invention over the old modes or devices, if any, that had
11  been used for achieving similar results;
12  (10) the nature of the patented invention, the
13  character of the commercial embodiment of it as owned and
14  produced by or for the licensor and the benefits to those who
12:02PM  15  have used the invention;
16  (11) the extent to which Pavemetrics has made use
17  of the invention and any evidence that shows the value of
18  that use;
19  (12) the portion of profit or of the selling price
12:02PM  20  that may be customary in the particular and comparable
21  business or incomparable businesses to allow for the use of
22  the invention or analogous inventions.
23  (13) the portion of the profit that arises from the
24  patented invention itself as opposed to the profit arising
12:02PM  25  from unpatented features such as the manufacturing process,

UNITED STATES DISTRICT COURT

138

1  business risks or significant features or improvements added
2  by the accused infringer;
3  (14) the opinion testimony of qualified experts;
4  (15) the amount that a licensor and a licensee such
12:02PM  5  as Pavemetrics would have agreed upon at the time the
6  infringement began if both sides had been reasonable and
7  voluntary trying to reach agreement, that is, the amount
8  which a prudent licensee who desired as a business
9  proposition to obtain a license to manufacture and sell a
12:03PM  10  particular article embodying the patented invention would
11  have been willing to pay as a royalty and yet be able to make
12  a reasonable profit and which amount would have been
13  acceptable by a patentee who was willing to grant a license;
14  (16) any other economic factor that a normally
12:03PM  15  prudent business person would under similar circumstances
16  take into consideration in negotiating the hypothetical
17  license.
18  We're almost done.  Just a few more pages.
19  48.  DAMAGES-APPORTIONMENT
12:03PM  20  The amount you find as damages must be based on the
21  value attributable to the patented invention as distinct from
22  unpatented features of the accused product or other factors
23  such as marketing or advertising or Tetra Tech's size or
24  market position.  A royalty compensating the patent holder
12:03PM  25  for damages must reflect the value attributable to the

UNITED STATES DISTRICT COURT

139

1  infringing features of the product and no more.
2  The process of separating the value of the
3  allegedly infringing features from the value of all other
4  features is called apportionment.  When the accused
12:04PM  5  infringing products have both patents and unpatented
6  features, your award must be apportioned so that is based
7  only on the value of the patented features and no more.
8  If the claim patented features are not the sole
9  driving factor for customer demand for the accused infringing
12:04PM  10  product, then you must perform what is called apportionment.
11  When damages must be apportioned, the amount you find as
12  damages must be based on the value attributable to the
13  patented invention as distinct from the unpatented features
14  of the accused product or other factors such as marketing or
12:04PM  15  advertising or Tetra Tech's size or market position.  Put
16  differently, when apportionment is required, a royalty
17  compensating the patent holder for damages must reflect the
18  value attributable to the infringing features of the product
19  and no more.
12:04PM  20  On the other hand, if demand for the entire accused
21  product depends only on the claimed features, then
22  apportionment is not necessary even though the accused
23  product includes some nonpatented features.
24  Now, in determining the amount of damages, you must
12:05PM  25  determine when the damages began.  For the '293 patent,

UNITED STATES DISTRICT COURT

140

1  damages commence on the date that Pavemetrics has both
2  infringed and been notified of the alleged infringement of
3  the '293 patent.  Tetra Tech and Pavemetrics agree that Tetra
4  Tech gave notice on January 5, 2021.
12:05PM  5  In determining when damages began with regard to
6  the '557 patent, there is no notice requirement because the
7  '557 patent is directed to method claims.  Accordingly, the
8  calculation of damages for infringement of the '557 patent
9  begins as of the date the patent issued or the date the
12:05PM  10  infringement began, whatever was later.
11  Now, four more instructions.
12  Before you begin deliberations, elect one member of
13  the jury as your presiding juror.  The presiding juror will
14  preside over the deliberations and serve as the spokesperson
12:05PM  15  for the jury here in court.  You shall diligently strive to
16  reach agreement with all of the other jurors if you can do
17  so.  Your verdict must be unanimous.
18  Each of you must decide the case for yourself, but
19  you should do so only after you've considered all the
12:06PM  20  evidence, discussed it fully with other jurors and listened
21  to their views.  It is important that you attempt to reach a
22  unanimous verdict, but, of course, only if each of you can do
23  so after having made your own conscientious decision.
24  Do not be unwilling to change your opinion if the
12:06PM  25  discussion persuade you that you should, but do not come to a

UNITED STATES DISTRICT COURT

**EXHIBIT 5**
**-214-**

141

1　decision simply because other jurors think it is right or
2　change an honest belief about the weight and effect of the
3　evidence simply to reach a verdict.
4　　　　Now, because you must base your verdict only on
12:06PM 5　evidence received in the case and on these instructions, I
6　remind you that you must not be exposed to any other
7　information about the case or to the issues it involves.
8　　　　Except for discussing this case with your fellow
9　jurors during deliberations:  Do not communicate with anyone
12:06PM 10　in any way, and do not let anyone else communicate with you
11　in any way about the merits of the case or anything to do
12　with it.  This includes discussing the case in person, in
13　writing, by phone, tablet, computer or any other means via
14　email, text messaging or Internet chat room, blog, website or
12:07PM 15　application including but not limited to Facebook, YouTube,
16　Twitter, Instagram, LinkedIn, Snapchat, TikTok or any other
17　forms of social media.
18　　　　This applies to communicating with your family
19　members, your employer, the media or press and the people
12:07PM 20　involved in the trial.  If you are asked or approached in any
21　way about your jury service or anything about this case, you
22　must respond that you have been ordered not to discuss the
23　matter and report the conduct to the Court.
24　　　　Do not read, watch or listen to any news or media
12:07PM 25　accounts or commentary about he case or anything to do with

UNITED STATES DISTRICT COURT

142

1　it although I have no information that there will be new
2　reports about this case.  Do not do any research such as
3　consulting dictionaries, searching the Internet or using
4　other reference materials, and do not make any investigation
12:07PM 5　or in any other way try to learn about the case on your own.
6　　　　Do not view or visit anyplace discussed in this
7　case, and do not use Internet programs or devices to
8　search for or view anyplace discussed during the trial.
9　Also, do not do any research about this case, the law or the
12:07PM 10　people involved including the parties, the witnesses or the
11　lawyers until you have been excused as jurors.  If you happen
12　to read or hear anything touching on this case in the media,
13　turn away and report it to me as soon as possible.
14　　　　These rules protect each party's right to have this
12:08PM 15　case decided only on evidence that has been presented here in
16　court.  Witnesses here in court take an oath to tell the
17　truth, and the accuracy of their testimony is tested through
18　the trial process.  If you do any research or investigation
19　outside the courtroom or gain any information through
12:08PM 20　improper communications, then your verdict may be influenced
21　by inaccurate, incomplete or misleading information that has
22　been tested by the trial process.
23　　　　Each of the parties is entitled to a fair trial by
24　an impartial jury.  And if you decide the case based on
12:08PM 25　information that was not presented in court, you will have

UNITED STATES DISTRICT COURT

143

1　denied the parties a fair trial.  Remember you have taken an
2　oath to follow the rules, and it is very important that you
3　do so.  A juror who violates these restrictions jeopardizes
4　the fairness of these proceedings, and a mistrial could
12:08PM 5　result that would require the entire trial process to start
6　over.  If any juror is exposed to any outside information,
7　please notify the Court immediately.
8　　　　If it becomes necessary during your deliberations
9　to communicate with me, you may send a note through the clerk
12:09PM 10　signed by any one or more of you.  No member of the jury
11　should ever attempt to communicate with me except by a signed
12　writing.  I will not communicate with any member of the jury
13　on anything concerning the case except in writing or here in
14　open court.
12:09PM 15　　　　If you send out a question, I will consult with the
16　lawyer before answering it which may take a little bit of
17　time.  You may continue your deliberations while waiting for
18　the answer to any question.  Remember that you are not to
19　tell anyone including the Court how the jury stands whether
12:09PM 20　in terms of vote count or otherwise until you have reached a
21　unanimous verdict or have been discharged.
22　　　　Finally, a verdict form has been prepared for you.
23　The verdict form is made up of a number of yes or no
24　questions.  After you have reached unanimous agreement on the
12:09PM 25　verdict form, your presiding juror should complete the form

UNITED STATES DISTRICT COURT

144

1　according to your deliberations, sign and date it and advise
2　the clerk that you are ready to return to the courtroom.
3　　　　Those are the instructions.  I'll leave you to
4　lunch, and we will start back up at 1 o'clock.  Thank you.
12:09PM 5　　　　THE CLERK:  All rise.
6　　　　　　(Jury not present.)
7　　　　THE COURT:  Okay.  We have the instructions read.
8　We'll start closing arguments at 1 o'clock.
9　　　　I'll hear a brief argument, Rule 50 motion, please.
12:10PM 10　　　　MR. RE:  Thank you, Your Honor.
11　　　　Since this is cutting into the lunch hour, I'll be
12　very brief.  I understand the Court is allowing a written
13　submission under Rule 50 A in the near future, but -- so I
14　didn't need to be thorough.
12:10PM 15　　　　I will just address a couple of points that I think
16　is possible to be left off the jury verdict form, but now the
17　instruction have been read and I understand.  I will assume
18　my chances are slim.  But I do want to address first of all,
19　the fact there cannot be infringement in this case for
12:11PM 20　numerous reasons.  I won't go through them all, but the most
21　obvious of them all is they're unconnected components.
22　　　　The most important part of the testimony that we
23　heard is Dr. Morellas analyzed the product in isolation.
24　There was no analysis at any time in this trial on the acts
12:11PM 25　of infringement and that is the sale itself.  The state of

UNITED STATES DISTRICT COURT

**EXHIBIT 5**
**-215-**

145

1  the article at the time of sale.
2       Mr. Morellas had no idea -- Dr. Morellas had no
3  idea and his expert report reflected that he no had idea what
4  are the five acts of infringement under 271 A, and I believe
12:11PM 5  that dooms this case from the start.  This case should not
6  have gone to trial.
7       Next, there also was no evidence concerning the
8  attributes of each of the four sales.  We heard no testimony.
9  As a matter of fact, we heard no testimony on Sale 4,
12:12PM 10  nothing.  We also had total -- a case based upon software
11  version, a software version that this Court ruled on summary
12  judgment was free and clear because it was before the marking
13  period.  And that's why we had this whole availability theory
14  which is not an act of infringement.  Availability is just
12:12PM 15  not recognized under the law as part of the sale.
16       There's undisputed testimony how the product
17  actually is sold and it's sold in a box of disconnected
18  components.  Claim 1 is directed to a system and there's no
19  contributory infringement in this case and there's no
12:12PM 20  inducement in this case with regard to the '293.
21       And so we'll put in submissions on the details of
22  the noninfringement, and I don't want to waste any more time
23  on that.
24       Also, the Claim 21, Dr. Morellas relied upon one
12:13PM 25  version of code for dependent claim for Claim 1 and a

UNITED STATES DISTRICT COURT

146

1  different version for Claim 21.  That is an absolute improper
2  bases for infringement.  You cannot go to two different
3  articles to pretend they're one article in order to concoct
4  an article for infringement of Claims 1 and 21 at the same
12:13PM 5  time.
6       I now want to go to inducement and willfulness and
7  I'll do them together and that's because the intent
8  requirement is the same for both.  There is no evidence, and
9  I mean no evidence of any possibility of inducement or
12:13PM 10  willfulness because no evidence suggested that my client knew
11  of the patents at any time.
12       You were told before this trial when we were at the
13  pretrial conference by Mr. Barney that he had circumstantial
14  evidence and you allowed the willfulness case to go forward
12:14PM 15  and thus the inducement case to go forward.  We didn't hear
16  any circumstantial evidence.  We heard a bunch of evidence
17  about GREX.  All those entries on Mr. Barney's opening
18  statement board about you might cause us to get sued, watch
19  out for patents, watch out all for GREX, yes, it's true we
12:14PM 20  were fearful of GREX, but the GREX patents aren't in suit.
21       Coincidentally, I argued at the Federal Circuit
22  just last month when a willfulness case, an inducement case
23  was brought where somebody was claiming knowledge of a
24  reissue patent when the only knowledge was of the parent and
12:14PM 25  the original.  Chief Judge Moore called that argument absurd

UNITED STATES DISTRICT COURT

147

1  twice at my oral argument where somebody implies an
2  obligation to go find the patent.  That you should have known
3  of the patent.
4       Those arguments were deemed absurd by
12:14PM 5  Chief Judge Moore in an oral argument we can listen to only
6  last month.  And I won that case with no literal infringement
7  so she didn't have to get to it, but the point is this.  You
8  were sold a bill of goods by the plaintiff that they would
9  have knowledge of the patent.  That we induced infringement
12:15PM 10  because we had knowledge of the patents.
11       You cannot also be willfully blind to facts that
12  don't exist.  If the patent did not exist, you can't be
13  willfully blind to a fact that doesn't exist and that's in
14  the Cammal case.  And if you read Cammal, you only can be
12:15PM 15  willfully blind of a fact that does in fact exist.  I can't
16  be willfully blind of who's gonna win the 2024 election.
17  That's impossible.  That's their case.
18       They presented a case as if knowledge existed or
19  facts were ignored concerning patents that never existed that
12:15PM 20  hadn't issued.  We heard about publication of the patent.  No
21  evidence was raised during this trial about when the patents
22  published, what the publication was or whether anyone at my
23  client saw them, knew of them.  This case should not have
24  gone to trial.
12:16PM 25       Now, I want to move from willfulness to damages.  I

UNITED STATES DISTRICT COURT

148

1  never thought I would be JMOLing on damages.  Particularly,
2  damages on the method claim.  First of all,
3  Mr. Schoettelkotte never made an analysis of the damages that
4  flow from the infringement.  The infringement is on Claim 8.
12:16PM 5  The infringement, the direct infringement, the infringement
6  at issue was by AID.  That's the use.  That's infringement at
7  issue.
8       Did you hear anything about a reasonable royalty
9  based on the number of uses?  As a matter of fact, he didn't
12:16PM 10  talk about uses at all.  He talked about the sale.  How can
11  the sale be the infringement when the infringement is by AID?
12  No reasonable royalty can be awarded on Claim 8 of the '557.
13       A complete misunderstanding of this case because
14  the expert reports were obviously prepared before
12:17PM 15  Mr. Barney's involvement and there's no focus on the acts of
16  infringement by Dr. Morellas or Mr. Schoettelkotte.  Acts of
17  infringement are acts by human beings.
18       You don't read claims on articles.  That's what
19  Dr. Morellas did.  He read claims on software versions and
12:17PM 20  never connected them to the sales or the acts of
21  infringement.  This case is doomed regardless of the jury
22  verdict for numerous reasons.
23       And I would request a waiver of the page limit so
24  that I can list all the grounds under Rule 50 A and not be
12:17PM 25  limited to the Local Rule of 25 pages.

UNITED STATES DISTRICT COURT

EXHIBIT 5
-216-

149

1    THE COURT:  I'll take that under consideration.

2    Can I get a response from counsel to these motions

3    and whether Tetra Tech has any motions?

4    MR. BARNEY:  Thank you, Your Honor.

12:18PM 5    I certainly can't match the vigor and energy of

6    Mr. Re who I've known for many years, but I'll give it a try.

7    We disagree with the motions that he's made.  If it's okay

8    with the Court, I will just briefly give my reasons, but I'm

9    assuming that I can elaborate later --

12:18PM 10    THE COURT:  Yes.

11    MR. BARNEY:  -- when those get fleshed out.

12    I believe moving for JMOL on just the infringement

13    case in general because they shipped the systems into the

14    United States in boxes or because the software gets

12:18PM 15    downloaded later.  Obviously, we disagree with that because

16    we think as properly instructed, the jury can find the sale

17    itself was an infringement and everything that happens after

18    that is irrelevant.

19    Doesn't matter how they ship it into the

12:18PM 20    United States.  Doesn't matter if they download the software

21    later or if they upgrade the software later because what was

22    sold was a system, was an operational system.  It was a

23    turnkey sale.  So we disagree with that.

24    I believe he moved for JMOL, um, on Claim 21, uh,

12:19PM 25    by saying that Dr. Morellas relied on two versions

UNITED STATES DISTRICT COURT

150

1    of code.  He had relied on one for Claim 1 and one for

2    Claim 21.  Just to make clear why that is, Your Honor, there

3    was a limitation on the number of pages that could be printed

4    out during the source code inspection.

12:19PM 5    And Dr. Morellas one of the first questions I asked

6    him very early on in his direct was whether those two

7    versions of code had any meaningful differences between them

8    for purpose of his analysis and he said no.  So the testimony

9    is that you can rely on either one of them because for

12:19PM 10    purposes of his analysis, they were the same.  Of course,

11    they can disagree with that, but that's a factual issue that

12    the jury can decide.

13    I believe he moved for JMOL on inducement and I do

14    take a little exception to some of the commentary that Mr. Re

12:19PM 15    made on terms of what we promised you.  We did not sell you a

16    bill of goods, Your Honor.  We believe we've made a fairly

17    strong case, circumstantial as it may be, of induced

18    infringement for the '557 patent.

19    Um, I can preview that to Your Honor, if you'd

12:20PM 20    like.  You'll see it in closing, but there's a wealth of

21    information that a reasonable juror can conclude that they

22    certainly knew about the specification of the '557 patent

23    because it's identical to the '293 patent.  I'll explain

24    during closing what that means.  They read the entire

12:20PM 25    specification of the '557 patent.

UNITED STATES DISTRICT COURT

151

1    They saw that it was disclosing the algorithm that

2    involves removing rail heads.  Removing rail heads is a big

3    deal, Your Honor.  They saw that algorithm was disclosed in

4    the '293 patent that they read when we accused them of

12:20PM 5    infringement.  They're the only people in the world who knew

6    that their code had that in it.  We didn't know it.  Nobody

7    else knew it, but they knew it.

8    And so when they read that specification and they

9    saw that disclosure of that algorithm, any reasonable

12:20PM 10    business person, anybody who knows anything about patents,

11    and certainly people who have law firms representing them

12    would have gone and searched the PTO website to see if there

13    might be another patent in that family that actually claimed

14    that algorithm.  They didn't do it.

12:20PM 15    They also didn't tell their customer that there is

16    this potential problem.  So they went ahead and allowed their

17    customer to directly infringe.  That's going to be our

18    circumstantial case, Your Honor.

19    THE COURT:  And that's for the '557 patent;

12:21PM 20    correct?

21    MR. BARNEY:  Yes.

22    THE COURT:  Is there a -- are you making a willful

23    infringement argument for the '293 patent?

24    MR. BARNEY:  Absolutely, Your Honor.

12:21PM 25    THE COURT:  So what's the evidence that there

UNITED STATES DISTRICT COURT

152

1    was -- that the intent was there for that?

2    MR. BARNEY:  Your Honor, we will argue they did not

3    have the adequate basis to, um, to analyze the patents.  None

4    of them are patent attorneys.  None of them have the

12:21PM 5    training.  They all admitted they do not have that training,

6    uh, to be able to analyze a patent.  What they're relying on

7    instead is the filing of their declaratory judgement lawsuit,

8    but they've produced no opinions of counsel.

9    And so they're basically just asking the jury to

12:21PM 10    infer that because they brought a lawsuit that necessarily

11    ipso facto means that they had a good faith basis of

12    noninfringement.  They didn't make that case.  I am free to

13    argue to the jury that they can infer otherwise especially

14    when you look at the timing.

