## GOODS AGREEMENT

**THIS GOODS AGREEMENT** (this "Agreement") is made as of this 15th day of March, 2021, (the "Effective Date") by and between **CSX TRANSPORTATION, INC**. ("Purchaser" or "CSXT"), a Virginia corporation with offices located at 500 Water Street, Jacksonville, FL 32202, and **PAVEMETRICS SYSTEMS INC**. ("Seller" or "Supplier"), a Canadian corporation with offices located at 150, boul. Rene-Levesque Est., Suite 1820 Quebec, Quebec G1R 5B1 Canada.

### W I T N E S S E T H :

**WHEREAS**, Purchaser wishes to purchase three (3) LRAIL Inspection Systems and additional support from Seller; and

**WHEREAS**, Seller is willing to sell such three (3) LRAIL Inspection Systems and additional support to Purchaser;

**NOW, THEREFORE**, in consideration of the covenants, conditions and payments hereinafter set forth, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.   <u>Price, Quantity, Shipping Instructions, and Payment Terms</u>.  Seller will sell to Purchaser three (3) LRAIL Inspection Systems and additional support (hereinafter the "Goods") per CSXT Quotation dates February 16, 2021 which is incorporated herein and made a part hereof, pursuant to the terms of this Agreement and the price, payment, delivery, and other terms set forth in the Appendix attached hereto and made a part hereof (the "Appendix").  Seller expressly warrants that throughout the Term of this Agreement, the price that Seller charges Purchaser for the Goods shall be no higher than the lowest price that Seller or any of its direct or indirect subsidiaries, parents, or affiliates offers or charges at that time to any other actual or prospective purchaser of substantially similar types and quantities of Goods. Seller further agrees that upon CSXT's request, Seller will provide the same pricing for the Goods contracted hereunder (the "Agreement Price") to any and all CSXT distributors or CSXT suppliers, with respect to Goods to ultimately be purchased by CSXT or its parent, subsidiaries or affiliates from such distributors, unless Seller objects in writing within fifteen (15) days following any such request on the basis that such CSXT distributor or supplier is a direct competitor of Seller concerning the Goods referenced herein. Such Agreement Price will be in effect for as long as CSXT receives the pricing referenced herein, with any modifications or changes in the agreed to pricing, to be reflected in the Agreement Price offered to a CSXT distributor or supplier.  Notwithstanding the foregoing, Seller agrees that CSXT and such third parties are independent entities and that with the exception of aggregating purchase volumes for purposes of calculating any volume discounts for direct or indirect CSXT purchases of the Goods (a) Seller shall deal with each such party independently, and (b) CSXT is not a guarantor or surety for any such third party and is not responsible in any way for any actions or inactions of such third parties, including, without limitation, any disputes for non-payment which may arise between Seller and any such third party. Nothing contained in this Agreement shall be construed as a commitment by Purchaser to purchase any Goods, or minimum quantity thereof, from Seller.

2.   <u>Term</u>.  The term of this Agreement shall begin on the Effective Date, and shall end on 31 December 2021 (the "Term") unless earlier terminated in accordance with this Agreement.

3.   <u>Drawings and Specifications</u>.  Copies of all mechanical and general arrangement drawings and changes to specifications are to be submitted **to Brad Spencer/Director Track Testing/500 Water Street, Jacksonville, Florida, 32202**, for approval.  Notwithstanding restrictive legends or invoice terms to the contrary, title to plans, drawings and specifications furnished by Seller to Purchaser with respect to the Goods shall be vested in and remain with Purchaser and may be used by Purchaser for any purpose.

4.   <u>Title and Risk of Loss</u>.  Title to and risk of loss of all Goods furnished hereunder shall remain with Seller until receipt, inspection, and acceptance of the Goods by Purchaser.  Seller warrants that it

Case
Pavemetrics v. Tetra Tech
Case No: 2:21-cv-1289 MCS
**Trial Exhibit**
**844**

RESTRICTED - ATTORNEYS' EYES ONLY

PAVEMETRICS0015587

**EXHIBIT 844**
-411-

has clear title to the Goods and that there is no outstanding hostile claim against or security interest in the Goods held by a third party.

5.   <u>Non-Disclosure</u>.

    (a)   All information, including but not limited to, financial statements, product information, manufacturing capabilities, passwords, documents, data and business records, which is disclosed to Seller by Purchaser or which Seller observes or comes into contact with during the Term of this Agreement or the provision of any services to Purchaser, whether generated by Purchaser or a customer or contractor of Purchaser, shall be deemed "Confidential Information" and the sole and exclusive property of Purchaser.  Seller shall take all reasonable measures to maintain the confidentiality of said Confidential Information by its employees, agents, representatives and couriers.   Seller shall not use the Confidential Information for any purposes other than to perform its obligations hereunder and shall not disclose any Confidential Information to any third party without the prior written consent of Purchaser.  Seller acknowledges that all right, title, and interest in and to said Confidential Information, including the right to produce, extract, or exhibit said Confidential Information to any third party and any intellectual property rights relating to said Confidential Information, exist in Purchaser only. Seller shall return such Confidential Information promptly upon the expiration or termination of this Agreement.  Notwithstanding any language contained herein to the contrary, Purchaser (and each employee, representative, or other agent of Purchaser) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of this transaction and all materials of any kind (including opinions or other tax analyses) that are provided to Purchaser relating to such treatment and tax structure.  In addition, Purchaser may disclose this Agreement, and any information pertaining to or arising from this Agreement and the performance thereof, to Purchaser's insurers, auditors and related personnel.

    (b)   Seller shall ensure that its employees, agents and contractors comply with the terms of this Section 5 and shall be fully responsible for any breach hereof by such employees, agents and contractors.

    (c)   In the event that Seller is required by law to disclose any Confidential Information, Seller shall promptly notify Purchaser, consult with Purchaser regarding whether there are legitimate grounds to narrow or contest such disclosure and only disclose that information that the Seller, in the opinion of counsel, is legally obligated to disclose.

    (d)   Seller expressly agrees that Purchaser shall be entitled to injunctive and/or other equitable relief in any court of competent jurisdiction to prevent or otherwise restrain a breach of this Section, provided that the foregoing shall not preclude Purchaser from seeking any and all legal and equitable relief to which Purchaser may be entitled as a result of any unauthorized disclosure by Seller.  Purchaser shall not have to post bond in connection with any such injunctive relief.

6.   <u>Inspection and Acceptance</u>.  Without waiver of any express or implied warranties, Purchaser may, at its option, inspect a sample of the Goods at Seller's facilities before full production and report any defects or deficiencies to Seller. Purchaser may, at its option and in lieu of or in addition to the foregoing, inspect each separate lot of the Goods at Seller's facilities upon completion of production of such lot of Goods in order to determine whether to accept such lot, and report any defects or deficiencies found at that time to Seller.    In the event that any of the Goods do not meet the required standards, Purchaser reserves the right, in its sole discretion, to reject the unacceptable Goods, without invalidating the entire order, or to cancel the entire order.  In the event that Purchaser cancels all or a portion of a given order, Seller shall immediately refund to Purchaser any and all funds paid to Seller in consideration of such rejected Goods. In the event that Purchaser accepts Goods based on inspection at Seller's facilities, but after delivery determines that some or all are defective, Section 8 below will apply.

Page 2 of 30

PAVEMETRICS0015588

EXHIBIT 844
-412-

7.   <u>Warranties</u>.   Notwithstanding any limitations to the contrary in Seller's invoice and/or sales documentation, Seller expressly covenants, represents and warrants that:

(a)   all Goods will conform to the requirements and specifications set forth in or attached to the Appendix and any other applicable plans, drawings, specifications or samples furnished by Purchaser, or furnished by Seller and approved and accepted by Purchaser, it being understood that such plans, drawings, specifications or samples, are incorporated by reference and made a part hereof;

(b)   all Goods will be of merchantable quality, fit and sufficient for the purpose ordered and communicated to Seller, and will be free from latent or patent defects in material and workmanship;

(c)   all services will be performed in a workmanlike, efficient and safe manner and will conform to standards generally accepted in the trade or industry involved;

(d)   all Goods are and will be free from any security interest, lien, or encumbrance;

(e)   Seller is also bound by any other implied warranty that, at the time of execution of this Agreement, prevails in the applicable industry in the United States. All warranties created by this Agreement or arising by operation of law that affect the rights of the parties are cumulative and should be construed in a manner consistent with one another, but shall not preclude Purchaser's exercise of any rights otherwise provided by law; and

(f)   Seller will comply with all safety rules and regulations established by Purchaser.

8.   <u>Remedies</u>.

