Christy G. Lea (SBN 212,060)
christy.lea@knobbe.com
Joseph R. Re (SBN 134,479)
joe.re@knobbe.com
Nicholas M. Zovko (SBN 238,248)
nicholas.zovko@knobbe.com
Alan G. Laquer (SBN 259,257)
alan.laquer@knobbe.com
Raymond Lu (SBN 340,873)
raymond.lu@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Phone: (949) 760-0404
Facsimile: (949) 760-9502

*Attorneys for Plaintiff/Counterclaim Defendant*
PAVEMETRICS SYSTEMS, INC.

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

|  |  |
|---|---|
| PAVEMETRICS SYSTEMS, INC., | Case No. 2:21-cv-1289-MCS-MMA |
| Plaintiff, | Honorable Mark C. Scarsi |
| v. | **PAVEMETRICS' REPLY IN SUPPORT OF ITS MOTION FOR RECONSIDERATION OF ORDER GRANTING NEW TRIAL ON INFRINGEMENT OF '293 PATENT ONLY** |
| TT, INC., |  |
| Defendant. |  |
|  | Date:        March 20, 2023 |
|  | Time:        9:00 a.m. |
|  | Location:   Courtroom 7C |
| AND RELATED COUNTERCLAIMS |  |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page No.**

I.      RECONSIDERATION IS PROCEDURALLY PROPER ....................... 1

    A.      Pavemetrics' Motion Complies with Local Rule 7-18 ................... 1

    B.      TT Confirmed Opposition and Declined to Meet and Confer ........ 2

II.     A NEW TRIAL ON THE '293 PATENT WOULD BE FUTILE BECAUSE TT'S INFRINGEMENT THEORIES ARE LEGALLY INCORRECT ...................................................................................... 3

    A.      As a Matter of Law, Pavemetrics' Offers and Sales of Hardware and Software Components Cannot Directly Infringe the System Claims ............................................................. 3

        1.      Though the Quotation and Goods Agreement List Components Only, TT Obscures that Fact by Calling the Components a "Complete System" ................................ 4

        2.      TT's Infringement Theory Based on the Sale of a "Complete System" Is Legally Incorrect............................. 7

    B.      TT's Infringement Theory Requires Ignoring the Ordinary Meaning of "Defining an Appropriate Gradient Neighborhood" .................................................................................... 8

# TABLE OF AUTHORITIES

**Page No(s).**

*Am. Seating Co. v. USSC Grp.*,
   514 F.3d 1262 (Fed. Cir. 2008) ..................................................................7

*Brown v. DirecTV*,
   No. 13-cv-1170, 2014 WL 12772076 (C.D. Cal. 2014) .............................2

*Cross Med. v. Medtronic*,
   424 F.3d 1293 (Fed. Cir. 2005) ..................................................................7

*Hewlett-Packard v. Mustek Sys.*,
   340 F.3d 1314 (Fed. Cir. 2003) ................................................................10

*Lutron Elecs. v. Crestron Elecs*,
   970 F. Supp. 2d 1229 (D. Utah 2013) ........................................................8

*MobileMedia Ideas v. Apple*,
   780 F.3d 1159 (Fed. Cir. 2015) ................................................................11

*Pegasus v. DirecTV*,
   318 F. Supp. 2d 968 (C.D. Cal. 2004) ........................................................2

*Rotec Indus. v. Mitsubishi*,
   215 F.3d 1246 (Fed. Cir. 2000) ..................................................................7

*Santana v. Specialized Loan*,
   No. 21-cv-8547, 2022 WL 17886019 (C.D. Cal. Nov. 2, 2022) .................2

*SPS Techs. v. Briles Aerospace*,
   No. 18-cv-9536, 2019 WL 6870436 (C.D. Cal. July 11, 2019) ..................1

*Stewart v. Wilkie*,
   No. 18-cv-188, 2020 WL 4286871 (C.D. Cal. July 27, 2020) .....................1

*Transocean Offshore Deepwater Drilling v. Maersk Drilling*,
   699 F.3d 1340 (Fed. Cir. 2012) ..................................................................7

*Union Pac. R.R. Co. v. Coast Packing*,
   236 F. Supp. 2d. 1130 (C.D. Cal. 2002) .....................................................1

