1            UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3                 WESTERN DIVISION

4                      ---

5       HONORABLE MARK C. SCARSI, JUDGE PRESIDING

6                      ---

7

8    PAVEMETRICS SYSTEMS, INC., )
                                )
9              Plaintiff,       )
                                )
10                              )
         vs.                    ) NO:  2:21-CV-01289-MCS-MAA
11                              )
                                )
12   TETRA TECH, INC.,          )
                                )
13             Defendant.       )
     _____)

14

15

16         REPORTER'S TRANSCRIPT OF PROCEEDINGS

17              Los Angeles, California

18             Monday, August 1, 2022

19

20

21

22

23

24              KATHERINE M. STRIDE, RPR,
                Court Reporter
25              katscsr@gmail.com

1

2    **APPEARANCES:**

3

4    In behalf of the Plaintiff:

5                    KNOBBE MARTENS OLSON & BEAR, LLP
                     BY:  CHRISTY L. LEA, ESQ.
6                         JOSEPH R. RE, ESQ.
                          NICHOLAS M. ZOVKO, ESQ.
7                         ALAN G. LAQUER, ESQ.
                     2040 Main Street, 14th Floor
8                    Santa Ana, CA  92614
                     (949)760-0404
9

10

11

12   On behalf of Defendant:

13                   FINNEGAN HENDERSON FARABOW GARRETT & DUNNER
                     BY:  JAMES R. BARNEY, ESQ.
14                        AARON L. PARKER, ESQ.
                          NICHOLAS A. CERULLI, ESQ.
15                        DANIEL G. CHUNG, ESQ.
                          RAYMOND S. LU, ESQ.
16                   901 New York Avenue, NW
                     Washington, DC  20001
17                   (202)408-4000

18

19

20                   CLARK HILL, LLP
                     BY:  RYAN C MCKIM, ESQ.
21                   555 South Flower Street, 24th Floor
                     Los Angeles, CA  90071
22                   (213)891-9100

23

24

25

1          **LOS ANGELES, CALIFORNIA; MONDAY, AUGUST 1, 2022;**

2

3

4          THE CLERK:  All rise.  This United States

5    District Court is now in session, the Honorable Mark C.

6    Scarsi, presiding.

7          THE COURT:  Please have a seat.

8          THE CLERK:  Calling Item No. 8, CV-21-01289,

9    *Pavemetrics Systems, Inc., vs. Tetra Tech, Inc.*

10         Counsel, state your appearances, please.

11         MS. LEA:  Your Honor, this is Christy Lea from

12   Knobbe Martens on behalf of Plaintiff, Pavemetrics

13   Systems.  I'd like to introduce, with me here, I have

14   Joseph Re from Knobbe Martens, Nick Zovko also from

15   Knobbe, Alan Laquer from Knobbe Martens, and we have

16   with us Ray Lu from Knobbe as well as a summer

17   associate, Isabella Castana (Phonetic), who's currently

18   in law school at Berkley, as well as our paralegal,

19   Linda Dunn.

20         THE COURT:  Good afternoon, everyone.

21         MR. BARNEY:  Good afternoon, Your Honor.  On

22   behalf of the Defendants, James Barney.  I'm with the

23   Finnegan law firm.  With me today is Aaron Parker,

24   Daniel Chung, Nicholas Cerulli, also with the Finnegan

25   law firm, and we have our local counsel, Ryan McKim, and

1    he's with the Clark Hill law firm.

2            THE COURT:  Good afternoon.  Okay.  So we're

3    here on a pretrial conference.  Just by way of

4    scheduling, we've got our trial set for -- let's see.

5    Is it two weeks from Wednesday?

6            THE CLERK:  Yes.

7            THE COURT:  Okay.  So, yeah, we'll be starting

8    the trial on Wednesday, and Wednesday, the --

9            THE CLERK:  It would be the 17th.

10            THE COURT:  17th.  And that will be the first

11    day of trial.  I'll likely want to meet the day before

12    on the 16th to go over some issues that are probably

13    going to be left over from today on jury instructions,

14    verdict forms, and those things.  So we will plan on

15    meeting -- meeting on the 16th to go over additional

16    issues, and maybe we'll meet at 1:00 o'clock on the

17    16th, and then we'll start our trial at 8:30 on the

18    17th.

19            So today I wanted to go through some of the

20    Motions in Limine, some of the questions the Court has,

21    and the -- the some of the -- some of the evidentiary

22    issues and then some instructions to the parties

23    about -- about jury instructions and verdict forms and

24    things.

25            I wanted to deal with this issue, though, about

```
 1    a witness that wouldn't be able to testify due to health
 2    issues, Pavemetrics' CEO, Richard Habel.  I wonder if I
 3    could hear a little bit more from Pavemetrics as to why
 4    that's -- why that's required.
 5            MS. Lea:  Yes, Your Honor.  Mr. Habel is the
 6    CEO of Pavemetrics.  So his testimony is important to
 7    the case, and he needs to be a witness, but he does have
 8    a chronic inflammatory disease that prevents him from
 9    travelling.  It's a disease that generates antibodies
10    that attacks his nerves, and it's controlled by lowering
11    his immune system through I.V. treatment every six weeks
12    and weekly chemo pills and steroids, and so travelling
13    would put him at risk, not just for COVID, but -- but,
14    really, for any infection.
15            THE COURT:  And is it the case that he just
16    doesn't travel at all?
17            MS. Lea:  He does not travel at all.
18            THE COURT:  Okay.  And how do you envision
19    doing -- doing it by, sort of, video hookup?
20            MS. Lea:  Yes, a Zoom-type of hookup.
21            THE COURT:  Okay.  And that would be for -- how
22    long do you anticipate that his -- his testimony will
23    last?
24            MS. Lea:  His testimony will be less than an
25    hour.
```

```
 1              THE COURT:  And what about the -- what about
 2    Tetra Tech?  What's your sense as to how long you're
 3    going to have Mr. Habel on the stand either on
 4    cross-examination or in your direct case?
 5              MR. BARNEY:  Without consulting my notes
 6    directly, I believe it will probably be half an hour.
 7              THE COURT:  Okay.  So we're looking at about an
 8    hour for this?
 9              MS. Lea:  Correct.
10              THE COURT:  Okay.  And then let me ask -- let
11    me ask, Tetra Tech, any objection to taking Mr. Habel's
12    testimony by video during the trial?
13              MR. BARNEY:  We don't have any objection to
14    that, Your Honor, obviously subject to your preference.
15    I don't know.  Every courtroom is different, and
16    sometimes it works, and sometimes it doesn't, but to the
17    extent that it could work, we do not have an objection
18    to it.
19              THE COURT:  Yeah, I would rather avoid it if we
20    could, but it doesn't sound like he's able to travel;
21    right?  So let's think about this:  What about exhibits?
22    How about we deal with presenting the witness with
23    exhibits?
24              MS. Lea:  Well, we could send the exhibits in
25    advance for direct, and then if there are exhibits in
```

1    cross, they would have to be uploaded to the Zoom

2    system.

3           THE COURT:  Okay.  Are you planning to have

4    somebody there with him, or -- or is he just going to be

5    by -- by himself?

6           MS. Lea:  We have not planned to have someone

7    with him.

8           THE COURT:  I'm just wondering, you know, there

9    might be -- and this is always hard to do -- but it

10   might be the case that you could prepare a witness

11   binder for him with potential exhibits that you're going

12   to use both on direct and cross you.  It obviously

13   crosses -- it would be the sort of thing where you

14   might, maybe, just do things on the fly with the Zoom,

15   but I guess I'll ask the parties to try to work to

16   figure out how to -- how to minimize this.  I hate to do

17   things by video just because it's sort of awkward.  We

18   always have problems and things, but it seems with the

19   circumstance, there's, really, no way around it.