12:22PM 15    And just as an example, Mr. Habel, there was only

16    ten days between when he said to us we're looking for

17    counsel.  We're gonna go find ourselves some patent counsel

18    so we can get an opinion and respond to you more fully.  Ten

19    days later they filed the lawsuit.  Um, he testified that

12:22PM 20    they hired Knobbe on the day they filed the lawsuit.

21    Now, I'm being generous.  I find that hard to

22    believe, but I mean, even if it was a few days before that,

23    the jury can infer there wasn't enough time to actually form

24    a good faith basis of noninfringement.  It took our expert

12:22PM 25    eight days to review the code, um, and so that's an inference

UNITED STATES DISTRICT COURT

EXHIBIT 5
-217-

153

1 they can draw. And that would be circumstantial, um, I
2 admit, but it's something the jury can and should be allowed
3 to do.
4 THE COURT: Okay. And then to damages on the '557.
12:22PM 5 The issue being no testimony or no consideration of the use
6 by AID of the system.
7 MR. BARNEY: Well, again, Your Honor, it's the
8 delivery of the system was an infringing act. And under the
9 statute, all acts of infringement must at a minimum be
12:23PM 10 awarded a reasonable royalty. There cannot be an act of
11 infringement for which there is no damages in the form of a
12 reasonable royalty that would violate the statute.
13 THE COURT: The '557 is a method patent; right?
14 MR. BARNEY: It is.
15 THE COURT: So are you still arguing that just the
16 mere sale of the system that's capable of implementing
17 that method then where the damage springs from?
18 MR. BARNEY: Yes, Your Honor.
19 In order to have provided that system to AID,
12:23PM 20 Pavemetrics would have needed a license. It's not a matter
21 of how many times it was used. It's a matter of they
22 couldn't have performed that infringing act of supplying the
23 system, uh, with instructions for use to infringe the system
24 without the license.
12:23PM 25 And, of course, they did use it. I mean we have

UNITED STATES DISTRICT COURT

154

1 evidence they used it at least eight times in a several month
2 span. Dr. Morellas provided that testimony. So there's no
3 question it was used. In terms of the quantity of how many
4 times it was used, I don't believe that's relevant to the,
12:23PM 5 you know, to the calculation of the reasonable royalty.
6 And to the extent it is relevant, it would just be
7 one of many factors that would go into the calculation of
8 that number. They were free to come in and argue that
9 because of that particular factor, the number should be
12:24PM 10 lower. I don't believe they did. I believe they've waived
11 it actually. Our expert did the full Georgia Pacific
12 analysis and he put the number on the table that he -- that
13 he offered.
14 THE COURT: Thank you.
12:24PM 15 So do you have any Rule 50 motions?
16 MR. BARNEY: Yes, Your Honor. And mine will not be
17 as eloquent as Mr. Re. I apologize. Tetra Tech moves for
18 JMOL that Pavemetrics failed to prove by clear and convincing
19 evidence that the asserted claims are invalid on the grounds
12:24PM 20 that they assert, um, and I don't believe -- I can read all
21 the reasons why, but I think you heard them today and I'm
22 happy to just brief it later.
23 But there is one in particular I'd like to point
24 you to and you probably saw some preview of it today and that
12:24PM 25 is we don't believe they've proved that those two software,

UNITED STATES DISTRICT COURT

155

1 um, the two portions of software code that they're including
2 as their base reference which they call the UML Sale and
3 Support, we don't believe those software codes are prior art.
4 We don't believe they've proved their prior art.
12:25PM 5 I do understand that prior art can be -- excuse
6 me -- software can be prior art even if it wasn't publicly
7 disclosed, but there's some requirements that they have to
8 prove first. They either have to prove that that prior art
9 was in public use. In other words, that software code was in
12:25PM 10 something that was in public use even if the public couldn't
11 see the software, if it was in public use and being
12 commercially exploited, we agree that could be okay.
13 The problem is they didn't even prove that that
14 software code made it into anything that was publicly used
12:25PM 15 and you heard that from Dr. Hebert. He sort of admitted it
16 when he was pressed, "How do you know that that particular
17 source code actually made it into a rail inspection system
18 that was out there on the rails collecting data under the
19 supervision of the University of Massachusetts?"
12:25PM 20 And he admitted, I mean, it was quite a moment, he
21 admitted, "I have emails. I've got things. I -- I know it."
22 "Is any of it in evidence?" He said no. And I don't like to
23 use the word doom lightly, but I think does doom their case
24 on those being prior art. There is no evidence that those
12:26PM 25 were actually used and that's the baseline test for whether

UNITED STATES DISTRICT COURT

156

1 that otherwise undisclosed software code can be considered
2 prior art.
3 Now, to the extent Mr. Re is gonna stand up after
4 I'm done and say well, actually, we have testimony.
12:26PM 5 Mr. Laurent or so-and-so said whatnot. We would point you to
6 several cases. I think it's a fairly, um, accepted principal
7 that you cannot create prior art through the testimony of an
8 interested witness.
9 And I would point Your Honor to the Juicy Whip v.
12:26PM 10 Orange Bang case 292 F3d 728 at page 737 and I would also
11 point Your Honor to the Finnegan, uh, not the firm, not our
12 firm, Fenigan Corp. versus International Trade Commission
13 180 F3d 1354 at page 166 and these cases, and there's several
14 others that I could cite including the Woodland v Flower Tree
12:27PM 15 Nursery case.
16 And, again, we actually have a memo that we're
17 willing to submit whenever Your Honor's ready for it, but the
18 case law is fairly consistent that simple witness testimony
19 by an interested party, an interested party just saying I'm
12:27PM 20 telling you that system was in public use, trust me is not
21 enough. It has to be corroborated by something else.
22 It sounds like they might have had some things to
23 bring in to corroborate that. They just didn't. Dr. Hebert
24 said it's not in evidence. I don't have the emails. I don't
12:27PM 25 have the receipt. I can't actually prove that that software

UNITED STATES DISTRICT COURT

**EXHIBIT 5
-218-**

157

1 actually made it into a system that was publicly used.  So we
2 do think that's fatal on that issue.
3 I've got one other one, Your Honor, unless you had
4 a question for me.
12:27PM 5 THE COURT:  Sure.  Go ahead.
6 MR. BARNEY:  We don't believe they made any case
7 for invalidity on Claim 8 of the '557 patent.  Their witness
8 literally said one sentence about it.  I believe he was asked
9 something along the lines of do you think it's invalid and he
12:28PM 10 said yeah and that was it cause they were pressed for time
11 and they sort of just dropped it at the end of his testimony.
12 The other issue that I would move for JMOL on and
13 I'm not entirely sure this is necessary, but just to preserve
14 it, they are the DJ plaintiff and so they have a declaratory
12:28PM 15 judgement of -- request for noninfringement.  I understand we
16 bear the burden on it.  So my understanding is we don't need
17 to move for JMOL on that and it may not be appropriate, but
18 just in case it is, we would also move for JMOL that they did
19 not carry whatever burden they have as the DJ plaintiff on
12:28PM 20 noninfringement.
21 THE COURT:  Thank you, Counsel.
22 Let me just hear from Mr. Re on two points, or
23 whoever wants to argue.  One, the software of the prior art,
24 the 2014 that was, um, what testimony was there that this was
12:29PM 25 in use or that it was used?

UNITED STATES DISTRICT COURT

158

1 MR. RE:  Well, it was part of the study.  And first
2 of all, Mr. Laurent testified that it was all part of the FRA
3 study with UML.  And so I want to just address one premise
4 for that question which is incorrect.  What the case law that
12:29PM 5 Mr. Barney raised, I'm very familiar with that case law,
6 that's when you're relying on oral testimony with no other
7 possible corroboration.
8 The evidence in this case was overwhelming of
9 corroboration.  You don't just treat it in isolation like
12:29PM 10 they did.  They implied to jury the source code was somehow
11 secret and not public was the implication which is why we had
12 that little tussle over the law.  But there's plenty of
13 evidence to show corroboration of the use and the study and
14 the UML and prior sales and, uh, this is a clear
12:30PM 15 corroboration case.
16 The case he's talking about is when one person says
17 X and another person says yeah, he's right, X.  That's not
18 our case.  We have documents and plenty of corroboration to
19 show that these things actually existed, were actually
12:30PM 20 implemented, used in a study.  And he asked if it was in the
21 2012 sale so they made the argument that the source code was
22 never used cause it wasn't part of something that happened in
23 2012.
24 But the trouble is it was a continuous development
12:30PM 25 through 2014 which is what -- he's shaking his head -- which

UNITED STATES DISTRICT COURT

159

1 is what Mr. Laurent said that this was continual.  And he
2 said just because he doesn't have emails to show that piece
3 of code doesn't mean it has no corroboration.
4 I wanted --
12:30PM 5 THE COURT:  Hang on one second because I do want to
6 end this.  Claim 8 of the '557 patent, what's the invalidity
7 evidence there?
8 MR. RE:  I'll leave that for Mr. Laquer.
9 MR. LAQUER:  Yes, Your Honor.  Again, the documents
12:31PM 10 around the UML activity have been submitted including the
11 find cracks script that was used and there is testimony as to
12 its use.  So it's part of the ongoing sale and support and
13 use of that activity.  That software is evidence of
14 implementation of a feature of an algorithm that will render
12:31PM 15 obvious Claim 8 and that was testified to by fact and expert
16 witnesses.
17 THE COURT:  So regardless of what the expert said
18 or what the expert covered in the detail, you're saying the
19 evidence is in the record from which you can make an
12:31PM 20 argument --
21 MR. LAQUER:  Yes, Your Honor.
22 THE COURT:  -- that Claim 8 is invalid because of
23 that code.
24 MR. LAQUER:  Yes, Your Honor.
12:31PM 25 THE COURT:  Okay.  Well, thank you for the argument

UNITED STATES DISTRICT COURT

160

1 on this.
2 MR. RE:  I'm concerned about the closing argument.
3 Based upon what I just heard, I heard several statements from
4 Mr. Barney that I pray he does not say at closing argument.
12:31PM 5 And by the way, the JMOLs will be in writing so we're not
6 here to preserve.  I know you said Mr. Re moved -- Mr. Re
7 argued.  I'm gonna move on everything, lost profits, validity
8 and we'll do that in writing.
9 But I was concerned about some of the statements
12:32PM 10 Mr. Barney made which are contrary to law which tells me he's
11 ready for his closing argument.  You asked him what was the
12 evidence of knowledge?  He had no answer on the '293.
13 Absolutely no answer.  It now seems like he's making an
14 argument on the '557 based on post-litigation activity which
12:32PM 15 is a new argument.
16 What he concerns me is he said no opinion of
17 counsel.  He knows that violates the statute.  The AIA in
18 Section 293 or 99, uh, said there's no obligation and it
19 cannot be mentioned.  You cannot make an inference of any
12:32PM 20 kind of failure to get opinion of counsel.  So I assume
21 Mr. Barney's not gonna talk about opinion of counsel.
22 Ms. Lea and I had no obligation, neither did the
23 client have to get an opinion of counsel.  So that's a
24 violation of the statute in the AIA and he's well aware of
12:33PM 25 that.

UNITED STATES DISTRICT COURT

**EXHIBIT 5**
**-219-**

161

1    The other thing is there is no obligation to do any
2  searching.  There is no obligation to suggest that we should
3  have searched.  Zero.  The case law is emphatic about that.
4  I want no argument that we somehow should have, could have
12:33PM 5  and would have done something with regard to a fact that does
6  not exist.
7    THE COURT:  Well, when you're say that, you're
8  talking about the '557?  When you say the fact -- the
9  argument, what is the fact that does not exist that you're
12:33PM 10  alluding to?
11    MR. RE:  Let's start with the issuance of a patent
12  owned by Tetra Tech.  All his evidence predates the issue of
13  a patent.  How can there possibly be an obligation to do
14  anything to investigate?
12:33PM 15    THE COURT:  Okay.  All right.
16    MR. RE:  Anything prior to the lawsuit.  The
17  patents just issued in 2019, 2020.  All this evidence
18  predated 2019.  So that is implying or suggesting some
19  obligation, and I don't know what obligation is, but it's the
12:34PM 20  argument Chief Judge Moore called absurd.
21    THE COURT:  Okay.  Mr. Barney, are you gonna talk
22  about opinion of counsel?
23    MR. BARNEY:  I don't plan to, Your Honor.
24    I don't want to run into any hot water.  I do plan
12:34PM 25  to point out that the analysis that was done by the personnel

UNITED STATES DISTRICT COURT

162

1  at Pavemetrics was not conducted by attorneys and they
2  admitted --
3    MR. RE:  You can't do that.
4    MR. BARNEY:  I can do that.
12:34PM 5    They admitted they don't have the skills
6  necessarily to properly analyze claims.  I don't intend to
7  mention the words opinion of counsel because I agree with you
8  that's not something the jury should weigh, but they can
9  weigh the competency.
12:34PM 10    And actually, this went to one of our motions in
11  liminae you probably remember, Your Honor.  They had their
12  own personnel evaluate the patents which they're entitled to
13  do, but I'm also entitled to point out to the jury that they
14  don't actually have the skill set necessary to properly do
12:34PM 15  it.  That's something the jury can consider.  It has nothing
16  to do with whether they got an opinion of counsel.  It has to
17  do with the competency of the people who did the review.
18    In fact, one of their witnesses, expert witnesses
19  criticized Mr. Habel for not having the right background.  We
12:35PM 20  heard it just today.  He said oh, well, he just has a telecom
21  background.  Well, Mr. Habel was the main person who did the
22  review of the patent and wrote us and said that he concluded
23  there's no infringement.  Why can't I tell the jury that?  I
24  don't see how that's improper.
12:35PM 25    MR. RE:  Because it's contrary to Halo.  Mr. Habel

UNITED STATES DISTRICT COURT

163

1  could be mentally retarded and conclude there's no
2  infringement and there can't be an allegation of willful
3  infringement.
4    THE COURT:  Okay.  I'll look at that case over the
12:35PM 5  lunch break and I'll see you all back here after lunch.
6    THE CLERK:  This court's in recess.
7    (Lunch Recess.)
8    THE COURT:  Okay.  We'll have closing arguments and
9  we'll getting you to deliberating.  Tetra Tech will go first
01:19PM 10  because they've got the burden of proof on the infringement
11  issues, and then they can save some time and have a rebuttal
12  argument after Pavemetrics.  Each side gets an hour.  So it
13  should be no longer than two hours.
14    MR. BARNEY:  Your Honor, I think we have one very
01:20PM 15  tiny housekeeping matter.  It should just take a few seconds.
16    THE COURT:  Sure.
17    MR. CERULLI:  So, Your Honor, Exhibit 990 is
18  already in evidence.  There were some redactions made and
19  we'd like to swap it out with 990-1.
01:20PM 20    THE COURT:  Any objection to that?
21    MS. LEA:  No objection, Your Honor.
22    THE COURT:  So the exhibit in evidence will be
23  called 990-1 or 990?
24    MR. CERULLI:  990-1.
01:20PM 25    THE COURT:  Okay.  That's great.  We can do that.

UNITED STATES DISTRICT COURT

164

1    MR. BARNEY:  May I proceed, Your Honor?
2    THE COURT:  You may proceed.
3    MR. BARNEY:  Good afternoon, ladies and gentlemen.
4    Before I get started, I'd like to thank you for
01:20PM 5  your service and for your professionalism during these
6  several days.  I know that being here has meant being away
7  from family and friends and from your work; from your
8  patients and from your students and your customers.  And for
9  one of you, away from your pet snake which is probably hungry
01:21PM 10  by now.  So I want to let you know that whatever happens in
11  this case and whatever verdict you return, we sincerely
12  appreciate your commitment and sacrifices that you've made to
13  be heard.
14    Now, as I explained in my opening argument, the
01:21PM 15  reason we're here is because Pavemetrics took Tetra Tech's
16  patented technology and refused to pay and that was wrong.
17  Now, back during my opening statement, I promised to prove
18  certain things to back up that claim and I believe we have.
19  So this is a matter of promises made and promises kept.
01:21PM 20    We've shown that Tetra Tech is a well-respected and
21  honorable company based right here in Los Angeles.  It's a
22  world leader in renewable energy, sustainable infrastructure,
23  engineering and international development.  And it has been
24  awarded or recognized as one of America's most responsible
01:22PM 25  companies.  None of these facts are disputed.

UNITED STATES DISTRICT COURT

EXHIBIT 5
-220-

165

1    Now, there has been an accusation of bullying and
2    I'd like to address that head on. You heard from Tetra Tech
3    -- three of Tetra Tech's senior executives during this trial.
4    You heard from Mr. Keyes, you heard from Dr. Mesher and you
01:22PM 5    heard from Mr. Larson. And by the way, we also have another
6    executive here. This is Preston Hobson. He is Tetra Tech's
7    Senior Vice President and General Counsel.
8    You saw those people on the stand and so you had an
9    opportunity to assess their demeanor and their testimony. So
01:22PM 10    you can come to your own conclusion whether they seem like
11    bullies to you. But let me make one thing clear. There is
12    nothing wrong about standing up for your rights.
13    As you saw from the patent video, patent rights are
14    derived from the U.S. constitution. Patents are very
01:23PM 15    difficult to get. It's hard to get a patent. A patent's a
16    property right just like the deed to your house or the title
17    to your car. And there is absolutely nothing wrong with
18    defending your property rights. It does not make you a
19    bully.
01:23PM 20    So let's turn to the actual issues that you're
21    gonna be asked to address in this case. Now, the first issue
22    is infringement. And I know you've heard a lot of evidence
23    about a lot of complicated technology and you might be
24    feeling overwhelmed, but luckily, the Judge has given you a
01:23PM 25    road map.

UNITED STATES DISTRICT COURT

166

1    And that road map consists of the jury verdict form
2    and the jury instructions. The verdict form is gonna have
3    specific questions that you need to answer and the jury
4    instructions are gonna provide you the instructions for how
01:23PM 5    to do that.
6    So let's take a look at the first one. Your first
7    question is gonna be did Tetra Tech prove by a preponderance
8    of the evidence that Pavemetrics directly infringed Claims 1
9    and 21 of the '293 patent by selling or offering to the sell
01:24PM 10    in the United States to CSX the laser rail inspection system
11    or LRAIL?
12    Now, a couple things to note. The first thing you
13    see there is a burden of proof: The preponderance of the
14    evidence. Well, what's that mean? The jury instructions are
01:24PM 15    gonna tell you and you're gonna have those back in the jury
16    room. And when you look up that standard, you'll find that
17    it means is it more likely than not that Pavemetrics
18    infringed these patents.
19    Now, the best way to think about that is our famous
01:24PM 20    symbol of the American justice system, Lady Justice. And
21    she's there with her blindfold on and she's holding scales in
22    her hands. She's blindfolded because justice is supposed to
23    be blind and she's holding scales, the scales of justice
24    because that's what you're gonna be doing when you get back
01:24PM 25    to your jury room. You're gonna be weighing evidence.