(a)   In addition to the remedies provided to Purchaser under Article 2 of the Uniform Commercial Code as enacted by the State of Florida, if any of the Goods are found within the warranty period provided in the Appendix to be defective in material or workmanship or otherwise not in conformity with the requirements of this Agreement, Purchaser, in addition to any other rights which it may have under warranties or otherwise, shall have the right, at its option:

(i)   to revoke acceptance, reject and return such Goods at Seller's expense, in which event conforming Goods shall be provided by Seller at its cost within ten (10) days of such revocation and such replacement Goods shall carry a warranty equivalent to that set forth in the Appendix running from the date of Purchaser's receipt of such replacement Goods; or

(ii)   notify Seller of noncompliance, defects, or deficiencies in the Goods, which Seller shall repair and/or correct at Seller's expense within ten (10) days of such notice and such repairs shall carry a warranty equivalent to that set forth in the Appendix running from the date of Purchaser's acceptance of such repaired Goods; or

(iii)   to revoke acceptance, reject and return such Goods at Seller's expense and upon receipt of such Goods, Seller shall issue a refund to Purchaser of the purchase price and reimburse Purchaser for delivery freight charges and labor costs incurred by Purchaser with respect to such Goods; and Purchaser may purchase  from a third party replacement Goods of comparable quality and design to the Goods ordered, with Seller being responsible for any costs incurred by Purchaser in purchasing such replacement Goods, up to a maximum of 5% of the costs of Goods purchased from Seller, including, but not limited to, the cost of such replacement Goods in excess of the costs of comparable Goods purchased from Seller together with shipping charges therefor; or

RESTRICTED - ATTORNEYS' EYES ONLY

PAVEMETRICS0015589

**EXHIBIT 844**
-413-

Trial Exhibit 0844 P. 3 of 30

(iv)     upon notice to Seller, to take such actions as may be required to cure all defects and/or bring the Goods into conformity with all the requirements of this Agreement, in which event all costs and expenses thereby incurred by Purchaser shall be for Seller's account.  Any and all expenses, including but not limited to shipping, manufacturing, materials and labor expenses, incurred by Purchaser in the exercise of its rights under this clause shall be reimbursed by Seller.  Efforts by Purchaser to correct defects or deficiencies shall not preclude Purchaser from revoking acceptance and rejecting the Goods under this Section or applicable law where Purchaser's commercially reasonable attempts to correct the defective conditions prove to be unsuccessful.

(b)     All rights and remedies of Purchaser, whether provided by this Agreement or by law, shall be cumulative and may be exercised singly or concurrently.

(c)     In the event that Purchaser invokes the remedy set forth in Section 8(a)(ii), Purchaser shall cooperate in providing reasonable access to the Goods, data and technical assistance (if available) as required to develop and schedule repairs and related testing of modifications or repairs, if necessary, to assist Seller in its correction of the defects or deficiencies in the Goods. Seller will schedule repairs to minimize disruption, loss and inconvenience to Purchaser, or if required, Seller shall, at its expense, arrange for delivery of the Goods to Seller's plant for repair or modification.

(d)     In the event that Seller breaches its warranty that the Goods will be delivered without reservation of any security interest and free from liens held by third parties, Seller shall, if Purchaser does not exercise the rights provided elsewhere in this Section or otherwise provided by law, pay to Purchaser any interest charges and/or finance charges paid by Purchaser for the purpose of releasing the Goods or the document of title to the Goods from any security interest improperly reserved by Seller or held by a third party, together with any attorneys' fees and other costs incurred by Purchaser.

9.     Indemnity.

(a)     Seller shall be liable for and will indemnify and hold harmless Purchaser from and against any and all claims, demands, liabilities, obligations, charges, suits, proceedings, actions and causes of action (collectively, "Claims") arising from the performance or non-performance of this Agreement, including, without limitation, Seller's services in connection with the Goods, the design, production and delivery of such Goods and any personal injury, death or property damage related thereto, howsoever caused, and shall defend any Claim brought against Purchaser and shall pay all losses, damages, judgments, costs and expenses in connection with such Claim, including Purchaser's attorneys' fees and court costs (collectively, "Damages").

(b)     In addition to the foregoing, Seller shall indemnify, hold harmless and defend Purchaser from and against any and all Claims and Damages arising out of any Claim for personal injury, death or property damage asserted against Purchaser attributable to a defect or deficiency in the Goods.

(c)     In the event that it is subsequently determined by any federal, state, local or administrative authority that Purchaser or any of its affiliates are employers or co-employers of personnel of Seller ("Seller Employees") or Seller's employees or agents, Seller covenants and agrees to indemnify, defend and save harmless Purchaser from and against any and all Claims and Damages whatsoever suffered or incurred by Purchaser as a result of the foregoing.

(d)     Seller agrees to indemnify, defend and hold Purchaser harmless from any and all Claims and Damages whatsoever suffered or incurred by Purchaser related to Employment Taxes (as defined in subparagraph 24(b) below).

Page 4 of 30

RESTRICTED - ATTORNEYS' EYES ONLY

PAVEMETRICS0015590

**EXHIBIT 844**
-414-

(e)     These indemnities shall apply without regard to whether the same arise from breach of contract, breach of warranty, negligence, strict liability, or other tort, and such indemnities shall survive delivery and acceptance of the Goods and the termination, cancellation or other expiration of this Agreement.

(f)     Seller's obligations to indemnify, defend and hold harmless Purchaser pursuant to this Agreement, including, without limitation, pursuant to this Section 9, shall also extend and apply to Purchaser's parent, subsidiaries and affiliates and their respective officers, agents, employees, successors and assigns, and the term "Purchaser" in such instances shall refer to Purchaser and such parties.

10.     <u>Insurance</u>.

(a)     <u>Liability Insurance</u>. Prior to and during any entry by Seller onto the premises of Purchaser and otherwise during the Term of this Agreement, Seller shall purchase and maintain the following insurance coverages:  (i) Commercial General Liability Insurance ("CGL"), with contractual liability covering obligations assumed in this Agreement (including any agreements entered into between the parties pursuant hereto) by Seller, providing for available limits of not less than Five Million Dollars ($5,000,000) single limit, bodily injury and/or property damage combined, for damages arising out of bodily injuries to or death of all persons in each occurrence and for damage to or destruction of property, including the loss of use thereof, in each occurrence, including Federal Employers Liability Act claims against the Purchaser, or other liability arising out of or incidental to railroad operations; (ii) Statutory Workers' Compensation, Employer's Liability Insurance with available limits of not less than One Million Dollars ($1,000,000) (which shall include but not be limited to coverage for employee misclassification) and Occupational Disease Insurance; (iii) if any motor vehicles are used in connection with the work to be performed hereunder (or in connection with any agreements entered into between the parties pursuant hereto), Business Automobile Liability Insurance with limits of not less than Two Million Dollars ($2,000,000) single limit, bodily injury and/or property damage combined, for damages to or destruction of property including the loss of use thereof, in any one occurrence; and (iv) if professional services are being rendered by Seller, Professional Liability coverage in an amount not less than Two Million Dollars ($2,000,000). If, in Purchaser's opinion, a higher limit of liability is necessary for any insurance policy required hereunder, Purchaser shall so notify Seller and Seller shall, within thirty (30) days of receipt of such notice, provide a copy of the endorsement to the appropriate policy increasing the liability coverage to the required limit.  Proof of insurance should be provided to the applicable notices address set forth in Section 26 below.

(b)     <u>Policy Requirements</u>.  All insurance required hereunder shall be effected by valid and enforceable policies issued by insurer(s) of financial responsibility and authorized to do business in all necessary states, all subject to the reasonable prior approval of Purchaser. Seller's liability insurance policies shall name Purchaser, its parent, affiliates and subsidiaries as additional insureds and will not have any exclusions for liability relating to railroad operations or contractual liability for construction or demolition within fifty (50) feet of Purchaser's tracks by endorsement. Specifically, Seller shall have endorsement CA20-70 to its Business Automobile Liability Insurance policy regarding coverage for certain operations in connection with railroads.  Seller's Workers' Compensation and property insurance policies shall include waivers of subrogation rights endorsements in favor of Purchaser, its parent, subsidiaries and affiliates, except where prohibited by law.  All policies shall contain a provision for thirty (30) days' written notice to Purchaser prior to any expiration or termination of, or any change in, the coverage provided, and shall be non-contributing with and shall apply only as primary and not excess to any insurance available to Purchaser.  Seller shall provide Purchaser with at least thirty (30) days' written notice prior to such expiration, termination or change in any insurance coverage.  Prior to any entry upon Purchaser's property pursuant to this Agreement and upon Purchaser's request thereafter, Seller shall provide or shall cause its insurer to provide Purchaser with complete

RESTRICTED - ATTORNEYS' EYES ONLY

PAVEMETRICS0015591

**EXHIBIT 844**
-415-

certified copies of the liability insurance policies in effect for the Term of this Agreement. The liability assumed by Seller under this Agreement, including, but not limited to, Seller's indemnification obligations, shall not be limited to the insurance coverage stipulated herein. Purchaser's acceptance of any certificate of insurance or policy does not constitute a waiver, release or modification of any of the insurance coverages or endorsements required under this Section 10.