*Yoon v. Lee*,
   No. 11-cv-6792, 2012 WL 13249614 (C.D. Cal. July 6, 2012) ..................2

*Zeiss v. Nikon*,
   No. 17-cv-3221, 2018 WL 9868970 (C.D. Cal. June 26, 2018) ..................2

# TABLE OF AUTHORITIES
### (*cont'd*)

**Page No(s).**

## OTHER AUTHORITIES

Local Rule 11-6.1 ................................................................................12

Local Rule 7-3 .....................................................................................2

Local Rule 7-18 ...................................................................................1

Undisputed facts preclude an infringement judgment on the '293 patent as a matter of law. Thus, a new trial on the patent would be futile. But the new trial order overlooked that dispositive issue. The Court should reconsider the order and deny a new trial on the '293 patent.

## I. RECONSIDERATION IS PROCEDURALLY PROPER

### A. Pavemetrics' Motion Complies with Local Rule 7-18

Local Rule 7-18 requires reconsideration upon a "manifest showing of a failure to consider material facts *presented to the Court before* the Order was entered."[1] Yet Tetra Tech ("TT") criticizes Pavemetrics for "simply repeat[ing] arguments." Opp'n at 3-4. TT misunderstands the reconsideration standard. TT is correct that Pavemetrics previously explained that a new trial would be futile with respect to the '293 patent based on undisputed facts. ECF328 at 21-22, 30; ECF336 at 16:17-21, 24:13-17. But the Order failed to address those material facts.[2] ECF335. Pavemetrics repeats the facts and argument in response to that failure. Memo. at 12-14. Repeating ignored, material facts and argument is not a fault in seeking reconsideration—it is a *basis*.

TT relies on cases that confirm this Motion is proper. *See* Opp'n at 4-5. In *Union Pacific* and *Stewart*, the motions for reconsideration were improper for raising *new* facts and arguments rather than repeating ignored ones. In *SPS Technologies*, the motion for reconsideration was improper for raising facts and argument that the court *had* considered and rejected. Here, Pavemetrics properly repeats facts and argument showing the futility of TT's infringement theory because the Court failed to consider them.

---

[1] TT contradicts itself by also arguing that "any new arguments . . . should not be considered at all." Opp'n at 7. But TT identifies no new arguments and concedes that Pavemetrics' arguments "are not new." *Id.* at 3.

[2] The Order failed to consider the futility of a new trial, despite the Court having acknowledged that issue at the hearing. ECF336 at 17:24-25 ("I get the arguments you're making and they're good noninfringement arguments.")

Conceding that the new trial order failed to consider the facts and argument raised by Pavemetrics, TT argues that the Court need not "expressly provide details about its reasoning for rejecting [Pavemetrics'] arguments." Opp'n at 6.  TT has no basis to assume the Order considered the futility of TT's infringement theory.  Moreover, "a court should grant a motion for reconsideration 'where it has failed to fully address a party's arguments on an issue that is important to a decision.'"  *Brown v. DirecTV*, 2014 WL 12772076, at *2 (C.D. Cal. 2014) (quoting *Pegasus v. DirecTV*, 318 F. Supp. 2d 968, 979 (C.D. Cal. 2004)).

TT relies on *Pegasus*.  Opp'n at 6.  But the court there **granted** reconsideration, holding it "failed to consider material facts presented to the court on this issue."  318 F. Supp. 2d at 978-79; *see also Zeiss v. Nikon*, 2018 WL 9868970, at *2-3 (C.D. Cal. 2018) (granting motion for partial reconsideration where the court "clearly erred in analyzing the [patent] specification"); *Yoon v. Lee*, 2012 WL 13249614, at *1 (C.D. Cal. 2012) (granting reconsideration based on error of law).  Reconsideration is necessary here to avoid the manifest injustice of wasting significant resources retrying TT's futile infringement theory on the '293 patent.