20          MS. Lea:  We understand, and, perhaps, we could

21   do the cross exhibits on the honor system.  We do

22   depositions sometimes where the other side wants to send

23   their exhibits in ahead of time, and we just ask the

24   witness not to look at them.

25          THE COURT:  Yeah, you could sent them in

1    double-sealed envelope or something, and have him

2    unseal, you know, at the beginning of cross or

3    something.

4         MR. BARNEY:  We're certainly willing to work

5    with them.  My personal preference in the way I've done

6    it, when we have these Zoom things at trial, the witness

7    is usually located in a law firm.  So there usually is

8    somebody there.  I've not done it where they're, kind

9    of, all by themselves, but from what Your Honor has

10   suggested, I'm happy to work with my colleague and get

11   it worked out.

12        THE COURT:  Yeah, that would be great, and I

13   think, you know, and obviously, you know, as much as it

14   can be difficult for the parties and the Court in

15   dealing with technical issues, it's horrible for the

16   jury if things aren't working.  And so whatever you do,

17   make sure it's tested and you sort of have it all set

18   up.  That would be helpful.

19        MS. Lea:  Absolutely.

20        THE COURT:  I want to just deal with this issue

21   about Pavemetrics is making an objection that Tetra Tech

22   disclosed too much deposition testimony, and so you've

23   now offered counter-designations.  I'm wondering -- I'm

24   a little confused by the objection.  So what is to much

25   deposition testimony, and how could it be that they've

 1    designated too much deposition?

 2           MS. Lea:  It's 19 hours, Your Honor, and they

 3    have stipulated to a four-hour trial subject to your

 4    approval, of course, for 18 hours per side, and they had

 5    designated 19 hours of deposition testimony in addition

 6    to their live witness testimony.  So, clearly, they

 7    cannot play 19 hours of deposition testimony at trial.

 8    For these witnesses, they've, actually, stated that

 9    they're going to either play depos or call them live for

10    one-and-a-half hours total among all eight witnesses,

11    and so to designate 19 hours, doesn't give us notice of

12    what they planned to, actually, put on or allow us to

13    properly designate a response.  I mean, if we designated

14    a response, it would basically be the other half of the

15    transcript.  So it's just not sufficient and not

16    consistent with the local rule.

17           THE COURT:  And so these are 19 hours of

18    deposition testimony of witnesses that are -- that are,

19    I guess, not within the subpoena power of the Court; is

20    that correct?

21           MR. BARNEY:  Yes, Your Honor.  We -- we

22    designated witnesses that it seems clear are not going

23    to be at trial, and their testimony will come in via

24    deposition, but we also -- and I think one thing that

25    needs to be clarified here is we also designated

1   witnesses who we expect will be called, but being COVID

2   times and you never quite know these days, so we went

3   ahead, as a prophylactic, and designated their testimony

4   as well.  So when she say's there's 19 hours, that's 19

5   hours of all witnesses, both those that will be here

6   live as well as those that probably we expect will not

7   be here live, and obviously we don't know exactly what's

8   going to happen at trial, and so we don't know what

9   evidentiary objections will be made, and

10  that necessarily means you have to prophylactically

11  designate things that probably won't come in at trial

12  because they'll become unnecessary.  And the parties

13  have an agreement in the pretrial order to exchange

14  their actual testimony that they actually intend to play

15  or to read to the jury 48 hours in advance, which is

16  plenty of time to -- to raise objections or to meet and

17  confer if there's something the parties disagree on.  So

18  we don't think that is unusual, and we think the parties

19  will just bee able to work it out that way.

20          THE COURT:  All right.  And let me ask you

21  this:  So 19 hours -- you've got ten hours of trial

22  time, you know, taking out the -- the openings and

23  closes, and did you think you could take another crack

24  and cut done on that, or is it your view that -- that

25  you've done this to make sure that you're in a secure

1    position so if you -- depending on what you want to do

2    at trial, you've have things already designated that you

3    need?

4         MR. BARNEY:  Your Honor, obviously we'll follow

5    any directive you give us, but I think that we've

6    designated what we think prophylactically is necessary

7    for us to preserve our -- our positions our issues.

8    There's probably one area that could be trimmed down.

9    We did not, at the time, designate the agreement that

10   the parties have now on authenticity.  So it's possible

11   we could get rid of some of the designated testimony

12   that was geared specifically to authenticity of

13   documents, but I don't know how many of the so-called 19

14   hours to account for.  But other than that, I think we

15   feel that we've designated what we need to preserve our

16   rights.

17        THE COURT:  Okay.  So why don't you -- why

18   don't you do this:  I'm not going to make a ruling on

19   this, but I'd just ask you to take a crack and see, you

20   know, what -- just to have somebody take one more pass

21   through to see what you can get rid of.  I'm not telling

22   you you have to cut it down, but if you can, you should,

23   and then -- and then I'll ask them, Pavemetrics, to do

24   counter-designations.  It doesn't seem -- it doesn't

25   seem too outlandish to the Court, the 19 hours; but

1    obviously, if it can be cut down, it should be cut done,

2    and I understand, you know, what you're saying is that,

3    you know, this process isn't getting to the crux of

4    what's actually going to be done, but in this -- in

5    trial prep, I can see everybody, kind of, over --

6    over-designating just to make sure they've got

7    everything right.  So that's how I would resolve that,

8    and so maybe if you can -- I don't know -- maybe take a

9    week and -- and cut down those designations if you can,

10   and then how much time will you need to do

11   counter-designations?

12        MS. Lea:  Well, obviously, it depends on how

13   much there is, but let's say three days, Your Honor.

14        THE COURT:  Okay.  Great.  Okay.  So let's go

15   ahead and do that.

16        I don't know if I said this already, but I'm

17   thinking about -- this is what I'm going to do as far as

18   time:  Each side is going to have 20 minutes for

19   opening, ten hours for direct and cross-examination, and

20   one hour for closing.

21        And now let's talk about the order of the

22   trial.  So Tetra Tech has a motion to, sort of, re-order

23   the parties for the trial where, for all intents and

24   purposes, we'd have Tetra Tech be the Plaintiff and

25   Pavemetrics be the Defendant.  That certainly would lead

1    to less confusion for the jury.  I've had a patent case

2    where we had it reversed, like it is here, and it could

3    be kind of confusing to the jury to really get a sense

4    to what's going on.  I understand that Pavemetrics,

5    though, would rather be the Plaintiff because they were

6    the first ones to file suit.

7            As I understand it, the Court has a lot of

8    discretion in this area.  I can't really find anything

9    from the Ninth Circuit or the Federal Circuit, which

10   points me to specific standards I'd have to use, but let

11   me hear from the parties on this.  First of all, let me

12   hear from Tetra Tech as to the reasons you think it

13   makes sense to re-order the parties.