UNITED STATES DISTRICT COURT

167

1    You'll be putting Tetra Tech's evidence on one side
2    and Pavemetrics' evidence on the other side and seeing which
3    way they tip the scales. And the preponderance standard that
4    applies here, the scales you have to tip a little tiny bit
01:25PM 5    in our favor for you to find infringement. 51 percent is
6    enough for you to find infringement. Now, in fact we've
7    proven that the scales are way in our favor, but actually, we
8    only need to a show little bit for you to find infringement.
9    So the other thing that I'd like to point out about
01:25PM 10    this, uh, first question is it says, "Is there infringement
11    based on selling or offering to sell the system?" That means
12    those are the only acts of infringement that are accused with
13    respect to the '293 patent.
14    Now, why am I bringing this up? It's because
01:25PM 15    Pavemetrics has this theory, this argument that they want to
16    make that because they packaged the LRAIL, uh, into boxes and
17    ship it into the United States where all the components are
18    disconnected from each other, and because the software is
19    downloaded later, and that there might be updates, you know,
01:25PM 20    down the road that somehow that gets them off the hook for
21    infringement. Ladies and gentlemen, it does not.
22    And that is because the accused acts here are the
23    offer for sale and the sale. As soon as they offered to sell
24    the system and as soon as they sold the system, they
01:26PM 25    infringed. It's like ringing a bell. You can't unring a

UNITED STATES DISTRICT COURT

168

1    bell and you can't unring infringement.
2    Once they did those infringing acts, it was done.
3    That was the infringement. Everything else they did later,
4    doesn't matter in this case. How they shipped it in, whether
01:26PM 5    they put it in boxes, et cetera, none of that matters.
6    So let's take a look at the actual documents that
7    relate to these two acts of infringement. You'll have these
8    in the jury room. Exhibit 811 is their offer for sale. It's
9    called a quotation. It took place on February 15, 2021. And
01:26PM 10    this is where they offered to sell both three LRAIL systems
11    to CSX including both hardware and software. That is an
12    offer for sale. That is an infringing act under the patent
13    statutes.
14    And, again, the jury instructions are gonna tell
01:26PM 15    you that. If you go to the infringement section, it's gonna
16    tell you an infringing act can be making, using, selling,
17    offering to sell or importation. Those are the five types of
18    acts that can be infringement. And the ones that are at
19    issue here are selling and offering to sell. Has nothing to
01:27PM 20    do with using, has nothing to do with making, just those two
21    acts.
22    On the right is Exhibit 844. That is the purchase
23    agreement or they called it a Goods Agreement. And that's
24    where CSX and Pavemetrics signed on the dotted line and
01:27PM 25    actually executed the sale for those three LRAIL systems that

UNITED STATES DISTRICT COURT

**EXHIBIT 5**

**-221-**

169

1    were the subject of the earlier quotation.  That is also an
2    infringing act.  Again, it's the act of selling and that was
3    an infringing act.
4           And as soon as the ink was dry on that agreement,
01:27PM  5    as soon as the last signature was placed and the ink dried,
6    that was the infringement.  The infringement occurred that
7    day and everything else they did afterwards is irrelevant to
8    whether or not they infringed that day.
9           Now, Pavemetrics wants you to believe that, if I
01:27PM 10    could have the next slide, that because they updated their
11    software code at some later date from the Fake3D algorithm to
12    what's called the Mixed Image algorithm that somehow that
13    gets them off the hook for infringement.  It doesn't for two
14    reasons.
01:28PM 15           First, our expert analyzed those codes and it turns
16    out they both infringe so to some extent, this is a moot
17    issue.  More importantly, again, it was the date of the sale
18    that the infringement occurred.  When they sold those units
19    to CSX in March of 2021, it was what is called a turnkey
01:28PM 20    sale.  We've heard that term a few times in this case.  A
21    turnkey includes both hardware and software.
22           And the prevailing commercially available software
23    at that time was the Fake3D software that was computed with a
24    deep convolutional neural network.  Did they update it later?
01:28PM 25    Yes, they did, but what was available at the time they made

UNITED STATES DISTRICT COURT

170

1    that sale was their Fake3D version of the code.
2           We know that from looking at the declaration of
3    Dr. Hebert.  And these are undisputed points, but it helps to
4    see that it's put in writing by one of their own employees
01:28PM  5    who signed it under oath, under penalty of perjury.  And he
6    said that these sales, including the four that are at issue
7    in this case, were what he called turnkey sales.  That
8    basically included the LRAIL hardware, the LRAIL acquisition
9    software and the LRAIL processing software.
01:29PM 10           He went on to explain that it includes
11    executable -- that the system, a complete LRAIL package,
12    includes executable copies of acquisition software compiled
13    from LRAIL software code.  And that tells you that this was a
14    sale for both software and hardware.  It wasn't just a
01:29PM 15    hardware sale.  You can see it right there.  It was hardware
16    plus software.
17           So this idea that somehow they made the sale, a
18    turnkey sale, that didn't include the software that was the
19    prevailing commercially available software at the time from
01:29PM 20    Pavemetrics makes no sense.  Why would a big company like CSX
21    buy three LRAILs with no software?  They wouldn't and they
22    didn't.
23           Next slide, please.  So the next question is, "Does
24    the LRAIL system that was sold to CSX on March 15th and that
01:30PM 25    was offered to first sell on February 15th, 2021, does it

UNITED STATES DISTRICT COURT

171

1    meet each and every limitation of the claim?"  This is how
2    you do a proper infringement analysis.  You have to go
3    limitation-by-limitation and look to the accused product and
4    see whether it satisfies that limitation.
01:30PM  5           You'll recall that Dr. Morellas, he's the gentleman
6    who has that Greek accent, uh, he went through this in
7    detail.  He went through limitation-by-limitation.  He showed
8    where each limitation is satisfied in the code, in the
9    software code.  He showed how the Pavemetrics' documents
01:30PM 10    actually corroborated his testimony and he was certain about
11    it.  He was confident that every single limitation in this
12    claim is met.
13           Now, you heard from Dr. Frakes yesterday and then a
14    little bit today and he has some disputes.  He disputes a
01:30PM 15    total of five limitations in Claim 1, and I'm gonna get to
16    each of those in just a moment.
17           In addition to those five disputes, Pavemetrics
18    also has kind of an overarching argument.  I call it more
19    theory and their overarching theory or argument is that
01:31PM 20    because they're using artificial intelligence and because the
21    patent doesn't specifically describe artificial intelligence
22    that somehow that gets them off the hook for infringement.
23           They had this theory and they've had it for quite a
24    while.  We saw it in some of their corporate documents that
01:31PM 25    if we put our code, if we put our algorithms into a

UNITED STATES DISTRICT COURT

172

1    convolutional neural network which is a type of artificial
2    intelligence, we can never be accused of infringement.  What
3    a wonderful theory if it were true, but it's not true.  It's
4    completely bogus.
01:31PM  5           And how do you know that?  You're not gonna see
6    anything like that in the jury instructions.  The jury
7    instructions tell you what the law actually is.  They tell
8    you a bunch of other stuff and they can have their own
9    theories and that's perfectly fine, but when you get to the
01:31PM 10    jury room, you have to follow the law.  And you're not gonna
11    see any such theory in the jury instructions because it's not
12    the law.
13           As Dr. Morellas explained, it is true that our
14    patent doesn't talk about AI and doesn't talk about neural
01:32PM 15    networks because our patent is about a specific algorithm
16    that's used in railroad detection.  And as Dr. Morellas
17    explained, you can use that algorithm, you can use AI to
18    perform that algorithm or you cannot use AI to perform that
19    algorithm.  You can use a convolutional neural network to
01:32PM 20    perform that algorithm or you could not use it.
21           It's like you could have an Apple computer perform
22    it, you can have an IBM computer perform it, you can have a
23    Lenix computer perform it.  It doesn't matter what you use to
24    perform the algorithm, if you're performing the algorithm,
01:32PM 25    and if you're performing every single one of these steps, you

UNITED STATES DISTRICT COURT

EXHIBIT 5
-222-

173

1  infringe the claim.  That's the law.  That's infringement.

2       This theory that AI somehow magically can't

3  infringe a patent is not true.  It's bogus.  Now,

4  Dr. Morellas, he not only analyzed Claim 1, but he also

5  analyzed Claim 21 and came to the conclusion that every

6  single limitation is met.

7       So let's take look at the counter-arguments one at

8  a time.  There's a total of five of them.  Their first

9  counter-argument is that they don't think the limitation that

10 requires at least one sensor be in communication with a

11 processor, they say that's not met.  Why?  Because they ship

12 the system in boxes.

13      And when they ship it in boxes, all the pieces are

14 disconnected and the cables aren't plugged in.  And, of

15 course, the computer is not plugged into the wall because who

16 plugs a computer in while it's being shipped.  That's their

17 boxes argument.  And ladies and gentlemen, again, that is not

18 the law.

19      The infringement here was the sale.  The

20 infringement occurred the day they made that sale and the day

21 they made that offer for sale.  You can't unring a bell.  You

22 can't unring that infringement.  It doesn't matter that they

23 later shipped it in boxes.

24      Moreover, on the date they made that sale, what

25 they were offering for sale wasn't boxes.  What they were

UNITED STATES DISTRICT COURT

174

1  offering for sale was a complete LRAIL system with all of the

2  software and all of the hardware needed for that system to

3  operate.  And that makes sense; right?  Who goes and pays

4  over a million dollars to buy a bunch of disconnected boxes?

5  Nobody.

6       What CSX was interested in buying were the LRAIL

7  systems and we know that from the testimony of Mr. Larson.

8  Mr. Larson, you may remember was the gentleman who was a

9  former Navy captain.  He served on warships in the Navy.  He

10 was a commanding officer of two warships, and then he went to

11 work for CSX.  He worked there for a number of years and now

12 he works for Tetra Tech.

13      He was at CSX at the time that these negotiations

14 were taking place between CSX and Pavemetrics.  And we asked

15 him what were you expecting that Pavemetrics would deliver to

16 CSX under this quotation?  And he said, well, exactly what it

17 says there.  It's the hardware, the software and the ability

18 upon receipt to conduct track inspection.

19      So that tells you that he was expecting a fully

20 operational system and that means a system where the

21 computers are plugged in, the cables are attached, and

22 there's communication of data between the sensors and the

23 computer.

24      Now, you don't even have to be a patent attorney to

25 understand that this argument they're making doesn't make

UNITED STATES DISTRICT COURT

175

1  sense.  You really don't have to be a patent attorney.  When

2  you buy something on Amazon, let's say you're buying a

3  computer or you're buying some piece of electronic equipment,

4  perhaps a piece of medical equipment or pathology equipment

5  or radio or something, you're on Amazon, you select what you

6  want.

7       Maybe you select some configurations that you want,

8  you want some special features on it.  When you click buy and

9  you buy that system, you bought an operational system.  Okay?

10 Yes, it's gonna come in a box or boxes.  Yes, you're gonna

11 have to maybe put some cables together or you may even have

12 to download software, but you what bought on Amazon was an

13 operational system because that's what you want and that's

14 what Amazon offered you.

15      It makes no sense that you be on Amazon shopping

16 for disconnected boxes.  That's what we do as consumers and

17 that's not what CSX was interested in buying from

18 Pavemetrics.

19      Next slide, please.  So their next argument is

20 actually not much better than the last argument.  And that is

21 they say they don't meet this requirement that the system has

22 to be configured to run an algorithm.  And the reason they

23 say that is because they have programmed it so that the

24 default is actually to be a different algorithm.

25      And that if you want to run the Fake3D or the Mixed

UNITED STATES DISTRICT COURT

176

1  Image algorithm, the user has to go into what's called a

2  config file and set a variable from zero to one or from zero

3  to two so that would then invoke or call the, um, the

4  accused, uh, modules or the accused algorithms.  Ladies and

5  gentlemen, that, again, does not get you off the hook for

6  infringement.  It just doesn't.

7       As Dr. Morellas explained, uh, this is just like

8  your word processor.  You open up Word, you've got some

9  options.  One of the options is a spell checker.  Some people

10 like it, some people don't.  Some people like to have it

11 running while you're typing.  Some people like to wait until

12 they're done typing and then check the whole document.  So

13 people like different things and so Microsoft gives you some

14 options.

15      The default option is that it's turned off while

16 you're typing, but if you want to turn it on, all you have to

17 do is go to that drop down menu and click and you've now

18 enabled that software to run.  The software is in the system

19 the whole time.  The system was enabled and configured to run

20 that software the whole time and it was just waiting for you

21 to asks.  As soon as you ask, it provides it to you.

22      You need to look at the Court's construction.  The

23 Court's construction says configured to run an algorithm

24 means is programmed to run an algorithm without the need to

25 rebuild, rewrite or compile code for or redesign any of that

UNITED STATES DISTRICT COURT

**EXHIBIT 5**
**-223-**

177

1    hardware or software.  You heard from Dr. Morellas and he was
2    just using Microsoft Word as an example.
3            You heard from him that when you click check
4    spelling as you type, you're not reprogramming anything.
01:37PM 5    You're not rewriting the software code.  You're not
6    recompiling the software code and you're not redesigning the
7    software or hardware.  The same is true for the LRAIL.  And
8    you can see it right there in the documentation.
9            They tell their users that it comes with Windows 7,
01:37PM 10   Windows 10 and a library of C and C++ functions that allow
11   the user to easily configure the operating system.  This is
12   just a matter of changing a number from zero to one or zero
13   to two.  And that is not the same thing as rewriting the code
14   or reconfiguring or recompiling the code.  So again, this
01:38PM 15   argument does not get them off the hook for infringement.
16           Let's look at their next argument.  Next they argue
17   that the LRAIL system does not create a track elevation map
18   and remember the Court construed track elevation map to
19   require two very distinct types of data; intensity data and
01:38PM 20   elevation data and elevation data is also called range data.
21           And I would submit to you, ladies and gentlemen,
22   they're maintaining it against all contrary evidence that is
23   overwhelming.  They're continuing to maintain their argument
24   that somehow their LRAIL doesn't combine these two types of
01:38PM 25   data into an elevation map.

UNITED STATES DISTRICT COURT

178

1            Now, Dr. Morellas walked in detail, he it did last
2    week and he did it again today, and he showed you where
3    exactly in the code.  He had all those purple and red boxes
4    showing you exactly where in the code the accused LRAIL
01:39PM 5    system combines intensity data and range or elevation data
6    into an elevation map.  It's not subtle.  It's there.  He
7    showed you where it is in the code.
8            Dr. Frakes, their expert, actually said something
9    interesting yesterday on that exact point.  He said
01:39PM 10   reasonable people could disagree.  That's what he said.
11   Reasonable people could disagree as to whether you're
12   combining both types of data into one.  Well, I would submit
13   reasonable people shouldn't be able to disagree on that one
14   because the evidence is so overwhelmingly clear.  They don't
01:39PM 15   really have an argument against this.
16           And, again, you don't even have to look at the code
17   to know this.  You can just look at what they tell their
18   customers and people in the industry about their system.  It
19   wasn't just maybe a year ago in 2021 that they went to this
01:39PM 20   conference called Arema and this is how they described their
21   LRAIL technology to other people in the industry.  They said
22   their LRAIL technology takes two types of scans and combines
23   them for analysis.
24           Now, they claim that's unique to Railmetrics and in
01:40PM 25   fact we now know it's not unique to Railmetrics.  It's unique

UNITED STATES DISTRICT COURT

179

1    to our patent.  What are the two types of data that they tell
2    others in the industry that they are combining?  2D intensity
3    data and 3D range data.  That's elevation data.
4            So it's clear in the documents.  It was clear in
01:40PM 5    the source code.  And let's be honest, if the response of
6    their expert is reasonable people could disagree, that pretty
7    much tells you they don't really have a good argument here.
8    So we think this limitation is satisfied.
9            Let's have the next slide, please.  Their fourth
01:40PM 10   argument is they say that the LRAIL doesn't define an
11   appropriate gradient neighborhood and this is in Step C of
12   the algorithm.  Now, let's be real clear about where the
13   dispute is.
14           Their expert Dr. Frakes does not dispute that the
01:40PM 15   LRAIL system defines a neighborhood that's of limited size
16   that scans across the data like a moving window.  He has a
17   dispute about the step, and I'm going to get to that in a
18   moment.  But in terms of whether it's a gradient
19   neighborhood, his real dispute which you heard yesterday, he
01:41PM 20   doesn't think the LRAIL defines an appropriate gradient
21   neighborhood.
22           And his argument is well, because it's a neural
23   network, it has to be trained and we do our training up in
24   Canada.  So they have a neural network training facility
01:41PM 25   where they're feeding the neural network pictures of -- of,

UNITED STATES DISTRICT COURT

180

1    uh, of rail ties, pictures of different things and training
2    that network how to recognize those specific types of
3    objects.
4            And he says that once that training is complete,
01:41PM 5    you sort of lock in the code.  Once it's complete and the
6    system is good enough to operate, you lock in the code and
7    then it's installed in the LRAIL software.  He says at that
8    point that gradient neighborhood is sort of locked, it's
9    fixed, it doesn't change any more.  And he says because of
01:41PM 10   that, there's no ability to vary it.
11           What he's forgetting and what he forgot to tell you
12   yesterday when he was expressing that opinion and what
13   Dr. Morellas explained today is that the system is programmed
14   to recognize and search for different types of features.
01:42PM 15   It's not just looking for ties.  It's not just looking for
16   spikes.  It's looking for ties, it's looking for spikes, it's
17   looking for fasteners.  Different types of features that are
18   very different from each other.  Different in size, different
19   in contours and different in shape.
01:42PM 20           And he explained to you and there's been no
21   rebuttal to this whatsoever in the LRAIL system when it
22   does that, it's using differently sized gradient
23   neighborhoods.  So it's gonna use one that's appropriate to
24   search for a tie which is a very big piece of wood or
01:42PM 25   concrete, but it's gonna use another appropriately size and

UNITED STATES DISTRICT COURT

EXHIBIT 5
-224-

181

1 weighted gradient neighborhood to search for fasteners. And
2 it's going to use even another to search for spikes because
3 they're very small comparatively speaking. They're basically
4 giant nails.
5 And he explained using the analogy of the face
6 recognition software that we're all familiar with. Remember,
7 I asked him, and he's an expert in this technology. He's
8 been doing this for 30 years. This is what he did at
9 Honeywell.
10 And I said if you're looking for a face, you're
11 gonna use one size and weight of your gradient neighborhood,
12 but if you want to look for eyeballs which are smaller than
13 the face and actually kind of have different contours and
14 features than an entire face, he said you're gonna have to
15 use a different sized gradient neighborhood.
16 And that's exactly what the LRAIL system does and
17 because it does that, it satisfies the definition of defining
18 an appropriate gradient neighborhood. It uses what's
19 appropriate for what it's searching for. And, again, there
20 was no real rebuttal to that so we believe this limitation is
21 satisfied.
22 And their last argument against Claim 1, I know
23 you've all seen this before, and I'll just hit it one more
24 time is this idea of the sliding window. And they don't
25 disagree that there's a window that is moving across the data