(c)   <u>Additional Remedy for Failure to Comply</u>.  Notwithstanding any contrary provision hereof, and in addition to any other remedy provided herein, in the event that Seller fails during the Term hereof to comply and continue its compliance with the provisions of this Section, Purchaser may, in its sole and absolute discretion, thereafter immediately deny or revoke access to Purchaser's premises. The parties agree that the remedies for Seller's breach of this Section shall control over any provision of this Agreement relating to the ability to cure a breach of this Agreement or relating to dispute resolution.

(d)   <u>Coverage</u>.  Irrespective of whether any work is required on Purchaser's premises, Seller shall procure and maintain, at its expense, adequate insurance to cover its risk of loss associated with the Goods before delivery, inspection and acceptance by Purchaser. Evidence of such coverage will be furnished to Purchaser upon request.

(e)   <u>Subcontractors</u>.  Seller shall cause each subcontractor, if any, under a subcontract let by Seller, to carry insurance equivalent to that required by subparagraph 10(a), covering such subcontractor's work.  Any such subcontracting shall be subject to Purchaser's prior written consent.

11.   <u>Intellectual Property and Data</u>.

(a)   Seller represents and warrants: (1) that the goods or services purchased hereunder as well as the production, sale and use thereof, do not and will not infringe any third party patents, trademarks or copyrights or other intellectual property; (2) that Seller will at its own expense defend any Claim that may arise with respect thereto; and (3) that Seller will indemnify, defend, and hold harmless the Purchaser and its customers from and against any and all Claims and Damages which may be incurred on account of the assertion of any infringement.  In case the Goods or a part thereof are held to be infringing, or the use of the Goods or a part thereof is enjoined, Seller shall, at Seller's expense, either procure for Purchaser the rights to continue using the Goods, replace the Goods or a part thereof with non-infringing Goods, modify the Goods so that they are non-infringing, or retake the Goods and refund the purchase price and other costs associated with delivery or return of the Goods.  If Purchaser is forced to procure substitute non-infringing Goods, Seller will refund the Purchaser, and Seller shall be liable for any and all costs associated therewith, up to a maximum of 5% over the cost of Goods purchased from Seller.

(b)   All data and information provided by CSXT or its affiliates, generated by the Goods, equipment, software, systems or other goods or otherwise gathered, learned or accessible by Seller or its employees, agents and contractors in performance of services or otherwise under this Agreement for CSXT and its affiliates, including any video and event recordings, images, photographs, inspection records and reports, operating data, databases, and other information and data (collectively, "Data") is Confidential Information and shall remain the sole and exclusive property of CSXT and its affiliates provided that, Seller shall have the right to use the Data solely in connection with performance of this Agreement. The Data shall be available and provided to CSXT on request, in Excel, Access or other standard commercially readable format at the option of CSXT, and, to the extent supported by Seller, for download into .dce files or other mutually agreed upon format.

12.   <u>Waiver</u>.  Waiver by the Purchaser of Seller's breach of any term or condition of this Agreement shall not be construed as a waiver of any other term or condition or a future waiver of the waived term or condition.

Page 6 of 30

13. <u>Cancellation</u>.

   (a)   Purchaser may cancel this Agreement without penalty or payment of cancellation charges upon ten (10) days' prior written notice to Seller if Seller fails to make delivery as specified or within a reasonable time if no time is specified, or fails to comply with any other provisions of this Agreement.

   (b)   Purchaser may cancel this Agreement without penalty or payment of cancellation charges at any time without cause upon giving Seller thirty (30) days' prior written notice.

   (c)   Upon receipt of any such notice by Seller, Seller shall immediately discontinue all work.

   (d)   Cancellation hereunder shall discharge all executory obligations of the parties but shall not affect any right or obligation based on a prior breach or performance of this Agreement nor affect any right or obligation which is intended to survive such cancellation.

14. <u>Labor and Contractor Qualification Matters</u>.

   (a)   If Seller interferes with Purchaser's operations because of a strike, picketing or a work stoppage by Seller's or its subcontractor's employees or a dispute between a union and the Seller or its subcontractor, Purchaser, after twenty-four (24) hours' oral or written notice to the Seller, may either employ a substitute or terminate this Agreement.  Further, Seller shall be liable for and promptly pay to Purchaser, any additional expense incurred by Purchaser in employing such substitute or terminating this Agreement.

   (b)   All contractors are required to complete the Contractor Safety Program of CSXT prior to performing any services for CSXT or its affiliates and prior to entry onto any property of CSXT or its affiliates, including registration, qualification and screening through CSXT or its designated Contractor Safety Program provider, currently, ISN SOFTWARE CORPORATION ("CSP Provider").   Ongoing compliance with the Contractor Safety Program may be audited by CSXT or its CSP Provider throughout the duration of any contract or services performed by Seller.  Seller is solely responsible for any costs incurred in complying with the Contractor Safety Program, including any CSP Provider registration or other fees.  Qualification through CSXT's Contractor Safety Program, and confirmation that Seller is in compliance with CSXT requirements, is a requirement for performance of services for CSXT and its affiliates.  Failure to maintain qualification may result in termination of this Agreement at the option of CSXT exercisable on written notice to Seller.

15. <u>Notice of Delay</u>. Time is of the essence in the performance of Seller's obligations hereunder.  Seller agrees to notify Purchaser in writing promptly of any factor, occurrence or event coming to its attention that may affect Seller's ability to meet its obligations under this Agreement.  Examples of where such notice shall be given, shall include, but not be limited to any loss, reassignment or unavailability of key employees, a *force majeure* event, threat of strike, or major equipment failure, changed requirements, or third party delays.

16. <u>Force Majeure</u>.  A party shall be excused from performing its contractual obligations if it is prevented or delayed in such performance as a result of conditions beyond the reasonable control and without the fault or negligence of such party (*force majeure*), such as acts of God, acts of terrorism, acts of the public enemy, labor disturbances, authority of law, fire or explosion, war or warlike act, insurrection, or a party's reasonable response (by way of example and not limitation, such as taking evasive action or canceling meetings or events) to a Governmental warning affecting local or national security. For clarity purposes, in no event shall any implementation of any taxes, tariff, duty or other expected or unexpected increase in costs pertaining to this Agreement be considered a force majeure event under this Agreement, nor may either party invoke force majeure delay or inability to perform by the mere fact that such performance has been made more difficult or burdensome by the event.  A party wishing to take advantage of the relief provided in this Section must as soon as practical advise the other party in writing of the existence of the *force majeure*

RESTRICTED - ATTORNEYS' EYES ONLY

PAVEMETRICS0015593

**EXHIBIT 844**
-417-

condition and the estimated time of its duration.  The parties shall cooperate to ascertain the facts and the effect of the delay on, and make appropriate adjustments where necessary.  If a *force majeure* condition continues for more than fifteen (15) days, Purchaser shall have the right to terminate this Agreement immediately upon oral or written notice.  During a *force majeure* event, Purchaser shall have the right to hire a third party to perform Seller's duties, and the sums due hereunder shall be reduced by the actual costs of procuring such substitute Goods.

17.  <u>Prohibition on Improper Influences</u>.  Seller represents and warrants that it has not and will not provide any gift, rebate, or other compensation - excluding nominal business entertainment or gifts - to any official, employee, representative, or agent of Purchaser or any of its affiliated or subsidiary companies.  Seller further represents that none of its officials or employees are known to be employed by Purchaser or any of its affiliated or subsidiary companies.  Seller agrees to promptly notify Purchaser if Seller becomes aware of information requiring modifications to either of the foregoing representations. Seller understands that Purchaser has relied upon the representations set forth in this Section and that failure to honor them will give Purchaser the right to immediately terminate this Agreement.

18.  <u>Insolvency</u>.  In the event Seller shall file a voluntary petition in bankruptcy, or a petition in bankruptcy shall be filed against Seller, or Seller shall make an assignment for the benefit of its creditors, or Seller shall apply for relief in any form as a debtor under any statute of the United States or laws or regulations of any other governmental authority, or any other proceeding under any statute of the United States or laws or regulations of any other governmental authority seeking the relief or readjustment of Seller's indebtedness shall be commenced, then Purchaser shall have the right to immediately cancel this Agreement or so much of it as has not been completed, without penalty or payment of cancellation charges.

19.  <u>Severability</u>.  Any provision of this Agreement which is determined to be invalid or unenforceable will be ineffective to the extent of such determination without invalidating the remaining provisions of this Agreement.

20.  <u>Complete Agreement</u>.  This Agreement and each Appendix and Exhibit attached hereto constitute the complete agreement of the parties relating to the matters specified in this Agreement and supersede all prior and contemporaneous representations or agreements with respect to such matters.  No oral modifications or waiver of any of the provisions of this Agreement shall be binding on either party.