## B. <u>TT Confirmed Opposition and Declined to Meet and Confer</u>

TT next argues that Pavemetrics' motion should be denied based on Local Rule 7-3.[3]  Opp'n at 8.  But TT ignored Pavemetrics' attempts to meet and confer.  Laquer Reply Decl. ¶4, Ex. B.  Moreover, TT identifies no prejudice. *See Santana v. Specialized Loan*, 2022 WL 17886019, at *3 (C.D. Cal. 2022) (considering motion on merits because respondent "does not allege any prejudice" and "was able to file a timely opposition").  TT has long known of

---

[3] TT's argument contradicts its own conduct.  TT first notified Pavemetrics about its motion for a new trial less than seven days before filing that motion, and never conducted a meet and confer with Pavemetrics before filing.  Laquer Ex. A; *compare* ECF323 *with* ECF338.

Pavemetrics' futility argument.  Ex. 5, Tr. 145:11-146:5, 148:13-150:12.  And TT requested and received an extension to file its opposition.  ECF341-342.  Under these circumstances, TT could not have suffered any prejudice.

## II.  A NEW TRIAL ON THE '293 PATENT WOULD BE FUTILE BECAUSE TT'S INFRINGEMENT THEORIES ARE LEGALLY INCORRECT

The Court has yet to address the issue that TT's infringement theories on the '293 patent fail as a matter of law for multiple reasons.  TT's Opposition confirms that the material facts for noninfringement are undisputed.  Even if TT had obtained an infringement verdict, Pavemetrics would have been entitled to judgment of noninfringement as a matter of law.  Thus, no attorney conduct could have affected the noninfringement outcome.  Because the undisputed facts require noninfringement as a matter of law, a new trial on the '293 patent would be futile.

### A.  As a Matter of Law, Pavemetrics' Offers and Sales of Hardware and Software Components Cannot Directly Infringe the System Claims

Claim 1 requires a system comprising a sensor in communication with a processor, and that the processor is configured to run an algorithm comprising certain steps.  TT accuses Pavemetrics of directly infringing the claim based on three sales and their corresponding offers.  But the undisputed facts show that those sales were merely for unconnected hardware and uninstalled software that allegedly could be used later to make an infringing system.  The parties dispute whether such sales are legally sufficient to sustain an infringement verdict.

TT relies on two documents—the Quotation and Goods Agreement—to argue that there are factual disputes.  Opp'n at 10.  But those documents confirm that Pavemetrics sold sensors disconnected from any processor.  Moreover, the documents never suggest that the customer would receive:

a) anything other than unconnected components,

b) a processor with installed software, or

c) software containing the claimed algorithm.

Ex. 811; Ex. 844. ***No evidence*** suggests that the three accused sales (Sales 2-4) were for a connected system with a processor loaded with processing software, let alone software that included an algorithm with the steps recited in the claim. The real dispute is whether a written quote and contract for unconnected components and uninstalled software can infringe a patent claim requiring a connected system with installed software having a specific algorithm as a matter of law.

**1.** **<u>Though the Quotation and Goods Agreement List Components Only, TT Obscures that Fact by Calling the Components a "Complete System"</u>**

TT argues that Pavemetrics sold "complete LRAIL systems," while hiding that the Quotation and Goods Agreement recite only a list of components. Opp'n at 11-12. The Quotation merely recites a bullet-point list of components, "installation manuals," and "necessary cables":

> 3    Laser Crack Measurement System 2 (LCMS-2) composed of:
> - Two 3-D LCMS-2 laser profiling sensors with built-in IMUs
> - Rackmount controller (2U) unit with DC power supply
> - Two frame grabber boards
> - Software reference and installation manuals
> - All necessary cables
> - 1-year full parts and labor warranty (excluding applicable shipping and travel expenses)

Ex. 811. Moreover, the Quotation does not even include a processor, which is a required claim limitation. *Id.* It never suggests that what is being offered for sale is a connected system having a processor with installed software. *Id.* Nor does it reflect any of the claimed algorithm steps. *Id.*

/ / /

-4-

The Goods Agreement similarly reflects the sale of components, detailing what components are and are not included.  For example, the first line item is for "Standard Pavemetrics LRAIL Sensor Hardware and Software":