14            MR. BARNEY:  Thank you, Your Honor.  You did

15   put your finger on it.  It's discretionary with the

16   Court, and we've laid out the legal argument in our

17   brief, which I don't intend to rehash word for word or

18   point for point, but the -- the basic point is that

19   Your Honor has the power to do this.  There is a

20   presumption that, if you're the declaratory judgment

21   Plaintiff and you maintain some aspect of the case where

22   you bear the burden of proof, then -- then you are the

23   Plaintiff.  There's no question about that, which is why

24   this doesn't come up that often, which is why you're

25   having problems finding lots of case law on this because

1    it doesn't happen that often, but it does, and it

2    happened here.  And what happened was they were the

3    declaratory judgment Plaintiff and their affirmative

4    arguments were not infringement, and the so-called

5    283 defense, and the non-infringement is still in, but

6    the other allegation has dropped out of the case.  That

7    was because of the Summary Judgment ruling that

8    Your Honor handed down, which found that the product

9    they were tying to rely on for that defense doesn't meet

10   the claim limitations and, therefore, it's no longer a

11   viable defense and neither is the sort of corresponding

12   anticipation argument that they had based on that same

13   product.  So both of those arguments are out.  What's

14   left on their side of the declaratory judgment complaint

15   is a -- is a request for a declaratory judgment of

16   non-infringement.  That puts us squarely in the

17   situation that we saw on the _Plum Tree_ case, where the

18   only issue left on their -- on their side is an issue

19   for which we bear the burden of proof solely, and the

20   fact that they're the DJ Plaintiff doesn't change that

21   fact.  We still bear that burden of proof, and if you go

22   through the factors that we laid out under the principle

23   purpose test, every one of those factors lines up

24   with -- with changing the order of presentation to the

25   jury.

```
 1                As Your Honor correctly point out, it's

 2       confusing to a jury to hear evidence of non-infringement

 3       before they've heard from the -- from the Plaintiff on

 4       infringement.  The evidence comes in backwards.

 5       Sometimes, you might have a situation where the experts

 6       are like two ships passing in the night because they

 7       haven't locked horns on whatever the actual dispute is

 8       in the case.  The -- the response to that particular

 9       point was, well, to the extent the jury's confused, it's

10       only going to -- it can only possibly hurt Pavemetrics

11       because the jury might think that they have the burden,

12       but I think it goes beyond that, Your Honor.  I don't

13       think jury confusion is really helpful for anybody.  It

14       leads to questions when the jury -- when the verdict

15       finally does come down.  Did they really receive the

16       evidence that they needed to make that verdict and so on

17       and so forth.  So I think this is a matter of judicial

18       housekeeping.  The best thing to do is to organize the

19       case the way most trials go, which is the party that has

20       the burden of proof on the primary issue goes first,

21       which would be us on infringement, at which point, they

22       could then present their case for non-infringement and

23       invalidity, and then we would have a rebuttal case on

24       validity.

25                That's our request, Your Honor.
```

1          THE COURT:  And let me hear from Pavemetrics.

2          MS. Lea:  Yes, Your Honor.  Mr. Laquer will

3     handle the argument for Pavemetrics.

4          MR. LAQUER:  Good afternoon, Your Honor.

5          THE COURT:  Good afternoon.

6          MR. LAQUER:  We do agree that this is a

7     discretionary issue, and we also agree that confusion is

8     an important question here, but the Court's distinction

9     between other cases and what we're looking at here is

10    that the reason we are here and the subjective belief of

11    Pavemetrics in filing this declaratory judgment action

12    is central to the liability allegations of Tetra Tech on

13    indirect infringement, both contributory and induced,

14    and on willful infringement, and there is significant

15    risk that the jury would believe this is Tetra Tech's

16    case that Tetra Tech filed if Tetra Tech goes first.  We

17    need to avoid that confusion.  In maintaining

18    Pavemetrics' status as Plaintiff, it's the -- it's

19    really the central most powerful way to avoid that

20    confusion.

21         THE COURT:  And so you thinks it's important

22    for the jury to know that you were the one that brought

23    suit first --

24         MR. LAQUER:  Yes.

25         THE COURT:  -- because it tells the jury that

1    you believed you didn't infringe the patents?

2          MR. LAQUER:  Absolutely.  Another important

3    point, Your Honor, Tetra Tech said something about the

4    Court's Summary Judgment order supposedly saying that an

5    invalidity -- or, rather, a prior-use defense is not

6    feasible.  That's not accurate.  That was not in the

7    order.  Pavemetrics dropped that defense because it was

8    redundant of our invalidity defense that we are taking

9    to trial that we do bear the burden on and, frankly,

10   would have brought but for some specifics of maintaining

11   an IPR option, which we ultimately did not pursue, and

12   we've explained that in the briefing as well.

13         So invalidity is an important issue.  It seems

14   that Tetra Tech acknowledges, if we filed for invalidity

15   in our original declaratory judgment Complaint, they

16   would not be contesting the presumption that we should

17   go first, and the Court acknowledged that our invalidity

18   defense is essentially identical to the prior-use

19   defense that we did already raise.

20         THE COURT:  Okay.  Let me ask you this:  It

21   seems to me the crux that you'd like to get out of this

22   is that you'd like the jury to know that you were the

23   one that brought suit first and because that sort of

24   goes with your theme, that you didn't think you

25   infringed the patent.

1          MR. LAQUER:  Yes, Your Honor.

2          THE COURT:  Could we do that with a -- with a

3     curative instruction from the Court to the jury and

4     still allow the patentholder to put their evidence on

5     first, and then you -- and then you can put your

6     invalidity evidence on?  I'm thinking that that might be

7     a way to, you know, kind of have our cake and eat it,

8     too.

9          MR. LAQUER:  I agree that that would mitigate

10    the issue, Your Honor, particularly if that was given

11    before opening arguments because I think, as soon as the

12    jury hears one side go first in the opening and then

13    call their witnesses first, that's influential aside

14    from instructions that are given days later.  I do still

15    believe that it would not fully mitigate, but I agree

16    that it would help, though.

17         THE COURT:  Okay.  So I think that that's

18    helpful.  I wonder about the -- there used to be a

19    video -- I'm dealing with a bunch of old patent lawyers

20    here so I feel like I'm with kinder -- kinder spirits.

21    I started out at a firm called Christy Parker & Hail in

22    Pasadena, which was an old patent firm here and then

23    moved on to O'Melvany & Melbank where I did patent

24    cases, but there used to be a patent video that we

25    played for the jurors.  It was old, and I don't know if

1    they updated that.

2            Has anybody had any success with that?  I was

3    just wondering if there's anything we can do at the

4    beginning of the case to get the jury a little bit

5    familiar with this whole thing.

6            Any thoughts on that?

7            MR. LAQUER:  If I could ask my co-counsel to

8    weigh in.

9            MS. Lea:  Yes.  So the parties have stipulated

10   to play the most recent version, which I believe is the

11   2016 or 2018 version.

12           THE COURT:  Okay.  How -- and so 2018, I guess

13   I don't think I've seen that one yet, but is that

14   available on-line?

15           MS. Lea:  It is on-line.

16           MR. BARNEY:  At the Judicial Center.

17           THE COURT:  Okay.  Okay.  Great.  So I'm just

18   going to -- I'm just going to take a look at that.

19           So do the parties want to play that before

20   opening, then?

21           MS. Lea:  Yes.

22           MR. BARNEY:  As part of the preliminary

23   instructions would be our suggestion.

24           THE COURT:  Okay.  Okay.  I just think it's

25   helpful just for the parties to have that because we

1   didn't do that in a couple prior patent matters, and I

2   just think it's hard for the jurors.

3          Okay.  Okay.  Those were just some preliminary

4   things we need to go through.

5          Now, let's talk about the Motions in Limine.

6   So the first Motion in Limine is to exclude this string

7   of e-mails with Bill Larson and Brad Spencer.

8          Now, Tetra Tech, you're arguing that there is

9   an exception to the hearsay involved in these -- in

10  these e-mails, and I'm not sure that -- I'm not sure

11  that -- I agree with you a hundred percent, but why

12  don't you give me your best -- why -- why are there

13  exceptions to the Hearsay Rule for this string of

14  e-mails?

15         MR. BARNEY:  Thank you, Your Honor.  Would you

16  like me to do it from the lectern?

17         THE COURT:  Yes, please.

18         MR. BARNEY:  Thank you, Your Honor.  I think

19  the first exception would be the statement against

20  interest.