182

1 like a sliding window. And their only dispute is that
2 because the LRAIL convolution network uses a stride of 2 that
3 means it doesn't meet the Court's construction.
4 So let's look at the Court's construction and let's
5 be very careful and methodical about how we look at this.
6 The Court's construction says, "sequentially and completely
7 applying above gradient neighborhood to the 3D elevation
8 data.
9 And Dr. Morellas explained in detail using this
10 animation which I'll replay for you that as that gradient
11 neighborhood slides with a step of two, each time it slides,
12 it's doing calculations on nine pixels. Then it slides again
13 and does more calculations on nine more pixels, and then it
14 slides again, more calculations, slides again more, and by
15 the time it's finished, every sing pixel in that image got to
16 participate in that calculation process.
17 Every single pixel was part of the application of
18 the gradient neighborhood. There wasn't a single pixel and
19 there isn't a single pixel in the LRAIL elevation map that
20 doesn't get, that doesn't get applied in terms of that
21 gradient neighborhood of being applied to the data. Nothing
22 gets skipped. There's no pixels that get left out. No pixel
23 gets left behind.
24 Now, what they're pointing to is this book, Karami
25 book that our expert actually cited, and it turns out that

183

1 Karami describes this going by steps of two, he says that's,
2 i.e., skipping one element. And they're very excited that
3 Karami using the word skipping because they're trying to
4 imply that that means it skips pixels. It does not.
5 As I've just shown, no pixel gets left behind.
6 Every pixel is the subject of a calculation. The Court's
7 construction is sequentially, there's no dispute that's
8 sequential, and completely applying the gradient neighborhood
9 to the elevation data. As we've just shown you and there's
10 no dispute about what I just showed you, it does apply to
11 every pixel in the picture, in the image.
12 So, again, we believe this limitation is satisfied
13 and what that means is because none of their five arguments
14 can really win the day on these limitations, that means
15 Claim 1 is infringed.
16 Now, if I can have the next slide, Dr. Morellas
17 didn't just stop at analyzing the Fake3D algorithm. He also
18 looked at that Mixed Image algorithm. Now, remember that's
19 the one they updated later after they made their sale to CSX.
20 And we don't think that's even relevant because the
21 infringement happened the day they made the sale, but even if
22 it is relevant, Dr. Morellas went and looked at that code.
23 Remember, he said he spent eight days reviewing
24 source code and it turns out that infringes as well. Because
25 all they did in the Mixed Image algorithm is they basically

184

1 put in an additional input to the elevation map. They put in
2 an additional input, but the elevation map still has
3 intensity data, it still has range data, and it's still
4 analyzed and processed exactly the same way it was done in
5 the 3D software and so nothing changes.
6 He went through, I'm showing you just his summary,
7 but you'll recall, he went through it in detail. He did not
8 skip anything. He went through the code. He showed you
9 where every single variable was that tied down these
10 limitations and his conclusion was they just updated to Mixed
11 Image, but it still infringes. It's still doing the same
12 thing. All you did was add one additional piece of
13 information. Same thing for Claim 21.
14 So ladies and gentlemen, at this point the evidence
15 has shown you that Claim 1 of the '293 patent is infringed
16 and remember the burden of proof is preponderance of the
17 evidence. It just has to tip a little bit in favor of
18 infringement for you to find that this is satisfied. We
19 think it tips a whole lot.
20 So we're going to ask you on Question 1 whether
21 we've proved by a preponderance of the evidence that
22 Pavemetrics infringed those two claims, Claim 1 and 21, we're
23 gonna ask you to check yes on your verdict form.
24 The next question you're gonna see is a question on
25 induced infringement. That's Question No. 2 and it asks,

**EXHIBIT 5**
**-225-**

185

1    "Did Tetra Tech prove by preponderance of the evidence that
2    Pavemetrics induced AID to infringe Claim 8 of the '557
3    patent?"
4         Now, a couple things there.  Again, you see that
5    same burden of proof, preponderance of the evidence.  It just
6    means we have to just tip the scales just the tiniest little
7    bit.  Even a feather would be enough for you to find this
8    induced infringement under the standard, but, of course,
9    we've presented a lot of more evidence than a feather.
10        The other thing you see is this term induced
11   infringement so what's induced infringement?  Well, again,
12   the Judge has given you a road map.  He's given you those
13   jury instructions which you'll have with you in the jury
14   room.  There's a whole jury instruction on induced
15   infringement.  And we have to prove, what Tetra Tech has to
16   prove under this induced infringement law is three things.
17        First, that AID's use of the LRAIL system directly
18   infringed Claim 8 of the '557 patent.
19        Second, that Pavemetrics took some action during
20   the life of the patent, um, that was intended and caused, uh,
21   that infringement.  Intended and causes the things that lead
22   to that infringement.
23        And third, there's a knowledge prong.  You've heard
24   us talk about this before.  The knowledge prong has two
25   alternatives to it.  The first alternative is that

UNITED STATES DISTRICT COURT

186

1    Pavemetrics was aware of the '557 patent and knew that AID's
2    use, if taken, would constitute infringement of that patent.
3    We're not relying on that part of the knowledge prong.
4         What we're relying on, ladies and gentlemen is that
5    second part.  Or and or is always important when you're
6    reading these types of, uh, sort of, you know, descriptions
7    of the law.  Or that Pavemetrics believes there was a high
8    probability that AID's use would infringe the '557 patent and
9    Pavemetrics took deliberate steps to avoid learning that
10   infringement.
11        Now, in the law we call that type of evidence, we
12   call that willful blindness.  It's a doctrine not just found
13   here in patent law.  It's found throughout our legal system.
14        And the reason willful blindness is in our legal
15   system is when there are issues where we want, uh, people to
16   act responsibly, we don't want to encourage them, we don't
17   want to create a legal system where we're actually
18   encouraging people in business, for instance, to put blinders
19   on and try and consciously try not to look to see where they
20   might be causing people harm.  We don't want that.
21        We want people to be responsible business owners.
22   We want them to make sure they're checking to make sure that
23   their restaurants are safe.  That the equipment they're using
24   in their medical, uh, practice is safe.  That they're not
25   doing something that might cause harm to somebody.  And so we

UNITED STATES DISTRICT COURT

187

1    have these willful blindness standards in our laws to prevent
2    that, to make sure people aren't putting blinders on.
3         And that is what we believe happened here.  We
4    believe they put blinders on and willfully blinded themselves
5    to the possibility of the infringement by AID very much like
6    like that ostrich in the picture there.
7         So let's go through each one of these three steps.
8         First, we proved by a preponderance of the evidence
9    that AID directly infringed the claim.  Again, Dr. Morellas
10   went through it limitation-by-limitation.  He did not leave
11   anything out.  He showed you where each limitation could be
12   found in the code itself in the software, and he also showed
13   you how Pavemetrics' own manuals and documentation support
14   his opinions.
15        And, again, we only have three disputes here and
16   you heard that from Dr. Frakes.  There are three disputed
17   limitations in this claim so let me just get right to them.
18        The first dispute that Dr. Frakes says the LRAIL
19   doesn't, uh, input rail based edge feature coordinates.  What
20   is his argument?  You heard it today and you heard
21   Dr. Morellas' response.  His big argument is because it's
22   done using a mask and a mask is a thing that they use in
23   computer programming and it's pretty well-known.
24        And Dr. Frakes is saying, hey, a mask can have any
25   shape.  It could be a blob and therefore, if you're just

UNITED STATES DISTRICT COURT

188

1    using a blob, that can't have any coordinates.  Well, of
2    course, he's only looking at half the story.  The other half
3    of the story that Dr. Morellas was able to tell you today is
4    yeah, it's a mask, but it's a mask being applied to something
5    specific.  It's a mask being applied to a rail base and a
6    rail base does have a shape.  A rail base is not a blob.
7         And so when you take that mask and you apply it to
8    a rail base, suddenly you have a rectangular shape.  It's no
9    longer a blob.  It's a rectangular shape and it has
10   coordinates.  And you tell where the vertices of that
11   rectangular shape is which by the way is the whole point of
12   this software.  They're trying to identify features on the
13   railway track.
14        So, of course, it would make no sense if they're
15   running around using blobs.  They're not using blobs.
16   They're using masks that map to specific elements on the
17   railroad track.  And so we believe Dr. Morellas showed very
18   strongly that this limitation is satisfied and Dr. Frakes's
19   argument really doesn't make sense.  He didn't apply the
20   second part of that is what is the mask being applied to.
21        Same thing for the next element they dispute.  They
22   say the LRAIL system doesn't input detected tie bounding
23   box data.  And, again, if you listen carefully to Dr. Frakes'
24   testimony, his real squabble was that it was a box.  He says
25   it's not a box.  He said a mask is a blob not a box.  That

UNITED STATES DISTRICT COURT

EXHIBIT 5
-226-

**189**

1  was his big argument.  It's a blob and this claim requires a
2  box.
3      Again, ladies and gentlemen, that's playing games.
4  That's playing word games.  The reality is that the code is
5  applying that mask to something.  It's applying it to a
6  railroad tie and railroad ties are rectangular.  And so when
7  you apply that mask to the railroad tie, you no longer have a
8  blob.  You have a mask that's shaped like a railroad tie and
9  it has coordinates.
10     And Dr. Morellas even showed you in the output file
11 that comes out at the end of this process, that the output
12 file indeed has the coordinates.  You can see them there.
13 It's got a series of eight XY values which is basically the
14 four corner of the rectangle.
15     They attack Dr. Morellas and say well, that's
16 output and the claim requires input, but Dr. Morellas
17 actually showed both.  He showed where the input is.  They
18 claim it's a blob.  He said it's not a blob, it's a
19 rectangle, and he proved it by showing what comes out at the
20 end in the output file is indeed a rectangle not blob.  So we
21 believe that has been satisfied.
22     And finally, they dispute this limitation that
23 requires inputting approximate tie surface plane data.  And
24 their big dispute here -- they don't -- they don't dispute
25 that there is plane data that is, uh, that is generated and

**190**

1  inputted.  They're just arguing that because that plane data
2  in the LRAIL system is calculated only looking at half the
3  tie, they say you don't meet the claim limitation because you
4  have to do the entire tie.
5      First off, nothing in this claim says entire tie.
6  There's no claim limitation that says that.  There's no court
7  construction that says that.  Moreover, to the contrary, the
8  claim says approximate tie surface plane data.
9      And as Dr. Morellas explained, if you a flat
10 surface like the top of this desk right here and you want to
11 find out where the plane of that desk is, it's a perfectly
12 reasonable thing to do is to take part of it and say well,
13 let me just find out where part of the plane is.  Once you
14 find that, you know where the rest of the plane is because
15 it's flat.
16     Rail ties are flat.  They're generally flat and
17 therefore, looking at half the tie is a way to approximate
18 the, uh, the plane surface of that rail tie.  So Dr. Morellas
19 explained this does get them off the hook for infringement.
20 This is an approximate tie surface plane data.
21     And so we've gone through all three of their
22 disputes and therefore, we believe we've shown Claim 8 of the
23 '557 patent has been infringed.
24     Now, there's another part of infringement, if I can
25 have the next slide, if you look at the jury instructions,

**191**

1  there's a little bit more we have to show.  We have to show
2  that the method was used and that it was used in the
3  United States.  So how do we know that it was used in the
4  United States?  Because we had the video deposition testimony
5  of Mr. Hafiz.
6      You remember he's the gentleman that was kind of
7  wearing the headset.  He's a project engineer at AID.  He
8  testified, and this is undisputed, that they received the
9  LRAIL system.  They assembled it.  They did the calibration
10 and then they used it.  They operated the system in
11 New Jersey and New Jersey is in the United States.  And
12 therefore, we've proven the method -- excuse me -- the
13 claim -- the LRAIL was used in the United States.
14     The last thing we need to prove is well, how do we
15 know that the method of Claim 8 was performed?  Maybe they
16 used it and never invoked that, uh, that software code.
17 Well, we know that because our expert, Dr. Morellas actually
18 looked at the output files, and he explained to you what an
19 output file is.  The output file is basically like a receipt.
20     You use the system.  You go out on the track, you
21 do an inspection, and then at the end of the inspection,
22 you're gonna essentially push a button.  I'm probably
23 exaggerating, but you can push some buttons and it provides
24 you a receipt.  It says this is what you did today.  And you
25 can see in the output file, the version of the software code

**192**

1  that was used.  You can even see the date and time that the
2  analysis took place.
3      You can see which modules were enabled during the
4  analysis.  In this case the tie rating, uh, module was
5  enabled and that's the module that we're accusing of
6  infringement.  That's the module that performs the steps of
7  Claim 8.  And you can see that it's listing various tie crack
8  parameters.
9      The other thing you can see from the output file,
10 if I can have the next page, is you can actually see the
11 result.  Again, it's like a receipt.  You can see that in
12 this particular run that they did, the system identified four
13 ties.  It says number of ties, four and it detected one
14 crack.  And then it actually provided the crack parameters
15 because you remember that's one of the limitations, that's
16 Step D of Claim 8 is to actually, uh, analyze crack
17 parameters.
18     So we see here from this output file that yes,
19 indeed, AID used the system, they used it in the
20 United States, and they used it to perform the method of
21 Claim 8.  Um, and so we didn't, uh, we didn't just come in
22 here and wave our hands.  We have the receipts.
23     And not only did they infringe it once,
24 Dr. Morellas actually looked at a whole bunch of output files
25 and he was able to tell that AID used the system in an

UNITED STATES DISTRICT COURT

**EXHIBIT 5**
**-227-**

193

1  infringing manner which means they practiced the method of
2  Claim 8 eight separate times, at least eight separate times
3  between April and August of 2021. So they didn't just
4  infringe once, they infringed multiple times.
01:57PM 5      So we believe we've carried burden that
6  preponderance burden by showing that AID directly infringed
7  Claim 8 of the '557 patent by practicing the method in the
8  United States.
9      Now, that's not the end of our analysis cause
01:58PM 10  remember now there's a second part. If I can have the next
11  slide. The second part of showing induced infringement is,
12  well, we have to show that Pavemetrics actually did something
13  that caused AID to infringe that claim. Well, we know they
14  did cause we have the receipts.
01:58PM 15      We have the email back from Mr. Hafiz to the people
16  at Pavemetrics saying hey, I've received the LRAIL. This is
17  the LRAIL that they purchased and that was delivered to them
18  in February of 2021. And they said confirming receipt of the
19  LRAIL. Everything looks good. We will start assembling the
01:58PM 20  LRAIL soon. So what did Pavemetrics do? They provided the
21  LRAIL that was necessary to infringe the claim.
22      Had they not provided that LRAIL, had they not
23  provided all the equipment that goes along with the LRAIL,
24  AID would not have been able to infringe the claim.
01:58PM 25  Therefore, this is a contribution, if you will, or an

UNITED STATES DISTRICT COURT

194

1  inducement of that -- of infringement and that's not all.
2      What else did they provide to AID? They provided
3  user manuals, installation manuals and instructions. And
4  there is no dispute, none, that these manuals collectively
01:59PM 5  teach and educate the end user, the customers, how to
6  practice all of the different modules and functionalities of
7  the LRAIL system including the tie crack detect module which
8  is the accused module for Claim 8. That's undisputed.
9      Now, we've seen there's direct infringement. Now,
01:59PM 10  we've seen Pavemetrics caused the actions that lead to
11  that direct infringement. Now, we're down to just one last
12  element and that's the knowledge prong so let's turn to that.
13      Now, remember, talking about willful blindness.
14  That's our theory of the case. That they willfully blinded
01:59PM 15  themselves to the facts. So let's take a look at just the
16  facts. I'm only gonna be talking about what's called direct
17  evidence. The Judge instructed you on the difference between
18  direct and indirect evidence or circumstantial evidence so
19  I'm only gonna be talking about direct evidence.
02:00PM 20      What do we know directly? We know they received
21  the notice letter on January 5, 2021. That notice letter
22  identified the '293 patent. That's not the '557 patent.
23  That's the '293 patent.
24      What else do we know? We know that Mr. Habel,
02:00PM 25  Mr. Laurent and Dr. Hebert, the three individuals from

UNITED STATES DISTRICT COURT

195

1  Pavemetrics who heard from during this trial, they reviewed
2  that '293 patent in its entirety. They reviewed it
3  cover-to-cover; the pictures, the diagrams, the language in
4  the specification and the claims. They all testified to
02:00PM 5  that. They did this analysis so they could come to the
6  conclusion that they did which was they said hey, we don't
7  infringe this '293 patent.
8      What else do we know as a fact? This is a fact.
9  The '293 patent and the '557 patent share the same
02:00PM 10  specification. What do I mean by that? They're two
11  different patents, but they come from the same original
12  application and so specification, the description of the
13  invention, all the words in the patent, the drawings, the
14  flow charts, all that stuff between the two patents, and I'm
02:01PM 15  just gonna borrow from one of my favorite movies, identical.
16  They are identical.
17      What else do we know? The only difference between
18  the patents was the claims. So specifications are the same.
19  The claims are different.
02:01PM 20      What else do we know? So when they reviewed the
21  '293 patent, they were also reviewing the entire
22  specification of the '557 patent because they're identical.
23  They're identical. So these are all facts. These aren't
24  inferences. These are facts.
02:01PM 25      So what did they see? What did these three

UNITED STATES DISTRICT COURT

196

1  individuals at Pavemetrics see when they reviewed that
2  specification which is the exact same specification as the
3  '557 patent?
4      Let's take a look. What they saw was an algorithm
02:01PM 5  and a whole bunch of description about a method called
6  removing rail heads. You remember we've heard about this
7  over the last few days. This is a very important thing and
8  by the way, this is something they can't even find in the
9  prior art. They couldn't find a single reference not one
02:02PM 10  that has this algorithm that removes rail head. They tried
11  and they couldn't. They could not find a single reference in
12  the prior art. So we know this is something important.
13      We know this is something new that Tetra Tech was
14  bringing to the table. It was disclosed in Dr. Mesher's
02:02PM 15  patents and it was disclosed in the specification which they
16  all read, they all read. And they saw this algorithm for
17  removing rail heads including Figure 9. It has descriptions
18  of how it works and it even has pictures showing before and
19  after. Figure 10 has the rail heads. Figure 11 the rail
02:02PM 20  heads have been removed. So this was unmistakable.
21      You can't possibly read this patent especially if
22  you're somebody with knowledge like Mr. Laurent or Mr. Hebert
23  who knows this industry. They go to conferences constantly.
24  They fly around the world. Million miles and all that.
02:02PM 25  There's no way they could have read what you're looking at

UNITED STATES DISTRICT COURT

**EXHIBIT 5**
**-228-**

197

1    here and not recognized that oh my goodness, Tetra Tech has
2    this algorithm that removes rail heads.
3           What else do we know?  We know that the only people
4    in the world or at least outside of the confidential circle
02:03PM 5    of Pavemetrics who knew that Pavemetrics had an algorithm
6    that removed rail heads was Pavemetrics.  Mr. Laurent knew.
7    Dr. Hebert knew that their code, the one they had already
8    delivered to AID, the one that was on the verge of being used
9    by AID down there in New Jersey had this algorithm.  It had
02:03PM 10   the removing rail head algorithm.
11          What else did they learn from reading that
12   specification?  Next slide.  The specification has columns
13   upon columns upon columns describing how this algorithm works
14   and it's the four steps that we've already gone through.  And
02:03PM 15   the first step of that is removing the rail head data from
16   the elevation data.  Now, let's look and see what they did or
17   maybe I should ask what they didn't do.  What didn't they do?
18   And, again, these are facts.
19          Picture yourself in January of 2021.  You're at
02:03PM 20   Pavemetrics.  You've just read this specification and you've
21   just seen that Tetra Tech has this remove algorithm, this
22   remove rail head algorithm in their patent.  You ask yourself
23   what would a reasonable person do and ask yourself what did
24   they do.  They apparently didn't even ask themselves whether
02:04PM 25   removing rail head might be covered by some other patent in