21.  <u>Assignment; Successor and Assigns</u>.  Purchaser may assign its rights under this Agreement to any parent, subsidiary or other affiliate.   Any assignment of this Agreement by Seller, by operation of law or otherwise, or any interest herein or any payment due or to become due hereunder, without the prior written consent of Purchaser, in Purchaser's sole discretion, shall be void.  However, this Agreement shall be binding upon and inure to the benefit of Purchaser, Seller and their respective permitted successors and assigns.

22.  <u>Laws</u>.

    (a)  <u>Governing Law</u>.  This Agreement, and all matters based upon, arising out of or relating in any way to this Agreement or the performance hereof, shall be governed by and interpreted in accordance with the laws of the State of Florida, without regard to the conflict of laws provisions of any jurisdiction.  The parties to this Agreement specifically intend that the provisions of Article 2 of the Uniform Commercial Code of Florida will control as to all aspects of this Agreement and its interpretation, except where inconsistent with the terms of this Agreement.

    (b)  <u>U.S.E.P.A. Toxic Substance Control Act</u>.  Seller represents and warrants that every chemical substance constituting or contained in the Goods is not on the list of prohibited chemical substances compiled and published by the Administrator of the U.S.E.P.A.

RESTRICTED - ATTORNEYS' EYES ONLY

PAVEMETRICS0015594

**EXHIBIT 844**
**-418-**

pursuant to the Toxic Substances Control Act ("TSCA") and that the Goods are otherwise in compliance with this Act.

(c)   <u>Occupational Safety and Health Act of 1970</u>.  Seller represents and warrants that the Goods covered hereby shall, upon delivery to Purchaser, be in compliance with the standards required by the Occupational Safety and Health Act of 1970 ("OSHA"), if any, for such Goods in effect at the time of such delivery, including the provision of Safety Data Sheets required by law.

(d)   <u>Hazardous Material</u>.  Materials deemed hazardous will be packaged, marked and shipped by the Seller to comply with all Federal, State and local laws and regulations then in effect and will further comply with any special requirements as might be noted in the Appendix attached.  Furthermore, Seller warrants that all Goods or other materials covered hereunder do not contain asbestos or otherwise constitute "asbestos containing material" as defined in OSHA, nor contain prohibited chemical substances under TSCA.

(e)   <u>Equal Employment Opportunity/Non-discrimination</u>.  As required by federal law, CSXT policy provides equal opportunities in employment without regard to race, color, religion, sex, sexual orientation, gender identity, or national origin, and it is committed to employing and advancing qualified disabled veterans, handicapped persons, and Vietnam Era veterans. CSXT further complies with the requirements placed on government contractors and subcontractors by Executive Order 11246, 41 CFR Section 60, Section 402 of the Vietnam Era Veterans Readjustment Assistance Act of 1974, and Section 503 of the Rehabilitation Act of 1973, all as amended.  By executing this Agreement, Seller hereby agrees that it shall also comply with these same executive orders, laws, rules and regulations, as applicable, and in particular:

(i)   **This Seller and any subcontractors shall abide by the requirements of Sections 41 CFR 60-1.4(a), 60-300.5(a), and 60-741.5(a). These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, sexual orientation, gender identity or national origin.  Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, protected veteran status or disability.**

(ii)   This Seller hereby agrees that it will incorporate, or cause to be incorporated, this equal employment opportunity/non-discrimination clause above in clause (i) into any non-exempt contract or subcontract for any construction work related to this Agreement.

(f)   <u>Taxes</u>.  CSXT shall be responsible for the payment and remittance of any sales or use tax, or customs duties (referred to collectively hereafter as "Tax") imposed on this Agreement or the Goods and services to be provided hereunder.  CSXT shall not be responsible for Seller's income tax, or any tax imposed on Seller's capital or franchise, or any taxes imposed directly and exclusively upon Seller for which CSXT is not otherwise responsible. Seller agrees to accept any valid tax certificates, including exemption certificates that CSXT submits to Seller with respect to any Tax as satisfying CSXT's obligation under this Section 22(f). Seller and CSXT acknowledge and agree that, to the extent applicable to the Goods hereunder, the parties intend for the payments made under this Agreement to qualify under Florida law (Rule 12A-1.032, F.A.C.), and the similar law of any other taxing jurisdiction, as payments for custom or customized software or other services that are not taxable under Florida's (or the other taxing jurisdictions') sales and use tax regime, and the parties further agree not to take any action inconsistent with this position. If Seller receives a notice or assessment from any taxing jurisdiction claiming that Seller or CSXT is liable

Page 9 of 30

PAVEMETRICS0015595

EXHIBIT 844
-419-

for any Tax for which CSXT has agreed to make payment under this Section 22(f), Seller shall so notify CSXT in writing no later than fifteen (15) days of its receipt of the claim. If Seller fails to provide CSXT such notice within the fifteen (15) days, CSXT shall have no obligation to pay the Tax if Seller is liable for the Tax under the law of the taxing jurisdiction. If CSXT has a reasonable basis to contest, protest, or appeal (the "Appeal") the imposition or amount of any Tax, CSXT, at its own expense, may prosecute the Appeal, in which case Seller shall cooperate fully with CSXT including, but not limited to, providing documentation and other information as required for CSXT to settle or sustain the Appeal.

(g)    <u>General Compliance with Laws</u>.    Seller represents, warrants and agrees that it has complied and will comply with all applicable laws.  Seller agrees to indemnify Purchaser and save Purchaser harmless from and against any and all Claims and Damages, resulting from Seller's failure to comply with the foregoing, and in the event of such failure, Purchaser may, in addition to all other rights and remedies Purchaser may have pursuant to this Agreement or otherwise in law or in equity, immediately cancel this Agreement.

(h)    <u>Buy America Compliance</u>.  Seller agrees to comply with federal Buy America requirements in projects that are funded in whole or in part by federal agencies, including the Federal Highway Administration (FHWA), the Federal Transit Administration (FTA) or the Federal Railroad Administration (FRA), as applicable, upon written notification from Purchaser of such funding.   For projects funded by FTA and FRA, the applicable Buy America requirements are that steel, iron and manufactured products, and all components of manufactured products, must be produced in the United States, unless a waiver has been granted by the federal agency involved.   A component is considered of U.S. origin if it is manufactured in the United States, regardless of the origin of its subcomponents.   For projects funded by FHWA, applicable Buy America requirements are that steel, iron and steel and iron components of manufactured products must be produced in the United States, unless a waiver has been granted.  Upon request, Seller agrees to submit to Purchaser a Buy America Certification in form and content required by Purchaser. As part of Seller's Certification, it agrees to make documentation regarding the Goods' compliance with federal Buy America requirements available for review, including, where applicable, the Mill Test Report (MTR) for steel or iron products certifying that the steel or iron was produced in the United States.

23.    <u>Arbitration</u>.  Except as otherwise expressly provided below, any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled through binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment on the award rendered by the arbitrator(s) may be entered in any court of competent jurisdiction. Exclusive venue for such arbitration shall be Jacksonville, Florida. Notwithstanding the foregoing, neither party shall be precluded from seeking injunctive or similar equitable relief in the courts of any jurisdiction including, but not limited to, temporary restraining orders and preliminary injunctions, to protect its rights, including, without limitation, as set forth in Section 5(d) of this Agreement. Further, if any dispute shall arise during the performance of this Agreement, Seller shall, unless otherwise directed by CSXT, continue to perform hereunder pending resolution of such dispute, unless Seller reasonably believes that such continuation would be unlawful or unsafe.

24.    <u>Independent Contractor</u>.

(a)    Seller acknowledges that it is an independent contractor and that Purchaser has no control over or ownership interest in any of the Seller's facilities that will be utilized in supplying Goods to Purchaser hereunder.   Seller shall indemnify, defend and hold Purchaser harmless from and against any and all Claims and Damages, and Seller shall not assert any such Claims against Purchaser, arising from Seller's operations or the conditions at, in or around Seller's facilities at or from which Goods are supplied under this Agreement, including without limitation, any environmental or natural resources damage claims.

Page 10 of 30

RESTRICTED - ATTORNEYS' EYES ONLY

(b)    In no event shall CSXT be responsible for Seller's income tax, payroll tax, withholding of any tax, taxes related to employee benefit plans sponsored or maintained by Seller, obligation to report any such taxes to a governmental authority or to any Seller Employees, or penalties of any kind associated therewith.  For the avoidance of doubt, taxes, reporting obligations and penalties for purposes of this Section 24(b) means obligations and assessments arising under the Internal Revenue Code and/or the Railroad Retirement System (related to retirement, health and disability benefits and the withholding obligations related thereto) (all such taxes and obligations are collectively referred to as "Employment Taxes").

(c)    CSXT and Seller agree that Seller Employees are solely employees or agents of Seller and not employees or agents of CSXT.  As an independent contractor to CSXT, Seller and Seller Employees shall not be entitled to any CSXT wages, awards, recognitions, perquisites or benefits, including without limitation, medical, dental and life insurance. In addition, Seller Employees' service under this Agreement shall be as an independent contractor and as permitted by law, and will not count as credited service under CSXT's pension or other benefit plans.