## CSX Autonomous Near-real-time Boxcar

## ROM1

**Standard Pavemetrics LRAIL Sensor Hardware and Software (3 UNITS)**

| # | Item Description | Units | Unit Price | Total Price | Notes/Comments |
|---|---|---|---|---|---|
| 1 | Standard LRAIL Hardware and Software | 3 | $350,000 | $1,050,000 | This is to add another 3 sets of sensors to the existing 2 sets.<br><br>This is just the LRAIL sensor heads and standard acquisiton and processing software. This is a reduced system compared to the initial "Turnkey Highrail" system that was delivered. The following items are NOT included in this line item: system enclosure and sensor mounts, power system, POS LVX GNSS, Wi-Fi Router, data acquisiton and storage computers, GUI computer, DMI, etc. |

Ex. 844 at 17.  TT chides Pavemetrics for referring to these as "sensor kits," but the document explains "[t]his is just the LRAIL sensor heads and standard acquisition and processing software."  *Id.*   The processing computer and data-storage hardware were included in separate line items under "Special Hardware."  *Id.* at 18.  The Goods Agreement never suggests that what is being offered for sale is a connected system with installed software having a particular algorithm.   By calling these components a "complete system," TT tries to obscure the fundamental defects in its infringement case.

TT relies heavily on Dr. Hébert's declaration that Pavemetrics submitted with its non-infringement summary-judgment motion.  That motion argued that three different software versions did not perform a particular claimed algorithm step.  Here, TT relies on Dr. Hébert's characterization of LRAIL sales as "turnkey" to somehow show infringement.  Opp'n at 11.  But Dr. Hébert explained that "turnkey sales" means sales including LRAIL hardware and

software.   Ex. 990, ¶4.   He never testified that Pavemetrics sold connected systems with processors installed with software.   To the contrary, both Dr. Hébert and Mr. Laurent testified that Pavemetrics sold unconnected components, including processors without software installed.   Ex. 4, Tr. 130:18-23 (Hébert), Tr. 63:11-15, 67:1-20 (Laurent).   The Quotation, Goods Agreement, invoices, and installation manual all confirm Dr. Hébert's and Mr. Laurent's testimony.   Ex. 811; Ex. 844; Ex. 849; Ex. 850; Ex. 28 at 13-14.   No evidence cited by TT rebuts the fact that Pavemetrics quoted, contracted for, invoiced, and delivered unconnected components, including a processor with no software installed.

Moreover, neither the Quotation, nor the Goods Agreement, refers to the three systems as "turnkey sales."   TT cites Mr. Laurent's testimony that "the quote is for a turnkey LRAIL inspection system."   Opp'n at 11.   But TT fails to disclose that Mr. Laurent was talking about the quote for a different sale, Sale A, and ***not*** accused Sales 2-4.   *See* Ex. 4, Tr. at 59-60.   Even with respect to Sale A, Mr. Laurent explained that "the turnkey LRAIL would be the LCMS sensors, the LRAIL software and basically all the other ***components*** you would need."   *Id.*, Tr. 59:22-60:15.

TT also argues that Dr. Hébert admitted that the LRAIL sales to CSX included "acquisition software" and that the sensors send signals to the computer running that software.   Opp'n at 11-12.   Dr. Hébert was referring to LRAIL sensors after they had been "mounted on a train car" and to acquisition software after it had been installed on a computer.   *See* Ex. 990, ¶8.   Moreover, the computer TT accuses of being configured to run the claimed algorithm is the LRAIL ***processing*** computer, not the acquisition computer.

TT characterizes Pavemetrics as arguing that "it sold complete systems" and "its LRAIL sales are irrelevant."   Opp'n at 12.   That is incorrect. Pavemetrics contends that its Quotation and Goods Agreement do not reflect an

infringing offer for sale or sale, because both documents are only for the sale of unconnected components and uninstalled software with no details regarding any algorithms.

Citing *American Seating* and *Transocean II*, TT accuses Pavemetrics of a "bait-and-switch" strategy. Opp'n at 12. But those cases are inapplicable. In *American Seating*, the defendant offered for sale an infringing version of its product, but delivered a different version without previously informing the customer. In *Transocean II*, the contract included schematics of the product offered for sale and the defendant did not argue that the product depicted in the schematics in the contract "is missing any of the limitations of the asserted claims." Here, the Quotation and Goods Agreement reflect unconnected components and uninstalled software that do not satisfy all of the claim limitations.