21         THE COURT:  Okay.  So who's -- who's interest

22  is this statement against because we've got -- we have

23  got this, I guess -- let me just --

24         MR. BARNEY:  It would be CSX's interest,

25  Your Honor.

```
 1              THE COURT:  So CSX is a customer of
 2    Pavemetrics; right?
 3              MR. BARNEY:  Right.
 4              THE COURT:  So they bought one of these
 5    systems, and this Brad Spencer says he talked about
 6    Tetra Tech's patents with Pavemetrics.
 7              Why is that a statement against Brad Spencer's
 8    interest?
 9              MR. BARNEY:  Because that would implicate CSX
10    as a direct infringer possibly without -- and that was
11    before suit was even filed.  So had -- had the -- had
12    that interest -- that interest would only come out, you
13    know, prior to suit being filed and him making that
14    statement would implicate CSX for potential infringement
15    as a direct infringer.
16              THE COURT:  Even though they're a customer and
17    not a -- not a manufacturer?
18              MR. BARNEY:  Correct.  Because they would be
19    the potential direct infringer at that time.
20              THE COURT:  Uh-huh.  And what is the statement?
21    Is it merely that he talked about -- that he talked
22    about the patents with -- so -- so he's telling --
23    Spencer, who's a Pavemetrics customer, is telling
24    Larson, who is a Tetra Tech employee, that
25    Spencer talked about Tetra Tech's patents with
```

1    Pavemetrics?

2            MR. BARNEY:  Correct.

3            THE COURT:  And anything any more damaging than

4    that?  It seems -- it doesn't seem like it's very, you

5    know, derogatory.

6            MR. BARNEY:  At that time, it would indicate

7    that they had -- CSX, as well, had knowledge of Tetra

8    Tech's patents and would implicate them and kind of

9    expose them to potential liability for infringement of

10   Tetra Tech's patents.

11           THE COURT:  Okay.  Because he's not saying that

12   he thinks that there's infringement; right?  In fact,

13   he's -- I mean, I guess the statement, as I see it, is

14   just saying that he talked to him about the patents, and

15   it could be -- you know, it could be I know they have

16   patents; but, I mean, it wouldn't seem -- it wouldn't

17   seem enough -- enough against interest to get over the

18   Hearsay Rule.

19           MR. BARNEY:  From what I recall, the rest of

20   the statement actually states that there would be an

21   infringement claim.  So that would, you know, go beyond

22   just the -- you know, them having knowledge of the

23   patent but CSX also having the potential to be

24   implicated in an infringement suit.

25           THE COURT:  Okay.  Let me hear from Pavemetrics

1    on that.

2           MR. ZOVKO:  Good afternoon, Your Honor.  Nick

3    Zovko with Pavemetrics.

4           THE COURT:  Good afternoon.

5           MR. ZOVKO:  So on the statement of interest

6    exception, there's actually an easier answer.  So the

7    statement of interest exception is under Federal Rule of

8    Evidence, 804, not 803, and so with 804, it only applies

9    when a Declarant is unavailable.  And so here, the

10   Declarant is, for this level of hearsay, Mr. Spencer of

11   CSX, and he's not unavailable under Rule 804 because he

12   has been available in this case.  Tetra Tech has deposed

13   Mr. Spencer.  They deposed him about six months ago, and

14   so under Federal Rule of Evidence, 804(a)(5)(b),

15   Mr. Spencer is not unavailable in any exception under

16   Rule 804 or does not apply, and this hearsay exception

17   was only first raised by Tetra Tech in their opposition.

18   So I'd provide a case cite as well to the Court, and

19   this is a very clear point of law.  The case is *Campbell*

20   *vs. Coleman*, 786 F.2d 892, Eighth Circuit, (1986), and

21   there's several cases afterwards including cases in this

22   district that apply such that a statement of interest

23   exception cannot apply to a witness that has been

24   deposed in a case whether or not that witness is going

25   to testify live at trial.

1          THE COURT:  Okay.  So that does -- that is

2     simpler than sort of the think that I was trying --

3     trying to tease out.

4          Any other responses to Tetra Tech's argument on

5     business records and the residual hearsay exception?

6          MR. BARNEY:  Yes.  On the second layer of

7     hearsay, Tetra Tech argues the business record

8     exception, but this -- that issue is just a simple

9     routine e-mail between Tetra Tech employees, and the

10    business record exception does not apply automatically

11    to e-mails.  It requires Tetra Tech to establish that he

12    or Mr. Larson had a regular practice imposed by Tetra

13    Tech to maintain e-mails, these types of e-mails in a

14    certain way, and that hasn't been established, and

15    there's no testimony or evidence showing that.

16         And then the additional point on that is

17    there's also a level of untrustworthiness here in that

18    13 days later is when Tetra Tech sent the letter to

19    Pavemetrics accusing Pavemetrics of infringing, and so,

20    in Pavemetrics' view, this e-mail was essentially

21    prepared in anticipation of litigation and not just in

22    the regular, ordinary course of business.

23         THE COURT:  Okay.  Can I get a response from

24    Tetra Tech, first of all, on the hearsay rules on 803,

25    804, and then, sort of, I guess the business records

```
 1    issue.

 2            MR. BARNEY:  Thank you, Your Honor.  I think

 3    I'd like to touch on the unavailability aspect of the --

 4    of this hearsay exception.  I think, here, the witness

 5    is unavailable because, at his deposition, he -- he

 6    stated that he did not remember, and under the Federal

 7    Rules of Evidence, I believe that qualifies as a witness

 8    that is, quote, "unavailable," and that goes to the

 9    residual exception where we have a contemporaneous

10    record versus the witness, when asked at deposition, not

11    recalling, and we also have the witness acknowledging

12    that the person that kept the record, Mr. Larson, is

13    trustworthy.

14            So I believe there is no more probative

15    evidence for the fact that we're trying to prove other

16    than this contemporaneous record that Mr. Larson kept in

17    his e-mails, and it's not just the record itself.  If

18    Mr. Larson were to testify and there is the hearsay

19    exception as Your Honor, then he would be able to

20    testify as to that conversation, and it's not just a

21    document itself from which we can get the evidence into

22    evidence.

23            THE COURT:  And so your response is the

24    witness's lack of inability to remember makes him an

25    unavailable witness?
```

1           MR. BARNEY:  Correct, Your Honor.

2           THE COURT:  Okay.  Let me get a response to

3    that.

4           MR. ZOVKO:  Thank you, Your Honor.

5    Pavemetrics' response is -- first of all, I'm not aware

6    of any authority to support that proposition.  Tetra

7    tech didn't cite any in its opposition.

8           And then, secondly, Mr. Spencer's testimony

9    wasn't really that he didn't remember.  If you read it

10   carefully, in our view, it's essentially this

11   conversation didn't happen.  The first time I spoke with

12   Mr. Larson about this subject matter was in 2021, not

13   2020.

14          THE COURT:  Okay.  Thanks.

15          So I want to move on to Pavemetrics' Motion in

16   Limine No. 2, and this is to prevent Tetra Tech from

17   eliciting evidence or testimony on the unavailability of

18   the source code at trial; and, to me, this is one of

19   those things where -- well, I don't think that the

20   issue -- you can go up to the podium -- but it sounds

21   like this issue is not really going to come up unless,

22   sort of, Pavemetrics opens the door and argues that

23   somehow that the expert didn't review this unavailable

24   source -- source code.

25          MR. ZOVKO:  Yes, Your Honor, and we expect that

1  will come up.  It did come up in the expert's deposition

2  when I asked him regarding the neural network binary

3  files, and there doesn't seem to be a dispute that the

4  files were on the inspection laptop.  The expert

5  inspected the laptop.  He claimed, during the

6  deposition, that he does not have the tools to make

7  those files visible.  Now, the neural network files are

8  important to the case.

9       Now, Dr. Morellas, the expert, opines that the

10  neural network satisfies several of the key claim

11  limitations.  This is something that's come up in the

12  briefing in this case as well, and so he presents no

13  opinions as to the contents of those files.  Whether the

14  expert reviewed the files is critically important.  Why

15  he did not review the files, on the other hand, is a

16  discovery dispute, and I think, really, the crux of the

17  dispute is reviewed on the first page of Tetra Tech's

18  opposition, the last paragraph, first sentence.  There,

19  Tetra Tech argues the evidence of why Dr. Morellas did

20  or did not review certain information is probative and

21  relevant to the issue of infringement.