UNITED STATES DISTRICT COURT

198

1    the '293 patent.  They didn't take the 10 minutes it would
2    have taken to go on the PTO website and see whether --
3           MS. LEA:  Objection, Your Honor.  This slide is
4    objectionable for what we discussed prior to the closing.
02:04PM 5           THE COURT:  Yeah, I did go through those materials
6    and I think this is on the side of case that's okay.
7    You can go ahead.
8           MR. BARNEY:  Thank you, Your Honor.
9           They didn't take the ten minutes.  You heard
02:04PM 10   Mr. Habel say yeah, I know how to do it.  I know how to go to
11   the PTO website.  He'd done it before.  He used to be an
12   intellectual property consultant for two to three years.  He
13   knew exactly how to go to that PTO website and take the ten
14   minutes to search to see whether Tetra Tech might have
02:04PM 15   actually filed another patent that claimed that algorithm.
16   They didn't do it.
17          Apparently, didn't ask their attorneys cause we've
18   seen no evidence of that.  They didn't -- here's important.
19   They didn't delay shipment of that LRAIL system to AID.  It
02:05PM 20   would have been very easy for them to say hey, you know what?
21   We've seen this algorithm in their specification.  Maybe we
22   should think twice about sending that shipment down to
23   New Jersey because it might infringe another patent that
24   Tetra Tech has.  Didn't do that.
02:05PM 25          They didn't pick up the phone and call AID, their

UNITED STATES DISTRICT COURT

199

1    customer, and say, hey, Hafiz, I'm sorry to tell you this,
2    but we think there might be a patent issue and would you
3    please refrain from invoking or enabling that module that
4    detects the tie cracks because we want to make sure that we
02:05PM 5    don't infringe first.  We want to make sure you don't
6    infringe first.  We want to keep our customers safe.  They
7    didn't do any of that.  All right?  Didn't do any of that.
8           In fact, they did the opposite.  Have the next
9    slide.  They kept their customer in the dark.  Now, just
02:05PM 10   think about that for those of you who are business owners and
11   have valued customers.  Their customers down there are
12   unaware that this lawsuit was even going on.  Pavemetrics
13   sued -- Pavemetrics initiated this lawsuit.  So Pavemetrics
14   certainly knew all about Tetra Tech's patents by the time
02:05PM 15   they filed the lawsuit.
16          By the time they filed the lawsuit on
17   February 11th, they surely knew all about Tetra Tech's
18   patents then.  It is inconceivable that by the time they
19   prepared a lawsuit against us, they hadn't at some point gone
02:06PM 20   and checked the rest of our patents.  Inconceivable.
21          With a big, giant law firm like Knobbe, with
22   somebody like Mr. Re with his credentials, inconceivable that
23   by the time they filed the lawsuit they didn't know about
24   that '557 patent that was also in the same -- in the same
02:06PM 25   family.  They didn't even tell their customer.  When asked

UNITED STATES DISTRICT COURT

200

1    about it, Mr. Hafiz was surprised to get a subpoena.  He had
2    never even heard of Tetra Tech which means Pavemetrics never
3    told AID about this lawsuit.
4           And the question at the bottom there:
5           "Q.  So you wanted to keep in the dark."
6           "A.  We -- we basically wanted to keep them out of
7    this lawsuit."
8           Ladies and gentlemen, what that means is they
9    didn't care that AID was out there directly infringing our
02:06PM 10   patent.  They just wanted to keep them out of the lawsuit.
11   You're allowed to bring that inference to the table.  That is
12   called circumstantial evidence.
13          Next slide, please.  It's even worse because not
14   only did they keep their customer in the dark, they went out
02:07PM 15   of their way to prevent us, Tetra Tech from learning about
16   their sale to AID.  Question -- this is Mr. Laurent's trial
17   testimony.
18          "Q.  You -- you Pavemetrics --
19          "A.  Yes.
02:07PM 20          "Q.  Wanted to keep Tetra Tech from learning about
21   your sale to AID in March of -- March 26, 2021?
22          "A.  I would say that's a fair assessment."
23          They kept their customer in the dark about the
24   patents.  They kept us in the dark about the infringing sale.
02:07PM 25   Again, you can draw whatever inference you feel is reasonable

UNITED STATES DISTRICT COURT

**EXHIBIT 5**
**-229-**

201

1  from that evidence.  Next slide, please.

2  What else do we know?  Look at some of the evidence

3  that came in at trial and look at the demeanor of their

4  witnesses.  Look at Mr. Habel said when I asked him about

02:07PM 5  that link that was provided by Mr. Fox-Ivey.  The link that

6  provided information about Dr. Mesher's patents.  This link

7  was from 20 -- this link was a 2017 email so it was five

8  years ago, but look what he says.

9  "Q.  He provided a Google link that listed patents

02:07PM 10  that named as the inventor Darel Mesher.

11  "A.  Yes.  I didn't click the link.

12  "Q.  And you understand that to be Dr. Mesher, the

13  Chief Technology Officer of Tetra Tech, TAS.

14  "A.  Yes, and I didn't click the link."

02:08PM 15  "Q.  And so by the date of the email, Pavemetrics

16  knew Dr. Mesher had patents; correct?

17  "A.  I said I didn't click that link."

18  You don't have to be a lawyer, you don't have to be

19  a judge, you just have to be a human being who's had

02:08PM 20  relations and interactions with other human beings.  When

21  people act that way, it's a sign of a guilty conscience.

22  You're allowed to draw that inference.  The Judge has said

23  you can use inferences from circumstantial evidence.

24  Next slide, please.  Very similarly look at what

02:08PM 25  was going on at Pavemetrics internally at the exact time in

UNITED STATES DISTRICT COURT

202

1  2018 when they were putting these algorithms into their deep

2  neural network.  A whole flurry of emails along the lines of

3  hey, is it true that we can't infringe if we put it in the

4  neural network?

02:08PM 5  Look at what Mr. Fox-Ivey says.  He's arguing in

6  one of the email chains that by the same token, you can argue

7  that at one specific time the deep neural network

8  configuration did infringe somebody's IP, but that moment

9  would be fleeting as the DNN configuration would subsequently

02:09PM 10  change as the DNN learns.  Basically, we're a moving target.

11  Not even their own executives believed that because

12  Mr. Laurent responded if we get sued, it's your fault.

13  Now, they're gonna say oh, they were just worried

14  about this other company called GREX.  My question to you,

02:09PM 15  ladies and gentlemen, does it matter?  Does it matter who

16  they were worried about?  This goes to their state of mind

17  and what type of company they are.

18  They don't care about other people's intellectual

19  property.  They only care about getting caught.  That's what

02:09PM 20  you can infer from this email.  So ladies and gentlemen, on

21  the question of induced infringement in the jury verdict

22  form, we're gonna ask you to click yes.  We believe we proved

23  it by a preponderance of the evidence.

24  Next slide, please.  The last thing I'm gonna

02:09PM 25  address before I sit down is willful infringement.  This

UNITED STATES DISTRICT COURT

203

1  question asks, If you found that Pavemetrics infringed the

2  '293 patent or the '557 has Tetra Tech proven that it's more

3  likely than not Pavemetrics, and listen to this

4  carefully, actually knew, intentionally ignored or recklessly

02:10PM 5  disregarded that its actions constituted infringement?  I

6  think I've already shown you they did for the '557 patent.

7  For the '293 patent, what do we know?  They had

8  three employees of Pavemetrics that analyzed the patent.

9  None of whom are lawyers.  None of whom had patent

02:10PM 10  experience.  None of whom are qualified to do the type of

11  analysis you actually would need to do to see if there really

12  is infringement.  Only a qualified patent attorney can do

13  that.  They admitted they don't have those qualifications.

14  There's no evidence that they reviewed the

02:10PM 15  prosecution history, for instance, which is important and you

16  have to review when you're analyzing patents and there's no

17  evidence they did a proper claim construction.  So their

18  analysis they did when they came to their conclusion they

19  don't infringe is not worth basically anything.

02:10PM 20  As a matter of fact, one of the people who did that

21  analysis, Mr. Habel, they kind of poked fun at him saying if

22  he ever had to go to court in a patent case, he would

23  probably get discredited because his background is in

24  telecommunication instead of the particular technology that's

02:11PM 25  at issue here.  So, again, you can infer from that they acted

UNITED STATES DISTRICT COURT

204

1  willfully.  They knew they were infringing and they did not

2  have a good faith basis for believing otherwise.  So we're

3  gonna ask you to check yes for willful infringement.

4  I have a few minutes left and I'm gonna reserve

02:11PM 5  time.  I'm gonna allow my colleague on the other side to

6  present their case, and then I'll have a chance to come back.

7  But remember while they're presenting their case that their

8  burden on invalidity is not 51 percent.  It's much higher

9  than that.  They have prove it by clear and convincing

02:11PM 10  evidence.  So listen carefully to see whether they proved

11  that to you and I'll talk to you in about an hour.

12  THE COURT:  Thank you, Mr. Barney.

13  Counsel for Pavemetrics.

14  MS. LEA:  May it please the Court?

02:12PM 15  THE COURT:  Please.

16  MS. LEA:  I too appreciate you all being here for

17  this trial and taking time away.  And I'm sorry that you had

18  to do that for this dispute because this dispute is not even

19  close.  You don't need a scale to decide this dispute.  It is

02:12PM 20  so clear who was first here and who lead this industry and

21  who is developing this industry.

22  I told you in my opening statement that the

23  evidence would show four things and the evidence has shown

24  each of those things.  It has shown without a doubt that

02:12PM 25  Pavemetrics was first to use 3D laser triangulation on both

UNITED STATES DISTRICT COURT

EXHIBIT 5
-230-

205

1 roads and railroads not Tetra Tech. Tetra Tech learned from
2 Pavemetrics.
3        You heard Tetra Tech's, uh, inventor Dr. Mesher
4 testify that he went to conferences, listened to John
02:13PM 5 Laurent's presentations, took notes, and came back and then
6 presented to his customers about that. You heard him laud
7 the pioneering technology developed by Pavemetrics. Who is
8 learning from whom here? And it's Tetra Tech learning from
9 Pavemetrics not the other way around.
02:13PM 10        Now, the patents in this suit are on old
11 technology. Dr. Mesher testified that the gradient
12 neighborhood is a standard technique. So when you start
13 listening to the experts, don't be confused between
14 Dr. Morellas and Dr. Frakes. We can tell who knows more
02:13PM 15 about this technology and has analyzed the prior art and
16 compared it to the claims.
17        We're not talking about combining microwaves and
18 frying pans here. Okay? We're talking about the same
19 Pavemetrics' work from 2012 and '13 and '14, and its
02:14PM 20 publications where you can see its algorithms in
21 publications.
22        Now, Pavemetrics didn't just sell a device to UML
23 in 2012. It also provided support. It's that ongoing
24 support that also shows that these patents are invalid. So
02:14PM 25 the whole series from 2012 to 2014 that shows these patents

UNITED STATES DISTRICT COURT

206

1 are on old technology. You will be instructed and you have
2 been instructed that the person of ordinary skill is presumed
3 to know all of the prior art. They're presumed to know all
4 of Pavemetrics' work. And so you will that to consider
02:14PM 5 before you when you're deciding the obviousness question.
6        Third, Pavemetrics uses artificial intelligence not
7 the patented standard techniques. Those techniques are the
8 old gradient neighborhood, the old Sobel filters, the old
9 Canny method. Pavemetrics is using the new artificial
02:15PM 10 intelligence.
11        Mr. Barney talked about honorable. He talked about
12 Tetra Tech being an honorable company, but this is not an
13 honest dispute. Pavemetrics identifies features by using a
14 range image in a neural network. That's what it does.
02:15PM 15 That's in fact what it's always done.
16        But Tetra Tech isn't accusing Pavemetrics' use of a
17 range image in a neural network as infringing. Instead, it
18 points to an R and D Mixed Image or it points to a Fake3D
19 image that's not even in the code in the versions that were
02:15PM 20 sold to CSX with Sales 2, 3 and 4.
21        There's nothing honorable about telling you what is
22 sold is not what is in the box. Anyone who's been to Ikea or
23 ordered something on Amazon knows what is sold is what you
24 get in the box. In this case it is unconnected components.
02:16PM 25        There's nothing honorable about telling you that

UNITED STATES DISTRICT COURT

207

1 LRAIL software is like spell check. That you can just bring
2 up this little box and click on it and it'll suddenly do
3 different things. You heard from Dr. Hebert that the R and D
4 code, the Mixed Image, is produced by, uh, configuration
02:16PM 5 files that only Pavemetrics knows about.
6        The customers don't even know about these Fake3D or
7 mixed images. No one knows about that. All they know is
8 that their product uses 3D triangulation. That's what the
9 customers care about and the fact the product uses range
02:17PM 10 images.
11        Now, there's nothing honorable about telling you
12 that an R and D test image like the Mixed Image is what's
13 infringing. There's nothing honorable about that. No one
14 has used that image. They've showed no configuration files
02:17PM 15 that has ever been used or configured to be used.
16        There's nothing honorable about telling you to look
17 at a software version that was sold with systems in 2020 and
18 acting like they apply to systems sold in 2021. Nothing
19 honorable about that.
02:17PM 20        There's nothing honorable about calling it a Fake3D
21 algorithm or a Mixed Image algorithm. These are algorithms
22 to detect features. So there's a fastener algorithm and
23 Pavemetrics uses a range image in a neural network in that
24 fastener algorithm. There's a spike detection algorithm.
02:17PM 25 Pavemetrics uses a range image in a neural network in that

UNITED STATES DISTRICT COURT

208

1 spike detection algorithm.
2        It's not using Fake3D. It's even in the code for
3 these sales that are here, Sales 2, 3 and 4. And it's not
4 using the test Mixed Image. And both of those are not even
02:18PM 5 in their code any more. They took them out in half a day,
6 had their software programmer take them out in half a day.
7 Not there.
8        Why are we here? I mean, really why are you taking
9 time away from your family and your jobs to be here to decide
02:18PM 10 this really dishonest dispute? Why? Why are you here to
11 decide if some images Pavemetrics doesn't even use or never
12 used infringe their patents?
13        Well, let's start talking about what the invention
14 could be. So Dr. Mesher testified, and we'll look at it,
02:18PM 15 that the gradient neighborhood is a standard technique. It's
16 standard. It was used in the Sobel filter, the Canny method
17 so they had to find another hook for their invention.
18        And he decided that the hook would be appropriate
19 cause that's a really great word that I don't even know
02:19PM 20 totally what it means in this context, but apparently it
21 means whatever Dr. Morellas is willing to say that day. One
22 day he says it means flexible, the next day it can be fixed.
23 He bounces around on that.
24        I'd also like to talk about why sales started
02:19PM 25 happening in 2020. They made a big deal, Tetra Tech made a

UNITED STATES DISTRICT COURT

**EXHIBIT 5**
**-231-**

**209**

1 big deal that Pavemetrics had a sale to UML in 2012, and then
2 its next sales were in 2020 and 2021. Well, there's a reason
3 for that. There's a lot of reasons. And one of the reasons
4 is because Pavemetrics had done the leg work.

02:19PM 5        It had done all of the research and development
6 with the University of Massachusetts Lowell to prove its
7 algorithm. It had done the work with the FRA. It had done
8 the work to test and find the best AI and had proven that
9 work also with the FRA. We have here an FRA press release
02:20PM 10 from May 1, 2020 talking about how great the LRAIL system is.

11        Something else happened around that time and that's
12 that the GREX patents were invalidated by Tetra Tech. That,
13 ladies and gentlemen is Tetra Tech's biggest contribution to
14 this industry. That contribution opened up the industry and
02:20PM 15 they did it with Pavemetrics' help. They asked Pavemetrics
16 for help with prior art and showing that this was all done
17 before and that's what happened.

18        The industry was scared of the GREX patents not
19 just Pavemetrics, not just Tetra Tech. They sued Tetra Tech
02:20PM 20 and they were sending threatening letters to everyone. Tetra
21 Tech stood up to that bully and invalidated all five of those
22 patents for obviousness. And then turned around and came
23 after Pavemetrics when they got upset about the sale.

24        Tetra Tech's patents are an after thought. You
02:21PM 25 heard that with every single witness in this case starting

**210**

1 with their own vice president Mr. Keyes. He has no technical
2 or legal understanding of these patents whatsoever.

3        You heard that with Mr. Larson. He never mentioned
4 any patents in his email. Remember Exhibit 178 I showed you
02:21PM 5 in my opening? He never mentioned any patents in that email
6 that Pavemetrics is a problem email when he emailed
7 Mr. Keyes.

8        Mr. Habel had never heard of the patent or the '293
9 patent before the threat letter.

02:21PM 10        Brad Spencer, the customer at CSX, Tetra Tech never
11 mentioned its patents to him either. You think if you had
12 patents that could control the whole entire industry, oh, my
13 gosh. Their patents prevents everyone from using a
14 convolution neural network in their entire industry, I'd sure
02:22PM 15 be bragging about that if I had that patent.

16        Mr. Olenoski, their own employee or consultant, he
17 never heard of their patents. And then John Laurent had
18 never heard of them before the threat letter and neither had
19 Dr. Hebert. So again why are we here?

02:22PM 20        I told you in my opening that we're here because
21 Tetra Tech is mad that they lost a sale to CSX. And I
22 believe we have proven that. That's clear. But in listening
23 to Mr. Keyes and cross-examining him, it occurred to me that
24 it's a little bit more than that. He's not just mad. Tetra
02:22PM 25 Tech is basically entitled cry babies. They didn't get the

**211**

1 sale that they thought they were entitled to because they're
2 an $8 billion company and so they decided to take their ball
3 and go home.

4        Instead of just going to their bedroom and pouting,
02:23PM 5 they decided -- he decided to look for some patents. Patents
6 he didn't know anything about to see if he could deal with
7 the problem, Pavemetrics. And that's exactly how he dealt
8 with it by turning patents on to Pavemetrics that no one had
9 heard of before then.

02:23PM 10        Now, you think as a business person, he'd listen to
11 the customer. The customer's always right. And Brad
12 Spencer, you heard from him. You heard him tell you the
13 problems that he had with Tetra Tech's bids. They did four
14 bids in the $4 million, then $5 million.

02:23PM 15        Then I guess they started listening cause they
16 shaved like four percent off for number three after CSX had
17 repeatedly told them I don't have the budget. You're too
18 expensive. I can't buy from you, but Tetra Tech didn't
19 listen. They are entitled to that sale in their view. They
02:24PM 20 want to own this market and they're going to use these
21 patents to do it.

22        Now, this isn't just about CSX. We're not here
23 because of three sales to CSX. I mean, look at all these
24 lawyers that they're paying for to be here about three sales
02:24PM 25 on CSX. I don't think so. This is about wanting to control

**212**

1 the market. They are going to set the tone for this market
2 by golly. They're going to do it any way that they can.

3        They want the market to be selling $5 million
4 boxcars. $5 million boxcars that's what they want the
02:24PM 5 customers to buy not $350,000 inspection systems. No. They
6 want to increase prices. They want inflation. And what
7 happens when prices are kept high like that? Well, then it
8 affects all of us. All of us who ride trains, all of us who
9 buys products from Amazon, all of us because those prices
02:25PM 10 will come back to us.