(d)    Seller agrees and covenants to comply with all local, state, federal and international laws, where applicable, as it relates to Seller Employees. Seller shall require any of its subcontractors to do the same on behalf of any subcontractor employees performing Services under this Agreement.  Furthermore, and without prejudice to the foregoing:

    i.    Seller agrees to provide its personnel all benefits required under local, state and federal law. Seller further agrees that Seller is solely responsible for complying with and will comply, to the extent required by law, with Internal Revenue Code sections 4980H (the "Employer Mandate") and 6056 with respect to its personnel.

    ii.    If required under Section 24(d)i., Seller agrees to offer health coverage to all "full-time employees," as such term is defined for purposes of the Employer Mandate. The coverage offered shall constitute "minimum essential coverage" and shall provide "minimum value," and be "affordable," as each such term is defined for purposes of the Employer Mandate.

    iii.    Seller shall pay Seller Employees all wages and other necessary payments for services performed pursuant to this Agreement and withhold taxes all in a manner compliant with local, state, federal and international laws, where applicable.

    iv.    Seller shall provide Seller Employees with the appropriate training necessary to perform the contracted Services.  Seller shall provide Seller Employees with all materials and implements necessary for the performance and completion of the Services.  Seller is solely responsible for the supervision and management of Seller Employees.  Seller shall take all necessary occupational safety and health measures and abide by industry standards and directives in respect of these measures.

25.    <u>Audit</u>.  Seller agrees to keep full, accurate, and complete books of account and records in sufficient detail, in accordance with generally accepted accounting practices. Seller will retain and not purge financial data and computer files for a period of not less than three (3) years after such data and files are created.  Purchaser will have the right to audit all of Seller's records that relate directly or indirectly to Seller's relations with Purchaser as contemplated by this Agreement.  The audit will take place at Seller's place of business and the timing of such audit will be mutually agreed upon. Seller will not be unreasonable in granting timely access to Purchaser or its authorized representatives.  Purchaser will have access, without cost, to all accounting, operational, and administrative information of Seller and those who control, produce or are responsible for this information. Records contemplated by this provision include but are not limited to, EDI records with Purchaser, invoicing, receipts from Purchaser, disbursements documents, and other related

Page 11 of 30

**EXHIBIT 844**
-421-

support documents.  During the audit, Purchaser shall have the right to copy information it considers appropriate, using Seller's resources and Purchaser will be responsible to reimburse Seller for Seller's direct out of pocket cost of such copies.  The payment by Purchaser of any invoice sent to Purchaser by Seller in accordance with the terms of this Agreement shall not preclude Purchaser from questioning the correctness of said invoice at any time.  In addition, if the audit shows that CSXT was invoiced and paid more than Ten-Thousand Dollars ($10,000) over the amounts it was obligated to pay under this Agreement during the period preceding the audit, then Seller will promptly reimburse CSXT for its reasonable expenses incurred in performing the audit.

26.     <u>Notices</u>.  All notices required by this Agreement or otherwise shall be in writing, sent to the attention of the following:

For Purchaser:

    (1)     Certificates of Insurance:

         Via e-mail to: <u>csx@ebix.com</u>

    (2)     All notices pertaining to this Agreement:

         Michelle Shoop
         CSX Transportation, Inc.
         500 Water Street (J-430)
         Jacksonville, Florida  32202

with a copy to:   Ian Hollingsworth
         Law Department J-150
         CSX Transportation, Inc.
         500 Water Street
         Jacksonville, Florida  32202

For Seller:   Richard Habel
         CEO
         Pavemetrics Systems, Inc.
         150 Boulevard, Rene-Levesque Est., Suite 1820
         Quebec (Quebec) Canada
         <u>rhabel@pavemetrics.com</u>
         1 (418) 210-3629

or at such other address as a party may indicate in writing as herein provided.  Notices shall be deemed given on the earliest of the date received, two (2) business days after delivery to a nationally recognized overnight courier, five (5) business days after proper mailing, or the date that receipt of such notice is rejected or refused.  Notwithstanding the foregoing, Seller's invoices may be sent by ordinary mail.

27.     <u>Amendments</u>.  This Agreement cannot be amended or modified except in writing, signed by or on behalf of the persons to be bound thereby.

28.     <u>Advertising</u>.  Seller will not use the name of CSXT or any of its affiliates or quote the opinion of any employees thereof or refer thereto directly or indirectly in any promotional literature, news release, advertisement or release to any professional or trade publications without receiving specific prior written approval for such use or release from CSXT.

29.     <u>Survival</u>.  Notwithstanding the termination or expiration of this Agreement, and except as otherwise stated in this Agreement, those obligations contained herein that by their terms or nature are intended to survive such termination or expiration shall do so including, as an example and without limitation, the indemnification and confidentiality provisions herein.

Page 12 of 30

RESTRICTED - ATTORNEYS' EYES ONLY

PAVEMETRICS0015598

EXHIBIT 844
-422-

30. <u>Priority of Documents</u>.  In the event of any conflict between any documents exchanged between the parties, the following order of priority shall control: (i) this Agreement; (ii) any Appendix; (iii) any other document incorporated herein by reference; (iv) Purchaser's purchase order; and (v) Seller's invoice.

31. <u>Counterparts</u>.  This Agreement may be executed in separate counterparts, each of which when so executed and delivered shall be an original for all purposes, but all such counterparts together shall constitute one instrument.  The exchange of copies of this Agreement and any amendments thereto and of signature pages by facsimile transmission or in Portable Document Format (PDF) shall constitute effective execution and delivery of this Agreement and any amendment thereto as to the parties and may be used in lieu of the original Agreement or amendment for all purposes.  Signatures of the parties transmitted by facsimile transmission or in Portable Document Format (PDF) shall be deemed to be their original signatures for all purposes.

[Signature Page Follows]

Page 13 of 30

RESTRICTED - ATTORNEYS' EYES ONLY

PAVEMETRICS0015599

**EXHIBIT 844**
-423-

**IN WITNESS WHEREOF**, each party has caused this Agreement to be properly executed on its behalf as of the date first written above.

**SELLER:**

**PAVEMETRICS SYSTEMS, INC.**

By: _____

Name:  John Laurent M.Sc.
Title:     Vice President Business Dev.

**PURCHASER:**

**CSX TRANSPORTATION, INC.**

By: _____
Name:  Evan Bell_____
Title:     Head of Procurement_____

FORM – Goods Agreement

Page 14 of 30

RESTRICTED - ATTORNEYS' EYES ONLY                    PAVEMETRICS0015600

**EXHIBIT 844**

-424-

Trial Exhibit 0844 P. 14 of 30

**APPENDIX to Goods Agreement between**
**CSX Transportation, Inc. and Pavemetrics Systems, Inc., dated 15 March 2021.**

**PRICE, PAYMENT and DELIVERY TERMS**

**1.     Delivery Terms:**

Agreement prices for the Goods are FOB: DAP Jacksonville, FL.  By attachment hereto as Exhibit A, the CSX Transportation Procurement and Supply Chain Statement of Policy & Procedure, No. P&M-220 (Routing Instructions), as amended from time to time, is made a part of this Agreement. Suppliers who do not comply with these routing instructions will be solely responsible for the cost of using an unapproved carrier.

**2.     Payment Terms:**

Purchaser will remit payment to Seller within sixty (60) days of receipt of Seller's invoice (for the elimination of doubt, the receipt date shall be considered the date an invoice is entered into Oracle). Purchaser shall not be subject to any late payment fees and/or interest on late payments.  Seller agrees to recognize the statutory exemptions and direct payment permits listed in the "Schedule of CSXT's Sales and Use Tax Exemption and Direct Pay Permits" (Schedule), where appropriate in lieu of otherwise applicable sales and use tax.  A copy of the Schedule is attached as Exhibit B and hereby incorporated into this Agreement.

All U.S. based Sellers must be set up for Electronic Funds Transfer ("EFT") in order to properly receive payments.  Purchaser may implement a $25 charge per check issued for U.S. based Sellers who are not set up to get paid by EFT.  Seller is responsible for maintaining the proper EFT banking information and maintaining up to date contact information in its CSX iSupplier Portal site.

**3.     Warranty:**

Seller shall warrant the Goods in accordance with this Agreement for one (1) year full parts and labor (excluding applicable shipping and travel expenses) from the date of final acceptance by Purchaser, and if the Goods are manufactured by a third-party then Seller shall ensure that the third-party's warranty of the Goods is transferred to Purchaser. Seller shall also warrant one (1) year of software updates and technical support (phone/email).

**4.     Quality Certification:**

Seller shall maintain a quality system at the manufacturing facility during the Term of the Agreement. The quality system is to be industry recognized and current by TUV Quality Certification.