## 2. TT's Infringement Theory Based on the Sale of a "Complete System" Is Legally Incorrect

TT argues that selling "complete LRAIL systems, inclusive of all the necessary hardware and software," is legally sufficient to infringe a claim reciting that:

a) certain hardware components be "in communication with" each other,

b) the processor hardware be "configured to run" an algorithm, and

c) the algorithm includes specific steps.

Opp'n at 13. TT ignores Federal Circuit precedent soundly rejecting TT's argument. *See* Memo. at 14-15, 17 (citing *Cross Med. v. Medtronic*, 424 F.3d 1293, 1311-12 (Fed. Cir. 2005); *Rotec Indus. v. Mitsubishi*, 215 F.3d 1246, 1252 (Fed. Cir. 2000)).

TT attempts to distinguish the district court decision in *Lutron v. Crestron* as missing a component required by the claims. Opp'n at 13. But *Lutron* did not turn on who provided the component, but on who connected the components

as required by the claims, i.e., who made the claimed invention. 970 F. Supp. 2d at 1236. Here, TT has not accused Pavemetrics of **making** the claimed combination. *See* Memo. at 16-17.

*Transocean I* and *II* also do not support TT's infringement theory. There, the contract included schematics showing an infringing product. *See* Memo. at 19. Here, even if "the Goods Agreement included the hardware and software necessary to operate the system," as TT argues, that would still be insufficient to show infringement as a matter of law. TT's patent claim requires *a connected system with installed software*.

TT argues that the "available" software at the time of the Goods Agreement was the version previously sold to CSX and the version sold to another customer. Opp'n at 13 (citing Ex. 5, Tr. 19:14-22 regarding CSX Sale A (r10205/r10323) and AID Sale 1 (r10494)). But TT fails to cite any evidence to support its availability claim. It never addresses the restrictive license that made the Sale A and Sale 1 software not available for any other sale (i.e., the accused Sales 2-4). *See* Memo. at 20. Nor does TT address Pavemetrics' practice of selling the latest version of software at the time the system is installed. *Id.* at 5 (citing Ex. 4, Tr. 130:2-11). Finally, TT cites no legal support for looking outside the contracted sale to other prior sales to determine what was currently sold.

**B.** **TT's Infringement Theory Requires Ignoring the Ordinary Meaning of "Defining an Appropriate Gradient Neighborhood"**

A new trial would also be futile because LRAIL does not satisfy Claim 1's requirement of "defining an appropriate gradient neighborhood." TT does not dispute that it accuses LRAIL's neural network filters as being the appropriate gradient neighborhood. *See* Opp'n at 14-16. And its expert admitted that Pavemetrics defined those filters in Canada using hardware and software different than the LRAIL systems sold to customers in the U.S. Ex. 5,

Tr. 107:15-108:10 (Morellas).  TT accuses Pavemetrics of mischaracterizing Morellas' testimony, but never explains the alleged mischaracterization.

Unable to overcome Morellas' admission, TT obfuscates its infringement theory.  It argues that LRAIL performs the defining step "when it **uses** the neural networks for identification, regardless of where the networks are trained."  Opp'n at 14 (emphasis by TT).  But rather than explain that theory, TT cites generally to the 60-page Exhibit 98, the 65-page Exhibit 24, and three pages of unexplained source code in Exhibit 740.  *Id.*  None of those exhibits mention defining an alleged gradient neighborhood.

TT next cites two portions of Morellas' testimony, but that testimony also fails to identify evidence of defining an appropriate gradient neighborhood in the U.S.  TT quotes Morellas testimony that the LRAIL system "uses a convolutional neural network that means that it defines an appropriate gradient neighborhood that is called a convolution here."  Opp'n at 16 (citing Ex. 2, Tr. 181:3-182:3).  That testimony did not address **when or where** the "defining" occurred, despite Tetra Tech's repeated claims otherwise.  Rather, Morellas testified that "defining" occurs due to "the very fact that the system" uses a convolutional neural network.  Ex. 2, Tr. 181:3.  A convolutional neural network **necessarily** defines something **only** during the training phase.  Ex. 4, Tr. 179:9-182:11.