22       Now, if his opinion was that he did not review

23  the neural network files because he doesn't rely on

24  them, he doesn't believe that their relevant to

25  infringement, then his why answer on why he did not

1   review them would be completely appropriate, we'd be

2   happy to take examination on him, the parties might

3   differ, and that could be litigated at trial, but that's

4   not the case.  It's undisputed that the neural network

5   files are relevant.  He's relying on the neural network

6   to satisfy Tetra Tech's burden of infringement.  And so

7   now, Tetra Tech is trying to blame Pavemetrics'

8   discovery efforts or activities to -- to make, really,

9   an excuse for their expert not having reviewed the

10  files.  And when they argue that the discovery conduct

11  is probative and relevant of infringement, that's

12  seeking an adverse inference.  They claim that they're

13  not seeking an adverse inference, but to say that the

14  reason why he didn't look at them is relevant, really,

15  is an adverse inference, and Tetra Tech seems to

16  acknowledge Dr. Morellas wanted to look at them.  I

17  mean, they say, on the second page, that it wasn't his

18  choice that he did not review those files.  Pavemetrics'

19  expert has reviewed the contents of the neural network

20  files and has confirmed that they are supportive of the

21  conclusion of non-infringement.

22          Also, revealed in the briefing is that Tetra

23  Tech acknowledges their source code programming attorney

24  came back on a later date and reviewed the files with

25  the tool that he requested and that I put on that

1    computer and I made available to him.  In Mr. Palace's

2    (phonetic) e-mail confirming that he wants to come back

3    on December 20th and 21st, he states that he'd like to

4    have the TensorFlow viewer available as it was

5    previously.  So that tool was on the computer.

6         Tetra Tech's attorney, who's a former

7    programmer, used the tool, came back on a date without

8    the expert, and then the expert never opined on the

9    contents of the files.  I think this goes beyond just a

10   discovery issue.  This is Tetra Tech choosing not to put

11   in front of their expert central evidence on a

12   functionality they're relying in their attempt to carry

13   their burden on infringement.

14        THE COURT:  And so the tool that was available

15   later on on the laptop to be able to look at the neural

16   network was not available on the laptop when the expert

17   reviewed the source code?

18        MR. ZOVKO:  It actually was later that day.  He

19   asked me the morning of December 10th to install it.

20   Under the protective order, we have a few days to

21   install it.  We put it on during his lunch break.  Right

22   after the lunch break, I went into the room.  I told

23   their counsel, Mr. Palace, and the expert that it was

24   available.  I can't recall with certainty if the expert

25   was there or if I had the conversation strictly with the

1    attorney, but we did make it available.  The expert

2    later claimed in his deposition that he didn't realize

3    it was there on his day.  There's been no explanation by

4    Tetra Tech why they didn't bring their expert back.  The

5    only person on Tetra Tech's side, who has acknowledged

6    that he used the tool, filed a Motion to Withdraw and is

7    no longer on their case, and their expert is saying that

8    he didn't look at the files because he didn't have the

9    tool, but the tool was there.

10          And, fundamentally, you can see what we're

11   discussing here is a discovery dispute.  This is not

12   something you would normally litigate in front of a

13   jury, and so we filed this Motion in Limine because this

14   doesn't seem like it's an appropriate dispute.

15          THE COURT:  No, I agree.  It didn't seem like

16   it's appropriate, but it's tricky because, you know, you

17   want to make the point to the jury that this -- that the

18   expert didn't review the neural network; right?  And it

19   seems fair that the expert can say, while I was

20   reviewing it, I wasn't aware that I had the ability to

21   do it because there was not a tool -- the tool wasn't

22   available, or I didn't at least think the tool was or

23   wasn't available.  I mean that seems to be an important

24   distinction for him to make, but let me hear from Tetra

25   Tech on this point.

1          MR. PARKER:  Thank you, Your Honor.  This is

2     Aaron Parker for Tetra Tech.

3          So Dr. Morellas, he reviewed the source code on

4     multiple days as you know, and Pavemetrics is contending

5     that an intense review was made available at lunchtime

6     on what was, effectively, his fifth day, you know,

7     throughout the case, maybe even more of reviewing the

8     source code.  So Dr. Morellas was not aware that it was

9     available on that day.  So I think there is -- there is

10    a dispute as to whether he was told.  He said he wasn't

11    told.  Mr. Laquer says that he did tell him.

12         So, I mean, we agree that it would be unfair

13    for Pavemetrics to ask Dr. Morellas if he -- if he

14    reviewed the binary files because the whole reason for

15    doing that is for them to try to damage his credibility,

16    and the show that he hasn't, you know, done what was

17    proper to establish infringement.  So I think that that

18    would be prejudicial for -- for Dr. Morellas and for

19    Tetra Tech.

20         But the other point I wanted to correct, one

21    thing that Mr. Laquer said, he said that Tetra Tech is

22    relying on those binary files for -- for infringement.

23    Dr. Morellas has pointed to other evidence that he was

24    able to establish infringement without actually looking

25    at those binary files.  So any implication by

1    Pavemetrics that reviewing those files was absolutely

2    necessary in order for Dr. Morellas and Tetra Tech to

3    prove infringement is incorrect.

4            THE COURT:  Okay.  Thank you.

5            Let's move on to Pavemetrics' Motion in Limine

6    No. 3, and I hear that it's just not clear to me that

7    Morellas is going to be testifying inconsistently with

8    the Court's Claim Construction Order and the Summary

9    Judgment order.  I mean, obviously, the Court will be --

10   will be, sort of, focused on this at the trial.  I

11   expect all -- I expect both experts to be testifying

12   consistently with the -- with the order -- with the

13   Claim Construction Order and with the Summary Judgment

14   order, and if not, I would expect objections at the

15   time.

16           I'm wondering about, you know, what is there in

17   the report that is definitive enough to -- to exclude by

18   way of Motion in Limine and why shouldn't we wait until

19   we see what exactly comes in at trial.

20           MS. Lea:  Well, Your Honor, those -- those are

21   great questions, and I will answer them.  First of all,

22   the argument that Tetra Tech is putting forward is that

23   the dependent claims were never before the Court in the

24   Summary Judgment motion on the '293 Patent when this

25   Court granted non-infringement of the fake 3D with

1    overlay algorithm.  Those claims were absolutely before

2    the Court.  We moved on all of the claims.  All of the

3    claims have the track elevation map limitation by virtue

4    of that limitation being in Claim 1.  So Claim 1

5    requires an algorithm with four steps.  One of those

6    steps is identifying a feature from a 3D map by

7    following two sub-steps.  The dependent claims add more

8    sub-steps to that same algorithm.  So Your Honor granted

9    Summary Judgment on the fake 3D with overlay.  That is

10   short for actually using a typical computer vision

11   algorithm to identify features from elevation data and

12   then taking those previous identified features and

13   overlaying them in color, coloring them in on a fake 3D.

14   That's what Your Honor granted Summary Judgment on for

15   Claim 1.

16        And there is -- there is a clerical error,

17   Your Honor, in -- in your expert report -- I mean -- I'm

18   sorry -- in your Summary Judgment order.  I'm so sorry.

19   So in your order on the first page, you mention the

20   claim that Pavemetrics is accused of infringing, and

21   those claims were taken from -- from the counterclaim

22   of infringement, and 2 and 4 are missing from that list.

23   They were added later by the Defendants in their

24   infringement contentions, and so we moved on all of

25   those claims.

1          If you look at the statement of undisputed

2     facts, it's undisputed that those claims were asserted.

3     If you look at our Notice of Motion, it was on all

4     claims.  If you look in our motion, it was on all

5     claims, but in your order, Your Honor, on the last page,

6     the order on fake 3D with overlay was limited to the

7     independent claims and two dependent claims that

8     actually repeated the 3D map limitation, but that

9     limitation is in all the claims by virtue of it being in

10    the first claim.  So by virtue of that, fake 3D with

11    overlay should be out completely as well as the

12    elevation-only algorithms that are part of it, but

13    those -- the expert report of Dr. Morellas was written

14    prior to your order, and so, in that order for Claim 1,

15    we had the exact, same fake 3D with overlay arguments

16    that were in Morellas's Declaration on the Summary

17    Judgment.  They are almost word for word, just -- just

18    minorly adjusted.