11        This is not what the patent system is meant to be.
12 They are using our United States patent system that we all
13 created to promote science and the useful arts, they're using
14 it to win in the market place and to control the tone of the
02:25PM 15 market place. That's not fair and it's not honorable.

16        Okay. That was just my introduction.

17        Let's talk about why Pavemetrics was first to use
18 3D laser on roads and railroads. Okay. I showed you this
19 time line in opening and it's completely held up.
02:25PM 20 Pavemetrics was founded. It sold sensors to inspect
21 railroads way before Tetra Tech ever filed for these patents
22 or even had, supposedly had a sale in 2015.

23        Pavemetrics pioneered the industry. You know, you
24 can make a sale or you can grow an industry. They grew an
02:26PM 25 industry and you do that by flying around the world and

**EXHIBIT 5**
**-232-**

213

1   talking about it and publishing on it, and doing research
2   with the FRA and NASA and everyone else that they did
3   research with.  That's how you build an industry so it can
4   grow from everyone.
02:26PM 5   Tetra Tech didn't do that.  I just want to talk
6   about them so much, but let me talk about Pavemetrics first.
7   So they sold three systems for rail in Europe to EuroConsult
8   in 2010.  Then they sold to UML in 2012 because UML had a
9   research contract with the U.S. government and they supported
02:26PM 10  that.  They sent their programmers to those meetings.  They
11  disclosed their algorithms.  You don't even need the code.
12  Those algorithms are in the meeting minutes and they're in
13  their publications.
14          Then they had their publication in 2014.  That was
02:26PM 15  a big deal.  EuroConsult published at the same time because
16  when they sold to EuroConsult, EuroConsult developed their
17  own software.  So we have two companies here developing the
18  inspection software at the same time using Pavemetrics'
19  sensors and publishing on it.  Where's Tetra Tech's
02:27PM 20  publication?
21          Now, as soon as the computers were available and
22  the knowledge became available, Pavemetrics started
23  experimenting with artificial intelligence and neural
24  networks.  And just like they always have with everything
02:27PM 25  else, they published on it.  They ran an experiment outside

UNITED STATES DISTRICT COURT

214

1   of LRAIL in Canada on a different hardware, software.
2          And they experimented with AI and they published on
3   it; Arema 2018, Arema 2019, Tokyo 2019.  They are sharing
4   their knowledge with the world.  They're working with the
02:27PM 5   FRA, the United States government to make our roads better,
6   our railroads better.
7          Then they -- we have -- word got out.  Pavemetrics'
8   business model is not even to sell to major railroads.  Their
9   business model was to sell the hi-rail truck to integrators.
02:28PM 10  That was their business.  But when word gets out, it gets out
11  and CSX came calling.  They knocked on Pavemetrics' door and
12  they asked for a quote.  And like anyone would, Pavemetrics
13  quoted them and was selected by CSX.  And boy, did that wake
14  up Tetra Tech because Pavemetrics got a threatening letter.
02:28PM 15          And these guys, these are not some kind of hacks
16  that can't read a patent or that don't understand their own
17  technology.  They read the '293 patent.  Dr. Hebert is a
18  programmer with extensive degrees.  So is Mr. Laurent.  They
19  read these patents and they compared it to their technology
02:28PM 20  and they knew they did not infringe the '293 patent.
21          Now, like I had mentioned, they published on their
22  algorithm.  This is one of their algorithms.  This is the
23  Canny method.  I already mentioned this and so I will move
24  on, but that performs the gradient neighborhood technique.
02:29PM 25  They published on LRAIL at the TRB 2014.

UNITED STATES DISTRICT COURT

215

1          We've heard lot about Fake3D and whether it's, um,
2   the track elevation map under the claim or not, whether it
3   has intensity and range.  And I just want to clear that up
4   for you.  First of all, there's only three choices here;
02:29PM 5   right?  You're either using an intensity image, you're using
6   a range image, that's what Pavemetrics actually does, or in
7   this case you're using a merged image, an image that has
8   both.
9          So when there's only three choices, you can see
02:29PM 10  this in the jury instructions, when there's a limited number
11  of choices, it might use a fancy word like finite number of
12  choices, it can be obvious to try them all and see which one
13  works best.  That's what any reasonable person would do.
14          But in this case, the 3D merged image in that
02:30PM 15  language like to show you from our manual, I showed it
16  to you, too during the witness testimony.  It's the same
17  language from 2021 as it was back in 2012 when the device was
18  sold to UML.  The 3D merged image is the Fake3D image.  That
19  image is an intensity image that then shadows are placed on
02:30PM 20  the image using range data.  So it is made using both
21  intensity and range image.
22          And that's why Dr. Frakes said well, you might --
23  you might think that's a representation of both intensity and
24  elevation.  He doesn't think so.  Pavemetrics doesn't think
02:30PM 25  so because it doesn't actually have elevation data in it.

UNITED STATES DISTRICT COURT

216

1   You couldn't take that data and calculate height
2   differentials.  You couldn't calculate gradients with it.
3   That's why it doesn't work for these claims.  But if you
4   think it does, Pavemetrics had it back then.
02:31PM 5          Okay.  So, again, LRAIL was publicly marketed in
6   2014.  This is, um, this is Rob Olenoski who back then was at
7   ICC, an integrator that bought from Pavemetrics, sending to
8   Darel Mesher in October 2014 an LRAIL inspection flyer.  They
9   made flyers.  They made brochures.  They wanted the world to
02:31PM 10  know that they had launched a product.  They had LRAIL before
11  these patents issued of course.  You can see those flyers
12  that Darel Mesher had.
13          So this is the testimony where he said that he
14  listened to Mr. Laurent at conferences, took concise notes,
02:31PM 15  and then went back and presented on them.
16          Who is learning from who?
17          Okay.  This slide is similar to one that Mr. Barney
18  showed you during opening statements.  He has, uh, four time
19  points he talked about.  One was when he filed the patents
02:32PM 20  in February 2015, and then he says Tetra Tech launched 3DTAS
21  for rail inspection.  Why do you think he uses the word like
22  launch instead of sold?
23          I mean, was there a launch party?  Did you hear
24  about a launch party?  Did you hear about any marketing
02:32PM 25  materials?  Did you hear about any publications?  Did you

UNITED STATES DISTRICT COURT

**EXHIBIT 5**
**-233-**

217

1 hear about any of this being sent out to the world? Think
2 about when Amazon launches Echo. It is a big show; right?
3 Not here.
4 02:32PM This was a private development with Canadian
5 National. They had a development contract with them for five
6 units and it was confidential. No one knew what they were
7 doing and they didn't want anyone to know. It wasn't on
8 their website. There were no papers, no speeches, no
9 nothing.
10 02:33PM Then around April 2020, Tetra Tech starts to put
11 its toe in the water and begins negotiations with CSX. He
12 says to sell 3DTAS. I forgot to cross that out. He was
13 actually selling RailAI, their boxcar that's 5 million bucks.
14 And then only after sending us a notice letter, does Tetra
15 02:33PM Tech even start building. . . Oh, even after the lawsuit.
16 I'm being corrected on the dates here. So they
17 filed the lawsuit February 2021. After the lawsuit that's
18 when Tetra Tech builds their website on RailAI. That's the
19 first time. If you were launching a product, wouldn't you at
20 02:33PM least have a website? They're an $8 billion company. They
21 can handle a website. And then, of course, he left off how
22 they'd been our customer for ten years.
23 You know why he used the word launch? He wanted
24 you to think we knew about it. He wanted you to think
25 02:34PM everyone knew about 3DTAS. He wanted you to believe that we

UNITED STATES DISTRICT COURT

218

1 knew them all along. And we should have somehow known
2 about their patents and we should have been aware. And we
3 should have stayed out of their -- their playing field.
4 We didn't know. They were our customer. They were
5 02:34PM our valued customer and they had been since 2012. They
6 purchased from us in 2012, 2017, and every single year
7 software and raw data.
8 Okay. Moving on to Tetra Tech's patents are old
9 technology. There is nothing about their patents that's new.
10 02:34PM The word appropriate doesn't give them anything new on their
11 patents. And your jury instructions will also use a pair of
12 words several times that you can use common sense when
13 evaluating these patents, common sense.
14 Common sense tells you that these patents are on
15 02:35PM old technology. They do not mention machine learning, deep
16 learning, convolutional neural networks, neural networks,
17 none of that. To tell the public -- remember this is, uh,
18 the patent is like a contract with the public; right?
19 You get the patent because you published about your
20 02:35PM invention. You have to tell the world what your invention is
21 in your patent, and then you get the right to exclude others
22 on it for a period of time. That's the contract with the
23 government.
24 But in this case, let's see, the Patent Office had
25 02:35PM no information on LRAIL. And Dr. Mesher was asked:

UNITED STATES DISTRICT COURT

219

1 "Q. You've been a patentee many times. Do you
2 understand that the Patent Office did not have any
3 information about LRAIL when examining your two patents?
4 "A. Correct."
5 02:36PM The Patent Office didn't know. You all are the
6 first to decided whether these patents or invalid or obvious
7 in view of Pavemetrics' own work. That's for you to decide.
8 It was not decided by the Patent Office because they did not
9 know. They didn't have it. There is no dispute about that.
10 02:36PM And your jury instructions will even tell you that you can
11 consider the fact that the Patent Office did not have this
12 prior art when making your obviousness determination.
13 You also heard the file histories for the patents
14 being admitted this morning into evidence. And that is so
15 02:36PM you can look at those file histories and you can see there's
16 nothing about LRAIL or Pavemetrics in there.
17 Now, here is where Dr. Mesher admitted that
18 gradient neighborhoods are standard techniques.
19 "Q. I was just asking you if you recognize that
20 02:37PM using a 2D gradient methodology for moving around inside your
21 elevation map of sliding window in order to measure height
22 changes, gradients, is a fairly standard technique.
23 "A. Yes, course it is."
24 It's the Sobel filter, it's the Canny method.
25 02:37PM Dr. Hebert said it's one of the first things you learn when

UNITED STATES DISTRICT COURT

220

1 you do Computer Vision.
2 So all of the asserted claims in this case are
3 obvious in view of Pavemetrics' early work on the UML sale
4 and support that was provided and the UML-TRB2014 paper
5 02:37PM either alone, you do obviousness by looking at them alone, or
6 combining them with the EuroConsult paper that was, um, also
7 done on Pavemetrics' devices. And those invalidate Claims 1
8 and 21 of the '293 patent. And then also Claim 21 is also
9 invalid when you consider Gibert-Serra and, of course,
10 02:38PM Claim 8 is invalid as obvious as well.
11 Now, I also want to point out, and you can see this
12 in your jury instructions, the code, the source code for the
13 UML sale and support does not have to be public when it's
14 sold. It does not. So when that device was sold, you have
15 02:38PM to ask yourself what is out there? What was available? What
16 was created during that project? And remember, it doesn't
17 really matter because the algorithms were published. They're
18 in the presentations, they're in the meeting minutes.
19 So on your verdict form, we would ask that you
20 02:38PM check yes that Claims 1 and 2 (sic) and 21 of the '293 patent
21 are invalid and that Claim 8 of the '557 patent is invalid.
22 The crack detection that Pavemetrics did back then is very
23 similar to what they are accusing of infringes and, of
24 course, these patents would have been obvious in view of that
25 02:39PM work.

UNITED STATES DISTRICT COURT

**EXHIBIT 5**
**-234-**

221

1    Okay.  So let's talk about how Pavemetrics uses
2  artificial intelligence and not the patents.  Again, these
3  patents are not on artificial intelligence.  I know you now
4  that by now.  We asked Dr. Mesher.
02:39PM 5    "Q.  Can you show me anywhere in your patent where
6  it mentions any of these types of artificial intelligence
7  techniques?"
8    "A.  Uh, it doesn't exist.  It's not in the
9  patents."
02:39PM 10    "Q.  So isn't it simple to say that convolution
11  neural networks is not in your 2015?"
12    "A.  Yes, that's true."
13    But yet here they are trying to extend their patent
14  monopoly to cover, you heard it from their expert, all
02:39PM 15  convolution neural networks.  It doesn't matter if we use
16  DeepCNet which we don't.  Doesn't matter that we use
17  TensorFlow.  Doesn't matter which one we use, if it's a
18  convolutional neural network, all of these publicly available
19  by the way, uh, it doesn't matter.  It infringes in their
02:40PM 20  view.  That's it.
21    They are trying to keep the entire industry from
22  using AI so that they can be the only ones to use AI when
23  they didn't invent AI.  They didn't invent AI for a railroad.
24  They didn't invent the convolutional neural network.  And,
02:40PM 25  again, those neural networks are public.  Tetra Tech uses

222

1    YOLO, You Only Look Once made by DarkNet and Pavemetrics uses
2  TensorFlow from Google.  And you heard all about how
3  TensorFlow works from Dr. Frakes, a former Google programmer.
4    Now, let's talk about the expert.  Dr. Morellas did
02:41PM 5  not look once, he did not look at anything.  He didn't look
6  at Tetra Tech's neural network.  He didn't look at
7  Pavemetrics' neural network.  He didn't look at Pavemetrics'
8  configuration files.  He just didn't look.  He doesn't want
9  to look because he doesn't want to see what's there; right?
02:41PM 10    He wants to be very focused and pretend that we're
11  talking about Fake3D even though that's not in the code and
12  we're talking about Mixed Image even though that's a test
13  image, and, of course, you know, whatever we need to say that
14  appropriate means and does that's what we're gonna do so we
02:41PM 15  can say convolutional neural networks in French.
16    All right.  So there are many reasons why LRAIL
17  does not infringe Claims 1 and 21 of the '293 patent, but I'm
18  going to focus on four of those.  You heard Dr. Frakes
19  testify about these.  You heard Mr. Laurent testify about the
02:41PM 20  underlying facts and Dr. Hebert testify about the underlying
21  facts as well.
22    And so first, like I told you, LRAIL uses range
23  image not a Mixed Image.  It is set, you saw it, it's set to
24  the zero.  That is for range image.  That is their default
02:42PM 25  image.  It is what they use.  The Mixed Image was a test

223

1  image and it was never configured for a customer.  The
2  customers don't know about it.  It's a secret, hidden
3  parameter that is only known at Pavemetrics.
02:42PM 4    There's no, uh, spell check box to check.  There's
5  no -- no box for the customer to check.  I can't even believe
6  they even suggested that this is similar to showing up in
7  Microsoft Word and just clicking on spell check.  This is not
8  like that.  You would have to actually type in a hidden
9  parameter that would then tell the configuration file to
02:42PM 10  change that zero in the source code, to change it to another
11  number.  Fake3D not even in the relevant code.
12    Number two.  The LRAIL algorithm doesn't define an
13  appropriate gradient neighborhood and move it like a sliding
14  window.  There was a lot of reasons why it doesn't do this.
02:43PM 15  We have the stride.  The sliding window has to slide
16  completely.  So it's not sliding completely because we're
17  skipping every other group; right?  So not only does it skip
18  a pixel, it skipping a group of calculations there.
19    Now, I want to talk about number 3, sales of
02:43PM 20  disconnected components.  Actual devices.  You don't actually
21  look at just the device and say does this device infringe?
22  That's not the way infringement works.  You have to have acts
23  by people that are accused of infringing.  And in this case,
24  Tetra Tech selected those acts to be Pavemetrics offering for
02:43PM 25  sale or selling.

224

1    Those are the only acts they selected.  I don't
2  know why they did that.  Maybe they have good reasons for
3  doing that.  I'm not sure, but those are the acts that they
4  selected.  And so you would have to look at what was actually
02:44PM 5  offered for sale and what was actually sold.
6    There's no details in those offers with respect to
7  these claims.  The offer, the quote doesn't say oh, use a
8  gradient neighborhood and slide it over.  There's no details
9  like that.  That offer doesn't have any infringement in it.
02:44PM 10  You're just looking to the actual sale.  Same thing with the
11  invoice.  No details about these claim limitations.  So
12  you're looking to actually what was sold and what was sold is
13  in a box.  It just is.
14    And you know when you go to Ikea and you buy a box
02:44PM 15  that has a table in it that you have to put together, you
16  bought those components in there.  And you might go home and
17  you might put them together and maybe someone could accuse
18  you of infringing by making, but that -- the sale is not what
19  can infringe.  Even if later you hired Ikea to put it
02:45PM 20  together for you, the sale did not infringe.  Even if you
21  hired someone else to put it together for you, the sale does
22  not infringe.  We look at what was sold, what was delivered.
23    Now, Fake3D I've already talked about it.  It's a
24  track elevation in our view because it doesn't have elevation
02:45PM 25  data in it; right?  So you actually have to calculate

**EXHIBIT 5**
**-235-**

225

1  gradients.  You have to calculate gradients and you need

2  elevation data to do that.  That's what the claim says and

3  there's no elevation data to calculate gradients over it.

4        Now, whether you think it's a track elevation map

02:45PM 5  because it is built using intensity and range, okay, but it

6  still doesn't have the elevation data in it with which to

7  calculate the gradient or the differential vertical

8  measurements so there can be no infringement.

9        And Dr. Frakes laid out all of his opinions about

02:46PM 10  infringement.  You can see that he is clearly an expert in

11  this field, but not only in this field, he's an expert in

12  TensorFlow the actual neural network that Pavemetrics uses.

13  He lead about two dozen programmers at Google and he used

14  TensorFlow when he was at Google so he knows it well.

02:46PM 15        I for one am really happy that Dr. Frakes' football

16  career did not work out.  I'm glad that he went on to do so

17  much schooling and work at Apple and work at Google and be

18  able to share here with you why Pavemetrics does not

19  infringe.

02:46PM 20        We can actually look at the evidence here.  This is

21  the relevant code, Code 480.  And this is the one that shows

22  you the first zero.  That is the zero that's telling the

23  algorithm what to do.  So it's telling it to use a range

24  image.  That's the default.  That's how the code is written.

02:47PM 25        To change that you would actually have to go in

UNITED STATES DISTRICT COURT

226

1  there and rewrite that zero to be a different number or you'd

2  have to use a configuration file that tells it to rewrite the

3  zero to be a different number.  And you'd have to know, you'd

4  have to know that the test image is in there, and you'd

02:47PM 5  have to know how to write that configuration file.

6        There's no evidence that any customer knew anything

7  about Mixed Image.  No evidence that CSX knew about it.  In

8  fact, Brad Spencer, you heard from him.  He told you I don't

9  know how the software works.  It's a black box to me.  It's

02:47PM 10  magic.  That's what Pavemetrics does.  That's not what he

11  does at CSX so he doesn't know.  He knows nothing about Mixed

12  Image and there's no evidence that he does.

13        And if he doesn't know about it, he can't know how

14  to rewrite the code, he can't know how to change the

02:47PM 15  configuration file.  It's not a box.  This is not Microsoft

16  Word spell check.  Okay?  You would have to know.  You'd have

17  to have the code to change the configuration file.

18        And then top of that, you'd have to have the neural

19  network actually trained on that image; right?  It's a

02:48PM 20  different image.  It's not the range image.  It's a different

21  image, a Mixed Image.  And these neural networks that are

22  provided to the customers have been trained back in Canada by

23  the way, um, have been trained on range images.

24        That's what they're trained to recognize.  So it's

02:48PM 25  not going to recognize features in a Mixed Image.  So to do

UNITED STATES DISTRICT COURT

227

1  that, you'd have to train a whole neural network on a Mixed

2  Image.  And Pavemetrics has not done that and certainly

3  hasn't provided one to a customer.