**5.     Price:**

Page 15 of 30

RESTRICTED - ATTORNEYS' EYES ONLY

PAVEMETRICS0015601

**EXHIBIT 844**
-425-

| Standard Pavemetrics LRAIL Sensor Hardware and Software (3 Units) | | | |
|---|---|---|---|
| Item Description | Units | Unit Price | Total Price |
| Standard LRAIL Hardware and Software | 3 | $350,000.00 | $1,050,000.00 |
| Total Price for LRAIL | | | $1,050,000.00 |

| Pavemetrics Labor for Autonomous Operation (3 Units) | | | |
|---|---|---|---|
| Item Description | Units | Unit Price | Total Price |
| System assembly, configuration, testing, deployment and remote support | 90 | $ 1,000.00 | $ 90,000.00 |
| Onsite Support (**NOTE:** Travel expenses noted in proposal is removed and replaced with CSX Travel Policy.) | 45 | $ 1,000.00 | $ 45,000.00 |
| Total Price for Support | | | $ 135,000.00 |

| Special Hardware for Autonomous Operation (3 Units) | | | |
|---|---|---|---|
| Item Description | Units | Unit Price | Total Price |
| Field Data acquisition hardware | 3 | $13,566.000 | $ 40,698.00 |
| Reel-time data processing hardware | 3 | $ 84,775.00 | $ 254,325.00 |
| Data storage hardware | 3 | $ 36,836.00 | $ 110,508.00 |
| High-accuracy GNSS | 3 | $ 22,000.00 | $ 66,000.00 |
| Networking system, power bars, junction boxes, monitor switch and miscellaneous hardware | 3 | $ 5,110.00 | $ 15,330.00 |
| Total Price for special Hardware | | | $ 486,861.00 |

| Total overall price for all components | | | $1,671,861.00 |
|---|---|---|---|

These prices are fixed through the Term of the Agreement, except to the extent that Seller is required to lower prices to Purchaser pursuant to Section 1 of the Agreement.

Pavemetrics is in agreement to hold the $350,000 price for any additional units purchased in 2021. The purchase of multiple units will result in a multiple unit discount for CSX.

RESTRICTED - ATTORNEYS' EYES ONLY

PAVEMETRICS0015602

**EXHIBIT 844**
-426-

**ANNEX 1 TO APPENDIX TO GOODS AGREEMENT**



## CSX Autonomous Near-real-time Boxcar ROM1

**Standard Pavemetrics LRAIL Sensor Hardware and Software (3 UNITS)**

| # | Item Description | Units | Unit Price | Total Price | Notes/Comments |
|---|---|---|---|---|---|
| 1 | Standard LRAIL Hardware and Software | 3 | $350,000 | $1,050,000 | This is to add another 3 sets of sensors to the existing 2 sets.<br><br>This is just the LRAIL sensor heads and standard acquisiton and processing software. This is a reduced system compared to the initial "Turnkey Highrail" system that was delivered. The following items are NOT included in this line item: system enclosure and sensor mounts, power system, POS LVX GNSS, Wi-Fi Router, data acquisiton and storage computers, GUI computer, DMI, etc. |

Total Fee    $1,050,000 USD

**Pavemetrics Labor for Autonomous Operation (3 UNITS)**

| # | Item Description | Units | Unit Price | Total Price | Notes/Comments |
|---|---|---|---|---|---|
| 1 | System assembly, configuration, testing, deployment and remote support | 90 | $1,000 | $90,000 | The rate here is the labour cost per day, per staff member. |
| 2 | Onsite support | 45 | $1,000 | $45,000 | The rate here is the labour cost per day, per staff member. We estimate that a minimum of 30 days will be required, but this will be invoiced as needed and as incurred. Travel expenses will be billed on a cost plus 25% basis. |

Total Fee    $135,000 USD

---

www.pavemetrics.com          Pavemetrics Systems Inc.          Tel. +1 418 210 3629
                    150, boul. Rene-Levesque East, suite 1820
                              Quebec (Quebec)
                              CANADA, G1R 5B1

RESTRICTED - ATTORNEYS' EYES ONLY

PAVEMETRICS0015603

Trial Exhibit 0844 P. 17 of 30

**EXHIBIT 844**
-427-



## Special Hardware for Autonomous Operation (3 UNITS)

| # | Item Description | Units | Unit Price | Total Price | Notes/Comments |
|---|------------------|-------|------------|-------------|----------------|
| 1 | Field data acquisition hardware | 3 | $13,566 | $40,699 | Allows for data acquisition at speeds between 0 and 74 mph. Each boxcar installation includes: -1 LCMS data acquisition computer -1 monitoring computer |
| 2 | Real-time data processing hardware | 3 | $84,775 | $254,325 | Allows for near-real-time data processing. Each boxcar installation includes: -1 processing manager computer -6 CPU+GPU processing nodes |
| 3 | Data storage hardware | 3 | $36,836 | $110,509 | 20,000 km of storage |
| 4 | High-accuracy GNSS | 3 | $22,000 | $66,000 | One Applanix POS LVX per boxcar |
| 5 | Networking system, power bars, junction boxes, monitor switch and miscellaneous hardware | 3 | $5,110 | $15,330 | One networking system per boxcar. Includes 10GB switch, LTE modem and Firewall-VPN |

**Total Fee    $486,863 USD**

## ROM 1 GRAND TOTAL   $1,671,863 USD

www.pavemetrics.com                Pavemetrics Systems Inc.            Tel. +1 418 210 3629
150, boul. Rene-Levesque East, suite 1820
Quebec (Quebec)
CANADA, G1R 5B1

RESTRICTED - ATTORNEYS' EYES ONLY                PAVEMETRICS0015604
EXHIBIT 844
-428-

Trial Exhibit 0844 P. 18 of 30

**EXHIBIT A**

**CSX Procurement and Supply Chain No. P&M-220**

**(see attached)**

- 

RESTRICTED - ATTORNEYS' EYES ONLY

PAVEMETRICS0015605

**EXHIBIT 844**

-429-

Trial Exhibit 0844 P. 19 of 30



**PROCUREMENT AND SUPPLY CHAIN
STATEMENT OF POLICY & PROCEDURE**

Policy No: P&M-220
Effective Date: 3/26/2019
Page No. 1 of 7

SUBJECT: TRANSPORTATION OF COMPANY MATERIAL

I.   Purpose

The purpose of this policy is to provide guidance to CSXT employees concerning the movement of purchased material from suppliers and the distribution of company material to using locations.

II.   Scope

This policy applies to all suppliers and CSXT employees engaged in the movement of company material.

III.   General

A.   The Procurement and Supply Chain Department is accountable for delivering material to field locations within required service times and by the most cost-effective means available. The two basic elements affecting transportation costs are quantity and timing. These elements must be balanced against one another to obtain the best service and lowest total cost for CSXT.

B.   For large quantities of material such as wheels, shipping via rail is the most economical mode on a cost per pound basis. However, shipping via rail is not economically feasible for small quantities and, depending on the route, may not always meet delivery time requirements.

C.   Expedited shipments are very costly regardless of quantity. A shipment requiring delivery within 6 hours may cost more than $1,000 while the same shipment may cost $100 if given 24 hours for delivery and only $20 if given 48 hours. The economic benefit of expedited delivery must always be considered prior to expediting shipments.

D.   Whenever quantities are sufficient and time allows, company rail or intermodal services are to be utilized for the movement of company material from outside suppliers as well as internally to field locations. Internal rail shipments of company material, as well as rail shipments from outside suppliers originating on CSXT, move at cost over the CSXT system.

E.   If quantities are insufficient or rail/intermodal cannot meet the necessary delivery schedule, a less economical but more expedient mode such as trucking must be utilized. CSXT Routing guidelines are to be utilized.

RESTRICTED - ATTORNEYS' EYES ONLY

PAVEMETRICS0015606

**EXHIBIT 844**
**-430-**



**PROCUREMENT AND SUPPLY CHAIN
STATEMENT OF POLICY & PROCEDURE**

Policy No: P&M-220
Effective Date: 3/26/2019
Page No. 2 of 7

SUBJECT: TRANSPORTATION OF COMPANY MATERIAL

---

F.  Routing instructions from the Procurement and Supply Chain Logistics Group apply to the shipments of company material controlled by CSXT and all shipments will filter through UPS/Kee/& Best transportation management systems.

G.  When shipments originate at the supplier the contract with the supplier shall state where title transfers and who pays for the freight. Negotiating contracts with the terms: "FOB Destination, Freight Collect" is preferred. FOB Destination places ownership of the material with the supplier until the material is delivered and accepted. Unless the contract specifies otherwise, CSXT may refuse the shipment if the material is received in an unacceptable condition, and refused material becomes the responsibility of the supplier at the supplier's expense.