TT also relies on Morellas' discussion of a paper presented in Tokyo. Opp'n at 14-15 (citing Ex. 2, Tr. 182:1-3).  But that does not provide any explanation of LRAIL defining any gradient neighborhood in the U.S.  That Tokyo paper did not even address LRAIL's neural network for Sales 2-4. Ex. 4, 49:20-52:14 (Laurent), 197:4-13 (Frakes).

TT next inaccurately claims that on redirect Morellas explained that LRAIL's source code showed that it "defines the appropriate gradient neighborhood for specific features, such as fasteners, spikes, and ties, **when** it

identifies features using the neural networks."  Opp'n at 15 (citing Ex. 5, Tr. 45:23-47:10).  But that testimony never mentions any "defining," or when or where that occurred.  *Id.*  Instead, it addressed the dispute whether particular alleged gradient neighborhoods were "appropriate."

TT and Morellas' obfuscated theory appears to be that merely ***selecting*** amongst appropriate gradient neighborhoods that were ***predefined*** in Canada ***literally*** satisfies the claim requirement of ***defining*** an appropriate gradient neighborhood.[4]  Opp'n at 16 (citing Ex. 740 at 295 (DetectFastenerNN), 315 (DetectSpikeNN), 322 (DetectTiePlateNN)).[5]  But that argument implicitly seeks to reconstrue "defining" beyond its ordinary meaning.  TT never sought that construction during *Markman* and may not do so now.  *See Hewlett-Packard v. Mustek Sys.*, 340 F.3d 1314, 1320 (Fed. Cir. 2003) ("the parties cannot reserve issues of claim construction for the stage of post-trial motions").

Moreover, the patent confirms that TT's new implicit meaning of "defining" is legally erroneous.  The patent Summary explains that the invention requires "defining" because it encounters ***unfamiliar*** features.  Ex. 12 at 2:17-19 ("As unfamiliar features are encountered, 3D surface models for the features are developed and physical ***parameters are defined*** for extraction.").  The patent describes ***defining*** parameters because the features are ***unfamiliar***.  With LRAIL, that occurred in Canada.  By the time LRAIL uses its predefined-filter parameters, the network has been trained and the features are familiar.  TT's theory that merely selecting amongst predefined appropriate gradient neighborhoods ignores the patent's specification.

The patent further contradicts TT's infringement theory.  Figure 6 is a flow chart where the second step is "Define 3D Gradient Neighborhood."  The

---

[4] TT never relied on DOE.

[5] TT improperly relies on source code version r10323, which was sold with Sale A, and not with accused Sales 2-4.  Ex. 4, Tr. 131:3-15.

only inputs to defining the gradient neighborhood are elevation data and resolutions from the first step. *Id.* at Fig. 6. TT appears to argue that "defining" an appropriate gradient neighborhood can be performed by selecting amongst predefined gradient neighborhoods. That would require gradient neighborhoods as **inputs** to the defining step. But Figure 6 shows that a gradient neighborhood is only an **output**. *Id.*

Unable to support its argument for the "defining" step, TT's Opposition relies exclusively on Morellas' conclusory opinion. But that is insufficient to avoid JMOL of non-infringement. *MobileMedia Ideas v. Apple*, 780 F.3d 1159, 1172 (Fed. Cir. 2015) ("Conclusory statements by an expert . . . are insufficient to sustain a jury's verdict."). TT should not be permitted to proceed to a futile trial on its legally erroneous theory.

Respectfully Submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: March 6, 2023

By: */s/ Christy G. Lea*
　　Christy G. Lea
　　Joseph R. Re
　　Nicholas M. Zovko
　　Alan G. Laquer
　　Raymond S. Lu

*Attorneys for Plaintiff/Counterclaim Defendant*,
PAVEMETRICS SYSTEMS, INC.

-11-

## **CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Pavemetrics Systems, Inc., certifies that this brief contains 2,966 words, which [choose one]:

  X   complies with the word limit of L.R. 11-6.1.

_____ complies with the word limit set by court order dated [date].

Dated: March 6, 2023          By: _/s/ Christy G. Lea_____
                                 Christy G. Lea

                                 *Attorneys for Plaintiff/Counterclaim Defendant*,
                                 PAVEMETRICS SYSTEMS, INC.

57163291

-12-