19          And then for Claim 2 and Claim 4, he continues

20    with the fake 3D with the overlay.  He's pointing to

21    very specific non-neural network, so not neural network,

22    just the computer vision algorithm.  So in this case,

23    they've accused fake 3D within a neural network, mixed

24    image within a neural network, and fake 3D with overlay

25    based upon elevation-only algorithms.  That's what you

1    granted Summary Judgment on.  So -- and that's what

2    Claim 2 and Claim 4 is based upon in his report, is

3    simply elevation-only algorithms that were combined with

4    the fake 3D.  It couldn't be combined with a neural

5    network.  There's no neural network argument, and he

6    can't make one.

7            Claim 21, he did both.  He said fake 3D with

8    overlay based upon elevation-only algorithms and neural

9    network on that one.  We're not trying to exclude the

10   neural network on Claim 21, but we are trying to exclude

11   the elevation-only algorithm analysis that Your Honor

12   already did on the Summary Judgment motion.  In fact,

13   two of those algorithms, one on Claim 2 and one on

14   Claim 21, are the exact, same algorithms that were at

15   issue on the Summary Judgment order, and your order,

16   Your Honor, actually cites to Dr. Morellas discussing

17   those algorithms.  You cite to:  *Morellas identifies an*

18   *overlay algorithm that analyzes maps containing*

19   *elevation data.  (See paragraphs 77 through 80.)*"  Those

20   paragraphs talk about the elevation-only algorithms and

21   two of the ones that they're trying to bring into this

22   trial and have the jury decide whether infringe Claims 2

23   and 21.  That is a violation of your order, and they

24   should not be allowed to do that.  And because

25   Claims 2 and 4, their expert only has opinions based

1   upon elevation-only algorithms that can only be compiled

2   with fake 3D, those claims should be out of the case.

3               THE COURT:  Okay.  Let me hear from Tetra Tech.

4               MR. CERULLI:  Thank you, Your Honor.  Nick

5   Cerulli on behalf of Tetra Tech.

6               So, you know, I think Your Honor acknowledged

7   this is -- this is very fact-intensive issues.  You

8   know, Ms. Lea just described some very, very intensive

9   factual analysis that are typically reserved for Summary

10  Judgment motions, and, you know, this is effectively a

11  Summary Judgment motion dressed up as a Motion in

12  Limine, and so I'm happy to go through some of these

13  factual disputes between the experts that were raised

14  here; but, you know, as you can see procedurally, it's -

15  it's not proper to ask that these claims be thrown out

16  at this stage.  You know, they filed several Summary

17  Judgment motions, and they could have also sought

18  Summary Judgments on Claims 2, 4, and 21.

19              THE COURT:  So let me ask you this:  Well,

20  counsel pointed out what she indicated was an error in

21  the Court's order with respect to those dependent claims

22  that relied on a fake -- a fake 3D map; is counsel

23  correct there?

24              MR. CERULLI:  I believe what that's referring

25  to is, if they -- if Claim 1 were to be found not

1    infringed then necessarily the dependent claims could

2    also not be found to infringe, but what we have here is

3    the algorithms that were cited for the purposes of

4    Claim 2, 4, and 21, which are now at issue in this

5    Motion in Limine, those specific algorithms were not

6    before the Court, and so those algorithms, in

7    conjunction with what Your Honor found to actually

8    survive Summary Judgment, which were the neural network

9    algorithms that utilized fake 3D and mixed images, those

10   are at play, and they should be, and there's nothing,

11   you know, counsel incorrectly said that these are the

12   same, exact algorithms that were at issue.  I mean,

13   these are -- these are different algorithms that are

14   also in Pavemetrics' source code.  And, you know, again,

15   it sounded liked there's factual dispute here between

16   the experts, and we certainly don't intend to put up any

17   opinions from Dr. Morellas that would be inconsistent

18   with Your Honor's order.

19          THE COURT:  Okay.  Thank you.

20          I want to move to Tetra Tech's Motion in Limine

21   No. 2 on denial of the preliminary -- asking that

22   Pavemetrics not be allowed to bring up the Preliminary

23   Injunction as evidence of good faith infringement, and

24   I'll hear from Pavemetrics on that.

25          MS. Lea:  And, Your Honor, I would like to hand

1    up on the last motion to rebut what he says that they

2    are the exact, same two algorithms.  I have that laid

3    out for you in this PowerPoint if that would be okay.

4              THE COURT:  Sure.  I can take a copy of it.

5              MR. BARNEY:  Your Honor, did you want to hear

6    from Tetra Tech first on the Preliminary Injunction?

7              THE COURT:  Yeah, I think I know -- I've got

8    your argument down.  So I just want to get a -- hear

9    from Pavemetrics on that, and then I'll come back to

10   you.

11             MR. RE:  Good afternoon, Your Honor.  Joseph Re

12   for Pavemetrics.

13             This is a very important Motion in Limine.

14   Obviously, the denial of the Preliminary Injunction was

15   a critical fact in this case and will be explained by

16   the witnesses on how that strongly impacted my client's

17   belief that there was no infringement.  And, in fact,

18   this Court's order wrote, in several spots back at the

19   time of the denial in April of 2021, that there is no

20   evidence that the "deep neural network" incorporated in

21   the current LRAIL meets the "moving the gradient

22   neighborhood like a sliding window over the 3D elevation

23   data using the processor" limitation cited in Claim 1.

24   I will make a proffer that my clients will explain that

25   this confirmed, if not, solidified their belief that

1    there is no infringement of the '293 Patent.

2           Now, the patent owner here is advocating

3    indirect infringement, both contributory infringement

4    and induced infringement, and they're also alleging

5    willful infringement, and to me, that's beyond the bonds

6    of zealous advocacy, and I couldn't even find any cases

7    of patent willful infringement allegations when the

8    Preliminary Injunction was denied.  We searched and

9    searched and could not find this scenario, and could it

10   be that it's difficult, if not impossible, to try to

11   prove willful infringement or indirect infringement,

12   meaning my client had the intent to cause infringement

13   by itself or through somebody else when the Court has

14   told my client in April that the deep neural networks,

15   which is what this case is going to be about, doesn't

16   infringe the '293 Patent.

17          Now, its up to them, Tetra Tech, to advance the

18   theory of the case, and they are advancing an

19   intent-based case.  They could have easily just sued and

20   focused on the sales that are at issue for damages.

21   Now, they're only seeking damages on four sales, literal

22   infringement.  I don't know why they need to do this

23   indirect infringement and get into intent.  This trial's

24   only going to be ten hours, and I think, if it's an

25   intent-based case, my client has to -- has to be able to

1    explain the bases for his beliefs.  He had beliefs

2    before the suit was filed, he had beliefs when he filed

3    the suit, and then this Court, a couple months later,

4    confirmed those beliefs in writing.  That, of course,

5    was very good news for my client because it confirmed

6    his belief of non-infringement.  This goes to the heart

7    of the case, and you'll notice that their briefs don't

8    discuss the *Commel* standard by the Supreme Court, don't

9    discuss *Halo*, don't discuss all the basic patent law

10   that goes to intent, and *Halo* made it clear that the

11   *Seagate* standard was no good because it allowed --

12   alleged infringers to base their beliefs on what

13   happened at trial.  The Supreme Court rejected that and

14   obviously said it's at the time of the infringement when

15   the clients -- *Commel* and *Halo* make it make it clear

16   that it's the opinion, the belief of the client.  And by

17   the way, this will take care of Motion in Limine No. 5.