4        Okay.  So this is the time line about the sales.

02:48PM 5  So we show in here that the sales were invoiced in

6  April 2021, and, of course, there was a quote before this.

7  Tetra Tech shows you that.  It doesn't change anything other

8  than it very clearly said that the software sold is licensed

9  only for the sensors that it is provided with.

02:49PM 10        Now, that hardware was shipped around August 2021

11  for Sales 2, 3 and 4.  And then it was installed the next

12  month on Sales 2 and 3.  And you heard testimony that Sale 4

13  wasn't even installed.  CSX wasn't ready to install it.  It

14  was having some supply problems with -- with a power supply

02:49PM 15  for its -- it's building a boxcar, um, so it's having supply

16  problems and it wasn't ready to do Sale 4.

17        So then a few months later, when it was ready for

18  Sales 2 and 3 to have the software, Pavemetrics provided

19  software and licensed it for Sales 2 and 3, Software 480.

02:49PM 20  That's the software that uses range in the neural network and

21  it has R and D Mixed Image in there that no customer has --

22  even knows how to access or knows is there.

23        Okay.  So, again, I'm showing you and reminding you

24  of the evidence that we walked through on Sale A to show that

02:50PM 25  the 10323 version of source code was sold with the 2020 sales

UNITED STATES DISTRICT COURT

228

1  that are before the notice letter in January.  So those sales

2  are not at issue in this case.  Sale A not at issue, not for

3  consideration.

4        And the reason Tetra Tech likes that version is

02:50PM 5  because that version had Fake3D as a backup option in it.  So

6  it has a range image and then it had the Fake3D.  And so they

7  want to pull that into the sales in '20 and '21 because they

8  want you to consider Fake3D, but Fake3D is not in the version

9  sold with Sales 2 and 3 in 2021 so it should not be

02:50PM 10  considered.

11        Again, Dr. Morellas, his entire presentation is on

12  10323, the version sold with Sale A in 2020.  No evidence

13  whatsoever that that version was ever licensed for Sales 2, 3

14  or 4 or ever used with Sales 2, 3 or 4 or even sold with

02:51PM 15  Sales 2, 3 and 4.  It was sold back in 2020.  It wasn't sold

16  again in 2021.

17        Now, Dr. Morellas, relied on the wrong neural

18  network.  He relied, instead of looking at our neural

19  network, and by the way, it was on a special computer at my

02:51PM 20  office.  He was welcome to come look at it any time he wanted

21  to.  Um, and he looked at a paper.  He looked at our paper on

22  our experimental development of artificial intelligence.  So

23  he looked at the Tokyo 2019 paper and said ah ha, you have

24  DeepCNet.

02:52PM 25        He still didn't tell us why DeepCNet infringes.

UNITED STATES DISTRICT COURT

**EXHIBIT 5**
**-236-**

229

1  other than, you know, in his view any convolutional neural

2  network would infringe these patents that have nothing to do

3  with AI because Tetra Tech is entitled to have their patents

4  be read as broadly as possible and cover the industry.

02:52PM  5       Okay.  Stride is equal to two.  I think you guys

6  know that means it skips pixels.  I won't talk about that any

7  more.

8       All right.  So what is the invention still?  What

9  is the invention?  If gradient neighborhoods are standard

02:52PM 10  techniques and, you know, there's only three choices for

11  images.  You're either using an intensity image, a range

12  image or one that combines them, what is the invention?

13       And they find their invention in the word

14  appropriate.  The gradient neighborhood has to be

02:52PM 15  appropriate.  And we heard from Dr. Morellas that that means

16  it needs to be flexible to encompass different sizes.  So we

17  are told, though, by Dr. Frakes that the TensorFlow

18  convolutional neural networks are not flexible.  They are

19  fixed.  So they do not meet even Dr. Morellas' definition of

02:53PM 20  appropriate gradient neighborhood.

21       Why do you think he added that requirement of

22  flexible?  Well, he thought it would be a way to distinguish

23  the prior art.  So he thought I'm going to say it's flexible

24  so then it won't be a Sobel filter and it won't be a Canny

02:53PM 25  method because those are fixed, too.  Instead, I'm gonna say

UNITED STATES DISTRICT COURT

230

1  it's flexible, but he didn't recognize how much Dr. Frakes

2  knew about TensorFlow and knew that is fixed also.

3       Okay.  This is the way it is.  I know it might seem

4  a little funny to you guys, but they are telling us that it's

02:54PM  5  the sale that is the act of infringement.  They chose that

6  act.  There's other acts that they could have chosen and they

7  chose sale and offer for sale.  And here what is sold is

8  sensors in a very special box.  They call it a carrying case

9  and there's no processor even in that box.

02:54PM 10       And these claims that by the way, Tetra Tech

11  controls that its claims say; right?  They wrote the claims.

12  So they wrote the claims to say that the sensor must be in

13  communication with the processor.  And when a patent attorney

02:54PM 15  writes a claim like that, they know it's going to take an

              actual assembled system to -- to meet that claim limitation

16  and something in a box is going to meet that claim

17  limitation.

18       So here we have sensors in a box not communicating

19  with anything, let alone a processor server.  And you can see

02:55PM 20  the left and the right sensor with no cable connected.

21  That's what their expert actually cited for his evidence as

22  meeting this claim limitation.  But we don't get to look down

23  the line.

24       You know, Mr. Barney makes fun of me for looking at

02:55PM 25  when the boxes shipped after the sale.  He wants to look at

UNITED STATES DISTRICT COURT

231

1  when the assembly happens way after that, months after that.

2  That's what he wants to look at and that is not what you look

3  at.  It's not an honorable argument.  You look at what was

4  sold and what was sold it what's in the box.

02:55PM  5       And I will tell you, too when the processor is

6  provided and you know in the case of CSX, there's no software

7  on it.  These claims require a processor configured to run an

8  algorithm.  The software has to actually be on the processor.

9  In this case at the time of the sale because that's the act

02:55PM 10  of infringement they picked and here was the effects.  You

11  know from our time line that the software was added two

12  months after CSX had the processors so there can be no direct

13  infringement.

14       And so we would ask that you check no for direct

02:56PM 15  infringement of Claim 1 and no for direct infringement of

16  Claim 21.  And there you can see it's right in the question.

17  Did Tetra Tech prove that Pavemetrics infringed by selling or

18  offering to sell?  They picked those acts of infringement not

19  us.

02:56PM 20       Okay.  I'd also like to talk about these

21  allegations indirect infringement so we're on Claim 8 of the

22  '557 patent.  That's the claim where they agree that

23  Pavemetrics doesn't actually perform that claim.  We don't

24  perform the method of crack detection; right?  Pavemetrics

02:56PM 25  isn't running the LRAIL.  And so what they've done in this

UNITED STATES DISTRICT COURT

232

1  case is they've said, well, AI does that.  And Pavemetrics

2  you are the one responsible for that because you've -- you've

3  sold them the LRAIL and you've told them to use it.

4       Well, in order to indirectly infringe a patent, and

02:57PM  5  you'll see this in your jury instructions and you heard it,

6  you have to actually believe that what your customer will do

7  is an infringement.  So you have to know about the patent and

8  I don't mean just the specifications.

9       There can be a lot of things disclosed in

02:57PM 10  specifications.  That's one way to get things to the public

11  is to disclose things in your specifications and not claim

12  them.  That happens all the time.  In this case what they did

13  is they kept a continuation pending and they got additional

14  claims on the same specifications in a later patent.  A

02:57PM 15  patent that did not issue until 2020 and a patent that they

16  did not tell us about until July of 2021.

17       So you have these attorneys writing to my client

18  Pavemetrics on January 5, 2021 and accusing them of

19  infringing the '293 patent, Tetra Tech's patents.  Tetra Tech

02:58PM 20  knows its patent portfolio.  It didn't raise any other

21  patents with Pavemetrics.  It only raised the '293 and it did

22  so after the sale to AID, by the way.

23       And then it wasn't until about six months later

24  that Tetra Tech raised the '557 patents after this lawsuit

02:58PM 25  was filed.  So by then they're not even allowed to talk to my

UNITED STATES DISTRICT COURT

**EXHIBIT 5**

**-237-**

233

1    clients.  They emailed us.  They emailed the attorneys in
2    July of 2021 and say you also -- we also believe you're
3    infringing the '557 patent.  And we, of course, immediately
4    responded to that in this lawsuit.
02:59PM  5         Mr. Habel testified that Pavemetrics was always
6    confident that they did not infringe those two patents and
7    you were here for that testimony.
8         Okay.  So Sale 1 to AID happened long before
9    Pavemetrics knew about these patents.  It was sold on
02:59PM 10   December 23rd, 2020.  No dispute about that.  The sensors
11   were shipped on January 4th, 2021.  That's the day before
12   Pavemetrics received the first threatening letter on
13   January 5th, and then the processor was shipped on
14   February 12th.  It wasn't until July of 2021 that Tetra Tech
02:59PM 15   sent a letter naming the '557 patent.
16        And the supposed use by AID that he showed you, the
17   date, I wrote it down, it was Slide 25.  That XML file was
18   dated April 13, 2021.  Well, before July 2021 and any notice
19   of these patents or any knowledge of these patents of the
03:00PM 20   '557 patent.  So we had to have knowledge of the patent which
21   we didn't have until July 2021 and then you have to actually
22   believe, subjectively believe that you infringe.
23        And it doesn't matter whether you were educated in
24   the patent or not.  It's about your subjective belief.  Just
03:00PM 25   so happens these guys are very technical, Mr. Laurent and Dr.

UNITED STATES DISTRICT COURT

234

1    Hebert, and they do understand the patents and they can tell
2    you why they don't infringe as they have done in this case.
3         So even if Pavemetrics had known about the '577
4    patent and even if they had subjectively believed that LRAIL
03:00PM  5    could infringe, using it could infringe, which they did not.
6    There is still no induced infringement because the use of
7    LRAIL doesn't infringe.
8         If you look at the claim in Claim 8, it requires a
9    whole bunch of inputs.  A lot of inputs that are not needed
03:01PM 10   to run that claim.  And we've pointed here to a few of those
11   that Pavemetrics does not use.  It does not input detected
12   tie bounding box data.  That has actually to be a box and
13   yeah, it's true the ties are kinda shaped -- are shaped like
14   a rectangular, but remember what Dr. Hebert said.
03:01PM 15        He said the ties they're inspecting aren't new.
16   Right?  They might have some ballast, some rocks on them,
17   they might have some shifting away so they're not exactly
18   rectangle.  So that's why Pavemetrics uses a map so they can
19   make sure they -- they encompass that entire, um, the entire
03:01PM 20   area of the rail.  If they limit it to a box, they would
21   probably miss some.
22        Okay.  No inputting the rail base edge feature
23   coordinates.  Dr. Frakes explained that.  He also explained
24   no comparing ties in the elevation data with a tie surface
03:01PM 25   plane model.  So any one of these reasons including that

UNITED STATES DISTRICT COURT

235

1    Pavemetrics did not believe it infringed Claim 8 results in a
2    no infringement verdict.  Check no on Question 2.
3         And finally, let's talk about what prompted this
4    dispute.  Well, we know, we know that Pavemetrics is a
03:02PM  5    problem in Tetra Tech's view.  This was October 2020, around
6    the time that Mr. Keyes decided to go and look for patents.
7    He received an email from Bill Larson who told him right
8    upfront, no uncertain terms that Pavemetrics is a problem.
9         And you heard Mr. Keyes testify that because
03:02PM 10   Pavemetrics, uh, because CSX purchased from Pavemetrics,
11   Tetra Tech's Business Unit didn't make its plan for that
12   quarter.  So he's annoyed that they did not make their plan
13   for that quarter.  And he's told here by Bill Larson why
14   Pavemetrics is a problem.  They're a low cost solution.  They
03:03PM 15   have conducted a successful trial with the FRA.  Pavemetrics
16   has done the work that Tetra Tech did not do.
17        And their other big problem was their development
18   deal with Canadian National.  Canadian National was paying
19   for that development and did not want their data released.
03:03PM 20   No photos, no data especially not to a competitor like CSX.
21   So Tetra Tech just did not have the proven data that it
22   needed to get the customer.
23        Well, you saw throughout that summer, Tetra Tech
24   was looking for information on Pavemetrics.  And here you
03:03PM 25   have Gary Keyes saying:

UNITED STATES DISTRICT COURT

236

1         "Q.  And hiring Bill Larson gave you access to more
2    information about CSX and Pavemetrics' LRAIL; correct?
3         "A.  Yes, I think he was able to, uh, provide
4    insights with respect to CSX's understanding of the
03:04PM  5    marketplace."
6         He wanted insights so he hired Bill Larson and he
7    started collecting information on Pavemetrics.
8         Now, this is Rob Olenoski.  Remember, he's the
9    Tetra Tech consultant that requested a quote from Pavemetrics
03:04PM 10   for an LRAIL.  Remember, Tetra Tech was the long-time
11   customer of Pavemetrics on road inspection and here they are
12   asking about rail inspection so Pavemetrics is excited.
13   Here's like another customer.  And so they sent them a quote.
14   They let them come look at their unit.
03:04PM 15        And here we have the email and I love this email.
16   It's one of my favorite emails in the case, Exhibit 189
17   because it gives us so much information in the very first
18   sentence he some questions.  I see the software will only
19   work with the sensors that come with the unit.  That's
03:04PM 20   exactly our point here on noninfringement; right?
21        So the 10323 software that only works with the
22   sensors it was sold with in 2020 Sale A, not gonna work with
23   Sales 2, 3, 4.  Not available like they're saying in this
24   case and Tetra Tech knew it back in June of 2020.
03:05PM 25        Number two, if Tetra Tech needed multiple systems,

UNITED STATES DISTRICT COURT

**EXHIBIT 5**
**-238-**

237

1   would Pavemetrics do anything for a discount?  Right?  Like
2   music to John's ears, music to Mr. Laurent's ears.  They want
3   to buy multiple systems.  I hope he was really wanting to buy
4   multiple systems and wasn't just digging up whatever discount
03:05PM 5   Pavemetrics was offering CSX for the five systems it was
6   buying.  I'm not sure, but I will maybe give them the benefit
7   of the doubt here.
8          Mr. Laurent, viewing them as a customer, says of
9   course, come on over and so they showed up.  Rob Olenoski
03:06PM 10   showed up to see LRAIL the day it was delivered to CSX.  And
11   he took photos of it and he sent those photos to Gary Keyes
12   in the corporate office.
13          Why did he send, I think it was about five and six
14   emails you heard in his deposition?  He sent the quote, he
03:06PM 15   sent the photos, he sent every single piece of information he
16   had about Pavemetrics to Gary Keyes in the head office.  And
17   we asked him why he did that and he said for informational
18   purposes.  And that's all he said over and over again for
19   informational purposes.
03:06PM 20          Tetra Tech was collecting information on
21   Pavemetrics and it didn't stop.  You know, we keep asking why
22   we're here.  We're here today on three sales to CSX.  Is that
23   really why you're being taken away from your friends and
24   family for three sales, damages on three sales even if they
03:07PM 25   were infringement?  I'm not so sure that's why we're here.

238

1          Even after the lawsuit was filed, Tetra Tech is
2   collecting information on Pavemetrics.  It gets a lot of the
3   information through discovery in this case and it sought to
4   depose the customers.  It sent subpoenas to its customers, to
03:07PM 5   Pavemetrics' customers.  It subpoenaed CSX.  CSX tried to
6   fight that subpoena unsuccessfully and they were subpoenaed
7   to testify.
8          This is not a way to win friends and influence
9   people.  Tetra Tech still talks about getting CSX's business
03:07PM 10   after the subpoening CSX in this case to testify.  They also
11   subpoenaed AID.  They even tried to depose the potential
12   acquirer of Pavemetrics.  They filed one motion to compel in
13   this case and it was to find out the name --
14          THE COURT:  Counsel, counsel, counsel.  Side bar,
03:08PM 15   please.
16          (Following proceedings were held at side bar:)
17          THE COURT:  Can you tell me why we're talking about
18   discovery and these subpoenas being sent to other parties?
19   That's not evidence in this case.  It goes against everything
03:08PM 20   we talked about in the motions in limine.  I don't want to
21   talk about litigation proceedings.  It's completely improper.
22   I was trying to not object during your closing, but at some
23   point it gets ridiculous.
24          The other thing is the fact that you have code that
03:08PM 25   expert didn't review, that's violating one of the things we

239

1   talked about in the motion in liminae.  This whole thing
2   about the subpoenas to customers, Mr. Barney, do you have
3   anything to add?
4          MR. BARNEY:  I also feel same way, but I was taught
03:09PM 5   the last thing you should do is object during closing.
6          THE COURT:  I can do curative instruction or not
7   say anything about it.  I'll leave it up to you.
8          MR. BARNEY:  I would appreciate a curative
9   instruction.
03:09PM 10          THE COURT:  This isn't that case.
11          What about the expert's review of this source code?
12   I can do the same thing with that and say counsel mentioned
13   source code that's not in evidence.
14          MR. BARNEY:  That would be appropriate was well.
03:09PM 15          THE COURT:  Okay.
16          (Side bar concluded.)
17          THE COURT:  Please proceed.
18          MS. LEA:  Okay.  So in the case of the three sales
19   with CSX, you heard Brad Spencer tell you that Tetra Tech is
03:10PM 20   just too expensive.  They had three proposals in the range of
21   $4 to $5 million and Pavemetrics was $350,000.  Brad Spencer
22   was buying five of these and that $25 million was too much.
23   He didn't have the budget.  Even if he wanted to do it, he
24   couldn't have bought it.
03:10PM 25          They could not -- Tetra Tech could never have made

240

1   the sale to Tetra Tech regardless of Pavemetrics and whether
2   it was practicing their patents or not.
3          Now, we saw this slide already.  Pavemetrics always
4   believed that it did not infringe these patents.  It was very
03:10PM 5   careful about these patents.  Immediately responded to, uh,
6   Mr. Parker's letter.  You heard Mr. Habel testify about that.
7   He always responded in the time set by Mr. Parker.  He
8   immediately hired counsel and filed this lawsuit.  I believe
9   they said it was within 11 days of the letter.
03:10PM 10          Now, Pavemetrics brought this lawsuit to stop the
11   bullying.  Here we have an email from Mr. Habel to at the a
12   potential acquirer.  This is in May 2021 and he's updating a
13   potential acquirer on the lawsuit and he's telling them that
14   they received letters of intimidation from Tetra Tech such as
03:11PM 15   the one and he attached the letter.
16          He wanted the acquirer to know that he was
17   receiving the threatening letters.  And then he told them
18   that we brought a lawsuit.  We brought a lawsuit to get a
19   determination that we do not infringe.
03:11PM 20          Who would bring a lawsuit to get a determination, a
21   declaratory judgment that they do not infringe if they
22   thought they infringed?  He believed he did not infringe.
23   That negates indirect infringement and it negates their
24   willfulness allegations.  No one at Pavemetrics was trying to
03:11PM 25   willfully infringe anyone's patents.  They always believed

EXHIBIT 5
-239-

241

1  they did not infringe these patents and they invested in this
2  lawsuit, brought this lawsuit to get a determination from
3  you.
4          Okay.  Now, this is another letter.  So, of course,
03:12PM 5  CSX has attorneys and CSX inquired about the lawsuit.  So
6  Pavemetrics wrote to CSX and -- and expressed that we filed a
7  lawsuit to show that the patents are not infringed.  To show
8  that the infringement is without merit.
9          Pavemetrics decided to stand up to the bully.  It
03:12PM 10  decided not to back down.  They wanted to show it does not
11  infringe and that these patents are invalid.  And, of course,
12  it said to CSX's lawyer, you're welcome to call our
13  attorneys.  You're welcome to call our attorneys and get any
14  details about the case that you would like because they
03:12PM 15  believed in their case.
16          So I would ask you to please rule in Pavemetrics'
17  favor.  These patents are not infringed by Pavemetrics' sale
18  and they are invalid in view of Pavemetrics' early work.
19          I want to thank you all very much.  And I want to
03:13PM 20  ask you, Mr. Barney gets to go again and I do not.  So when
21  he talks today for a few more minutes, think about what I
22  would say in response.  Think about what our witnesses
23  testified to.  When you're in the jury room, think about what
24  would Ms. Lea say if she were here.  What evidence would she
03:13PM 25  show us?  What testimony would she point out?