IV.  THE FOLLOWING INSTRUCTIONS APPLY TO SUPPLIERS AND CSXT FIELD PERSONNEL WHEN SHIPPING MATERIALS FOR CSXT.

A.  GENERAL:

1.  Safety – It is your responsibility to make sure that all shipments are handled, loaded and unloaded with safety as the first priority. Each shipment, loading, or unloading assignment starts with knowledge of the task and a job briefing that includes all personnel involved.  Remember that no job is so urgent that we cannot take the time to do it safely.

2.  PPE – CSXT has a required policy for the wearing of Personal Protective Equipment (PPE) for contractors, truck drivers, service and delivery personnel, customers, visitors and employees while on company property. All personnel and contractors must wear protective eyewear, hard hats, steel-toed safety shoes, long pants, and shirts with sleeves. Finger rings, necklaces, bracelets or other jewelry shall be removed prior to entering CSXT property. Hearing protection must be used in areas marked "Hearing Protection Required." Access to CSXT buildings, offices, platforms and ramps should be limited to main aisles and those areas marked as green "safe walkways." Work areas and red zones should be avoided if possible.

3.  Vehicle Operation – When on CSXT property, drivers must operate their vehicles within the posted speed limit and obey all traffic indicators including yield and stop signs. Drivers must not operate over a railroad grade crossing unless it is safe to do so and must be alert for movement of trains, locomotives, cars or other railroad equipment at all times, in all directions, on all tracks. Grade crossings in yards may not have active warning devices. It is the driver's responsibility to cross any tracks safely. Do not cross tracks ahead of moving railroad equipment.

RESTRICTED - ATTORNEYS' EYES ONLY

PAVEMETRICS0015607

**EXHIBIT 844**
-431-



**PROCUREMENT AND SUPPLY CHAIN STATEMENT OF POLICY & PROCEDURE**

Policy No: P&M-220
Effective Date: 3/26/2019
Page No. 3 of 7

SUBJECT: TRANSPORTATION OF COMPANY MATERIAL

4. Working Near Tracks – Drivers should not perform any duties within fifteen feet (15') of any railroad operating track without first contacting CSXT for permission to do so; CSXT will then advise the driver under what conditions and precautions the driver may perform his/her duties near said track.

5. Environmental – All materials must be handled and shipped in compliance with all government regulations and company policy. Hazardous materials must be properly placarded and noted on the bill of lading. Important: Do not ship hazardous materials by an air carrier. This includes fuel in any quantity or used injectors or other components containing fuel or fuel residue. Hazardous materials should only be shipped according to CSXT procedures. If you do not know such procedures, find out first, before you ship. Heavy fines can be levied against the company and individual violators.

6. Accountability – Each shipment request must include a CSXT reference number to identify responsibility. The bill of lading and freight invoice must include a Purchase Order Number, PROJECT and TASK code, an AFE number, an OUTSIDE PARTY (OP) number or a CSXT ORACLE EXPENDITURE ORGANIZATION provided by the person making the shipment request.

• ROUTING:

    i. Small Parcel Shipments

        1. Shipments weighing less than 150 pounds in total and comprised of 9 or fewer cartons are eligible for Small Parcel shipping. All cartons must be less than 130 inches in length and girth. All other restrictions on shippable cartons are per the parcel carriers' published guidelines.

        2. UPS is the core Small Parcel carrier for CSX. All Small Parcel shipments must be executed utilizing UPS

        3. Personnel will utilize the UPS WorldShip application to manifest a package. At no time will personnel utilize a "paper waybill."

        4. Personnel will access the UPS WorldShip application to assess the cheapest UPS shipping option which will effect delivery to a CSX location on or before the requested delivery date.

        5. Personnel will first attempt to utilize "UPS Ground" as a Small Parcel shipment option presuming that such a service option will effect delivery to a CSX customer or another CSX location on or before the requested delivery date. Personnel will access the UPS website to download a copy of their respective origin's

RESTRICTED - ATTORNEYS' EYES ONLY

PAVEMETRICS0015608

**EXHIBIT 844**
-432-



PROCUREMENT AND SUPPLY CHAIN
STATEMENT OF POLICY & PROCEDURE

Policy No: P&M-220
Effective Date: 3/26/2019
Page No. 4 of 7

SUBJECT: TRANSPORTATION OF COMPANY MATERIAL

UPS Ground delivery schedule to various points across the continental United States.

6. Personnel will not utilize "UPS Next Day Early" as a Small Parcel shipment option without the express written approval of a reporting manager. Any such utilization of "UPS Next Day Early" shipment option will clearly document and display the name and title of the team member who has provided authorization for such an expedited service, as well as, a relevant Purchase Order / Sales Order number within a UPS reference field.

7. Packaging must conform to the published requirements of UPS. These requirements may be accessed at the UPS website.

8. Small Parcel labeling requirements must conform to the published requirements of UPS. Additionally, all Small Parcel shipments must have a clearly visible purchase order number on the shipping label, as well as marked "1 of X", "2 of X", etc. in cases where a single shipment is comprised of multiple parcels.

9. All cartons shipped as Small Parcel must contain a clearly marked packing list. If a shipment is comprised of multiple parcels, EACH parcel must contain a packing slip identifying the contents of that individual parcel and its relationship to the entire shipment.

10. Multiple, smaller -size cartons (less than 20 pounds each) should be consolidated into "repack" cartons whenever possible to reduce freight cost and minimize "free astray" (i.e., split shipments) on delivery. Repack cartons should be marked as such with "REPACK" clearly stated on the outside of the carton.

11. Personnel will confirm that the destination address of a Small Parcel shipment is correct by utilizing the UPS WorldShip application and associated tools which will confirm the validity of any customer address (or any CSX facility address).

12. Personnel will confirm that the destination address of a parcel / small package shipment is indeed a "commercial" address versus a "residential" address by utilizing the UPS WorldShip application and associated tools which will confirm the designation of any customer address (or any CSX facility address).

RESTRICTED - ATTORNEYS' EYES ONLY

PAVEMETRICS0015609

EXHIBIT 844
-433-



**PROCUREMENT AND SUPPLY CHAIN**
**STATEMENT OF POLICY & PROCEDURE**

Policy No: P&M-220
Effective Date: 3/26/2019
Page No. 5 of 7

SUBJECT: TRANSPORTATION OF COMPANY MATERIAL

13. Personnel will neither insure any Small Parcel shipment nor enter a Small Parcel shipment's value within the "Declared Value" section of the UPS WorldShip application.

14. UPS imposes a weekly service fee against any CSX location where a daily requested "stop by" service by UPS has been requested. If a specific CSX facility does not have at least one (1) UPS Small Parcel shipment per day, please contact a CSX Procurement team member immediately.

15. Personnel will ensure that no Small Parcel shipment to a CSX customer or to a CSX facility incurs an accessorial fee related to "Additional Handling." Namely, Personnel will not ship a Small Parcel to a CSX customer or to a CSX facility which is in violation of the specific rules highlighted below:

16. Any article that is encased within an outside shipping container made of metal or wood.

17. Any cylindrical item, such as a barrel, drum, pail, or tire, that is not fully encased in a corrugated cardboard shipping container.

18. Any package with the longest side exceeding 48 inches (122 cm) or its second-longest side exceeding 30 inches (76 cm).

19. Any package in a shipment where the average weight per package is greater than 70 pounds (32 kg) and the weight for each package is not specified on the source document or the UPS automated shipping system Bill of Lading.

ii. Less Than Truckload

1. Shipments which reflect a weight range of at least 151 pounds but not greater than 19,999 lbs. in total weight and which occupy no more than 699 cubic feet and/or contain less than 10 pallets.

2. Personnel will access the UPS WorldShip application to assess the cheapest UPS shipping option which will effect delivery to a CSX location on or before the requested delivery date.

3. Personnel will confirm that the destination address of a Less Than Truckload shipment is correct by utilizing the UPS WorldShip application and associated tools which will confirm the validity of any customer address (or any CSX facility address).

4. Personnel will provide details on the pickup locations to include any special requirements such as lift gate; total number

Page 24 of 30

RESTRICTED - ATTORNEYS' EYES ONLY

PAVEMETRICS0015610

**EXHIBIT 844**
**-434-**



**PROCUREMENT AND SUPPLY CHAIN
STATEMENT OF POLICY & PROCEDURE**

Policy No: P&M-220
Effective Date: 3/26/2019
Page No. 6 of 7

SUBJECT: TRANSPORTATION OF COMPANY MATERIAL

of skids, crates or bundles to be picked up; any dimensions if outside the normal 4x4 skid; Total Weight; Commodity, NMFC, Class and Destination Zip Code; Ready Time and Close Time

5. Personal are responsible for routing assignment

UPS Freight LTL Corporate Customer Service

Toll Free Number: 800.333.7400

UPS Worldship Software/ www.ups.com

iii. Full Truck Load/Expedite

1. Shipments which reflect a total weight in excess of 20,000 pounds or which occupy more than 700 cubic feet or contain more than 10 pallets

2. Personnel presently utilize the Kee Logistics - Transport Management System (TMS) application to create an FTL shipment destined to a CSX customer or CSX location, CSXFr8.com. CSX personnel will continue to utilize this same exact application and process.