18   5 and 2 are kind of joined at the hip.  They're not

19   being offered for the truth.  It's being offered to

20   rebut allegations that my client intentionally infringed

21   and intentionally caused others to infringe, and how

22   could we possibly think of any better evidence to show

23   that those allegations lack merit when my client, of

24   course, took comfort in this Court's explanation of no

25   evidence, and you have a few sentences in here of no

1   evidence.  It wasn't just not a preponderance, not

2   likely.  It was no evident that the deep neural network

3   satisfies these very specific algorithms in the '293

4   Patent; and, obviously, on the '293, not on the second

5   patent, but I can't see how this could be a fair trial

6   if this is excluded altogether.  And, of course, we

7   offered what they should have done was a curative

8   instruction.  Just like you said before, if we don't get

9   to go first, the curative instruction.  This falls

10  within that same bucket.  If there's any prejudice,

11  offer an instruction.  Of course, we're not telling the

12  jury this is binding or final, like their brief

13  pretends.  It goes to my client's intent, and it clearly

14  does, and that's why we need Mr. Habel to testify

15  remotely if necessary.

16          THE COURT:  Thank you.  Let me get a response

17  from Tetra Tech.

18          MR. CERULLI:  Thank you, Your Honor.  I'm not

19  going to be able to address all of that.  I don't really

20  have time, I don't think, but the point Tetra Tech's

21  arguing here is that the Preliminary Injunction Motion

22  is highly prejudicial to the jury.  So the jury

23  essentially is being told by Pavemetrics, "Look, The

24  judge already decided some of these issues, they decided

25  them in our favor," and then they, essentially from the

1    beginning, turned the jury's, you know, view in their

2    favor.

3              With respect to the Preliminary Injunction

4    evidence being so important and being their primary

5    evidence for -- for intent, Pavemetrics has conceded

6    that it does not need the Preliminary Injunction Motion

7    to support it's non-infringement belief.  It's -- it has

8    stated that it has other evidence it intends to rely on

9    including letters, non-infringement contentions,

10   deposition and Declaration testimony, and expert

11   reports.  So by not given the opportunity to refer to

12   the -- the Preliminary Injunction Motion, they're

13   actually not losing their opportunity to argue that they

14   had this belief.  But I also want to point out that the

15   belief of non-infringement that they allegedly have was,

16   again, based on them being the only one with the

17   information.  They want to tout this Court's Preliminary

18   Injunction denial, but Your Honor did not have the full

19   information regarding the infringing products just like

20   Tetra Tech didn't at that point either.  At the time of

21   the Preliminary Injunction Motion, there was -- there

22   was no discovery -- there was no discovery of the source

23   code.  The burdens were different, as you know, during

24   the Preliminary Injunction Motion.

25             So for them to allege that they had this good

1    faith belief of non-infringement, they were actually the

2    only ones who knew about the infringement.  They're the

3    only ones that knew that their source code infringed or

4    had the opportunity to know that their source code

5    infringed the claims of -- of the asserted patent.

6           So, again, I think, as you know, that many

7    courts have decided that Preliminary Injunction

8    decisions are too prejudicial, and in this situation, we

9    believe that the prejudice far outweighs the probative

10   of letting in --

11          THE COURT:  So it's really a 403 analysis?

12          MR. CERULLI:  Yeah.

13          THE COURT:  The probative value -- well, let me

14   ask you this:  When we're looking at the intent of the

15   infringer -- right? -- or intent of the alleged

16   infringer, we're looking at that at what period of time?

17          MR. CERULLI:  I mean, at that time, it was the

18   time of -- of the motion; right?

19          THE COURT:  Yeah.  What I'm wondering about is

20   we're looking at the intent of the infringer with

21   respect the constructs of patent law that look at

22   intent.  We're looking at that at the time of the

23   infringement, at the time of the lawsuit, during the law

24   suit?  What's your -- what's your take on that?

25          MR. CERULLI:  I guess it's the time of

1   infringement, but we heard the story, Mr. Re said, "We

2   had belief before.  We had belief, you know, after the

3   case was filed but before the Preliminary Injunction

4   Motion."  So it's a little bit confusing as to what

5   their belief was at what time; and, certainly, things

6   change at some point; right?  After evidence was

7   actually provided in this case, Your Honor found, you

8   know, that -- that we survived the Summary Judgment

9   motion of non-infringement.  So I'm not so sure what

10  their argument is as to when their belief was and when

11  that changed, but to your question, it's at the time of

12  infringement.

13          THE COURT:  All right.  We don't have a lot

14  more time.  So I just want to make sure I get to Tetra

15  Tech's Motion in Limine No. 4 about untimely-produced

16  materials.

17          Who would like to address that?

18          MR. PARKER:  Thank you, Your Honor.  I'd like

19  to just be brief.  I'll be as brief as possible.

20          I think the -- the first piece of evidence or

21  information that I'd like to start with is this:  This

22  new sale that was first disclosed to us July 11th in

23  Pavemetrics' memo of contentions of fact and law.  That

24  sale happened in February of 2022, five months ago, and

25  there were -- there were interrogatories that asked for

1    the identification of all offers, sales in the U.S.

2    That was never supplemented.  I think it's so egregious

3    that it should be completely out.

4            And in terms of the source code, that source

5    code is dated January 28th, 2022.  The first time we're

6    getting is -- is also June, you know, so about five

7    months later.  I think it's just way too late at this

8    point.  It's purely, I think, gamesmanship when they're

9    trying to slip in this extra sale and get a -- a

10   Declaration of non-infringement without giving us the

11   opportunity to -- to review the code, to have proper

12   discovery, and to rebut any of their -- their

13   alligations of -- of non-infringement.

14           If there's certain areas that you'd like me to

15   address specifically, Your Honor, I'd be happy to do it.

16           THE COURT:  Let me get a response from

17   Pavemetrics on that.

18           MS. Lea:  I'm a little bit in an ironic

19   position, Your Honor.  Normally, the patentee's knocking

20   on my door trying to get an update on sales before

21   trial; and, here, they're trying to exclude our

22   additional sale.  So as ironic as that is, let me

23   respond.

24           So Tetra Tech's actually seeking sanctions

25   here.  They're trying to exclude the documents of the

1    expert opinion because they say they were late, but in

2    this case, none of this became relevant until the

3    assembly of the LRAILs in May of 2022, and as soon as we

4    learned about those assemblies, we produced the relevant

5    documents.  We offered for them to come and inspect the

6    source code.  We believe we already gave them the

7    relevant portion of the source code, but if they would

8    like to see more, we offered that.  We offered for them

9    to depose Dr. Hébert, the vice president of R & D at

10   Pavemetrics.  We offered for them to depose Dr. Frakes,

11   our expert witness.

12          And, Your Honor, the fact that the code

13   changed, that's not new.  That happened back in

14   December.  Dr. Hébert testified to it at his deposition

15   on January 7th.  Tetra Tech's attorneys asked him all

16   about the removal of mixed image from the code.  That

17   was during fact discovery.  They could have come back

18   and looked at the source code if they would have liked

19   to.

20          Our expert, in his rebuttal report of

21   non-infringement, relied upon the removal of mixed

22   images from the code.  He even attached code showing

23   that mixed images had been removed.  They then deposed

24   Dr. Frakes.  They did not ask him a single question on

25   mixed image removal.  And, now, that is actually

1    relevant because three devices, one of which is at issue

2    in this case, Sale 4, have been assembled with that code

3    that has absolutely no accused functionality in it, they

4    want to keep it out of the case.  But it's absolutely

5    relevant to our acceptable non-infringing substitute for

6    contributory infringement, for lost profits, and for

7    reasonable royalty.  It should be in.  We should not be

8    having a trial based on fictitious facts, and that's

9    basically what they are asking for.

10              THE COURT:  All right.  Thank you, Counsel.

11              And then the last issue I wanted to discuss is

12    how -- how the parties want to try the issues that are

13    essentially court issues:  Indefiniteness, equitable

14    estoppel, priority of a permanent injunction, enhanced

15    damages.