UNITED STATES DISTRICT COURT

242

1          I know you'll do the right thing.  I appreciate
2  your time.  Thank you very much.
3          THE COURT:  Now, Mr. Barney will come up and give a
4  rebuttal argument.
03:13PM 5          I just wanted to clarify a couple things, um, that
6  came up in the closing argument.  There was some talk about
7  this case is not about the three sales, it's about something
8  else.  This case is about the three sales.  You're here to
9  decide infringement based on the sales that were made.  All
03:14PM 10  these, um, other things that counsel spoke about are not part
11  of this case and not relevant to your determination of
12  infringement.  You're to follow the law and the facts.
13          There was mention of subpoenas that went to other
14  people.  That's got nothing to do with this case.  It's kind
03:14PM 15  of improper to bring out that sort of thing in closing
16  argument.
17          Um, the other thing is there was some illusion to
18  the fact that Ms. Lea had software code in her office that
19  could have been reviewed.  That's not in evidence either.
03:14PM 20  That's not really relevant to what we're talking about here.
21          Mr. Barney, you can do your rebuttal argument.
22          MR. BARNEY:  Hello, again, ladies and gentlemen.
23  I'm gonna keep this brief cause I know you're all eager to
24  get started with your deliberations.  So I want to respond to
03:14PM 25  the validity issues that Ms. Lea talked about.

UNITED STATES DISTRICT COURT

243

1          And if I could please start with Slide 42.
2          You're gonna have these questions in your verdict
3  form and these go to the question of whether or not
4  Pavemetrics has proved by clear and convincing evidence that
03:15PM 5  these various allegations that they've made render our
6  patents invalid.  And remember what they're asking you to
7  decide.
8          They want you to decide that the Patent Office made
9  a mistake.  After all of that examination by the expert
03:15PM 10  patent examiner that you saw on that patent video, they would
11  like you now to revoke those patents or at least the claims
12  of the patents based on their allegations of obviousness.
13          Remember their burden of proof is much higher than
14  what we have on infringement.  You're gonna see that in your
03:15PM 15  jury instruction.  It's called clear and convincing evidence.
16  You have to be left with an abiding conviction that what
17  they're saying is correct and that these patents are invalid.
18          Now, if you've had hard time following their
19  invalidity arguments, you're not alone and it's not your
03:15PM 20  fault.  I'd like to address a couple just problems with their
21  invalidity case at a high level.
22          If I could have the next slide, please.  The first
23  thing you need to look to in your jury instructions is what
24  is the definition of prior art.  You don't need to guess
03:16PM 25  about it.  You don't need to take my word for it or Ms. Lea's

UNITED STATES DISTRICT COURT

244

1  word for it or anybody else's other than the Judge.
2          The Judge has told you what prior art is and when
3  you're alleging that a public use is a prior art, that's
4  something that can invalidate a patent, there's a specific
03:16PM 5  test you have to pass.  An invention was publicly used when
6  it was either accessible to the public or commercially
7  exploited.  That's what public use is.
8          Now, there's another definition for an offer for
9  sale that says it was either offered for sale -- excuse me.
03:16PM 10  It was offered for sale and what was offered was ready to be
11  patented.  That means everything was put together in one
12  package at the time of the sale and if they wanted to, they
13  could have submitted that to the Patent Office and actually
14  gotten the patent on it.  So keep those two standards in mind
03:16PM 15  when you take a look at what they're asserting as their
16  obviousness combinations.
17          Next slide, please.  So what they call the UML sale
18  and support is actually a collection of documents and that's
19  fine they're allowed to do that.  They're allowed to take a
03:17PM 20  collection of documents and say this is the evidence we're
21  providing to you to show public use.  And so two of those
22  documents are fine.  There's nothing wrong with them relying
23  on an invoice.  That's perfectly fine.  There's nothing wrong
24  with them relying on a user manual.  That's perfectly fine.
03:17PM 25          But they're also trying to rely on these two

UNITED STATES DISTRICT COURT

**EXHIBIT 5**
**-240-**

245

1   snippets of source code.  That was source code that was on
2   somebody's computer at some time.  Um, one of them's undated.
3   The one on the right is completely undated so we actually
4   don't know when it existed.  The one on the left has a date
03:17PM 5   of May 9, 2014.  But these source code snippets are really
6   important to their public use case because without the source
7   code snippets, all you have is sensors.
8        All they sold to the University of Massachusetts
9   were their old sensors.  These are just basic sensors that
03:17PM 10  don't practice the claimed invention.  And so they're really
11  relying a lot on these snippets of source code.  The problem
12  is there is no evidence, none, that that source code was
13  actually delivered to the University of Massachusetts Lowell,
14  was actually put into a system for rail inspection and was
03:18PM 15  actually sent out on a railroad track and put in public use.
16        Remember the jury instruction we just looked at.
17  There's got to be a public use.  There has to be a public
18  use.  Now, we know these source code snippets weren't made
19  public.  All the witnesses said that.  So this is not an
03:18PM 20  issue where the source code got published and was therefore
21  available to the public.
22        They're relying on public use and do that they have
23  to come in with some sort of documentation that these source
24  code snippets actually made their way to the University of
03:18PM 25  Massachusetts, actually got loaded into a rail inspection,

246

1   actually got put on a railroad track and actually got put in
2   public use that the public could have access to.  They just
3   didn't do it.
4        Dr. Hebert's the one that came the closest.  He
03:18PM 5   suggested well, I might have had some emails back in my
6   office that might have had something to do with this, but
7   they didn't put them in evidence.  You remember that?  He was
8   asked, well, are they in evidence?  Where are they?  He said,
9   no, they're not in evidence.
03:19PM 10        And so ladies and gentlemen, all you have before is
11  the documents they put in evidence.  And so I would encourage
12  you when you go back to the jury room and you start talking
13  about invalidity, maybe the first thing you should do is just
14  look to see if you can find any evidence, anything at all,
03:19PM 15  any document that shows that that source code was actually in
16  public use; put into a system, put on railroad tracks and put
17  in public use.  But don't spend too much time cause I can
18  guarantee you, you're not gonna find anything.
19        The next slide, please.  So these are not prior
03:19PM 20  art.  Now, even if you do assume that these are prior art for
21  the sake of argument, their combination has another problem.
22  And that is when you combine them together, if I could have
23  the next slide, they can't find everything they need in just
24  those four documents and that's why their expert, Dr. Frakes,
03:19PM 25  he keeps adding more and more documents.  And by the time he

247

1   gets to Claim 21, he's up to six documents.
2        His idea is that a person of ordinary skill in the
3   art sitting there was going to find it obvious to reach out
4   to six different documents, including confidential source
03:20PM 5   code and put them all together into one sort of a pot and
6   stir it together and come up with our invention.  They're
7   allowed to argue that.  They're allowed to argue that.  It's
8   just you have to ask yourself is that really likely.  And
9   remember their burden of proof, clear and convincing
03:20PM 10  evidence.  It's a very high burden.  So that's another
11  problem with their arguments.
12        The even bigger problem is on the next slide.  The
13  even bigger problem is even if you were to combine all those
14  things together, as Dr. Morellas explained, the source code
03:20PM 15  and those documentations that they're relying on for their
16  public use didn't include the track generation limitation
17  didn't include, uh, identifying a feature based on the track
18  elevation map.
19        So even if you were to combine all that stuff
03:20PM 20  together and even if it were actually prior art which it's
21  not, you still don't have the features and so it still
22  wouldn't render it obvious.  That's another problem with
23  their, um, their obviousness argument.
24        And since Ms. Lea did bring up Claim 8 of the '557
03:21PM 25  patent.  And I'll just mention to you, you may remember this

248

1   or you may not because it went by so quickly that the only
2   thing Dr. Frakes said about Claim 8 of the '557 patent, he
3   was asked one question about it.  Sir, is the patent invalid?
4   Yes.  Cause they were in a hurry at that time and they were
03:21PM 5   running out of time to put their evidence in.  That's it.
6   That's their invalidity case on Claim 8 of the '557 patent.
7        Nevertheless, just to close the loop on it and make
8   sure nobody makes a mistake or misremembers, the other
9   problem with their, uh, argument on Claim 8 of the '557
03:21PM 10  patent is the prior art that they're relying on which is
11  those four references that make up the prior use, even their
12  own expert Dr. Frakes admitted that that doesn't do removal
13  of rail head.
14        He said it right there on one of his
03:21PM 15  demonstratives, the UML system could extract the rail head
16  creating an image with only the rail head.  Well, ladies and
17  gentlemen, that's the opposite.  That's opposite of removing
18  a rail head, and he's just asking you to take his word for it
19  that it would have been obvious for somebody to do the
03:22PM 20  opposite of that.
21        He didn't show you one scrap of paper anywhere in
22  the prior art where anybody ever did that.  And in fact,
23  there is no evidence that anybody ever did that before
24  Dr. Mesher.  So that's another big problem with their
03:22PM 25  invalidity case.

**EXHIBIT 5**
**-241-**

249

1        And the last thing I'll say is you have to apply
2  common sense.  You have to ask yourself before you -- before
3  you overrule the Patent Office so to speak, you have to ask
4  yourself does this make common sense?  If this were so
03:22PM 5  obvious that a person would sit there back in 2015 and reach
6  out and grab five or six references and put them together to
7  arrive at the claimed invention, why didn't Pavemetrics do
8  it?  I mean, gosh, why didn't they do it?
9        And if you look at the time line, you start to see
03:22PM 10  another big problem with their case.  So they made their
11  first sale, it wasn't really an LRAIL by the way.  All they
12  did was sell their sensors to University of Massachusetts.
13  These are just the same sensors that are used for inspecting
14  roads.  It wasn't actually an LRAIL at that time.  So they
03:23PM 15  made their sale of sensors in 2012 for use in research on
16  rail systems.
17        And then they didn't make another sale all the way
18  until 2020.  And it is true that what Ms. Lea said that there
19  was a GREX litigation going on, and so that certainly could
03:23PM 20  have been part of the reason they weren't making sales.  I'm
21  not doubting her about that, but take a look at what they
22  were saying internally during that time period and ask
23  yourself was it really obvious to them to reach out and grab
24  those five or six references and come up with our invention?
03:23PM 25        In 2014 they were sitting around, this was after

UNITED STATES DISTRICT COURT

250

1  the University of Massachusetts' research, and they were
2  sitting telling themselves internally we don't yet have all
3  the algorithms for automated distress analysis.  They didn't
4  have them.  It wasn't obvious at that time.
03:23PM 5        THE COURT:  Counsel, you've got 30 seconds.
6        MR. BARNEY:  You can trust me it would have been a
7  great slide, but that's what happens in litigation, you run
8  out of time.
9        Ladies and gentlemen, it's been an honor to present
03:23PM 10  to you.  In your verdict form, the other piece of information
11  you're gonna have is the damages.  And just remember our
12  damages expert was the only one who actually put a number on
13  there.
14        His number was, for lost profits, uh, it was
03:24PM 15  $3,357,000 in lost profits and $250,000 for a reasonable
16  royalty.  That is the only number anybody presented in this
17  case for appropriate damages and we ask that that be the
18  damages you award.
19        Thank you, again, ladies and gentlemen.
03:24PM 20        It's been an honor.
21        THE COURT:  Thank you, Counsel.
22        Okay.  Now you are free to deliberate.  We're going
23  to have the bailiff come and be sworn in.  He's gonna be your
24  bodyguard here while you're deliberating on the case and make
03:24PM 25  sure no one talks to you and tries to exert any undue

UNITED STATES DISTRICT COURT

251

1  influence over the jury.
2        THE CLERK:  Please raise your right hand.
3        (Bailiff sworn.)
4        THE CLERK:  Please state your name for the record.
03:25PM 5        THE BAILIFF:  Gary Bolin B-o-l-i-n.
6        (Jury not present.)
7        THE COURT:  So I don't know how long the jury will
8  go today, but my typical practice is to allow them to stay as
9  long as they want.  So if they decide they're gonna stay
03:25PM 10  late, um, we're gonna stick around and let them deliberate.
11  At some point, you know, we'll call it if it gets too late
12  and it looks like they're not going to come back today.
13        If they don't come back, we'll start back up
14  tomorrow at 9:00.  So what I would say if you could stay
03:26PM 15  within reach of the courtroom deputy this afternoon in case
16  we get questions and things.  Just make sure if you're not in
17  the courtroom, we know how to get you back here in a few
18  minutes just so we don't need to keep them waiting.
19        Tomorrow, same thing.  Try to be within five
03:26PM 20  minutes cause if we get a note and it takes, you know, a half
21  hour for a party to come, it really drags out the process for
22  them.
23        Okay.  We'll wait to see if we hear from the jury.
24  Thank you.
03:26PM 25        I'm sorry.  You've got to go over the exhibits with

UNITED STATES DISTRICT COURT

252

1  the courtroom deputy and make sure he sends the right stuff
2  back there.
3        THE CLERK:  We are in recess.
4        (Jury deliberates.)
04:59PM 5        THE COURT:  So we have a note from the jurors.  Um,
6  they have reached a verdict.  So we'll get them in here and
7  see what they have to say.
8        Anything we need to discuss before that?
9        MS. LEA:  No, Your Honor.
04:59PM 10        MR. BARNEY:  No, Your Honor.
11        THE COURT:  Okay.  Let's get the jury in.
12        (Jury present.)
13        THE COURT:  Welcome back to the jurors.  Thanks
14  again for all your hard work.  I understand the jury has
05:02PM 15  reached a verdict.  I'll ask the jury foreperson to please
16  pass the verdict up to the courtroom deputy.
17        I'll ask the courtroom deputy to please read the
18  verdict.
19        United States District Court.
05:03PM 20        Central District of California.
21        Pavemetrics Systems, Inc. versus Tetra Tech, Inc.
22        Case No. CV 21-1289.
23        Verdict form.
24        Jury verdict.
05:03PM 25        We the jury unanimously agree to the answers to the

UNITED STATES DISTRICT COURT

EXHIBIT 5
-242-

253

1 following questions and return them under the instructions of
2 this court as our verdict in this case.
3     Findings of Infringement Claim.
4     A-1. Did Tetra Tech prove by a preponderance of
05:04PM 5 the evidence that Pavemetrics directly infringed any of the
6 following claims of the '293 patent by selling or offering in
7 the United States to CSX the laser rail inspection system
8 LRAIL Claim No. 1 as to the '293 patent?
9     No.
05:04PM 10     A-2. Claim 21 of the '293 patent?
11     No.
12     B. Induced Infringement.
13     2. Did Tetra Tech prove by a preponderance of the
14 evidence that Pavemetrics induced AID to infringe Claim 8 of
05:04PM 15 the '557 patent?
16     No.
17     Finding of Invalidity Defenses.
18     A. The '293 patent.
19     4. Did Pavemetrics prove by clear and convincing
05:05PM 20 evidence that the following claims of the '293 patent would
21 have been obvious to a person of ordinary skill in the art
22 and view of Pavemetrics' UML sale and support and/or
23 UML-TRB2014 either alone or in combination EC-TRB2014.
24     Claim 1 of the '293 patent?
05:05PM 25     Yes.

UNITED STATES DISTRICT COURT

254

1     Claim 21 of the '293 patent?
2     Yes.
3     5. Did Pavemetrics prove by clear and convincing
4 evidence that Claim 21 of the '293 patent would have been
05:05PM 5 obvious to a person of ordinary skill in the art in view of
6 Pavemetrics' UML sale and support and/or UML-TRB2014 in
7 combination with EC-TRB2014 and Gibert-Serra?
8     Yes.
9     B. The '557 patent.
05:06PM 10     6. Did Pavemetrics prove by clear and convincing
11 evidence that Claim 8 of the '557 patent would have been
12 obvious to a person of ordinary skill in the art in view of
13 Pavemetrics' UML sale and support and/or UML-TRB2014?
14     Yes.
05:06PM 15     Dated August 24, 2022 and signed by the juror.
16     THE COURT: Thank you.
17     Thank you to the jurors. I appreciate your hard
18 work in the case. Thank you for helping us with this
19 process. The parties certainly appreciate all of your hard
05:06PM 20 work. I'm gonna talk to the parties for just a minute or
21 two, but sometimes they like to talk to the jurors after the
22 case to see if you've got any information that you can convey
23 to them about your deliberation process. If you want to talk
24 to the lawyers, um, they'll typically be outside the
05:07PM 25 courtroom here and they'd probably like to talk with you. If

UNITED STATES DISTRICT COURT

255

1 not, you're perfectly free to go. They won't chase after you
2 or anything so it's completely up to you.
3     With that I will thank the jury. You are excused.
4     (Jury excused.)
05:07PM 5     THE COURT: Just briefly what are the parties'
6 thoughts on a schedule for post-trial motions?
7     MR. BARNEY: Well, what is your normal practice,
8 Your Honor?
9     THE COURT: I'd like to give you enough time, but
05:08PM 10 can we do it in two weeks?
11     MR. BARNEY: I think that might, uh, that's a
12 little tight, but I think we can get that done, Your Honor.
13     THE COURT: We could do it in three if you need
14 more time. Do you want three weeks?
05:08PM 15     MR. BARNEY: Three might be a little better.
16     THE COURT: Okay. So we'll say post-trial motions
17 will be due in three weeks and then I'll ask the plaintiffs
18 for a proposed judgment to be filed.
19     MR. RE: Pardon me?
05:08PM 20     THE COURT: I'll ask you to submit a proposed
21 judgment.
22     MR. RE: Oh yes, Your Honor.
23     THE COURT: I'll let you go for now. You probably
24 want to talk to the jurors. Thanks.
05:08PM 25     THE CLERK: This court is adjourned.

UNITED STATES DISTRICT COURT

256

1     (Proceedings were concluded at 5:08 p.m.)
2
3     CERTIFICATE OF REPORTER
4
5 COUNTY OF LOS ANGELES   )
6     ) SS.
7 STATE OF CALIFORNIA   )
8
9 I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED
10 STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,
11 DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE
12 FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET
13 FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN
14 FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO
15 FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION
16 OF MY STENOGRAPHIC NOTES.
17
18
19 DATE:  AUGUST 27, 2022_____
20
21    /s/ LAURA MILLER ELIAS___
22 LAURA MILLER ELIAS, CSR 10019
23 FEDERAL OFFICIAL COURT REPORTER
24
25

UNITED STATES DISTRICT COURT

**EXHIBIT 5**
**-243-**