3. Kee Logistics / ATG personnel are subsequently responsible for a routing assignment relative to any requested Full Truckload (FTL) / Expedite FTL quantity shipment. Kee Logistics / ATG personnel may be reached

   a. Business Hours 07:00 – 18:00 – (904) 652-0647

   b. After Hours (Weekend & Holidays) – (904) 652-0647

   c. After Hours Emergency/backup – (904) 305-4787

- Rail Shipments – Orders for cars should be placed through SHIPCSX, a web-based order placement facility. Instructions on how to become a registered user of SHIPCSX can be obtained from the SHIPCSX Help Desk at 877-744-7279 option #2, then option #1. Any supplier site that is off line may order cars by calling (904) 359-3132 or (904) 359-1056.

- Shipments from CSXT to Suppliers – Generally, shipments from CSXT locations to suppliers will be shipped PREPAID. However, when returning material to suppliers due to the supplier's error such as overfilled orders,

RESTRICTED - ATTORNEYS' EYES ONLY

PAVEMETRICS0015611

**EXHIBIT 844**

-435-



| | |
|---|---|
| **PROCUREMENT AND SUPPLY CHAIN** | **Policy No: P&M-220** |
| **STATEMENT OF POLICY & PROCEDURE** | **Effective Date: 3/26/2019** |
| | **Page No. 7 of 7** |

**SUBJECT: TRANSPORTATION OF COMPANY MATERIAL**

incorrect material delivered, defective material or wrong location, return shipments should be shipped COLLECT unless the contract specifies otherwise.

- Non-Compliance – Compliance with these routing instructions is essential to the CSXT logistics program and our budget for transportation services. Careful consideration has been given to the best overall service and cost as part of a broad logistics strategy. Since CSXT no longer employs a third party logistics provider to manage carriers and pay freight bills, we no longer have a process in place to pay carriers other than those contracted above.

- Suppliers who do not comply with CSXT's routing instructions may be held responsible for the payment and cost of using an unapproved carrier.

Page 26 of 30

RESTRICTED - ATTORNEYS' EYES ONLY

PAVEMETRICS0015612

**EXHIBIT 844**
-436-

**EXHIBIT B**

**Schedule of CSXT Sales and Use Tax Exemptions and Direct Pay Permits**

| State | CSX Transportation, Inc. | SCL Railway Supplies, Inc. | B & O Chicago Terminal | Western Railway of Alabama |
|---|---|---|---|---|
| =========== | ====================== | ================ | ============ | ======== |
| Alabama | 45 | | | 50 |
| Connecticut | N/A | | | |
| Florida | TPP-0003 | 26-08-66275-58 | | |
| Georgia | DP-3265920 | 148-34-04094 | | |
| Illinois | 1273-0076 | | (2) | |
| Indiana | 0003419762 | | (3) | |
| Kentucky | 122306 | | | |
| Louisiana | 4318069-001 | | | |
| Maryland | 19 | | | |
| Massachusetts | N/A | | | |
| Michigan | 546000720 | | | |
| Mississippi | 183-07385-7 | | | |
| New Jersey | 546000720/000 | | | |
| New York | OP 003135 | | | |
| North Carolina | 00060 | | | |
| Ohio | 97305895 | | | |
| Ontario | N/A | | | |
| Pennsylvania | 99-483-397 | | | |
| South Carolina | 1307562-003 | | | |
| Tennessee | 1000464351-SLC | | | |
| Virginia | 10-546000720F-002 | | | |
| West Virginia | 91-1-0850535 | | | |

(1)    Application submitted for Exemption/Direct Pay Authority

(2)    Exempt:  Rolling stock equipment, parts, lubricants, special design electronic, track and bridge components.

(3)    Mark all purchases tax-free as directly used in railroad transportation.

Page 27 of 30

RESTRICTED - ATTORNEYS' EYES ONLY

PAVEMETRICS0015613

**EXHIBIT 844**
-437-

**EXHIBIT C**

# CSX Supplier Travel Guidelines

# June, 2011

RESTRICTED - ATTORNEYS' EYES ONLY

PAVEMETRICS0015614

**EXHIBIT 844**

-438-

Trial Exhibit 0844 P. 28 of 30

**Introduction**

The following sets forth the travel guidelines for suppliers. CSX Suppliers, Contractors, and Consultants are required to conform to these or higher standards.

Travel should be the last resort to accomplishing a business mission.  Travel is allowed only when ordinary business communications (e.g., telephone, e-mail, overnight mail, web conferencing) and/or other personnel at the intended destination cannot accomplish the business mission without travel.

If your contract includes reimbursement of travel expenses, you must use the following guidelines. In applying these guidelines, it is intended that the accommodations and services required shall be of a standard of quality that will adequately meet the needs of employees from both the standpoint of safety and of appropriateness for the effective conduct of business.  CSX will not pay unreasonable or excessive charges.

Questions on the interpretation of these guidelines should be referred to the CSX Manager Corporate Travel, Purchasing & Materials, at (904) 359-7464 (RNX: 322-7464).

## Travel Reservations
**Travelers must exercise good judgment when determining modes of transportation.  Depending on time and distance, Suppliers should select the most cost-effective means of transportation**

### AIR TRAVEL

CSX Suppliers must exercise good judgment when determining the need for and the parameters of their air transportation.

**Airlines** Whenever possible, CSX Suppliers should book advance purchase (7-day, 14-day, or 21-day), nonrefundable electronic tickets.    All commercial air travel within the Continental U.S., Hawaii, Alaska, Canada, Mexico, Central America and the Caribbean Basin must be booked at the lowest logical airfare in coach accommodations.

- At **no time** should a lower airfare be declined due to "**Airline Preference**".
- Travel should be booked at least 14 days in advance and **No later than 7 days in advance,** whenever possible.  Please plan ahead.

    Meeting times should be booked around the most economical travel arrangements

Promotional upgrades (upgrades obtained by paying additional fees or redeeming frequent flyer points) are allowable at the Supplier's personal expense as long as the upgrade does not sacrifice the lowest logical airfare obtained.

### GROUND TRANSPORTATION

CSX Suppliers must exercise good judgment when determining the need for and the method of ground transportation for conducting Company business at their travel destination.  Traveler should consider the different methods and costs of ground transportation that best facilitates the objective of the business trip in the most cost-effective manner.

**Rental Cars** All rental car reservations should be made for intermediate cars, returned to the original pick up point to avoid higher rates and additional charges.

**Rental Car Refueling** All rental cars should be refueled before returning.

**Taxi Service** Taxi service is permitted, when no other reasonable means of transportation (hotel shuttles, buses, commuter trains, etc.) is available.

**Personal Automobile Mileage Reimbursement** Mileage will be reimbursed at the current IRS standards.

RESTRICTED - ATTORNEYS' EYES ONLY

PAVEMETRICS0015615

**EXHIBIT 844**
**-439-**

## Lodging Arrangements

All overnight stays will be at a CSX approved hotel or a safe, clean moderate rate hotel.

### TRAVEL EXPENSES

**Receipts**  Receipts are required for all expenses in excess of $25.00.  Receipts must accompany invoice.

**Meals** Meals associated with out-of-town and overnight travel, are reimbursable at actual expense. Gratuities should generally not exceed fifteen percent (15%).  .  Additional explanation is required t for any meals that exceed $15 for breakfast and $40 for dinner, per person.  CSX Suppliers will **NOT** be reimbursed for lunches whether on travel status or not.

**Miscellaneous or Other Expenses** Any minor charge (tips, parking, tolls, etc.) must be described appropriately on the invoice in order to qualify for reimbursement.  Family expenses (child care, pet care, etc.) are non-reimbursable unless pre-approved in writing by the CSX prior to the date of travel.

**Non-Reimbursable Expenses** If your contract calls for reimbursement of travel expenses you must use the following guidelines.

Specific non-reimbursable expenses are listed below:

- Deviations from the CSX Supplier Travel Policy, unless approved and documented on the expense report.
- Exorbitant gratuities and/or meals.
- Personal entertainment, such as concerts, plays, and movies (including in-room movie charges).
- Laundry Service
- Personal items, such as apparel, toiletries, newspapers, magazines and other private reading material, other personal expenses.
- Additional airline trip insurance.
- Penalties for traffic violations.
- Repairs and maintenance of personal vehicles.
- Personal gifts.
- Wireless charges, accessories or equipment such as cell phones, smart phones, tablets, chargers or air cards.
- Computers (computer equipment, software, etc.).
- Delinquency/late fee charges on Supplier's credit cards.

69127651_24

RESTRICTED - ATTORNEYS' EYES ONLY

PAVEMETRICS0015616

**EXHIBIT 844**

-440-