16              Were we looking at a bench trial component

17    after the -- the jury returns its verdict?

18              MS. Lea:  Yes.  So, first of all, on equitable

19    estoppel, Pavemetrics will withdraw that argument.  So

20    there's no need for a bench trial on that.

21              With respect to indefiniteness, we have

22    requested bifurcation on that issue.  We believe it can

23    be submitted to your court based upon written direct

24    testimony or deposition testimony, and, you know, if

25    necessary, we could be have a bench trial on

1    cross-examination while the jury's deliberating.  We can

2    do it quickly.

3              And then, of course, enhancement and

4    injunction, which I feel a little silly saying because

5    all the accused functionality has been removed from our

6    code.  That, of course, would be addressed by

7    Your Honor, I think, in post-trial briefing.

8              THE COURT:  Okay.  Yeah, what I'm envisioning

9    is for those issues -- I'll let you go ahead and

10   respond.

11             MR. BARNEY:  Sorry, Your Honor.  I'll keep it

12   brief.

13             With respect to indefiniteness, our position is

14   they've had their chance.  That usually comes up during

15   Markman.  That's usually when indefiniteness is argued

16   and briefed.  It's akin to claim construction.  It's a

17   question of law for the Court.  That's part of its claim

18   construction duties.  That's when most parties raise it,

19   or if they don't raise it, then they raise it on Summary

20   Judgment.  They decided not to do that.  In either

21   instance, we think they've waived it.  We don't think

22   they're entitled to a bench trial on the indefiniteness.

23   We think the time has come and gone for them to make

24   that argument, but to the extent Your Honor's going to

25   entertain indefiniteness, it ought to be on the briefs.

```
 1              THE COURT:  Okay.  That's all the time I have,
 2    unfortunately.  So I will issue an order, hopefully, by
 3    the end of the week with rulings on the Motions in
 4    Limine.  I'll ask the parties at that point to go
 5    through and try to resolve your jury instruction
 6    disputes.  It's kind of premature until you have the
 7    rulings on the Motions in Limine to do that, but I'll
 8    ask you to try to get those jury instruction disputes
 9    down to a reasonable number and work on -- and see if
10    you can get the Verdict Form a little bit closer
11    together, and then on the 17th, we'll -- we'll chew
12    through the jury instructions and the Verdict Form.
13              MR. BARNEY:  The 16th.
14              THE COURT:  The 16th.  I'm sorry.
15              MS Lea:  Your Honor, I know you're done, but we
16    do have a really important issue, and that's Issue No. 3
17    in our pretrial order, and that is on what claims are
18    before the Court, what acts of infringement are going to
19    be tried, and we're seeing an expansion of their case,
20    and we would really like to clarify that; and, perhaps,
21    it could be done before trial, but we would really like
22    to clarify what acts of infringement are we trying.
23              THE COURT:  Okay.  And this is an issue that
24    the parties have got in the Pretrial Conference
25    Statement, or is it part of the Motions in Limine?
```

1          MS. Lea:  It's in the Pretrial Conference

2     Statement, Your Honor.

3          THE COURT:  Okay.  Okay.  Why don't you -- I'll

4     go ahead and give you an opportunity to argue that

5     briefly.

6          MS. Lea:  Okay.  Briefly.  I do have a couple

7     things to hand up if I may.

8

9                    (Brief interruption)

10

11         THE COURT:  Okay.

12         MS. Lea:  Okay.  So briefly, Your Honor,

13    throughout discovery, they have only identified sales

14    that they are arguing infringe, and now, for the first

15    time, in their Memorandum of Contentions, we're suddenly

16    hearing that offers for sale are at issue.  We don't

17    know what those offers are at all, and we don't know

18    which offers they're talking about, when they were made,

19    or anything about them.  They were not identified in

20    discovery.

21         I gave you a copy of their expert report.

22    There's an entire section dedicated to direct, induce,

23    and contributory.  The first part of that is

24    Pavemetrics' sales.  They're accusing four sales.  There

25    were six.  You granted Summary Judgment on two of them.

1    There's now four sales.  That's what their damages

2    report is based upon, four sales, four units.  Then

3    on -- so that's the direct infringement.  It should be

4    on four sales.  Now, we have offers for sale that we

5    don't know what they are.

6         On indirect infringement, inducement, the only

7    thing disclosed is use by customers.  That's Section 2

8    of Morellas's report.  Suddenly, in their Memorandum of

9    Contentions, we saw making and we saw importing the

10   actual device by customers.  I understand, from counsel

11   and from reading the pretrial order, I don't believe

12   they're pursuing those.  I would like to hear that, that

13   it is used by customers.

14        And then, specifically, Your Honor, their

15   expert disclosed use by two customers, CSX and AID.

16   With respect to CSX -- this is Paragraph 6-12 of his

17   report -- every single use is Sale A.  That's a sale

18   that you granted Summary Judgment on, and there -- can

19   be no -- that one is free and clear.  Now, it's like

20   exhaustion, they cannot sue for uses based upon a

21   pre-notice sale.  We cited a ton of case law on that in

22   the pretrial conference.  So we should be down to uses

23   by AID only.  We would like your order enforced on that

24   Summary Judgment motion.  That's the one for sales prior

25   to notice.

1              I think I got it covered.

2              THE COURT:  Okay.  Counsel.

3              MR. PARKER:  Thank you, Your Honor.  I'll start

4      with the offers for sale.

5              The offers for sale were plead in the operative

6      counter-claim.  They're also disclosed in our

7      infringement contentions, and there is no unidentified

8      offer for sale.  The offer for sale is going to be with

9      respect to CSX and AID.  We're not going to mysteriously

10     bringing in another customer or another potential

11     customer there.

12             With respect to the use, I think the -- the

13     indirect -- indirect infringement, Pavemetrics would

14     like to have our case trimmed down to just use by the

15     direct infringer.  We are going to go with use as well

16     as making because, in order to use, the -- the accused

17     LRAIL, one must make the LRAIL, and at this point, based

18     on the new discovery we got, you know, a couple weeks

19     ago, apparently, the LRAIL is not made by Pavemetrics.

20     It's shipped in -- in separate boxes.  So it's either

21     going to be made by the customer or it's made by

22     Pavemetrics in order to use for purposes of direct

23     infringement.  For indirect infringement purposes,

24     somebody's got to make it.  It's either the customer or

25     it's Pavemetrics.

53

1        With respect to CSX uses and whether or not we

2   cannot pursue direct infringement by CSX for indirect

3   infringement theories, I think they're incorrect in

4   terms of stretching Your Honor's Summary Judgement

5   order.  I think there is a -- a collection of

6   circumstantial evidence that demonstrates CSX using the

7   LRAILs and that that pattern of circumstantial evidence

8   of use stems before notice, after notice, and continues

9   on.  So the -- the -- the circumstantial evidence is

10  there.  We'll present it at trial.  It is a disputed

11  factual issue that -- that a jury will need to decide.

12        THE COURT:  Thank you, Counsel.  That's all the

13  time I've got, unfortunately.  So I will issue an order,

14  and I'll see you all on the 16th.

15

16              (Proceedings concluded.)

17

18                    --oOo--

19

20

21

22

23

24

25

1                        **C E R T I F I C A T E**

2

3

4    STATE OF ARIZONA   )
                        ) ss
5    COUNTY OF PIMA     )

6

7

8              I, Katherine M. Stride, a Registered

9    Professional Reporter, in and for the state of Arizona,

10   do hereby certify that the foregoing transcript of the

11   proceedings in Pima County Superior Court is full, true

12   and accurate to the best of my knowledge, skill, and

13   ability.

14

15   Signed and dated this 12th day of August, 2022.

16

17

18

19

20                        _____

21                        Katherine M. Stride, RPR, CSR
                          Certified Reporter No. 50904
22

23

24

25